# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) | Case No. 22-10778 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) AUTHORIZING
## THE DEBTORS TO (A) MAINTAIN AND ADMINISTER THEIR
## CUSTOMER PROGRAMS AND (B) HONOR CERTAIN PREPETITION
## OBLIGATIONS RELATED THERETO, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

### Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing the Debtors to (i) maintain and administer their Customer Programs (as defined herein) and (ii) honor certain prepetition obligations related thereto; and (b) granting related relief.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

[2] A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Scott H. Rosa, Chief Financial Officer of Carestream Health, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

**Background**

5. The Debtors, together with their non-Debtor affiliates (collectively, "Carestream" or the "Company"), are a leading provider of medical imaging and non-destructive testing products with over 100 years of industry experience. The Company is a partner of choice to approximately 8,000 direct customers and approximately 900 dealers in more than 130 countries. Its products are used by prominent health systems, hospitals, imaging centers, specialty practices and industrial companies worldwide. Headquartered in Rochester, New York, Carestream employs a global workforce of approximately 3,410 employees with approximately 180 contractors.

6. Carestream, like many businesses, faced significant headwinds in 2020, principally as a result of changing product and customer trends and the global COVID-19 pandemic, which, in light of the Debtors' capital structure, placed substantial strain on the Debtors' businesses. To alleviate the strain, the Debtors executed a voluntary amend-and-extend transaction in early 2020 that extended the maturities of their first lien revolver and term loan and second lien term loan debt. The amend-and-extend transaction provided the Debtors with time to meaningfully examine various strategic alternatives, including sale transactions and debt-for-equity exchanges to deleverage the Company.

7. Ultimately, the Debtors determined that a substantial deleveraging combined with new capital investment was the best path forward for their business. To implement the foregoing, the Debtors negotiated, and ultimately agreed, with a majority of their prepetition secured lenders and their equity sponsor on the terms of a comprehensive financial restructuring. The terms of the proposed restructuring are memorialized in a restructuring support agreement (the "RSA") that serves as the foundation of the Debtors' prepackaged Plan. Under the RSA, the Debtors will eliminate approximately $470 million of prepetition funded debt and raise up to $75 million of new equity capital, while also leaving general unsecured claims unimpaired. As of August 23, 2022 (the "Petition Date"), the Debtors have fully solicited their Plan, which was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 73% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of the Debtors' prepetition second lien term loan debt.

8. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are

operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**The Debtors' Customer Programs**

9. The Debtors historically have provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships, the majority of which do not independently entail the expenditure of cash (such programs, as described below, collectively, the "Customer Programs").[3] The Debtors believe that their ability to continue the Customer Programs and to honor any obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, comply with their legal obligations, meet competitive market pressures, and ensure customer satisfaction. Continuing the Customer Programs allows the Debtors to maintain the goodwill of their current customers and partners, attract new customers and partners, and, ultimately, enhance their businesses' revenue and profitability to the benefit of all of the Debtors' stakeholders. Moreover, because obligations to all trade creditors are expected to be reinstated pursuant to the Plan or paid in full pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of All Accounts Payable Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Satisfaction of Obligations Related Thereto, and (IV) Granting Related Relief* filed contemporaneously herewith,

---

[3] Although the description of the Customer Programs set forth in this motion is intended to be comprehensive, the Debtors may have inadvertently omitted some of the Customer Programs. The Debtors request relief with regard to all Customer Programs, regardless of whether any individual Customer Program is specifically identified herein. While referred to as "Customer Programs," such programs also target the Debtors' distributors.

the Debtors believe that no creditor will be harmed by the Debtors' continuance of the Customer Programs.

10. As of the Petition Date, the Debtors estimate that there are approximately $38.8 million of prepetition obligations outstanding related to Customer Programs, of which $34.4 million are on account of prepayments that do not entail cash expenditure, but represent a future obligation of performance against the Company. These obligations include (a) warranties, (b) rebates, (c) GPO Contracts (as defined herein), and (c) prepayments, credits, refunds, and other billing adjustments, owing to customers and certain third parties. By this motion, the Debtors seek authorization, but not direction, to maintain the Customer Programs in the ordinary course of business and to continue to honor all customer-related obligations, including paying any prepetition obligations associated therewith.

**I.     Warranties.**

11. To maintain their reputation for quality and to maximize customer loyalty, the Debtors provide, in the ordinary course of business and consistent with industry practice, certain warranties covering their various products (collectively, the "<u>Warranties</u>"). The coverage period under the Warranties is typically one year, but may vary depending on the specific product or other factors, such as the term of any assignable warranty the Debtors receive from a third party (such as a software developer) or the warranty period required by the customer.

12. The terms of the Warranties are typically set forth in the Debtors' sale and license agreements and distributor contracts. Generally, the Warranties cover product defects that are not attributable to external factors (such as damage caused by the customer or by other factors beyond the Debtors' control). However, for certain products, the Debtors offer a more comprehensive accident protection plan, which includes coverage for damage caused by, among other things,

sudden and accidental impacts or drops. The Debtors also provide certain warranty services, including technology support and equipment repair and maintenance.

13. This Customer Program usually does not entail the expenditure of the Debtors' cash, but rather signifies an obligation of future performance on account of the Warranties. The Debtors estimate that they spend approximately $10.7 million annually on account of their obligations under the Warranties. As of the Petition Date, the Debtors estimate that they owe approximately $1.9 million[4] on account of their obligations under the Warranties. If the Debtors do not continue to honor their obligations under the Warranties, certain customers may be unwilling to transact with the Debtors, which would likely lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates. Accordingly, the Debtors seek authorization to continue honoring their obligations under the Warranties on a postpetition basis in a manner consistent with their historical practices.

## II. Rebates.

14. In the ordinary course of business, the Debtors have contracts that provide certain distributors of medical and dental film with rebates (collectively, the "<u>Rebates</u>"). Through the Rebate incentives, the Debtors provide these distributors with concessions that are earned as a percentage of sales, or through another contractually agreed formula. Typically, the distributors receive the benefit of the Rebates as a credit against future purchase orders. As such, this Customer Program usually does not entail the expenditure of the Debtors' cash, but rather signifies an obligation of future performance on account of the Rebates.

15. The Rebates foster customer loyalty and provide incentives for the distributors to promote the Debtors' products and services. The Debtors' ability to continue the Rebates and to

---

[4] The Debtors update their warranty reserve quarterly. The warranty reserve was $1.9 million as of June 30, 2022.

honor the obligations thereunder in the ordinary course of business is critically important to the Debtors' reputation and the uninterrupted distribution of their products to customers. Without the ability to continue offering Rebates, certain distributors may be unwilling to transact with the Debtors or purchase at high volumes, which could lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates.

16. The Debtors estimate that they remit approximately $2.2 million annually in Rebate obligations. As of the Petition Date, the Debtors estimate that they have approximately $361,000 in Rebates reflected in their accounting systems. The Debtors seek authorization to honor any prepetition Rebates and continue processing Rebates in the ordinary course of business on a postpetition basis consistent with their historical practices.

### III. GPO Contracts.

17. Pursuant to certain contracts (collectively, the "GPO Contracts") with group purchasing organizations (each, a "GPO"), each GPO earns a fee based on a percentage of the Debtors' sales to the GPO's respective members (such fees, collectively, the "GPO Fees"). Currently, the Debtors are party to GPO Contracts with six GPOs, most of which are healthcare networks.

18. The Debtors estimate that they pay approximately $3 million annually in GPO Fees under the GPO Contracts. As of the Petition Date, the Debtors estimate that they owe approximately $461,000 in GPO Fees on account of the GPO Contracts. Continuing to honor the terms of the GPO Contracts, including payment of the GPO Fees, is critical to maintaining access to the GPO market and fostering customer loyalty therein. Without the GPO Contracts, GPOs and member customers may be unwilling to transact with the Debtors, which would likely lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates. Accordingly, the Debtors seek authorization to continue honoring their obligations under the

GPO Contracts, including payment of the GPO Fees, on a postpetition basis in a manner consistent with their historical practices.

## IV. Prepayment, Billing Adjustments, and Credits and Refunds.

19. <u>Prepayment</u>. In the ordinary course of business, the Debtors' customers may prepay for certain products and services pursuant to certain agreements (the "<u>Prepaid Service Agreements</u>"). Depending on the terms of the Prepaid Service Agreement, the Debtors provide, among other things, (a) phone-based technical support, (b) equipment repair and maintenance, (c) software updates, and (d) technical training. The coverage period under the Prepaid Service Agreements is typically one year, but may be longer, with the option for a customer to cancel service without fault, typically by providing 60 days' written notice to the Debtors, and receive a pro-rated refund based on the remaining prepaid service period.

20. Barring termination of a Prepaid Service Agreement, this Customer Program does not entail the expenditure of the Debtors' cash, but rather signifies an obligation of future performance on account of the prepayments. As of the Petition Date, the Debtors estimate that the total amount of prepayments, including prepayments related to Prepaid Service Agreements, is approximately $34.4 million. Out of an abundance of caution, the Debtors seek authorization to continue to honor all of the Debtors' obligations related to customer prepayments, including satisfying any prepetition obligations on a postpetition basis in a manner consistent with historical practices.

21. <u>Billing Adjustments</u>. From time to time, in the ordinary course of business, the Debtors provide accommodations to their customers in connection with the collection of outstanding balances, including but not limited to, extending payment terms. The Debtors provide these adjustments and accommodations to their customers in an effort to maintain customer satisfaction and retain customer loyalty. The Debtors seek authorization to continue to provide

and honor billing adjustments and accommodations, including satisfying any prepetition billing adjustments and accommodations on a postpetition basis in a manner consistent with past practice.

22. <u>Credits and Refunds</u>. In the ordinary course of business, the Debtors' customers may from time to time have a credit balance on their account with the Debtors (collectively, the "<u>Credits</u>"). For the convenience of customers, the Debtors typically apply the Credits to the customers' subsequent accounts receivable charges. As a result, a customer's account will not typically show that Credits have been applied unless the amount of Credits exceeds the customer's accounts receivable balance, resulting in a credit balance on the customer's account.

23. Upon request and when an account is no longer active, the Debtors may issue a refund check on account of the Credits. At any given time, it is difficult to determine the amount of Credits for which a refund check has not yet been issued. Moreover, some refund checks issued to customers before the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

24. The Debtors estimate that as of the Petition Date, approximately 160 customers have credit balances on account of Credits. The total amount owed to customers on account of such credit balances is approximately $1.73 million. The Debtors seek authorization to continue to apply Credits to customers' accounts and issue and pay refund checks on account of Credits, including issuing and paying refunds made prepetition or resulting from prepetition products and services on a postpetition basis in a manner consistent with historical practices.

**Basis for Relief**

25. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999);

*see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

26. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

27. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential

10

to the continued operation of a debtor's businesses. *See In re Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497.

28. Continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases will help to preserve the Debtors' valuable customer relationships and goodwill, and to maintain business and drive additional business, which will inure to the benefit of all of the Debtors' stakeholders and their estates. If the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and fulfill obligations owing on account of the Customer Programs, the Debtors risk alienating certain customer constituencies (who might then initiate business relationships with the Debtors' competitors) and suffer corresponding losses in customer loyalty that will harm the Debtors' prospects for reorganization

or otherwise damage the value of the estates. Importantly, the Debtors' competitors maintain programs similar to the Customer Programs, meaning that customers have a ready audience willing to meet their needs and take business away from the Debtors at this crucial time.

29. Failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of any customer uncertainty that may arise from these chapter 11 cases. Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which could adversely impact their prospects for a successful emergence from bankruptcy. Maintaining the Customer Programs and the corresponding relationships will ensure a smooth transition immediately following the filing of these chapter 11 cases. Accordingly, the Debtors submit that they have shown sufficient cause to warrant the authority to honor the Customer Programs and to honor any customer obligations relating thereto.

30. Where, as here, retaining the loyalty and patronage of customers is critical to the success of chapter 11 cases, courts in this district and others have granted relief similar to that requested herein. *See*, *e.g.*, *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (authorizing the debtors to honor customer-related obligations in the ordinary course of business and to honor prepetition obligations related to same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Sept. 16, 2020) (same); *In re APC Auto. Techs. Intermediate Holdings, LLC*, No. 20-11466 (CSS) (Bankr. D. Del. June 23, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (Bankr. D. Del. June 11, 2020) (same).[5]

---

[5] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

31. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

32. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### Reservation of Rights

33. Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment

made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

34. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

35. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the First Lien Agent and Second Lien Agent; (e) counsel to the

Crossover Group; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

36. No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

| | |
|---|---|
| Dated: August 23, 2022<br>Wilmington, Delaware | */s/ Laura Davis Jones*<br>Laura Davis Jones (DE Bar No. 2436)<br>Timothy P. Cairns (DE Bar No. 4228)<br>Edward Corma (DE Bar No. 6718)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email: ljones@pszjlaw.com<br>tcairns@pszjlaw.com<br>ecorma@pszjlaw.com |

-and-

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Tricia Schwallier Collins (*pro hac vice* pending)
Yusuf U. Salloum (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
tricia.schwallier@kirkland.com
yusuf.salloum@kirkland.com

-and-

Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: nicole.greenblatt@kirkland.com
Email: rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*