IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CARESTREAM HEALTH, INC., *et al.*,[1] | Case No. 22-10778 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION
FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING
PAYMENT OF ALL ACCOUNTS PAYABLE CLAIMS
IN THE ORDINARY COURSE OF BUSINESS, (II) GRANTING
ADMINISTRATIVE EXPENSE PRIORITY TO UNDISPUTED OBLIGATIONS
ON ACCOUNT OF OUTSTANDING ORDERS, (III) AUTHORIZING SATISFACTION
OF OBLIGATIONS RELATED THERETO, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

**Preliminary Statement**

1. As described more fully in the First Day Declaration, the Debtors commenced these chapter 11 cases with a restructuring support agreement signed by key stakeholders across their capital structure, which serves as the foundation of the Debtors' prepackaged Plan. Prior to the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

[2] A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Scott H. Rosa, Chief Financial Officer of Carestream Health, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

filing of these chapter 11 cases, the Debtors fully solicited their Plan, which was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 73% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of their prepetition second lien term loan debt.

2.  The ultimate goal of the Plan, and these chapter 11 cases, is to restructure the Debtors' balance sheet while preventing any interruption to their ongoing business operations. The Debtors negotiated the terms of the Plan with this goal in mind. The Plan leaves unimpaired the legal, equitable, and contractual rights of trade creditors. Through this design, the Plan is meant to avoid any disruption to the normal operations of the Debtors' businesses resulting from the commencement of these chapter 11 cases.

3.  The Debtors' businesses are dependent on maintaining positive relationships with their trade counterparties, many of whom are essential to their business operations. Accordingly, the Debtors seek to honor their commitments to make payments on behalf of trade liabilities incurred prepetition (the "Accounts Payable Claims") as and when they come due during the course of these chapter 11 cases to their vendors and trade counterparties (the "Trade Creditors"). The Debtors estimate that, as of the Petition Date, there are approximately $58.8 million of accrued and unpaid Accounts Payable Claims, of which approximately $10.7 million comprise section 503(b)(9) claims (including certain lien claims), approximately $6.3 million comprise statutory lien claims not entitled to priority status under section 503(b)(9) of the Bankruptcy Code, and approximately $41.8 million comprise General Unsecured Claims (as defined in the Plan) that are neither section 503(b)(9) claims nor lien claims. The Debtors estimate that approximately $48.6 million of the accrued and unpaid Accounts Payable Claims will come due prior to the final

hearing, of which $39 million comprise General Unsecured Claims that are neither section 503(b)(9) claims nor lien claims.

4.  The relief requested in this motion is tailored to further the Debtors' restructuring goals and to maximize the value of their estates. Through this motion, the Debtors seek authority to pay amounts owed on account of the Accounts Payable Claims as they come due in the ordinary course of business. The Debtors also seek authority to satisfy, in the ordinary course of business, any undisputed obligations on account of goods and services ordered by the Debtors prior to the date hereof that will not be delivered until after the Petition Date (the "Outstanding Orders"). In light of the prepackaged nature of these chapter 11 cases, the unimpaired treatment of General Unsecured Claims under the Plan, and the overwhelmingly affirmative support for the Plan expressed by the Debtors' voting creditors, the Debtors believe that this relief is appropriate.

## Relief Requested

5.  The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), (a) authorizing the Debtors to pay all Accounts Payable Claims in the ordinary course of business; (b) granting administrative expense priority to all undisputed obligations on account of Outstanding Orders; (c) authorizing the Debtors to satisfy obligations on account of Outstanding Orders in the ordinary course of business; and (d) granting related relief.[3] In addition, the Debtors

---

[3] Contemporaneously with the filing of this motion, the Debtors have filed certain other "first day" motions seeking authority to satisfy certain prepetition obligations to parties including, among others, employees, utility providers, and taxing authorities. This motion is not duplicative of any such motion. As used herein, the term "Accounts Payable Claims" does not include any obligation the Debtors seek to pay under a separate motion. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any asserted claim.

request that the Court schedule a final hearing approximately thirty-five days after the commencement of these chapter 11 cases to consider entry of the Final Order.

6. The Debtors also request that any order entered on this motion provide that: (a) if a Trade Creditor is subject to a prepetition contract with the Debtors (the terms of such prepetition contract, the "Customary Terms"), then the Debtors are authorized to condition payment of Accounts Payable Claims on a Trade Creditor's maintenance or application, as applicable, of contract terms during the pendency of these chapter 11 cases that are at least as favorable to the Debtors as those Customary Terms; and (b) if a Trade Creditor, after receiving a payment under the Interim Order or Final Order, ceases to provide goods or services to the Debtors in accordance with the Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Trade Creditor.

## Jurisdiction and Venue

7. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory bases for the relief requested herein are sections 105(a), 363, 503(b), and 549 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"),

rules 2002, 6003, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

**Background**

10. The Debtors, together with their non-Debtor affiliates (collectively, "Carestream" or the "Company"), are a leading provider of medical imaging and non-destructive testing products with over 100 years of industry experience. The Company is a partner of choice to approximately 8,000 direct customers and approximately 900 dealers in more than 130 countries. Its products are used by prominent health systems, hospitals, imaging centers, specialty practices and industrial companies worldwide. Headquartered in Rochester, New York, Carestream employs a global workforce of approximately 3,410 employees with approximately 180 contractors.

11. Carestream, like many businesses, faced significant headwinds in 2020, principally as a result of changing product and customer trends and the global COVID-19 pandemic, which, in light of the Debtors' capital structure, placed substantial strain on the Debtors' businesses. To alleviate the strain, the Debtors executed a voluntary amend-and-extend transaction in early 2020 that extended the maturities of their first lien revolver and term loan and second lien term loan debt. The amend-and-extend transaction provided the Debtors with time to meaningfully examine various strategic alternatives, including sale transactions and debt-for-equity exchanges to deleverage the Company.

12. Ultimately, the Debtors determined that a substantial deleveraging combined with new capital investment was the best path forward for their business. To implement the foregoing, the Debtors negotiated, and ultimately agreed, with a majority of their prepetition secured lenders and their equity sponsor on the terms of a comprehensive financial restructuring. The terms of the proposed restructuring are memorialized in a restructuring support agreement (the "RSA") that serves as the foundation of the Debtors' prepackaged Plan. Under the RSA, the Debtors will

5

eliminate approximately $470 million of prepetition funded debt and raise up to $75 million of new equity capital, while also leaving general unsecured claims unimpaired. As of August 23, 2022 (the "Petition Date"), the Debtors have fully solicited their Plan, which was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 73% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of the Debtors' prepetition second lien term loan debt.

13. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**The Debtors' Business Obligations**

**I.     The Accounts Payable Claims.**

14. The Trade Creditors provide the Debtors with goods and services in the ordinary course of business, including, among other things: the chemicals, resins, components, subassemblies, and other raw materials used in the design and manufacture of the Debtors' products and that constitute the Debtors' inventory; third-party cloud computing platforms and networking subscriptions; shipping and logistical services; commodity hedges on silver, a key input for film manufacturing; and a variety of other basic business necessities for the operation of the Debtors' businesses. While the Debtors have a variety of arrangements with their Trade Creditors, a majority of the Trade Creditors provide the Debtors with "net 60" payment terms. The Debtors thus incur numerous fixed, liquidated, and undisputed payment obligations to the Trade

6

Creditors in the ordinary course of business. These payment obligations averaged approximately $38.4 million per month, in the aggregate, for the twelve months preceding the Petition Date, and, as of the Petition Date, the Debtors estimate that there are approximately $58.8 million of accrued and unpaid Accounts Payable Claims, of which approximately $10.7 million comprise section 503(b)(9) claims (including certain lien claims), approximately $6.3 million comprise statutory lien claims not entitled to priority status under section 503(b)(9) of the Bankruptcy Code, and approximately $41.8 million comprise General Unsecured Claims that are neither section 503(b)(9) claims nor lien claims. The Debtors estimate that approximately $48.6 million of the accrued and unpaid Accounts Payable Claims will come due prior to the final hearing, of which $39 million comprise General Unsecured Claims that are neither section 503(b)(9) claims nor lien claims.

15. The goods and services giving rise to the Accounts Payable Claims are necessary to the Debtors' business operations. A significant portion of the Accounts Payable Claims are related to materials necessary for (i) the production of medical and dental film, digital and computed radiography products, non-destructive testing products, and ancillary products; and (ii) the Debtors' contract manufacturing operations, which together constitute the Debtors' principal business. The failure to pay these Accounts Payable Claims in a timely manner could result in material disruptions in the Debtors' business operations, which could have a negative impact on the Debtors' reputation with their customers and cause irreparable harm to the Debtors' businesses. Additionally, a portion of the Accounts Payable Claims comprises claims entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code on account of goods delivered to the Debtors within twenty days of the Petition Date. Such claims are entitled to administrative priority and are required to be paid in full to confirm a plan of reorganization. Similarly, certain

Accounts Payable Claims are held by Trade Creditors that may be able to assert liens on account of any unpaid obligations, such as carrier liens, warehouseman's liens, and mechanics' liens. The failure to pay the Accounts Payable Claims of such Trade Creditors in a timely manner could unnecessarily disrupt the Debtors' business operations.

## II. The Outstanding Orders.

16. Prior to the Petition Date, and in the ordinary course of business, the Debtors placed the Outstanding Orders. In the mistaken belief that they would be prepetition general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may seek to recall shipments then in transit) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders. As set forth in greater detail below, because the Outstanding Orders are administrative expenses of the Debtors' estates, the Debtors are requesting that the Court confirm the administrative expense priority of the Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the ordinary course of business.

## **Basis for Relief**

### I. Payment of the Accounts Payable Claims Is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code.

17. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims outside of a chapter 11 plan.

18. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (authorizing the debtor's proposed transaction under section 363(b) because a "good business reason" justified the sale).

19. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See In re Just for Feet*, 242 B.R. at 825 ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."). Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92

9

(Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business).

20. The Debtors respectfully submit that the relief requested herein is in the best interest of their estates, Trade Creditors, and other parties in interest. A significant portion of the Accounts Payable Claims is held by Trade Creditors that provide the Debtors goods and services necessary to run their businesses. In instances where a Trade Creditor may itself be facing financial hardship or where a Trade Creditor may be able to easily transition its business to competitors of the Debtors, the Debtors' failure to timely pay Accounts Payable Claims may result in Trade Creditors stopping work for, or deliveries to, the Debtors, which may severely disrupt the Debtors' businesses.

21. That disruption may occur before the Debtors would be able to successfully bring an action to compel performance or otherwise enforce the automatic stay. Also, the Debtors interact with the Trade Creditors pursuant to a variety of arrangements, including arrangements that may not be executory in nature. The counterparty of such an arrangement may not agree to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors and would be under no obligation to do so.

22. Because the Debtors will pay the Accounts Payable Claims in full in the ordinary course of business under the Plan, which has majority support of all creditors entitled to vote, the relief requested in this motion seeks to alter only the timing of payments, not whether such payments will ultimately be made to Trade Creditors under the Plan. By expediting payment of Accounts Payable Claims that otherwise would be paid at a later date under the Plan, the relief requested herein avoids unnecessary disruption and harm to the Debtors' businesses and facilitates a timely restructuring process. Indeed, the Debtors believe that delaying payment of the Accounts

Payable Claims beyond normal practices could damage the Debtors' going concern value by undermining the "business as usual" message that serves as a cornerstone of these chapter 11 cases. Moreover, the ability to continue making ordinary course payments to the Debtors' day-to-day creditors was a key component of the Debtors' prepetition negotiations. The Debtors believe that the relief requested herein, in light of the prepackaged nature of these chapter 11 cases, is necessary to avoid unnecessary disruption to their businesses and ensure a timely restructuring process.

23. Further, payment of certain Accounts Payable Claims complies with the statutory requirements of the Bankruptcy Code. Specifically, certain Accounts Payable Claims relate to goods delivered to the Debtors within the twenty days prior to the Petition Date. Section 503(b)(9) of the Bankruptcy Code provides that such Accounts Payable Claims are administrative expense claims against the applicable Debtor's estate. The Debtors, therefore, are required to pay such Accounts Payable Claims in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority). The Plan provides for payment in full of administrative expense claims in the ordinary course of business, on the effective date of the Plan, or as soon as practicable thereafter. Accordingly, payment of the Accounts Payable Claims that are entitled to administrative priority will only change the timing of the payment of such Accounts Payable Claims, not the amounts, and no party in interest will be materially prejudiced. *See In re CEI Roofing, Inc.*, 315 B.R. 50, 60 (Bankr. N.D. Tex. 2004) ("[T]he payment of prepetition . . . claims . . . that qualify as priority . . . claims . . . does not trigger the same concerns (*i.e.*, upsetting priorities under the [Bankruptcy] Code and unfair discrimination among general unsecured claims).").

24. Similarly, certain Accounts Payable Claims are held by Trade Creditors that may be entitled to assert liens on account of any unpaid obligations. For instance, certain

Accounts Payable Claims are held by Trade Creditors that may be able to assert carrier liens and warehouseman's liens against certain of the Debtors' assets under certain state and federal laws.[4] Under section 363(e) of the Bankruptcy Code, certain Trade Creditors with liens on estate assets may be entitled to adequate protection of their liens, the enforcement of which may impose additional costs on the Debtors' estates. Considering that Accounts Payable Claims that are supported by valid liens will be unimpaired under the Plan, to avoid any unnecessary costs to the Debtors' estates, and for reasons previously stated regarding avoiding disruption to the Debtors' operations, the Debtors' payment of such Accounts Payable Claims in the ordinary course postpetition is an exercise of the Debtors' sound business judgment.

25. Finally, key stakeholders support the Debtors' payment of the Accounts Payable Claims. As of the Petition Date, the Debtors have fully solicited their Plan, which provides for the payment of Accounts Payable Claims in the ordinary course of business postpetition. The Plan was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 73% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of the Debtors' prepetition second lien term loan debt. As future equity owners of, and lenders to, the Reorganized Debtors, these secured parties recognize that timely payment of the Accounts Payable Claims is necessary to avoid unnecessary disruption to the Debtors' businesses and ensure a smooth restructuring process, preserving value for all stakeholders.

26. For all these reasons, courts in this and other jurisdictions routinely authorize payments of the kind contemplated herein in prepackaged bankruptcy cases. *See, e.g.*, *In re APC*

---

[4] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."

*Auto. Techs. Intermediate Holding, LLC*, No. 20-11466 (CAS) (Bankr. D. Del. June 23, 2020) (approving payment of all accounts payable claims in the ordinary course of business postpetition on a final basis); *In re Longview Power, LLC*, No. 20-10951 (BLS) (Bankr. D. Del. May 18, 2020) (same); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Dec. 19, 2019) (same); *In re Blackhawk Mining LLC,* No. 19-11595 (LSS) (Bankr. D. Del. Aug. 9, 2019) (same); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. Apr. 5, 2018) (same).

II. **The Court Should Confirm That Outstanding Orders Are Administrative Expense Priority Claims and That Payment of Such Claims Is Authorized.**

27. Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority). Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

28. Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority. The attendant disruption to the continuous and timely flow of critical inventory and other goods to the Debtors would force the Debtors to potentially halt operations, disrupt the Debtors' businesses, and lead to a loss of revenue, all to the detriment of the Debtors and their creditors.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

29. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

30. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Reservation of Rights**

31. Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment

made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

32. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### **Notice**

33. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the First Lien Agent and the Second Lien Agent; (e) counsel to the

Crossover Group; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

34. No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

| | |
|---|---|
| Dated: August 23, 2022<br>Wilmington, Delaware | */s/ Laura Davis Jones*<br>Laura Davis Jones (DE Bar No. 2436)<br>Timothy P. Cairns (DE Bar No. 4228)<br>Edward Corma (DE Bar No. 6718)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email: ljones@pszjlaw.com<br>tcairns@pszjlaw.com<br>ecorma@pszjlaw.com<br><br>-and-<br><br>Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)<br>Tricia Schwallier Collins (*pro hac vice* pending)<br>Yusuf U. Salloum (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>Email: patrick.nash@kirkland.com<br>tricia.schwallier@kirkland.com<br>yusuf.salloum@kirkland.com<br><br>-and-<br><br>Nicole L. Greenblatt, P.C. (*pro hac vice* pending)<br>Rachael M. Bentley (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>Email: nicole.greenblatt@kirkland.com<br>Email: rachael.bentley@kirkland.com<br><br>*Proposed Co-Counsel for the Debtors and Debtors in Possession* |