# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) Case No. 22-10778 (___) |
| Debtors. | ) (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) DETERMINING
ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE
UTILITY SERVICES, (II) PROHIBITING UTILITY PROVIDERS
FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES,
(III) APPROVING DEBTORS' PROPOSED PROCEDURES FOR RESOLVING
ADEQUATE ASSURANCE REQUESTS, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state as follows in support of this motion:[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>"), (a) approving the Debtors' proposed adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing services; (c) approving

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

[2] A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Scott H. Rosa, Chief Financial Officer of Carestream Health, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith. Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), as applicable.

the Debtors' proposed procedures for resolving Adequate Assurance Requests (as defined herein); and (d) granting related relief. In addition, the Debtors request that the Court schedule a final hearing approximately thirty-five days after the commencement of these chapter 11 cases to consider entry of the Final Order.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a) and 366 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

**Background**

5. The Debtors, together with their non-Debtor affiliates (collectively, "Carestream" or the "Company"), are a leading provider of medical imaging and non-destructive testing products with over 100 years of industry experience. The Company is a partner of choice to approximately 8,000 direct customers and approximately 900 dealers in more than 130 countries. Its products

are used by prominent health systems, hospitals, imaging centers, specialty practices and industrial companies worldwide. Headquartered in Rochester, New York, Carestream employs a global workforce of approximately 3,410 employees with approximately 180 contractors.

6. Carestream, like many businesses, faced significant headwinds in 2020, principally as a result of changing product and customer trends and the global COVID-19 pandemic, which, in light of the Debtors' capital structure, placed substantial strain on the Debtors' businesses. To alleviate the strain, the Debtors executed a voluntary amend-and-extend transaction in early 2020 that extended the maturities of their first lien revolver and term loan and second lien term loan debt. The amend-and-extend transaction provided the Debtors with time to meaningfully examine various strategic alternatives, including sale transactions and debt-for-equity exchanges to deleverage the Company.

7. Ultimately, the Debtors determined that a substantial deleveraging combined with new capital investment was the best path forward for their business. To implement the foregoing, the Debtors negotiated, and ultimately agreed, with a majority of their prepetition secured lenders and their equity sponsor on the terms of a comprehensive financial restructuring. The terms of the proposed restructuring are memorialized in a restructuring support agreement (the "RSA") that serves as the foundation of the Debtors' prepackaged Plan. Under the RSA, the Debtors will eliminate approximately $470 million of prepetition funded debt and raise up to $75 million of new equity capital, while also leaving general unsecured claims unimpaired. As of August 23, 2022 (the "Petition Date"), the Debtors have fully solicited their Plan, which was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 98% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of the Debtors' prepetition second lien term loan debt.

8. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**The Utility Services**

9. In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, and other similar services (collectively, the "Utility Services") from a number of utility providers or brokers (each, a "Utility Provider" and collectively, the "Utility Providers"). A nonexclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtors' various locations and their business operations as of the Petition Date (the "Utility Services List") is attached hereto as **Exhibit C**.[3]

10. Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases. The Utility Services are essential for the Debtors to maintain their businesses and to operate corporate offices across multiple states throughout the United States to provide functions essential for daily operations.

---

[3] The descriptions of the Utility Services set forth in this motion constitute a summary only. The actual terms of the Utility Services and related agreements will govern in the event of any inconsistency with the description thereof set forth herein. Although **Exhibit C** is intended to be comprehensive, the Debtors may have inadvertently omitted one or more Utility Providers. By this motion, the Debtors request relief applicable to all Utility Providers, regardless of whether such Utility Provider is specifically identified on **Exhibit C**. Additionally, the listing of an entity on the Utility Services List is not an admission that such entity is a "utility" within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

4

These offices require electricity, telecommunications, internet, and other Utility Services in order to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to successfully operate and manage their reorganization efforts.

11. For some of the Debtors' locations, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements. The relief requested herein is with respect to all Utility Providers supplying Utility Services to the Debtors, including those that indirectly supply services through the applicable landlords.

12. To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services. In the aggregate, the Debtors pay approximately $1.25 million each month for Utility Services, calculated as the historical average payment for the twelve-month period ending December 31, 2021.

**I.      Proposed Adequate Assurance and Adequate Assurance Procedures.**

13. The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. Moreover, the Plan provides for the payment in full in cash of all trade creditors, including Utility Providers and, contemporaneously herewith, the Debtors have filed a motion requesting authority to pay certain undisputed general unsecured claims in the ordinary course of business (the "All Claims Motion"). The Debtors' access to cash collateral is sufficient to pay the Debtors' Utility Services obligations in accordance with their prepetition practice during the pendency of their chapter 11 cases.

14. To provide additional assurance of payment, the Debtors propose to deposit $687,409.80 (the "Adequate Assurance Deposit") into a segregated account (the "Adequate Assurance Account") as soon as reasonably practicable after entry of the Interim Order or the

5

interim order approving the Debtors' use of cash collateral, whichever is later. The Adequate Assurance Deposit is equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated as the historical average payment for the twelve-month period ending December 31, 2021, exluding Utility Services billed directly to the Debtors' landlords, plus an additional $62,491.80 (*i.e.*, 10 percent of the approximately one-half of the Debtors' average monthly cost of Utility Services) included out of an abundance of caution to provide assurance to any Utility Provider that may have inadvertently been excluded from the Utility Services List.

15. The Adequate Assurance Deposit will be held in the Adequate Assurance Account at HSBC Bank USA NA for the benefit of the Utility Providers for the duration of these chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable Utility Services, and may be applied to any postpetition defaults in payment to the applicable Utility Providers. No liens senior to the interests of the Utility Providers will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

16. The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in accordance with their prepetition practice (collectively, the "Proposed Adequate Assurance"), provides adequate assurance of payment as required by section 366 of the Bankruptcy Code.

**II.     The Adequate Assurance Procedures.**

17. The Debtors request that the Court approve the procedures for requesting different or additional adequate assurance of future payment (each, an "Adequate Assurance Request") set forth in the proposed Interim Order and Final Order (the "Adequate Assurance Procedures"). Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make an Adequate Assurance Request pursuant to the Adequate Assurance Procedures.

18. The Adequate Assurance Procedures provide a streamlined process for a Utility Provider to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to continue their business operations uninterrupted. More specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Adequate Assurance Request upon certain notice parties.

19. The Debtors, in their discretion, may then resolve any Adequate Assurance Request by mutual agreement with the applicable Utility Provider and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors may seek Court resolution of the Adequate Assurance Request. Unless and until a Utility Provider timely files an objection or serves an Adequate Assurance Request, such Utility Provider shall be (a) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with section 366 of the Bankruptcy Code and (b) forbidden to discontinue, alter, or refuse services to, or discriminate against, the Debtors on account of any unpaid prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

### III. Modifications to the Utility Services List.

20. The Debtors have made an extensive and good-faith effort to identify all Utility Providers and include them on the Utility Services List. To the extent the Debtors identify new or additional Utility Providers or discontinue services from existing Utility Providers, the Debtors seek authority, in their sole discretion, to amend the Utility Services List to add or remove any Utility Provider. For any Utility Provider that is subsequently added to the Utility Services List, the Debtors will serve such Utility Provider with a copy of the Interim Order or Final Order, as applicable, including the Adequate Assurance Procedures. The Debtors request that the terms of

the Interim Order or Final Order, as applicable, and the Adequate Assurance Procedures apply to any subsequently identified Utility Provider. For any Utility Provider that is subsequently removed from the Utility Services List, the Debtors request the authority to decrease the Adequate Assurance Deposit by an amount equal to two weeks of the Debtors' average cost of services from such removed Utility Provider; *provided, however,* that the Debtors shall provide the applicable Utility Provider with seven days' notice thereof and the opportunity to respond to such removal.

## Basis for Relief

21. Section 366 of the Bankruptcy Code, which protects a debtor against the immediate termination or alteration of utility services after the petition date, provides the debtor thirty days following the petition date to provide "adequate assurance" of payment for postpetition services in a form "satisfactory" to the utility provider before the utility provider may alter, refuse, or discontinue service. 11 U.S.C. § 366(c)(2). For purposes of section 366 of the Bankruptcy Code, "assurance of payment" can be provided in the form of a cash deposit, letter of credit, certificate of deposit, surety bond, prepayment, or other mutually-agreed form of security. 11 U.S.C. § 366(c)(1). "Adequate assurance of payment" need not constitute an absolute guarantee of the debtors' ability to pay. *See, e.g.*, *In re Great Atl. & Pac. Tea Co.*, 2011 WL 5546954, at *5 (Bankr. S.D.N.Y. Nov. 14, 2011) (finding that "[c]ourts will approve an amount that is adequate enough to insure against unreasonable risk of nonpayment, but are not required to give the equivalent of a guaranty of payment in full"); *In re Caldor, Inc.*, 199 B.R. 1, 3 (S.D.N.Y. 1996) ("Section 366(b) requires . . . 'adequate assurance' of payment. The statute does not require an absolute guarantee of payment." (citation omitted)), *aff'd sub nom. Va. Elec. & Power Co. v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997).

22. When considering whether a given assurance of payment is "adequate," the courts examine the totality of the circumstances to make an informed decision as to whether the utility

provider will be subject to an unreasonable risk of nonpayment. *See In re Keydata Corp.*, 12 B.R. 156, 158 (B.A.P. 1st Cir. 1981) (citing *In re Cunha*, 1 B.R. 330 (Bankr. E.D. Va. 1979)); *In re Adelphia Bus. Sols., Inc.*, 280 B.R. 63, 82–83 (Bankr. S.D.N.Y. 2002). In determining the level of adequate assurance, however, "a bankruptcy court must focus upon the need of the utility for assurance, and . . . require that the debtor supply no more than that, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." *In re Penn Jersey Corp.*, 72 B.R. 981, 985 (Bankr. E.D. Pa. 1987); *see also In re Penn. Cent. Transp. Co.*, 467 F.2d 100, 103–04 (3d Cir. 1972) (affirming the bankruptcy court's ruling that no utility deposits were necessary where such deposits likely would "jeopardize the continuing operation of the [debtor] merely to give further security to suppliers who already are reasonably protected").

23. Here, the Utility Providers are adequately assured against any risk of nonpayment for future services. The Adequate Assurance Deposit and the Debtors' ongoing ability to meet obligations as they come due in the ordinary course provide assurance that the Debtors will pay their future obligations to the Utility Providers. In contrast, termination of the Utility Services could render the Debtors unable to operate their businesses to the detriment of all stakeholders. *See In re Monroe Well Serv., Inc.*, 83 B.R. 317, 321–22 (Bankr. E.D. Pa. 1988) (noting that without utility service the debtors "would have to cease operations" and that section 366 of the Bankruptcy Code "was intended to limit the leverage held by utility companies, not increase it").

24. Courts are permitted to fashion reasonable procedures, such as the Adequate Assurance Procedures proposed herein, to implement the protections afforded under section 366 of the Bankruptcy Code. *See, e.g.*, *In re Circuit City Stores Inc.*, No. 08-35653, 2009 WL 484553, at *5 (Bankr. E.D. Va. Jan. 14, 2009) (stating that "the plain language of §366 of the Bankruptcy Code allows the court to adopt the Procedures set forth in the Utility

Order"). Such procedures are important because, without them, the Debtors "could be forced to address numerous requests by utility companies in an unorganized manner at a critical period in their efforts to reorganize." *Id*. Moreover, any rights the Utility Providers believe they have under sections 366(b) and (c)(2) of the Bankruptcy Code are fully preserved under the Adequate Assurance Procedures, because the Utility Providers may choose, in accordance with the Adequate Assurance Procedures, to request modification of the Proposed Adequate Assurance. *See id.* at *5–6. The Adequate Assurance Procedures, however, avoid a haphazard and chaotic process whereby each Utility Provider could make an extortionate, last-minute demand for adequate assurance that would force the Debtors to pay under the threat of losing critical Utility Services. *See id.* at *5.

25. The Adequate Assurance Procedures are reasonable and in accord with the purposes of section 366 of the Bankruptcy Code. The Debtors respectfully request that the Court grant the relief requested herein. Similar procedures have been approved by courts in this district. *See, e.g.*, *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (approving adequate assurance deposit equal to one-half of debtor's monthly utility expenses on a final basis); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 26, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Oct. 15, 2020) (same); *In re RGN-Group Holdings, LLC*, No. 20-11961 (BLS) (Bankr. D. Del. Sept. 29, 2020) (same); *In re Extraction Oil & Gas*, No. 20-11548 (CSS) (Bankr. D. Del. July 13, 2020) (same).[4]

26. Further, the Court possesses the power, under section 105(a) of the Bankruptcy Code, to "issue any order, process, or judgment that is necessary or appropriate to

---

[4] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

carry out the provisions of this title." The Adequate Assurance Procedures and the Proposed Adequate Assurance are necessary and appropriate to carry out the provisions of the Bankruptcy Code, particularly section 366 thereof. Accordingly, the Court should exercise its powers under sections 366 and 105(a) of the Bankruptcy Code and approve both the Adequate Assurance Procedures and the Proposed Adequate Assurance.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

27. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

28. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have

demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Reservation of Rights

29. Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

30. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

31. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the First Lien Agent and the Second Lien Agent; (e) counsel to the Crossover Group; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the Utility Providers; (j) certain of the Debtors' landlords; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

32. No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

| | |
|---|---|
| Dated: August 23, 2022<br>Wilmington, Delaware | */s/ Laura Davis Jones*<br>Laura Davis Jones (DE Bar No. 2436)<br>Timothy P. Cairns (DE Bar No. 4228)<br>Edward Corma (DE Bar No. 6718)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email: ljones@pszjlaw.com<br>tcairns@pszjlaw.com<br>ecorma@pszjlaw.com<br><br>-and-<br><br>Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)<br>Tricia Schwallier Collins (*pro hac vice* pending)<br>Yusuf U. Salloum (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>Email: patrick.nash@kirkland.com<br>tricia.schwallier@kirkland.com<br>yusuf.salloum@kirkland.com<br><br>-and-<br><br>Nicole L. Greenblatt, P.C. (*pro hac vice* pending)<br>Rachael M. Bentley (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>Email: nicole.greenblatt@kirkland.com<br>Email: rachael.bentley@kirkland.com<br><br>*Proposed Co-Counsel for the Debtors and Debtors in Possession* |