*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) | Case No. 22-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DISCLOSURE STATEMENT FOR THE JOINT
## PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
## CARESTREAM HEALTH, INC., AND ITS DEBTOR AFFILIATES

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                 tcairns@pszjlaw.com
                 ecorma@ pszjlaw.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Tricia Schwallier Collins (*pro hac vice* pending)
Yusuf U. Salloum (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
                 tricia.schwallier@kirkland.com
                 yusuf.salloum@kirkland.com
-and-
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          nicole.greenblatt@kirkland.com
Email:          rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

Dated: August 21, 2022

---

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232).  The location of the Debtors' service address is:  150 Verona Street, Rochester, New York 14608.

**CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

THE DEBTORS ARE SOLICITING VOTES ON THE *JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CARESTEAM HEALTH, INC. AND ITS DEBTOR AFFILIATES* FROM THE HOLDERS OF OUTSTANDING:

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | FIRST LIEN CLAIMS |
| CLASS 4 | SECOND LIEN TERM LOAN CLAIMS |

IF YOU ARE IN CLASS 3 OR CLASS 4, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

<u>DELIVERY OF BALLOTS AND CONSENT FORMS</u>

CLASS 3 AND CLASS 4 BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS:

<u>BY REGULAR MAIL, OVERNIGHT MAIL, OR HAND DELIVERY AT:</u>

Carestream Health, Inc. Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

<u>BY ELECTRONIC MAIL AT:</u>

CARESTREAMBALLOTS@KCCLLC.NET

PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT.

CLASS 3 AND CLASS 4 BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 12:00 P.M. (PREVAILING EASTERN TIME) ON AUGUST 22, 2022, AS DIRECTED ON THE BALLOT OR CONSENT FORM, AS APPLICABLE.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR
VOTING ON THE PLAN PLEASE CONTACT THE SOLICITATION AGENT AT:

<u>BY E-MAIL TO:</u>
CARESTREAMBALLOTS@KCCLLC.COM

<u>BY TELEPHONE:</u>
(877) 709-4750 (TOLL-FREE FROM US / CANADA) OR +1 (424) 236-7230 (INTERNATIONAL)

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the Restructuring Support Agreement, this "<u>Disclosure Statement</u>") provides information regarding the Restructuring Transactions and the *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the Restructuring Support Agreement, and including all exhibits and supplements thereto, the "<u>Plan</u>").[2]  A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

Pursuant to the Restructuring Support Agreement, the Restructuring Transactions are currently supported by the Debtors and certain consenting stakeholders that have executed the Restructuring Support Agreement, including Holders of approximately 70% in principal amount of the First Lien Claims and approximately 99% in principal amount of the Second Lien Term Loan Claims (collectively, the "<u>Restructuring Support Parties</u>").

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed Restructuring Transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Class 3 and Class 4 to read this Disclosure Statement (including the Risk Factors described in Article VIII hereof) and the Plan in their entirety before voting to accept or reject the Plan.  If the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

<div style="border:1px solid black; padding:10px;">

<u>RECOMMENDATION BY THE DEBTORS</u>

EACH DEBTOR'S BOARD OF DIRECTORS, SOLE MEMBER, OR EQUIVALENT GOVERNING BODY, AS APPLICABLE, HAS APPROVED THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ASSETS, AND PROVIDE THE BEST RECOVERY TO THE DEBTORS' STAKEHOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS WHOSE VOTES ON THE PLAN ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>AUGUST 22, 2022, AT 12:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.

</div>

---

[2]  Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws").  The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense.  The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain Holders of First Lien Claims and Second Lien Term Loan Claims that are "accredited investors" as defined in Rule 501(a) of the Securities Act, respectively, of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code and the exemptions listed above to exempt from registration under the Securities Act and Blue Sky Laws the offer, sale, issuance and distribution of the New Common Stock under the Plan, and the shares of Rights Offering New Common Stock issuable in connection with the Rights Offering.  The Debtors will rely on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the distribution of Rights Offering New Common Stock. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized or is unlawful.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential.  This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities.  Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting votes on the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that the summaries contained in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with the Debtors' advisors, has prepared the financial projections attached hereto as **Exhibit D** and described in this Disclosure Statement (the "**Financial Projections**"). The Financial Projections, while presented with numerical specificity, necessarily are based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against the Debtors or any other party in interest. Please refer to Article VIII of this Disclosure Statement, entitled "Risk Factors" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If

any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

*[Remainder of page intentionally left blank.]*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION................................................................................................................1

II.  PRELIMINARY STATEMENT .......................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT, THE RESTRUCTURING TRANSACTIONS, AND THE PLAN...........................................3

    A.    What is chapter 11?........................................................................................3
    B.    Why are the Debtors sending me this Disclosure Statement?........................................3
    C.    Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?.............................................................................................3
    D.    Am I entitled to vote on the Plan?........................................................................3
    E.    What will I receive from the Debtors if the Plan is consummated?.............................4
    F.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?..........................................................................................7
    G.    Are any regulatory approvals required to consummate the Plan?..............................8
    H.    What happens to my recovery if the Plan is not confirmed or does not go effective? ....8
    I.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"...................................................................................8
    J.    What are the sources of Cash and other consideration required to fund the Plan?...........8
    K.    Are there risks to owning the New Common Stock upon emergence from chapter 11?.................8
    L.    Is there potential litigation related to the Plan?.......................................................8
    M.    What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?...............................................................................................9
    N.    How will the preservation of the Causes of Action impact my recovery under the Plan? ...............9
    O.    Will there be releases and exculpation granted to parties in interest as part of the Restructuring Transactions?.............................................................................10
    P.    What is the deadline to vote on the Plan? .............................................................14
    Q.    How do I vote for or against the Plan?..................................................................14
    R.    Why is the Bankruptcy Court holding a Confirmation Hearing?..............................15
    S.    What is the purpose of the Confirmation Hearing?................................................15
    T.    What is the effect of the Plan on the Debtors' ongoing businesses?.........................15
    U.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? .......................................................................15
    V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .................................................................................16
    W.    Do the Debtors recommend voting in favor of the Plan?.........................................16

IV.  THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ...............................16

    A.    Restructuring Support Agreement.......................................................................16
    B.    The Plan ..........................................................................................................17

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW..........21

    A.    Carestream's Corporate History and Business Operations ...................................21
    B.    The Debtors' Prepetition Organizational and Capital Structure..............................22

VI.  EVENTS LEADING TO THE CHAPTER 11 FILINGS .................................................24

    A.    Industry Headwinds and the COVID-19 Pandemic ..............................................24
    B.    Term Loan Extensions and Sale Process................................................................25
    C.    Entry into the Initial Restructuring Support Agreement ........................................25

|     | D.  | Initial RSA Financing Process | 26 |
|     | E.  | Entry into the Restructuring Support Agreement | 26 |

**VII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS RELATING TO THE RESTRUCTURING TRANSACTIONS AND POTENTIAL CHAPTER 11 CASES ........................ 26**

|     | A.  | Proposed Timeline | 26 |
|     | B.  | First Day Relief | 27 |

**VIII. RISK FACTORS ........................................................................................................ 27**

|     | A.  | Bankruptcy Law Considerations | 27 |
|     | B.  | Risks Related to Recoveries under the Plan | 34 |
|     | C.  | Risks Related to the Offer and Issuance of Securities Under the Plan | 36 |
|     | D.  | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 38 |

**IX. SOLICITATION, VOTING, AND RELATED MATTERS ........................................ 41**

|     | A.  | Holders of Claims Entitled to Vote on the Plan | 41 |
|     | B.  | Voting Record Date | 41 |
|     | C.  | Voting on the Plan | 41 |
|     | D.  | Ballots and Consent Forms Not Counted | 42 |

**X. CONFIRMATION OF THE PLAN ........................................................................... 42**

|     | A.  | Requirements for Confirmation of the Plan | 42 |
|     | B.  | Best Interests of Creditors/Liquidation Analysis | 42 |
|     | C.  | Feasibility | 43 |
|     | D.  | Acceptance by Impaired Classes | 43 |
|     | E.  | Confirmation Without Acceptance by All Impaired Classes | 44 |
|     | F.  | Valuation of the Reorganized Debtors | 45 |

**XI. CERTAIN SECURITIES LAW MATTERS ........................................................... 45**

|     | A.  | Issuance of Securities under the Plan | 46 |
|     | B.  | Subsequent Transfers of 1145 Securities | 46 |
|     | C.  | Resales of Non-1145 Securities | 47 |
|     | D.  | New Common Stock & Management Incentive Plan | 48 |

**XII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .............................................................................................................. 49**

|     | A.  | Introduction | 49 |
|     | B.  | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Debtors. | 50 |
|     | C.  | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote | 53 |
|     | D.  | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims | 61 |
|     | E.  | Information Reporting and Back-Up Withholding | 65 |

**XIII. RECOMMENDATION ........................................................................................... 67**

**EXHIBITS**[1]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Restructuring Support Agreement

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

---

[1]    Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION

Carestream Health, Inc. ("<u>Carestream Health</u>") and certain of its affiliates, as prospective debtors and debtors in possession (collectively, the "<b><u>Debtors</u></b>", and together with Carestream Health's direct and indirect non-Debtor subsidiaries, the "<b><u>Company</u></b>" or "<b><u>Carestream</u></b>"), submit this Disclosure Statement to Holders of First Lien Claims and Second Lien Term Loan Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan.[1]  A copy of the Plan is attached hereto as <b><u>Exhibit A</u></b> and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ASSETS, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST AVAILABLE OPTION FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

## II.    PRELIMINARY STATEMENT

Carestream is a leading global provider of highly innovative medical imaging and non-destructive testing products which promote efficacy and accuracy of care around the world.  Headquartered in Rochester, New York, Carestream offers best-in-class products and materials to its customers.  As of the date of this Disclosure Statement, among other obligations, the Debtors have approximately $1,032.9 million in aggregate outstanding principal amount of funded debt obligations, consisting of approximately:

- $507.7 million in first lien term loan indebtedness;
- $77.0 million in outstanding first lien revolver borrowings; and
- $448.2 million in second lien term loan indebtedness.

As further described herein, Carestream has spent significant time over the past several months working together with its existing lenders to explore strategic alternatives to best position the Company for success.  The Plan reflects the culmination of those efforts and seeks to implement a comprehensive recapitalization of the Debtors' balance sheet with overwhelming creditor support.  Specifically, after extensive diligence and arms' length negotiations with an ad hoc group of holders of First Lien Claims and Second Lien Term Loan Claims (the "<u>Crossover Group</u>"), the Debtors reached an agreement with its Sponsor, First Lien Lenders holding more than 70 percent of the outstanding First Lien Claims, and Second Lien Lenders holding more than 99 percent of the outstanding Second Lien Term Loan Claims on the terms of the restructuring transactions set forth in that certain restructuring support agreement, dated as of August 21, 2022, a copy of which is attached hereto as <b><u>Exhibit B</u></b> (the "<u>Restructuring Support Agreement</u>" or "<u>RSA</u>," and the transactions contemplated thereby, the "<u>Restructuring Transactions</u>").  To facilitate the implementation of the Restructuring Transactions, concurrently with the execution of the Restructuring Support Agreement, (i) certain members of the Crossover Group have committed to providing the Debtors with up to $80 million in debtor-in-possession financing to cover the administrative costs of these chapter 11 cases and to bolster the Debtors' liquidity upon their exit from chapter 11, and (ii) certain parties, including certain First Lien Lenders, have committed to provide an $85 million New ABL Facility to support the Debtors' working capital needs following emergence.  Importantly, the Plan will also deleverage the Debtors' balance sheet by approximately $470 million.

---

[1]    **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

The key terms of the Restructuring Transactions, as reflected in the Plan, include the following:

- certain members of the Crossover Group have committed to provide the Debtors with access to up to $80 million in debtor-in-possession financing consisting of (a) a $5 million tranche that will be repaid in full in cash, and (b) a $75 million tranche that will be partially satisfied with proceeds of an equity rights offering, if any, and the remainder will be equitized into the New Common Stock through the DIP Rollover, subject to dilution by the Debtors' management incentive plan;

- each holder of an Allowed First Lien Claim shall receive (a) cash in an amount equal to 3% of its Allowed First Lien Claim and (b) its pro rata share of the New Term Loan Facility in aggregate principal amount between $536 million and $547 million (depending on the level of participation in the ABL Roll Option) for the remainder of its claim, provided that holders of Allowed First Lien Revolving Claims may elect to roll a portion of their Allowed First Lien Revolving Claims into new loans under the New ABL Facility pursuant to the ABL Roll Option;

- the Debtors' existing Second Lien Term Loan will be cancelled and each holder of an Allowed Second Lien Term Loan Claim shall receive its pro rata share of (a) 10% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan, and (b) the right to purchase for cash its pro rata share of 80% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan;

- each Holder of an Allowed General Unsecured Claim will be paid in full in cash or have its claim reinstated; and

- Existing equity interests will be cancelled on the Effective Date.

To provide the Reorganized Debtors with sufficient liquidity as a going concern, the Reorganized Debtors will enter into the New ABL Facility upon the Debtors' emergence from chapter 11. Certain parties, including certain First Lien Lenders, have committed to provide the Reorganized Debtors with the New ABL Facility in an aggregate principal amount of $85 million, consistent with the terms set forth in the New ABL Facility Term Sheet attached to the Restructuring Support Agreement as Exhibit F. Furthermore, the material terms of the New Term Loan Facility are set forth in the New Term Loan Facility Term Sheet attached to the Restructuring Term Sheet as Annex 1.

Notably, the Plan leaves general unsecured creditors unimpaired and will allow the Debtors to minimize disruptions to their go-forward operations while effectuating a value-maximizing transaction through the chapter 11 process. In light of the foregoing, the Debtors expect to continue operating normally throughout the court-supervised process and remain focused on serving their customers and working with suppliers on normal terms. With the overwhelming support of their lenders, the Debtors are seeking authority to move through the chapter 11 process on an expedited basis to implement the Restructuring Transactions in approximately 30-45 days.

The Debtors, with broad support across their capital structure, believe that the deleveraging and liquidity-enhancing Restructuring Transactions set forth in the Plan represent a value-maximizing path forward. Consummation of the Restructuring Transactions will position the Debtors to capitalize on their core strengths—including their leading imaging, non-destructive testing, and contract manufacturing business—to achieve long-term success. Each of the Debtors strongly believes that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions to ensure the Debtors' long-term viability. **FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTE TO ACCEPT THE PLAN**.

III.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT, THE RESTRUCTURING TRANSACTIONS, AND THE PLAN**

A.    **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking the requisite stakeholder approvals to consummate the Restructuring Transactions by confirming a chapter 11 plan of reorganization.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

C.    **Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting votes on the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases. The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement together with Confirmation of the Plan at the same hearing, which may be scheduled shortly after the commencement of the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

D.    **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "**Class**."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### E.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| | | SUMMARY OF EXPECTED RECOVERIES[2] | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Allowed Amount of Claims[3] | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $2,500,000 | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, which renders such Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $6,400,000 | 100% |
| 3 | First Lien Claims | Each Holder of an Allowed First Lien Claim shall receive, in full and final satisfaction of such Allowed First Lien Claim, (i) Cash in an amount equal to 3.00% of the principal amount of such Holder's Allowed First Lien Claim (the "First Lien Cash Recovery"); and (ii) with respect to any remaining Allowed First Lien Claim held by such Holder after giving effect to clause (i), its Pro Rata share of the New Term Loan Facility; provided, however, that (A) Holders of Allowed First Lien Revolving Claims may, with respect to their Allowed First Lien Revolving Claims, instead elect to, and commit to, each and all components of the following: (x) roll up to an aggregate amount equal to the ABL Funded Rollover Cap of their Allowed First Lien Revolving Claims into the New ABL Facility on a Pro Rata basis and in an amount not to exceed a Holder's respective Allowed First Lien Revolving Claims, (y) with respect to any remaining Allowed First Lien Revolving Claims held by such electing Holders after giving effect to clause (x), receive the treatment specified in Article III.B.3(c)(i) and (ii) of the Plan for such remaining Allowed First Lien Revolving Claims, and (z) provide New ABL Commitments in an amount equal to such Holder's respective Allowed First Lien Revolving Claims rolled pursuant to clause (x), multiplied by the | $600,433,377 | 100% |

---

[2]   The projected recoveries set forth in this table may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

[3]   Projected amounts of Claims represent estimated Allowed Claims as of the Effective Date and take into account estimated payments to be made under anticipated "first-day" motions and DIP Orders. With respect to First Lien Claims, and Second Lien Term Loan Claims, as provided in the Plan, the Allowed Amounts of such Claims shall include accrued and unpaid interest owed under the applicable debt documents through the Effective Date (or with respect to Second Lien Term Loan Claims, the Petition Date).

| | | SUMMARY OF EXPECTED RECOVERIES[2] | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Allowed Amount of Claims[3] | Projected Recovery Under the Plan |
| | | ABL Roll Multiplier (collectively, the treatment in clauses (x), (y), and (z), the "ABL Roll Option"); and (B) the New ABL Backstop Commitment Parties that are Holders of Allowed First Lien Revolving Claims have agreed not to exercise the ABL Roll Option, and shall not exercise, their respective ABL Roll Options and, instead, shall roll their Allowed First Lien Revolving Claims into the New ABL Facility in an aggregate amount equal to the ABL Backstop Roll Option Funded Pool in the proportions set forth in, and subject to the terms and conditions of, the New ABL Backstop Commitment Letter (the treatment in clause (B), the "ABL Backstop Roll Option"). | | |
| 4 | Second Lien Term Loan Claims | Each Holder of an Allowed Second Lien Term Loan Claim shall receive, in full and final satisfaction of such Allowed Second Lien Term Loan Claim, its Pro Rata share of (i) 10% of the New Common Stock, subject to dilution on account of the Management Incentive Plan; and (ii) the Rights Offering Subscription Rights; *provided, however*, that each Tranche B DIP Lender that is also a Holder of Allowed Second Lien Term Loan Claims has agreed not to exercise, and shall not exercise, its Rights Offering Subscription Rights, and at least a corresponding portion of such Tranche B DIP Lender's Allowed DIP Claims shall be converted into New Common Stock through the DIP Rollover. | $457,968,524 | 23% |
| 5 | General Unsecured Claims | Each Allowed General Unsecured Claim (other than any Sponsor General Unsecured Claim) shall, at the option of the applicable Debtor, be either (i) Reinstated or (ii) paid in full in Cash on the later of (x) the Effective Date and (y) the date on which such payment would otherwise be due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. On the Effective Date, each Sponsor General Unsecured Claim shall be canceled, released, and extinguished, and will be of no further force or effect, without any distribution to the Holder of such Claim on account thereof, as agreed by the Sponsor pursuant to the Restructuring Support Agreement. | $14,200,000 | 100% |
| 6 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated unless otherwise agreed by the applicable Debtor and the Required DIP Lenders. | N/A | 100% / 0% |
| 7 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be Reinstated unless otherwise agreed by the applicable Debtor and the Required DIP Lenders. | N/A | 100% / 0% |
| 8 | Existing Interests | All Existing Interests shall be canceled, released, and extinguished and will be of no further force or effect, without any distribution to Holders of Existing Interests. | N/A | 0% |
| 9 | Section 510(b) Claims | On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be canceled, released, and | N/A | 0% |

| SUMMARY OF EXPECTED RECOVERIES[2] | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Allowed Amount of Claims[3] | Projected Recovery Under the Plan |
| | | extinguished, and will be of no further force or effect, without any distribution to Holders of Section 510(b) Claims. | | |

### F.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1.     Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, with the consent of the Required DIP Lenders, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such allowance or as soon as reasonably practicable thereafter, but in any event no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

#### 2.     Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.D of the Plan, as summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

#### 3.     Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court, will be paid by each of the applicable

Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

### G.    Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan that have not already been received by the Company or affected lenders.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to consummate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### H.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 42, and the Liquidation Analysis attached hereto as **Exhibit C**.

### I.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "**Effective Date**"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 42, for a discussion of the conditions precedent to consummation of the Plan.

### J.    What are the sources of Cash and other consideration required to fund the Plan?

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) Cash on hand, including Cash from operations and the proceeds from the Rights Offering, as applicable; (2) the New Common Stock; (3) the New Term Loan Facility Term Loans; and (4) the New ABL Facility.

### K.    Are there risks to owning the New Common Stock upon emergence from chapter 11?

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 27.

### L.    Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  *See* Article VIII.D.7 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 40.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article X.X.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 44.

**M.    What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or after the Effective Date, the Reorganized Debtors will adopt and implement the Management Incentive Plan in accordance with the terms of the Management Compensation Term Sheet and the Restructuring Support Agreement. As described more fully in Annex 3 to **Exhibit B** of this Disclosure Statement, the Management Incentive Plan will reserve a pool of New Common Stock that the New Board can use to attract, incentivize, and retain talented key employees (including officers) after the Effective Date. The issuance of New Common Stock in connection with the Management Incentive Plan will dilute all New Common Stock then outstanding.

**N.    How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation (to the extent applicable) of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

> **O.**     **Will there be releases and exculpation granted to parties in interest as part of the Restructuring Transactions?**

The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Restructuring Support Parties in obtaining their support for the Restructuring Transactions pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Restructuring Transactions, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (1) ALL HOLDERS OF CLAIMS THAT VOTE OR ARE DEEMED TO ACCEPT THE PLAN; (2) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT TIMELY FILE ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE THIRD-PARTY RELEASE THAT IS NOT RESOLVED BEFORE CONFIRMATION; (3) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT TIMELY FILE ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE THIRD-PARTY RELEASE THAT IS NOT RESOLVED BEFORE CONFIRMATION AND (4) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT TIMELY FILE ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE THIRD-PARTY RELEASE THAT IS NOT RESOLVED BEFORE CONFIRMATION.    THE RELEASES, IN EACH CASE, ARE AN INTEGRAL ELEMENT OF THE PLAN.**

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  The Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and

propriety of the Plan's release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

            1.        **Release of Liens.**

**Except as otherwise provided in the New Debt Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or Foreign Guarantor Subsidiary (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the New Term Loan Agent, or the New ABL Agent that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

            2.        **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights**

Offering or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, any Restructuring Document, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and the New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and the New Term Loan Facility) executed to implement the Plan or the Restructuring Transactions; (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (3) any matters retained by the Debtors and the Reorganized Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

3.    Releases by the Releasing Parties.

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any

other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Restructuring Documents, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and New Term Loan Facility) executed to implement the Plan or the Restructuring Transactions; or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

4.    Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and New Term Loan Facility) executed to implement the Plan.

5.      **Injunction.**

**Effective as of the Effective Date, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Actions that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions released, settled or subject to exculpation pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and New Term Loan Facility) executed to implement the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in** Error! Reference source not found.**.F of the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

P.      **What is the deadline to vote on the Plan?**

The Voting Deadline with respect to the Plan is August 22, 2022, at 12:00 p.m. (prevailing Eastern Time).

Q.      **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that the ballot containing your vote is **actually received** by the Solicitation Agent **on or before the Voting Deadline, _i.e._, August 22,**

**2022, at 12:00 p.m., prevailing Eastern Time**.  *See* Article IX of this Disclosure Statement, entitled, "Solicitation, Voting, and Related Matters" which begins on page 41 for more information.

R.        **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court shortly after the commencement of the Chapter 11 Cases.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

S.        **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

T.        **What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors will seek to reorganize under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date of the Plan means that the Debtors will ***not*** be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan).  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

U.        **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the then-sitting members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the New Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents (including the New Stockholders Agreement).  The initial New Board shall consist of those individuals that are selected in accordance with Article IV.K of the Plan.

Assuming that the Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of the aggregate outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the Holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

### V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

*By regular mail, overnight mail, or hand delivery at:*

Carestream Health, Inc. Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

*By electronic mail at:*
CarestreamBallots@kccllc.com
*By telephone at:*
(877) 709-4750 (toll free) or (424) 236-7230 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://www.kccllc.net/Carestream (free of charge) or, following the commencement of the Chapter 11 Cases (if applicable), the Bankruptcy Court's website at https://ecf.deb.uscourts.gov (for a fee).

### W.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Restructuring Transactions (as set forth in the Plan), which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan, as applicable.

## IV.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.    Restructuring Support Agreement

On August 21, 2022, the Debtors and the Restructuring Support Parties entered into the Restructuring Support Agreement.  The Debtors have since further documented the terms of the Restructuring Transactions contemplated thereby, including in the Plan, and have commenced solicitation of votes on the Plan.

The Restructuring Support Agreement and the Plan represent significant steps in the Debtors' restructuring process.  Pursuant to the Restructuring Support Agreement, the Restructuring Transactions are broadly supported by stakeholders across the Debtors' capital structure.  The Restructuring Support Agreement will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan will eliminate approximately $470 million of the Debtors' funded debt obligations and provide them with up to $75 million of new equity capital at exit.  With a substantially deleveraged balance sheet and ample go-forward liquidity, the Reorganized Debtors will be well positioned to implement the Company's business plan and achieve long-term success.

**B.**     **The Plan**

The Plan contemplates the following key terms, among others described herein and therein:

**1.**     **General Settlement of Claims and Interests**

Except as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, First Lien Claims, and Second Lien Term Loan Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, First Lien Claims, and Second Lien Term Loan Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**2.**     **Restructuring Transactions**

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, as set forth in the Restructuring Steps Memorandum or as otherwise reasonably acceptable to the Required DIP Lenders, which may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents constituting the Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement, and having other terms for which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) the consummation of the Rights Offering pursuant to the Rights Offering Procedures, including the distribution of the Rights Offering Subscription Rights to the Rights Offering Participants and the issuance of Rights Offering New Common Stock in connection therewith; (5) the execution and delivery of the New Organizational Documents (including the New Stockholders Agreement); and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (6) the execution and delivery of the New ABL Credit Agreement and the New Term Loan Credit Agreement; and (7) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 3.    Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations and the Rights Offering Cash, as applicable; (2) the New Common Stock; (3) the New Term Loan Facility; and (4) the New ABL Facility.

### (a)    Rights Offering

The Debtors shall, subject to the treatment described in **Error! Reference source not found.** of the Plan, raise up to an aggregate of $75 million of equity capital through the Rights Offering, pursuant to which eligible Holders of Allowed Second Lien Term Loan Claims may elect to purchase for Cash their Pro Rata share of 80% of the New Common Stock at the Rights Offering Subscription Price, subject to the DIP Rollover and dilution on account of the Management Incentive Plan.  On and as of the Effective Date, the Reorganized Debtors shall consummate the Rights Offering in accordance with the Rights Offering Procedures and the Plan.  To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Rights Offering; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Rights Offering, in each case, without any further notice to or order of the Bankruptcy Court.  Upon exercise of the Rights Offering Subscription Rights by the Rights Offering Participants pursuant to the Rights Offerings Procedures, Reorganized Holdings shall be authorized to issue any issuable Rights Offering New Common Stock pursuant to such exercise.

For the avoidance of doubt, the issuance and distribution of any Rights Offering New Common Stock purchased by the Rights Offering Participants in the Rights Offering shall be solely on account of the new money provided by such Rights Offering Participants in the Rights Offering and not on account of any Allowed Second Lien Term Loan Claims held by such Rights Offering Participants.  The Rights Offering Cash, if any, shall be applied to payment of DIP Claims in accordance with **Error! Reference source not found.** of the Plan.

### (b)    Issuance of New Common Stock

On the Effective Date, Reorganized Holdings shall issue the New Common Stock, including the Rights Offering New Common Stock, the New Common Stock issued pursuant to the DIP Rollover and the DIP Rollover Premium New Common Stock pursuant to the Plan.  The issuance of the New Common Stock, including equity awards reserved for the Management Incentive Plan, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors or by Holders of any Claims or Interests, as applicable.

All of the shares (or comparable units) of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of New Common Stock, including the Rights Offering New Common Stock, the New Common Stock issued pursuant to the DIP Rollover and the DIP Rollover Premium New Common Stock, shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms.  As a condition to receiving the New Common Stock, Holders of Allowed Second Lien Term Loan Claims (including Rights Offering Participants) and any DIP Lender entitled to a distribution of New Common Stock pursuant to the DIP Rollover and the DIP Rollover Premium will be required to execute

and deliver the New Stockholders Agreement; *provided*, *however*, that, notwithstanding any failure to execute the New Stockholders Agreement, any Entity that is entitled to and accepts a distribution of New Common Stock under the Plan, by accepting such distribution, will be deemed to have accepted and consented to the terms of the New Stockholders Agreement (solely in such Entity's capacity as a stockholder of Reorganized Holding), without the need for execution by any party thereto. The New Stockholders Agreement will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock will be bound thereby in all respects. The New Common Stock will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the Depository Trust Company.

### (c)    New Term Loan Facility

On the Effective Date, the Reorganized Debtors shall enter into the New Term Loan Facility pursuant to the New Term Loan Documents. To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the New Term Loan Facility and the New Term Loan Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New Term Loan Facility, including executing and delivering the New Term Loan Documents, in each case, without any further notice to or order of the Bankruptcy Court.

The New Term Loan Credit Agreement shall (a) provide for the Excess Cash Sweep Payment; and (b) provide that the Excess Cash Sweep Payment, if any, shall be due and payable by the Reorganized Debtors on April 10, 2023, in each case, in accordance with the terms and conditions of the New Term Loan Credit Agreement.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the New Term Loan Documents: (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the New Term Loan Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. To the extent provided in the New Term Loan Documents, the New Term Loan Agent is authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the New Term Loan Documents. The New Term Loan Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The guarantees granted under the New Term Loan Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

(d)        **New ABL Facility**

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility pursuant to the New ABL Documents.  To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the New ABL Facility and the New ABL Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New ABL Facility, including executing and delivering the New ABL Documents, in each case, without any further notice to or order of the Bankruptcy Court.

All Existing Letters of Credit outstanding immediately prior to the Effective Date shall, on the Effective Date, either be returned to the applicable Issuing Lender or cash collateralized as set forth herein.  Any New ABL Facility Roll Draw, if repaid on or after the Effective Date, may be re-borrowed under the New ABL Facility in accordance with the terms thereof.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the New ABL Documents:  (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the New ABL Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  To the extent provided in the New ABL Documents, the New ABL Agent is authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the New ABL Documents.  The New ABL Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The guarantees granted under the New ABL Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

4.        **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Confirmation Order, the Plan, or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

### 5.    Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed.  The New Board will initially consist of the directors to be identified in the Plan Supplement or otherwise disclosed prior to the Effective Date.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents. Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

### 6.    Management Compensation Program

On or after the Effective Date, the Reorganized Debtors shall adopt and implement the Management Compensation Programs, including the Management Incentive Plan, in accordance with the terms of the Management Compensation Term Sheet, the Restructuring Term Sheet, and the Restructuring Support Agreement.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Carestream's Corporate History and Business Operations

Originally formed as Eastman Kodak Corp.'s Health Group, the Company is a leading global provider of innovative medical imaging and non-destructive testing products.  In 2007 the Company was acquired by Onex Corp.  As part of the spin out acquisition, the Company adopted the Carestream name after its prominent healthcare IT product, the Carestream Picture Archiving and Communication System.

Carestream's business is primarily comprised of three product areas: (a) medical film, (b) medical digital, and (c) non-destructive testing.  The Company's medical film product line includes printer systems, laser imaging films, and dental film and accounts for approximately 44% of the Company's revenue.  The medical digital product line includes digital radiography stationary and mobile units, as well as digital detector systems, and accounts for approximately 35% of the Company's revenue.  The non-destructive testing product line includes digital and traditional non-destructive testing products and accounts for approximately 9% of the Company's revenue.  In addition, the Company provides contract manufacturing services to third parties, which accounts for approximately 12% of Carestream's annual revenue.

*Medical Film.* The Company's medical film product line, which generated approximately $502 million in 2021, is the largest driver of the Company's revenue.  Carestream's medical film products include printer systems and films that are used to print physical images from digital imaging equipment (*e.g.*, X-Ray, MRI, CT, etc.) for diagnosis, referral, or archiving purposes.  These printers utilize Carestream film, resulting in high rates of customer retention and recurring purchases.  The Company has a 37% market share in this space globally, with a base of approximately 75,000 printers.

*Medical Digital.* The Company's medical digital line offers a portfolio of fixed and mobile general radiography systems, including X-ray equipment able to produce digital images for real-time patient diagnoses.  In tandem with these products, the Company provides a full spectrum of related services (*e.g.*, to its customers, including but not limited to, maintenance agreements, system implementation, and upgrades). Key products in this category include the DRX-Evolution Plus premium room offering and the DRX-Revolution mobile x-ray system accompanied with a broad selection of DR detectors.  During the past twelve months, the Company's medical digital line was the second largest driver of the Company's revenue, accounting for approximately $402 million of revenue.

*Non-Destructive Testing.* The Debtors offer a portfolio of non-destructive testing products, including film-based and digital imaging products used to test the quality and integrity of materials and structures, such as motor vehicle components, aircraft components, bridges, pipelines, and trains. The Company's non-destructive testing line accounted for approximately $103 million of the Company's revenue in 2021. Approximately 80% of the Company's revenue from its non-destructive testing line is derived from traditional non-destructive physical testing products such as film, chemicals, and processors, with the remainder of such revenue derived from the sale of higher-margin digital offerings. The Company's wide range of non-destructive testing offerings hold a global market share of approximately 25% in this space.

*Contract Manufacturing.* In addition to the Company's three primary product lines, the Company provides contract manufacturing services to deliver precision-coated products for industrial customers and competitors operating in the Company's vertical markets. The Company capitalizes on its full medical supply chain and materials coating experience to provide leading manufacturing capabilities for its clients. The contract manufacturing business generated approximately $103 million of revenue in 2021.

Today, Carestream is headquartered in Rochester, New York, and employs over 3,410 employees and utilizes 180 contractors worldwide. The Company has a trusted relationship with customers and dealers globally, delivering imaging products to over 130 countries, including approximately 8,000 direct customers and approximately 900 dealers worldwide, who in turn distribute to approximately 54,000 end users. Carestream's customers include individuals, dealers, as well as blue-chip hospitals and health systems. The Company has a global manufacturing and distribution network with facilities in Rochester, New York; Windsor, Colorado; White City, Oregon; Guadalajara, Mexico; Varginha, Brazil; Xiamen, China; Shanghai, China; Singapore; and Dordrecht, Netherlands. The Company's facilities have a combined total footprint of approximately 1.5 million square feet that allow Carestream to service customers and distributors around the world.

**B.    The Debtors' Prepetition Organizational and Capital Structure**

The Debtors' current organizational structure is reflected, in simplified form, in the following chart.



As of the date of this Disclosure Statement, the Debtors have approximately $1,032.9 million in aggregate outstanding funded debt obligations. Each of the Debtors in these chapter 11 cases are obligors under the First Lien Credit Agreement and the Second Lien Credit Agreement (as defined below).

| *Funded Debt* | *Approximate Outstanding Principal Amount* |
| --- | --- |
| First Lien Term Loans | $507.7 million |
| First Lien Revolving Loans | $77.0 million |
| Second Lien Term Loans | $448.2 million |
| | |
| *Total Funded Debt Obligations* | $1,032.9 million |

### 1.    First Lien Term Loan Facility

Carestream Health Holdings, Inc. ("Carestream Holdings"), as Holdings, Carestream Health, Inc. ("Carestream Health"), as Company and Term Loan Borrower,[4] the several lenders party thereto (the lenders under the First Lien Term Loan Facility and the First Lien Revolving Loan Facility, collectively, the "First Lien Lenders"), and Credit Suisse AG, Cayman Islands Branch ("Credit Suisse Cayman"), as Administrative Agent, are each party to that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013 (as the same may be amended, supplemented, restated, or otherwise modified from time to time, the "First Lien Credit Agreement," the term loan facility thereunder, the "First Lien Term Loan Facility," and the revolving loan facility thereunder, the "First Lien Revolving Loan Facility").[5]

The First Lien Term Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors and is secured on a first priority basis (*pari passu* with the First Lien Revolving Loan Facility) by substantially all of the Debtors' assets.

The First Lien Term Loan Facility matures on May 8, 2023, and accrues interest at a rate of LIBOR plus 6.75% per annum. As of the Petition Date, approximately $507.7 million in aggregate principal amount remains outstanding under the First Lien Term Loan Facility, plus applicable interest, fees, costs, expenses and premiums.

### 2.    First Lien Revolving Loans

The First Lien Revolving Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors and is secured on a first-priority basis (*pari passu* with the First Lien Term Loan Facility) by substantially all of the Debtors' assets.

The First Lien Revolving Loan Facility matures on May 8, 2023, and accrues interest at a rate of LIBOR plus 6.75% per annum (subject to adjustments pursuant to the First Lien Credit Agreement). As of the Petition Date, approximately $77 million in aggregate principal amount remains outstanding under the First Lien Revolving Loan Facility, plus applicable interest, fees, costs and expenses.

---

[4]    On December 31, 2017, Onex Carestream Finance LP ("Onex Finance"), the Term Loan Borrower under the original First Lien Credit Agreement, assigned its obligations as Term Loan Borrower to Carestream Health.

[5]    The First Lien Credit Agreement has been subsequently amended on June 7, 2013, June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020, May 8, 2020, and October 14, 2020.

### 3.    Second Lien Term Loan

Carestream Holdings, as Holdings, Carestream Health, as Company and Term Loan Borrower,[6] the several lenders party thereto (the "Second Lien Term Lenders"), and Credit Suisse Cayman, as Administrative Agent, are each party to that certain Second Lien Credit Agreement, dated as of June 7, 2013 (as the same may be amended, supplemented, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement" and the term loan facility thereunder, the "Second Lien Term Loan Facility").[7]

The Second Lien Term Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors and is secured on a second-priority basis to the First Lien Term Loan Facility and First Lien Revolving Loan Facility by substantially all of the Debtors' assets.

The Second Lien Term Loan Facility matures on August 8, 2023 and accrues interest at a rate of LIBOR plus 4.50% per annum payable in cash and 8% per annum payable in kind (subject to adjustments pursuant to the Second Lien Credit Agreement). As of the Petition Date, approximately $448.2 million, plus applicable interest, fees, costs and expenses remains outstanding under the Second Lien Term Loan Facility.

### 4.    Equity

Onex holds the majority of the equity interests of Debtor Carestream Health Holdings, Inc., the ultimate parent of the Debtors. The remaining shares of Carestream Health Holdings, Inc. are primarily held by current and former management of the Debtors.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Industry Headwinds and the COVID-19 Pandemic

In recent years, the medical imaging business has faced challenges resulting from decreasing demand for traditional film products and downward pricing pressures. While the Company has maintained consistent sales volume for medical film products in developing markets, it has seen a shift in demand to digital-only products in developed markets. In the last ten years, Company sales to developed market buyers as a portion of all digital print product sales have fallen from approximately 24% to just 4%. These market changes have had a significant impact on the Company's earnings as medical digital products generate lower EBITDA than medical film. In emerging markets, the Company has faced downward pricing pressures due to competitive pressures as well as government efforts to reduce the cost of healthcare. As an example, in 2018, the Chinese government created the National Healthcare Security Administration (NHSA), which uses volume-based procurement strategies to secure testing and imaging products on a consolidated basis for healthcare purchasers across the country. While the Company has focused on decreasing costs to maintain a competitive margin in digital print film, which accounted for approximately 39% of the Company's revenue in 2021, it has seen revenue declines of approximately $100 million since 2018.

These trends across the medical film industry were further exacerbated by COVID-19 restrictions which impacted volumes due to delayed routine medical exams and closed dental operations. The resulting

---

[6]    On December 31, 2017, Onex Finance, the Term Loan Borrower under the original Second Lien Credit Agreement, assigned its obligations as Term Loan Borrower to Carestream Health.

[7]    The Second Lien Credit Agreement has been subsequently amended on June 9, 2017, December 27, 2018, April 11, 2019, January 29, 2020, May 8, 2020, October 14, 2020, and December 30, 2020.

fallout of COVID-19 is still affecting the Company's business today. Periodic lockdowns, staffing shortages, the increased prevalence of virtual medical appointments, further delay of certain medical tests and procedures, and the continued shift towards digital only products continues to exert downward pressure on the Company's film sales volume. The Company, like many other businesses today, has also faced substantial disruption across its global supply chain, increasing input costs for product components and delaying delivery of products and testing modules to customers and distributors. Finally, global inflationary pressures have created challenges for maintaining product margins.

### B.    Term Loan Extensions and Sale Process

Leading up to the COVID-19 pandemic, the Debtors faced mounting headwinds to their business and upcoming maturities under their debt facilities. As noted above, the medical imaging business has seen significant shifts in developed markets to digital-only products, counter to the historic print-focus of the Debtors' product line. In emerging markets, the Debtors faced downward pricing pressures with buyers consolidating and driving further pricing concessions. In early 2020, facing a constrained liquidity position as a result of these challenges, the Company commenced discussions with its lenders to address the approaching February 2021 and June 2021 maturities under the First Lien Credit Agreement and Second Lien Credit Agreement, respectively. In May 2020, the Company and its lenders successfully amended both facilities to extend the maturity date under the First Lien Credit Agreement to May 2023 and the maturity date under the Second Lien Credit Agreement to August 2023. As part of the amendment negotiations, the Company committed to achieving significant annual cost savings, among other things. Following execution of the amendments under the debt facilities, the Company continued to explore various liquidity enhancing opportunities by investing in select growth initiatives to mitigate certain business headwinds, and by adapting its product offering to comport with recent product demand. In September 2020 the Company retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to advise the Company on strategic transaction alternatives with respect to a potential sale process (the "Sale Process"), as contemplated by the Second Lien Credit Agreement amendment.

In February 2021, Houlihan Lokey began marketing the Company, contacting more than 145 financial and strategic buyers, 57 of which executed non-disclosure agreements and received initial diligence materials. In April 2021, four parties submitted initial indications of interest and three were subsequently invited to complete further diligence, including meeting with members of the Company's management team. Following completion of additional diligence by these parties, each of these parties indicated that their bid valuation would be less than the principal amount of the Company's funded debt. Upon receiving this feedback, Houlihan Lokey approached several additional potential buyers and re-approached parties included in the initial outreach. Ultimately, all of the bids received by the Company in the Sale Process were at pricing levels below the principal amount of the Company's funded debt. Accordingly, the Company proactively sought to explore alternate, comprehensive restructuring solutions.

### C.    Entry into the Initial Restructuring Support Agreement

In September 2021, the Crossover Group organized and engaged advisors to begin negotiations with the Company regarding the terms of a comprehensive restructuring transaction. Following months of arm's-length negotiations, on April 22, 2022, the Company and certain First Lien Lenders and Second Lien Lenders entered into that certain Restructuring Support Agreement (the "Initial RSA"). The Initial RSA provided for a toggle approach, contemplating an out-of-court voluntary debt restructuring (the "Out-of-Court Restructuring") in the event certain consent thresholds were reached, and an in-court chapter 11 process if the Company was unable to effectuate the Out-of-Court Restructuring. Specifically, under the Initial RSA, the Company agreed to pay all then outstanding first lien claims in full from the proceeds of a new first lien term loan facility (the "Anticipated New 1L Facility") and the holders of Second Lien Term Loan Claims agreed to exchange their claims for their pro rata share of (a) a new subordinated secured debt

facility and (b) 100% of the equity interests in the reorganized Company, subject to dilution. Certain members of the Crossover Group committed to backstopping the Anticipated New 1L Facility subject to the Company achieving satisfactory corporate and debt ratings.

### D.    Initial RSA Financing Process

To market the Anticipated New 1L Facility, the Company retained JPMorgan Chase Bank, N.A. ("JPM") in June 2022. While JPM was marketing the financing, the U.S. credit markets shifted dramatically and demand for participation in similar refinancings was substantially diminished. Preliminary feedback from market participants indicated that market terms would be less favorable than the backstopped terms provided by certain members of the Crossover Group. Accordingly, the Company sought to enforce the Crossover Group's backstop commitment under the Initial RSA.

In July 2022, the Company received a determination that the resulting facility would not achieve the necessary rating required by the Initial RSA–accordingly the Company was unable to satisfy the conditions to exercise the backstop rights under the Initial RSA. As a result of the foregoing, the Company faced a funding shortfall of approximately $142 million for the refinancing. The Backstop Parties were unable to fund the deficiency and instead the Company and its stakeholders entered into further negotiations regarding a potential consensual path forward.

 Following extensive, good faith negotiations, the parties mutually agreed to implement a new consensual transaction that would account for the Company's financing needs.

### E.    Entry into the Restructuring Support Agreement

The Company and the Crossover Group commenced negotiations regarding the optimal path forward for the Company. After extensive, arm's-length negotiations, on August 21, 2022, the Debtors and the parties to the Initial RSA terminated the Initial RSA and certain of their lenders, including the Crossover Group, entered into the new Restructuring Support Agreement with the Sponsor. The Restructuring Support Agreement provides for a comprehensive in-court restructuring whereby the Restructuring Transactions would be implemented through an equity rights offering, entry into a new term loan facility and a new asset based revolving facility, and a debt-for-equity exchange, as further detailed herein and in the Plan. Importantly, the Restructuring Support Agreement provided that all general unsecured claims, including employee and vendor obligations, would be paid in full in cash or reinstated.

The Restructuring Support Agreement provides for the reorganization of the Debtors as a going concern with a substantially deleveraged capital structure and sufficient liquidity to implement the Debtors' go-forward business plan. Consummation of the Restructuring Transactions will reduce the Debtors' funded debt obligations by more than $470 through an equitization of the Second Lien Term Loan Claims, and will provide the Debtors with up to $75 million of new money through the Rights Offering. The Restructuring Support Agreement represents the successful culmination of months of restructuring efforts and a significant compromise and continued commitment to the Debtors' future by its key creditor constituencies.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS RELATING TO THE RESTRUCTURING TRANSACTIONS AND POTENTIAL CHAPTER 11 CASES

### A.    Proposed Timeline

As part of the Restructuring Support Agreement, the Debtors agreed to the following milestones to ensure an orderly, timely implementation of the Restructuring Transactions:

| Event | Date |
|---|---|
| Voting Record Date and Rights Offering Record Date | August 15, 2022 |
| Solicitation Commencement Date | August 21, 2022 |
| Voting Deadline and Rights Offering Subscription Deadline | August 22, 2022, at 12:00 p.m., prevailing Eastern Time |
| Petition Date | No later than August 23, 2022 |
| Plan and Disclosure Statement to be filed with the Bankruptcy Court | No later than two (2) Business Days after the Petition Date |
| Entry of the Interim DIP Order | No later than three (3) Business Days after the Petition Date |
| Entry of the Confirmation Order | No later than forty-five (45) days after the Petition Date |
| Entry of the Final DIP Order | No later than forty-five (45) days after the Petition Date |
| Occurrence of the Plan Effective Date | No later than sixty (60) days after the Petition Date |

### B.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors intend to file several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, facilitating the continuation of the Debtors' relationships with employees, vendors, and customers in the ordinary course following the commencement of the Chapter 11 Cases.  In such event, the First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/Carestream.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      **There Is a Risk of Termination of the Restructuring Support Agreement**

The Restructuring Support Agreement contains provisions that give the Restructuring Support Parties (collectively or individually, as applicable) the ability to terminate the Restructuring Support Agreement upon the occurrence of certain events or if certain conditions are not satisfied, including the Debtors' failure to use commercially reasonable efforts to achieve certain milestones. To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

2.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

4.      **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable non-bankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule,

or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 5. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them or Interests would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance acceptable to the Required Lenders (as defined in the Restructuring Support Agreement)), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 7. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being

determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may, with the consent of the Required Lenders (which consent shall not be unreasonably withheld), request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 8.    Continued Risk Upon Confirmation

**B.    Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, changes in interest rates, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the products and services the Debtors provide, and increasing expenses. *See* Article VIII.D of this Disclosure Statement, entitled "Risks Related to the Offer and Issuance of Securities Under the Plan.**

### 1.    A Liquid Trading Market for the Shares of New Common Stock May Not Develop

The New Common Stock (including the New Common Stock issued on account of the DIP Equitization Recovery, the DIP Rollover Premium and the Management Incentive Plan, and the Rights Offering New Common Stock) will be a new issuance of Securities, and there is no established trading market for those Securities. The Debtors do not intend to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system. You may not be able to sell your New Common Stock at a particular time or at favorable prices. As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock. Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock indefinitely. If a trading market were to develop, future trading prices of the New Common Stock may be volatile and will depend on many factors, including: (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities.

### 2.    Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities

The shares of New Common Stock (including the New Common Stock issued on account of the DIP Equitization Recovery and the DIP Rollover Premium, but excluding the Rights Offering New Common Stock and the New Common Stock issued on account of the Management Incentive Plan) being issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) only to the extent that such exemption under section 1145 of the Bankruptcy Code is not available (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act.

Securities issued in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and

(a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable by any holder thereof that, at the time of transfer, (1) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (2) has not been such an "affiliate" within ninety (90) days of such transfer, (3) has not acquired such securities from an "affiliate" within one year of such transfer and (4) is not an entity that is an "underwriter."

The New Common Stock will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities.  *See* Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 45.

### 3.    Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that Securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.

Under Rule 144 of the Securities Act, the resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding ninety (90) days may resell restricted securities under Rule 144 after a one-year holding period.  An affiliate may resell restricted securities after a one-year holding period in a resale under Rule 144, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.

The Rights Offering New Common Stock and New Common Stock issued on account of the Management Incentive Plan will be issued pursuant to section 4(a)(2) under the Securities Act. Accordingly, shares of Rights Offering New Common Stock will be deemed "restricted securities," and, as such, subject to the transfer restrictions described in the above paragraph and discussed in more detail in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 45.

### 4.    Holders of the New Common Stock May Not Have Access to the Same Level of Information Available to Holders of Registered Securities

The New Common Stock will not be registered under the Securities Act or any state securities laws and the Debtors do not intend to exchange the New Common Stock in an exchange offer registered under the Securities Act.  As a result, the Reorganized Debtors will not be subject to the reporting requirements of the Securities Act or the Exchange Act, and the information available to Holders of the New Common Stock may be less than would be required if the New Common Stock were registered.  Such a reduced availability of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock.

### 5.     The Debtors Could Modify the Rights Offering Procedures

Subject to the written consent of the Required DIP Lenders and the Required Consenting Second Lien Lenders, the Debtors may modify the Rights Offering Procedures to among other things, include additional procedures, as needed, to effectuate the Rights Offering and to issue the shares of Rights Offering New Common Stock.  Such modifications may adversely affect the rights of Rights Offering Participants.

### 6.     The Restructuring Support Agreement May Be Terminated and Thus Terminate the Rights Offering

The Restructuring Support Agreement may be terminated upon the occurrence of certain events. Termination of the Restructuring Support Agreement will result in termination of the Rights Offering. Additionally, the consummation of the Rights Offering is subject to approval by the Bankruptcy Court, and there is no guarantee that the Bankruptcy Court will grant its approval.

Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 38.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.     The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.   The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.      **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.      **Contingencies Could Affect Distributions to Holders of Allowed Claims**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

10.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization. The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

11.     **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

Although the prepackaged Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy

proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.  There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities;

- key customers may choose to switch to a competitor; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases.  If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

  **12.**  **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or met, the Effective Date will not take place.

  **13.**  **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

 **C.**  **Risks Related to Recoveries under the Plan**

  **1.**  **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the

Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

>## 2.        The New Common Stock is Subject to Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution by the Management Incentive Plan.

>## 3.        Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Assuming that the Effective Date occurs, Holders of Claims who receive distributions representing a substantial percentage of the aggregate outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the Holders of shares of New Common Stock, including, among other things, the election of directors, pursuant to the terms of the New Organizational Documents (including the New Stockholders Agreement). The Holders may have interests that differ from those of the other Holders of shares of New Common Stock and may vote in a manner adverse to the interests of other Holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock. Such actions by Holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

>## 4.        Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement entitled "Certain United States Federal Income Tax Consequences of the Plan" which begins on page 49, to determine how certain tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and certain Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

>## 5.        The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under applicable law or otherwise. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

D.       **Risks Related to the Offer and Issuance of Securities Under the Plan.**

1.       **A Liquid Trading Market for the Shares of New Common Stock May Not Develop**

The New Common Stock (including the New Common Stock issued on account of the DIP Equitization Recovery, the DIP Rollover Premium and the Management Incentive Plan, and the Rights Offering New Common Stock) will be a new issuance of Securities, and there is no established trading market for those Securities.  The Debtors do not intend to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  You may not be able to sell your New Common Stock at a particular time or at favorable prices.  As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock.  Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock indefinitely.  If a trading market were to develop, future trading prices of the New Common Stock may be volatile and will depend on many factors, including: (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities.

2.       **Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

The shares of New Common Stock (including the New Common Stock issued on account of the DIP Equitization Recovery and the DIP Rollover Premium, but excluding the Rights Offering New Common Stock and the New Common Stock issued on account of the Management Incentive Plan) being issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) only to the extent that such exemption under section 1145 of the Bankruptcy Code is not available (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act.

Securities issued in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable by any holder thereof that, at the time of transfer, (1) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (2) has not been such an "affiliate" within ninety (90) days of such transfer, (3) has not acquired such securities from an "affiliate" within one year of such transfer and (4) is not an entity that is an "underwriter."

The New Common Stock will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities.  *See* Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 45.

3.       **Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies**

To the extent that Securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise

transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.

Under Rule 144 of the Securities Act, the resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding ninety (90) days may resell restricted securities under Rule 144 after a one-year holding period. An affiliate may resell restricted securities after a one-year holding period in a resale under Rule 144, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.

The Rights Offering New Common Stock and New Common Stock issued on account of the Management Incentive Plan will be issued pursuant to section 4(a)(2) under the Securities Act. Accordingly, shares of Rights Offering New Common Stock will be deemed "restricted securities," and, as such, subject to the transfer restrictions described in the above paragraph and discussed in more detail in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 45.

### 4. Holders of the New Common Stock May Not Have Access to the Same Level of Information Available to Holders of Registered Securities

The New Common Stock will not be registered under the Securities Act or any state securities laws and the Debtors do not intend to exchange the New Common Stock in an exchange offer registered under the Securities Act. As a result, the Reorganized Debtors will not be subject to the reporting requirements of the Securities Act or the Exchange Act, and the information available to Holders of the New Common Stock may be less than would be required if the New Common Stock were registered. Such a reduced availability of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock.

### 5. The Debtors Could Modify the Rights Offering Procedures

Subject to the written consent of the Required DIP Lenders and the Required Consenting Second Lien Lenders, the Debtors may modify the Rights Offering Procedures to among other things, include additional procedures, as needed, to effectuate the Rights Offering and to issue the shares of Rights Offering New Common Stock. Such modifications may adversely affect the rights of Rights Offering Participants.

### 6. The Restructuring Support Agreement May Be Terminated and Thus Terminate the Rights Offering

The Restructuring Support Agreement may be terminated upon the occurrence of certain events. Termination of the Restructuring Support Agreement will result in termination of the Rights Offering. Additionally, the consummation of the Rights Offering is subject to approval by the Bankruptcy Court, and there is no guarantee that the Bankruptcy Court will grant its approval.

E.       **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

1.       **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, obligations under the New Term Loan Facility upon emergence. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

2.       **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a Chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.       **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and

growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  If the chapter 11 proceedings last longer than anticipated, the Debtors may require debtor-in-possession financing to fund the Debtors' operations.  If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.        Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 5.        Recent Global Economic Trends, Especially in Response to the COVID-19 Pandemic, Could Adversely Affect the Debtors' Business, Results of Operations, and Financial Condition

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations, and financial condition, primarily through disrupting the labor pool and their customers' businesses.  Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services.  In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' business may adversely affect the Debtors' ability to fill all workforce positions needed to support future growth, as well the Debtors' customers' level of spending, ability to obtain financing for purchases, and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak. Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure. The Debtors are closely monitoring developments in connection with this outbreak. Restrictions on travel, quarantines and other measures imposed in response to the COVID-19 outbreak, as well as ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain shortages and other business disruptions. The Debtors expect the outbreak will materially affect results in the current and potentially future operating periods; however, the duration and extent of potential supply chain, demand, and other disruptions is highly uncertain and will depend on future developments with respect to the spread and severity of the virus. An extended period of further economic deterioration could exacerbate the other risks described herein.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations. These have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely affected.

### 6.    The Reorganized Debtors May Not Be Able to Implement the Business Plan

While the Debtors believe that consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan. In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base. Given the nature of the Debtors' customer arrangements, there can be no assurance that the Reorganized Debtors will maintain and grow their customer base. The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

### 7.    The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 8.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the imaging and materials industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels

could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

## IX.    SOLICITATION, VOTING, AND RELATED MATTERS

This Disclosure Statement is being distributed to Holders of First Lien Claims and Holders of Second Lien Term Loan Claims in connection with the solicitation of votes to accept or reject the Plan. This Disclosure Statement is accompanied by a ballot to be used for voting on the Plan.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 3, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 and Class 4 (collectively, the "**Voting Classes**").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, if the Plan is confirmed and consummated, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, 8, or 9.

### B.    Voting Record Date

**The Voting Record Date is August 15, 2022** (the "**Voting Record Date**").  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is August 22, 2022 at 12:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.  Ballots and consent forms may be delivered to the Solicitation Agent by **one** of the following methods:

**By Regular Mail, Overnight Mail, or Hand Delivery to:**

Carestream Health, Inc. Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

*By electronic mail at:*
CarestreamBallots@kccllc.com
*By telephone at:*
(877) 709-4750 (toll free) or (424) 236-7230 (international)

---

**If you have any questions about the voting process, please contact the Solicitation Agent at (877) 709-4750 (toll free) or (424) 236-7230 (international) or via electronic mail to CarestreamBallots@kccllc.com.**

---

### D.    Ballots and Consent Forms Not Counted

**No ballot will be counted toward Confirmation of the Plan if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to any person or entity other than the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to your ballot for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE IX OF THE DISCLOSURE STATEMENT WILL NOT BE COUNTED.**

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of their advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7

of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of AlixPartners and Houlihan Lokey, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as **Exhibit D** and incorporated herein by reference. Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 27, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

---

[8]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it so long as the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may, with the prior consent of the Required Lenders (which consent shall not be unreasonably withheld), request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of

the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors pursue "cramdown" of the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, for all Plan Classes, the Plan either (a) provides substantially equivalent treatment to Classes of equal rank; or (b) treats Classes of equal rank differently only to the extent necessary for the Debtors' successful reorganization under the Plan, including a consideration of commercial imperatives for the go-forward business. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Reorganized Debtors

The Restructuring Transactions contemplate, among other things, the Debtors' raising up to an aggregate principal amount of $75 million of New Common Stock through the Rights Offering. The Rights Offering is the product of extensive, arm's-length negotiations between the Debtors and the other parties to the Restructuring Support Agreement, all sophisticated financial institutions familiar with the Debtors' business and operations.

Based on the Rights Offering, the Reorganized Debtors' imputed equity value at emergence is approximately $213 million, as provided in the Valuation Analysis attached hereto as **Exhibit E**. This imputed valuation is not, and is not to be construed as, (1) a recommendation to any Holder of Claims as to how to vote on, or otherwise act with respect to, the Plan; (2) an opinion as to the fairness from a financial point of view of the consideration to be received pursuant to the Restructuring Transactions; or (3) an appraisal of the assets of the Reorganized Debtors. Additionally, this imputed valuation should also be considered in conjunction with the risk factors described in Article VIII of this Disclosure Statement and the Financial Projections attached hereto as **Exhibit C**.

## XI.    CERTAIN SECURITIES LAW MATTERS

The Debtors believe that New Common Stock, including the New Common Stock issued on account of the DIP Equitization Recovery and the DIP Rollover Premium and the Rights Offering New Common Stock, to be issued under the Plan will constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "**Blue Sky Law**"). The Debtors further believe that the offer, sale, issuance and initial distribution of the New Common Stock Reorganized Holdings pursuant to the Plan is exempt from federal and state securities registration requirements under the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law, as described in more detail below. New Common Stock issued in connection with the Management Incentive Plan will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The following discussion of the issuance and transferability of the New Common Stock relates solely to matters arising under federal and state securities laws. The rights of holders of New Common Stock, including the right to transfer such interests, will also be governed by the New Organizational Documents (including the Stockholders Agreement).

A.    **Issuance of Securities under the Plan**

As discussed herein, the Plan provides for the Reorganized Holdings' distribution of New Common Stock to (1) Holders of an Allowed Second Lien Term Loan Claim, (2) Rights Offering Participants, upon exercise of the Subscription Rights, pursuant to the terms of the Rights Offerings Procedures, (3) Holders of an Allowed DIP Claim pursuant to the DIP Equitization Recovery and the DIP Rollover Premium, and (4) in each case, on the Effective Date. The shares of New Common Stock, other than the Rights Offering New Common Stock and the New Common Stock issued in connection with the Management Incentive Plan, are referred to herein as "**1145 Securities**."  The shares of Rights Offering New Common Stock and the New Common Stock issued in connection with the Management Incentive Plan are referred to herein as "**Non-1145 Securities**."

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the issuance of the 1145 Securities in exchange for the Claims (excluding, for the avoidance of doubt, the Rights Offering New Common Stock) described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

All Non-1145 Securities will be issued in reliance upon section 4(a)(2) of the Securities Act. Any shares of New Common Stock issued in reliance on section 4(a)(2) of the Securities Act will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

No registration statement for the 1145 Securities or the Non-1145 Securities will be filed under the Securities Act or any state securities laws.  Recipients of the 1145 Securities and the Non-1145 Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

B.    **Subsequent Transfers of 1145 Securities**

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act,

includes as "statutory underwriters" any person who, directly or indirectly, through one or more intermediaries, control, are controlled by, or any person under direct or indirect common control with, an issuer of securities. As a result, reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer, director, or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities, through contract or otherwise. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law. Under certain circumstances, holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell their 1145 Securities in a public resale pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public resale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met, if applicable. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to any 1145 Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the 1145 Securities and, in turn, whether any Person may freely resell the 1145 Securities.

## C.    Resales of Non-1145 Securities

The Rights Offering New Common Stock that constitute Non-1145 Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws. Generally, Rule 144 of the Securities Act would permit the resale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer or has been an affiliate within the preceding ninety (90) days, if volume limitations and manner of sale requirements are met. The Debtors express no view as to whether any person may freely resell any Non-1145 Securities.

All Non-1145 Securities will be issued in certificated or book-entry form and will bear a restrictive legend. Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any Non-1145 Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], AND THE OFFER AND SALE OF THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN

EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND APPLICABLE STATE SECURITIES LAWS."

The Reorganized Debtors will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Non-1145 Securities. The Reorganized Debtors will also reserve the right to stop the transfer of any Non-1145 Securities if such transfer is not in compliance with Rule 144 or another applicable exemption from registration.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock, including the Rights Offering New Common Stock and the New Common Stock issued on account DIP Equitization Recovery and the DIP Rollover Premium, are exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the 1145 Securities and the Non-1145 Securities will also be subject to any applicable transfer restrictions contained in the New Organizational Documents (including the New Stockholders Agreement).

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

     **D.**     **New Common Stock & Management Incentive Plan**

The Confirmation Order shall authorize the board of the Reorganized Holdings to adopt and enter into the Management Incentive Plan, which shall reserve 11.5% of the fully-diluted and fully-distributed New Common Stock for issuance pursuant to the Management Incentive Plan. The issuance of New Common Stock pursuant to the Management Incentive Plan will dilute all of the New Common Stock outstanding at the time of such issuance. The New Common Stock is also subject to dilution in connection with the conversion of any other options, warrants, convertible securities or other securities that may be issued post-emergence. New Common Stock issued under the Management Incentive Plan will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

XII.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

A.    **Introduction**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, Reorganized Debtors, and to certain Holders. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Changes in these rules or new interpretations of the rules with retroactive effect could significantly affect the U.S. federal income tax consequences described herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors have not requested, and do not intend to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, Holders that are pass-through entities and beneficial owners of such Holders, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons using a mark-to-market method of tax accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds such Claims only as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Reorganized Debtors, and Holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, (b) of Administrative Claims or DIP Claims, or (c) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

    **B.**    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Debtors.**

        **1.**    **Characterization of the Restructuring Transactions**

The transactions undertaken pursuant to the Plan are expected to be treated as a recapitalization of the Debtors.  As a result, it is not expected that the Debtors will currently recognize gain or loss as a result of the Restructuring Transactions other than as a result of cancellation of indebtedness income ("COD Income") (as described immediately below).  The Debtors' tax attributes will, subject to the rules discussed below regarding COD Income and section 382 of the IRC, survive the restructuring process and carry over to the Reorganized Debtors.

        **2.**    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the issue price of any new debt instruments of the taxpayer issued, (ii) the fair market value of other non-cash consideration (including stock of the taxpayer or a party related to the taxpayer), and (iii) the amount of cash, in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income pursuant to section 108 of the IRC if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the

Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer must reduce its net operating losses ("NOLs") and certain other tax attributes (collectively, "Tax Attributes") and aggregate tax basis in assets (including the stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in Tax Attributes and aggregate tax basis occurs only after the tax for the year of the debt discharge has been determined. In general, Tax Attributes and aggregate tax basis will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Interest expense deductions allowable under section 163(j) of the IRC (and carryforwards of any such deductions) ("163(j) Deductions") are not subject to reduction under these rules. Any excess COD Income over the amount of available items described in clauses (a) through (g), above, will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The Debtors are expected to realize COD Income in connection with the Restructuring Transactions, with an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Debtors' liabilities, as determined for these purposes, immediately after the Effective Date). The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of new debt instruments and the value of non-cash consideration, neither of which can be determined until after the Plan is consummated. As a result, the total amount of attribute reduction as a result of the Plan cannot be determined until after the Effective Date. Depending on the amount of COD Income, some of the Reorganized Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and other tax attributes.

### 3.    Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes

After giving effect to the reduction in Tax Attributes and aggregate tax basis pursuant to excluded COD Income, the ability of the Reorganized Debtors to use any remaining Tax Attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the IRC as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change" as defined under section 382 of the IRC, the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain

adjustments) before the ownership change. While proposed Treasury Regulations could significantly modify the calculation and treatment of net unrealized built-in gains and losses, those regulations are not expected to apply to the Reorganized Debtors, and the remainder of this discussion assumes they will not apply.[9]

The rules of section 382 of the IRC are complicated, but an ownership change is expected to occur as a result of the Restructuring Transactions. If such an ownership change occurs, the ability of the Reorganized Debtors to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

(a)      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation (or parent of the consolidated group) immediately before the "ownership change" (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 2.54 percent for August 2022). Under certain circumstances, the annual limitation may be increased to the extent that the corporation (or parent of the consolidated group) has an overall built-in gain in its assets at the time of the ownership change. If the corporation or consolidated group has such "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized (or, according to the currently effective IRS Notice 2003-65, treated as recognized) during the following five year period (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its otherwise applicable annual limitation. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

---

[9]      The IRS issued proposed regulations in September 2019 that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the IRC are calculated. The changes would decrease the limitation set forth in section 382 of the IRC in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses. Additionally, the IRS issued further proposed regulations in January 2020 that would provide certain transition relief for the application of any finalized regulation. Under such transition relief, any finalized regulations would apply only to ownership changes occurring 31 days after the regulations are finalized and certain specified and identifiable transactions would be subject to a "grandfathering" rule that allows for application of the prior IRS Notice 2003-65 rules. Additionally, the "grandfathering" rule would also apply as long as a company files its chapter 11 case on or before the day that is 31 days following the issuance of final regulations, even where the applicable ownership change occurs more than 31 days after finalization of the regulations. The Debtors cannot predict whether these proposed regulations will be finalized (or in what form) prior to the filing of the chapter 11 cases.

(b)    **Special Bankruptcy Exceptions**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis but, instead, NOL carryforwards and carryforwards of disallowed 163(j) Deductions would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of the stock of a debtor corporation that undergoes an "ownership change" to be determined immediately before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards and carryforwards of disallowed 163(j) Deductions by the amount of interest deductions claimed within the prior three-year period (and during the part of the taxable year prior to and including the effective date of the plan of reorganization), and a debtor corporation may undergo another change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not yet determined whether they qualify for, or if so whether they will elect out of, the 382(l)(5) Exception.  Regardless of whether the Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the use of their Pre-Change Losses (if any) after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

C.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to certain U.S. Holders of Claims will depend, in part, on whether, for U.S. federal income tax purposes, (a) the Claim surrendered constitutes a "security" of a Debtor, and (b) the consideration received constitutes stock or a "security" of the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).

Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

**Due to the inherently factual nature of the determination, if relevant based on the form of the Restructuring Transactions, U.S. Holders are urged to consult their own tax advisors regarding the status of their Claims or the consideration received under the Plan as "securities" for U.S. federal income tax purposes**.

1.    **Consequences to Holders of First Lien Claims (Class 3)**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed First Lien Claim shall receive (1) the First Lien Cash Recovery; and (2) its Pro Rata share of the New Term Loan Facility; unless such Holder elects the ABL Roll Option or receives the ABL Backstop Roll Option in which case such Holder shall receive a share of the New ABL Facility and may receive First Lien Cash Recovery and a share of the New Term Loan Facility, as described in the Plan.

If (a) the First Lien Claims constitute "securities," and  (b) a U.S. Holder receives a share of the New Term Loan Facility and/or New ABL Facility and such New Term Loan Facility and/or New ABL Facility received by the U.S. Holder, as applicable, constitutes a "security," then a U.S. Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a transaction treated as a "recapitalization" for U.S. federal income tax purposes, with the receipt of (1) any First Lien Cash Recovery, if applicable, and (2) any New Term Loan Facility or New ABL Facility that does not constitute a "security," as applicable, each treated as "boot" in such recapitalization. A U.S. Holder of such Claim should not recognize loss, but should recognize gain to the extent of the lesser of (a) the amount of any "boot" received, if applicable, and (b) (i) the sum of (1) the amount of any First Lien Cash Recovery received, if applicable, and (2) the issue price of any New Term Loan Facility and/or New ABL Facility received, as applicable, (determined as discussed below under "—*U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Term Loan Facility and the New ABL Facility— Original Issue Discount*"), minus (ii) the U.S. Holder's adjusted tax basis in its Allowed First Lien Claim. In general, a U.S. Holder would obtain an initial tax basis in its share of the New Term Loan Facility and/or New ABL Facility received in the exchange that constitutes a "security," as applicable, equal to its adjusted tax basis in its existing Claim surrendered (excluding any amounts attributable to accrued but untaxed interest on the applicable existing Claim), increased by the amount of any gain recognized pursuant to such exchange and decreased by the amount of any "boot" received, if applicable. A U.S. Holder should obtain a tax basis in any New Term Loan Facility or New ABL Facility that does not constitute a "security," if applicable, equal to its issue price. If the New Term Loan Facility or New ABL Facility constitutes a "security," a U.S. Holder's holding period for its interest in such New Term Loan Facility and/or New ABL Facility received, as applicable, should include the holding period for the Claim exchanged therefor. If any New Term Loan Facility or New ABL Facility received does not constitute a "security," a U.S. Holder's

holding period for its interests in such New Term Loan Facility or New ABL Facility received, if applicable, should begin on the day following the date the U.S. Holder receives such interest.

If either (a) the First Lien Claims do not constitute "securities," or (b) none of the New Term Loan Facility nor New ABL Facility received by a U.S. Holder constitute a "security," then, a U.S. Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. The U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (i) the issue price of any New Term Loan Facility and/or New ABL Facility received, as applicable, and (ii) the amount of any First Lien Cash Recovery received, if applicable, and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The holding period for any interest in the New Term Loan Facility and/or New ABL Facility received in the exchange, as applicable, should begin on the day following the date the U.S. Holder receives such interest. A U.S. Holder should obtain a tax basis in any New Term Loan Facility and/or New ABL Facility, as applicable, equal to its issue price.

U.S. Holders should consult their own tax advisers regarding the treatment of the Restructuring Transactions for U.S. federal income tax purposes. To the extent that any amount received by a U.S. Holder of a First Lien Claim under the Plan is attributable to accrued interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a First Lien Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on First Lien Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to First Lien Claims will be allocated first to the principal amount of First Lien Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of First Lien Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

U.S. Holders should consult their own tax advisers regarding the treatment of the Restructuring Transactions for U.S. federal income tax purposes.

### 2.    Consequences to Holders of Second Lien Term Loan Claims (Class 4)

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed Second Lien Term Loan Claim shall receive (1) its Pro

Rata share of 10% of the New Common Stock, subject to dilution on account of the Management Incentive Plan; and (2) its Pro Rata share of the Rights Offering Subscription Rights.

Each U.S. Holder of Second Lien Term Loan Claims will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. The U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of the consideration received in the exchange and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The holding period for the New Common Stock and Rights Offering Subscription Rights received in the exchange should begin on the day following the date the U.S. Holder receives such New Common Stock and Rights Offering Subscription Rights. A U.S. Holder should obtain a tax basis equal to the fair market value of such New Common Stock and Rights Offering Subscription Rights received.

The characterization of the Rights Offering Subscription Rights and their subsequent exercise for U.S. federal income tax purposes—as simply the exercise of options to acquire the property that is subject to the Rights Offering Subscription Rights or, alternatively, as an integrated transaction pursuant to which the applicable option consideration is acquired directly in partial satisfaction of a U.S. Holder's Claim—is uncertain. Although the issue is not free from doubt, this discussion assumes that the exchange of a Claim for the Subscription Rights (along with the other consideration under the Plan) is a separately identifiable step from the exercise of such Subscription Rights.

A U.S. Holder that elects to exercise its Rights Offering Subscription Rights should be treated as purchasing, in exchange for its Rights Offering Subscription Rights and the amount of cash funded by such U.S. Holder to exercise such Rights Offering Subscription Rights, the New Common Stock that it is entitled to with respect thereto. Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Rights Offering Subscription Rights. A U.S. Holder's holding period for the New Common Stock received pursuant to such exercise should begin on the day following the exercise date. A U.S. Holder should obtain a tax basis in such New Common Stock equal to the sum of (i) such U.S. Holder's tax basis in the Rights Offering Subscription Rights exercised and (ii) the cash funded by such U.S. Holder to exercise such Rights Offering Subscription Rights.

A U.S. Holder that elects not to exercise its Rights Offering Subscription Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such Rights Offering Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their Rights Offering Subscription Rights should consult with their own tax advisors as to the tax consequences of such decision.

U.S. Holders should consult their own tax advisers regarding the treatment of the Restructuring Transactions for U.S. federal income tax purposes. To the extent that any amount received by a U.S. Holder of a Second Lien Term Loan Claim under the Plan is attributable to accrued interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Second Lien Term Loan Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt

instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Second Lien Term Loan Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Second Lien Term Loan Claims will be allocated first to the principal amount of Second Lien Term Loan Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest.  Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Second Lien Term Loan Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 3.    Market Discount

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim.  Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory *de minimis* amount.  Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues.  For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim.  To the extent that Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.  U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Restructuring Transactions.

### 4.    U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock

#### (a)    Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### (b)    Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year, taking into account the holding period rules described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

For a discussion of the potential "dividend equivalence" rules to redemptions or repurchases of the New Common Stock, see below.

### 5.    U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Term Loan Facility and the New ABL Facility

### (a)    Payments of Qualified Stated Interest

Payments or accruals on the New Term Loan Facility and the New ABL Facility, to the extent constituting "qualified stated interest" (as defined below), may be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the New Term Loan Facility or the New ABL Facility, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

### (b)    Original Issue Discount

A debt instrument may be treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the applicable debt instrument multiplied by the number of complete years to maturity from the original issue date, or if the debt instrument provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity of the debt instrument (as determined under applicable Treasury Regulations). If the New Term Loan Facility or the New ABL Facility is treated as issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Term Loan Facility or the New ABL Facility, in advance of the receipt of

the cash attributable to such OID and regardless of the U.S. Holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Term Loan Facility or the New ABL Facility that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the New Term Loan Facility or the New ABL Facility is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID generally will be treated as gain from the sale of the New Term Loan Facility or the New ABL Facility, and a pro rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Term Loan Facility or the New ABL Facility.

As a general matter, in determining the "issue price" of the New Term Loan Facility and the New ABL Facility, (a) if the New Term Loan Facility or the New ABL Facility is "publicly traded," then the trading value of the New Term Loan Facility or the New ABL Facility determines its issue price; (b) if the New Term Loan Facility or the New ABL Facility is not "publicly traded," but the First Lien Claim exchanged therefore is "publicly traded," the trading value of the First Lien Claim exchanged therefore determines its issue price (unless such trading values represent mere indicative quotes and a position is established that demonstrates that such indicative quote materially misrepresented the fair market value of such property); and (c) if neither the New Term Loan Facility nor the New ABL Facility nor the First Lien Claim exchanged therefore is "publicly traded," the issue price of the New Term Loan Facility or the New ABL Facility would be its stated redemption price at maturity.  New debt instruments (or Claims against the Debtors) may be "publicly traded" for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such new debt or Claims. Whether the New Term Loan Facility or the New ABL Facility will be "publicly traded" for these purposes cannot be predicated with certainty.

### (c)      Acquisition Premium or Amortizable Bond Premium on New Term Loan Facility and the New ABL Facility

If a U.S. Holder's initial tax basis in the New Term Loan Facility or the New ABL Facility is greater than the issue price of such debt but less than the stated principal amount of such debt, such New Term Loan Facility or the New ABL Facility will have an "acquisition premium."  Under the acquisition premium rules, the amount of original issue discount that must be included in gross income with respect to the applicable New Term Loan Facility or the New ABL Facility for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.  Alternatively, if a U.S. Holder's initial tax basis in the New Term Loan Facility or the New ABL Facility exceeds its stated principal amount, the U.S. Holder will be considered to have acquired the New Term Loan Facility or the New ABL Facility with "amortizable bond premium" and will not be required to include any original issue discount in income. A U.S. Holder may generally elect to amortize the bond premium over the remaining term of the New Term Loan Facility or the New ABL Facility on a constant yield method as an offset to stated interest when includible in income under such Holder's regular accounting method.  If a U.S. Holder elects to amortize bond premium, such Holder must reduce its tax basis in the New Term Loan Facility or the New ABL Facility by the amount of the premium used to offset stated interest.  If a U.S. Holder does not elect to amortize the bond premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the New Term Loan Facility or the New ABL Facility.  If a U.S. Holder's initial tax basis in the New Term Loan Facility or the New ABL Facility is less than the issue price of such debt, see the "market discount" discussion above.

### (d)      Sale, Taxable Exchange or other Taxable Disposition

Upon the disposition of the New Term Loan Facility or the New ABL Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts

attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the U.S. Holder's adjusted tax basis in the New Term Loan Facility or the New ABL Facility.  The calculation of a U.S. Holder's adjusted tax basis in the New Term Loan Facility or the New ABL Facility is discussed above.  A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income and decreased by any payments on the New Term Loan Facility or the New ABL Facility other than qualified stated interest.  A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the New Term Loan Facility or the New ABL Facility for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

### 6.    Application of Dividend Equivalence Rules

The discussions above regarding the treatment of redemptions and repurchases of the New Common Stock are subject to the potential application of the "dividend equivalence" rules.  As a general matter, if an issuer repurchases or redeems stock, such redemption or repurchase is treated as a sale and subject to the rules discussed above.  However, in certain circumstances, a repurchase or redemption will be recharacterized as a distribution that is potentially subject to the dividend taxation rules discussed above.  In general, such circumstances apply where the interest of a holder of stock being repurchased or redeemed in the earnings and profits of the issuer is not being sufficiently changed as a result of such repurchase or redemption.  Particularly in the context of a company that is not publicly traded, this analysis is fact-specific and takes into account, among other things, a particular holder's overlapping shareholdings in multiple series of stock.  Accordingly, Holders of Claims receiving New Common Stock must take these dividend equivalence rules into account in evaluating the consequences of future repurchases and redemptions.

### 7.    Limitations on Use of Capital Losses

A U.S. Holder who recognizes capital losses will be subject to limits on their use of capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 8.    Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their own tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

**D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder and the ownership and disposition of the New Common Stock, the New Term Loan Facility and the New ABL Facility, as applicable.

**1.    Gain Recognition**

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock**

**(a)    Dividends on New Common Stock**

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, such dividends paid with respect to stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to stock held by a Non-U.S. Holder that are effectively

connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### (b)        Sale, Redemption, or Repurchase of New Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of stock unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such stock is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  With respect to the third exception, the Debtors consider it unlikely, based on their current business plan and operations, that such rules currently apply or will apply in the future.

### 3.        U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including Amounts Paid to Such Non-U.S. Holders under the Plan) and of Owning and Disposing of the New Term Loan Facility and the New ABL Facility

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the New Term Loan Facility or the New ABL Facility.  Non-U.S. Holders should consult their own tax advisors regarding the application of these rules.

(a)     **Payments of Interest (Including OID and Interest Attributable to Accrued but Untaxed Interest, Including Amounts Paid to Non-U.S. Holders under the Plan)**

Subject to the discussion of backup withholding and FATCA, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power in the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but untaxed interest) or in the issuer of the New Term Loan Facility (in the case of interest payments with respect to the New Term Loan Facility) or the New ABL Facility (in the case of interest payments with respect to the New ABL Facility) within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;[10]

- the Non-U.S. Holder is not a controlled foreign corporation related to the issuer, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the issuer or the issuer's paying agent or other withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a non-U.S. person.

If all of these conditions are not met, interest on the New Term Loan Facility or the New ABL Facility paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the New Term Loan Facility or the New ABL Facility or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement (generally a properly executed IRS Form W-8ECI or suitable substitute or successor form or such other as the IRS may

---

[10]    Currently proposed legislation would change this test to apply to a holder that actually or constructively owns 10 percent or more of the total combined voting power or value of the relevant debt issuer. The legislation as currently proposed would apply prospectively to debt instruments issued after enactment of the legislation. The Debtors cannot predict whether any such legislation will be enacted prior to the issuance of the New Term Loan Facility or the New ABL Facility.

prescribe) is provided to the issuer or the issuer's paying agent or other withholding agent) unless an applicable income tax treaty provides otherwise. If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**(b)** **Sale, Taxable Exchange, or Other Disposition of the New Term Loan Facility or the New ABL Facility**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the New Term Loan Facility or the New ABL Facility (other than any amount representing accrued but untaxed interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the New Term Loan Facility or the New ABL Facility under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower treaty rate applies) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

**4.      FATCA**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source

interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW EQUITY.**

### E.    Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of page intentionally left blank.*]

## XIII.    RECOMMENDATION

In the opinion of the Debtors, the Restructuring Transactions are preferable to all other available alternatives, maximize the value of each Debtor's assets, and provide for the best recovery to the Debtors' stakeholders.  Accordingly, the Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated:  August 21, 2022                    Carestream Health, Inc.
                                           on behalf of itself and all other Debtors


                                           */s/  Scott H. Rosa*
                                           Name:  Scott H. Rosa
                                           Title:  Vice President and Chief Financial Officer

**<u>Exhibit A</u>**

**Plan of Reorganization**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) | Case No. 22-[____] (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF CARESTREAM HEALTH, INC., AND ITS DEBTOR AFFILIATES

> **THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:       ljones@pszjlaw.com
             tcairns@pszjlaw.com
             ecorma@pszjlaw.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Tricia Schwallier Collins (*pro hac vice* pending)
Yusuf U. Salloum (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:       patrick.nash@kirkland.com
             tricia.schwallier@kirkland.com
             yusuf.salloum@kirkland.com

-and-

Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-49000
Email:       nicole.greenblatt@kirkland.com
             rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

Dated:  August 21, 2022

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232).  The location of the Debtors' service address is:  150 Verona Street, Rochester, New York 14608.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW..................................................................................................1
    A.     Defined Terms. ...............................................................................................................1
    B.     Rules of Interpretation. .................................................................................................15
    C.     Computation of Time. ...................................................................................................15
    D.     Governing Law. .............................................................................................................16
    E.     Reference to Monetary Figures. ....................................................................................16
    F.     Reference to the Debtors or the Reorganized Debtors. .................................................16
    G.     Controlling Document. ..................................................................................................16
    H.     Consultation, Information, Notice, and Consent Rights................................................16

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS.......................................16
    A.     Administrative Claims. ..................................................................................................16
    B.     DIP Claims.....................................................................................................................17
    C.     Professional Fee Claims.................................................................................................18
    D.     Priority Tax Claims. .......................................................................................................18
    E.     Payment of Statutory Fees. ............................................................................................19
    F.     Payment of Certain Fees and Expenses.........................................................................19

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................19
    A.     Classification of Claims and Interests. ..........................................................................19
    B.     Treatment of Claims and Interests. ...............................................................................20
    C.     Special Provision Governing Unimpaired Claims. ........................................................23
    D.     Elimination of Vacant Classes. ......................................................................................23
    E.     Voting Record Date and Voting Deadline. .....................................................................23
    F.     Intercompany Interests. ..................................................................................................24
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..................24
    H.     Controversy Concerning Impairment..............................................................................24
    I.     Subordinated Claims and Interests. ................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN............................................24
    A.     General Settlement of Claims and Interests. ..................................................................24
    B.     Restructuring Transactions.............................................................................................25
    C.     Sources of Consideration for Plan Distributions. ..........................................................25
    D.     Corporate Existence. ......................................................................................................27
    E.     Vesting of Assets in the Reorganized Debtors. ..............................................................28
    F.     Cancellation of Existing Securities and Agreements. ....................................................28
    G.     Corporate Action............................................................................................................28
    H.     New Organizational Documents.....................................................................................29
    I.     New Stockholders Agreement........................................................................................29
    J.     Indemnification Obligations...........................................................................................29
    K.     Directors and Officers of the Reorganized Debtors. ......................................................30
    L.     Effectuating Documents; Further Transactions..............................................................30
    M.     Existing Letter of Credit Cash Collateralization. ..........................................................30
    N.     Section 1146 Exemption. ...............................................................................................30
    O.     Director and Officer Liability Insurance. .......................................................................31
    P.     Management Compensation Programs.............................................................................31
    Q.     Preservation of Causes of Action. ..................................................................................31
    R.     Release of Avoidance Actions. .......................................................................................32
    S.     Termination of Sponsor Management Arrangements. .....................................................32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............32
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................32

B. Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................................33
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.................................33
D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........34
E. Insurance Policies.......................................................................................................................34
F. Reservation of Rights..................................................................................................................35
G. Nonoccurrence of Effective Date................................................................................................35
H. Employee Compensation and Benefits.......................................................................................35
I. Contracts and Leases Entered Into After the Petition Date........................................................36

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..............................................................36
A. Distributions on Account of Claims Allowed as of the Effective Date........................................36
B. Disbursing Agent.......................................................................................................................36
C. Rights and Powers of Disbursing Agent.....................................................................................36
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions...................................37
E. Manner of Payment....................................................................................................................38
F. Indefeasible Distributions..........................................................................................................38
G. Securities Law Matters...............................................................................................................38
H. Compliance with Tax Requirements...........................................................................................39
I. Allocations..................................................................................................................................39
J. No Postpetition Interest on Claims.............................................................................................39
K. Foreign Currency Exchange Rate................................................................................................39
L. Setoffs and Recoupment............................................................................................................40
M. Claims Paid or Payable by Third Parties.....................................................................................40

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS ..............................................................................................41
A. Disputed Claims Process............................................................................................................41
B. Allowance of Claims...................................................................................................................41
C. Claims Administration Responsibilities.......................................................................................41
D. Estimation of Claims and Interests.............................................................................................42
E. Adjustment to Claims or Interests without Objection.................................................................42
F. Disallowance of Claims or Interests............................................................................................42
G. No Distributions Pending Allowance..........................................................................................42
H. Distributions After Allowance.....................................................................................................42

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .............................43
A. Discharge of Claims and Termination of Interests......................................................................43
B. **Release of Liens.**....................................................................................................................43
C. **Releases by the Debtors.** ......................................................................................................44
D. **Releases by the Releasing Parties.** .......................................................................................44
E. **Exculpation.**.........................................................................................................................45
F. **Injunction.**............................................................................................................................46
G. Protections Against Discriminatory Treatment............................................................................46
H. Document Retention...................................................................................................................46
I. Reimbursement or Contribution.................................................................................................46

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...........................................47
A. Conditions Precedent to the Effective Date. ..............................................................................47
B. Waiver of Conditions..................................................................................................................48
C. Effect of Failure of Conditions....................................................................................................48
D. Substantial Consummation.........................................................................................................48

ARTICLE X. EFFECT OF CONFIRMATION OF THE PLAN ................................................................48
A. Jurisdiction and Venue................................................................................................................48
B. Voting Report..............................................................................................................................49
C. Judicial Notice. ...........................................................................................................................49

| | | |
|---|---|---|
| D. | Transmittal and Mailing of Materials; Notice. | 49 |
| E. | Solicitation. | 49 |
| F. | Burden of Proof. | 49 |
| G. | Bankruptcy Rule 3016(a) Compliance. | 49 |
| H. | Compliance with the Requirements of Section 1129 of the Bankruptcy Code. | 50 |
| I. | Securities Under the Plan. | 54 |
| J. | Releases and Discharges. | 54 |
| K. | Release and Retention of Causes of Action. | 55 |
| L. | Approval of Restructuring Support Agreement and Other Restructuring Documents and Agreements. | 55 |
| M. | Confirmation Hearing Exhibits. | 55 |
| N. | Objections to Confirmation of the Plan. | 55 |
| O. | Retention of Jurisdiction. | 55 |
| P. | Plan Supplement. | 55 |

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........................ 55
| | | |
|---|---|---|
| A. | Modification and Amendments. | 55 |
| B. | Effect of Confirmation on Modifications. | 56 |
| C. | Revocation or Withdrawal of Plan. | 56 |

ARTICLE XII. RETENTION OF JURISDICTION ........................ 56

ARTICLE XIII. MISCELLANEOUS PROVISIONS ........................ 58
| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 58 |
| B. | Additional Documents. | 58 |
| C. | Statutory Committee and Cessation of Fee and Expense Payment | 58 |
| D. | Reservation of Rights. | 58 |
| E. | Successors and Assigns. | 59 |
| F. | Notices. | 59 |
| G. | Term of Injunctions or Stays. | 60 |
| H. | Entire Agreement. | 60 |
| I. | Plan Supplement. | 60 |
| J. | Nonseverability of Plan Provisions. | 60 |
| K. | Votes Solicited in Good Faith. | 61 |
| L. | Closing of Chapter 11 Cases. | 61 |
| M. | Waiver or Estoppel. | 61 |

# INTRODUCTION

Carestream Health, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (as may be altered, amended, modified, or supplemented from time to time in accordance with its terms and the Restructuring Support Agreement (as defined below), this "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates*. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion on the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*ABL Backstop Roll Option*" has the meaning given to such term in Article III.B.3 of the Plan.

2.    "*ABL Backstop Roll Option Funded Pool*" means an amount equal to the aggregate principal amount of Allowed First Lien Revolving Claims held by the New ABL Backstop Commitment Parties on the Effective Date, up to and not to exceed an amount equal to $36,265,790.

3.    "*ABL Funded Rollover Cap*" means an amount equal to (a) the total principal amount of the New ABL Facility (funded and unfunded commitments), multiplied by (b) 0.5579352, *less* (c) the ABL Backstop Roll Option Funded Pool; *provided*, *however*, that such amount may be adjusted with the consent of the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders if the total principal amount of the New ABL Facility (funded and unfunded commitments) is less than $85 million.

4.    "*ABL Roll Multiplier*" means a number equal to 0.7923227.

5.    "*ABL Roll Option*" has the meaning given to such term in Article III.B.3 of the Plan.

6.    "*ABL Roll Option Adjustment Amount*" means an amount equal to the aggregate principal amount of Allowed First Lien Revolving Claims that are rolled up into the New ABL Facility pursuant to (a) the ABL Roll Option and (b) the ABL Backstop Roll Option.

7.    "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) the Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

8. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

9. "*Agents*" means, collectively, the DIP Agent, the First Lien Agent, the Second Lien Agent, and any other administrative agent, collateral agent, or similar Entity under the DIP Facility Documents, the First Lien Credit Agreement, or the Second Lien Credit Agreement, including any successors thereto.

10. "*Allowed*" means, with respect to a Claim or Interest, any Claim or Interest (or portion thereof) against any Debtor that: (a) is deemed allowed under the Bankruptcy Code; (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (c) has been allowed by a Final Order of the Bankruptcy Court. For the avoidance of doubt, any Claim or Interest (or portion thereof), that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.

11. "*Available Liquidity*" means, with respect to the Reorganized Debtors and the Foreign Guarantor Subsidiaries after the Effective Date, the sum of (a) the unrestricted balance sheet cash of the Reorganized Debtors and the Foreign Guarantor Subsidiaries; and (b) the aggregate amount available to be drawn under the New ABL Facility (taking into account any applicable restrictions on borrowing under the New ABL Facility).

12. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

13. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

14. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Cases, or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the District of Delaware.

15. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

16. "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks in the State of Delaware or the State of New York are closed for business as a result of federal, state, or local holiday.

17. "*Carestream Health*" means Carestream Health, Inc. prior to the Effective Date.

18. "*Carestream Holdings*" means Carestream Health Holdings, Inc. prior to the Effective Date.

19. "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

20. "*Causes of Action*" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected

or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

21.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

22.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code.

23.     "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

24.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

25.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

26.     "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

27.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

28.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider Confirmation of the Plan and approval of the Disclosure Statement and Solicitation Materials, as such hearing(s) may be adjourned or continued from time to time.

30.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and approving the Disclosure Statement and the Solicitation Materials, which order shall be in form and substance acceptable to the Debtors and the Required Consenting Stakeholders.

31.     "*Consenting Creditors*" has the meaning ascribed to such term in the Restructuring Support Agreement.

32.     "*Consenting Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

33.     "*Consummation*" means the occurrence of the Effective Date.

34.     "*Crossover Group*" means that certain ad hoc group of Holders of First Lien Claims and Second Lien Term Loan Claims represented by the Crossover Group Advisors.

35.    "*Crossover Group Advisors*" means Akin Gump Strauss Hauer & Feld LLP, GLC Advisors & Co., Troutman Pepper Hamilton Sanders LLP, any other local counsel, and any other professionals and/or consultants for the Crossover Group, if any, as may be mutually agreed to by the Crossover Group and the Debtors.

36.    "*Cure*" means all amounts, including an amount of $0, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

37.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

38.    "*Debtors*" has the meaning set forth in the preamble.

39.    "*Debtor Release*" means the releases given on behalf of the Debtors and their Estates as set forth in Article VIII.C of the Plan.

40.    "*DIP Agent*" means the administrative agent and collateral agent under the DIP Facility.

41.    "*DIP Claims*" means any Claim against any Debtor derived from, based upon, or arising under the DIP Facility.

42.    "*DIP Exit Cash Recovery*" has the meaning given to such term in Article II.B of the Plan.

43.    "*DIP Equitization New Common Stock*" means a pool of New Common Stock comprised of 100% of the undiluted New Common Stock *less* (a) the aggregate amount of Rights Offering New Common Stock actually issued and distributed pursuant to the Plan; (b) the aggregate amount of DIP Rollover Premium New Common Stock; and (c) the aggregate amount of New Common Stock issued and distributed to Holders of Allowed Second Lien Term Loan Claims on account of such Claims pursuant to Article III.B.4(c)(i) of the Plan, in each case, subject to dilution on account of the Management Incentive Plan.

44.    "*DIP Equitization Recovery*" has the meaning given to such term in Article II.B of the Plan.

45.    "*DIP Facility*" means the superpriority senior secured debtor-in-possession credit facility provided for under the DIP Facility Documents.

46.    "*DIP Facility Documents*" means, collectively, the DIP Term Sheet and any other documents governing the DIP Facility, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

47.    "*DIP Lenders*" means, collectively, each lender under the DIP Facility.

48.    "*DIP Loans*" means the loans under the DIP Facility.

49.    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

50.    "*DIP Rights Offering Cash Recovery*" has the meaning given to such term in Article II.B of the Plan.

51.    "*DIP Rollover*" has the meaning given to such term in Article II.B of the Plan.

52.    "*DIP Rollover Premium*" has the meaning given to such term in Article II.B of the Plan.

53.    "*DIP Rollover Premium New Common Stock*" means any New Common Stock issued in respect of the DIP Rollover Premium.

54.     "*DIP Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit C-1 thereto, as such term sheet may be amended, supplemented, or otherwise modified from time to time in accordance with its terms and approved pursuant to the DIP Orders.

55.     "*Disbursing Agent*" means the Reorganized Debtors or, as applicable, the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions pursuant to the Plan.

56.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

57.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest (or portion thereof):  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

58.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

59.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date or such other date as agreed to by the Debtors and the Required Consenting Stakeholders.

60.     "*Effective Date*" means the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) the Plan is declared effective by the Debtors.

61.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

62.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

63.     "*Excess Cash Sweep Payment*" means a one-time prepayment in respect of the New Term Loan Facility in an aggregate amount equal to the lesser of (a) the positive difference, if any, between (i) Total Effective Date Available Liquidity and (ii) $100,000,000.00; and (b) the positive difference, if any, between (i) Available Liquidity as of March 31, 2023, and (ii) $100,000,000.00, which prepayment shall be provided for in the New Term Loan Credit Agreement.

64.     "*Exculpated Parties*" means collectively, and in each case in its capacity as such, the Debtors and each Related Party of the Debtors; *provided* that Exculpated Parties shall not include non-Debtor Affiliates and such non-Debtor Affiliates' Related Parties.

65.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

66.     "*Existing Interests*" means any Interest in Carestream Holdings existing immediately prior to the occurrence of the Effective Date.

67.     "*Existing Letter of Credit*" means any letter of credit issued and outstanding under the First Lien Revolving Facility.

68.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

69.      "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

70.      "*Final DIP Order*" means the final order entered by the Bankruptcy Court approving the DIP Facility and authorizing the Debtors to, among other things, enter into and perform under the DIP Facility Documents and use cash collateral (as defined in section 363(a) of the Bankruptcy Code).

71.      "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken; or as to which, any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought, or the new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

72.      "*First Lien Agent*" means the administrative agent and collateral agent under the First Lien Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the First Lien Credit Agreement.

73.      "*First Lien Cash Recovery*" has the meaning given to such term in Article III.B.3(c) of the Plan.

74.      "*First Lien Claims*" means any Claim against any Debtor derived from, based upon, or arising under the First Lien Credit Agreement.

75.      "*First Lien Credit Agreement*" means that certain Amended and Restated Credit Agreement (First Lien), by and among Carestream Health, Inc., as company, Carestream Health Holdings, Inc., as holdings, the guarantors thereunder, the lenders from time to time party thereto, and the administrative agent thereunder, dated as of June 7, 2013, as amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms prior to the Petition Date.

76.      "*First Lien Lenders*" means, collectively, each lender under the First Lien Credit Agreement.

77.      "*First Lien Revolving Claims*" means any First Lien Claims on account of the First Lien Revolving Facility and any Hedge Claims.

78.      "*First Lien Revolving Facility*" means the revolving credit facility provided for under the First Lien Credit Agreement.

79.      "*Foreign Guarantor Subsidiaries*" means each non-Debtor direct or indirect subsidiary of Carestream Holdings that is organized or formed pursuant to the law of a jurisdiction outside of the United States and is an obligor or guarantor under the First Lien Credit Agreement or the Second Lien Credit Agreement as of the Petition Date, including each such non-Debtor subsidiary set forth on Exhibit A to the Restructuring Support Agreement as a Foreign Guarantor Subsidiary.

80.      "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors, other than: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) any Second Lien Deficiency Claim; or (e) an Intercompany Claim.

81.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

82.     "*Hedge Claims*" means any Claim against any Debtor derived from, based upon, or arising under that certain ISDA Master Agreement, dated as of September 29, 2011, between JPMorgan Chase Bank, N.A. and Carestream Health, including any schedules and appendix thereto.

83.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

84.     "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

85.     "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

86.     "*Intercompany Claim*" means any Claim against any Debtor held by a Debtor or an Affiliate of a Debtor (excluding the Sponsor).

87.     "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

88.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit or share in any Debtor and any other rights, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled restricted stock units, other securities, agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor or any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security).

89.     "*Interim DIP Order*" means the interim order entered by the Bankruptcy Court approving the DIP Facility and authorizing the Debtors to, among other things, enter into and perform under the DIP Facility Documents and use cash collateral (as defined in section 363(a) of the Bankruptcy Code).

90.     "*Issuing Lender*" has the meaning given to such term in the First Lien Credit Agreement.

91.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

92.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

93.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

94.     "*Management Compensation Programs*" means, collectively, each base salary arrangement, annual bonus arrangement, supplemental bonus arrangement, long-term incentive plan or program, and severance arrangement described in the Management Compensation Term Sheet, including the Management Incentive Plan, but excluding any sale bonus agreements in effect prior to the Petition Date.

95.     "*Management Compensation Term Sheet*" means that certain term sheet attached to the Restructuring Term Sheet as Annex 3 thereto.

96.     "*Management Incentive Plan*" means the management incentive plan described in the Management Compensation Term Sheet (and defined therein as the "MIP"), which management incentive plan shall be consistent in all respects with the Management Compensation Term Sheet, the Restructuring Term Sheet, and the Restructuring Support Agreement.

97.     "*MIP New Common Stock*" means any New Common Stock issued pursuant to the Management Incentive Plan.

98.     "*New ABL Agent*" means the administrative agent and collateral agent under the New ABL Documents.

99.     "*New ABL Backstop Commitments*" means the respective backstop commitments of the New ABL Backstop Commitment Parties under the New ABL Backstop Commitment Letter with respect to the New ABL Commitments.

100.    "*New ABL Backstop Commitment Letter*" means that certain backstop commitment letter attached to the Restructuring Support Agreement as <u>Exhibit E</u> thereto, as amended, supplemented, or otherwise modified from time to time in accordance with its terms.

101.    "*New ABL Backstop Commitment Parties*" means, collectively, each Entity that has committed to backstop the New ABL Facility pursuant to, and in accordance with, the New ABL Backstop Commitment Letter.

102.    "*New ABL Commitments*" means each new money commitment under the New ABL Facility.

103.    "*New ABL Credit Agreement*" means the definitive credit agreement governing the New ABL Facility, which credit agreement shall be on terms and conditions consistent with the terms and conditions set forth in the New ABL Facility Term Sheet and otherwise acceptable to the Debtors, the New ABL Backstop Commitment Parties, the Required Consenting First Lien Lenders and the Required DIP Lenders.

104.    "*New ABL Documents*" means collectively, the New ABL Credit Agreement and all other agreements, documents, and instruments to be delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents, in each case, on terms and conditions acceptable to the Debtors, the New ABL Backstop Commitment Parties, the Required Consenting First Lien Lenders, and the Required DIP Lenders.

105.    "*New ABL Facility*" means an $85 million first lien revolving credit facility to be provided to Reorganized Carestream on terms and conditions consistent with the terms and conditions set forth in the New ABL Facility Term Sheet and otherwise acceptable to the Debtors, the New ABL Backstop Commitment Parties, the Required Consenting First Lien Lenders, and the Required DIP Lenders; *provided*, *however*, that the total principal amount of the New ABL Facility may be decreased to $75 million with the consent of the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders.

106.    "*New ABL Facility Roll Draw*" means any amount drawn under the New ABL Facility on the Effective Date on account of any Allowed First Lien Revolving Claim that is rolled up into the New ABL Facility pursuant to the ABL Roll Option or the ABL Backstop Roll Option.

107.    "*New ABL Facility Term Sheet*" means that certain term sheet attached to the Restructuring Support Agreement as <u>Exhibit E-1</u> thereto, as such term sheet may be amended, supplemented, or otherwise modified from time to time in accordance with its terms.

108.    "*New Board*" means the board of directors or the board of managers, as applicable, of Reorganized Holdings.  The identities of directors on the New Board as of the Effective Date shall be set forth in the Plan Supplement, to the extent known at the time of filing of the Plan Supplement, but in any event prior to the Effective Date.

109.    "*New Common Stock*" means the common equity interests of Reorganized Holdings.

110.    "*New Debt Documents*" means, collectively, the New ABL Documents and the New Term Loan Documents.

111.     "*New Employment Agreements*" has the meaning given to such term in Article V.H.1 of the Plan.

112.     "*New Term Loan Agent*" means the administrative agent and collateral agent under the New Term Loan Documents.

113.     "*New Term Loan Credit Agreement*" means the definitive credit agreement governing the New Term Loan Facility, which credit agreement shall be on terms and conditions consistent with the terms and conditions set forth in the New Term Loan Facility Term Sheet and otherwise acceptable to the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders.

114.     "*New Term Loan Documents*" means, collectively, the New Term Loan Credit Agreement and all other agreements, documents, and instruments to be delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents, in each case, on terms and conditions consistent with the terms set forth in the New Term Loan Facility Term Sheet and otherwise acceptable to the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders.

115.     "*New Term Loan Facility*" means a first lien term loan credit facility in an aggregate principal amount equal to the New Term Loan Facility Amount, which credit facility shall be provided to Reorganized Carestream on terms and conditions consistent with the terms and conditions set forth in the New Term Loan Facility Term Sheet and otherwise acceptable to the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders.

116.     "*New Term Loan Facility Amount*" means an amount equal to (a) the aggregate amount of Allowed First Lien Claims, *less* (b)(i) the ABL Roll Option Adjustment Amount and (ii) the aggregate amount of Cash that is distributed to Holders of Allowed First Lien Claims on account of such Claims pursuant to the First Lien Cash Recovery under Article III.B.3 of the Plan.

117.     "*New Term Loan Facility Term Sheet*" means the term sheet attached to the Restructuring Term Sheet as <u>Annex 1</u> thereto, as such term sheet may be amended, supplemented, or otherwise modified from time to time in accordance with its terms.

118.     "*New Organizational Documents*" means the formation documents and governance documents for each of the Reorganized Debtors (including the New Stockholders Agreement), which documents shall be consistent with the Restructuring Support Agreement and otherwise acceptable to the Debtors and the Required DIP Lenders.

119.     "*New Stockholders Agreement*" means the definitive shareholders agreement or other applicable agreement (including all annexes, exhibits, and schedules thereto) governing the New Common Stock, which agreement shall be acceptable to the Debtors and the Required DIP Lenders.

120.     "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

121.     "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, a First Lien Claim, or a Second Lien Term Loan Claim.

122.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

123.     "*Petition Date*" means the first date on which any of the Debtors commence a Chapter 11 Case.

124.     "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims or other eligible Entities in accordance with the Plan.

125.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to

be Filed with the Bankruptcy Court, and any additional documents Filed as amendments to the Plan Supplement, including the following, as applicable: (a) certain of the New Organizational Documents; (b) the New Stockholders Agreement; (c) the New Term Loan Credit Agreement; (d) the New ABL Credit Agreement; (e) to the extent known, the identities of the members of the New Board; (f) the Rejected Executory Contracts and Unexpired Leases Schedule (if any); (g) the Schedule of Proposed Cure Amounts; (h) the Schedule of Retained Causes of Action; and (i) the Restructuring Steps Memorandum.  To the extent any document to be set forth in the Plan Supplement is an exhibit to the Disclosure Statement, the Plan Supplement may cross-refer to such exhibit.  The documents constituting the Plan Supplement shall be consistent with the terms of the Restructuring Support Agreement and the Restructuring Term Sheet, including any consent rights contained therein, as applicable.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan and the Restructuring Support Agreement on or before the Effective Date.  The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full; *provided* that in the event of a conflict between the Plan and the Plan Supplement, the Plan Supplement shall control in accordance with Article I.G.

126. "*Prepetition Credit Agreements*" means the First Lien Credit Agreement and the Second Lien Credit Agreement.

127. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

128. "*Pro Rata*" means (a) the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class; (b) in the case of a DIP Claim, the proportion that an Allowed DIP Claim bears to the aggregate amount of all Allowed DIP Claims; and (c) with respect to clause (x) of the ABL Roll Option, the proportion that an Allowed First Lien Revolving Claim that participates in the ABL Roll Option bears to the aggregate amount of all Allowed First Lien Revolving Claims that participate in the ABL Roll Option.

129. "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

130. "*Professional Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

131. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

132. "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

133. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

134. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

135. "*Rejected Executory Contracts and Unexpired Leases Schedule*" means, to the extent applicable, a schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and

Unexpired Leases (if any) to be rejected by the Debtors pursuant to the Plan, which schedule (if any) shall be included in the Plan Supplement.

136.    "*Related Parties*" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent) advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

137.    "*Released Parties*" means each of, and in each case in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Agents; (e) the DIP Lenders; (f) the Releasing Parties; (g) current and former Affiliates of each Entity in clause (a) through the following clause (h); and (h) each Related Party of each Entity in clause (a) through this clause (h); *provided*, *however*, that, notwithstanding the foregoing, any holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

138.    "*Releasing Parties*" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Agents; (e) the DIP Lenders; (f) all holders of Claims; (g) all Holders of Interests; (h) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (i); *provided*, *however*, that, notwithstanding the foregoing, an Entity shall not be a "Releasing Party" if such Entity (x) does not vote to, and is not deemed to, accept the Plan, and (y) timely Files on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not resolved before Confirmation or otherwise validly opts out of the Third-Party Release; and *provided*, *further*, that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

139.    "*Reorganized Debtors*" means, collectively, the Debtors, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto, by merger, consolidation, or otherwise, including any new entity established in connection with the implementation of the Restructuring Transactions.

140.    "*Reorganized Holdings*" means Carestream Holdings, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

141.    "*Reorganized Carestream*" means Carestream Health, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

142.    "*Required Consenting First Lien Lenders*" has the meaning given to such term in the Restructuring Support Agreement.

143.    "*Required Consenting Second Lien Lenders*" has the meaning given to such term in the Restructuring Support Agreement.

144.    "*Required Consenting Stakeholders*" has the meaning given to such term in the Restructuring Support Agreement.

145.    "*Required DIP Lenders*" has the meaning given to such term in the Restructuring Support Agreement.

146.    "*Restructuring Documents*" means the documents listed in section 3.01 of the Restructuring Support Agreement, in each case consistent with the Plan and the Restructuring Support Agreement (including any consent rights contained therein).

147.    "*Restructuring Expenses*" means, collectively, all of the Crossover Group's reasonable and documented fees, costs and expenses incurred through the Effective Date in connection with the Restructuring Transactions, including, without limitation, all reasonable and documented fees, costs and expenses of the Crossover Group Advisors, in each case, without any requirement for the filing of retention applications in the Chapter 11 Cases, to be paid on the Effective Date.

148.    "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be (a) included in the Plan Supplement; and (b) consistent with the Plan and the Restructuring Support Agreement (including any consent rights contained therein).

149.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, entered into and dated as of August 21, 2022, by and among the Debtors and the Consenting Parties, including all exhibits, schedules, and other attachments thereto, as such agreement may be further amended, modified, or supplemented from time to time, solely in accordance with its terms, which is attached as <u>Exhibit B</u> to the Disclosure Statement.

150.    "*Restructuring Term Sheet*" means that certain term sheet attached as <u>Exhibit B</u> to the Restructuring Support Agreement.

151.    "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan and Restructuring Support Agreement, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

152.    "*Rights Offering*" means the offering of rights to Holders of Allowed Second Lien Term Loan Claims to purchase for cash their Pro Rata share of 80% of the New Common Stock at the Rights Offering Subscription Price, subject to dilution on account of the Management Incentive Plan, on the terms and subject to the conditions set forth in the Plan and the Rights Offering Procedures.

153.    "*Rights Offering Cash*" means the aggregate cash proceeds of the Rights Offering received by the Debtors.

154.    "*Rights Offering New Common Stock*" means the New Common Stock issued in connection with the Rights Offering.

155.    "*Rights Offering Participants*" means each Holder of an Allowed Second Lien Term Loan Claim that is an Accredited Investor (as defined in the Rights Offering Procedures).

156.    "*Rights Offering Procedures*" means the procedures for conducting the Rights Offering, which procedures shall be in form and substance acceptable to the Debtors and the Required Consenting Second Lien Lenders.

157.    "*Rights Offering Subscription Price*" means a price equal to $9.375 per share (or comparable unit) of New Common Stock.

158.    "*Rights Offering Subscription Rights*" means the subscription rights issued in connection with the Rights Offering, which collectively shall provide for the subscription for up to $75 million of New Common Stock, in the aggregate; and for the avoidance of doubt, no Holder of Second Lien Term Loan Claims shall be permitted to oversubscribe for any Rights Offering New Common Stock.

159.     "*Schedule of Proposed Cure Amounts*" means any schedule (including any amendments, supplements, or modifications thereto) of the Debtors' proposed Cure amounts (if any) with respect to each of the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan.

160.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

161.     "*Scheduling Order*" means the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Approving the Rights Offering Procedures and Related Dates, Deadlines, and Notices, and (V) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports*.

162.     "*Second Lien Agent*" means the administrative agent and collateral agent under the Second Lien Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Second Lien Credit Agreement.

163.     "*Second Lien Term Loan Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Credit Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Second Lien Credit Agreement, including any Second Lien Deficiency Claims.

164.     "*Second Lien Credit Agreement*" means that certain Second Lien Credit Agreement, by and among Carestream Health, Inc., as company, Carestream Health Holdings, Inc., as holdings, the guarantors thereunder, the lenders from time to time party thereto, and the administrative agent thereunder, dated as of June 7, 2013, as amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

165.     "*Second Lien Deficiency Claims*" means any Second Lien Term Loan Claim that is not a Secured Claim.

166.     "*Section 510(b) Claims*" means any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

167.     "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

168.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

169.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

170.     "*Solicitation Agent*" means Kurtzman Carson Consultants LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

171.     "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

172.     "*Specified DIP Claims*" means, collectively, any DIP Claims on account of any accrued, unpaid interest, fees, or expenses payable by the Debtors under the DIP Facility Documents.

13

173.    "*Sponsor*" has the meaning given to such term in the Restructuring Support Agreement.

174.    "*Sponsor Fee Claims*" means, collectively, any Claims against a Debtor held by the Sponsor on account of any management fee, operational fee, or comparable fee or charge.

175.    "*Sponsor General Unsecured Claims*" means, collectively, any General Unsecured Claims against a Debtor held by the Sponsor, including any Sponsor Fee Claims.

176.    "*Sponsor Management Arrangements*" means, collectively, any management agreement or arrangement between any of the Debtors and the Sponsor.

177.    "*Tranche A DIP Claim*" means any Claim against any Debtor derived from, based upon, or arising under the DIP Facility with respect to the Tranche A DIP Loans.

178.    "*Tranche A DIP Lenders*" means the DIP Lenders providing the Tranche A DIP Loans under the DIP Facility.

179.    "*Tranche A DIP Loans*" means the DIP Loans in the amount of up to $5 million to be provided by the Tranche A DIP Lenders under the DIP Facility.

180.    "*Tranche B DIP Claim*" means any Claim against any Debtor derived from, based upon, or arising under the DIP Facility with respect to the Tranche B DIP Loans.

181.    "*Tranche B DIP Lenders*" means the DIP Lenders providing the Tranche B DIP Loans under the DIP Facility.

182.    "*Tranche B DIP Loans*" means the DIP Loans in the amount of up to $75 million to be provided by the Tranche B DIP Lenders under the DIP Facility.

183.    "*Third-Party Release*" means the releases set forth in Article VIII.D of the Plan.

184.    "*Total Effective Date Available Liquidity*" means, with respect to the Reorganized Debtors and the Foreign Guarantor Subsidiaries, the sum of (a) the unrestricted balance sheet cash of the Reorganized Debtors as of the Effective Date, (b) the unrestricted balance sheet cash of the Foreign Guarantor Subsidiaries as of the Effective Date, and (c) the aggregate amount of all undrawn revolving commitments under the New ABL Facility as of the Effective Date (after giving effect to any exercise of the ABL Roll Option and taking into account any applicable restrictions on borrowing under the New ABL Facility), in each case, after taking into account (x) any Cash distributions and other Cash payments to be made under the Plan on or about the Effective Date (including any First Lien Cash Recovery, any fees payable pursuant to the New Debt Documents, and the funding of the Professional Escrow Account), and (y) any amounts that may come due after the Effective Date on account of Allowed Professional Fee Claims, net of the aggregate amount funded into the Professional Escrow Account pursuant to Article II.C of the Plan.

185.    "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

186.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 180 calendar days of receipt; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution within 180 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

187.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

188.    "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

189.    "*Unsecured Claim*" means any Claim that is not a Secured Claim.

190.    "*Voting Deadline*" means August 22, 2022, at 12:00 p.m. (prevailing Eastern Time).

191.    "*Voting Record Date*" means August 15, 2022.

192.    "*Voting Report*" means the report certifying the methodology for the tabulation of votes and result of voting on the Plan.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any party's consent rights over any of the Restructuring Documents or any amendments thereto as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15)  references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.    *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Restructuring Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim

and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, with the consent of the Required DIP Lenders, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such allowance or as soon as reasonably practicable thereafter, but in any event no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.    *DIP Claims.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (1) the principal amount outstanding under the DIP Facility on such date, (2) all interest accrued and unpaid thereon to the date of payment, and (3) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Facility Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Holder shall receive the following on the Effective Date:  (1) with respect to the portion of such Holder's Allowed DIP Claim that constitutes a Specified DIP Claim, such Holder shall receive cash in the amount of such Specified DIP Claim (the "DIP Exit Cash Recovery"); and (2) with respect to the remaining portion of such Holder's Allowed DIP Claim, (a) if such Allowed DIP Claim is a Tranche A DIP Claim, such Holder shall receive Cash in the amount of such Allowed Tranche A DIP Claim; and (b) if such Allowed DIP Claim is a Tranche B DIP Claim, such Holder shall receive (i) its Pro Rata share of the Rights Offering Cash, if any (the "DIP Rights Offering Cash Recovery"); and (ii) its Pro Rata share of the DIP Equitization New Common Stock, subject to dilution on account of the Management Incentive Plan (the "DIP Equitization Recovery").  In connection with the DIP Equitization Recovery, each Tranche B DIP Lender shall convert (or be deemed to have converted) the applicable amount of such Holder's Allowed Tranche B DIP Claim (after deducting the DIP Exit Cash Recovery and the DIP Rights Offering Cash Recovery) into New Common Stock at the Rights Offering Subscription Price (such conversion, the "DIP Rollover"), in each case, subject to the occurrence of the Effective Date and satisfaction or waiver of the conditions to such DIP Rollover set forth in the DIP Facility Documents.

Additionally, in consideration for the Tranche B DIP Lenders' agreement to the DIP Rollover, each Tranche B DIP Lender shall receive, on the Effective Date, its Pro Rata share of 10% of the New Common Stock, subject to dilution on account of the Management Incentive Plan (the "DIP Rollover Premium").

On the Effective Date, the DIP Facility and all DIP Facility Documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable, and the Debtors shall be permitted to file any applicable releases or terminations.

C.    *Professional Fee Claims.*

    1.    <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

    2.    <u>Professional Escrow Account.</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Escrow Account with Cash equal to the Professional Fee Amount. The Professional Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Escrow Account. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.    <u>Post-Confirmation Date Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees payable to the U.S. Trustee and any interest thereon pursuant to 31 U.S.C. § 3717 ("Quarterly Fees") as determined by the Bankruptcy Court, shall be paid in full in Cash when due by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.  Nothing in the Plan shall discharge or release any Quarterly Fees.  The U.S. Trustee shall not be required to file a Proof of Claim or request for payment for Quarterly Fees.  The Reorganized Debtors shall timely file all required monthly operating reports and post-confirmation quarterly reports in a form prescribed by the U.S. Trustee until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

F.      *Payment of Certain Fees and Expenses.*

The Debtors and Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented fees, costs, and expenses of the Crossover Group Advisors, the DIP Agent and its counsel, the DIP Lenders' advisors, and the Agents' counsel, in each case, in accordance with the terms and conditions of any applicable agreement with the Debtors, including the DIP Facility Documents, the Prepetition Credit Agreements, and the Restructuring Support Agreement, and, if any such fee or expense is unpaid as of the Effective Date, such fee or expense shall be paid on the Effective Date without application to or further approval of the Bankruptcy Court and without any reduction to the respective recoveries of the Holders of Allowed DIP Claims, Allowed First Lien Claims, or Allowed Second Lien Term Loan Claims provided for under the Plan.  Without duplication of the foregoing, on the Effective Date, the Debtors shall also pay in Cash the reasonable and documented accrued fees, expenses, and costs of the First Lien Agent, the Second Lien Agent, and the Issuing Lender, including the reasonable and documented accrued fees, expenses, and costs of its counsel, in each case, incurred through the Effective Date in connection with the Restructuring Transactions.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan proposed by each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors (except for Class 8 Existing Interests, which shall only apply to Carestream Holdings).  All of the potential Classes for the Debtors are set forth herein.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

    (a)      *Classification*:  Class 1 consists of all Other Secured Claims.

    (b)      *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor:

        (i)      payment in full in Cash of its Allowed Other Secured Claim;

        (ii)      the collateral securing its Allowed Other Secured Claim;

        (iii)      Reinstatement of its Allowed Other Secured Claim; or

        (iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

    (a)      *Classification*:  Class 2 consists of all Other Priority Claims.

    (b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, treatment in a manner consistent with

section 1129(a)(9) of the Bankruptcy Code, which renders such Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – First Lien Claims</u>

(a)    *Classification*: Class 3 consists of all First Lien Claims.

(b)    *Allowed Amount*: As of the Effective Date, the First Lien Claims shall be Allowed and deemed to be Allowed Claims in the amount of $585,201,786.00 of principal plus applicable interest, fees, costs, expenses, and premiums owed under the First Lien Credit Agreement through the Effective Date.

(c)    *Treatment*: Each Holder of an Allowed First Lien Claim shall receive, in full and final satisfaction of such Allowed First Lien Claim, (i) Cash in an amount equal to 3.00% of the principal amount of such Holder's Allowed First Lien Claim (the "<u>First Lien Cash Recovery</u>"); and (ii) with respect to any remaining Allowed First Lien Claim held by such Holder after giving effect to clause (i), its Pro Rata share of the New Term Loan Facility; *provided*, *however*, that (A) Holders of Allowed First Lien Revolving Claims may, with respect to their Allowed First Lien Revolving Claims, instead elect to, and commit to, each and all components of the following: (x) roll up to an aggregate amount equal to the ABL Funded Rollover Cap of their Allowed First Lien Revolving Claims into the New ABL Facility on a Pro Rata basis and in an amount not to exceed a Holder's respective Allowed First Lien Revolving Claims, (y) with respect to any remaining Allowed First Lien Revolving Claims held by such electing Holders after giving effect to clause (x), receive the treatment specified in Article III.B.3(c)(i) and (ii) for such remaining Allowed First Lien Revolving Claims, and (z) provide New ABL Commitments in an amount equal to such Holder's respective Allowed First Lien Revolving Claims rolled pursuant to clause (x), <u>multiplied by</u> the ABL Roll Multiplier (collectively, the treatment in clauses (x), (y), and (z), the "<u>ABL Roll Option</u>"); and (B) the New ABL Backstop Commitment Parties that are Holders of Allowed First Lien Revolving Claims have agreed not to exercise the ABL Roll Option, and shall not exercise, their respective ABL Roll Options and, instead, shall roll their Allowed First Lien Revolving Claims into the New ABL Facility in an aggregate amount equal to the ABL Backstop Roll Option Funded Pool in the proportions set forth in, and subject to the terms and conditions of, the New ABL Backstop Commitment Letter (the treatment in clause (B), the "<u>ABL Backstop Roll Option</u>").

(d)    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Second Lien Term Loan Claims</u>

(a)    *Classification*: Class 4 consists of all Second Lien Term Loan Claims.

(b)    *Allowed Amount*: As of the Effective Date, the Second Lien Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the amount of $448,235,000.00 of principal plus accrued and unpaid interest owed under the Second Lien Credit Agreement through the Petition Date.

(c)     *Treatment*:  Each Holder of an Allowed Second Lien Term Loan Claim shall receive, in full and final satisfaction of such Allowed Second Lien Term Loan Claim, its Pro Rata share of (i) 10% of the New Common Stock, subject to dilution on account of the Management Incentive Plan; and (ii) the Rights Offering Subscription Rights; *provided, however*, that each Tranche B DIP Lender that is also a Holder of Allowed Second Lien Term Loan Claims has agreed not to exercise, and shall not exercise, its Rights Offering Subscription Rights, and at least a corresponding portion of such Tranche B DIP Lender's Allowed DIP Claims shall be converted into New Common Stock through the DIP Rollover.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

5.  Class 5 – General Unsecured Claims

(a)     *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)     *Treatment*:  Each Allowed General Unsecured Claim (other than any Sponsor General Unsecured Claim) shall, at the option of the applicable Debtor, be either (i) Reinstated or (ii) paid in full in Cash on the later of (x) the Effective Date and (y) the date on which such payment would otherwise be due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.  On the Effective Date, each Sponsor General Unsecured Claim shall be canceled, released, and extinguished, and will be of no further force or effect, without any distribution to the Holder of such Claim on account thereof, as agreed by the Sponsor pursuant to the Restructuring Support Agreement.

(c)     *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.  Class 6 – Intercompany Claims

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  Each Allowed Intercompany Claim shall be Reinstated unless otherwise agreed by the applicable Debtor and the Required DIP Lenders.

(c)     *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.  Class 7 – Intercompany Interests

(a)     *Classification*:  Class 7 consists of all Intercompany Interests.

(b)     *Treatment:*  On the Effective Date, Intercompany Interests shall be Reinstated unless otherwise agreed by the applicable Debtor and the Required DIP Lenders.

(c)     *Voting*:  Class 7 is Unimpaired under the Plan.  Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

    8.   Class 8 – Existing Interests

        (a)     *Classification*:  Class 8 consists of all Existing Interests.

        (b)     *Treatment*:  All Existing Interests shall be canceled, released, and extinguished and will be of no further force or effect, without any distribution to Holders of Existing Interests.

        (c)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of Existing Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Interests are not entitled to vote to accept or reject the Plan.

    9.   Class 9 – Section 510(b) Claims

        (a)     *Classification*:  Class 9 consists of all Section 510(b) Claims.

        (b)     *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

        (c)     *Treatment*:  On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished, and will be of no further force or effect, without any distribution to Holders of Section 510(b) Claims.

        (d)     *Voting*:  Class 9 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders (if any) are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

    Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.     *Elimination of Vacant Classes.*

    Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Record Date and Voting Deadline.*

    **The Voting Record Date is August 15, 2022**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

    **The Voting Deadline is August 22, 2022, at 12:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be:  (a) electronically submitted utilizing the online balloting portal maintained by the Solicitation Agent on or before the Voting Deadline, as applicable; or (b) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, personal delivery, or via electronic mail in the limited scenario where a nominee submits a master ballot including votes for its underlying beneficial holders) so that the ballots are ***actually received*** by the Solicitation Agent on or before the Voting Deadline.

23

F.        *Intercompany Interests.*

        To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, unless otherwise set forth in the Restructuring Steps Memorandum, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.        *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

        Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.        *Controversy Concerning Impairment.*

        If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.        *Subordinated Claims and Interests.*

        The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.        *General Settlement of Claims and Interests.*

        Except as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, First Lien Claims, and Second Lien Term Loan Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, First Lien Claims, and Second Lien Term Loan Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests

in the Debtors.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.    *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, as set forth in the Restructuring Steps Memorandum or as otherwise reasonably acceptable to the Required DIP Lenders, which may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents constituting the Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreement, and having other terms for which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) the consummation of the Rights Offering pursuant to the Rights Offering Procedures, including the distribution of the Rights Offering Subscription Rights to the Rights Offering Participants and the issuance of Rights Offering New Common Stock in connection therewith; (5) the execution and delivery of the New Organizational Documents (including the New Stockholders Agreement); and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (6) the execution and delivery of the New ABL Credit Agreement and the New Term Loan Credit Agreement; and (7) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

C.    *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations and the Rights Offering Cash, as applicable; (2) the New Common Stock; (3) the New Term Loan Facility; and (4) the New ABL Facility.

1.    Rights Offering.

The Debtors shall, subject to the treatment described in Article III.B.4(c) of the Plan, raise up to an aggregate of $75 million of equity capital through the Rights Offering, pursuant to which eligible Holders of Allowed Second Lien Term Loan Claims may elect to purchase for Cash their Pro Rata share of 80% of the New Common Stock at the Rights Offering Subscription Price, subject to the DIP Rollover and dilution on account of the Management Incentive Plan.  On and as of the Effective Date, the Reorganized Debtors shall consummate the Rights Offering in accordance with the Rights Offering Procedures and the Plan.  To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Rights Offering; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Rights Offering, in each case, without any further notice to or order of the Bankruptcy Court.  Upon exercise of the Rights Offering Subscription Rights by the Rights Offering Participants pursuant to the Rights Offerings Procedures, Reorganized Holdings shall be authorized to issue any issuable Rights Offering New Common Stock pursuant to such exercise.

For the avoidance of doubt, the issuance and distribution of any Rights Offering New Common Stock purchased by the Rights Offering Participants in the Rights Offering shall be solely on account of the new money provided by such Rights Offering Participants in the Rights Offering and not on account of any Allowed Second Lien Term Loan Claims held by such Rights Offering Participants.  The Rights Offering Cash, if any, shall be applied to payment of DIP Claims in accordance with Article II.B.

2.  <u>Issuance of New Common Stock</u>.

On the Effective Date, Reorganized Holdings shall issue the New Common Stock, including the Rights Offering New Common Stock, the New Common Stock issued pursuant to the DIP Rollover, and the DIP Rollover Premium New Common Stock, pursuant to the Plan.  The issuance of the New Common Stock, including equity awards reserved for the Management Incentive Plan, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors or by Holders of any Claims or Interests, as applicable.

All of the shares (or comparable units) of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of New Common Stock, including the Rights Offering New Common Stock, the New Common Stock issued pursuant to the DIP Rollover, and the DIP Rollover Premium New Common Stock, shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms.  As a condition to receiving the New Common Stock, Holders of Allowed Second Lien Term Loan Claims (including Rights Offering Participants) and any DIP Lender entitled to a distribution of New Common Stock pursuant to the DIP Rollover and the DIP Rollover Premium will be required to execute and deliver the New Stockholders Agreement; *provided*, *however*, that, notwithstanding any failure to execute the New Stockholders Agreement, any Entity that is entitled to and accepts a distribution of New Common Stock under the Plan, by accepting such distribution, will be deemed to have accepted and consented to the terms of the New Stockholders Agreement (solely in such Entity's capacity as a stockholder of Reorganized Holding), without the need for execution by any party thereto. The New Stockholders Agreement will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock will be bound thereby in all respects. The New Common Stock will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the Depository Trust Company.

3.  <u>New Term Loan Facility</u>.

On the Effective Date, the Reorganized Debtors shall enter into the New Term Loan Facility pursuant to the New Term Loan Documents.  To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the New Term Loan Facility and the New Term Loan Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New Term Loan Facility, including executing and delivering the New Term Loan Documents, in each case, without any further notice to or order of the Bankruptcy Court.

The New Term Loan Credit Agreement shall (a) provide for the Excess Cash Sweep Payment; and (b) provide that the Excess Cash Sweep Payment, if any, shall be due and payable by the Reorganized Debtors on April 10, 2023, in each case, in accordance with the terms and conditions of the New Term Loan Credit Agreement.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the New Term Loan Documents:  (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the New  Term Loan Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  To the extent provided in the New Term Loan Documents, the New Term Loan Agent is authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the New Term Loan Documents.  The New Term Loan Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that

perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The guarantees granted under the New Term Loan Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

4.    New ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility pursuant to the New ABL Documents. To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the New ABL Facility and the New ABL Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New ABL Facility, including executing and delivering the New ABL Documents, in each case, without any further notice to or order of the Bankruptcy Court.

All Existing Letters of Credit outstanding immediately prior to the Effective Date shall, on the Effective Date, either be returned to the applicable Issuing Lender or cash collateralized as set forth herein. Any New ABL Facility Roll Draw, if repaid on or after the Effective Date, may be re-borrowed under the New ABL Facility in accordance with the terms thereof.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the New ABL Documents: (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the New ABL Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. To the extent provided in the New ABL Documents, the New ABL Agent is authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the New ABL Documents. The New ABL Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The guarantees granted under the New ABL Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

D.    *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Restructuring Support Agreement and the consent rights therein (which are incorporated herein pursuant to Article I.H), and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than

any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan, or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

F.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests shall be canceled, and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates (including the Foreign Guarantor Subsidiaries) thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Agents shall be released from all duties thereunder; *provided*, *however*, that notwithstanding any provision of the Plan to the contrary, including, without limitation, Article VIII of the Plan, Confirmation, or the occurrence of the Effective Date, any credit document or agreement, including, without limitation, the First Lien Credit Agreement and the Second Lien Credit Agreement, that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing Holders of Allowed Claims to receive distributions under the Plan; (b) allowing and preserving the rights of the Agents to make distributions pursuant to the Plan; (c) permitting the Agents to enforce any obligation (if any) owed to such Agents under the Plan; (d) preserving the Agents' respective rights to compensation, participations and indemnification as against any money or property distributable to the Holders of Claims, including permitting an Agents' right to maintain, enforce, and exercise their charging liens, if any, against such distribution; (e) preserving all rights, including rights of enforcement, of the Agents and the Issuing Lender against any person other than the Debtors and their Affiliates, including with respect to indemnification, participations or contribution from the Holders of First Lien Claims and Second Lien Term Loan Claims, pursuant and subject to the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, as in effect on the Effective Date, (f) permitting the Agents and the Issuing Lender to enforce any obligation (if any) owed to the Agents and the Issuing Lender, respectively, under the Plan; (g) permitting the Agents and the Issuing Lender to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (h) permitting the Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan; and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. The Agents and the Issuing Lender shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Agents and the Issuing Lender and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Agents and the Issuing Lender shall be relieved of and released from any obligations and duties arising thereunder.

G.      *Corporate Action.*

Subject to the Restructuring Support Agreement, on or before the Effective Date, as applicable, all actions contemplated under the Plan (including the Restructuring Steps Memorandum and the other documents contained in

the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) the adoption or assumption, as applicable, of the Compensation and Benefits Programs; (2) the selection of the directors and officers for the Reorganized Debtors, including the appointment of the New Board; (3) the authorization, issuance and distribution of the New Term Loan Facility, the New ABL Facility, the New Common Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (4) the implementation of the Restructuring Transactions; (5) the entry into the New Term Loan Documents and New ABL Documents; (6) the consummation of the Rights Offering; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) the adoption of the New Organizational Documents (including the New Stockholders Agreement); (9) the assumption, assumption and assignment, or rejection (to the extent applicable), as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents (including the New Stockholders Agreement), the New ABL Documents, the New Term Loan Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under nonbankruptcy law.

H.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents (including the New Stockholders Agreement) shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable authorities in its respective jurisdiction of organization if and to the extent required in accordance with the applicable laws of such jurisdiction.  The New Organizational Documents will, among other things, (a) authorize the issuance of the New Common Stock and (b) prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents.

I.       *New Stockholders Agreement.*

From and after the Effective Date, all holders of New Common Stock shall be subject to the terms and conditions of the New Stockholders Agreement.

J.       *Indemnification Obligations.*

All indemnification provisions currently in place consistent with applicable law (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) as of the Petition Date for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall, to the fullest extent permitted by applicable law (including being subject to the limitations of the Delaware General Corporation Law, including the limitations contained therein on a corporation's ability to indemnify officers and directors), be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

K.    *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed.  The New Board will initially consist of the directors to be identified in the Plan Supplement or otherwise disclosed prior to the Effective Date.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents. Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

L.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New ABL Facility and New  Term Loan Facility entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

M.    *Existing Letter of Credit Cash Collateralization.*

On the Effective Date, all undrawn Existing Letters of Credit and all obligations related thereto shall either be returned to the applicable Issuing Lender or cash collateralized on terms reasonably satisfactory to the Issuing Lender, and the obligation to either return the undrawn Existing Letters of Credit or cash collateralize the undrawn Existing Letters of Credit shall be on terms reasonably satisfactory to the Issuing Lender.

N.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock, (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the New ABL Facility and the New Term Loan Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise adversely affect the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.      *Management Compensation Programs.*

On or after the Effective Date, the Reorganized Debtors shall adopt and implement the Management Compensation Programs, including the Management Incentive Plan, in accordance with the terms of the Management Compensation Term Sheet, the Restructuring Term Sheet, and the Restructuring Support Agreement.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.**  The Reorganized Debtors may settle any such Cause of Action without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute between the Reorganized Debtors and the Entity against whom the Reorganized Debtors are asserting the Cause of Action regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved for thirty days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation (to the extent applicable) of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly

provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.      *Release of Avoidance Actions.*

On the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions, and the Debtors, the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors.

S.      *Termination of Sponsor Management Arrangements.*

The Sponsor Management Arrangements shall not constitute or be deemed to constitute Executory Contracts. On the Effective Date, all Sponsor Management Arrangements shall be automatically terminated without the need for any further action by, payment to, or notice to any Person or Entity.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected (to the extent applicable) will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are:  (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule (if any); (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected (to the extent applicable) by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and related Cure amounts with respect thereto, or rejections (to the extent applicable) of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Proposed Cure Amounts or the Rejected Executory Contracts and Unexpired Leases Schedule (if any), pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections (to the extent applicable) of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the

Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule (if any) or Schedule of Proposed Cure Amounts at any time up to forty-five days after the Effective Date. The Debtors or the Reorganized Debtors, as applicable, shall file with the Bankruptcy Court and serve on the applicable counterparty notice regarding any change to the Rejected Executory Contracts and Unexpired Leases Schedule (if any) or the Schedule of Proposed Cure Amounts, as applicable, and the counterparty shall have fourteen days from service of such notice to file an objection with the Bankruptcy Court.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, to the extent applicable, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including pursuant to the Plan or the Confirmation Order, must be Filed with the Bankruptcy Court within thirty days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts, pay all Cure costs (if any) relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan in the ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure costs that differ

from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed on or before fourteen days after the Filing of the Schedule of Proposed Cure Amounts or fourteen days after notice of a change to the Schedule of Proposed Cure Amounts. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or as otherwise scheduled for hearing by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts, the Debtors shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases (if any).

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection (to the extent applicable), the Debtors or the Reorganized Debtors, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Employee Compensation and Benefits.*

1.      <u>Compensation and Benefits Programs</u>.

Except as otherwise set forth herein, on or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall (a) assume all employment agreements or letters, indemnification agreements, severance agreements, or other agreements entered into with current and former officers and other employees; and (b) enter into new agreements with the officers and other employees referenced in the Management Compensation Term Sheet on terms and conditions consistent with those set forth in the Management Compensation Term Sheet (such agreements, the "<u>New Employment Agreements</u>"). Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of the Plan and the Debtors' entry into the New Employment Agreements, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

> (a)      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Existing Interests in any of the Debtors, which shall not constitute or be deemed to constitute Executory Contracts and shall be terminated on or prior to the Effective Date;

> (b)      any sale bonus agreements, which shall not constitute or be deemed to constitute Executory Contracts and shall be terminated on or prior to the Effective Date

> (c)      Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

> (d)      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

A counterparty to a Compensation and Benefits Program assumed pursuant to the Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided*, *however*, that any assumption of Compensation and Benefits Programs pursuant to the Plan or any of the Restructuring Transactions shall not trigger or be deemed to trigger any change of control, immediate vesting, termination, or similar provisions therein.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy law.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.5 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register shall be deemed completed by the Debtors when received by such Disbursing Agent. The Plan Distributions shall be made to any such Holders at the direction of the applicable Disbursing Agent.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby;

(c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

     2.   <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

     1.   <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

     2.   <u>Delivery of Distributions in General</u>.

Except as otherwise provided herein, distributions payable to Holders of Allowed Claims shall be made by the Disbursing Agent to such Holder at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

     3.   <u>Minimum Distributions</u>.

No Cash payment of less than $50 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half ($\frac{1}{2}$) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half ($\frac{1}{2}$) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

     4.   <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) and, to the extent such unclaimed distribution comprises New Common Stock, such New Common Stock shall be canceled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. The Disbursing Agent shall adjust the number of shares of New Common Stock outstanding as of the date of such

cancelation to ensure that the distributions of New Common Stock contemplated under the Plan are given full force and effect.

     5.    <u>Surrender of Canceled Instruments or Securities</u>.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been canceled in accordance with Article IV.F hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be canceled solely with respect to the Debtors and the Foreign Guarantor Subsidiaries, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties (other than the Foreign Guarantor Subsidiaries) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

*E.*     *Manner of Payment.*

     1.    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated by the Plan or the Plan Supplement, all distributions of the New Common Stock to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

     2.    All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

     3.    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.*     *Indefeasible Distributions.*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback or turnover provisions.

*G.*     *Securities Law Matters.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock, including the New Common Stock issued on account of the DIP Equitization Recovery and the DIP Rollover Premium New Common Stock, but excluding the Rights Offering New Common Stock and the MIP New Common Stock, in each case, after the Petition Date, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under Section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act. Pursuant to section 1145 of the Bankruptcy Code, such New Common Stock (other than the Rights Offering New Common Stock and the MIP New Common Stock) will be freely tradable in the U.S. without registration under the Securities Act by the recipients thereof, subject to the provisions of (1) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, (2) any other applicable regulatory approvals, and (3) any restrictions in the Reorganized Debtors' New Organizational Documents (including the New Stockholders Agreement). The offering, issuance and distribution (if applicable) of any Securities before the Petition Date and any Securities issuable pursuant to the Rights Offering and the Management Incentive Plan will be issued pursuant to section 4(a)(2) of the Securities Act. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue Sky Laws.

Any Securities distributed pursuant to section 4(a)(2) under the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act or applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and applicable state securities laws and subject to any restrictions in the New Organizational Documents and the New Stockholders Agreement.

Notwithstanding anything to the contrary in the Plan, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock, including the Rights Offering New Common Stock, the New Common Stock issued on account of the DIP Rollover, the DIP Rollover Premium New Common Stock, and any MIP New Common Stock, are exempt from the registration requirements of section 5 of the Securities Act.

Recipients of the New Common Stock, including the Rights Offering New Common Stock, the New Common Stock issued on account of the DIP Rollover, the DIP Rollover Premium New Common Stock, and any MIP New Common Stock, are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue Sky Laws.

H.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (subject to reasonable consultation with the Required Consenting Stakeholders).  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

I.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

J.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

K.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

L.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.F hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

M.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the Reorganized Debtors.  The Debtors (with the consent of the Required DIP Lenders) and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (2) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors (in consultation with the Required DIP Lenders) or the Reorganized Debtors may elect to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided, further,* that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided* that the U.S. Trustee shall also have the authority to object to Claims or Interests after the Effective Date.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.Q of the Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute may be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced, provided that, for the avoidance of doubt, the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code to the extent applicable.

D.      *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  The Debtors shall provide any Holder of such a Claim or Interest with fourteen days' notice prior to the Claim or Interest being adjusted or expunged from the Claims Register as the result of a Claim or Interest being paid, satisfied, amended or superseded.

F.      *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Restructuring Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

B.       **Release of Liens.**

**Except as otherwise provided in the New Debt Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or Foreign Guarantor Subsidiary (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the New Term Loan Agent, or the New ABL Agent that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.     *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, any Restructuring Document, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and the New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and the New Term Loan Facility) executed to implement the Plan or the Restructuring Transactions; (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (3) any matters retained by the Debtors and the Reorganized Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     *Releases by the Releasing Parties.*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors  (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term

44

Loan Facility, the New Common Stock, the Rights Offering, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Restructuring Documents, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and New Term Loan Facility) executed to implement the Plan or the Restructuring Transactions; or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

E.    *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the New ABL Facility, the New Term Loan Facility, the New Common Stock, the Rights Offering, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and New Term Loan Facility) executed to implement the Plan.

*F.*      ***Injunction.***

**Effective as of the Effective Date, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Actions that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions released, settled or subject to exculpation pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New ABL Facility and New Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New ABL Facility and New Term Loan Facility) executed to implement the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.**

*G.*      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H.*      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*I.*      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of

the Bankruptcy Code, unless prior to the Confirmation Date (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.  the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect;

2.  the Bankruptcy Court shall have entered the DIP Orders, and the Final DIP Order shall be in full force and effect;

3.  the Bankruptcy Court shall have entered the Confirmation Order, in form and substance consistent with the Restructuring Support Agreement, which shall be a Final Order;

4.  each Restructuring Document shall have been executed (or deemed executed) or Filed, as applicable, in form and substance consistent with the Restructuring Support Agreement and the Plan, and shall not have been modified in a manner inconsistent therewith, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Restructuring Documents shall have been satisfied or duly waived in writing in accordance with the terms of the applicable Restructuring Document;

5.  all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed (or deemed executed);

6.  the DIP Rollover shall have been consummated in accordance with its terms;

7.  the Rights Offering shall have been consummated in accordance with its terms;

8.  the New Common Stock shall have been issued (including the Rights Offering New Common Stock and the New Common Stock to be issued on account of the DIP Rollover and the DIP Rollover Premium New Common Stock);

9.  the New Term Loan Documents shall have been duly executed and delivered by all of the Entities that are parties thereto (*provided* that Holders of Allowed First Lien Claims shall be deemed to be parties to the New Term Loan Credit Agreement without the requirement to deliver signature pages thereto), and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New Term Loan Facility shall have been satisfied or duly waived in writing in accordance with the terms of the Restructuring Support Agreement and the closing of the New Term Loan Facility shall have occurred;

10. the New ABL Documents shall have been duly executed and delivered by all of the Entities that are parties thereto (provided that Holders of Allowed First Lien Revolving Claims electing the ABL Roll Option shall be deemed to be parties to the New ABL Credit Agreement without the requirement to deliver signature pages thereto) and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New ABL Facility shall have been satisfied or duly waived in writing in accordance with the terms of the New ABL Backstop Commitment Letter and the closing of the New ABL Facility shall have occurred;

11. all undrawn Existing Letters of Credit shall either be returned to the applicable Issuing Lender or cash collateralized on terms reasonably satisfactory to the Issuing Lender, and the obligation to either return the undrawn Existing Letters of Credit or cash collateralize the undrawn Existing Letters of Credit on terms reasonably satisfactory to the Issuing Lender, cannot be waived absent the consent of the applicable Issuing Lender;

12. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

13. all fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Escrow Account pending the Bankruptcy Court's approval of such fees and expenses; and

14. all fees, expenses, and other amounts payable to the Consenting Creditors pursuant to the Restructuring Support Agreement, including, without limitation, the Restructuring Expenses, shall have been paid in full.

B.    *Waiver of Conditions.*

Any one or more of the conditions to Consummation set forth in this Article IX may be waived by the Debtors with the prior written consent (e-mail from counsel being sufficient) of the Required Consenting Stakeholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by the Debtors, or any Holders of Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims against or Interests in the Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

D.    *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

# ARTICLE X.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing. Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

A.    *Jurisdiction and Venue.*

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue in the District of Delaware was proper as of the Petition Date and continues to be proper. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter

jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.      *Voting Report.*

Prior to the Confirmation Hearing, the Solicitation Agent filed the Voting Report.  All procedures used to distribute Solicitation Materials to the applicable Holders of Claims and to tabulate the ballots were fair and conducted in accordance with the Scheduling Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, Laws, and regulations.  Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

C.      *Judicial Notice.*

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing).  Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

D.      *Transmittal and Mailing of Materials; Notice.*

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article VIII of the Plan, along with all deadlines for voting on or objecting to the Plan, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b) and the Scheduling Order, has been given to (1) all known Holders of Claims and Interests, (2) parties that requested notice in accordance with Bankruptcy Rule 2002, (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed in the Claims Register.  Such transmittal and service were appropriate, adequate, and sufficient.  Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Scheduling Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

E.      *Solicitation.*

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Scheduling Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, Laws, and regulations.  The Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of New Common Stock and any debt securities that were offered or sold under the Plan and, pursuant to section 1125(e) of the Bankruptcy Code, and no Released Party is or shall be liable on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such debt securities.

F.      *Burden of Proof.*

The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.  The Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

G.      *Bankruptcy Rule 3016(a) Compliance.*

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

H.  *Compliance with the Requirements of Section 1129 of the Bankruptcy Code.*

The Plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1.  Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

(a)  Standing.

Each of the Debtors has standing to file a plan and the Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

(b)  Proper Classification.

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are not required to be classified.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within such Class.

(c)  Specification of Unimpaired Classes.

Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Interests that are not Impaired.

(d)  Specification of Treatment of Impaired Classes.

Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

(e)  No Discrimination.

Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

(f)  Plan Implementation.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation.  Immediately upon the Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Effective Date pursuant to the terms of the Plan.  Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

(g)  Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan.

The New Organizational Documents comply with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

(h)  Impairment/Unimpairment of Classes of Claims and Equity Interests.

Pursuant to section 1123(b)(1) of the Bankruptcy Code: (i) Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), and Class 7 (Intercompany Interests) are Unimpaired under the Plan; and (ii) Class 3 (First Lien Claims), Class 4 (Second Lien Term Loan Claims), Class 8 (Existing Interests), and Class 9 (Section 510(b) Claims) are Impaired under the Plan.

(i)        Assumption and Rejection of Executory Contracts and Unexpired Leases.

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to Article V of the Plan, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed except as provided in Article V.A. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

The Debtors have exercised reasonable business judgment in determining whether to assume, assume and assign, or reject (to the extent applicable) each of their Executory Contracts and Unexpired Leases under the terms of the Plan. Each pre- or post-Confirmation assumption, assumption and assignment, or rejection (to the extent applicable) of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid, and binding upon the applicable Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such assumption, assumption and assignment, or rejection (to the extent applicable) had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be assumed, assumed and assigned, or rejected (to the extent applicable) is deemed to be an Executory Contract or an Unexpired Lease, as applicable.

(j)        Settlement of Claims and Causes of Action.

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Specifically, the settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors, as applicable: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.

(k)        Cure of Defaults.

Article V.C of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Cure costs noticed to counterparties to Executory Contracts and Unexpired Leases represent the amount, if any, the Debtors propose to pay in full and complete satisfaction of such default claims. Any disputed Cure amounts will be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will Cure, or provide adequate assurance that the Debtors will promptly Cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

(l)        Other Appropriate Provisions.

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) distributions to Holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving Disputed, contingent, and unliquidated Claims, (iv) Cure amounts, procedures governing Cure disputes, and (v) indemnification obligations.

    2.    <u>Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code</u>.

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019. In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances or rejections of the Plan was (i) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation and (ii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code. Accordingly, the Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

    3.    <u>Section 1129(a)(3)–Proposal of Plan in Good Faith</u>.

The Debtors have proposed the Plan in good faith and not by any means forbidden by Law based on the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize.

    4.    <u>Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable</u>.

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved. The fees and expenses incurred by Professionals retained by the Debtors shall be payable according to the orders approving such Professionals' retentions, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.

    5.    <u>Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy</u>.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the individuals proposed to serve on the New Board and as management of Reorganized Holdings, and each such individual's compensation upon Consummation of the Plan, has been fully disclosed in the Plan Supplement to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

    6.    <u>Section 1129(a)(6)–Approval of Rate Changes</u>.

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtors.

    7.    <u>Section 1129(a)(7)–Best Interests of Creditors and Interest Holders</u>.

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits or declarations in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits or declarations Filed in connection with, the Confirmation Hearing, are reasonable. With respect to each Impaired Class, each Holder of an Allowed Claim or Allowed Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a

value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

8.　　Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class.

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan.  Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.　　Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.

The treatment of DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

10.　　Section 1129(a)(10)–Acceptance by at Least One Impaired Class.

At least one Impaired Class has voted to accept the Plan.  Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

11.　　Section 1129(a)(11)–Feasibility of the Plan.

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  Based upon the evidence proffered or adduced at, or prior to, or in affidavits or declarations Filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except as such liquidation is proposed in the Plan.  Furthermore, the Debtors will have adequate assets to satisfy their respective obligations under the Plan.

12.　　Section 1129(a)(12)–Payment of Bankruptcy Fees.

Article II.E of the Plan provides for the payment of all fees payable under section 1930(a) of the Judicial Code in accordance with section 1129(a)(12) of the Bankruptcy Code.

13.　　Section 1129(a)(13)–Retiree Benefits.

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

14.　　Section 1129(a)(14)–Domestic Support Obligations.

The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

15.　　Section 1129(a)(15)–The Debtors Are Not Individuals.

The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

16.    <u>Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers</u>.

Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

17.    <u>Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes</u>.

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any) because all similarly situated Claims and Interests will receive substantially similar treatment. The Plan also does not discriminate unfairly with respect to classification or treatment of the Holders of Impaired Claims. The treatment of the Holders of Impaired Claims is "fair and equitable" pursuant to 1129(b). There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan. The Plan, therefore, subject to Article III.G of the Plan, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

18.    <u>Section 1129(c)–Confirmation of Only One Plan With Respect to the Debtors</u>.

The Plan is the only plan that has been Filed in these Chapter 11 Cases with respect to the Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

19.    <u>Section 1129(d)–Principal Purpose Not Avoidance of Taxes</u>.

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

20.    <u>Section 1129(e)–Small Business Case</u>.

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases.

I.    *Securities Under the Plan.*

Pursuant to the Plan, and without further corporate or other action, the New Common Stock and any debt issued or assumed by the Reorganized Debtors will be issued, entered into, or assumed, as applicable, on the Effective Date subject to the terms of the Plan.

J.    *Releases and Discharges.*

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims and Interests, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (1) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (2) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (3) is an integral element of the transactions incorporated into the Plan; (4) confers material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors; (5) is important to the overall objectives of the Plan to finally resolve all Claims and Interests among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (6) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (7) is given and made after due notice and opportunity for hearing; and (8), without limiting the foregoing, with respect to the releases and injunctions in Article VIII of the Plan, are (a) essential elements of the Restructuring Transactions and Plan, terms and conditions without which the Consenting Parties would not have entered into the Restructuring Support Agreement and (b) narrowly tailored. Further, the injunction set forth in Article VIII.F is an essential component of the Plan, the product of long-term negotiations, and achieved by the exchange of good and valuable consideration in the Chapter 11 Cases.

K.        *Release and Retention of Causes of Action.*

It is in the best interests of Holders of Claims and Interests that the provisions in Article VIII of the Plan be approved.

L.        *Approval of Restructuring Support Agreement and Other Restructuring Documents and Agreements.*

All documents and agreements necessary to implement the Plan and the Restructuring Transactions, including the Restructuring Support Agreement, are essential elements of the Plan, are necessary to consummate the Plan and the Restructuring Transactions, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable, and are hereby reaffirmed and approved, and, subject to the occurrence of the Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

M.        *Confirmation Hearing Exhibits.*

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

N.        *Objections to Confirmation of the Plan.*

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

O.        *Retention of Jurisdiction.*

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

P.        *Plan Supplement.*

The Debtors Filed the Plan Supplement.  All of the documents contained in the Plan Supplement comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE XI.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.        *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement (which are incorporated herein pursuant to Article I.H), the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any

inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement and subject to the consent rights therein (which are incorporated herein pursuant to Article I.H), the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection (to the extent applicable) of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to:   (a) the assumption, assumption and assignment, or rejection (to the extent applicable) of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (to the extent applicable) or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.  ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.  enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.M hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the New Organizational Documents and the New Stockholders Agreement and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims against or Interests in the Debtors (irrespective of whether such Holders have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.    *Additional Documents.*

Subject to and in accordance with the Restructuring Support Agreement, on or before the Effective Date, (1) the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement and (2) the Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims against the Debtors receiving distributions pursuant to the Plan, and all other parties in interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Statutory Committee and Cessation of Fee and Expense Payment*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members or advisors to any statutory committee after the Confirmation Date.

D.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity; *provided* that nothing in this Article XIII.E modifies section 524(e) of the Bankruptcy Code.

F.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Carestream Health, Inc.<br>150 Verona Street<br>Rochester, New York 14608<br>Attention: Julie Lewis | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention: Patrick J. Nash, Jr., P.C.<br>Tricia Schwallier Collins<br>Yusuf U. Salloum<br>(patrick.nash@kirkland.com)<br>(tricia.schwallier@kirkland.com)<br>(yusuf.salloum@kirkland.com)<br><br>and<br><br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Nicole L. Greenblatt, P.C.<br>Rachael M. Bentley<br>(nicole.greenblatt@kirkland.com)<br>(rachael.bentley@kirkland.com)<br><br>and<br><br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19801<br>Attention: Laura Davis Jones<br>Timothy P. Cairns<br>Edward Corma<br>(ljones@pszjlaw.com)<br>(tcairns@pszjlaw.com)<br>(ecorma@pszjlaw.com) |
| **Counsel to the Crossover Group** ||
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York 10036<br>Attention: Philip Dublin; Naomi Moss; Iain Wood<br>E-mail address: pdublin@akingump.com; nmoss@akingump.com; iwood@akingump.com ||

| United States Trustee |
|---|
| Office of the United States Trustee<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801 |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date and provided such notice was sent, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests. Notwithstanding anything herein to the contrary, the Reorganized Debtors shall provide notice of any documents to all Entities whose rights are affected by any such document Filed by the Reorganized Debtors.

G.      *Term of Injunctions or Stays.*

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

H.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://kccllc.net/Carestream or the Bankruptcy Court's website at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however*, any such alteration or interpretation shall be acceptable to the Debtors and the Required Consenting Stakeholders. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors and the Consenting Parties will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Parties, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.      *Closing of Chapter 11 Cases.*

On and after the Effective Date, the Debtors, or the Reorganized Debtors shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Carestream Holdings, or any other Debtor identified in the Restructuring Steps Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims and any adversary proceedings, shall be administered and heard in the Chapter 11 Case of Debtor Carestream Holdings, or any other Debtor identified in the Restructuring Steps Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

M.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  August 21, 2022

CARESTREAM HEALTH, INC.
on behalf of itself and all other Debtors

_/s/  Scott H. Rosa_
Name:  Scott H. Rosa
Title:  Vice President and Chief Financial Officer

**Exhibit B**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING PRE-PACKAGED CHAPTER 11 CASES IN THE BANKRUPTCY COURT (AS DEFINED BELOW).

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of August 21, 2022 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):[1]

    i.    Carestream Health Holdings, Inc., a company incorporated under the Laws of Delaware ("**Carestream**"), and each of its affiliates listed on **Exhibit A** to this

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Parties (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold, First Lien Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting First Lien Lenders**");

iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Second Lien Lenders**," and together with the Consenting First Lien Lenders, the "**Consenting Creditors**");

iv.    the DIP Lenders (as defined below and, together with the Consenting Creditors, the "**Consenting Stakeholders**"); and

v.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold Equity Interests in Carestream and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Crossover Group (the Entities in this clause (iv), collectively, and solely in their capacity as current holders of Equity Interests in Carestream, the "**Sponsor**," and together with the Consenting Stakeholders, the "**Consenting Parties**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Parties have in good faith and at arm's-length negotiated certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in (a) this Agreement and (b) the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**") and, such transactions as described in this Agreement, the Restructuring Term Sheet, the DIP Commitment Letter (including the DIP Term Sheet attached thereto), the New First Lien ABL Backstop Commitment Letter (including the New First Lien ABL Facility Term Sheet attached thereto), the New First Lien Term Loan Facility Term Sheet, and the Definitive Documents (each as defined below), in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, and including any exhibits, annexes, and schedules thereto, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties shall implement the Restructuring Transactions through pre-packaged chapter 11 cases by commencing voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**", such cases, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Plan (as defined below) and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Term Sheets, as applicable.  The following terms shall have the following definitions:

"**<u>Affiliate</u>**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**<u>Agent</u>**" means, collectively, any administrative agent, collateral agent, or similar Entity under the First Lien Term Loan Facility, the First Lien Revolving Facility and/or the Second Lien Term Loan Facility, including any successors thereto.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02.

"**<u>Agreement Effective Date</u>**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Party that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Party becomes a party hereto) to the Termination Date applicable to that Party.

"**<u>Alternative Restructuring Proposal</u>**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**<u>Bankruptcy Code</u>**" has the meaning set forth in the Recitals to this Agreement.

"**<u>Bankruptcy Court</u>**" has the meaning set forth in the Recitals to this Agreement.

3

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Carestream**" has the meaning set forth in the preamble of this Agreement.

"**Causes of Action**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions including those certain Confidentiality Agreements between Carestream and certain members of the Crossover Group, dated November 21, 2021, March 18, 2022 or March 22, 2022, as applicable.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129, which shall be in form and substance acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Parties**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Crossover Group**" means that certain ad hoc group of holders of First Lien Term Loan Claims and Second Lien Term Loan Claims represented by the Crossover Group Advisors.

"**Crossover Group Advisors**" means Akin Gump Strauss Hauer & Feld LLP, GLC Advisors & Co., Troutman Pepper Hamilton Sanders LLP, any other local counsel, and any other professionals and/or consultants for the Crossover Group, if any, as may be mutually agreed to by the Crossover Group and the Company Parties.

"**Debtors**" means the Company Parties that are debtors and debtors in possession in the event the Company Parties commence Chapter 11 Cases.

"**Definitive Documents**" means, collectively, each of the documents listed in Section 3.01 of this Agreement.

"**DIP Agent**" means the administrative agent and collateral agent under the DIP Facility.

"**DIP Commitment Letter**" means the commitment letter, the form of which is attached as **Exhibit C** hereto, as may be amended, supplemented, or otherwise modified from to time in accordance with its terms, to be entered into between the Company Parties that will be Debtors and the DIP Lenders concurrently with effectiveness of this Agreement, pursuant to which the DIP Lenders will agree to fund the DIP Facility in an amount of up to $80 million in accordance with the terms thereof.

"**DIP Facility**" means the debtor in possession financing facility for the priming super priority secured delay draw term loans to be provided to the Debtors on the terms and conditions set forth in the term sheet attached hereto as **Exhibit C-1** (the "**DIP Term Sheet**") and on other terms and conditions to be agreed by the Debtors and the Required DIP Lenders, not inconsistent with the DIP Term Sheet.

"**DIP Facility Documents**" means any documents governing the DIP Facility that are entered into in accordance with the DIP Term Sheet and the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, including the DIP Term Sheet.

"**DIP Lenders**" means the lenders providing the DIP Facility under the DIP Facility Documents.

"**DIP Obligations**" means all loans and other liabilities and obligations owed to the DIP Lenders and the DIP Agent under or in connection with the DIP Facility and DIP Term Sheet.

"**DIP Orders**" means, together, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Domestic Company Parties**" means the Company Parties identified as "Domestic Company Parties" in **Exhibit A** to this Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants (including the Existing Warrants), rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended and including any rule or regulation promulgated thereunder.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Warrants**" means those certain warrants issued pursuant to the issuance agreement, dated May 8, 2020, by and among Carestream and the parties thereto, and any warrants issued in exchange for or replacement of such warrants pursuant to the terms thereof.

"**Final DIP Order**" means the final order approving the DIP Facility and the DIP Facility Documents.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek leave to appeal, or seek certiorari has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari or leave to appeal could be sought or the new trial, reargument, leave to appeal or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" means the first-day motions, applications and related pleadings that the Debtors determine, in consultation with the Required Consenting Stakeholders, are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**First Lien Claims**" means, collectively, the First Lien Term Loan Claims and First Lien Revolving Facility Claims.

"**First Lien Credit Agreement**" means the loan agreement, dated as of June 7, 2013 between Carestream Health Holdings, Inc., as borrower, the lenders party thereto, and Credit Suisse AG. Cayman Islands Branch, as Administrative Agent, including all amendments, modifications, and supplements thereto.

"**First Lien Revolving Facility**" means the revolving credit facility provided for under the First Lien Credit Agreement.

"**First Lien Revolving Facility Claims**" means any Claim on account of the First Lien Revolving Facility.

"**First Lien Term Loan Claims**" means any Claim on account of the First Lien Term Loan Facility.

"**First Lien Term Loan Facility**" means the term loan facility provided for under the First Lien Credit Agreement.

"**Foreign Company Party**" means each Company Party identified as a "Foreign Guarantor Subsidiary" in **Exhibit A** to this Agreement.

"**Foreign Guarantor Subsidiaries Forbearance Provisions**" means the provisions set forth in **Exhibit D** to this Agreement, as such provisions may be amended, restated, waived, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Foreign Guarantor Subsidiaries**" means each direct or indirect subsidiary of Carestream that is organized or formed pursuant to the law of a jurisdiction outside of the United States and is an obligor or guarantor under the First Lien Credit Agreement or the Second Lien Credit Agreement as of the Execution Date, including each such subsidiary set forth on **Exhibit A** as a Foreign Guarantor Subsidiary.

"**Governance Documents**" means, as applicable, the organizational and governance documents for New Carestream, the Company Parties (and the obligors under the New First Lien Term Loan Facility and the New First Lien ABL Facility, if not a Company Party), and their respective direct and indirect subsidiaries, giving effect to the Restructuring Transactions, including any certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements, (or equivalent governing documents), and the identities of proposed members of the board of directors of New Carestream.

"**Interim DIP Order**" means the interim order approving the DIP Facility and the DIP Facility Documents.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit F**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Management Compensation Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as <u>Annex 3</u> thereto, which provides the terms of employment of New Carestream's management team.

"**Milestones**" means the applicable milestones set forth on **Schedule 1** attached hereto, as such may be extended in accordance with the terms of this Agreement.

"**New Carestream**" means Carestream, as reorganized pursuant to the Plan, which shall be the ultimate parent of the other Company Parties on and after the Plan Effective Date.

"**New Common Stock**" means the new common stock or equivalent equity interests of New Carestream.

"**New ERO Common Stock**" means the New Common Stock offered for purchase in connection with the Rights Offering.

"**New First Lien ABL Backstop Commitment Letter**" means that certain backstop commitment letter, the form of which is attached as **Exhibit E** hereto, as may be amended, supplemented or otherwise modified from time to time in accordance with its terms, to be entered into between certain of the Company Parties and certain Entities that have agreed to backstop the New First Lien ABL Facility.

"**New First Lien ABL Credit Agreement**" means the definitive credit agreement with respect to the New First Lien ABL Facility as such may be amended, supplemented, or otherwise modified from to time, and on terms consistent with the terms set forth in the New First Lien ABL Facility Term Sheet and otherwise acceptable to the Debtors, the Required Consenting First Lien Lenders and the Required DIP Lenders.

"**New First Lien ABL Facility**" means the first lien asset-based lending facility provided for under the New First Lien ABL Credit Agreement, which New Carestream shall enter into on the Plan Effective Date.

"**New First Lien ABL Facility Term Sheet**" means the term sheet attached hereto as **Exhibit E-1**.

"**New First Lien Term Loan Facility Credit Agreement**" means the definitive credit agreement with respect to the New First Lien Term Loan Facility as such may be amended, supplemented, or otherwise modified from to time, and on terms consistent with the terms set forth in the New First Lien Term Loan Facility Term Sheet and otherwise acceptable to the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders.

"**New First Lien Term Loan Facility**" means the first lien term loan facility provided for under the New First Lien Term Loan Facility Credit Agreement, which New Carestream shall enter into on the Plan Effective Date.

"**New First Lien Term Loan Facility Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as <u>Annex 1</u> thereto, which provides the terms of the New First Lien Term Loan Facility.

"**Original Restructuring Support Agreement**" means that certain restructuring support agreement, dated as of April 22, 2022, by and among the Company Parties and certain of the Consenting Parties, as amended, supplemented, or otherwise modified from time to time in accordance with its terms prior to the Agreement Effective Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint pre-packaged chapter 11 plan of reorganization for the Debtors, which shall be on terms and conditions consistent with this Agreement, the Term Sheets, and the other Definitive Documents.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that, subject to the terms and conditions provided in this Agreement, will be filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting First Lien Lenders**" means, as of the relevant date, three (3) or more unaffiliated Consenting First Lien Lenders holding, collectively, in excess of 50% of the aggregate outstanding principal amount of First Lien Claims that are held by Consenting First Lien Lenders.

"**Required Consenting Second Lien Lenders**" means, as of the relevant date, three (3) or more unaffiliated Consenting Second Lien Lenders holding, collectively, in excess of 50% of the aggregate outstanding principal amount of Second Lien Term Loan Claims that are held by Consenting Second Lien Lenders.

"**Required Consenting Stakeholders**" means the Required Consenting First Lien Lenders, the Required Consenting Second Lien Lenders and the Required DIP Lenders.

"**Required DIP Lenders**" means, as of the relevant date, three (3) or more unaffiliated DIP Lenders holding, in the aggregate, in excess of 50% in principal amount of the outstanding Tranche B DIP Obligations held by the DIP Lenders.

"**Restructuring Steps Memorandum**" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rights Offering**" means the offering of rights to holders of Second Lien Term Loan Claims to purchase the New ERO Common Stock on the terms set forth in the Plan, which rights offering shall be consummated by the Debtors on the Plan Effective Date in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" means the procedures governing the conduct of the Rights Offering, which Rights Offering Procedures shall be in accordance with this Agreement and the Definitive Documents.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Credit Agreement**" means the loan agreement, dated as of June 7, 2013, between Carestream Health Holdings, Inc., as borrower, and Credit Suisse AG. Cayman Islands Branch, as Administrative Agent, including all amendments, modifications, and supplements thereto.

"**Second Lien Term Loan Facility**" means the second lien term loan facility provided for under the Second Lien Credit Agreement.

"**Second Lien Term Loan Claims**" means any Claim on account of the Second Lien Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, forms and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including the Disclosure Statement.

"**Term Sheets**" means, collectively, the Restructuring Term Sheet, the New First Lien Term Loan Facility Term Sheet, the New First Lien ABL Facility Term Sheet, the DIP Term Sheet, and the Management Compensation Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, 13.04, 13.05, 13.06, 13.07 or 13.08.

"**Tranche A DIP Lenders**" means the DIP Lenders providing the Tranche A DIP Loans under the DIP Facility.

"**Tranche A DIP Loans**" means the loans in the amount of up to $5 million to be provided by the Tranche A DIP Lenders under the DIP Facility.

"**Tranche A DIP Obligations**" means the DIP Obligations in connection with the Tranche A DIP Loans to be provided by the Tranche A DIP Lenders.

"**Tranche B DIP Obligations**" means the DIP Obligations other than the Tranche A DIP Obligations.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); provided, however that any pledge in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit G**.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Parties" refers in this Agreement to each counsel specified in Section 16.10 other than counsel to the Company Parties.

**Section 2.     *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Domestic Company Parties (as set forth in **Exhibit A**) shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)     holders of at least 66 2/3% of the aggregate amount of First Lien Claims;

(ii)     holders of at least 66 2/3% of the aggregate amount of Second Lien Term Loan Claims; and

(iii)     the Sponsor; and

(c)     counsel to the Company Parties shall have given notice to counsel to the Crossover Group in the manner set forth in Section 16.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.     *Definitive Documents*.**

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following:

(a)     the Plan (and all exhibits thereto);

(b)     the Confirmation Order;

(c)     the Disclosure Statement;

(d)     the Solicitation Materials;

(e)     the order of the Bankruptcy Court (which may be the Confirmation Order) approving the Disclosure Statement and the other Solicitation Materials (and motion(s) seeking approval thereof);

(f)      all pleadings filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto, but excluding any retention applications and related orders;

(g)      the Rights Offering Procedures and the subscription form for subscribing to the Rights Offering;

(h)      each Plan Supplement;

(i)      the Restructuring Steps Memorandum;

(j)      the DIP Commitment Letter (and the DIP Term Sheet attached thereto);

(k)      the DIP Orders (and motion(s) seeking approval thereof);

(l)      the DIP Facility Documents;

(m)      the New First Lien ABL Backstop Commitment Letter (and the New First Lien ABL Facility Term Sheet attached thereto);

(n)      the Management Compensation Term Sheet;

(o)      the Foreign Guarantor Subsidiaries Forbearance Provisions;

(p)      the Governance Documents;

(q)      the New First Lien ABL Credit Agreement and related ancillary documentation;

(r)      the New First Lien Term Loan Facility Credit Agreement and related ancillary documentation;

(s)      any and all filings with or requests for regulatory or other approvals from any governmental entity or unit; and

(t)      such other agreements instruments and documentation as may be necessary to consummate and document the transactions contemplated by this Agreement or the Plan.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14.  Unless otherwise set forth herein, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance acceptable to the Company Parties, the Required Consenting First Lien Lenders and the Required DIP Lenders; provided, however, that (a) the Governance Documents and the Management Compensation Term Sheet shall be in form and substance acceptable solely to the Company Parties and the Required DIP Lenders;

(b) any provision of any Definitive Document that impacts the treatment of the Second Lien Term Loan Claims, the terms of the Rights Offering, or the releases given by or received by the Consenting Second Lien Lenders shall be acceptable to the Required Consenting Second Lien Lenders; (c) the DIP Orders, DIP Commitment Letter and DIP Facility Documents shall be in form and substance acceptable solely to the Company Parties, the Required DIP Lenders, and the Tranche A DIP Lenders; (d) any provision of any Definitive Document that impacts the treatment of the Tranche A DIP Obligations shall be acceptable to the Tranche A DIP Lenders; and (e) any provision of any Definitive Document that impacts the consent rights of the Sponsor or that adversely modifies or affects the release, exculpation, injunction, indemnification, or insurance provisions related to the Sponsor shall be acceptable to the Sponsor.

**Section 4.**     *Commitments of the Consenting Parties*.

4.01.    <u>General Commitments, Forbearances, and Waivers</u>.

(a)    During the Agreement Effective Period, each Consenting Party severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, to:

(i)    with respect to the Consenting Parties that hold any First Lien Claims or any Second Lien Term Loan Claims, give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions as of the Plan Effective Date, including, but not limited to, to the extent applicable, amending and/or extending the duration of the Foreign Guarantor Subsidiaries Forbearance Provisions to reflect any amendments or extensions of duration of the Outside Date or other Milestones under this Agreement;

(ii)    with respect to the Consenting Parties that hold any First Lien Claims or any Second Lien Term Loan Claims, agree by execution of this Agreement and the effectiveness of this Agreement to (A) consent and to be deemed to have consented to the incurrence of the DIP Facility on the terms set forth in the DIP Term Sheet; (B) consent to the use of cash collateral pursuant to the DIP Orders; and (C) if necessary, give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the foregoing;

(iii)    support the Restructuring Transactions and vote or consent and not object, to the extent applicable, all Company Claims/Interests owned by or held by such Consenting Party and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(iv)    not, and not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims or Equity Interests against the Company Parties other than in accordance with this Agreement and the Definitive Documents;

(v)    support the Company Parties' efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(vi)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; and

(vii)    negotiate in good faith and use commercially reasonable efforts to execute, deliver, and implement the Definitive Documents and any other necessary agreements that are consistent with this Agreement to which it is a party in a timely manner to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)    During the Agreement Effective Period, each Consenting Party severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, or support any Alternative Restructuring Proposal;

(iii)    seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement, the Plan and the Restructuring Term Sheet; or

(iv)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its Company Claims/Interests against the Company Parties.

(c)    Each Consenting Party agrees to release, waive and discharge any and all Claims and Causes of Action it may have against the Company Parties and each other Consenting Party pursuant to the terms of the Plan.

4.02.    <u>Chapter 11 Voting</u>.  In addition to the obligations set forth in Section 4.01, during the Agreement Effective Period, each Consenting Party that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Party, whether before or after the commencement of the Chapter 11 Cases, of the Disclosure Statement and the Solicitation Materials:

(a)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Disclosure Statement and any other Solicitation Materials and the ballot;

(b)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(c)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a) and (b) above; <u>provided</u> that such votes or elections shall be automatically deemed revoked and void *ab initio* upon the expiration of the Agreement Effective Period.

4.03.   <u>Negative Commitments</u>. During the Agreement Effective Period, each Consenting Party, in respect of each of its Company Claims/Interests, severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other person to:

(a)     file any motion, objection, pleading, or other document with the Bankruptcy Court (if applicable) or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Plan and the Restructuring Term Sheet.

(b)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(c)     object to, delay, impede, or take any other action to: (i) interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code or (ii) take any other action inconsistent with this Agreement, the Plan and the Restructuring Term Sheet.

4.04.   <u>Forbearances and Waivers</u>.

(a)     Each Consenting Creditor (collectively constituting the "Required Lenders" under each of the First Lien Credit Agreement and the Second Lien Credit Agreement), during the Agreement Effective Period, hereby waives and agrees to forbear from exercising or directing any Entity to exercise remedies on account of, any breach by any Company Party (other than a Foreign Guarantor Subsidiary) of, and any default or event of default (howsoever described) under, the First Lien Credit Agreement or Second Lien Credit Agreement or any other loan document entered into in connection therewith which shall or may arise as a result of, directly or indirectly:

(i)     any of the steps, actions, or transactions required by, specified or contemplated in and/or implemented by or undertaken pursuant to this Agreement, the entry into the New First Lien ABL Credit Agreement, the entry into the New First Lien Term Loan Facility Credit Agreement and incurrence of the New First Lien Term Loan Facility, the entry into the DIP Commitment Letter and incurrence of the DIP Facility or the commencement of the Chapter 11 Cases;

(ii)     failing to make any regularly scheduled payment of principal, amortization or interest, or other amount due under the First Lien Credit Agreement or Second Lien Credit Agreement or any other loan document entered into in connection therewith; or

(iii)     failing to comply with any covenant or obligation under the First Lien Credit Agreement or Second Lien Credit Agreement or any other loan document entered into in connection therewith, or the breach of any representation or warranty or notice obligation related thereto.

(b)     For the avoidance of doubt, unless the Restructuring Transactions are consummated, it is understood and agreed that any waiver granted pursuant to Section 4.04(a) shall

16

be effective during the Agreement Effective Period only and shall not be deemed to be a permanent waiver of any default or event of default arising under the First Lien Credit Agreement or the Second Lien Credit Agreement.

(c)     Each Consenting Creditor hereby agrees to the Foreign Guarantor Subsidiaries Forbearance Provisions set forth in **Exhibit D** to this Agreement.

**Section 5.     *Additional Provisions Regarding the Consenting Parties' Commitments***. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Party to consult with any other Consenting Party, the Company Parties, the Debtors or any other party in interest (including, if applicable, any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) obligate a Consenting Party to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit a Consenting Party from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); provided, that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and such Consenting Party shall have the opportunity to change its vote; (e) prevent any Consenting Party from taking any action which is required by applicable Law; (f) require any Consenting Party to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege; (g) unless provided for under this Agreement, incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations; (h) prevent any Consenting Party by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; or (i) prohibit any Consenting Party from taking any action that is not inconsistent with this Agreement.

**Section 6.     *Commitments of the Company Parties***.

6.01.     Affirmative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with the terms, conditions and applicable deadlines set forth in this Agreement and instruct each of their applicable subsidiaries to do the same;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      consider in good faith all reasonable actions necessary or reasonably requested by the Required Consenting Stakeholders to facilitate the solicitation, confirmation (if applicable), and consummation of the Restructuring Transactions;

(f)      cause each of the Foreign Guarantor Subsidiaries to execute and deliver, and to take all actions necessary to execute and deliver, a duly executed Joinder to this Agreement as a Company Party to counsel to the Crossover Group no later than the earlier of (i) prior to any Company Party filing a voluntary petition to commence a Chapter 11 Case; and (ii) two (2) Business Days following the Execution Date, pursuant to which it shall have agreed to be legally bound by the Agreement as a Company Party hereto in all respects;

(g)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders;

(h)      continue ordinary course practices to maintain good standing under the jurisdiction in which each Company Party and each of its subsidiaries is incorporated or organized;

(i)      provide draft copies of all material (i) motions, (ii) documents, and (iii) other pleadings to be filed in the Chapter 11 Cases (excluding any retention applications) to the Crossover Group Advisors as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Crossover Group Advisors regarding the form and substance of any such proposed filing; provided, however, that in the event that not less than two (2) Business Days' notice is impossible or impracticable under the circumstances, the Company Parties shall provide draft copies of any motions or other pleadings (excluding any retention applications) to the Crossover Group Advisors as soon as otherwise practicable before the date when the Company Parties intend to file any such motion or other pleading;

(j)      prior to the Petition Date and, thereafter, subject to the terms of the DIP Orders, timely pay in full and in cash as and when invoiced all of the Crossover Group's reasonable and documented fees, costs and expenses, including, all reasonable and documented fees, costs and expenses of the professionals, consultants and advisors to the Crossover Group specified herein arising prior to and after the Petition Date; it being understood that, as of the Agreement Effective Date, the Crossover Group Advisors include (i) Akin Gump Strauss Hauer & Feld LLP, (ii) GLC Advisors & Co., (iii) Troutman Pepper Hamilton Sanders LLP, as Delaware local counsel, (iv) ALMAIN A.A.R.P.I., as French local counsel, (v) Legance – Avvocati Associati, as Italian local counsel, (vi) Perez-Llorca, as Spanish local counsel; and (vii) Alvarez & Marsal (as compensation consultant);

(k)    provide, and direct their employees, officers, advisors and other representatives to provide, to the Crossover Group and the Crossover Group Advisors (i) reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business, (ii) reasonable access to the management and advisors of the Company Parties on reasonable advance notice to such persons and without disruption to the operation of the Company Parties' business, and (iii) such other information as reasonably requested by the Crossover Group or the Crossover Group Advisors; in all cases, subject to the appropriate agreement on use and confidentiality;

(l)    (i) stipulate to the allowance and amounts of the First Lien Claims and the Second Lien Term Loan Claims and to the validity of the liens securing such Claims and (ii) timely file a formal objection to any motion filed with the Bankruptcy Court by a third party challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, disallowance or subordination of, any portion of the First Lien Claims or the Second Lien Term Loan Claims, or the liens securing such Claims (as applicable);

(m)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Cases; and

(n)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable.

6.02.    Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions or any of the other transactions described in, this Agreement, the Plan or the other Definitive Documents;

(c)    seek to modify the Plan or any other Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Restructuring Term Sheet in all material respects;

(d)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court (if applicable) or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement;

(e)    sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business; or

(f)      seek, solicit or support any Alternative Restructuring Proposal, other than as expressly permitted under Section 7.01 hereof.

6.03.    Foreign Guarantor Subsidiaries Forbearance Provisions.  Each Foreign Company Party agrees to the Foreign Guarantor Subsidiaries Forbearance Provisions set forth in **Exhibit D** to this Agreement.

**Section 7.**      *Additional Provisions Regarding Company Parties' Commitments*.

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Party), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals, in each case, if the board of directors of such Company Party determines, after consulting with counsel, in good faith, and consistent with its fiduciary duties, that (i) such Alternative Restructuring Proposal could maximize the value of the Company Parties' estates and recoveries to all their stakeholders as compared to the Restructuring Transactions, and (ii) proceeding with the Restructuring Transactions would be inconsistent with the applicable fiduciary duties of the board of directors of such Company Party.  The Company Parties shall (x) provide to the Crossover Group Advisors, on a professional eyes only basis, a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring Proposal within one (1) Business Day of the Company Parties' or their advisors' receipt of such offer or proposal and (y) provide such information to the Crossover Group Advisors regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep the Crossover Group Advisors reasonably contemporaneously informed as to the status and substance of such discussions.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Party shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Party;

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Party or an affiliate thereof bound by the terms of this Agreement and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties by the close of business on the second Business Day following such Transfer; and

(c)     in the case of a Transfer by a DIP Lender, such transfer is made pursuant to the terms of the DIP Commitment Letter.

8.02.    Upon compliance with the requirements of Section 8.01, the transferee shall be deemed a Consenting Party, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Parties from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Parties) and (b) such Consenting Party must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Party to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for

such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a permitted Transfer under Section 8.01.  To the extent that a Consenting Party is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Party without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting Party and is unable to transfer such Company Claims/Interests within the five (5) Business Day-period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement  in respect of such Company Claims/Interests.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**    *Representations and Warranties of Consenting Parties*.  Each Consenting Party severally, and not jointly, represents and warrants that, as of the date such Consenting Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting Party's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to tender, act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, tender, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor

(as defined in the Rules), and (ii) any securities acquired by the Consenting Party in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.** ***Representations and Warranties of Company Parties***.  Each of Carestream and Carestream Health, Inc., severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement, entry into this Agreement is consistent with the exercises of such Company Party's fiduciary duties.

**Section 11.** ***Reserved.***

**Section 12.** ***Mutual Representations, Warranties, and Covenants***.  Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, a Joinder or a Transfer Agreement, as applicable, and as of the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, if applicable, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 13.**    *Termination Events*.

13.01.   Consenting Stakeholder Termination Events.[2]  This Agreement may be terminated by the Required DIP Lenders or the Required Consenting First Lien Lenders as to all Parties by the delivery to all Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for seven (7) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 16.10 hereof detailing any such breach;

(b)      any of the Milestones set forth in **Schedule 1** (as may have been extended with the approval of the Required DIP Lenders and Required Consenting First Lien Lenders) is not achieved, except where such Milestone has been waived or extended by the applicable Required Consenting Stakeholders; *provided*, that the right to terminate this Agreement under this Section 13.01(b) shall not be available to a Consenting Stakeholder if the failure of such Milestone to be achieved is caused by, or results from, the breach by such Consenting Stakeholder of its covenants, agreements or other obligations under this Agreement;

(c)      this Agreement or any Definitive Document is amended, waived or modified in any manner not consistent in any material respect with the terms of this Agreement;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)      the Bankruptcy Court enters an order denying confirmation of the Plan and (i) such order remains in effect for seven (7) Business Days after entry of such order and (ii) the Company Parties have failed to timely appeal such order;

(f)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required DIP Lenders and Required Consenting First Lien Lenders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the

---

[2]    Any and all references to "Company Party" or "Company Parties" in this Section 13.01 shall mean each of the Company Parties set forth on **Exhibit A** hereto, including any such party that has not yet executed and delivered a counterpart signature page or Joinder to this Agreement as of the Execution Date.

Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(g)     upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding;

(h)     any Company Party (i) files, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Consenting Stakeholders under this Agreement) without the prior written consent of the applicable Required Consenting Stakeholders, (ii) revokes the Restructuring Transactions without the prior consent of the Required Consenting Stakeholders, including the withdrawal of the Plan or support therefor, or (iii) publicly announces its intention to take any such acts listed in the foregoing clauses (i) or (ii) or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(i)     any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required DIP Lenders and the Required Consenting First Lien Lenders;

(j)     if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(k)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required DIP Lenders and the Required Consenting First Lien Lenders;

(l)     the occurrence of any "Event of Default" under (and as defined in) the DIP Orders or DIP Facility Documents that has not been cured (if susceptible to cure) or waived by the Required DIP Lenders;

(m)     if (i) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the consent of the Required DIP Lenders and the Tranche A DIP Lenders, or (ii) a motion for reconsideration, reargument or rehearing with respect to any such order has been filed and the Company Parties have failed to timely object to such motion;

(n)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal (including as contemplated by Section 7.02);

(o)    entry by any of the Company Parties, or announcement of their intention to enter into, definitive documentation relating to any Alternative Restructuring Proposal;

(p)    seven (7) Business Days after the occurrence of any court of competent jurisdiction or other competent governmental or regulatory authority issuing a ruling or an order and such ruling or order becoming final and non-appealable, making illegal or otherwise restricting, preventing or prohibiting the consummation of the transactions contemplated by this Agreement in a way that cannot be reasonably remedied by the Company Parties; or

(q)    the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the First Lien Claims or Second Lien Term Loan Claims, other than an order approving the transactions as contemplated by this Agreement or the Plan, as applicable, or the filing of any motion by the Company Parties that, if approved, would result in any of the foregoing.

13.02.  <u>Sponsor Termination Event</u>.  The Sponsor may terminate this Agreement as to itself upon the occurrence of any of the following events:

(a)    a material breach of this Agreement by any Party (other than the terminating Sponsor), which material breach is (i) adverse to the Sponsor and (ii) has not been cured (if susceptible to cure) within ten (10) Business Days after written notice in accordance with Section 16.10 hereof to the Company Parties and the Consenting Stakeholders of such material breach.  Notwithstanding anything in this Agreement, in the event the Sponsor terminates this Agreement under the terms of this Section 13.02(a), the Sponsor shall no longer be obligated to release, waive and discharge any and all Claims and Causes of Action it may have against the Consenting Stakeholders pursuant to Section 4.01(c) hereof and under the terms of the Plan, and the Company Parties and Consenting Stakeholders shall not be obligated to grant or support the grant of any releases to the Sponsor whether pursuant to the terms of the Plan or otherwise; or

(b)    any Definitive Document adversely modifies or affects the release, exculpation, injunction, indemnification, or insurance provisions related to the Sponsor as identified in this Agreement or the Term Sheets or implemented pursuant to the Plan.

13.03.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more Consenting Stakeholders of any provision set forth in this Agreement that remains uncured (to the extent curable) for a period of seven (7) Business Days after the receipt by the Consenting Stakeholders of notice of such breach; <u>provided</u>, <u>however</u>, that so long as the non-breaching Consenting Stakeholders continue to hold or control at least 66 2/3% of the aggregate outstanding principal amount of the First Lien Claims and at least 66 2/3% of the aggregate outstanding principal amount of the Second Lien Term Loan Claims, such termination shall be effective only with respect to such breaching Consenting Stakeholder;

(b)    the termination of this Agreement by the Required Consenting Stakeholders;

(c)        following delivery of notice by the Company Parties pursuant to Section 7.02, the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d)        the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for seven (7) Business Days after entry of such order;

(e)        the filing of any motion or pleading by any Consenting Stakeholder with the Bankruptcy Court that (i) is inconsistent in any material respect with this Agreement, the Plan or the Term Sheets or (ii) seeks approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Company Parties under this Agreement) without the consent of the Company Parties, and such motion or pleading has not been withdrawn within five (5) Business Days of such filing; provided, however, that so long as the non-breaching Consenting Stakeholders continue to hold or control at least 66 2/3% of the aggregate outstanding principal amount of the First Lien Claims and at least 66 2/3% of the aggregate outstanding principal amount of the Second Lien Term Loan Claims, such termination shall be effective only with respect to such breaching Consenting Stakeholder;

(f)        the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(g)        upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding;

(h)        seven (7) Business Days after the occurrence of any court of competent jurisdiction or other competent governmental or regulatory authority issuing a ruling or an order and such ruling or order becoming final and non-appealable, making illegal or otherwise restricting, preventing or prohibiting the consummation of the transactions contemplated by this Agreement in a way that cannot be reasonably remedied by the Company Parties; and

(i)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any

Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

13.04.  <u>Additional Termination Events</u>.  Upon the termination of this Agreement by the Sponsor with respect to the Sponsor pursuant to Section 13.02, the Required Consenting Stakeholders may terminate this Agreement with respect to all Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 16.10 hereof.

13.05.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Stakeholders; (b) the Sponsor; and (c) any Company Party.

13.06.  <u>Individual Termination</u>.  Any Consenting Stakeholder may terminate this Agreement as to itself only, upon written notice to the Company Parties and the other Consenting Stakeholders in the event that (a) this Agreement is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting Creditor as compared to similarly situated Consenting Creditors or (b) the Plan Effective Date has not occurred by the Outside Date, in each case, by giving seven (7) Business Days' written notice to the Company Parties and the other Consenting Stakeholders.

13.07.  <u>Required Consenting Second Lien Lender Termination</u>.  This Agreement may be terminated by the Required Consenting Second Lien Lenders with respect to the Consenting Second Lien Lenders should the treatment of the Second Lien Term Loan Claims, the terms of the Rights Offering or the releases given by or received by the Consenting Second Lien Lenders in any Definitive Document, including for the avoidance of doubt, any material amendments or modifications to any Definitive Document, be inconsistent with this Agreement, the Plan or the Restructuring Term Sheet.

13.08.  <u>Tranche A DIP Lender Termination</u>.  Any Tranche A DIP Lender may terminate this Agreement as to itself only, solely in its capacity as a Tranche A DIP Lender, upon written notice to the Company Parties and the other Consenting Stakeholders in the event that the DIP Orders, DIP Commitment Letter, DIP Facility Documents or the treatment of the Tranche A DIP Obligations are amended, modified or supplemented without its consent in a manner that adversely affects such Tranche A DIP Lender.

13.09.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

13.10.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the effectiveness of the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to

such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Creditor withdrawing or changing its vote pursuant to this Section 13.10 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Party, and (b) any right of any Consenting Party, or the ability of any Consenting Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Party.  No purported termination of this Agreement shall be effective under this Section 13.10 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.03(b).  Nothing in this Section 13.10 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.03(c).

**Section 14.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (i) each Company Party and (ii) the Required Consenting Stakeholders; provided, that if the proposed modification, amendment, waiver or supplement materially and adversely affects the rights of the Sponsor, then the consent of the Sponsor shall be required to effectuate such amendment, waiver, or supplement; provided, further, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Claims held by a Consenting Creditor as compared to similarly situated Consenting Creditors, then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment, waiver, or supplement; provided, further, that (a) any modification, amendment, or supplement to the definition of "Outside Date" shall not be binding on any Consenting Creditor that has not provided its prior written consent to such amendment, (b) any modification, amendment, or supplement to the definition of: (i) "Required Consenting Stakeholders" shall require the prior written consent of the Required Consenting First Lien Lenders, Required Consenting Second Lien Lenders, and the Required DIP Lenders, (ii) "Required Consenting First Lien Lenders" shall require the prior written consent of each Consenting First Lien Lender, (iii) "Required Consenting Second Lien Lenders" shall require the prior written consent of each Consenting Second Lien Lender, and (iv) "Required DIP Lenders" shall require the prior written consent of each DIP Lender holding Tranche B DIP Obligations; (c) any modification, amendment, or supplement to this Agreement

or the Restructuring Term Sheet that impacts the treatment of:  (i) the First Lien Claims shall require the prior written consent of each Consenting First Lien Lender, (ii) the Second Lien Term Loan Claims shall require the prior written consent of each Consenting Second Lien Lender, (iii) the Tranche A DIP Obligations shall require the prior written consent of each DIP Lender holding Tranche A DIP Obligations, and (iv) the Tranche B DIP Obligations shall require the prior written consent of each DIP Lender holding Tranche B DIP Obligations; and (d) any modification, amendment, or supplement to Section 14 hereof shall require the prior written consent of each Consenting Stakeholder.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**     *Termination of Original Restructuring Support Agreement*.  Each Company Party and each Consenting Party hereby agrees and consents to the termination of the Original Restructuring Support Agreement, and the Original Restructuring Support Agreement is hereby terminated, in each case, pursuant to Section 13.05 thereof and effective as of the Agreement Effective Date.

**Section 16.**     *Miscellaneous*

16.01.     <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.     <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.     <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Upon the commencement of the Chapter 11 Cases, each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.  TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and, except as set forth in Section 8, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Julie Lewis, General Counsel
E-mail address: Julie.Lewis@carestream.com
*with copies to*:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Patrick J. Nash; Tricia Schwallier
E-mail address:  patrick.nash@kirkland.com; tricia.schwallier@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Nicole L. Greenblatt; Rachael Bentley
E-mail address:  nicole.greenblatt@kirkland.com; rachael.bentley@kirkland.com

(b)    if to a Consenting Stakeholder, to:

Akin Gump Strauss Hauer & Feld
One Bryant Park
New York, NY 10036
Attention:  Philip Dublin; Naomi Moss; Iain Wood
E-mail address:  pdublin@akingump.com; nmoss@akingump.com,
iwood@akingump.com

(c)    if to the Sponsor, to:

Onex Partners Manager LP
712 Fifth Avenue
New York, New York 10019
Attention:  Adam Cobourn
E-mail:  acobourn@onex.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.12. <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.13. <u>Waiver</u>. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.15. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and neither joint nor joint and several.

16.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.18. <u>Capacities of Consenting Parties</u>. Each Consenting Party has entered into this agreement on account all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.19. <u>Relationship Among Consenting Parties and the Company Parties</u>. Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Parties under this Agreement shall be several and neither joint nor joint and several. None of the Consenting Parties shall have any fiduciary duty, any duty or trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Party, the Company Parties, or any of the Company Parties' creditors or other stakeholders, including without limitation any holders

of Company Claims/Interests, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Parties.  It is understood and agreed that any Consenting Party may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Party, subject to applicable securities laws, any Confidentiality Agreement, and this Agreement.  No prior history, pattern or practice of sharing confidences among or between any of the Consenting Parties and/or the Company Parties shall in any way affect or negate this understanding and agreement.  All rights under this Agreement are separately granted to each Consenting Party by the Company Parties and vice versa, and the use of a single document is for the convenience of the Company Parties. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

16.20.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 16 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

16.21.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14 or otherwise, including a written approval by the Company Parties, the Sponsor or the Required Consenting Stakeholders, as applicable, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.22.  <u>Settlement Discussions</u>.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

16.23.  <u>Confidentiality and Publicity</u>.  Other than as may be required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Party), other than legal, accounting, financial and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Company Claims/Interests held by any Consenting Party or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer); <u>provided</u>, <u>however</u>, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims/Interests held by the Consenting Parties collectively. Notwithstanding the foregoing, the Consenting Parties hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by law

or regulation; provided, however, that (a) if any of the Company Parties determines that they are required to attach a copy of this Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or concerning a specific Consenting Party's holdings of Company Claims/Interests (including before filing any pleading with the Bankruptcy Court) and (b) if disclosure of additional identifying information of any Consenting Party is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Party (who shall have the right to seek a protective order prior to disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement. Notwithstanding the foregoing, the Company Parties will submit to the Crossover Group Advisors all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable Law) in advance of release. Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow.]*

[*Signature pages omitted*]

## EXHIBIT A

### Domestic Company Parties

1. Carestream Health Acquisition LLC
2. Carestream Health Canada Holdings, Inc.
3. Carestream Health Holdings, Inc.
4. Carestream Health, Inc.
5. Carestream Health International Holdings, Inc.
6. Carestream Health International Management Company, Inc.
7. Carestream Health Puerto Rico, LLC
8. Carestream Health World Holdings LLC
9. Lumisys Holdings Co.

### Foreign Guarantor Subsidiaries

10. Carestream Health Canada Company
11. Medical Flow Solutions S.A.
12. Carestream Health (Near East) Limited
13. Carestream Health (Near East) Limited (Dubai BR)
14. Carestream Holdings (Bermuda) Ltd.
15. Carestream do Brasil Comércio e Serviços de Produtos Médicos Ltda.
16. Carestream Health Deutschland Administration GmbH
17. Carestream Health Deutschland Holding GmbH
18. Coöperatieve Carestream Global Holdings U.A.
19. Health Products and Services B.V.
20. Carestream Health Netherlands B.V.
21. Carestream Health Singapore Pte. Ltd.
22. Carestream Health SA
23. Carestream Health Japan Co., Ltd.
24. Soluciones Medicas Exportacion, S. de R.L. de C.V.
25. Soluciones Medicas Comercial, S.A. de C.V.
26. Soluciones Medicas Manufactura, S.A. de C.V.
27. Carestream Health Hong Kong Limited
28. Carestream Health Hong Kong Holding Limited

## **EXHIBIT B**

**Restructuring Term Sheet**

# CARESTREAM HEALTH, INC.

## RESTRUCTURING TERM SHEET

This term sheet (this "Restructuring Term Sheet") contains certain material terms and conditions of the proposed restructuring (the "Restructuring" or "Restructuring Transactions") of Carestream Health Holdings, Inc. ("Carestream") and certain of its direct and indirect subsidiaries (together with Carestream, the "Company" or the "Debtors").   This Restructuring Term Sheet does not address all terms, conditions or other provisions that would be required in connection with the Restructuring or that will be set forth in the Definitive Documents, which are subject to agreement in accordance with the restructuring support agreement to which this Restructuring Term Sheet is attached (the "Restructuring Support Agreement").[1]

**THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT.**

**THIS RESTRUCTURING TERM SHEET IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE COMPANY AND THE CROSSOVER GROUP.[2] ACCORDINGLY, THIS RESTRUCTURING TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING TERM SHEET IS PROVIDED IN CONFIDENCE.   NEITHER THIS RESTRUCTURING TERM SHEET, NOR THE FACT THAT IT EXISTS OR THE TERMS HEREOF, MAY BE SHARED WITH ANY PARTY WITHOUT THE EXPRESS WRITTEN CONSENT OF THE COMPANY AND THE CROSSOVER GROUP AND/OR THEIR RESPECTIVE LEGAL ADVISORS.   THIS RESTRUCTURING TERM SHEET DOES NOT CREATE A DUTY TO NEGOTIATE IN GOOD FAITH TOWARD DEFINITIVE DOCUMENTATION AND SHALL NOT BE RELIED UPON BY ANY PERSON AS THE BASIS FOR ANY LIABILITY OR THE BASIS FOR A CONTRACT BY ESTOPPEL OR OTHERWISE.**

---

[1]   Terms used but not defined herein shall have the definitions ascribed to them in the Restructuring Support Agreement or the exhibits, annexes and schedules thereto.

[2]   The "Crossover Group" means that certain ad hoc group of holders of First Lien Claims and Second Lien Term Loan Claims, including the DIP Lenders (each as defined below), represented by Akin Gump Strauss Hauer & Feld LLP and Troutman Pepper Hamilton Sanders LLP, as counsel, and GLC Advisors & Co. LLC, as financial advisor.

| Restructuring Transactions Overview | |
|---|---|
| **Restructuring Overview** | The Restructuring will be consummated pursuant to the Definitive Documents through confirmation of a pre-packaged chapter 11 plan (the "<u>Plan</u>") in voluntary cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>" and such cases, the "<u>Chapter 11 Cases</u>"). |
| | The Restructuring Transactions will be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto) and the consent rights set forth therein. |
| | In general, the Restructuring contemplates: |
| | (a)   certain Consenting Creditors shall provide priming senior secured superpriority debtor in possession financing (the "<u>DIP Facility</u>") in the form of delayed-draw term loans in an amount of up to $5 million in Tranche A DIP Loans (as defined below) and in an amount of up to $75 million in Tranche B DIP Loans (as defined below); the Tranche A DIP Loans shall be repaid in full in cash on or prior to the Plan Effective Date and the Tranche B DIP Loans shall be satisfied, in part, from the proceeds of the Rights Offering (as defined below), with any portion of the Tranche B DIP Loans not repaid from Rights Offering proceeds converting into New Common Stock (as defined below) on the Plan Effective Date (as defined below); |
| | (b)   the entry into the New First Lien Term Loan Facility (as defined below); |
| | (c)   the entry into the New First Lien ABL Facility (as defined below); |
| | (d)   an equity rights offering of up to $75 million (the "<u>Rights Offering</u>") that will provide holders of the Second Lien Term Loan Claims with rights to purchase for cash their *pro rata* share of 80% of the New Common Stock, subject to dilution on account of the Management Incentive Plan (as defined below); |
| | (e)   in full and final satisfaction of each First Lien Claim, each holder of a First Lien Claim shall receive (i) cash in an amount equal to 3.00% of the principal amount of such holder's First Lien Claim (the "<u>First Lien Cash Recovery</u>"); and (ii) with respect to any remaining Allowed First Lien Claim held by such holder after giving effect to clause (i), its pro rata share of the New First Lien Term |

Loan Facility; provided, however, that (A) holders of First Lien Revolving Claims may, with respect to their allowed First Lien Revolving Claims, instead elect to, and commit to, each and all components of the following: (x) roll up to an aggregate amount equal to the ABL Funded Rollover Cap (as defined below) of their allowed First Lien Revolving Claims into the New First Lien ABL Facility on a pro rata basis and in an amount not to exceed a holder's respective allowed First Lien Revolving Claims, (y) with respect to any remaining allowed First Lien Revolving Claims held by such electing holders after giving effect to subclause (x), receive the treatment specified in clauses (i) and (ii) of this subparagraph (e) for such remaining allowed First Lien Revolving Claims, and (z) provide new money commitments under the New First Lien ABL Facility in an amount equal to such holder's respective allowed First Lien Revolving Claims rolled pursuant to clause (x), multiplied by 0.7923227 (collectively, the treatment in subclauses (x), (y), and (z), the "ABL Roll Option"); and (B) the New ABL Backstop Commitment Parties (as defined below) that are holders of allowed First Lien Revolving Claims have agreed not to exercise the ABL Roll Option, and shall not exercise their respective ABL Roll Options and, instead, shall roll their allowed First Lien Revolving Claims into the New First Lien ABL Facility in an aggregate amount equal to the ABL Backstop Roll Funded Pool (as defined below) in the proportions set forth in, and subject to the terms and conditions of, the New ABL Backstop Commitment Letter (the treatment in clause (B), the "ABL Backstop Roll");[3]

(f)     in full and final satisfaction of each Second Lien Term Loan Claim, each holder of a Second Lien Term Loan Claim shall receive its *pro rata* share of (i) 10% of the new common stock or equivalent equity interests of New Carestream (the "New Common Stock"), subject to

---

[3]     "ABL Funded Rollover Cap" means an amount equal to (a) the total principal amount of the New First Lien ABL Facility (funded and unfunded commitments), multiplied by (b) 0.5579352, less (c) the ABL Backstop Roll Funded Pool; provided, however, that such amount may be adjusted with the consent of the Debtors, the Required Consenting First Lien Lenders, and the Required DIP Lenders if the total amount of the New First Lien ABL Facility (funded and unfunded commitments) is less than $85 million.

"ABL Backstop Roll Funded Pool" means an amount equal to the aggregate principal amount of Allowed First Lien Revolving Claims held by the New ABL Backstop Commitment Parties on the Effective Date, up to and not to exceed an amount equal to $36,265,790.

|  | dilution on account of the Management Incentive Plan and (ii) the Rights (as defined below); |
|  | (g) all unsecured claims against the Debtors ("General Unsecured Claims") will be reinstated or paid in full or otherwise provided such treatment as to render them unimpaired; and |
|  | (h) all Equity Interests[4] of Carestream and the Existing Warrants (as defined below) will be cancelled and no consideration shall be paid to holders of Equity Interests of Carestream or the Existing Warrants. |
|  | The Restructuring will be supported by the Sponsor and the Consenting Creditors party to the Restructuring Support Agreement that in the aggregate hold at least (i) 66 2/3% of the aggregate amount of First Lien Claims and (ii) 66 2/3% of the aggregate amount of the Second Lien Term Loan Claims. |
|  | The effective date of the Restructuring (the "Plan Effective Date") will be the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Plan has been substantially consummated. |
|  | From and after the Plan Effective Date, the Debtors shall be referred to herein as the "Reorganized Debtors." |
| **Claims and Interests to be Addressed** | Outstanding indebtedness of the Debtors that will be restructured or otherwise addressed pursuant to the Restructuring includes: |
|  | • First Lien Claims: comprising indebtedness under that certain Amended and Restated Credit Agreement (First Lien), among the Company, the lenders from time to time party thereto, and Credit Suisse AG, Cayman Islands Branch as administrative agent, dated as of June 7, 2013, as amended on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020, and May 8, 2020 (as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "First Lien Credit Agreement"), consisting of (a) term loans in an estimated aggregate principal |

---

[4] "Equity Interests" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants (including the Existing Warrants), rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

| | |
|---|---|
| | amount outstanding of approximately $507.7 million,[5] plus applicable interest, fees, costs, expenses and premiums ("First Lien Term Loan Claims"); and (b) revolving loans in an aggregate principal amount outstanding of approximately $77 million,[6] plus applicable interest, fees, costs and expenses (together with any Hedge Claims (as defined below), collectively, "First Lien Revolving Claims");[7]

   • Second Lien Term Loan Claims: comprising indebtedness under that certain Second Lien Credit Agreement, among the Company, the lenders from time to time party thereto, and Credit Suisse AG, Cayman Islands Branch as administrative agent, dated as of June 7, 2013, as amended on June 9, 2017, December 27, 2018, April 11, 2019, January 29, 2020, April 13, 2020, May 8, 2020, October 14, 2020 and December 30, 2020 (as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "Second Lien Credit Agreement"), consisting of term loans in an estimated aggregate principal amount outstanding of approximately $448.2 million,[8] plus applicable interest, fees, costs, expenses and premiums; and

   • all General Unsecured Claims.

The Restructuring will also address the Debtors' outstanding Equity Interests, including the warrants issued pursuant to that certain issuance agreement, dated as of May 8, 2020, by and among Carestream and the other parties thereto, and any warrants issued in exchange for or replacement of such warrants pursuant to the terms thereof (the "Existing Warrants"). |
| **DIP Facility** | Certain Consenting Creditors shall provide a delayed-draw term loan DIP Facility in an aggregate principal amount of up to $80 million (the loans under the DIP Facility, the "DIP Loans") consisting of (i) $5 million (the "Tranche A DIP Loans") to be provided by certain Consenting Creditors (the "Tranche A DIP Lenders") and (ii) $75 million (the "Tranche B DIP Loans") to be provided by certain Consenting Creditors (the "Tranche B DIP Lenders and, together with the Tranche A DIP Lenders, the "DIP Lenders"). |

---

[5]   Balance as of 7/31/22.

[6]   Balance as of 7/31/22.

[7]   "Hedge Claims" means, collectively, Claims in the aggregate amount of $482,098 on account of that certain ISDA Master Agreement, dated as of September 29, 2011, between JPMorgan Chase Bank, N.A. and Carestream Health, Inc., including any schedules and appendix thereto.

[8]   Balance as of 7/31/22.

| | |
|---|---|
| | $3.125 million of Tranche A DIP Loans and $46.875 million of Tranche B DIP Loans shall be available upon entry of the interim order approving the DIP Facility (the "<u>Interim DIP Order</u>"). Up to an additional $1.875 million of Tranche A DIP Loans and $28.125 million of Tranche B DIP Loans shall be available in accordance with the terms and conditions set forth in the DIP Commitment Letter (and the term sheet attached thereto (the "<u>DIP Term Sheet</u>")) attached to the Restructuring Support Agreement as <u>Exhibit C</u> upon entry of the final order approving the DIP Facility (the "<u>Final DIP Order</u>" and, together with the Interim DIP Order, the "<u>DIP Orders</u>"). The Debtors' obligations under the DIP Facility are referred to herein as the "<u>DIP Facility Claims</u>". |
| **New First Lien Term Loan Facility** | On the Plan Effective Date, the Reorganized Debtors and the Foreign Guarantor Subsidiaries shall enter into a new first lien term loan facility in an aggregate principal amount equal to the New First Lien Term Loan Facility Amount (as defined below) on the terms and conditions set forth in the term sheet attached hereto as **Annex 1** (the "<u>New First Lien Term Loan Facility Term Sheet</u>"), as such terms and conditions may be modified from time to time subject to the consent rights set forth in the Restructuring Support Agreement (the "<u>New First Lien Term Loan Facility</u>"). For the avoidance of doubt, no Liquidating Foreign Guarantor Subsidiary (as defined below) shall be required to provide any guarantee or similar undertaking with respect to the New First Lien Term Loan Facility. |
| | The "<u>New First Lien Term Loan Facility Amount</u>" means an amount equal to (i) the aggregate amount of allowed First Lien Claims *less* (ii)(a) the aggregate amount of allowed First Lien Revolving Claims that are rolled up into the New First Lien ABL Facility pursuant to (1) the ABL Roll Option and (2) the ABL Backstop Roll and (b) the aggregate amount distributed to holders of allowed First Lien Claims under the Plan pursuant to the First Lien Cash Recovery. |
| | A "<u>Liquidating Foreign Guarantor Subsidiary</u>" means any Foreign Guarantor Subsidiary that will be liquidated in connection with consummation of the Plan. |
| **New First Lien ABL Facility** | On the Plan Effective Date, the Reorganized Debtors and the Foreign Guarantor Subsidiaries organized in Canada shall enter into a new first lien asset based lending facility with availability of up to $85 million (inclusive of the aggregate amount of allowed First Lien Revolving Claims that are rolled up into the New First Lien ABL Facility pursuant to the ABL Roll Option and the ABL Backstop Roll) on the terms and conditions set forth in the term sheet attached to the Restructuring Support Agreement as <u>Exhibit E-1</u> thereto (the "<u>New First Lien ABL Facility</u>"). |
| | All letters of credit outstanding under the revolving credit facility under the First Lien Credit Agreement immediately prior to the Plan |

| | |
|---|---|
| | Effective Date shall, on the Plan Effective Date, be converted into outstanding letters of credit under the New First Lien ABL Facility. |
| | Any New First Lien ABL Facility Roll Draw (as defined below), if repaid on or after the Plan Effective Date, may be re-borrowed under the New First Lien ABL Facility in accordance with the terms thereof. A "New First Lien ABL Facility Roll Draw" means any amount drawn under the New First Lien ABL Facility on the Plan Effective Date on account of any allowed First Lien Revolving Claim that is rolled up into the New First Lien ABL Facility pursuant to the ABL Roll Option or the ABL Backstop Roll. |
| | Certain entities shall backstop the New First Lien ABL Facility in accordance with the terms and conditions of that certain New ABL Backstop Commitment Letter attached to the Restructuring Support Agreement as Exhibit E thereto (the "New ABL Backstop Commitment Letter").  The entities that agree to provide backstop commitments pursuant to the New ABL Backstop Commitment Letter are referred to herein as the "New ABL Backstop Commitment Parties." |
| **Rights Offering** | The Plan will provide for a Rights Offering of up to $75 million pursuant to which holders of the Second Lien Term Loan Claims will be provided with rights to purchase for cash their *pro rata* share of 80% of the New Common Stock (such rights, the "Rights," and such New Common Stock issued pursuant to the Rights, the "New ERO Common Stock"), subject to dilution on account of the Management Incentive Plan.  The New ERO Common Stock shall be offered at a purchase price of $9.375 per share. |
| | The aggregate amount of cash received by the Debtors from participating holders of Second Lien Term Loan Claims for the New ERO Common Stock (including as a result of the DIP Rollover (as defined below)) is referred to herein as the "Rights Offering Cash".  The Rights Offering Cash, together with the Debtors' cash on hand, shall be used to (i) repay a portion of the DIP Facility, (ii) make other payments and distributions pursuant to the Plan, and (iii) otherwise fund post-emergence operations of the Reorganized Debtors. |
| | The shares of New ERO Common Stock shall be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to section 4(a)(2) thereunder, and will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act or applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and applicable state securities laws and subject to any restrictions in the Governance Documents. |

|  | The New Common Stock issued pursuant to the Plan (including the New Common Stock issued in connection with the DIP Rollover and the DIP Rollover Fee, but excluding the New ERO Common Stock and any New Common Stock issued pursuant to the Management Incentive Plan) shall be exempt from the registration requirements of the securities laws as a result of section 1145 of the Bankruptcy Code or, if section 1145 is not available, then otherwise exempt from registration under the Securities Act and any other applicable securities laws. |
|---|---|
| **Treatment of Claims[9] and Equity Interests** | |
| Each holder of an allowed Claim or Equity Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed Claim or Equity Interest. | |
| **DIP Facility Claims** | On the Plan Effective Date, on account of its DIP Facility Claims, (i) each Tranche A DIP Lender shall receive payment in full in cash on account its Tranche A DIP Loans and (ii) each Tranche B DIP Lender shall (a) receive its *pro rata* share of the Rights Offering Cash (if any) and (b) convert all of its DIP Facility Claims that are not paid in cash from the Rights Offering Cash into New Common Stock at the Rights Offering price per share (the "DIP Rollover"). In consideration for agreeing to the DIP Rollover, each Tranche B DIP Lender shall receive its *pro rata* share of a fee (the "DIP Rollover Fee") equal to 10% of the New Common Stock, subject to dilution on account of the Management Incentive Plan. <br><br> On the Plan Effective Date, all fees and expenses payable under the DIP Facility (to the extent not previously paid pursuant to the DIP Orders), including any exit fees, shall be paid in full in cash. |
| **Administrative, Priority and Priority Tax Claims** | On or as soon as practicable after the later to occur of (i) the Plan Effective Date and (ii) the date such claim becomes allowed (or as otherwise set forth in the Plan), each holder of an administrative, priority or priority tax claim will either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Other Secured Claims[10]** | Allowed Other Secured Claims shall receive either (i) payment in cash in full of the unpaid portion of their allowed Other Secured Claims, (or if payment is not then due, in accordance with the terms of such allowed Other Secured Claims), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the collateral securing |

---

[9]    "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any Debtors.

[10]    "Other Secured Claim" means any secured Claim against the Debtors, but not the DIP Facility Claims, First Lien Claims or Second Lien Term Loan Claims.

| | |
|---|---|
| | such allowed Other Secured Claim, plus any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. |
| **First Lien Claims** | On the Plan Effective Date, each holder of an allowed First Lien Claim shall receive on account of such allowed First Lien Claim (i) the First Lien Cash Recovery; and (ii) with respect to any remaining allowed First Lien Claim held by such holder after giving effect to clause (i), its *pro rata* share of the New First Lien Term Loan Facility ; provided, however, that (A) holders of allowed First Lien Revolving Claims (other than New ABL Backstop Commitment Parties) may, with respect to their allowed First Lien Revolving Claims, instead elect, and commit to, the ABL Roll Option; and (B) the New ABL Backstop Commitment Parties that are holders of allowed First Lien Revolving Claims have agreed not to exercise the ABL Roll Option, and shall not exercise their respective ABL Roll Options, and, instead, shall participate in the ABL Backstop Roll. |
| **Second Lien Term Loan Claims** | On the Plan Effective Date, each holder of an allowed Second Lien Term Loan Claim shall receive on account of such Second Lien Term Loan Claim its *pro rata* share of (i) 10% of the New Common Stock, subject to dilution on account of the Management Incentive Plan, to the extent applicable, and (ii) the Rights; provided, however, that each Tranche B DIP Lender that is also a holder of Second Lien Term Loan Claims shall agree not to exercise its Rights, and at least a corresponding portion of such Tranche B DIP Lender's DIP Facility Claims shall be converted into New Common Stock as if such Tranche B DIP Lender had exercised its full allocable share of the Rights in its capacity as a holder of Second Lien Term Loan Claims. |
| **General Unsecured Claims** | On the Plan Effective Date, each holder of an allowed General Unsecured Claim will have its General Unsecured Claim reinstated or paid in full in cash and, thereby, shall be rendered unimpaired as set forth in section 1124 of the Bankruptcy Code. |
| **Sponsor Claims** | On the Plan Effective Date, (i) any management agreements and/or arrangements between the Debtors and the Sponsor shall be terminated and (ii) the Sponsor shall release, waive and discharge (a) any and all of its General Unsecured Claims and (b) any and all management or operational fees in exchange for the releases under the Plan. |
| **Section 510(b) Claims**[11] | On the Plan Effective Date, all Section 510(b) Claims will be canceled, released, discharged, and extinguished and will be of no |

---

[11] "Section 510(b) Claims" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of a security of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a security; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; *provided* that a Section 510(b) Claim shall not include any Claims subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Equity Interest.

| | further force or effect, and holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. |
|---|---|
| **Equity Interests/Existing Warrants** | All Equity Interests of Carestream, including the Existing Warrants, will be cancelled and no consideration shall be paid to holders of Equity Interests of Carestream, including the Existing Warrants, on account thereof. |
| **Intercompany Claims/Interests** | Intercompany Claims and Intercompany Interests shall be reinstated unless otherwise agreed by the Debtors and the Required DIP Lenders.[12] |
| **Other Terms** | |
| **Fees and Expenses** | The Debtors shall pay all reasonable and documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP, GLC Advisors & Co., Troutman Pepper Hamilton Sanders LLP and any other local counsel, and any other professionals and/or consultants for the Crossover Group, if any, as such professionals may be mutually agreed to by the Crossover Group and the Company Parties (the "Crossover Group Advisors"), in each case, in accordance with the terms of their applicable engagement letters.   For the avoidance of doubt, the obligation to pay such fees and expenses shall be included in the DIP Orders and the Plan shall provide that any fees and expenses of the Crossover Group Advisors that are unpaid as of the Plan Effective Date shall be paid on the Plan Effective Date. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Tax Structure** | The terms of the Restructuring will be structured to maximize tax efficiencies for each of the Debtors and the Consenting Stakeholders, as agreed to by the Debtors, the Required DIP Lenders and the Required Consenting First Lien Lenders and in accordance with the Plan and the Plan Supplement. |

---

[12] "Intercompany Claim" means any Claim against any Debtor held by a Debtor or an affiliate of a Debtor (excluding the Sponsor). "Intercompany Interest" means an Equity Interest in a Debtor held by another Debtor.

| | |
|---|---|
| **Management Compensation; Management Incentive Plan** | The terms of employment of the Reorganized Debtors' management team shall be agreed to by the Debtors' chief executive officer (the "<u>CEO</u>") and the Required DIP Lenders prior to the Plan Effective Date, and such terms (and any related conditions) shall be consistent in all respects with the term sheet attached hereto as **<u>Annex 3</u>** (the "<u>Management Compensation Term Sheet</u>").  On or after the Plan Effective Date, the Reorganized Debtors shall adopt and implement a management incentive plan that is consistent in all respects with the management compensation plan described in the Management Compensation Term Sheet (and defined therein as the "MIP") (the "<u>Management Incentive Plan</u>"). |
| **Plan Releases and Exculpation** | The Plan shall include release and exculpation provisions (and related definitions) substantially in the form set forth in **<u>Annex 2</u>** to this Restructuring Term Sheet. |
| **Conditions Precedent to Plan Effective Date** | The occurrence of the Plan Effective Date will be subject to the following conditions precedent, among others; *provided, however*, that any condition can be waived with the prior written consent of the Debtors and the Required Consenting Stakeholders: <br><br> (a) the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect; <br><br> (b) the Bankruptcy Court shall have entered the DIP Orders, and the Final DIP Order shall be in full force and effect; <br><br> (c) the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement, and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal; <br><br> (d) the Definitive Documents shall (i) be on terms consistent with the Restructuring Support Agreement and otherwise approved by the requisite parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties; <br><br> (e) all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed; <br><br> (f) the DIP Rollover shall have been consummated in accordance with its terms; <br><br> (g) the Rights Offering shall have been consummated in accordance with its terms; |

| | |
|---|---|
| | (h) the New Common Stock shall have been issued (including the New ERO Common Stock and the New Common Stock to be issued in connection with the DIP Rollover and the DIP Rollover Fee);<br><br>(i) each of the New First Lien ABL Credit Agreement and related documentation and the New First Lien Term Loan Facility Credit Agreement and related documentation shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Required DIP Lenders and the Required Consenting First Lien Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;<br><br>(j) all fees, expenses, and other amounts payable to the Consenting Creditors pursuant to the Restructuring Support Agreement shall have been paid in full; and<br><br>(k) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring. |
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents (as defined in the Restructuring Support Agreement), which shall be in form and substance subject to the consent rights set forth herein and in the Restructuring Support Agreement. |
| **Organizational Documents and Governance** | The Governance Documents and any other documentation evidencing the corporate governance for any Company Party and any direct or indirect subsidiary thereof, including charters, bylaws, limited liability company agreements, shareholder agreements, and/or other organization documents of such entities will be consistent with the Restructuring Support Agreement (including the consent rights set forth therein).<br><br>New Carestream will be managed by a board of directors (the "Board" and, each director on such Board, a "Director") comprised of five (5) Directors, selected in the following manner, in consultation with the Debtors' CEO:[13] |

---

[13] "Stockholder" means any holder of New Common Stock.

"Ownership Percentage" means, with respect to any Stockholder or group of Stockholders, a fraction (a) the numerator of which is the total number of shares of outstanding New Common Stock beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time (without duplication) and (b) the denominator of which is the total number of shares of outstanding New Common Stock held by all Stockholders at such time, in each case, excluding, for purposes of this calculation, (i) any shares of

(a) one (1) Director shall be the CEO;

(b) one (1) Director shall be appointed by Brigade Capital Management, LP so long as it, together with its Affiliates and Related Funds, has an Ownership Percentage equal to or in excess of fifteen percent (15%) as of both the Plan Effective Date and any applicable date of determination thereafter;

(c) one (1) Director shall be appointed by Vector Capital so long as it, together with its Affiliates and Related Funds, has an Ownership Percentage equal to or in excess of fifteen percent (15%) as of both the Plan Effective Date and any applicable date of determination thereafter;

(d) one (1) Director shall be appointed, collectively, by Apollo Capital Management, L.P. and CION Investment Corporation so long as they, together with their Affiliates and Related Funds, have an Ownership Percentage equal to or in excess of fifteen percent (15%) as of both the Plan Effective Date and any applicable date of determination thereafter; and

(e) the remaining Director shall be designated by the Required DIP Lenders as of the Plan Effective Date and thereafter the remaining Director or Directors, if applicable, shall be designated by Stockholders holding a majority of the outstanding New Common Stock at any annual or special meeting of the Stockholders or by any action by written consent in lieu thereof; provided, however, that at least one (1) of such remaining Director(s) must be acceptable to each Stockholder (together with its Affiliates and Related Funds) that has an Ownership Percentage equal to or in excess of twenty-five percent (25%) as of both the Plan Effective Date and any applicable date of determination thereafter, in its sole discretion.

---

New Common Stock issuable upon the exercise, conversion or exchange of any securities that are convertible or exercisable into, or exchangeable for, New Common Stock, (ii) any shares of New Common Stock beneficially owned by New Carestream at such time, and (iii) any shares of New Common Stock issued or issuable pursuant to any compensation arrangements (including the Management Incentive Plan) adopted and approved by the Board.

"Related Fund" means with respect to any person or entity, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such person or entity, (b) an Affiliate of such person or entity or (c) the same investment manager, sub-investment manager, advisor or sub-advisor as such person or entity or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

## **Annex 1**

**New First Lien Term Loan Facility Term Sheet**

CARESTREAM HEALTH, INC.
New First Lien Term Loan Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions (the "Term Loan Term Sheet") for the Term Loan Facility (as defined below). This summary is for indicative purposes only and does not purport to summarize all of the terms of the definitive documentation with respect to the Term Loan Facility, and reference should be made to the definitive documentation for the final terms of the Term Loan Facility. Reference is hereby made to that certain Restructuring Support Agreement, dated as of August 21, 2022 (including all amendments, modifications, exhibits, and supplements thereto, the "RSA"), by and among Carestream Health Holdings, Inc., a Delaware corporation, and the Consenting Parties (as defined therein), including the "Restructuring Term Sheet" attached thereto (the "Restructuring Term Sheet").

1.    PARTIES

| | |
|---|---|
| Borrower: | Carestream Health, Inc., a Delaware corporation (the "Borrower"). |
| Holdings: | A direct parent entity of the Borrower, as reorganized pursuant to that certain pre-packaged chapter 11 plan of reorganization as described in the RSA (the "Plan") ("Holdings"). |
| Guarantors: | Holdings and each existing and subsequently acquired or organized domestic and, to the extent no adverse tax consequences or repatriation of earnings to the Borrower, (i) would, in the good faith judgment of the Borrower at the time provided or (ii) thereafter, could reasonably be expected to result therefrom, foreign subsidiary of the Borrower (the "Subsidiary Guarantors"; Holdings and the Subsidiary Guarantors, the "Guarantors"; and the Borrower and the Guarantors, the "Loan Parties"), it being agreed that the Subsidiary Guarantors shall be subject to exclusions consistent with and no less favorable to the Borrower than the exclusions set forth in the Referenced First Lien Credit Agreement (as defined below) and other exclusions to be agreed consistent with the Term Loan Documentation Principles (as defined below). |
| Transactions: | On the Plan Effective Date (as defined in the Plan), the Borrower shall refinance the debt outstanding under that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013, among Carestream Health Holdings, Inc. (prior to its reorganization pursuant to the Plan, "Existing Holdings"), the Borrower, the subsidiary guarantors party thereto, the lenders and other parties from time to time parties thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "Existing Administrative Agent"), as amended on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020 and May 8, 2020 (as it may be further amended, restated or otherwise modified from time to time prior to the date of the initial funding of the Facilities (or, in the case of the ABL Facility, the date of effectiveness thereof) (the "Closing Date") the |

"<u>Prepetition First Lien Credit Agreement</u>") with the Term Loan Facility (as defined below) and a new asset-based loan facility in the amount of at least $85,000,000 (the "<u>ABL Facility</u>" and the loans thereunder, the "<u>ABL Loans</u>") and the ABL Facility together with the Term Loan Facility, the "<u>Facilities</u>").

| | |
|---|---|
| Lead Arrangers and Bookrunners: | JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>") (in such capacity, the "<u>Term Lead Left Arranger</u>", together with any other lead arranger appointed, the "<u>Term Lead Arrangers</u>"). |
| Administrative Agent: | JPMorgan Chase Bank (in such capacity, the "<u>Term Administrative Agent</u>"). |
| Lenders: | Lenders of the Initial Term Loans shall consist of certain holders of "First Lien Claims" (as defined in the Restructuring Term Sheet) (collectively, the "<u>Lenders</u>"). |

## 2.    TERM LOAN FACILITY

<u>A.</u>    <u>Term Loan Facility</u>

| | |
|---|---|
| Type and Amount: | A five-year term loan B facility (the "<u>Term Loan Facility</u>" and the commitments thereunder, the "<u>Term Loan Commitments</u>") in an aggregate principal amount equal to the allowed amount of First Lien Claims less the amount of First Lien Claims that are satisfied pursuant to the terms of the Plan (the loans thereunder, the "<u>Initial Term Loans</u>"; together with term loans under the Incremental Term Facilities, the "<u>Term Loans</u>"). |
| Maturity and Amortization: | The Initial Term Loans will mature on the date that is five years after the Closing Date (the "<u>Term Loan Maturity Date</u>"). |
| | The Initial Term Loans shall be repayable in equal quarterly installments commencing on the last day of the fiscal quarter ending September 30, 2023 in an aggregate annual amount equal to 2.5% of the original amount of the Term Loan Facility (subject to reduction in connection with debt prepayments and debt buybacks).  The balance of the Initial Term Loans will be repayable on the Term Loan Maturity Date. |
| | The Term Loan Credit Documentation shall provide the right for individual Lenders to agree to extend the maturity date of all or a portion of the outstanding Initial Term Loans (which may include, among other things, an increase in the interest rate payable), upon the request of the Borrower and without the consent of any other Lender; it being understood that each Lender under the applicable tranche or tranches that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender in such tranche or tranches; |

*provided* that it is understood that no existing Lender will have any obligation to commit to any such extension.

Availability:

The Initial Term Loans shall be made in a single drawing on the Closing Date, which shall be the Plan Effective Date. Amounts not borrowed on the Closing Date shall not thereafter be available. Repayments and prepayments of the Initial Term Loans may not be reborrowed.

Use of Proceeds:

The proceeds of the Initial Term Loans will be used for other general corporate purposes permitted under the Term Loan Credit Documentation.

B. Incremental Term Facility:

The Term Loan Credit Documentation (as defined below) will permit the Borrower from time to time to solicit the existing Lenders or prospective lenders determined by the Borrower (and subject to the same consents as assignees) to add one or more incremental term loan facilities to the Term Loan Facility (each, an "Incremental Term Facility"; and together with the Term Loan Facility, the "Term Loan Facilities"); *provided* that (i) no Lender will be required to participate in any such Incremental Term Facility, (ii) the loans under any such Incremental Term Facility shall rank *pari passu* in right of payment and security with the Term Loan Facility and no Incremental Facility may be secured by any assets other than the Collateral, or may be guaranteed by any entities other than the Guarantors, (iii) subject to customary limited conditionality provisions in the case of a Limited Conditionality Transaction (as defined below), no default or event of default exists or would exist after giving effect thereto, (iv) the aggregate principal amount of the Incremental Term Facilities shall not exceed (a) the greater of (1) $150 million and (2) 75% of Consolidated EBITDA ("Fixed Incremental Amount") *plus* (b) an amount equal to all voluntary prepayments of Initial Term Loans (other than any prepayment using the proceeds of long-term indebtedness); *plus* (c) an additional amount if, after giving effect to the incurrence of such additional amount (and after giving effect to any permitted and concurrent use of proceeds thereof and all other appropriate pro forma adjustment events), the Total Net First Lien Leverage Ratio (to be defined in a manner consistent with the Referenced First Lien Credit Agreement, as modified by agreement of the Borrower and the Term Administrative Agent in accordance with the Term Loan Documentation Principles and it being understood that the proceeds of such Incremental Term Facility shall be disregarded in determining unrestricted cash and cash equivalents) of the Borrower being no greater than 3.00:1.00 (the amount permitted under clauses (a), (b) and (c), collectively, the "Incremental Debt Amount"), (v) the representations and warranties in the Term Loan Credit Documentation (or, in the case of a Limited Conditionality Transaction, customary limited representations and warranties) shall be true and correct in all material respects immediately prior to, and after giving effect to,

3

the incurrence of such Incremental Term Facility, (vi) the maturity date and weighted average life to maturity of any such Incremental Term Facility shall be no earlier than the maturity date and weighted average life to maturity, respectively, of any outstanding Term Loan Facility, (vii) the interest rates and amortization schedule applicable to any Incremental Term Facility shall be determined by the Borrower and the lenders thereunder; *provided* that the all-in yield (whether in the form of interest rate margins, original issue discount, upfront fees (with original discount and upfront fees being equated to an interest rate assuming a 4-year life to maturity (or, if shorter, the remaining life) on a straight line basis)) or SOFR/ABR floors, but   excluding arrangement, commitment, structuring and underwriting fees and any amendment fees and other fees not shared generally with other Lenders) applicable to any Incremental Term Facility incurred after the Closing Date that are secured on a *pari passu* basis with the initial Initial Term Loans will not be more than 0.50% higher than the corresponding all-in yield (giving effect to interest rate margins, original issue discount, upfront fees and LIBOR/ABR floors, but excluding arrangement, commitment, structuring and underwriting fees and any amendment fees and other fees not shared generally with other Lenders) for the existing Term Loan Facility, unless the interest rate margins with respect to the existing Term Loan Facility is increased by an amount equal to the difference between the all-in yield with respect to the Incremental Term Facility and the corresponding all-in yield on the existing Term Loan Facility *minus* 0.50% (the "MFN Protection"), (viii) the Incremental Term Loans shall (x) be secured only by Collateral and on a *pari passu* basis with the Term Loan Facility and (y) be guaranteed only by Loan Parties, (ix) the Borrower shall have delivered such legal opinions, board resolutions, secretary's certificates, officer's certificates and other customary closing documents as, in each case, shall be reasonably requested by the Term Administrative Agent, (x) the Borrower shall be in pro forma compliance with the Financial Covenant and (xi) except as required in clauses (i) through (x), all other terms of any Incremental Term Facility, if not consistent with the terms of the existing Term Loan Facility, will be as agreed between Borrower and the lenders providing such Incremental Term Facility; *provided* that any mandatory prepayments corresponding to the same mandatory prepayments under the existing Term Loan Facility shall not be in excess of their pro rata share; *provided*, *further* that, to the extent such terms and documentation are not consistent with the Term Loan Facility (except to the extent permitted by clause (vi) or (vii) above), they shall be reasonably satisfactory to the Term Administrative Agent (unless such terms apply after the latest maturity date for then existing Initial Term Loans).  The proceeds of the Incremental Term Facility shall be used for general corporate purposes of the Borrower and its subsidiaries, including permitted acquisitions, investments and

other uses not prohibited by the Term Loan Credit Documentation.

C. Incremental Equivalent Debt:

The Borrower may utilize availability under the Incremental Term Loan Facility to issue senior secured or junior lien secured or unsecured notes or borrow (or obtain commitments in respect thereof) junior lien secured or unsecured loans ("Incremental Equivalent Debt"), subject to customary limitations, including (a) any such Incremental Equivalent shall rank *pari passu* or junior in right of payment and security with the Term Loan Facility and no Incremental Equivalent Debt may be secured by any assets other than the Collateral, or may be guaranteed by any entities other than the Guarantors, (b) the MFN Protection shall apply to Incremental Equivalent Debt that is in the form of *pari passu* term loans, (c) the maturity date and weighted average life to maturity of any such Incremental Equivalent Debt shall be no earlier than the maturity date and weighted average life to maturity, respectively, of any then outstanding Term Loan Facilities, (d) in lieu of the leverage based test set forth in clause (iv)(c) above, the Borrower may incur Incremental Equivalent Debt in the form of junior lien or unsecured indebtedness; *provided* that (i) in the case of any Incremental Equivalent Debt that is secured on a junior lien basis, the Total Net Secured Leverage Ratio (to be defined in a manner consistent with the Referenced First Lien Credit Agreement subject to the Term Loan Documentation Principles and it being understood that the proceeds of such Incremental Equivalent Debt shall be disregarded in determining unrestricted cash and cash equivalents) of the Borrower shall be no greater than 3.50:1.00 and (ii) in the case of Incremental Equivalent Debt that is unsecured, the Total Net Leverage Ratio (to be defined in a manner consistent with the Referenced First Lien Credit Agreement subject to the Term Loan Documentation Principles and it being understood that the proceeds of such Incremental Equivalent Debt shall be disregarded in determining unrestricted cash and cash equivalents) of the Borrower shall be no greater than 4.00:1.00 and (e) to the extent secured, customary intercreditor terms to be mutually agreed between Borrower and the Term Administrative Agent.

D. Refinancing Facilities

The Term Loan Credit Documentation will permit the Borrower to refinance loans under the Term Facility, in whole or in part, (each, a "Refinancing Facility")); *provided* that (i) the all-in-yield, premiums, optional prepayment terms and financial covenants with respect to any such Refinancing Facility shall be determined by Borrower and the lenders providing such Refinancing Facility, (ii) any Refinancing Facility does not mature prior to the maturity date of, or have a shorter weighted average life than, the Initial Term Loans or commitments being refinanced, (iii) the Refinancing Facility shall rank *pari passu* in right of payment and security with the Term Facility and no Refinancing Facility may be secured by any assets other than the Collateral, or may be

5

guaranteed by any entities other than the Guarantors, (iv) the other terms and conditions of such Refinancing Facility are substantially identical to, or, taken as a whole, less favorable to the lenders providing such Refinancing Facility, and (v) the proceeds of such Refinancing Facility shall be applied, substantially concurrently with the incurrence thereof, to the pro rata prepayment of outstanding loans under the applicable Term Loan Facility being so refinanced; and *provided, further* that in no event shall Refinancing Facility or be permitted to be voluntarily prepaid prior to the repayment in full of the applicable Term Loan Facility being refinanced, unless accompanied by a ratable prepayment of such Term Loan Facility.

| E. Limited Conditionality Provision: | For purposes of determining pro forma compliance with any financial ratio in the Term Loan Facility or any other basket based on Consolidated EBITDA (to be defined in a manner no less favorable to the Borrower than in the Referenced First Lien Credit Agreement and otherwise as agreed by the Term Administrative Agent and the Borrower subject to the Term Loan Documentation Principles (*provided* that (i) pro forma cost savings and synergy addbacks shall be permitted in the calculation of Consolidated EBITDA capped at 15% of Consolidated EBITDA with an 18 month look-forward period) and (ii) management incentive plan cash and equity-based compensation addbacks shall be permitted in the calculation of Consolidated EBITDA) or other financial ratio, or whether a default or event of default has occurred and is continuing, or the accuracy of any representation or warranty contained in the Term Loan Credit Documentation, in each case in connection with the consummation of an acquisition or similar investment that the Borrower or one or more of its subsidiaries is contractually committed to consummate (it being understood that such commitment may be subject to conditions precedent, which conditions precedent may be amended, satisfied or waived in accordance with the terms of the applicable agreement) and whose consummation is not conditioned on the availability of, or on obtaining, third party financing (any such acquisition or investment, a "<u>Limited Conditionality Transaction</u>"), the date of determination shall, at the option of the Borrower (the exercise of such option, an "<u>LC Election</u>"), be the time the definitive agreements for such acquisition or investment are entered into or (the "<u>LC Test Date</u>") after giving pro forma effect to such acquisition or investment and the other transactions to be entered into in connection therewith (including any incurrence of indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the applicable test period, rather than the date that such Limited Conditionality Transaction is consummated and, for the avoidance of doubt, if any of such ratios or amounts are exceeded on any date other than the LC Test Date as a result of fluctuations in such ratio or amount including due to fluctuations in Consolidated EBITDA of the Borrower, if applicable, or the person subject to such acquisition or investment, |

6

at or prior to the consummation of the relevant transaction or action, such ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the relevant transaction or action is permitted to be consummated or taken.

If the Borrower has made an LC Election for any Limited Conditionality Transaction, then in connection with any calculation of any ratio, test or basket availability in connection with the consummation of any subsequent acquisition or similar investment that the Borrower or one or more of its subsidiaries is contractually committed to consummate (each, a "Subsequent Transaction") following the relevant LC Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, for purposes of determining whether such Subsequent Transaction is permitted under the Term Loan Credit Documentation, any such ratio, test or basket shall be required to be satisfied on a pro forma basis (a) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated, and (b) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of indebtedness and the use of proceeds thereof) have not been consummated.

3.     CERTAIN PAYMENT PROVISIONS

Fees and Interest Rates:                As set forth on Annex I.

Optional Prepayments and
Commitment Reductions:                  Term Loans may be prepaid, in whole or in part without premium or penalty (except as provided below), in minimum amounts of $1 million or a whole multiple of $100,000 in excess thereof, at the option of the Borrower at any time upon one day's (or, in the case of a prepayment of Term Benchmark Loans (as defined in Annex I hereto), three (3) days') prior notice, subject to customary reimbursement of the Lenders' redeployment costs in the case of a prepayment of Term Benchmark Loans prior to the last day of the relevant interest period.  Optional prepayments of the Term Loans shall be applied as directed by the Borrower.

Any prepayment of the Initial Term Loans resulting from a Repricing Event (as defined below) shall be accompanied by a prepayment fee equal to 1.0% of the aggregate principal amount of such prepayment if made on or prior to the six-month anniversary of the Closing Date.

As used herein, "Repricing Event" means (i) the repayment, prepayment or refinancing of all or any portion of the Initial Term Loans substantially concurrently with the incurrence by a Borrower, any Guarantor or any other restricted subsidiary of any indebtedness the primary purpose of which is to reduce the "effective" yield applicable to the Term Loan Facility, or (ii) any amendment to the Term Loan Facility the primary purpose of which is to reduce the "effective" yield (as reasonably determined by the Term Administrative Agent in consultation with the Borrower, but excluding any bona fide arrangement, underwriting, structuring or similar fees not generally shared with the applicable lenders) then applicable to, the Initial Term Loans (including any mandatory assignment in connection therewith with respect to each Lender that refuses to consent to such amendment); *provided* that "Repricing Event" shall not include any prepayment, refinancing or amendment in connection with a Change of Control (to be defined in the Term Loan Credit Documentation subject to Term Loan Documentation Principles), initial public offering or acquisition or investment not permitted by the Term Loan Credit Documentation or permitted but with respect to which the Borrower has determined in good faith that the Term Loan Credit Documentation will not provide sufficient flexibility for the operation of the combined business following consummation thereof.

Mandatory Prepayments:

Mandatory prepayments of Initial Term Loans shall be required from:

(a)      100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation and excluding sales of inventory in the ordinary course of business, obsolete or worn-out property, property no longer used or useful in such person's business, sales of ABL Priority Collateral and other customary exceptions to be mutually agreed)) by the Loan Parties in excess of an amount to be agreed and subject to the right of the Loan Parties to reinvest (or commit to reinvest) in assets used or useful in the business of the Loan Parties and their subsidiaries if such proceeds are reinvested (or committed to be reinvested) within eighteen (18) months (and if so committed to be reinvested, actually reinvested within the later of (x) eighteen (18) months following the receipt of such proceeds and (y) 180 days after the date of entry into such commitment);

(b)      100% of the net cash proceeds from issuances or incurrences of debt by the Borrower and its subsidiaries (other than indebtedness permitted by the Term Loan Credit Documentation);

(c)      commencing with the end of the first full fiscal year ending after the Closing Date, 50% (with step-downs to 25% and

0% when the Total Net First Lien Leverage Ratio (at time of prepayment) is at least 2.50:1.00 and 2.00:1.00, respectively, of annual Excess Cash Flow (to be defined in a manner consistent with the Referenced First Lien Credit Agreement, as modified by agreement of the Borrower and the Term Administrative Agent in accordance with the Term Loan Documentation Principles, but to include deductions for amounts paid in cash during the applicable fiscal year in respect of Permitted Acquisitions (to be defined in a manner to be agreed), capital expenditures, and investments of the Borrower and its subsidiaries; *provided* that any voluntary prepayments of Term Loans and ABL Loans (to the extent accompanied by a permanent reduction of the ABL Commitments), other than prepayments funded with the proceeds of long term indebtedness, shall be credited dollar-for-dollar against Excess Cash Flow prepayment obligations for such fiscal year on a dollar-for-dollar basis; and

(d)    on April 10, 2023, an amount equal to the lesser of (x) the positive difference, if any, between Total Closing Date Available Liquidity (as defined below) on the Closing Date and $100 million and (y) the positive difference, if any, between Available Liquidity on March 31, 2023 and $100 million.

"Total Closing Date Available Liquidity" means, with respect to the Reorganized Debtors (as defined in the Plan) and the Foreign Guarantor Subsidiaries (as defined in the Plan), the sum of (i) unrestricted balance sheet cash and (ii) amounts available to be drawn on the ABL Facility (after taking into account the actual amount of participation in the ABL Roll Option and any other restrictions on borrowing), in each case, after taking into account (x) any cash distributions to be paid under the Plan on or about the Plan Effective Date (including, for the avoidance of doubt, the First Lien Claim Cash Payment (as defined in the Plan)) and (y) any amounts that may come due after the Plan Effective Date on account of Allowed Professional Fee Claims (as defined in the Plan), net of the aggregate amount funded into the Professional Escrow Account (as defined in the Plan) pursuant to Article II.C. of the Plan.

"Available Liquidity" means, with respect to the Loan Parties, the sum of (i) unrestricted balance sheet cash and (ii) amounts available to be drawn on the ABL Facility.

Each mandatory prepayment of Initial Term Loans shall be applied as directed by the Borrower (and if not so directed, in direct order of maturity).

The Term Loan Credit Documentation shall also provide that in the case of mandatory prepayments in respect of any asset sale of Collateral subject to mandatory prepayment, or casualty or condemnation event, a ratable portion of the net proceeds thereof

may be applied to prepay or offer to purchase any indebtedness secured by a lien on the Collateral ranking *pari passu* with the lien securing the Initial Term Loans, if required under the terms of such indebtedness.

Mandatory prepayments of the Term Loans may not be reborrowed.

Any Lender may elect not to accept its pro rata portion of any mandatory prepayment (each, a "<u>Declining Lender</u>"), and any such declined prepayment shall first be offered to each Lender on a pro rata basis that has accepted prepayments and second may be retained by the Borrower (such retained amount, the "<u>Declined Proceeds</u>") and shall be an addition to the Available Amount Basket (as defined below).

Prepayments Below Par:    The Term Loan Credit Documentation shall provide that Term Loans may be prepaid below par on a non-pro rata basis through (x) open market purchases on pro rata or non-pro rata basis or (y) Dutch auction or similar procedures to be agreed that are offered to all Lenders holding Term Loans of the applicable tranche on a pro rata basis, in each case, in accordance with procedures and subject to restrictions to be agreed, including that (i) the proceeds of ABL Loans shall not be used for such prepayments and (ii) in the case of clause (x) above, no default or event of default has occurred and is continuing. Any Term Loan so prepaid shall automatically be canceled and retired.

4.    COLLATERAL

Collateral:    Subject to customary exclusions and limitations consistent with and no less favorable to the Borrower than the Referenced First Lien Credit Agreement subject to the Term Loan Documentation Principles, the obligations of each of the Borrower and the Guarantors in respect of the Term Loan Facility shall be secured by (i) a perfected first priority security interest in all of their tangible and intangible assets (including, without limitation, intellectual property, real property owned in fee in excess of an amount to be agreed and all  capital stock of their direct subsidiaries (limited, in the case of foreign subsidiaries, to 65% of the voting capital stock thereof to the extent a pledge of a greater percentage could reasonably be expected to result in adverse tax consequences), except for those assets as to which the Term Administrative Agent shall determine in its reasonable discretion that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby, in each case other than the ABL Priority Collateral, and (ii) a perfected second priority interest in all of the ABL Priority Collateral (as defined below) (collectively, the "<u>Collateral</u>").

"Term Priority Collateral" shall mean all Collateral securing the Initial Term Loans other than ABL Priority Collateral.

"ABL Priority Collateral" shall mean all of the present and after acquired (a) cash, deposit accounts, securities accounts, accounts receivable and inventory of the Loan Parties; (b) general intangibles, instruments, documents and chattel paper relating to the property identified in clause (a); (c) commercial tort claims, security and guarantees and supporting obligations in respect of the collateral identified in clauses (a) and (b); and (d) proceeds (including insurance proceeds) of the foregoing (other than any such items constituting proceeds arising from the sale or disposition of Term Priority Collateral and cash on deposit in trust accounts, payroll or tax accounts and escrow accounts).

The lien priority, relative rights and other creditors' rights issues in respect of the Term Loan Facility  and the ABL Facility shall be subject to an intercreditor agreement reasonably satisfactory to the TL Administrative Agent and the Borrower (the "Intercreditor Agreement").

## 5.    CERTAIN CONDITIONS

Conditions Precedent:

The availability of the Term Loan Facility on the Closing Date will be subject to customary conditions precedent for facilities of this type.

## 6.    DOCUMENTATION

Term Loan Credit Documentation:

The definitive documentation for the Term Loan Facility (the "Term Loan Credit Documentation"; and together with the definitive documentation for the ABL Facility, the "Credit Documentation") shall be based on and consistent with the Prepetition First Lien Credit Agreement in the form that was in effect after giving effect to that certain Second Amendment to Amended and Restated Credit Agreement (First Lien), dated as of June 22, 2017, among Existing Holdings, the Borrower, the subsidiary guarantors party thereto, the lenders party thereto, and the Existing Administrative Agent (such version of the Prepetition First Lien Credit Agreement, the "Referenced First Lien Credit Agreement"), with certain modifications, including those modifications as are necessary to reflect (i) the term loan only structure, (ii) the terms and conditions set forth in this Term Loan Term Sheet, (iii) the operational and strategic requirements of the Borrower and its subsidiaries in light of their size, industries and practices, (iv) basket capacity and sizes to be agreed between the Term Administrative Agent and the Borrower based on negotiations and as set forth in the Term Loan Credit Documentation and (v) the customary agency and operational

requirements of the Term Administrative Agent (the "Term Loan Documentation Principles").

**Financial Covenant:**

Commencing on the last day of the first full fiscal quarter ended after the Closing Date, a maximum Total Net Leverage Ratio not to exceed 4.00:1.00 (the "Financial Covenant"), to be tested at the end of the most recently ended four fiscal quarters for which financial statements have been or are required to be delivered.

For purposes of determining compliance with the Financial Covenant, any cash equity contribution made to Holdings, and contributed by Holdings to the Borrower as common equity, after the beginning of the relevant fiscal quarter and prior to the day that is ten (10) business days after the day on which financial statements are required to be delivered for such fiscal quarter will, at the request of the Borrower, be included in the calculation of Consolidated EBITDA of the Borrower and its restricted subsidiaries solely for the purposes of determining compliance with the Financial Covenant at the end of such fiscal quarter and applicable subsequent periods that include such fiscal quarter (any such equity contribution so included in the calculation of Consolidated EBITDA of the Borrower and its restricted subsidiaries, a "Specified Equity Contribution"); *provided* that (a) in each four consecutive fiscal quarter period, there shall be at least two (2) fiscal quarters in respect of which no Specified Equity Contribution is made, (b) during the life of the Term Loan Facility there shall be no more than five (5) Specified Equity Contributions in the aggregate, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in pro forma compliance with the Financial Covenant for the relevant fiscal quarter, (d) all Specified Equity Contributions shall be disregarded for purposes of calculating Consolidated EBITDA in determining any financial ratio-based conditions or baskets with respect to the covenants contained in the Term Loan Credit Documentation (other than, with respect to any future period, with respect to any portion of such Specified Equity Contribution that is actually applied to repay any indebtedness) and (e) there shall be no pro forma or other reduction of indebtedness with the proceeds of any Specified Equity Contribution for purposes of determining compliance with the Financial Covenant for the fiscal quarter in respect of which such Specified Equity Contribution was made.

The Term Loan Credit Documentation will contain a standstill provision with regard to exercise of remedies during the period in which any Specified Equity Contribution will be made after the receipt of written notice by the Term Administrative Agent of the Borrower's intention to cure a Financial Covenant default with proceeds of a Specified Equity Contribution; *provided, however,* that such standstill shall be solely with respect to a breach of the

|  | Financial Covenant to which such Specified Equity Contribution applies. |
|---|---|
| Representations and Warranties: | Limited to the following (applicable to Holdings, the Borrower and its restricted subsidiaries), in each case, with customary materiality qualifiers, thresholds, exceptions, limitations and qualifications to be mutually agreed subject to the Term Loan Documentation Principles: financial condition, financial statements, no Material Adverse Effect (substantially as defined in the Referenced First Lien Credit Agreement, subject to the Term Loan Documentation Principles), corporate existence, compliance with laws, corporate power and authority, enforceability of Term Loan Credit Documentation, no material litigation, no default, ownership of property, liens, intellectual property, taxes, Federal Reserve regulations; anti-corruption laws, bribery and sanctions; ERISA, labor matters, Investment Company Act, subsidiaries, use of proceeds, environmental matters, accuracy of disclosure, creation and perfection of security interests, solvency, Regulation H and Affected Financial Institutions. |
| Affirmative Covenants: | Limited to the following (applicable to the Holdings, the Borrower and its restricted subsidiaries), in each case, with customary materiality qualifiers, thresholds, exceptions, limitations and qualifications to be mutually agreed subject to the Term Loan Documentation Principles: delivery of annual and quarterly (other than the fourth quarter of any year) financial statements, in each case, along with customary management discussion and analysis, accountants' letters, annual budgets, compliance certificates and other information requested by the Lenders, payment of obligations, maintenance of existence, compliance, maintenance of policies and procedures reasonably designed to ensure compliance with anti-corruption, bribery and sanctions laws, maintenance of property (other than ordinary wear and tear, casualty or condemnation), adequate insurance, maintenance of books and records, right of Lenders to inspect property and books and records, notices of defaults, material litigation and other material events, compliance with environmental laws, ERISA, further assurances (including without limitation, with respect to security interests in after acquired property), quarterly conference calls with Lenders (which shall only be required to be conducted if a public earnings call for equity security holders is not then being held), maintenance of monitored public corporate family/corporate credit and facility ratings (but without an obligation to achieve any specific rating) and performance of post-closing matters (including, within sixty (60) days following the Closing Date, delivery of audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries, in each case for the fiscal year ended December 31, 2021). |

13

Negative Covenants:  Limitations, subject to the Term Loan Documentation Principles, on (to apply to Holdings, the Borrower and its restricted subsidiaries):

(a) indebtedness (including guarantee obligations of indebtedness), which shall permit, among other things, the ABL Facility;

(b) liens;

(c) mergers, consolidations, liquidations and dissolutions;

(d) sales of assets, which shall permit, among other things, (i) the asset sales set forth under the heading "Permitted Asset Sales" below and (ii) other exceptions and qualifications to be agreed;

(e) dividends and other payments in respect of capital stock; *provided* that, among other exceptions, such dividends and payments will be permitted to be made in amounts necessary to fund restricted payments without limitation subject to (i) no Default or Event of Default and (ii) pro forma compliance with a Total Net Leverage Ratio of 2.00:1.00;

(f) acquisitions, investments, loans and advances; *provided* that investments will be permitted without limitation subject to (i) no Default or Event of Default and (ii) pro forma compliance with a Total Net Leverage Ratio of 2.75:1.00;

(g) voluntary prepayments, redemptions and repurchases ("Specified Prepayments") of material contractually subordinated debt for borrowed money, unsecured debt for borrowed money or junior lien debt for borrowed money (collectively, "Covered Debt") (it being understood that there shall be no restriction on prepayments of ABL Loans); *provided* that Specified Prepayments of Covered Debt will be permitted subject to pro forma compliance with a Total Net Leverage Ratio of 2.00:1.00;

(h) transactions with affiliates;

(i) sale-leasebacks;

(j) swap agreements;

(k) changes in fiscal periods;

(l) negative pledge clauses and clauses restricting subsidiary distributions;

(m) changes in lines of business;

(n) amendments to organizational documents;

14

(o) passive Holdings covenant; and

(p) use of proceeds in compliance with anti-corruption, bribery and sanctions laws;

*provided* that neither Holdings, the Borrower or any Restricted Subsidiary shall transfer or dispose of material intellectual property to an Unrestricted Subsidiary.

The negative covenants will be subject, in the case of each of the foregoing covenants, to mutually agreed upon exceptions, qualifications and "baskets" to be set forth in the Term Loan Credit Documentation that are consistent with those under the Referenced First Lien Credit Agreement, as modified in accordance with the Term Loan Documentation Principles.

In addition, each of the covenants limiting restricted payments, prepayments of subordinated debt and investments shall include an "Available Amount Basket", which shall mean a cumulative amount equal to the sum of (a) $50 million, *plus* (b) 50% of Consolidated Net Income (which shall not be less than zero) (this clause (b) being the "Available Amount Builder Component"), *plus* (c) the cash proceeds of new equity issuances of any direct or indirect parent of the Borrower to the extent contributed to the Borrower after the Closing Date, *plus* (d) capital contributions to the Borrower (subject to certain limitations to be set forth in the Term Loan Credit Documentation) after the Closing Date, including any purchases of loans by affiliates of the Borrower that have been contributed to the Borrower, *plus* (e) the net cash proceeds received by the Borrower from debt and disqualified stock issuances issued after the Closing Date and exchanged or converted into equity (other than disqualified equity), *plus* (f) distributions and similar amounts received in cash or cash equivalents by the Borrower and its restricted subsidiaries in respect of investments (including investments in non-Guarantors) made using the Available Amount Basket (not to exceed the amount of such investments), *plus* (g) the investments of the Borrower and its restricted subsidiaries in any unrestricted subsidiary out of the Available Amount Basket that has been re-designated as or merged into a restricted subsidiary, *plus* (h) any Declined Proceeds. The use of the Available Amount Basket shall not be subject to a governor other than  no payment or bankruptcy event of default and, in the case of Restricted Payments and Specified Prepayments of Covered Debt, Total Net Leverage Ratio being no greater than 2.50:1.00.

The Borrower or any restricted subsidiary will be permitted to make acquisitions of the equity interests in a person that becomes a wholly-owned restricted subsidiary, or all or substantially all the assets, together with any investment necessary to consummate the

foregoing (each, a "<u>Permitted Acquisition</u>"), so long as (a) after giving effect thereto, no event of default has occurred and is continuing, (b) the acquired company and its subsidiaries will be a restricted subsidiary and (subject to the exceptions contained in the Affirmative Covenants of the Term Loan Credit Documentation governing "Further Assurances" and/or requiring the provision of outgoing guarantees and collateral) will become Guarantors and pledge their Collateral to the Term Administrative Agent and (c) there shall be a cap to be agreed on acquisitions of subsidiaries that are not Guarantors or acquisitions by entities that are not Loan Parties.

|  |  |
|---|---|
| Permitted Asset Sale: | The Borrower or any of its restricted subsidiaries will be permitted to make non-ordinary course of business asset sales or dispositions without limit so long as (a) such sales or dispositions are for fair market value as reasonably determined by the Borrower, (b) at least 75% of the consideration for asset sales and dispositions shall consist of cash or cash equivalents (including a dollar basket for non-cash consideration that may be designated as cash consideration) and subject to additional exceptions consistent with the Referenced First Lien Credit Agreement, as modified in accordance with the Term Loan Documentation Principles  (c) such asset sale or disposition is subject to the terms set forth in the section entitled "Mandatory Prepayments" hereof, as well as certain other dispositions consistent with the Term Loan Credit Documentation, and (d) no default or event of default shall have occurred and be continuing or resulting therefrom. |
| Events of Default: | Nonpayment of principal when due, nonpayment of interest, fees and other amounts after five day grace period, material inaccuracy of a representation or warranty when made, cross-default to material indebtedness (including the ABL Facility), violation of covenants (subject, in the case of certain affirmative covenants, to a grace period), bankruptcy events, certain ERISA events that would result in a Material Adverse Effect, final and nonappealable material judgments, actual or asserted invalidity of guarantee or security document and change of control. |

The occurrence of an event of default under the ABL Facility (other than a payment event of default) shall not constitute an event of default under the cross-default provisions of the Term Loan Facility unless and until the earliest of (a) the acceleration of the obligations under the ABL Facility or (b) the actual exercise by the ABL Administrative Agent of remedies under the ABL Facility in accordance with the express instruction of the Required Lenders, which remedies are only available to secured creditors under applicable law (and not to creditors generally) as a result of such event of default (excluding, for the avoidance of doubt, the imposition of control over any deposit account whether in connection with a Cash Dominion Period or otherwise).

Voting:

Amendments and waivers of the Term Loan Credit Documentation will require the approval of three (3) or more unaffiliated Lenders holding more than 50% of the aggregate amount of the loans and commitments under the Term Loan Facility held by non-defaulting Lenders ("Required Lenders"), except that (i) the consent of each Lender directly and adversely affected thereby shall also be required with respect to: (A) increases in the commitment of such Lender, (B) reductions of principal, interest or fees owing to such Lender, (C) extensions of the final maturity or the due date of any interest, amortization or fee payment, (D) changes to pro rata sharing and pro rata payment provisions, (E) changes to the payment waterfall and (F) actions taken to contractually subordinate (or have the effect of contractually subordinating) the payment obligations or all or substantially all of the liens in the Collateral under the Term Loan Credit Documentation to other indebtedness for borrowed money (including guarantees) (any such other indebtedness to which the liens securing the obligations or such obligations under the Term Loan Credit Documentation are subordinated, the "Senior Indebtedness"), unless pursuant to a transaction where each adversely affected Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share of the Senior Indebtedness and, to the extent such adversely affected Lender participates in the Senior Indebtedness, it receives its pro rata share of the fees and any other similar benefit, (ii) the consent of 100% of the Lenders will be required with respect to (A) changes in the voting thresholds and (B) releases of all or substantially all the value of the guarantees or releases of liens on all or substantially all of the Collateral (in each case, other than as permitted under the Term Loan Facility) and (iii) customary protections for the Term Administrative Agent and the Issuing Lenders will be provided.

Notwithstanding the foregoing, provisions regarding pro rata payments or sharing of payments shall permit loan buy-back or similar programs, "amend and extend" transactions or additions of one or more tranches of debt and modifications to such pro rata and sharing of payment provisions for such further programs or debt, shall permit non-pro rata distributions and commitment reductions in connection with any such loan buy-back or similar programs, amend and extend transactions or additions of one or more tranches of debt on terms set forth herein.

The Term Loan Credit Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

Assignments and

| | |
|---|---|
| Participations: | The Lenders shall be permitted to assign (other than to a natural person) all or a portion of their Term Loans and commitments with the consent, not to be unreasonably withheld or delayed, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) a payment or bankruptcy event of default has occurred and is continuing; *provided* that such consent shall be deemed given if the Borrower has not responded within ten (10) business days following written notice, and (b) the Term Administrative Agent,.  In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000, unless otherwise agreed by the Borrower and the Term Administrative Agent.  The Term Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment.  The Lenders shall also be permitted to sell participations in their Term Loans (other than to a natural person, a defaulting lender, Holdings, the Borrower or any of its subsidiaries); *provided* that the obligations under the Term Loan Credit Documentation for such Lender selling a participation shall remain unchanged and such Lender shall remain solely responsible to the other parties under the Term Loan Credit Documentation for the performance of such obligations.  Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations.  Voting rights of participants shall be limited to matters that require the consent of each Lender directly affected thereby and that directly affect such Participant.  Pledges of Term Loans in accordance with applicable law shall be permitted without restriction.

No assignment or participation may be made or sold to the Borrower or any of its affiliates (other than the Lenders under the Term Loan Facility as of the Closing Date and their respective affiliates). |
| Unrestricted Subsidiaries: | Consistent with similar transactions of this kind, the Term Loan Credit Documentation shall contain provisions pursuant to which, subject to customary limitations on investments, loans, advances to and other investments in, unrestricted subsidiaries, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a "restricted subsidiary"; *provided* that (i) no default shall have occurred and be continuing or would result from any such designation, (ii) after giving pro forma effect to such designation or redesignation, the Borrower shall be in compliance with the Financial Covenant (whether or not then in effect), (iii) no restricted subsidiary shall be designated as an unrestricted subsidiary if it owns material intellectual property, (iv) such designation of a restricted subsidiary to an unrestricted subsidiary shall be made in compliance with the investments covenant and |

18

(v) such redesignation of any unrestricted subsidiary as a restricted subsidiary shall be deemed to constitute the incurrence of indebtedness and liens of such subsidiary (to the extent assumed). Unrestricted subsidiaries will not be subject to the mandatory prepayment, representation and warranty, affirmative or negative covenant or event of default provisions of the Term Loan Credit Documentation and the results of operations, indebtedness and interest expense of unrestricted subsidiaries will not be taken into account for purposes of determining any financial ratio or covenant contained in the Term Loan Credit Documentation. No subsidiary may be designated an "unrestricted subsidiary" unless it is also designated as such under the ABL Facility or any other instrument governing material indebtedness in excess of $35 million.

| | |
|---|---|
| Yield Protection: | The Term Loan Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (*provided* that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes (including appropriate gross-up provisions) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Term Benchmark Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto. |
| Expenses and Indemnification: | Neither Holdings or any of its subsidiaries, nor the Term Administrative Agent, the Term Lead Arrangers, or the Lenders (or any of their affiliates or their respective officers, directors, employees, advisors and agents) shall have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by any other party to the Term Loan Credit Documentation arising out of, in connection with, or as a result of, the Term Loan Facility or the Term Loan Credit Documentation. As used herein, the term "<u>Liabilities</u>" shall mean any losses, claims (including intraparty claims), demands, damages or liabilities of any kind. |

Regardless of whether the Closing Date occurs, the Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Term Administrative Agent and the Term Lead Arrangers associated with the syndication of the Term Loan Facility and the

preparation, execution, delivery and administration of the Term Loan Credit Documentation and any amendment, modification or waiver with respect thereto (including the reasonable fees, disbursements and other charges of one primary counsel and one local counsel in each applicable jurisdiction for the Term Administrative Agent and the Term Lead Arrangers taken as a whole) and (b) all reasonable and documented out-of-pocket expenses of the Term Administrative Agent and the Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term Loan Credit Documentation.

The Term Administrative Agent, the Term Lead Arrangers and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (each, an "<u>Indemnified Person</u>") will be indemnified and held harmless against Liabilities or expenses (including the fees, disbursements and other charges of counsel) incurred by such Indemnified Person in connection with or as a result of (i) the execution and delivery of the Term Loan Credit Documentation and any agreement or instrument; (ii) the funding of the Term Loan Facility, issuance of letters of credit thereunder, or the or the use or the proposed use of proceeds thereof; (iii) any act or omission of the Term Administrative Agent in connection with the administration of the Term Loan Credit Documentation; (iv) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by Holdings, the Borrower or any of its subsidiaries, or any environmental liability resulting from the handling of hazardous materials or violation of environmental laws, related in any way to Holdings, the Borrower or any of its subsidiaries and (v) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "<u>Proceeding</u>") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by Holdings, the Borrower, their affiliates or equity holders or any other party; *provided* that such indemnification shall not, as to any Indemnified Person, be available to the extent that such Liabilities or expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person in performing its activities or in furnishing its commitments or services under the Term Loan Credit Documentation.

| | |
|---|---|
| EU/UK Bail-In Provisions: | The Term Loan Credit Documentation will contain customary EU/UK bail-in provisions on terms to be mutually agreed subject to the Term Loan Documentation Principles. |

| | |
|---|---|
| QFC Provisions: | The Term Loan Credit Documentation will contain customary "QFC" provisions on terms to be mutually agreed subject to the Term Loan Documentation Principles. |
| Erroneous Payments: | The Term Loan Credit Documentation will contain customary erroneous payment provisions on terms to be mutually agreed subject to the Term Loan Documentation Principles. |
| Governing Law: | New York. |
| Forum: | United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the  Borough of Manhattan), and any appellate court from any thereof. |
| Counsel to the Term Administrative Agent: | Simpson Thacher & Bartlett LLP. |

Annex I

**INTEREST AND CERTAIN FEES**

Interest Rate Options:

The Borrower may elect that the Term Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Adjusted Term SOFR Rate, plus the Applicable Margin.

As used herein:

"<u>ABR</u>" means the highest of (i) the rate of interest last quoted by The Wall Street Journal in the U.S. as the prime rate in effect (the "<u>Prime Rate</u>"), (ii) the NYFRB Rate from time to time plus 0.50% and (iii) the Adjusted Term SOFR Rate applicable for an interest period of one month plus 1.00%. If the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00%.

"<u>ABR Loans</u>" means Term Loans bearing interest based upon the ABR.

"<u>Adjusted Term SOFR Rate</u>" means the Term SOFR Rate, plus 0.10%; *provided* that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of calculating such rate.

"<u>Applicable Margin</u>" means 6.50% in the case of ABR Loans and 7.50% in the case of Term Benchmark Loans.

"<u>CME Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate calculated by the Federal Reserve Bank of New York (the "<u>NYFRB</u>") based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as the federal funds effective rate, *provided* that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"<u>Floor</u>" means the benchmark rate floor, if any, provided in the Term Loan Credit Documentation initially (as of the execution of the Term Loan Credit Documentation, the modification, amendment or renewal of the Term Loan Credit Documentation or otherwise) with respect to the Adjusted Term SOFR Rate. For

the avoidance of doubt the initial Floor for Adjusted Term SOFR Rate shall be 1.00%.

"Interest Period" means, with respect to any Term Benchmark, a period of one, three or six months.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; *provided* that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in U.S. Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"SOFR" means, with respect to any business day, a rate per annum equal to the secured overnight financing rate for such business day published by the NYFRB on the NYFRB's on the immediately succeeding business day.

"Term Benchmark" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"Term Benchmark Loans" means Term Loans bearing interest based upon the Term Benchmark Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association

recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

The Term Loan Credit Documentation will contain provisions to be mutually agreed with respect to a replacement of any Term Benchmark.

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, quarterly in arrears, on the first day of each calendar quarter. |
| | In the case of Term Benchmark Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period. |
| Default Rate: | At any time when the Borrower is in default in the payment of any amount under the Term Loan Facility, after giving effect to any applicable grace period, the Required Lenders may elect that such overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable thereto (or, in the event there is no applicable rate, 2.00% per annum in excess of the rate otherwise applicable to Initial Term Loans maintained as ABR Loans from time to time). |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed. |

**<u>Annex 2</u>**

**Plan Release and Exculpation Provisions**

*Releases by the Debtors*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New First Lien ABL Facility, the New First Lien Term Loan Facility, the New Common Stock, the Rights Offering, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New First Lien ABL Facility, the New First Lien Term Loan Facility, the New Common Stock, the Rights Offering, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, any Restructuring Document, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New First Lien ABL Facility and the New First Lien Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New First Lien ABL Facility and the New First Lien Term Loan Facility) executed to implement the Plan or the Restructuring Transactions; (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (3) any matters retained by the Debtors and the Reorganized Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the

Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### *Releases by the Releasing Parties*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New First Lien ABL Facility, the New First Lien Term Loan Facility, the New Common Stock, the Rights Offering, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the New First Lien ABL Facility, the New First Lien Term Loan Facility, the New Common Stock, the Rights Offering, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Restructuring Documents, or any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New First Lien ABL Facility and New First Lien Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New First Lien ABL Facility and New First Lien Term Loan Facility) executed to implement the Plan or the Restructuring Transactions; or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:   (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any

of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Facility, the New First Lien ABL Facility, the New First Lien Term Loan Facility, the New Common Stock, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the New First Lien ABL Facility, the New First Lien Term Loan Facility, the New Common Stock, the Rights Offering, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.   The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.   Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the New First Lien ABL Facility and New First Lien Term Loan Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New First Lien ABL Facility and New First Lien Term Loan Facility) executed to implement the Plan.

<div align="center">*    *    *    *    *    *</div>

### Certain Definitions Related to Release and Exculpation Provisions

"Causes of Action" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.   Causes of Action also include:   (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity;

(b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"Exculpated Parties" means collectively, and in each case in its capacity as such, the Debtors and each Related Party of the Debtors; *provided* that Exculpated Parties shall not include non-Debtor Affiliates and such non-Debtor Affiliates' Related Parties.

"Related Parties" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

"Released Parties" means each of, and in each case in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Agents; (e) the DIP Lenders; (f) the DIP Agent; (g) the Releasing Parties; (h) current and former Affiliates of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); provided, however, that, notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

"Releasing Parties" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Agents; (e) the DIP Lenders; (f) all holders of Claims; (g) all Holders of Interests; (h) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (i); provided, however, that, notwithstanding the foregoing, an Entity shall not be a "Releasing Party" if such Entity (x) does not vote to, and is not deemed to, accept the Plan, and (y) timely Files on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not resolved before Confirmation or otherwise validly opts out of the Third-Party Release; and provided, further, that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

## **Annex 3**

**Management Compensation Term Sheet**

**CARESTREAM HEALTH, INC.**

**MANAGEMENT COMPENSATION PROGRAM**

**TERM SHEET[1]**

| _Term_ | _Description_ |
|---|---|
| _Annual Cash Compensation_: | Base Salary: Base Salary amounts for each Executive as of the Plan Effective Date (as defined in the RSA) shall be equal to the amounts set forth on an exhibit to the RSA. Each individual holding an officer position set forth on such exhibit is referred to herein as an "Executive" and, collectively, as the "Executives".<br><br>Annual Bonus:<br><br>• 2022 Annual Bonus: The Company's current cash incentive bonus plan will remain in effect for calendar year 2022 and targets for Q3 and Q4 of calendar year 2022 will be deemed earned based on achieving objective and reasonably attainable financial/operational goals negotiated in good faith by the post-Plan Effective Date Board of Directors (the "New Board") and the Company's Chief Executive Officer (the "CEO"); provided that the payout for each quarter will be no less than (i) target levels for the CEO, the Chief Financial Officer (the "CFO"), President, Greater China Cluster, and President, Americas and (ii) threshold levels for each of the remaining Executives.<br><br>• Future Annual Bonus: An exhibit to the RSA lists target bonus opportunity for each Executive commencing in 2023. For calendar year 2023, each Executive will have the opportunity to earn 50% of his/her target bonus for achieving threshold performance, 100% of his/her target bonus for achieving budgeted performance, and 200% of his/her target bonus for achieving maximum performance, in each case based on achieving objective and reasonably attainable financial/operational goals negotiated in good faith by the New Board and Company's CEO. |
| _2023 Supplemental Bonuses_: | The CEO will be eligible to earn a supplemental bonus (the "CEO Supplemental Bonus"), subject to the CEO's continuing employment with the Company through December 31, 2023 (except as otherwise provided below in the event of a Qualifying Termination). The CEO Supplemental Bonus, to the extent earned, will be paid no later than March 15, 2024.<br><br>Certain other Executives will be able to earn a supplemental bonus from a pool, as allocated by the New Board in consultation with the CEO provided that such allocation shall be consistent with the allocation schedule set forth by the CEO prior to the Petition Date (each, an "Executive Supplemental Bonus"). The Executive Supplemental Bonuses will vest as follows:<br><br>• 50% will be subject to time-based vesting ("Time Awards"), which will vest ratably on each of December 31, 2023, December 31, 2024 and December 31, 2025. |

---

[1] Reference is hereby made to that certain Restructuring Support Agreement, dated as of August 21, 2022 (including all amendments, modifications, exhibits, and supplements thereto, the "RSA"), by and among Carestream Health Holdings, Inc., a Delaware corporation, and the Consenting Parties (as defined therein). Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the RSA.

| Term | Description |
|---|---|
| | • 50% will be subject to performance-based vesting ("Performance Awards") over a three-year performance period (i.e., three one-year periods with catch-up opportunities) and payment to be made within 45 days of the end of each one-year performance period, with metrics to be determined by the New Board and the CEO in good faith.<br><br>In no event will any Executive Supplemental Bonus be reallocated in the event of an Executive departure or other forfeiture. |
| *Long Term Incentive*: | The long-term incentive program will consist of two components, (i) an equity award and (ii) annual cash awards, in each case, which will vest based on both time and performance criteria as further described below.<br><br>*Equity LTI*<br><br>A post-Plan Effective Date management incentive plan (the "MIP") for equity awards to members of the management team will be established, and such plan will have a pool (the "MIP Pool") equal to 11.5% of the New Common Stock (as defined in the RSA) determined on a fully-diluted, fully distributed basis.  The terms of grants under the MIP will be determined by the New Board in consultation with the CEO with the following parameters:<br><br>Equity awards granted under the MIP will vest as follows:<br><br>• Vesting to be effective as of January 1, 2023 (the "Vesting Commencement Date")<br><br>• 50% will be subject to time-based vesting, which will vest ratably on the first three anniversaries of the Vesting Commencement Date;<br><br>• 50% will be subject to performance-based vesting, with metrics to be agreed upon by the CEO and the New Board.<br><br>Any unvested grants from the MIP Pool that are forfeited by a participant will be returned to the MIP Pool and allocated before an exit event by the New Board in consultation with the CEO.<br><br>*Cash LTI*<br><br>Beginning in FY 2024, the Company will implement a long-term cash incentive program with the terms and allocations to be established by the New Board in consultation with the CEO.<br><br>Any cash awards granted under such a long-term cash incentive program will vest as follows:<br><br>• 50% will be Time Awards, which will vest ratably on the first three anniversaries of grant.<br><br>• 50% will be Performance Awards over a three-year performance period (i.e., three one-year periods with catch-up opportunities) and payment to be made within 45 days of the end of each one-year performance period, with metrics to be determined by the New Board and the CEO in good faith.<br><br>Any separate CIC program to be negotiated in the future. |

| *Term* | *Description* |
|---|---|
| *Severance*: | If an Executive's employment with the Company is terminated by the Executive for Good Reason[2] or by the Company for a reason other than Cause or (a "<u>Qualifying Termination</u>"), the Executive will be entitled[3] to (i) a lump sum Cash Severance payment, (ii) any earned but unpaid annual bonus, (iii) with respect to any Executive Supplemental Bonus and Cash LTI, pro rata vesting of unvested Time Awards and pro rata vesting Performance Awards based on actual performance through the then current performance year, (iv) for the CEO and CFO only, a pro rata annual bonus for the year of termination based on actual performance for such year and (v) for the CEO only, any unpaid CEO Supplemental Bonus.<br><br>In addition, with respect to the CEO, a Qualifying Termination shall include the termination of employment by the CEO effective as of December 31, 2023 in the event that the Company and the CEO fail to reasonably agree by September 30, 2023, following good faith negotiations, to the terms governing the CEO's employment commencing on January 1, 2024. |
| *Sale Bonus Agreements*: | 2020 Sale Bonus Agreements to be terminated on or prior to the Plan Effective Date. |

---

[2]    To be defined consistently with existing agreements in place with the Company, provided that for CEO and CFO, "Good Reason" will include any reduction in cash compensation.

[3]    Benefits other than accrued benefits will be subject to execution and non-revocation of a customary release of claims to be attached to the applicable severance arrangement.

## EXHIBIT C

**DIP Commitment Letter**

[*Omitted*]

**<u>EXHIBIT C-1</u>**

**DIP Term Sheet**

# CARESTREAM HEALTH, INC.

## Senior Secured Superpriority
## Debtor in Possession Credit Facility Term Sheet

This Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "**DIP Term Sheet**" or this "**Agreement**") describes the terms and conditions of the senior secured superpriority debtor in possession term loan facility (the "**DIP Credit Facility**") provided by the DIP Lenders (as defined below) to Carestream Health, Inc., a Delaware corporation (the "**Borrower**"), in connection with cases (collectively, the "**Chapter 11 Cases**") filed or to be filed by Carestream Health Holdings, Inc., a Delaware corporation ("**Carestream**"), the Borrower and the other Guarantors (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") no later than August 23, 2022 (the "**Petition Date**"). The DIP Credit Facility is being provided by the DIP Lenders in reliance upon the promulgation and consummation of the Restructuring Transactions (as defined below).

Capitalized terms used but not defined herein have the meanings assigned to them in the Restructuring Support Agreement, dated as of August 21, 2022 (including all amendments, modifications, exhibits, and supplements thereto, the "**RSA**") by and among the Company Parties and the Consenting Parties (each, as defined therein) or the restructuring term sheet attached as Exhibit B to the RSA (the "**Restructuring Term Sheet**") or the Interim DIP Order (as defined below).

| | |
|---|---|
| **BORROWER:** | Carestream Health, Inc., a Delaware corporation, in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code. |
| **GUARANTORS:** | Carestream Health Holdings, Inc., a Delaware corporation ("**Holdings**"), and each material domestic subsidiary of the Borrower set forth on Exhibit A-1 hereto, each of which shall be a Debtor in the Chapter 11 Cases (collectively, the "**Guarantors**" and each, individually, a "**Guarantor**"). The guaranty provisions set forth in Exhibit A-2 attached hereto are hereby incorporated herein by reference. |
| **DIP LENDERS:** | The entities set forth on Annex A hereto (consisting of both Tranche A DIP Lenders and Tranche B DIP Lenders (each as defined below), collectively, the "**DIP Lenders**" and individually, each a "**DIP Lender**"). |
| **DIP AGENT:** | JPMorgan Chase Bank, N.A. shall be the sole administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"). The DIP Agent and each DIP |

| | |
|---|---|
| | Lender hereby agree to the agency provisions set forth in <u>Exhibit E</u> hereto, which are incorporated herein by reference. |
| **DIP CREDIT FACILITY:** | The DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor in possession loans comprising (x) a $5,000,000 tranche of terms loans (the "**Tranche A DIP Loans**") and (y) a $75,000,000 tranche of terms loans (the "**Tranche B DIP Loans**") to the Borrower in a total aggregate principal amount (exclusive of capitalized DIP Fees (as defined below) not to exceed at any time outstanding aggregate principal commitments of $80,000,000 (the "**DIP Commitment**") on the terms and conditions herein; *provided* that no DIP Lender shall be obligated to make DIP Loans in an amount in excess of the portion of the DIP Commitment set forth next to such DIP Lender's name in the table set forth on <u>Annex A</u> hereto (and which DIP Commitment shall be subject to reductions as set forth below). |
| **AVAILABILITY PERIOD & DRAW SCHEDULE:** | The DIP Credit Facility shall be available from the Interim Closing Date (as defined below) to the earlier of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as defined below) (the "**Availability Period**"). The Borrower may request draws under the DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Agent in substantially the form of <u>Exhibit B</u> attached hereto (the "**Notice of Borrowing**"), duly executed by an authorized officer of the Borrower (the "**Draw Schedule**"):<br><br>(i)  <u>Initial DIP Loans</u>:  On or after the Interim Closing Date and prior to the Final Closing Date (as defined below), the Borrower may request loans in one or more borrowings in an aggregate principal amount not to exceed $50,000,000 (the "**Initial DIP Amount**"), consisting of (A) $3,125,000 of Tranche A DIP Loans (the "**Tranche A Initial DIP Loans**") to be provided by certain Prepetition Secured Parties (as defined below) (the "**Tranche A DIP Lenders**") and (B) $46,875,000 of Tranche B DIP Loans (the "**Tranche B Initial DIP Loans**" and, together with the Tranche A Initial DIP Loans, the "**Initial DIP Loans**") to be provided by certain Prepetition Secured Parties (the "**Tranche B DIP Lenders**"), strictly in accordance with the Approved DIP Budget (as defined below) (after giving effect to the Permitted Variances (as defined below)), subject to the satisfaction or any waiver by the |

Required DIP Lenders (as defined below) of the conditions precedent described under the Section below entitled "Conditions Precedent to the Initial DIP Loans on the Interim Closing Date" and otherwise in accordance with the provisions of this DIP Term Sheet and the "Use of Proceeds" hereof and the terms of the Interim DIP Order (as defined below); and

(ii)    <u>Delayed Draw DIP Loans</u>:  On or after the Final Closing Date, the Borrower may request loans in one or more borrowings of Tranche B DIP Loans in an aggregate principal amount not to exceed $30,000,000 (the "**Delayed Draw DIP Amount**"), consisting of (A) $1,875,000 of Tranche A DIP Loans (the "**Tranche A Final DIP Loans**") to be provided by the Tranche A DIP Lenders and (B) $28,125,000 of Tranche B DIP Loans (the "**Tranche B Final DIP Loans**" and, together with the Tranche A Final DIP Loans, the "**Delayed Draw DIP Loans**" and, together with the Initial DIP Loans, the "**DIP Loans**"), to be provided by the Tranche B DIP Lenders, strictly in accordance with the Approved DIP Budget (after giving effect to the Permitted Variances), subject to the satisfaction or any waiver by the Required DIP Lenders of the conditions precedent described under the Section below entitled "Conditions Precedent to any Delayed Draw DIP Loan on or After the Final Closing Date" and in accordance with the provisions of this DIP Term Sheet and the "Use of Proceeds" hereof and the terms of the Final DIP Order (as defined below). Any incurrence of Delayed Draw DIP Loans on or after the Final Closing Date will be in minimum amounts of the lesser of (i) $15 million and (ii) the remaining undrawn amount of the Delayed Draw DIP Amount, and subject only to the following conditions, measured at the time of the incurrence of such Delayed Draw DIP Loans.

Upon the Debtors' filing of the Chapter 11 Cases in the Bankruptcy Court, Akin Gump Strauss Hauer & Feld LLP shall notify the DIP Lenders of the anticipated date of the first day hearing (the "**First Day Hearing Date**").

The DIP Lenders shall fund each Initial DIP Loan by wire transfer of immediately available funds no later than 9:00 a.m., New York City time, on the First Day Hearing Date to the

|  | account of the DIP Agent most recently designated by it for such purpose by notice to the DIP Lenders.

The DIP Lenders shall fund each Delayed Draw DIP Loan by wire transfer of immediately available funds no later than 4:00 p.m., New York City time, one (1) Business Day prior to the requested funding date for such Delayed Draw DIP Loan to the account of the DIP Agent most recently designated by it for such purpose by notice to the DIP Lenders.

As soon as reasonably practicable after the funding of the Initial DIP Loans, the proceeds of all DIP Loans not otherwise applied directly to the payment of amounts permitted to be paid under the Approved DIP Budget (after giving effect to the Permitted Variances) shall be funded into a deposit account of the Borrower that shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent, which shall be granted and perfected pursuant to the DIP Orders. |
|---|---|
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to the Initial DIP Loans on the Interim Closing Date" as set forth below (including, without limitation, entry of the Interim DIP Order) shall have been satisfied or waived by the Required DIP Lenders in accordance with this DIP Term Sheet.

"**Final Closing Date**" means the date on which the "Conditions Precedent to any Delayed Draw DIP Loan On or After the Final Closing Date" as set forth below (including, without limitation, entry of the Final DIP Order) shall have been satisfied or waived by the Required DIP Lenders in accordance with this DIP Term Sheet.

As used herein, "**Business Day**" shall mean, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City; *provided* that, in addition to the foregoing, a Business Day shall be in relation to DIP Loans referencing the Adjusted Term SOFR Rate (as defined in Annex C) and any interest rate settings, fundings, disbursements, settlements or payments of any such Loans referencing the Adjusted Term SOFR Rate or any other dealings of such Loans referencing the Adjusted Term SOFR Rate, any such day that is only a U.S. Government Securities Business Day (as defined below).

As used herein, "**U.S. Government Securities Business Day**" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a |

| | |
|---|---|
| | day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities. |
| **DIP LOAN DOCUMENTATION; DIP TERM SHEET CONTROLS:** | At the option of the Required DIP Lenders, in their sole discretion, the Debtors shall execute definitive financing documentation with respect to the DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to each of the DIP Agent, the Required DIP Lenders and the Debtors (the "**DIP Facility Documents**"), which such DIP Facility Documents shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the Borrower, the DIP Agent and the Required DIP Lenders shall agree, it being understood that such DIP Facility Documents shall be substantially based on the Prepetition First Lien Credit Agreement and the Loan Documents (as defined in the Prepetition First Lien Credit Agreement). The provisions of the DIP Facility Documents shall, upon execution, supersede the provisions of this DIP Term Sheet; *provided* that if the DIP Lenders determine not to require the Debtors to execute additional DIP Facility Documents, the provisions of this DIP Term Sheet, the Interim DIP Order and the Final DIP Order shall govern the DIP Credit Facility. The provisions of the DIP Facility Documents shall be consistent with this DIP Term Sheet, the Interim DIP Order and, once entered, a final order with respect to the Chapter 11 Cases and the DIP Credit Facility, in form and substance reasonably satisfactory to the DIP Agent, the Required DIP Lenders and the Debtors, granting final approval of the DIP Credit Facility and DIP Facility Documents, the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"). |
| **CASH COLLATERAL:** | Subject to entry of the Interim DIP Order, the Prepetition Secured Parties (as defined herein) and the DIP Lenders hereby consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") on the terms and conditions set forth in the DIP Orders and the DIP Facility Documents. |
| **USE OF PROCEEDS:** | Subject to Bankruptcy Court approval, the Debtors shall use the proceeds of the DIP Credit Facility and Cash Collateral strictly in accordance with this DIP Term Sheet, the DIP Facility Documents (if any) and the Approved DIP Budget (after giving effect to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, |

| | |
|---|---|
| | including for the payment of rent and other lease expenses and professional fees, (b) bankruptcy-related costs and expenses, (c) costs and expenses related to the DIP Credit Facility, and (d) any other purposes specifically set forth in the Approved DIP Budget.  Notwithstanding anything herein, the Approved DIP Budget shall not in any regard limit or test the payment of any professional fees.<br><br>No Cash Collateral or proceeds of the DIP Credit Facility may be used by the Debtors to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with, the DIP Credit Facility or any Prepetition Credit Agreement (as defined below); *provided* that the official committee of unsecured creditors (the "**Creditors' Committee**"), if any, may use up to $50,000 to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action.<br><br>Without the prior written approval of the Required DIP Lenders, no Cash Collateral or proceeds of the DIP Credit Facility may be distributed by the Debtors to, or used by the Debtors for the benefit of, any non-Debtor affiliates or subsidiaries of the Debtors, except as set forth in the Approved DIP Budget (after giving effect to Permitted Variances). |
| **APPROVED DIP BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | By no later than the Petition Date, the Debtors shall prepare and deliver to the DIP Agent and the DIP Lenders a weekly cash flow forecast for the 13-week period commencing on the Petition Date, and such weekly cash flow forecast shall be approved by the Required DIP Lenders in their sole discretion and shall set forth, among other things, the projected cash receipts and cash disbursements of the Debtors for the period covered thereby (the "**Approved DIP Budget**").<br><br>By no later than 5:00 PM (Eastern Time) on Thursday of the calendar week following the week in which the Petition Date occurs (the "**First Testing Date**"), and no later than 5:00 PM (Eastern Time) on each Thursday of each calendar week thereafter (together with the First Testing Date, each a "**Testing Date**"), prior to the Initial Variance Testing Date (as defined below), the Debtors shall deliver to the DIP Agent and the DIP Lenders (and their advisors), a variance report (each, a "**Weekly Variance Report**") setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth |

in the then-in-effect Approved DIP Budget for the Monthly Testing Period (as defined below).

By no later than 5:00 PM (Eastern Time) on the first Testing Date that occurs after the four (4)-week anniversary of the First Testing Date (the "**Initial Variance Testing Date**") and by not later than 5:00 PM (Eastern Time) on each Thursday thereafter (each such date, a "**Monthly Variance Testing Date**" and each such subsequent four-week period ending on the Sunday preceding each such Monthly Variance Testing Date, the "**Monthly Testing Period**"), the Debtors shall provide to the DIP Agent and the DIP Lenders, a report reasonably detailing (i) the aggregate receipts of the Debtors and aggregate disbursements of the Debtors, in each case, during the applicable Monthly Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between (a) the aggregate receipts received by the Debtors during such Monthly Testing Period against the aggregate receipts for such Monthly Testing Period as set forth in the applicable Approved DIP Budget and (b) the aggregate disbursements made by the Debtors during such Monthly Testing Period against the aggregate disbursements for such Monthly Testing Period as set forth in the applicable Approved DIP Budget (a "**Monthly Variance Report**" and, together with the Weekly Variance Report, the "**Approved Variance Reports**").

The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):

As of the Initial Variance Testing Date, for the period commencing on the Petition Date and ending on the week after the four-week anniversary of the Petition Date, the Debtors shall not allow:  (i) the aggregate receipts of the Debtors to be less than 80% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including professional fees and expenses incurred by the Debtors, the DIP Agent and/or the DIP Lenders)) to exceed 115% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements provided in the then-in-effect Approved DIP Budget.

As of any subsequent Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such

Monthly Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 85% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including professional fees and expenses incurred by the Debtors, the DIP Agent and/or the DIP Lenders)) to exceed 110% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements provided in the then-in-effect Approved DIP Budget (after giving effect to any Permitted Variances).

Additional variances, if any, from the Approved DIP Budget, and any proposed changes to the Approved DIP Budget, shall be subject to the written approval of the Required DIP Lenders. For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by email (including as communicated by counsel in writing to the DIP Lenders).

Commencing at 5:00 P.M. (Eastern Time) on the Thursday of the fourth full calendar week after the Petition Date, and continuing at 5:00 P.M. (Eastern Time) on the Thursday of every fourth week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the Required DIP Lenders in their sole discretion, it shall become the "Approved DIP Budget" for purposes of this DIP Term Sheet and the DIP Orders. Any amendments, supplements or modifications to the Approved DIP Budget or an Approved Variance Report shall be subject to the prior written approval of the Required DIP Lenders prior to the implementation thereof. If the Required DIP Lenders have not objected, in writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved DIP Budget or an Approved Variance Report, within five (5) Business Days after the DIP Agent's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the Required DIP Lenders. Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the Required DIP Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

| | |
|---|---|
| **CASH MANAGEMENT OBLIGATIONS:** | One or more of the Debtors are obligated to Bank of America, N.A. (together with its affiliates, the "**Cash Management Bank**") in connection with various cash management products and services (including, without limitation, treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any overdraft or similar services) provided to the Debtors and/or any of their affiliates (for which the Debtors are otherwise liable) to the extent constituting "Cash Management Obligations" (as defined in the Prepetition First Lien Credit Agreement) as of the Petition Date (collectively, the "**Cash Management Obligations**"). The Cash Management Obligations are secured by the Prepetition First Lien Collateral (as defined below) under the Prepetition First Lien Credit Agreement. |
| | The Debtors are seeking to continue to utilize similar products and services of the Cash Management Bank on a post-petition basis and have sought, pursuant to the Debtors' cash management motion, authority to do so. Because the Cash Management Bank is unwilling to provide such products and services post-petition on a junior lien basis to any other indebtedness for borrowed money, the Debtors seek approval, and the DIP Lenders and DIP Agent have agreed, that any postpetition Cash Management Obligations (the "**Postpetition Cash Management Obligations**") shall be secured by the DIP Collateral on a *pari passu* basis with the DIP Liens (the "**Cash Management Liens**"). |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lenders and the DIP Agent under or in connection with this DIP Term Sheet, the DIP Facility Documents and/or the DIP Orders (collectively, the "**DIP Obligations**"), in all cases subject to (a) the Carve Out (as defined in the Interim DIP Order) and (b) the Prepetition Permitted Liens (as defined below), shall be: |
| | (i)      pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code; |

<table>
<tr><td></td><td>

(ii)     pursuant to section 364(c)(2) secured by a fully perfected first-priority lien on the DIP Collateral (as defined below), to the extent that such DIP Collateral is not subject to the Prepetition Permitted Liens;

(iii)    pursuant to section 364(c)(3), secured by a fully perfected junior lien on DIP Collateral, to the extent such DIP Collateral is subject to a Prepetition Permitted Lien; and

(iv)    pursuant to section 364(d)(1), secured by a fully perfected first-priority priming lien on DIP Collateral, *provided* that such lien shall be subordinate to the Prepetition Permitted Liens (including the Prepetition Obligations) (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**").

The DIP Liens shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve Out (as defined in the Interim DIP Order), and Prepetition Permitted Liens.

As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Credit Agreements (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the liens securing the Prepetition First Lien Term Loan Claims as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

</td></tr>
<tr><td>

**PREPETITION FIRST LIEN FACILITY**

</td><td>

The Debtors have outstanding (i) term loans in an aggregate estimated principal amount outstanding of approximately $507,719,000 plus applicable interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition First Lien Term Loan Claims**") and (ii) revolving loans in an aggregate principal amount outstanding of approximately $77,000,000 plus applicable interest, premiums (if any), costs, fees, expenses and other obligations, and $482,098 in Hedge Claims (as defined below) owed to JPMorgan Chase Bank, N.A. (or one of its affiliates) (collectively, the "**Prepetition First Lien Revolving Facility Claims**" and together with the Prepetition First Lien Term Loan Claims, the "**Prepetition First Lien Claims**"), in each case, under that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7,

</td></tr>
</table>

| | |
|---|---|
| | 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition First Lien Credit Agreement**" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, by and among Borrower, Holdings, the financial institutions party thereto from time to time as lenders (the "**Prepetition First Lien Lenders**"), and Credit Suisse AG. Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**" and together with the Prepetition First Lien Lenders, the "**Prepetition First Lien Term Loan Secured Parties**" and the Prepetition First Lien Term Loan Secured Parties together with holders of the Prepetition First Lien Revolving Facility Claims, the "**Prepetition First Lien Secured Parties**"). |
| | The Prepetition First Lien Claims (as well as various Cash Management Obligations outstanding as of the Petition Date) are secured by a first priority lien on the Collateral (as defined in the Prepetition First Lien Credit Agreement, the "**Prepetition First Lien Collateral**"), other than the assets of, and the equity in, Carestream. |
| | As used herein, "**Hedge Claims**" shall mean the obligations of one or more Debtors to JPMorgan Chase Bank, N.A. (or one if its affiliates) under the ISDA Master Agreement, dated as of September 29, 2011, between JPMorgan Chase Bank, N.A. and Carestream Health Inc., including any schedules and appendix thereto, including any amounts, now or hereafter due (including termination payments). |
| **PREPETITION EXISTING SECOND LIEN FACILITY** | The Debtors owe $448,235,000 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition Second Lien Claims**" and together with the Prepetition First Lien Claims, the "**Prepetition Obligations**") under that certain Amended and Restated Second Lien Credit Agreement, dated as of June 7, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Second Lien Term Loan Credit Agreement**" and together with the Prepetition First Lien Credit Agreement, the "**Prepetition Credit Agreements**") and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, by and among Carestream Health, Inc., as borrower, Holdings, the financial institutions party thereto |

|  | from time to time as lenders (the "**Prepetition Second Lien Lenders**" and together with the Prepetition First Lien Lenders, the "**Prepetition Lenders**"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Term Loan Agent**" and together with the Prepetition Second Lien Lenders, the "**Prepetition Second Lien Term Loan Secured Parties**" and together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**").<br><br>The Prepetition Second Lien Claims are secured by a second priority lien on the Collateral (as defined in the Prepetition Second Lien Credit Agreement) (the "**Prepetition Second Lien Collateral**" and together with the Prepetition First Lien Collateral, the "**Prepetition Collateral**"), other than the assets of, and the equity in, Carestream. |
|---|---|
| **ADEQUATE PROTECTION FOR PREPETITION SECURED PARTIES:** | As set forth and provided in the Interim DIP Order. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of the Borrower and each Guarantor (and, in the case of each Debtor, its bankruptcy estate) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, and subject to entry of the Final DIP Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. All of the DIP Liens described herein with respect to the DIP Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the |

|  | necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, other than in respect of assets in which such perfection, in the good faith judgment of the Debtors with the consent of the Required DIP Lenders, could reasonably be expected to result in material adverse tax consequences to the Debtors at the time of such perfection or in the future.  Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
|---|---|
| **DIP FEES:** | The Debtors shall pay the following fees:<br><br>(a) to the DIP Lenders, on a pro rata basis in accordance with their DIP Commitments and DIP Loans:<br><br>   (i) 2.00% of the aggregate amount of the DIP Commitments (the "**DIP Commitment Fee**"), payable in  kind on the new-money portion of the DIP Credit Facility, earned upon execution of the DIP Commitment Letter and payable upon entry of the Interim DIP Order;<br><br>   (ii) 4.00% on the funded amount of the DIP Loans (the "**Exit Fee**"), payable in cash, earned upon entry of the Interim DIP Order and payable upon the earlier of (i) the Plan Effective Date and (ii) any other payoff, refinancing or termination of the DIP Credit Facility;<br><br>   (iii) 1.00% per annum (the "**Undrawn DIP Fee**") on the unused portion of the DIP Commitments, payable monthly on the first Business Day of each calendar month in cash on the average unused amount of the Initial DIP Amount or the Delayed Draw DIP Amount, as the case may be, between entry of the Interim DIP Order or the Final DIP Order, as the case may be, and the date the Initial DIP Amount or the Delayed Draw DIP Amount, as the case may be, has been fully funded; and<br><br>(b) to the DIP Agent, an agency fee as set forth in the letter agreement between the DIP Agent and the Borrower |

| | |
|---|---|
| | (the "**Agency Fee**" and together with the DIP Commitment Fee, the Exit Fee and the Undrawn DIP Fee, the "**DIP Fees**"), payable in accordance with the terms of such letter agreement. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all funded DIP Loans (and, in the case of the funded Initial DIP Loans, commencing on the date that is one (1) Business Day prior of the First Day Hearing Date) and all accrued and unpaid interest thereon at a rate per annum equal to the Adjusted Term SOFR Rate for the one-month Interest Period (as defined in <u>Annex C</u>) then in effect <u>plus</u> 9.00%.<br><br>For the avoidance of doubt, the initial one-month Interest Period for any DIP Loan shall commence on the date of funding thereof, and each new one-month Interest Period shall commence at the end of the immediately preceding Interest Period.<br><br>Interest with respect to any DIP Loan shall be paid in cash on (i) the last day of each Interest Period applicable to such DIP Loan and (ii) on the Maturity Date.<br><br>All interest and fees under this DIP Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. |
| **DEFAULT RATE:** | Upon the written election of the Required DIP Lenders following the occurrence and during the continuance of an Event of Default (after giving effect to any applicable grace periods), principal, interest and all other amounts due in respect of the DIP Obligations shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **RESTRUCTURING TRANSACTIONS:** | The Debtors shall implement the Restructuring Transactions through the Chapter 11 Cases as described in the RSA.<br><br>Pursuant to the Plan:<br><br>(a) On account of its DIP Obligations with respect to the Tranche A DIP Loans, each Tranche A DIP Lender shall be repaid in full in cash on or prior to the occurrence of the Plan Effective Date (as defined in the RSA). |

|  | (b) On account of its DIP Obligations with respect to the Tranche B DIP Loans, each Tranche B DIP Lender shall: (i) receive its pro rata share of the Rights Offering Cash (as defined in the Restructuring Term Sheet) (if any)) and (ii) any portion of its DIP Obligations that are not paid in cash from the Rights Offering Cash will be paid in New Common Stock (as defined in the Restructuring Term Sheet) at the Rights Offering price per share (the "**DIP Rollover**"), subject to (A) the occurrence of the Plan Effective Date and (B) the satisfaction or waiver by the Required DIP Lenders of the conditions precedent described under the Section below entitled "*Conditions Precedent to any Delayed Draw DIP Loan On or After the Final Closing Date*" on or prior to such Plan Effective Date.  In connection with agreeing to the DIP Rollover, each Tranche B DIP Lender shall receive its pro rata share of a fee equal to 10% of the New Common Stock, subject to dilution for the Management Incentive Plan (as defined in the Restructuring Term Sheet). |
|  | In connection with the DIP Rollover, any New Common Stock shall be delivered directly by the Borrower to the applicable DIP Lenders, and no New Common Stock shall be delivered to the DIP Agent for distribution to the DIP Lenders. |
|  | On the Plan Effective Date, all fees and expenses payable under the DIP Credit Facility (to the extent not previously paid pursuant to the DIP Orders or to the extent required to be paid-in-kind) (including the Exit Fee) shall be paid in full in cash. |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
|  | (i)    75 calendar days after the Petition Date, subject to no more than two extensions (each, a "**Maturity Extension**") of 30 days each, if (x) such Maturity Extension is approved in writing by the Required DIP Lenders or (y) on the date that is the then-current Maturity Date: |
|  | a.    no Event of Default shall have occurred and be continuing; |
|  | b.    the Debtors shall have provided the DIP Agent and/or the DIP Lenders an "extension budget" for the corresponding 30-day period covered by such Maturity Extension which has been approved by the Required DIP Lenders and which demonstrates that the Debtors can maintain a minimum liquidity of no |

15

|  | less than $2,000,000 of unrestricted cash in deposit accounts subject to the liens of the DIP Agent, excluding any new-money DIP Credit Facility amounts to be funded for that extension period;<br><br>(ii)  forty-five (45) calendar days after the Petition Date if the Final DIP Order has not been entered by the Bankruptcy Court on or before such date;<br><br>(iii) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>(iv) the termination of the RSA by the Required Consenting First Lien Lenders, the Required DIP Lenders or the Company Parties;<br><br>(v)  the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;<br><br>(vi) the date of entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business;<br><br>(vii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to chapter 7 of the Bankruptcy Code; and<br><br>(viii)   the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments in respect thereof upon the occurrence of an Event of Default (as defined below). |
| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the DIP Loans in whole or in part without premium or penalty (but with the Exit Fee) at any time upon delivery of written notice to the DIP Agent no later than 11:00 a.m., New York City time, three (3) Business Days prior to the date of such prepayment (or such later time as the Required DIP Lenders may agree to acting reasonably).  All optional prepayments shall be applied to the DIP Loans in |

| | |
|---|---|
| | accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below and include the Exit Fee for such prepaid DIP Loans. Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | The Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Fee) (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows:<br><br>(i)   100% of the net cash proceeds of any DIP Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, after funding the Carve Out (as defined in the Interim DIP Order);<br><br>(ii)   100% of the net cash proceeds of any other sale or other disposition by the Borrower or any Guarantor of any DIP Collateral in excess of $1,000,000, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business);<br><br>(iii)  100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding (x) receipts contemplated to be received by any of the Debtors as set forth in the Approved DIP Budget and (y) insurance proceeds that are reinvested by any Debtor in assets used to useful in the business of the Debtors on or prior to the date that is 180 days after the receipt of such net cash proceeds) by the Borrower or any Guarantor that constitute DIP Collateral (provided that receipts received from subsidiaries of Holdings other than the Debtors pursuant to the global treasury plan or in the ordinary course of business shall not be subject to the requirements of this provision); and<br><br>(iv)  100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "**Negative Covenants**" below.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, |

17

asset sales or other proceeds described above shall be permitted without the prior written consent of the Required DIP Lenders.

Voluntary and mandatory payments or prepayments and proceeds of DIP Collateral received by the Borrower or any Guarantor outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the Required DIP Lenders), after giving effect to the Carve Out (as defined in the Interim DIP Order), and any other payments required pursuant to the DIP Orders:

(1) first, to pay all documented out-of-pocket expenses of the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of counsel and external advisors);

(2) second, to pay the Exit Fee to DIP Lenders in connection with the funded portion of the DIP Loans;

(3) third, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders;

(4) fourth, to repay any principal amounts outstanding in respect of the DIP Loans (including any interest or other amounts that have been paid in kind and added to the principal balance thereof);

(5) fifth, to pay all other amounts owing to the DIP Lenders and the DIP Agent; and

(6) last, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of each of the Prepetition First Lien Term Loan Agent and Prepetition Second Lien Term Loan Agent for the benefit of the respective Prepetition Lenders.

For the avoidance of doubt, payments that are required to be made to the DIP Lenders as specified above shall be apportioned to each DIP Lender ratably based upon such DIP Lender's ratable share of the sum of the applicable DIP Loans outstanding at such time.

Section 2.17 (*Pro Rata Treatment and Payments*) of the Prepetition First Lien Credit Agreement is hereby incorporated by reference herein *mutatis mutandis*.

| CONDITIONS PRECEDENT TO THE INITIAL DIP LOANS ON THE INTERIM CLOSING DATE:[1] | The obligations of the DIP Lenders to make any Initial DIP Loan on the Interim Closing Date will be subject to satisfaction, or written waiver, by the Required Tranche A DIP Lenders (as applicable) and the Required DIP Lenders, of each of the following conditions precedent in connection with the related draw request:<br><br>(i) Debtors shall have timely delivered to the DIP Agent the Approved DIP Budget or any update thereto then required to be delivered in accordance with this DIP Term Sheet;<br><br>(ii) Debtors shall have delivered to the DIP Agent (x) a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time on the Petition Date and (y) a certification that the Interim DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the DIP Agent with a copy of the signed Interim DIP Order);<br><br>(iii) the Borrower shall have delivered to the DIP Agent a closing certificate duly executed, substantially in the form attached hereto as <u>Exhibit C</u>, by the chief executive officer, president or chief financial officer of the Borrower, delivered to the DIP Agent, appropriately completed, by which such officer shall certify to the DIP Agent and the DIP Lenders that the conditions precedent to the Initial DIP Loan set forth in clauses (viii) and (ix) hereof to be made on the Interim Closing Date have been satisfied;<br><br>(iv) the interim order (in form and substance acceptable to the Required DIP Lenders) approving the DIP Credit Facility and DIP Facility Documents (the "**Interim DIP Order**") shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required DIP Lenders, the Required Tranche A DIP Lenders, and the Debtors shall be in compliance in all respects with the Interim DIP Order; |

---

[1] All Conditions Precedent subject to revision to conform to terms of final RSA.

19

(v) all of the "first day" motions, orders and related pleadings shall have been delivered in advance to counsel to the DIP Agent and counsel to the DIP Lenders;

(vi) the Required DIP Lenders shall be reasonably satisfied that the liens and security interests of the DIP Agent in the DIP Collateral have been perfected by the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to the Carve-Out (as defined in the Interim DIP Order)) and the Prepetition Permitted Liens;

(vii) Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral (which shall be deemed satisfied if such insurance as required by the Prepetition First Lien Credit Agreement remains in place);

(viii) no default or Event of Default under the DIP Credit Facility or the under the Interim DIP Order shall have occurred and be continuing on the Interim Closing Date or shall exist after giving effect to the Initial DIP Loan to be made on the Interim Closing Date;

(ix) all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on the Interim Closing Date (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(x) the Borrower has implemented and it and its direct and indirect subsidiaries and Holdings will maintain in effect policies and procedures designed to ensure compliance by the Borrower and its Subsidiaries, and their respective directors, managers, officers, employees, and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions (each as defined on Annex B, attached hereto);

(xi) subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(xii) receipt by the DIP Agent for distribution to each DIP Lender, of a certificate, in form and substance reasonably satisfactory to the Required DIP Lenders, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable, of such Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute the DIP Commitment Letter and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof;

(xiii) to the extent invoiced by at least two (2) Business Days prior to the Interim Closing Date, substantially concurrently with the Interim Closing Date, all fees and

out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Initial DIP Loan draw) in accordance with the terms of the Interim DIP Order. Modifications of the Interim DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written (email being sufficient) consent of the Required DIP Lenders and the Required Tranche A DIP Lenders;

(xiv)   the RSA shall be in full force and effect and the Debtors are in compliance in all respects with the schedule of Milestones set forth in Schedule 1 of the RSA;

(xv)   the DIP Agent shall have received, at least five (5) Business Days prior to the Interim Closing Date (or such shorter period as the DIP Agent may agree) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act (Title III of Pub. L. 107 56 signed into law October 26, 2001), as subsequently amended and reauthorized), in each case, requested at least ten (10) Business Days prior to the Interim Closing Date; and

(xvi)   to the extent requested, at least ten (10) Business Days prior to the Closing Date, the DIP Agent and each requesting Interim DIP Lender shall have received, at least three (3) days prior to the Interim Closing Date (or such shorter period as the DIP Agent may agree) in connection with the requirements of 31 C.F.R. § 1010.230, a customary certification regarding beneficial ownership or control of the Borrower in a form reasonably satisfactory to the DIP Agent and each requesting DIP Lender.

For the purposes of this DIP Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, a material adverse change in, (i) the business, operations, properties, prospects, liabilities or financial condition of the Debtors, taken as a whole, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases, (ii) the ability of any Debtor to perform its obligations under this DIP Term Sheet or any other DIP Facility Document to which it is a party, (iii) the validity or enforceability against any Debtor of this DIP Term Sheet or any

|  | other DIP Facility Document to which it is a party or (iv) the rights and remedies of the DIP Agent or any DIP Lender hereunder or thereunder. |
|--|--|
|  | It is understood and agreed that, to the extent any condition described under this Section is satisfied after 4:00 p.m., New York Time, on any such date, the DIP Agent shall release the Initial DIP Loans received from the DIP Lenders to the Borrower on the next succeeding Business Day. |
| **CONDITIONS PRECEDENT TO ANY DELAYED DRAW DIP LOAN ON OR AFTER THE FINAL CLOSING DATE:** | The obligations of the DIP Lenders to make any Delayed Draw DIP Loan on or after the Final Closing Date shall be subject to satisfaction, or written waiver, by the DIP Agent and each DIP Lender of each of the following conditions precedent in connection with the related draw request: |
|  | (i)    Debtors shall have timely delivered to the DIP Agent the Approved DIP Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet; |
|  | (ii)   Debtors shall have delivered to the DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time four (4) Business Days prior to the requested funding date for such Delayed Draw DIP Loan (or such later time as the Required DIP Lenders may agree to); |
|  | (iii)  the Borrower shall have delivered to the DIP Agent a closing certificate, duly executed by the chief executive officer, president or chief financial officer of the Borrower, delivered to the DIP Agent, appropriately completed, by which such officer shall certify to the DIP Agent and the DIP Lenders the conditions precedent to the Delayed Draw DIP Loan set forth in clauses (vi) and (vii) hereof to be made on the Final Closing Date have been satisfied; |
|  | (iv)   the Final DIP Order (in form and substance acceptable to the Required DIP Lenders) shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required DIP Lenders and the Required |

Tranche A DIP Lenders, and the Debtors shall be in compliance in all respects with the Final DIP Order;

(v)     the Required DIP Lenders shall be reasonably satisfied that the liens and security interests of the DIP Agent in the DIP Collateral have been perfected by the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to Prepetition Permitted Liens);

(vi)    no default or Event of Default under the DIP Credit Facility or the under the Final DIP Order shall have occurred and be continuing on the Final Closing Date or shall exist after giving effect to the Delayed Draw DIP Loan to be made on the Final Closing Date;

(vii)   all representations and warranties of the Debtors hereunder shall be true and correct in all material respects as of the Final Closing Date (except those qualified by materiality or Material Adverse Change (as defined above), which shall be true and correct in all respects);

(viii)  the Borrower has implemented and it and its direct and indirect subsidiaries and Holdings will maintain in effect policies and procedures designed to ensure compliance by the Borrower and its Subsidiaries, and their respective directors, managers, officers, employees, and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions (each as defined on Annex B, attached hereto);

(ix)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Final DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not

24

reasonably be expected to cause a Material Adverse Change (as defined above);

(x) to the extent invoiced at least two (2) Business Days prior to the Final Closing Date, substantially concurrently with the Final Closing Date, and prior to or substantially concurrently with the making of any subsequent Delayed Draw DIP Loans after the Final Closing Date, all fees and out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Delayed Draw DIP Loan draw) in accordance with the terms of the Final DIP Order;

(xi) DIP Agent shall have received additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies, in form and substance reasonably acceptable to the Required DIP Lenders, unless waived by the Required DIP Lenders;

(xii) to the extent requested pursuant to the terms of this DIP Term Sheet, receipt by the DIP Agent and the DIP Lenders of duly executed and delivered copies of the DIP Facility Documents (including, without limitation a debtor in possession credit agreement), in each case on the terms set forth in this DIP Term Sheet or otherwise on terms reasonably acceptable to the Required DIP Lenders; and

(xiii) the RSA is in full force and effect and the Debtors are in compliance in all respects with the schedule of Milestones set forth in Schedule 1 of the RSA.

Modifications of the Final DIP Order shall require the prior written consent of the Required DIP Lenders, the Required Tranche A DIP Lenders, and the Debtors.

Further, the obligations of the DIP Lenders to consummate the DIP Rollover and to be paid in the form of New Common Stock for any portion of the DIP Obligations that are not paid in cash from the Rights Offering Cash shall be subject to satisfaction, or written waiver, by the DIP Agent and each DIP Lender of

|  | each of the conditions precedent in clauses (iii), (vi), (vii), and (viii) above on such Plan Effective Date. |
|---|---|
| **REPRESENTATIONS AND WARRANTIES:** | See attached <u>Annex B</u>. |
| **AFFIRMATIVE COVENANTS:** | So long as any obligations remain outstanding under this DIP Term Sheet or the DIP Orders, each Debtor shall:<br><br>(i)  timely deliver, or cause to be timely delivered, to the DIP Agent, for distribution to each DIP Lender, the Approved DIP Budget and the Approved Variance Reports, all in accordance with the provisions set forth in the section above entitled "Approved DIP Budget; Approved Cash Flow Projection; Variance Reports" and otherwise in the DIP Orders;<br><br>(ii)  maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of such person;<br><br>(iii)  cooperate, consult with, and provide to the DIP Agent, for distribution to each DIP Lender, all such information as required under this DIP Term Sheet or the DIP Orders or as reasonably requested by the DIP Agent or such DIP Lender, and permit representatives and independent contractors of the DIP Agent and each DIP Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (so long as the Debtors have the reasonable opportunity to participate in such meeting), all at the reasonable expense of the Borrower (provided that the Borrower shall only be obligated to reimburse such expenses for two visits during the pending of the Chapter 11 cases; *provided*, *further*, that no more than one visit shall take place during any 60-day period) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall |

be excluded from this "Affirmative Covenants" subparagraph (iii);

(iv) comply with the Approved DIP Budget (after giving effect to the Permitted Variances) and with provisions of this DIP Term Sheet and the Interim DIP Order and/or the Final DIP Order (as applicable);

(v) comply in all respects with the RSA, including the schedule of Milestones set forth in Schedule 1 of the RSA (as then in effect after giving effect to any waivers or amendments thereto made in accordance with the requirements of the RSA);

(vi) take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Agent or the Required DIP Lenders to carry out the provisions of this DIP Term Sheet, the other DIP Facility Documents and the DIP Orders;

(vii) except to the extent contemplated by the Approved DIP Budget or otherwise consented to by the Required DIP Lenders in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations of the Debtors;

(viii) take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Prepetition Permitted Liens, liens permitted to be incurred or exist pursuant to clause (i) of the "Negative Covenant" section hereof, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders (collectively, "**Permitted Liens**");

(ix) take, or cause to be taken, all appropriate action to comply with all material applicable laws applicable to the Debtors or the DIP Collateral unless failure to comply could not

reasonably be expected to result in a Material Adverse Change;

(x)     subject to the Approved DIP Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;

(xi)    provide copies of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Chapter 11 Cases to counsel to the DIP Agent and the DIP Lenders at least two (2) days in advance of such filing or as promptly as practicable; *provided, however,* that the following are not material: ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or motions relating to the retention or fees of any professional; or statements of financial affairs and schedules of assets and liabilities;

(xii)   promptly provide such additional information concerning the Debtors, or the DIP Collateral as the DIP Agent or any DIP Lender may reasonably request; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (xii);

(xiii)  maintain its cash management system in a manner reasonably acceptable to the Required DIP Lenders (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered);

(xiv)   deposit all distributions, dividends and other payments (other than payments of intercompany trade payables in the ordinary course of business) made by or on account of non-Debtor subsidiaries of the Debtors in a segregated account established by the Debtors (or in another account

28

|  | after receiving the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders in their sole discretion)) at or prior to the time of receipt thereof, and maintain all such funds in such account unless otherwise approved in writing by the DIP Agent (acting at the direction of the Required DIP Lenders in their sole discretion) unless such distributions, dividends and other payments are remitted directly to the DIP Agent for application to the DIP Loans; and |
|---|---|
|  | (xv) cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once every other calendar week at reasonable times during normal business hours and upon reasonable prior notice, if reasonably requested by the Required DIP Lenders, to discuss the Approved DIP Budget, the Approved Variance Report, the Chapter 11 Cases, and the financial condition, performance and business affairs of the Debtors. |
| **NEGATIVE COVENANTS:** | So long as any obligations remain outstanding under the DIP Credit Facility or the DIP Orders, unless otherwise provided in the Approved DIP Budget, no Debtor shall, without the express, prior written consent of the Required DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following: |
|  | (i)    other than liens securing indebtedness required or permitted by this DIP Term Sheet, including the Cash Management Liens, and the DIP Orders, create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out (as defined in the Interim DIP Order), (b) liens permitted by the Prepetition Credit Agreements which, other than the Prepetition Permitted Liens, or other liens that are permitted to be senior to the DIP Liens by the Required DIP Lenders acting reasonably, are junior to the liens securing the DIP Credit Facility, (c) the "**Replacement Liens**" set forth and as defined in the DIP Orders, (d) other liens securing obligations in an aggregate principal amount at any time outstanding not to exceed $100,000; |
|  | (ii)   other than the Restructuring Transactions, convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or |

29

hereafter acquired, other than (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders, (b) dispositions described in clause (ii) under "Mandatory Prepayments" above, (c) any disposition which would indefeasibly satisfy the DIP Obligations in full in cash, (d) asset sales in the ordinary course of business, (e) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and dispositions of property no longer used or useful in the conduct of the business of the Debtor and (f) dispositions of property not otherwise permitted so long as the aggregate fair market value of all assets so disposed shall not exceed $250,000;

(iii) create, incur assume or permit to exist any indebtedness outside of the ordinary course of business, other than (a) the DIP Obligations and (b) indebtedness permitted pursuant to Section 7.2 of the Prepetition First Lien Credit Agreement (other than postpetition indebtedness pursuant to Sections 7.2(d), (e), (f), (g), (q), (r), (s), (x), (z) and (aa), of the Prepetition First Lien Credit Agreement);

(iv) amend, modify or compromise any material term or material amount owed under a real property lease or material contract without the prior written consent of the Required DIP Lenders;

(v) incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment without the prior written consent of the Required DIP Lenders, other than in accordance with the Approved DIP Budget, after giving effect to the Permitted Variances;

(vi) create or acquire any ownership interest in any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;

(vii) create or permit to exist any other superpriority claim which is *pari passu* with or senior to the claims of the DIP Lenders under the DIP Credit Facility or the Prepetition First Lien Claims or Prepetition Second Lien Claims, except for the Carve Out (as defined in the Interim DIP Order) and except as set forth in this DIP Term Sheet and the DIP Orders;

(viii) modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code or plan of reorganization materially consistent with the RSA or in a manner that is not materially adverse to the interests of the DIP Lenders (in their capacities as such) without the prior written consent of the Required DIP Lenders;

(ix) file or propose any plan of reorganization that is materially inconsistent with the RSA;

(x) pay pre-petition indebtedness, except (a) payments contemplated by this DIP Term Sheet and the DIP Orders, (b) payments authorized by an order of the Bankruptcy Court and (c) adequate protection payments as set forth in the Interim DIP Order;

(xi) engage in any activities that would result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or

(xii) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of Holdings that is not a Guarantor without the prior written approval of the Required DIP Lenders (other than payments of intercompany trade payables in the ordinary course of business consistent with the Approved DIP Budget).

As used in this DIP Term Sheet, "**Restricted Payment**" means, with respect to any person, (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, or any redemption, purchase, retirement, defeasance, sinking fund or similar payment or any claim for rescission with respect to, any indebtedness (other than adequate protection payments in respect of the pre-petition indebtedness as expressly provided for herein, in the Interim

| | |
|---|---|
| | DIP Order or in the Approved DIP Budget); and (d) any payment made to retire, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding, in each case of (a) through (d), other than any payment to any Debtor (other than Holdings). |
| **EVENTS OF DEFAULT:** | Each of following shall constitute an "**Event of Default**": |
| | (i)      the entry of an Interim DIP Order or Final DIP Order in form or substance that is not acceptable to the Required DIP Lenders in their sole discretion; |
| | (ii)      failure by any Debtor to be in compliance in all material respects with provisions of this DIP Term Sheet (subject to applicable grace periods as set forth in the DIP Orders, including a two (2) Business Day grace period for delivery of the Approved DIP Budget, cash flow forecasts and Approved Variance Reports), any other DIP Facility Document or any DIP Order; |
| | (iii)      any request made by any Debtor for, or the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the Required DIP Lenders and the Required Tranche A DIP Lenders; |
| | (iv)      termination of the RSA by any Company Party, the Required Consenting First Lien Lenders or the Required DIP Lenders; |
| | (v)failure of any Milestone set forth in Schedule 1 of the RSA to be satisfied by the specified deadline therefor (in each case, as then in effect after giving effect to any waivers or amendments thereto made in accordance with the requirements of the RSA); |
| | (vi)      failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; |
| | (vii)      the filing of any application by any Debtor  for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien |

32

in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Obligations, DIP Liens, Adequate Protection Claims (as defined in the Interim DIP Order), Adequate Protection Liens (as defined in the Interim DIP Order), Prepetition First Lien Claims or Prepetition Obligations, excluding the Carve Out (as defined in the Interim DIP Order), the Prepetition Permitted Liens, liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders;

(viii) any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the DIP Agent or any DIP Lender or any of their agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Facility Document or under any DIP Order in favor of the DIP Lenders or DIP Agent;

(ix) any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the Prepetition Agents or any Prepetition Lender or any of their agents or employees, to subordinate or avoid any liens granted under the Prepetition Credit Agreements or under any other Loan Documents;

(x)     (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or the disallow any DIP Obligations, in whole or in part, or (b) any material provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the Required DIP Lenders);

(xi)     without the prior written consent of the Required DIP Lenders, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtor under section 363 of the Bankruptcy Code that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of all DIP Obligations and does not provide for the indefeasible payment in full in cash to the Prepetition First Lien Agent and the Prepetition First Lien Lenders upon closing of such sale or the

|  | effective date of a plan pursuant to which such sale is made, unless otherwise agreed to by the Required DIP Lenders and Required First Lien Lenders; |
|---|---|
|  | (xii) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) (without the prior written consent of the Required DIP Lenders); |
|  | (xiii) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral with an aggregate value of at least $100,000 without the prior written consent of the Required DIP Lenders; |
|  | (xiv) termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of repayment of the DIP Loans; |
|  | (xv) the conversion of any Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code; |
|  | (xvi) the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code without the prior written consent of the Required DIP Lenders; |
|  | (xvii) a dismissal of any of the Chapter 11 Cases; |
|  | (xviii) the filing of any chapter 11 plan or related disclosure statement that is inconsistent with the RSA; |
|  | (xix) the filing of any motion seeking approval of a sale of any DIP Collateral without the consent of the Required DIP Lenders (other than any sale permitted under "Negative Covenants"); or |
|  | (xx) failure to pay principal, interest or other DIP Obligations or Adequate Protection Obligations in full when due, including without limitation, on the Maturity Date. |
| **REMEDIES UPON EVENT OF DEFAULT:** | As set forth in the DIP Orders. |

34

| | |
|---|---|
| **OTHER BANKRUPTCY MATTERS:** | All reasonable and documented prepetition and post-petition professional fees, costs and expenses of the DIP Agent and the DIP Lenders relating to the DIP Credit Facility (including, without limitation, (i) the preparation of documentation (including, any amendments, modifications or waivers) in respect thereof, (ii) the administration thereof and (iii) in connection with the enforcement or protection of rights in connection with the DIP Credit Facility or the documentation in respect thereof) and the Chapter 11 Cases (including, without limitation, prepetition and post-petition fees and disbursements of counsel and advisors, including, but not limited to, the fees, costs and expenses of Akin Gump Strauss Hauer & Feld, LLP, GLC & Co. Advisors, LLC, Simpson Thacher & Bartlett LLP and Troutman Pepper Hamilton Sanders LLP (as Delaware counsel), subject to the DIP Orders, shall be payable by the Borrower no later than five (5) days following written demand without the requirement to file retention or fee applications with the Bankruptcy Court. A copy of each summary invoice therefor shall be provided by the DIP Agent and the DIP Lenders to the Office of the U.S. Trustee, counsel to the Prepetition Secured Parties and counsel for any statutory committee appointed in the Chapter 11 Cases. <br><br> The Borrower shall indemnify the DIP Agent and each DIP Lender in accordance with the indemnity provisions set forth in <u>Annex D</u> hereto. <br><br> The Final DIP Orders shall contain releases and exculpations for the DIP Agent and each DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions. <br><br> Subject to the entry of the Interim DIP Order, pursuant to section 363(k) of the Bankruptcy Code, the DIP Agent (at the direction of the Required DIP Lenders) shall have the unconditional right to credit bid ("**Credit Bid**") the outstanding DIP Obligations (and any other applicable obligations) in connection with any non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise. <br><br> Subject to the entry of the Interim DIP Order, section 363(k) of the Bankruptcy Code and that certain Intercreditor Agreement, dated as of June 7, 2013 by and between Credit Suisse AG, Cayman Islands Branch in its capacity as first lien administrative agent thereunder and Credit Suisse AG, |

| | |
|---|---|
| | Cayman Islands Branch, in its capacity as second lien administrative agent thereunder (as may be amended, restated, supplemented or modified from time to time, the "**Intercreditor Agreement**"), the Prepetition First Lien Term Loan Agent, at the direction of the Required Lenders (as defined in the Prepetition First Lien Credit Agreement) shall have the unconditional right to Credit Bid the Prepetition First Lien Term Loan Claims in connection with any non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise. |
| | Subject to the entry of the Interim DIP Order, section 363(k) of the Bankruptcy Code and the Intercreditor Agreement, the Prepetition Second Lien Term Loan Agent, at the direction of the Required Lenders (as defined under the Prepetition Second Lien Term Loan Credit Agreement), shall have the unconditional right to Credit Bid the Prepetition Second Lien Claims in connection with a non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise. |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this DIP Term Sheet and any DIP Order, such DIP Order shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order may be amended other than by an instrument in writing signed by (i) three (3) or more unaffiliated DIP Lenders holding, in the aggregate, in excess of 50% in principal amount of the outstanding Tranche B DIP Obligations held by the Tranche B DIP Lenders (the "**Required DIP Lenders**") and (ii) the Debtors. |
| | "**Required Tranche A DIP Lenders**" means, as of the relevant date, three (3) or more unaffiliated DIP Lenders holding, in the aggregate, in excess of 50% in principal amount of the outstanding Tranche A DIP Obligations held by the Tranche A DIP Lenders. |
| | Notwithstanding the foregoing, any amendment, consent, waiver, supplement or modification to this DIP Term Sheet, any other DIP Facility Documents or any DIP Order that has the effect of (i) increasing the DIP Commitments of any DIP Lender, (ii) decreasing the amount of or postponing the payment of any scheduled principal, interest or fees payable to any DIP Lender (other than as a result of any extension of the Maturity Date, in accordance with the terms of any such extension, or waiver of default interest by the DIP Lenders in |

| | |
|---|---|
| | accordance herewith), (iii) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of prepayments in this DIP Term Sheet, (iv) amending or modifying the definition of "Required DIP Lenders" or "Required Tranche A DIP Lenders" or any provision of this section "AMENDMENT AND WAIVER", (v) releasing all or substantially all of the Guarantors of the DIP Obligations, or (vi) releasing all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court with the prior written consent of the Required DIP Lenders, in each case, shall require the written consent of each DIP Lender directly and adversely affected thereby; *provided* that any amendment, consent, waiver, supplement or modification to this DIP Term Sheet, any other DIP Facility Documents or any DIP Order that adversely impacts the treatment of the Tranche A DIP Obligations or the Tranche B DIP Obligations shall require the written consent of each Tranche A DIP Lender and Tranche B DIP Lender, respectively; *provided*, *further*, that no amendment shall amend, modify or otherwise affect the rights or duties of the DIP Agent without the prior written consent of the DIP Agent. |
| **ASSIGNMENTS:** | The DIP Lenders may assign all or any part of the DIP Loans or the DIP Commitments from time to time with the consent of the Borrower; *provided* that no consent of the Borrower shall be required (i) so long as an Event of Default has occurred and is continuing after giving effect to any applicable grace period or (ii) for any assignment to a DIP Lender, an affiliate of a DIP Lender, an Approved Fund (as defined in the Prepetition First Lien Credit Agreement), or any other person that has become a party to the RSA pursuant to the terms thereof.  The parties to each assignment shall execute and deliver to the DIP Agent an assignment agreement in substantially the form of <u>Exhibit D</u> attached hereto (an "**Assignment Agreement**").  Subject to receipt and recording thereof by the DIP Agent, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a DIP Lender hereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder.  The DIP Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment, except with respect to any assignment to a DIP Lender, an affiliate of a DIP Lender, an |

| | |
|---|---|
| | Approved Fund (as defined in the Prepetition First Lien Credit Agreement), or any other person that has become a party to the RSA pursuant to the terms thereof. The minimum assignment amount shall be $250,000 (or if less than $250,000, the total amount held by such assigning Lender).<br><br>No assignment of the DIP Loans or the DIP Commitments shall be permitted unless the applicable assignee executes and agrees to be bound by the RSA and the transactions contemplated therein or otherwise consents/commits to the Restructuring Transactions. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet. The Debtors submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Term Sheet shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.<br><br>As used herein, "Electronic Signature" shall mean an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record. |
| **PATRIOT ACT:** | The DIP Lenders hereby notify the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub. L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will |

| | |
|---|---|
| | allow the DIP Lenders to identify the Borrower in accordance with the Act. |
| **NOTICES** | (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows: |
| | if to the Borrower or any Guarantor, to |
| | Carestream Health, Inc. 150 Verona Street Rochester, New York 14608 Attention of Julie Lewis, General Counsel E-mail address: Julie.lewis@carestream.com); |
| | if to the DIP Agent, to |
| | JPMorgan Chase Bank, N.A. 500 Stanton Christiana Road, NCC5, Floor 1 Newark, DE 19713-2107, United States Attention: Yili Xu, Account Manager Telephone number: (302) 643 – 7761 Email address: yili.x.xu@chase.com Facsimile: 12012443657@tls.ldsprod.com |
| | if to any other DIP Lender, to it at its address (or telecopy number) set forth in its signature page. |
| | Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopy shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through Approved Electronic Platforms, to the extent provided in clause (b) below, shall be effective as provided in said clause (b). |
| | (b) Notices and other communications to the Borrower, any Guarantor, the DIP Agent, and the DIP Lenders hereunder may be delivered or furnished by using Approved Electronic Platforms pursuant to procedures approved by the DIP Agent; *provided* that the foregoing shall not apply to borrowing, prepayment or other operational loan notices unless otherwise |

|  | agreed by the DIP Agent and the applicable DIP Lender. The DIP Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.<br><br>(c) Unless the DIP Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.<br><br>(d) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.<br><br>As used herein, "**Approved Electronic Platform**" shall mean IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the DIP Agent to be its electronic transmission system. |
|---|---|
| **COUNSEL TO DIP AGENT:** | Simpson Thacher & Bartlett LLP. |
| **COUNSEL TO DIP LENDERS:** | Akin Gump Strauss Hauer & Feld LLP. |

## ANNEX B[3]

## REPRESENTATIONS AND WARRANTIES

As of the Closing Date, the Borrower represents and warrants to the DIP Agent and each DIP Lender and acknowledges and confirms that the DIP Agent and each DIP Lender is relying upon such representations and warranties:

1. <u>Existence; Compliance with Law</u>.  Subject to any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code, each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except where the failure to be so qualified or in good standing could not reasonably be expected to result in a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

2. <u>Power; Authorization; Enforceable Obligations</u>.  Subject to any restrictions with respect to the Prepetition Credit Agreements or arising on account of any Debtors, status as a "debtor" under the Bankruptcy Code and subject to the entry of the DIP Orders, the Debtors have the power and authority, and the legal right, to make, deliver and perform the DIP Term Sheet, the DIP Orders and the other DIP Facility Documents (collectively, the "**Loan Documents**") to which it is a party and, in the case of each Borrower, to obtain extensions of credit hereunder. Each Debtors has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of each Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement and to authorize the other Transactions. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement of any of the Loan Documents, except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.19 of the Prepetition First Lien Credit Agreement. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the consummation of the Transactions (excluding the Loan Documents), except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect, (ii) the filings referred to in Section 4.19 of the Prepetition First Lien Credit Agreement and (iii) those, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect. Each Loan Document has been duly executed and delivered on behalf of the Debtors thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of the Debtors party thereto, enforceable against each such Borrower and each Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

---

[3] Capitalized terms and section references used but not defined herein, within this <u>Annex B</u>, have the meanings assigned to them in the Prepetition First Lien Credit Agreement.

3.  <u>Litigation</u>.  Subject to the Chapter 11 Cases, and any litigation that is stayed by operation of the Bankruptcy Code, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Group Member, threatened by or against any Group Member or against any of their respective properties, assets or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.  <u>Ownership of Property; Liens</u>.  With the exception of the DIP Liens and the Prepetition Permitted Liens, each Group Member has title in fee simple to, or a valid leasehold interest in, all of its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 7.3 of the Prepetition First Lien Credit Agreement.

5.  <u>Intellectual Property</u>.  The Group Members own, or are licensed to use, all Intellectual Property necessary for the conduct in all material respects of the business of the Company and its Restricted Subsidiaries, taken as a whole, as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning any Group Member's use of any Intellectual Property or the validity or effectiveness of any Group Member's Intellectual Property or alleging that the conduct of any Group Member's business infringes or violates the rights of any Person, nor does Holdings or the Company know of any valid basis for any such claim except for such claims that could not reasonably be expected to impair or interfere in any material respect with the operations of the business conducted by the Company and its Restricted Subsidiaries, taken as a whole or result in a Material Adverse Effect.

6.  <u>Taxes</u>.  Except as could not, individually or in an aggregate, reasonably be expected to have a Material Adverse Effect and other than Taxes that are excused or stayed by an order of the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases, each Group Member has filed or caused to be filed all tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); and no tax Lien has been filed, and, to the knowledge of any of the Group Members, no claim is being asserted, with respect to any such tax, fee or other charge.

7.  <u>Federal Regulations</u>.

7.1.    None of the Borrower or its Subsidiaries is a United States real property holding corporation or "USRPHC" for U.S. federal income tax purposes, including within the meaning of Section 897(c)(2) of the Internal Revenue Code of 1986, as amended (the "Code"), during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

7.2.    None of the Borrower or its Subsidiaries is, and has no current intention of engaging in activities that would cause it to become in the future, a "TID U.S. business," as that term is defined at 31 C.F.R. 800.248. For avoidance of doubt, the Borrower and its Subsidiaries do not (i) produce, design, test, manufacture, fabricate or develop any "critical technologies," as defined at 31 C.F.R. 800.215; (ii) perform any functions related to "covered investment critical infrastructure" as defined at 31 C.F.R. 800.212 and as set forth in Appendix A to 31 C.F.R. Part 800; or (iii) maintain or collect, directly or indirectly, any "sensitive personal data" of U.S. citizens as defined at 31 C.F.R. 800.241.

7.3.    No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U), and no part of the proceeds of any DIP Loans, and no other extensions of credit hereunder, will be used for the purpose of buying or carrying margin stock or for any purpose that violates the provisions of the Regulations of the Board. If requested by any DIP Lender or the DIP Agent and the Borrower will furnish to the DIP Agent and each DIP Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

7.4.    The Borrower and its Subsidiaries and their respective directors, managers, officers and, to the knowledge of the Borrower after due inquiry, their respective employees and agents, have been during the past five (5) years and are in compliance with Anti-Corruption Laws[4], Anti-Money Laundering Laws[5], Trade Control Laws[6] and Sanctions in all respects. Neither the Borrower nor any of its Subsidiaries nor any of their respective directors, managers, officers and, to the knowledge of the Borrower after due inquiry, their respective employees and agents has during the past five (5) years made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit.

7.5.    The Borrower has implemented and will maintain in effect policies and procedures designed to ensure compliance by the Borrower and its Subsidiaries, and their respective directors, managers, officers, employees and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions.

7.6.    None of the Borrower, any of its Subsidiaries or any of their directors, managers, employees or officers, or, to the knowledge of the Borrower after due inquiry, agents is a Sanctioned Person[7].

---

[4] "Anti-Corruption Laws" means the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, the Canadian Corruption of Foreign Public Officials Act, in each case, as amended, and, with respect to a Person, any other laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to bribery or corruption.

[5] "Anti-Money Laundering Laws" means the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT ACT ((Pub. L. No. 107-56), and the Bank Secrecy Act (31 U.S.C. §§5311-5332)), the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000, the Currency and Foreign Transactions Reporting Act of 1970 and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), in each case, as amended, and, with respect to a Person, any other laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to money laundering or terrorism financing.

[6] "Trade Control Laws" means applicable Laws related to (a) export controls, including the U.S. Export Administration Act of 1979, as amended, the U.S. Export Administration Regulations, the Arms Export Control Act, the U.S. International Traffic In Arms Regulations; and (b) customs or import controls, including those administered by the U.S. Customs and Border Protection.

[7] "Sanctioned Person" means at any time, (a) any Person who is the subject or target of Sanctions including any Person listed in any Sanctions-related list of designated Persons, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person 50 percent or more owned or controlled by one or more Persons identified in clause (a) or (b).

"Sanctioned Country" means at any time, a country or territory which is the subject or target of (a) comprehensive Sanctions, including, as of the Closing Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic and the Crimea region of Ukraine, Cuba, Iran, North Korea, and Syria, and (b) other broad Sanctions, including, as of the Closing Date, Russia, Belarus, Venezuela and Afghanistan.

"Sanctions" means economic, financial and trade sanctions administered or enforced by the United States (including the U.S. Department of the Treasury's Office of Foreign Assets Control, U.S. Department of State, and

7.7.    No part of the proceeds of any extension of credit hereunder will be used by the Borrower, directly or, to the knowledge of the Borrower after due inquiry, indirectly, or lent, contributed or otherwise made available to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country, or (ii) in any manner that would result in a violation of Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws by any Person (including any Person participating in the Loan, whether as lender, underwriter, advisor, investor, or otherwise).

7.8.    None of the Borrower or any of its Subsidiaries has during the past five years engaged in, is now engaged in, nor will engage in, any dealings or transactions with any Sanctioned Person, or in any Sanctioned Country, to the extent in violation of Sanctions.

7.9.    Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, fund all or part of any repayment of the Loan or other payments under this Agreement out of proceeds derived from criminal activity or activity or transactions in violation of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws, or that would otherwise cause any Person (including any Person participating in the Loan, whether as lender, underwriter, advisor, investor, or otherwise) to be in violation of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

7.10.    None of the Borrower, any of its Subsidiaries, or any of their respective directors, managers, officers or employees, or to the knowledge of the Borrower after due inquiry, any agent of such Person that will act in any capacity in connection with or benefit from any Facility, (i) currently is conducting, or has, at any time during the past five (5) years, conducted, any internal investigation regarding any violation or potential violation of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws; or (ii) currently is, or has been at any time during the past five (5) years, the subject of any current, pending or threatened investigation, inquiry or proceedings by a Governmental Authority for potential or apparent violations of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

8.    <u>Labor Matters</u>. Except, with respect to clause (c) hereunder, to the extent permitted under the DIP Orders, and except as, when taken in the aggregate, such events could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of any Group Member, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) to the extent permitted under the Approved DIP Budget (after giving effect to any Permitted Variances) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

9.    <u>ERISA</u>. Neither a Reportable Event nor a failure to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 or 303 of ERISA has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has

---

U.S. Department of Commerce), the United Nations Security Council, the European Union and any member state thereof, the United Kingdom (including Her Majesty's Treasury of the United Kingdom), and the Government of Canada (or the government of any province or territory thereof).

arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by a material amount. Neither any Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither any Borrower nor any Commonly Controlled Entity would become subject to any material liability under ERISA if any Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No such Multiemployer Plan is in Reorganization or Insolvent.

10. Investment Company Act; Other Regulations. Neither Borrower nor any Guarantor is an "investment company" within the meaning of the Investment Company Act of 1940, as amended. No Borrower and each Guarantor is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

11. Subsidiaries. Except, with respect to clause (b) hereunder, as created by the Prepetition Credit Agreement, as of the Closing Date and after giving effect to the Transactions, (a) Schedule 4.15 sets forth the name and jurisdiction of organization of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Borrower and each Guarantor, and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of either Borrower or any Subsidiary, except as created by the Loan Documents and the Second Lien Loan Documents. As of the Interim Closing Date, there are no Unrestricted Subsidiaries, and all Subsidiaries of the Company are Restricted Subsidiaries.

12. Environmental Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

   12.1. the facilities and properties owned, leased or operated by any Group Member (the "Properties") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability for any Group Member under, any Environmental Law;

   12.2. no Group Member has received or has knowledge of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "Business"), nor does any Borrower and each Guarantor have knowledge that any such notice will be received or is being threatened;

   12.3. Materials of Environmental Concern have not been released, transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability for any Group Member under, any Environmental Law, nor have any Materials of Environmental Concern been released, generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability for any Group Member under, any applicable Environmental Law;

   12.4. no judicial proceeding or governmental or administrative action is pending or, to the knowledge of any Group Member, threatened, under any Environmental Law to which any

Group Member is or to the knowledge of any Group Member will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business, nor, to the knowledge of any Group Member, are there any environmental conditions with respect to the Properties or the Business, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that could form the basis of any such action or order against any Group Member or against any person or entity whose liability for any such action or order any Group Member has retained or assumed contractually, or otherwise result in any costs or liabilities for any Group Member under Environmental Law;

12.5.    all operations of the Group Members (including at the Properties) are in compliance, and for the past five years have in the past been in compliance, with all applicable Environmental Laws; and

12.6.    no Group Member has contractually assumed any liability of any other Person under Environmental Laws.

13. <u>Accuracy of Information</u>.

13.1.    No statement or information concerning any Group Member or the Business contained in this Agreement, any other Loan Document, the Confidential Information Memorandum or any other document, certificate or statement furnished by or on behalf of any Borrower and each Guarantor to the DIP Agent or the DIP Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished (or, in the case of the Confidential Information Memorandum, as of the date of this Agreement), any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading. The projections and pro forma financial information, taken as a whole, contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Company to be reasonable at the time made and as of the Closing Date (with respect to such projections and pro forma financial information delivered prior to the Closing Date), it being recognized by the DIP Lenders that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized.

13.2.    As of the Interim Closing Date, the information included in the Beneficial Ownership Certification[8] is true and correct in all material respects.

---

[8] Such Beneficial Ownership Certification to be defined as the new certificate delivered on or prior to the Interim Closing Date.

## ANNEX C

## INTEREST

"<u>Adjusted Term SOFR Rate</u>" means the Term SOFR Rate, <u>plus</u> 0.10%; <u>provided</u> that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of calculating such rate.

"<u>CME Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate calculated by the Federal Reserve Bank of New York (the "<u>NYFRB</u>") based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as the federal funds effective rate, <u>provided</u>, that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"<u>Floor</u>" means the benchmark rate floor, if any, provided in the Agreement initially (as of the execution of the Agreement, the modification, amendment or renewal of the Agreement or otherwise) with respect to the Adjusted Term SOFR Rate. For the avoidance of doubt the initial Floor for Adjusted Term SOFR Rate shall be 1.00%.

"<u>Interest Period</u>" means, the period commencing on the date of such borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a borrowing initially shall be the date on which such borrowing is made and, in the case of a borrowing, thereafter shall be the effective date of the most recently ended Interest Period.

"<u>NYFRB Rate</u>" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; <u>provided</u>, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"<u>Overnight Bank Funding Rate</u>" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in U.S. Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"<u>SOFR</u>" means, with respect to any business day, a rate per annum equal to the secured overnight financing rate for such business day published by the NYFRB on the NYFRB's on the immediately succeeding business day.

"<u>Term Benchmark</u>" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"<u>Term Benchmark Loans</u>" means ABL Loans bearing interest based upon the Term Benchmark Rate.

"<u>Term SOFR Rate</u>" means, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such Interest Period, as such rate is published by the CME Term SOFR Administrator.

"<u>Term SOFR Reference Rate</u>" means, for any day and time, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR.

## ANNEX D

## INDEMNIFICATION

The Borrower shall indemnify the DIP Agent and each DIP Lender, and each Related Party (as defined below) of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all Liabilities and related expenses, including the fees, charges and disbursements of one counsel for any Indemnitee, and if necessary, one local counsel in any relevant jurisdiction, and in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this DIP Term Sheet, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, (ii) the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iii) any DIP Loan or the use of the proceeds therefrom, (iv) any actual or alleged presence or release of Materials of Environmental Concern on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (v) any actual or prospective Proceeding relating to any of the foregoing, whether or not such Proceeding is brought by the Borrower or any Guarantor or its or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such Liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnitee. This Annex shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

For purposes of this Annex and Term Sheet, the terms capitalized herein shall be defined as set forth below.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the release or threatened release of any of Environmental Concern into the environment or (e) any contract, agreement or other consensual arrangement the extent to which liability is assumed or imposed with respect to any of the foregoing.

"Liabilities" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Related Parties" means with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

**EXHIBIT A-1 TO DIP TERM SHEET**

**GUARANTORS**[9]

| GUARANTOR | JURISDICTION OF ORGANIZATION |
|---|---|
| Carestream Health Acquisition, LLC | Delaware |
| Carestream Health International Holdings, Inc. | Delaware |
| Carestream Health International Management Company, Inc. | Delaware |
| Carestream Health Canada Holdings, Inc. | Delaware |
| Carestream Health World Holdings LLC | Delaware |
| Lumisys Holding Co. | Delaware |

---

[9] All subsidiary guarantors shall be Debtors in the Chapter 11 Cases.

**EXHIBIT A-2 TO DIP TERM SHEET**

**GUARANTY**

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet to which this Exhibit A-2 is attached.

1.    The Guaranty.

Each of the Guarantors hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) of the DIP Obligations, including, without limitation, (a) the principal of and interest on each DIP Loan made to the Borrower pursuant to this DIP Term Sheet or any other DIP Facility Document, (b) all other DIP Obligations under this DIP Term Sheet, any other DIP Facility Document or any DIP Order owing to the DIP Agent or any DIP Lender, and (c) the punctual and faithful performance, keeping, observance, and fulfillment by the Borrower of all of the agreements, conditions, covenants, and obligations of the Borrower contained in this DIP Term Sheet, any other DIP Facility Document or any DIP Order (all of the foregoing being referred to collectively as the "**Guaranteed Obligations**"). Upon the failure by the Borrower to pay punctually any such amount or perform such obligation, subject to any applicable grace or notice and cure period, each of the Guarantors agrees that it shall forthwith on demand pay such amount or perform such obligation at the place and in the manner specified in the DIP Term Sheet, any other DIP Facility Document or any DIP Order, as the case may be. The Borrower hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) the Guaranteed Obligations.

2.    Guaranty Unconditional. The obligations of each of the Guarantors hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations, whether (in any such case) by operation of law or otherwise, or any failure or omission to enforce any right, power or remedy with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations;

(b)    any modification or amendment of or supplement to this DIP Term Sheet, any other DIP Facility Document or any DIP Order, including, without limitation, any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(c)    any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any other person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations;

(d)     any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower or any other guarantor of any of the Guaranteed Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or any other guarantor of the Guaranteed Obligations, or any of their respective assets or any resulting release or discharge of any obligation of the Borrower or any other guarantor of any of the Guaranteed Obligations;

(e)     the existence of any claim, setoff or other rights which the Guarantors may have at any time against the Borrower, any other guarantor of any of the Guaranteed Obligations, the DIP Agent, any DIP Lender, or any other person, whether in connection herewith or in connection with any unrelated transactions;

(f)     the enforceability or validity of the Guaranteed Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower or any other guarantor of any of the Guaranteed Obligations, for any reason related to this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or any provision of applicable law, decree, order or regulation purporting to prohibit the payment by the Borrower or any other guarantor of the Guaranteed Obligations, of any of the Guaranteed Obligations or otherwise affecting any term of any of the Guaranteed Obligations;

(g)     the failure of the DIP Agent to take any steps to perfect and maintain any security interest in, or to preserve any rights to, any security or collateral for the Guaranteed Obligations, if any;

(h)     the election by, or on behalf of, any one or more of the DIP Agent or any DIP Lender, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters;

(k)     the failure of any other guarantor to sign or become party to this Guaranty or any amendment, change, or reaffirmation hereof; or

(l)     any other act or omission to act or delay of any kind by the Borrower, any other guarantor of the Guaranteed Obligations, the DIP Agent, any DIP Lender or any other person or any other circumstance whatsoever that might, but for the provisions of this Section 2, constitute a legal or equitable discharge of any Guarantor's obligations hereunder or otherwise reduce, release, prejudice or extinguish its liability under this Guaranty.

3.     Continuing Guarantee; Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. Each of the Guarantors' obligations hereunder shall constitute a continuing and irrevocable guarantee of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until Security Termination, subject to all the foregoing conditions, upon which date the guarantees made hereunder shall automatically terminate. If at any time any payment of the principal of or interest on any DIP Loan, any DIP Obligation or any other amount payable by the Borrower or any other party under the DIP Term Sheet, any other DIP Facility Document or any DIP Order (including a payment effected through exercise of a right of setoff) is rescinded, or is or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by the DIP Agent or any DIP Lender in their discretion), each of the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

4.      General Waivers; Additional Waivers.

(a)      General Waivers.  Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand or action on delinquency, protest, the benefit of any statutes of limitations and, to the fullest extent permitted by applicable law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against the Borrower, any other guarantor of the Guaranteed Obligations, or any other person.

(b)      Additional Waivers.  Notwithstanding anything herein to the contrary, each of the Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives, to the fullest extent permitted by applicable law:

(i)      any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

(ii)      (A) notice of acceptance hereof; (B) notice of any DIP Loans or other financial accommodations made or extended under the DIP Term Sheet, any other DIP Facility Document or any DIP Order or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Guarantor's right to make inquiry of the DIP Agent and the DIP Lenders to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any fact that might increase such Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments, the DIP Term Sheet, any other DIP Facility Document or any DIP Order; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Guarantor hereunder) and demands to which each Guarantor might otherwise be entitled;

(iii)      its right, if any, to require the DIP Agent or any DIP Lender to institute suit against, or to exhaust any rights and remedies which the DIP Agent or any of the DIP Lenders have or may have against the other Guarantors or any third party or against any DIP Collateral provided by the other Guarantors or any third party; and each Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and paid in full in cash) of the other Guarantors or by reason of the cessation from any cause whatsoever of the liability of the other Guarantors in respect thereof;

(iv)      (A) any rights to assert against the DIP Agent or the DIP Lenders any defense (legal or equitable), set-off, counterclaim, or claim that such Guarantor may now or at any time hereafter have against the other Guarantors or any other party liable to the DIP Agent or the DIP Lenders; (B) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; (C) any defense such Guarantor has to performance hereunder, and any right such Guarantor has to be exonerated, arising by reason of: (1) the impairment or suspension of the DIP Agent's or the DIP Lenders' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) the alteration by the DIP Agent or the DIP Lenders of the Guaranteed Obligations; (3) any discharge of the other Guarantors' obligations to the DIP Agent or the DIP Lenders by operation of law as a result of the DIP Agent's or the DIP Lenders' intervention or omission; or (4) the acceptance by the DIP Agent or the DIP Lenders of anything in partial satisfaction of the Guaranteed Obligations; and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed

Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder; and

(v)     any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the DIP Agent or the DIP Lenders; or (B) any election by the DIP Agent or the DIP Lenders under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against the Guarantors.

5.     Subordination of Subrogation; Subordination of Intercompany Indebtedness.

(a)     Subordination of Subrogation.  Until the Guaranteed Obligations have been fully and finally performed and paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor), the Guarantors (i) shall have no right of subrogation with respect to such Guaranteed Obligations and (ii) waive any right to enforce any remedy which the DIP Agent or any of the DIP Lenders now have or may hereafter have against the Borrower, any endorser or any guarantor of all or any part of the Guaranteed Obligations or any other person, and until such time as the Guarantors waive any benefit of, and any right to participate in, any security or collateral given to the DIP Agent or the DIP Lenders to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to the DIP Agent or the DIP Lenders.  Should any Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights, each Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off that such Guarantor may have to the payment in full in cash of the Guaranteed Obligations until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor) and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor).  Each Guarantor acknowledges and agrees that this subordination is intended to benefit the DIP Agent and the DIP Lenders and shall not limit or otherwise affect such Guarantor's liability hereunder or the enforceability of this Guaranty, and that the DIP Agent, the DIP Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this paragraph 5(a).

(b)     Subordination of Intercompany Indebtedness.  Each Guarantor agrees that any and all claims of such Guarantor against the Borrower or any other Guarantor hereunder (each an "**Obligor**") with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Guaranteed Obligations, or against any of its properties shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Guaranteed Obligations; provided that, such Guarantor may receive payments from any Obligor with respect to Intercompany Indebtedness unless an Event of Default has occurred and is continuing.  Notwithstanding any right of any Guarantor to ask, demand, sue for, take or receive any payment from any Obligor, all rights, liens and security interests of such Guarantor, whether now or hereafter arising and howsoever existing, in any assets of any other Obligor shall be and are subordinated to the rights of the DIP Agent and the DIP Lenders in those assets.  No Guarantor shall have any right to foreclose upon any asset of any Obligor in respect of Intercompany Indebtedness, whether by judicial action or otherwise, until Security Termination. If all or any part of the assets of any Obligor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such Obligor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such Obligor is dissolved or if substantially all of the assets of any such Obligor are sold, then, and in any such event constituting a dissolution or sale described above that constitutes an Event of Default (such events being herein referred to as an "**Insolvency Event**"), any payment or distribution of any kind or character, either in cash, securities

or other property, which shall be payable or deliverable upon or with respect to any indebtedness of any Obligor to any Guarantor ("**Intercompany Indebtedness**") shall be paid or delivered directly to the DIP Agent for application to the Guaranteed Obligations, due or to become due, until such Guaranteed Obligations shall have been fully paid and satisfied (in cash).  Should any payment, distribution, security or instrument or proceeds thereof be received by the applicable Guarantor upon or with respect to the Intercompany Indebtedness after any Insolvency Event and prior to the satisfaction of all of the Guaranteed Obligations and the termination of all financing arrangements pursuant to this DIP Term Sheet, any other DIP Facility Document or any DIP Order, such Guarantor shall receive and hold the same in trust, as trustee, for the benefit of the DIP Agent and the DIP Lenders and shall forthwith deliver the same to the DIP Agent, for the benefit of the DIP Lenders, in precisely the form received (except for the endorsement or assignment of such Guarantor where necessary), for application to any of the Guaranteed Obligations, due or not due, and, until so delivered, the same shall be held in trust by such Guarantor as the property of the DIP Agent and the DIP Lenders.  If any such Guarantor fails to make any such endorsement or assignment to the DIP Agent, the DIP Agent or any of its officers or employees is irrevocably authorized to make the same.  Each Guarantor agrees that until Security Termination, no Guarantor will assign or transfer to any person (other than the DIP Agent) any claim any such Guarantor has or may have against any Obligor except as expressly permitted by this DIP Term Sheet, any other DIP Facility Document or any DIP Order.

For purposes of this Exhibit A-2, "**Security Termination**" means the expiration or termination of the DIP Commitments and the payment in full in cash of the principal of and interest on each DIP Loan and all fees payable hereunder and all other Guaranteed Obligations payable hereunder (other than contingent indemnification obligations as to which no claim has been received by any Debtor).

## EXHIBIT B TO DIP TERM SHEET

## FORM OF NOTICE OF BORROWING

**Date:**  _____

THIS NOTICE OF BORROWING (this "**Notice**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**DIP Term Sheet**") attached as Exhibit A to the commitment letter, dated as of August 21, 2022 (together with the DIP Term Sheet and each other exhibit, schedule or other attachment thereto and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Commitment Letter**"), by and among CARESTREAM HEALTH, INC., a Delaware corporation (the "**Borrower**"), the Guarantors (as defined therein) party thereto, and certain of the DIP Lenders in their capacity as Commitment Parties thereunder (as defined therein), in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on or about August 23, 2022.  Capitalized terms used herein without definition shall have the meanings set forth in the DIP Commitment Letter.  To the extent the provisions set forth in this Notice conflict with any provisions in the DIP Commitment Letter, the DIP Commitment Letter shall govern.

The undersigned, as [the chief executive officer, president or chief financial officer] of the Borrower, hereby certifies to the DIP Agent and the DIP Lenders, on behalf of the Borrower, and not in any individual capacity, that he/she is authorized to execute this Notice and hereby gives notice to the DIP Agent and the DIP Lenders of the Borrower's request to borrow a [Tranche A Initial DIP Loan][Tranche B Initial DIP Loan][Tranche A Final DIP Loan][Tranche B Final DIP Loan] in the amount of $_____ on _____.

The undersigned hereby requests that such funds be disbursed to the following account:[10][11]

Name of Bank:  [_____]
ACH Routing Number:  [_____]
Account No.:  [_____]
Wire Transfer ABA:  [_____]
SWIFT:  [_____]

[The undersigned, as the [chief executive officer, president or chief financial officer] of the Borrower, hereby certifies to the DIP Agent and each DIP Lender, on behalf of Borrower, and not in any individual capacity, that as of the date hereof, each of the applicable conditions precedent set forth below and in the DIP Term Sheet has been satisfied (or waived in writing by the Required DIP Lenders):

1.      No Default or Event of Default has occurred and is continuing under the DIP Credit Facility or [the Interim Order][12][the Final Order][13] before or after giving effect to the [Tranche A Initial DIP Loan][Tranche B Initial DIP Loan][Tranche A Final DIP Loan][Tranche B Final DIP Loan] made on the date hereof.

---

[10] To the extent any funds will be netted or otherwise disbursed, to provide appropriate direction.

[11] To include what, if any, amount of commitment fee will be paid in kind on any such borrowing date.

[12] To be included for any borrowing made after the Interim Closing Date and prior to the Final Closing Date.

[13] To be included for any borrowing made after the Final Closing Date.

2.      All representations and warranties of the Debtors set forth in the DIP Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which are true and correct in all respects and except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects, or all respects, as applicable, as of such earlier date).][14]

*[Signature page follows]*

---

[14] To be included for any borrowing made on any date other than the Interim Closing Date or the Final Closing Date.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice as of the date first set forth above.

**BORROWER:**

**CARESTREAM HEALTH, INC.**


By: _____
Name:
Title:

## EXHIBIT C TO DIP TERM SHEET

## FORM OF CLOSING CERTIFICATE

## CLOSING CERTIFICATE

## OF

## CARESTREAM HEALTH, INC.

August [●], 2022

This Certificate (this "**Certificate**") is furnished pursuant to the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (the "**DIP Term Sheet**") attached as Exhibit A to that certain commitment letter, dated as of August 21, 2022 (together with the DIP Term Sheet and each other exhibit, schedule or other attachment thereto, the "**DIP Commitment Letter**") among Carestream Health Holdings, Inc., a Delaware corporation ("**Holdings**"), Carestream Health, Inc., a Delaware corporation (the "**Borrower**"), certain of the Borrower's direct and indirect domestic subsidiaries and the commitment parties party thereto. Capitalized terms used herein without definition shall have the meaning assigned to such term in the DIP Term Sheet.

The undersigned, being the Vice President & Chief Financial Officer of the Borrower, hereby certifies solely in his capacity as such and not in any individual or personal capacity, as follows:

1. Each of the representations and warranties made by the Borrower or the Guarantors in or pursuant to the DIP Term Sheet shall be true and correct in all material respects on the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

2. As of the date hereof, no Default or Event of Default under the DIP Credit Facility or under the [Final][Interim] DIP Order has occurred or are continuing or after giving effect to the [Initial DIP Loans][Delayed Draw DIP Loans], will be made on the date hereof.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has hereunto set his name as of the date first written above.

**CARESTREAM HEALTH, INC.**

By: _____
Name:  Scott H. Rosa
Title:    Vice President & Chief Financial Officer

**EXHIBIT D TO DIP TERM SHEET**

**FORM OF ASSIGNMENT AGREEMENT**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Term Sheet identified below, receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Term Sheet, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a DIP Lender under the Term Sheet and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Term Sheet, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:                  _____

2.    Assignee:                 _____
                               [and is an Affiliate/Approved Fund (as defined in the Prepetition First Lien Credit Agreement) of [*identify Lender*][15] ]

3.    Borrower:                 CARESTREAM HEALTH, INC., a Delaware corporation

4.    Administrative Agent:     JPMorgan Chase Bank, N.A., as the administrative agent in respect of the credit facility provided under the Term Sheet

5.    Term Sheet:               Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**" attached as Exhibit A to the Commitment Letter, dated as of August 21, 2022 (together with the Term Sheet, the "**DIP Commitment Letter**")), by and among the Borrower, the Guarantors (as defined therein) party thereto, the certain of the DIP Lenders (as defined therein) in their capacity as such Commitment Parties

---

[15] Select as applicable.

thereunder (as defined therein), the DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on or around August 22, 2022.

6.    Assigned Interest:

| Facility Assigned[16] | Aggregate Amount of DIP Commitment/ DIP Loans for all Lenders | Amount of DIP Commitment/DIP Loans Assigned | Percentage Assigned of DIP Commitment/DIP Loans[17] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the DIP Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower[, the Loan Parties] and [its] [their] Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR**

[NAME OF ASSIGNOR]

By:    _____
          Name:
          Title:

**ASSIGNEE**

[NAME OF ASSIGNEE]

By:    _____
          Name:
          Title:

---

[16] Fill in the appropriate terminology for the types of facilities under the Term Sheet that are being assigned under this Assignment (e.g., "DIP Loan" etc.)

[17] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all DIP Lenders thereunder.

[Consented to and][18] Accepted:

[NAME OF DIP AGENT], as DIP Agent

By: _____
      Title:

[Consented to:][19]

[NAME OF RELEVANT PARTY]

By: _____
      Title:

---

[18] To be added only if the consent of the DIP Agent is required by the terms of the Term Sheet.

[19] To be added only if the consent of the Borrower and/or other parties is required by the terms of the Term Sheet.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      *Representations and Warranties.*

1.1     *Assignor.*  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Term Sheet, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Term Sheet or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of the Term Sheet, (iv) any requirements under applicable law for the Assignee to become a lender under the Term Sheet or to charge interest at the rate set forth therein from time to time or (v) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under the Term Sheet.

1.2.    *Assignee.*  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a DIP Lender under the Term Sheet, (ii) it satisfies the requirements, if any, specified in the Term Sheet and under applicable law that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Term Sheet as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Term Sheet, together with copies of the most recent financial statements delivered pursuant to Section ___ thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the DIP Agent, the Assignor or any other Lender or any of their respective Related Parties, and (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Term Sheet, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the DIP Agent, the Assignor or any other Lender or any of  their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Term Sheet, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Term Sheet are required to be performed by it as a Lender.

2.      *Payments.*  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      *General Provisions.*  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Acceptance and adoption of the terms of this Assignment and Assumption by the Assignee and the Assignor by Electronic Signature or delivery of an executed counterpart of a signature page of this Assignment and Assumption by any Approved Electronic Platform shall be effective as delivery of a manually executed

counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT E TO DIP TERM SHEET**

**AGENCY PROVISIONS**

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet to which this <u>Exhibit E</u> is attached.

1.    <u>Appointment and Authorization</u>.  Each DIP Lender hereby irrevocably designates and appoints the DIP Agent as the agent of such DIP Lender under this Agreement and the other Loan Documents, and each such DIP Lender irrevocably authorizes the DIP Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the DIP Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each DIP Lender hereby authorizes the DIP Agent to enter into or accept each Loan Document, other intercreditor arrangements or collateral trust arrangements contemplated by this Agreement on behalf of and for the benefit of the DIP Lenders and the other Prepetition Secured Parties named therein and agrees to be bound by the terms of each Loan Document and other agreements or documents, and to exercise all rights, powers and remedies that the DIP Agent may have under such Loan Documents. Each DIP Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy with respect to any Collateral against the Borrower or any Guarantor or any other obligor under any of the Loan Documents (including, in each case, the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral of the Borrower or any Guarantor, without the prior written consent of the DIP Agent.

2.    <u>Delegation of Duties</u>.  The DIP Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the DIP Agent.  The DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through its Related Parties.  The exculpatory provisions of this <u>Exhibit E</u> shall apply to any such sub-agent and to the Related Parties of the DIP Agent and any such sub-agent, and shall apply to their respective activities as DIP Agent.  The DIP Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

3.    <u>Default; DIP Collateral</u>.

a.    Upon the occurrence and continuance of an Event of Default, the DIP Lenders agree to promptly confer in order that the Required DIP Lenders may agree upon a course of action for the enforcement of the rights of the DIP Lenders; and the DIP Agent shall be entitled to refrain from taking any action (without incurring any liability to any person for so refraining) unless and until the DIP Agent shall have received instructions from the Required DIP Lenders and indemnification acceptable to it.  All rights of action under this Term Sheet and all right to the DIP Collateral, if any, hereunder may be enforced by the DIP Agent and any suit or proceeding instituted the DIP Agent in furtherance of such enforcement shall be brought in its name as the DIP Agent without the necessity of joining as plaintiffs or defendants any other DIP Lender, and the recovery of any judgment shall be for the benefit of the applicable DIP Lender, subject to the fees and expenses of the DIP Agent.  In actions with respect to any DIP Collateral or other property or assets of Holdings or any subsidiary of Holdings, the DIP Agent is acting for the ratable benefit of each DIP Lender. Any and all agreements to subordinate (whether made heretofore or hereafter) other indebtedness

or obligations of the Debtors to the DIP Obligations shall be construed as being for the ratable benefit of each DIP Lender.

b.    Each DIP Lender authorizes and directs the DIP Agent to enter into this Term Sheet and any security documents on behalf of and for the benefit of the DIP Lenders (or if previously entered into, hereby ratifies the DIP Agent's (or any predecessor collateral agent's) previously entering into such agreements and security documents).

c.    Except to the extent unanimity is required hereunder, each DIP Lender agrees that any action taken by the Required DIP Lenders in accordance with the provisions of this Term Sheet, and the exercise by the Required DIP Lenders of the power set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon, all of the DIP Lenders.

d.    The DIP Agent is hereby authorized (but not obligated) on behalf of the DIP Lenders, without the necessity of any notice to or further consent from any DIP Lender, from time to time to take any action with respect to any DIP Collateral or security documents which may be necessary to create, perfect and maintain perfected the liens upon the DIP Collateral granted pursuant to the security documents.

e.    The DIP Agent shall not have any obligation whatsoever to any DIP Lender or to any other person to assure that the DIP Collateral exists or is owned (whether in fee or by leasehold) by the person purporting to own it or is cared for, protected, or insured or has been encumbered or that the liens granted to the DIP Agent (or any predecessor collateral agent) herein or pursuant to the security documents have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights granted or available to such Agent in this paragraph 3 of this <u>Exhibit E</u> or in any of the security documents; IT BEING UNDERSTOOD AND AGREED THAT IN RESPECT OF THE DIP COLLATERAL, OR ANY ACT, OMISSION, OR EVENT RELATED THERETO, THE DIP AGENT MAY ACT IN ANY MANNER IT MAY DEEM APPROPRIATE, IN ITS SOLE DISCRETION, AND THAT THE DIP AGENT SHALL NOT HAVE ANY DUTY OR LIABILITY WHATSOEVER WITH RESPECT TO ANY DIP COLLATERAL OR THE SECURITY DOCUMENTS TO ANY DIP LENDER, IN THE ABSENCE OF ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT.   Notwithstanding anything herein to the contrary, the DIP Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the security documents; (ii) take any necessary steps to preserve rights against any parties with respect to any DIP Collateral; or (iii) take any action to protect against any diminution in value of the DIP Collateral.

f.    In furtherance of the authorizations set forth in this paragraph 3 of this <u>Exhibit E</u>, each DIP Lender hereby irrevocably appoints (i) the DIP Agent as its attorney- in-fact, with full power of substitution, for and on behalf of and in the name of each such DIP Lender (1) to enter into any security document (including, without limitation, any appointments of substitute trustees under any security document), (2) to take action with respect to the DIP Collateral and security documents to create, perfect, maintain, and preserve the DIP Lenders' DIP Liens therein, and (3) to execute instruments of release or to take other action necessary to release DIP Liens upon any DIP Collateral to the extent authorized herein and (ii) the DIP Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such DIP Lender to execute

instruments of release or to take other actions necessary to release Debtors to the extent authorized herein.  The powers and authorities herein conferred on the DIP Agent may be exercised by the DIP Agent through any person who, at the time of the execution of a particular instrument, is an officer of the DIP Agent (or any person acting on behalf of the DIP Agent pursuant to a valid power of attorney).  The power of attorney conferred by this clause (f) to the DIP Agent is granted for valuable consideration and is coupled with an interest and is irrevocable (subject to paragraph 1) so long as the DIP Obligations, or any part thereof, shall remain unpaid or the DIP Lenders are obligated to make any DIP Loan hereunder.

4.      Liability of DIP Agent.

a.   The DIP Agent shall have no duties or obligations to any DIP Lender or any other Person (as defined below) except those expressly set forth herein and in the other Loan Documents and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the DIP Agent. The DIP Agent's duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing, the DIP Agent:

     i.    shall not be subject to any fiduciary or other implied duties to any Lender or any other Person, regardless of whether any Default or any Event of Default has occurred and is continuing;

     ii.   shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the DIP Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), as applicable, provided that the DIP Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the DIP Agent may seek clarification or direction from the Required DIP Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided;

     iii.  shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the DIP Agent shall not be liable for the failure to disclose, any information relating to the Borrower or any of its respective Affiliates that is communicated to or obtained by any Person serving as the DIP Agent or any of its Affiliates in any capacity; and

     iv.   shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the DIP Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the DIP Agent be responsible or liable to the Lenders or the Issuing Lender for any failure to monitor or maintain any portion of the Collateral. Nothing in this Agreement shall require the DIP Agent to expend or risk its own funds or otherwise incur any financial liability in

the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

    b.   The DIP Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary, or as the DIP Agent shall believe in good faith shall be necessary, under the circumstances as provided in Amendment and Waivers Section) or (ii) in the absence of its own gross negligence or willful misconduct (as determined in a final, non-appealable judgment of a court of competent jurisdiction).

    c.   The DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the value, validity, enforceability, effectiveness, sufficiency or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the DIP Agent's reliance on any electronic signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), (v) any failure of any Loan Party to perform its obligations hereunder or thereunder or (vi) the satisfaction of any condition set forth in conditions precedent or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the DIP Agent.

    5.   <u>Reliance by DIP Agent</u>. The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a DIP Lender, the DIP Agent may presume that such condition is satisfactory to such Lender unless the DIP Agent shall have received notice to the contrary from such DIP Lender prior to the making of such Loan. The DIP Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The DIP Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the DIP Agent. The DIP Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of DIP Lenders as shall be provided for herein or in the other Loan Documents) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The DIP Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required DIP Lenders (or such other number or percentage of Lenders as shall be provided for herein or in the other Loan Documents), and such request and any action taken or failure to act pursuant thereto shall be binding upon the DIP Lenders and all future holders of the Loans.

6.    Notice of Default.  The DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until the DIP Agent has received written notice from a DIP Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default in Section 9.1 " in respect of this Agreement and identifying the specific clause under said Section is given to the DIP Agent by the Borrower, or (ii) notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the DIP Agent by the Borrower or a DIP Lender. In the event that the DIP Agent receives such a notice, the DIP Agent shall give notice thereof to the Lenders. The DIP Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required DIP Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the DIP Agent shall have received such directions, the DIP Agent may (but shall not be obligated to) take such action or refrain from taking such action with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

7.    Credit Decision; Disclosure of Information by DIP Agent.  Each DIP Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such DIP Lender, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the DIP Agent or any other DIP Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold DIP Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.  Each DIP Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other DIP Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates (as defined below)) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Each DIP Lender, by delivering its signature page to this Agreement on the Interim Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a DIP Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the DIP Agent or the DIP Lenders on the Interim Closing Date. Except for notices, reports and other documents expressly required to be furnished to the DIP Lenders by the DIP Agent herein, the DIP Agent shall not have any duty or responsibility to provide any DIP Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Debtors or any of their respective affiliates which may come into the possession of the DIP Agent or any sub-agent or related party thereof.

8.    Indemnification of the DIP Agent.  Each of the DIP Lenders agrees to indemnify the DIP Agent (and their Related Parties) in their respective capacities as such (to the extent not reimbursed by Holdings, the Borrower or any other Loan Party and without limiting the obligation of Holdings, the Borrower or any other Loan Party to do so), according to its Aggregate Exposure Percentage (as defined below), on a pro rata basis, in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the DIP Commitments shall have terminated and the

DIP Loans shall have been paid in full, on a pro rata basis, in accordance with its Aggregate Exposure Percentage immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the DIP Loans) be imposed on, incurred by or asserted against the Administrative Agent, the Joint Lead Arrangers or their Related Parties in any way relating to or arising out of, the DIP Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the DIP Agent or any other Person under or in connection with any of the foregoing; *provided* that no DIP Lender shall be liable to any such Person for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the DIP Loans and all other amounts payable hereunder.

9.      <u>DIP Agent in its Individual Capacity</u>.  With respect to its DIP Commitment, DIP Loans, the Person serving as the DIP Agent shall have and may exercise the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the DIP Agent and the term "DIP Lender" or "DIP Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as DIP Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with the Borrower, Holdings, or any of their respective Subsidiaries or other Affiliate thereof as if such Person were not the DIP Agent hereunder and without any duty to account therefor to the DIP Lenders.

10.     <u>Successor Agent</u>.

The DIP Agent may at any time give 30 days' prior written notice of its resignation to the DIP Lenders and the Borrower, whether or not a successor DIP Agent has been appointed. Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right, subject to the approval of the Borrower, not to be unreasonably withheld, for so long as no Event of Default has occurred and is continuing, to appoint a successor. If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its resignation, then the retiring DIP Agent may on behalf of the Lenders, appoint a successor DIP Agent (which shall be a bank with an office in New York, New York or an Affiliate of any such bank with an office in New York, New York), provided that if the retiring DIP Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the DIP Agent on behalf of the Prepetition Secured Parties under any of the Loan Documents, the retiring DIP Agent may continue to hold such collateral security until such time as a successor DIP Agent is appointed and such collateral security is assigned to such successor DIP Agent) and (2) all payments, communications and determinations provided to be made by, to or through such DIP Agent shall instead be made by or to each Lender directly, until such time as the Required DIP Lenders appoint a successor DIP Agent as provided for above in this <u>Section</u>; provided that the DIP Agent may, in its sole discretion, agree to continue to perform any or all of such functions until such time as a successor is appointed as provided in this <u>Section</u>. Upon the acceptance of a successor's appointment as DIP Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) DIP Agent, and the retiring DIP Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom

as provided above in this <u>Section</u>). Prior to any retiring DIP Agent's resignation hereunder as DIP Agent, the retiring DIP Agent shall take such action as may be reasonably necessary to assign to the successor DIP Agent its rights as DIP Agent under the Loan Documents. The fees payable by the Borrower to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring DIP Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Exhibit E</u> and <u>Annex D</u> shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting as DIP Agent.

Notwithstanding paragraph (a) of this <u>Section</u>, in the event no successor DIP Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its intent to resign, the retiring DIP Agent may give notice of the effectiveness of its resignation to the DIP Lenders, and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; *provided* that, solely for purposes of maintaining any security interest granted to the DIP Agent under any Security Document for the benefit of the Prepetition Secured Parties, the retiring DIP Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Security Document and Loan Document, and, in the case of any Collateral in the possession of the DIP Agent, shall continue to hold such Collateral, in each case until such time as a successor DIP Agent is appointed and accepts such appointment in accordance with this <u>Section</u> (it being understood and agreed that the retiring DIP Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent; *provided* that (A) all payments required to be made hereunder or under any other Loan Document to the DIP Agent for the account of any Person other than the DIP Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the DIP Agent shall directly be given or made to each Lender. Following the effectiveness of the DIP Agent's resignation from its capacity as such, the provisions of this <u>Exhibit E</u>, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting as DIP Agent and in respect of the matters referred to in the proviso under clause (i) above.

11.     <u>Disbursements of DIP Loan Payments; Return of Payments</u>.

(a) If the DIP Agent pays an amount to a DIP Lender under this Agreement in the belief or expectation that a related payment has been or will be received by the DIP Agent from any Debtor and such related payment is not received by the DIP Agent, then the DIP Agent will be entitled to recover such amount from such DIP Lender on demand without setoff, counterclaim or deduction of any kind.

(b) Each DIP Lender hereby agrees that (x) if the DIP Agent notifies such DIP Lender that the DIP Agent has determined in its sole discretion that any funds received by such Lender from the DIP Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Payment</u>") were erroneously transmitted to such DIP Lender (whether or not known to such DIP Lender), and demands the return of such Payment (or a portion thereof), such DIP Lender shall promptly, but in no event later than one Business Day thereafter, return to the DIP Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from

and including the date such Payment (or portion thereof) was received by such DiP Lender to the date such amount is repaid to the DIP Agent at the greater of the NYFRB Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the DIP Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the DIP Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this Section shall be conclusive, absent manifest error.

(c) Each DIP Lender hereby further agrees that if it receives a Payment from the DIP Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the DIP Agent (or any of its Affiliates) with respect to such Payment (a "<u>Payment Notice</u>") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the DIP Agent of such occurrence and, upon demand from the DIP Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the DIP Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such DIP Lender to the date such amount is repaid to the DIP Agent at the greater of the NYFRB Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d) The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any DIP Lender that has received such Payment (or portion thereof) for any reason, the DIP Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(e) Each party's obligations under this <u>Section</u> shall survive the resignation or replacement of the DIP Agent or any transfer of rights or obligations by, or the replacement of, a DIP Lender, the termination of the DIP Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

12.    <u>Taxes.</u>

(a)    All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (including, any taxes imposed under Part XIII of the Income Tax Act (Canada) (as the same may be amended, supplemented or replaced from time to time)), excluding (i) net income taxes, capital taxes imposed by the laws of Canada or any political subdivision thereof, and franchise taxes (which franchise taxes are imposed in lieu of net income taxes) imposed on the DIP Agent or any DIP Lender as a result of a present or former connection between the DIP Agent or such DIP Lender and the jurisdiction of the governmental authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the DIP Agent or such DIP Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (ii) branch profits taxes

imposed on the DIP Agent or any DIP Lender by the United States of America or any similar tax imposed by any other jurisdiction described in clause (i) above, (iii) United States withholding taxes to the extent imposed on amounts payable to any DIP Lender at the time such DIP Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such DIP Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment, if any) to receive additional amounts from the Borrower with respect to such taxes pursuant to this clause (a), (iv) taxes that are attributable to a DIP Lender's failure to comply with the requirements of clause (d), (e) or (g) of this Section 12 and (v) United States federal withholding taxes imposed by sections 1471 through 1474 of the Code as in existence on the date of this Agreement (and any amended versions of such provisions that are substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder and official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code ("FATCA") (such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings, the "Non-Excluded Taxes"). If any Non-Excluded Taxes, or any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document ("Other Taxes"), are required to be withheld from any amounts payable to the DIP Agent or any DIP Lender hereunder, the amounts so payable to the DIP Agent or such DIP Lender shall be increased to the extent necessary to yield to the DIP Agent or such DIP Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement. The Borrower shall indemnify the DIP Agent and each DIP Lender within 10 Business Days after written demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section 12) paid by such person and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by a DIP Lender (with a copy to the DIP Agent), or by the DIP Agent on its own behalf or on behalf of a DIP Lender shall be conclusive absent manifest error.

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant governmental authority in accordance with applicable law.

(c)      Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the DIP Agent for its own account or for the account of the relevant DIP Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Agent. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the DIP Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the DIP Agent and the DIP Lenders for any incremental taxes, interest or penalties that may become payable by the DIP Agent or any DIP Lender as a result of any such failure.

(d)      Except as provided in the next sentence, each DIP Lender (or assignee) that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the DIP Agent two original copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8BEN-E or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code

with respect to payments of "portfolio interest", a statement substantially in the applicable form attached to the Prepetition First Lien Credit Agreement, and a Form W-8BEN or Form W-8BEN-E, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents. To the extent a Non-U.S. Lender is not the beneficial owner, such Non-U.S. Lender shall deliver to the Borrower and the DIP Agent two original copies of U.S. Internal Revenue Service Form W-8IMY, accompanied by U.S. Internal Revenue Service Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a statement substantially in the applicable form attached to the Prepetition First Lien Credit Agreement, U.S. Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a statement, substantially in the applicable form attached to the Prepetition First Lien Credit Agreement, on behalf of such direct and indirect partner. Any DIP Lender (or assignee) that is not a Non-U.S. Lender shall deliver to the Borrower and the DIP Agent two original copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such person claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The forms and certification referenced in the previous two sentences (the "Forms") shall be delivered by each DIP Lender on or before the date it becomes a party to this Agreement. In addition, each DIP Lender shall deliver such Forms promptly upon the obsolescence or invalidity of any Form previously delivered by such DIP Lender and upon (i) the written request of either Borrower or (ii) any such DIP Lender otherwise having actual knowledge of the obsolescence or invalidity of such Forms. Each DIP Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered Form to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this clause (d), no DIP Lender shall be required to deliver any Form pursuant to this clause (d) that such DIP Lender is not legally able to deliver.

(e)    The DIP Agent that is a "United States person" as defined in Section 7701(a)(30) of the Code shall, on or before the date on which the Administrative Agent becomes a party hereto, provide the Borrower with two original copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the DIP Agent, claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The DIP Agent that is not a "United States person" as defined in Section 7701(a)(30) of the Code shall, on or before the date on which the DIP Agent becomes a party hereto, to the extent it is legally eligible to do so, provide the Borrower with two original copies of U.S. Internal Revenue Service Form W-8, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the DIP Agent, certifying as to any entitlement of the DIP Agent to an exemption from, or reduction in, any U.S. federal withholding tax with respect to any fees received on its own behalf under any Loan Document. In addition, the DIP Agent shall deliver such copies of U.S. Internal Revenue Service Form W-8 or U.S. Internal Revenue Service Form W-9, as applicable, promptly upon the obsolescence or invalidity of such U.S. Internal Revenue Service Form previously delivered by the DIP Agent and upon (i) the written request of either Borrower or (ii) the DIP Agent otherwise having actual knowledge of the obsolescence or invalidity of such U.S. Internal Revenue Service Form. Notwithstanding any other provision of this clause (d), the DIP Agent shall not be required to deliver any Form pursuant to this clause (d) that the Administrative Agent is not legally able to deliver.

(f)        A DIP Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the DIP Agent), at the time or times reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such DIP Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such DIP Lender.

(g)        If the DIP Agent or any DIP Lender determines, in its sole discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by either Borrower or with respect to which either Borrower has paid additional amounts pursuant to this Section 12, it shall pay over such refund to such Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section 12 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the DIP Agent or such DIP Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund); *provided*, that the Borrower, upon the request of the DIP Agent or such DIP Lender, agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant governmental authority) to the DIP Agent or such DIP Lender in the event the DIP Agent or such DIP Lender is required to repay such refund to such governmental authority. This clause (f) shall not be construed to require the DIP Agent or any DIP Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other person.

(h)        If a payment made to a DIP Lender under any Loan Document would be subject to United States federal withholding tax imposed by FATCA if such DIP Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such DIP Lender shall deliver to the Borrower and the DIP Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the DIP Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the DIP Agent as may be necessary for the Borrower and the DIP Agent to comply with their obligations under FATCA and to determine that such DIP Lender has complied with such DIP Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)        Each DIP Lender shall severally indemnify the DIP Agent, within 10 days after demand therefor, for (i) any Non-Excluded Taxes attributable to such DIP Lender (but only to the extent that the Borrower has not already indemnified the DIP Agent for such Non-Excluded Taxes and without limiting the obligation of the Borrower to do so) and (ii) any Taxes attributable to such DIP Lender, in each case, that are payable or paid by the DIP Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to any DIP Lender by the DIP Agent shall be conclusive absent manifest error. Each DIP Lender hereby authorizes the DIP Agent to set off and apply any and all amounts at any time owing to such DIP Lender under any Loan Document or otherwise payable by the DIP Agent to the DIP Lender from any other source against any amount due to the Administrative Agent under this clause (i).

13.     <u>ERISA and Related Matters.</u>

(a)     Each DIP Lender (x) represents and warrants, as of the date such Person became a DIP Lender party hereto, to and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the DIP Agent and its Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such DIP Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA (as defined below) or otherwise) of one or more Plans (as defined below) with respect to such Lender's entrance into, or participation in connection with the DIP Loans, the DIP Commitments or this Agreement;

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to, and all of the conditions for exemptive relief are satisfied in connection with, such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement;

(iii)   (A) such DIP Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the DIP Loans, the DIP Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such DIP Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the DIP Agent, in its sole discretion, and such DIP Lender.

(b)     In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a DIP Lender or (2) such DIP Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such DIP Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a DIP Lender party hereto, for the benefit of, the DIP Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the DIP Agent or any of its Affiliates is a fiduciary with respect to the assets of such DIP Lender involved in such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP

Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the DIP Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

(c)    The DIP Agent hereby informs the DIP Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the DIP Loans, the DIP Commitments, this Agreement and any other Loan Documents (ii) may recognize a gain if it extended the DIP Loans or the DIP Commitments for an amount less than the amount being paid for an interest in the DIP Loans or the DIP Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

14.    <u>Interest Rates.</u>

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. The DIP Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The DIP Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The DIP Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any DIP Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

The terms capitalized herein shall be defined as set forth below.

"<u>Affiliate</u>" shall mean with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"<u>Aggregate Exposure</u>" shall mean with respect to any DIP Lender at any time, an amount equal to the amount of such Lender's DIP Commitment then in effect or, if the DIP Commitments have been terminated, the amount of such Lender's DIP Loans then outstanding.

"<u>Aggregate Exposure Percentage</u>" shall mean with respect to any DIP Lender at any time, the ratio (expressed as a percentage) of such DIP Lender's Aggregate Exposure at such time to the Aggregate Exposure of all DIP Lenders at such time.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>Governmental Authority</u>" shall mean any nation or government, any state, province or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"<u>Person</u>" shall mean any individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"<u>Plan</u>" shall mean at a relevant time, any employee benefit plan (other than a Multiemployer Plan) that is covered by ERISA and in respect of which Holdings or the Borrower is (or, if such plan were terminated at such time, would be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

# **EXHIBIT D**

**Foreign Guarantor Subsidiaries Forbearance Provisions**

**FOREIGN GUARANTOR SUBSIDIARIES FORBEARANCE PROVISIONS**

Capitalized terms used in this **Exhibit D** (this "Exhibit") without definition herein have the meaning set forth in the Restructuring Support Agreement to which this Exhibit is attached (the "RSA"), or, if not defined in the RSA, have the meaning set forth in the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

**SECTION 1.      Lender Specified Defaults**

(a) During the Lender Forbearance Period (as hereinafter defined), the Consenting Creditors agree to forbear from exercising any and all rights and remedies against each of the Foreign Guarantor Subsidiaries, with respect to the Event of Default under Section 9.1(g) of the First Lien Credit Agreement and the Second Lien Credit Agreement (together, the "Existing Credit Agreements"), as applicable, resulting, directly or indirectly, from the Chapter 11 Cases and with respect to any Defaults or Events of Default that have occurred, or that may occur as a result of failure to comply with any of the following, (clauses (1) through (12) below, together with the Event of Default under Section 9.1(g) of the Existing Credit Agreements resulting, directly or indirectly, from the Chapter 11 Cases, collectively, the "Lender Specified Defaults"):

(1) **Annual Financial Statements**. The requirement under Section 6.1(a) of the Existing Credit Agreements to deliver audited financial statements of the Company 105 days after the end of the fiscal year;

(2) **Quarterly Financial Statements**. The requirement under Section 6.1(b) of the Existing Credit Agreements to deliver unaudited financial statements of the Company 45 days after the end of each fiscal quarter;

(3) **Other certificates and information**. The requirement under Section 6.2(c) of the Existing Credit Agreements that concurrently with the delivery annual financial statements, delivery is required of those materials described in 6.2(c)(i) through 6.2(c)(iv) of the Existing Credit Agreements;

(4) **Certificate of independent certified public accountants**. The requirement under Section 6.2(b) of the Existing Credit Agreements that along with the delivery of annual financials, delivery is required of a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Event of Default, except as specified in such certificate;

(5) **Budget**. The requirement under Section 6.2(d) of the Existing Credit Agreements that a detailed consolidated budged for the following fiscal years is required to be delivered by 105 days after the end of the last fiscal year;

(6) **Financial Narrative**. The requirement under Section 6.2(e) of the Existing Credit Agreements that a backwards-looking narrative discussion and analysis of the financial condition and results of operations of the Company and its Subsidiaries must be delivered 105 days after the end of each fiscal year and 45 days after the end of the first fiscal quarter;

(7) **Teleconference Meeting**. The requirement under Section 6.2(i) of the Existing Credit Agreements that the Company shall hold a meeting by teleconference with

the Lenders to discuss the Company's financial results, the Company's implementation of the Cost Savings Plan and other relevant matters;

(8) **Sale Update**. The requirement under Section 6.2(k) of the First Lien Credit Agreement and Section 6.2(l) of the Second Lien Credit Agreement that the Company or the sell-side advisor must provide an update with respect to a potential sale of the Company at least once every fiscal quarter, including engagement of Sale Information Agent;

(9) **Payment of Obligations**. The requirement under Section 6.3 of the Existing Credit Agreements that obligations must be paid before they are delinquent;

(10) **Total Net Leverage Covenant**. The requirement under Section 7.1(a) of the Existing Credit Agreements that the Total Net Leverage Ratio as of the last day for four consecutive fiscal quarters cannot exceed: (i) on December 31, 2021—4.20 to 1.00; (ii) on March 31, 2022—4.20 to 1.00; (iii) on June 30, 2022—4.20 to 1.00; and (iv) on September 30, 2022—4.20 to 1.00;

(11) **Minimum Liquidity Covenant**. The requirement under Section 7.1(b) of the Existing Credit Agreements that the Liquidity of the Company cannot be less than $75,000,000.00; and

(12) **Minimum EBITDA**. The requirement under Section 7.1(c) of the Existing Credit Agreements that the Consolidated EBITDA, on a Pro Forma Basis as of the last day of any four consecutive fiscal quarters cannot be less than: (i) on December 31, 2021—$203,000,000.00, (ii) on March 31, 2022—$203,000,000.00; (iii) on June 30, 2022—$203,000,000.00; and (iv) on September 30, 2022—$203,000,000.00.

**SECTION 2.**        **Confirmation of Lender Specified Defaults.**

(a)        Each Foreign Guarantor Subsidiary represents that, (i) there are no claims, demands, offsets or defenses at law or in equity that would defeat or diminish the present and unconditional right of the Lenders or the Administrative Agents to collect the indebtedness evidenced by the Loan Documents in respect of the Term Loans that is owed to such Person, and to proceed to enforce the rights and remedies available to Administrative Agents and Lenders as provided in the Loan Documents as of the date hereof and (ii) except for the Lender Specified Defaults that have occurred and are continuing as of the date hereof, no Defaults or Events of Default under the Existing Credit Agreements have occurred and are continuing as of the date hereof.  The Lender Specified Defaults (x) cannot be cured (but, for the avoidance of doubt, can be waived) and (y) but for entry into the RSA and the effect of this Exhibit's provisions, would permit the Consenting Creditors to exercise any applicable rights and remedies provided for under the Loan Documents and applicable law.

(b)        Each Foreign Guarantor Subsidiary acknowledges and agrees that the Lenders and the Administrative Agents have not waived, released or compromised and do not hereby waive, release or compromise, occurrences, acts or omissions that may constitute or give rise to any Defaults or Events of Default (including the Lender Specified Defaults) that existed or may have existed, may presently exist, or may arise in the future, nor does any Lender or Administrative Agent waive any rights and remedies under the Existing Credit Agreements or the other Loan Documents (other than, to the extent and for the period expressly set forth herein, with respect to the Lender Specified Defaults or any other Defaults or Events of

Default under the Loan Documents), including any Lender's right to direct the respective Administrative Agent to exercise any rights and remedies.

(c)    Each Foreign Guarantor Subsidiary acknowledges and agrees that the Forbearance (as hereinafter defined) is limited in time and scope and is subject to the terms and conditions set forth herein. Each Foreign Guarantor Subsidiary further acknowledges and agrees that, upon the occurrence of a Termination Event (as hereinafter defined), the Consenting Creditors shall be entitled to exercise all rights and remedies in respect of the Lender Specified Defaults or any other Defaults or Events of Default under the Loan Documents and applicable law.

**SECTION 3.**    **Forbearance; Forbearance Default Rights and Remedies**.

(a)    In reliance upon the representations and warranties and covenants of each Foreign Guarantor Subsidiary contained in this Exhibit, and subject to the terms and conditions of this Exhibit and any documents or instruments executed in connection herewith, effective as of the Agreement Effective Date, each of the Consenting Creditors (severally and not jointly) agrees that, until the expiration or termination of the Lender Forbearance Period:

(i)    it shall deem the obligations of the Foreign Guarantor Subsidiaries not to have been accelerated upon commencement of the Chapter 11 Cases;

(ii)    it will forbear from exercising any and all rights or remedies under the Loan Documents and applicable law ("Remedial Action") against the Foreign Guarantor Subsidiaries (or any of their assets or properties, whether or not constituting Collateral); and

(iii)    it will forbear from directing the Administrative Agent to take any Remedial Action against the Foreign Guarantor Subsidiaries,

in each case, described in clauses (i), (ii) and (iii) (the "Forbearance"). As used herein, the term "Lender Forbearance Period" shall mean the period beginning on the Agreement Effective Date and ending automatically on the earliest to occur of (the occurrence of any of the events in the succeeding clauses (1) through (4), a "Termination Event"):

(1)    any Forbearance Default (as hereinafter defined) and the delivery to the Foreign Guarantor Subsidiaries by the Consenting Creditors, with the consent of the Consenting Creditors, of written notice of such Forbearance Default and such Consenting Creditors' intent to terminate the Forbearance (which notice may be delivered by counsel to the Consenting Creditors, including by electronic mail); *provided* that such Consenting Creditors' consent shall not be required if, in the case of clause (B) of the definition of Forbearance Default below, such Forbearance Default (x) materially alters or impedes consummation of the Restructuring Transactions or (y) directly or indirectly has a materially adverse effect on the terminating Consenting Creditors' legal and/or economic rights or benefits under the RSA);

(2)    the Plan Effective Date; and

(3)    (i) the enforcement of a security interest or other exercise of remedies, as a secured creditor or otherwise, by any party other than the Administrative Agents or the Lenders against a material portion of the Collateral owned by any Foreign Guarantor Subsidiary with respect to any liabilities in excess of $10,000,000 or (ii) any case or proceeding is commenced by or against any Foreign Guarantor Subsidiary under any Debtor Relief Law, or any petition, application, filing, or submission is made with respect to any Foreign Guarantor Subsidiary, for (x) the entry of an order

for relief under the Bankruptcy Code, any Debtor Relief Law, or any other reorganization, arrangement, insolvency, debtor relief, moratorium, suspension, deferral of payment or debt adjustment law; *provided* that, in the case of the commencement of an involuntary case against any such Foreign Guarantor Subsidiary that, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements have been delivered to the Administrative Agents, has individually, both (i) assets with a value not exceeding 2.5% of total assets of, and (ii) revenues not exceeding 2.5% of the total revenues of, the Borrower and its Restricted Subsidiaries on a consolidated basis for the Reference Period most recently ended, under the Bankruptcy Code, any Debtor Relief Law or any analogous law in any jurisdiction outside the United States, such case shall not have been dismissed within 30 days of commencement thereof with respect to such Foreign Guarantor Subsidiary, (y) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Foreign Guarantor Subsidiary or any part of its property to the extent such proceeding is consented to by any Foreign Guarantor Subsidiary or remains undismissed for a period of 30 days with respect to such Foreign Guarantor Subsidiary or (z) an assignment or trust mortgage for the benefit of creditors.

As used herein, the term "Forbearance Default" shall mean the occurrence of any of the following:

(A)    the occurrence of any Event of Default under either Credit Agreement solely to the extent such Event of Default is with respect to a default or failure to comply by a Foreign Guarantor Subsidiary, other than any of the Lender Specified Defaults, and such default or failure shall continue beyond any applicable grace period therefor contained in the applicable Credit Agreement; *provided* that notwithstanding anything to the contrary herein or in the Existing Credit Agreements, the Foreign Guarantor Subsidiaries shall, in order to satisfy any reimbursement obligations under Article 3 of the Existing Credit Agreements in respect of any L/C Obligations, be permitted to access cash collateral arrangements established pursuant to the Approved DIP Budget (as defined in the DIP Facility Documents) in accordance with such DIP Facility Documents; or

(B)    the failure by any Foreign Guarantor Subsidiary to comply in all material respects with any term, condition, or covenant set forth in this Exhibit, which failure remains uncured (to the extent curable) for three (3) Business Days after the Required Lenders deliver a written notice of such failure to the Foreign Guarantor Subsidiaries (which notice may be delivered by counsel to the Required Lenders, including by electronic mail).

The Foreign Guarantor Subsidiaries shall provide notice to the Consenting Creditors of the occurrence of any Forbearance Default as soon as reasonably possible but in any event within three (3) Business Days of the Foreign Guarantor Subsidiaries becoming aware of the occurrence of such Forbearance Default, which notice shall state that such event occurred and shall set forth, in reasonable detail, the facts and circumstances that gave rise to such event.

(b)    The Consenting Creditors hereby (i) direct the Administrative Agent not to take any Remedial Action with respect to the Foreign Guarantor Subsidiaries during the Lender Forbearance Period as a result of any of the Lender Specified Defaults and as otherwise set forth herein and (ii) agree to take all actions reasonably requested by the Administrative Agent pursuant to the Loan Documents in connection with such direction.

(c)    The Forbearance is limited in nature and nothing contained herein is intended, or shall be deemed or construed, (i) to constitute a waiver of any of the Lender Specified Defaults or any other future Defaults or Events of Default or compliance with any term or provision of the Loan Documents or applicable law, (ii) to establish a custom or course of dealing between any Foreign Guarantor Subsidiary,

on the one hand, and any Consenting Creditor, on the other hand, (iii) to give rise to any obligation on the part of the Lenders to extend, modify or waive any term or condition of the Loan Documents or (iv) to give rise to any defenses or counterclaims to the right of the Lenders to compel payment of the Obligations of the Foreign Guarantor Subsidiaries or otherwise enforce their rights and remedies set forth in the Loan Documents following a Termination Event.  Nothing contained in this Exhibit shall be deemed to obligate any Consenting Creditor to extend the Lender Forbearance Period or enter into any other forbearance agreements.

(d)    Upon the occurrence of a Termination Event, automatically and without any further action by any Consenting Creditor or either Administrative Agent, the agreement of the Consenting Creditors hereunder to forbear from taking any Remedial Action with respect to the Foreign Guarantor Subsidiaries shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind, all of which each Foreign Guarantor Subsidiary waives.  Each Foreign Guarantor Subsidiary agrees that the Consenting Creditors may at any time thereafter proceed to exercise any and all of their rights and remedies under any or all of the Loan Documents and/or applicable law, including, without limitation, Remedial Action with respect to any of the Lender Specified Defaults.  In furtherance of the foregoing, and notwithstanding the occurrence of the Agreement Effective Date, each Foreign Guarantor Subsidiary acknowledges and confirms that, subject to the Forbearance, all rights and remedies of the Consenting Creditors under the Loan Documents and applicable law with respect to the Foreign Guarantor Subsidiaries shall continue to be available to the Consenting Creditors.

(e)    Each of the parties bound hereby agrees that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that the Consenting Creditors may be entitled to take or bring in order to enforce their rights and remedies against the Foreign Guarantor Subsidiaries are, to the fullest extent permitted by law, tolled and suspended during the Lender Forbearance Period.

(f)    Each of the Foreign Guarantor Subsidiaries understands and accepts the temporary nature of the forbearance provided hereby and that the Consenting Creditors have given no assurances that they will extend such forbearance or provide waivers or amendments to the Existing Credit Agreements after the Lender Forbearance Period.

**SECTION 4.** **Reference To And Effect Upon The Existing Credit Agreements**.

(a)    All terms, conditions, covenants, representations and warranties contained in the Existing Credit Agreements, and all rights of the Consenting Creditors, shall, subject to the Forbearance, remain in full force and effect.  Each Foreign Guarantor Subsidiary hereby confirms that it has no right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to the Existing Credit Agreements or the applicable Loans.

(b)    Except as set forth herein, the agreement to and effectiveness of this Exhibit shall not directly or indirectly (i) constitute a consent or waiver of any past, present or future violations of any provisions of either of the Existing Credit Agreements nor constitute a novation of any of the Obligations of the Foreign Guarantor Subsidiaries under either of the Existing Credit Agreements, (ii) amend, modify or operate as a waiver of any provision of either of the Existing Credit Agreements or any right, power or remedy of any Consenting Creditor, or (iii) constitute a course of dealing or other basis for altering either of the Existing Credit Agreements or any other contract or instrument.  Except as set forth herein, each Consenting Creditor reserves all of its rights, powers, and remedies under the Loan Documents and applicable laws.

(c)    Each Foreign Guarantor Subsidiary acknowledges and agrees that the Consenting Creditors' agreement to forbear from exercising their default-related rights and remedies during the Lender Forbearance Period does not in any manner whatsoever limit any Consenting Creditor's right to insist upon strict compliance by each Foreign Guarantor Subsidiary with the Existing Credit Agreements, this Exhibit, or any other document during the Lender Forbearance Period, except as set forth herein.

**SECTION 5.**    **General Release.**

(a)    As of the Agreement Effective Date, each of the Foreign Guarantor Subsidiaries, on behalf of itself and each other Foreign Guarantor Subsidiary and each of their respective Subsidiaries (collectively, the "Releasors"), to the fullest extent permitted by law, hereby releases, and forever discharges the Administrative Agents, each Consenting Creditor and each of its or their respective trustees, officers, directors, participants, beneficiaries, agents, attorneys, affiliates and employees, and the successors and assigns of the foregoing (collectively, the "Released Parties"), from any and all claims, actions, causes of action, suits, defenses, set-offs against the Obligations of the Foreign Guarantor Subsidiaries under the Existing Credit Agreements, and liabilities of any kind or character whatsoever, known or unknown, contingent or matured, suspected or unsuspected, anticipated or unanticipated, liquidated or unliquidated, claimed or unclaimed, in contract or in tort, at law or in equity, or otherwise, including, without limitation, claims or defenses relating to allegations of usury, which relate, in whole or in part, directly or indirectly, to the Term Loans, the applicable Loan Documents, the Obligations of the Foreign Guarantor Subsidiaries under the Existing Credit Agreements, the Collateral or this Exhibit, in each case, which existed, arose or occurred at any time prior to the Agreement Effective Date, including, without limitation, the negotiation, execution, performance or enforcement of the Loan Documents and this Exhibit, any claims, causes of action or defenses based on the negligence of any of the Released Parties or on any "lender liability" theories of, among others, unfair dealing, control, misrepresentation, omissions, misconduct, overreaching, unconscionability, disparate bargaining position, reliance, equitable subordination, or otherwise, and any claim based upon illegality or usury (collectively, the "Released Claims"). No Releasor shall intentionally, willfully or knowingly commence, join in, prosecute, or participate in any suit or other proceeding in a position which is adverse to any of the Released Parties, arising directly or indirectly from any of the Released Claims. The Released Claims include, but are not limited to, any and all unknown, unanticipated, unsuspected or misunderstood claims and defenses which existed, arose or occurred at any time prior to the Agreement Effective Date, all of which are released by the provisions hereof in favor of the Released Parties.

(b)    Each Releasor acknowledges and agrees that it has no defenses, counterclaims, offsets, cross-complaints, causes of action, rights, claims or demands of any kind or nature whatsoever, including, without limitation, any usury or lender liability claims or defenses, arising out of the Loan Documents or this Exhibit, that can be asserted either to reduce or eliminate all or any part of any of the Releasors' liability to the Administrative Agents and the Lenders under the Loan Documents, or to seek affirmative relief or damages of any kind or nature from the Administrative Agents or the Lenders, for or in connection with the Loans or any of the Loan Documents. Each Releasor further acknowledges that, to the extent that any such claim does in fact exist, it is being fully, finally and irrevocably released by them as provided in this Exhibit.

(c)    Each Releasor hereby waives the provisions of any applicable laws restricting the release of claims which the releasing parties do not know or suspect to exist as of the Agreement Effective Date, which, if known, would have materially affected the decision to agree to these releases. Accordingly, each Releasor hereby agrees, represents and warrants to the Administrative Agents and each Lender that it understands and acknowledges that factual matters now unknown may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and each Releasor further agrees, represents and

warrants that the releases provided herein have been negotiated and agreed upon, and in light of, that realization and that each Releasor nevertheless hereby intends to release, discharge and acquit the parties set forth hereinabove from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are in any manner set forth in or related to the Released Claims and all dealings in connection therewith.

(d)      In making the releases set forth in this Exhibit, each Releasor acknowledges that it has not relied upon any representation of any kind made by any Released Party.

(e)      It is understood and agreed by the Releasors and the Released Parties that the acceptance of delivery of the releases set forth in this Exhibit shall not be deemed or construed as an admission of liability by any of the Released Parties and the Administrative Agents, on behalf of itself and the other Released Parties, hereby expressly denies liability of any nature whatsoever arising from or related to the subject of such releases.

**EXHIBIT E**

**New First Lien ABL Backstop Commitment Letter**

[*Omitted*]

## **EXHIBIT E-1**

**New First Lien ABL Facility Term Sheet**

CARESTREAM HEALTH, INC.
$85 million
New First Lien ABL Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions (the "ABL Term Sheet") for the ABL Facility (as defined below). This summary is for indicative purposes only and does not purport to summarize all of the terms of the definitive documentation with respect to the ABL Facility, and reference should be made to the definitive documentation for the final terms of the ABL Facility.

1.      PARTIES

Borrower:

Carestream Health, Inc., a Delaware corporation (the "Borrower").

Holdings:

A direct parent entity of the Borrower, as reorganized pursuant to the Plan (as defined in the Commitment Letter) ("New Carestream" or "Holdings").

Guarantors:

Holdings and each existing and subsequently acquired or organized domestic and Canadian and, to the extent no adverse tax consequences or repatriation of earnings to the Borrower, (i) would, in the good faith judgment of the Borrower at the time provided or (ii) thereafter, could reasonably be expected to result therefrom, foreign subsidiary of the Borrower (the "Subsidiary Guarantors"; Holdings and the Subsidiary Guarantors, the "Guarantors"; and the Borrower and the Guarantors, the "Loan Parties"), it being agreed that the Subsidiary Guarantors shall be subject to exclusions consistent with and no less favorable to the Borrower than the exclusions set forth in the Referenced First Lien Credit Agreement (as defined below) and other exclusions to be agreed consistent with the ABL Documentation Principles (as defined below). The ABL Credit Documentation will include "Chewy" protections to be agreed.

Transactions:

On the Plan Effective Date, in accordance with the Plan, the Borrower shall refinance a portion of the debt outstanding under that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013, among Carestream Health Holdings, Inc. (prior to its reorganization pursuant to the Plan, "Existing Holdings"), the Borrower, the subsidiary guarantors party thereto, the lenders and other parties from time to time parties thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "Existing Administrative Agent"), as amended on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020 and May 8, 2020 (the "Prepetition First Lien Credit Agreement") with the ABL Facility and a new term loan facility in an aggregate principal amount equal to the allowed amount of the First Lien Claims less the amount of First Lien Claims that are satisfied pursuant to the terms of the Plan (the "Term Loan Facility", the loans

thereunder, the "<u>Term Loans</u>"; and the Term Loan Facility together with the ABL Facilities, the "<u>Facilities</u>").

| | |
|---|---|
| Lead Arrangers and Bookrunners: | JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>") and Barclays Bank PLC ("<u>Barclays</u>"). |
| Commitment Parties | JPMorgan Chase Bank, Credit Suisse AG (acting through such of its affiliates or branches as it deems appropriate, "<u>CS</u>"), Barclays and Apollo Credit Master Fund Ltd. ("<u>Apollo</u>", and with JPMorgan Chase Bank, CS and Barclays, in such capacity, the "<u>ABL Commitment Parties</u>"). |
| Administrative Agent: | JPMorgan Chase Bank (in such capacity, the "<u>ABL Administrative Agent</u>"). |
| Lenders: | Lenders of the ABL Facility shall consist of the ABL Commitment Parties and certain other Prepetition Revolving Lenders (collectively, the "<u>Lenders</u>"). |
| Commitment Reduction: | The commitments in respect of the ABL Facility of the ABL Commitment Parties under the Commitment Letter shall be reduced dollar-for-dollar by the ABL Commitments (as defined below) of the Prepetition Revolving Lenders (other than the ABL Commitment Parties) that such Prepetition Revolving Lenders elect to provide in accordance with the Plan, with any such reduction to be ratable among the ABL Commitment Parties |
| Closing Date | The date each of the conditions set forth in <u>Exhibit B</u> are satisfied or otherwise waived in accordance with the Commitment Letter. |

## 2.    ABL FACILITY

### A.  ABL Facility

| | |
|---|---|
| Type and Amount: | A four and a half-year asset-based revolving facility (the "<u>ABL Facility</u>", the date of effectiveness thereof, the "<u>Closing Date</u>", and the commitments thereunder, the "<u>ABL Commitments</u>") in the amount of $85 million (the loans thereunder, the "<u>ABL Loans</u>"). |
| Availability and Maturity: | The ABL Commitments will expire, and the ABL Loans will mature, on the date that is four and a half years after the Closing Date (the "<u>ABL Termination Date</u>"); *provided* that the ABL Credit Documentation shall include (x) "amend and extend" provisions and (y) commitment reduction and termination provisions, in each case, usual and customary for facilities of this type. The ABL Facility shall be available on a revolving basis |

during the period commencing on the Closing Date and ending on the ABL Termination Date; *provided* that no more than $47,424,613.62 of ABL Loans may be drawn on the Closing Date and no Letters of Credit (as defined below) shall be issued (or deemed issued) under the ABL Facility on the Closing Date. Funding will be ratable among the ABL Lenders according to ABL Commitments on the Closing Date and in a manner that is satisfactory to the ABL Commitment Parties and ABL Administrative Agent.

Excess Availability (as defined below) under the ABL Facility will be subject to the Borrowing Base referred to below.

"Excess Availability" means, at any time, an amount equal to (i) the Line Cap (as defined below) minus (ii) the sum of (a) the aggregate outstanding amount of ABL Loans plus (b) the aggregate undrawn amount of outstanding Letters of Credit and (c) unreimbursed drawings in respect of Letters of Credit (unless otherwise converted into ABL Loans).

"Line Cap" means, at any time, the lesser of the aggregate ABL Commitments at such time and the Borrowing Base at such time.

"Specified Excess Availability" means the sum of (i) Excess Availability plus (ii) the amount (not to exceed 2.5% of the total ABL Commitments then in effect) by which the Borrowing Base then in effect exceeds the total ABL Commitments then in effect.

| | |
|---|---|
| Letters of Credit: | All letters of credit outstanding under the revolving credit facility under the Prepetition First Lien Credit Agreement immediately prior to the Plan Effective Date shall, on the Plan Effective Date, continue to be cash collateralized in a manner satisfactory to CS until replacement Letters of Credit can be issued under the ABL Facility and such letters of credit are returned to CS undrawn and the applicable beneficiaries have accepted the applicable replacement Letters of Credit. A portion of the ABL Facility in an amount equal to $15 million shall be available, subject to Excess Availability, for the issuance of letters of credit (the "Letters of Credit") by JPMorgan Chase Bank, CS and other Lenders reasonably satisfactory to the Borrower (in such capacity, each an "Issuing Lender"); *provided* that (x) no Issuing Lender shall be required to issue Letters of Credit in an aggregate face amount in excess of $5.0 million (or such greater amount as agreed to by the applicable Issuing Lender (as defined below)) and (y) with respect to any Letter of Credit issued, the Borrower shall provide cash collateral to the applicable Issuing Lender in an amount equal to 103% of the pro rata portion of such Letter of Credit attributable to any Lender that is not a Regulated Bank.  No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five |

(5) business days prior to the ABL Termination Date, *provided* that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of ABL Loans) within one business day.  To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the ABL Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis.

Borrowing Base:    The "Borrowing Base" will equal the sum of:

(a) 85% of the eligible accounts receivable of the Borrowing Base Loan Parties (as defined below) plus

(b) the lesser of (i) 70% of the eligible inventory of the Borrowing Base Loan Parties (valued at the lower of cost and fair market value) and (ii) the product of 85% multiplied by the net orderly liquidation value percentage identified in the most recent inventory appraisal ordered by the ABL Administrative Agent multiplied by the Borrowing Base Loan Parties' eligible inventory minus

(c) Eligible Reserves (as defined below).

The ABL Administrative Agent will have the right to establish and modify Eligible Reserves, which the ABL Administrative Agent determines from time to time in its Permitted Discretion (as defined below) as being necessary, against the Borrowing Base assets, upon at least three (3) business days' prior written notice to the Borrower (such three (3) business days (or longer) period, the "Review Period") (which notice shall include a reasonably detailed description of such reserve being established); *provided* that no reserves may be taken after the Closing Date based on circumstances, conditions, events or contingencies known to the ABL Administrative Agent as of the Closing Date and for which no reserves were imposed on the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in any material adverse respect since the Closing Date.  During the Review Period, (i) the ABL Administrative Agent shall, if requested, discuss any such reserve or change with the Borrower, and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent reasonably satisfactory to the ABL

Administrative Agent, (ii) if failure to implement any such reserve or change within a shorter time period would, in the good faith judgment of the ABL Administrative Agent, reasonably be expected to result in a Material Adverse Effect (to be defined in the ABL Credit Documentation) or materially and adversely affect the Collateral or the rights of the Lenders, such change may be implemented within a shorter time as determined by the ABL Administrative Agent in its Permitted Discretion and (iii) any borrowings or issuances of Letters of Credit made during the Review Period shall be made based on the Borrowing Base as modified by the proposed new or modified Eligible Reserves. Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change, (b) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria and (c) no reserves shall be imposed on the first 5% of dilution of accounts receivable and thereafter no dilution reserve shall exceed 1% for each incremental whole percentage in dilution over 5%.

As used herein:

"Borrowing Base Loan Parties" means domestic and Canadian Loan Parties.

"Eligible Reserves" means such amounts as the ABL Administrative Agent, in its Permitted Discretion, may from time to time establish in accordance with the ABL Credit Documentation.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

A certificate presenting the Borrower's computation of the Borrowing Base (a "Borrowing Base Certificate") will be delivered to the ABL Administrative Agent on or prior to the 20th calendar day following the end of each calendar month, (or, if such day is not a business day, on the immediately following Business Day); *provided*, *however*, that during a Cash Dominion Period (as defined below), the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate on a weekly basis (on or prior to the date that is the third business day following the end of each such week) (each delivery of a Borrowing Base certificate pursuant to this paragraph, a "Scheduled Borrowing Base Delivery").

|  |  |
|---|---|
| Eligibility: | The definitions of eligible accounts and eligible inventory will be mutually agreed by the ABL Commitment Parties and the Borrower in accordance with the ABL Documentation Principles |

and contained in the ABL Credit Documentation; *provided* that eligible accounts and eligible inventory shall only include accounts and inventory owned by a Borrowing Base Loan Party and located in the United States or Canada. In addition, the ABL Administrative Agent will retain the right, from time to time, in its Permitted Discretion, to establish additional standards of eligibility against eligibility and to adjust reserves.

|  |  |
|---|---|
| Use of Proceeds: | The Proceeds of the ABL Loans on the Closing Date shall be used as set forth on Exhibit B. The proceeds of the ABL Loans after the Closing Date shall be used to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries, including on the Closing Date to refinance the indebtedness outstanding under the Prepetition First Lien Credit Agreement (the "Refinancing") and to pay fees and expenses in connection therewith and in connection with the ABL Credit Documentation. |
| B.  Increase in ABL Commitments: | The ABL Credit Documentation (as defined below) will permit the Borrower to request an increase in commitments under the ABL Facility (any such increase, an "Incremental ABL Facility") in an aggregate principal amount that shall not exceed the greater of (a) the sum of (i) $25 million plus (ii) any voluntary prepayments that are accompanied by permanent commitment reductions under the ABL Facility (including the termination of commitments in connection with any "yank-a-bank" provisions) and (b) the excess of the Borrowing Base then in effect over the aggregate amount of ABL Commitments then in effect, by requesting additional commitments from one or more Lenders or, with the consent of the ABL Administrative Agent to the extent such consent would be required under the heading "Assignment and Participations" below, but without the consent of any other Lenders, from other entities; provided that, in connection with any Incremental ABL Facility, each ABL Lender shall be permitted to elect to have its ABL Commitment reduced by an amount equal to 40% of such Incremental ABL Facility and the Borrower shall prepay the outstanding ABL Loans held by such Lender in an amount proportionate to the ABL Commitment so reduced as compared to the aggregate ABL Commitment of such Lender outstanding immediately prior to such reduction; provided, further, that if more than one ABL Lender elects to have their ABL Commitments reduced, such reduction shall be applied on a pro rata basis as between such electing ABL Lenders. For the avoidance of doubt the terms of and conditions of any Incremental ABL Facility shall be substantially identical to the ABL Facility. |
| Limited Conditionality Provision: | For purposes of determining pro forma compliance with any basket (but not, for the avoidance of doubt, the satisfaction of conditions to the making of a credit extension) based on (a) a financial ratio (other than Excess Availability or Specified |

Excess Availability), (b) Consolidated EBITDA (to be defined in a manner no less favorable, taken as a whole, to the Borrower than in the Referenced First Lien Credit Agreement and otherwise as agreed by the ABL Administrative Agent and the Borrower subject to the ABL Documentation Principles (*provided* that (i) pro forma cost savings and synergy addbacks shall be permitted in the calculation of Consolidated EBITDA and capped at 15% of Consolidated EBITDA with an 12 month look-forward period) and (ii) management incentive plan cash and equity-based compensation addbacks shall be permitted in the calculation of Consolidated EBITDA), (c) whether a default or event of default has occurred and is continuing, or (d) the accuracy of any representation or warranty contained in the ABL Credit Documentation, in each case, in connection with the consummation of an acquisition or similar investment that the Borrower or one or more of its subsidiaries is contractually committed to consummate (it being understood that such commitment may be subject to conditions precedent, which conditions precedent may be amended, satisfied or waived in accordance with the terms of the applicable agreement) and whose consummation is not conditioned on the availability of, or on obtaining, third party financing (any such acquisition or investment, a "Limited Conditionality Transaction"), the date of determination shall, at the option of the Borrower (the exercise of such option, an "LC Election"), be the time the definitive agreements for such acquisition or investment are entered into or (the "LC Test Date") after giving pro forma effect to such acquisition or investment and the other transactions to be entered into in connection therewith (including any incurrence of indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the applicable test period, rather than the date that such Limited Conditionality Transaction is consummated and, for the avoidance of doubt, if any of such ratios or amounts are exceeded on any date other than the LC Test Date as a result of fluctuations in such ratio or amount including due to fluctuations in Consolidated EBITDA of the Borrower or, if applicable, the person subject to such acquisition or investment, at or prior to the consummation of the relevant transaction or action,  such ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the relevant transaction or action is permitted to be consummated or taken under any basket.

If the Borrower has made an LC Election for any Limited Conditionality Transaction, then in connection with any calculation of any basket availability in connection with the consummation of any subsequent acquisition or similar investment that the Borrower or one or more of its subsidiaries is contractually committed to consummate (each, a "Subsequent Transaction") following the relevant LC Test Date and prior to the earlier of the date on which such Limited Condition

Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, for purposes of determining whether such Subsequent Transaction is permitted under the ABL Credit Documentation, any such basket shall be required to be satisfied on a pro forma basis (a) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated, and (b) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of indebtedness and the use of proceeds thereof) have not been consummated.

3.      CERTAIN PAYMENT PROVISIONS

Fees and Interest Rates:             As set forth on Annex I.

Optional Prepayments and
Commitment Reductions:               ABL Loans may be prepaid and ABL Commitments may be reduced, in whole or in part without premium or penalty, in minimum amounts of $1 million or a whole multiple of $100,000 in excess thereof, at the option of the Borrower at any time upon one day's (or, in the case of a prepayment of Term Benchmark Loans (as defined in Annex I hereto), three (3) days') prior notice, subject to customary reimbursement of the Lenders' redeployment costs in the case of a prepayment of Term Benchmark Loans prior to the last day of the relevant interest period).

Mandatory Prepayments:               If at any time the aggregate amount of outstanding ABL Loans, unreimbursed Letter of Credit drawings and undrawn Letters of Credit exceeds the lesser of the aggregate ABL Commitments and the Borrowing Base, the ABL Credit Documentation will require a prepayment to the extent of such excess be applied *first*, to the outstanding ABL Loans (without a concurrent reduction of the ABL Commitments) and *second*, to the cash collateralization of outstanding Letters of Credit.

4.      COLLATERAL

Collateral:                          The ABL Facility will be secured by the collateral which secures the Term Loan Facility (the "Collateral").  The liens securing the ABL Facility will be first priority in the case of the ABL Priority Collateral (as defined below) and, with respect to Term Priority Collateral, junior only to the liens securing the Term Loans.

                                     "Term Priority Collateral" shall mean all Collateral securing the Term Loans other than ABL Priority Collateral.

"<u>ABL Priority Collateral</u>" shall mean all of the present and after acquired (a) cash, deposit accounts, securities accounts, accounts receivable and inventory of the Loan Parties; (b) general intangibles, instruments, documents and chattel paper relating to the property identified in clause (a); (c) commercial tort claims, security and guarantees and supporting obligations in respect of the collateral identified in clauses (a) and (b); and (d) proceeds (including insurance proceeds) of the foregoing (other than any such items constituting proceeds arising from the sale or disposition of Term Priority Collateral and cash on deposit in trust accounts, payroll or tax accounts and escrow accounts).

The ABL Priority Collateral will also secure obligations in respect of interest rate protection or other hedging arrangements entered into for non-speculative purposes in the ordinary course of business (including, for the avoidance of doubt, any interest rate protection or other hedging arrangements entered into prepetition) and cash management obligations (collectively, the "<u>Swap and Cash Management Obligations</u>"), in each case, owing to any person that is (or was on the date such obligation was entered into) the ABL Administrative Agent, any ABL Commitment Party, any Lender or any affiliate of the foregoing; *provided* that Swap and Cash Management Obligations shall only be pari with principal in the payment waterfall to the extent that (x) Borrowing Base reserves are in place in respect of such obligations and (y) such Swap and Cash Management Obligations are owing to the ABL Administrative Agent, any ABL Commitment Party, any Lender or any affiliate of the foregoing. For the avoidance of doubt, no Borrowing Base reserves shall be in place in respect of Swap and Cash Management Obligations owing to a person that is not the ABL Administrative Agent, an ABL Commitment Party, a Lender or an affiliate of the foregoing.

The lien priority, relative rights and other creditors' rights issues in respect of the ABL Facility and the Term Loan Facility shall be subject to an intercreditor agreement reasonably satisfactory to the ABL Commitment Parties and the Borrower (the "<u>Intercreditor Agreement</u>").

5.      CERTAIN CONDITIONS

Initial Conditions:                The availability of the ABL Facility on the Closing Date will be subject to the conditions set forth in Exhibit B.

On-Going Conditions:        The making of each ABL Loan and the issuance of each Letter of Credit shall be conditioned upon (a) the accuracy in all material respects (or in all respects if qualified by materiality) of all representations and warranties in the ABL Credit Documentation and (b) there being no default or event of default

in existence at the time of, or immediately after giving effect to, such extension of credit.

6.    DOCUMENTATION

ABL Credit
Documentation:

The definitive documentation for the ABL Facility (the "ABL Credit Documentation"; and together with the definitive documentation for the Term Loan Facility, the "Credit Documentation") shall be based on and consistent with the Prepetition First Lien Credit Agreement in the form that was in effect after giving effect to that certain Second Amendment to Amended and Restated Credit Agreement (First Lien), dated as of June 22, 2017, among *inter alia*, the Borrower, the guarantors and lenders party thereto and the Existing Administrative Agent (such version of the Prepetition First Lien Credit Agreement, the "Referenced First Lien Credit Agreement") with certain modifications, including those modifications as are necessary to reflect (i) the ABL structure (including that the baskets in respect of the dividend, investment and prepayment of debt covenants shall be customary for an ABL structure), (ii) the terms and conditions set forth in this ABL Term Sheet, (iii) the operational and strategic requirements of the Borrower and its subsidiaries in light of their size, industries and practices, (iv) basket capacity and sizes to be agreed between the ABL Commitment Parties and the Borrower based on negotiations and as set forth in the ABL Credit Documentation and (v) the customary agency and operational requirements of the ABL Administrative Agent (the "ABL Documentation Principles"). Capitalized terms not defined in this ABL Term Sheet shall be given substantially the same meaning assigned to such terms as defined in the Referenced First Lien Credit Agreement, with changes as mutually agreed, subject to the ABL Documentation Principle.

Financial Covenant:

Limited to a minimum Fixed Charge Coverage Ratio (as defined below) of not less than 1.00:1.00 (the "ABL Financial Covenant"), to be tested at the end of the most recently ended four fiscal quarters for which financial statements have been or are required to be delivered (each such period, a "Testing Period") but only during the continuance of a Financial Covenant Compliance Period (as defined below).

As used herein:

"Financial Covenant Compliance Period" means any period beginning on any date on which Specified Excess Availability is less than the greater of (x) 15% of the Line Cap and (y) $10.5 million and ending on the subsequent date on which Specified Excess Availability is equal to or greater than the greater of (x) 15% of the Line Cap and (y) $10.5 million for at least thirty (30) consecutive calendar days.

"<u>Fixed Charge Coverage Ratio</u>" means during any period, with respect to the Borrower and its restricted subsidiaries on a consolidated basis, the ratio of (a)(i) Consolidated EBITDA, <u>minus</u>, (ii) in each case to the extent paid in cash, the aggregate amount of all capital expenditures made by the Borrower and its restricted subsidiaries during such period (other than capital expenditures to the extent financed with the proceeds of any incurrence of indebtedness (other than the incurrence of any ABL Loans), proceeds from asset sales or proceeds from equity issuances), <u>minus</u>, (iii) the aggregate amount of all cash payments made by the Borrower and its restricted subsidiaries in respect of income taxes or income tax liabilities (net of cash income tax refunds) during such period (excluding, solely for purposes of testing the Financial Covenant, the lesser of (x) $5,000,000 and (y) 50% of the tax or tax liabilities paid in cash by the Borrower related to the taxable years ending on or before December 31, 2022 related to any gain as a result of the recapitalization effected on the Closing Date), to (b) Fixed Charges of the Borrower and its restricted subsidiaries for such period.

"<u>Fixed Charges</u>" means during any period, with respect to the Borrower and its restricted subsidiaries on a consolidated basis, the sum of (i) consolidated interest expense paid in cash, <u>plus</u> (ii) scheduled payments in cash of principal on indebtedness (other than ABL Loans) included in the definition of Consolidated Total Debt (to be defined in a manner substantially similar to the definition contained in the Referenced First Lien Credit Agreement, subject to the ABL Documentation Principles) (other than mandatory prepayments of Term Loans based on (x) "Excess Cash Flow" of the Borrower pursuant to the Term Loan Facility or (y) asset sales) <u>plus</u> (iii) Restricted Payments paid in cash.

The foregoing Financial Covenant shall be tested quarterly with respect to the Borrower and its restricted subsidiaries on a consolidated basis, (i) immediately upon trigger of a Financial Covenant Compliance Period based on the most recently completed four-fiscal quarter period for which financial statements have been delivered under the ABL Credit Documentation and (ii) on the last day of each subsequently completed fiscal quarter of the Borrower ending during a Financial Covenant Compliance Period for which financial statements are required to have been delivered hereunder.

For purposes of determining compliance with the Financial Covenant, any cash equity contribution made to Holdings, and contributed by Holdings to the Borrower as common equity, after the beginning of the relevant fiscal quarter and prior to the day that is ten (10) business days after the day on which financial statements are required to be delivered for such fiscal quarter

will, at the request of the Borrower, be included in the calculation of Consolidated EBITDA of the Borrower and its restricted subsidiaries solely for the purposes of determining compliance with the Financial Covenant at the end of such fiscal quarter and applicable subsequent periods that include such fiscal quarter (any such equity contribution so included in the calculation of Consolidated EBITDA of the Borrower and its restricted subsidiaries, a "Specified Equity Contribution"); *provided* that (a) in each four consecutive fiscal quarter period, there shall be at least two (2) fiscal quarters in respect of which no Specified Equity Contribution is made, (b) during the life of the ABL Facility there shall be no more than five (5) Specified Equity Contributions in the aggregate, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in pro forma compliance with the Financial Covenant for the relevant fiscal quarter, (d) all Specified Equity Contributions shall be disregarded for purposes of calculating Consolidated EBITDA in determining any financial ratio-based conditions or baskets with respect to the covenants contained in the ABL Credit Documentation (other than, with respect to any future period, with respect to any portion of such Specified Equity Contribution that is actually applied to repay any indebtedness) and (e) there shall be no pro forma or other reduction of indebtedness with the proceeds of any Specified Equity Contribution for purposes of determining compliance with the Financial Covenant for the fiscal quarter in respect of which such Specified Equity Contribution was made.

The ABL Credit Documentation will contain a standstill provision with regard to exercise of remedies (but no borrowings or issuances of Letters of Credit shall be permitted during the standstill period (without Required Lender (as defined below) consent)) during the period in which any Specified Equity Contribution will be made after the receipt of written notice by the ABL Administrative Agent of the Borrower's intention to cure a Financial Covenant default with proceeds of a Specified Equity Contribution; *provided*, *however*, that such standstill shall be solely with respect to a breach of the Financial Covenant to which such Specified Equity Contribution applies.

Representations and Warranties:    Limited to the following (applicable to Holdings, the Borrower and its restricted subsidiaries), in each case, with customary materiality qualifiers, thresholds, exceptions, limitations and qualifications to be mutually agreed in accordance with the ABL Documentation Principles: financial condition, financial statements, no Material Adverse Effect (substantially as defined in the Referenced First Lien Credit Agreement, subject to the ABL Documentation Principles), corporate existence, compliance with laws, corporate power and authority, non-contravention, governmental authorization, enforceability of

ABL Credit Documentation, no material litigation, no default, ownership of property, liens, intellectual property, taxes, Federal Reserve regulations, anti-corruption laws, bribery and sanctions, ERISA, labor matters, Investment Company Act, subsidiaries, use of proceeds, environmental matters, accuracy of disclosure, creation and perfection of security interests, solvency, Regulation H and Affected Financial Institutions and good faith preparation of annual budget.

Affirmative Covenants:

Limited to the following (applicable to the Holdings, the Borrower and their respective restricted subsidiaries), in each case, with customary materiality qualifiers, thresholds, exceptions, limitations and qualifications to be mutually agreed in accordance with the ABL Documentation Principles: delivery of annual and quarterly (other than the fourth quarter of any year) financial statements, accountants' letters, annual budgets, compliance certificates (including calculations of the quarterly fixed charge coverage ratio irrespective of whether a Financial Covenant Compliance Period is then in effect), monthly collateral reporting (including agings and inventory reports and monthly borrowing base certificates) and other information reasonably requested by the Lenders (*provided* that all collateral reporting will be delivered on a monthly basis (*provided* that such reporting shall be required to be delivered on a weekly basis during a Cash Dominion Period)), payment of obligations, maintenance of existence, compliance, maintenance of policies and procedures reasonably designed to ensure compliance with anti-corruption, bribery and sanctions laws, maintenance of property (other than ordinary wear and tear, casualty or condemnation), adequate insurance, maintenance of books and records, right of Lenders to inspect property and books and records, field examinations and inventory appraisals as described under the headings Field Examinations and Inventory Appraisals, notices of defaults, material litigation and other material events, compliance with environmental laws, ERISA, deposit accounts, further assurances (including without limitation, with respect to security interests in after acquired property), and performance of post-closing matters (including, within sixty (60) days following the Closing Date (or such later date as agreed to by the ABL Administrative Agent in its sole discretion), entrance into control agreements, delivery of insurance endorsements and delivery of audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries, in each case for the fiscal year ended December 31, 2021).

Negative Covenants:

Subject to certain exceptions and baskets to be mutually agreed subject to the ABL Documentation Principles, limitations on (to apply to Holdings, the Borrower and their respective restricted subsidiaries):

(a) indebtedness (including guarantee obligations of indebtedness), which shall permit, among other things, the Term Loan Facility, Incremental Term Facilities and Incremental Equivalent Debt; *provided* that any Incremental Equivalent Debt shall be junior in right of security to the ABL Priority Collateral; *provided further* that the aggregate principal amount of the Incremental Term Facilities and Incremental Equivalent Debt (as each such term is defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) shall not exceed (a) the greater of (1) $100 million and (2) 50% of Consolidated EBITDA *plus* (b) an amount equal to all voluntary prepayments of initial term loans (other than any prepayment using the proceeds of long-term indebtedness); *plus* (c) (i) in the case of any Incremental Equivalent Debt that is secured on *pari passu* basis, an additional amount if, after giving effect to the incurrence of such additional amount (and after giving effect to any permitted and concurrent use of proceeds thereof and all other appropriate pro forma adjustment events), the Total Net First Lien Leverage Ratio (as defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) of the Borrower being no greater than 2.50:1.00; (ii) in the case of any Incremental Equivalent Debt that is secured on a junior lien basis, the Total Net Secured Leverage Ratio (as defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) of the Borrower shall be no greater than 3.25:1.00 and (ii) in the case of Incremental Equivalent Debt that is unsecured, the Total Net Leverage Ratio (as defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) of the Borrower shall be no greater than 3.75:1.00;

(b) liens;

(c) mergers, consolidations, liquidations and dissolutions;

(d) sales of assets, which shall permit, among other things, the asset sales set forth under the heading "Permitted Asset Sales" below;

(e) dividends and other payments in respect of capital stock; *provided* that among other exceptions, such restricted payments will be permitted without limitation upon satisfaction of the Payment Conditions;

(f) acquisitions, investments, loans and advances; *provided* that investments will be permitted without limitation upon satisfaction of the Payment Conditions;

(g) voluntary prepayments, redemptions and repurchases ("Specified Prepayments") of material contractually

subordinated debt for borrowed money, unsecured debt for borrowed money or junior lien debt for borrowed money (collectively, "Covered Debt") (it being understood that there shall be no restriction on prepayments of Term Loans); *provided* that Specified Prepayments of Covered Debt will be permitted (x) so long as (i) such prepayments are not prohibited by the documentation governing such debt (including any applicable intercreditor or subordination agreement) and (ii) the Payment Conditions are satisfied and (y) to the extent constituting a permitted refinancing thereof permitted under the indebtedness covenant;

(h) transactions with affiliates;

(i) sale-leasebacks;

(j) swap agreements;

(k) changes in fiscal periods;

(l) negative pledge clauses and clauses restricting subsidiary distributions;

(m) changes in lines of business;

(n) material amendments to organizational documents;

(o) passive Holdings covenant; and

(p) use of proceeds in compliance with anti-corruption, bribery and sanctions laws;

*provided* that neither Holdings, the Borrower or any Restricted Subsidiary shall transfer or dispose of material intellectual property to an Unrestricted Subsidiary.

"Payment Conditions" means (a) no Event of Default has occurred and is continuing and (b) (i) after giving effect to the proposed event as if it occurred on the first day of the Pro Forma Period, daily average pro forma Specified Excess Availability is greater than the greater of (x) 25.0% of the Line Cap and (y) $19 million at all times during the Pro Forma Period, or (ii) after giving effect to the proposed event as if it occurred on the first day of the Pro Forma Period or the most recently ended testing period, as applicable, (A) daily average pro forma Specified Excess Availability during the Pro Forma Period is greater than the greater of (x) 20.0% of the Line Cap and (y) $15.0 million and (B) the Fixed Charge Coverage Ratio as of the end of the most recently ended Testing Period greater than 1.00:1.00.

"<u>Pro Forma Period</u>" means the period commencing ninety (90) days prior to the date an event is proposed by the Borrower to occur.

Permitted Asset Sale:

The Borrower or any of its restricted subsidiaries will be permitted to make non ordinary course of business asset sales or dispositions of property without limit so long as (a) such sales or dispositions are for fair market value, (b) at least seventy-five (75%) of the consideration for asset sales and dispositions shall consist of cash or cash equivalents (including a dollar basket for non-cash consideration that may be designated as cash consideration) and subject to additional exceptions consistent with the ABL Credit Documentation, (c) no default or event of default shall have occurred and be continuing or result therefrom and (d) to the extent such disposition is of assets in excess of an amount equal to the greater of (i) $4 million and (ii) 5.0% of the then-effective Borrowing Base that are included by the Borrower in the Borrowing Base, the Borrower delivers a pro forma Borrowing Base Certificate.

Cash Dominion:

The Loan Parties will be subject to "springing" cash dominion during any Cash Dominion Period. During a Cash Dominion Period, funds deposited into any material, domestic depository account will be swept on a daily basis into a blocked account with the ABL Administrative Agent and shall be used to reduce amounts owing under the ABL Facility. The ABL Administrative Agent or another Lender or a bank acceptable to the ABL Administrative Agent shall be the Borrower's principal depository and disbursement bank (it being agreed that the Borrower's current depository and disbursement bank shall be deemed acceptable to the ABL Administrative Agent). The appropriate documentation, including blocked account and/or lockbox agreements acceptable to the ABL Administrative Agent, will be required for all such material depository accounts of the Borrower and its subsidiaries and will be implemented within ninety (90) days following the Closing Date (or such later date as agreed by the ABL Administrative Agent).

"<u>Cash Dominion Period</u>" means any period commencing (a) on the fifth consecutive business day on which Excess Availability is less than the greater of (x) 15% of the Line Cap and $10.5 million and ending on the date on which Excess Availability is equal to or greater than the greater of (y) 15% of the Line Cap and $10.5 million for thirty (30) consecutive calendar days or (b) upon the occurrence of a Specified Event of Default and ending when no such Specified Event of Default is continuing.

"<u>Specified Event of Default</u>" means any event of default with respect to non-payment, bankruptcy, failure to deliver beyond the applicable grace period or material inaccuracy of a Borrowing Base Certificate, breach of the financial covenant or

failure to comply with cash management provisions relating to cash dominion.

Events of Default:

Nonpayment of principal when due, nonpayment of interest, fees and other amounts after five (5) day grace period, material inaccuracy of a representation or warranty when made, cross-default to material indebtedness (including the Term Loan Facility), violation of covenants (subject, in the case of certain affirmative covenants, to a grace period (it being understood that there shall only be a three (3) business day grace period for failure to deliver a required Borrowing Base certificate or failure to comply with controlled account requirements)), bankruptcy events, certain ERISA events that would result in a Material Adverse Effect, final and nonappealable material judgments, actual or asserted invalidity of guarantee or security document and change of control.

Voting:

Amendments and waivers of the ABL Credit Documentation will require the approval of non-defaulting Lenders holding more than 50% of the aggregate amount of the loans and commitments under the ABL Facility held by non-defaulting Lenders ("Required Lenders"), except that (i) the consent of each Lender directly and adversely affected thereby shall also be required with respect to: (A) increases in the commitment of such Lender, (B) reductions of principal, interest or fees owing to such Lender, (C) extensions of the final maturity or the due date of any interest, amortization or fee payment, (D) changes to pro rata sharing and pro rata payment provisions, (E) changes to the payment waterfall and (F) actions taken to contractually subordinate (or have the effect of contractually subordinating) the payment obligations or all or substantially all of the liens in the Collateral under the ABL Credit Documentation to other indebtedness for borrowed money (including guarantees), (ii) the consent of 100% of the Lenders will be required with respect to (A) changes in the voting thresholds and (B) releases of all or substantially all the value of the guarantees or releases of liens on all or substantially all of the Collateral (in each case, other than as permitted under the ABL Facility), (iii) increases to the advance rates set forth in the definition of Borrowing Base and changes to the eligibility criteria applicable to the Borrowing Base which have the effect of increasing availability thereunder shall require the approval of Lenders holding more than 66 2/3% of the ABL Commitments and (iv) customary protections for the ABL Administrative Agent and the Issuing Lenders will be provided.

Notwithstanding anything to the contrary, in connection with any determination as to whether the Required Lenders have consented (or not consented) to any amendment or waiver, any non-defaulting Lender (other than (x) any Lender that is a Regulated Bank or an affiliate of a Regulated Bank and (y) any

Lender that is the ABL Administrative Agent or an affiliate of the ABL Administrative Agent) that owns, directly or indirectly, any equity in the Borrower (each, an "<u>Affiliated Lender</u>") shall have no right to vote any of its ABL Loans and ABL Commitments and shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders; provided that Apollo entities that are Lenders on the Closing Date (the "<u>Closing Date Apollo Entities</u>") shall be entitled to vote their ABL Loans and ABL Commitments so long as such entities are Debt Fund Affiliates and provided that, with respect to any such vote, any ABL Loans and ABL Commitments of the Closing Date Apollo Entities in excess of 12% of the aggregate ABL Commitments as of such date shall be deemed to have voted in the same proportion as other ABL Lenders that are not Closing Date Apollo Entities.

"<u>Regulated Bank</u>" means an Approved Bank that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board of Governors under 12 CFR part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to in clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"<u>Approved Bank</u>" means any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks or $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks.

"<u>Debt Fund Affiliate</u>" means any investment fund, separate account, or other entity owned (in whole or in part), controlled, managed and/or advised by any affiliate of Apollo Global Management, Inc. (a) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course, (b) that does not directly or indirectly have beneficial ownership of equity interests of the Borrower or any Subsidiary and (c) which is not managed on a day to day basis by Persons responsible for the management of the Borrower on a day to day.

The ABL Credit Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all

Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

**Assignments and Participations:**

The Lenders shall be permitted to assign (other than to a natural person) all or a portion of their ABL Loans and ABL Commitments with the consent, not to be unreasonably withheld or delayed, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) a payment or bankruptcy event of default has occurred and is continuing; *provided* that such consent shall be deemed given if the Borrower has not responded within ten (10) business days following written notice, (b) the ABL Administrative Agent, unless the assignee is a Lender or an affiliate of a Lender that is a Regulated Bank, and (c) any Issuing Lender.  In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $2,500,000, unless otherwise agreed by the Borrower and the ABL Administrative Agent.  The ABL Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment.  The Lenders shall also be permitted to sell participations in their ABL Loans (other than to a natural person, a defaulting lender, Holdings, the Borrower or any of its affiliates), *provided* that the obligations under the ABL Credit Documentation for such Lender selling a participation shall remain unchanged and such Lender shall remain solely responsible to the other parties under the ABL Credit Documentation for the performance of such obligations. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations.  Voting rights of participants shall be limited to matters that require the consent of each Lender directly affected thereby and that directly affect such Participant.   Pledges of ABL Loans in accordance with applicable law shall be permitted without restriction.

No assignment or participation may be made or sold to the Borrower or any of its affiliates.

**Field Examinations:**

Upon reasonable notice to the Borrower, field examinations will be conducted on an ongoing basis at regular intervals at the discretion of the ABL Administrative Agent to ensure the adequacy of Borrowing Base collateral and related reporting and control systems.  No more than one field examination per year will be conducted; *provided* that one additional field examination may be performed if Excess Availability is less than the greater of (x) 20% of the Line Cap and (y) $15 million for a period of five (5) consecutive business days; *provided*, *further*, that there shall be no limitation on the number or frequency of field examinations if an Event of Default shall have occurred and be

continuing. Each such field examination shall be at the Borrower's expense and in a form reasonably satisfactory to the ABL Administrative Agent.

Inventory Appraisals:

Upon reasonable notice to the Borrower, inventory appraisals will be conducted on an ongoing basis at regular intervals at the discretion of the ABL Administrative Agent.  No more than one inventory appraisal per year will be conducted; *provided* that one additional inventory appraisal may be performed if Excess Availability is less than the greater of (x) 20% of the Line Cap and (y) $15 million for a period of five (5) consecutive business days; *provided*, *further*, that there shall be no limitation on the number or frequency of inventory appraisals if an Event of Default shall have occurred and be continuing; *provided*, *further*, that the ABL Administrative Agent shall have the right, but not the obligation, to conduct an additional inventory appraisal if the value of inventory designated in the subledger as film inventory of the Borrowing Base Loan Parties (valued at the lower of cost and market) is greater than 50% of the value of the total inventory of the Borrowing Base Loan Parties (valued at the lower of cost and market). Each such inventory appraisal shall be at the Borrower's expense and in a form reasonably satisfactory to the ABL Administrative Agent.

Unrestricted Subsidiaries:

Consistent with similar transactions of this kind, the ABL Credit Documentation shall contain provisions pursuant to which, subject to customary limitations on investments, loans, advances to and other investments in, unrestricted subsidiaries, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a "restricted subsidiary"; *provided* that (i) no default shall have occurred and be continuing or would result from any such designation, (ii) after giving pro forma effect to such designation or redesignation, the Borrower shall be in compliance with the Financial Covenant (whether or not then in effect), (iii) no restricted subsidiary shall be designated as an unrestricted subsidiary if it owns material intellectual property, (iv) the Payment Conditions are satisfied, (v) such designation of a restricted subsidiary to an unrestricted subsidiary shall be made in compliance with the investments covenant and (vi) such redesignation of any unrestricted subsidiary as a restricted subsidiary shall be deemed to constitute the incurrence of indebtedness and liens of such subsidiary (to the extent assumed). Unrestricted subsidiaries will not be subject to the mandatory prepayment, representation and warranty, affirmative or negative covenant or event of default provisions of the ABL Credit Documentation and the results of operations, indebtedness and interest expense of unrestricted subsidiaries will not be taken into account for purposes of determining any financial ratio or covenant contained in the ABL Credit Documentation. No

subsidiary may be designated an "unrestricted subsidiary" unless it is also designated as such under the Term Loan Credit Documentation or any other instrument governing material indebtedness in excess of $35 million.

Yield Protection:

The ABL Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (*provided* that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes (including appropriate gross-up provisions) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Term Benchmark Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto.

Defaulting Lenders:

The ABL Credit Documentation shall contain provisions relating to "defaulting" Lenders (including provisions relating to reallocation of participations in, or the Borrower providing cash collateral to support or Letters of Credit, to the suspension of voting rights and rights to receive certain fees, and to assignment of the ABL Commitments or ABL Loans of such Lenders).

Expenses and Indemnification:

Neither Holdings nor any of its subsidiaries, nor the ABL Administrative Agent, the ABL Commitment Parties, the Lenders nor the Issuing Lenders (or any of their affiliates or their respective officers, directors, employees, advisors and agents) shall have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by any other party to the ABL Credit Documentation arising out of, in connection with, or as a result of, the ABL Facility or the ABL Credit Documentation.  As used herein, the term "Liabilities" shall mean any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

Regardless of whether the Closing Date occurs, the Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the ABL Administrative Agent and the ABL Commitment Parties associated with the syndication of the ABL Facility and the preparation, execution, delivery and administration of the ABL Credit Documentation and any

amendment, modification or waiver with respect thereto (including the reasonable fees, disbursements and other charges of one primary counsel and one local counsel in each applicable, jurisdiction for the ABL Administrative Agent and the ABL Commitment Parties taken as a whole), (b) all documented out-of-pocket expenses of the ABL Administrative Agent, the Lenders and the Issuing Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the ABL Credit Documentation and (c) subject to the limitations set forth in the ABL Credit Documentation, reasonable out-of-pocket fees and expenses associated with collateral monitoring, collateral reviews (including field examination fees) and appraisals, environmental reviews and fees and expenses of other advisors and professionals engaged by the ABL Administrative Agent or (prior to the Closing Date) the ABL Commitment Parties.

The ABL Administrative Agent, the ABL Commitment Parties, the Lenders and the Issuing Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (each, an "Indemnified Person") will be indemnified and held harmless against Liabilities or expenses (including the fees, disbursements and other charges of counsel) incurred by such Indemnified Person in connection with or as a result of (i) the execution and delivery of the ABL Credit Documentation and any agreement or instrument; (ii) the funding of the ABL Facility, issuance of letters of credit thereunder, or the or the use or the proposed use of proceeds thereof; (iii) any act or omission of the ABL Administrative Agent in connection with the administration of the ABL Credit Documentation; (iv) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by Holdings, the Borrower or any of its subsidiaries, or any environmental liability resulting from the handling of hazardous materials or violation of environmental laws, related in any way to Holdings, the Borrower or any of its subsidiaries and (v) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "Proceeding") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by Holdings, the Borrower, their affiliates or equity holders or any other party; *provided* that such indemnification shall not, as to any Indemnified Person, be available to the extent that such Liabilities or expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person in performing its activities or in furnishing

its commitments or services under the ABL Credit Documentation.

EU/UK Bail-In Provisions:    The ABL Credit Documentation will contain customary EU/UK bail-in provisions on terms to be mutually agreed subject to the ABL Documentation Principles.

QFC Provisions:    The ABL Credit Documentation will contain customary "QFC" provisions on terms to be mutually agreed subject to the ABL Documentation Principles.

Erroneous Payments:    The ABL Credit Documentation will contain customary erroneous payment provisions on terms to be mutually agreed subject to the ABL Documentation Principles.

Governing Law:    New York.

Forum:    United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the  Borough of Manhattan), and any appellate court from any thereof.

Counsel to the ABL Administrative Agent:    Simpson Thacher & Bartlett LLP.

Annex I

**INTEREST AND CERTAIN FEES**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the ABL Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Adjusted Term SOFR Rate, in each case, plus the Applicable Margin. |

As used herein:

"ABR" means the highest of (i) the rate of interest last quoted by The Wall Street Journal in the U.S. as the prime rate in effect (the "Prime Rate"), (ii) the NYFRB Rate from time to time plus 0.50% and (iii) the Adjusted Term SOFR Rate applicable for an interest period of one month plus 1.00%. If the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 2.00%.

"ABR Loans" means ABL Loans bearing interest based upon the ABR.

"Adjusted Term SOFR Rate" means the Term SOFR Rate, plus 0.10%; *provided* that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of calculating such rate.

"Applicable Margin" means 1.00% in the case of ABR Loans and 2.00% in the case of Term Benchmark Loans through the first full fiscal quarter after the Closing Date and, thereafter, subject to adjustment in accordance with the Pricing Grids (as defined below).

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York (the "NYFRB") based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as the federal funds effective rate, *provided* that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Floor" means the benchmark rate floor, if any, provided in the ABL Credit Documentation initially (as of the execution of the

ABL Credit Documentation, the modification, amendment or renewal of the ABL Credit Documentation or otherwise) with respect to the Adjusted Term SOFR Rate. For the avoidance of doubt the initial Floor for Adjusted Term SOFR Rate shall be 1.00%.

"Interest Period" means, with respect to any Term Benchmark, a period of one, three or six months.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; *provided* that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in U.S. Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"SOFR" means, with respect to any business day, a rate per annum equal to the secured overnight financing rate for such business day published by the NYFRB on the NYFRB's on the immediately succeeding business day.

"Term Benchmark" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"Term Benchmark Loans" means ABL Loans bearing interest based upon the Term Benchmark Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR.

"<u>U.S. Government Securities Business Day</u>" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

The ABL Credit Documentation will contain provisions to be mutually agreed with respect to a replacement of any Term Benchmark.

| | |
|---|---|
| **Interest Payment Dates:** | In the case of ABR Loans, quarterly in arrears, on the first day of each calendar quarter. |
| | In the case of Term Benchmark Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period. |
| **Commitment Fees:** | The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.50% on the average daily unused portion of the ABL Facility (based on total commitments). |
| **Pricing Grids:** | Commencing two full fiscal quarters after the Closing Date, the Applicable Margins and commitment fees will be subject to pricing adjustment as set forth in the Pricing Grids attached hereto as <u>Annex I-A</u>. |
| **Letter of Credit Fees:** | The Borrower shall pay a fee on the face amount of each Letter of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Term Benchmark Loans under the ABL Facility.  Such fee shall be shared ratably among the Lenders participating in the ABL Facility and shall be payable quarterly in arrears. |
| | A fronting fee in an amount equal to 0.125% of the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account.  In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account. |
| **Default Rate:** | At any time when the Borrower is in default in the payment of any amount under the ABL Facility, after giving effect to any applicable grace period, the Required Lenders may elect that all outstanding amounts under the ABL Facility shall bear interest at 2.00% per annum above the rate otherwise applicable thereto (or, in the event there is no applicable rate, 2.00% per annum in excess of the rate otherwise applicable to ABL Loans maintained as ABR Loans from time to time). |

Rate and Fee Basis:    All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.

Annex I-A

| Level | Excess Availability | Term Benchmark Applicable Margin | ABR Applicable Margin |
|-------|---------------------|---------------------------------|----------------------|
| Level I | > 66% | 3.00% | 2.00% |
| Level II | ≤ 66% but > 33% | 3.25% | 2.25% |
| Level III | ≤ 33% | 3.50% | 2.50% |

The applicable margins and fees shall be determined in accordance with the foregoing tables based on the most recent Borrowing Base certificate delivered pursuant to the ABL Credit Documentation. Adjustment, if any, to the applicable margins and fees shall be effective three (3) business days after the ABL Administrative Agent has received the applicable Borrowing Base certificate.  If the Borrower fails to deliver the Borrowing Base certificate to the ABL Administrative Agent at the time required pursuant to the ABL Credit Documentation, then the ABL Administrative Agent shall, at the direction of the Required Lenders only, declare the applicable margins and fees to be the highest applicable margin and fees set forth in the foregoing table until the date that such Borrowing Base certificate is so delivered.

# <u>EXHIBIT F</u>

**Form of Joinder Agreement**

## Joinder Agreement to Restructuring Support Agreement

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement, dated as of August 21, 2022 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Agreement"),[1] by and among Carestream Health Holdings, Inc. ("Carestream"), and each of its affiliates that executes the Agreement (collectively, the "Company Parties"), certain holders of, or investment advisors, sub-advisors or managers of funds or accounts that hold First Lien Claims (collectively, the "Consenting First Lien Lenders"), certain holders of, or investment advisors, sub-advisors or managers of funds or accounts that hold Second Lien Term Loan Claims (collectively, the "Consenting Second Lien Lenders") and certain holders of Equity Interests in Carestream (the "Sponsor") (and by the execution hereof hereby agrees to be bound by and comply with the terms and conditions thereof as a Consenting Creditor).

The undersigned hereby makes the applicable representations and warranties set forth in Section 9 and Section 10 of the Agreement to each other Party, effective as of the date hereof.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

Date: _____, 2022

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

**[JOINING PARTY]**

_____
Name:
Title:


Address:


E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Term Loan Claims | |
| First Lien Revolving Facility Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests (including Existing Warrants) | |

## <u>EXHIBIT G</u>

**Provision for Transfer Agreement**

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of August 21, 2022 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof the "<u>Agreement</u>"),[1] by and among Carestream Health Holdings, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Parties, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "<u>Transferor</u>"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Party", a "Consenting First Lien Lender," and/or a "Consenting Second Lien Lender", as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| First Lien Term Loan Claims | |
| First Lien Revolving Facility Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests (including Existing Warrants) | |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

**Schedule 1**

**Milestones**

The Company Parties shall implement the Restructuring Transactions in accordance with the following Milestones, each of which may be extended or waived with the consent of the Required DIP Lenders and the Required Consenting First Lien Lenders:

       (a)     No later than August 23, 2022, the Petition Date shall have occurred;

       (b)     No later than two (2) Business Days after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement with the Bankruptcy Court;

       (c)     No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

       (d)     No later than forty-five (45) days after the Petition Date, the Confirmation Order and all other related relief required to be obtained from the Bankruptcy Court to implement the Restructuring Transactions shall have been entered and/or granted, as applicable, by the Bankruptcy Court (the "**Confirmation Date**");

       (e)     No later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order; and

       (f)     No later than sixty (60) days after the Petition Date, the Plan Effective Date shall have occurred (the "**Outside Date**").

## Exhibit C

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

## Introduction

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared the hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by this Liquidation Analysis, Holders of Claims or Interests in Impaired Classes and Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis and values stated herein have not been subject

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and its Debtor Affiliates* (as altered, amended, modified, or supplemented from time to time, the "Plan").

to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Liquidation Analysis should not be used for any other purpose. The Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets, (ii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, (iii) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code, or (iv) additional unsecured and contract breakage claims arising from a chapter 7 liquidation. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind-down costs and trustee fees (together, the "Wind-Down Expenses"). To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Basis of Presentation**

The Liquidation Analysis has been prepared assuming that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about September 30, 2022 (the "Liquidation Date").  Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of June 30, 2022 and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.  The Debtors' management team believes that the June 30, 2022 book value of assets and certain liabilities are a proxy for such book values as of the Liquidation Date.  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of liquidation, wind-down expenses, and trustee fees attributable to the Wind-Down Expenses; (ii) *second*, to pay the secured portions of  the DIP facility, from the respective collateral; (iii) *third*, to pay amounts on the First Lien Claims; (iii) *fourth*, to pay amounts on the Second Lien Claims.  Any remaining net cash would be distributed to creditors holding Unsecured Claims, including deficiency Claims that arise to the extent of the unsecured portion of the Allowed Secured Claims.

This Liquidation Analysis assumes operations of the Debtors and Non-Debtors (the "Liquidating Entities") will cease on the Liquidation Date, and the related individual assets will be sold in a sale under a three-month liquidation process (the "Liquidation Timeline") under the direction of the Trustee, utilizing the Debtors' resources and third-party advisors, to allow for the orderly wind down of the Debtors' estates.  There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.  The Liquidation Analysis is also based on the assumptions that: (i) the Debtors have continued access to cash collateral during the course of the Liquidation Timeline to fund Wind-Down Expenses and (ii) operations, accounting, treasury, IT, and other management services needed to wind down the estates continue.  The Liquidation Analysis was prepared on a by-entity basis for all Liquidating Entities and is displayed below on a consolidated basis for the Debtors for convenience.  Asset recoveries accrue first to satisfy creditor claims at the legal entity level.  To the extent any remaining value exists, it flows to each individual entity's parent organization or appropriate shareholder.  In addition, the Liquidation Analysis includes an analysis of the recovery of pre-petition Intercompany Claims.

## DETAILED LIQUIDATION ANALYSIS

The liquidation analysis for the Liquidation Entities was analyzed on a by-entity basis. The following Liquidation Analysis summary of the consolidated Debtors and should be reviewed in conjunction with the associated notes.

| Carestream Health Liquidation Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Recovery % | | | Proceeds $ | |
| *In $Thousands* | Note: | Book Value | | Low | High | | Low | High |
| Cash and Cash Equivalents | [A] | $ 28,114 | | 100% | 100% | $ | 28,114 | $ 28,114 |
| Accounts Receivable | [B] | 62,564 | | 77% | 86% | | 48,091 | 54,103 |
| Inventory | [C] | 138,411 | | 30% | 39% | | 40,967 | 54,667 |
| Property, Plant, and Equipment | [D] | 125,552 | | 32% | 38% | | 39,833 | 47,857 |
| Intangible Assets | [E] | 162,665 | | 0% | 1% | | 756 | 1,135 |
| Other Assets | [F] | 20,083 | | 9% | 20% | | 1,715 | 4,007 |
| Equity in Non-Debtor Subsidiaries | [G] | NM | | NM | NM | | 2,397 | 2,765 |
| Intercompany Receivables from Non-Debtors | [H] | NM | | NM | NM | | 4,519 | 4,942 |
| Recovery to First Lien Claims from Non-Debtor Guarantees | [I] | NM | | NM | NM | | 44,917 | 55,550 |
| Gross Proceeds from Liquidation | | $ 537,388 | | 39% | 47% | $ | 211,311 | $ 253,138 |
| **Wind-Down Expenses** | [J] | | | | | | | |
| Total Wind-Down Expenses | | | | | | $ | 31,374 | $ 33,316 |
| Total Wind-Down Expense Recovery | | | | | | | 31,374 | 33,316 |
| *Total Wind-Down Expense Recovery %* | | | | | | | *100.0%* | *100.0%* |
| **DIP Claims** | [K] | | | | | | | |
| DIP Claims | | | | | | $ | 85,020 | $ 85,020 |
| DIP Recovery | | | | | | | 85,020 | 85,020 |
| *DIP Recovery %* | | | | | | | *100.0%* | *100.0%* |
| **First Lien Claims** | [L] | | | | | | | |
| First Lien Claims | | | | | | $ | 600,433 | $ 600,433 |
| First Lien Recovery | | | | | | | 94,917 | 134,802 |
| Total First Lien Recovery | | | | | | $ | 94,917 | $ 134,802 |
| *First Lien Recovery %* | | | | | | | *15.8%* | *22.5%* |
| **Second Lien Term Loan Claims** | [M] | | | | | | | |
| Second Lien Term Loan Claims | | | | | | $ | 457,969 | $ 457,969 |
| Second Lien Term Loan Recovery | | | | | | | - | - |
| Total Second Lien Term Loan Recovery | | | | | | | - | - |
| *Second Lien Term Loan Recovery %* | | | | | | | *0.0%* | *0.0%* |
| **General Unsecured Claims** | [N] | | | | | | | |
| General Unsecured Claims | | | | | | $ | 186,177 | $ 186,177 |
| General Unsecured Recovery | | | | | | | - | - |
| *General Unsecured Recovery %* | | | | | | | *0.0%* | *0.0%* |

## Notes to the Liquidation Analysis

[A] <u>Cash and Cash Equivalents</u>: The cash balance represents the estimated balance as of the Liquidation Date. A 100% recovery on cash and equivalents has been estimated for the low and high cases.

[B] <u>Accounts Receivable</u>: The Accounts Receivable balance represents all third-party trade accounts net of any reserves and other miscellaneous accounts receivables. A blended recovery of 77% to 86% has been estimated for the Debtors' receivables based on the high likelihood of recoverability.

[C] <u>Inventory</u>:  Inventory consists of raw materials, semi-finished goods, service parts, and finished goods, many of which are specifically purchased to create goods for certain customers. A moderate likelihood of recoverability exists for these assets and a blended recovery of 30% to 39% has been estimated for the Debtors' inventory which was informed by recent inventory appraisals.

[D] <u>Property, Plant, and Equipment, Net</u>:  Property, Plant & Equipment consists of tangible assets such as real property, buildings, machinery, office equipment, construction-in-progress, and rental products, which have been evaluated for recovery by asset type.  On a blended basis, a recovery of 32% to 38% of the June 30, 2022 net book value has been estimated.

[E] <u>Intangible Assets, Net</u>:  Intangible Assets consist of goodwill, patents, intellectual property, trademarks customer relationships and overall, are unlikely to have significant recoveries.  On a blended basis, a recovery of approximately 0% to 1% has been estimated on the Debtors' intangible assets.

[F] <u>Other Assets</u>:  Other Assets primarily consists of prepaids and various tax receivables and are not expected to have significant economic value in a liquidation scenario.  A blended recovery of 9% to 20% has been estimated for these assets.

[G] <u>Equity in Non-Debtor Subsidiaries</u>:  Equity in Non-Debtor Subsidiaries represents residual equity value after debt and other claims have been paid at non-debtor entities.

[H] <u>Intercompany Receivables</u>:  Intercompany receivables represent claims on other, non-debtor entities.

[I] <u>Recovery to First Lien Claim from Non-Debtor Guarantees</u>:  Recovery to First Lien Claims from Non-Debtor Guarantees represents claims from non-debtor entities that are guarantors to the first lien debt.  Proceeds have been estimated assuming a wind-down of all foreign operations.

[J] <u>Wind-Down Expenses</u>:  Wind-Down Expenses represent the expenses associated with administering the chapter 7 liquidation and existing chapter 11 administrative expenses.  A 3% trustee fee and a 3% cost for related legal and professional fees has been applied to non-cash asset recovery values.  Additionally, an estimated $23.5 million of combined operating expenses and certain priority liabilities (e.g., accrued salary) have been included in the estimated Wind-Down Expenses.  A full recovery is estimated for Wind-Down Expenses.

[K] <u>DIP Claims</u>:  DIP Claims represent the estimated Claims for the DIP.  We anticipate a full recovery for the DIP.

[L] <u>First Lien Claims</u>:  Represents the estimated Claims for the First Lien Lenders.  Based on the available proceeds to pay First Lien Claims, a blended recovery of 16% to 23% has been estimated for the First Lien Claims.

[M] <u>Second Lien Term Loan Claims</u>:  Represents the estimated claims for the Second Lien Term Loan Lenders.  Based on the available proceeds to pay Second Lien Term Loan Claims, no recovery has been estimated for the Second Lien Term Loan Claims.

[N] <u>General Unsecured Claims</u>:  General Unsecured Claims represent an estimate of pre-petition unsecured claims.  No recovery has been estimated for the General Unsecured Claims.

**<u>Exhibit D</u>**

**Financial Projections**

## Financial Projections[1]

The financial projections for the Debtors are based on the Debtors' budget for the remainder of the fiscal year ended December 31, 2022 and for fiscal years 2023–2026 (the "Financial Projections"), as informed by the current and projected conditions in each of the Debtors' markets and businesses.

The Financial Projections were prepared by management with the assistance of the Debtors' advisors and are based on assumptions developed by management with respect to the future performance of the Debtors' operations. Although management prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurances that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Section VIII of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation of the Plan is not likely to be followed by a liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its attainability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

**Principal Assumptions for the Financial Projections**

Houlihan Lokey relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors to Houlihan Lokey (i) have been prepared in good faith, (ii) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (iii) reflect the Debtors' best currently available estimates, and (iv) reflect the good faith judgments of the Debtors. Houlihan Lokey does not offer an opinion as to the attainability of the Financial Projections.

The future financial performance of the Reorganized Debtors is contingent on various factors, many of which are beyond the control or knowledge of the Debtors, and consequently, are inherently difficult to predict. The Reorganized Debtors' actual future results may differ materially

---

[1] Capitalized terms used by not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

1

from the Financial Projections and, as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein. See Section VIII of the Disclosure Statement entitled "Risk Factors". In addition, the assumptions underlying the Financial Projections do not take into account the uncertainty and disruption of the business that may accompany a restructuring pursuant to the Bankruptcy Code.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. See Section VIII of the Disclosure Statement entitled "Risk Factors".

Under Accounting Standards Codification "ASC" 852, "Reorganizations," the Debtors note that the Financial Projections reflect the operational emergence from Chapter 11, but not the impact of fresh-start accounting that may be required upon the Effective Date. Fresh-start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh-start accounting upon emergence, they have not yet completed the work required to quantify the effect upon the Financial Projections, which could be material.

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements that constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' business plan, market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Section VIII of the Disclosure Statement.

**General Assumptions and Methodology**

The Debtors' Financial Projections, which are presented on a consolidated basis, were developed by forecasting the performance of each of the Company's core business segments: Value Tier (which includes digital print film, computed radiography, dental film and other products); Premium Tier (which includes digital radiography and other products and solutions); Non-Destructive Testing; and Contract Manufacturing. In addition, management forecasts corporate expenses that are not allocated to the individual business segments.

Performance for the remainder of fiscal year 2022 is based on management's latest review of the Debtors' annual operating plan and reflects recent performance trends and assumptions through the remainder of the year. For fiscal years 2023 through 2026, management projects annual revenue by business segment and by region as a function of global market trends and management's expectations about potential performance. Specific business drivers, including new product introductions, strategic growth initiatives and productivity improvements, have been incorporated. The Financial Projections do not assume any material acquisitions or divestitures, or entry into adjacent market growth opportunities outside of those currently being implemented.

The Financial Projections are based on the foreign exchange rates utilized in the Company's 2022 budget, which relied upon spot rates as of December 31, 2021.

The Financial Projections consist of the following unaudited, pro-forma financial statements: (i) projected consolidated income statement; (ii) projected consolidated balance sheet; and (iii) projected consolidated statement of cash flows.

**Select Projected Consolidated Income Statement Assumptions**

Revenue: The Debtors' revenues are derived from a range of products and services, including equipment, film and other product sales, along with revenue generated from service and software maintenance contracts and routine service appointments. Within each business segment, the Debtors' finance and sales teams developed revenue projections based on historical and anticipated customer, seasonal and market trends within each region where the Company operates and their corresponding impact on volumes, pricing and changes to contracts. Management also developed estimates regarding the revenue impact of new product and service initiatives.

Cost of Goods Sold: Cost of Goods Sold includes costs incurred in the post-feasibility research and development, manufacture, storage and distribution of the Company's products, as well as service costs and depreciation and amortization expenses that are directly allocable to specific business segments and product offerings.

SG&A and R&D: Selling, general and administrative costs ("SG&A") are projected on a business segment and regional level and include, among other expenses, executive and other corporate employees, sales and marketing-related spend, and depreciation and amortization and R&D costs not included in Cost of Goods Sold. The Financial Projections include the base and bonus components of the Company's current short-term management incentive plans, but do not reflect the impact of any long-term incentive plan component of the Management Incentive Plan.

Provision for Income Tax: The provision for income taxes is calculated as the sum of the application of a blended tax rate to foreign earnings on a transfer pricing basis and a U.S. tax computation including estimated permanent and temporary differences (including tax attributes).

Interest Expense: Interest expense is based on the post-emergence capital structure, as contemplated by the Plan, assumed to be in place on October 1, 2022.

One-Time Costs: One-time costs include, but are not limited to, professional services fees associated with the contemplated transaction and expenses associated with ongoing cost savings initiatives.

Adjusted EBITDA: Adjusted EBITDA (a non-GAAP metric) is utilized by management to evaluate the performance of the business and excludes the impact of what management believes are non-recurring or one-time impacts to the Company's financial statements.

**Select Projected Consolidated Cash Flow Statement and Balance Sheet Assumptions**

Working Capital: The projection of current assets and liabilities reflects management's latest estimates on the current and potential future impacts of supply chain disruptions caused by the post COVID-19 environment and other global macroeconomic factors. Inventory is projected based on historical and anticipated days inventory on hand, accounts receivable based on days sales outstanding, accounts payable based on days payable outstanding, and deferred revenue (which represents amounts invoiced to customers or payments received from customers in advance of satisfying the associated customer obligations) based on a percentage of revenue, each of which utilize unique assumptions by business segment.

Capital Expenditures: Management projects the amount of maintenance capital expenditures and growth capital expenditures required to achieve the projected revenues and expenses for each business segment, based on historical levels of spend and anticipated projects.

Property, Plant & Equipment, Net ("PP&E"): PP&E is stated at cost less accumulated depreciation and amortization.

Goodwill and Other Intangible Assets: Goodwill has been adjusted as of the Effective Date to reconcile total assets with the implied equity value of the Reorganized Debtors, but this non-cash adjustment is not reflected on the Consolidated Income Statement. Actual adjustments to reflect fresh-start accounting may result in a different balance and related expense.

Proceeds / (Repayment) on Debt: Proceeds and repayments are projected based on the terms of the capital structure contemplated by the Plan, specifically a $85 million asset-based lending facility and a $536 million first lien term loan.

4

| Consolidated Income Statement | | 4Q'22B | | 2023P | | 2024P | | 2025P | | 2026P |
|---|---|---|---|---|---|---|---|---|---|---|
| *($ millions)* | | | | | | | | | | |
| Revenue | $ | 318 | $ | 1,165 | $ | 1,187 | $ | 1,207 | $ | 1,243 |
| (-) COGS | | (210) | | (773) | | (793) | | (811) | | (840) |
| **Gross Profit** | | **108** | | **391** | | **394** | | **396** | | **404** |
| (-) SG&A | | (50) | | (199) | | (198) | | (196) | | (197) |
| (-) R&D | | (9) | | (37) | | (39) | | (40) | | (41) |
| (-) Other Expense, Net | | (0) | | (1) | | (1) | | (1) | | (1) |
| **EBIT** | | **48** | | **154** | | **156** | | **158** | | **165** |
| (+) Depreciation & Amortization | | 11 | | 43 | | 43 | | 42 | | 42 |
| **Adj. EBITDA** | | **59** | | **197** | | **199** | | **201** | | **207** |
| Adjustments for Net Income (Loss): | | | | | | | | | | |
| (-) Depreciation & Amortization | | (11) | | (43) | | (43) | | (42) | | (42) |
| (-) Provision for Income Taxes | | (15) | | (40) | | (39) | | (39) | | (41) |
| (-) Interest Expense | | (15) | | (60) | | (53) | | (50) | | (48) |
| (-) One-Time Costs | | (5) | | (2) | | (2) | | (2) | | (2) |
| **Net Income** | $ | **14** | $ | **52** | $ | **62** | $ | **68** | $ | **74** |

| Consolidated Balance Sheet | | 12/31/2022 | | 12/31/2023 | | 12/31/2024 | | 12/31/2025 | | 12/31/2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| *($ millions)* | | | | | | | | | | |
| Current Assets | | | | | | | | | | |
| Cash and Cash Equivalents | $ | 83 | $ | 103 | $ | 153 | $ | 209 | $ | 268 |
| Receivables, Net | | 196 | | 200 | | 206 | | 213 | | 223 |
| Inventories | | 169 | | 171 | | 176 | | 180 | | 188 |
| Other Current Assets | | 26 | | 25 | | 24 | | 24 | | 23 |
| Total Current Assets | | 474 | | 499 | | 560 | | 627 | | 702 |
| Property, Plant and Equipment, Net | | 165 | | 159 | | 154 | | 149 | | 143 |
| Goodwill | | 433 | | 433 | | 433 | | 433 | | 433 |
| Other Intangible Assets, Net | | 8 | | 8 | | 8 | | 8 | | 8 |
| Deferred Tax Assets | | 19 | | 19 | | 19 | | 19 | | 19 |
| Other Long-Term Assets, Net | | 6 | | 6 | | 6 | | 6 | | 6 |
| **Total Assets** | | **1,106** | | **1,125** | | **1,180** | | **1,242** | | **1,312** |
| Current Liabilities | | | | | | | | | | |
| Trade Accounts Payable | | 83 | | 84 | | 88 | | 91 | | 96 |
| Accrued Liabilities | | 173 | | 172 | | 175 | | 178 | | 183 |
| Income Taxes Payable | | 5 | | 5 | | 5 | | 5 | | 5 |
| Current portion of long-term debt and capital leases | | 6 | | - | | - | | - | | - |
| Total Current Liabilities | | 267 | | 261 | | 268 | | 275 | | 284 |
| Long-Term Debt and Capital Leases | | 536 | | 509 | | 495 | | 482 | | 468 |
| Other Liabilities | | 79 | | 79 | | 79 | | 79 | | 79 |
| Deferred Tax Liabilities | | 10 | | 10 | | 10 | | 10 | | 10 |
| **Total Liabilities** | | **892** | | **859** | | **852** | | **846** | | **842** |
| **Total Shareholders' Equity** | | **214** | | **266** | | **328** | | **396** | | **470** |
| **Total Liabilities & Shareholders' Equity** | $ | **1,106** | $ | **1,125** | $ | **1,180** | $ | **1,242** | $ | **1,312** |

| Consolidated Statement of Cash Flows | 4Q'22B | 2023P | 2024P | 2025P | 2026P |
|---|---|---|---|---|---|
| *($ millions)* | | | | | |
| Net (Loss) Income | $ 14 | $ 52 | $ 62 | $ 68 | $ 74 |
| Depreciation & Amortization | 11 | 43 | 43 | 42 | 42 |
| Change in Net Working Capital | 37 | (5) | (4) | (4) | (7) |
| Other Items, Net | (5) | - | - | - | - |
| **Cash Flow from Operations** | **57** | **91** | **101** | **106** | **109** |
| Additions to Property, Plant and Equipment | (15) | (38) | (37) | (37) | (37) |
| **Cash Flow from Investments** | **(15)** | **(38)** | **(37)** | **(37)** | **(37)** |
| Proceeds / (Repayments) on Debt | (41) | (33) | (13) | (13) | (13) |
| **Cash Flow from Financing** | **(41)** | **(33)** | **(13)** | **(13)** | **(13)** |
| **Net Increase in Cash and Cash Equivalents** | $ (0) | $ 20 | $ 50 | $ 56 | $ 59 |
| Cash and Cash Equivalents, Beginning of Period | 83 | 83 | 103 | 153 | 209 |
| Cash and Cash Equivalents, End of Period | 83 | 103 | 153 | 209 | 268 |

**Exhibit E**

**Valuation Analysis**

<div align="center">

**VALUATION ANALYSIS**

</div>

**A. Disclaimer[1]**

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR THE DEBTORS AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS.**

**B. Valuation Estimate**

In connection with developing the Plan, the Debtors directed their investment banker, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), to estimate the going-concern value of the Reorganized Debtors ("Enterprise Value"). This analysis has been prepared for the Debtors' sole use and is based on information provided to Houlihan Lokey by the Debtors.[2]

Based on financial projections provided by the Debtors and subject to the disclaimers and the descriptions of Houlihan Lokey's methodology set forth herein, and solely for purposes of the Plan, Houlihan Lokey estimates the total Enterprise Value of the Reorganized Debtors will be within the range of approximately $658 million to $777 million on an assumed Effective Date of October 1, 2022, with an estimated midpoint of $714 million. The range of total equity value ("Equity Value"), which takes into account the total Enterprise Value less the estimated net debt outstanding as of the Effective Date, was estimated by Houlihan Lokey to be between approximately $158 million and $276 million, with an estimated midpoint of $213 million.[3] The implied total Enterprise Value of the Reorganized Debtors should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated total Enterprise Value for the Reorganized Debtors, Houlihan Lokey: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods provided by the Debtors; (ii) reviewed certain internal financial and operating data of the debtors, including the Financial Projections, which were prepared and provided to Houlihan Lokey by management and which relate to the Debtors' business and its prospects; (iii) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Debtors' *Joint Prepackaged Chapter 11 Plan of Reorganization* filed contemporaneously herewith (as may be amended, modified, or supplemented from time to time, the "Plan") or the Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement"), as applicable.

[2] The analysis herein reflects the combined assets and operations of all Debtor and non-Debtor subsidiaries of the Company.

[3] This Valuation Analysis assumes that the Reorganized Debtors will have, as of the Effective Date, funded net debt obligations of $500 million (comprised of $47 million outstanding under the New First Lien ABL Facility, $536 million of New First Lien Term Loan and unrestricted cash of $83 million)

1

prospects; (iv) reviewed publicly available financial data and considered the market values of public companies deemed by Houlihan Lokey to be potentially comparable to the operating businesses of the Debtors; (v) considered certain economic and industry information relevant to the Debtors' operating businesses; (vi) prepared discounted cash flow analyses based on the financial projections, utilizing various discount rates and assumptions in the calculation of terminal values; (vii) considered the value assigned to certain precedent change-of-control transactions for other businesses that are potentially similar to those of the Debtors; and (viii) conducted such other analyses as Houlihan Lokey deemed appropriate.

Although Houlihan Lokey conducted a review and analysis of the Debtors' business, operating assets and liabilities and business plans, Houlihan Lokey relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors, as well as certain publicly-available information as to which Houlihan Lokey does not have independent knowledge.

The Financial Projections provided by the Debtors to Houlihan Lokey are for the remainder of fiscal year 2022 and for fiscal years 2023 through 2026. Houlihan Lokey has relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors to Houlihan Lokey: (i) have been prepared in good faith; (ii) are based on fully-disclosed assumptions that, in light of the circumstances under which they were made, are reasonable; (iii) reflect the Debtors' best currently-available estimates; and (iv) reflect the good faith judgments of the Debtors. Houlihan Lokey does not offer an opinion as to the attainability of the financial projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and, consequently, are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual total Enterprise Value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of the Debtors' assets were sought or obtained in connection with Houlihan Lokey's valuation. Houlihan Lokey did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Debtors and therefore makes no representations as to their impact on the Debtors' financial statements.

## C. Valuation Considerations

This valuation is based upon information available to, and analyses undertaken by, Houlihan Lokey as of August 18, 2022, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Houlihan Lokey has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to August 18, 2022, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither Houlihan Lokey nor the Debtors have any obligation to update, revise, or reaffirm the valuation.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the Enterprise Value of the Reorganized Debtors.

Further, the valuation of newly-issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 cases or by other factors not possible to predict. Accordingly, the total Enterprise Value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the total Enterprise Value ranges associated with Houlihan Lokey's valuation analysis. The Reorganized Debtors are anticipated to be a private Company that will not be obligated to file public reports or disclosures. There can be no assurance that any trading market will develop for the New Common Stock. The estimated values for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets. Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Houlihan Lokey's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the solvency of the Debtors or the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Valuation estimates are inherently subject to uncertainties, and consequently, none of the Debtors, Houlihan Lokey, or any other professional

3

or person assumes responsibility for any differences between the estimated valuation ranges herein and any actual outcome.

## D. Valuation Methodology

In preparing its valuation, Houlihan Lokey performed a variety of financial analyses and considered a variety of factors. Several generally accepted valuation techniques for estimating the Debtors' enterprise value were considered. Houlihan Lokey largely relied on a Discounted Cash Flow ("DCF") analysis, after considering a Comparable Public Company Analysis and a Precedent Transactions Analysis; however, the lack of publicly-traded comparable companies and M&A transactions involving companies that have similar business, financial and operating characteristics to the Reorganized Debtors make the results of these analyses inapplicable. Houlihan Lokey also took into consideration and relied upon the results of the Sale Process undertaken by the Company prior to filing for bankruptcy.

The summary herein does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions. The preparation of a valuation is a complex process involving various quantitative and qualitative determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors to the particular circumstances of the Debtors. As a result, the process involved in preparing a valuation is not readily summarized.

[*Remainder of page intentionally left blank*]