## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CARESTREAM HEALTH, INC., *et al.*,[1] | Case No. 22-10778 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF SCOTT H. ROSA,
## CHIEF FINANCIAL OFFICER OF CARESTREAM HEALTH, INC.,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Scott H. Rosa, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of Carestream Health, Inc. ("Carestream Health," and together with the other above-captioned debtors and debtors in possession, the "Debtors," and collectively with their non-debtor affiliates, "Carestream" or the "Company").

2.      I have approximately seventeen years of experience in the healthcare technology sector, with particular expertise in finance, accounting, and corporate operations. I received a Bachelor of Science degree in accounting from SUNY Geneseo in 1996, and I am a Certified Public Accountant in the State of New York. From September 1996 until September 2002, I worked at Pricewaterhouse Coopers, where I served as an Assurance Manager for both large public and mid-sized private companies. From September 2002 until January 2007, I served as Controller within various business units at Carestream's predecessor, Eastman Kodak Company ("Kodak"), including serving as the Controller for Kodak's Health Group. Following the May 2007

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

acquisition of Kodak's Health Group by Onex Corporation (together with its affiliates, "Onex"), I served as Controller of Carestream. During the Company's formation, I was an initial member of the Company's finance leadership team and I helped establish the Company's finance department and its operating mechanisms. I also assisted with multiple acquisitions and divestitures while in that role. In August 2018, I was appointed Chief Financial Officer of Carestream.

3.      Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court") on August 23, 2022. To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions"). The facts set forth in each First Day Motion are incorporated herein by reference. I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

4.      As the Chief Financial Officer of Carestream, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

**Introduction**

5.     Originally formed as Kodak's Health Group, Carestream is a leading global provider of innovative medical imaging and non-destructive testing products with over 100 years of industry experience.  In 2007, the Company was acquired by Onex.  Carestream is a partner of choice to approximately 8,000 direct customers and 900 dealers that distribute its products to more than 50,000 end users in more than 130 countries.  Carestream's products are used by major health systems, hospitals, imaging centers, specialty practices, and industrial companies worldwide. Headquartered in Rochester, New York, Carestream, through its global workforce of approximately 3,410 employees, offers best in class products and materials to its customers.  As of the date hereof, among other obligations, the Debtors[2] have approximately $1,032.9 million in aggregate outstanding principal amount of funded debt obligations, consisting of approximately:

- $507.7 million in first lien term loan indebtedness;
- $77.0 million in outstanding first lien revolver borrowings; and
- $448.2 million in second lien term loan indebtedness.

6.     As further described herein, Carestream has spent significant time over the past several months working together with its existing lenders to explore strategic alternatives to best position the Company for success.  The Plan[3] reflects the culmination of those efforts and seeks to implement a comprehensive recapitalization of the Debtors' balance sheet with overwhelming creditor support.  Specifically, after extensive diligence and arms' length negotiations with an

---

[2]   The Debtors in these chapter 11 cases are Carestream's U.S. subsidiaries.  For the avoidance of doubt, none of Carestream's international entities are Debtors in these chapter 11 cases, and such entities will continue to operate in the ordinary course during the pendency of these chapter 11 cases.

[3]   Capitalized terms used but not defined herein have the meanings ascribed to them in the in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "Plan") or the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), as applicable.

ad hoc group of holders of First Lien Claims and Second Lien Term Loan Claims (the "Crossover Group"), the Debtors reached an agreement with their Sponsor, First Lien Lenders holding more than 70 percent of the outstanding First Lien Claims, and Second Lien Lenders holding more than 99 percent of the outstanding Second Lien Term Loan Claims on the terms of the restructuring transactions set forth in that certain restructuring support agreement, dated as of August 21, 2022 (the "Restructuring Support Agreement," and the transactions contemplated thereby, the "Restructuring Transactions").  To facilitate the implementation of the Restructuring Transactions, concurrently with the execution of the Restructuring Support Agreement, (i) certain members of the Crossover Group have committed to provide the Debtors with up to $80 million in debtor-in-possession financing to cover the administrative costs of these chapter 11 cases and to bolster the Debtors' liquidity upon their exit from chapter 11, and (ii) certain parties, including certain First Lien Lenders, have committed to provide an $85 million New ABL Facility to support the Debtors' working capital needs following emergence.  Importantly, the Plan will also deleverage the Debtors' balance sheet by approximately $470 million.

7.     The key terms of the Restructuring Transactions, as reflected in the Plan, include the following:

- certain members of the Crossover Group have committed to provide the Debtors with access to up to $80 million in debtor-in-possession financing consisting of (a) a $5 million tranche that will be repaid in full in cash, and (b) a $75 million tranche that will be partially satisfied with proceeds of an equity rights offering, if any, and the remainder will be equitized into the New Common Stock through the DIP Rollover, subject to dilution by the Debtors' Management Incentive Plan;

- each holder of an Allowed First Lien Claim shall receive (a) cash in an amount equal to 3% of its Allowed First Lien Claim and (b) its pro rata share of the New Term Loan Facility in aggregate principal amount between $536 million and $547 million (depending on the level of participation in the ABL Roll Option) for the remainder of its claim, *provided* that holders of Allowed First Lien Revolving Claims may elect to roll a portion of their Allowed First Lien

Revolving Claims into new loans under the New ABL Facility pursuant to the ABL Roll Option;

- the Debtors' existing Second Lien Term Loan will be cancelled and each holder of an Allowed Second Lien Term Loan Claim shall receive its pro rata share of (a) 10% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan, and (b) the right to purchase for cash its pro rata share of 80% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan;

- each Holder of an Allowed General Unsecured Claim will be paid in full in cash or have its claim reinstated; and

- existing equity interests will be cancelled on the Effective Date.

8.      To provide the Reorganized Debtors with sufficient liquidity as a going concern, the Reorganized Debtors will enter into the New ABL Facility upon the Debtors' emergence from chapter 11.  Certain parties, including certain First Lien Lenders, have committed to provide the Reorganized Debtors with the New ABL Facility in an aggregate principal amount of $85 million.

9.      Notably, the Plan leaves general unsecured creditors unimpaired and will allow the Debtors to minimize disruptions to their go-forward operations while effectuating a value-maximizing transaction through the chapter 11 process.  In light of the foregoing, the Debtors expect to continue operating normally throughout the court-supervised process and remain focused on serving their customers and working with suppliers on normal terms.  With the overwhelming support of their lenders, the Debtors are seeking authority to move through the chapter 11 process on an expedited basis to implement the Restructuring Transactions as set forth below.

10.     The Debtors believe that the deleveraging and liquidity-enhancing Restructuring Transactions set forth in the Plan represent a value-maximizing path forward.  Consummation of the Restructuring Transactions will position the Debtors to capitalize on their core strengths— including their leading imaging, non-destructive testing, and contract manufacturing business—to achieve long-term success.  In my opinion, the Plan is in the best interests of the Debtors' estates

and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions to ensure the Debtors' long-term viability.

11. On August 21, 2022 (the "Solicitation Commencement Date"),[4] the Debtors launched solicitation of votes on the Plan, and as of the Petition Date, Holders of approximately 73% of First Lien Claims and approximately 98% of Second Lien Term Loan Claims have accepted the Plan. Moreover, as soon as practicable following the Court's approval of the Scheduling Motion,[5] the Debtors will send a notice (the "Combined Hearing Notice")[6] to all parties listed on their creditor matrix. The Debtors also will post the Combined Hearing Notice on the Debtors' public restructuring website (along with the Plan and the Disclosure Statement), and they have arranged for a shorter-form version of the Combined Hearing Notice to be published in *The New York Times* (national and international editions) and the *Rochester Democrat and Chronicle*.

12. In my opinion, it is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these chapter 11 cases. Given that the Plan has been accepted by all Holders of First Lien Claims and Second Lien Term Loan Claims that submitted ballots and pays all other claims in full, a prolonged stay in chapter 11 is unnecessary and would result in significant incremental administrative costs and business disruption. Furthermore, pursuant to the milestones

---

[4]   The Debtors' solicitation process is discussed in greater detail in the Disclosure Statement and the Scheduling Motion (as defined herein).

[5]   The "Scheduling Motion" refers to the *Debtors' Motion for entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Approving the Rights Offering Procedures and Related Dates, Deadlines, and Notices, (V) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports*, filed contemporaneously herewith.

[6]   The proposed Combined Hearing Notice clearly discloses, among other things, the Debtors' proposed timeline for these chapter 11 cases, including the proposed confirmation hearing date and confirmation objection deadline, the treatment of stakeholders under the Plan, and the contemplated release provisions.

in the Restructuring Support Agreement, the Debtors must obtain confirmation of the Plan within 45 days of the Petition Date. Accordingly, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date and Rights Offering Record Date | August 15, 2022 |
| Solicitation Commencement Date | August 21, 2022 |
| Voting Deadline and Rights Offering Subscription Deadline | August 22, 2022, at 12:00 p.m., prevailing Eastern Time |
| Petition Date | August 23, 2022 |
| Service of Combined Hearing Notice | As soon as practicable following approval of the Combined Hearing Notice |
| Initial Plan Supplement Deadline | September 14, 2022 |
| Objection Deadline | September 21, 2022, at 5:00 p.m., prevailing Eastern Time |
| Deadline to File Confirmation Brief and Reply | September 26, 2022, at 12:00 p.m., prevailing Eastern Time |
| Combined Hearing | September 28, 2022, subject to Court availability |

13.     The Plan has been accepted by all impaired creditors entitled to vote that submitted ballots, and the Debtors will provide notice to all parties in interest such that they will have had ample notice of and opportunity to participate in these chapter 11 cases. The expeditious confirmation of the Plan and consummation of the Restructuring Transactions are therefore in the best interests of the Debtors, their estates, and all interested parties.

14.     To further familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into four sections as follows:

- **Part I** provides a general overview of the Debtors' organizational history and business operations;

- **Part II** provides an overview of the Debtors' prepetition organizational and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in the First Day Motions.

## I. Carestream's History and Business Operations

### A. Corporate History

15.     As noted above, the Company began as Kodak's Health Group and has been a leader in medical imaging and testing products for over a century. Kodak introduced the first X-ray specific medical imaging paper in 1886 and developed innovative products designed for radiation detection, cardiology, dentistry, mammography, and oncology, among other disciplines. In 2007, the Company was acquired by Onex and certain minority shareholders for $2.35 billion. The Company was named "Carestream," after its prominent healthcare IT product, the Carestream Picture Archiving and Communication System. At the time of its acquisition, the Company provided medical, dental, molecular imaging, healthcare IT, and non-destructive testing products to a broad customer base of distributors, healthcare systems, and medical and dental professionals around the world. Today, Carestream is a partner of choice to approximately 8,000 direct customers and 900 dealers that distribute its products to more than 50,000 end users in more than 130 countries. Carestream is the number one producer of digital print film, number two producer of digital radiography equipment, and number three producer of non-destructive testing products globally.

### B. Business Operations and Product Lines

16.    As further detailed below, the Company's business is comprised of three main product lines: (a) medical film, (b) medical digital, and (c) non-destructive testing. The Company's medical film product line includes printer systems, laser imaging films, and dental film, and accounts for approximately 44% of the Company's revenue. The medical digital product line includes digital radiography stationary and mobile units, as well as digital detector systems, and accounts for approximately 35% of the Company's revenue. The non-destructive testing product line includes digital and traditional non-destructive testing products and accounts for approximately 9% of the Company's revenue. In addition, the Company provides contract manufacturing services to third parties, which account for approximately 12% of the Company's revenue.

### 1. Medical Film

17.    The Company's medical film product line, which generated approximately $502 million in 2021, is the largest driver of the Company's revenue. Carestream's medical film products include printer systems and films that are used to print physical images from digital imaging equipment (*e.g.*, X-Ray, MRI, CT, etc.) for diagnosis, referral, or archiving purposes. These printers utilize Carestream film, resulting in high rates of customer retention and recurring purchases. The Company has a 37% market share in this space globally, with a base of approximately 75,000 printers.

 

(*Carestream medical film and packaging*)

### 2. Medical Digital

18.    The Company's medical digital product line offers a portfolio of fixed and mobile general radiography systems, including X-ray equipment able to produce digital images for real-time patient diagnoses.  In tandem with these products, the Company provides a full spectrum of related services to its customers, including but not limited to, maintenance agreements, system implementation, and upgrades.  Key products in this category include the DRX-Evolution Plus premium room offering and the DRX-Revolution mobile X-ray system accompanied with a broad selection of DR detectors.  During the past twelve months, the Company's medical digital line was the second largest driver of the Company's revenue, accounting for approximately $402 million of revenue.



(*Carestream's DRX-Evolution Plus System, DRX-Revolution Mobile X-ray System*)

### 3. Non-Destructive Testing

19.    The Debtors offer a portfolio of non-destructive testing products, including film-based and digital imaging products used to test the quality and integrity of materials and structures, such as motor vehicle components, aircraft components, bridges, pipelines, and trains. The Company's non-destructive testing line accounted for approximately $103 million of the Company's revenue in 2021.  Approximately 80% of the Company's revenue from its non-

destructive testing line is derived from traditional non-destructive physical testing products such as film, chemicals, and processors, with the remainder of such revenue derived from the sale of higher-margin digital offerings.  The Company's wide range of non-destructive testing offerings hold a global market share of approximately 25% in this space.

 

(*Exposure Interface Box, and example materials testing software*)

### 4.      Contract Manufacturing

20.      In addition to the Company's three primary product lines, the Company provides contract manufacturing services to deliver precision-coated products for industrial customers and competitors operating in the Company's vertical markets.  The Company capitalizes on its full medical supply chain and materials coating experience to provide leading manufacturing capabilities for its clients.  The contract manufacturing business generated approximately $103 million of revenue in 2021.

### 5.      Operations

21.      The Company has a global manufacturing and distribution network with facilities in Rochester, New York; Windsor, Colorado; White City, Oregon; Guadalajara, Mexico; Varginha, Brazil; Xiamen, China; Shanghai, China; Singapore; and Dordrecht, Netherlands.

The Company's facilities have a combined total footprint of approximately 1.5 million square feet that allow Carestream to service customers and distributors in more than 130 counties.

## II.     Carestream's Organizational Structure and Prepetition Capital Structure

### A.     Carestream's Organizational Structure

22.     Carestream's current organizational structure is reflected, in simplified form, in the following chart.  A comprehensive organizational chart is attached hereto as **Exhibit A**.



### B.     Carestream's Prepetition Capital Structure

23.     As of the Petition Date, the Debtors have approximately $1,032.9 million in aggregate outstanding principal amount of funded debt obligations.  Each of the Debtors in these chapter 11 cases are obligors under the First Lien Credit Agreement and the Second Lien Credit Agreement (each as defined below).

| *Funded Debt* | *Approximate Outstanding Principal Amount* |
| --- | --- |
| First Lien Term Loan Facility | $507.7 million |
| First Lien Revolving Loan Facility | $77.0 million |
| Second Lien Term Loan Facility | $448.2 million |
| | |
| ***Total Funded Debt Obligations*** | $1,032.9 million |

### 1. First Lien Term Loan Facility

24.     Carestream Health Holdings, Inc. ("Carestream Holdings"), as holdings, Carestream Health, as Company and Term Loan Borrower,[7] the several lenders party thereto (the lenders under the First Lien Credit Agreement (as defined below), collectively, the "First Lien Lenders"), and Credit Suisse AG, Cayman Islands Branch ("Credit Suisse Cayman"), as Administrative Agent, are each party to that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013 (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement," the term loan facility thereunder, the "First Lien Term Loan Facility," and the revolving loan facility thereunder, the "First Lien Revolving Loan Facility").[8]

25.     The First Lien Term Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors (as defined in the First Lien Credit Agreement) and is secured on a first priority basis (*pari passu* with the First Lien Revolving Loan Facility) by substantially all of the Debtors' assets.

26.     The First Lien Term Loan Facility matures on May 8, 2023, and accrues interest at a rate of LIBOR plus 6.75% per annum.  As of the Petition Date, approximately $507.7 million in aggregate principal amount remains outstanding under the First Lien Term Loan Facility.

### 2. First Lien Revolving Loan Facility

27.     The First Lien Revolving Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors and is secured on a first-priority basis (*pari passu* with the First Lien Term Loan Facility) by substantially all of the Debtors' assets.

---

[7]     On December 31, 2017, Onex Carestream Finance LP ("Onex Finance"), the Term Loan Borrower under the original First Lien Credit Agreement, assigned its obligations as Term Loan Borrower to Carestream Health.

[8]     The First Lien Credit Agreement has been subsequently amended or supplemented on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020, April 13, 2020, May 8, 2020, and October 14, 2020.

28.     The First Lien Revolving Loan Facility matures on May 8, 2023, and accrues interest at a rate of LIBOR plus 6.75% per annum (subject to adjustments pursuant to the First Lien Credit Agreement).  As of the Petition Date, approximately $77.0 million in aggregate principal amount remains outstanding under the First Lien Revolving Loan Facility.

### 3.     Second Lien Term Loan Facility

29.     Carestream Holdings, as holdings, Carestream Health, as Company and Term Loan Borrower,[9] the several lenders party thereto (the "Second Lien Term Lenders"), and Credit Suisse Cayman, as Administrative Agent, are each party to that certain Second Lien Credit Agreement, dated as of June 7, 2013 (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement" and the term loan facility thereunder, the "Second Lien Term Loan Facility").[10]

30.     The Second Lien Term Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors (as defined in the Second Lien Credit Agreement) and is secured on a second-priority basis to the First Lien Term Loan Facility and First Lien Revolving Loan Facility by substantially all of the Debtors' assets.

31.     The Second Lien Term Loan Facility matures on August 8, 2023, and accrues interest at a rate of LIBOR plus 4.50% per annum payable in cash and 8% per annum payable in kind (subject to adjustments pursuant to the Second Lien Credit Agreement).  As of the Petition Date, approximately $448.2 million in aggregate principal amount remains outstanding under the Second Lien Term Loan Facility.

---

[9]     On December 31, 2017, Onex Finance, the Term Loan Borrower under the original Second Lien Credit Agreement, assigned its obligations as Term Loan Borrower to Carestream Health.

[10]    The Second Lien Credit Agreement has been subsequently amended or supplemented on June 9, 2017, December 27, 2018, April 11, 2019, January 29, 2020, April 13, 2020, May 8, 2020, October 14, 2020, and December 30, 2020.

### 4. Equity Interests

32.     Onex holds the majority of the equity interests of Debtor Carestream Holdings, the ultimate parent of the Debtors.  The remaining shares of Carestream Holdings are primarily held by current and former management of the Debtors.

## III.  Events Leading to These Chapter 11 Cases

### A.  Industry Headwinds and the COVID-19 Pandemic

33.     In recent years, the medical imaging business has faced challenges resulting from decreasing demand for traditional film products and downward pricing pressures.   While the Company has maintained consistent sales volume for medical film products in developing markets, it has seen a shift in demand to digital-only products in developed markets.   In the last ten years, Company sales to developed market buyers as a portion of all digital print product sales have fallen from approximately 24% to just 4%.   These market changes have had a significant impact on the Company's earnings, as medical digital products generate lower EBITDA than medical film.   In emerging markets, the Company has faced downward pricing pressures due to competitive pressures as well as government efforts to reduce the cost of healthcare.   As an example, in 2018, the Chinese government created the National Healthcare Security Administration (NHSA), which uses volume-based procurement strategies to secure testing and imaging products on a consolidated basis for healthcare purchasers across the country.   While the Company has focused on decreasing costs to maintain a competitive margin in digital print film, it has seen revenue declines of approximately $100 million since 2018.

34.     These trends across the medical film industry were further exacerbated by COVID-19 restrictions, which impacted volumes due to delayed routine medical exams and closed dental operations.   The resulting fallout of COVID-19 is still affecting the Company's business today.   Periodic lockdowns, staffing shortages, the increased prevalence of virtual medical

appointments, further delay of certain medical tests and procedures, and the continued shift towards digital-only products continues to exert downward pressure on the Company's film sales volume. The Company, like many other businesses today, has also faced substantial disruption across its global supply chain, increasing input costs for product components and delaying delivery of products and testing modules to customers and distributors. Finally, global inflationary pressures have created further challenges for maintaining product margins.

### B. Prepetition Restructuring Efforts

### i. Term Loan Extensions and Sale Process

35. Leading up to the COVID-19 pandemic, the Debtors faced mounting headwinds to their business and upcoming maturities under their debt facilities. As noted above, the medical imaging business has seen significant shifts in developed markets to digital-only products, counter to the historic print-focus of the Debtors' product line. In emerging markets, the Debtors faced downward pricing pressures with buyers consolidating and driving further pricing concessions. In early 2020, facing a constrained liquidity position as a result of these challenges, the Company commenced discussions with its lenders to address the approaching February 2021 and June 2021 maturities under the First Lien Credit Agreement and Second Lien Credit Agreement, respectively. In May 2020, the Company and its lenders successfully amended both facilities to extend the maturity date under the First Lien Credit Agreement to May 2023 and the maturity date under the Second Lien Credit Agreement to August 2023. As part of the amendment negotiations, the Company committed to achieving significant annual cost savings, among other things. Following execution of the amendments under the debt facilities, the Company continued to explore various liquidity enhancing opportunities by investing in select growth initiatives to mitigate certain business headwinds, and by adapting its product offerings to comport with recent product demand.

In September 2020, the Company retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to advise the Company on strategic transaction alternatives with respect to a potential sale process (the "Sale Process"), as contemplated by the amended Second Lien Credit Agreement.

36.     In February 2021, Houlihan Lokey began marketing the Company, contacting more than 145 financial and strategic buyers, 57 of which executed non-disclosure agreements and received initial diligence materials.  In April 2021, four parties submitted initial indications of interest and three were subsequently invited to complete further diligence, including meeting with members of the Company's management team.  Following completion of additional diligence by these parties, each of these parties indicated that their bid valuation would be less than the principal amount of the Company's funded debt.  Upon receiving this feedback, Houlihan Lokey approached several additional potential buyers and re-approached parties included in the initial outreach. Ultimately, all of the bids received by the Company in the Sale Process were at pricing levels below the principal amount of the Company's funded debt.  Accordingly, the Company proactively sought to explore alternate, comprehensive restructuring solutions.

### ii.     Entry into the Initial Restructuring Support Agreement

37.     In September 2021, the Crossover Group organized and engaged advisors to begin negotiations with the Company regarding the terms of a comprehensive restructuring transaction. Following months of arm's-length negotiations, on April 22, 2022, the Company and certain First Lien Lenders and Second Lien Term Lenders entered into a restructuring support agreement (the "Initial RSA").  The Initial RSA provided for a toggle approach, contemplating an out-of-court voluntary debt restructuring (the "Out-of-Court Restructuring") in the event certain consent thresholds were reached, and an in-court chapter 11 process if the Company was unable to effectuate the Out-of-Court Restructuring.  Specifically, under the Initial RSA, the Company

agreed to pay all then outstanding first lien claims in full from the proceeds of a new first lien term loan facility (the "Anticipated New 1L Facility") and the holders of second lien term loan claims agreed to exchange their claims for their pro rata share of (a) a new subordinated secured debt facility and (b) 100% of the equity interests in the reorganized Company, subject to dilution. Certain members of the Crossover Group committed to backstopping the Anticipated New 1L Facility subject to the Company achieving satisfactory corporate and debt ratings.

### iii. Initial RSA Financing Process

38.     To market the Anticipated New 1L Facility, the Company retained JPMorgan Chase Bank, N.A. ("JPM") in June 2022. While JPM was marketing the financing, the U.S. credit markets shifted dramatically and demand for participation in similar refinancings was substantially diminished. Preliminary feedback from market participants indicated that market terms would be less favorable than the backstopped terms provided by certain members of the Crossover Group. Accordingly, the Company sought to enforce the Crossover Group's backstop commitment under the Initial RSA.

39.     In July 2022, the Company received a determination that the resulting facility would not achieve the necessary rating required by the Initial RSA. Accordingly, the Company was unable to satisfy the conditions to exercise the backstop rights under the Initial RSA. As a result of the foregoing, the Company faced a funding shortfall of approximately $142 million for the refinancing. The remaining Backstop Parties were unable to fund the deficiency and instead the Company and its stakeholders entered into further negotiations regarding a potential consensual path forward. Following extensive, good faith negotiations, the parties mutually agreed to implement a new consensual transaction that would account for the Company's financing needs.

### iv.    Entry into the Restructuring Support Agreement

40.    The Company and the Crossover Group commenced negotiations regarding the optimal path forward for the Company.   After extensive, arm's-length negotiations, on August 21, 2022, the Debtors and the parties to the Initial RSA terminated the Initial RSA and the Debtors and certain of their lenders, including the Crossover Group, entered into the new Restructuring Support Agreement with the Sponsor.   The Restructuring Support Agreement provides for a comprehensive in-court restructuring whereby the Restructuring Transactions will be implemented through an equity rights offering, entry into a new term loan facility and a new asset based revolving facility, and a debt-for-equity exchange, as further detailed in the Disclosure Statement and the Plan.   Importantly, the Restructuring Support Agreement provides that all general unsecured claims, including employee and vendor obligations, will be paid in full in cash or reinstated.

41.    The Restructuring Support Agreement provides for the reorganization of the Debtors as a going concern with a substantially deleveraged capital structure and sufficient liquidity to implement the Debtors' go-forward business plan.  Consummation of the Restructuring Transactions will reduce the Debtors' total funded debt obligations by approximately $470 million through an equitization of the Second Lien Term Loan Claims and will provide the Debtors with up to $75 million of new money through the Rights Offering. The Restructuring Support Agreement represents the successful culmination of months of restructuring efforts and a significant compromise and continued commitment to the Debtors' future by its key creditor constituencies.

## IV.    Proposed Timeline for These Chapter 11 Cases.

42.    Under the Restructuring Support Agreement, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions.

The Debtors have requested through the Scheduling Motion that the Combined Hearing be held on September 28, 2022 (or as soon thereafter as the Court's schedule allows), and the Debtors intend to emerge from chapter 11 as soon as practicable after the Combined Hearing.

43.     In my opinion, the Debtors must proceed promptly through confirmation and emergence to preserve value for the benefit of the Debtors' estates.  A swift emergence from chapter 11 will mitigate uncertainty among employees, customers, and vendors, minimize disruptions to Carestream's supply chain and business, and curtail professional fees and administrative costs.  I believe that expeditious confirmation of the Plan and consummation of the Restructuring Transactions is in the best interests of the Debtors, their estates, and their stakeholders, especially because Holders of approximately 73% of First Lien Claims and approximately 98% of Second Lien Term Loan Claims have voted to accept the Plan.

**V.     The Debtor-in-Possession Financing and Use of Cash Collateral**

44.     During these chapter 11 cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on hand, to (a) satisfy payroll obligations, (b) honor all obligations under their customer contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.  Such cash, however, is likely insufficient to meet the Debtors' liquidity needs.  Accordingly, the Debtors seek access to the liquidity provided by the DIP Facility during the pendency of these chapter 11 proceedings.

45.    The material terms of the DIP Facility are as follows:

| | |
|---|---|
| **Company Parties** | ▪ Carestream Health, Inc. (as Borrower) and Carestream Health Holdings, Inc. and each material domestic subsidiary of the Borrower (as Guarantors), each of which shall be a Debtor |
| **Commitment Parties** | ▪ Ten separate lenders in the Crossover Group |
| **Facility** | ▪ $80 million multiple-draw, super-priority, senior secured term loan facility secured by all assets of the Borrower / Guarantors<br>   - $50 million available for funding on the Interim Closing Date<br>   - $30 million to be funded on the Interim Closing Date<br>▪ Tranche A ($5 million) and Tranche B ($75 million) |
| **Rate** | ▪ Interest Rate: SOFR (1% floor) + 9.00% cash, payable monthly in cash<br>▪ Undrawn DIP Fee: 1.00% per annum on the unused DIP Commitment amount, payable monthly in cash |
| **Adequate Protection** | ▪ Adequate protection payments equal to contractual (non-default) debt service on the existing 1L Revolver and 1L Term Loan |
| **Maturity** | ▪ DIP Loans to mature and become payable on the earlier of:<br>   - 75 calendar days after the Petition Date, subject to no more than 2 extensions of 30 days each<br>   - 45 calendar days after the Petition Date if the Final DIP Order has not been entered by such date<br>   - Select other milestones (including termination of the RSA by the Required Consenting 1L Lenders and other events) |
| **DIP Budget, Reporting, & Variances** | ▪ 13-week cash flow forecast delivered to and approved by the Required DIP Lenders prior to the Petition Date, and updated every four weeks thereafter (subject to Required DIP Lender approval)<br>▪ Weekly Variance Report to be delivered by 5pm ET each Thursday<br>▪ Permitted Variances from DIP Budget: No less than 85% of aggregate receipts and no more than 115% of aggregate operating disbursements during first four-week period; no less than 90% and no more than 110% for each four-week period thereafter |
| **Fees** | ▪ DIP Commitment Fee: 2.00% on the aggregate DIP Commitment amount, paid in-kind, earned upon execution of the Commitment Letter<br>▪ Exit Fee: 4.00% cash fee on the DIP Loans, earned upon entry of the Interim DIP Order, paid in cash upon exit / termination |

46.    As laid out more fully in the *Declaration of Andrew Turnbull in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, the DIP Facility

represents the best and only financing terms available to the Debtors under the circumstances. I believe that the terms of the DIP Facility and DIP Documents, including the DIP Budget (as defined therein), and the form and amount of adequate protection provided to the prepetition secured parties, are fair and appropriate under the circumstances and in the best interests of the Debtors' estates.

47. The transactions contemplated by the Restructuring Support Agreement and the Plan will position Carestream for long-term success and will ensure that its vendors have a financially sound go-forward business partner. After an extensive review process, the Debtors have determined that the transactions set forth in the Restructuring Support Agreement and Plan present the Debtors with a viable path forward to maximize value for all stakeholders.

## VI. First Day Motions

48. On the Petition Date, the Debtors filed the following First Day Motions:

- **DIP Motion**. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*

- **DIP Sealing Motion**. *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact Certain Portions of the Letters Related to the DIP Facility.*

- **Cash Management Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief.*

- **All Claims Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of All Accounts Payable Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Satisfaction of Obligations Related Thereto, and (V) Granting Related Relief.*

- **Utilities Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services,*

*(II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief.*

- **Wages Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief.*

- **Customer Programs Motion**. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief.*

- **Insurance Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered Into Prepetition and Pay-Related Prepetition Obligations, and (B) Renew, Supplement, Modify, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief.*

- **Taxes Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief.*

- **NOL Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief.*

- **Scheduling Motion**. *Debtors' Motion for entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Approving the Rights Offering Procedures and Related Dates, Deadlines, and Notices, (V) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports.*

- **Creditor Matrix Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, (B) File A Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable Information, and (II) Granting Related Relief.*

- **Exit ABL Motion**. *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Entry into the Exit ABL Facility Commitment Documents, (II) Authorizing Payment of Expenses and Fees Thereunder, and (III) Granting Related Relief.*

- **Exit ABL Sealing Motion**. *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact Certain Portions of the Exit ABL Facility Commitment Documents.*

- **Joint Administration Motion**. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- **Kurtzman Carson Consultant LLC 156(c) Retention Application**. *Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of August 23, 2022.*

49.      I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

50.      Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is:  (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value; (b) critical to the Debtors' achieving a successful restructuring; and (c) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

* * * * * *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 23, 2022

*By: /s/ Scott H. Rosa*
Name: Scott H. Rosa
Title:  Chief Financial Officer of
Carestream Health, Inc., on behalf of itself and each
of its Debtor affiliates