`

## Exhibit A

**Redacted DIP Motion**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) Case No. 22-10778 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS**
**AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING**
**ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,**
**(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion:[2]

**<u>Preliminary Statement</u>**

1.    After several months of exploring options to address their capital structure, the

Debtors commenced these prepackaged chapter 11 cases with a clear path to exit from bankruptcy

and emerge as a stronger, better-capitalized business.  Prior to the commencement of these chapter

11 cases, the Debtors entered into a restructuring support agreement ("<u>RSA</u>") with holders of more

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232).  The location of the Debtors' service address is:  150 Verona Street, Rochester, New York 14608.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Scott H. Rosa, Chief Financial Officer of Carestream Health, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith.  Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), as applicable.

than 70% in principal amount of their First Lien Claims and more that 99% in principal amount of their Second Lien Term Loan Claims (both as defined in the Plan), which contemplates a comprehensive restructuring whereby certain restructuring transactions will be implemented through an equity rights offering, entry into a new term loan facility and a new asset based revolving facility, and a debt-for-equity exchange through a consensual prepackaged chapter 11 plan (the "Plan").  Importantly, the Plan will also deleverage the Debtors' balance sheet by approximately $470 million.

2.      To that end, as part of the RSA, the Debtors negotiated the terms of the consensual use of cash collateral (as defined in section 363(a) of the Bankruptcy Code) ("Cash Collateral") and an $80 million debtor-in-possession term loan credit facility (the "DIP Facility") provided by certain of their prepetition Second Lien Lenders (as defined in the Interim Order) to ensure the Debtors have adequate liquidity during these chapter 11 cases.  Access to the proposed DIP Facility will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis.  Indeed, the DIP Facility and the RSA demonstrate the belief of the Debtors' existing lenders in the value of the Debtors' business and send a strong signal to the market that the Debtors will have the liquidity necessary to emerge a stronger, well-capitalized company.  If approved, the Debtors will use the liquidity provided by the DIP Facility and their continued access to Cash Collateral to, among other things, pay critical obligations such as employee wages and benefits, procure goods and services from vendors, fund the administration of these chapter 11 cases, and/or satisfy other working capital needs.  The relief requested herein therefore is necessary for the continued operation of the Debtors' business and the preservation of their property, and thus is unquestionably in the best interests of the Debtors, their estates, and their creditors.

3.      Significantly, the proposed $80 million DIP Facility is comprised entirely of new money financing:  that is, the Debtors are not seeking to "roll-up" the prepetition term loan under the DIP Facility, nor do the Debtors seek to prime any creditors without their consent.  As described below and in the supporting declarations, the Debtors' proposed DIP Facility is the product of arm's-length negotiations with their existing lenders.  The Debtors are not aware of any third party who is willing to provide postpetition financing to the Debtors on more favorable terms under the circumstances:  notably, the Debtors are unable to obtain financing junior to the Prepetition Secured Credit Facilities (as defined herein), and the Prepetition Secured Parties (as defined herein) will not consent to a priming third party financing.  Notably, the DIP Lenders have agreed to equitize a significant amount of the DIP Claims under the Plan and receive both cash and New Common Stock in lieu of repayment in full in cash.

4.      In short, the DIP Facility is a key component of the RSA and the transactions contemplated thereby, and will provide the Debtors with the liquidity necessary to continue to operate their business in the ordinary course and thus preserve and maintain the going-concern value of the Debtors' estates during their short stay in chapter 11.

**Relief Requested**

5.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order,"[3] and collectively with the Interim Order, the "DIP Orders"):  (a) authorizing the Debtors to incur the senior secured superpriority debtor-in-possession DIP Facility; (b) authorizing the Debtors to use Cash Collateral; (c) granting liens and providing superpriority administrative expense status to the DIP Facility; (d) granting adequate protection, solely to the extent provided in the DIP Orders, to the Prepetition

---

[3]      The Debtors will file a proposed form of the Final Order prior to the Final Hearing (as defined herein).

Secured Parties; (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; (f) scheduling a final hearing (the "Final Hearing") to consider approval of this motion on a final basis; and (g) granting related relief. The Prepetition Secured Parties are consenting to the use of Cash Collateral under the terms and conditions of the Interim Order.

6.      In support of this motion, the Debtors respectfully submit the declaration of Andrew Turnbull (the "Turnbull Declaration"), a copy of which is attached hereto as **Exhibit B**, and the First Day Declaration.

### Jurisdiction and Venue

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1(m).

## Background

10.     The Debtors, together with their non-Debtor affiliates (collectively, "Carestream"

or the "Company"), are a leading provider of medical imaging and non-destructive testing products

with over 100 years of industry experience.  The Company is a partner of choice to approximately

8,000 direct customers and approximately 900 dealers in more than 130 countries.  Its products

are used by prominent health systems, hospitals, imaging centers, specialty practices and industrial

companies worldwide.  Headquartered in Rochester, New York, Carestream employs a global

workforce of approximately 3,410 employees with approximately 180 contractors.

11.     Carestream, like many businesses, faced significant headwinds in 2020, principally

as a result of changing product and customer trends and the global COVID-19 pandemic, which,

in light of the Debtors' capital structure, placed substantial strain on the Debtors' businesses.  To

alleviate the strain, the Debtors executed a voluntary amend-and-extend transaction in early 2020

that extended the maturities of their first lien revolver and term loan and second lien term loan

debt.  The amend-and-extend transaction provided the Debtors with time to meaningfully examine

various strategic alternatives, including sale transactions and debt-for-equity exchanges to

deleverage the Company.

12.     Ultimately, the Debtors determined that a substantial deleveraging combined with

new capital investment was the best path forward for their business.  To implement the foregoing,

the Debtors negotiated, and ultimately agreed, with a majority of their prepetition secured lenders

and their equity sponsor on the terms of a comprehensive financial restructuring.  The terms of the

proposed restructuring are memorialized in the RSA that serves as the foundation of the Debtors'

prepackaged Plan.  Under the RSA, the Debtors will eliminate approximately $470 million of

prepetition funded debt and raise up to $75 million of new equity capital, while also leaving general

unsecured claims unimpaired.  As of August 23, 2022 (the "Petition Date"), the Debtors have fully

solicited their Plan, which was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 73% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of the Debtors' prepetition second lien term loan debt.

13.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Interim Relief is Necessary**

14.     The Debtors will not be able to meet ordinary course obligations without access to the DIP Facility and Cash Collateral during the interim period following the Petition Date, which is needed to pay wages and benefits, taxes and fees, rent, and invoices for goods and services, and other obligations that will come due during the interim period.  Otherwise, the Debtors risk disrupting their business materially and jeopardizing their existing relationships with employees, government entities, contract counterparties, and business partners, among others.  These constituents are important to the Debtors' go-forward business and should not be harmed merely because the Debtors cannot access cash on hand.  Therefore, authority to enter into the DIP Facility, access the DIP Loans, and use Cash Collateral during the interim period is necessary to ensure that the Debtors do not harm their businesses while pursuing a value maximizing restructuring transaction during these prepackaged chapter 11 cases.

**Concise Statement Pursuant to Bankruptcy Rules 4001(b) and 4001(c)
and Local Rule 4001-2[4]**

15.    By this motion, the Debtors seek entry of the Interim Order and Final Order:

a.    authorizing the Debtors to obtain postpetition financing and other financial accommodations in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured multi-draw term loan facility in an aggregate principal amount of up to $80,000,000 (the "DIP Facility"), consisting of (x) a $5,000,000 tranche of new money terms loans (the "Tranche A DIP Loans") and (y) a $75,000,000 tranche of new money terms loans (the "Tranche B DIP Loans"); *provided* that (A) an initial amount of up to $50,000,000 of the DIP Facility (the "Initial DIP Amount"), which shall consist of $3,125,000 of Tranche A DIP Loans (the "Tranche A Initial DIP Loans") and $46,875,000 of Tranche B DIP Loans (the "Tranche B Initial DIP Loans" and, together with the Tranche A Initial DIP Loans, the "Initial DIP Loans"), shall be made available to the Debtors immediately upon entry of this Interim Order and in accordance with the terms set forth in the *Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet*, dated as of August 21, 2022, attached to the Interim Order as Exhibit A (the "DIP Term Sheet") and (B) an additional amount of up to $30,000,000 (the "Delayed Draw DIP Amount"), which shall consist of $1,875,000 of Tranche A DIP Loans (the "Tranche A Final DIP Loans") and $28,125,000 of Tranche B DIP Loans (the "Tranche B Final DIP Loans," and, together with the Tranche A Final DIP Loans, the "Delayed Draw DIP Loans," and, together with the Initial DIP Loans, the "DIP Loans"), shall be made available to the Debtors in one or more draws, upon entry of, and subject to the terms of, the Final Order and, for each of the Initial DIP Loans and Delayed Draw DIP Loans, subject to satisfaction of the applicable conditions set forth in the DIP Term Sheet and all other applicable terms and conditions of the DIP Loan Documents (as defined below);

b.    authorizing the Debtors to (a) enter into the DIP Term Sheet by and among the Borrower, the Guarantors, the relevant lenders (collectively, the "DIP Lenders"),[5] and JPMorgan Chase Bank, N.A., as administrative and

---

[4]    The summary of the Interim Order and the terms and conditions for the DIP Facility and use of Cash Collateral set forth in this motion is qualified are its entirety by the Interim Order. In the event that there is any conflict between this motion and the Interim Order, the Interim Order will control in all respects. Capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to them in the Interim Order.

[5]    The DIP Lenders include the lenders under the Prepetition Secured Credit Facilities that are each party to the DIP Commitment Letter, dated August 21, 2022 (the "DIP Commitment Letter"). A copy of the DIP Commitment Letter, with the DIP Term Sheet, is attached hereto as **Exhibit C**. The Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact Certain Portions of the Letters Related to the DIP*

collateral agent (in each such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; together with this Interim Order, the Final Order, and, and all agreements, documents, and instruments delivered or executed in connection therewith, collectively the "DIP Loan Documents"), (b) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents, and (c) to enter into any agreements with respect to the cash collateralization of any outstanding and undrawn Letters of Credit issued under (and as defined in) the First Lien Credit Agreement (as defined below) (any such agreement  an "L/C Cash Collateral Agreement" and the liens granted thereunder, the "L/C Cash Collateral Liens");

c.      authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral, including Cash Collateral, in accordance with the terms hereof and the DIP Budget (after giving effect to Permitted Variances), as further described herein, to pay for working capital needs, and to provide working capital for other general corporate purposes, of the Debtors in the ordinary course of business and for the costs and expenses of administering the Cases, including for payment of any Adequate Protection Obligations (all as defined below) and reasonable and documented transaction costs, fees, and expenses incurred in connection with the restructuring to be implemented through the Cases and to cash collateralize any outstanding and undrawn Letters of Credit as provided in this Interim Order and in the other DIP Loan Documents;

d.      granting adequate protection to the extent of any Diminution in Value, with respect to each of the Debtors, to the Prepetition Secured Parties under the Prepetition Credit Documents on account of the Priming Liens and for the use of their Cash Collateral and the Prepetition Collateral (all as defined below);

e.      authorizing on the terms set forth in the Interim Order, the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such become earned, due and payable, including, without limitation, the DIP Commitment Fee, the Exit Fee, the Undrawn DIP Fee, the Agency Fee (all as defined below), audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees and expenses, and prepetition and postpetition reasonable fees and disbursements of each of the DIP Secured Parties' attorneys, advisors, accountants, appraisers, bankers and other consultants,

---

*Facility*, contemporaneously herewith, requesting to file under seal certain terms of the DIP Commitment Letter and the DIP Agent Fee Letter (as defined below) (the "Motion to Seal").

all to the extent provided in, and in accordance with, the DIP Loan Documents;

f.  granting valid, enforceable, non-avoidable, and fully perfected liens and security interests pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code on the DIP Collateral and all proceeds thereof, including, any (subject to entry of the Final Order) Avoidance Proceeds subject only to the Carve Out, the Permitted Liens (all as defined below), if any, and the L/C Cash Collateral Liens in each case on the terms and conditions set forth herein and in the DIP Loan Documents, to secure principal of, and accrued interest on, the DIP Loans, and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other Obligations (as defined in the DIP Loan Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the DIP Facility, including the DIP Commitment Fee, the Exit Fee, the Undrawn DIP Fee, the Agency Fee (collectively, the "DIP Obligations");

g.  granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Secured Parties, with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

h.  subject to and upon entry of a Final Order, the waiver of (x) the Debtors' and the estates' ability to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, effective as of the Petition Date, (y) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the Prepetition Collateral, and (z) the doctrine of "marshaling" and any other similar equitable doctrine with respect to any of the Prepetition Collateral;

i.  authorizing the DIP Secured Parties to exercise remedies under the DIP Loan Documents on the terms described herein upon the occurrence and during the continuation of a DIP Termination Event (as defined below);

j.  authorizing for the Issuing Lender (as defined in the First Lien Credit Agreement) to exercise any remedies under any L/C Cash Collateral Agreement in accordance therewith;

k.  waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

l.      scheduling a Final Hearing approximately 35 days after the Petition Date to
        consider the relief requested herein and approving the form of notice with
        respect to the Final Hearing; and

m.      granting related relief.

16.    The below chart contains a summary of the material terms of the proposed DIP

Loans, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2(a)(i).[6]

| Summary of Material Terms[7] | |
|---|---|
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | Carestream Health, Inc. <br><br> *See* DIP Term Sheet, p. 1 |
| **Holdings and Guarantors** <br> Bankruptcy Rule 4001(c)(1)(B) | Carestream Health Holdings, Inc. ("Holdings") and <br><br> Carestream Health Acquisition, LLC, Carestream Health International Holdings, Inc., Carestream Health International Management Company, Inc., Carestream Health Canada Holdings, Inc., Carestream Health World Holdings LLC, and Lumisys Holding Co. (the "Guarantors"). <br><br> *See* DIP Term Sheet, p. 1 and Exhibit A-1 to the DIP Term Sheet |
| **DIP Lenders** <br><br> Bankruptcy Rule 4001(c)(1)(B) | Those lenders listed on Annex A to the DIP Term Sheet and any other Person that becomes a Lender thereunder. <br><br> *See* DIP Term Sheet, p. 1 |
| **Term** <br> Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) <br><br> Del. Bankr. L.R. 4001-2(a)(i) | The earliest of (a) 75 calendar days after the Petition Date, subject to no more than two extensions of 30 days each, (b) 45 calendar days after the Petition Date if the Final Order has not been entered by the Court on or before such date, (c) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (d) the termination of the RSA by the Required Consenting First Lien Lenders, the Required DIP Lenders, or the Company Parties (all as defined in the RSA), (e) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in these chapter 11 cases that is confirmed pursuant to an order entered by the Court, (f) the date of entry of an order by the Court approving (A) a motion seeking conversion or dismissal of any or all of these chapter 11 cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, (g) the date the Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to chapter 7 of the Bankruptcy Code, |

---

[6]   Local Rules 4001-2(a)(i)(N) and 4001-2(a)(i)(O) are not applicable to the Interim Order.

[7]   Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

| Summary of Material Terms[7] | |
|---|---|
| | and (h) the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments in respect thereof upon the occurrence of an Event of Default (as defined in the DIP Term Sheet). *See* DIP Term Sheet, pp. 15–16 |
| **Commitment** Bankruptcy Rule 4001(b)(1)(B)(ii), 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(i)(A) | $80 million in the aggregate in the form of a term loan credit facility. *See* DIP Term Sheet, p. 2 |
| **Provisions that Provide for the Funding of Non-Debtor Affiliates** Del. Bankr. L.R. 4001-2(a)(i)(D) | The Debtors are permitted to use Cash Collateral to make payments to non-Debtor affiliates as set forth in the Approved DIP Budget (after giving effect to Permitted Variances (as defined below)) or with the written consent of the Required DIP Lenders (as defined in the DIP Term Sheet). *See* DIP Term Sheet, pp. 5–6 |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(i)(I) | <u>Conditions Precedent to the Initial DIP Loans on the Interim Closing Date</u>. Standard and customary conditions precedent to borrowing, the satisfaction of which is a condition precedent to the DIP Lenders' obligation to make Initial DIP Loans on the Interim Closing Date. <u>Conditions Precedent to any Delayed Draw DIP Loans on or After the Final Closing Date</u>. Standard and customary conditions precedent to borrowing, the satisfaction of which is a condition precedent to the DIP Lenders' obligation to make Delayed Draw DIP Loans on or after the Final Closing Date. *See* DIP Term Sheet, pp. 19–26. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(ii) | One-month Adjusted Term SOFR Rate (as defined in the DIP Term Sheet) then in effect plus 9.00%. *See* DIP Term Sheet, p. 14 |
| **Use of DIP Financing Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) Del. Bankr. L.R. 4001-2(a)(ii) | The Debtors shall use the proceeds of the DIP Facility and Cash Collateral in accordance with the DIP Loan Documents, and the Approved DIP Budget (subject to Permitted Variances), for the following:<br>• working capital and general corporate purposes of the Debtors, including for the payment of rent and other lease expenses and professional fees;<br>• bankruptcy-related costs and expenses, including Adequate Protection Obligations (as defined in the Interim Order);<br>• costs and expenses related to the DIP Facility; and<br>• any other purposes specifically set forth in the Approved DIP Budget. *See* DIP Term Sheet, pp. 5–6; Interim Order ¶¶ 2, 13 |

| **Summary of Material Terms**[7] | |
|---|---|
| **Adequate Protection and Professional Fees and Expenses**<br>Bankruptcy Rule 4001(c)(1)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B), 4001-2(a)(i)(G), 4001-2(a)(i)(K) | The Debtors have agreed to provide the following forms of Adequate Protection to the Prepetition Secured Parties, in each case subject to the Carve Out:<br><br>First Lien Adequate Protection Liens. To the Prepetition First Lien Agent for the benefit of the First Lien Lenders, solely to the extent of any Diminution in Value, a perfected security interest and lien on the DIP Collateral which shall be, with respect to the DIP Collateral, junior in priority to the DIP Liens and the L/C Cash Collateral Liens (as defined in the Interim Order), but senior to the Second Lien Adequate Protection Liens.<br><br>Second Lien Adequate Protection Liens. To the Prepetition Second Lien Agent for the benefit of the Second Lien Lenders, solely to the extent of any Diminution in Value, a perfected security interest in and lien on the DIP Collateral which shall be, with respect to the DIP Collateral, junior in priority to the DIP Liens, the L/C Cash Collateral Liens (as defined in the Interim Order), the First Lien Adequate Protection Liens, and the Prepetition First Liens.<br><br>Adequate Protection Claims. Superpriority administrative expense claims as provided by section 507(b) of the Bankruptcy Code, junior to the claims of the DIP Agent and the DIP Lenders; *provided, that*, the Adequate Protection Claims in respect of the First Lien Obligations shall be senior to the Adequate Protection Claims in respect of the Second Lien Term Loan Obligations.<br><br>Fees and Expenses. Payment in cash of all reasonable and documented out-of-pocket fees and expenses of any of the Prepetition Secured Parties.<br><br>First Lien Adequate Protection Payments. Payment of all accrued but unpaid interest under the First Lien Credit Agreement.<br><br>*See* Interim Order ¶¶ 2, 14 |
| **Repayment Features / Provisions Limiting Repayment**<br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(I) | Voluntary Prepayments. No Limits on Voluntary Prepayments.<br><br>Mandatory Repayments. The Borrower shall pay or prepay the DIP Loans and all other DIP Obligations (a) 100% of the net cash proceeds of any DIP Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, after funding the Carve Out, (b) 100% of the net cash proceeds of any other sale or other disposition by the Borrower or any Guarantor of any DIP Collateral in excess of $1,000,000, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business), (c) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding (x) receipts contemplated to be received by any of the Debtors as set forth in the Approved DIP Budget and (y) insurance proceeds that are reinvested by any Debtor in assets used to useful in the business of the Debtors on or prior to the date that is 180 days after the receipt of such net cash proceeds) by the Borrower or any Guarantor that constitute DIP Collateral (provided that receipts received from subsidiaries of Holdings other than the Debtors pursuant to the global treasury plan or in the ordinary course of business shall not be subject to the requirements of this provision), and (d) 100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" in the DIP Term Sheet. |

| Summary of Material Terms[7] | |
|---|---|
| | *See* DIP Term Sheet, pp. 16–18 |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) and 4001-2(a)(iii) | The use of proceeds of the DIP Facility and Cash Collateral is subject to the DIP Budget, attached to the Interim Order as <u>Exhibit B</u>.<br><br>*See* Interim Order, <u>Exhibit B</u> |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) and 4001-2(a)(iii) | The Approved Budget (subject to Permitted Variances) shall set forth, on a weekly basis, among other things, (i) weekly projected cash receipts, (ii) weekly projected disbursements (including operating expenses in the ordinary course of business, capital expenditures and bankruptcy related expenses) under the Cases, (iii) the weekly projected outstanding principal balance of the DIP Loans, and (iv) the weekly projected liquidity of the Debtors.<br><br>By no later than 5:00 PM (Eastern Time) on Thursday of the calendar week following the week in which the Petition Date occurs (the "<u>First Testing Date</u>"), and no later than 5:00 PM (Eastern Time) on each Thursday of each calendar week thereafter (together with the First Testing Date, each a "<u>Testing Date</u>"), prior to the Initial Variance Testing Date (as defined below), the Debtors shall deliver to the DIP Secured Parties (and their advisors), a variance report (each, a "<u>Weekly Variance Report</u>") setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in the then-in-effect Approved DIP Budget for the Monthly Testing Period (as defined below).<br><br>By no later than 5:00 PM (Eastern Time) on the first Testing Date that occurs after the four-week anniversary of the First Testing Date (the "<u>Initial Variance Testing Date</u>") and by not later than 5:00 PM (Eastern Time) on each Thursday thereafter (each such date, the "<u>Monthly Variance Testing Date</u>" and each such subsequent four-week period ending on the Sunday preceding each such Monthly Variance Testing Date, the "<u>Monthly Testing Period</u>"), the Debtors shall provide to the DIP Secured Parties a report reasonably detailing: (i) the aggregate receipts of the Debtors and aggregate disbursements of the Debtors, in each case, during the applicable Monthly Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between (a) the aggregate receipts received by the Debtors during such Monthly Testing Period against the aggregate receipts for such Monthly Testing Period as set forth in the applicable Approved DIP Budget and (b) the aggregate disbursements made by the Debtors during such Monthly Testing Period against the aggregate disbursements for such Monthly Testing Period as set forth in the applicable Approved DIP Budget (a "<u>Monthly Variance Report</u>," together with the Weekly Variance Report, the "<u>Approved Variance Reports</u>"). The Debtors shall comply with the following (collectively, the "<u>Permitted Variances</u>")<br><br>*See* DIP Term Sheet, pp. 6–8; Interim Order ¶ 16 |

| Summary of Material Terms[7] | |
|---|---|
| **Termination Events / Events of Default**<br>Bankruptcy Rules 4001(b)(1)(B)(iii) and 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i) and 4001-2(a)(i)(M), (S) | The DIP Term Sheet and Interim Order contain "Events of Default" and "Termination Events" that are usual and customary including without limitation, a breach of any Milestone set forth in Schedule 1 of the RSA.<br><br>*See* DIP Term Sheet, pp. 32–34; Interim Order ¶ 18 |
| **Remedies Notice Period and Emergency Hearing**<br>Del. Bankr. L.R. 4001-2(a)(i)(S), 4001-2(a)(i)(T) | Upon receipt of an Enforcement Notice and during the Notice Period, the Debtors, the Required DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis at which the Debtors, any official committee of unsecured creditors, or any other party may be heard with respect to the Enforcement Notice and whether a DIP Termination Event has occurred.<br><br>Prior to the exercise of any remedies upon a DIP Termination Event, counsel for the applicable DIP Secured Party shall provide five (5) business days' notice to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee, during which time the Debtors, any official committee of unsecured creditors, or any other party may seek an emergency hearing before the Court.<br><br>*See* Interim Order ¶ 19 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will, jointly and severally, indemnify the DIP Lenders and the DIP Agent, and their respective affiliates, successors and assigns and the partners, officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each of the foregoing (each an "<u>Indemnified Person</u>"), and hold them harmless from and against any and all losses, claims (including intraparty claims), demands, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities of any kind (collectively, "<u>Liabilities</u>") arising out of or relating to (i) the execution or delivery of the DIP Term Sheet, the DIP Loan Agreement (if any), and the other DIP Loan Documents, transactions contemplated hereby and thereby, (ii) the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Restructuring Transactions (as defined in the DIP Term Sheet) or any other transactions contemplated hereby, (iii) any DIP Loan or any actual or proposed use of the proceeds therefrom, (iv) any actual or alleged presence or release of Materials of Environmental Concern (as defined in the DIP Term Sheet) on or from any property owned or operated by the Debtors or any of their subsidiaries, or (v) any actual or prospective claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction (each, a "<u>Proceeding</u>") relating to any of the foregoing, whether or not such Proceeding is brought by a Debtor or its equity holders, affiliates, creditors or any other third party and whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto; *provided* that no such person will be indemnified for costs, expenses, or liabilities to the extent such Liabilities or related expenses are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence, or willful misconduct of such Indemnified Person.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such |

| Summary of Material Terms[7] | |
|---|---|
| | Indemnified Person's actual fraud, gross negligence, or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.<br><br>*See* Interim Order ¶ 24(b) |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>• DIP Secured Parties<br><br>• Prepetition Secured Parties<br><br>*See* Interim Order ¶¶ H, 13 |
| **Carve Out**<br>Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, all as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 8 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B) | The Debtors agree to pay to the DIP Agent and the DIP Lenders any amounts due in accordance with the terms of the fee letters, in accordance with the applicable terms thereof.<br><br>*See* DIP Term Sheet, pp. 13–14; Interim Order ¶ 2(c)(iii) |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(U) | Subject to and upon entry of the Final DIP Order, the DIP Liens shall attach to the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, and 550 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>*See* Interim Order ¶ 4 |
| **Waiver/Modification of Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(S) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtors to grant the liens and security interests to the DIP Secured Parties, make payments on account of the Adequate Protection Obligations, and perform other acts necessary in connection with the DIP Loan Documents, including entering in to the L/C Cash Collateral Agreement.<br><br>*See* Interim Order ¶¶ 2(b), 2(c) |
| **Provisions Limiting the Court's Power and/or Discretion**<br>Del. Bankr. L.R. 4001-2(a)(i)(C) | The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.<br><br>In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section |

| Summary of Material Terms[7] |  |
|---|---|
| | 364(e) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations |
| | *See* Interim Order ¶¶ 5, 22(b) |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) Del. Bankr. L.R. 4001-2(a)(i)(B) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens. *See* Interim Order ¶ G |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i), (ii) Del. Bankr. L.R. 4001-2(a)(i)(G), 4001-2(a)(i)(P) | The Interim Order provides for DIP Liens on the DIP Collateral, which may include unencumbered assets. The DIP Obligations, subject to the Carve Out and the L/C Cash Collateral Liens, at all times be secured by DIP Liens on the DIP Collateral, as follows: |
| | • pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral, that, on or as of the Petition Date is not subject to Permitted Liens or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), excluding Avoidance Actions but, subject to entry of the Final Order, including the Avoidance Proceeds, subject only to Permitted Liens, the L/C Cash Collateral Liens, and payment of the Carve Out; |
| | • pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming security interest and lien (the "Priming Liens") on all DIP Collateral, subject only to the Carve Out, Permitted Liens, L/C Cash Collateral Liens, or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (if any). The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties, with respect to the Prepetition Secured Credit Facilities (including, without limitation, the Prepetition Liens and the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "Primed Liens"). Notwithstanding anything herein to the contrary, the Priming Liens (i) shall be subject and junior to the Carve Out in all respects and Permitted Liens (if any) and L/C Cash Collateral Liens and (ii) shall be senior in all respects to the Primed Liens; and |
| | • pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest and lien on all DIP Collateral that is subject to valid, perfected, and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b) (other than the Primed Liens, L/C Cash Collateral Liens, or to any Permitted Liens), which liens shall be junior and subordinate to (a) the Carve Out, (b) any such valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date, and/or (c) any such valid and non-avoidable liens in existence immediately prior to |

| | |
|---|---|
| | **Summary of Material Terms**[7] |

| | |
|---|---|
| | the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b); *provided* that nothing in the foregoing shall limit the rights of the DIP Secured Parties under the DIP Loan Documents to the extent any such liens are not permitted thereunder. |
| | DIP Superpriority Claims |
| | • Pursuant to, and to the extent provided by, section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions"), but including, subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise (collectively, the "Avoidance Proceeds")) in accordance with the other DIP Loan Documents, subject only to, and subordinated in all respects to, payment of the Carve Out and to any obligations under any L/C Cash Collateral Agreement. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise. |
| | *See* Interim Order ¶¶ 4, 5 |
| **Joint Liability** Del. Bankr. L.R. 4001-2(a)(i)(J) | The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder. *See* Interim Order ¶ 20 |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) Del. Bankr. L.R. 4001-2(a)(i)(H) | It shall be an Event of Default for the Debtors to fail to remain in compliance with the Milestones set forth in the RSA. *See* DIP Term Sheet, p. 32 |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B)(viii) | "Challenge Period" means seventy-five (75) calendar days following the date of entry of this Interim Order, subject to further extension by (i) written agreement of the Debtors and the Prepetition Secured Parties or (ii) an order of this Court obtained on notice and after a hearing; *provided* that in the case of the Committee |

| Summary of Material Terms[7] | |
|---|---|
| Del. Bankr. L.R. 4001-2(a)(i)(Q) | (if any), so long as the RSA remains in full force and effect and provides for the payment of general unsecured claims in full in cash, the Challenge Period shall be tolled until sixty (60) days after the earliest to occur of (1) termination of the RSA, and (2) the Court's entry of an order denying confirmation of the Plan (as defined in the RSA) (the "Committee Challenge Period") and the Committee Challenge Period shall lapse upon the effective date of a chapter 11 plan that provides for the payment of general unsecured claims in full in cash; *provided* further that in the event that, prior to the expiration of the Challenge Period, (x) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Cases, then in each such case, the Challenge Period shall be extended by the later of (A) the remaining time under the Challenge Period plus fifteen (15) days or (B) such other time as ordered by the Court solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding.<br><br>*See* Interim Order ¶ 26 |
| **Limitation on Estate Funds Related to the Challenge Period** Del. Bankr. L.R. 4001-2(a)(i)(L) | The limitation on estate funds related to the Challenge Period is $50,000.<br><br>*See* Interim Order ¶ 25 |
| **Approval of the DIP Facility** Del. Bankr. L.R. 4001-2(a)(i)(R) | The Interim Order provides for approval of the DIP Facility.<br><br>*See* Interim Order ¶ 2 |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(V) | The Interim Order waives the Debtors' rights under section 506(c) of the Bankruptcy Code, subject to the entry of the Final Order.<br><br>*See* Interim Order ¶ 9 |
| **Section 552(b) Waiver** Del. Bankr. L.R. 4001-2(a)(i)(W) | The Interim Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens, subject to entry of the Final Order.<br><br>*See* Interim Order ¶ 11 |
| **Marshalling Provision** Del. Bankr. L.R. 4001-2(a)(i)(X) | The Interim Order provides that in no event shall any of the DIP Secured Parties or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable, subject to entry of the Final Order.<br><br>*See* Interim Order ¶ 10 |

**Explanation for Inclusion of Significant Provisions Pursuant to Local Rule 4001-2(a)(i)**

**I.      The Significant Provisions Are Appropriate and Justified Under the Circumstances of These Chapter 11 Cases.**

17.     Local Rule 4001-2(a)(i) requires that the Debtors explain the reason for including certain significant provisions described in Local Rules 4001-2(a)(i)(N)–(X) (collectively, the "Significant Provisions").[8]  The Debtors believe that each of the Significant Provisions and the Carve Out is justified and necessary in the context and circumstances of these chapter 11 cases.

**A.      The Scope of the Carve Out Is Appropriate (Del. Bankr. L.R. 4001-2(a)(i)(F)).**

18.     The DIP Liens, the DIP Superpriority Claims, and the proposed Adequate Protection Obligations are subject to the Carve Out.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors and any statutory committee.

---

[8]     Local Rules 4001-2(a)(i)(N) and 4001-2(a)(i)(O) are not applicable to the Interim Order.  In addition, as further explained above, Local Rule 4001-2(a)(i)(P) does not apply and Local Rules 4001-2(a)(i)(U)–(X) are only applicable upon entry of the Final Order.

**B.      The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate (Del. Bankr. L.R. 4001-2(a)(i)(Q)).**

19.      Local Rule 4001-2(a)(i)(Q) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order to investigate such matters.   Here, the Interim Order complies with this requirement by providing any statutory committee appointed in these cases and all parties in interest in each case, with requisite standing, to file an adversary proceeding challenging the validity, extent, perfection, or priority of the Prepetition Liens on the Prepetition Collateral, the validity, allowability, priority, or amount of the Prepetition Secured Obligations, or the Stipulations by the earlier of (i) seventy-five (75) days after the entry of the Interim Order and (ii) the date of entry of an order confirming a chapter 11 plan. In addition, the Interim Order provides that, with respect to any committee appointed in these cases, so long as the RSA remains in full force and effect and provides for the payment of general unsecured claims in full in cash, the Challenge Period shall be tolled until sixty (60) days after the earliest to occur of (i) termination of the RSA, and (ii) the Court's entry of an order denying confirmation of the Plan.   This additional challenge period shall lapse upon the effective date of a chapter 11 plan that provides for the payment of general unsecured claims in full in cash.

**C.      The Provisions Immediately Approving All Terms and Conditions of the DIP Term Sheet Are Appropriate (Del. Bankr. L.R. 4001-2(a)(i)(R)).**

20.      Local Rule 4001-2(a)(i)(R) requires explicit disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement.   Here, the Interim Order provides that upon entry, the parties to the DIP Facility are authorized to enter into their respective obligations and that, upon execution, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors.   Moreover, to the extent the DIP Loan Documents conflict

with the Interim Order, the Interim Order controls.  *See* Interim Order ¶¶ 2, 40.  This is necessary and appropriate for the Debtors to access the DIP Loans and to provide all parties with the assurances that the Debtors' entry into the DIP Facility postpetition is valid.  Without this provision, the Debtors would be unable to access the DIP Loans or use Cash Collateral on an interim basis.

> **D.** **The Provisions Modifying the Automatic Stay, Providing for a Remedies Notice Period, and Providing for a Default Notice Hearing Are Appropriate (Del. Bankr. L.R. 4001-2(a)(i)(S), (T)).**

21.    Local Rules 4001-2(a)(i)(S) and (T) require explicit disclosure of provisions that modify the automatic stay upon a DIP Termination Event without a Notice Period and provisions that seek to limit what parties in interest may raise at an emergency hearing during the Notice Period.  The Interim Order provides for a five-day Notice Period for all DIP Termination Events, and thus such Remedies Notice Period is appropriate.  *See* Interim Order ¶ 19.  In addition, as explained above, there is no limit as to what parties in interest may raise during an emergency hearing scheduled during a Remedies Notice Period.  *See id*.  Thus, the Interim Order complies with Local Rule 4001-2(a)(i)(T).  In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Order should be approved.

### The Debtors' Prepetition Capital Structure and Need to Use Cash Collateral

22.    As of the Petition Date, the Debtors have approximately $1,032.9 million[9] in aggregate outstanding funded debt obligations.  Each of the Debtors in these chapter 11 cases are obligors under the First Lien Credit Agreement and the Second Lien Credit Agreement (each as defined below).

---

[9]    This amount does not include any amounts rising out of Hedge Claims (as defined in the Plan).

| Funded Debt | Approximate Outstanding Principal Amount |
|---|---|
| First Lien Term Loan Facility | $507.7 million |
| First Lien Revolving Loan Facility | $77.0 million[10] |
| Second Lien Term Loan Facility | $448.2 million |
| | |
| **Total Funded Debt Obligations** | $1,032.9 million |

### A.    First Lien Term Loan Facility

23.    Carestream Health Holdings, Inc. ("Carestream Holdings"), as holdings, Carestream Health, Inc. ("Carestream Health"), as borrower,[11] the several lenders party thereto (the lenders under the First Lien Credit Agreement (as defined below), collectively, the "First Lien Lenders"), and Credit Suisse AG, Cayman Islands Branch ("Credit Suisse Cayman"), as Administrative Agent, are each party to that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013 (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement," the term loan facility thereunder, the "First Lien Term Loan Facility," and the revolving loan facility thereunder, the "First Lien Revolving Loan Facility").[12]

24.    The First Lien Term Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors (as defined in the First Day Declaration) and is secured on a first priority basis (*pari passu* with the First Lien Revolving Loan Facility) by substantially all of the Debtors' assets.

---

[10]    This amount does not include any amounts rising out of Hedge Claims.

[11]    On December 31, 2017, Onex Carestream Finance LP ("Onex Finance"), the Term Loan Borrower under the original First Lien Credit Agreement, assigned its obligations as Term Loan Borrower to Carestream Health.

[12]    The First Lien Credit Agreement has been subsequently amended or supplemented on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020, April 13, 2020, May 8, 2020, and October 14, 2020.

25.     The First Lien Term Loan Facility matures on May 8, 2023, and accrues interest at a rate of LIBOR plus 6.75% per annum.  As of the Petition Date, approximately $507.7 million in aggregate principal amount remains outstanding under the First Lien Term Loan Facility.

**B.      First Lien Revolving Loan Facility**

26.     The First Lien Revolving Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors and is secured on a first-priority basis (*pari passu* with the First Lien Term Loan Facility) by substantially all of the Debtors' assets.

27.     The First Lien Revolving Loan Facility matures on May 8, 2023, and accrues interest at a rate of LIBOR plus 6.75% per annum (subject to adjustments pursuant to the First Lien Credit Agreement).  As of the Petition Date, approximately $77.0 million[13] in aggregate principal amount remains outstanding under the First Lien Revolving Loan Facility.

**C.      Second Lien Term Loan Facility**

28.     Carestream Holdings, as holdings, Carestream Health, as borrower,[14] the several lenders party thereto (the "Second Lien Term Lenders"), and Credit Suisse Cayman, as Administrative Agent, are each party to that certain Second Lien Credit Agreement, dated as of June 7, 2013 (as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement" and the term loan facility thereunder, the "Second Lien Term Loan Facility").[15]

---

[13]    This amount does not include any amounts rising out of Hedge Claims.

[14]    On December 31, 2017, Onex Finance, the Term Loan Borrower under the original Second Lien Credit Agreement, assigned its obligations as Term Loan Borrower to Carestream Health.

[15]    The Second Lien Credit Agreement has been subsequently amended or supplemented on June 9, 2017, December 27, 2018, April 11, 2019, January 29, 2020, April 13, 2020, May 8, 2020, October 14, 2020, and December 30, 2020.

29.     The Second Lien Term Loan Facility is guaranteed by Carestream Holdings and the Company Subsidiary Guarantors and is secured on a second-priority basis to the First Lien Term Loan Facility and First Lien Revolving Loan Facility by substantially all of the Debtors' assets.

30.     The Second Lien Term Loan Facility matures on August 8, 2023, and accrues interest at a rate of LIBOR plus 4.50% per annum payable in cash and 8% per annum payable in kind (subject to adjustments pursuant to the Second Lien Credit Agreement).   As of the Petition Date, approximately $448.2 million in aggregate principal amount remains outstanding under the Second Lien Term Loan Facility.

**D.     Equity Interests**

31.     Onex Corporation and its affiliates hold the majority of the equity interests of Debtor Carestream Health Holdings, Inc., the ultimate parent of the Debtors.  The remaining shares of Carestream Health Holdings, Inc. are primarily held by current and former management of the Debtors.

**The DIP Facility**

**I.     The Debtors' Need for Access to Financing and Use of Cash Collateral.**

32.     The Debtors require access to additional liquidity to ensure that they are able to continue operating their business during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.

33.     As part of the Debtors' preparations for these chapter 11 cases, the Debtors and their advisors analyzed how much postpetition financing would be required to operate the Debtors' business and fund the administrative costs of this chapter 11 process.  As part of this analysis, the Debtors and their advisors developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the

business, the fees, and interest expense associated with the DIP Facility and consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and the potential acceleration of demands on available liquidity through working capital contraction. *See* Turnbull Decl. ¶ 9.

34.    Based on this analysis, the Debtors determined that they would require incremental liquidity to comfortably operate postpetition and satisfy all administrative costs and expenses. *See* Turnbull Decl. ¶ 10.   The Debtors believe that their ability to continue funding ongoing operations during these chapter 11 cases is essential to the preservation of the Debtors' assets and their ability to maximize the value of those assets.

35.    The Debtors also believe that the DIP Facility and access to Cash Collateral will provide a strong, clear message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally.   Specifically, access to liquidity will communicate that the Debtors are able to continue meeting the needs of their customers, provide compensation to their employees, and are continuing to manage their businesses as close to the ordinary course as possible.   Furthermore, access to the proposed DIP Facility and Cash Collateral will provide the Debtors with sufficient funds to pay wages to their employees, administer these chapter 11 cases, and thereby enable the Debtors to continue their efforts to preserve and maximize the value of their estates during these prepackaged chapter 11 cases. *See* Turnbull Decl. ¶ 10.

### A.    Alternative Sources of Financing Are Not Available on Better Terms.

36.    Leading up to the Petition Date, the Debtors, the Prepetition Secured Parties, and the DIP Lenders engaged in good faith, arm's-length negotiations over the terms of the DIP Facility.   Given the Debtors' capital structure and under the current circumstances, the only viable, actionable source of debtor-in-possession financing was with the Prepetition Secured Parties and

DIP Lenders. Furthermore, the Prepetition Secured Parties and the DIP Lenders made it known that they would not consent to a priming loan from a third-party. *See* Turnbull Decl. ¶ 12.

37.     Further, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including timing and due diligence constraints, necessarily involving the payment of additional professional fees. In contrast, the proposed consensual DIP Facility and access to Cash Collateral offered by the DIP Lenders allows the Debtors to avoid such risks at the outset of these chapter 11 cases. *See* Turnbull Decl. ¶ 13.

38.     To ensure that there was no other available financing on better terms under the circumstances, Houlihan Lokey reached out to six other parties to assess any party's willingness to provide financing. Of those six parties, none of them expressed an interest in providing financing to the Debtors other than on a consensual priming basis, let alone financing on better terms. *See* Turnbull Decl. ¶ 14.

39.     Importantly, the DIP Facility is an integral part of the Debtors' RSA and the transactions contemplated thereunder, and all of the proposed DIP Lenders also signed the RSA. Further, the DIP Facility is critical to the Debtors' ability to fund the administrative costs of these chapter 11 cases and provides the Debtors with sufficient liquidity to operate their business. As noted above, the Prepetition Secured Parties indicated that they would not consent to a "priming" DIP financing provided by a third party, and therefore the DIP Facility avoids the need for a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases. In tandem with the RSA, the DIP Facility provides a path to emergence that is important to reassure customers and vendors, protect operations, and maximize value for creditors. *See* Turnbull Decl. ¶ 15. Finally, and perhaps most importantly, the DIP Lenders have agreed to equitize a significant

amount of the DIP Claims under the Plan and receive both cash and New Common Stock in lieu of repayment in full in cash. *Id*.

40.     In the lead up to the Petition Date, the Debtors, along with Houlihan Lokey and their other advisors, negotiated the terms and provisions of the DIP Facility on behalf of the Debtors. During that time, the parties exchanged multiple term sheets and mark-ups. Over the course of these negotiations, the size and terms of the DIP Facility improved to the benefit of the Debtors. *See* Turnbull Decl. ¶ 16.

41.     The DIP Facility is critical to the Debtors' ability to fund the administrative costs of these chapter 11 cases and provides the Debtors with sufficient liquidity to operate their business without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases. In tandem with the RSA, the DIP Facility provides a path to emergence that is important to reassure customers and vendors, protect operations, and maximize value for creditors.

## Basis for Relief

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

    **A.     Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

42.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables

facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

43.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

44.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition

facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern

District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.***  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

45.    The Debtors' determination to move forward with the DIP Facility is an exercise

of their sound business judgment following an arm's-length process and careful evaluation of

available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors

would require postpetition financing to support their operational and chapter 11 activities.  The

DIP Facility will allow the Debtors to:  (a) fund certain costs, fees, and expenses related to these

chapter 11 cases; (b) provide Adequate Protection Claims (as defined in the Interim Order);

(c) fund the fees, interest, payments, and expenses associated with the DIP Facility, including fees,

costs, and expenses incurred by the DIP Agent and/or the DIP Lenders; and (d) fund the working

capital needs, capital improvements, and expenditures related to these chapter 11 cases.  The

Debtors negotiated the DIP Facility and other DIP Loan Documents with the Prepetition Secured

Parties in good faith, at arm's length, and with the assistance of their respective advisors, and the

Debtors believe that they have obtained the best financing available under the circumstances.

Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents, as it is

a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

46.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders with a: (a) first priority security interest in and liens on the DIP Collateral (as defined in the Interim Order) that was not, on the Petition Date, subject to valid, enforceable, non-avoidable, and perfected security interests and liens; (b) junior security interest in and liens on DIP Collateral of each DIP Lender to the extent such DIP Collateral was, as of the Petition Date, subject to valid, binding, perfected, and non-avoidable senior liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and non-avoidable permitted senior liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and (c) priming security interest and lien on the DIP Collateral of each DIP Lender to the extent such DIP Collateral is subject to prepetition liens that secure the Prepetition Secured Credit Facilities of the Prepetition Secured Parties.

47.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Turnbull Declaration, were a necessary feature here to provide security for the proposed DIP Facility. Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon.  *See, e.g.*, *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); (*In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. July 23, 2019) (same); *In re Blackhawk Mining LLC*, No. 19-

11595 (LSS) (Bankr. D. Del. July 22, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS)

(Bankr. D. Del. Apr. 9, 2019) (same); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D.

Del. Oct. 26, 2018) (same).

48.     The statutory requirement for obtaining postpetition credit under section 364(c) of

the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain

unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C.

§ 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit

under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing

that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine

whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.

Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the
       Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the
       circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't*

*Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393,

401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

49.     As described above and as set forth in the Turnbull Declaration, during the Debtors'

prepetition marketing process, no third-party lender indicated it would be willing to provide

postpetition financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured

Parties.  *See* Turnbull Decl. ¶ 14.  Further, with any third-party proposal, the Debtors would incur

the execution risk associated with a new lender transaction, including timing and due diligence

constraints, necessarily involving the payment of additional professional fees. *Id*. ¶ 13.  The DIP

Facility is therefore the best DIP financing available to the Debtors under the circumstances to provide liquidity during these chapter 11 cases.  *See id*. ¶ 23.

50.     Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these prepackaged chapter 11 cases.  Under the circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are reasonable, as more fully set forth above and in the Turnbull Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

51.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

52.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is

adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility to the extent such DIP Collateral is subject to prepetition liens that secure the Prepetition Secured Credit Facilities of the Prepetition Secured Parties. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) their Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

53.     Here, a substantial majority of the Prepetition Secured Parties have affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility. Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition Secured Parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

54.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d

1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

55.     As noted above, the Debtors do not believe that more favorable alternative debtor-in-possession financing is reasonably available given the realities imposed by the Debtors' capital structure and the Debtors' solicitation of alternative financing proposals.  Additionally, the Debtors' overall restructuring is closely tied to the transactions described in the RSA.  Thus, the Debtors have determined that the DIP Facility provides the most favorable terms, is an integral piece of the transactions contemplated by the RSA, and is provided on reasonable terms under the circumstances.  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for successfully implementing these prepackaged chapter 11 cases on an expeditious basis.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

56.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.[16]  Pursuant to section 363(c)(2) of the Bankruptcy Code, a

---

[16]     The Bankruptcy Code defines "cash collateral" as:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as

debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Here, the DIP Lenders and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

57.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms

provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

35

and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

## A. Adequate Protection Provided to the Prepetition Secured Parties.

58.    As described more fully below and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors, priming of their security interests and liens in the DIP Collateral, and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations") and Adequate Protection Payments (as defined in the Interim Order):

    a.    allowed, superpriority administrative expense claims under section 507(b) of the Bankruptcy Code (subject to the Carve Out and the priorities set out in the Interim Order);

    b.    valid and perfected security interests in and liens on the DIP Collateral (subject to the liens priorities set forth in the Interim Order);

    c.    the reasonable and documented out-of-pocket fees and professional fees and expenses of the Prepetition Secured Parties; and

    d.    payment of all accrued but unpaid interest under the First Lien Credit Agreement.

59.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able

to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim

Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Loan Documents.**

60.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court

approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above,

the Debtors have agreed to pay:

> a.    a commitment fee of 2.0% of the aggregate principal amount of the DIP Commitments;
>
> b.    an exit fee equal to 4.0% of the aggregate funded principal amount of the DIP Loans;
>
> c.    an undrawn DIP fee of 1.0% per annum on the unused portion of the DIP Commitments; and
>
> d.    an agency fee set forth in the letter agreement between the DIP Agent and the Borrower (the "<u>DIP Agent Fee Letter</u>").[17]

61.    Courts in this district and others have approved similar aggregates in fees in large

chapter 11 cases. *See In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2022)

(approving a commitment fee of approximately 3.0 percent of the DIP loans, a backstop fee of

approximately 2.0 percent of the DIP loans, and a fronting premium of approximately 0.50% of

the DIP loans); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving

a cash fee approximately 2.0 percent of the overall DIP facility); *In re PES Holdings LLC*, No. 18-

10122 (KG) (Bankr. D. Del. Jan. 22, 2018) (same); *In re Toys "R" US, Inc.,* No. 17-34665 (KLP)

(Bankr. E.D.Va. Sept. 19, 2017) (approving aggregate fees that were just less than 3.0 percent of

the overall DIP facility).

---

[17]    A copy of the redacted DIP Agent Fee Letter is attached hereto as **<u>Exhibit D</u>**.  The Debtors are requesting to file under seal certain terms of the DIP Agent Fee Letter as further set forth in the Motion to Seal.

62.     It is understood and agreed by all parties that these fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Turnbull Decl. ¶¶ 17–18.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

63.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

64.     As explained herein, the Turnbull Declaration, and the First Day Declaration, the DIP Loan Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances; and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of

section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      Failure to Obtain Immediate Interim Access to Cash Collateral and Incur the DIP Facility Would Cause Immediate and Irreparable Harm.**

65.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

66.      For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facility to continue operations, preserve and maximize the value of their estates, and administer these prepetition chapter 11 cases. The Debtors require immediate access to liquidity to satisfy the day-to-day financing needs of their business operations.  This access will permit the orderly continuation of the operation of their business, maintain business relationships with their vendors and suppliers, pay wages and benefits, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

67.      The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral.  The Debtors will therefore be unable to proceed with their proposed restructuring and sale process, operate their business in the near term, or otherwise fund these chapter 11 cases without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest, including the Prepetition Secured Parties.  In short, the Debtors' ability to finance their operations and the

availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

68.    The Debtors, therefore, seek immediate authority to use the Cash Collateral and incur the DIP Facility, as set forth in this Motion and in the Interim Order, to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).  Accordingly, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

**VI.    The Automatic Stay Should Be Modified on a Limited Basis.**

69.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as defined in the DIP Term Sheet) or a DIP Termination Event and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

70.    In addition, with respect to the Prepetition Secured Parties, the Interim Order permits the Debtors to (a) grant Adequate Protection Liens and Adequate Protection Claims, (b) perform such acts as the Prepetition Agents may request in its reasonable discretion to assure

the perfection and priority of the liens granted herein, (c) incur all liabilities and obligations to the Prepetition Secured Parties under the Interim Order, and (d) subject to the Carve Out, make, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order.  The Interim Order further provides that, upon the expiration of the Notice Period (as defined in the Interim Order), the automatic stay will be automatically terminated (a) to permit the DIP Agent, on behalf of itself and for the benefit of each of the DIP Lenders, to exercise all its rights and remedies set forth in the Interim Order, the DIP Loan Documents, and as otherwise available at law without further order or application or motion to the Court to foreclose upon and sell all or a portion of the DIP Collateral in order to collect any amounts payable to the DIP Secured Parties and (b) to permit the Prepetition Secured Parties to exercise any rights and remedies to satisfy the Prepetition Secured Obligations, the Adequate Protection Claims, and any other Adequate Protection Obligations, subject to the limitations set forth in the Interim Order.

71.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 22, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (same).

### **Request for Final Hearing**

72.    Pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

73.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Reservation of Rights

74.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) other than with respect to the liens in favor of the Prepetition Agents, an admission as to the validity, priority, enforceability or perfection of any lien on, security interest

42

in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

75.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the First Lien Agent and the Second Lien Agent; (e) counsel to the Crossover Group; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral; (j) the Debtors' landlords; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

76.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

| | |
|---|---|
| Dated: August 23, 2022<br>Wilmington, Delaware | */s/ Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              ecorma@pszjlaw.com

-and-

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Tricia Schwallier Collins (*pro hac vice* pending)
Yusuf U. Salloum (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              tricia.schwallier@kirkland.com
              yusuf.salloum@kirkland.com

-and-

Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        nicole.greenblatt@kirkland.com
Email:        rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CARESTREAM HEALTH, INC., *et al.*,[1] | Case No. 22-10778 (___) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket No. [●]** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO**
**(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE**
**CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE**
**PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A**
**FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in these chapter 11 cases (the "<u>Cases</u>") and pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), seeking entry of this interim order (this "<u>Interim Order</u>"):

(i) authorizing the Debtors to obtain postpetition financing and other financial accommodations in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured multi-draw term loan facility in an aggregate principal amount of up to $80,000,000 (the "<u>DIP</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

[2] Capitalized terms used but not defined in this Interim Order have the meanings ascribed to them in the Motion.

Facility"), consisting of (x) a $5,000,000 tranche of new money terms loans (the "Tranche A DIP Loans") and (y) a $75,000,000 tranche of new money terms loans (the "Tranche B DIP  Loans"); *provided* that (A) an initial amount of up to $50,000,000 of the DIP Facility (the "Initial DIP Amount"), which shall consist of $3,125,000 of Tranche A DIP Loans (the "Tranche A Initial DIP Loans") and $46,875,000 of Tranche B DIP Loans (the "Tranche B Initial DIP Loans" and, together with the Tranche A Initial DIP Loans, the "Initial DIP Loans"), shall be made available to the Debtors immediately upon entry of this Interim Order and in accordance with the terms set forth in the *Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet*, dated as of August 21, 2022, attached hereto as **Exhibit A** (the "DIP Term Sheet") and (B) an additional amount of up to $30,000,000 (the "Delayed Draw DIP Amount"), which shall consist of $1,875,000 of Tranche A DIP Loans (the "Tranche A Final DIP Loans") and $28,125,000 of Tranche B DIP Loans (the "Tranche B Final DIP Loans," and, together with the Tranche A Final DIP Loans, the "Delayed Draw DIP Loans," and, together with the Initial DIP Loans, the "DIP Loans"), shall be made available to the Debtors in one or more draws, upon entry of, and subject to the terms of, the Final Order and, for each of the Initial DIP Loans and Delayed Draw DIP Loans, subject to satisfaction of the applicable conditions set forth in the DIP Term Sheet and all other applicable terms and conditions of the DIP Loan Documents (as defined below);

(ii)     authorizing the Debtors to (a) enter into the DIP Term Sheet by and among the Borrower, the Guarantors, the relevant lenders (collectively, the "DIP Lenders"),[3] and JPMorgan Chase Bank, N.A., as administrative and collateral agent (in each such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; together with this Interim Order, the Final Order, and, and all agreements, documents, and instruments delivered or executed in connection therewith, collectively the "DIP Loan Documents"), (b) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents, and (c) to enter into any agreements with respect to the cash collateralization of any outstanding and undrawn Letters of Credit issued under (and as defined in) the First Lien Credit Agreement (as defined below) (any such agreement  an "L/C Cash Collateral Agreement" and the liens granted thereunder, the "L/C Cash Collateral Liens");

(iii)    authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral, including Cash Collateral, in accordance with the terms hereof and the DIP Budget (after giving effect to Permitted Variances), as further described herein, to pay for working capital needs, and to provide working capital for other general corporate purposes, of the Debtors in the ordinary course of business and for the costs and expenses of administering the Cases, including for payment of any

---

[3]    The DIP Lenders include the lenders under the Prepetition Secured Credit Facilities that are each party to the DIP Commitment Letter, dated August 21, 2022 (the "DIP Commitment Letter"), attached hereto as **Exhibit A**.

Adequate Protection Obligations (all as defined below) and reasonable and documented transaction costs, fees, and expenses incurred in connection with the restructuring to be implemented through the Cases and to cash collateralize any outstanding and undrawn Letters of Credit as provided in this Interim Order and in the other DIP Loan Documents;

(iv)     granting adequate protection to the extent of any Diminution in Value, with respect to each of the Debtors, to the Prepetition Secured Parties under the Prepetition Credit Documents on account of the Priming Liens and for the use of their Cash Collateral and the Prepetition Collateral (all as defined below);

(v)      authorizing, on the terms set forth herein, the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such become earned, due and payable, including, without limitation, the DIP Commitment Fee, the Exit Fee, the Undrawn DIP Fee, the Agency Fee (all as defined below), audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees and expenses, and prepetition and postpetition reasonable fees and disbursements of each of the DIP Secured Parties' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Loan Documents;

(vi)     granting valid, enforceable, non-avoidable, and fully perfected liens and security interests pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code on the DIP Collateral and all proceeds thereof, including, any (subject to entry of the Final Order) Avoidance Proceeds subject only to the Carve Out, the Permitted Liens (all as defined below), if any, and the L/C Cash Collateral Liens in each case on the terms and conditions set forth herein and in the DIP Loan Documents, to secure principal of, and accrued interest on, the DIP Loans, and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other Obligations (as defined in the DIP Loan Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the DIP Facility, including the DIP Commitment Fee, the Exit Fee, the Undrawn DIP Fee, the Agency Fee (collectively, the "DIP Obligations");

(vii)    granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Secured Parties, with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(viii)   subject to and upon entry of a Final Order, the waiver of (x) the Debtors' and the estates' ability to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, effective as of the Petition Date, (y) the applicability of the "equities of the case" exception under Bankruptcy Code section

552(b) with respect to the proceeds, products, offspring or profits of the Prepetition Collateral, and (z) the doctrine of "marshaling" and any other similar equitable doctrine with respect to any of the Prepetition Collateral;

(ix)    authorizing the DIP Secured Parties to exercise remedies under the DIP Loan Documents on the terms described herein upon the occurrence and during the continuation of a DIP Termination Event (as defined below);

(x)    authorizing for the Issuing Lender (as defined in the First Lien Credit Agreement) to exercise any remedies under any L/C Cash Collateral Agreement in accordance therewith;

(xi)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(xii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and entry of a final order (the "Final Order") and approving the form of notice with respect to the Final Hearing.

This Court having considered the relief requested in the Motion, the DIP Declaration,[4] the First Day Declaration and the arguments of counsel made at the Hearing; and notice of the Motion and the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and all applicable Local Rules; the Hearing to consider the relief requested in the Motion having been held and concluded; all objections and reservations of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled on the merits by this Court; it appearing that approval of the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; it appearing that the Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors'

---

[4]    The "DIP Declaration" means the *Declaration of Andrew Turnbull in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed contemporaneously with the Motion.

business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[5]

A.      <u>Disposition</u>.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effectively immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.      <u>Petition Date</u>.  On August 23, 2022 (the "<u>Petition Date</u>"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>").

C.      <u>Debtors in Possession</u>.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Cases and no official committees have been appointed or designated.

D.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of

---

[5]      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

Delaware, dated February 29, 2012.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1.

E.    <u>Notice</u>.  Upon the record presented to this Court at the Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) and Local Rule 9013-1(m), which notice was appropriate under the circumstances and sufficient for the Motion.  No other or further notice of the Motion or entry of this Interim Order is required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

F.    <u>Final Hearing</u>.  At the Final Hearing, the Debtors will seek approval of the Final Order, which shall be subject to the terms and conditions of the DIP Loan Documents.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

G.    <u>Prepetition Secured Debt</u>.  Without prejudice to the rights of any party, but subject to the limitations thereon contained in Paragraphs 26 and 27 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(i)    *<u>First Lien Credit Agreement</u>*.

(a)    *Revolving and Term Loan Credit Facilities*.  Pursuant to that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013 (as amended,

6

restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement," and together with all other related documents, guarantees, and agreements, including, without limitation, security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments or certificates executed in connection with the First Lien Credit Agreement, including the Intercreditor Agreement (as defined below), the "First Lien Credit Documents"), by and among Debtor Carestream Health, Inc., as borrower (the "Borrower"), the Debtor Carestream Health Holdings, Inc., as Holdings, the subsidiary guarantors thereunder, Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "First Lien Agent"), and the lenders party thereto (the "First Lien Lenders" and together with the First Lien Agent, the "First Lien Secured Parties"), which provided (x) a term loan facility pursuant to which First Lien Lenders (in such capacity, the "First Lien Term Loan Lenders") made loans to the Borrower (such loans, the "First Lien Term Loans") and (y) a revolving credit facility (the "First Lien Revolving Facility" and, together with the First Lien Term Loans, the "First Lien Secured Credit Facilities") pursuant to which certain First Lien Lenders (in such capacity, the "Revolving Lenders") made loans (such loans, the "Revolving Facility Loans") to, and participated in Letters of Credit issued for the benefit of, the Borrower. Each of the First Lien Credit Documents is valid, binding, and enforceable in accordance with its terms.

(b)     *Revolving Facility Loans Obligations.* As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Revolving Lenders in respect of (i) the Revolving Facility Loans in the aggregate principal amount outstanding of approximately $77,000,000 (which amount excludes the face value of Letters of Credit and the amount of the Hedge Claims (as defined in the Plan)), (ii) approximately $541,593 on account of accrued and unpaid interest thereon as of the Petition Date, and (iii) the

aggregate face amount of $5,317,486 on account of undrawn Letters of Credit issued under the First Lien Credit Agreement, in each case, pursuant to, and in accordance with the terms of, the First Lien Documents (together with all accrued and unpaid commitment and participation fees thereon as of the Petition Date, the "Revolving Loan Obligations Amount"), plus any amounts, including termination payments, now or hereafter due under Specified Swap Agreements (as defined in the First Lien Credit Agreement), including the ISDA Master Agreement, dated as of September 29, 2011, between JP Morgan Chase Bank, N.A. and Carestream Health, Inc., including any schedules and appendix thereto, plus (in each case, to the extent constituting allowable claims under the Bankruptcy Code) all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other Obligations (as defined in the First Lien Credit Agreement) in respect of the First Lien Revolving Facility and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the First Lien Credit Agreement (collectively, including the Revolving Loan Obligations Amount, the "Revolving Loan Obligations").

(c)     *First Lien Term Loans Obligations*.  As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the First Lien Term Loan Lenders and the First Lien Agent in respect of the First Lien Term Loans in the aggregate amount of approximately $514,955,000, which consists of (x) approximately $507,719,700 in principal amount of term loans advanced under the First Lien Credit Agreement, *plus* (y) approximately $7,235,300 on account of accrued and unpaid interest thereon as of the Petition Date ((x) and (y) together, the "First Lien Term Loan Obligations Amount"), *plus* (in each case, to the extent constituting allowable claims under the Bankruptcy Code) all other fees, costs, expenses, indemnification obligations, reimbursement obligations,

charges, premiums, if any, additional interest, any other Obligations (as defined in the First Lien Credit Agreement) in respect of the First Lien Term Loans and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the First Lien Credit Agreement (collectively, including the First Lien Term Loan Obligations Amount, the "First Lien Term Loan Obligations").  The First Lien Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise.

(d)     *Prepetition First Liens*.  The liens and security interests granted to the First Lien Secured Parties pursuant to and in connection with the First Lien Credit Documents (the "Prepetition First Liens") are:  (i) valid, binding, perfected, enforceable, first-priority (subject to Permitted Liens (as defined in the First Lien Credit Agreement) permitted to have priority under the First Lien Credit Agreement) liens and security interests in the Collateral (as defined in the First Lien Credit Agreement, the "Prepetition Collateral"); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law.

(e)     No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the First Lien Secured Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the First Lien Credit Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action, or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(ii)        *Second Lien Credit Agreement*.

(a)        Pursuant to that certain Second Lien Credit Agreement, dated as of June 7, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement," and together with all other related documents, guarantees, and agreements, including, without limitation, security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments or certificates executed in connection with the Second Lien Credit Agreement, the "Second Lien Credit Documents" and, together with the First Lien Credit Documents, the "Prepetition Credit Documents"), by and among the Borrower, as borrower, Debtor Carestream Health Holdings, Inc., as Holdings, the subsidiary guarantors thereunder, Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "Second Lien Term Loan Agent" and, together with the First Lien Agent, the "Prepetition Agents"), and the lenders party thereto (the "Second Lien Lenders" and together with the Second Lien Term Loan Agent, the "Second Lien Secured Parties" and, together with the First Lien Secured Parties, the "Prepetition Secured Parties"), which provided a term loan facility pursuant to which the Second Lien Lenders made loans to the Borrower (the "Second Lien Term Loan" and, together with the First Lien Secured Credit Facilities, the "Prepetition Secured Credit Facilities").  Each of the Second Lien Credit Documents is valid, binding, and enforceable in accordance with its terms.

(b)        *Second Lien Term Loan Obligations*.  As of the Petition Date, the aggregate outstanding principal amount owed by the Borrower and the guarantors under the Second Lien Credit Documents was approximately $448,235,000 (together with any interest, premiums (if any) fees, expenses (including, without limitation, the reasonable and documented fees, disbursements and other charges of counsel to the Second Lien Secured Parties), costs, and other charges or

amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Second Lien Credit Documents, and further including all Obligations (as defined in the Second Lien Credit Agreement), and all interest, fees, premiums (if any) costs, expenses, and other charges allowable under Bankruptcy Code section 506(b), the "Second Lien Term Loan Obligations" and, collectively with the First Lien Obligations, the "Prepetition Secured Obligations").

(c)     *Prepetition Second Liens.*   The liens and security interests granted to the Second Lien Secured Parties pursuant to and in connection with the Second Lien Credit Documents (the "Prepetition Second Liens" and together with the Prepetition First Liens, the "Prepetition Liens") are:  (i) valid, binding, perfected, enforceable, second-priority (subject to Permitted Liens (as defined in the Second Lien Credit Agreement) permitted to have priority under the Second Lien Credit Agreement) liens and security interests in the Prepetition Collateral; and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law.

(iii)     *Prepetition Liens.*   As of the Petition Date:  (a) the Prepetition Liens were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain senior liens senior by operation of law or as permitted by the Prepetition Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date or were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (such liens, "Permitted Liens"); (c) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of

any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (d) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Secured Credit Facilities; and (e) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors.

(iv)     *Intercreditor*.  That certain Intercreditor Agreement, dated as of June 7, 2013 (as amended from time to time), among the First Lien Agent, the Second Lien Term Loan Agent and each other Representative (as defined therein) from time to time party thereto (the "Intercreditor Agreement") is binding and enforceable in accordance with its terms.

(v)     *Cash Collateral*.  Substantially all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, existing as of the Petition Date, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral, existing as of the Petition Date, and the proceeds of any of the foregoing, wherever located is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(vi)     *No Control*.  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors'

12

operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition Secured Credit Facilities, or the Prepetition Credit Documents.

(vii)        *Credit Bidding*.  No Debtor or Debtor's affiliate shall object to any DIP Secured Party's or Prepetition Secured Party's right to credit bid up to the full amount of its DIP Obligations and/or Prepetition Secured Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise, subject to applicable law.

H.    Findings Regarding the DIP Facility and Use of Cash Collateral.

(i)        Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Facility and to use the Cash Collateral of the Prepetition Secured Parties (solely to the extent consistent with the Approved DIP Budget (as defined below) (after giving effect to permitted variances as set forth in this Interim Order and the DIP Loan Documents)) and to authorize the provision of adequate protection.

(ii)        As set forth in the DIP Declaration, and the First Day Declaration, the Debtors have an ongoing and immediate need to continue the use of Cash Collateral, and the need to obtain credit pursuant to the DIP Facility, among other things:   (a) permit the orderly continuation of their respective businesses; (b) maintain business relationships with their vendors, suppliers, customers, and other parties; (c) make investments, capital expenditures, and pay ongoing costs of operations; (d) make adequate protection payments; and (e) pay the costs of administration of the Cases and satisfy other working capital and general corporate purposes of

the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' businesses.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout the Cases without the DIP Facility and authorized use of Cash Collateral.

(iii)    As set forth in the DIP Declaration and the First Day Declaration, the Debtors are unable to obtain financing and other financial accommodations on more favorable terms from sources other than from the DIP Lenders under the DIP Loan Documents and are unable to obtain satisfactory unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Loan Documents and the consensual use of Cash Collateral on more favorable terms without the Debtors granting to the DIP Agent, for the benefit of itself and the DIP Lenders, subject to the Carve Out as provided for herein and the Permitted Liens (if any), the DIP Liens (as defined below), the L/C Cash Collateral Liens, and the DIP Superpriority Claims (as defined below), incurring the Adequate Protection Obligations, in each case subject to the Carve Out and incurring the DIP Commitment Fee, the Exit Fee, the Undrawn DIP Fee, the Agency Fee, and all other fees and expenses provided in the DIP Loan Documents, in each case subject to the Carve Out, under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(iv)    Based on the Motion, the First Day Declaration, and the DIP Declaration, and the record presented to the Court at the Hearing, the terms of the DIP Facility and the terms of the adequate protection granted to the Prepetition Secured Parties as provided in this Interim

Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

(v)      The DIP Facility and the use of Prepetition Collateral, including Cash Collateral, have been negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents, and any DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vi)      The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral), to fund the administration of the Debtors' estates and the continued operation of their businesses, (including the incurrence and payment of any Adequate Protection Obligations and the granting of Adequate Protection Liens (defined below)), in accordance with the terms hereof, and the Adequate Protection Claims (defined below), security interests and liens, and other rights, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns) pursuant to this Interim Order and the DIP Loan Documents shall be deemed to have been agreed

to by the Prepetition Secured Parties and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the Prepetition Secured Parties (and their successors and assigns) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vii)    The Prepetition Agents (at the direction of the applicable lenders as set forth in the Prepetition Credit Agreements), on behalf and for the benefit of each of the Prepetition Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, and the terms of the adequate protection provided for in this Interim Order, including that the Adequate Protection Liens and Adequate Protection Claims are subject and subordinate to the Carve Out and the L/C Cash Collateral Liens.

I.    <u>Permitted Liens; Continuation of Prepetition Liens</u>.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice any rights of any party in interest, including, but not limited to, any of the Debtors, the DIP Secured Parties, or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Lien or security interest.

J.    <u>Sections 506(c) and 552(b) of the Bankruptcy Code and Marshaling</u>.  Subject to entry of a Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facility that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facility

to the extent set forth herein, (b) the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of Cash Collateral consistent with the Approved DIP Budget and the terms of this Interim Order, and subject to entry of the Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties have negotiated for, and (x) the Debtors intend to seek (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof and (y) shall not be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

K.    Immediate Entry.    Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).    Consummation of the DIP Facility and the use of Cash Collateral, in accordance with this Interim Order and the DIP Loan Documents, is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.    Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

1.    Motion Granted.    The interim relief sought in the Motion is granted to the extent set forth herein, the financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection on an interim basis is authorized, in each case subject to the terms and conditions set forth in this Interim Order and the other DIP Loan Documents.    Any and all objections to this Interim Order, to the extent not withdrawn, waived,

settled, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

       2.     <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

       (a)     The Debtors are hereby expressly authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, and such additional documents, instruments, certificates and agreements as may be required or reasonably requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Loan Documents in good faith and in all respects such DIP Loan Documents shall be consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Agent and the Required DIP Lenders (as defined in the DIP Term Sheet) consistent with the consent rights under the RSA.[6]  The Debtors are also authorized and empowered to enter into and deliver any L/C Cash Collateral Agreements and such additional documents, instruments, certificates and agreements as may be required or requested by the Issuing Lender to implement the terms or effectuate the purposes of this Interim Order and any L/C Cash Collateral Agreement, in each case, in accordance with this Interim Order.  Upon execution and delivery thereof, each L/C Cash Collateral Agreement shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically modified, to the extent necessary, with respect to the L/C Issuer so that it may exercise the rights and remedies set forth in any L/C Cash Collateral Agreement in accordance therewith for the benefit of the First Lien Secured Parties, without further notice or order of the Court.  Upon entry of this Interim Order and until execution and delivery of

---

[6] The "<u>RSA</u>" means the Restructuring Support Agreement, dated August 21, 2022.

the DIP Loan Documents required or requested by the DIP Secured Parties, the Debtors and the DIP Secured Parties shall be bound by (x) the terms and conditions and other provisions set forth in the DIP Term Sheet, with the same force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (y) this Interim Order, and this Interim Order and the DIP Term Sheet shall govern and control the DIP Facility.  Upon execution and delivery of the DIP Loan Documents, (a) the DIP Term Sheet shall be superseded by any debtor in possession loan agreement (if any) (the "DIP Loan Agreement") and such other DIP Loan Documents, and (b) this Interim Order, the DIP Loan Agreement, and such other DIP Loan Documents shall govern and control the DIP Facility.  The parties to the DIP Facility are hereby authorized to execute and enter into their respective obligations under the DIP Loan Documents, subject to the terms and conditions set forth therein and this Interim Order.  Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the Motion, the DIP Loan Documents, and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  To the extent there is a conflict between the terms and conditions of the Motion and the DIP Loan Documents, the terms and conditions of the DIP Loan Documents shall govern.

(b)      Upon entry of this Interim Order, the Borrower is hereby immediately authorized, subject to the terms and conditions of the DIP Loan Documents, to borrow, and the Guarantors, on a joint and several basis, are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $50 million (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Loan Documents) in DIP Loans, and upon entry of the Final Order, up to an aggregate principal amount of $80 million (plus interest, fees, indemnities, and

other expenses and other amounts provided for in the DIP Loan Documents) in DIP Loans, in each case subject to any limitations on availability or borrowing under the DIP Loan Documents, which shall be used for all purposes permitted under the DIP Loan Documents, including, without limitation, to provide working and investment capital for the Debtors and to pay interest, fees, and expenses and make adequate protection and other payments in accordance with this Interim Order and the other DIP Loan Documents, as set forth in the DIP Loan Documents, all subject to and in accordance with this Interim Order.

(c)     In furtherance of the foregoing and without further approval of this Court, each Debtor is hereby authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary to perform all acts and to perform all acts, to make, execute, and deliver all instruments, certificates, agreements and documents (including, without limitation, the DIP Loan Agreement (if any), the execution or recordation of pledge and security agreements, financing statements, and other similar documents) and to pay all reasonable and actual fees and expenses in connection with or that may be reasonably required, appropriate or desirable for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Loan Documents, including, without limitation, the DIP Term Sheet, the DIP Loan Agreement (if applicable) and any collateral documents contemplated thereby;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the DIP Loan Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may agree), it being understood that no

further approval of this Court shall be required for any non-material authorizations, amendments, waivers, consents or other non-material modifications to and under the DIP Loan Documents or the DIP Obligations, as well as any fees and other expenses (including attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in connection therewith;

(iii)       the non-refundable and irrevocable payment to the DIP Agent and the DIP Lenders, as the case may be, of all reasonable and documented fees and expenses (which fees and expenses, in each case, were and were deemed to have been approved upon entry of this Interim Order, whether or not the fees and expenses arose before or after the Petition Date, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Loan Agreement or DIP Loan Documents, including (a) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, Akin Gump Strauss Hauer & Feld, LLP (as counsel to the DIP Lenders), GLC & Co. Advisors, LLC (as financial advisor to the DIP Lenders), Simpson Thacher & Bartlett LLP (as counsel to the DIP Agent), and Troutman Pepper Hamilton Sanders LLP (as Delaware counsel to the DIP Lenders) to the DIP Secured Parties, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with

respect thereto any interim or final fee application with the Court provided that any fees and expenses of a professional shall be subject to the provisions of Paragraphs 14 and 24 of this Interim Order, (b) a commitment fee of 2.00% of the total aggregate commitments in respect of the DIP Facility payable in kind, earned upon execution of the DIP Commitment Letter and payable upon entry of this Interim Order pursuant to the terms of the DIP Term Sheet (the "<u>DIP Commitment Fee</u>"), (c) a fee of 4.00% of the funded amount of the DIP Loans, payable in cash, earned upon entry of this Interim Order and payable in accordance with the DIP Term Sheet and the DIP Loan Documents (the "<u>Exit Fee</u>"), (d) an unused commitment fee of 1.00% per annum on the unused portion of the DIP Commitments (as defined in the DIP Term Sheet), payable in accordance with the DIP Term Sheet and the DIP Loan Documents (the "<u>Undrawn DIP Fee</u>"), and (e) an agency fee set forth in the letter agreement between the DIP Agent and the Borrower (the "<u>Agency Fee</u>");

      (iv)      make the payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

      (v)      the performance of all other acts necessary, appropriate, or desirable under or in connection with the DIP Loan Documents.

3.    <u>DIP Obligations</u>.  Upon entry of this Interim Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $50 million in Initial DIP Loans, subject to and in accordance with this Interim Order.  Upon entry of this Interim Order, the DIP Loan Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Interim Order and the other DIP Loan Documents, against each Debtor, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the

foregoing (collectively, the "Successor Cases").  Except as permitted by this Interim Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents to the DIP Agent and/or the DIP Lenders or the Issuing Lender shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.

4.     DIP Liens.  Subject to the Carve Out and the L/C Cash Collateral Liens in all respects, subject to the below, effective and perfected immediately upon entry of this Interim Order, the DIP Obligations shall be secured by valid, binding, continuing enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests, the "DIP Liens"), all assets of the Borrower and each Guarantor (and, in the case of each Debtor, its bankruptcy estate) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights

and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, and subject to entry of the Final DIP Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (all such property, the "DIP Collateral") as follows:

(a)     Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral, that, on or as of the Petition Date is not subject to Permitted Liens or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), excluding Avoidance Actions (as defined below) but, subject to entry of the Final Order, including the Avoidance Proceeds (as defined below), subject only to Permitted Liens, the L/C Cash Collateral Liens, and payment of the Carve Out;

(b)     Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming security interest and lien (the "Priming Liens") on all DIP Collateral, subject only to the Carve Out, Permitted Liens, L/C Cash Collateral Liens, or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (if any).  The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties, with respect to the Prepetition Secured Credit Facilities (including, without limitation, the Prepetition Liens and the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "Primed Liens").  Notwithstanding anything herein to the contrary, the Priming Liens (i) shall

be subject and junior to the Carve Out in all respects and Permitted Liens (if any) and L/C Cash Collateral Liens and (ii) shall be senior in all respects to the Primed Liens; and

(c)    Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest and lien on all DIP Collateral that is subject to valid, perfected, and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b) (other than the Primed Liens, L/C Cash Collateral Liens, or to any Permitted Liens), which liens shall be junior and subordinate to (a) the Carve Out, (b) any such valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date, and/or (c) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b); *provided* that nothing in the foregoing shall limit the rights of the DIP Secured Parties under the DIP Loan Documents to the extent any such liens are not permitted thereunder.

5.    DIP Superpriority Claims.    Pursuant to, and to the extent provided by, section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may

become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions"), but including, subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise (collectively, the "Avoidance Proceeds")) in accordance with the other DIP Loan Documents, subject only to, and subordinated in all respects to, payment of the Carve Out and to any obligations under any L/C Cash Collateral Agreement. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

6.    Cash Management Obligations.  The Debtors are authorized to continue utilizing the products and services of Bank of America, N.A. (together with its affiliates, a "Cash Management Bank") and incur obligations in connection with various cash management products and services (including, without limitation, treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any overdraft or similar services) provided to the Debtors and/or any of their affiliates (for which the Debtors are otherwise liable) on a postpetition basis consistent with historical practices (the "Postpetition Cash Management Obligations") on the terms set forth

in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief*, filed contemporaneously herewith. Notwithstanding anything else in this Interim Order, any Postpetition Cash Management Obligations shall be secured by the DIP Collateral on a *pari passu* basis with the DIP Liens (the "Cash Management Liens").

   7. <u>Reporting Requirements/Access to Records</u>.  The Debtors shall provide advisors to the DIP Lenders with all reporting and other information required to be provided to the DIP Agent under the DIP Loan Documents.  During the pendency of these Cases, the Debtors shall permit representatives and independent contractors of the DIP Agent and each DIP Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (so long as the Debtors have the reasonable opportunity to participate in such meeting), all at the reasonable expense of the Borrower (*provided* that the Borrower shall only be obligated to reimburse such expenses for two visits during the pendency of these Cases, *provided further*, that no more than one visit shall take place during any 60-day period) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this paragraph 7.

8.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notices set forth in (iii) below), (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, which shall not be subject to the Approved DIP Budget (without regard to the notice set forth in (iii) below), (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers) (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 (the "<u>Debtor Professionals</u>") and any official committee of unsecured creditors pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether allowed by this Court prior to or after delivery of a Carve Out Trigger Notice, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following the delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any official committee of unsecured creditors (the "<u>Committee</u>") (if any), which notice may be delivered following the

occurrence and during the continuation of a DIP Termination Event and acceleration of the DIP Obligations stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel for the Committee (if any) (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for the DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (whether or not such Allowed Professional Fees have been allowed by this Court prior to the Termination Declaration Date).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations), in an an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advance shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the Interim Order as set forth above).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to

pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business date after the DIP Agent gives any such notice to such DIP Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of an Event of Default (as defined in the DIP Term Sheet) or DIP Termination Event, the failure of the Debtors to satisfy any or all of the conditions precedent for the DIP Loans under the DIP Facility, any termination of the DIP Obligations following a DIP Termination Event, or the occurrence of the Maturity Date, each DIP Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Obligations have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Obligations have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 8, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 8, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved DIP Budget, DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Secured Credit Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Claims, and any and

all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees (regardless of the date such Allowed Professional Fees are allowed by this Court) shall not reduce the Carve Out.

(d)    <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases.  Subject to the Carve Out, nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

9.    <u>Limitation on Charging Expenses against Collateral</u>.  Subject to entry of the Final Order and effective as of the Petition Date, in light of the agreement of the DIP Secured Parties and the Prepetition Secured Parties to allow (i) the Debtors to use Cash Collateral as provided for herein, (ii) the Carve Out, and (iii) for the subordination of the Primed Liens to the DIP Liens, no

expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Required DIP Lenders, and the Prepetition Agents, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence.

10.    <u>No Marshaling/Application of Proceeds</u>.  Subject to entry of the Final Order and effective as of the Petition Date, the DIP Agent and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Final Order, the DIP Loan Documents, and the Prepetition Credit Documents, as applicable, and in no event shall any of the DIP Secured Parties or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

11.    <u>Equities of the Case</u>.  Subject to entry of the Final Order and effective as of the Petition Date, in light of, among other things, the agreement of the DIP Secured Parties and the Prepetition Secured Parties to allow the Debtors to use Cash Collateral on the terms set forth herein (i) the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, if any, and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

12.    <u>Payments Free and Clear</u>.  Subject to the Carve Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Issuing Lender pursuant to the provisions of this Interim Order and any other DIP Loan Document or any subsequent order of this Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through, or on behalf of the Debtors (and, solely in the case of waivers of rights under sections 506(c) and 552(b) of the Bankruptcy Code, subject to the entry of the Final Order).

13.    <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties solely in accordance with this Interim Order and the DIP Loan Documents, to the extent set forth in the Approved DIP Budget, including, without limitation, to make payments on account of the Adequate Protection Obligations and other obligations provided for in this Interim Order and the DIP Loan Documents, including, for the avoidance of doubt, (a) for working capital and general corporate purposes of the Debtors, including for the payment of rent and other lease expenses and professional fees, in the ordinary course of business, (b) for the costs and expenses of administering the Cases, including for payment of any Adequate Protection Obligations, including all outstanding and unpaid fees and expenses of the Prepetition Secured Parties, and their professionals in accordance with the terms of this Interim Order, (c) the costs and expenses related to the DIP Facility, and (d) any other purposes specifically set forth in the Approved DIP Budget.  The Debtors may also, in accordance with this Interim Order, use and/or apply Cash Collateral, proceeds of the Prepetition First Lien Collateral and the DIP Collateral, including proceeds realized form a sale or disposition thereof,

or from payment thereon, and DIP Loans to cash collateralize outstanding and undrawn Letters of Credit.

14.    <u>Adequate Protection for the Prepetition Secured Parties</u>.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the aggregate postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from, among other things, the imposition of the Priming Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Agents, for the benefit of itself and the other Prepetition Secured Parties, are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):

(a)    <u>First Lien Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, the Prepetition First Lien Agent for the benefit of the First Lien Lenders, is hereby granted additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected postpetition security interests in, and liens on (the "<u>First Lien Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, the DIP Collateral, excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Proceeds).  The First Lien Adequate Protection Liens shall be subject and junior to the DIP Liens (and any liens to which the DIP Liens are junior), the Carve Out, and the L/C Cash Collateral Liens and otherwise be

senior to all other security interests in, liens on, or claims against any of the Prepetition Collateral, including the Prepetition Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

(b)     Second Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, the Prepetition Second Lien Agent for the benefit of the Second Lien Lenders, is hereby granted additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected postpetition security interests in, and liens on, (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, the DIP Collateral, excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Proceeds.  The Second Lien Adequate Protection Liens shall be subject and junior to the DIP Liens (including any liens to which the DIP Liens are junior), the Carve Out, the L/C Cash Collateral Liens, the First Lien Adequate Protection Liens, and the Prepetition First Liens and otherwise be senior to all other security interests in, liens on, or claims against any of the Prepetition Collateral and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

(c)     Adequate Protection Claims.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative expense claim in the Cases of each of the Debtors ahead of and senior to any and all other Administrative Expense Claims in such Cases to the extent of any postpetition Diminution in Value, except the Carve Out and the DIP Superpriority Claims (the "Adequate Protection

Claims"). The Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but, subject to entry of the Final Order, including the Avoidance Proceeds); *provided, that*, the Adequate Protection Claims in respect of the First Lien Obligations shall be senior to the Adequate Protection Claims in respect of the Second Lien Term Loan Obligations. Subject to the Carve Out, the DIP Superpriority Claims, and any obligations under any L/C Cash Collateral Agreement in all respects, the Adequate Protection Claims will not be junior or *pari passu* to any claims and shall have priority over all Administrative Expense Claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code. The Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Adequate Protection Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required DIP Lenders, in each case as provided in the DIP Loan Documents.

(d)     Fees and Expenses. As further adequate protection, the Debtors are authorized and directed to pay, in accordance with Paragraphs 2 and 24 of this Interim Order, the reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (1) Akin Gump Strauss Hauer & Feld LLP and Troutman Pepper Hamilton Sanders LLP, as legal counsel and GLC & Co. Advisors, LLC, as financial advisor, and (2) one primary counsel and one local counsel to Credit Suisse AG, Cayman

Islands Branch, solely in its capacity as First Lien Agent and Second Lien Agent.  Professionals for the Prepetition Secured Parties shall not be required to file applications or motions with the Court for compensation and reimbursement of fees and expenses; *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee (if any) (collectively, the "Fee Notice Parties").  If no objection to payment of the requested Adequate Protection Fees and expenses is made, in writing, by any of the Fee Notice Parties within seven (7) calendar days after delivery of such invoices (the "Fee Objection Period"), then such invoice shall be promptly paid, without further order of, or application to, this Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement.  If within the Fee Objection Period, a Fee Notice Party sends to the affected professional a written objection to such invoice, then only the disputed portion of such Adequate Protection Fees shall not be paid as set forth above until the objection is resolved by the applicable parties in good faith or by order of this Court.  Subject to the terms hereof, the Debtors are authorized, without further notice or hearing, to pay all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition Secured Parties to the extent otherwise payable in accordance with the terms of the Prepetition Credit Documents and this Interim Order; *provided*, *however* that parties shall not have to comply

with the fee review provisions set forth above with respect to any fees or expenses incurred prior to the entry of this Interim Order.

(e)  First Lien Adequate Protection Payments.  As further adequate protection, the First Lien Agent on behalf of the First Lien Lenders, shall receive cash payments in an amount equal to accrued and unpaid interest (excluding default interest) and commitment and participation fees, whether accruing prior to, on, or after the Petition Date as set forth in the First Lien Credit Agreement; *provided* that any amounts previously due but not yet paid as of the Petition Date shall be paid within one (1) Business Day of the funding of the Initial DIP Loans.

15.  Perfection of DIP Liens and Adequate Protection Liens.

(a)  The DIP Agent and the Prepetition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agent or the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable, effective by operation of law and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order) as of the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent or the Prepetition Agents, as applicable, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition Secured Parties, without representation or warranty of any kind) to enable the DIP Agent and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens and the

applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the date of this Interim Order.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition Agents, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)    Subject to entry of a Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto in connection with the granting of the DIP Liens and the Adequate Protection Liens, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Loan Agreement or this Interim Order.

16.    <u>DIP Budget</u>.

(a)    Attached to this Interim Order as **Exhibit B** is a 13-week cash forecast approved by the DIP Agent and the Required DIP Lenders, which reflects on a line-item basis, the Debtors' (i) weekly projected cash receipts, (ii) weekly projected disbursements (including operating expenses in the ordinary course of business, capital expenditures and bankruptcy related

expenses) under the Cases, (iii) the weekly projected outstanding principal balance of the DIP

Loans, and (iv) the weekly projected liquidity of the Debtors (the "Approved DIP Budget").

Starting on the Thursday of the fourth full calendar week after the Petition Date, and continuing

on the Thursday of every fourth week thereafter, the Debtors shall provide the DIP Agent with an

updated budget (collectively with the Approved DIP Budget, the "DIP Budget") covering the

4-week period (each, a "Budget Period") commencing on the date such DIP Budget is delivered.

The updated DIP Budget will replace the previously delivered Approved DIP Budget only if such

updated DIP Budget is acceptable to the Required DIP Lenders in form and substance in their sole

discretion.

(b)    Budget Reporting.  The Debtors shall at all times comply with the DIP

Budget, subject to the Permitted Variances (defined below).  By no later than 5:00 PM (Eastern

Time) on Thursday of the calendar week following the week in which the Petition Date occurs

(the "First Testing Date"), and no later than 5:00 PM (Eastern Time) on each Thursday of each

calendar week thereafter (together with the First Testing Date, each a "Testing Date"), prior to the

Initial Variance Testing Date (as defined below), the Debtors shall deliver to the DIP Secured

Parties (and their advisors), a variance report (each, a "Weekly Variance Report") setting forth, in

reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances

between the actual amounts and those set forth in the then-in-effect Approved DIP Budget for the

Monthly Testing Period (as defined below).  The term "Testing Period" means, with respect to the

Weekly Variance Report required to be delivered, the prior four-week period (except that no such

variance reporting shall be required for the periods prior to the Petition Date).

(c)    Budget Testing.  By no later than 5:00 PM (Eastern Time) on the first

Testing Date that occurs after the four-week anniversary of the First Testing Date (the "Initial

Variance Testing Date") and by not later than 5:00 PM (Eastern Time) on each Thursday thereafter (each such date, the "Monthly Variance Testing Date" and each such subsequent four-week period ending on the Sunday preceding each such Monthly Variance Testing Date, the "Monthly Testing Period"), the Debtors shall provide to the DIP Secured Parties a report reasonably detailing: (i) the aggregate receipts of the Debtors and aggregate disbursements of the Debtors, in each case, during the applicable Monthly Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between (a) the aggregate receipts received by the Debtors during such Monthly Testing Period against the aggregate receipts for such Monthly Testing Period as set forth in the applicable Approved DIP Budget and (b) the aggregate disbursements made by the Debtors during such Monthly Testing Period against the aggregate disbursements for such Monthly Testing Period as set forth in the applicable Approved DIP Budget (a "Monthly Variance Report," together with the Weekly Variance Report, the "Approved Variance Reports"). The Debtors shall comply with the following (collectively, the "Permitted Variances"):

(i)         As of the Initial Variance Testing Date, for the period commencing on the Petition Date and ending on the four-week anniversary of the Petition Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 80% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including professional fees and expenses incurred by the Debtors, the DIP Agent and/or the DIP Lenders)) to exceed 115% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements for such items in the then-in-effect Approved DIP Budget.

(ii)    As of any subsequent Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 85% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including professional fees and expenses incurred by the Debtors, DIP Agent and/or the DIP Lenders)) to exceed 110% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements for such items in the then-in-effect Approved DIP Budget (after giving effect to any Permitted Variances).

17.    Section 507(b) Reservation.  Subject to the Carve Out, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18.    DIP Termination Event.  Subject to any applicable grace period, this Interim Order, and Paragraph 17, the DIP Obligations shall accelerate and become due and payable in full and the DIP Commitments (as defined in the DIP Term Sheet) shall terminate, in each case, without further notice or action by the Court following the earliest to occur of any of the following, unless waived in writing by the DIP Agent and the Required DIP Lenders (each a "DIP Termination Event"):  (i) the occurrence of any Event of Default (as defined in the DIP Term Sheet or the DIP

Loan Documents), which Events of Default are explicitly incorporated by reference into this Interim Order; (ii) the Debtors' failure to comply with any material provision of this Interim Order (provided that such failure is not the result of any action or inaction of the DIP Secured Parties); (iii) the occurrence of the Maturity Date (as defined in the DIP Term Sheet or the DIP Loan Documents); (iv) the entry of an order authorizing the use of Cash Collateral of the DIP Lenders on a non-consensual basis or financing under Bankruptcy Code section 364 that is *pari passu* or senior to the DIP Loans or the Prepetition Secured Credit Facilities or the filing by the Debtors of a motion seeking such authority; (v) dismissal or conversion of the Cases; (vi) any suit, indictment, or similar action by the Department of Justice or a regulatory agency (or entry of any order granting relief from the automatic stay related to the foregoing) against or with respect to any Debtor, the business, operations or assets of any Debtor or any current or former employee of any Debtor, that the DIP Agent determines (in its sole discretion) may be adverse in any material respect to the value of the business, operations, or assets of any Debtor, which is not dismissed or resolved within thirty (30) days; *provided*, that the filing of a proof of claim in the Cases shall not constitute a DIP Termination Event; (vii) termination of the Interim Order or the Final Order, as applicable (except in the case of the Interim Order, as a result of the entry of the Final Order); (viii) the filing of a plan or disclosure statement other than a plan or disclosure statement that is consistent with the RSA or that is otherwise approved by the Required DIP Lenders, which does not provide for the payment in full, in cash of the DIP Loans; and (ix) termination of the RSA by the Company Parties, the Required DIP lenders, or the Required First Lien Consenting Lenders (each as defined in the RSA).

19.    <u>Remedies Upon a DIP Termination Event</u>.  The Debtors shall as soon as reasonably practicable provide notice to counsel to the DIP Agent, the DIP Lenders, and the Prepetition

Agents of the occurrence of any DIP Termination Event.  Upon the occurrence and during the continuation of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence) and following the giving of not less than five (5) business days' advance written notice by counsel for the applicable DIP Secured Party, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee (the "Notice Period"), subject to the obligations with respect to the Carve Out, (i) the DIP Agent, acting at the direction of the Required DIP Lenders, may exercise any rights and remedies against the DIP Collateral available to it under this Interim Order, the DIP Loan Documents, and applicable non-bankruptcy law, and the DIP Secured Parties may exercise such other rights available to them under the DIP Loan Documents or this Interim Order, as applicable, (ii) the Prepetition Secured Parties may exercise any rights and remedies to satisfy the Prepetition Secured Obligations, the Adequate Protection Claims and any other Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, the Permitted Liens (if any) and, in each case, the Carve Out, and (iii) the commitment of each DIP Lender to make DIP Loans will be terminated to the extent any such commitment remains under the DIP Facility.  The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically modified with respect to the DIP Secured Parties and the Prepetition Secured Parties at the end of the Notice Period, without further notice or order of the Court, unless (a) the DIP Agent, acting at the direction of the Required DIP Lenders, the First Lien Agent, acting at the direction of the Required Lenders (as defined in the First Lien Credit Agreement), and the Second Lien Term Loan Agent, acting at the direction of the Required Lenders (as defined in the Second Lien Credit Agreement) elect otherwise in a written notice to the Debtors, which may be by email, and/or (b) the Court has determined that a DIP Termination Event has not occurred and/or is not continuing or the Court

orders otherwise.  Upon termination of the automatic stay, the DIP Secured Parties and the Prepetition Secured Parties, as applicable, shall be permitted to exercise all rights and remedies set forth herein, in the DIP Loan Documents and the Prepetition Credit Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Secured Parties or the Prepetition Secured Parties pursuant to the DIP Loan Documents, the Prepetition Credit Documents, or this Interim Order, as applicable; *provided* that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a DIP Termination Event) or Cash Collateral only to (i) fund operations in the ordinary course of business, subject to the Approved DIP Budget and (ii) to fund the Carve Out Reserves; *provided*, *further* that during the Notice Period the Debtors, the Required DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis at which the Debtors, any official committee of unsecured creditors, or any other party may be heard with respect to the Enforcement Notice and whether a DIP Termination Event has occurred.

20.    <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

21.    <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of any of the DIP Secured Parties or any of the Prepetition Secured Parties to exercise rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Credit Agreements, or applicable law, as

the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

22.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Subject to the Carve Out, other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 364(e) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(c)    Subject to the Carve Out, unless and until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (i) except as permitted under the DIP Loan Documents or with the prior written consent of the DIP Agent and the Required DIP Lenders and the Prepetition Agents, to the extent applicable, (x) any modification, stay, vacatur,

or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), or 507(b)) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Claims, or the Prepetition Secured Obligations (or the liens and security interests secured such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Loan Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, the L/C Cash Collateral Liens, or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iv) an order converting or dismissing any of the Cases; (v) an order appointing a chapter 11 trustee in any of the Cases; or (vi) an order appointing an examiner with expanded powers in any of the Cases.

(d)    Notwithstanding any order dismissing the Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the L/C Cash Collateral Liens, the Adequate Protection Claims and the other administrative claims granted or authorized pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, L/C Cash Collateral Liens, Adequate Protection Claims, and the other administrative claims granted or authorized pursuant to this Interim Order, shall notwithstanding such dismissal, remain binding on all parties in interest),

and (y) to the fullest extent permitted by law this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)    Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the L/C Cash Collateral Liens, the Adequate Protection Claims and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted or authorized by the provisions of this Interim Order and the DIP Loan Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b), or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in the Cases, in any Successor Cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent).  Notwithstanding

anything to the contrary in this Interim Order or the DIP Loan Documents, nothing in this Interim

Order or the DIP Loan Documents shall affect any right of any DIP Lender to object to any sale

of the Debtors' assets or chapter 11 plan that does not pay the DIP Obligations and DIP

Superpriority Claims in full, and all such rights are expressly preserved.

23.    Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Interim Order.  The DIP Secured Parties and the Prepetition Secured Parties have acted in

good faith in connection with this Interim Order and are entitled to rely upon the protections

granted herein and by Bankruptcy Code section 364(e).  Based on the findings set forth in this

Interim Order and the record made during the Interim Hearing, and in accordance with Bankruptcy

Code section 364(e), in the event any or all of the provisions of this Interim Order are hereafter

modified, amended or vacated by a subsequent order of this Court or any other court, the DIP

Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in

Bankruptcy Code section 364(e).  Any such modification, amendment or vacate shall not affect

the validity and enforceability of any advances previously made or made hereunder, or lien, claim

or priority authorized or created hereby.

24.    Expenses and Indemnification.

(a)    The Debtors are authorized and directed to pay, without further Court order,

the reasonable and documented prepetition and postpetition fees, costs, and expenses incurred by

the DIP Agent, the DIP Lenders, and the Crossover Group (as defined in the RSA) relating to the

DIP Facility (including (i) any amendments, modifications or waivers in respect thereof, (ii) the

administration thereof and (iii) in connection with the enforcement or protection of rights in

connection with the DIP Facility or the documentation in respect thereof) and the Cases (including,

without limitation, prepetition and postpetition fees and disbursements of counsel and advisors,

including, but not limited to, the fees, costs and expenses of Akin Gump Strauss Hauer & Feld, LLP, GLC & Co. Advisors, LLC, Simpson Thacher & Bartlett LLP and Troutman Pepper Hamilton Sanders LLP (as Delaware counsel) (collectively, the "DIP Professionals")) (collectively, the "DIP Professional Fees").  The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Fee Notice Parties.  If no objection to payment of the requested DIP Professional Fees and expenses is made, in writing, by any of the Fee Notice Parties within the Fee Objection Period, then such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement.  For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.  If within the Fee Objection Period, a Fee Notice Party sends to the affected professional and files with the Court a written objection to such invoice, then only the disputed portion of such DIP Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any undisputed portion shall be paid within five (5) calendar days following the expiration of the Fee Objection Period.

(b)      In addition, the Debtors will, jointly and severally, indemnify the DIP

Lenders and the DIP Agent, and their respective affiliates, successors and assigns and the partners,

officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each

of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any

and all losses, claims (including intraparty claims), demands, damages, costs, expenses (including

but not limited to reasonable and documented legal fees and expenses), and liabilities of any kind

(collectively, "Liabilities") arising out of or relating to (i) the execution or delivery of the DIP

Term Sheet, the DIP Loan Agreement (if any), and the other DIP Loan Documents, transactions

contemplated hereby and thereby, (ii) the performance by the parties hereto of their respective

obligations hereunder or thereunder or the consummation of the Restructuring Transactions (as

defined in the DIP Term Sheet) or any other transactions contemplated hereby, (iii) any DIP Loan

or any actual or proposed use of the proceeds therefrom, (iv) any actual or alleged presence or

release of Materials of Environmental Concern (as defined in the DIP Term Sheet) on or from any

property owned or operated by the Debtors or any of their subsidiaries, or (v) any actual or

prospective claim, litigation, investigation, action, suit, arbitration or administrative, judicial or

regulatory action or proceeding in any jurisdiction (each, a "Proceeding") relating to any of the

foregoing, whether or not such Proceeding is brought by a Debtor or its equity holders, affiliates,

creditors or any other third party and whether based on contract, tort or any other theory and

regardless of whether any Indemnified Person is a party thereto; *provided* that no such person will

be indemnified for costs, expenses, or liabilities to the extent such Liabilities or related expenses

are determined by a final, non-appealable judgment of a court of competent jurisdiction to have

resulted primarily from the bad faith, gross negligence, or willful misconduct of such Indemnified

Person.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort

or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's actual fraud, gross negligence, or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

25.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Except as provided herein, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral (including cash held in respect of the L/C Cash Collateral Liens), or the Carve Out may be used:  (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Loan Documents, this Interim Order or the Prepetition Term Loan and Security Agreement, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (b) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP

Obligations, or the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral, the L/C Cash Collateral Liens, or the Prepetition Secured Obligations or the Prepetition Liens in the Prepetition Collateral, or (c) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations or by or on behalf of the DIP Secured Parties related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; or (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of:  (x) any of the DIP Liens or any other rights or interests of the DIP Secured Parties related to the DIP Obligations or the DIP Liens, (y) any of the L/C Cash Collateral Liens or any rights or interests of the parties to the L/C Cash Collateral Agreement, or (z) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations or the Prepetition Liens; *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any Committee to investigate the foregoing

matters within the Challenge Period.  Nothing contained in this paragraph 25 shall prohibit the Debtors from responding or objecting to or complying with discovery requests of any Committee, in whatever form, made in connection with such investigation or the payment from the DIP Collateral (including Cash Collateral) of professional fees related thereto or from contesting or challenging whether a DIP Termination Event has in fact occurred.

26.    Effect of Stipulations on Third Parties.

(a)    Subject to the rights and limitations set forth in this paragraph 26, the Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successor and assigns.  The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (i) such party with requisite standing granted by an order of this Court (or such other court of competent jurisdiction), has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (each such proceeding or contested matter, a "Challenge") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens, or the Prepetition Secured Obligations by no later than seventy-five (75) calendar days following the date of entry of this Interim Order, subject to further extension by (i) written agreement of the Debtors and the Prepetition Secured Parties or (ii) an order of this Court obtained on notice and after a hearing, such time, the "Challenge Period"); *provided* that in the case of the Committee (if any), so long as

the RSA remains in full force and effect and provides for the payment of general unsecured claims in full in cash, the Challenge Period shall be tolled until sixty (60) days after the earliest to occur of (1) termination of the RSA, and (2) the Court's entry of an order denying confirmation of the Plan (as defined in the RSA) (the "Committee Challenge Period") and the Committee Challenge Period shall lapse upon the effective date of a chapter 11 plan that provides for the payment of general unsecured claims in full in cash; *provided* further that in the event that, prior to the expiration of the Challenge Period, (x) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Cases, then in each such case, the Challenge Period shall be extended by the later of (A) the remaining time under the Challenge Period plus fifteen (15) days or (B) such other time as ordered by the Court solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Court:  (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in Paragraph G, not

subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral, and the Prepetition Secured Parties (in their capacities as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed as provided above prior to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on any Committee and any other party in the Cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (ii) any Challenge not brought in such adversary proceeding shall be forever barred; *provided* that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)      Subject to Paragraph 26(a), nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents or the Prepetition Secured Obligations.

27.    <u>Release</u>.  Subject to the rights and limitations set forth in Paragraph 26 of this Interim Order, effective upon entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs,

subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the DIP Secured Parties, the Prepetition Secured Parties, and each of their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition Secured Facilities, the Prepetition Secured Obligations, the Prepetition Liens, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order; *provided* that nothing in this paragraph shall in any way limit or release the obligations of the DIP Agent and the DIP Lenders under the DIP Loan Documents.

28.    <u>Insurance</u>.  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Agent is, and will be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

29.    <u>Credit Bidding</u>.  Subject to section 363(k) of the Bankruptcy Code, (i) the DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required DIP Lenders and on behalf of the DIP Lenders, shall have the right to credit bid up to the full amount of any DIP Obligations in any sale of any of the Debtors' assets, including pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725 and (ii) the First Lien Agent (on behalf of the First Lien Lenders) shall have the right to credit bid (x) up to the full amount of the First Lien Term Loan Obligations and the Revolving Loan Obligations and (y) the First Lien Adequate Protection Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.  The DIP Agent, at the direction of the Required DIP Lenders and on behalf of the DIP Lenders, and the First Lien Agent on behalf of the First Lien Lenders, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Secured Parties or First Lien Secured

Parties, as applicable, to any acquisition entity or joint venture formed in connection with such bid.

30.     <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance under the relevant DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders and in accordance with the terms of the relevant DIP Loan Documents.

31.     <u>No Duty to Monitor Collateral</u>.  None of the DIP Secured Parties or the Prepetition Secured Parties shall have any obligation or responsibility to monitor any of the Debtors' use of DIP Collateral, Prepetition Collateral, or Cash Collateral, and each of the DIP Secured Parties and the Prepetition Secured Parties may rely upon each of the Debtors' representations that the use of the proceeds of the DIP Facility and the use of Cash Collateral is in accordance with the requirements of this Interim Order and the DIP Loan Documents.

32.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Term Loan and Security Agreement or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

33.     <u>Reservation of Rights Under the Intercreditor Agreement</u>.  Except as expressly provided in this Interim Order, nothing in this Interim Order shall amend, modify or waive the terms or provisions of the Intercreditor Agreement and all parties' rights and remedies under the Intercreditor Agreement are preserved.

34.     <u>Binding Effect; Successors and Assigns</u>.    The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, and any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties; *provided* that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

35.     <u>Limitation of Liability</u>.    Solely in determining to make any loan under the DIP Loan Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Loan Documents, the Prepetition Term Loan and Security Agreement, the DIP Secured Parties and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.    Furthermore, nothing in this Interim Order, the DIP Loan Documents, or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims

arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

36.    <u>Master Proofs of Claim</u>.  Notwithstanding anything to the contrary in the Motion or this Interim Order, the Prepetition Agents are authorized, but not directed or required, to file one master proof of claim on behalf of themselves and the applicable Prepetition Secured Parties, as applicable, on account of any and all of the respective claims arising under the applicable Prepetition Credit Documents, as applicable, and hereunder (the "<u>Master Proof of Claim</u>").  For administrative convenience, any Master Proof of Claim authorized herein may be filed in the case of Debtor Carestream Health, Inc. with respect to all amounts asserted in such Master Proof of Claim, and such Master Proof of Claim shall be deemed to be filed and asserted by the applicable entity or entities against every Debtor asserted to be liable for the applicable claim.  For the avoidance of doubt, the provisions set forth in this paragraph and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest, including, without limitation, the numerosity requirements set forth in Bankruptcy Code section 1126.  The Prepetition Agents shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the Prepetition Secured Parties, as applicable, which instruments, agreements, or other documents will be provided to the Debtors upon written request to counsel to the applicable Prepetition Agent.

37.    <u>Agency Provisions</u>.  The DIP Agent and each DIP Lender are bound by the provisions set forth in <u>Exhibit E</u> to the DIP Term Sheet.

38. <u>Necessary Action</u>. The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

39. <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(g), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

40. <u>Interim Order Governs</u>. In the event of any inconsistency between the provisions of the DIP Loan Documents and this Interim Order, the provisions of this Interim Order shall govern.

41. <u>Final Hearing</u>. The Final Hearing on the Motion shall be held on September [●], 2022, at [●], prevailing Eastern Time; *provided* that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the consent of the DIP Agent (acting at the direction of the Required DIP Lenders). The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing and in compliance with Local Rule 9013-1(m)) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court. Any objections or responses to entry of the Final Order shall be filed on or before [●], prevailing Eastern Time, on September [●], 2022 and shall be served on (a) Kirkland & Ellis LLP, as counsel to the Debtors, (b) the U.S. Trustee for the District of Delaware, (c) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis), (d) counsel to the DIP Agent, (e) counsel to

the First Lien Agent and the Second Lien Agent, (f) counsel to the Crossover Group, (g) the office of the attorney general for each of the states in which the Debtors operate, (h) the United States Attorney's Office for the District of Delaware, (i) the Internal Revenue Service, (j) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral, (k) the Debtors' landlords, and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

42.     <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction with respect to all matters arising from or related to the DIP Loan Documents and the implementation of this Interim Order and to enforce the same.

## Exhibit A

**DIP Commitment Letter and DIP Term Sheet**

(Intentionally Omitted)

**<u>Exhibit B</u>**

**DIP Budget**

# Carestream Health, Inc

Weekly Cash Forecast
($ in '000)

| | Week 1 Forecast 21-Aug-22 27-Aug-22 | Week 2 Forecast 28-Aug-22 3-Sep-22 | Week 3 Forecast 4-Sep-22 10-Sep-22 | Week 4 Forecast 11-Sep-22 17-Sep-22 | Week 5 Forecast 18-Sep-22 24-Sep-22 | Week 6 Forecast 25-Sep-22 1-Oct-22 | Week 7 Forecast 2-Oct-22 8-Oct-22 | Week 8 Forecast 9-Oct-22 15-Oct-22 | Week 9 Forecast 16-Oct-22 22-Oct-22 | Week 10 Forecast 23-Oct-22 29-Oct-22 | Week 11 Forecast 30-Oct-22 5-Nov-22 | Week 12 Forecast 6-Nov-22 12-Nov-22 | Week 13 Forecast 13-Nov-22 19-Nov-22 | Week 1 Week 13 13WK Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Customer receipts | 5,417 | 7,409 | 6,321 | 6,321 | 6,323 | 9,523 | 6,969 | 7,069 | 6,919 | 9,159 | 6,552 | 6,852 | 6,852 | 91,686 |
| Other receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **5,417** | **7,409** | **6,321** | **6,321** | **6,323** | **9,523** | **6,969** | **7,069** | **6,919** | **9,159** | **6,552** | **6,852** | **6,852** | **91,686** |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll & Benefits | (765) | (6,965) | (984) | (6,939) | (963) | (6,913) | (1,000) | (6,904) | (995) | (6,903) | (1,000) | (9,401) | (1,000) | (50,734) |
| 3rd Party Trade Vendors | (17,608) | (16,894) | (7,058) | (4,867) | (4,319) | (4,315) | (4,257) | (4,251) | (4,803) | (4,278) | (5,051) | (5,052) | (5,052) | (87,803) |
| Net Silver Settlements | (707) | (4,342) | (2,171) | (1,303) | (434) | (434) | (3,969) | (1,984) | (1,191) | (794) | (3,277) | (1,638) | (983) | (23,226) |
| Taxes & Duties | (331) | (340) | (352) | (352) | (352) | (348) | (326) | (326) | (326) | (326) | (290) | (290) | (275) | (4,233) |
| Other Operating Disbursements | - | (30) | - | - | - | (30) | - | - | - | (30) | - | - | - | (90) |
| **Total Operating Disbursements** | **(19,411)** | **(28,570)** | **(10,566)** | **(13,461)** | **(6,069)** | **(12,040)** | **(9,552)** | **(13,465)** | **(7,314)** | **(12,300)** | **(9,648)** | **(16,381)** | **(7,311)** | **(166,086)** |
| | | | | | | | | | | | | | | |
| **Net Operating Cash Flow** | **(13,994)** | **(21,161)** | **(4,244)** | **(7,140)** | **255** | **(2,517)** | **(2,583)** | **(6,396)** | **(396)** | **(3,141)** | **(3,095)** | **(9,528)** | **(458)** | **(74,400)** |
| | | | | | | | | | | | | | | |
| **Non-Operating Cash Flows** | | | | | | | | | | | | | | |
| Debt Service - Pre-Petition [1] | - | (678) | - | - | - | (13,107) | - | - | - | - | - | (638) | - | (14,423) |
| Debt Service - DIP | (75) | (8) | - | - | (500) | - | (23) | - | - | (718) | - | - | - | (1,323) |
| Debt Service - Post-Emergence | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | (11,359) | - | - | - | - | - | - | - | (11,359) |
| Other Non-Operating Cash Flows | (5,175) | - | - | - | - | - | - | - | - | - | - | - | - | (5,175) |
| **Total Non-operating Cash Flows** | **(5,250)** | **(685)** | **-** | **-** | **(500)** | **(24,466)** | **(23)** | **-** | **-** | **(718)** | **(638)** | **-** | **-** | **(32,280)** |
| | | | | | | | | | | | | | | |
| Net Intercompany | (12,200) | 7,250 | 3,320 | 3,320 | 3,320 | 10,040 | 3,320 | (6,680) | 3,320 | 10,040 | 3,320 | 3,320 | 3,320 | 35,010 |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | **(31,444)** | **(14,596)** | **(924)** | **(3,820)** | **3,075** | **(16,944)** | **715** | **(13,076)** | **2,924** | **6,181** | **(414)** | **(6,208)** | **2,862** | **(71,670)** |
| | | | | | | | | | | | | | | |
| Beginning Bank Cash Balance | 12,769 | 31,324 | 16,728 | 15,804 | 11,984 | 15,059 | 28,115 | 28,830 | 15,754 | 18,678 | 24,859 | 24,445 | 18,237 | 12,769 |
| Net Cash Flow | (31,444) | (14,596) | (924) | (3,820) | 3,075 | (16,944) | 715 | (13,076) | 2,924 | 6,181 | (414) | (6,208) | 2,862 | (71,670) |
| Debt Proceeds/Repayment | 50,000 | - | - | - | - | 30,000 | - | - | - | - | - | - | - | 80,000 |
| **Ending Bank Cash Balance** | **31,324** | **16,728** | **15,804** | **11,984** | **15,059** | **28,115** | **28,830** | **15,754** | **18,678** | **24,859** | **24,445** | **18,237** | **21,098** | **21,098** |

(1) Assumed adequate protection payments (non-default interest and fees) for revolver and 1st lien term loan lenders.
Note: Budget does not contemplate the effectuation, or impact, of a transaction. Excludes exit costs such as success fees / transaction fees and potential cure costs.

**<u>Exhibit B</u>**

**Turnbull Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CARESTREAM HEALTH, INC., *et al.*,[1] | Case No. 22-10778 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ANDREW TURNBULL IN SUPPORT**
**OF THE DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING**
**ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,**
**(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Andrew Turnbull, make this Declaration pursuant to 28 U.S.C. § 1746:

1.      I am a Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the

proposed investment banker to the above captioned debtors and debtors in possession (collectively,

the "Debtors").

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Motion*

*Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition*

*Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative*

*Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay,*

*(V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").   In

particular, I submit this Declaration in support of my view that the proposed debtor-in-possession

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232).  The location of the Debtors' service address is:  150 Verona Street, Rochester, New York 14608.

financing facility (the "DIP Facility") is (a) the product of an arm's-length, good-faith negotiation process, (b) the best available postpetition financing option for the Debtors, and (c) contains reasonable terms and conditions under the circumstances.

3.      The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Houlihan Lokey working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Houlihan Lokey team, which, since July 2021, has been one of the principal advisors to the Debtors. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and postpetition financing efforts. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

4.      Houlihan Lokey, together with the other subsidiaries of its direct parent company, Houlihan Lokey, Inc., is an internationally recognized investment banking and financial advisory firm, with 35 offices worldwide and more than 1,600 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 200 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in some of the largest restructuring cases in the United States, including representing debtors and official committees in numerous chapter 11 cases in this and other districts.

5.      Since joining Houlihan Lokey in 2004, I have specialized in assisting companies, lenders, creditors, and investors in distressed situations.  My experience includes conducting acquisitions and divestitures of financially troubled assets, raising various forms of capital and negotiations relating to the restructuring of private and public securities, both in chapter 11 and in out-of-court situations.

6.      Prior to joining Houlihan Lokey, I was a Director at PricewaterhouseCoopers Securities.  I hold a Bachelor of Science in Biology and an Honours Business Administration degree, both from the University of Western Ontario.

7.      The Debtors retained Houlihan Lokey on September 16, 2020 to serve as their investment banker in relation to a sale process of the entire company, including the Debtors and the company's non-Debtor operations.  The Debtors expanded the role of Houlihan Lokey on July 2, 2021, to incorporate the firm's Financial Restructuring Group.  The Debtors chose Houlihan Lokey for these roles because of our expertise in the healthcare sector, as well as on issues relating to financially distressed companies and its extensive experience acting as an advisor in both in and out-of-court restructurings of companies of all sizes across a wide array of industries. Houlihan Lokey and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate compensated professional in various capacities in numerous chapter 11 cases within this district and others.  I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the DIP Motion.[2]

### The Debtors' Need for the DIP Facility and Access to Cash Collateral

8.      Since its retention by the Debtors, Houlihan Lokey has provided investment banking advisory services to the Debtors in connection with their evaluation of various strategic

---

[2]     Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the DIP Motion.

alternatives, including a sale process and recapitalization transaction. Ultimately, this process, which is described further below, culminated in the execution of the RSA with certain of the Debtors' prepetition secured lenders and equity sponsor pursuant to which the Debtors will, among other things, consummate a prepackaged chapter 11 plan that will (a) reduce pre-petition funded debt of approximately $470 million, (b) receive an equity capital infusion of $75 million, and (c) pay all trade, vendor, and employee obligations in full in the ordinary course of business.

9.      As part of the Debtors' preparations for these chapter 11 cases, the Debtors and their advisors analyzed how much postpetition financing would be required to operate the Debtors' business and fund the administrative costs of this chapter 11 process. As part of this analysis, the Debtors and their advisors developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the business, the fees, and interest expense associated with the DIP Facility and consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and the potential acceleration of demands on available liquidity through working capital contraction.

10.     Based on this analysis, the Debtors determined that they would require incremental liquidity to comfortably operate postpetition and satisfy all administrative costs and expenses. The Debtors also believe that the DIP Facility and access to Cash Collateral will provide a strong, clear message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally. Specifically, access to liquidity will communicate that the Debtors are able to continue meeting the needs of their customers, provide compensation to their employees, and are

continuing to manage their businesses as close to the ordinary course as possible. Furthermore, access to the proposed DIP Facility and Cash Collateral will provide the Debtors with sufficient funds to pay wages to their employees, administer these chapter 11 cases, and thereby enable the Debtors to continue their efforts to preserve and maximize the value of their estates during these prepackaged chapter 11 cases.

## The Debtors' Efforts to Obtain Postpetition Financing

11.    The Debtors, with Houlihan Lokey's assistance, solicited a new money postpetition financing facility backstopped by certain prepetition secured lenders (the "DIP Lenders"), the primary parties with which the Debtors were negotiating the global restructuring transaction contemplated by the RSA. Over the course of multiple weeks, the Debtors and their advisors engaged in various conversations and extensive negotiations with the DIP Lenders to achieve the best possible terms for the DIP Facility and consensual use of Cash Collateral. Following these arm's-length negotiations, the Debtors were able to secure the proposed $80 million DIP Facility. The negotiations resulted in certain concessions being made by the DIP Lenders, including not rolling up any prepetition debt, additional flexibility on the Debtors' financial reporting and financial performance covenants, and their agreement to fund on a term sheet-only basis. Significantly, the DIP Facility was the Debtors' only viable source of postpetition funding and I believe that no other, better alternative is reasonably attainable.

## I.    The Prepetition Marketing Processes

12.    Leading up to the Petition Date, the Debtors, the Prepetition Secured Parties, and the DIP Lenders engaged in arm's-length negotiations over the terms of the DIP Facility. Given the Debtors' capital structure and under the current circumstances, I believe that the only viable, actionable source of debtor-in-possession financing was with the Prepetition Secured Parties and DIP Lenders. Based upon my experience and review of the Debtors' capital structure and financial

records, any potential lenders, if any were to make a financing proposal at all, would require priming of the existing secured parties. Furthermore, the Prepetition Secured Parties and the DIP Lenders made it known that they would not consent to a priming loan from a third-party. In my experience, any such attempt, even if actionable by the Debtors, would likely result in expensive and distracting litigation at the outset of these chapter 11 cases that the Debtors do not have the requisite financing to support.

13.     Further, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including timing and due diligence constraints, necessarily involving the payment of additional professional fees. In contrast, the proposed consensual DIP Facility and access to Cash Collateral offered by the DIP Lenders allows the Debtors to avoid such risks at the outset of these chapter 11 cases.

14.     To ensure that there was no other available financing on better terms under the circumstances, my colleagues and I reached out to six other parties to assess their willingness to provide financing. Of those six parties, none expressed an interest in providing financing to the Debtors other than on a consensual priming basis.

**II.     The DIP Facility Proposal.**

15.     Importantly, the DIP Facility is an integral part of the Debtors' RSA and the transactions contemplated thereunder, and all of the proposed DIP Lenders also signed the RSA. Further, the DIP Facility is critical to the Debtors' ability to fund the administrative costs of these chapter 11 cases and provides the Debtors with sufficient liquidity to operate their business. As noted above, the Prepetition Secured Parties indicated that they would not consent to a "priming" DIP financing provided by a third party, and therefore the DIP Facility avoids the need for a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases. Finally, and perhaps most importantly, the DIP Lenders have agreed to equitize a significant amount of the

DIP Claims under the Plan and receive both cash and New Common Stock in lieu of repayment in full in cash.  In tandem with the RSA, the DIP Facility provides a path to emergence that is important to reassure customers and vendors, protect operations, and maximize value for creditors.

## The DIP Facility Was Negotiated in Good Faith and At Arm's Length and the Fees in Connection with the DIP Facility are Reasonable and Market

16.     In the lead up to the Petition Date, my team and I, along with the Debtors' other advisors, negotiated the terms and provisions of the DIP Facility on behalf of the Debtors.  During that time, the parties exchanged multiple term sheets and mark-ups.  Over the course of these negotiations, the size and terms of the DIP Facility improved to the benefit of the Debtors.

17.     The fees and rates to be paid under the proposed DIP Facility were the subject of arm's-length and good faith negotiation between the Debtors and the DIP Lenders, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  These fees are summarized below.

| | |
|---|---|
| **Interest Rate** | Adjusted Term SOFR Rate for the one-month Interest Period (as defined in <u>Annex C</u> to the DIP Term Sheet) then in effect <u>plus</u> 9.00%, payable monthly |
| **Commitment Fee** | 2.00% of the aggregate amount of the DIP Commitments |
| **Exit Fee** | 4.00% on the funded amount of the DIP Loans |
| **Undrawn DIP Fee** | 1.00% per annum on the unused portion of the DIP Commitments |
| **Agency Fee** | As set forth in <u>Exhibit D</u> to the DIP Motion |

18.     Under the current circumstances, given the lack of any other alternatives, and based on my knowledge of other financings in the market, I believe that the fees, rates, and other economics provided for in the DIP Facility are reasonable under the circumstances.

## The DIP Facility Is the Best Postpetition Financing Arrangement Available to the Debtors

19.     Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Facility and the facts of this case, the DIP Facility

is the best financing option available to the Debtors under the circumstances.  The proposed DIP Facility maximizes the value of the enterprise by allowing the Debtors to:  (a) fund certain costs, fees, and expenses related to these chapter 11 cases; (b) provide Adequate Protection Claims (as defined in the Interim Order); (c) fund the fees, interest, payments, and expenses associated with the DIP Facility, including fees, costs, and expenses incurred by the DIP Agent and/or the DIP Lenders; and (d) fund the working capital needs, capital improvements, and expenditures related to these chapter 11 cases.  In short, the proposed DIP Facility will allow the Debtors to maximize value by continuing operations with minimal disruption.

20.    The DIP Lenders agreed to provide the DIP Facility to the Debtors on terms that I consider to be reasonable under the circumstances.  The DIP Lenders expressly conditioned their proposals on, among other things, priming first-priority liens on assets encumbered by the Debtors' Prepetition Secured Credit Facilities and customary forms of adequate protection.  The DIP Lenders also expressly conditioned their proposals on postpetition liens on the Debtors' prepetition unencumbered assets as part of the collateral package securing the DIP Loans.  Additionally, although the DIP Loans prime the Prepetition Secured Parties' liens, such priming is being done on a consensual basis.  With respect to the DIP Loans, certain of the Prepetition Secured Parties that signed the RSA—holding more than 70% of the outstanding First Lien Claims and 99% of the outstanding Second Lien Term Loan Claims (both as defined in the Plan)—have consented to the priming.

21.    In addition to providing the Debtors with incremental liquidity, the DIP Facility will provide the Debtors with access to the use of Cash Collateral on a consensual basis and will allow the Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of the estate for the benefit of all stakeholders.

22.     Finally, and perhaps most importantly, the DIP Facility provides the Debtors with a path towards a successful and expeditious confirmation.  The proposed DIP Facility, together with the RSA, provide the clearest path to an expeditious and adequately funded prepackaged chapter 11 case, which would best preserve the value of the Debtors' business and operations.

23.     In sum, it is my professional opinion that the terms of the DIP Facility are reasonable under the circumstances, and were the product of good faith, arm's-length negotiations and that the DIP Facility will benefit all stakeholders in these chapter 11 cases.  For all of the reasons included in this Declaration, I submit it would be appropriate for the Court to approve the DIP Facility and the use of cash collateral as contemplated by the DIP Motion.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

August 23, 2022
Chicago, Illinois

By:
/s/ Andrew Turnbull
Andrew Turnbull
Houlihan Lokey Capital, Inc.

## <u>Exhibit C</u>

### DIP Commitment Letter

*Execution Version*

August 21, 2022

Carestream Health Holdings, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Scott Rosa and Robert Johnson

$80,000,000 Superpriority Senior Secured Debtor in Possession Credit Facility
Commitment Letter

Ladies and Gentlemen:

Carestream Health Holdings, Inc., a Delaware corporation ("you" or "Carestream") and certain of its direct and indirect domestic subsidiaries (collectively, the "Debtors" and each a "Debtor") have requested that the parties listed on Annex I hereto ("us", "we" or the "Commitment Parties") agree to provide, under section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), a multiple draw superpriority senior secured debtor in possession term loan facility (the "DIP Credit Facility") in an aggregate principal amount of $80,000,000 (the "DIP Commitment"), comprising (x) a $5,000,000 tranche of terms loans ("Tranche A Loans") and (y) a $75,000,000 tranche of term loans ("Tranche B Loans"), of which (i) $50,000,000 shall be available to be funded on the Interim Closing Date (as defined in the DIP Term Sheet (as defined below)) subject to entry of the Interim DIP Order (as defined in the Restructuring Support Agreement (as defined below)), consisting of $3,125,000 of Tranche A Loans and $46,875,000 of Tranche B Loans and (ii) $30,000,000 shall be available to be funded in the form of delayed-draw term loans on the Final Closing Date (as defined in the DIP Term Sheet) subject to entry of the Final DIP Order (as defined in the Restructuring Support Agreement), consisting of $1,875,000 of Tranche A Loans and $28,125,000 of Tranche B Loans. The availability of the DIP Credit Facility will be conditioned on and subject solely to the conditions set forth in Section 5 below. Capitalized terms used but not defined herein are used with the meanings assigned to them in (i) that certain Restructuring Support Agreement, dated as of the date hereof (including the term sheets attached thereto and any other attachments thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Restructuring Support Agreement"), by and among the Company Parties party thereto and the Consenting Stakeholders (as defined in the Restructuring Support Agreement) from time to time party thereto or (ii) the term sheet (the "DIP Term Sheet") attached hereto as Exhibit A (together with this letter, collectively, this "Commitment Letter"), as applicable.

1.    **Commitment**

In connection with the foregoing, the Commitment Parties are pleased to advise you of their commitments to provide the DIP Credit Facility, on a several and not joint basis, in the

respective amounts set forth adjacent to each such DIP Lender's name on <u>Annex I</u> hereto (the "<u>DIP Commitments</u>") upon the terms and subject to solely the conditions set forth in this Commitment Letter and the DIP Term Sheet.

The rights and obligations of each of the Commitment Parties under this Commitment Letter shall be several and not joint, and no failure of any Commitment Parties to comply with any of its obligations hereunder shall prejudice the rights, or reduce the obligations, of any other DIP Lender; <u>provided</u> that no DIP Lender shall be required to fund the commitment of another DIP Lender in the event such other DIP Lender fails to do so (the "<u>Breaching Party</u>"), but may at its option do so, in whole or in part, in which case such performing DIP Lender shall be entitled to all or a proportionate share, as the case may be, of the DIP Credit Facility and related fees that would otherwise be issued to the Breaching Party.

2.    **Titles and Roles**

It is agreed that JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>") will act as the administrative agent (in such capacity, the "<u>DIP Agent</u>") in respect of the DIP Credit Facility.  It is understood and agreed that this Commitment Letter shall not constitute either an express or implied commitment or offer by the DIP Agent or any of its affiliates to provide any portion of the DIP Facility or to otherwise provide any financing.

3.    **Information**

You hereby represent that (a) all written factual information, other than (i) the Projections (as defined below) and (ii) information of a general economic or industry specific nature (such written information other than as described in the immediately preceding clauses (i) and (ii), the "<u>Information</u>"), that has been or will be made available to us by you or on behalf of you or any of your representatives in connection herewith is or will be, when taken as a whole, complete and correct in all material respects and does not or will not, when furnished and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial projections and other forward-looking information (the "<u>Projections</u>") that have been or will be made available to us by you or on behalf of you or any of your representatives in connection herewith have been or will be prepared in good faith based upon assumptions that are reasonable at the time made and at the time the related Projections are made available to us; it being understood that (x) the Projections are merely a prediction as to future events and are not to be viewed as facts, (y) the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and (z) no assurance can be given that any particular Projection will be realized and that actual results during the period or periods covered by any the Projections may differ significantly from the projected results and such differences may be material. You agree that if, at any time prior to the execution of the DIP Credit Facility, you become aware that any of the representations in the preceding sentence would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that such representations will be correct under those circumstances; <u>provided</u> that any such supplemental

Information and Projections shall be treated as confidential in accordance with this Commitment Letter.

In providing this Commitment Letter and arranging the DIP Credit Facility, the Commitment Parties are relying on the accuracy of the Information furnished to them by or on behalf of you by your representatives without independent verification thereof.

4.    **Fees**

As consideration for the commitments and agreements of the Commitment Parties hereunder, Carestream and the other Debtors jointly and severally agree to pay or cause to be paid to each DIP Lender its allocable share of the nonrefundable fees described in the DIP Term Sheet (the "<u>Fees</u>") at the times, on the terms and subject to the conditions set forth both in this Commitment Letter, the Restructuring Support Agreement and the DIP Term Sheet.

The Debtors acknowledge and agree that the Fees shall be fully earned, nonrefundable, and non-avoidable upon the occurrence of such events or such applicable dates as described with respect thereto in the DIP Term Sheet and shall be paid by the Debtors, free and clear of any withholding or deduction for any applicable taxes, on the applicable dates as set forth in the DIP Term Sheet; <u>provided</u> that a DIP Lender's Fees will be refunded to Carestream in their entirety by such DIP Lender to the extent such DIP Lender later breaches its funding obligations pursuant to, and subject to, the conditions set forth in this Commitment Letter. The Fees are being earned as consideration for each DIP Lender's DIP Commitment hereunder and not with respect to any other services being provided.

5.    **Conditions**

Each DIP Lender's commitments and agreements hereunder are subject only to the conditions set forth under the sections of the DIP Term Sheet entitled (i) "Conditions Precedent to the Interim DIP Loans on the Interim Closing Date" and (ii) "Conditions Precedent to the Final DIP Loan on or after the Final Closing Date."

Each DIP Lender acknowledges that the obligations of the Borrower and the other Debtors hereunder are subject to the approval of the Bankruptcy Court.

6.    **Indemnification and Expenses**

You agree to indemnify, hold harmless and defend the Commitment Parties (including in connection with their capacity as lenders under the DIP Credit Facility), the DIP Agent and their respective affiliates and their respective directors, officers, employees, attorneys, advisors, consultants, agents and other representatives (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, expenses and liabilities, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Credit Facility, the use of the proceeds thereof or any claim, litigation, investigation or proceeding (a "<u>Proceeding</u>") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with

investigating or defending any of the foregoing**,** but subject to the limitations in the next sentence, <u>provided</u> that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of, or a material breach of this Commitment Letter by, such Indemnified Person or its control affiliates, directors, officers or employees (collectively, the "Related Parties"). In addition, (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agent and the Commitment Parties whether accrued on, prior to or after the Interim Closing Date, in connection with the Chapter 11 Cases, the DIP Credit Facility and the transactions contemplated thereby shall be paid by the Borrower and the other Debtors from time to time, whether or not the Interim Closing Date occurs and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of outside counsel and financial advisors) of the Commitment Parties and the DIP Agent for enforcement costs and documentary taxes associated with the DIP Credit Facility and the transactions contemplated thereby will be paid by the Borrower and the other Debtors.

It is further agreed that each DIP Lender shall only have liability to you (as opposed to any other person) and that each DIP Lender shall be liable solely in respect of its own commitment to the DIP Credit Facility on a several, and not joint, basis with any other DIP Lender. None of the Indemnified Persons or the Borrower or other Debtors or their respective directors, officers, employees, advisors, and agents shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Credit Facility or the transactions contemplated hereby or thereby, <u>provided</u> that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this <u>Section 6</u>.

7.      **Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities**

You acknowledge that each DIP Lender (or an affiliate) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of, or claims against, you, your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, and you waive, to the fullest extent permitted by law, any claims you may have against any DIP Lender for breach of duty or alleged breach of any fiduciary duty on the part of the Commitment Parties and agree that no DIP Lender will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including equity holders, employees or

4

creditors, in each case, in respect of any of the transactions contemplated by this Commitment Letter, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, and you are responsible for making your own independent judgment with respect to the transactions contemplated by this Commitment Letter and the process leading thereto, (d) you have been advised that the Commitment Parties and their respective affiliates are engaged in a broad range of transactions that may involve interests that differ from your and your affiliates' interests and that the Commitment Parties and their respective affiliates have no obligation to disclose such interests and transactions to you and your affiliates, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each DIP Lender has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, or any of your affiliates and (g) none of the Commitment Parties or their affiliates has any obligation or duty (including any implied duty) to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such DIP Lender and you or any such affiliate.

You acknowledge for United States securities law purposes that any DIP Lender may establish an information blocking device or "Information Barrier" between, on the one hand, its directors, officers, employees, agents, affiliates (as such term is used in Rule 12b-2 under the Exchange Act) and, on the other hand, its affiliates and its and their attorneys, accountants, financial or other advisors, members, equity holders, partners, directors and employees who, pursuant to such Information Barrier policy, are permitted to receive confidential information or otherwise participate in discussions concerning the transactions contemplated hereby, and those of such DIP Lender's, and its affiliates', other employees. You acknowledge the potential existence of any DIP Lender's Information Barrier but do not warrant or guarantee any DIP Lender's compliance with United States securities law or that the Information Barrier will operate in accordance with its intended purpose.

Additionally, you acknowledge and agree that none of the Commitment Parties are advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated by this Commitment Letter, and the Commitment Parties shall not have any responsibility or liability to you with respect thereto. Any review by the Commitment Parties of the transactions contemplated by this Commitment Letter or other matters relating thereto will be performed solely for the benefit of the Commitment Parties and shall not be on behalf of you or any of your affiliates.

You acknowledge that each DIP Lender may be (or may be affiliated with) a full service financial firm and as such from time to time may, and its affiliates may, (a) effect transactions for its own or its affiliates' account or the account of customers, and hold long positions in debt or equity securities, loans or other securities and financial instruments of companies that may be the subject of the Transactions or with which you or your subsidiaries may have commercial or other relationships or (b) provide debt financing, equity capital, investment banking, financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling to other companies or similar services in respect of which you or your

subsidiaries may have conflicting interests. Carestream and the other Debtors hereby waive and release, to the fullest extent permitted by law, any claims each of them has or will or may have hereunder with respect to any conflict of interest arising from such transactions, activities, investments or holdings, or arising from the failure of any DIP Lender or any of its respective affiliates or customers to bring such transactions, activities, investments or holdings to their attention.

8. **Confidentiality**

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to you and your affiliates and your and their respective officers, directors, employees, members, partners, stockholders, attorneys, accountants, independent auditors, professionals, experts, advisors and advisors (collectively, "Representatives"), in each case on a confidential and need-to-know basis, (b) pursuant to the order of any court or administrative agency or in any legal, judicial or administrative proceeding, or otherwise as required by applicable law or regulation or compulsory legal process (in which case, such DIP Lender agrees to inform you promptly thereof prior to such disclosure to the extent timely practicable and not prohibited by law, rule, regulation or other legal process), (c) upon the request or demand of any regulatory authority having jurisdiction over such DIP Lender or any of its affiliates, (d) upon notice to the Commitment Parties, in connection with any public filing requirement you are legally obligated to satisfy, in form and substance acceptable to the Commitment Parties (such approval not to be unreasonably withheld, conditioned or delayed), (e) in a Bankruptcy Court filing in order to implement the transactions contemplated hereunder, (f) to the United States Trustee, the official committee of unsecured creditors or any other statutory committee formed in the Chapter 11 Cases (each, a "Committee") and each of their legal counsel, independent auditors, professionals and other experts or agents who are informed of the confidential nature of such information and agree to be bound by confidentiality and use restrictions substantially similar to those set forth in this Section 8 and (g) the parties and potential parties to the Restructuring Support Agreement (h) to the extent any such information becomes publicly available other than by reason of disclosure by you, your affiliates or its or your representatives in breach of this Commitment Letter and (i) to potential participants, assignees or potential counterparties to any swap, credit insurance or derivative transaction relating to Carestream or any of its subsidiaries or any of their respective obligations, in each case, who agree to be bound by confidentiality and use restrictions.

Each of the Commitment Parties shall use all nonpublic information provided to them by you or on behalf of you by any of your representatives hereunder solely in connection with DIP Credit Facility or the Restructuring Transactions and shall treat confidentially all such information; provided that nothing herein shall prevent any DIP Lender from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case such DIP Lender agrees to inform you promptly thereof prior to such disclosure to the extent timely practicable and not prohibited by law, rule, regulation or other legal process), (ii) upon the request or demand of any regulatory authority having jurisdiction over such DIP Lender or any of its affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure by such DIP Lender, its affiliates or their

Representatives in breach of this Commitment Letter, (iv) to any DIP Lender's affiliates, and its and such affiliates' respective Representatives who need to know such information in connection with the transactions contemplated by the Commitment Letter and are informed of the confidential nature of such information and instructed to keep such information of this type confidential, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is or was received by such DIP Lender from a third party that is not to such DIP Lender's knowledge subject to confidentiality obligations owed to you, (vii) to the extent that such information is independently developed by such DIP Lender or (viii) to potential participants, assignees or potential counterparties to any swap, credit insurance or derivative transaction relating to Carestream or any of its subsidiaries or any of their respective obligations, in each case, who agree to be bound by confidentiality and use restrictions substantially similar to those set forth in this Section 8. The provisions of this paragraph shall automatically terminate and be superseded by the confidentiality provisions to the extent covered in the definitive documentation for the DIP Credit Facility upon the initial funding thereunder and the provisions of this Section 8 shall in any event automatically terminate one year following the date of this Commitment Letter. Notwithstanding any other provision herein, this Commitment Letter does not limit the disclosure of any tax strategies.

9.    **Miscellaneous**

This Commitment Letter shall not be assignable by you without the prior written consent of each DIP Lender (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the DIP Agent and the Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, the DIP Agent and the Indemnified Persons to the extent expressly set forth herein. Any DIP Lender may assign its DIP Commitment (in whole or in part) to (i) any other DIP Lender, (ii) its affiliates and affiliated investment funds, (iii) any investment funds, accounts, vehicles, or other entities that are managed, advised or sub-advised by such DIP Lender, its affiliates or the same person as such DIP Lender or its affiliates, (iv) any other person that has become a party to the Restructuring Support Agreement pursuant to the terms thereof and (v) any other person you agree to in writing in your sole discretion. It is understood and agreed that Annex I hereto shall be revised upon each assignment of the DIP Commitments pursuant to the terms hereof, such revised Annex I shall supersede any previous Annex I attached hereto and copies thereof shall be provided (i) upon the effectiveness of such assignment, to Carestream and (ii) upon conclusion of the DIP Commitment re-allocation, to all Commitment Parties. Further, the Commitment Parties reserve the right to employ the services of their respective affiliates in providing services contemplated hereby, and to satisfy their obligations hereunder through, or assign their rights and obligations hereunder to, one or more of their respective affiliates, separate funds and/or accounts within their control or investment funds under their or their respective affiliates' management and/or advisement (collectively, "DIP Lender Affiliates"); and to allocate, in whole or in part, to their respective affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their respective affiliates may agree in their sole discretion; provided that such DIP Lender will be liable for the actions or inactions of any such person whose services are so employed and, no delegation or assignment to a DIP Lender Affiliate shall relieve such DIP Lender from its obligations hereunder to the extent that any DIP Lender Affiliate fails to satisfy the DIP Commitments hereunder at the time required.

This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each DIP Lender, except to amend Annex I as otherwise described herein. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter (and the Restructuring Support Agreement and the agreements referenced in this Commitment Letter) set forth the entire understanding of the parties with respect to the DIP Credit Facility, and replace and supersede all prior agreements and understandings (written or oral) related to the subject matter hereof. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and the Bankruptcy Code, to the extent applicable.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York (or if such court does not have jurisdiction, any state court or Federal court located in the Borough of Manhattan), any appellate court from any thereof, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of the Chapter 11 Cases may be heard and determined in the Bankruptcy Court and any other Federal court having jurisdiction over the Chapter 11 Cases from time to time, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder. Notwithstanding the foregoing consent to jurisdiction in United States District Court for the Southern District of New York, upon the commencement of the Chapter 11 Cases, each of the Parties agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Commitment Letter or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies Carestream and the Debtors, which information includes names, addresses, tax identification numbers and other information that will allow such DIP Lender (and any other lender under the DIP Credit Facility) to identify Carestream and the other Debtors in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and any other lender under the DIP Credit Facility.

The indemnification, expense reimbursement, jurisdiction, confidentiality, governing law, sharing of information, no agency or fiduciary duty, waiver of jury trial, service of process and venue provisions contained herein shall remain in full force and effect regardless of whether the

DIP Facility Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the DIP Commitments; provided that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded by the provisions of the DIP Facility Documents upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent any of the DIP Facility Documents has comparable provisions with comparable coverage.

You and we hereto agree that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein; it being acknowledged and agreed that the funding of the DIP Credit Facility is subject solely to the conditions specified in Section 5 herein. Each of the Commitment Parties and you will use their commercially reasonable efforts to promptly prepare, negotiate and finalize the DIP Facility Documents as contemplated by the DIP Term Sheet.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter no later than 11:59 p.m. New York City time, on August 21, 2022. This offer will automatically expire if we have not received such executed counterparts in accordance with the preceding sentence. In addition, the commitment and agreements of the Commitment Parties hereunder shall expire (the date of such expiration, the "Termination Date") automatically upon the occurrence of any of the following unless waived by the Required DIP Lenders (by email or otherwise): (i) if you have not commenced the Chapter 11 Cases and filed a motion seeking entry of the Interim DIP Order and the Final DIP Order by the applicable date set forth in the Restructuring Support Agreement (as such date may be extended under the terms of the Restructuring Support Agreement), (ii) if the Bankruptcy Court has not entered the Interim DIP Order within three (3) calendar days after the Petition Date, or (iii) upon the termination of the Restructuring Support Agreement in accordance with its terms, unless, in each case, prior to such time, the Final Closing Date shall have occurred and Carestream shall have paid to the Commitment Parties the fees that are specified in this Commitment Letter to be due on or prior to the Final Closing Date.

[Remainder of this page intentionally left blank]

# **ANNEX I**

DIP COMMITMENTS

See attached.

**ANNEX I**

## DIP LENDERS AND DIP COMMITMENTS[1]

| DIP Lender | Tranche A Initial DIP Loan Commitment | Tranche B Initial DIP Loan Commitment | Tranche A Final DIP Loan Commitment | Tranche B Final DIP Loan Commitment | Total DIP Commitment |
|---|---|---|---|---|---|
| First Eagle Investments | ██████ | ██ | ████ | ██ | █████ |
| LCM Asset Management LLC | ██████ | ██ | ████ | ██ | █████ |
| Apollo Capital Management, L.P. | ██ | █████ | ██ | █████ | █████ |
| Blackstone Credit | ██ | █████ | ██ | █████ | █████ |
| Brigade Capital Management, LP | ██ | ██████ | ██ | █████ | █████ |
| CION Investment Corporation | ██ | █████ | ██ | █████ | █████ |
| Federated Hermes | ██ | ████ | | █████ | █████ |
| Marathon Asset Management | ██ | ████ | | ████ | ████ |
| MJX Asset Management | ██ | ████ | ██ | █████ | █████ |
| Nuveen Asset Management, LLC | ██ | █████ | ██ | █████ | █████ |
| Vector Capital | ██ | █████ | ██ | █████ | █████ |
| **Total** | **$3,125,000.00** | **$46,875,000.00** | **$1,875,000.00** | **$28,125,000.00** | **$80,000,000.00** |

---

[1] All amounts subject to adjustment as set forth in the DIP Term Sheet. Individual fund level details were previously provided to the DIP Agent.

**EXHIBIT A**

DIP TERM SHEET

**EXHIBIT A**

### CARESTREAM HEALTH, INC.

**Senior Secured Superpriority
Debtor in Possession Credit Facility Term Sheet**

This Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "**DIP Term Sheet**" or this "**Agreement**") describes the terms and conditions of the senior secured superpriority debtor in possession term loan facility (the "**DIP Credit Facility**") provided by the DIP Lenders (as defined below) to Carestream Health, Inc., a Delaware corporation (the "**Borrower**"), in connection with cases (collectively, the "**Chapter 11 Cases**") filed or to be filed by Carestream Health Holdings, Inc., a Delaware corporation ("**Carestream**"), the Borrower and the other Guarantors (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") no later than August 23, 2022 (the "**Petition Date**"). The DIP Credit Facility is being provided by the DIP Lenders in reliance upon the promulgation and consummation of the Restructuring Transactions (as defined below).

Capitalized terms used but not defined herein have the meanings assigned to them in the Restructuring Support Agreement, dated as of August 21, 2022 (including all amendments, modifications, exhibits, and supplements thereto, the "**RSA**") by and among the Company Parties and the Consenting Parties (each, as defined therein) or the restructuring term sheet attached as Exhibit B to the RSA (the "**Restructuring Term Sheet**") or the Interim DIP Order (as defined below).

| | |
|---|---|
| **BORROWER:** | Carestream Health, Inc., a Delaware corporation, in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code. |
| **GUARANTORS:** | Carestream Health Holdings, Inc., a Delaware corporation ("**Holdings**"), and each material domestic subsidiary of the Borrower set forth on Exhibit A-1 hereto, each of which shall be a Debtor in the Chapter 11 Cases (collectively, the "**Guarantors**" and each, individually, a "**Guarantor**"). The guaranty provisions set forth in Exhibit A-2 attached hereto are hereby incorporated herein by reference. |
| **DIP LENDERS:** | The entities set forth on Annex A hereto (consisting of both Tranche A DIP Lenders and Tranche B DIP Lenders (each as defined below), collectively, the "**DIP Lenders**" and individually, each a "**DIP Lender**"). |
| **DIP AGENT:** | JPMorgan Chase Bank, N.A. shall be the sole administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"). The DIP Agent and each DIP |

| | |
|---|---|
| | Lender hereby agree to the agency provisions set forth in <u>Exhibit E</u> hereto, which are incorporated herein by reference. |
| **DIP CREDIT FACILITY:** | The DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor in possession loans comprising (x) a $5,000,000 tranche of terms loans (the "**Tranche A DIP Loans**") and (y) a $75,000,000 tranche of terms loans (the "**Tranche B DIP Loans**") to the Borrower in a total aggregate principal amount (exclusive of capitalized DIP Fees (as defined below)) not to exceed at any time outstanding aggregate principal commitments of $80,000,000 (the "**DIP Commitment**") on the terms and conditions herein; *provided* that no DIP Lender shall be obligated to make DIP Loans in an amount in excess of the portion of the DIP Commitment set forth next to such DIP Lender's name in the table set forth on <u>Annex A</u> hereto (and which DIP Commitment shall be subject to reductions as set forth below). |
| **AVAILABILITY PERIOD & DRAW SCHEDULE:** | The DIP Credit Facility shall be available from the Interim Closing Date (as defined below) to the earlier of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as defined below) (the "**Availability Period**"). The Borrower may request draws under the DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Agent in substantially the form of <u>Exhibit B</u> attached hereto (the "**Notice of Borrowing**"), duly executed by an authorized officer of the Borrower (the "**Draw Schedule**"): |
| | (i)    <u>Initial DIP Loans</u>:  On or after the Interim Closing Date and prior to the Final Closing Date (as defined below), the Borrower may request loans in one or more borrowings in an aggregate principal amount not to exceed $50,000,000 (the "**Initial DIP Amount**"), consisting of (A) $3,125,000 of Tranche A DIP Loans (the "**Tranche A Initial DIP Loans**") to be provided by certain Prepetition Secured Parties (as defined below) (the "**Tranche A DIP Lenders**") and (B) $46,875,000 of Tranche B DIP Loans (the "**Tranche B Initial DIP Loans**" and, together with the Tranche A Initial DIP Loans, the "**Initial DIP Loans**") to be provided by certain Prepetition Secured Parties (the "**Tranche B DIP Lenders**"), strictly in accordance with the Approved DIP Budget (as defined below) (after giving effect to the Permitted Variances (as defined below)), subject to the satisfaction or any waiver by the |

Required DIP Lenders (as defined below) of the conditions precedent described under the Section below entitled "Conditions Precedent to the Initial DIP Loans on the Interim Closing Date" and otherwise in accordance with the provisions of this DIP Term Sheet and the "Use of Proceeds" hereof and the terms of the Interim DIP Order (as defined below); and

(ii)    <u>Delayed Draw DIP Loans</u>:    On or after the Final Closing Date, the Borrower may request loans in one or more borrowings of Tranche B DIP Loans in an aggregate principal amount not to exceed $30,000,000 (the "**Delayed Draw DIP Amount**"), consisting of (A) $1,875,000 of Tranche A DIP Loans (the "**Tranche A Final DIP Loans**") to be provided by the Tranche A DIP Lenders and (B) $28,125,000 of Tranche B DIP Loans (the "**Tranche B Final DIP Loans**" and, together with the Tranche A Final DIP Loans, the "**Delayed Draw DIP Loans**" and, together with the Initial DIP Loans, the "**DIP Loans**"), to be provided by the Tranche B DIP Lenders, strictly in accordance with the Approved DIP Budget (after giving effect to the Permitted Variances), subject to the satisfaction or any waiver by the Required DIP Lenders of the conditions precedent described under the Section below entitled "Conditions Precedent to any Delayed Draw DIP Loan on or After the Final Closing Date" and in accordance with the provisions of this DIP Term Sheet and the "Use of Proceeds" hereof and the terms of the Final DIP Order (as defined below). Any incurrence of Delayed Draw DIP Loans on or after the Final Closing Date will be in minimum amounts of the lesser of (i) $15 million and (ii) the remaining undrawn amount of the Delayed Draw DIP Amount, and subject only to the following conditions, measured at the time of the incurrence of such Delayed Draw DIP Loans.

Upon the Debtors' filing of the Chapter 11 Cases in the Bankruptcy Court, Akin Gump Strauss Hauer & Feld LLP shall notify the DIP Lenders of the anticipated date of the first day hearing (the "**First Day Hearing Date**").

The DIP Lenders shall fund each Initial DIP Loan by wire transfer of immediately available funds no later than 9:00 a.m., New York City time, on the First Day Hearing Date to the

3

|  | account of the DIP Agent most recently designated by it for such purpose by notice to the DIP Lenders.<br><br>The DIP Lenders shall fund each Delayed Draw DIP Loan by wire transfer of immediately available funds no later than 4:00 p.m., New York City time, one (1) Business Day prior to the requested funding date for such Delayed Draw DIP Loan to the account of the DIP Agent most recently designated by it for such purpose by notice to the DIP Lenders.<br><br>As soon as reasonably practicable after the funding of the Initial DIP Loans, the proceeds of all DIP Loans not otherwise applied directly to the payment of amounts permitted to be paid under the Approved DIP Budget (after giving effect to the Permitted Variances) shall be funded into a deposit account of the Borrower that shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent, which shall be granted and perfected pursuant to the DIP Orders. |
|---|---|
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to the Initial DIP Loans on the Interim Closing Date" as set forth below (including, without limitation, entry of the Interim DIP Order) shall have been satisfied or waived by the Required DIP Lenders in accordance with this DIP Term Sheet.<br><br>"**Final Closing Date**" means the date on which the "Conditions Precedent to any Delayed Draw DIP Loan On or After the Final Closing Date" as set forth below (including, without limitation, entry of the Final DIP Order) shall have been satisfied or waived by the Required DIP Lenders in accordance with this DIP Term Sheet.<br><br>As used herein, "**Business Day**" shall mean, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City; *provided* that, in addition to the foregoing, a Business Day shall be in relation to DIP Loans referencing the Adjusted Term SOFR Rate (as defined in <u>Annex C</u>) and any interest rate settings, fundings, disbursements, settlements or payments of any such Loans referencing the Adjusted Term SOFR Rate or any other dealings of such Loans referencing the Adjusted Term SOFR Rate, any such day that is only a U.S. Government Securities Business Day (as defined below).<br><br>As used herein, "**U.S. Government Securities Business Day**" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a |

| | |
|---|---|
| | day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities. |
| **DIP LOAN DOCUMENTATION; DIP TERM SHEET CONTROLS:** | At the option of the Required DIP Lenders, in their sole discretion, the Debtors shall execute definitive financing documentation with respect to the DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to each of the DIP Agent, the Required DIP Lenders and the Debtors (the "**DIP Facility Documents**"), which such DIP Facility Documents shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the Borrower, the DIP Agent and the Required DIP Lenders shall agree, it being understood that such DIP Facility Documents shall be substantially based on the Prepetition First Lien Credit Agreement and the Loan Documents (as defined in the Prepetition First Lien Credit Agreement). The provisions of the DIP Facility Documents shall, upon execution, supersede the provisions of this DIP Term Sheet; *provided* that if the DIP Lenders determine not to require the Debtors to execute additional DIP Facility Documents, the provisions of this DIP Term Sheet, the Interim DIP Order and the Final DIP Order shall govern the DIP Credit Facility. The provisions of the DIP Facility Documents shall be consistent with this DIP Term Sheet, the Interim DIP Order and, once entered, a final order with respect to the Chapter 11 Cases and the DIP Credit Facility, in form and substance reasonably satisfactory to the DIP Agent, the Required DIP Lenders and the Debtors, granting final approval of the DIP Credit Facility and DIP Facility Documents, the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"). |
| **CASH COLLATERAL:** | Subject to entry of the Interim DIP Order, the Prepetition Secured Parties (as defined herein) and the DIP Lenders hereby consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") on the terms and conditions set forth in the DIP Orders and the DIP Facility Documents. |
| **USE OF PROCEEDS:** | Subject to Bankruptcy Court approval, the Debtors shall use the proceeds of the DIP Credit Facility and Cash Collateral strictly in accordance with this DIP Term Sheet, the DIP Facility Documents (if any) and the Approved DIP Budget (after giving effect to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, |

|  | including for the payment of rent and other lease expenses and professional fees, (b) bankruptcy-related costs and expenses, (c) costs and expenses related to the DIP Credit Facility, and (d) any other purposes specifically set forth in the Approved DIP Budget.  Notwithstanding anything herein, the Approved DIP Budget shall not in any regard limit or test the payment of any professional fees.<br><br>No Cash Collateral or proceeds of the DIP Credit Facility may be used by the Debtors to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with, the DIP Credit Facility or any Prepetition Credit Agreement (as defined below); *provided* that the official committee of unsecured creditors (the "**Creditors' Committee**"), if any, may use up to $50,000 to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action.<br><br>Without the prior written approval of the Required DIP Lenders, no Cash Collateral or proceeds of the DIP Credit Facility may be distributed by the Debtors to, or used by the Debtors for the benefit of, any non-Debtor affiliates or subsidiaries of the Debtors, except as set forth in the Approved DIP Budget (after giving effect to Permitted Variances). |
|---|---|
| **APPROVED DIP BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | By no later than the Petition Date, the Debtors shall prepare and deliver to the DIP Agent and the DIP Lenders a weekly cash flow forecast for the 13-week period commencing on the Petition Date, and such weekly cash flow forecast shall be approved by the Required DIP Lenders in their sole discretion and shall set forth, among other things, the projected cash receipts and cash disbursements of the Debtors for the period covered thereby (the "**Approved DIP Budget**").<br><br>By no later than 5:00 PM (Eastern Time) on Thursday of the calendar week following the week in which the Petition Date occurs (the "**First Testing Date**"), and no later than 5:00 PM (Eastern Time) on each Thursday of each calendar week thereafter (together with the First Testing Date, each a "**Testing Date**"), prior to the Initial Variance Testing Date (as defined below), the Debtors shall deliver to the DIP Agent and the DIP Lenders (and their advisors), a variance report (each, a "**Weekly Variance Report**") setting forth, in reasonable detail, "cumulative receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth |

in the then-in-effect Approved DIP Budget for the Monthly Testing Period (as defined below).

By no later than 5:00 PM (Eastern Time) on the first Testing Date that occurs after the four (4)-week anniversary of the First Testing Date (the "**Initial Variance Testing Date**") and by not later than 5:00 PM (Eastern Time) on each Thursday thereafter (each such date, a "**Monthly Variance Testing Date**" and each such subsequent four-week period ending on the Sunday preceding each such Monthly Variance Testing Date, the "**Monthly Testing Period**"), the Debtors shall provide to the DIP Agent and the DIP Lenders, a report reasonably detailing (i) the aggregate receipts of the Debtors and aggregate disbursements of the Debtors, in each case, during the applicable Monthly Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between (a) the aggregate receipts received by the Debtors during such Monthly Testing Period against the aggregate receipts for such Monthly Testing Period as set forth in the applicable Approved DIP Budget and (b) the aggregate disbursements made by the Debtors during such Monthly Testing Period against the aggregate disbursements for such Monthly Testing Period as set forth in the applicable Approved DIP Budget (a "**Monthly Variance Report**" and, together with the Weekly Variance Report, the "**Approved Variance Reports**").

The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):

As of the Initial Variance Testing Date, for the period commencing on the Petition Date and ending on the week after the four-week anniversary of the Petition Date, the Debtors shall not allow:  (i) the aggregate receipts of the Debtors to be less than 80% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including professional fees and expenses incurred by the Debtors, the DIP Agent and/or the DIP Lenders)) to exceed 115% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements provided in the then-in-effect Approved DIP Budget.

As of any subsequent Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such

Monthly Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 85% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements (excluding professional fees (including professional fees and expenses incurred by the Debtors, the DIP Agent and/or the DIP Lenders)) to exceed 110% (on a cumulative basis taking into account the variance for any prior Monthly Testing Period) of the estimated operating disbursements provided in the then-in-effect Approved DIP Budget (after giving effect to any Permitted Variances).

Additional variances, if any, from the Approved DIP Budget, and any proposed changes to the Approved DIP Budget, shall be subject to the written approval of the Required DIP Lenders. For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by email (including as communicated by counsel in writing to the DIP Lenders).

Commencing at 5:00 P.M. (Eastern Time) on the Thursday of the fourth full calendar week after the Petition Date, and continuing at 5:00 P.M. (Eastern Time) on the Thursday of every fourth week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the Required DIP Lenders in their sole discretion, it shall become the "Approved DIP Budget" for purposes of this DIP Term Sheet and the DIP Orders. Any amendments, supplements or modifications to the Approved DIP Budget or an Approved Variance Report shall be subject to the prior written approval of the Required DIP Lenders prior to the implementation thereof. If the Required DIP Lenders have not objected, in writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved DIP Budget or an Approved Variance Report, within five (5) Business Days after the DIP Agent's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the Required DIP Lenders. Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the Required DIP Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

| | |
|---|---|
| **CASH MANAGEMENT OBLIGATIONS:** | One or more of the Debtors are obligated to Bank of America, N.A. (together with its affiliates, the "**Cash Management Bank**") in connection with various cash management products and services (including, without limitation, treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any overdraft or similar services) provided to the Debtors and/or any of their affiliates (for which the Debtors are otherwise liable) to the extent constituting "Cash Management Obligations" (as defined in the Prepetition First Lien Credit Agreement) as of the Petition Date (collectively, the "**Cash Management Obligations**"). The Cash Management Obligations are secured by the Prepetition First Lien Collateral (as defined below) under the Prepetition First Lien Credit Agreement. <br><br> The Debtors are seeking to continue to utilize similar products and services of the Cash Management Bank on a post-petition basis and have sought, pursuant to the Debtors' cash management motion, authority to do so. Because the Cash Management Bank is unwilling to provide such products and services post-petition on a junior lien basis to any other indebtedness for borrowed money, the Debtors seek approval, and the DIP Lenders and DIP Agent have agreed, that any postpetition Cash Management Obligations (the "**Postpetition Cash Management Obligations**") shall be secured by the DIP Collateral on a *pari passu* basis with the DIP Liens (the "**Cash Management Liens**"). |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lenders and the DIP Agent under or in connection with this DIP Term Sheet, the DIP Facility Documents and/or the DIP Orders (collectively, the "**DIP Obligations**"), in all cases subject to (a) the Carve Out (as defined in the Interim DIP Order) and (b) the Prepetition Permitted Liens (as defined below), shall be: <br><br> (i)     pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code; |

|  | (ii) | pursuant to section 364(c)(2) secured by a fully perfected first-priority lien on the DIP Collateral (as defined below), to the extent that such DIP Collateral is not subject to the Prepetition Permitted Liens; |
|  | (iii) | pursuant to section 364(c)(3), secured by a fully perfected junior lien on DIP Collateral, to the extent such DIP Collateral is subject to a Prepetition Permitted Lien; and |
|  | (iv) | pursuant to section 364(d)(1), secured by a fully perfected first-priority priming lien on DIP Collateral, *provided* that such lien shall be subordinate to the Prepetition Permitted Liens (including the Prepetition Obligations) (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**"). |

The DIP Liens shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve Out (as defined in the Interim DIP Order), and Prepetition Permitted Liens.

As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Credit Agreements (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the liens securing the Prepetition First Lien Term Loan Claims as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

| **PREPETITION FIRST LIEN FACILITY** | The Debtors have outstanding (i) term loans in an aggregate estimated principal amount outstanding of approximately $507,719,000 plus applicable interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition First Lien Term Loan Claims**") and (ii) revolving loans in an aggregate principal amount outstanding of approximately $77,000,000 plus applicable interest, premiums (if any), costs, fees, expenses and other obligations, and $482,098 in Hedge Claims (as defined below) owed to JPMorgan Chase Bank, N.A. (or one of its affiliates) (collectively, the "**Prepetition First Lien Revolving Facility Claims**" and together with the Prepetition First Lien Term Loan Claims, the "**Prepetition First Lien Claims**"), in each case, under that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, |

| | |
|---|---|
| | 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition First Lien Credit Agreement**" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, by and among Borrower, Holdings, the financial institutions party thereto from time to time as lenders (the "**Prepetition First Lien Lenders**"), and Credit Suisse AG. Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**" and together with the Prepetition First Lien Lenders, the "**Prepetition First Lien Term Loan Secured Parties**" and the Prepetition First Lien Term Loan Secured Parties together with holders of the Prepetition First Lien Revolving Facility Claims, the "**Prepetition First Lien Secured Parties**"). |
| | The Prepetition First Lien Claims (as well as various Cash Management Obligations outstanding as of the Petition Date) are secured by a first priority lien on the Collateral (as defined in the Prepetition First Lien Credit Agreement, the "**Prepetition First Lien Collateral**"), other than the assets of, and the equity in, Carestream. |
| | As used herein, "**Hedge Claims**" shall mean the obligations of one or more Debtors to JPMorgan Chase Bank, N.A. (or one if its affiliates) under the ISDA Master Agreement, dated as of September 29, 2011, between JPMorgan Chase Bank, N.A. and Carestream Health Inc., including any schedules and appendix thereto, including any amounts, now or hereafter due (including termination payments). |
| **PREPETITION EXISTING SECOND LIEN FACILITY** | The Debtors owe $448,235,000 plus accrued interest, premiums (if any), costs, fees, expenses and other obligations ("**Prepetition Second Lien Claims**" and together with the Prepetition First Lien Claims, the "**Prepetition Obligations**") under that certain Amended and Restated Second Lien Credit Agreement, dated as of June 7, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Second Lien Term Loan Credit Agreement**" and together with the Prepetition First Lien Credit Agreement, the "**Prepetition Credit Agreements**") and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, by and among Carestream Health, Inc., as borrower, Holdings, the financial institutions party thereto |

| | |
|---|---|
| | from time to time as lenders (the "**Prepetition Second Lien Lenders**" and together with the Prepetition First Lien Lenders, the "**Prepetition Lenders**"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Term Loan Agent**" and together with the Prepetition Second Lien Lenders, the "**Prepetition Second Lien Term Loan Secured Parties**" and together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**"). <br><br> The Prepetition Second Lien Claims are secured by a second priority lien on the Collateral (as defined in the Prepetition Second Lien Credit Agreement) (the "**Prepetition Second Lien Collateral**" and together with the Prepetition First Lien Collateral, the "**Prepetition Collateral**"), other than the assets of, and the equity in, Carestream. |
| **ADEQUATE PROTECTION FOR PREPETITION SECURED PARTIES:** | As set forth and provided in the Interim DIP Order. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of the Borrower and each Guarantor (and, in the case of each Debtor, its bankruptcy estate) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, and subject to entry of the Final DIP Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.  All of the DIP Liens described herein with respect to the DIP Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the |

| | |
|---|---|
| | necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, other than in respect of assets in which such perfection, in the good faith judgment of the Debtors with the consent of the Required DIP Lenders, could reasonably be expected to result in material adverse tax consequences to the Debtors at the time of such perfection or in the future. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **DIP FEES:** | The Debtors shall pay the following fees:<br><br>(a) to the DIP Lenders, on a pro rata basis in accordance with their DIP Commitments and DIP Loans:<br><br>    (i) 2.00% of the aggregate amount of the DIP Commitments (the "**DIP Commitment Fee**"), payable in kind on the new-money portion of the DIP Credit Facility, earned upon execution of the DIP Commitment Letter and payable upon entry of the Interim DIP Order;<br><br>    (ii) 4.00% on the funded amount of the DIP Loans (the "**Exit Fee**"), payable in cash, earned upon entry of the Interim DIP Order and payable upon the earlier of (i) the Plan Effective Date and (ii) any other payoff, refinancing or termination of the DIP Credit Facility;<br><br>    (iii) 1.00% per annum (the "**Undrawn DIP Fee**") on the unused portion of the DIP Commitments, payable monthly on the first Business Day of each calendar month in cash on the average unused amount of the Initial DIP Amount or the Delayed Draw DIP Amount, as the case may be, between entry of the Interim DIP Order or the Final DIP Order, as the case may be, and the date the Initial DIP Amount or the Delayed Draw DIP Amount, as the case may be, has been fully funded; and<br><br>(b) to the DIP Agent, an agency fee as set forth in the letter agreement between the DIP Agent and the Borrower |

| | |
|---|---|
| | (the "**Agency Fee**" and together with the DIP Commitment Fee, the Exit Fee and the Undrawn DIP Fee, the "**DIP Fees**"), payable in accordance with the terms of such letter agreement. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all funded DIP Loans (and, in the case of the funded Initial DIP Loans, commencing on the date that is one (1) Business Day prior of the First Day Hearing Date) and all accrued and unpaid interest thereon at a rate per annum equal to the Adjusted Term SOFR Rate for the one-month Interest Period (as defined in Annex C) then in effect plus 9.00%. |
| | For the avoidance of doubt, the initial one-month Interest Period for any DIP Loan shall commence on the date of funding thereof, and each new one-month Interest Period shall commence at the end of the immediately preceding Interest Period. |
| | Interest with respect to any DIP Loan shall be paid in cash on (i) the last day of each Interest Period applicable to such DIP Loan and (ii) on the Maturity Date. |
| | All interest and fees under this DIP Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. |
| **DEFAULT RATE:** | Upon the written election of the Required DIP Lenders following the occurrence and during the continuance of an Event of Default (after giving effect to any applicable grace periods), principal, interest and all other amounts due in respect of the DIP Obligations shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **RESTRUCTURING TRANSACTIONS:** | The Debtors shall implement the Restructuring Transactions through the Chapter 11 Cases as described in the RSA. |
| | Pursuant to the Plan: |
| | (a) On account of its DIP Obligations with respect to the Tranche A DIP Loans, each Tranche A DIP Lender shall be repaid in full in cash on or prior to the occurrence of the Plan Effective Date (as defined in the RSA). |

|  | (b) On account of its DIP Obligations with respect to the Tranche B DIP Loans, each Tranche B DIP Lender shall: (i) receive its pro rata share of the Rights Offering Cash (as defined in the Restructuring Term Sheet) (if any)) and (ii) any portion of its DIP Obligations that are not paid in cash from the Rights Offering Cash will be paid in New Common Stock (as defined in the Restructuring Term Sheet) at the Rights Offering price per share (the "**DIP Rollover**"), subject to (A) the occurrence of the Plan Effective Date and (B) the satisfaction or waiver by the Required DIP Lenders of the conditions precedent described under the Section below entitled "*Conditions Precedent to any Delayed Draw DIP Loan On or After the Final Closing Date*" on or prior to such Plan Effective Date.  In connection with agreeing to the DIP Rollover, each Tranche B DIP Lender shall receive its pro rata share of a fee equal to 10% of the New Common Stock, subject to dilution for the Management Incentive Plan (as defined in the Restructuring Term Sheet). |
|  | In connection with the DIP Rollover, any New Common Stock shall be delivered directly by the Borrower to the applicable DIP Lenders, and no New Common Stock shall be delivered to the DIP Agent for distribution to the DIP Lenders. |
|  | On the Plan Effective Date, all fees and expenses payable under the DIP Credit Facility (to the extent not previously paid pursuant to the DIP Orders or to the extent required to be paid-in-kind) (including the Exit Fee) shall be paid in full in cash. |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
|  | (i)   75 calendar days after the Petition Date, subject to no more than two extensions (each, a "**Maturity Extension**") of 30 days each, if (x) such Maturity Extension is approved in writing by the Required DIP Lenders or (y) on the date that is the then-current Maturity Date: |
|  | a.   no Event of Default shall have occurred and be continuing; |
|  | b.   the Debtors shall have provided the DIP Agent and/or the DIP Lenders an "extension budget" for the corresponding 30-day period covered by such Maturity Extension which has been approved by the Required DIP Lenders and which demonstrates that the Debtors can maintain a minimum liquidity of no |

<table>
<tr><td></td><td>

less than $2,000,000 of unrestricted cash in deposit accounts subject to the liens of the DIP Agent, excluding any new-money DIP Credit Facility amounts to be funded for that extension period;

(ii) forty-five (45) calendar days after the Petition Date if the Final DIP Order has not been entered by the Bankruptcy Court on or before such date;

(iii) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;

(iv) the termination of the RSA by the Required Consenting First Lien Lenders, the Required DIP Lenders or the Company Parties;

(v) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;

(vi) the date of entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business;

(vii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to chapter 7 of the Bankruptcy Code; and

(viii)    the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments in respect thereof upon the occurrence of an Event of Default (as defined below).

</td></tr>
<tr><td>

**OPTIONAL PREPAYMENTS:**

</td><td>

The Debtors may prepay the DIP Loans in whole or in part without premium or penalty (but with the Exit Fee) at any time upon delivery of written notice to the DIP Agent no later than 11:00 a.m., New York City time, three (3) Business Days prior to the date of such prepayment (or such later time as the Required DIP Lenders may agree to acting reasonably). All optional prepayments shall be applied to the DIP Loans in

</td></tr>
</table>

| | |
|---|---|
| | accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below and include the Exit Fee for such prepaid DIP Loans. Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | The Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Fee) (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows:<br><br>(i)    100% of the net cash proceeds of any DIP Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, after funding the Carve Out (as defined in the Interim DIP Order);<br><br>(ii)   100% of the net cash proceeds of any other sale or other disposition by the Borrower or any Guarantor of any DIP Collateral in excess of $1,000,000, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business);<br><br>(iii)  100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding (x) receipts contemplated to be received by any of the Debtors as set forth in the Approved DIP Budget and (y) insurance proceeds that are reinvested by any Debtor in assets used to useful in the business of the Debtors on or prior to the date that is 180 days after the receipt of such net cash proceeds) by the Borrower or any Guarantor that constitute DIP Collateral (provided that receipts received from subsidiaries of Holdings other than the Debtors pursuant to the global treasury plan or in the ordinary course of business shall not be subject to the requirements of this provision); and<br><br>(iv)   100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "**Negative Covenants**" below.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, |

asset sales or other proceeds described above shall be permitted without the prior written consent of the Required DIP Lenders.

Voluntary and mandatory payments or prepayments and proceeds of DIP Collateral received by the Borrower or any Guarantor outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the Required DIP Lenders), after giving effect to the Carve Out (as defined in the Interim DIP Order), and any other payments required pursuant to the DIP Orders:

(1)  first, to pay all documented out-of-pocket expenses of the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of counsel and external advisors);

(2)  second, to pay the Exit Fee to DIP Lenders in connection with the funded portion of the DIP Loans;

(3)  third, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders;

(4)  fourth, to repay any principal amounts outstanding in respect of the DIP Loans (including any interest or other amounts that have been paid in kind and added to the principal balance thereof);

(5)  fifth, to pay all other amounts owing to the DIP Lenders and the DIP Agent; and

(6)  last, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of each of the Prepetition First Lien Term Loan Agent and Prepetition Second Lien Term Loan Agent for the benefit of the respective Prepetition Lenders.

For the avoidance of doubt, payments that are required to be made to the DIP Lenders as specified above shall be apportioned to each DIP Lender ratably based upon such DIP Lender's ratable share of the sum of the applicable DIP Loans outstanding at such time.

Section 2.17 (*Pro Rata Treatment and Payments*) of the Prepetition First Lien Credit Agreement is hereby incorporated by reference herein *mutatis mutandis*.

| | |
|---|---|
| **CONDITIONS PRECEDENT TO THE INITIAL DIP LOANS ON THE INTERIM CLOSING DATE:[1]** | The obligations of the DIP Lenders to make any Initial DIP Loan on the Interim Closing Date will be subject to satisfaction, or written waiver, by the Required Tranche A DIP Lenders (as applicable) and the Required DIP Lenders, of each of the following conditions precedent in connection with the related draw request:<br><br>(i)  Debtors shall have timely delivered to the DIP Agent the Approved DIP Budget or any update thereto then required to be delivered in accordance with this DIP Term Sheet;<br><br>(ii) Debtors shall have delivered to the DIP Agent (x) a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time on the Petition Date and (y) a certification that the Interim DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the DIP Agent with a copy of the signed Interim DIP Order);<br><br>(iii) the Borrower shall have delivered to the DIP Agent a closing certificate duly executed, substantially in the form attached hereto as <u>Exhibit C</u>, by the chief executive officer, president or chief financial officer of the Borrower, delivered to the DIP Agent, appropriately completed, by which such officer shall certify to the DIP Agent and the DIP Lenders that the conditions precedent to the Initial DIP Loan set forth in clauses (viii) and (ix) hereof to be made on the Interim Closing Date have been satisfied;<br><br>(iv) the interim order (in form and substance acceptable to the Required DIP Lenders) approving the DIP Credit Facility and DIP Facility Documents (the "**Interim DIP Order**") shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required DIP Lenders, the Required Tranche A DIP Lenders, and the Debtors shall be in compliance in all respects with the Interim DIP Order; |

---

[1] All Conditions Precedent subject to revision to conform to terms of final RSA.

(v) all of the "first day" motions, orders and related pleadings shall have been delivered in advance to counsel to the DIP Agent and counsel to the DIP Lenders;

(vi) the Required DIP Lenders shall be reasonably satisfied that the liens and security interests of the DIP Agent in the DIP Collateral have been perfected by the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to the Carve-Out (as defined in the Interim DIP Order)) and the Prepetition Permitted Liens;

(vii) Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral (which shall be deemed satisfied if such insurance as required by the Prepetition First Lien Credit Agreement remains in place);

(viii) no default or Event of Default under the DIP Credit Facility or the under the Interim DIP Order shall have occurred and be continuing on the Interim Closing Date or shall exist after giving effect to the Initial DIP Loan to be made on the Interim Closing Date;

(ix) all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on the Interim Closing Date (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(x) the Borrower has implemented and it and its direct and indirect subsidiaries and Holdings will maintain in effect policies and procedures designed to ensure compliance by the Borrower and its Subsidiaries, and their respective directors, managers, officers, employees, and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions (each as defined on Annex B, attached hereto);

(xi) subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(xii) receipt by the DIP Agent for distribution to each DIP Lender, of a certificate, in form and substance reasonably satisfactory to the Required DIP Lenders, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable, of such Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute the DIP Commitment Letter and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof;

(xiii) to the extent invoiced by at least two (2) Business Days prior to the Interim Closing Date, substantially concurrently with the Interim Closing Date, all fees and

out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Initial DIP Loan draw) in accordance with the terms of the Interim DIP Order.  Modifications of the Interim DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written (email being sufficient) consent of the Required DIP Lenders and the Required Tranche A DIP Lenders;

(xiv)   the RSA shall be in full force and effect and the Debtors are in compliance in all respects with the schedule of Milestones set forth in Schedule 1 of the RSA;

(xv)   the DIP Agent shall have received, at least five (5) Business Days prior to the Interim Closing Date (or such shorter period as the DIP Agent may agree) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act (Title III of Pub. L. 107 56 signed into law October 26, 2001), as subsequently amended and reauthorized), in each case, requested at least ten (10) Business Days prior to the Interim Closing Date; and

(xvi)   to the extent requested, at least ten (10) Business Days prior to the Closing Date, the DIP Agent and each requesting Interim DIP Lender shall have received, at least three (3) days prior to the Interim Closing Date (or such shorter period as the DIP Agent may agree) in connection with the requirements of 31 C.F.R. § 1010.230, a customary certification regarding beneficial ownership or control of the Borrower in a form reasonably satisfactory to the DIP Agent and each requesting DIP Lender.

For the purposes of this DIP Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, a material adverse change in, (i) the business, operations, properties, prospects, liabilities or financial condition of the Debtors, taken as a whole, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases, (ii) the ability of any Debtor to perform its obligations under this DIP Term Sheet or any other DIP Facility Document to which it is a party, (iii) the validity or enforceability against any Debtor of this DIP Term Sheet or any

22

<table>
<tr>
<td></td>
<td>other DIP Facility Document to which it is a party or (iv) the rights and remedies of the DIP Agent or any DIP Lender hereunder or thereunder.

It is understood and agreed that, to the extent any condition described under this Section is satisfied after 4:00 p.m., New York Time, on any such date, the DIP Agent shall release the Initial DIP Loans received from the DIP Lenders to the Borrower on the next succeeding Business Day.</td>
</tr>
<tr>
<td><strong>CONDITIONS PRECEDENT TO ANY DELAYED DRAW DIP LOAN ON OR AFTER THE FINAL CLOSING DATE:</strong></td>
<td>The obligations of the DIP Lenders to make any Delayed Draw DIP Loan on or after the Final Closing Date shall be subject to satisfaction, or written waiver, by the DIP Agent and each DIP Lender of each of the following conditions precedent in connection with the related draw request:

(i)   Debtors shall have timely delivered to the DIP Agent the Approved DIP Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet;

(ii)   Debtors shall have delivered to the DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 am New York City time four (4) Business Days prior to the requested funding date for such Delayed Draw DIP Loan (or such later time as the Required DIP Lenders may agree to);

(iii)   the Borrower shall have delivered to the DIP Agent a closing certificate, duly executed by the chief executive officer, president or chief financial officer of the Borrower, delivered to the DIP Agent, appropriately completed, by which such officer shall certify to the DIP Agent and the DIP Lenders the conditions precedent to the Delayed Draw DIP Loan set forth in clauses (vi) and (vii) hereof to be made on the Final Closing Date have been satisfied;

(iv)   the Final DIP Order (in form and substance acceptable to the Required DIP Lenders) shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required DIP Lenders and the Required</td>
</tr>
</table>

Tranche A DIP Lenders, and the Debtors shall be in compliance in all respects with the Final DIP Order;

(v)   the Required DIP Lenders shall be reasonably satisfied that the liens and security interests of the DIP Agent in the DIP Collateral have been perfected by the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to Prepetition Permitted Liens);

(vi)   no default or Event of Default under the DIP Credit Facility or the under the Final DIP Order shall have occurred and be continuing on the Final Closing Date or shall exist after giving effect to the Delayed Draw DIP Loan to be made on the Final Closing Date;

(vii)   all representations and warranties of the Debtors hereunder shall be true and correct in all material respects as of the Final Closing Date (except those qualified by materiality or Material Adverse Change (as defined above), which shall be true and correct in all respects);

(viii) the Borrower has implemented and it and its direct and indirect subsidiaries and Holdings will maintain in effect policies and procedures designed to ensure compliance by the Borrower and its Subsidiaries, and their respective directors, managers, officers, employees, and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions (each as defined on Annex B, attached hereto);

(ix)   subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Final DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not

reasonably be expected to cause a Material Adverse Change (as defined above);

(x)    to the extent invoiced at least two (2) Business Days prior to the Final Closing Date, substantially concurrently with the Final Closing Date, and prior to or substantially concurrently with the making of any subsequent Delayed Draw DIP Loans after the Final Closing Date, all fees and out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Delayed Draw DIP Loan draw) in accordance with the terms of the Final DIP Order;

(xi)   DIP Agent shall have received additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies, in form and substance reasonably acceptable to the Required DIP Lenders, unless waived by the Required DIP Lenders;

(xii)  to the extent requested pursuant to the terms of this DIP Term Sheet, receipt by the DIP Agent and the DIP Lenders of duly executed and delivered copies of the DIP Facility Documents (including, without limitation a debtor in possession credit agreement), in each case on the terms set forth in this DIP Term Sheet or otherwise on terms reasonably acceptable to the Required DIP Lenders; and

(xiii) the RSA is in full force and effect and the Debtors are in compliance in all respects with the schedule of Milestones set forth in Schedule 1 of the RSA.

Modifications of the Final DIP Order shall require the prior written consent of the Required DIP Lenders, the Required Tranche A DIP Lenders, and the Debtors.

Further, the obligations of the DIP Lenders to consummate the DIP Rollover and to be paid in the form of New Common Stock for any portion of the DIP Obligations that are not paid in cash from the Rights Offering Cash shall be subject to satisfaction, or written waiver, by the DIP Agent and each DIP Lender of

| | |
|---|---|
| | each of the conditions precedent in clauses (iii), (vi), (vii), and (viii) above on such Plan Effective Date. |
| **REPRESENTATIONS AND WARRANTIES:** | See attached <u>Annex B</u>. |
| **AFFIRMATIVE COVENANTS:** | So long as any obligations remain outstanding under this DIP Term Sheet or the DIP Orders, each Debtor shall: |
| | (i)  timely deliver, or cause to be timely delivered, to the DIP Agent, for distribution to each DIP Lender, the Approved DIP Budget and the Approved Variance Reports, all in accordance with the provisions set forth in the section above entitled "Approved DIP Budget; Approved Cash Flow Projection; Variance Reports" and otherwise in the DIP Orders; |
| | (ii)  maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of such person; |
| | (iii)  cooperate, consult with, and provide to the DIP Agent, for distribution to each DIP Lender, all such information as required under this DIP Term Sheet or the DIP Orders or as reasonably requested by the DIP Agent or such DIP Lender, and permit representatives and independent contractors of the DIP Agent and each DIP Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (so long as the Debtors have the reasonable opportunity to participate in such meeting), all at the reasonable expense of the Borrower (provided that the Borrower shall only be obligated to reimburse such expenses for two visits during the pending of the Chapter 11 cases; *provided*, *further*, that no more than one visit shall take place during any 60-day period) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall |

be excluded from this "Affirmative Covenants" subparagraph (iii);

(iv) comply with the Approved DIP Budget (after giving effect to the Permitted Variances) and with provisions of this DIP Term Sheet and the Interim DIP Order and/or the Final DIP Order (as applicable);

(v) comply in all respects with the RSA, including the schedule of Milestones set forth in Schedule 1 of the RSA (as then in effect after giving effect to any waivers or amendments thereto made in accordance with the requirements of the RSA);

(vi) take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Agent or the Required DIP Lenders to carry out the provisions of this DIP Term Sheet, the other DIP Facility Documents and the DIP Orders;

(vii) except to the extent contemplated by the Approved DIP Budget or otherwise consented to by the Required DIP Lenders in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations of the Debtors;

(viii) take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Prepetition Permitted Liens, liens permitted to be incurred or exist pursuant to clause (i) of the "Negative Covenant" section hereof, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders (collectively, "**Permitted Liens**");

(ix) take, or cause to be taken, all appropriate action to comply with all material applicable laws applicable to the Debtors or the DIP Collateral unless failure to comply could not

reasonably be expected to result in a Material Adverse Change;

(x)  subject to the Approved DIP Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;

(xi)  provide copies of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Chapter 11 Cases to counsel to the DIP Agent and the DIP Lenders at least two (2) days in advance of such filing or as promptly as practicable; *provided, however,* that the following are not material: ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or motions relating to the retention or fees of any professional; or statements of financial affairs and schedules of assets and liabilities;

(xii) promptly provide such additional information concerning the Debtors, or the DIP Collateral as the DIP Agent or any DIP Lender may reasonably request; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (xii);

(xiii)  maintain its cash management system in a manner reasonably acceptable to the Required DIP Lenders (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered);

(xiv)  deposit all distributions, dividends and other payments (other than payments of intercompany trade payables in the ordinary course of business) made by or on account of non-Debtor subsidiaries of the Debtors in a segregated account established by the Debtors (or in another account

<table>
<tr>
<td></td>
<td>after receiving the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders in their sole discretion)) at or prior to the time of receipt thereof, and maintain all such funds in such account unless otherwise approved in writing by the DIP Agent (acting at the direction of the Required DIP Lenders in their sole discretion) unless such distributions, dividends and other payments are remitted directly to the DIP Agent for application to the DIP Loans; and

(xv) cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once every other calendar week at reasonable times during normal business hours and upon reasonable prior notice, if reasonably requested by the Required DIP Lenders, to discuss the Approved DIP Budget, the Approved Variance Report, the Chapter 11 Cases, and the financial condition, performance and business affairs of the Debtors.</td>
</tr>
<tr>
<td>**NEGATIVE COVENANTS:**</td>
<td>So long as any obligations remain outstanding under the DIP Credit Facility or the DIP Orders, unless otherwise provided in the Approved DIP Budget, no Debtor shall, without the express, prior written consent of the Required DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following:

(i)    other than liens securing indebtedness required or permitted by this DIP Term Sheet, including the Cash Management Liens, and the DIP Orders, create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out (as defined in the Interim DIP Order), (b) liens permitted by the Prepetition Credit Agreements which, other than the Prepetition Permitted Liens, or other liens that are permitted to be senior to the DIP Liens by the Required DIP Lenders acting reasonably, are junior to the liens securing the DIP Credit Facility, (c) the "**Replacement Liens**" set forth and as defined in the DIP Orders, (d) other liens securing obligations in an aggregate principal amount at any time outstanding not to exceed $100,000;

(ii)   other than the Restructuring Transactions, convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or</td>
</tr>
</table>

29

hereafter acquired, other than (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders, (b) dispositions described in clause (ii) under "Mandatory Prepayments" above, (c) any disposition which would indefeasibly satisfy the DIP Obligations in full in cash, (d) asset sales in the ordinary course of business, (e) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and dispositions of property no longer used or useful in the conduct of the business of the Debtor and (f) dispositions of property not otherwise permitted so long as the aggregate fair market value of all assets so disposed shall not exceed $250,000;

(iii) create, incur assume or permit to exist any indebtedness outside of the ordinary course of business, other than (a) the DIP Obligations and (b) indebtedness permitted pursuant to Section 7.2 of the Prepetition First Lien Credit Agreement (other than postpetition indebtedness pursuant to Sections 7.2(d), (e), (f), (g), (q), (r), (s), (x), (z) and (aa), of the Prepetition First Lien Credit Agreement);

(iv) amend, modify or compromise any material term or material amount owed under a real property lease or material contract without the prior written consent of the Required DIP Lenders;

(v) incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment without the prior written consent of the Required DIP Lenders, other than in accordance with the Approved DIP Budget, after giving effect to the Permitted Variances;

(vi) create or acquire any ownership interest in any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;

(vii) create or permit to exist any other superpriority claim which is *pari passu* with or senior to the claims of the DIP Lenders under the DIP Credit Facility or the Prepetition First Lien Claims or Prepetition Second Lien Claims, except for the Carve Out (as defined in the Interim DIP Order) and except as set forth in this DIP Term Sheet and the DIP Orders;

(viii) modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code or plan of reorganization materially consistent with the RSA or in a manner that is not materially adverse to the interests of the DIP Lenders (in their capacities as such) without the prior written consent of the Required DIP Lenders;

(ix) file or propose any plan of reorganization that is materially inconsistent with the RSA;

(x) pay pre-petition indebtedness, except (a) payments contemplated by this DIP Term Sheet and the DIP Orders, (b) payments authorized by an order of the Bankruptcy Court and (c) adequate protection payments as set forth in the Interim DIP Order;

(xi) engage in any activities that would result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or

(xii) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of Holdings that is not a Guarantor without the prior written approval of the Required DIP Lenders (other than payments of intercompany trade payables in the ordinary course of business consistent with the Approved DIP Budget).

As used in this DIP Term Sheet, "**Restricted Payment**" means, with respect to any person, (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, or any redemption, purchase, retirement, defeasance, sinking fund or similar payment or any claim for rescission with respect to, any indebtedness (other than adequate protection payments in respect of the pre-petition indebtedness as expressly provided for herein, in the Interim

| | |
|---|---|
| | DIP Order or in the Approved DIP Budget); and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding, in each case of (a) through (d), other than any payment to any Debtor (other than Holdings). |
| **EVENTS OF DEFAULT:** | Each of following shall constitute an "**Event of Default**": <br><br>(i) the entry of an Interim DIP Order or Final DIP Order in form or substance that is not acceptable to the Required DIP Lenders in their sole discretion; <br><br>(ii) failure by any Debtor to be in compliance in all material respects with provisions of this DIP Term Sheet (subject to applicable grace periods as set forth in the DIP Orders, including a two (2) Business Day grace period for delivery of the Approved DIP Budget, cash flow forecasts and Approved Variance Reports), any other DIP Facility Document or any DIP Order; <br><br>(iii) any request made by any Debtor for, or the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the Required DIP Lenders and the Required Tranche A DIP Lenders; <br><br>(iv) termination of the RSA by any Company Party, the Required Consenting First Lien Lenders or the Required DIP Lenders; <br><br>(v) failure of any Milestone set forth in Schedule 1 of the RSA to be satisfied by the specified deadline therefor (in each case, as then in effect after giving effect to any waivers or amendments thereto made in accordance with the requirements of the RSA); <br><br>(vi) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; <br><br>(vii) the filing of any application by any Debtor for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien |

in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Obligations, DIP Liens, Adequate Protection Claims (as defined in the Interim DIP Order), Adequate Protection Liens (as defined in the Interim DIP Order), Prepetition First Lien Claims or Prepetition Obligations, excluding the Carve Out (as defined in the Interim DIP Order), the Prepetition Permitted Liens, liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders;

(viii) any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the DIP Agent or any DIP Lender or any of their agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Facility Document or under any DIP Order in favor of the DIP Lenders or DIP Agent;

(ix) any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the Prepetition Agents or any Prepetition Lender or any of their agents or employees, to subordinate or avoid any liens granted under the Prepetition Credit Agreements or under any other Loan Documents;

(x)    (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or the disallow any DIP Obligations, in whole or in part, or (b) any material provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the Required DIP Lenders);

(xi)    without the prior written consent of the Required DIP Lenders, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtor under section 363 of the Bankruptcy Code that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of all DIP Obligations and does not provide for the indefeasible payment in full in cash to the Prepetition First Lien Agent and the Prepetition First Lien Lenders upon closing of such sale or the

|  | effective date of a plan pursuant to which such sale is made, unless otherwise agreed to by the Required DIP Lenders and Required First Lien Lenders; |
|  | (xii)  the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) (without the prior written consent of the Required DIP Lenders); |
|  | (xiii)  the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral with an aggregate value of at least $100,000 without the prior written consent of the Required DIP Lenders; |
|  | (xiv)  termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of repayment of the DIP Loans; |
|  | (xv)  the conversion of any Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code; |
|  | (xvi)  the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code without the prior written consent of the Required DIP Lenders; |
|  | (xvii)  a dismissal of any of the Chapter 11 Cases; |
|  | (xviii)  the filing of any chapter 11 plan or related disclosure statement that is inconsistent with the RSA; |
|  | (xix)  the filing of any motion seeking approval of a sale of any DIP Collateral without the consent of the Required DIP Lenders (other than any sale permitted under "Negative Covenants"); or |
|  | (xx)  failure to pay principal, interest or other DIP Obligations or Adequate Protection Obligations in full when due, including without limitation, on the Maturity Date. |
| **REMEDIES UPON EVENT OF DEFAULT:** | As set forth in the DIP Orders. |

| | |
|---|---|
| **OTHER BANKRUPTCY MATTERS:** | All reasonable and documented prepetition and post-petition professional fees, costs and expenses of the DIP Agent and the DIP Lenders relating to the DIP Credit Facility (including, without limitation, (i) the preparation of documentation (including, any amendments, modifications or waivers) in respect thereof, (ii) the administration thereof and (iii) in connection with the enforcement or protection of rights in connection with the DIP Credit Facility or the documentation in respect thereof) and the Chapter 11 Cases (including, without limitation, prepetition and post-petition fees and disbursements of counsel and advisors, including, but not limited to, the fees, costs and expenses of Akin Gump Strauss Hauer & Feld, LLP, GLC & Co. Advisors, LLC, Simpson Thacher & Bartlett LLP and Troutman Pepper Hamilton Sanders LLP (as Delaware counsel), subject to the DIP Orders, shall be payable by the Borrower no later than five (5) days following written demand without the requirement to file retention or fee applications with the Bankruptcy Court. A copy of each summary invoice therefor shall be provided by the DIP Agent and the DIP Lenders to the Office of the U.S. Trustee, counsel to the Prepetition Secured Parties and counsel for any statutory committee appointed in the Chapter 11 Cases.<br><br>The Borrower shall indemnify the DIP Agent and each DIP Lender in accordance with the indemnity provisions set forth in <u>Annex D</u> hereto.<br><br>The Final DIP Orders shall contain releases and exculpations for the DIP Agent and each DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions.<br><br>Subject to the entry of the Interim DIP Order, pursuant to section 363(k) of the Bankruptcy Code, the DIP Agent (at the direction of the Required DIP Lenders) shall have the unconditional right to credit bid ("**Credit Bid**") the outstanding DIP Obligations (and any other applicable obligations) in connection with any non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise.<br><br>Subject to the entry of the Interim DIP Order, section 363(k) of the Bankruptcy Code and that certain Intercreditor Agreement, dated as of June 7, 2013 by and between Credit Suisse AG, Cayman Islands Branch in its capacity as first lien administrative agent thereunder and Credit Suisse AG, |

| | |
|---|---|
| | Cayman Islands Branch, in its capacity as second lien administrative agent thereunder (as may be amended, restated, supplemented or modified from time to time, the "**Intercreditor Agreement**"), the Prepetition First Lien Term Loan Agent, at the direction of the Required Lenders (as defined in the Prepetition First Lien Credit Agreement) shall have the unconditional right to Credit Bid the Prepetition First Lien Term Loan Claims in connection with any non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise.<br><br>Subject to the entry of the Interim DIP Order, section 363(k) of the Bankruptcy Code and the Intercreditor Agreement, the Prepetition Second Lien Term Loan Agent, at the direction of the Required Lenders (as defined under the Prepetition Second Lien Term Loan Credit Agreement), shall have the unconditional right to Credit Bid the Prepetition Second Lien Claims in connection with a non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any plan or otherwise. |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this DIP Term Sheet and any DIP Order, such DIP Order shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order may be amended other than by an instrument in writing signed by (i) three (3) or more unaffiliated DIP Lenders holding, in the aggregate, in excess of 50% in principal amount of the outstanding Tranche B DIP Obligations held by the Tranche B DIP Lenders (the "**Required DIP Lenders**") and (ii) the Debtors.<br><br>"**Required Tranche A DIP Lenders**" means, as of the relevant date, three (3) or more unaffiliated DIP Lenders holding, in the aggregate, in excess of 50% in principal amount of the outstanding Tranche A DIP Obligations held by the Tranche A DIP Lenders.<br><br>Notwithstanding the foregoing, any amendment, consent, waiver, supplement or modification to this DIP Term Sheet, any other DIP Facility Documents or any DIP Order that has the effect of (i) increasing the DIP Commitments of any DIP Lender, (ii) decreasing the amount of or postponing the payment of any scheduled principal, interest or fees payable to any DIP Lender (other than as a result of any extension of the Maturity Date, in accordance with the terms of any such extension, or waiver of default interest by the DIP Lenders in |

| | |
|---|---|
| | accordance herewith), (iii) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of prepayments in this DIP Term Sheet, (iv) amending or modifying the definition of "Required DIP Lenders" or "Required Tranche A DIP Lenders" or any provision of this section "AMENDMENT AND WAIVER", (v) releasing all or substantially all of the Guarantors of the DIP Obligations, or (vi) releasing all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court with the prior written consent of the Required DIP Lenders, in each case, shall require the written consent of each DIP Lender directly and adversely affected thereby; *provided* that any amendment, consent, waiver, supplement or modification to this DIP Term Sheet, any other DIP Facility Documents or any DIP Order that adversely impacts the treatment of the Tranche A DIP Obligations or the Tranche B DIP Obligations shall require the written consent of each Tranche A DIP Lender and Tranche B DIP Lender, respectively; *provided*, *further*, that no amendment shall amend, modify or otherwise affect the rights or duties of the DIP Agent without the prior written consent of the DIP Agent. |
| **ASSIGNMENTS:** | The DIP Lenders may assign all or any part of the DIP Loans or the DIP Commitments from time to time with the consent of the Borrower; *provided* that no consent of the Borrower shall be required (i) so long as an Event of Default has occurred and is continuing after giving effect to any applicable grace period or (ii) for any assignment to a DIP Lender, an affiliate of a DIP Lender, an Approved Fund (as defined in the Prepetition First Lien Credit Agreement), or any other person that has become a party to the RSA pursuant to the terms thereof.  The parties to each assignment shall execute and deliver to the DIP Agent an assignment agreement in substantially the form of <u>Exhibit D</u> attached hereto (an "**Assignment Agreement**").  Subject to receipt and recording thereof by the DIP Agent, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a DIP Lender hereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder.  The DIP Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment, except with respect to any assignment to a DIP Lender, an affiliate of a DIP Lender, an |

| | |
|---|---|
| | Approved Fund (as defined in the Prepetition First Lien Credit Agreement), or any other person that has become a party to the RSA pursuant to the terms thereof. The minimum assignment amount shall be $250,000 (or if less than $250,000, the total amount held by such assigning Lender).<br><br>No assignment of the DIP Loans or the DIP Commitments shall be permitted unless the applicable assignee executes and agrees to be bound by the RSA and the transactions contemplated therein or otherwise consents/commits to the Restructuring Transactions. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet. The Debtors submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Term Sheet shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.<br><br>As used herein, "Electronic Signature" shall mean an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record. |
| **PATRIOT ACT:** | The DIP Lenders hereby notify the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub. L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will |

| | |
|---|---|
| | allow the DIP Lenders to identify the Borrower in accordance with the Act. |
| **NOTICES** | (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows: |
| | if to the Borrower or any Guarantor, to |
| | Carestream Health, Inc.<br>150 Verona Street Rochester,<br>New York 14608<br>Attention of Julie Lewis, General Counsel<br>E-mail address:  Julie.lewis@carestream.com); |
| | if to the DIP Agent, to |
| | JPMorgan Chase Bank, N.A.<br>500 Stanton Christiana Road, NCC5, Floor 1<br>Newark, DE 19713-2107, United States<br>Attention: Yili Xu, Account Manager<br>Telephone number: (302) 643 – 7761<br>Email address: yili.x.xu@chase.com<br>Facsimile: 12012443657@tls.ldsprod.com |
| | if to any other DIP Lender, to it at its address (or telecopy number) set forth in its signature page. |
| | Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopy shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through Approved Electronic Platforms, to the extent provided in clause (b) below, shall be effective as provided in said clause (b). |
| | (b) Notices and other communications to the Borrower, any Guarantor, the DIP Agent, and the DIP Lenders hereunder may be delivered or furnished by using Approved Electronic Platforms pursuant to procedures approved by the DIP Agent; *provided* that the foregoing shall not apply to borrowing, prepayment or other operational loan notices unless otherwise |

| | |
|---|---|
| | agreed by the DIP Agent and the applicable DIP Lender. The DIP Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.<br><br>(c) Unless the DIP Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.<br><br>(d) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.<br><br>As used herein, "**Approved Electronic Platform**" shall mean IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the DIP Agent to be its electronic transmission system. |
| **COUNSEL TO DIP AGENT:** | Simpson Thacher & Bartlett LLP. |
| **COUNSEL TO DIP LENDERS:** | Akin Gump Strauss Hauer & Feld LLP. |

## ANNEX A TO DIP TERM SHEET

## DIP LENDERS AND DIP COMMITMENTS[2]

| DIP Lender | Tranche A Initial DIP Loan Commitment | Tranche B Initial DIP Loan Commitment | Tranche A Final DIP Loan Commitment | Tranche B Final DIP Loan Commitment | Total DIP Commitment |
|---|---|---|---|---|---|
| First Eagle Investments | ■■■■■■ | ■■■ | ■■■■■ | ■■■ | ■■■■■ |
| LCM Asset Management LLC | ■■■■■■ | ■■■ | ■■■■■ | ■■■ | ■■■■■ |
| Apollo Capital Management, L.P. | ■■■ | ■■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| Blackstone Credit | ■■■ | ■■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| Brigade Capital Management, LP | ■■■ | ■■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| CION Investment Corporation | ■■■ | ■■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| Federated Hermes | ■■■ | ■■■■ | ■■■ | ■■■■ | ■■■■■ |
| Marathon Asset Management | ■■■ | ■■■■ | ■■■ | ■■■■ | ■■■■ |
| MJX Asset Management | ■■■ | ■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| Nuveen Asset Management, LLC | ■■■ | ■■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| Vector Capital | ■■■ | ■■■■■ | ■■■ | ■■■■■ | ■■■■■ |
| **Total** | **$3,125,000.00** | **$46,875,000.00** | **$1,875,000.00** | **$28,125,000.00** | **$80,000,000.00** |

---

[2] All amounts subject to adjustment as set forth in the DIP Term Sheet. Individual fund level details were previously provided to the DIP Agent.

## ANNEX B[3]

## REPRESENTATIONS AND WARRANTIES

As of the Closing Date, the Borrower represents and warrants to the DIP Agent and each DIP Lender and acknowledges and confirms that the DIP Agent and each DIP Lender is relying upon such representations and warranties:

1. <u>Existence; Compliance with Law</u>.  Subject to any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code, each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except where the failure to be so qualified or in good standing could not reasonably be expected to result in a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

2. <u>Power; Authorization; Enforceable Obligations</u>.  Subject to any restrictions with respect to the Prepetition Credit Agreements or arising on account of any Debtors, status as a "debtor" under the Bankruptcy Code and subject to the entry of the DIP Orders, the Debtors have the power and authority, and the legal right, to make, deliver and perform the DIP Term Sheet, the DIP Orders and the other DIP Facility Documents (collectively, the "**Loan Documents**") to which it is a party and, in the case of each Borrower, to obtain extensions of credit hereunder. Each Debtors has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of each Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement and to authorize the other Transactions. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement of any of the Loan Documents, except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.19 of the Prepetition First Lien Credit Agreement. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the consummation of the Transactions (excluding the Loan Documents), except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect, (ii) the filings referred to in Section 4.19 of the Prepetition First Lien Credit Agreement and (iii) those, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect. Each Loan Document has been duly executed and delivered on behalf of the Debtors thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of the Debtors party thereto, enforceable against each such Borrower and each Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

---

[3] Capitalized terms and section references used but not defined herein, within this <u>Annex B</u>, have the meanings assigned to them in the Prepetition First Lien Credit Agreement.

3.  Litigation.  Subject to the Chapter 11 Cases, and any litigation that is stayed by operation of the Bankruptcy Code, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Group Member, threatened by or against any Group Member or against any of their respective properties, assets or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.  Ownership of Property; Liens.  With the exception of the DIP Liens and the Prepetition Permitted Liens, each Group Member has title in fee simple to, or a valid leasehold interest in, all of its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 7.3 of the Prepetition First Lien Credit Agreement.

5.  Intellectual Property.  The Group Members own, or are licensed to use, all Intellectual Property necessary for the conduct in all material respects of the business of the Company and its Restricted Subsidiaries, taken as a whole, as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning any Group Member's use of any Intellectual Property or the validity or effectiveness of any Group Member's Intellectual Property or alleging that the conduct of any Group Member's business infringes or violates the rights of any Person, nor does Holdings or the Company know of any valid basis for any such claim except for such claims that could not reasonably be expected to impair or interfere in any material respect with the operations of the business conducted by the Company and its Restricted Subsidiaries, taken as a whole or result in a Material Adverse Effect.

6.  Taxes.  Except as could not, individually or in an aggregate, reasonably be expected to have a Material Adverse Effect and other than Taxes that are excused or stayed by an order of the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases, each Group Member has filed or caused to be filed all tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); and no tax Lien has been filed, and, to the knowledge of any of the Group Members, no claim is being asserted, with respect to any such tax, fee or other charge.

7.  Federal Regulations.

    7.1.    None of the Borrower or its Subsidiaries is a United States real property holding corporation or "USRPHC" for U.S. federal income tax purposes, including within the meaning of Section 897(c)(2) of the Internal Revenue Code of 1986, as amended (the "Code"), during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

    7.2.    None of the Borrower or its Subsidiaries is, and has no current intention of engaging in activities that would cause it to become in the future, a "TID U.S. business," as that term is defined at 31 C.F.R. 800.248. For avoidance of doubt, the Borrower and its Subsidiaries do not (i) produce, design, test, manufacture, fabricate or develop any "critical technologies," as defined at 31 C.F.R. 800.215; (ii) perform any functions related to "covered investment critical infrastructure" as defined at 31 C.F.R. 800.212 and as set forth in Appendix A to 31 C.F.R. Part 800; or (iii) maintain or collect, directly or indirectly, any "sensitive personal data" of U.S. citizens as defined at 31 C.F.R. 800.241.

7.3.    No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U), and no part of the proceeds of any DIP Loans, and no other extensions of credit hereunder, will be used for the purpose of buying or carrying margin stock or for any purpose that violates the provisions of the Regulations of the Board. If requested by any DIP Lender or the DIP Agent and the Borrower will furnish to the DIP Agent and each DIP Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

7.4.    The Borrower and its Subsidiaries and their respective directors, managers, officers and, to the knowledge of the Borrower after due inquiry, their respective employees and agents, have been during the past five (5) years and are in compliance with Anti-Corruption Laws[4], Anti-Money Laundering Laws[5], Trade Control Laws[6] and Sanctions in all respects. Neither the Borrower nor any of its Subsidiaries nor any of their respective directors, managers, officers and, to the knowledge of the Borrower after due inquiry, their respective employees and agents has during the past five (5) years made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit.

7.5.    The Borrower has implemented and will maintain in effect policies and procedures designed to ensure compliance by the Borrower and its Subsidiaries, and their respective directors, managers, officers, employees and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions.

7.6.    None of the Borrower, any of its Subsidiaries or any of their directors, managers, employees or officers, or, to the knowledge of the Borrower after due inquiry, agents is a Sanctioned Person[7].

---

[4] "Anti-Corruption Laws" means the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, the Canadian Corruption of Foreign Public Officials Act, in each case, as amended, and, with respect to a Person, any other laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to bribery or corruption.

[5] "Anti-Money Laundering Laws" means the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT ACT ((Pub. L. No. 107-56), and the Bank Secrecy Act (31 U.S.C. §§5311-5332)), the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000, the Currency and Foreign Transactions Reporting Act of 1970 and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), in each case, as amended, and, with respect to a Person, any other laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to money laundering or terrorism financing.

[6] "Trade Control Laws" means applicable Laws related to (a) export controls, including the U.S. Export Administration Act of 1979, as amended, the U.S. Export Administration Regulations, the Arms Export Control Act, the U.S. International Traffic In Arms Regulations; and (b) customs or import controls, including those administered by the U.S. Customs and Border Protection.

[7] "Sanctioned Person" means at any time, (a) any Person who is the subject or target of Sanctions including any Person listed in any Sanctions-related list of designated Persons, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person 50 percent or more owned or controlled by one or more Persons identified in clause (a) or (b).

"Sanctioned Country" means at any time, a country or territory which is the subject or target of (a) comprehensive Sanctions, including, as of the Closing Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic and the Crimea region of Ukraine, Cuba, Iran, North Korea, and Syria, and (b) other broad Sanctions, including, as of the Closing Date, Russia, Belarus, Venezuela and Afghanistan.

"Sanctions" means economic, financial and trade sanctions administered or enforced by the United States (including the U.S. Department of the Treasury's Office of Foreign Assets Control, U.S. Department of State, and

7.7.     No part of the proceeds of any extension of credit hereunder will be used by the Borrower, directly or, to the knowledge of the Borrower after due inquiry, indirectly, or lent, contributed or otherwise made available to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country, or (ii) in any manner that would result in a violation of Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws by any Person (including any Person participating in the Loan, whether as lender, underwriter, advisor, investor, or otherwise).

7.8.     None of the Borrower or any of its Subsidiaries has during the past five years engaged in, is now engaged in, nor will engage in, any dealings or transactions with any Sanctioned Person, or in any Sanctioned Country, to the extent in violation of Sanctions.

7.9.     Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, fund all or part of any repayment of the Loan or other payments under this Agreement out of proceeds derived from criminal activity or activity or transactions in violation of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws, or that would otherwise cause any Person (including any Person participating in the Loan, whether as lender, underwriter, advisor, investor, or otherwise) to be in violation of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

7.10.    None of the Borrower, any of its Subsidiaries, or any of their respective directors, managers, officers or employees, or to the knowledge of the Borrower after due inquiry, any agent of such Person that will act in any capacity in connection with or benefit from any Facility, (i) currently is conducting, or has, at any time during the past five (5) years, conducted, any internal investigation regarding any violation or potential violation of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws; or (ii) currently is, or has been at any time during the past five (5) years, the subject of any current, pending or threatened investigation, inquiry or proceedings by a Governmental Authority for potential or apparent violations of any Sanctions, Trade Control Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

8.    <u>Labor Matters</u>. Except, with respect to clause (c) hereunder, to the extent permitted under the DIP Orders, and except as, when taken in the aggregate, such events could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of any Group Member, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) to the extent permitted under the Approved DIP Budget (after giving effect to any Permitted Variances) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

9.    <u>ERISA</u>. Neither a Reportable Event nor a failure to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 or 303 of ERISA has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has

---

U.S. Department of Commerce), the United Nations Security Council, the European Union and any member state thereof, the United Kingdom (including Her Majesty's Treasury of the United Kingdom), and the Government of Canada (or the government of any province or territory thereof).

arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by a material amount. Neither any Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither any Borrower nor any Commonly Controlled Entity would become subject to any material liability under ERISA if any Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No such Multiemployer Plan is in Reorganization or Insolvent.

10. <u>Investment Company Act; Other Regulations</u>. Neither Borrower nor any Guarantor is an "investment company" within the meaning of the Investment Company Act of 1940, as amended. No Borrower and each Guarantor is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

11. <u>Subsidiaries</u>. Except, with respect to clause (b) hereunder, as created by the Prepetition Credit Agreement, as of the Closing Date and after giving effect to the Transactions, (a) Schedule 4.15 sets forth the name and jurisdiction of organization of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Borrower and each Guarantor, and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of either Borrower or any Subsidiary, except as created by the Loan Documents and the Second Lien Loan Documents. As of the Interim Closing Date, there are no Unrestricted Subsidiaries, and all Subsidiaries of the Company are Restricted Subsidiaries.

12. <u>Environmental Matters</u>. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

12.1.    the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability for any Group Member under, any Environmental Law;

12.2.    no Group Member has received or has knowledge of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>"), nor does any Borrower and each Guarantor have knowledge that any such notice will be received or is being threatened;

12.3.    Materials of Environmental Concern have not been released, transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability for any Group Member under, any Environmental Law, nor have any Materials of Environmental Concern been released, generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability for any Group Member under, any applicable Environmental Law;

12.4.    no judicial proceeding or governmental or administrative action is pending or, to the knowledge of any Group Member, threatened, under any Environmental Law to which any

Group Member is or to the knowledge of any Group Member will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business, nor, to the knowledge of any Group Member, are there any environmental conditions with respect to the Properties or the Business, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that could form the basis of any such action or order against any Group Member or against any person or entity whose liability for any such action or order any Group Member has retained or assumed contractually, or otherwise result in any costs or liabilities for any Group Member under Environmental Law;

12.5.    all operations of the Group Members (including at the Properties) are in compliance, and for the past five years have in the past been in compliance, with all applicable Environmental Laws; and

12.6.    no Group Member has contractually assumed any liability of any other Person under Environmental Laws.

13. <u>Accuracy of Information</u>.

13.1.    No statement or information concerning any Group Member or the Business contained in this Agreement, any other Loan Document, the Confidential Information Memorandum or any other document, certificate or statement furnished by or on behalf of any Borrower and each Guarantor to the DIP Agent or the DIP Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished (or, in the case of the Confidential Information Memorandum, as of the date of this Agreement), any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading. The projections and pro forma financial information, taken as a whole, contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Company to be reasonable at the time made and as of the Closing Date (with respect to such projections and pro forma financial information delivered prior to the Closing Date), it being recognized by the DIP Lenders that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized.

13.2.    As of the Interim Closing Date, the information included in the Beneficial Ownership Certification[8] is true and correct in all material respects.

---

[8] Such Beneficial Ownership Certification to be defined as the new certificate delivered on or prior to the Interim Closing Date.

## ANNEX C

### INTEREST

"Adjusted Term SOFR Rate" means the Term SOFR Rate, plus 0.10%; provided that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of calculating such rate.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Federal Funds Effective Rate" means, for any day, the rate calculated by the Federal Reserve Bank of New York (the "NYFRB") based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as the federal funds effective rate, provided, that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Floor" means the benchmark rate floor, if any, provided in the Agreement initially (as of the execution of the Agreement, the modification, amendment or renewal of the Agreement or otherwise) with respect to the Adjusted Term SOFR Rate. For the avoidance of doubt the initial Floor for Adjusted Term SOFR Rate shall be 1.00%.

"Interest Period" means, the period commencing on the date of such borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a borrowing initially shall be the date on which such borrowing is made and, in the case of a borrowing, thereafter shall be the effective date of the most recently ended Interest Period.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; provided, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in U.S. Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"SOFR" means, with respect to any business day, a rate per annum equal to the secured overnight financing rate for such business day published by the NYFRB on the NYFRB's on the immediately succeeding business day.

"<u>Term Benchmark</u>" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"<u>Term Benchmark Loans</u>" means ABL Loans bearing interest based upon the Term Benchmark Rate.

"<u>Term SOFR Rate</u>" means, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such Interest Period, as such rate is published by the CME Term SOFR Administrator.

"<u>Term SOFR Reference Rate</u>" means, for any day and time, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR.

**ANNEX D**

**INDEMNIFICATION**

The Borrower shall indemnify the DIP Agent and each DIP Lender, and each Related Party (as defined below) of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all Liabilities and related expenses, including the fees, charges and disbursements of one counsel for any Indemnitee, and if necessary, one local counsel in any relevant jurisdiction, and in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this DIP Term Sheet, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, (ii) the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iii) any DIP Loan or the use of the proceeds therefrom, (iv) any actual or alleged presence or release of Materials of Environmental Concern on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (v) any actual or prospective Proceeding relating to any of the foregoing, whether or not such Proceeding is brought by the Borrower or any Guarantor or its or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such Liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnitee.  This Annex shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

For purposes of this Annex and Term Sheet, the terms capitalized herein shall be defined as set forth below.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the release or threatened release of any of Environmental Concern into the environment or (e) any contract, agreement or other consensual arrangement the extent to which liability is assumed or imposed with respect to any of the foregoing.

"Liabilities" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Related Parties" means with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

## EXHIBIT A-1 TO DIP TERM SHEET

## GUARANTORS[9]

| GUARANTOR | JURISDICTION OF ORGANIZATION |
|---|---|
| Carestream Health Acquisition, LLC | Delaware |
| Carestream Health International Holdings, Inc. | Delaware |
| Carestream Health International Management Company, Inc. | Delaware |
| Carestream Health Canada Holdings, Inc. | Delaware |
| Carestream Health World Holdings LLC | Delaware |
| Lumisys Holding Co. | Delaware |

---

[9] All subsidiary guarantors shall be Debtors in the Chapter 11 Cases.

## EXHIBIT A-2 TO DIP TERM SHEET

## GUARANTY

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet to which this Exhibit A-2 is attached.

1.    The Guaranty.

Each of the Guarantors hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) of the DIP Obligations, including, without limitation, (a) the principal of and interest on each DIP Loan made to the Borrower pursuant to this DIP Term Sheet or any other DIP Facility Document, (b) all other DIP Obligations under this DIP Term Sheet, any other DIP Facility Document or any DIP Order owing to the DIP Agent or any DIP Lender, and (c) the punctual and faithful performance, keeping, observance, and fulfillment by the Borrower of all of the agreements, conditions, covenants, and obligations of the Borrower contained in this DIP Term Sheet, any other DIP Facility Document or any DIP Order (all of the foregoing being referred to collectively as the "**Guaranteed Obligations**"). Upon the failure by the Borrower to pay punctually any such amount or perform such obligation, subject to any applicable grace or notice and cure period, each of the Guarantors agrees that it shall forthwith on demand pay such amount or perform such obligation at the place and in the manner specified in the DIP Term Sheet, any other DIP Facility Document or any DIP Order, as the case may be. The Borrower hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) the Guaranteed Obligations.

2.    Guaranty Unconditional. The obligations of each of the Guarantors hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations, whether (in any such case) by operation of law or otherwise, or any failure or omission to enforce any right, power or remedy with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations;

(b)    any modification or amendment of or supplement to this DIP Term Sheet, any other DIP Facility Document or any DIP Order, including, without limitation, any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(c)    any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any other person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations;

(d)     any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower or any other guarantor of any of the Guaranteed Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or any other guarantor of the Guaranteed Obligations, or any of their respective assets or any resulting release or discharge of any obligation of the Borrower or any other guarantor of any of the Guaranteed Obligations;

(e)     the existence of any claim, setoff or other rights which the Guarantors may have at any time against the Borrower, any other guarantor of any of the Guaranteed Obligations, the DIP Agent, any DIP Lender, or any other person, whether in connection herewith or in connection with any unrelated transactions;

(f)     the enforceability or validity of the Guaranteed Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower or any other guarantor of any of the Guaranteed Obligations, for any reason related to this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or any provision of applicable law, decree, order or regulation purporting to prohibit the payment by the Borrower or any other guarantor of the Guaranteed Obligations, of any of the Guaranteed Obligations or otherwise affecting any term of any of the Guaranteed Obligations;

(g)     the failure of the DIP Agent to take any steps to perfect and maintain any security interest in, or to preserve any rights to, any security or collateral for the Guaranteed Obligations, if any;

(h)     the election by, or on behalf of, any one or more of the DIP Agent or any DIP Lender, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters;

(k)     the failure of any other guarantor to sign or become party to this Guaranty or any amendment, change, or reaffirmation hereof; or

(l)     any other act or omission to act or delay of any kind by the Borrower, any other guarantor of the Guaranteed Obligations, the DIP Agent, any DIP Lender or any other person or any other circumstance whatsoever that might, but for the provisions of this Section 2, constitute a legal or equitable discharge of any Guarantor's obligations hereunder or otherwise reduce, release, prejudice or extinguish its liability under this Guaranty.

3.     Continuing Guarantee; Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. Each of the Guarantors' obligations hereunder shall constitute a continuing and irrevocable guarantee of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until Security Termination, subject to all the foregoing conditions, upon which date the guarantees made hereunder shall automatically terminate. If at any time any payment of the principal of or interest on any DIP Loan, any DIP Obligation or any other amount payable by the Borrower or any other party under the DIP Term Sheet, any other DIP Facility Document or any DIP Order (including a payment effected through exercise of a right of setoff) is rescinded, or is or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by the DIP Agent or any DIP Lender in their discretion), each of the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

4.    General Waivers; Additional Waivers.

(a)    General Waivers.  Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand or action on delinquency, protest, the benefit of any statutes of limitations and, to the fullest extent permitted by applicable law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against the Borrower, any other guarantor of the Guaranteed Obligations, or any other person.

(b)    Additional Waivers.  Notwithstanding anything herein to the contrary, each of the Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives, to the fullest extent permitted by applicable law:

(i)    any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

(ii)    (A) notice of acceptance hereof; (B) notice of any DIP Loans or other financial accommodations made or extended under the DIP Term Sheet, any other DIP Facility Document or any DIP Order or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Guarantor's right to make inquiry of the DIP Agent and the DIP Lenders to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any fact that might increase such Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments, the DIP Term Sheet, any other DIP Facility Document or any DIP Order; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Guarantor hereunder) and demands to which each Guarantor might otherwise be entitled;

(iii)    its right, if any, to require the DIP Agent or any DIP Lender to institute suit against, or to exhaust any rights and remedies which the DIP Agent or any of the DIP Lenders have or may have against the other Guarantors or any third party or against any DIP Collateral provided by the other Guarantors or any third party; and each Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and paid in full in cash) of the other Guarantors or by reason of the cessation from any cause whatsoever of the liability of the other Guarantors in respect thereof;

(iv)    (A) any rights to assert against the DIP Agent or the DIP Lenders any defense (legal or equitable), set-off, counterclaim, or claim that such Guarantor may now or at any time hereafter have against the other Guarantors or any other party liable to the DIP Agent or the DIP Lenders; (B) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; (C) any defense such Guarantor has to performance hereunder, and any right such Guarantor has to be exonerated, arising by reason of: (1) the impairment or suspension of the DIP Agent's or the DIP Lenders' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) the alteration by the DIP Agent or the DIP Lenders of the Guaranteed Obligations; (3) any discharge of the other Guarantors' obligations to the DIP Agent or the DIP Lenders by operation of law as a result of the DIP Agent's or the DIP Lenders' intervention or omission; or (4) the acceptance by the DIP Agent or the DIP Lenders of anything in partial satisfaction of the Guaranteed Obligations; and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed

Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder; and

(v)    any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the DIP Agent or the DIP Lenders; or (B) any election by the DIP Agent or the DIP Lenders under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against the Guarantors.

5.    Subordination of Subrogation; Subordination of Intercompany Indebtedness.

(a)    Subordination of Subrogation.    Until the Guaranteed Obligations have been fully and finally performed and paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor), the Guarantors (i) shall have no right of subrogation with respect to such Guaranteed Obligations and (ii) waive any right to enforce any remedy which the DIP Agent or any of the DIP Lenders now have or may hereafter have against the Borrower, any endorser or any guarantor of all or any part of the Guaranteed Obligations or any other person, and until such time as the Guarantors waive any benefit of, and any right to participate in, any security or collateral given to the DIP Agent or the DIP Lenders to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to the DIP Agent or the DIP Lenders.    Should any Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights, each Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off that such Guarantor may have to the payment in full in cash of the Guaranteed Obligations until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor) and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor).    Each Guarantor acknowledges and agrees that this subordination is intended to benefit the DIP Agent and the DIP Lenders and shall not limit or otherwise affect such Guarantor's liability hereunder or the enforceability of this Guaranty, and that the DIP Agent, the DIP Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this paragraph 5(a).

(b)    Subordination of Intercompany Indebtedness.    Each Guarantor agrees that any and all claims of such Guarantor against the Borrower or any other Guarantor hereunder (each an "**Obligor**") with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Guaranteed Obligations, or against any of its properties shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Guaranteed Obligations; provided that, such Guarantor may receive payments from any Obligor with respect to Intercompany Indebtedness unless an Event of Default has occurred and is continuing.    Notwithstanding any right of any Guarantor to ask, demand, sue for, take or receive any payment from any Obligor, all rights, liens and security interests of such Guarantor, whether now or hereafter arising and howsoever existing, in any assets of any other Obligor shall be and are subordinated to the rights of the DIP Agent and the DIP Lenders in those assets.    No Guarantor shall have any right to foreclose upon any asset of any Obligor in respect of Intercompany Indebtedness, whether by judicial action or otherwise, until Security Termination. If all or any part of the assets of any Obligor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such Obligor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such Obligor is dissolved or if substantially all of the assets of any such Obligor are sold, then, and in any such event constituting a dissolution or sale described above that constitutes an Event of Default (such events being herein referred to as an "**Insolvency Event**"), any payment or distribution of any kind or character, either in cash, securities

or other property, which shall be payable or deliverable upon or with respect to any indebtedness of any Obligor to any Guarantor ("**Intercompany Indebtedness**") shall be paid or delivered directly to the DIP Agent for application to the Guaranteed Obligations, due or to become due, until such Guaranteed Obligations shall have been fully paid and satisfied (in cash).  Should any payment, distribution, security or instrument or proceeds thereof be received by the applicable Guarantor upon or with respect to the Intercompany Indebtedness after any Insolvency Event and prior to the satisfaction of all of the Guaranteed Obligations and the termination of all financing arrangements pursuant to this DIP Term Sheet, any other DIP Facility Document or any DIP Order, such Guarantor shall receive and hold the same in trust, as trustee, for the benefit of the DIP Agent and the DIP Lenders and shall forthwith deliver the same to the DIP Agent, for the benefit of the DIP Lenders, in precisely the form received (except for the endorsement or assignment of such Guarantor where necessary), for application to any of the Guaranteed Obligations, due or not due, and, until so delivered, the same shall be held in trust by such Guarantor as the property of the DIP Agent and the DIP Lenders.  If any such Guarantor fails to make any such endorsement or assignment to the DIP Agent, the DIP Agent or any of its officers or employees is irrevocably authorized to make the same.  Each Guarantor agrees that until Security Termination, no Guarantor will assign or transfer to any person (other than the DIP Agent) any claim any such Guarantor has or may have against any Obligor except as expressly permitted by this DIP Term Sheet, any other DIP Facility Document or any DIP Order.

For purposes of this Exhibit A-2, "**Security Termination**" means the expiration or termination of the DIP Commitments and the payment in full in cash of the principal of and interest on each DIP Loan and all fees payable hereunder and all other Guaranteed Obligations payable hereunder (other than contingent indemnification obligations as to which no claim has been received by any Debtor).

## EXHIBIT B TO DIP TERM SHEET

## FORM OF NOTICE OF BORROWING

**Date:** _____

THIS NOTICE OF BORROWING (this "**Notice**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**DIP Term Sheet**") attached as Exhibit A to the commitment letter, dated as of August 21, 2022 (together with the DIP Term Sheet and each other exhibit, schedule or other attachment thereto and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Commitment Letter**"), by and among CARESTREAM HEALTH, INC., a Delaware corporation (the "**Borrower**"), the Guarantors (as defined therein) party thereto, and certain of the DIP Lenders in their capacity as Commitment Parties thereunder (as defined therein), in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on or about August 23, 2022. Capitalized terms used herein without definition shall have the meanings set forth in the DIP Commitment Letter. To the extent the provisions set forth in this Notice conflict with any provisions in the DIP Commitment Letter, the DIP Commitment Letter shall govern.

The undersigned, as [the chief executive officer, president or chief financial officer] of the Borrower, hereby certifies to the DIP Agent and the DIP Lenders, on behalf of the Borrower, and not in any individual capacity, that he/she is authorized to execute this Notice and hereby gives notice to the DIP Agent and the DIP Lenders of the Borrower's request to borrow a [Tranche A Initial DIP Loan][Tranche B Initial DIP Loan][Tranche A Final DIP Loan][Tranche B Final DIP Loan] in the amount of $_____ on _____.

The undersigned hereby requests that such funds be disbursed to the following account:[10][11]

Name of Bank: [_____]
ACH Routing Number: [_____]
Account No.: [_____]
Wire Transfer ABA: [_____]
SWIFT: [_____]

[The undersigned, as the [chief executive officer, president or chief financial officer] of the Borrower, hereby certifies to the DIP Agent and each DIP Lender, on behalf of Borrower, and not in any individual capacity, that as of the date hereof, each of the applicable conditions precedent set forth below and in the DIP Term Sheet has been satisfied (or waived in writing by the Required DIP Lenders):

1.    No Default or Event of Default has occurred and is continuing under the DIP Credit Facility or [the Interim Order][12][the Final Order][13] before or after giving effect to the [Tranche A Initial DIP Loan][Tranche B Initial DIP Loan][Tranche A Final DIP Loan][Tranche B Final DIP Loan] made on the date hereof.

---

[10] To the extent any funds will be netted or otherwise disbursed, to provide appropriate direction.

[11] To include what, if any, amount of commitment fee will be paid in kind on any such borrowing date.

[12] To be included for any borrowing made after the Interim Closing Date and prior to the Final Closing Date.

[13] To be included for any borrowing made after the Final Closing Date.

2.      All representations and warranties of the Debtors set forth in the DIP Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which are true and correct in all respects and except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects, or all respects, as applicable, as of such earlier date).][14]

*[Signature page follows]*

---

[14] To be included for any borrowing made on any date other than the Interim Closing Date or the Final Closing Date.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice as of the date first set forth above.

**BORROWER:**

**CARESTREAM HEALTH, INC.**

By: _____

Name:

Title:

**EXHIBIT C TO DIP TERM SHEET**

**FORM OF CLOSING CERTIFICATE**

**CLOSING CERTIFICATE**

**OF**

**CARESTREAM HEALTH, INC.**

August [●], 2022

This Certificate (this "**Certificate**") is furnished pursuant to the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (the "**DIP Term Sheet**") attached as Exhibit A to that certain commitment letter, dated as of August 21, 2022 (together with the DIP Term Sheet and each other exhibit, schedule or other attachment thereto, the "**DIP Commitment Letter**") among Carestream Health Holdings, Inc., a Delaware corporation ("**Holdings**"), Carestream Health, Inc., a Delaware corporation (the "**Borrower**"), certain of the Borrower's direct and indirect domestic subsidiaries and the commitment parties party thereto. Capitalized terms used herein without definition shall have the meaning assigned to such term in the DIP Term Sheet.

The undersigned, being the Vice President & Chief Financial Officer of the Borrower, hereby certifies solely in his capacity as such and not in any individual or personal capacity, as follows:

1. Each of the representations and warranties made by the Borrower or the Guarantors in or pursuant to the DIP Term Sheet shall be true and correct in all material respects on the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

2. As of the date hereof, no Default or Event of Default under the DIP Credit Facility or under the [Final][Interim] DIP Order has occurred or are continuing or after giving effect to the [Initial DIP Loans][Delayed Draw DIP Loans], will be made on the date hereof.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has hereunto set his name as of the date first written above.

**CARESTREAM HEALTH, INC.**

By: _____
Name:  Scott H. Rosa
Title:    Vice President & Chief Financial Officer

**EXHIBIT D TO DIP TERM SHEET**

**FORM OF ASSIGNMENT AGREEMENT**

      This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Term Sheet identified below, receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

      For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Term Sheet, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a DIP Lender under the Term Sheet and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Term Sheet, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.      Assignor:      _____

2.      Assignee:      _____
                   [and is an Affiliate/Approved Fund (as defined in the Prepetition First Lien Credit Agreement) of [*identify Lender*][15] ]

3.      Borrower:      CARESTREAM HEALTH, INC., a Delaware corporation

4.      Administrative Agent:      JPMorgan Chase Bank, N.A., as the administrative agent in respect of the credit facility provided under the Term Sheet

5.      Term Sheet:      Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**" attached as Exhibit A to the Commitment Letter, dated as of August 21, 2022 (together with the Term Sheet, the "**DIP Commitment Letter**")), by and among the Borrower, the Guarantors (as defined therein) party thereto, the certain of the DIP Lenders (as defined therein) in their capacity as such Commitment Parties

---

[15] Select as applicable.

thereunder (as defined therein), the DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by the Borrower and the Guarantors (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on or around August 22, 2022.

6.      Assigned Interest:

| Facility Assigned[16] | Aggregate Amount of DIP Commitment/ DIP Loans for all Lenders | Amount of DIP Commitment/DIP Loans Assigned | Percentage Assigned of DIP Commitment/DIP Loans[17] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the DIP Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower[, the Loan Parties] and [its] [their] Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR**

[NAME OF ASSIGNOR]

By: _____
       Name:
       Title:

**ASSIGNEE**

[NAME OF ASSIGNEE]

By: _____
       Name:
       Title:

---

[16] Fill in the appropriate terminology for the types of facilities under the Term Sheet that are being assigned under this Assignment (e.g., "DIP Loan" etc.)

[17] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all DIP Lenders thereunder.

[Consented to and][18] Accepted:

[NAME OF DIP AGENT], as DIP Agent

By: _____
    Title:

[Consented to:][19]

[NAME OF RELEVANT PARTY]

By: _____
    Title:

---

[18] To be added only if the consent of the DIP Agent is required by the terms of the Term Sheet.

[19] To be added only if the consent of the Borrower and/or other parties is required by the terms of the Term Sheet.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      *Representations and Warranties.*

1.1      *Assignor.*  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Term Sheet, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Term Sheet or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of the Term Sheet, (iv) any requirements under applicable law for the Assignee to become a lender under the Term Sheet or to charge interest at the rate set forth therein from time to time or (v) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under the Term Sheet.

1.2.      *Assignee.*  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a DIP Lender under the Term Sheet, (ii) it satisfies the requirements, if any, specified in the Term Sheet and under applicable law that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Term Sheet as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Term Sheet, together with copies of the most recent financial statements delivered pursuant to Section ___ thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the DIP Agent, the Assignor or any other Lender or any of their respective Related Parties, and (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Term Sheet, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the DIP Agent, the Assignor or any other Lender or any of  their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Term Sheet, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Term Sheet are required to be performed by it as a Lender.

2.      *Payments.*  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      *General Provisions.*  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Acceptance and adoption of the terms of this Assignment and Assumption by the Assignee and the Assignor by Electronic Signature or delivery of an executed counterpart of a signature page of this Assignment and Assumption by any Approved Electronic Platform shall be effective as delivery of a manually executed

counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

## EXHIBIT E TO DIP TERM SHEET

## AGENCY PROVISIONS

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet to which this Exhibit E is attached.

1.    Appointment and Authorization.  Each DIP Lender hereby irrevocably designates and appoints the DIP Agent as the agent of such DIP Lender under this Agreement and the other Loan Documents, and each such DIP Lender irrevocably authorizes the DIP Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the DIP Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each DIP Lender hereby authorizes the DIP Agent to enter into or accept each Loan Document, other intercreditor arrangements or collateral trust arrangements contemplated by this Agreement on behalf of and for the benefit of the DIP Lenders and the other Prepetition Secured Parties named therein and agrees to be bound by the terms of each Loan Document and other agreements or documents, and to exercise all rights, powers and remedies that the DIP Agent may have under such Loan Documents. Each DIP Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy with respect to any Collateral against the Borrower or any Guarantor or any other obligor under any of the Loan Documents (including, in each case, the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral of the Borrower or any Guarantor, without the prior written consent of the DIP Agent.

2.    Delegation of Duties.  The DIP Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the DIP Agent.  The DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through its Related Parties.  The exculpatory provisions of this Exhibit E shall apply to any such sub-agent and to the Related Parties of the DIP Agent and any such sub-agent, and shall apply to their respective activities as DIP Agent.  The DIP Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

3.    Default; DIP Collateral.

a.    Upon the occurrence and continuance of an Event of Default, the DIP Lenders agree to promptly confer in order that the Required DIP Lenders may agree upon a course of action for the enforcement of the rights of the DIP Lenders; and the DIP Agent shall be entitled to refrain from taking any action (without incurring any liability to any person for so refraining) unless and until the DIP Agent shall have received instructions from the Required DIP Lenders and indemnification acceptable to it.  All rights of action under this Term Sheet and all right to the DIP Collateral, if any, hereunder may be enforced by the DIP Agent and any suit or proceeding instituted the DIP Agent in furtherance of such enforcement shall be brought in its name as the DIP Agent without the necessity of joining as plaintiffs or defendants any other DIP Lender, and the recovery of any judgment shall be for the benefit of the applicable DIP Lender, subject to the fees and expenses of the DIP Agent.  In actions with respect to any DIP Collateral or other property or assets of Holdings or any subsidiary of Holdings, the DIP Agent is acting for the ratable benefit of each DIP Lender. Any and all agreements to subordinate (whether made heretofore or hereafter) other indebtedness

or obligations of the Debtors to the DIP Obligations shall be construed as being for the ratable benefit of each DIP Lender.

b.    Each DIP Lender authorizes and directs the DIP Agent to enter into this Term Sheet and any security documents on behalf of and for the benefit of the DIP Lenders (or if previously entered into, hereby ratifies the DIP Agent's (or any predecessor collateral agent's) previously entering into such agreements and security documents).

c.    Except to the extent unanimity is required hereunder, each DIP Lender agrees that any action taken by the Required DIP Lenders in accordance with the provisions of this Term Sheet, and the exercise by the Required DIP Lenders of the power set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon, all of the DIP Lenders.

d.    The DIP Agent is hereby authorized (but not obligated) on behalf of the DIP Lenders, without the necessity of any notice to or further consent from any DIP Lender, from time to time to take any action with respect to any DIP Collateral or security documents which may be necessary to create, perfect and maintain perfected the liens upon the DIP Collateral granted pursuant to the security documents.

e.    The DIP Agent shall not have any obligation whatsoever to any DIP Lender or to any other person to assure that the DIP Collateral exists or is owned (whether in fee or by leasehold) by the person purporting to own it or is cared for, protected, or insured or has been encumbered or that the liens granted to the DIP Agent (or any predecessor collateral agent) herein or pursuant to the security documents have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights granted or available to such Agent in this paragraph 3 of this Exhibit E or in any of the security documents; IT BEING UNDERSTOOD AND AGREED THAT IN RESPECT OF THE DIP COLLATERAL, OR ANY ACT, OMISSION, OR EVENT RELATED THERETO, THE DIP AGENT MAY ACT IN ANY MANNER IT MAY DEEM APPROPRIATE, IN ITS SOLE DISCRETION, AND THAT THE DIP AGENT SHALL NOT HAVE ANY DUTY OR LIABILITY WHATSOEVER WITH RESPECT TO ANY DIP COLLATERAL OR THE SECURITY DOCUMENTS TO ANY DIP LENDER, IN THE ABSENCE OF ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT.    Notwithstanding anything herein to the contrary, the DIP Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the security documents; (ii) take any necessary steps to preserve rights against any parties with respect to any DIP Collateral; or (iii) take any action to protect against any diminution in value of the DIP Collateral.

f.    In furtherance of the authorizations set forth in this paragraph 3 of this Exhibit E, each DIP Lender hereby irrevocably appoints (i) the DIP Agent as its attorney- in-fact, with full power of substitution, for and on behalf of and in the name of each such DIP Lender (1) to enter into any security document (including, without limitation, any appointments of substitute trustees under any security document), (2) to take action with respect to the DIP Collateral and security documents to create, perfect, maintain, and preserve the DIP Lenders' DIP Liens therein, and (3) to execute instruments of release or to take other action necessary to release DIP Liens upon any DIP Collateral to the extent authorized herein and (ii) the DIP Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such DIP Lender to execute

instruments of release or to take other actions necessary to release Debtors to the extent authorized herein.  The powers and authorities herein conferred on the DIP Agent may be exercised by the DIP Agent through any person who, at the time of the execution of a particular instrument, is an officer of the DIP Agent (or any person acting on behalf of the DIP Agent pursuant to a valid power of attorney).  The power of attorney conferred by this clause (f) to the DIP Agent is granted for valuable consideration and is coupled with an interest and is irrevocable (subject to paragraph 1) so long as the DIP Obligations, or any part thereof, shall remain unpaid or the DIP Lenders are obligated to make any DIP Loan hereunder.

4.      Liability of DIP Agent.

a.    The DIP Agent shall have no duties or obligations to any DIP Lender or any other Person (as defined below) except those expressly set forth herein and in the other Loan Documents and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the DIP Agent. The DIP Agent's duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing, the DIP Agent:

i.      shall not be subject to any fiduciary or other implied duties to any Lender or any other Person, regardless of whether any Default or any Event of Default has occurred and is continuing;

ii.     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the DIP Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), as applicable, provided that the DIP Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the DIP Agent may seek clarification or direction from the Required DIP Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided;

iii.    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the DIP Agent shall not be liable for the failure to disclose, any information relating to the Borrower or any of its respective Affiliates that is communicated to or obtained by any Person serving as the DIP Agent or any of its Affiliates in any capacity; and

iv.     shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the DIP Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the DIP Agent be responsible or liable to the Lenders or the Issuing Lender for any failure to monitor or maintain any portion of the Collateral. Nothing in this Agreement shall require the DIP Agent to expend or risk its own funds or otherwise incur any financial liability in

the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

b.    The DIP Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary, or as the DIP Agent shall believe in good faith shall be necessary, under the circumstances as provided in Amendment and Waivers Section) or (ii) in the absence of its own gross negligence or willful misconduct (as determined in a final, non-appealable judgment of a court of competent jurisdiction).

c.    The DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the value, validity, enforceability, effectiveness, sufficiency or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the DIP Agent's reliance on any electronic signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), (v) any failure of any Loan Party to perform its obligations hereunder or thereunder or (vi) the satisfaction of any condition set forth in conditions precedent or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the DIP Agent.

5.    <u>Reliance by DIP Agent</u>. The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a DIP Lender, the DIP Agent may presume that such condition is satisfactory to such Lender unless the DIP Agent shall have received notice to the contrary from such DIP Lender prior to the making of such Loan. The DIP Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The DIP Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the DIP Agent. The DIP Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of DIP Lenders as shall be provided for herein or in the other Loan Documents) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The DIP Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required DIP Lenders (or such other number or percentage of Lenders as shall be provided for herein or in the other Loan Documents), and such request and any action taken or failure to act pursuant thereto shall be binding upon the DIP Lenders and all future holders of the Loans.

6.     Notice of Default.  The DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until the DIP Agent has received written notice from a DIP Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default in Section 9.1 " in respect of this Agreement and identifying the specific clause under said Section is given to the DIP Agent by the Borrower, or (ii) notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the DIP Agent by the Borrower or a DIP Lender. In the event that the DIP Agent receives such a notice, the DIP Agent shall give notice thereof to the Lenders. The DIP Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required DIP Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the DIP Agent shall have received such directions, the DIP Agent may (but shall not be obligated to) take such action or refrain from taking such action with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

7.     Credit Decision; Disclosure of Information by DIP Agent.  Each DIP Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such DIP Lender, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the DIP Agent or any other DIP Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold DIP Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.  Each DIP Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other DIP Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates (as defined below)) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Each DIP Lender, by delivering its signature page to this Agreement on the Interim Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a DIP Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the DIP Agent or the DIP Lenders on the Interim Closing Date. Except for notices, reports and other documents expressly required to be furnished to the DIP Lenders by the DIP Agent herein, the DIP Agent shall not have any duty or responsibility to provide any DIP Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Debtors or any of their respective affiliates which may come into the possession of the DIP Agent or any sub-agent or related party thereof.

8.     Indemnification of the DIP Agent.  Each of the DIP Lenders agrees to indemnify the DIP Agent (and their Related Parties) in their respective capacities as such (to the extent not reimbursed by Holdings, the Borrower or any other Loan Party and without limiting the obligation of Holdings, the Borrower or any other Loan Party to do so), according to its Aggregate Exposure Percentage (as defined below), on a pro rata basis, in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the DIP Commitments shall have terminated and the

DIP Loans shall have been paid in full, on a pro rata basis, in accordance with its Aggregate Exposure Percentage immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the DIP Loans) be imposed on, incurred by or asserted against the Administrative Agent, the Joint Lead Arrangers or their Related Parties in any way relating to or arising out of, the DIP Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the DIP Agent or any other Person under or in connection with any of the foregoing; *provided* that no DIP Lender shall be liable to any such Person for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the DIP Loans and all other amounts payable hereunder.

9.      DIP Agent in its Individual Capacity.  With respect to its DIP Commitment, DIP Loans, the Person serving as the DIP Agent shall have and may exercise the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the DIP Agent and the term "DIP Lender" or "DIP Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as DIP Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with the Borrower, Holdings, or any of their respective Subsidiaries or other Affiliate thereof as if such Person were not the DIP Agent hereunder and without any duty to account therefor to the DIP Lenders.

10.     Successor Agent.

The DIP Agent may at any time give 30 days' prior written notice of its resignation to the DIP Lenders and the Borrower, whether or not a successor DIP Agent has been appointed. Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right, subject to the approval of the Borrower, not to be unreasonably withheld, for so long as no Event of Default has occurred and is continuing, to appoint a successor. If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its resignation, then the retiring DIP Agent may on behalf of the Lenders, appoint a successor DIP Agent (which shall be a bank with an office in New York, New York or an Affiliate of any such bank with an office in New York, New York), provided that if the retiring DIP Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the DIP Agent on behalf of the Prepetition Secured Parties under any of the Loan Documents, the retiring DIP Agent may continue to hold such collateral security until such time as a successor DIP Agent is appointed and such collateral security is assigned to such successor DIP Agent) and (2) all payments, communications and determinations provided to be made by, to or through such DIP Agent shall instead be made by or to each Lender directly, until such time as the Required DIP Lenders appoint a successor DIP Agent as provided for above in this Section; provided that the DIP Agent may, in its sole discretion, agree to continue to perform any or all of such functions until such time as a successor is appointed as provided in this Section. Upon the acceptance of a successor's appointment as DIP Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) DIP Agent, and the retiring DIP Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom

as provided above in this <u>Section</u>). Prior to any retiring DIP Agent's resignation hereunder as DIP Agent, the retiring DIP Agent shall take such action as may be reasonably necessary to assign to the successor DIP Agent its rights as DIP Agent under the Loan Documents. The fees payable by the Borrower to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring DIP Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Exhibit E</u> and <u>Annex D</u> shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting as DIP Agent.

Notwithstanding paragraph (a) of this <u>Section</u>, in the event no successor DIP Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its intent to resign, the retiring DIP Agent may give notice of the effectiveness of its resignation to the DIP Lenders, and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; *provided* that, solely for purposes of maintaining any security interest granted to the DIP Agent under any Security Document for the benefit of the Prepetition Secured Parties, the retiring DIP Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Security Document and Loan Document, and, in the case of any Collateral in the possession of the DIP Agent, shall continue to hold such Collateral, in each case until such time as a successor DIP Agent is appointed and accepts such appointment in accordance with this <u>Section</u> (it being understood and agreed that the retiring DIP Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent; *provided* that (A) all payments required to be made hereunder or under any other Loan Document to the DIP Agent for the account of any Person other than the DIP Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the DIP Agent shall directly be given or made to each Lender. Following the effectiveness of the DIP Agent's resignation from its capacity as such, the provisions of this <u>Exhibit E</u>, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting as DIP Agent and in respect of the matters referred to in the proviso under clause (i) above.

11.     <u>Disbursements of DIP Loan Payments; Return of Payments</u>.

(a) If the DIP Agent pays an amount to a DIP Lender under this Agreement in the belief or expectation that a related payment has been or will be received by the DIP Agent from any Debtor and such related payment is not received by the DIP Agent, then the DIP Agent will be entitled to recover such amount from such DIP Lender on demand without setoff, counterclaim or deduction of any kind.

(b) Each DIP Lender hereby agrees that (x) if the DIP Agent notifies such DIP Lender that the DIP Agent has determined in its sole discretion that any funds received by such Lender from the DIP Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Payment</u>") were erroneously transmitted to such DIP Lender (whether or not known to such DIP Lender), and demands the return of such Payment (or a portion thereof), such DIP Lender shall promptly, but in no event later than one Business Day thereafter, return to the DIP Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from

and including the date such Payment (or portion thereof) was received by such DiP Lender to the date such amount is repaid to the DIP Agent at the greater of the NYFRB Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the DIP Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the DIP Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this Section shall be conclusive, absent manifest error.

(c) Each DIP Lender hereby further agrees that if it receives a Payment from the DIP Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the DIP Agent (or any of its Affiliates) with respect to such Payment (a "<u>Payment Notice</u>") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the DIP Agent of such occurrence and, upon demand from the DIP Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the DIP Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such DIP Lender to the date such amount is repaid to the DIP Agent at the greater of the NYFRB Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d) The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any DIP Lender that has received such Payment (or portion thereof) for any reason, the DIP Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(e) Each party's obligations under this <u>Section</u> shall survive the resignation or replacement of the DIP Agent or any transfer of rights or obligations by, or the replacement of, a DIP Lender, the termination of the DIP Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

12.    <u>Taxes.</u>

(a)     All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (including, any taxes imposed under Part XIII of the Income Tax Act (Canada) (as the same may be amended, supplemented or replaced from time to time)), excluding (i) net income taxes, capital taxes imposed by the laws of Canada or any political subdivision thereof, and franchise taxes (which franchise taxes are imposed in lieu of net income taxes) imposed on the DIP Agent or any DIP Lender as a result of a present or former connection between the DIP Agent or such DIP Lender and the jurisdiction of the governmental authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the DIP Agent or such DIP Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (ii) branch profits taxes

imposed on the DIP Agent or any DIP Lender by the United States of America or any similar tax imposed by any other jurisdiction described in clause (i) above, (iii) United States withholding taxes to the extent imposed on amounts payable to any DIP Lender at the time such DIP Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such DIP Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment, if any) to receive additional amounts from the Borrower with respect to such taxes pursuant to this clause (a), (iv) taxes that are attributable to a DIP Lender's failure to comply with the requirements of clause (d), (e) or (g) of this Section 12 and (v) United States federal withholding taxes imposed by sections 1471 through 1474 of the Code as in existence on the date of this Agreement (and any amended versions of such provisions that are substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder and official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code ("FATCA") (such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings, the "Non-Excluded Taxes"). If any Non-Excluded Taxes, or any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document ("Other Taxes"), are required to be withheld from any amounts payable to the DIP Agent or any DIP Lender hereunder, the amounts so payable to the DIP Agent or such DIP Lender shall be increased to the extent necessary to yield to the DIP Agent or such DIP Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement. The Borrower shall indemnify the DIP Agent and each DIP Lender within 10 Business Days after written demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section 12) paid by such person and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by a DIP Lender (with a copy to the DIP Agent), or by the DIP Agent on its own behalf or on behalf of a DIP Lender shall be conclusive absent manifest error.

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant governmental authority in accordance with applicable law.

(c)      Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the DIP Agent for its own account or for the account of the relevant DIP Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Agent. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the DIP Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the DIP Agent and the DIP Lenders for any incremental taxes, interest or penalties that may become payable by the DIP Agent or any DIP Lender as a result of any such failure.

(d)      Except as provided in the next sentence, each DIP Lender (or assignee) that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the DIP Agent two original copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8BEN-E or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code

with respect to payments of "portfolio interest", a statement substantially in the applicable form attached to the Prepetition First Lien Credit Agreement, and a Form W-8BEN or Form W-8BEN-E, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents. To the extent a Non-U.S. Lender is not the beneficial owner, such Non-U.S. Lender shall deliver to the Borrower and the DIP Agent two original copies of U.S. Internal Revenue Service Form W-8IMY, accompanied by U.S. Internal Revenue Service Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a statement substantially in the applicable form attached to the Prepetition First Lien Credit Agreement, U.S. Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a statement, substantially in the applicable form attached to the Prepetition First Lien Credit Agreement, on behalf of such direct and indirect partner. Any DIP Lender (or assignee) that is not a Non-U.S. Lender shall deliver to the Borrower and the DIP Agent two original copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such person claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The forms and certification referenced in the previous two sentences (the "Forms") shall be delivered by each DIP Lender on or before the date it becomes a party to this Agreement. In addition, each DIP Lender shall deliver such Forms promptly upon the obsolescence or invalidity of any Form previously delivered by such DIP Lender and upon (i) the written request of either Borrower or (ii) any such DIP Lender otherwise having actual knowledge of the obsolescence or invalidity of such Forms. Each DIP Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered Form to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this clause (d), no DIP Lender shall be required to deliver any Form pursuant to this clause (d) that such DIP Lender is not legally able to deliver.

(e)     The DIP Agent that is a "United States person" as defined in Section 7701(a)(30) of the Code shall, on or before the date on which the Administrative Agent becomes a party hereto, provide the Borrower with two original copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the DIP Agent, claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The DIP Agent that is not a "United States person" as defined in Section 7701(a)(30) of the Code shall, on or before the date on which the DIP Agent becomes a party hereto, to the extent it is legally eligible to do so, provide the Borrower with two original copies of U.S. Internal Revenue Service Form W-8, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the DIP Agent, certifying as to any entitlement of the DIP Agent to an exemption from, or reduction in, any U.S. federal withholding tax with respect to any fees received on its own behalf under any Loan Document. In addition, the DIP Agent shall deliver such copies of U.S. Internal Revenue Service Form W-8 or U.S. Internal Revenue Service Form W-9, as applicable, promptly upon the obsolescence or invalidity of such U.S. Internal Revenue Service Form previously delivered by the DIP Agent and upon (i) the written request of either Borrower or (ii) the DIP Agent otherwise having actual knowledge of the obsolescence or invalidity of such U.S. Internal Revenue Service Form. Notwithstanding any other provision of this clause (d), the DIP Agent shall not be required to deliver any Form pursuant to this clause (d) that the Administrative Agent is not legally able to deliver.

(f)     A DIP Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the DIP Agent), at the time or times reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such DIP Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such DIP Lender.

(g)     If the DIP Agent or any DIP Lender determines, in its sole discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by either Borrower or with respect to which either Borrower has paid additional amounts pursuant to this Section 12, it shall pay over such refund to such Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section 12 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the DIP Agent or such DIP Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund); *provided*, that the Borrower, upon the request of the DIP Agent or such DIP Lender, agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant governmental authority) to the DIP Agent or such DIP Lender in the event the DIP Agent or such DIP Lender is required to repay such refund to such governmental authority. This clause (f) shall not be construed to require the DIP Agent or any DIP Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other person.

(h)     If a payment made to a DIP Lender under any Loan Document would be subject to United States federal withholding tax imposed by FATCA if such DIP Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such DIP Lender shall deliver to the Borrower and the DIP Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the DIP Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the DIP Agent as may be necessary for the Borrower and the DIP Agent to comply with their obligations under FATCA and to determine that such DIP Lender has complied with such DIP Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)     Each DIP Lender shall severally indemnify the DIP Agent, within 10 days after demand therefor, for (i) any Non-Excluded Taxes attributable to such DIP Lender (but only to the extent that the Borrower has not already indemnified the DIP Agent for such Non-Excluded Taxes and without limiting the obligation of the Borrower to do so) and (ii) any Taxes attributable to such DIP Lender, in each case, that are payable or paid by the DIP Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to any DIP Lender by the DIP Agent shall be conclusive absent manifest error. Each DIP Lender hereby authorizes the DIP Agent to set off and apply any and all amounts at any time owing to such DIP Lender under any Loan Document or otherwise payable by the DIP Agent to the DIP Lender from any other source against any amount due to the Administrative Agent under this clause (i).

13.    <u>ERISA and Related Matters.</u>

(a)    Each DIP Lender (x) represents and warrants, as of the date such Person became a DIP Lender party hereto, to and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the DIP Agent and its Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

    (i)    such DIP Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA (as defined below) or otherwise) of one or more Plans (as defined below) with respect to such Lender's entrance into, or participation in connection with the DIP Loans, the DIP Commitments or this Agreement;

    (ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to, and all of the conditions for exemptive relief are satisfied in connection with, such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement;

    (iii)    (A) such DIP Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the DIP Loans, the DIP Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such DIP Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement; or

    (iv)    such other representation, warranty and covenant as may be agreed in writing between the DIP Agent, in its sole discretion, and such DIP Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a DIP Lender or (2) such DIP Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such DIP Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a DIP Lender party hereto, for the benefit of, the DIP Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the DIP Agent or any of its Affiliates is a fiduciary with respect to the assets of such DIP Lender involved in such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP

Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the DIP Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

(c)    The DIP Agent hereby informs the DIP Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the DIP Loans, the DIP Commitments, this Agreement and any other Loan Documents (ii) may recognize a gain if it extended the DIP Loans or the DIP Commitments for an amount less than the amount being paid for an interest in the DIP Loans or the DIP Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

14.    <u>Interest Rates.</u>

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. The DIP Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. The DIP Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The DIP Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any DIP Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

The terms capitalized herein shall be defined as set forth below.

"<u>Affiliate</u>" shall mean with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"<u>Aggregate Exposure</u>" shall mean with respect to any DIP Lender at any time, an amount equal to the amount of such Lender's DIP Commitment then in effect or, if the DIP Commitments have been terminated, the amount of such Lender's DIP Loans then outstanding.

"<u>Aggregate Exposure Percentage</u>" shall mean with respect to any DIP Lender at any time, the ratio (expressed as a percentage) of such DIP Lender's Aggregate Exposure at such time to the Aggregate Exposure of all DIP Lenders at such time.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>Governmental Authority</u>" shall mean any nation or government, any state, province or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"<u>Person</u>" shall mean any individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"<u>Plan</u>" shall mean at a relevant time, any employee benefit plan (other than a Multiemployer Plan) that is covered by ERISA and in respect of which Holdings or the Borrower is (or, if such plan were terminated at such time, would be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

**<u>Exhibit D</u>**

**DIP Agent Fee Letter**

*Execution Version*

JPMORGAN CHASE BANK, N.A.
383 Madison Avenue
New York, New York 10179

August 21, 2022

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Scott Rosa and Robert Johnson

<u>DIP Administrative Agent Fee Letter</u>

Ladies and Gentlemen:

Reference is made to the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits thereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>DIP Term Sheet</u>"), attached as <u>Exhibit A</u> to that certain commitment letter, dated as of August 21, 2022 (together with the DIP Term Sheet, the "<u>DIP Commitment Letter</u>"), by and among us, you and the other parties party thereto, regarding the transactions described therein. Capitalized terms used but not defined herein are used with the meanings assigned to them in the DIP Commitment Letter.

1.      Appointment

It is agreed that JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>") will act as the administrative agent (in such capacity, the "<u>Administrative Agent</u>") in respect of the DIP Credit Facility.

2.      Fees

As consideration for the agreements of JPMorgan to act as Administrative Agent in respect of the DIP Credit Facility, you agree to pay or cause to be paid to JPMorgan, for its own account, an administration fee in respect of the DIP Credit Facility equal to ████, which fee will be payable in full on the Closing Date (as defined below).

For purposes hereof, "<u>Closing Date</u>" shall mean the date of initial funding of the DIP Credit Facility.

You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable hereunder shall be paid in U.S. Dollars and in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses as provided for in the DIP Commitment Letter. In addition, all such payments will be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any federal, State or local taxing authority, or will be grossed up by you for such amounts. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any of the other Lenders.

3.  Confidentiality

This Fee Letter is delivered to you on the understanding that this Fee Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person without our prior written consent except (a) you and your officers, directors, employees, affiliates, members, partners, attorneys, accountants, agents and advisors, in each case on a confidential basis and (b) in any legal, judicial or administrative proceeding, including proceedings with the Bankruptcy Court (provided that, you agree to use commercially reasonable efforts to maintain the confidentiality of the fee arrangements herein by seeking authority to make any necessary filings either under seal or in redacted form acceptable to JPMorgan and pursuant to section 107(b) of the Bankruptcy Code), or other compulsory process or as otherwise required by applicable law or regulations (in which case you agree to use commercially reasonable efforts to promptly notify us to the extent not prohibited by law); provided, however, it is understood and agreed that (i) after your acceptance of this Fee Letter, you may disclose the aggregate fees payable under this Fee Letter (but not this Fee Letter nor the contents hereof) in generic disclosure of aggregate sources and uses contained in any marketing materials relating to the DIP Credit Facility; (ii) the aggregate fees and other amounts herein (but not the Fee Letter nor the contents hereof) may be reflected in your financial statements as part of the aggregate expenses in connection with the transactions contemplated hereby and may otherwise be disclosed as part of projections, pro forma information and a generic disclosure of aggregate sources and uses and (iii) you may disclose this Fee Letter in connection with the exercise of remedies hereunder or any suit, action or proceeding relating to this Fee Letter or the transactions contemplated hereby or enforcement hereof.

4.  Miscellaneous

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing.  This Fee Letter may not be amended or waived except by an instrument in writing signed by us and you.  This Fee Letter may not be assigned by any party without the prior written consent of the other party hereto.  This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.  This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Fee Letter shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.

As used herein, "Electronic Signature" shall mean an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]