## EXHIBIT A

**(ABL Commitment Letter Motion)**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) Case No. 22-10778 (JKS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF AN
## ORDER (I) APPROVING THE DEBTORS' ENTRY INTO THE EXIT ABL
## FACILITY COMMITMENT DOCUMENTS, (II) AUTHORIZING PAYMENT OF
## FEES AND EXPENSES THEREUNDER, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:[2]

### Preliminary Statement

1.      On August 21, 2022, after extensive negotiations, the Debtors, JPMorgan Chase

Bank, N.A. ("JPM" or the "Agent," as applicable), and the other lenders party thereto (together

with JPM, collectively, the "Exit ABL Backstop Parties") entered into (a) a commitment

letter (together with all exhibits and attachments thereto, the "Commitment Letter"), attached

hereto as **Exhibit B**, which documents the Exit ABL Backstop Parties' commitment to provide a

senior secured asset-based revolving credit facility to the Debtors in an aggregate principal

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health
Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International
Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health
Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co.
(3232).  The location of the Debtors' service address is:  150 Verona Street, Rochester, New York 14608.

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to
the Debtors' chapter 11 cases, is set forth in the *Declaration of Scott H. Rosa, Chief Financial Officer of
Carestream Health, Inc., in Support of Chapter 11 Petitions and First Day Motions*
(the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not defined in this
motion have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed
*Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates*
(as amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

amount of up to $85 million (the "<u>Exit ABL Facility</u>"), and (b) related fee letters (attached hereto as **<u>Exhibits C</u>**, **<u>D</u>**, and **<u>E</u>**).

2.     The Commitment Letter is the product of extensive good faith, arm's-length negotiations between the Debtors and the Exit ABL Backstop Parties.  The Commitment Letter provides that the Exit ABL Backstop Parties will continue to conduct legal and business diligence, prepare and negotiate the definitive documentation for the Exit ABL Facility, and ultimately fund at least a portion of the Exit ABL Facility, subject to confirmation of the Plan and other conditions precedent detailed in the Commitment Letter.  In exchange for such obligations, the Commitment Letter includes customary provisions for reimbursement of reasonable and documented costs and expenses related to the Exit ABL Facility, payment of certain other nonrefundable fees related to the Exit ABL Facility as set forth in the Fee Letters (as defined in the Commitment Letter, and together with the Commitment Letter, the "<u>Exit ABL Facility Commitment Documents</u>"), and an indemnification (such provisions, collectively, the "<u>Expense Reimbursement and Indemnification</u>").

3.     The Exit ABL Backstop Parties' commitment to provide the Exit ABL Facility is conditioned on the Debtors' seeking approval of the Exit ABL Facility Commitment Documents at the outset of these chapter 11 cases through this motion, and the Debtors' performance under the Exit ABL Facility Commitment Documents is necessary to secure the Exit ABL Backstop Parties' commitment to provide the Exit ABL Facility.  In the Debtors' business judgment, the Exit ABL Backstop Parties' exit financing proposal is the best available proposal, and allows the Debtors to embark on these chapter 11 cases with exit financing already secured.  Additionally, the Debtors' ability to consummate their proposed chapter 11 plan of reorganization depends on the availability of the exit financing provided by the Exit ABL Facility.  Accordingly, the

Debtors seek approval of their entry into the Exit ABL Facility Commitment Documents and to perform thereunder to facilitate their prompt emergence from chapter 11.

**Relief Requested**

4. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) approving the Debtors' entry into and performance under the Exit ABL Facility Commitment Documents; (b) authorizing the Debtors' payment of the Exit ABL Facility Obligations (as defined below); and (c) granting related relief. In support of this motion, the Debtors submit the *Declaration of Scott H. Rosa in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Entry Into the Exit ABL Facility Commitment Documents, (II) Authorizing Payment of Fees and Expenses Thereunder, and (III) Granting Related Relief* (the "Rosa Declaration"), filed contemporaneously herewith.

**Jurisdiction and Venue**

5. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein are sections 363 and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rule 6004 of

the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rules 2002-1 and 9013-1.

**<u>Background</u>**

8.　　The Debtors, together with their non-Debtor affiliates (collectively, "<u>Carestream</u>" or the "<u>Company</u>"), are a leading provider of medical imaging and non-destructive testing products with over 100 years of industry experience. The Company is a partner of choice to approximately 8,000 direct customers and approximately 900 dealers in more than 130 countries. Its products are used by prominent health systems, hospitals, imaging centers, specialty practices and industrial companies worldwide. Headquartered in Rochester, New York, Carestream employs a global workforce of approximately 3,410 employees with approximately 180 contractors.

9.　　Carestream, like many businesses, faced significant headwinds in 2020, principally as a result of changing product and customer trends and the global COVID-19 pandemic, which, in light of the Debtors' capital structure, placed substantial strain on the Debtors' businesses. To alleviate the strain, the Debtors executed a voluntary amend-and-extend transaction in early 2020 that extended the maturities of their first lien revolver and term loan and second lien term loan debt. The amend-and-extend transaction provided the Debtors with time to meaningfully examine various strategic alternatives, including sale transactions and debt-for-equity exchanges to deleverage the Company.

10.　　Ultimately, the Debtors determined that a substantial deleveraging combined with new capital investment was the best path forward for their business. To implement the foregoing, the Debtors negotiated, and ultimately agreed, with a majority of their prepetition secured lenders and their equity sponsor on the terms of a comprehensive financial restructuring. The terms of the proposed restructuring are memorialized in a restructuring support agreement

(the "RSA") that serves as the foundation of the Debtors' prepackaged Plan. Under the RSA, the Debtors will eliminate approximately $470 million of prepetition funded debt and raise up to $75 million of new equity capital, while also leaving general unsecured claims unimpaired. As of August 23, 2022 (the "Petition Date"), the Debtors have fully solicited their Plan, which was accepted by all creditor classes entitled to vote, including lenders collectively holding approximately 73% of the Debtors' prepetition first lien revolver and term loan debt and approximately 98% of the Debtors' prepetition second lien term loan debt.

11.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## The Exit ABL Facility and Related Obligations

12.     The Plan contemplates that the reorganized Debtors will enter into the Exit ABL Facility on the effective date of the Plan. The Exit ABL Facility will allow the Debtors to replace or continue their outstanding letters of credit, have access to certain existing revolving commitments, and provide additional borrowing availability to fund go-forward operations following their reorganization and emergence from chapter 11. Key provisions of the Exit ABL Facility include:

| | Select Terms of the Exit ABL Facility[3] |
|---|---|
| **Company Parties** | • Carestream Health, Inc. (as Borrower), a direct parent entity of the Borrower (Holdings), and each domestic, Canadian, and material foreign subsidiary of the Borrower, with exclusions consistent with the existing prepetition facilities (as Guarantors) |
| **Lenders** | • JPMorgan Chase Bank, Credit Suisse AG, Barclays, and Apollo Credit Master Fund Ltd. (as the ABL Commitment Parties) and certain other prepetition revolving lenders |
| **Facility** | • Asset-based revolving facility in the amount of $85 million<br>  ○ Closing date maximum draw of $47,424,613.62<br>• Letters of Credit up to $15 million<br>  ○ No Letters of Credit issued on Closing Date |
| **Commitment Increase** | • Borrower may request increase not to exceed the greater of: (a) the sum of (i) $25 million plus (ii) any voluntary prepayments resulting in commitment reductions under the ABL Facility and (b) the excess of the Borrowing Base over the aggregate amount of ABL Commitments<br>• Each ABL Lender can elect to have its commitment reduced by an amount equal to 40% of such increase |
| **Rate** | • Interest Rate:<br>  ○ ABR (2% floor) + 1.00% cash, payable quarterly<br>  ○ SOFR + 0.10% (1% floor) + 2.00% cash, payable at elected period of one, three or six months<br>• Applicable Margin subject to adjustment after the first two full fiscal quarters after the Closing Date |
| **Maturity** | • 4.5 years after the Closing Date |
| **Covenants / Reporting** | • Usual and customary covenants and reporting requirements<br>• Fixed charge coverage ratio financial covenant<br>• Cash dominion and sweep in connection with certain defaults or availability conditions |
| **Fees** | • Commitment Fee: 0.50% per annum on the average daily unused portion of the ABL Facility<br>• Fronting Fee: 0.125% on the face amount of each Letter of Credit, payable quarterly<br>• Letter of Credit Fee |

---

[3] This table is provided for reference purposes only. The specific terms of the Exit ABL Facility are set forth in greater detail in the Commitment Letter, which documents the Exit ABL Backstop Parties' commitment to provide the Exit ABL Facility.

13.     The Exit ABL Facility Commitment Documents also provide for the Debtors'
payment of the Exit ABL Facility Obligations, as summarized below (collectively,
the "Exit ABL Facility Obligations"):[4]

a.   **Expense Reimbursement.**  The reorganized Debtors will reimburse the Exit ABL Backstop Parties for all reasonable and documented out-of-pocket expenses (including due diligence expenses, field exam and appraisal expenses, travel expenses, and reasonable and documented fees, charges and disbursements of counsel (including Simpson Thacher & Bartlett LLP and Freshfields Bruckhaus Deringer US LLP) and of local counsel in each appropriate jurisdiction incurred in connection with the Exit ABL Facility and any related documentation (including the Exit ABL Facility Commitment Documents, the definitive documentation relating to the ABL Facility, the Plan or the Cases).

b.   **Indemnification.**  In connection with the Debtors' acceptance of the Exit ABL Facility Commitment Documents, the Debtors have agreed to indemnify the Exit ABL Backstop Parties and certain related parties from liabilities and related expenses to which any such indemnified person may become subject arising out of or in connection with the Exit ABL Facility Commitment Documents, the Exit ABL Facility, the use of the proceeds thereof, any related transaction or the activities performed or services furnished pursuant to the Exit ABL Facility Commitment Documents or the role of any Exit ABL Commitment Party, unless otherwise resulting from the willful misconduct or gross negligence of such indemnified party, subject to the terms of the Commitment Letter.

c.   **Arranger / Structuring Fees.**  Annual administration fee (payable on the effective date of the Plan and each anniversary thereafter) to the Agent and one-time arrangement and structuring fees, payable on the Closing Date.

d.   **Commitment / Upfront Fees.**  Commitment fee equal to a percentage of the commitments of each Exit ABL Commitment Party in the Exit ABL Facility payable on the Closing Date.

14.     In the Debtors' business judgement, the Exit ABL Facility Obligations are a
reasonable price to pay for the Exit ABL Backstop Parties' commitment to provide the Exit ABL
Facility given the benefits arising therefrom and the Debtors' ability to promptly emerge from

---

[4]   Capitalized terms used but not defined in this summary have the meanings given to them in the Commitment Letter.  The full provisions governing the reimbursement and payment of fees and expenses are set forth in the Commitment Letter and Fee Letters.  If any description set forth herein is in conflict with the Commitment Letter, the Commitment Letter shall control.

chapter 11 with sufficient liquidity to fund Plan distributions and the reorganized Debtors' go-forward businesses.  Moreover, the Commitment Letter expressly contemplates that the Debtors use reasonable best efforts to seek approval of their entry into the Exit ABL Facility Commitment Documents at the outset of these chapter 11 cases in order to secure the benefit of the commitments contemplated therein:

> It is a condition to the Commitment Parties' commitments and agreements hereunder that (a) you use reasonable best efforts to obtain entry of an order (in form and substance reasonably satisfactory to the Commitment Parties) by the Bankruptcy Court approving the Borrower's entry into to this Commitment Letter and the Fee Letters and authorizing the payment of fees and expenses and the granting of indemnification provided for in this Commitment Letter and the payment of fees provided for in the Fee Letters) at the initial hearing for relief in the Cases; provided, however, that to the extent such an order is not entered by the Bankruptcy Court at the initial hearing for relief in the Cases, it shall be a condition to the Commitment Parties' commitments and agreements hereunder that such an order is entered within ten (10) calendar days of the date the Cases are commenced.

15.     Accordingly, the Debtors seek approval of their entry into the Exit ABL Facility Commitment Documents.

## Basis for Relief

**I.     The Debtors' Entry Into and Performance Under the Exit ABL Facility Commitment Documents and Payment of the Exit ABL Facility Obligations Are Sound Exercises of the Debtors' Business Judgment.**

16.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in this circuit will approve the use, sale or lease of estate property outside of the ordinary course if the proposed action is supported by a valid business reason.  *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) ("[U]nder normal circumstances the court would defer to the [debtor's] judgment so long as there is a legitimate business justification."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153

(D. Del. 1999) ("[C]ourts require the debtor to show that a sound business purpose justifies such actions."); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting section 363 requires "a sound business purpose" for proposed use of property).

17.     If a valid business reason exists for non-ordinary-course use of estate property, then the debtor's business decision to so use estate property is entitled to judicial deference under the business judgment rule. *See, e.g.*, *Martin*, 91 F.3d at 395; *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008). Under the business judgment rule, courts will approve the debtor's business decision to use estate property outside of the ordinary course of business unless it is shown that such decision is the product of bad faith. *See In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that overcoming the business judgment rule is a "near-Herculean task," in that it requires a showing that the business decision in question "go[es] so far beyond the bounds of reasonable business judgment that its only explanation is bad faith").

18.     Here, the Debtors' entry into and performance under the Exit ABL Facility Commitment Documents is supported by valid and sound business reasons. The Exit ABL Facility Commitment Documents are the product of extensive good faith, arm's-length negotiations between the Debtors and the Exit ABL Backstop Parties and allow the Debtors to commence these cases with a line of sight to emerging with a well-capitalized balance sheet. Through this motion, the Debtors seek court approval of the Exit ABL Facility Commitment Documents to reciprocate the Exit ABL Backstop Parties' commitment at the outset of these chapter 11 cases to finalize and document the Exit ABL Facility during the pendency of these cases, and ultimately fund the Exit ABL Facility upon emergence. Absent the Debtors' entry into and performance under the Exit ABL Facility Commitment Documents, including payment of the Exit ABL Facility Obligations, the Debtors would likely be unable to secure the Exit ABL

Backstop Parties' commitment to provide the Exit ABL Facility, therefore jeopardizing the Debtors' ability to conclude the chapter 11 cases within the timeframe contemplated by the DIP Orders and the RSA. Rather than delay ongoing work on the Exit ABL Facility until after confirmation of the Plan and potentially risk defaulting on the milestones contained in the RSA and the DIP Orders, the Debtors submit that it is in the best interests of all stakeholders for the Debtors to continue advancing documentation of the Exit ABL Facility as soon as possible.

19.     In light of the foregoing, and given the importance of the Exit ABL Facility to the Debtors' successful reorganization, the Debtors' entry into and performance under the Exit ABL Facility Commitment Documents constitutes a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates.

## II.     The Expense Reimbursement and Indemnification Should Constitute Allowed Administrative Expenses Pursuant to Section 503(b) of the Bankruptcy Code.

20.     The Expense Reimbursement and Indemnification should be approved under section 503(b) of the Bankruptcy Code as necessary to preserve the value of the Debtors' estates. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit stated: "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were *actually necessary to preserve the value of the estate*." *Id.* (emphasis added). Because the Exit ABL Backstop Parties require the Expense Reimbursement and Indemnification to enter into the Commitment Letter, and because the Exit ABL Facility is essential to the Debtors' ability to consummate the Plan in accordance with the timeframe set forth in the DIP Orders and RSA, the Expense Reimbursement and Indemnification are "necessary to preserve the value of the estate[s]."

21.     The Expense Reimbursement and Indemnification are designed to fairly compensate the Exit ABL Backstop Parties for their efforts to negotiate and finalize documentation of the Exit ABL Facility during the pendency of these chapter 11 cases. The Exit ABL Backstop Parties have already committed substantial time and resources in connection with the Exit ABL Facility, and will only continue to do so with the assurance of the relief requested in this motion. The Debtors believe that the Exit ABL Facility is critical to the Debtors' successful emergence, but there remains a risk, however limited, that the Exit ABL Facility will not be consummated. Accordingly, the Expense Reimbursement and Indemnification will protect the Exit ABL Backstop Parties during the pre-closing period and is a necessary inducement to the Exit ABL Backstop Parties' agreement to enter into the Commitment Letter. Importantly, the Exit ABL Facility ensures that the Debtors have the necessary financing to consummate the Plan, if approved, and emerge expeditiously from chapter 11 with a deleveraged balance sheet—a tremendous benefit to the Debtors' estates.

22.     Moreover, because the Plan provides for unimpaired treatment for all allowed unsecured claims, the Debtors submit that approval of the Expense Reimbursement and Indemnification does not prejudice any junior creditors, particularly in light of the benefits of securing the Exit ABL Backstop Parties' commitment at this time. Accordingly, the Debtors request that the Court grant administrative expense status to the Expense Reimbursement and Indemnification.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

23.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe immediate approval of the Exit ABL Facility Commitment Documents is necessary to secure the commitment of the

Exit ABL Backstop Parties and the failure to receive the requested relief during the first 21 days of these chapter 11 cases would extinguish the Debtors' prepetition efforts to sign up the Commitment Letter and severely disrupt the Debtors' efforts to expeditiously conclude these chapter 11 cases at this important juncture. The requested relief is necessary for the Debtors to preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

<u>**Reservation of Rights**</u>

24. Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any

other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

25.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

26.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the First Lien Agent and the Second Lien Agent; (e) counsel to the Crossover Group; (f) counsel to the Agent; (g) the office of the attorney general for each of the states in which the Debtors operate; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

27.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated: August 23, 2022
Wilmington, Delaware

/s/ Laura Davis Jones
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                ecorma@pszjlaw.com
-and-

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Tricia Schwallier Collins (*pro hac vice* pending)
Yusuf U. Salloum (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                tricia.schwallier@kirkland.com
                yusuf.salloum@kirkland.com
-and-

Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Rachael M. Bentley (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          nicole.greenblatt@kirkland.com
Email:          rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

# Exhibit A

## Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) | Case No. 22-10778 (JKS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. _** |

## ORDER (I) APPROVING THE DEBTORS' ENTRY INTO THE EXIT
## ABL FACILITY COMMITMENT DOCUMENTS, (II) AUTHORIZING PAYMENT
## OF FEES AND EXPENSES THEREUNDER, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>"), (a) approving the Debtors' entry into and performance under the Exit ABL Facility Commitment Documents; (b) authorizing the Debtors to pay the Exit ABL Facility Obligations; and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration and the Rosa Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth in this Order.

2.      The Debtors' entry into the Exit ABL Facility Commitment Documents, and all terms, conditions, and covenants set forth therein, are hereby approved.

3.      The Debtors are authorized, but not directed, to fully perform their obligations as and when they are incurred and come due under the Exit ABL Facility Commitment Documents, including incurring and paying the Exit ABL Facility Obligations, in each case on the terms and subject to the conditions set forth in the Exit ABL Facility Commitment Documents.

4.      The Expense Reimbursement and Indemnification are each necessary to preserve the value of the Debtors' estates and shall each be treated as an allowed administrative expense under section 503(b) of the Bankruptcy Code

5.      Nothing contained in the Motion or this Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis

for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

6.     The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

7.     The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003.

8.     Nothing in this Order authorizes the Debtors to accelerate any payments not otherwise due.

9.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

12.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit B**

## **Commitment Letter**

JPMORGAN CHASE BANK, N.A.
383 Madison Avenue
New York, New York 10179

CREDIT SUISSE AG
Eleven Madison Avenue
New York, New York 10010

BARCLAYS
745 Seventh Avenue
New York, New York 10019

APOLLO CREDIT MASTER FUND LTD.
9 West 57th Street
New York, New York 10019

August 21, 2022

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Scott Rosa and Robert Johnson

<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>"), Credit Suisse AG (acting through such of its affiliates or branches as it deems appropriate, "<u>CS</u>"), Barclays Bank PLC ("<u>Barclays</u>") and Apollo Credit Master Fund Ltd. ("<u>Apollo</u>" and, together with JPMorgan Chase Bank, CS and Barclays, the "<u>Commitment Parties</u>", "<u>us</u>" or "<u>we</u>") that Carestream Health Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), Carestream Health, Inc., a Delaware corporation (the "<u>Borrower</u>") and certain direct and indirect subsidiaries of Holdings (collectively, "<u>you</u>" or the "<u>Company</u>") (i) intend to commence voluntary cases (the "<u>Cases</u>") under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), (ii) expect the Company and its subsidiaries to be reorganized pursuant to the prepackaged Chapter 11 plan of reorganization filed by the Company on or around August 22, 2022, which shall be in substantially the form provided to the Commitment Parties on August 19, 2022 (as amended, waived or supplemented in a manner that is not materially adverse to the Lenders (as defined below) or the Commitment Parties and their affiliates (including in their capacity as Prepetition Lenders and Prepetition Agent to the Prepetition Credit Agreement (each as defined therein, the "<u>Plan</u>") and (iii) intend to obtain a new asset-based loan facility in the amount of $85,000,000 (the "<u>ABL Facility</u>"), with the proceeds of the ABL Facility to be used to, among other things, refinance a portion of the revolving debt outstanding under that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013, among Holdings, the Borrower, the Lenders (as defined therein, the "<u>Prepetition Lenders</u>") and other parties from time to time parties thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "<u>Prepetition Agent</u>") (as amended on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020 and May 8, 2020, and as amended, restated or otherwise modified from time to time, the "<u>Prepetition First Lien Credit Agreement</u>"). "<u>Transactions</u>" means the entry into the definitive financing documents in respect of the ABL Facility, the initial borrowings under the ABL Facility and the use of proceeds thereof.

1. Commitment

In connection with the Transactions, (a) JPMorgan Chase Bank is pleased to advise you of its several and not joint commitment to provide ███████ of commitments in respect of the ABL Facility, (b) CS is pleased to advise you of its several and not joint commitment to provide ███████ of commitments in respect of the ABL Facility, (c) Barclays is pleased to advise you of its several and not joint commitment to provide ███████ of commitments in respect of the ABL Facility and (d) Apollo is

pleased to advise you of its several and not joint commitment to provide ███████ of commitments in respect of the ABL Facility, in each case, upon the terms and subject solely to the conditions set forth or referred to in <u>Section 5</u> of this commitment letter (as amended, waived or supplemented in accordance with the terms of <u>Section 9</u> hereof, the "<u>Commitment Letter</u>") and the section of the Summary of Terms and Conditions attached hereto as <u>Exhibit A</u> (the "<u>Term Sheet</u>") found under the heading "Certain Conditions - Initial Conditions" and in the Conditions Exhibit attached hereto as <u>Exhibit B</u> (the "<u>Conditions Annex</u>").

The commitments of the Commitment Parties in respect of the ABL Facility will be reduced upon the election via the ABL Roll Election Form of Holders (as defined in the Plan as in effect on the date hereof) of Allowed (as defined in the Plan) First Lien Revolving Claims Holders (as defined in the Plan) ("<u>Prepetition Revolving Lenders</u>") (in each case, other than the Commitment Parties) to participate in the ABL Facility, which commitment reduction shall be allocated among the Commitment Parties in accordance with the provisions in the Term Sheet under the heading "Commitment Reductions".

2. Titles and Roles

It is agreed that (i) each of JPMorgan Chase Bank and Barclays will act as a joint lead arranger and bookrunner for the ABL Facility (acting in such capacity, the "<u>Lead Arrangers</u>"); <u>provided</u> that you agree that JPMorgan Chase Bank may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC and (ii) JPMorgan Chase Bank will act as sole administrative agent for the ABL Facility (acting in such capacity, the "<u>Administrative Agent</u>").

It is further agreed that JPMorgan will have "left" placement in any marketing materials or other documentation used in connection with the ABL Facility and shall hold the leading role and responsibilities customarily associated with such "top left" placement. You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation will be paid (in each case, other than that expressly contemplated by this Commitment Letter and the Fee Letters referred to below) in connection with the ABL Facility unless you and we shall so agree

3. Information

You hereby represent and warrant that (a) all written information, other than the Projections (as defined below) and information of a general economic or industry specific nature (the "<u>Information</u>"), that has been or will be made available to any Commitment Party by you or by any of your representatives on your behalf in connection with the transactions contemplated hereby, when taken as a whole after giving effect to all supplements and updates provided thereto, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, when taken as a whole, not materially misleading in light of the circumstances under which such statements are made and (b) the financial projections, including financial estimates, forecasts and other forward-looking information (the "<u>Projections</u>") that have been or will be made available to any Commitment Party by you or any of your representatives on your behalf in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions that are believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that Projections are not to be viewed as facts, Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized and that actual results during the period or periods covered by any such Projections may differ from the Projections, and such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence would be incorrect if such Information or Projections were furnished at such time and such

representations were remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances. You understand that in arranging the ABL Facility we may use and rely on the Information and Projections without independent verification thereof.

In connection with our distribution to prospective Lenders of any marketing materials and, upon our reasonable written request, any other Information, you will execute and deliver to us a customary authorization letter authorizing such distribution and, in the case of any marketing materials consisting exclusively of information that is not material non-public information (within the meaning of United States federal securities laws and any state securities laws) with respect to you and your affiliates (such information, "Non-MNPI"), representing that it only contains Non-MNPI. Such marketing materials will be accompanied by a disclaimer exculpating you and us with respect to any use thereof and of any related Information by the recipients thereof. You also agree to identify information to be distributed that contains only Non-MNPI by clearly and conspicuously marking the same as "PUBLIC". By marking any documents, information or other data "PUBLIC", you shall be deemed to have authorized the Commitment Parties and the prospective Lenders to treat such documents, information or other data as containing Non-MNPI. You also agree that all of the information that is not specifically identified as "PUBLIC" shall be treated as being suitable for distribution to private lenders.

You also understand and acknowledge that we may provide to market data collectors, such as league tables, or other service providers to the lending industry, customary information regarding the closing date, size, type, purpose of, and parties to, the ABL Facility.

4. Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the Commitment Fee Letter dated the date hereof and delivered herewith (the "Commitment Fee Letter"), the Barclays Fee Letter dated the date hereof and delivered herewith (the "Barclays Fee Letter") and the Administrative Agent Fee Letter dated the date hereof and delivered herewith (the "Administrative Agent Fee Letter"; and together with the Commitment Fee Letter and the Barclays Fee Letter, the "Fee Letters") on the terms and subject to the conditions set forth therein.

You agree to use commercially reasonable efforts to (a) obtain any necessary bankruptcy court authorization for payment of the fees in the Fee Letters pursuant to orders in form and substance satisfactory to the Commitment Parties and (b) maintain the confidentiality of the fee arrangements herein by seeking authority to make any necessary filings either under seal or in redacted form acceptable to the Commitment Parties and pursuant to section 107(b) of the Bankruptcy Code.

5. Conditions

Each Commitment Parties' commitments and agreement hereunder are subject solely to the satisfaction of the conditions expressly set forth in this Section 5, the Term Sheet under the heading "Certain Conditions – Initial Conditions" and the Conditions Annex and there shall be no conditions to closing and funding other than those expressly referred to in this Section 5.

It is a condition to the Commitment Parties' commitments and agreements hereunder that (a) you use reasonable best efforts to obtain entry of an order (in form and substance reasonably satisfactory to the Commitment Parties) by the Bankruptcy Court approving the Borrower's entry into to this Commitment Letter and the Fee Letters and authorizing the payment of fees and expenses and the granting of indemnification provided for in this Commitment Letter and the payment of fees provided for in the Fee

Letters) at the initial hearing for relief in the Cases; provided, however, that to the extent such an order is not entered by the Bankruptcy Court at the initial hearing for relief in the Cases, it shall be a condition to the Commitment Parties' commitments and agreements hereunder that such an order is entered within ten (10) calendar days of the date the Cases are commenced (the date such Cases are commenced, the "Petition Date"), (b) within five (5) calendar days following the Petition Date, the Bankruptcy Court shall have entered an interim order granting adequate protection to the Prepetition Lenders and Prepetition Agent and authorizing the cash collateralization of the Letters of Credit (as defined in the Prepetition Credit Agreement) in form and substance satisfactory to the Commitment Parties (the "Interim Order"), and (c) by the date that is sixty (60) days following the Petition Date, the Bankruptcy Court shall have entered an order granting the relief granted pursuant to the Interim Order on a final basis, and such order shall not have reversed, stayed, modified or amended.

6.  Limitation of Liability, Indemnity, Settlement

(a) You and we agree that (i) in no event shall any Commitment Party, its affiliates and its and their respective officers, directors, employees, advisors, and agents (each, and including, without limitation, each Commitment Party, a "Related Person") or you or your affiliates and your and their respective officers, directors, employees, advisors, and agents have any Liabilities (as defined below), on any theory of liability, for any special, indirect, consequential or punitive damages incurred by us or you, or our or your affiliates or our or your respective equity holders arising out of, in connection with, or as a result of, this Commitment Letter, the Fee Letters or any other agreement or instrument contemplated hereby and (ii) no Related Person shall have any Liabilities arising from, or be responsible for, the use by others of Information (as defined below) or other materials (including, without limitation, any personal data) obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet; provided that nothing in this clause (a) shall relieve you of any obligation you may have to indemnify an Indemnified Person (as defined below), as provided in clause (b) below, against any special, indirect, consequential or punitive damages asserted against such Indemnified Person by a third party.  You agree, to the extent permitted by applicable law, to not assert any claims against any Related Person with respect to any of the foregoing.  As used herein, the term "Liabilities" shall mean any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

(b) You agree (A) to (i) indemnify and hold harmless each Commitment Party, its affiliates and its and their respective officers, directors, employees, advisors, and agents (each, and including, without limitation, each Commitment Party, an "Indemnified Person") from and against any and all Liabilities and related expenses to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the ABL Facility, the use of the proceeds thereof, any related transaction or the activities performed or services furnished pursuant to this Commitment Letter or the role of any Commitment Party in connection therewith or in connection with any actual or prospective claim, litigation, investigation, arbitration or  administrative, judicial or regulatory action or proceeding in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of clause (a) above and the terms of this clause (b)) (each, a "Proceeding"), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by you, your equity holders, affiliates, creditors or any other person and (ii) reimburse each Indemnified Person upon demand for any documented, out-of-pocket legal or other expenses incurred in connection with investigating or defending any of the foregoing, regardless of whether or not in connection with any pending or threatened Proceeding to which any Indemnified Person is a party, in each case as such expenses are incurred or paid (it being understood that such legal expenses shall be limited to one firm of counsel for all such Indemnified Persons, taken as a whole and, if necessary, of a single local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) of all such Indemnified Persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnified Person affected by such conflict informs you of such conflict, of another firm of counsel for all similarly affected Indemnified Persons);

provided that the foregoing indemnity will not, as to any Indemnified Person, apply to any Liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to (I) primarily result from the willful misconduct or gross negligence of such Indemnified Person in performing its activities or in furnishing its services under this Commitment Letter or (II) have not resulted from an act or omission by you or any of your affiliates and have been brought by an Indemnified Person against any other Indemnified Person (other than any claims against any Commitment Party in its capacity or in fulfilling its role as a Commitment Party, an arranger or an agent or any similar role hereunder) and (B) to reimburse each Commitment Party and their respective affiliates on written demand for all reasonable and documented out-of-pocket expenses (including due diligence expenses, field exam and appraisal expenses, travel expenses, and reasonable and documented fees, charges and disbursements of counsel (including Simpson Thacher & Bartlett LLP and Freshfields Bruckhaus Deringer US LLP) and of local counsel in each appropriate jurisdiction incurred in connection with the ABL Facility and any related documentation (including this Commitment Letter, the Fee Letters and the definitive documentation relating to the ABL Facility, the Plan or the Cases) or the administration, amendment, modification or waiver thereof. The expense reimbursements and the indemnification provisions of this Commitment Letter shall constitute administrative expenses under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code in the Cases without the need to file any motion (other than any motion as may be necessary to obtain the approvals of this Commitment Letter and the Fee Letters), without application or proof of claim and notwithstanding any administrative claims bar date, and shall be immediately payable in accordance with the terms hereof without further notice or order of the Bankruptcy Court.

(c) You shall not be liable for any settlement of any Proceedings effected without your consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent or if there is a final non-appealable judgment against an Indemnified Person in any such Proceedings, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the preceding paragraphs. You shall not, without the prior written consent of each Commitment Party affected thereby and their respective affiliates affected thereby (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Commitment Party unless (x) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Commitment Party from all liability on claims that are the subject matter of such Proceedings and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Commitment Party or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to the Commitment Parties and the other Indemnified Persons.

7. Sharing of Information, Affiliate Activities

You acknowledge that each Commitment Party and their respective affiliates may be providing debt financing, equity capital or other services (including but not limited to financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. None of the Commitment Parties will use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you in connection with the performance by the Commitment Parties or their respective affiliates of services for other companies, and none of the Commitment Parties will furnish such information to other companies or customers. You also acknowledge that none of the Commitment Parties has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You acknowledge and agree that (i) the arrangement and other services described herein regarding the Transactions are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Commitment Parties, on the other hand, that do not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Parties, (ii) no Commitment Party or any affiliate thereof has provided any legal, accounting, regulatory or tax advice to you with respect to any of the Transactions and you are not relying on the Commitment Parties for such advice, (iii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on the Commitment Parties for such advice, (iv) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and (v) you waive, to the fullest extent permitted by law, any claims that you may have against any Commitment Party and/or any Lead Arranger for breach of fiduciary duty or alleged breach of fiduciary duty arising solely by virtue of this Commitment Letter and agree that, in such capacity, we shall not have any liability (whether direct or indirect) to you in respect of a fiduciary duty claim arising under this Commitment Letter or to any person asserting any such fiduciary claim arising under this Commitment Letter on behalf of or in right of you, including your stockholders, employees or creditors.

You further acknowledge that each of the Commitment Parties is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, each of the Commitment Parties may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the any of the Commitment Parties or any of their customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

8. Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letters nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person without our prior written consent except (a) you may provide a copy of the Commitment Letter (including any exhibits and annexes thereto) to the Bankruptcy Court to obtain its approval for any of the Borrower and its subsidiaries to execute, deliver and perform its obligations hereunder, so long as any pleadings or filings with respect to this Commitment Letter shall be reasonably acceptable to the Commitment Parties, (b) you may disclose the Fee Letters in a Bankruptcy Court filing in order to implement the Transactions, provided that the Fee Letters may only be disclosed to the Bankruptcy Court, the US Trustee and, on a confidential and "professional eyes only" basis, to (x) any statutorily appointed committee in connection with the Cases and (y) the Ad Hoc Committee (as defined in the Plan) (provided that the Fee Letters shall only be filed with the Bankruptcy Court (x) under seal pursuant to an order reasonably acceptable to the Commitment Parties or (y) in a redacted form acceptable to the Commitment Parties), (c) between you and your officers, directors, employees, affiliates, members, partners, attorneys, accountants, agents and advisors, in each case on a confidential basis and (d) in any legal, judicial or administrative proceeding or other compulsory process or as otherwise required by applicable law or regulations (in which case you agree to use commercially reasonable efforts to promptly notify us to the extent not prohibited by law); provided, however, it is understood and agreed that (i) you may disclose this Commitment Letter (including the Summary of Terms) but not the Fee Letters nor the contents thereof after your acceptance of this Commitment Letter and the Fee Letters, in filings with applicable regulatory authorities; (ii) after your acceptance of this Commitment Letter and the Fee Letters, you may disclose the aggregate fees payable under the Fee Letters (but not the Fee Letters or the contents thereof) in generic disclosure of aggregate sources and uses contained in any marketing materials relating to the ABL Facility; (iii) the aggregate fees and other amounts herein and in the Fee Letters (but not the Fee Letters or the

contents thereof) may be reflected in your financial statements as part of the aggregate expenses in connection with the transactions contemplated hereby and may otherwise be disclosed as part of projections, pro forma information and a generic disclosure of aggregate sources and uses and (iv) you may disclose the Commitment Letter and the Fee Letters in connection with the exercise of remedies hereunder or any suit, action or proceeding relating to this Commitment Letter, the Fee Letters, or the transactions contemplated hereby or thereby or enforcement hereof and thereof. This paragraph shall terminate (as it relates to the Commitment Letter but not as it relates to the Fee Letters) on the two-year anniversary of the date hereof.

The Commitment Parties shall use all nonpublic and other confidential information received by them in connection with the ABL Facility and the transactions contemplated hereby ("Confidential Information") solely for the purposes of providing the services that are the subject of this Commitment Letter and otherwise in connection with the transactions and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any Confidential Information (a) to any banks, financial institutions, investors and other lenders that may come into the ABL Facility as a lender thereunder (the "Lenders") or participants or prospective Lenders, subject to the proviso below, (b) in any legal, judicial or administrative proceeding or other compulsory process or as required by applicable law or regulations or as requested by a governmental authority  (in which case such Commitment Party shall use commercially reasonable efforts to promptly notify you, in advance, to the extent not prohibited by law), (c) upon the request or demand of any regulatory authority or self-regulatory organization having jurisdiction or oversight over such Commitment Party or its affiliates (in which case such Commitment Party shall use commercially reasonable efforts to promptly notify you, in advance, to the extent permitted by law, except in connection with any request as part of a regulatory or bank examination or an inquiry by a self-regulatory body in the ordinary course), (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") who need to know such information and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential (provided that the Commitment Parties shall be responsible for its Representative's compliance with this paragraph), (e) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the ABL Facility and any related transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in violation of this Commitment Letter and (g) for purposes of establishing a "due diligence" defense in any suit, action or proceeding relating to this Commitment Letter, the Fee Letters, the ABL Facility or the enforcement of rights thereunder; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants (or its advisors) referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant (or its advisors) that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information, which shall in any event require "click through" or other affirmative actions on the part of the recipient to access such information on terms that have been approved by and are reasonably acceptable to you. The Commitment Parties' obligations under this paragraph will automatically terminate and be superseded by the confidentiality provisions in the ABL Facility Documentation upon the execution and delivery thereof and in any event will automatically terminate two years following the date of this Commitment Letter.

9.   Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does

not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. This Commitment Letter may not be assignable by the Commitment Parties without your prior written consent (and any purported assignment without such consent shall be null and void), provided that the Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Commitment Letter, the Fee Letters and/or any document to be signed in connection with this Commitment Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. "Electronic Signatures" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record. This Commitment Letter and the Fee Letters are the only agreements that have been entered into among us and you with respect to the ABL Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan) or, so long as the Cases are pending, by the Bankruptcy Court, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the transactions contemplated hereby, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act") and the requirements of 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation"), it (i) is required to obtain, verify and record information that identifies the Borrower and each guarantor under the ABL Facility, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrower and each guarantor under the ABL Facility in accordance with the PATRIOT Act and (ii) may be required to obtain a certification regarding beneficial ownership (a "Beneficial Ownership Certification") from the Borrower, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for the

Commitment Parties and each Lender. You hereby acknowledge that the Commitment Parties shall be permitted to share any or all such information with the Lenders.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein and in the Fee Letters, in each case, shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter; <u>provided</u> that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the ABL Facility Documentation upon the funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letters by returning to the Commitment Parties executed counterparts of this Commitment Letter and the Fee Letters not later than 11:59 p.m., New York City time, on August 21, 2022. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. Thereafter, all commitments and undertakings of the Commitment Parties hereunder will expire on the earliest of (a) the date that is sixty (60) days following the Petition Date, in the event the Closing Date has not occurred on or prior to such date unless we shall, in our sole discretion, agree to an extension, (b) the execution of the ABL Facility Documentation, (c) the termination of the Restructuring Support Agreement (as defined in the Plan) or the Rights Offering (as defined in the Plan) or (d) receipt by the Commitment Parties of written notice from the Borrower of its election to terminate all commitments under the ABL Facility in full.

## EXHIBIT A

TERM SHEET

CARESTREAM HEALTH, INC.
$85 million
New First Lien ABL Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions (the "ABL Term Sheet") for the ABL Facility (as defined below). This summary is for indicative purposes only and does not purport to summarize all of the terms of the definitive documentation with respect to the ABL Facility, and reference should be made to the definitive documentation for the final terms of the ABL Facility.

1.      PARTIES

| | |
|---|---|
| Borrower: | Carestream Health, Inc., a Delaware corporation (the "Borrower"). |
| Holdings: | A direct parent entity of the Borrower, as reorganized pursuant to the Plan (as defined in the Commitment Letter) ("New Carestream" or "Holdings"). |
| Guarantors: | Holdings and each existing and subsequently acquired or organized domestic and Canadian and, to the extent no adverse tax consequences or repatriation of earnings to the Borrower, (i) would, in the good faith judgment of the Borrower at the time provided or (ii) thereafter, could reasonably be expected to result therefrom, foreign subsidiary of the Borrower (the "Subsidiary Guarantors"; Holdings and the Subsidiary Guarantors, the "Guarantors"; and the Borrower and the Guarantors, the "Loan Parties"), it being agreed that the Subsidiary Guarantors shall be subject to exclusions consistent with and no less favorable to the Borrower than the exclusions set forth in the Referenced First Lien Credit Agreement (as defined below) and other exclusions to be agreed consistent with the ABL Documentation Principles (as defined below). The ABL Credit Documentation will include "Chewy" protections to be agreed. |
| Transactions: | On the Plan Effective Date, in accordance with the Plan, the Borrower shall refinance a portion of the debt outstanding under that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013, among Carestream Health Holdings, Inc. (prior to its reorganization pursuant to the Plan, "Existing Holdings"), the Borrower, the subsidiary guarantors party thereto, the lenders and other parties from time to time parties thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "Existing Administrative Agent"), as amended on June 9, 2017, June 22, 2017, December 27, 2018, April 11, 2019, January 29, 2020 and May 8, 2020 (the "Prepetition First Lien Credit Agreement") with the ABL Facility and a new term loan facility in an aggregate principal amount equal to the allowed amount of the First Lien Claims less the amount of First Lien Claims that are satisfied pursuant to the terms of the Plan (the "Term Loan Facility", the loans |

thereunder, the "<u>Term Loans</u>"; and the Term Loan Facility together with the ABL Facilities, the "<u>Facilities</u>").

| | |
|---|---|
| Lead Arrangers and Bookrunners: | JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>") and Barclays Bank PLC ("<u>Barclays</u>"). |
| Commitment Parties | JPMorgan Chase Bank, Credit Suisse AG (acting through such of its affiliates or branches as it deems appropriate, "<u>CS</u>"), Barclays and Apollo Credit Master Fund Ltd. ("<u>Apollo</u>", and with JPMorgan Chase Bank, CS and Barclays, in such capacity, the "<u>ABL Commitment Parties</u>"). |
| Administrative Agent: | JPMorgan Chase Bank (in such capacity, the "<u>ABL Administrative Agent</u>"). |
| Lenders: | Lenders of the ABL Facility shall consist of the ABL Commitment Parties and certain other Prepetition Revolving Lenders (collectively, the "<u>Lenders</u>"). |
| Commitment Reduction: | The commitments in respect of the ABL Facility of the ABL Commitment Parties under the Commitment Letter shall be reduced dollar-for-dollar by the ABL Commitments (as defined below) of the Prepetition Revolving Lenders (other than the ABL Commitment Parties) that such Prepetition Revolving Lenders elect to provide in accordance with the Plan, with any such reduction to be ratable among the ABL Commitment Parties |
| Closing Date | The date each of the conditions set forth in <u>Exhibit B</u> are satisfied or otherwise waived in accordance with the Commitment Letter. |

2. ABL FACILITY

A. ABL Facility

| | |
|---|---|
| Type and Amount: | A four and a half-year asset-based revolving facility (the "<u>ABL Facility</u>", the date of effectiveness thereof, the "<u>Closing Date</u>", and the commitments thereunder, the "<u>ABL Commitments</u>") in the amount of $85 million (the loans thereunder, the "<u>ABL Loans</u>"). |
| Availability and Maturity: | The ABL Commitments will expire, and the ABL Loans will mature, on the date that is four and a half years after the Closing Date (the "<u>ABL Termination Date</u>"); *provided* that the ABL Credit Documentation shall include (x) "amend and extend" provisions and (y) commitment reduction and termination provisions, in each case, usual and customary for facilities of this type. The ABL Facility shall be available on a revolving basis |

during the period commencing on the Closing Date and ending on the ABL Termination Date; *provided* that no more than $47,424,495.19 of ABL Loans may be drawn on the Closing Date and no Letters of Credit (as defined below) shall be issued (or deemed issued) under the ABL Facility on the Closing Date. Funding will be ratable among the ABL Lenders according to ABL Commitments on the Closing Date and in a manner that is satisfactory to the ABL Commitment Parties and ABL Administrative Agent.

Excess Availability (as defined below) under the ABL Facility will be subject to the Borrowing Base referred to below.

"Excess Availability" means, at any time, an amount equal to (i) the Line Cap (as defined below) minus (ii) the sum of (a) the aggregate outstanding amount of ABL Loans plus (b) the aggregate undrawn amount of outstanding Letters of Credit and (c) unreimbursed drawings in respect of Letters of Credit (unless otherwise converted into ABL Loans).

"Line Cap" means, at any time, the lesser of the aggregate ABL Commitments at such time and the Borrowing Base at such time.

"Specified Excess Availability" means the sum of (i) Excess Availability plus (ii) the amount (not to exceed 2.5% of the total ABL Commitments then in effect) by which the Borrowing Base then in effect exceeds the total ABL Commitments then in effect.

|                    |                    |
|--------------------|--------------------|
| Letters of Credit: | All letters of credit outstanding under the revolving credit facility under the Prepetition First Lien Credit Agreement immediately prior to the Plan Effective Date shall, on the Plan Effective Date, continue to be cash collateralized in a manner satisfactory to CS until replacement Letters of Credit can be issued under the ABL Facility and such letters of credit are returned to CS undrawn and the applicable beneficiaries have accepted the applicable replacement Letters of Credit. A portion of the ABL Facility in an amount equal to $15 million shall be available, subject to Excess Availability, for the issuance of letters of credit (the "Letters of Credit") by JPMorgan Chase Bank, CS and other Lenders reasonably satisfactory to the Borrower (in such capacity, each an "Issuing Lender"); *provided* that (x) no Issuing Lender shall be required to issue Letters of Credit in an aggregate face amount in excess of $5.0 million (or such greater amount as agreed to by the applicable Issuing Lender (as defined below)) and (y) with respect to any Letter of Credit issued, the Borrower shall provide cash collateral to the applicable Issuing Lender in an amount equal to 103% of the pro rata portion of such Letter of Credit attributable to any Lender that is not a Regulated Bank. No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five |

(5) business days prior to the ABL Termination Date, *provided* that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of ABL Loans) within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the ABL Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis.

Borrowing Base:

The "Borrowing Base" will equal the sum of:

(a) 85% of the eligible accounts receivable of the Borrowing Base Loan Parties (as defined below) plus

(b) the lesser of (i) 70% of the eligible inventory of the Borrowing Base Loan Parties (valued at the lower of cost and fair market value) and (ii) the product of 85% multiplied by the net orderly liquidation value percentage identified in the most recent inventory appraisal ordered by the ABL Administrative Agent multiplied by the Borrowing Base Loan Parties' eligible inventory minus

(c) Eligible Reserves (as defined below).

The ABL Administrative Agent will have the right to establish and modify Eligible Reserves, which the ABL Administrative Agent determines from time to time in its Permitted Discretion (as defined below) as being necessary, against the Borrowing Base assets, upon at least three (3) business days' prior written notice to the Borrower (such three (3) business days (or longer) period, the "Review Period") (which notice shall include a reasonably detailed description of such reserve being established); *provided* that no reserves may be taken after the Closing Date based on circumstances, conditions, events or contingencies known to the ABL Administrative Agent as of the Closing Date and for which no reserves were imposed on the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in any material adverse respect since the Closing Date. During the Review Period, (i) the ABL Administrative Agent shall, if requested, discuss any such reserve or change with the Borrower, and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent reasonably satisfactory to the ABL

Administrative Agent, (ii) if failure to implement any such reserve or change within a shorter time period would, in the good faith judgment of the ABL Administrative Agent, reasonably be expected to result in a Material Adverse Effect (to be defined in the ABL Credit Documentation) or materially and adversely affect the Collateral or the rights of the Lenders, such change may be implemented within a shorter time as determined by the ABL Administrative Agent in its Permitted Discretion and (iii) any borrowings or issuances of Letters of Credit made during the Review Period shall be made based on the Borrowing Base as modified by the proposed new or modified Eligible Reserves. Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change, (b) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria and (c) no reserves shall be imposed on the first 5% of dilution of accounts receivable and thereafter no dilution reserve shall exceed 1% for each incremental whole percentage in dilution over 5%.

As used herein:

"Borrowing Base Loan Parties" means domestic and Canadian Loan Parties.

"Eligible Reserves" means such amounts as the ABL Administrative Agent, in its Permitted Discretion, may from time to time establish in accordance with the ABL Credit Documentation.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

A certificate presenting the Borrower's computation of the Borrowing Base (a "Borrowing Base Certificate") will be delivered to the ABL Administrative Agent on or prior to the 20th calendar day following the end of each calendar month, (or, if such day is not a business day, on the immediately following Business Day); *provided*, *however*, that during a Cash Dominion Period (as defined below), the Borrower will be required to compute the Borrowing Base and deliver a Borrowing Base Certificate on a weekly basis (on or prior to the date that is the third business day following the end of each such week) (each delivery of a Borrowing Base certificate pursuant to this paragraph, a "Scheduled Borrowing Base Delivery").

|              |                                                                 |
|--------------|-----------------------------------------------------------------|
| Eligibility: | The definitions of eligible accounts and eligible inventory will be mutually agreed by the ABL Commitment Parties and the Borrower in accordance with the ABL Documentation Principles |

and contained in the ABL Credit Documentation; *provided* that eligible accounts and eligible inventory shall only include accounts and inventory owned by a Borrowing Base Loan Party and located in the United States or Canada. In addition, the ABL Administrative Agent will retain the right, from time to time, in its Permitted Discretion, to establish additional standards of eligibility against eligibility and to adjust reserves.

|                    |                                                                 |
|--------------------|-----------------------------------------------------------------|
| Use of Proceeds:   | The Proceeds of the ABL Loans on the Closing Date shall be used as set forth on <u>Exhibit B</u>. The proceeds of the ABL Loans after the Closing Date shall be used to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries, including on the Closing Date to refinance the indebtedness outstanding under the Prepetition First Lien Credit Agreement (the "<u>Refinancing</u>") and to pay fees and expenses in connection therewith and in connection with the ABL Credit Documentation. |

| | |
|--|--|
| **B. Increase in ABL Commitments:** | The ABL Credit Documentation (as defined below) will permit the Borrower to request an increase in commitments under the ABL Facility (any such increase, an "<u>Incremental ABL Facility</u>") in an aggregate principal amount that shall not exceed the greater of (a) the sum of (i) $25 million <u>plus</u> (ii) any voluntary prepayments that are accompanied by permanent commitment reductions under the ABL Facility (including the termination of commitments in connection with any "yank-a-bank" provisions) and (b) the excess of the Borrowing Base then in effect over the aggregate amount of ABL Commitments then in effect, by requesting additional commitments from one or more Lenders or, with the consent of the ABL Administrative Agent to the extent such consent would be required under the heading "Assignment and Participations" below, but without the consent of any other Lenders, from other entities; <u>provided</u> that, in connection with any Incremental ABL Facility, each ABL Lender shall be permitted to elect to have its ABL Commitment reduced by an amount equal to 40% of such Incremental ABL Facility and the Borrower shall prepay the outstanding ABL Loans held by such Lender in an amount proportionate to the ABL Commitment so reduced as compared to the aggregate ABL Commitment of such Lender outstanding immediately prior to such reduction; <u>provided</u>, further, that if more than one ABL Lender elects to have their ABL Commitments reduced, such reduction shall be applied on a pro rata basis as between such electing ABL Lenders. For the avoidance of doubt the terms of and conditions of any Incremental ABL Facility shall be substantially identical to the ABL Facility. |

| | |
|--|--|
| Limited Conditionality Provision: | For purposes of determining pro forma compliance with any basket (but not, for the avoidance of doubt, the satisfaction of conditions to the making of a credit extension) based on (a) a financial ratio (other than Excess Availability or Specified |

Excess Availability), (b) Consolidated EBITDA (to be defined in a manner no less favorable, taken as a whole, to the Borrower than in the Referenced First Lien Credit Agreement and otherwise as agreed by the ABL Administrative Agent and the Borrower subject to the ABL Documentation Principles (*provided* that (i) pro forma cost savings and synergy addbacks shall be permitted in the calculation of Consolidated EBITDA and capped at 15% of Consolidated EBITDA with an 12 month look-forward period) and (ii) management incentive plan cash and equity-based compensation addbacks shall be permitted in the calculation of Consolidated EBITDA), (c) whether a default or event of default has occurred and is continuing, or (d) the accuracy of any representation or warranty contained in the ABL Credit Documentation, in each case, in connection with the consummation of an acquisition or similar investment that the Borrower or one or more of its subsidiaries is contractually committed to consummate (it being understood that such commitment may be subject to conditions precedent, which conditions precedent may be amended, satisfied or waived in accordance with the terms of the applicable agreement) and whose consummation is not conditioned on the availability of, or on obtaining, third party financing (any such acquisition or investment, a "Limited Conditionality Transaction"), the date of determination shall, at the option of the Borrower (the exercise of such option, an "LC Election"), be the time the definitive agreements for such acquisition or investment are entered into or (the "LC Test Date") after giving pro forma effect to such acquisition or investment and the other transactions to be entered into in connection therewith (including any incurrence of indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the applicable test period, rather than the date that such Limited Conditionality Transaction is consummated and, for the avoidance of doubt, if any of such ratios or amounts are exceeded on any date other than the LC Test Date as a result of fluctuations in such ratio or amount including due to fluctuations in Consolidated EBITDA of the Borrower or, if applicable, the person subject to such acquisition or investment, at or prior to the consummation of the relevant transaction or action, such ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the relevant transaction or action is permitted to be consummated or taken under any basket.

If the Borrower has made an LC Election for any Limited Conditionality Transaction, then in connection with any calculation of any basket availability in connection with the consummation of any subsequent acquisition or similar investment that the Borrower or one or more of its subsidiaries is contractually committed to consummate (each, a "Subsequent Transaction") following the relevant LC Test Date and prior to the earlier of the date on which such Limited Condition

Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, for purposes of determining whether such Subsequent Transaction is permitted under the ABL Credit Documentation, any such basket shall be required to be satisfied on a pro forma basis (a) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated, and (b) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of indebtedness and the use of proceeds thereof) have not been consummated.

3.       CERTAIN PAYMENT PROVISIONS

Fees and Interest Rates:      As set forth on Annex I.

Optional Prepayments and
Commitment Reductions:      ABL Loans may be prepaid and ABL Commitments may be reduced, in whole or in part without premium or penalty, in minimum amounts of $1 million or a whole multiple of $100,000 in excess thereof, at the option of the Borrower at any time upon one day's (or, in the case of a prepayment of Term Benchmark Loans (as defined in Annex I hereto), three (3) days') prior notice, subject to customary reimbursement of the Lenders' redeployment costs in the case of a prepayment of Term Benchmark Loans prior to the last day of the relevant interest period).

Mandatory Prepayments:      If at any time the aggregate amount of outstanding ABL Loans, unreimbursed Letter of Credit drawings and undrawn Letters of Credit exceeds the lesser of the aggregate ABL Commitments and the Borrowing Base, the ABL Credit Documentation will require a prepayment to the extent of such excess be applied *first*, to the outstanding ABL Loans (without a concurrent reduction of the ABL Commitments) and *second*, to the cash collateralization of outstanding Letters of Credit.

4.       COLLATERAL

Collateral:      The ABL Facility will be secured by the collateral which secures the Term Loan Facility (the "Collateral").  The liens securing the ABL Facility will be first priority in the case of the ABL Priority Collateral (as defined below) and, with respect to Term Priority Collateral, junior only to the liens securing the Term Loans.

"Term Priority Collateral" shall mean all Collateral securing the Term Loans other than ABL Priority Collateral.

"ABL Priority Collateral" shall mean all of the present and after acquired (a) cash, deposit accounts, securities accounts, accounts receivable and inventory of the Loan Parties; (b) general intangibles, instruments, documents and chattel paper relating to the property identified in clause (a); (c) commercial tort claims, security and guarantees and supporting obligations in respect of the collateral identified in clauses (a) and (b); and (d) proceeds (including insurance proceeds) of the foregoing (other than any such items constituting proceeds arising from the sale or disposition of Term Priority Collateral and cash on deposit in trust accounts, payroll or tax accounts and escrow accounts).

The ABL Priority Collateral will also secure obligations in respect of interest rate protection or other hedging arrangements entered into for non-speculative purposes in the ordinary course of business (including, for the avoidance of doubt, any interest rate protection or other hedging arrangements entered into prepetition) and cash management obligations (collectively, the "Swap and Cash Management Obligations"), in each case, owing to any person that is (or was on the date such obligation was entered into) the ABL Administrative Agent, any ABL Commitment Party, any Lender or any affiliate of the foregoing; *provided* that Swap and Cash Management Obligations shall only be pari with principal in the payment waterfall to the extent that (x) Borrowing Base reserves are in place in respect of such obligations and (y) such Swap and Cash Management Obligations are owing to the ABL Administrative Agent, any ABL Commitment Party, any Lender or any affiliate of the foregoing. For the avoidance of doubt, no Borrowing Base reserves shall be in place in respect of Swap and Cash Management Obligations owing to a person that is not the ABL Administrative Agent, an ABL Commitment Party, a Lender or an affiliate of the foregoing.

The lien priority, relative rights and other creditors' rights issues in respect of the ABL Facility and the Term Loan Facility shall be subject to an intercreditor agreement reasonably satisfactory to the ABL Commitment Parties and the Borrower (the "Intercreditor Agreement").

5.      CERTAIN CONDITIONS

Initial Conditions:

The availability of the ABL Facility on the Closing Date will be subject to the conditions set forth in Exhibit B.

On-Going Conditions:

The making of each ABL Loan and the issuance of each Letter of Credit shall be conditioned upon (a) the accuracy in all material respects (or in all respects if qualified by materiality) of all representations and warranties in the ABL Credit Documentation and (b) there being no default or event of default

in existence at the time of, or immediately after giving effect to, such extension of credit.

6.      DOCUMENTATION

ABL Credit
Documentation:          The definitive documentation for the ABL Facility (the "<u>ABL Credit Documentation</u>"; and together with the definitive documentation for the Term Loan Facility, the "<u>Credit Documentation</u>") shall be based on and consistent with the Prepetition First Lien Credit Agreement in the form that was in effect after giving effect to that certain Second Amendment to Amended and Restated Credit Agreement (First Lien), dated as of June 22, 2017, among *inter alia*, the Borrower, the guarantors and lenders party thereto and the Existing Administrative Agent (such version of the Prepetition First Lien Credit Agreement, the "<u>Referenced First Lien Credit Agreement</u>") with certain modifications, including those modifications as are necessary to reflect (i) the ABL structure (including that the baskets in respect of the dividend, investment and prepayment of debt covenants shall be customary for an ABL structure), (ii) the terms and conditions set forth in this ABL Term Sheet, (iii) the operational and strategic requirements of the Borrower and its subsidiaries in light of their size, industries and practices, (iv) basket capacity and sizes to be agreed between the ABL Commitment Parties and the Borrower based on negotiations and as set forth in the ABL Credit Documentation and (v) the customary agency and operational requirements of the ABL Administrative Agent (the "<u>ABL Documentation Principles</u>"). Capitalized terms not defined in this ABL Term Sheet shall be given substantially the same meaning assigned to such terms as defined in the Referenced First Lien Credit Agreement, with changes as mutually agreed, subject to the ABL Documentation Principle.

Financial Covenant:        Limited to a minimum Fixed Charge Coverage Ratio (as defined below) of not less than 1.00:1.00 (the "<u>ABL Financial Covenant</u>"), to be tested at the end of the most recently ended four fiscal quarters for which financial statements have been or are required to be delivered (each such period, a "<u>Testing Period</u>") but only during the continuance of a Financial Covenant Compliance Period (as defined below).

As used herein:

"<u>Financial Covenant Compliance Period</u>" means any period beginning on any date on which Specified Excess Availability is less than the greater of (x) 15% of the Line Cap and (y) $10.5 million and ending on the subsequent date on which Specified Excess Availability is equal to or greater than the greater of (x) 15% of the Line Cap and (y) $10.5 million for at least thirty (30) consecutive calendar days.

"Fixed Charge Coverage Ratio" means during any period, with respect to the Borrower and its restricted subsidiaries on a consolidated basis, the ratio of (a)(i) Consolidated EBITDA, minus, (ii) in each case to the extent paid in cash, the aggregate amount of all capital expenditures made by the Borrower and its restricted subsidiaries during such period (other than capital expenditures to the extent financed with the proceeds of any incurrence of indebtedness (other than the incurrence of any ABL Loans), proceeds from asset sales or proceeds from equity issuances), minus, (iii) the aggregate amount of all cash payments made by the Borrower and its restricted subsidiaries in respect of income taxes or income tax liabilities (net of cash income tax refunds) during such period (excluding, solely for purposes of testing the Financial Covenant, the lesser of (x) $5,000,000 and (y) 50% of the tax or tax liabilities paid in cash by the Borrower related to the taxable years ending on or before December 31, 2022 related to any gain as a result of the recapitalization effected on the Closing Date), to (b) Fixed Charges of the Borrower and its restricted subsidiaries for such period.

"Fixed Charges" means during any period, with respect to the Borrower and its restricted subsidiaries on a consolidated basis, the sum of (i) consolidated interest expense paid in cash, plus (ii) scheduled payments in cash of principal on indebtedness (other than ABL Loans) included in the definition of Consolidated Total Debt (to be defined in a manner substantially similar to the definition contained in the Referenced First Lien Credit Agreement, subject to the ABL Documentation Principles) (other than mandatory prepayments of Term Loans based on (x) "Excess Cash Flow" of the Borrower pursuant to the Term Loan Facility or (y) asset sales) plus (iii) Restricted Payments paid in cash.

The foregoing Financial Covenant shall be tested quarterly with respect to the Borrower and its restricted subsidiaries on a consolidated basis, (i) immediately upon trigger of a Financial Covenant Compliance Period based on the most recently completed four-fiscal quarter period for which financial statements have been delivered under the ABL Credit Documentation and (ii) on the last day of each subsequently completed fiscal quarter of the Borrower ending during a Financial Covenant Compliance Period for which financial statements are required to have been delivered hereunder.

For purposes of determining compliance with the Financial Covenant, any cash equity contribution made to Holdings, and contributed by Holdings to the Borrower as common equity, after the beginning of the relevant fiscal quarter and prior to the day that is ten (10) business days after the day on which financial statements are required to be delivered for such fiscal quarter

will, at the request of the Borrower, be included in the calculation of Consolidated EBITDA of the Borrower and its restricted subsidiaries solely for the purposes of determining compliance with the Financial Covenant at the end of such fiscal quarter and applicable subsequent periods that include such fiscal quarter (any such equity contribution so included in the calculation of Consolidated EBITDA of the Borrower and its restricted subsidiaries, a "Specified Equity Contribution"); *provided* that (a) in each four consecutive fiscal quarter period, there shall be at least two (2) fiscal quarters in respect of which no Specified Equity Contribution is made, (b) during the life of the ABL Facility there shall be no more than five (5) Specified Equity Contributions in the aggregate, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in pro forma compliance with the Financial Covenant for the relevant fiscal quarter, (d) all Specified Equity Contributions shall be disregarded for purposes of calculating Consolidated EBITDA in determining any financial ratio-based conditions or baskets with respect to the covenants contained in the ABL Credit Documentation (other than, with respect to any future period, with respect to any portion of such Specified Equity Contribution that is actually applied to repay any indebtedness) and (e) there shall be no pro forma or other reduction of indebtedness with the proceeds of any Specified Equity Contribution for purposes of determining compliance with the Financial Covenant for the fiscal quarter in respect of which such Specified Equity Contribution was made.

The ABL Credit Documentation will contain a standstill provision with regard to exercise of remedies (but no borrowings or issuances of Letters of Credit shall be permitted during the standstill period (without Required Lender (as defined below) consent)) during the period in which any Specified Equity Contribution will be made after the receipt of written notice by the ABL Administrative Agent of the Borrower's intention to cure a Financial Covenant default with proceeds of a Specified Equity Contribution; *provided*, *however*, that such standstill shall be solely with respect to a breach of the Financial Covenant to which such Specified Equity Contribution applies.

| | |
|---|---|
| Representations and Warranties: | Limited to the following (applicable to Holdings, the Borrower and its restricted subsidiaries), in each case, with customary materiality qualifiers, thresholds, exceptions, limitations and qualifications to be mutually agreed in accordance with the ABL Documentation Principles: financial condition, financial statements, no Material Adverse Effect (substantially as defined in the Referenced First Lien Credit Agreement, subject to the ABL Documentation Principles), corporate existence, compliance with laws, corporate power and authority, non-contravention, governmental authorization, enforceability of |

ABL Credit Documentation, no material litigation, no default, ownership of property, liens, intellectual property, taxes, Federal Reserve regulations, anti-corruption laws, bribery and sanctions, ERISA, labor matters, Investment Company Act, subsidiaries, use of proceeds, environmental matters, accuracy of disclosure, creation and perfection of security interests, solvency, Regulation H and Affected Financial Institutions and good faith preparation of annual budget.

Affirmative Covenants:

Limited to the following (applicable to the Holdings, the Borrower and their respective restricted subsidiaries), in each case, with customary materiality qualifiers, thresholds, exceptions, limitations and qualifications to be mutually agreed in accordance with the ABL Documentation Principles: delivery of annual and quarterly (other than the fourth quarter of any year) financial statements, accountants' letters, annual budgets, compliance certificates (including calculations of the quarterly fixed charge coverage ratio irrespective of whether a Financial Covenant Compliance Period is then in effect), monthly collateral reporting (including agings and inventory reports and monthly borrowing base certificates) and other information reasonably requested by the Lenders (*provided* that all collateral reporting will be delivered on a monthly basis (*provided* that such reporting shall be required to be delivered on a weekly basis during a Cash Dominion Period)), payment of obligations, maintenance of existence, compliance, maintenance of policies and procedures reasonably designed to ensure compliance with anti-corruption, bribery and sanctions laws, maintenance of property (other than ordinary wear and tear, casualty or condemnation), adequate insurance, maintenance of books and records, right of Lenders to inspect property and books and records, field examinations and inventory appraisals as described under the headings Field Examinations and Inventory Appraisals, notices of defaults, material litigation and other material events, compliance with environmental laws, ERISA, deposit accounts, further assurances (including without limitation, with respect to security interests in after acquired property), and performance of post-closing matters (including, within sixty (60) days following the Closing Date (or such later date as agreed to by the ABL Administrative Agent in its sole discretion), entrance into control agreements, delivery of insurance endorsements and delivery of audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries, in each case for the fiscal year ended December 31, 2021.

Negative Covenants:

Subject to certain exceptions and baskets to be mutually agreed subject to the ABL Documentation Principles, limitations on (to apply to Holdings, the Borrower and their respective restricted subsidiaries):

(a) indebtedness (including guarantee obligations of indebtedness), which shall permit, among other things, the Term Loan Facility, Incremental Term Facilities and Incremental Equivalent Debt; *provided* that any Incremental Equivalent Debt shall be junior in right of security to the ABL Priority Collateral; *provided further* that the aggregate principal amount of the Incremental Term Facilities and Incremental Equivalent Debt (as each such term is defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) shall not exceed (a) the greater of (1) $100 million and (2) 50% of Consolidated EBITDA *plus* (b) an amount equal to all voluntary prepayments of initial term loans (other than any prepayment using the proceeds of long-term indebtedness); *plus* (c) (i) in the case of any Incremental Equivalent Debt that is secured on *pari passu* basis, an additional amount if, after giving effect to the incurrence of such additional amount (and after giving effect to any permitted and concurrent use of proceeds thereof and all other appropriate pro forma adjustment events), the Total Net First Lien Leverage Ratio (as defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) of the Borrower being no greater than 2.50:1.00; (ii) in the case of any Incremental Equivalent Debt that is secured on a junior lien basis, the Total Net Secured Leverage Ratio (as defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) of the Borrower shall be no greater than 3.25:1.00 and (ii) in the case of Incremental Equivalent Debt that is unsecured, the Total Net Leverage Ratio (as defined in the Term Loan Facility and in a manner satisfactory to the ABL Commitment Parties) of the Borrower shall be no greater than 3.75:1.00;

(b) liens;

(c) mergers, consolidations, liquidations and dissolutions;

(d) sales of assets, which shall permit, among other things, the asset sales set forth under the heading "Permitted Asset Sales" below;

(e) dividends and other payments in respect of capital stock; *provided* that among other exceptions, such restricted payments will be permitted without limitation upon satisfaction of the Payment Conditions;

(f) acquisitions, investments, loans and advances; *provided* that investments will be permitted without limitation upon satisfaction of the Payment Conditions;

(g) voluntary prepayments, redemptions and repurchases ("Specified Prepayments") of material contractually

subordinated debt for borrowed money, unsecured debt for borrowed money or junior lien debt for borrowed money (collectively, "Covered Debt") (it being understood that there shall be no restriction on prepayments of Term Loans); *provided* that Specified Prepayments of Covered Debt will be permitted (x) so long as (i) such prepayments are not prohibited by the documentation governing such debt (including any applicable intercreditor or subordination agreement) and (ii) the Payment Conditions are satisfied and (y) to the extent constituting a permitted refinancing thereof permitted under the indebtedness covenant;

(h) transactions with affiliates;

(i) sale-leasebacks;

(j) swap agreements;

(k) changes in fiscal periods;

(l) negative pledge clauses and clauses restricting subsidiary distributions;

(m) changes in lines of business;

(n) material amendments to organizational documents;

(o) passive Holdings covenant; and

(p) use of proceeds in compliance with anti-corruption, bribery and sanctions laws;

*provided* that neither Holdings, the Borrower or any Restricted Subsidiary shall transfer or dispose of material intellectual property to an Unrestricted Subsidiary.

"Payment Conditions" means (a) no Event of Default has occurred and is continuing and (b) (i) after giving effect to the proposed event as if it occurred on the first day of the Pro Forma Period, daily average pro forma Specified Excess Availability is greater than the greater of (x) 25.0% of the Line Cap and (y) $19 million at all times during the Pro Forma Period, or (ii) after giving effect to the proposed event as if it occurred on the first day of the Pro Forma Period or the most recently ended testing period, as applicable, (A) daily average pro forma Specified Excess Availability during the Pro Forma Period is greater than the greater of (x) 20.0% of the Line Cap and (y) $15.0 million and (B) the Fixed Charge Coverage Ratio as of the end of the most recently ended Testing Period greater than 1.00:1.00.

"<u>Pro Forma Period</u>" means the period commencing ninety (90) days prior to the date an event is proposed by the Borrower to occur.

Permitted Asset Sale:

The Borrower or any of its restricted subsidiaries will be permitted to make non ordinary course of business asset sales or dispositions of property without limit so long as (a) such sales or dispositions are for fair market value, (b) at least seventy-five (75%) of the consideration for asset sales and dispositions shall consist of cash or cash equivalents (including a dollar basket for non-cash consideration that may be designated as cash consideration) and subject to additional exceptions consistent with the ABL Credit Documentation, (c) no default or event of default shall have occurred and be continuing or result therefrom and (d) to the extent such disposition is of assets in excess of an amount equal to the greater of (i) $4 million and (ii) 5.0% of the then-effective Borrowing Base that are included by the Borrower in the Borrowing Base, the Borrower delivers a pro forma Borrowing Base Certificate.

Cash Dominion:

The Loan Parties will be subject to "springing" cash dominion during any Cash Dominion Period. During a Cash Dominion Period, funds deposited into any material, domestic depository account will be swept on a daily basis into a blocked account with the ABL Administrative Agent and shall be used to reduce amounts owing under the ABL Facility. The ABL Administrative Agent or another Lender or a bank acceptable to the ABL Administrative Agent shall be the Borrower's principal depository and disbursement bank (it being agreed that the Borrower's current depository and disbursement bank shall be deemed acceptable to the ABL Administrative Agent). The appropriate documentation, including blocked account and/or lockbox agreements acceptable to the ABL Administrative Agent, will be required for all such material depository accounts of the Borrower and its subsidiaries and will be implemented within ninety (90) days following the Closing Date (or such later date as agreed by the ABL Administrative Agent).

"<u>Cash Dominion Period</u>" means any period commencing (a) on the fifth consecutive business day on which Excess Availability is less than the greater of (x) 15% of the Line Cap and $10.5 million and ending on the date on which Excess Availability is equal to or greater than the greater of (y) 15% of the Line Cap and $10.5 million for thirty (30) consecutive calendar days or (b) upon the occurrence of a Specified Event of Default and ending when no such Specified Event of Default is continuing.

"<u>Specified Event of Default</u>" means any event of default with respect to non-payment, bankruptcy, failure to deliver beyond the applicable grace period or material inaccuracy of a Borrowing Base Certificate, breach of the financial covenant or

failure to comply with cash management provisions relating to cash dominion.

Events of Default:

Nonpayment of principal when due, nonpayment of interest, fees and other amounts after five (5) day grace period, material inaccuracy of a representation or warranty when made, cross-default to material indebtedness (including the Term Loan Facility), violation of covenants (subject, in the case of certain affirmative covenants, to a grace period (it being understood that there shall only be a three (3) business day grace period for failure to deliver a required Borrowing Base certificate or failure to comply with controlled account requirements)), bankruptcy events, certain ERISA events that would result in a Material Adverse Effect, final and nonappealable material judgments, actual or asserted invalidity of guarantee or security document and change of control.

Voting:

Amendments and waivers of the ABL Credit Documentation will require the approval of non-defaulting Lenders holding more than 50% of the aggregate amount of the loans and commitments under the ABL Facility held by non-defaulting Lenders ("Required Lenders"), except that (i) the consent of each Lender directly and adversely affected thereby shall also be required with respect to: (A) increases in the commitment of such Lender, (B) reductions of principal, interest or fees owing to such Lender, (C) extensions of the final maturity or the due date of any interest, amortization or fee payment, (D) changes to pro rata sharing and pro rata payment provisions, (E) changes to the payment waterfall and (F) actions taken to contractually subordinate (or have the effect of contractually subordinating) the payment obligations or all or substantially all of the liens in the Collateral under the ABL Credit Documentation to other indebtedness for borrowed money (including guarantees), (ii) the consent of 100% of the Lenders will be required with respect to (A) changes in the voting thresholds and (B) releases of all or substantially all the value of the guarantees or releases of liens on all or substantially all of the Collateral (in each case, other than as permitted under the ABL Facility), (iii) increases to the advance rates set forth in the definition of Borrowing Base and changes to the eligibility criteria applicable to the Borrowing Base which have the effect of increasing availability thereunder shall require the approval of Lenders holding more than 66 2/3% of the ABL Commitments and (iv) customary protections for the ABL Administrative Agent and the Issuing Lenders will be provided.

Notwithstanding anything to the contrary, in connection with any determination as to whether the Required Lenders have consented (or not consented) to any amendment or waiver, any non-defaulting Lender (other than (x) any Lender that is a Regulated Bank or an affiliate of a Regulated Bank and (y) any

Lender that is the ABL Administrative Agent or an affiliate of the ABL Administrative Agent) that owns, directly or indirectly, any equity in the Borrower (each, an "Affiliated Lender") shall have no right to vote any of its ABL Loans and ABL Commitments and shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders; provided that Apollo entities that are Lenders on the Closing Date (the "Closing Date Apollo Entities") shall be entitled to vote their ABL Loans and ABL Commitments so long as such entities are Debt Fund Affiliates and provided that, with respect to any such vote, any ABL Loans and ABL Commitments of the Closing Date Apollo Entities in excess of 12% of the aggregate ABL Commitments as of such date shall be deemed to have voted in the same proportion as other ABL Lenders that are not Closing Date Apollo Entities.

"Regulated Bank" means an Approved Bank that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board of Governors under 12 CFR part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to in clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"Approved Bank" means any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks or $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks.

"Debt Fund Affiliate" means any investment fund, separate account, or other entity owned (in whole or in part), controlled, managed and/or advised by any affiliate of Apollo Global Management, Inc. (a) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course, (b) that does not directly or indirectly have beneficial ownership of equity interests of the Borrower or any Subsidiary and (c) which is not managed on a day to day basis by Persons responsible for the management of the Borrower on a day to day.

The ABL Credit Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all

Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

**Assignments and Participations:**

The Lenders shall be permitted to assign (other than to a natural person) all or a portion of their ABL Loans and ABL Commitments with the consent, not to be unreasonably withheld or delayed, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) a payment or bankruptcy event of default has occurred and is continuing; *provided* that such consent shall be deemed given if the Borrower has not responded within ten (10) business days following written notice, (b) the ABL Administrative Agent, unless the assignee is a Lender or an affiliate of a Lender that is a Regulated Bank, and (c) any Issuing Lender. In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $2,500,000, unless otherwise agreed by the Borrower and the ABL Administrative Agent. The ABL Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. The Lenders shall also be permitted to sell participations in their ABL Loans (other than to a natural person, a defaulting lender, Holdings, the Borrower or any of its affiliates), *provided* that the obligations under the ABL Credit Documentation for such Lender selling a participation shall remain unchanged and such Lender shall remain solely responsible to the other parties under the ABL Credit Documentation for the performance of such obligations. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of participants shall be limited to matters that require the consent of each Lender directly affected thereby and that directly affect such Participant. Pledges of ABL Loans in accordance with applicable law shall be permitted without restriction.

No assignment or participation may be made or sold to the Borrower or any of its affiliates.

**Field Examinations:**

Upon reasonable notice to the Borrower, field examinations will be conducted on an ongoing basis at regular intervals at the discretion of the ABL Administrative Agent to ensure the adequacy of Borrowing Base collateral and related reporting and control systems. No more than one field examination per year will be conducted; *provided* that one additional field examination may be performed if Excess Availability is less than the greater of (x) 20% of the Line Cap and (y) $15 million for a period of five (5) consecutive business days; *provided*, *further*, that there shall be no limitation on the number or frequency of field examinations if an Event of Default shall have occurred and be

|                           | continuing. Each such field examination shall be at the Borrower's expense and in a form reasonably satisfactory to the ABL Administrative Agent. |
|---|---|
| Inventory Appraisals:     | Upon reasonable notice to the Borrower, inventory appraisals will be conducted on an ongoing basis at regular intervals at the discretion of the ABL Administrative Agent.  No more than one inventory appraisal per year will be conducted; *provided* that one additional inventory appraisal may be performed if Excess Availability is less than the greater of (x) 20% of the Line Cap and (y) $15 million for a period of five (5) consecutive business days; *provided*, *further*, that there shall be no limitation on the number or frequency of inventory appraisals if an Event of Default shall have occurred and be continuing; *provided*, *further*, that the ABL Administrative Agent shall have the right, but not the obligation, to conduct an additional inventory appraisal if the value of inventory designated in the subledger as film inventory of the Borrowing Base Loan Parties (valued at the lower of cost and market) is greater than 50% of the value of the total inventory of the Borrowing Base Loan Parties (valued at the lower of cost and market). Each such inventory appraisal shall be at the Borrower's expense and in a form reasonably satisfactory to the ABL Administrative Agent. |
| Unrestricted Subsidiaries: | Consistent with similar transactions of this kind, the ABL Credit Documentation shall contain provisions pursuant to which, subject to customary limitations on investments, loans, advances to and other investments in, unrestricted subsidiaries, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a "restricted subsidiary"; *provided* that (i) no default shall have occurred and be continuing or would result from any such designation, (ii) after giving pro forma effect to such designation or redesignation, the Borrower shall be in compliance with the Financial Covenant (whether or not then in effect), (iii) no restricted subsidiary shall be designated as an unrestricted subsidiary if it owns material intellectual property, (iv) the Payment Conditions are satisfied, (v) such designation of a restricted subsidiary to an unrestricted subsidiary shall be made in compliance with the investments covenant and (vi) such redesignation of any unrestricted subsidiary as a restricted subsidiary shall be deemed to constitute the incurrence of indebtedness and liens of such subsidiary (to the extent assumed). Unrestricted subsidiaries will not be subject to the mandatory prepayment, representation and warranty, affirmative or negative covenant or event of default provisions of the ABL Credit Documentation and the results of operations, indebtedness and interest expense of unrestricted subsidiaries will not be taken into account for purposes of determining any financial ratio or covenant contained in the ABL Credit Documentation. No |

subsidiary may be designated an "unrestricted subsidiary" unless it is also designated as such under the Term Loan Credit Documentation or any other instrument governing material indebtedness in excess of $35 million.

| | |
|---|---|
| Yield Protection: | The ABL Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (*provided* that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes (including appropriate gross-up provisions) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Term Benchmark Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto. |
| Defaulting Lenders: | The ABL Credit Documentation shall contain provisions relating to "defaulting" Lenders (including provisions relating to reallocation of participations in, or the Borrower providing cash collateral to support or Letters of Credit, to the suspension of voting rights and rights to receive certain fees, and to assignment of the ABL Commitments or ABL Loans of such Lenders). |
| Expenses and Indemnification: | Neither Holdings nor any of its subsidiaries, nor the ABL Administrative Agent, the ABL Commitment Parties, the Lenders nor the Issuing Lenders (or any of their affiliates or their respective officers, directors, employees, advisors and agents) shall have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by any other party to the ABL Credit Documentation arising out of, in connection with, or as a result of, the ABL Facility or the ABL Credit Documentation. As used herein, the term "Liabilities" shall mean any losses, claims (including intraparty claims), demands, damages or liabilities of any kind. |
| | Regardless of whether the Closing Date occurs, the Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the ABL Administrative Agent and the ABL Commitment Parties associated with the syndication of the ABL Facility and the preparation, execution, delivery and administration of the ABL Credit Documentation and any |

amendment, modification or waiver with respect thereto (including the reasonable fees, disbursements and other charges of one primary counsel and one local counsel in each applicable, jurisdiction for the ABL Administrative Agent and the ABL Commitment Parties taken as a whole), (b) all documented out-of-pocket expenses of the ABL Administrative Agent, the Lenders and the Issuing Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the ABL Credit Documentation and (c) subject to the limitations set forth in the ABL Credit Documentation, reasonable out-of-pocket fees and expenses associated with collateral monitoring, collateral reviews (including field examination fees) and appraisals, environmental reviews and fees and expenses of other advisors and professionals engaged by the ABL Administrative Agent or (prior to the Closing Date) the ABL Commitment Parties.

The ABL Administrative Agent, the ABL Commitment Parties, the Lenders and the Issuing Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (each, an "Indemnified Person") will be indemnified and held harmless against Liabilities or expenses (including the fees, disbursements and other charges of counsel) incurred by such Indemnified Person in connection with or as a result of (i) the execution and delivery of the ABL Credit Documentation and any agreement or instrument; (ii) the funding of the ABL Facility, issuance of letters of credit thereunder, or the or the use or the proposed use of proceeds thereof; (iii) any act or omission of the ABL Administrative Agent in connection with the administration of the ABL Credit Documentation; (iv) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by Holdings, the Borrower or any of its subsidiaries, or any environmental liability resulting from the handling of hazardous materials or violation of environmental laws, related in any way to Holdings, the Borrower or any of its subsidiaries and (v) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "Proceeding") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by Holdings, the Borrower, their affiliates or equity holders or any other party; *provided* that such indemnification shall not, as to any Indemnified Person, be available to the extent that such Liabilities or expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person in performing its activities or in furnishing

its commitments or services under the ABL Credit Documentation.

| | |
|---|---|
| EU/UK Bail-In Provisions: | The ABL Credit Documentation will contain customary EU/UK bail-in provisions on terms to be mutually agreed subject to the ABL Documentation Principles. |
| QFC Provisions: | The ABL Credit Documentation will contain customary "QFC" provisions on terms to be mutually agreed subject to the ABL Documentation Principles. |
| Erroneous Payments: | The ABL Credit Documentation will contain customary erroneous payment provisions on terms to be mutually agreed subject to the ABL Documentation Principles. |
| Governing Law: | New York. |
| Forum: | United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the  Borough of Manhattan), and any appellate court from any thereof. |
| Counsel to the ABL Administrative Agent: | Simpson Thacher & Bartlett LLP. |

**INTEREST AND CERTAIN FEES**

Interest Rate Options:

The Borrower may elect that the ABL Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR <u>plus</u> the Applicable Margin or (b) the Adjusted Term SOFR Rate, in each case, <u>plus</u> the Applicable Margin.

As used herein:

"<u>ABR</u>" means the highest of (i) the rate of interest last quoted by The Wall Street Journal in the U.S. as the prime rate in effect (the "<u>Prime Rate</u>"), (ii) the NYFRB Rate from time to time plus 0.50% and (iii) the Adjusted Term SOFR Rate applicable for an interest period of one month plus 1.00%. If the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 2.00%.

"<u>ABR Loans</u>" means ABL Loans bearing interest based upon the ABR.

"<u>Adjusted Term SOFR Rate</u>" means the Term SOFR Rate, plus 0.10%; *provided* that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of calculating such rate.

"<u>Applicable Margin</u>" means 1.00% in the case of ABR Loans and 2.00% in the case of Term Benchmark Loans through the first full fiscal quarter after the Closing Date and, thereafter, subject to adjustment in accordance with the Pricing Grids (as defined below).

"<u>CME Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate calculated by the Federal Reserve Bank of New York (the "<u>NYFRB</u>") based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as the federal funds effective rate, *provided* that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"<u>Floor</u>" means the benchmark rate floor, if any, provided in the ABL Credit Documentation initially (as of the execution of the

ABL Credit Documentation, the modification, amendment or renewal of the ABL Credit Documentation or otherwise) with respect to the Adjusted Term SOFR Rate. For the avoidance of doubt the initial Floor for Adjusted Term SOFR Rate shall be 1.00%.

"Interest Period" means, with respect to any Term Benchmark, a period of one, three or six months.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day; *provided* that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in U.S. Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"SOFR" means, with respect to any business day, a rate per annum equal to the secured overnight financing rate for such business day published by the NYFRB on the NYFRB's on the immediately succeeding business day.

"Term Benchmark" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"Term Benchmark Loans" means ABL Loans bearing interest based upon the Term Benchmark Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time, with respect to any Term Benchmark Borrowing denominated in U.S. Dollars for any Interest Period, the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR.

"<u>U.S. Government Securities Business Day</u>" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

The ABL Credit Documentation will contain provisions to be mutually agreed with respect to a replacement of any Term Benchmark.

**Interest Payment Dates:**

In the case of ABR Loans, quarterly in arrears, on the first day of each calendar quarter.

In the case of Term Benchmark Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

**Commitment Fees:**

The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.50% on the average daily unused portion of the ABL Facility (based on total commitments).

**Pricing Grids:**

Commencing two full fiscal quarters after the Closing Date, the Applicable Margins and commitment fees will be subject to pricing adjustment as set forth in the Pricing Grids attached hereto as <u>Annex I-A</u>.

**Letter of Credit Fees:**

The Borrower shall pay a fee on the face amount of each Letter of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Term Benchmark Loans under the ABL Facility.  Such fee shall be shared ratably among the Lenders participating in the ABL Facility and shall be payable quarterly in arrears.

A fronting fee in an amount equal to 0.125% of the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account.  In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.

**Default Rate:**

At any time when the Borrower is in default in the payment of any amount under the ABL Facility, after giving effect to any applicable grace period, the Required Lenders may elect that all outstanding amounts under the ABL Facility shall bear interest at 2.00% per annum above the rate otherwise applicable thereto (or, in the event there is no applicable rate, 2.00% per annum in excess of the rate otherwise applicable to ABL Loans maintained as ABR Loans from time to time).

Rate and Fee Basis:          All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.

| Level | Excess Availability | Term Benchmark Applicable Margin | ABR Applicable Margin |
|-------|---------------------|----------------------------------|-----------------------|
| Level I | > 66% | 3.00% | 2.00% |
| Level II | ≤ 66% but > 33% | 3.25% | 2.25% |
| Level III | ≤ 33% | 3.50% | 2.50% |

The applicable margins and fees shall be determined in accordance with the foregoing tables based on the most recent Borrowing Base certificate delivered pursuant to the ABL Credit Documentation. Adjustment, if any, to the applicable margins and fees shall be effective three (3) business days after the ABL Administrative Agent has received the applicable Borrowing Base certificate. If the Borrower fails to deliver the Borrowing Base certificate to the ABL Administrative Agent at the time required pursuant to the ABL Credit Documentation, then the ABL Administrative Agent shall, at the direction of the Required Lenders only, declare the applicable margins and fees to be the highest applicable margin and fees set forth in the foregoing table until the date that such Borrowing Base certificate is so delivered.

# EXHIBIT B

CONDITIONS ANNEX

Conditions

The availability of the ABL Facility shall be subject to the satisfaction of the following conditions. Capitalized terms used but not defined herein have the meanings set forth in the Summary of Terms and Conditions.

1.      The Borrower, each Guarantor, the Administrative Agent and the ABL Commitment Parties shall have executed and delivered the ABL Credit Documentation to which it is a party, including the Intercreditor Agreement (collectively, the "Facility Documentation"), which shall be in accordance with the terms of the Term Sheet and reasonably satisfactory to the ABL Commitment Parties, and the ABL Administrative Agent shall have received:

a.      customary insurance certificates, officer's certificate, closing certificates, good standing certificates and legal opinions; and

b.      a solvency certificate, dated the Closing Date, in the form attached hereto as Annex II-I, executed by the chief financial officer of the Borrower, certifying that the Borrower and its subsidiaries, on a consolidated basis after giving effect to the Transactions and the incurrence of the Term Loan Facility (the Transactions together with the incurrence of the Term Loan Facility, the "Debt Transactions"), are solvent.

2.      Except as contemplated by the ABL Credit Documentation, on the Closing Date, and after giving effect to the Debt Transactions, neither Holdings nor any of its subsidiaries shall have any material indebtedness for borrowed money (excluding, for the avoidance of doubt, capital lease obligations, purchase money debt and intercompany indebtedness), other than the ABL Facility and the Term Loan Facility.

3.      The ABL Commitment Parties shall have received (a) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries, in each case for the fiscal years ended December 31, 2019 and December 31, 2020, (b) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries, in each case for the fiscal year ended December 31, 2021 and (c) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter ended (that is not a fiscal year-end) at least forty-five (45) days before the Closing Date.

4.      The ABL Commitment Parties shall have received a pro forma consolidated balance sheet and related pro forma consolidated statement of income of the Borrower and its subsidiaries as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least forty-five (45) days prior to the Closing Date, prepared after giving effect to the Debt Transactions as if the Debt Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of income).

5.      The ABL Commitment Parties shall have received, at least five (5) business days prior to the Closing Date (a) all documentation and other information about the Borrower and the Guarantors that shall have been reasonably requested by the ABL Commitment Parties in writing at least ten (10) business days prior to the Closing Date and that the ABL Commitment Parties reasonably determine is required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act and (b) if the Borrower qualifies as a "legal

entity" customer under the Beneficial Ownership Regulation, and to the extent requested by any Lender at least five (5) days prior to the Closing Date, a Beneficial Ownership Certificate.

6. All costs, fees and expenses (including, without limitation, reasonable and documented legal fees and expenses of one primary counsel to the ABL Administrative Agent and one local counsel to the ABL Administrative Agent in each relevant jurisdiction invoiced to the Borrower at least two (2) Business Days prior to the Closing Date) and other compensation required to be paid by the Borrower to the ABL Commitment Parties, the ABL Administrative Agent or the Lenders shall have been paid to the extent due.

7. All actions necessary to establish that the ABL Administrative Agent will have a perfected security interest (subject to permitted liens and other exceptions to be agreed consistent with the ABL Documentation Principles) in the Collateral under the ABL Facility shall have been taken; provided that, to the extent any action, filing, notice, agreement or pledge is designated under the Facility Documentation as a post-closing requirement by the ABL Administrative Agent, such action or document shall not be required to be completed on the Closing Date but shall instead by required to be completed by the date separately designated thereunder.

8. The ABL Commitment Parties shall have received the results of recent lien and judgment searches in each of the jurisdictions where the Loan Parties are located (within the meaning of Section 9-307 of the New York UCC, the PPSA or the corresponding code or statute of any other applicable jurisdiction) and such searches shall reveal no liens on any of the assets of the Loan Parties (except for liens permitted under the Definitive Documentation), or any such Liens (except for liens permitted under the Definitive Documentation) shall be discharged on or prior to the Closing Date pursuant to customary documentation reasonably satisfactory to the ABL Administrative Agent.

9. At least three (3) business days prior to the Closing Date, the Borrower shall have provided the ABL Administrative Agent with a completed borrowing base certificate, calculated in accordance with Exhibit A, prepared as at the end of the most recent calendar month ended at least twenty (20) business days (or such shorter period as may be elected by the Borrower) prior to the Closing Date.

10. (a) No more than $47,424,495.19 (but no less than the outstanding principal amount of the aggregate Revolving Loans and Specified Swap Obligations (as defined in the Prepetition First Lien Credit Agreement) of the Commitment Parties)) of ABL Loans shall be drawn on the Closing Date, (b) no letters of credit shall be issued (or deemed issued) under the ABL Facility on the Closing Date and (c) substantially simultaneously with the initial drawings under the ABL Facility, such drawings shall be applied to the Allowed (as defined in the Plan) First Lien Revolving Claims (as defined in the Plan) of the Commitment Parties in satisfaction in full of the Commitment Parties' Plan treatment as set forth in Article III.B.3(c)(ii)(B), and any funded amounts in excess thereof shall be applied to the Allowed First Lien Revolving Claims of any lenders in respect of the ABL Facility that are not Commitment Parties (to the extent of such outstanding Allowed First Lien Revolving Claims and not to exceed the ABL Funded Rollover Cap (as defined in the Plan)) in satisfaction of such lenders' Plan treatment as set forth in Article III.B.3(c)(ii)(A)(x).

11. On the Closing Date, (i) the accuracy in all material respects (or in all respects if qualified by materiality) of the representations and warranties in the Facility Documentation and (ii) there being no default or event of default in existence at the time of, or immediately after giving effect to, the Closing Date and any extensions of credit to be made on such date.

12. Since December 31, 2021 and after taking into account the Debt Transactions and after giving effect to the consummation of the Plan, there not having been any change, development or event that,

individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of the Borrower and its subsidiaries, taken as a whole, other than as a result of events leading up to, resulting from and/or following the commencement of their proceedings under chapter 11 of the Bankruptcy Code or the continuation and prosecution thereof (including the announcement of the filing or commencement of the Cases).

13.     The order confirming the Plan shall have become a Final Order (as defined in the Plan) and such order shall not have been amended, modified, vacated, stayed or reversed.

14.     The conditions precedent to the confirmation of the Plan set forth in the Plan shall have occurred and the conditions precedent to the Effective Date (as defined in the Plan) shall have occurred. With respect to such conditions precedent to the confirmation of the Plan and Effective Date, the Borrower shall have confirmed to Administrative Agent in writing that such conditions precedent have been satisfied or waived and that the Effective Date has occurred.  All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

15.     There shall be no adversary proceeding pending in the Bankruptcy Court, or litigation commenced outside of the bankruptcy proceedings that is not stayed pursuant to section 362 of the Bankruptcy Code, seeking to enjoin or prevent the Transactions.

16.     The Rights Offering (as defined in the Plan) shall have closed in accordance with its terms and the Borrower shall have received the proceeds therefrom and applied such proceeds (if any) in accordance with the Plan.

17.     As of the Effective Date (as defined in the Plan) and after giving effect to the Restructuring Transactions (as defined in the Plan), the Reorganized Debtors (as defined in the Plan) and the Foreign Guarantor Subsidiaries (as defined in the Plan) shall have Minimum Liquidity. "Minimum Liquidity" means, with respect to the Reorganized Debtors and the Foreign Guarantor Subsidiaries (as defined in the Plan) as of the Effective Date, an amount of total available liquidity equal to $100 million, including (a) at least $60 million of unrestricted balance sheet cash for the Reorganized Debtors and foreign subsidiaries, after taking into account (x) any Cash (as defined in the Plan) distributions to be paid under the Plan on or about the Effective Date and (y) any amounts that may come due after the Effective Date on account of Allowed Professional Fee Claims (as defined in the Plan as), net of the aggregate amount funded into the Professional Escrow Account (as defined in the Plan) pursuant to Article II.C of the Plan.

18.     The Plan shall not have been amended, supplemented or modified in a manner that is materially adverse to the interests of the Commitment Parties without the consent of the Commitment Parties and as further          set          forth          in          the          Commitment          Letter..

Annex II-I

FORM OF SOLVENCY CERTIFICATE

This Certificate is being delivered pursuant to Section [  ] of the Credit Agreement dated as of [  ], 2022 (the "Credit Agreement"), among Carestream Health, Inc. (the "Borrower"), Carestream Health Holdings, Inc. ("Holdings"), the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent. Unless otherwise defined herein, terms used herein have the meanings provided in the Credit Agreement.

[  ] hereby certifies that he is the Chief Financial Officer of the Borrower and that he/she is knowledgeable of the financial and accounting matters of the Borrower and its Subsidiaries, the Credit Agreement and the covenants and representations (financial and other) contained therein and that, as such, he is authorized to execute and deliver this Certificate on behalf of the Borrower.

The undersigned hereby further certifies, solely in his/her capacity as Chief Financial Officer of the Borrower and not in an individual capacity, as follows:

1.     As of the date hereof, immediately after giving effect to the consummation of the Transactions and the incurrence of the Term Loan Facility (collectively, the "Debt Transactions"), in each case to occur on and as of the Closing Date, including the making of each Loan to be made on the Closing Date and the application of the proceeds thereof, the fair value of the assets of the Borrower and its Restricted Subsidiaries, on a consolidated basis, at a fair valuation, will exceed their debts and liabilities, subordinated, contingent or otherwise on a consolidated basis.

2.     As of the date hereof, immediately after giving effect to the consummation of the Debt Transactions to occur on and as of the Closing Date, including the making of each Loan to be made on the Closing Date and the application of the proceeds thereof, the present fair saleable value of the property of the Borrower and its Restricted Subsidiaries, on a consolidated basis, will, as of such date, be greater than the amount that will be required to pay the probable liabilities on their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured.

3.     As of the date hereof, immediately after giving effect to the consummation Debt Transactions to occur on and as of the Closing Date, including the making of each Loan to be made on the Closing Date and the application of the proceeds thereof, the Borrower and its Restricted Subsidiaries, on a consolidated basis, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured in the ordinary course.

4.     As of the date hereof, immediately after giving effect to the consummation Debt Transactions to occur on and as of the Closing Date, including the making of each Loan to be made on the Closing Date and the application of the proceeds thereof, the Borrower and its Restricted Subsidiaries, on a consolidated basis, will not have an unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and proposed to be conducted following the date hereof.

The financial information, projections and assumptions which underlie and form the basis for the representations made in this certificate were based upon good faith estimates and assumptions believed to be reasonable to the management of the Borrower at the time made, in light of the circumstances under which they were made (it being understood that such financial information, projections or forecasts as they relate to future events are not to be viewed as fact and that actual results during the period or periods

covered by such financial information, projections or assumptions may differ from the projected results set forth therein by a material amount).

In computing the amount of the contingent liabilities of the Borrower and its Restricted Subsidiaries as of the date hereof, such liabilities have been computed at the amount that, in light of all the facts and circumstances existing as of the date hereof, represents the amount that can reasonably be expected to become an actual or matured liability.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the undersigned has executed this Certificate solely in his capacity as Chief Financial Officer of the Borrower (and not in an individual capacity) this [ ] day of [ ], 2022.

CARESTREAM HEALTH, INC.

By: _____
   Name:
   Title:    Chief Financial Officer

## Exhibit C

## Commitment Fee Letter

JPMORGAN CHASE BANK, N.A.
383 Madison Avenue
New York, New York 10179

CREDIT SUISSE AG
Eleven Madison Avenue
New York, New York 10010

APOLLO CREDIT MASTER FUND LTD.
9 West 57th Street
New York, New York 10019

August 20, 2022

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Scott Rosa and Robert Johnson

Commitment Fee Letter

Ladies and Gentlemen:

Reference is made to the Commitment Letter dated the date hereof (including the exhibits thereto, the "Commitment Letter") among us and you, regarding the Transactions described therein. Capitalized terms used but not defined herein are used with the meanings assigned to them in the Commitment Letter. This letter agreement (this "Fee Letter") is the Commitment Fee Letter referred to in the Commitment Letter.

1.      Fees

As consideration for the agreements and commitments under the Commitment Letter, you agree to pay or cause to be paid to each of JPMorgan Chase Bank, CS and Apollo, for the respective account of each of JPMorgan Chase Bank, CS and Apollo, a commitment fee (the "Commitment Fee") in an amount equal to ███ of the respective amount of commitments of each of JPMorgan Chase Bank, CS and Apollo in respect of the ABL Facility under the Commitment Letter as in effect on the date hereof, which Commitment Fee shall be payable on the Closing Date.

You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable hereunder shall be paid in U.S. Dollars and in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses as provided for in the Commitment Letter. In addition, all such payments will be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any federal, State or local taxing authority, or will be grossed up by you for such amounts. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any of our respective affiliates.

2.      Miscellaneous

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the Commitment Letter if accepted in accordance with its terms. This Fee Letter may not be amended or waived except by an

instrument in writing signed by each Commitment Party and you. This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Fee Letter and/or any document to be signed in connection with this Fee Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. "Electronic Signatures" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

The provisions of this Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extensions thereof). You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the Commitment Letter.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

## Exhibit D

## Agency Fee Letter

JPMORGAN CHASE BANK, N.A.
383 Madison Avenue
New York, New York 10179

August 20, 2022

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Scott Rosa and Robert Johnson

<u>Administrative Agent Fee Letter</u>

Ladies and Gentlemen:

Reference is made to the Commitment Letter dated the date hereof (including the exhibits thereto, the "<u>Commitment Letter</u>") among us, you and the other parties party thereto, regarding the Transactions described therein. Capitalized terms used but not defined herein are used with the meanings assigned to them in the Commitment Letter. This letter agreement (this "<u>Fee Letter</u>") is the Administrative Agent Fee Letter referred to in the Commitment Letter.

1.      Fees

As consideration for the agreements and commitments under the Commitment Letter, you agree to pay or cause to be paid the following fees:

A.      To the Administrative Agent, for its own account, an annual administration fee in respect of the ABL Facility equal to ████, which fee will be payable annually, in advance, commencing on the Closing Date (as defined below) and thereafter on each anniversary thereof prior to the termination of all commitments and repayment of all amounts under the ABL Facility. If prior to the final maturity date of the ABL Facility, the ABL Facility is fully prepaid and the commitments thereunder terminated, a part of such administrative agent fee will be refunded to the Borrower on the date of such prepayment and termination in proportion to (i) the number of days remaining until (but not including) the next anniversary of the Closing Date divided by (ii) the number of days in such period.

B.      To JPMorgan Chase Bank, for its own account, a one-time, non-refundable additional fee (the "<u>Arrangement Fee</u>") in an amount equal to ████, which Arrangement Fee shall be payable on the Closing Date.

You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable hereunder shall be paid in U.S. Dollars and in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses as provided for in the Commitment Letter. In addition, all such payments will be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any federal, State or local taxing authority, or will be grossed up by you for such amounts. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any of the other Lenders.

2.  Miscellaneous

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the Commitment Letter if accepted in accordance with its terms.  This Fee Letter may not be amended or waived except by an instrument in writing signed by us and you.  This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.  This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this letter agreement by facsimile transmission or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

The provisions of this Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extensions thereof).  You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the Commitment Letter.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

## Exhibit E

## Side Fee Letter

**BARCLAYS**
745 Seventh Avenue
New York, New York 10019

**PERSONAL AND CONFIDENTIAL**

August 21, 2022

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Scott Rosa and Robert Johnson

**Fee Letter**

Ladies and Gentlemen:

Reference is made in this letter (this "Fee Letter") to that certain Commitment Letter among Carestream Health, Inc., a Delaware corporation ("you", "Carestream" or the "Company"), JPMorgan Chase Bank, N.A., Credit Suisse AG, Barclays Bank PLC ("Barclays," "we" or "us") and Apollo Capital Management, L.P.], dated as of the date hereof (including the exhibits thereto, the "Commitment Letter"). Any capitalized term used but not defined herein shall have the meaning assigned to such term in the Commitment Letter.

      1.    Fees. Subject to the occurrence of the Closing Date, you agree to pay:

      (a)    *Upfront Fee*. To Barclays, for its own account, an upfront fee equal to ▇▇▇▇ of the aggregate principal amount of Barclays' commitment under the ABL Facility on the Closing Date, which will be earned on the date hereof and due and payable on the Closing Date; and

      (b)    *Transaction Structuring Fee*. To Barclays, for its own account, in consideration of Barclay's assistance in structuring certain exit financings, a transaction structuring fee in an amount equal to ▇▇▇▇▇▇, which will be earned on the date hereof and due and payable by Carestream on the Closing Date.

All fees shall be payable in U.S. dollars in immediately available funds free and clear of, and without deduction for, any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (with appropriate gross-up for withholding taxes). All fees shall be fully earned upon becoming due and payable in accordance with the terms hereof and shall be in addition to any other fees, costs and expenses payable pursuant to the ABL Credit Documentation. Once paid, all fees will be nonrefundable under all circumstances (except as expressly provided herein with respect to rebate of the annual administrative agent fee for any partial period) and will not be subject to any counterclaim, setoff or other impairment or right of recession or turnover. Barclays, at its sole discretion, may allocate, in whole or in part, to its affiliates any fees payable to it for its own account hereunder.

      2.    Waiver of Jury Trial; Governing Law; Submission to Jurisdiction; Surviving Provisions

ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING OR CLAIM ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO

IN THIS FEE LETTER OR THE COMMITMENT LETTER IS HEREBY IRREVOCABLY WAIVED BY THE PARTIES HERETO. THIS FEE LETTER WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK. Each of the parties hereto hereby irrevocably (i) submits, for itself and its property, to the exclusive jurisdiction of (a) the Supreme Court of the State of New York, New York County and (b) the United States District Court for the Southern District of New York, located in the Borough of Manhattan, and any appellate court from any such court, in any action, suit, proceeding or claim arising out of or relating to this Fee Letter, the Commitment Letter or the Transactions or the performance of services contemplated hereunder or under the Commitment Letter, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such New York State court or such Federal court, (ii) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Fee Letter, the Commitment Letter or the Transactions or the performance of services contemplated hereunder or under the Commitment Letter in any such New York State or Federal court and (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court. Each of the parties hereto agrees to commence any such action, suit, proceeding or claim either in the United States District Court for the Southern District of New York or in the Supreme Court of the State of New York, New York County located in the Borough of Manhattan.

The Company agrees that, in connection with any action, suit, proceeding or claim arising out of or relating to the Transactions or the performance of services contemplated hereunder or under the Commitment Letter, it (i) will submit to the jurisdiction of (a) the Supreme Court of the State of New York, New York County, located in the Borough of Manhattan and (b) the United States District Court for the Southern District of New York and any appellate court from any such court and (ii) agrees to venue in any such New York State or Federal court.

This Fee Letter is entered into for your benefit only and no other person or entity (other than the Lenders) may rely hereon.

The provisions of Section 2 of this Fee Letter will survive any termination or completion of the arrangements contemplated by the Commitment Letter, this Fee Letter and the Transactions, including, without limitation, whether or not the ABL Credit Documentation are executed and delivered and whether or not the ABL Facility is made available or any loans under the ABL Facility are disbursed.

3.  <u>Miscellaneous</u>

This Fee Letter may be executed in any number of counterparts, each of which when executed will be an original and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile or other electronic transmission will be as effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," and words of like import in or relating to this Fee Letter will be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Fee Letter and the Commitment Letter are the only agreements that have been entered into among the parties hereto with respect to the ABL Facility and set forth the entire understanding of the parties with respect thereto and supersede any prior

written or oral agreements among the parties hereto with respect to the ABL Facility. Those matters that are not covered or made clear in this Fee Letter or in the Commitment Letter are subject to mutual agreement of the parties. This Fee Letter is in addition to the agreements of the parties set forth in the Commitment Letter. No person has been authorized by Barclays to make any oral or written statements that are inconsistent with this Fee Letter or the Commitment Letter.

You acknowledge and agree that this Fee Letter is not a commitment by Barclays to provide any financing or provide or purchase any loans in connection with the ABL Facility, which commitment, if any, will only be set forth in a separate commitment letter or other agreement.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Barclays the enclosed copy of this Fee Letter.

[*The remainder of this page is intentionally left blank.*]