## **Exhibit B**

**New Stockholder Agreement**

# AMENDED AND RESTATED

# BYLAWS

# OF

# CARESTREAM HEALTH HOLDINGS, INC.

## ARTICLE I
### Offices

SECTION 1.01.  <u>Registered Office</u>.  The registered office and registered agent of Carestream Health Holdings, Inc. (the "<u>Corporation</u>") in the State of Delaware shall be as set forth in the Certificate of Incorporation (as defined below).  The Corporation may also have offices in such other places in the United States or elsewhere (and may change the Corporation's registered agent) as the Board of Directors of the Corporation (the "<u>Board</u>") may, from time to time, determine or as the business of the Corporation may require as determined by any officer of the Corporation.

## ARTICLE II
### Meetings of Stockholders

SECTION 2.01.  <u>Annual Meetings</u>.  Unless directors are elected by written consent in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware (the "<u>DGCL</u>"), annual meetings of stockholders may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board shall determine and state in the notice of meeting.  The Board may, in its sole discretion, determine that meetings of the stockholders shall not be held at any place, but may instead be held solely by means of remote communication as described in <u>Section 2.11</u> of this <u>Article II</u> in accordance with Section 211(a)(2) of the DGCL.  The Board may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board.

SECTION 2.02.  <u>Special Meetings</u>.  Special meetings of the stockholders may only be called in the manner provided in the Corporation's certificate of incorporation as then in effect (including any Preferred Stock Designation (as defined therein)) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "<u>Certificate of Incorporation</u>") and the Stockholders' Agreement, dated as of [•], 2022, by and among the Corporation and the equityholders of the Corporation party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "<u>Stockholders' Agreement</u>"), and may be held at such place, if any, either within or without the State of Delaware, and at such time and date as the Board, the Chairperson of the Board (the "<u>Chairperson</u>") or the Chief Executive Officer of the Corporation (the "<u>Chief Executive Officer</u>") shall determine and shall be stated in the notice of such meeting. The Board may postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board, the Chairperson or the Chief Executive Officer.

1

SECTION 2.03.   Notice of Stockholder Business and Nominations.

(a)      Annual Meetings of Stockholders.   Subject to the terms of the Stockholders' Agreement, at annual meetings of stockholders, the stockholders shall elect directors to the Board and transact such other business as may properly be brought before the meeting.

(b)      Special Meetings of Stockholders.   Only such business (including the election of specific individuals to fill vacancies or newly created directorships on the Board) shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.   At any time that stockholders are not prohibited from filling vacancies or newly created directorships on the Board, nominations of persons for election to the Board to fill any vacancy or unfilled newly created directorship may be made at a special meeting of stockholders at which any proposal to fill any vacancy or unfilled newly created directorship is to be presented to the stockholders (i) as provided in the Stockholders' Agreement or (ii) by or at the direction of the Board or any committee thereof.

SECTION 2.04.   Notice of Meetings.   Whenever stockholders are required or permitted to take any action at a meeting, a timely notice in writing or by electronic transmission, in the manner provided in Section 232 of the DGCL, of the meeting, which shall state the place, if any, date and time of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purposes for which the meeting is called, shall be mailed to or transmitted electronically by the Secretary of the Corporation to each stockholder of record entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting. Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

SECTION 2.05.   Quorum.   Unless otherwise required by law and except as provided in the Stockholders' Agreement, the Certificate of Incorporation or the rules of any stock exchange upon which the Corporation's securities are listed, the holders of record of a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of stockholders.   Notwithstanding the foregoing, where a separate vote by a class or series or classes or series is required, the holders of record of a majority of the voting power of the issued and outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on that matter.   Once a quorum is present to organize a meeting, it shall not be broken by the subsequent withdrawal of any stockholders.

SECTION 2.06.   Voting.   Except as otherwise provided by or pursuant to the provisions of the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder that has voting power upon the matter in question.   Each stockholder entitled to vote at a meeting of stockholders or to

express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy in any manner provided by applicable law, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Unless required by the Certificate of Incorporation, the Stockholders' Agreement or applicable law, or determined by the chairperson of the meeting to be advisable, the vote on any question need not be by ballot. On a vote by ballot, each ballot shall be signed by the stockholder voting, or by such stockholder's proxy, if there be such proxy. When a quorum is present or represented at any meeting, the vote of the holders of a majority of the voting power of the shares of stock present in person or represented by proxy and entitled to vote on the subject matter shall decide any question brought before such meeting, unless the matter is one upon which, by express provision of applicable law, of the rules or regulations of any stock exchange applicable to the Corporation, of any regulation applicable to the Corporation or its securities, of the Certificate of Incorporation, of the Stockholders' Agreement or of these Bylaws, a minimum or different vote is required, in which case such minimum or different vote shall be the applicable vote on such matter. Notwithstanding the foregoing sentence and subject to the Certificate of Incorporation, unless the Stockholders' Agreement requires a different standard, all elections of directors shall be determined by a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

SECTION 2.07. <u>Chairperson of Meetings</u>. The Chairperson, if one is elected, or, in his or her absence or disability, the Vice Chairperson of the Board (the "<u>Vice Chairperson</u>"), if one is appointed, or in his or her absence of disability, the Chief Executive Officer, or in the absence of the Chairperson, the Vice Chairperson and the Chief Executive Officer, a person designated by the Board shall be the chairperson of the meeting and, as such, preside at all meetings of the stockholders. The order of business at each meeting of the stockholders shall be determined by the chairperson of such meeting, but such order of business may be changed by a majority in voting interest of those present in person or by proxy at such meeting and entitled to vote thereat.

SECTION 2.08. <u>Secretary of Meetings</u>. The Secretary of the Corporation (the "<u>Secretary</u>") shall act as secretary at all meetings of the stockholders. In the absence or disability of the Secretary, an Assistant Secretary of the Corporation (an "<u>Assistant Secretary</u>") shall act as secretary at all meetings of the stockholders. In the absence of the Secretary and all Assistant Secretaries, the Chairperson, the Vice Chairperson or the Chief Executive Officer shall appoint a person to act as secretary at such meetings.

SECTION 2.09. <u>Consent of Stockholders in Lieu of Meeting</u>. Subject to the terms of the Stockholders' Agreement, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, only if a consent, setting forth the action so taken, is signed by the holders of record of the issued and outstanding capital stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action (such minimum number of votes to be in accordance with any applicable terms of the Stockholders' Agreement and the DGCL) at a meeting at which all shares entitled to vote thereon were present and voted

and is delivered to the Corporation in accordance with the DGCL. Prompt, written notice of the action taken by means of any such consent that is other than unanimous shall be given to those stockholders who have not consented in writing.

SECTION 2.10.  Adjournment.  At any meeting of stockholders of the Corporation, if less than a quorum be present, the chairperson of the meeting or stockholders upon the vote of a majority of the votes cast, shall have the power to adjourn the meeting from time to time without notice, other than announcement at the meeting, until a quorum shall be present.  Any business may be transacted at the adjourned meeting that might have been transacted at the meeting originally noticed.  If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date so fixed for notice of such adjourned meeting.

SECTION 2.11.  Remote Communication.   If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(a)    participate in a meeting of stockholders; and

(b)    be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication; provided, however, that:

(i)    the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder;

(ii)    the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings; and

(iii)    if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

SECTION 2.12.  Inspectors of Election.  The Corporation may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment or postponement thereof and to make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  In the event that no inspector so appointed or designated is able to act at a meeting of stockholders, the chairperson of the meeting

shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability. The inspector or inspectors so appointed or designated shall (a) ascertain the number of shares of capital stock of the Corporation outstanding and the voting power of each such share, (b) determine the shares of capital stock of the Corporation represented at the meeting and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify his or her determination of the number of shares of capital stock of the Corporation represented at the meeting and such inspectors' count of all votes and ballots. Such certification and report shall specify such other information as may be required by law. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders of the Corporation, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for an office at an election may serve as an inspector at such election.

## ARTICLE III
## Board of Directors

SECTION 3.01. <u>Powers</u>. Except as otherwise provided by the Certificate of Incorporation, the Stockholders' Agreement or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of its Board. The Board may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by the DGCL, the Stockholders' Agreement or the Certificate of Incorporation directed or required to be exercised or done by the stockholders.

SECTION 3.02. <u>Number and Term; Chairperson</u>. Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, the number of directors shall be fixed exclusively by resolution of the Board. Directors shall be elected by the stockholders at each annual meeting of stockholders, and the term of each director so elected shall be as set forth in the Certificate of Incorporation. Directors need not be stockholders. The Board shall elect a Chairperson, who shall have such powers and perform such duties as provided in these Bylaws and as the Board may from time to time prescribe. The Chairperson shall preside at all meetings of the Board at which he or she is present. The Board may also appoint a Vice Chairperson. If the Chairperson is not present at a meeting of the Board, the Vice Chairperson, if one has been appointed, shall preside at such meeting. If neither the Chairperson nor the Vice Chairperson is present at a meeting of the Board, the Chief Executive Officer (if the Chief Executive Officer is a director and is not also the Chairperson) shall preside at such meeting, and, if the Chief Executive Officer is not present at such meeting or is not a director, a majority of the directors present at such meeting shall elect one (1) of their members to preside. The Board may remove and/or replace the Chairperson or the Vice Chairperson at any time.

SECTION 3.03. <u>Resignations</u>. Any director may resign at any time upon notice given in writing or by electronic transmission to the Board, the Chairperson, the Chief Executive Officer or the Secretary of the Corporation or, in the case of the resignation from a committee, the chairperson of the applicable committee. The resignation shall take effect at the time specified therein, and if no time is specified, at the time of its receipt. The acceptance of a resignation shall not be necessary to make it effective unless otherwise expressly provided in the resignation.

SECTION 3.04.  <u>Removal</u>.  Subject to the terms of the Stockholders' Agreement, directors of the Corporation may be removed in the manner provided by applicable law.

SECTION 3.05.  <u>Vacancies and Newly Created Directorships</u>.  Subject to the terms of the Stockholders' Agreement (including the requirement that certain stockholders may designate directors for election to the Board so long as such stockholders meet certain Ownership Percentage (as defined in the Stockholders' Agreement) thresholds), newly created directorships resulting from any increase in the number of directors and any vacancies on the Board resulting from death, resignation, disqualification, removal or other cause may be filled by the affirmative vote of a majority of the remaining directors then in office, even if less than a quorum of the Board, or by a sole remaining director.  Any director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the director whose seat is being filled and until such director's successor has been elected and qualified.  No decrease in the number of directors constituting the Board may shorten the term of any incumbent director. If there are no directors in office, then an election of directors may be held in accordance with the Stockholders' Agreement and in the manner provided by law.

SECTION 3.06.  <u>Meetings</u>.  Regular meetings of the Board may be held at such places and times as shall be determined from time to time by the Board.  Subject to the terms of the Stockholders' Agreement, special meetings of the Board may be called by the Chief Executive Officer or the Chairperson or Vice Chairperson, and shall be called by the Chief Executive Officer or the Secretary of the Corporation if directed by the Board and shall be at such places and times as they or he or she shall fix.  Notice need not be given of regular meetings of the Board.  At least twenty-four (24) hours before each special meeting of the Board, written notice, notice by electronic transmission or oral notice (either in person or by telephone) of the time, date and place of the meeting shall be given to each director, which required notice shall be deemed to be waived by a director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice).  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

SECTION 3.07.  <u>Quorum, Voting and Adjournment</u>.  Subject to the terms of the Stockholders' Agreement, at least a majority of the total number of directors that the Corporation would have if there were no vacancies on the Board shall constitute a quorum for the transaction of business.  Except as otherwise provided by law, the Certificate of Incorporation, the Stockholders' Agreement or these Bylaws, the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.  In the absence of a quorum, a majority of the directors present thereat may adjourn such meeting to another time and place.  Notice of such adjourned meeting need not be given if the time and place of such adjourned meeting are announced at the meeting so adjourned.

SECTION 3.08.  <u>Committees; Committee Rules</u>.  Subject to the terms of the Stockholders' Agreement, the Board may designate one or more committees, including, but not limited to, an Audit Committee, a Compensation Committee and an International Trade Compliance Committee, each such committee to consist of one or more of the directors of the Corporation; <u>provided</u>, <u>however</u>, that the Board may elect to have the Audit Committee act as, and have the mandate of, the International Trade Compliance Committee.  The Board may designate one or more directors as alternate members of any committee to replace any absent or disqualified member at any

meeting of the committee.  Subject to the terms of the Stockholders' Agreement, any such committee, to the extent provided in the resolution of the Board establishing such committee, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority in reference to the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, (b) adopting, amending or repealing these Bylaws or (c) adopting any action requiring the consent of a stockholder or stockholders, pursuant to the terms of the Stockholders' Agreement, without such consent.  All committees of the Board shall keep minutes of their meetings and shall report their proceedings to the Board when requested or required by the Board.  Each committee of the Board may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board designating such committee.  Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present at a meeting of the committee at which a quorum is present.  Unless otherwise provided in such a resolution, in the event that a member and that member's alternate, if alternates are designated by the Board, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in place of any such absent or disqualified member.

SECTION 3.09.  <u>Action Without a Meeting</u>.  Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all members of the Board or any committee thereof, as the case may be, consent thereto in writing or by electronic transmission.  The writing or writings or electronic transmission or transmissions shall be filed in the minutes of proceedings of the Board or committee, as applicable.  Such filing shall be in paper form if the minutes are maintained in paper form or shall be in electronic form if the minutes are maintained in electronic form.

SECTION 3.10.  <u>Remote Meeting</u>.  Unless otherwise restricted by the Certificate of Incorporation, members of the Board, or any committee designated by the Board, may participate in a meeting by means of conference telephone or other communications equipment in which all persons participating in the meeting can hear each other.  Participation in a meeting by means of conference telephone or other communications equipment shall constitute presence in person at such meeting.

SECTION 3.11.  <u>Compensation</u>.  Subject to the Stockholders' Agreement, the Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors and board observers for services to the Corporation in any capacity.

SECTION 3.12.  <u>Reliance on Books and Records</u>.  A member of the Board, or a member of any committee designated by the Board shall, in the performance of such person's duties, be fully protected in relying in good faith upon records of the Corporation and upon such information,

opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

## ARTICLE IV
### Officers

SECTION 4.01.  Number.  The officers of the Corporation shall include a Chief Executive Officer and a Secretary, each of whom shall be elected by the Board and who shall hold office for such terms as shall be determined by the Board and until such officer's successor is elected and qualified or until such officer's earlier resignation or removal.  In addition, the Board may elect a President and one or more Vice Presidents, including one or more Executive Vice Presidents, Senior Vice Presidents, a Chief Operating Officer, a Chief Financial Officer, a Treasurer and one or more Assistant Treasurers and one or more Assistant Secretaries, who shall hold their office for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, any number of offices may be held by the same person.  Officers need not be stockholders or residents of the State of Delaware.

SECTION 4.02.  Other Officers and Agents.  The Board may appoint or delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove the same, as it deems advisable, who shall hold their office for such terms and shall exercise and perform such powers and duties as shall be determined from time to time by the Board; provided, however, that any officer possessing authority over or responsibility for any functions of the Board shall be an elected officer. Each appointed officer shall hold office until such officer's successor has been appointed and qualified or until such officer's earlier resignation or removal.

SECTION 4.03.  Chief Executive Officer.  The Chief Executive Officer, subject to the control of the Board, shall have general responsibility for the business and affairs of the Corporation and shall be the chief policy making officer of the Corporation.  In the absence of the Chairperson and the Vice Chairperson, the Chief Executive Officer shall preside at all meetings of the stockholders and the Board, and he or she shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board or these Bylaws.

SECTION 4.04.  President.  The President, subject to the powers of the Board and the Chief Executive Officer, shall have the general powers and duties incident to the office of the president of a corporation, shall perform such duties and services and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.05.  Chief Operating Officer.  The Chief Operating Officer, subject to the powers of the Board and the Chief Executive Officer, shall have direct responsibility for the business and affairs of the Corporation, including supervisory responsibility for the officers, agents, employees and properties of the Corporation and shall have such other powers and duties

as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.06.  <u>Vice Presidents</u>.  Each Vice President, including any Executive Vice President and any Senior Vice President, shall have such powers and perform such duties incident to the office of the vice president of a corporation, and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.07.  <u>Chief Financial Officer</u>.  The Chief Financial Officer shall have responsibility for all financial and accounting matters, including supervisory responsibilities for the Treasurer, any Assistant Treasurer or any Vice President of Finance of the Corporation.  The Chief Financial Officer shall have the general powers and duties incident to the office of the chief financial officer of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.08.  <u>Treasurer</u>.  The Treasurer shall have custody of the corporate funds, securities, evidences of indebtedness and other valuables of the Corporation and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation.  The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Corporation in such depositories as may be designated by the Board or its designees selected for such purposes.  The Treasurer shall disburse the funds of the Corporation, taking proper vouchers therefor.  The Treasurer shall render to the Chief Executive Officer, the Chief Financial Officer and the Board, upon their request, a report of the financial condition of the Corporation.  The Treasurer shall, in the absence or disability of the Chief Financial Officer, act with all of the powers and have the responsibilities assigned to the Chief Financial Officer.  In addition, the Treasurer shall have the general powers and duties incident to the office of the treasurer of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer, the Chief Financial Officer or these Bylaws.  If required by the Board, the Treasurer shall give the Corporation a bond for the faithful discharge of his or her duties in such amount and with such surety as the Board shall prescribe.

SECTION 4.09.  <u>Secretary</u>.  The Secretary shall: (a) record the proceedings of the meetings of the stockholders and the Board in a minute book to be kept for that purpose; (b) cause notices to be duly given in accordance with the provisions of these Bylaws and as required by law; (c) be the custodian of the records and the seal of the Corporation and affix and attest the seal to any stock certificates of the Corporation (unless the seal of the Corporation on such certificates shall be a facsimile, as hereinafter provided) and affix and attest the seal to all other documents to be executed on behalf of the Corporation under its seal; (d) cause the books, reports, statements, certificates and other documents and records required by law to be kept and filed to be properly kept and filed; and (e) in general, have all the powers and perform all the duties incident to the office of the secretary of a corporation and shall have such other powers and duties as may be assigned to, or required of, such officer from time to time by the Board, the Chief Executive Officer or these Bylaws.

SECTION 4.10.  <u>Assistant Treasurers and Assistant Secretaries</u>.  Each Assistant Treasurer and each Assistant Secretary, if any are elected, shall be vested with all the powers and shall perform all the duties of the Treasurer and Secretary, respectively, in the absence or disability of such officer, unless or until the Chief Executive Officer or the Board shall otherwise determine. In addition, Assistant Treasurers and Assistant Secretaries shall have such other powers and duties as may be assigned to, or required of, them from time to time by the Board, the Chief Executive Officer, the President or these Bylaws.

SECTION 4.11.  <u>Corporate Funds and Checks</u>.  The funds of the Corporation shall be kept in such depositories as shall from time to time be prescribed by the Board or its designees selected for such purposes.  All checks or other orders for the payment of money shall be signed by the Chief Executive Officer, the Chief Financial Officer and such other persons as may from time to time be authorized by the Board.

SECTION 4.12.  <u>Contracts and Other Documents</u>.  The Chief Executive Officer, the President, the Chief Operating Officer and any such other officer or officers as may from time to time be authorized by the Board, shall have the power to sign and execute on behalf of the Corporation deeds, conveyances and contracts, and any and all other documents requiring execution by the Corporation.

SECTION 4.13.  <u>Ownership of Stock of Another Corporation</u>.  Unless otherwise directed by the Board, the Chief Executive Officer, the President, the Chief Operating Officer, and any such other person as shall be authorized by the Board, shall have the power and authority, on behalf of the Corporation, to attend and to vote at any meeting of securityholders of any entity in which the Corporation holds securities or equity interests and may exercise, on behalf of the Corporation, any and all of the rights and powers incident to the ownership of such securities or equity interests at any such meeting, including the authority to execute and deliver proxies and consents on behalf of the Corporation.

SECTION 4.14.  <u>Delegation of Duties</u>.  In the absence, disability or refusal of any officer to exercise and perform his or her duties, the Board may delegate to another officer such powers or duties.

SECTION 4.15.  <u>Resignation and Removal</u>.  Any officer of the Corporation may be removed from office for or without cause at any time by the Board.  Any officer may resign at any time in the same manner prescribed under <u>Section 3.03</u> of <u>Article III</u> of these Bylaws.

SECTION 4.16.    <u>Compensation; Vacancies</u>.  The compensation of elected officers shall be set by the Board or delegated by the Board to the same extent as permitted by these Bylaws. The Board shall have the power to fill vacancies occurring in any office.  The compensation of appointed officers and the filling of vacancies in appointed offices shall be set and filled, respectively, by the Board or delegated by the Board to the same extent as permitted by these Bylaws for the initial filling of such offices.

## ARTICLE V
### Stock

SECTION 5.01.  <u>Uncertificated Shares</u>.  The shares of stock of the Corporation shall be uncertificated and shall be represented by book entries on the Corporation's securities transfer books and records; provided, however, that, subject to the Stockholders' Agreement, the Board may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be represented by certificates.  Notice of the information required by the DGCL shall be furnished in accordance with the DGCL within a reasonable time after the issue or transfer of uncertificated shares.  Every holder of stock in the Corporation represented by certificates shall be entitled to have a certificate signed by or in the name of the Corporation by any two authorized officers of the Corporation, certifying the number and class of shares of stock of the Corporation owned by such holder.  Any or all of the signatures on the certificate may be a facsimile.  The Board shall have the power to appoint one or more transfer agents and/or registrars for the transfer or registration of certificates of stock of any class, and may require stock certificates to be countersigned or registered by one or more of such transfer agents and/or registrars.  The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.  The Corporation shall not have power to issue a certificate in bearer form.

SECTION 5.02.  Transfer of Shares.  Upon compliance with the provisions restricting the transfer or registration of transfer of shares of stock, if any, contained in the Certificate of Incorporation and the Stockholders' Agreement, shares of stock of the Corporation shall be transferable upon its books, which may be maintained by a third-party registrar or transfer agent, by the holders thereof, in person or by their duly authorized attorneys or legal representatives, upon surrender to the Corporation by delivery thereof (to the extent evidenced by a physical stock certificate) to the person in charge of the stock and transfer books and ledgers.  Certificates representing such shares, if any, shall be cancelled and new certificates, if the shares are to be certificated, shall thereupon be issued.  Shares of capital stock of the Corporation that are not represented by a certificate shall be transferred in accordance with the Stockholders' Agreement and applicable law.  A record shall be made of each transfer.  Whenever any transfer of shares shall be made for collateral security, and not absolutely, it shall be so expressed in the entry of the transfer if, when the certificates are presented, both the transferor and transferee request the Corporation to do so.

SECTION 5.03.  Lost, Stolen, Destroyed or Mutilated Certificates.  A new certificate of stock or uncertificated shares may be issued in the place of any certificate previously issued by the Corporation alleged to have been lost, stolen or destroyed, and the Corporation may, in its discretion, require the owner of such lost, stolen or destroyed certificate, or his or her legal representative, to give the Corporation a bond or an agreement of indemnity, in such sum as the Corporation may direct, in order to indemnify the Corporation against any claims that may be made against it in connection therewith.  A new certificate or uncertificated shares of stock may be issued in the place of any certificate previously issued by the Corporation that has become mutilated upon the surrender by such owner of such mutilated certificate and, if required by the Corporation, the posting of a bond or delivering of an agreement of indemnity by such owner to indemnify the Corporation against any claims that may be made against it in connection therewith.

11

SECTION 5.04.  <u>List of Stockholders Entitled to Vote</u>.  The Corporation shall prepare, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (<u>provided</u>, <u>however</u>, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting at least ten (10) days prior to the meeting (a) on a reasonably accessible electronic network; <u>provided</u>, <u>however</u>, that the information required to gain access to such list is provided with the notice of meeting or (b) during ordinary business hours at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.  Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this <u>Section 5.04</u> or to vote in person or by proxy at any meeting of stockholders.

SECTION 5.05.  <u>Fixing Date for Determination of Stockholders of Record</u>.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall, unless otherwise required by law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; <u>provided</u>, <u>however</u>, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon

which the resolution fixing the record date is adopted, and which record date shall not be more than sixty (60) days prior to such action. If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)     Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, in order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date for determining the stockholders entitled to express consent to corporate action in writing without a meeting is fixed by the Board, (i) when no prior action of the Board is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law or (ii) when prior action by the Board is required by law, the record date for such purpose shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

SECTION 5.06.  Registered Stockholders.  Prior to the surrender to the Corporation of the certificate or certificates for a share or shares of stock or notification to the Corporation of the transfer of uncertificated shares with a request to record the transfer of such share or shares, the Corporation may treat the registered owner of such share or shares as the person entitled to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner of such share or shares.  To the fullest extent permitted by law, the Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

**ARTICLE VI**
**Notice and Waiver of Notice**

SECTION 6.01.  Notice.  Notice may be given in any manner permitted by law.  If mailed, notice to stockholders shall be deemed given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the DGCL.

SECTION 6.02.  Waiver of Notice.  A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person.  Neither the business nor the purpose of any meeting need be specified in such a waiver.  Attendance at any meeting (in person or by remote communication) shall constitute waiver of notice except attendance for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE VII
## Indemnification and Advancement

SECTION 7.01.  <u>Right to Indemnification</u>.  The rights, if any, of directors, officers, employees and agents of the Corporation with respect to indemnification shall be as set forth in the Certificate of Incorporation.

SECTION 7.02.  <u>Right to Advancement of Expenses</u>.  The rights, if any, of directors, officers, employees and agents of the Corporation with respect to advancement of expenses shall be as set forth in the Certificate of Incorporation.

## ARTICLE VIII
## Interested Directors, Officers and Stockholders

SECTION 8.01.  <u>Validity</u>. Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement, any contract or other transaction between the Corporation and any of its directors, officers or stockholders (or any corporation or firm in which any of them are directly or indirectly interested) shall be valid for all purposes notwithstanding the presence of such director, officer or stockholder at the meeting authorizing such contract or transaction, or his or her participation or vote in such meeting or authorization.

SECTION 8.02.  <u>Disclosure, Approval</u>. Unless otherwise restricted by the Certificate of Incorporation or the Stockholders' Agreement,  <u>Section 8.01</u> shall apply only if the material facts of the relationship or the interest of each such director, officer or stockholder is known or disclosed: (a) to the Board and it nevertheless in good faith authorizes or ratifies the contract or transaction by a majority of the directors present, each such interested director to be counted in determining whether a quorum is present but not in calculating the majority necessary to carry the vote; or (b) to the stockholders and they nevertheless in good faith authorize or ratify the contract or transaction by a majority of the shares present, each such interested person to be counted for quorum and voting purposes.

SECTION 8.03.  <u>Nonexclusive</u>. This provision shall not be construed to invalidate any contract or transaction that would be valid in the absence of this provision.

## ARTICLE IX
## Miscellaneous

SECTION 9.01.  <u>Electronic Transmission</u>.  For purposes of these Bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

SECTION 9.02.  <u>Dividends</u>.  Dividends on the capital stock of the Corporation, paid in cash, property, or securities of the Corporation and as may be limited by the DGCL and applicable provisions of the Certificate of Incorporation and Stockholders' Agreement (if any), may be declared by the Board at any regular or special meeting.

SECTION 9.03.   <u>Corporate Seal</u>.  The Board may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary.  If and when so directed by the Board or a committee thereof, duplicates of the seal may be kept and used by the Chief Financial Officer or by an Assistant Secretary or Assistant Treasurer.

SECTION 9.04.   <u>Fiscal Year</u>.  The fiscal year of the Corporation shall end on December 31, or such other day as the Board may designate.

SECTION 9.05.   <u>Section Headings; Interpretation</u>.  In these Bylaws, (a) section headings are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein and (b) the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined.

SECTION 9.06.   <u>Inconsistent Provisions</u>.  In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL, any other applicable law, or the Stockholders' Agreement, such provision of these Bylaws shall not be given effect to the extent of such inconsistency but shall otherwise be given full force and effect.

SECTION 9.07.   <u>Stockholders' Agreement</u>.  Any reference herein to the Stockholders' Agreement will be disregarded upon termination of the Stockholders' Agreement in accordance with its terms.

## ARTICLE X
## Amendments

SECTION 10.01. <u>Amendments</u>.    Subject to the provisions of the Certificate of Incorporation and the Stockholders' Agreement, these Bylaws may be altered, amended or repealed, or new Bylaws adopted or enacted, by the Board or by the stockholders by, in the case of the stockholders, the affirmative vote of shares representing a majority of the voting power of the shares entitled to vote on such matter.

Dated: [•], 2022

## **Exhibit B-1**

**Comparison of New Stockholder Agreement with the Initial Plan Supplement**

*Draft 9/14/2022*

**STOCKHOLDERS' AGREEMENT**

dated as of

[•], 2022

by and among

**CARESTREAM HEALTH HOLDINGS, INC.**

and

**CERTAIN OTHER PERSONS NAMED HEREIN**

# TABLE OF CONTENTS

PAGE

ARTICLE 1 Definitions ........................................................................................ 2
    Section 1.01.  *Definitions* .............................................................................. 2
    Section 1.02.  *Other Definitional and Interpretative Provisions* ............... 10 1

ARTICLE 2 Governance ...................................................................................... 11
    Section 2.01.  *Vacancies* .............................................................................. 11
    Section 2.02.  *Board of Directors* ............................................................... 11 2
    Section 2.03.  *Board Observer Rights* ........................................................ 13
    Section 2.04.  *Board Expenses* ................................................................... 13 4
    Section 2.05.  *Board Meetings* .................................................................... 14
    Section 2.06.  *Notice of Meeting; Agenda* ................................................. 14
    Section 2.07.  *Other Governing Document Provisions* .............................. 14
    Section 2.08.  *Directors' and Officers' Insurance* .................................... 14
    Section 2.09.  *No Liability for Board Designees or Board Observers* ....... 14 5
    Section 2.10.  *Board Committees* ............................................................... 15
    Section 2.11.  *Related Party Transactions* ................................................ 15
    Section 2.12.  *Actions Requiring Consent* ................................................. 15

ARTICLE 3 Drag-Along Rights ........................................................................... 16
    Section 3.01.  *Drag-Along Rights* ............................................................... 16
    Section 3.02.  *Additional Conditions to Drag-Along Rights* ..................... 19

ARTICLE 4 Tag-Along Rights; Right of First Offer .......................................... 20 1
    Section 4.01.  *Tag-Along Rights* ................................................................. 20 1
    Section 4.02.  *Right of First Offer* ............................................................. 23 4

ARTICLE 5 Preemptive Rights ........................................................................... 26
    Section 5.01.  *Preemptive Rights* ............................................................... 26
    Section 5.02.  *Excluded Issuances* ............................................................. 27 8

ARTICLE 6 Information Rights; Delivery of Information ................................. 28 9
    Section 6.01.  *Information Rights* ............................................................... 28 9
    Section 6.02.  *Delivery of Information; Confidentiality* ........................... 29 30

ARTICLE 7 Certain Covenants and Agreements ............................................... 30
    Section 7.01.  *Confidentiality* ..................................................................... 30
    Section 7.02.  *Irrevocable Proxy and Power of Attorney* .......................... 31 2
    Section 7.03.  *Transfer Restrictions; Permitted Transferees* .................... 32

Section 7.04.  *Compliance with Law; Policies and Procedures* ............................................ 34

ARTICLE 8 Miscellaneous ..................................................................................................... 34

Section 8.01.  *Binding Effect; Assignability; No Third Party Beneficiaries* ..................... 34

Section 8.02.  *Notices* ...................................................................................................... 35

Section 8.03.  *Waiver; Amendment* ................................................................................. 35

Section 8.04.  *Effectiveness; Termination; Survival* ....................................................... 36

Section 8.05.  *Governing Law* .................................................................................... 367

Section 8.06.  *Jurisdiction; Service of Process* ........................................................ 367

Section 8.07.  *WAIVER OF JURY TRIAL* ...................................................................... 37

Section 8.08.  *Specific Performance* ............................................................................... 37

Section 8.09.  *Counterparts* ............................................................................................. 37

Section 8.10.  *Entire Agreement* ................................................................................. 378

Section 8.11.  *Severability* ............................................................................................... 38

Section 8.12.  *Further Assurances* ................................................................................... 38

Section 8.13.  *Aggregation of Shares* .............................................................................. 38

Section 8.14.  *Calculation of Ownership* ......................................................................... 38

Section 8.15.  *Independent Agreement by the Stockholders* ...................................... 389

Schedule 1    List of Certain Equityholders
Schedule 2    Initial Directors
Exhibit A     Joinder Agreement
Exhibit B     Form of Offer Notice
Exhibit C     Form of Transfer Certificate

# STOCKHOLDERS' AGREEMENT

This STOCKHOLDERS' AGREEMENT dated as of [•], 2022 (this "**Agreement**"), by and among (i) Carestream Health Holdings, Inc., a Delaware corporation (the "**Corporation**"), (ii) those Persons (as defined below) listed on Schedule 1 attached hereto, and (iii) any other Person who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a Joinder, substantially in the form attached hereto as Exhibit A (a "**Joinder**"), in accordance with the terms hereof (the Persons described in clauses (ii) and (iii), collectively, the "**Stockholders**").

## RECITALS

WHEREAS, the Corporation and certain of its Subsidiaries agreed to implement the transactions contemplated by that certain Restructuring Support Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), dated as of August 21, 2022 through pre-packaged chapter 11 cases by commencing voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, pursuant to that certain *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and its Debtor Affiliates* (the "**Plan**") confirmed by the Bankruptcy Court in the jointly administered cases captioned *In re Carestream Health, Inc., et al.*, Case No. 22-10778 (JKS), pursuant to an order dated [__], 2022 [Docket No. [__]] (the "**Confirmation Order**"), the Corporation has agreed as of the Plan Effective Date (as defined below) to, among other things, issue shares of Common Stock (as defined below) to certain providers of financing to and certain creditors of the Corporation, including the issuance of shares of Common Stock pursuant to a rights offering to certain creditors of the Corporation and the issuance of shares of Common Stock as contemplated by the DIP Rollover and the DIP Rollover Premium (each as defined in the Plan);

WHEREAS, pursuant to the Plan, all Persons who are issued Common Stock or receive Common Stock pursuant to a transfer from an existing holder thereof, as applicable, must become a party to this Agreement by signing this Agreement or a Joinder;

WHEREAS, pursuant to the Plan and Confirmation Order, as of the Plan Effective Date, each Stockholder is automatically deemed to have accepted the terms of this Agreement (in its capacity as a Stockholder) and is automatically deemed to be a party hereto as a Stockholder without any further action and as if, and with the same effect as if, such Stockholder had delivered a duly executed counterpart signature page to this Agreement; and

WHEREAS, pursuant to the Plan, the Corporation and the Stockholders are authorized to enter into this Agreement to establish certain rights and obligations with respect to the composition of the Corporation's Board of Directors (the "**Board**" and, each director on such Board, a "**Director**") and other matters relating to the corporate governance of the Corporation.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and intending to be legally bound, the Corporation and each of the other parties hereby agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.    *Definitions*.

(a)    As used in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, an "Affiliate" of a Stockholder shall include any investment fund, alternative investment vehicle, special purpose vehicle or holding company that (i) is directly or indirectly managed, advised, sub-advised or controlled by such Stockholder or any Affiliate of such Stockholder or (ii) is managed, advised or sub-advised by the same investment adviser as, or an Affiliate of the investment adviser of, such Stockholder; *provided*, *however*, that an Affiliate shall not include any portfolio company of any Person (including any Stockholder) nor any Corporate Entity; *provided*, *further*, that limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder. The term "**Affiliated**" shall have a correlative meaning.

"**Anti-Corruption Laws**" means the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and the Canadian Corruption of Foreign Public Officials Act, in each case, as amended, and, with respect to a Person, any other Laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT ACT (Pub. L. No. 107-56), the Bank Secrecy Act (31 U.S.C. §§ 5311-5332), the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000, the Currency and Foreign Transactions Reporting Act of 1970 and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), in each case, as amended, and, with respect to a Person, any other Laws, rules, and regulations of any jurisdiction applicable to such Person or any of its Affiliates from time to time concerning or relating to money laundering or terrorism financing.

"**Apollo/CION**" means (i) Apollo Capital Management, L.P., (ii) CION Investment Corporation and (iii) Redding Ridge Asset Management LLC, in each case, together with their respective Affiliates and Related Funds.

"**beneficial ownership**" or "**beneficially own**" means beneficial ownership as determined pursuant to Rule 13d-3 and Rule 13d-5 under the Exchange Act.

"**Board Supermajority**" means an affirmative vote by either (i) 80% of the total number of Directors of the Corporation then in office or (ii) a majority of the total number of Directors

then in office; *provided*, *however*, that such majority must include Directors that have been designated by at least two of three of Brigade, Vector and Apollo/CION pursuant to <u>Section 2.02(a)</u>.

"**Brigade**" means Brigade Capital Management, LP together with its Affiliates and Related Funds.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Bylaws**" means the bylaws of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with their terms.

"**Capital Stock**" means the capital stock of the Corporation.

"**Certificate of Incorporation**" means the Amended and Restated Certificate of Incorporation of the Corporation, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"**Common Stock**" means the shares of common stock, par value $0.0001 per share, of the Corporation.

"**Corporation Securities**" means any Capital Stock (including Common Stock) or equity interests of the Corporation, including the Common Stock, and any other security exercisable or convertible into or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

"**Competitor**" means any Person that is a direct competitor of the Corporation or any other Corporate Entity as determined by the Board acting in good faith; *provided*, *however*, that, with respect to any Stockholder, the beneficial ownership of Securities held for passive investment purposes of a portfolio company engaged in competitive activities shall not be deemed to result in such Stockholder being deemed a Competitor.

"**Convertible Securities**" means any Securities that are convertible or exercisable into, or exchangeable for, Common Stock.

"**Corporate Entity**" means the Corporation and any of the Corporation's Subsidiaries.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**GAAP**" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a

significant segment of the accounting profession that are in effect from time to time, applied on a consistent basis for the periods involved.

"**Governing Documents**" means this Agreement, the Certificate of Incorporation and the Bylaws and any similar organizational document of a Subsidiary of the Corporation.

"**Governmental Approval**" means the approval of any Governmental Authority, or the completion of required prior notice filings with any Governmental Authority.

"**Governmental Authority**" means any government of any nation, state, city, locality or other political subdivision thereof, whether federal, national, international, regional, provincial, state, tribal, local, foreign or multinational, entity or official exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any of the foregoing, or corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Indebtedness**" means with respect to any Person, without duplication, any liability of such Person (a) for borrowed money, whether current or funded, secured or unsecured, or with respect to deposits or advances of any kind, (b) incurred or assumed as the deferred purchase price of assets, property or services (but excluding trade accounts payable arising in the ordinary course of business), (c) evidenced by notes, bonds, debentures or other similar instruments, (d) for the reimbursement of any obligor on any banker's acceptance, letter of credit, performance bond or similar credit transaction, (e) for indebtedness of others guaranteed by such Person to the extent of such guarantee or arrangement and (f) for indebtedness of any other Person of the type referred to in clauses (a), (b), (c), (d) and (e) of this definition which is secured by any lien on any property or asset of such first referred to Person, the amount of such indebtedness referred to in this clause (f) being deemed to be the lesser of the value of such property or asset or the amount of the indebtedness so secured to the extent of such security interest. Except as otherwise provided in this definition of "Indebtedness", the amount of Indebtedness of any Person at any date shall be (i) the outstanding principal amount of all unconditional obligations described above and interest, as such amount would be reflected on a balance sheet prepared in accordance with GAAP, and (ii) with respect to all contingent obligations described above, the maximum liability as of such date of such Person for any guarantees of Indebtedness for borrowed money of any other Person and the amount required under GAAP to be accrued with respect to any other contingent obligation.

"**Independent Director**" means a Director who shall neither be affiliated with any Stockholder, nor be an employee of any Corporate Entity, and shall be determined to be "independent" (as such term is defined by the corporate governance standards of a National Securities Exchange), in each case, as determined in good faith by the Board.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"**Law**" means any applicable statute, law, rule, regulation, ordinance, code, policy or rule of common law issued, administered or enforced by any Governmental Authority, or any judicial or administrative interpretation thereof including the rules of any stock exchange.

4

"**Management Incentive Plan**" means a management incentive plan adopted and approved by the Board.

"**National Securities Exchange**" means the Nasdaq Global Market, the Nasdaq Global Select Market or the New York Stock Exchange.

"**New ABL Credit Agreement**" means that certain [•] ABL Credit Agreement, dated as of [•], by and among the Corporation, Carestream Health, Inc., as Borrower, the subsidiary guarantors party thereto, the several banks, financial institutions, institutional investors and other entities from time to time party thereto as lenders or holders of the loans and issuers of letters of credit, and JPMorgan Chase Bank, N.A., as Administrative Agent.

"**New Term Loan Credit Agreement**" means that certain [•] Term Loan Credit Agreement, dated as of [•], by and among the Corporation, Carestream Health, Inc., as Borrower, the subsidiary guarantors party thereto, the several banks, financial institutions, institutional investors and other entities from time to time party thereto as lenders or holders of the loans, and JPMorgan Chase Bank, N.A., as Administrative Agent.

"**Ownership Percentage**" means, with respect to any Stockholder or group of Stockholders, a fraction (a) the numerator of which is the total number of shares of outstanding Common Stock beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time (without duplication) and (b) the denominator of which is the total number of shares of outstanding Common Stock held by all Stockholders at such time, in each case, excluding, for purposes of this calculation, (i) any shares of Common Stock issuable upon the exercise, conversion or exchange of Convertible Securities, (ii) any shares of Common Stock not beneficially owned by such Stockholder or group of Stockholders (together with their respective Affiliates and Related Funds) at such time, and (iii) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Plan Effective Date**" shall mean the Effective Date (as defined in the Plan).

"**Public Company Event**" means the earlier of (a) the closing of a Qualified IPO or (b) a listing of any class of Common Stock or any class of capital stock in such other entity that owns all or substantially all of the assets of the Corporation on any National Securities Exchange.

"**Public Offering**" means any sale or distribution to the public of a Corporation Security or other equity Security of any of the Corporation's Subsidiaries pursuant to an offering registered under the Securities Act, whether by the Corporation, by a Subsidiary, by Stockholders and/or by any other holders of such Corporation Security or other equity Security of any of the Corporation's Subsidiaries.

"**Qualified IPO**" means a firm commitment underwritten Public Offering that provides for at least $100,000,000 in gross proceeds to the Corporation or any of the Corporation's Subsidiaries and, immediately after such Public Offering, such Corporation Security or other

equity Security of any of the Corporation's Subsidiaries is quoted or listed for trading on a National Securities Exchange.

"**Related Fund**" means with respect to any Person, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, sub-investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

"**Rights Holder**" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds two and five tenths percent (2.5%).

"**Sale Transaction**" means the occurrence of any of the following: (a) the direct or indirect sale, lease, transfer, exclusive license, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation, whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Corporation and its Subsidiaries (taken as a whole) or (b) the consummation of any transaction or series of transactions (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that any Person or "group" (as defined under Section 13 of the Exchange Act) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Corporation Securities or of the membership or other equity interests of any surviving entity of any such merger or consolidation; *provided*, *however*, that, a Sale Transaction shall not be deemed to have occurred in the case of clause (a), if such Sale Transaction is completed in connection with the internal restructuring of the Corporation and the resulting owner(s) of the assets of the Corporation are, directly or indirectly, the same Stockholders who owned such assets prior to such Sale Transaction.

"**Sanctions**" means economic, financial and trade sanctions administered or enforced by the United States (including the U.S. Department of the Treasury's Office of Foreign Assets Control, U.S. Department of State, and U.S. Department of Commerce), the United Nations Security Council, the European Union and any member state thereof, the United Kingdom (including Her Majesty's Treasury of the United Kingdom), and the Government of Canada (or the government of any province or territory thereof).

"**SEC**" means the United States Securities and Exchange Commission or any successor governmental agency.

"**Securities**" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, capital stock or other equity interests issued by such Person or any options, warrants or other Securities that are directly or indirectly convertible into, or exercisable or exchangeable for, capital stock or other equity interests issued by such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Significant Holder**" means, at the time of determination, a Stockholder (together with its Affiliates and Related Funds) whose Ownership Percentage equals or exceeds ten percent (10%).

"**Specified Event**" means any of the following: (a) any Corporate Entity's breach of or default under (i) the New Term Loan Credit Agreement or (ii) the New ABL Credit Agreement or (b) the reported EBITDA in the annual or quarterly reports, as applicable and as delivered pursuant to Section 6.01(a), is less than the EBITDA target in the business plan projections, as applicable and as delivered pursuant to Section 6.01(a), by (i) twenty percent (20%) or greater for two (2) consecutive fiscal quarters or (ii) fifteen percent (15%) or greater for three (3) fiscal quarters in any twelve (12) month period.

"**Subsidiary**" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to GAAP, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

"**Tag-Along Pro Rata Portion**" means with respect to any Tag-Along Offeree, a number of shares of Common Stock determined by multiplying (a) the number of shares of outstanding Common Stock beneficially owned by the applicable Tag-Along Offeree immediately prior to the Tag-Along Transfer by (b) a fraction, (i) the numerator of which is the number of shares of outstanding Common Stock proposed to be Transferred by the Tag-Along Seller in connection with the Tag-Along Transfer and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the Tag-Along Transfer, excluding, for purposes of this calculation, (x) any shares of Common Stock issuable upon the exercise, conversion or exchange of Convertible Securities, (y) any shares of Common Stock not beneficially owned by such Tag-Along Offeree (together with its Affiliates and Related Funds) at such time, and (z) any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan.

"**Third Party**" means a prospective purchaser(s) of the Corporation, Corporation Securities, or any of the Corporation's direct or indirect assets, in each case, other than any Significant Holder or Affiliate or Related Fund thereof.

"**Trade Control Laws**" means applicable Laws related to (a) export controls, including the U.S. Export Administration Act of 1979, as amended, the U.S. Export Administration Regulations, the Arms Export Control Act, the U.S. International Traffic In Arms Regulations, and (b) customs or import controls, including those administered by U.S. Customs and Border Protection.

"**Transfer**" means any direct or indirect, transfer, sale, assignment, pledge, hypothecation or other disposition of any Corporation Securities, whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose

of any Corporation Securities, including (a) any such transfer, sale, assignment, pledge, hypothecation, disposition by operation of law or otherwise to an heir, successor or assign, (b) a derivative transaction or the transfer of any equity interests in any direct or indirect holding company holding Corporation Securities or the issuance and redemption by any such holding company of its securities, or (c) any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Corporation Securities, whether any such transaction described in clause (a), (b) or (c) above is to be settled by delivery of Capital Stock or such other securities, in cash or otherwise; *provided*, *however*, that, (i) subject to customary pledge requirements, a grant of or existence of a security interest or encumbrance over any Corporation Securities that is required by any bank or financial institution shall not be deemed to be a Transfer unless and until any enforcement of remedies in respect of such security interest or encumbrance that results in any Person other than such Stockholder becoming the beneficial owner of such Corporation Securities; (ii) with respect to any Stockholder that is a widely held "investment company" as defined in the Investment Company Act or any publicly traded company whose Securities are registered under the Exchange Act, a transfer, sale, assignment, pledge, hypothecation, or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed to be a Transfer; and (iii) with respect to any Stockholder that is a private equity fund, hedge fund or similar vehicle, any transfer of limited partnership or other similar non-control interest in any entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Stockholder, or the change in control of any general partner, manager or similar person of such entity, shall not be deemed to be a Transfer for purposes hereof, so long as any such transfer pursuant to clause (i), (ii) or (iii) above (x) is not with the purpose of circumventing the Transfer provisions of this Agreement and (y) does not impact the Stockholder's control of the applicable Corporation Securities. The terms "**Transferee**", "**Transferor**", "**Transferred**", "**Transferring**" and other forms of the word "**Transfer**" shall have correlative meanings.

"**Transfer Period**" means the twenty (20) day period immediately following delivery to the Stockholders of the audited consolidated financial statements or the unaudited consolidated financial statements of the Corporation, as applicable, described in Section 6.01(a).

"**Vector**" means Vector Capital together with its Affiliates and Related Funds.

"**Voting Power**" means the total number of votes of the applicable Voting Shares.

"**Voting Shares**" means any outstanding shares of Capital Stock entitled to vote for the election of Directors to the Board.

(b)       Each of the following terms is defined in the page set forth opposite such term:

Accelerated Acquirer .......................................................................................................... 27
Accredited Investor ............................................................................................................. 18
Affiliate .................................................................................................................................. 2
Agreement .............................................................................................................................. 1
Anti-Corruption Laws .......................................................................................................... 2
Anti-Money Laundering Laws ............................................................................................. 2
Apollo/CION ......................................................................................................................... 2

Bankruptcy Code ........................................................................................ 1
Bankruptcy Court ....................................................................................... 1
Base Participating Holder .......................................................................... 24
beneficial ownership .................................................................................. 2
beneficially own ......................................................................................... 2
Board ........................................................................................................... 1
Board Observer ......................................................................................... 13
Board Supermajority .................................................................................. 2
Brigade ........................................................................................................ 3
Business Day ............................................................................................... 3
Bylaws ......................................................................................................... 3
Capital Stock .............................................................................................. 3
CEO ........................................................................................................... 12
CEO Director ............................................................................................ 12
Certificate of Incorporation ....................................................................... 3
Chairperson ........................................................................................... 1223
Common Stock ........................................................................................... 3
Competitor .................................................................................................. 3
Confidential Information .......................................................................... 30
Confirmation Order .................................................................................... 1
Convertible Securities ................................................................................ 3
Corporate Entity ......................................................................................... 3
Corporation ................................................................................................. 1
Corporation Securities ............................................................................... 3
Data Site ................................................................................................ 2930
Director ....................................................................................................... 1
Drag-Along Buyer ................................................................................... 167
Drag-Along Notice .................................................................................. 167
Drag-Along Rights ................................................................................... 16
Drag-Along Sellers .................................................................................. 16
Dragged Holders ...................................................................................... 16
Excess ROFO Portion .............................................................................. 24
Exchange Act .............................................................................................. 3
Excluded Issuance .................................................................................. 278
Extra Participating Rights Holder .......................................................... 24
Final Offer Notice ................................................................................... 245
GAAP .......................................................................................................... 3
Governing Documents ................................................................................ 4
Governmental Approval ............................................................................. 4
Indebtedness ............................................................................................... 4
Independent Director .................................................................................. 4
Investment Company Act ........................................................................... 4
Issuance Notice ........................................................................................ 26
Joinder ......................................................................................................... 1
Law .............................................................................................................. 4
Management Incentive Plan ....................................................................... 5

National Securities Exchange.................................................................5
New ABL Credit Agreement..................................................................5
New Term Loan Credit Agreement........................................................5
Offer Notice......................................................................................234
Offer Purchase Notice........................................................................24
Offer Sale Price..................................................................................24
Offered Interests................................................................................24
Ownership Percentage..........................................................................5
Participating Rights Holders................................................................24
Person..................................................................................................5
Plan......................................................................................................1
Plan Effective Date..............................................................................5
Preemptive Shares..............................................................................26
Prohibited Transfer............................................................................23
Public Company Event..........................................................................5
Public Offering.....................................................................................5
Qualified IPO.......................................................................................5
Related Fund.....................................................................................56
Related Party......................................................................................15
Related Party Agreement....................................................................15
Representatives...................................................................................30
Rights Holder.......................................................................................6
ROFO Evaluation Period....................................................................24
ROFO Percentage..............................................................................24
Sale Transaction...................................................................................6
Sale Transaction Documents..............................................................17
Sanctions..............................................................................................6
SEC......................................................................................................6
Securities..............................................................................................6
Securities Act.......................................................................................6
Selling ROFO Holder......................................................................234
Share Sale..........................................................................................17
Significant Holder.................................................................................6
Specified Event...................................................................................67
Stockholder Representative................................................................18
Stockholders.........................................................................................1
Subsidiary............................................................................................7
Tag-Along Notice...............................................................................21
Tag-Along Offeree.............................................................................21
Tag-Along Per Share Consideration...................................................21
Tag-Along Pro Rata Portion.................................................................7
Tag-Along Sellers.................................................................................7
Tag-Along Transfer............................................................................21
Tagging Stockholder...........................................................................21
Termination Event..............................................................................36
Third Party............................................................................................7

Third Party ROFO Sale ............................................................................. 25
Trade Control Laws ................................................................................... 7
Transfer ....................................................................................................... 7
Transfer Period .......................................................................................... 8
Unexercised Tag-Along Portion ............................................................. 21
Vector .......................................................................................................... 8
Voting Power ............................................................................................. 8
Voting Shares ............................................................................................ 8

  Section 1.02.  *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof; *provided* that with respect to any agreement or contract listed on any Schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate Schedule. References to any Law include all rules and regulations promulgated thereunder. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent and no rule of strict construction shall be applied against any party hereto. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto to express their mutual intent and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement, nor shall any rule of strict construction be applied against any party hereto. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

ARTICLE 2

Governance

Section 2.01.    *Vacancies.*

(a)    Upon any vacancy on the Board arising as a result of the death, disability, retirement, resignation or removal of a Director designated by any of the Stockholders pursuant to Section 2.02, the first order of business at any meeting of the Board shall be to hold a vote with respect to the election of the replacement Director designated by such Stockholder or Stockholders, as applicable, in accordance with Section 2.02.

Section 2.02.    *Board of Directors.*

(a)    From and after the date hereof and subject to adjustment in accordance with Section 2.12(b), the Board shall consist of five (5) Directors, who initially are the Directors set forth on Schedule 2 hereto. At each meeting of Stockholders at which Directors are to be elected, and whenever the Stockholders act by written consent with respect to the election of Directors, each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of Stockholders at which an election of Directors is held or pursuant to any written consent of the Stockholders:

(i)    the Chief Executive Officer of the Corporation (the "**CEO**") is elected to the Board (the "**CEO Director**");

(ii)    one (1) Director designated by Brigade is elected to the Board, so long as Brigade has an Ownership Percentage equal to or in excess of fifteen percent (15%) as of both the Plan Effective Date and any applicable date of determination thereafter;

(iii)    one (1) Director designated by Vector is elected to the Board, so long as Vector has an Ownership Percentage equal to or in excess of fifteen percent (15%) as of both the Plan Effective Date and any applicable date of determination thereafter;

(iv)    one (1) Director designated, collectively, by Apollo/CION is elected to the Board, so long as Apollo/CION has an Ownership Percentage equal to or in excess of fifteen percent (15%) as of both the Plan Effective Date and any applicable date of determination thereafter; and

(v)    any remaining Director(s) are elected to the Board as designated by Stockholders holding a majority of the Voting Power; *provided*, *however*, that at least one (1) of such remaining Director(s) must be acceptable to Brigade, in its sole discretion, so long as Brigade has an Ownership Percentage equal to or in excess of twenty-five percent (25%) as of both the Plan Effective Date and any applicable date of determination thereafter.

(b)    If for any reason the CEO Director shall cease to serve as the CEO, then at the request of a majority of the other Directors, each of the Stockholders shall vote their respective

12

shares to convene a special meeting of Stockholders if necessary or to take any other action necessary to convene such a meeting or meetings or to act by written consent on the removal of the former CEO from the Board and/or the appointment of a new Director. Each of the Stockholders shall, furthermore, at any meeting of Stockholders or by written consent if requested: (i) if the CEO Director does not resign from the Board, vote to remove the former CEO from the Board; and (ii) vote to elect such Person's replacement as CEO as the new CEO Director.

(c)     In furtherance of the foregoing, the Corporation and the Board shall, subject to and consistent with the Board's fiduciary duties and applicable Law, take such actions as necessary to cause the foregoing Directors to be nominated and submitted to the Stockholders for election to the Board, or appointed to the Board by the remaining members of the Board, or removed from the Board as the case may be, in any annual or special meeting of the Stockholders or by any action by written consent to elect Directors in lieu thereof, or to remove them as the case may be.

(d)     The initial Chairperson of the Board (the "**Chairperson**") shall be the CEO Director as of the date hereof. Thereafter, the Chairperson shall be appointed from among the Directors by majority vote of the Board. If the individual serving as Chairperson shall cease to serve on the Board, his or her seat shall be filled by majority vote of the Board.

Section 2.03.     *Board Observer Rights*.

(a)     Each Significant Holder as of the date of notice of such meeting of the Board shall have the right to designate one (1) non-voting observer to the Board (each, a "**Board Observer**"), in each case, if a Specified Event has occurred and is continuing as of the date of notice of such meeting of the Board or has occurred and was continuing any time within three (3) months prior to the date of notice of such meeting of the Board.

(b)     Subject to the provisions of this Section 2.03, each Board Observer shall have the right to attend all meetings of the Board, and the Corporation shall give each Board Observer copies of all notices, minutes, consents and other materials that it provides to the Directors contemporaneously with providing such notices, minutes, consents and other materials to the Directors; *provided*, *however*, that each Board Observer's rights to receive such notices or materials or to attend such meetings shall be conditional upon such Board Observer entering into a customary confidentiality and restriction on usage agreement in form and substance reasonably satisfactory to the Board. Notwithstanding the foregoing, the Corporation reserves the right to withhold any information and to exclude any Board Observer from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Corporation and its counsel, serve to waive the work product doctrine or any other similarly protective privilege or doctrine, or result in disclosure of trade secrets or a conflict of interest, in each case, upon the affirmative vote of a majority of the members of the Board not affiliated with such Board Observer, acting in good faith.

(c)     For the avoidance of doubt, each Board Observer shall not be permitted to vote at any meeting of the Board or be counted for purposes of determining whether there is a sufficient quorum for the Board to conduct its business.

(d)     An applicable Board Observer shall cease to have any rights hereunder automatically when the Stockholder that designated such Board Observer stops being a Significant Holder or the conditions in Section 2.03(a) are not met. Each Board Observer may be removed at any time for any reason by the Significant Holder that designated such Board Observer.

(e)     The parties hereto hereby acknowledge and agree that each Board Observer shall not, by virtue of each Board Observer's status as such, owe any fiduciary or other duties to the Stockholders or otherwise have any directorial or other duties or liabilities to the Corporation or its Stockholders.

Section 2.04.     *Board Expenses*. Any Independent Director shall be entitled to be paid such reasonable fees to be determined by a majority vote of the Board in connection with such Independent Director's membership on the Board and, if approved by the Board, any committee of the Board. In addition, each Director and Board Observer shall be entitled to reimbursement of his or her reasonable and documented out-of-pocket expenses incurred by such Director or Board Observer in connection with his or her attendance at meetings of the Board or any committees thereof, and any such meetings of the board of directors of any Corporate Entity and any committee thereof.

Section 2.05.     *Board Meetings*. Regular meetings of the Board shall be held at such dates, times and places as the Board shall from time to time determine. From and after the date hereof, attendance by all Directors then in office shall constitute a quorum for any meeting of the Board. If a quorum is not present within ~~half~~ an hour of the time appointed for the Board meeting ~~or if a quorum ceases to be present during the course of the meeting~~, the Directors present ~~shall~~may adjourn the Board meeting to a specified place and time not less than two (2) Business Days or more than five (5) Business Days after the original date. Notice of any adjourned meeting shall be given to all Directors. At any such adjourned meeting, a majority of the total number of Directors ~~that the~~n ~~Corporation would have if there were no vacancies on the Board~~in office shall constitute a quorum. Special meetings of the Board may be called at any time by the Board or by Stockholders that beneficially own at least twenty-five percent (25%) of the Voting Power then outstanding by delivering, or causing the Corporation to deliver, the notice required by Section 2.06. Each special meeting shall be held at such date, time and place, as shall be fixed by the Director, Directors or Stockholders calling the meeting.

Section 2.06.     *Notice of Meeting; Agenda*. Each Director (by email or otherwise) shall be given notice of the time, date and place of and the agenda for each meeting of the Board or any committee thereof at least two (2) Business Days prior to such meeting, which required notice may be waived by any Director in writing (which may be by email) before or after the meeting, and shall be deemed to be waived by a Director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice). Where exigent circumstances are deemed by the Chairperson to exist, he or she may call a special meeting of the Board by notice given at least twenty-four (24) hours prior to the meeting. The agenda for any meeting of the Board or

committee thereof shall include any matter requested to be included therein by any Director in advance of circulation of such agenda or at the relevant meeting itself.

Section 2.07. *Other Governing Document Provisions.* Each Stockholder agrees to vote all of its Voting Shares or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the other Governing Documents (a) do not at any time conflict with any provision of this Agreement and (b) permit each Stockholder to exercise the express rights to which each such Stockholder is entitled under this Agreement.

Section 2.08. *Directors' and Officers' Insurance.* The Corporation will purchase and will use its reasonable best efforts to maintain director and officer liability insurance in such amounts and such limits as reasonably determined by the Board on behalf of any Person who is or was a member of the Board against any claims asserted against him or her or incurred by him or her in any capacity as such, whether or not the Corporation would have the power to indemnify him or her against that liability under any of the Governing Documents.

Section 2.09. *No Liability for Board Designees or Board Observers.* No Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of nominating or designating a Director or Board Observer for any act or omission by such Director or Board Observer in his or her capacity as a Director or Board Observer, as applicable.

Section 2.10. *Board Committees.* Composition of the committees of the Board shall be determined by the Board; *provided*, *however*, that if the purpose of such committee is to review and approve a Related Party Agreement involving one of the nominating or designating parties, such nominating or designating party's Director shall not be represented on such committee. The committees of the Board shall include an audit committee, a ~~nominations committee, a~~ compensation committee and an international trade compliance committee*: provided, however, that the Board may elect to have the audit committee act as, and have the mandate of, the international trade compliance committee*.

Section 2.11. *Related Party Transactions.* The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, enter, amend or renew an agreement, arrangement or transaction with (a) any Affiliate of the Corporation or (b) any Person that constitutes a Significant Holder or an Affiliate of such Person (each of the Persons described in clauses (a) and (b), a "**Related Party**"), excluding (i) any agreement, amendment or renewal relating to a compensation or benefits arrangement with a director, officer or other employee of the Corporation or any of its Subsidiaries entered into in the ordinary course of business or (ii) intercompany agreements among the Corporation and/or its Subsidiaries in the ordinary course of business (a "**Related Party Agreement**"), in each case, unless such Related Party Agreement is (x) on an arm's-length basis and approved by (y)(i) the holders of a majority of the Voting Power (excluding from such calculation any Corporation Securities held by the Related Party and any of its Affiliates and Related Funds) or (ii) all of the Directors that are not affiliated with, or designated by, the Related Party or any of its Affiliates or Related Funds and are otherwise disinterested with respect to such Related Party Agreement; *provided*, *however*, that any issuance of Corporation Securities in accordance with the terms of <u>Article 5</u> or Drag-Along Right exercise in accordance with the terms of <u>Article 3</u> shall not be deemed a Related Party Agreement.

Section 2.12.    *Actions Requiring Consent*.

(a)    Prior to the occurrence of a Termination Event, the Corporation shall not, and, as applicable, shall not permit any of its Subsidiaries to, take any of the following actions without prior approval of at least a majority of the total number of Directors then in office, and any such action taken without such majority shall be null and void *ab initio* (it being understood the following is not by way of limitation):

(i)    appoint the Chairperson;

(ii)    terminate or appoint the CEO or Chief Financial Officer of the Corporation;

(iii)    approve the annual budget of the Corporation for any fiscal year;

(iv)    authorize any Public Offering;

(v)    settle any legal dispute by the Corporation for consideration or value in excess of $25,5000,000;

(vi)    commence voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532;

(vii)    consummate any acquisition or disposition (whether of a sale of stock or assets, disposition of assets, merger or consolidation) of the Corporation or any of its Subsidiaries, in each case, in a transaction or series of related transactions involving total consideration in excess of $15,000,000 but less than $25,000,000 and outside the ordinary course of business, in each case, other than a Sale Transaction to any Third Party pursuant to Section 3.01; and

(viii)    terminate or appoint the independent auditors of the Corporation.

(b)    Prior to the occurrence of a Termination Event, the Corporation shall not, and, as applicable, shall not permit any of its Subsidiaries to, take any action in violation of applicable Law, including any of the following actions without prior approval of at least a Board Supermajority, and any such action taken without such Board Supermajority shall be null and void *ab initio*:

(i)    create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness in excess of $25,000,000 outside the ordinary course of business;

(ii)    consummate any acquisition or disposition (whether of a sale of stock or assets, disposition of assets, merger or consolidation) of the Corporation or any of its Subsidiaries, in each case, in a transaction or series of related transactions involving total consideration in excess of $25,000,000 and outside the ordinary course of business, in each case, other than a Sale Transaction to any Third Party pursuant to Section 3.01; and

16

(iii)     increase the size of the Board.

ARTICLE 3
DRAG-ALONG RIGHTS

Section 3.01.     *Drag-Along Rights*.

(a)     At any time prior to a Public Offering, if (i) one or more Stockholders that, directly or indirectly, own or hold, collectively with their Affiliates and Related Funds, a majority of the Voting Power (collectively, the "**Drag-Along Sellers**") determine to effect, approve or otherwise take any action that would cause the occurrence of a Sale Transaction to any Third Party or (ii) the Drag-Along Sellers determine to effect, approve or otherwise take any action that would cause the occurrence of a Sale Transaction, and, in the case of this clause (ii), the Board approves such Sale Transaction, then, in either case of (i) or (ii), the Drag-Along Sellers will have the right, but not the obligation (the "**Drag-Along Rights**"), to require the other Stockholders (the "**Dragged Holders**") to support such Sale Transaction by delivering, or requesting the Corporation to deliver (and the Corporation shall deliver) written notice thereof pursuant to Section 8.02 (a "**Drag-Along Notice**") to such other Stockholders. Such Drag-Along Notice shall contain a description of the material terms and conditions of the Sale Transaction, including the identity of the acquirer (the "**Drag-Along Buyer**").

(b)     Subject to Section 3.02, if a Drag-Along Notice is delivered by the Corporation or by or on behalf of the Drag-Along Sellers to the Dragged Holders, each of the Dragged Holders shall:

(i)     if such Sale Transaction requires Stockholder approval, with respect to all Corporation Securities (including all Voting Shares) beneficially owned by such Dragged Holder, (A) vote (in person, by proxy or by action by written consent, as applicable) all such Corporation Securities (including all Voting Shares) in favor of and to adopt such Sale Transaction and in opposition to any and all other proposals that would reasonably be expected to delay or impair the ability of the Corporation, any other Corporate Entity or the Drag-Along Sellers to consummate the Sale Transaction and (B) not raise any objection against such Sale Transaction or the process pursuant to which it was arranged;

(ii)     if such Sale Transaction is structured as an acquisition of Corporation Securities, including any Convertible Securities (a "**Share Sale**"), Transfer to the Drag-Along Buyer, at the closing of such Sale Transaction, all such Corporation Securities, including any Convertible Securities held by such Dragged Holder (or, as applicable, the same proportion of shares of Corporation Securities beneficially held by such Dragged Holder as is being sold by the Drag-Along Sellers) on the same terms and conditions as the Drag-Along Sellers (other than in the case of Convertible Securities, which shall be Transferred on the same terms and conditions as the shares of Corporation Securities issuable upon exercise thereof, subject to the deduction of any applicable exercise price from the purchase price therefor);

(iii)     if such Sale Transaction is structured as a Transfer of assets (including by or through the sale, issuance or other disposition of the outstanding capital stock or other

17

outstanding equity interests of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect Corporate Entity), approve any subsequent dissolution and liquidation of the Corporation or any of the other Corporate Entities in connection therewith and execute and/or deliver such applicable documents, instruments or agreements related thereto as the Corporation or the Drag-Along Sellers reasonably request; *provided*, *however*, that, in any liquidation, each Stockholder shall receive on account of its Corporation Securities, including any Convertible Securities, the distributions pursuant to the rights and preferences set forth in the Governing Documents as in effect immediately prior to such Sale Transaction;

(iv)     execute and deliver any purchase agreement, merger agreement, indemnity agreement, escrow agreement, support agreement, voting agreement, written consent, letter of transmittal or other agreements or documents governing or relating to such Sale Transaction that the Corporation or the Drag-Along Sellers may reasonably request (the "**Sale Transaction Documents**");

(v)     use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Holder to effectuate such Sale Transaction, including any required Governmental Approvals;

(vi)     affirmatively waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Sale Transaction;

(vii)     if the consideration to be paid in exchange for the Corporation Securities, including any Convertible Securities, pursuant to this <u>Article 3</u> includes any Securities and due receipt of such Securities by such Dragged Holder would require under applicable Law either (A) the registration or qualification of such Securities or of any Person as a broker or dealer or agent with respect to such Securities or (B) the provision to such Dragged Holder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act (each, an "**Accredited Investor**"), agree that the Corporation may cause to be paid to such Dragged Holder (in lieu of such securities) against surrender of such Dragged Holder's Corporation Securities, including any Convertible Securities, an amount in cash equal to the fair value (as determined in good faith by the Board) of such Securities that such Dragged Holder would otherwise have received as of the date of the issuance of such securities;

(viii)     if the Drag-Along Sellers, in connection with such Sale Transaction, appoint a stockholder representative (the "**Stockholder Representative**") with respect to matters affecting the Stockholders under any of the Sale Transaction Documents following consummation of such Sale Transaction, (A) consent to (1) the appointment of such Stockholder Representative, (2) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (3) the payment of such Dragged Holder's *pro rata* portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale Transaction and its related service as the

representative of the Stockholders and (B) not assert any claim or commence any suit against the Stockholder Representative or any other Stockholder with respect to any action or inaction taken or failed to be taken by the Stockholder Representative in connection with its service as the Stockholder Representative, absent fraud, gross negligence or willful misconduct; and

(ix)     take all other necessary or desirable actions reasonably requested by the Drag-Along Sellers and/or the Corporation in connection with the consummation of such Sale Transaction.

(c)     In the case of a Sale Transaction involving less than one hundred percent (100%) of the then issued and outstanding Corporation Securities, including any Convertible Securities, a percentage of the Corporation Securities, including any Convertible Securities, directly or indirectly owned or held by each Dragged Holder and each Drag-Along Seller shall be Transferred in such Sale Transaction, which percentage shall be derived by dividing (i) the total number of shares of Corporation Securities, including any Convertible Securities, directly or indirectly owned or held by the Drag-Along Sellers that are proposed to be included in such Sale Transaction by (ii) the total number of shares of Corporation Securities, including any Convertible Securities, directly or indirectly owned or held by the Drag-Along Sellers, in each case, on an as-converted to Common Stock basis (if applicable).

(d)     At the closing of any Sale Transaction that is structured as a Share Sale in which the Drag-Along Sellers have exercised their rights under this Article 3, each Dragged Holder shall deliver, against payment of the purchase price therefor in accordance with the terms of the Sale Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Drag-Along Buyer) representing such Dragged Holder's Corporation Securities, including any Convertible Securities, to be sold, duly endorsed for transfer or accompanied by duly endorsed stock powers, or if electronically represented the electronic equivalent thereof, and such other documents as are deemed reasonably necessary by the Drag-Along Sellers or the Corporation for the proper transfer of such Corporation Securities, including any Convertible Securities, on the books of the Corporation.

(e)     Subject to Section 3.01(a), the Drag-Along Sellers shall have the power and authority to cause the Corporation to enter into a Sale Transaction and to take any and all such further action in connection therewith as the Drag-Along Sellers may deem necessary or appropriate in order to consummate (or, if directed by the Drag-Along Sellers, abandon) any such Sale Transaction. Neither the Corporation nor any Drag-Along Sellers shall have any liability if any such Sale Transaction is not consummated for any reason. Subject to the provisions of this Article 3, the Drag-Along Sellers, in exercising their Drag-Along Rights, shall have complete discretion over the terms and conditions of any Sale Transaction effected thereby, including price, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows. Without limitation of the foregoing, the Drag-Along Sellers may, subject to Section 3.01(a), authorize and cause the Corporation or any now or hereafter created Corporate Entity to execute such Sale Transaction Documents or other agreements, documents, applications, authorizations, registration statements and instruments related thereto as they may deem necessary or appropriate in connection with

19

any Sale Transaction, and each third Person who is party to any such documents may rely on the authority vested in the Drag-Along Sellers under this Article 3 for all purposes.

(f)    Transfers of Corporation Securities, including any Convertible Securities, in a Sale Transaction by a Drag-Along Seller or a Dragged Holder pursuant to Section 3.01 shall not be subject to the Transfer restrictions set forth in the Governing Documents, including Section 7.03 hereof; *provided* that any such Transfer would not, if consummated, result in any violation of the Securities Act or any state Securities Laws or regulations, or any other applicable federal or state Laws or orders of any Governmental Authority having jurisdiction over the Corporation.

Section 3.02.    *Additional Conditions to Drag-Along Rights.* Notwithstanding anything contained in Section 3.01, the obligations of the Dragged Holders and the rights of the Drag-Along Sellers under Section 3.01 are subject to the following conditions:

(a)    if the Drag-Along Buyers in a Sale Transaction include one or more Significant Holders or an Affiliate or Related Fund thereof, such Sale Transaction must be approved by Stockholders that, directly or indirectly, own or hold, collectively with their Affiliates and Related Funds, a majority of the Voting Power (excluding from such calculation any Corporation Securities held by such Significant Holder or Affiliates or Related Funds thereof);

(b)    upon the consummation of such Sale Transaction, (i) all of the Stockholders participating therein will receive the same form and amount of consideration per share of Corporation Securities, including any Convertible Securities, as each other share of Corporation Securities, including any Convertible Securities, of the same class and series; *provided, however*, that in no event shall any consideration for any services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Drag-Along Sellers or any related Person in connection with such transaction, or any consideration for any additional agreements entered into in connection with such transaction, such as non-competition agreements, be included in such amount of per share consideration; (ii) if any Stockholders are given an option as to the form and amount of consideration to be received, all Stockholders participating therein will be given the same option; *provided*, *however*, that the foregoing conditions shall not be required to the extent that any Stockholder would receive cash in lieu of Securities pursuant to Section 3.01(b)(vii); and (iii) all of the Stockholders participating therein will be subject to substantially the same terms and conditions;

(c)    other than for its own fraud or knowing and willful breach, each Dragged Holder shall be obligated to pay only its *pro rata* share of expenses, including any indemnification or similar obligations, incurred in connection with a consummated Sale Transaction to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Corporation or another Person; and

(d)    the terms of such Sale Transaction: (i) may require each Stockholder to make such representations, warranties and covenants as are customary for transactions of the nature of the Sale Transaction; *provided* that no Stockholder shall be required to make any representations or warranties that are more extensive or burdensome than those made by the other Stockholders or enter into any agreements not also executed by the other Stockholders; *provided*, *further*, that no Stockholder (other than Stockholders that are also employees of the Corporation or any of its

Subsidiaries) shall be required to agree to any noncompetition or similar agreements or covenants; (ii) shall not require any Stockholder to make any representations or warranties relating to the other Stockholders (provided that the terms of such Sale Transaction may contemplate an escrow, set-off right, indemnity or similar arrangement for the purpose of indemnification with respect to claims for breaches of representations, warranties and covenants made by the Corporation or any of its Subsidiaries); (iii) shall provide that any liability of each Stockholder in respect of indemnifiable claims against the Corporation or any of its Subsidiaries shall be (A) several and neither joint nor joint and several among all Stockholders and (B) *pro rata* in proportion to, and capped at, the amount of consideration to be paid to such Stockholder in connection with the Sale Transaction (provided that the terms of such Sale Transaction may contemplate an escrow, set-off right, indemnity or similar arrangement for the purpose of indemnification with respect to claims for breaches of representations, warranties and covenants made by the Corporation or any of its Subsidiaries); and (iv) may provide that any liability of a Stockholder in respect of indemnifiable claims against such Stockholder with respect to such Stockholder's fraud or knowing and willful breach be uncapped.

ARTICLE 4

TAG-ALONG RIGHTS; RIGHT OF FIRST OFFER

Section 4.01.    *Tag-Along Rights*.

(a)    Subject to the other provisions of this <u>Section 4.01</u> (including <u>Section 4.01(j)</u>), if any Stockholder (together with any of its Affiliates and Related Funds) proposes to Transfer to a Third Party shares of Common Stock (excluding, for purposes of this calculation, any shares of Common Stock issued or issuable pursuant to a Management Incentive Plan) representing twenty-five percent (25%) or more of the then-outstanding shares of Common Stock (i) in a single transaction or series of related transactions or (ii) as part of the same disposition plan (including if acting in concert with other holders) (such holder or holders acting together, collectively, the "**Tag-Along Sellers**" and such transfer, the "**Tag-Along Transfer**"), then each other Stockholder shall have the right to exercise tag-along rights in accordance with the terms and conditions set forth herein (any such Stockholder, a "**Tag-Along Offeree**").

(b)    The Tag-Along Sellers shall promptly give notice to the Corporation, and the Corporation shall, to the extent reasonably practicable, promptly give or cause to give notice pursuant to <u>Section 8.02</u> (the "**Tag-Along Notice**") to each Tag-Along Offeree, at least ten (10) Business Days prior to the consummation of the proposed Tag-Along Transfer. The Tag-Along Notice shall set forth the number of shares of Common Stock proposed to be Transferred, the name of the proposed Transferees, the proposed purchase price for each share of Common Stock (the "**Tag-Along Per Share Consideration**"), and any other material terms and conditions of the Tag-Along Transfer, including an acknowledgment that any required prior approvals of the Tag-Along Transfer must be sought and obtained prior to the closing of the Tag-Along Transfer and the form of the proposed transfer agreement, if any.

(c)    Each Tag-Along Offeree shall have a period of ten (10) Business Days from the date of the Tag-Along Notice within which to elect to sell up to its Tag-Along Pro Rata Portion of shares of Common Stock for the same form and amount of consideration per share as the Tag-Along Per Share Consideration in connection with such Tag-Along Transfer. Any

Tag-Along Offeree may exercise such right by delivery of an irrevocable written notice to the Tag-Along Sellers and the Corporation specifying the number of shares of Common Stock such Tag-Along Offeree desires to include in the Tag-Along Transfer (any such Tag-Along Offeree exercising such rights, a "**Tagging Stockholder**") and wire transfer or other instructions for payment of any consideration for the shares of Common Stock. Unless the proposed Transferee agrees to purchase all of the shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and the Tagging Stockholders, then the total number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and Tagging Stockholders in such Tag-Along Transfer shall be reduced by recalculating the allocation on a *pro rata* basis set forth in this paragraph assuming such smaller number of shares of Common Stock is to be Transferred.

(d)     If (i) any Stockholder other than the Tag-Along Sellers declines to exercise its tag-along rights or (ii) any Tagging Stockholder elects to exercise its tag-along rights with respect to less than such Tagging Stockholder's Tag-Along Pro Rata Portion (the number of shares of Common Stock underlying any such unexercised Tag-Along Pro Rata Portion in (i) and (ii), an "**Unexercised Tag-Along Portion**"), the Tag-Along Sellers shall promptly notify those Tagging Stockholders who have exercised their tag-along rights with respect to their full Tag-Along Pro Rata Portion. Each such Tagging Stockholder and Tag-Along Seller shall then be entitled to Transfer an additional number of its shares of Common Stock equal in aggregate to the Unexercised Tag-Along Portion. The Unexercised Tag-Along Portion shall be allocated, if necessary, among each such Tagging Stockholder and Tag-Along Seller, by multiplying the Unexercised Tag-Along Portion by a fraction the numerator of which is the number of shares of Common Stock owned by such Tagging Stockholder (or Tag-Along Seller, as the case may be), and the denominator of which is the aggregate number of shares of Common Stock owned by the Tag-Along Sellers and all such Tagging Stockholders that exercise their tag-along rights with respect to the Unexercised Tag-Along Portion. The Tag-Along Sellers shall continue to offer and allocate any such Unexercised Tag-Along Portions in accordance with the procedure set forth in the preceding sentence, until the time at which one or more Stockholders have exercised their tag-along rights with respect to the entirety of such Unexercised Tag-Along Portions. If, after following such procedure, any Unexercised Tag-Along Portion remains outstanding and no Tagging Stockholder wishes to further exercise its tag-along rights in respect thereof, then the Tag-Along Seller shall be entitled to Transfer a further number of its shares of Common Stock equal to the Unexercised Tag-Along Portion.

(e)     Each Tagging Stockholder shall agree:

(i)     to make the same representations and warranties to the Transferees with respect to itself and related items as the Tag-Along Sellers make with respect to themselves and related items in connection with the Tag-Along Transfer;

(ii)     to the same covenants, indemnities and agreements with respect to itself and related items as agreed by the Tag-Along Sellers with respect to themselves and related items in connection with the Tag-Along Transfer; and

(iii)     to the same terms and conditions to the Transfer of shares of Common Stock as the Tag-Along Sellers agree (including bearing their proportionate share of any escrows, holdbacks or adjustments in purchase price);

*provided*, *however*, that with respect to the immediately preceding clauses (i), (ii) and (iii), all such representations, warranties, covenants, indemnities, agreements, terms and conditions must be customary for Transfers of such kind unless otherwise agreed to by Tagging Stockholders holding a majority of the Voting Power then held by all Tagging Stockholders. All such representations, warranties, covenants, indemnities, agreements, terms and conditions shall be made by each Tagging Stockholder and Tag-Along Seller severally and neither jointly nor jointly and severally.

(f)     If at the end of a 45-day period after delivery of such Tag-Along Notice (which 45-day period shall be extended if any of the transactions contemplated by the Tag-Along Notice are subject to required Governmental Approvals until the expiration of five (5) Business Days after all such Governmental Approvals have been received, but in no event later than one hundred twenty (120) days following receipt of the Tag-Along Notice by the Tag-Along Sellers), the Tag-Along Sellers have not completed the Transfer of all shares of Common Stock proposed to be sold by the Tag-Along Sellers and all Tagging Stockholders on substantially the same terms and conditions set forth in the Tag- Along Notice, then the Tag-Along Sellers shall (i) return to each Tagging Stockholder the instruments of transfer, limited power-of-attorney and all certificates and other applicable instruments representing the shares of Common Stock that such Tagging Stockholder delivered for Transfer pursuant to this Section 4.01 and any other documents in the possession of the Tag-Along Sellers executed by the Tagging Stockholders in connection with the proposed Tag-Along Transfer and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such shares of Common Stock shall continue in effect.

(g)     Promptly after the consummation of the Tag-Along Transfer, the Tag-Along Sellers shall (i) notify each Tagging Stockholder thereof, (ii) remit to each Tagging Stockholder the total consideration for the shares of Common Stock that such Tagging Stockholder Transferred pursuant thereto less such Tagging Stockholder's *pro rata* share of any escrows, holdbacks or adjustments in purchase price and any transaction expenses as determined in accordance with this Section 4.01, with the cash portion of the purchase price paid by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by such Tagging Stockholder and (iii) furnish such other evidence of the completion and the date of completion of such Transfer and the terms thereof as may be reasonably requested by such Tagging Stockholder. The Tag-Along Sellers shall promptly remit to each Tagging Stockholder any additional consideration payable upon the release of any escrows, holdbacks or adjustments in purchase price.

(h)     Upon the consummation of such Tag-Along Transfer, (i) all of the Tagging Stockholders participating therein will receive the same form and amount of consideration in respect of each share of Common Stock sold by them in such Tag-Along Transfer; *provided*, *however*, that in no event shall any consideration for any services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Tag-Along Sellers, as the case may be, or any related Person in connection with such transaction, or any

consideration for any additional agreements entered into in connection with such transaction, such as non-competition agreements, be included in the amount of consideration and (ii) if any Tagging Stockholders are given an option as to the form and amount of consideration to be received, all Tagging Stockholders participating therein will be given the same option.

(i)      If a Stockholder purports to sell any shares of Common Stock in contravention of this Section 4.01 (a "**Prohibited Transfer**"), each other Stockholder who desires to exercise tag-along rights in accordance with the terms and conditions set forth in this Section 4.01 may, in addition to such remedies as may be available by Law, in equity or hereunder, require the selling Stockholder to purchase from such Stockholder the type and number of shares of Common Stock that such Stockholder would have been entitled to sell in a Tag-Along Transfer had the Prohibited Transfer been effected in compliance with the terms of this Section 4.01. The sale will be made on the same terms, including, without limitation, as provided in Section 4.01(h), as applicable, and subject to the same conditions as would have applied had the selling Stockholder not made the Prohibited Transfer. Such sale (including, without limitation, the delivery of the purchase price) must be made within ninety (90) days after such Stockholder learns of the Prohibited Transfer. The selling Stockholder shall also reimburse each participating Stockholder for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the participating Stockholder's rights under this Section 4.01.

(j)      The provisions of this Section 4.01 shall not apply to (i) any Transfer pursuant to Article 3, or (ii) Transfers by Stockholders to their Affiliates and Related Funds.

Section 4.02.     *Right of First Offer*.

(a)      Except in a transaction pursuant to which Article 3, Section 4.01 or Section 7.03 applies, if at any time a Stockholder (the "**Selling ROFO Holder**") wishes to Transfer all or any portion of such Stockholder's Common Stock to any Third Party, such Selling ROFO Holder shall first offer such Common Stock that is proposed to be Transferred by sending written notice (the "**Offer Notice**") in substantially the form attached hereto as Exhibit B, to the Corporation for transmittal to each Rights Holder, which Offer Notice shall be an offer to sell and shall state the proposed terms of such Transfer, including (i) the number of shares of Common Stock such Selling ROFO Holder proposes to Transfer (the "**Offered Interests**"), (ii) the proposed amount and consideration (which consideration shall be exclusively cash) and terms and conditions of payment (the "**Offer Sale Price**"), (iii) the identity of the proposed Third Party purchaser and (iv) all other material terms and conditions of the proposed Transfer; *provided*, *however* that an Offer Notice may only be sent during the first ten (10) Business Days following the commencement of the most recent Transfer Period. No Stockholder shall, directly or indirectly, (x) Transfer any Common Stock except in a transaction pursuant to which Article 3, Section 4.01 or Section 7.03 applies  or (y) with the prior written consent of the Board.

(b)      Each Rights Holder shall have a period of ten (10) Business Days following the receipt of the Offer Notice (the "**ROFO Evaluation Period**") to accept the Selling ROFO Holder's offer by delivering written notice (the "**Offer Purchase Notice**") to the Corporation agreeing to purchase the Offered Interests on the terms set forth in the Offer Notice (including the same price and with the same amount of consideration), which Offer Purchase Notice shall

include: (i) such Rights Holder's election and agreement to purchase the number of Offered Interests up to such Rights Holder's *pro rata* portion of the Offered Interests based on the proportion of the number of shares of Common Stock held by such Rights Holder to the total number of shares of Common Stock held by all Rights Holders (each, a "**Base Participating Holder**" and such *pro rata* portion, the "**ROFO Percentage**"), (ii) if such Rights Holder has elected to purchase its entire ROFO Percentage of Offered Interests, then, in such Rights Holder's sole discretion, such Rights Holder's election and agreement to purchase up to its entire ROFO Percentage of the Offered Interests not subscribed for by other Rights Holders and (iii) if such Rights Holder has elected to purchase its entire ROFO Percentage of Offered Interests and its entire ROFO Percentage of the Offered Interests not subscribed for by other Rights Holders (each, an "**Extra Participating Rights Holder**", and together with the Base Participating Holders, the "**Participating Rights Holders**"), then, in such Rights Holder's sole discretion, such Rights Holder's election and agreement to purchase the number of remaining Offered Interests not purchased by other Rights Holders (the "**Excess ROFO Portion**"). During the ROFO Evaluation Period (but not after the end of such period), the offer to purchase by the Participating Rights Holders and the offer to sell by the Selling ROFO Holder shall, in each case, be revocable; *provided, however*, that if the Selling ROFO Holder revokes its offer to sell its Common Stock included in its Offer Notice, such Selling ROFO Holder shall not be entitled to deliver a subsequent Offer Notice pursuant to Section 4.02(a) for thirty (30) days following the end of such ROFO Evaluation Period. If more than one Extra Participating Rights Holder wishes to exercise its right to purchase all of the Excess ROFO Portion, each such Extra Participating Rights Holder shall only have the right to purchase Offered Interests with respect to such Excess ROFO Portion equal to the ratio of (i) the number of Offered Interests then held by such Extra Participating Rights Holder to (ii) the total number of Offered Interests then held by all Extra Participating Rights Holders wishing to so exercise.

(c)    During the ROFO Evaluation Period the Corporation shall not provide or discuss any Offer Purchase Notice with any Stockholder; *provided, however*, that the Corporation may discuss an Offer Purchase Notice with the Participating Rights Holder who delivered such Offer Purchase Notice. The Corporation shall notify (the "**Final Offer Notice**") the Selling ROFO Holder and each Participating Rights Holder within three (3) Business Days following the expiration of the ROFO Evaluation Period of the number of Offered Interests which such Participating Rights Holder has agreed to purchase pursuant to this Section 4.02. Subject to the parties agreeing to a mutually acceptable definitive transfer agreement in accordance with Section 4.02(e), the Participating Rights Holders and the Selling ROFO Holder shall consummate the transaction contemplated by the Offer Notice within three (3) Business Days after receipt of the Final Offer Notice. At such closing, the Selling ROFO Holder shall deliver to each Participating Rights Holder the Offered Interests, including certificates (if any) representing the Offered Interests. Each Participating Rights Holder shall, at the closing, deliver to the Selling ROFO Holder payment in full in immediately available funds for the Offered Interests purchased by it; it being agreed that no portion of the purchase price shall be subject to any escrow or holdback. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(d)    If no Offer Purchase Notice has been timely delivered under Section 4.02(b), if the Rights Holders have not agreed to purchase all of the Offered Interests pursuant to the terms and conditions in the Offer Notice, or if the Rights Holders have failed to purchase all of the

Offered Interests pursuant to the terms and conditions in this <u>Section 4.02</u>, then the Selling ROFO Holder shall be permitted to Transfer the remaining Offered Interests on the terms and conditions set forth in the Offer Notice for a purchase price in cash, net of commissions or similar expenses, that is no lower than the Offer Sale Price (a "**Third Party ROFO Sale**"); *provided*, *however*, that such Third Party ROFO Sale is consummated within sixty (60) days after the earlier to occur of (i) the waiver by all of the Rights Holders of their option to purchase the Offered Interests and (ii) the expiration of the ROFO Evaluation Period. If such Third Party ROFO Sale is not consummated within such sixty (60) day period for any reason, then the restrictions provided for in this <u>Section 4.02</u> shall again become effective, and no Transfer of Common Stock may be made thereafter by the Selling ROFO Holder without again offering the same to the Rights Holders in accordance with this <u>Section 4.02</u>.

(e)    At the closing contemplated by <u>Section 4.02(c)</u>, the Selling ROFO Holder shall provide representations, warranties, covenants and indemnities in its individual capacity in connection with such transaction, and such representations, warranties, covenants and indemnities shall be limited to customary fundamental representations and warranties of (i) its brokers and finders, (ii) title to its Offered Interests, free and clear of all liens, claims and encumbrances (other than those arising under applicable Securities Laws and this Agreement), (iii) its authority, power and right to enter into and consummate the transaction without violating any other material agreement or applicable Law, (iv) its power and right to enter into and consummate the transaction without the consent of a Governmental Authority or Person and (v) the absence of any required consents for it to enter into and consummate the transaction and the absence of any registration requirements in connection therewith. The Selling ROFO Holder's liability under the definitive transfer agreement with respect to such transaction will not exceed the total purchase price received by the Selling ROFO Holder in such transaction except for liability resulting from fraud or knowing and willful breach. In no event shall any Affiliate (other than any Affiliate of such Selling ROFO Holder which Affiliate itself is Transferring Common Stock in such transaction) of such Selling ROFO Holder be liable under such transaction, in any respect.

(f)    Upon the delivery of any Offer Notice, if requested by any Director, the Corporation shall inform such Director if the Corporation believes such Director possesses material non-public information regarding the Corporation.

ARTICLE 5

PREEMPTIVE RIGHTS

Section 5.01.    *Preemptive Rights*.

(a)    On the terms and subject to the conditions of this <u>Article 5</u> and applicable Law, if the Corporation or any other Corporate Entity proposes to offer, sell or issue any Corporation Securities, in each case, except for any Excluded Issuance (as defined below) (collectively, the "**Preemptive Shares**"), then the Corporation shall, or shall cause such Corporate Entity to, give each Rights Holder, pursuant to <u>Section 8.02</u>, written notice of such proposed issuance at least ten (10) Business Days prior to the proposed issuance date (an "**Issuance Notice**"). The Issuance Notice shall specify the number of Preemptive Shares and the price (or a good faith estimate or range of estimates of the price if the final price is not then determinable) at which such

Preemptive Shares are proposed to be issued and the other material terms and conditions of such Preemptive Shares and of the issuance, including the proposed issuance date. Each Rights Holder shall be entitled to purchase, at the price and on the other terms and conditions specified in the Issuance Notice, up to a number of Preemptive Shares equal to its *pro rata* portion which shall be calculated as (i) the number of Preemptive Shares proposed to be issued by the Corporation multiplied by (ii) the Ownership Percentage of such Rights Holder as of immediately prior to the proposed issuance; *provided* that if a range is provided in the Issuance Notice then each Rights Holder shall be entitled to condition such participation upon the final price being within such specified price range. A Rights Holder may, in its sole discretion, allocate its right to purchase its portion of the Preemptive Shares among its Affiliates and Related Funds, including any funds managed by such Rights Holder or its Affiliates.

(b)     A Rights Holder may exercise its right to purchase its *pro rata* portion of the Preemptive Shares by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Issuance Notice to the Corporation within five (5) Business Days after receipt of the Issuance Notice. If, at the end of such five (5) Business Day period, any Rights Holder has not exercised its right to purchase any of its *pro rata* portion of such Preemptive Shares by delivering such notice, such Rights Holder shall be deemed to have waived all of its rights under this Article 5 with respect to the purchase of such Preemptive Shares specified in the applicable Issuance Notice.

(c)     If any of the Rights Holders fails to exercise its right to purchase its *pro rata* portion of the Preemptive Shares, or elects to exercise such rights with respect to less than such Rights Holder's *pro rata* portion of the Preemptive Shares, the Corporation shall offer to sell to the Rights Holders that have elected to purchase all of their *pro rata* portion of the Preemptive Shares any Preemptive Shares not purchased by other Rights Holders *pro rata* and at the same price and on the same terms as those specified in the Issuance Notice. Such Rights Holders shall have the right to acquire all or any portion of such additional Preemptive Shares within five (5) Business Days following the Corporation's notice of such additional Preemptive Shares.

(d)     Subject to compliance with this Article 5, the Corporation shall have ninety (90) days after the date of the Issuance Notice to consummate the proposed issuance of any or all of such Preemptive Shares that the applicable Rights Holders have elected not to purchase at the same (or higher) price and upon such other terms and conditions that, taken as a whole, are not materially less favorable to the Corporation than those specified in the Issuance Notice; *provided* that, if such issuance is subject to Governmental Approvals, such 90-day period shall be extended until the expiration of five (5) Business Days after all such Governmental Approvals have been received, but in no event to later than one hundred eighty (180) days after the date of the Issuance Notice. If the Board proposes to issue any Preemptive Shares after such 90-day period (or 180-day period, if applicable) or during such 90-day period (or 180-day period, if applicable) at a lower price or on such other terms that are, taken as a whole, materially less favorable to the Corporation, it shall again comply with the procedures set forth in this Article 5.

(e)     The closing of any issuance of Preemptive Shares to the Rights Holders pursuant to this Article 5 shall take place at the time and in the manner provided in the Issuance Notice; *provided*, *however*, that any required Governmental Approvals have first been obtained.

(f)        Notwithstanding anything to the contrary set forth herein, a Rights Holder shall not be entitled to purchase Preemptive Shares unless (i) such Rights Holder is an Accredited Investor and (ii) an exemption from registration or qualification under any state Securities Laws or foreign Securities Laws applicable to the issuance of the Preemptive Shares would be available.

(g)        Notwithstanding anything to the contrary contained herein, but subject to compliance with Section 2.11, if the Board, acting in good faith, determines, whose determination shall be conclusive, that it would be in the best interests of the Corporation to issue Preemptive Shares that would otherwise be required to be offered in compliance with the provisions of this Article 5, the Corporation may, in order to expedite the issuance of the Preemptive Shares, issue all of the Preemptive Shares to one or more prospective buyers (the "**Accelerated Acquirer**"), without complying with the provisions of this Article 5, *provided* that within ten (10) Business Days after the occurrence of such issuance, the Corporation shall provide to each Rights Holder: (i) written notice of such issuance and (ii) the right to purchase such Rights Holder's *pro rata* portion of the Preemptive Shares that such Rights Holder would have been entitled to purchase, pursuant to the procedures set forth in this Article 5, had this Section 5.01(g) not been invoked. If one or more Rights Holders exercises its right to make a purchase under this Section 5.01(g), the Corporation shall give effect to each such exercise by (x) requiring that the Accelerated Acquirer (in which case the Accelerated Acquirer hereby agrees to) Transfer a portion of its Preemptive Shares to such Rights Holders, (y) issuing additional Preemptive Shares to such Rights Holders or (z) a combination of (x) and (y), so long as such action effectively provides such Rights Holders with the same amount of Preemptive Shares and resulting Ownership Percentage, on the same terms and conditions as such Preemptive Shares were issued to the Accelerated Acquirer, that such Rights Holders would have been entitled to purchase, pursuant to the procedures set forth in this Article 5, had this Section 5.01(g) not been invoked.

Section 5.02.    *Excluded Issuances.* The preemptive rights under this Article 5 shall not apply to the following (each of the following, an "**Excluded Issuance**"):

(a)        (i) issuances or sales of any Corporation Securities to employees, officers, directors, managers or consultants of the Corporation or any other Corporate Entity pursuant to a Management Incentive Plan and (ii) any other employee benefits or similar employee or management equity incentive plans or arrangements of the Corporation or any other Corporate Entity, including offer letters, employment agreements, consulting agreements or appointment letters that in the case of this clause (ii) have been approved in accordance with Article 2 hereof;

(b)        issuances or sales in, or in connection with, a bona fide joint venture, merger or reorganization of the Corporation or any other Corporate Entity with or into another Person or a bona fide acquisition by the Corporation or any other Corporate Entity of another Person or substantially all of the assets of another Person or a strategic partnership or other similar relationship;

(c)        issuances in connection with an exchange of debt or debt Securities for previously existing Securities of the Corporation;

(d)      issuances pursuant to any syndication of debt, or any financing, refinancing, amendment or modification of debt (so long as not primarily directed toward existing Stockholders);

(e)      issuances pursuant to any private placement of warrants to purchase any form of equity interests in the Corporation on an arm's-length basis to non-Affiliated third party lenders (other than Stockholders) as part of a debt financing to the Corporation;

(f)      issuances by the Corporation or a direct or indirect wholly-owned Subsidiary of the Corporation to another direct or indirect wholly-owned Subsidiary of the Corporation;

(g)      issuances as a dividend or upon any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities, or other similar transaction (in each case, on a *pro rata* basis);

(h)      issuances or sales of any Corporation Securities or other equity Security of any of the Corporation's Subsidiaries in a Qualified IPO and pursuant to any Public Offering following a Qualified IPO;

(i)      issuances upon the conversion or exercise of any Corporation Securities which Corporation Securities were (i) outstanding on the date hereof or (ii) issued in compliance with the terms and conditions of this Article 5; or

(j)      the issuances of the shares of Common Stock to the Stockholders contemplated by the Plan on the Plan Effective Date.

ARTICLE 6
INFORMATION RIGHTS; DELIVERY OF INFORMATION

Section 6.01.    *Information Rights*.

(a)      *Financial Statements and Periodic Reports*. At all times when the Corporation is not required to file reports under Section 13 or Section 15(d) of the Exchange Act or under the listing rules of any National Securities Exchange, then, subject to Section 7.01, the Corporation shall provide the following information:

(i)      to each Stockholder that is ~~not~~neither a Competitor nor a holder solely of shares of Corporation Securities issued or issuable pursuant to a Management Incentive Plan, commencing with the fiscal year ending December 31, 2022, as soon as available, and in any event within [one hundred five (105)] days after the end of each fiscal year, a copy of the audited consolidated financial statements (including a balance sheet, statement of income and statement of cash flows, together with the loans thereto) of the Corporation as of the end of such year, setting forth, in each case, in comparative form the figures for the previous fiscal year, all in reasonable detail and accompanied by the opinion of a recognized independent certified public accounting firm with respect to such financial statements;

(ii)    to each Stockholder that is notneither a Competitor nor a holder solely of shares of Corporation Securities issued or issuable pursuant to a Management Incentive Plan, commencing with the fiscal quarter ending on [September 30, 2022], as soon as available, and in any event within [forty-five (45)] days after the end of each of the subsequent first three fiscal quarters of each fiscal year, a copy of the unaudited consolidated financial statements (including a balance sheet, statement of income and statement of cash flows, together with the loans thereto) of the Corporation as of the end of each such quarter, all certified by an appropriate officer of the Corporation; and

(iii)    to each Significant Holder that is notneither a Competitor nor a holder solely of shares of Corporation Securities issued or issuable pursuant to a Management Incentive Plan, as soon as available, but, in any event, within [one hundred five (105)] days after the end of each fiscal year of the Corporation, a budget and business plan for the next fiscal year, approved by the Board, which shall include consolidated statements of income (including an EBITDA target), stockholders' equity and cash flows of the Corporation and its Subsidiaries for the next twelve months.

Notwithstanding anything to the contrary in this Section 6.01, any Stockholder may elect not to receive the information described in this Section 6.01 by written notice to the Corporation at any time, and such election shall remain in effect until such Stockholder elects to again receive the information described in this Section 6.01.

(b)    *Other Information*. With reasonable promptness upon the reasonable request therefor, the Corporation shall provide any Significant Holder, such other information or documents regarding the operations, business affairs and the financial condition of the Corporation or any other Corporate Entity as any such Significant Holder may reasonably request in writing from time to time in good faith.

Section 6.02.    *Delivery of Information; Confidentiality*.

(a)    Documents and information required to be delivered pursuant to Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on Intralinks or another similar password-protected data site (the "**Data Site**") to which each Stockholder shall have access; *provided*, *however*, for the avoidance of doubt, no Competitor shall be given access to the Data Site. As a condition to gaining access to the information posted on the Data Site, Persons shall be required to "click through" or take other affirmative action pursuant to which such Persons shall either (i) confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement or (ii) acknowledge its confidentiality obligations in respect of such information and agree to abide by the terms of this Agreement related to Confidential Information (as defined below).

(b)    Each Stockholder shall at all times, except as otherwise required by applicable Law, keep confidential all information provided under this Article 6 pursuant to the confidentiality provisions contained in Section 7.01 and all such information shall be deemed to be Confidential Information.

30

ARTICLE 7

CERTAIN COVENANTS AND AGREEMENTS

Section 7.01.    *Confidentiality*.

(a)    Each Stockholder acknowledges and agrees that without the prior written consent of the Corporation:

(i)    any information (A) provided to any Stockholder by the Corporation pursuant to this Agreement, including, pursuant to an employee serving as a Director or as a Board Observer or any information rights under Article 6, (B) disclosed by the Corporation pursuant to Article 6 and (C) regarding each of the Corporation and the other Corporate Entities, including their business, affairs, financial information, operating practices and methods, customers, suppliers, expansion plans, strategic plans, marketing plans, contracts and other business documents obtained by a Stockholder from or on behalf of the Corporation or the other Corporate Entities (collectively, "**Confidential Information**") will be kept confidential, and will not be disclosed to any Person, except that Confidential Information may be disclosed:

(1)    to such Stockholder's members, shareholders, managers, directors, officers, employees, representatives, Affiliates, advisors and agents (collectively, "**Representatives**") in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder, so long as such Person is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(2)    to any limited partner or other investor in such Stockholder, its Affiliates or Related Funds, so long as such Person is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(3)    to the extent required by applicable Law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Stockholder is subject; *provided* that such Stockholder agrees to give the Corporation prompt notice of such request(s), to the extent practicable, so that the Corporation may seek an appropriate protective order or similar relief (and the Stockholder shall use its reasonable best efforts, at the Corporation's expense, to cooperate with such efforts by the Corporation));

(4)    to any Person to whom such Stockholder is contemplating a Transfer of Corporation Securities; *provided, however*, that such Transfer would not be in violation of the provisions of this Agreement and such potential Transferee is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

31

(5)   to any regulatory authority or rating agency to which the Stockholder or any of its Affiliates is subject or with which it has regular dealings; *provided* that such authority or agency is advised of the confidential nature of such information;

(6)   to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Corporation, its Affiliates or its Representatives have provided to such Stockholder relating to such tax treatment and tax structure); *provided* that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or Representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information; or

(7)   if the prior written consent of the Board shall have been obtained.

(b)   Notwithstanding Section 7.01(a), "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Stockholders in violation of this Section 7.01; (ii) was available to the Stockholder on a non-confidential basis prior to its disclosure by the Corporation or its Representatives; (iii) becomes available to the Stockholder on a non-confidential basis from a Person other than the Corporation and the Corporate Entities or their respective Representatives who is not known by the Stockholder to have violated a confidentiality agreement with the Corporation or the other Corporate Entities or any of their respective Representatives in respect of such information; or (iv) was independently developed by the Stockholder without reference to or use of such information;

(c)   A Stockholder shall not be required to receive Confidential Information and may decline to receive information provided pursuant to Article 6 that constitutes Confidential Information.

Section 7.02.   *Irrevocable Proxy and Power of Attorney.* Each Stockholder hereby constitutes and appoints as the proxies of such Stockholder and hereby grants a power of attorney to the Board and any designee of the Board (who may be a Director or an officer of the Corporation), and hereby grants each of them with full power of substitution, not generally but only with respect to the election or removal of Persons as members of the Board in accordance with Article 2 and all matters relating to any Drag-Along Rights pursuant to Article 3 and tag-along rights and rights of first offer pursuant to Article 4, and hereby authorizes each of them to represent and vote, if and only if the Stockholder (a) fails to vote or (b) attempts to vote (whether by proxy, in person or by written consent) in a manner that is inconsistent with the terms of this Agreement, all of such Stockholder's Voting Shares in accordance with the terms and provisions of this Agreement. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Corporation and the Stockholders in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 8.04. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Voting Shares and shall

not hereafter, unless and until this Agreement terminates or expires pursuant to Section 8.04, purport to grant any other proxy or power of attorney with respect to any of the Voting Shares, deposit any of its Voting Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any other Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Voting Shares, in each case, with respect to any of the matters set forth herein. Notwithstanding the foregoing, the provisions of this Section 7.02 shall not prevent a Stockholder from Transferring its Capital Stock so long as such Transfer complies with the provisions of the Governing Documents, including Section 7.03.

Section 7.03.    *Transfer Restrictions; Permitted Transferees.*

(a)    Other than in compliance with any exercise of Drag-Along Rights pursuant to Article 3, in addition to any other transfer restriction set forth in the Governing Documents, each Stockholder agrees that it shall not Transfer any of its Corporation Securities at any time if such Transfer: (i) is to a Person who has not become a party to this Agreement by executing and delivering a Joinder (subject to Section 7.03(c)); (ii) is to a Competitor; (iii) ~~would~~is determined by the Board to not comply with U.S. federal or state Securities Laws or other applicable Securities Law; (iv) would, individually or together with other concurrently proposed Transfers, impose liability or reporting obligations on the Corporation under the Exchange Act or would otherwise require the Corporation or any Stockholder to make any filing with the SEC; (v) would, individually or together with other concurrently proposed Transfers, cause the Corporation to be regarded as an "investment company" under the Investment Company Act; or (vi) if applicable, would not be compliant with Article 4; *provided*, *however*, that with respect to the immediately preceding clauses (i), (ii), ~~(iii), (~~iv), (v) and (vi), an otherwise prohibited Transfer shall be permitted if a majority of the disinterested members of the Board approve such Transfer ~~or if such Transfer is made in compliance with Article 3 hereof~~. Any Transfer or attempted Transfer in violation of the provisions of this Section 7.03(a) shall be null and void *ab initio* and the Corporation (x) shall not register or effect such Transfer, (y) may institute legal proceedings to force rescission of such Transfer and (z) may seek any other remedy available to it at Law, in equity or otherwise, including an injunction prohibiting such Transfer.

(b)    Prior to effectuating any Transfer of Corporation Securities, other than in compliance with any exercise of Drag-Along Rights, the Stockholder proposing to make such Transfer shall deliver to the Corporation:

(i)    the transfer certificate a form of which is attached hereto as Exhibit C;

(ii)    such information as the Corporation may reasonably request in order for the Corporation to determine in good faith that the proposed Transfer will be made in compliance with Section 7.03(a) (including information used to determine whether any Person to whom the proposed Transfer is to be made is an Accredited Investor and not a Competitor); and

(iii)    such information as the Corporation's transfer agent may reasonably request.

(c)     Unless otherwise approved by the Board, no issuance of Capital Stock to any Person by the Corporation shall be effective unless such Person has delivered to the Corporation a Joinder, pursuant to which such Person agrees to be bound by the terms and conditions of this Agreement as if an original party hereto. Any issuance or attempted issuance in violation of this Section 7.03(c) shall be null and void *ab initio* and the Corporation (i) shall not register or effect such issuance, (ii) may institute legal proceedings to force rescission of such issuance and (iii) may seek any other remedy available to it at Law, in equity or otherwise, including an injunction prohibiting such issuance.

(d)     Notwithstanding anything contained herein to the contrary, each Stockholder may Transfer its Corporation Securities to any of its Affiliates without restriction so long as such Transferee agrees to become a party to this Agreement by executing and delivering a Joinder (subject to Section 7.03(c)).

(e)     Legends. All certificates (if any) or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock shall conspicuously bear the applicable legends set forth below, with such changes as the Board, in its discretion, deems to be necessary and appropriate, and any other legends required by the Governing Documents. Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the Governing Documents and this Agreement (including the restrictions on Transfer set forth in this Section 7.03), whether or not any certificate or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock owned or held by such Stockholder bear the legends set forth below and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

(i)     Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued under the Plan in reliance on the Securities Act exemption provided by Section 1145 of the Bankruptcy Code shall include a legend substantially to the following effect:

"THE SECURITIES ARE SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF CARESTREAM HEALTH HOLDINGS, INC. (THE "COMPANY"), DATED AS OF [  ], 2022, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(ii)     Each certificate, if any, or book-entry accounts and related statements representing or otherwise evidencing shares of Common Stock issued in reliance on the Securities Act exemption provided by Section 4(a)(2) of the Securities Act shall include a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][STATEMENT] WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE] AND THE OFFER AND SALE OF THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND APPLICABLE STATE SECURITIES LAWS. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT OF CARESTREAM HEALTH HOLDINGS, INC. (THE "COMPANY"), DATED AS OF [ ], 2022, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS' AGREEMENT, AND ALL HOLDERS OF SECURITIES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS' AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Section 7.04.    *Compliance with Law; Policies and Procedures*. The Corporation has implemented and maintains policies and procedures designed to ensure compliance by, and shall maintain and comply with such policies and procedures necessary in order to cause compliance by, the Corporation and its Subsidiaries and their respective Representatives, distributors, suppliers and any other Person acting for or on behalf of the Corporation or its Subsidiaries with Anti-Corruption Laws, Anti-Money Laundering Laws, Trade Control Laws and Sanctions.

## ARTICLE 8
### Miscellaneous

Section 8.01.    *Binding Effect; Assignability; No Third Party Beneficiaries*.

(a)    This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, successors, legal representatives and permitted assigns. Any Stockholder that ceases to beneficially own any Capital Stock shall cease to be bound by the terms hereof other than such provisions which also survive the termination of this Agreement pursuant to Section 8.04(b).

(b)    Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party hereto pursuant to any Transfer of Capital Stock or otherwise, except that (i) any Person acquiring Capital Stock from any Stockholder in a Transfer in compliance with the transfer restrictions set forth in the Governing Documents (but excluding any such Transfer made in a Public Offering or through a National Securities Exchange) and (ii) any Person, other than the Corporation or any other Corporate Entity, acquiring Capital Stock that is required or permitted by the terms of this Agreement or any employment agreement or stock purchase, option, stock option or other compensation plan of the Corporation or any other Corporate Entity to become a party hereto shall (unless already

35

bound hereby) execute and deliver to the Corporation a Joinder and shall thenceforth be a "Stockholder" for all purposes under this Agreement.

(c)     Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.02.   *Notices.*   All notices, consents, approvals, waivers or other communications required or permitted to be given hereunder shall be in writing and shall be: (a) delivered personally or by commercial messenger; (b) sent via a recognized overnight courier service; (c) sent by registered or certified mail, postage pre-paid and return receipt requested; (d) sent by electronic mail transmission; or (e) with respect to notices [required by Article 3, Article 4, Article 5, or Section 8.03],[1] posted to the Data Site; in the case of each of clauses (a), (b), (c) and (d), so long as such notice is addressed to the intended recipient thereof as set forth below; any notice shall be deemed given upon actual receipt (or refusal of receipt):

(i)     if to the Corporation:

Carestream Health, Inc.
150 Verona Street
Rochester, New York 14608
Attention: Julie Lewis, General Counsel
E-mail address: Julie.Lewis@carestream.com

(ii)     if to any Stockholder, at the address as set forth on such Stockholder's signature page hereto or on file with the Corporation.

Any Stockholder may change its address and other notice information by notice to the Corporation given in accordance with this Section 8.02 and any other party may change its address and other notice information by notice to the other parties.

Section 8.03.   *Waiver; Amendment.*

(a)     Except as provided in the next sentence, no provision of this Agreement may be amended, modified, restated or waived in any manner unless approved by (i) Stockholders holding a majority of the Voting Power and (ii) at least three (3) Stockholders that are not Affiliates or Related Funds of each other; *provided, however,* that any amendment, modification, restatement or waiver that has, or would have, a material and adverse effect on the rights, preferences or privileges of any Stockholder in a manner that is materially disproportionate to the manner in which the rights, preferences or privileges of other Stockholders are affected (for the avoidance of doubt, without giving effect to any Stockholder's specific holdings of Corporation Securities, specific tax or economic position or any other matters personal to a Stockholder), shall not be effective as to such Stockholder without such Stockholder's prior written consent. Upon any modification, amendment or restatement of this Agreement, the Corporation shall

---

[1]  **NTD: Notices permitted to be issued via Data Site to be confirmed.**

deliver to each of the Stockholders, in accordance with <u>Section 6.02</u>, a copy of such modification, amendment or restatement of this Agreement.

(b)     Notwithstanding <u>Section 8.03(a)</u>, the addition of new parties to this Agreement in accordance with the terms hereof as a result of Transfers permitted in accordance with this Agreement shall not be deemed to be an amendment requiring the consent of any Stockholder.

(c)     Notwithstanding any provisions to the contrary contained herein, any party may waive any rights with respect to which such party is entitled to benefits under this Agreement; *provided* that such a waiver shall only affect the rights of the party waiving its rights.

(d)     Unless expressly specified in the terms of this Agreement, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission or waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

(e)     Any amendment or waiver effected in accordance with this <u>Section 8.03</u> shall be binding upon each party to the Agreement, regardless of whether such party has signed such amendment or waiver, and each then current and future Stockholder and the Corporation.

Section 8.04.     *Effectiveness; Termination; Survival.*

(a)     This Agreement shall be effective as of the date hereof and shall continue in effect until the earlier of (i) the closing of a Sale Transaction, (ii) a Public Company Event and (iii) the mutual written agreement of (A) the Corporation, (B) Stockholders holding at least two-thirds (2/3) of the then outstanding Voting Power and (C) at least three (3) Stockholders that are not Affiliates or Related Funds of each other (each of clauses (i)-(iii), a "**Termination Event**").

(b)     Upon the occurrence of a Termination Event, this Agreement shall be terminated and become void and of no force or effect without liability of any party; *provided*, *however*, no termination under this Agreement shall relieve any Person of liability for breach prior to termination. The provisions of <u>Section 2.09</u> and this <u>Article 8</u> shall survive any termination of this Agreement.

Section 8.05.     *Governing Law.* This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware without regard to the conflicts of laws rules of such state.

Section 8.06.     *Jurisdiction; Service of Process.* The parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Court of Chancery of the State of Delaware, or to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware, or to the extent

such court also does not have subject matter jurisdiction, another court of the State of Delaware, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that notice to such party as provided in <u>Section 8.02</u> shall be deemed effective service of process on such party.

Section 8.07.    *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08.    *Specific Performance.* The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that, in addition to any other applicable remedies at Law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at Law or (b) an award of specific performance is not an appropriate remedy for any reason at Law or in equity. Each of the parties hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at Law would be adequate and (y) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.09.    *Counterparts.* This Agreement may be executed with counterparty signature pages or in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by electronic mail in "portable document format" (".pdf") form or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 8.10.    *Entire Agreement.* This Agreement and the other Governing Documents constitute the entire agreement among the parties and supersede all prior and contemporaneous agreements and understandings, both oral and written, among the parties with respect to the subject matter hereof and thereof.

Section 8.11.   *Severability.* If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.12.   *Further Assurances.* Each party shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.13.   *Aggregation of Shares.* All Corporation Securities held by a Stockholder and its Affiliates and Related Funds shall be aggregated together for purposes of determining the availability of any rights hereunder. Notwithstanding the foregoing, in no event shall two or more Stockholders, acting separately and not on an aggregated basis, be entitled to claim beneficial ownership of the same Corporation Securities for purposes of exercising any rights hereunder, and the Corporation shall be permitted to disregard any such claims in its good faith judgment. Upon the request of the Corporation or any transfer agent for the Corporation Securities, each Stockholder shall promptly provide to the Corporation or its transfer agent, as applicable, written confirmation (including reasonable supporting documentation) of such Stockholder's then current ownership of its Corporation Securities. In determining the ownership of such Corporation Securities for any purposes hereunder, the Corporation shall be entitled to conclusively rely in good faith on (a) the then most current ownership information provided to it by the transfer agent or (b) if there is no such transfer agent, the most current ownership information then in its possession, and, in each case, any such determination made by the Corporation in reliance thereon shall be deemed final and binding on all parties.

Section 8.14.   *Calculation of Ownership.* For purposes of calculating the number of shares of Common Stock or other Corporation Securities held by a Person or group of Persons, the effects of any stock split, reclassification, recapitalization, exchange or readjustment of Corporation Securities or other similar transaction shall be disregarded to the extent occurring between the reference date and the date of measurement. For example, if a certain Stockholder is required to continue to hold 50% of the number of shares of Common Stock held by such Stockholder as of the date hereof in order to exercise certain rights hereunder, and a reverse stock split is consummated after the date hereof and prior to the applicable measurement date, the effects of the reverse stock split shall be disregarded in determining whether such Stockholder satisfies such ownership test.

Section 8.15.   *Independent Agreement by the Stockholders.* The obligations of each Stockholder hereunder are several and neither joint nor joint and several with the obligations of any other Stockholder, and, except as expressly set forth herein, no provision of this Agreement is intended to confer any obligations on any Stockholder vis-à-vis any other Stockholder. Nothing contained herein, and no action taken by any Stockholder pursuant hereto, shall be deemed to constitute the Stockholders as a partnership, an association, a joint venture or any

other kind of entity, or create a presumption that the Stockholders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Signature pages follow.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date above first above written.

<u>THE CORPORATION</u>:

CARESTREAM HEALTH HOLDINGS, INC.

By: _____
    Name:
    Title:

<u>STOCKHOLDER</u>:

_____

By: _
    Name:
    Title:


Notice information pursuant to <u>Section 8.02</u>:

Address: _

        _____

        _____

        _____

E-mail: _____
Fax No.: _____

<u>Schedule 1</u>

<u>List of Certain Equityholders</u>

1.  [Initial equityholders to be listed]

Schedule 2

Initial Directors[2]

1. David Westgate, the current CEO.

2. [Director 2]Bob Rasmus, appointed by Brigade.

3. [Director 3]Quentin Lilly, appointed by Vector.

4. [Director 4]Chris Yamamoto, appointed by Apollo/CION.

5. [Director 5]Bob Marshall.

---

[2] **NTD**: Initial Board members to be finalized.

<u>Exhibit A</u>
<u>Joinder Agreement</u>

## JOINDER TO STOCKHOLDERS' AGREEMENT

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with that certain Stockholders' Agreement dated as of [•], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among Carestream Health Holdings, Inc. (the "**Corporation**") and certain Stockholders party thereto from time to time. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Stockholders' Agreement as of the date hereof and shall have all of the rights and obligations of a Stockholder thereunder as if it had executed the Stockholders' Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Stockholders' Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: _____, _____

STOCKHOLDER:


By: _____
      Name:
      Title:


Notice information pursuant to Section 8.02:

Address:

      _____
      _____
      _____

E-mail: _____
Fax No.: _____

<u>Exhibit B</u>
<u>Form of Offer Notice</u>

**Offer Notice**
Re: Transfer of Common Stock
<u>in Carestream Health Holdings, Inc.</u>

Dated as of [_____]

To:   Carestream Health, Inc.
      150 Verona Street
      Rochester, New York 14608
      Attention: Julie Lewis, General Counsel
      E-mail address: Julie.Lewis@carestream.com

Reference is hereby made to that certain Stockholders' Agreement, dated as of [•], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among Carestream Health Holdings, Inc. (the "**Corporation**") and certain Stockholders party thereto from time to time. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

The undersigned Stockholder (the "**Transferor**") wishes to transfer its Common Stock and hereby gives this Offer Notice to the Rights Holders as required under <u>Section 4.02(a)</u> of the Stockholders' Agreement.

Pursuant to <u>Section 4.02(b)</u> of the Stockholders' Agreement, you have until the expiration of the ROFO Evaluation Period to deliver an Offer Purchase Notice to the Corporation: (i) agreeing to purchase the number of Offered Interests up to your entire ROFO Percentage of Offered Interests; (ii) if you have elected to purchase your entire ROFO Percentage of Offered Interests, agreeing to purchase up to your entire ROFO Percentage of the Offered Interests not subscribed for by other Rights Holders and (iii) if you have elected to purchase your entire ROFO Percentage of Offered Interests and your entire ROFO Percentage of the Offered Interests not subscribed for by other Rights Holders, agreeing to purchase the number of remaining Offered Interests not purchased by other Rights Holders, in each case, upon the terms set forth below.

(A)    <u>Offered Interests</u>: [  ] shares of Common Stock as recorded on the books of the Corporation as of the date hereof.

(B)    <u>Price and Form of Consideration</u>: [  ].

(C)    <u>Identity of Third Party Purchaser</u>: [  ].

If you elect to purchase the Offered Interests pursuant to the terms above, you and the Transferor shall enter into a definitive transfer agreement, which shall include the terms set forth in <u>Section 4.02(e)</u> of the Stockholders' Agreement. Notwithstanding anything to the contrary herein,

nothing in this Offer Notice shall be deemed to amend, modify or supersede <u>Section 4.02</u> of the Stockholders' Agreement, which shall continue in full force and effect.

Very truly yours,

[TRANSFEROR]:

By:_____
Name:
Title:

[*Signature Page to Offer Notice*]

<u>Exhibit C</u>
<u>Form of Transfer Certificate</u>

## FORM OF TRANSFER CERTIFICATE

Reference is made to that certain Stockholders' Agreement dated as of [•], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Stockholders' Agreement**"), by and among Carestream Health Holdings, Inc. (the "**Corporation**") and certain Stockholders party thereto from time to time. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

The undersigned hereby notifies the Corporation of its intent to assign and Transfer [•] shares of [TYPE OF CORPORATION SECURITY] to [TRANSFEREE], a [corporation] organized under the Laws of [•], whose Social Security Number or Tax ID Number is [•] and whose record address is [•], and hereby irrevocably appoints [•] the attorney of the undersigned, subject to confirmation by the Corporation, to assign, Transfer and convey such shares of [TYPE OF CORPORATION SECURITY] with full power of substitution in this matter.

The undersigned certifies that such Transfer shall be completed in accordance with the terms of the Stockholders' Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the date written below.

Date: _____, _____

[TRANSFEROR]:


_____
By: 
   Name:
   Title: