## Exhibit D

**New ABL Credit Agreement**

ABL CREDIT AGREEMENT

among

Carestream Health Holdings, Inc.,

as Holdings,

Carestream Health, Inc.,

as Borrower,

The Several Lenders from Time to Time Parties Hereto,

and

JPMorgan Chase Bank, N.A.

as Administrative Agent

Dated as of [  ], 2022

JPMorgan Chase Bank, N.A. and Barclays Bank PLC,

as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

Page

RECITALS ............................................................................................................ 1

SECTION 1.    DEFINITIONS ......................................................................... 1

    1.1  Defined Terms .................................................................................. 1
    1.2  Other Interpretive Provisions ......................................................... 54
    1.3  Accounting ...................................................................................... 55
    1.4  Divisions .......................................................................................... 55
    1.5  Interest Rates; Benchmark Notification ........................................ 55
    1.6  Limited Condition Transactions ..................................................... 56

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS ..................... 57

    2.1  [Reserved] ....................................................................................... 57
    2.2  [Reserved] ....................................................................................... 57
    2.3  [Reserved] ....................................................................................... 57
    2.4  Revolving Commitments ................................................................ 57
    2.5  Procedure for Revolving Loan Borrowing ..................................... 57
    2.6  Protective Advances ....................................................................... 58
    2.7  [Reserved] ....................................................................................... 59
    2.8  Commitment Fees, etc. ................................................................... 59
    2.9  Termination or Reduction of Revolving Commitments .................. 59
    2.10  Optional Prepayments ................................................................... 59
    2.11  Mandatory Prepayments and Commitment Reductions .................... 60
    2.12  Conversion and Continuation Options .......................................... 60
    2.13  Limitations on Term Benchmark ................................................... 61
    2.14  Interest Rates and Payment Dates ................................................ 61
    2.15  Computation of Interest and Fees ................................................. 62
    2.16  Inability to Determine Interest Rate; Illegality ............................ 62
    2.17  Pro Rata Treatment and Payments ............................................... 65
    2.18  Requirements of Law ..................................................................... 67
    2.19  Taxes .............................................................................................. 68
    2.20  Indemnity........................................................................................ 72
    2.21  Change of Lending Office .............................................................. 73
    2.22  Replacement of Lenders ................................................................ 73
    2.23  Notes .............................................................................................. 74
    2.24  Incremental Credit Extensions. ..................................................... 74
    2.25  Cash Management Services; Swap Agreements .............................. 76
    2.26  Defaulting Lenders ........................................................................ 76
    2.27  Loan Modification Offers............................................................... 78

SECTION 3.    LETTERS OF CREDIT ........................................................... 79

i

| | | | |
|---|---|---|---|
| 3.1 | L/C Commitment | | 79 |
| 3.2 | Procedure for Issuance of Letter of Credit | | 80 |
| 3.3 | Fees and Other Charges | | 81 |
| 3.4 | L/C Participations | | 82 |
| 3.5 | Reimbursement Obligation of the Borrower | | 82 |
| 3.6 | Obligations Absolute | | 83 |
| 3.7 | Letter of Credit Payments | | 83 |
| 3.8 | Applications | | 84 |
| 3.9 | [Reserved] | | 84 |
| 3.10 | Additional Issuing Lenders | | 84 |

SECTION 4.  REPRESENTATIONS AND WARRANTIES ........... 84

| | | | |
|---|---|---|---|
| 4.1 | Financial Condition | | 84 |
| 4.2 | No Change | | 84 |
| 4.3 | Existence; Compliance with Law | | 85 |
| 4.4 | Power; Authorization; Enforceable Obligations | | 85 |
| 4.5 | No Legal Bar | | 85 |
| 4.6 | Litigation | | 85 |
| 4.7 | No Default | | 86 |
| 4.8 | Ownership of Property; Liens | | 86 |
| 4.9 | Intellectual Property | | 86 |
| 4.10 | Taxes | | 86 |
| 4.11 | Federal Regulations; Sanctions and Anti-Corruption Laws | | 86 |
| 4.12 | Labor Matters | | 87 |
| 4.13 | ERISA | | 87 |
| 4.14 | Investment Company Act; Other Regulations | | 88 |
| 4.15 | Subsidiaries | | 88 |
| 4.16 | Use of Proceeds | | 88 |
| 4.17 | Environmental Matters | | 88 |
| 4.18 | Accuracy of Information, etc. | | 89 |
| 4.19 | Security Documents | | 90 |
| 4.20 | Solvency | | 90 |
| 4.21 | Regulation H | | 91 |
| 4.22 | Affected Financial Institution | | 91 |

SECTION 5.  CONDITIONS PRECEDENT ........... 91

| | | | |
|---|---|---|---|
| 5.1 | Conditions to Initial Extension of Credit | | 91 |
| 5.2 | Conditions to Each Extension of Credit | | 95 |

SECTION 6.  AFFIRMATIVE COVENANTS ........... 95

| | | | |
|---|---|---|---|
| 6.1 | Financial Statements | | 95 |
| 6.2 | Certificates; Borrowing Base; Other Information | | 96 |
| 6.3 | Payment of Obligations | | 100 |
| 6.4 | Maintenance of Existence; Compliance | | 100 |

| | | |
|---|---|---|
| 6.5 | Maintenance of Property; Insurance | 100 |
| 6.6 | Inspection of Property; Books and Records; Discussions; Appraisals; Field Examinations | 100 |
| 6.7 | Notices | 101 |
| 6.8 | Environmental Laws | 102 |
| 6.9 | Additional Collateral, etc. | 102 |
| 6.10 | Deposit Account Control Agreements | 106 |
| 6.11 | Further Assurances | 106 |
| 6.12 | [Reserved] | 106 |
| 6.13 | Designation of Unrestricted Subsidiaries | 106 |
| 6.14 | Sanctions | 107 |
| 6.15 | Post-Closing Matters | 107 |

**SECTION 7.   NEGATIVE COVENANTS ................................................ 107**

| | | |
|---|---|---|
| 7.1 | Financial Condition Covenant | 108 |
| 7.2 | Indebtedness | 108 |
| 7.3 | Liens | 111 |
| 7.4 | Fundamental Changes | 115 |
| 7.5 | Disposition of Property | 116 |
| 7.6 | Restricted Payments | 119 |
| 7.7 | Investments | 120 |
| 7.8 | Payments and Modifications of Certain Debt Instruments | 123 |
| 7.9 | Transactions with Affiliates | 123 |
| 7.10 | Sale Leaseback Transactions | 124 |
| 7.11 | Swap Agreements | 124 |
| 7.12 | Changes in Fiscal Periods | 124 |
| 7.13 | Negative Pledge Clauses | 124 |
| 7.14 | Clauses Restricting Restricted Subsidiary Distributions | 124 |
| 7.15 | Lines of Business | 125 |
| 7.16 | Amendments to Organizational Documents | 126 |
| 7.17 | [Canadian Pension Plans | 126 |

**SECTION 8.   GUARANTEE ................................................................. 126**

| | | |
|---|---|---|
| 8.1 | The Guarantee | 126 |
| 8.2 | Obligations Unconditional | 127 |
| 8.3 | Reinstatement | 128 |
| 8.4 | No Subrogation | 128 |
| 8.5 | Remedies | 128 |
| 8.6 | Instrument for the Payment of Money | 128 |
| 8.7 | Continuing Guarantee | 128 |
| 8.8 | General Limitation on Guarantor Obligations | 128 |
| 8.9 | Release of Guarantors | 129 |
| 8.10 | Right of Contribution | 129 |
| 8.11 | Keepwell | 129 |

SECTION 9.    EVENTS OF DEFAULT ................................................................ 129

    9.1    Events of Default ................................................................ 129
    9.2    Action in Event of Default ................................................ 132
    9.3    Holdings' Right to Cure .................................................... 132

SECTION 10.    ADMINISTRATIVE AGENT ...................................................... 133

    10.1    Appointment .................................................................... 133
    10.2    Delegation of Duties ....................................................... 134
    10.3    Exculpatory Provisions .................................................... 134
    10.4    Reliance by Agents .......................................................... 135
    10.5    Notice of Default ............................................................. 136
    10.6    Posting of Communications. ........................................... 136
    10.7    Non-Reliance on Administrative Agent and Other Lenders ........................... 137
    10.8    Indemnification ............................................................... 138
    10.9    Administrative Agent in its Individual Capacity ............... 138
    10.10    Successor Administrative Agent ..................................... 138
    10.11    No Other Duties, etc ....................................................... 139
    10.12    [Reserved] ....................................................................... 140
    10.13    Acknowledgements of Lenders. ..................................... 140
    10.14    Cashless Settlement Option ............................................ 140
    10.15    Bankruptcy. ..................................................................... 140
    10.16    Erroneous Payments. ...................................................... 141
    10.17    Collateral Matters. .......................................................... 142
    10.18    Credit Bidding ................................................................ 142
    10.19    ERISA and Related Matters ................................**Error! Bookmark not defined.**
    10.20    Quebec Security .............................................................. 143

SECTION 11.    MISCELLANEOUS .................................................................... 144

    11.1    Amendments and Waivers ............................................... 144
    11.2    Notices ............................................................................ 146
    11.3    No Waiver; Cumulative Remedies .................................. 147
    11.4    Survival of Representations and Warranties .................... 147
    11.5    Payment of Expenses and Taxes ..................................... 147
    11.6    Successors and Assigns; Participations and Assignments ........................... 149
    11.7    Adjustments; Set-off. ...................................................... 152
    11.8    Counterparts; Electronic Execution ................................ 153
    11.9    Severability ..................................................................... 154
    11.10    Integration ....................................................................... 154
    11.11    Governing Law ............................................................... 154
    11.12    Submission To Jurisdiction; Waivers ............................. 154
    11.13    Acknowledgements ......................................................... 155
    11.14    Releases of Guarantees and Liens .................................. 155
    11.15    Confidentiality ................................................................ 156
    11.16    **WAIVERS OF JURY TRIAL** ................................... 156

11.17    PATRIOT Act Notification ................................................................ 156
11.18    Maximum Amount ........................................................................... 157
11.19    Intercreditor Agreement ................................................................. 158
11.20    [Reserved] ...................................................................................... 158
11.21    Lender Action .................................................................................. 158
11.22    No Fiduciary Duty ........................................................................... 158
11.23    Acknowledgement and Consent to Bail-In of Affected Financial
        Institutions ..................................................................................... 158
11.24    Judgment Currency .......................................................................... 159
11.25    Acknowledgement Regarding Any Supported QFCs ...................... 159

SCHEDULES & ANNEXES:

1.1A        Commitments
1.1B        Agreed Securities Principles
1.1C        Mortgaged Properties
4.15        Subsidiaries
4.19(a)     UCC and PPSA Filing Jurisdictions
6.15        Post-Closing Matters
7.2(h)      Existing Indebtedness
7.3(f)      Existing Liens
7.7(n)      Existing Investments
7.09        Affiliate Transactions

EXHIBITS:

A-1     Form of Pledge and Security Agreement
A-2     Form of Canadian Pledge and Security Agreement
B       Form of Compliance Certificate
C       Form of Officer's Certificate
D       Form of Assignment and Assumption
F       Form of Exemption Certificate
G       Form of Note
H       Form of Solvency Certificate
I       [Reserved]
J       Form of Borrowing Base Certificate
K       [Reserved]
M       Form of Guarantor Joinder Agreement
N       Form of Borrowing Request

ABL CREDIT AGREEMENT, dated as of [  ], 2022 (this "Agreement"), among Carestream Health Holdings, Inc., a Delaware corporation ("Holdings"), Carestream Health, Inc., a Delaware corporation (the "Borrower"), the Subsidiary Guarantors (this and each other capitalized term used herein without definition having the meaning assigned to such term in Section 1.1), the several banks, financial institutions, institutional investors and other entities from time to time parties to this Agreement as lenders or holders of the Loans and issuers of Letters of Credit (collectively, the "Lenders"), and JPMorgan Chase Bank, N.A., as Administrative Agent.

## **R E C I T A L S**

On August 23, 2022 (the "Petition Date"), Holdings and certain of its direct and indirect Subsidiaries (collectively the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C., §§ 101–1532, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

On the Petition Date, the Debtors filed the *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and its Debtor Affiliates* pursuant to Chapter 11 of the Bankruptcy Code Docket No. [  ] (the "Original Chapter 11 Plan" and as amended, supplemented, or revised prior to the date hereof in accordance to the Commitment Letter, the "Chapter 11 Plan") with the Bankruptcy Court, which was confirmed by the Bankruptcy Court on [  ], 2022.

The parties hereto hereby agree as follows:

SECTION 1.    DEFINITIONS

1.1    Defined Terms. As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABL Priority Collateral": as defined in the Intercreditor Agreement.

"ABR": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus 1/2 of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that, for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the ABR due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective day of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively. If the ABR is being used as an alternate rate of interest pursuant to Section 2.16 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.16(b)), then the ABR shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.  For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00% for purposes of this Agreement.

"ABR Loans": Loans the rate of interest applicable to which is based upon the ABR.

"Accepting Lenders": as defined in Section 2.27(a).

"<u>Account</u>": as defined in the Security Agreement.

"<u>Account Debtor</u>": any Person obligated on an Account.

"<u>Additional Lender</u>": at any time, any bank or other financial institution that agrees to provide any portion of any Revolving Commitment Increase pursuant to an Incremental Amendment in accordance with Section 2.24; <u>provided</u> that (i) the Administrative Agent and each Issuing Lender shall have consented (not to be unreasonably withheld) to such Additional Lender if such consent would be required under <u>Section 11.6(b)</u> for an assignment of Loans or Revolving Commitments, as applicable, to such Additional Lender and (ii) the Borrower shall have consented to such Additional Lender.

"<u>Adjusted Daily Simple SOFR</u>": an interest rate per annum equal to (a) the Daily Simple SOFR, plus (b) 0.10%; <u>provided</u> that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"<u>Adjusted Term SOFR Rate</u>": for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, plus (b) 0.10%; <u>provided</u> that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"<u>Administrative Agent</u>": JPMorgan Chase Bank, N.A., together with its affiliates, as the administrative agent for the Lenders and as the collateral agent for the Secured Parties under this Agreement and the other Loan Documents, together with any of its successors in such capacities.

"<u>Affected Financial Institution</u>": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>": with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"<u>Affiliate Transaction</u>": as defined in <u>Section 7.9</u>.

"<u>Agent</u>": the Administrative Agent, the Joint Bookrunners and the Joint Lead Arrangers.

"<u>Agreed Security Principles</u>": the Agreed Security Principles set forth on Schedule 1.1B.

"<u>Aggregate Exposure</u>": with respect to any Lender at any time, an amount equal to the amount of such Lender's Revolving Commitment then in effect or, if the Revolving Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"<u>Aggregate Exposure Percentage</u>": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"<u>Agreement</u>": as defined in the preamble hereto.

"<u>Agreement Currency</u>": as defined in <u>Section 11.24</u>.

2

"Alternate Currency": any currency acceptable to the applicable Issuing Lender and the Administrative Agent.

"Annual Field Examination": as defined in Section 6.6(c).

"Annual Inventory Appraisal" as defined in Section 6.6(b).

"Anti-Corruption Laws": with respect to a Person, all laws, rules, and regulations of any jurisdiction applicable to such Person from time to time concerning or relating to bribery or corruption.

"Anti-Money Laundering Laws": with respect to a Person, all laws, rules, and regulations of any jurisdiction applicable to such Person from time to time concerning or relating to financial recordkeeping, reporting requirements, and money laundering including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), as amended.

"Applicable Margin":  initially, 2.25% in the case of ABR Loans and 3.25% in the case of Term Benchmark Loans through the first two full fiscal quarters after the Closing Date and, thereafter, subject to adjustment in accordance with the Applicable Pricing Grids (as defined below).

"Applicable Pricing Grids": the table set forth below:

| Average Quarterly Excess Availability | Applicable Margin for Term Benchmark Loans and RFR Loans | Applicable Margin for ABR Loans |
|---|---|---|
| Category 1 > 66% of the Line Cap | 3.00% | 2.00% |
| Category 2 ≤66% but > 33% of the Line Cap | 3.25% | 2.25% |
| Category 3 ≤33% of the Line Cap | 3.50% | 2.50% |

For purposes of the foregoing, each change in the Applicable Margin resulting from a change in the Average Quarterly Excess Availability shall be effective during the period commencing on and including the first day of each fiscal quarter of the Borrower and ending on the last day of such fiscal quarter, it being understood and agreed that, for purposes of determining the Applicable Margin on the first day of any fiscal quarter of the Borrower, the Average Quarterly Excess Availability during the most recently ended fiscal quarter of the Borrower shall be used. Notwithstanding the foregoing, with respect to the Applicable Margin, the Average Quarterly Excess Availability shall be deemed to be in Category 3 (as specified above), at the option of the Administrative Agent or at the request of the Required Lenders if the Borrower fails to deliver any Borrowing Base Certificate or related information required to be delivered by them pursuant to Section 6.2, during the period from the expiration of the time for delivery thereof until each such Borrowing Base Certificate and related information is so delivered.

"Application": an application, in such form as the applicable Issuing Lender may specify from time to time, requesting the applicable Issuing Lender to issue a Letter of Credit.

"Approved Electronic Communications": as defined in Section 11.2.

"Approved Bank": any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks or $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks.

"Approved Fund": as defined in Section 11.6(b)(ii).

"Asset Acquisition": an acquisition of assets constituting at least a division or a business unit of, or all or substantially all of the assets of, any Person.

"Assignee": as defined in Section 11.6(b)(i).

"Assignment and Assumption": an Assignment and Assumption, substantially in the form of Exhibit D.

"Attributable Debt": in respect of a Sale Leaseback Transaction, at the time of determination, the present value of the obligation of the Loan Party that acquires, leases or licenses back the right to use all or a material portion of the subject property for net rental, license or other payments during the remaining term of the lease, license or other arrangement included in such Sale Leaseback Transaction including any period for which such lease, license or other arrangement has been extended or may, at the sole option of the other party (or parties) thereto, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP.

"Available Revolving Commitment": as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Commitment then in effect minus (b) such Lender's Revolving Extensions of Credit then outstanding; provided that in calculating the amount of the Available Revolving Commitment, Letters of Credit denominated in an Alternate Currency will be deemed to be equal to the Dollar Equivalent thereof at the relevant time of determination.

"Available Tenor": as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 2.16.

"Average Quarterly Excess Availability": for any fiscal quarter of the Borrower, an amount equal to the average daily Excess Availability during such fiscal quarter, as determined by the Administrative Agent in its Permitted Discretion by reference to the Administrative Agent's system of records; provided, that in order to determine Excess Availability on any day for purposes of this definition, the Borrower's Borrowing Base for such day shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.2(e) as of such day.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule. and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United

Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11 of the United States Code entitled "Bankruptcy", as now and hereinafter in effect, or any successor statute.

"Bankruptcy Event": with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, interim receiver, receiver and manager, monitor, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality), to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark": initially, with respect to any (i) Term Benchmark Loan, the Term SOFR Rate and (ii) RFR Loan, the Daily Simple SOFR; provided that if a Benchmark Transition Event, and the related Benchmark Replacement Date have occurred with respect to the Term SOFR Rate or Daily Simple SOFR, as applicable, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.16.

"Benchmark Replacement": for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)    the Adjusted Daily Simple SOFR;

(2)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment": with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable

Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes": with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date": with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event": with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

6

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period": with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.16 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.16.

"Beneficial Ownership Certification": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation, which certification shall be substantially similar to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Beneficially Own": as defined within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act; "Beneficial Ownership" shall have a correlative meaning.

"Benefited Lender": as defined in Section 11.7(a).

"BHC Act Affiliate": of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Borrowing": a Revolving Borrowing.

"Borrowing Base": at any time, the sum of:

(a)    85% of the Borrowing Base Loan Parties' Eligible Accounts (to be the Dollar Equivalent of the Eligible Accounts), plus (b)    the lesser of (i) the product of 85% multiplied by the Net Orderly Liquidation Value percentage identified in the most recent Inventory appraisal ordered by the Administrative Agent multiplied by the Borrowing Base Loan Parties' Eligible Inventory and (ii) the product of 70% multiplied by the Borrowing Base Loan Parties' Eligible Inventory (valued at the lower of cost and fair market value), minus

(c)    Reserves;

provided that in determining the Net Orderly Liquidation Value with respect to Inventory, the Administrative Agent may determine such value on a blended, class (e.g., raw materials, semi-finished inventory, finished goods inventory and service parts inventory ) or other basis as it determines in its Permitted Discretion.

The Borrowing Base credit in respect of (i) Eligible Accounts of Konica Minolta included in the Borrowing Base shall not exceed the lesser of 10% of the Borrowing Base (calculated after giving effect to the Eligible Accounts of Konica Minolta) and $8,500,000 (after taking into account the 85% advance rate referenced in clause (a) of this definition) and (ii) Eligible Accounts owed by any government of the U.S., or any department, agency, public corporation, or instrumentality thereof for which the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) has not been complied with to the Administrative Agent's satisfaction shall not exceed $5,000,000 (after taking into account the 85% advance rate referenced in clause (a) of this definition). The Administrative Agent may, in its Permitted Discretion reduce the advance rates set forth above or adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base, with any change to the Reserves to be implemented as set forth in the definition thereof. The Borrowing Base at any time shall, subject to the immediately preceding sentence, be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.2(e) of this Agreement.

"Borrowing Base Certificate": a certificate, signed and certified as accurate and complete by a Responsible Officer of the Borrower, in substantially the form of Exhibit J or another form which is acceptable to the Administrative Agent in its sole discretion, which certificate shall, among other things, set forth a calculation of the Borrowing Base.

"Borrowing Base Loan Party": any Loan Party (other than Holdings) that is organized under the laws of (a) any state within the United States, (b) the District of Columbia or (c) Canada or any province or territory thereof.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"<u>Borrowing Request</u>": a request by the Borrower for a Borrowing in accordance with <u>Section 2.5</u>, which shall be substantially in the form of <u>Exhibit N</u> or any other form approved by the Administrative Agent.

"<u>Business</u>": as defined in <u>Section 4.17(b)</u>.

"<u>Business Day</u>": any day (other than a Saturday or a Sunday) on which banks are open for business in New York City; provided that, in addition to the foregoing, a Business Day shall be (a) in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings of such RFR Loan and (b) in relation to Loans referencing the Adjusted Term SOFR Rate and any interest rate settings, fundings, disbursements, settlements or payments of any such Loans referencing the Adjusted Term SOFR Rate or any other dealings of such Loans referencing the Adjusted Term SOFR Rate, any such day that is only a U.S. Government Securities Business Day.

"<u>CAML</u>": the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), the *United Nations Act* (Canada) and other anti-terrorism laws and "know your client" policies, regulations, laws or rules applicable in Canada, including any guidelines or orders thereunder.

"<u>Canadian Defined Benefit Plan</u>": any Canadian Pension Plan which contains a "defined benefit provision", as defined in subsection 147.1(1) of the *Income Tax Act* (Canada). "<u>Canadian Dollars</u>" and "<u>C$</u>": dollars in lawful currency of Canada.

"<u>Canadian Multiemployer Plan</u>": any Canadian Pension Plan that is considered to be a "multi-employer pension plan" or similar plan under applicable federal or provincial pension standards legislation in Canada.

"<u>Canadian Pension Event</u>": the occurrence of any of the following: (a) any Group Member passes a resolution or takes any other action to terminate or wind up in whole or in part any Canadian Defined Benefit Plan, (b) notice being given by a Governmental Authority to any Group Member that it intends to order a wind up in whole or in part of a Canadian Defined Benefit Plan without right of hearing or appeal, (c) there is a cessation of required contributions to the fund of a Canadian Pension Plan other than suspension of contributions for the normal cost of the pension plan and contributions for the provision for adverse deviations in respect of the normal cost of the pension plan if the pension plan has an available actuarial surplus, (d) the wind up or termination (in whole or in part) of any Canadian Defined Benefit Plan, (e) the occurrence of an event or condition which would reasonably be expected to constitute grounds for the termination (in whole or in part) of, or winding-up (in full or as a partial wind-up), or the appointment by a Governmental Authority of a replacement administrator or trustee to wind up or terminate (in whole or in part) any Canadian Defined Benefit Plan, (f) the withdrawal of any Group Member from a Canadian Multiemployer Plan where any additional contributions by any Group Member are triggered by such withdrawal, (g) the imposition of any liability by any Governmental Authority in respect of a Canadian Defined Benefit Plan, other than for premiums or contributions due but not delinquent, upon any Group Member, or (h) any statutory deemed trust or Lien, other than a Permitted Lien, arises in respect of a Canadian Pension Plan.

"<u>Canadian Pension Plan</u>": any plan or arrangement that is required to be registered as a "registered pension plan", as defined in subsection 248(1) of the *Income Tax Act* (Canada), or is required to be registered under Canadian federal or provincial pension standards laws (i) which is or was established, maintained or contributed to by, or required to be contributed to by, any Group Member for its employees or former employees, or (ii) with respect to which any Group Member has any actual or

contingent liability, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively.

"Canadian Pledge and Security Agreement": the Canadian Pledge and Security Agreement, dated as of [ ], 2022, made by the grantors party thereto in favor of the Administrative Agent, substantially in the form of Exhibit A-2.

"Canadian Priority Payables Reserves": with respect to any Collateral of a Canadian Borrowing Base Loan Party or other Collateral located in, or subject to the laws of, Canada, without duplication, (a) the full amount of all obligations, liabilities or indebtedness of any Borrowing Base Loan Party that (i) have a trust, deemed trust or statutory lien imposed to provide for payment or a Lien, choate or inchoate, ranking or capable or ranking senior to or pari passu with Liens securing the Obligations, respectively, on any Collateral under any applicable law of Canada or any province or territory thereof, or (ii) have a right imposed to provide for payment ranking or capable or ranking senior or pari passu with the Obligations or under any applicable law of Canada or any province or territory thereof, including claims for unremitted and/or accelerated rents, utilities, taxes (including sales taxes and goods and services taxes and harmonized sales taxes and withholding taxes), amounts payable to an insolvency administrator, wages (including wages or other amounts due under the *Wage Earner Protection Program Act*), employee withholdings and deductions (including amount payable with respect to statutory benefit plans) and vacation pay, severance and termination pay, government royalties and pension fund obligations (including, without duplication, normal cost contributions and any special payments required to be made) and any amounts, whether or not due, representing wind-up deficiency or position with respect to any Canadian Defined Benefit Plans, pursuant to the *Pension Benefits Act* (Ontario) or any similar legislation, and (b) the amount equal to the aggregate value of the Inventory in Canada which the Administrative Agent, in good faith, and on a reasonable basis, considers is or may be subject to retention of title by a supplier or a right of a supplier to recover possession thereof, where such supplier's rights has priority over the Liens securing the Obligation including, without limitation, Inventory subject to a right of a supplier to repossess goods pursuant to Section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or any other applicable laws granting revendication or similar rights to unpaid suppliers.

"Canadian Subsidiary": any Subsidiary of the Borrower organized under the laws of Canada or any province or territory thereof.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as determined prior to implementation of ASC 842) and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP (as determined prior to implementation of ASC 842).

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation (including common stock and preferred stock), any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests (general and limited), and membership and limited liability company interests, and any and all warrants, rights or options to purchase any of the foregoing (but excluding any debt security that is exchangeable for or convertible into such capital stock).

"Cash Collateral": as defined in the definition of "Collateralize".

"<u>Cash Dominion Period</u>": (a) each period when a Specified Event of Default has occurred and is continuing or (b) each period beginning on the fifth (5th) consecutive Business Day on which Excess Availability is less than the greater of (x) 15.0% of the Line Cap and (y) $10,500,000; <u>provided</u> that any such Cash Dominion Period commencing pursuant to clause (b) shall end when and if Excess Availability shall have not been less than such specified level for 30 consecutive calendar days.

"<u>Cash Equivalents</u>": (a) Dollars (including such Dollars as are held as overnight bank deposits and demand deposits with banks); (b) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 24 months from the date of acquisition; (c) certificates of deposit, time deposits, eurodollar time deposits, bankers' acceptances or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having combined capital and surplus of not less than $250,000,000.00; (d) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (e) repurchase obligations of any Lender or of any commercial bank satisfying (at the time of acquisition) the requirements of clause (c) of this definition, having a term of not more than 90 days, with respect to securities issued or fully guaranteed or insured by the United States government; (f) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) have one of the two highest ratings obtainable from either S&P or Moody's; (g) securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (c) of this definition; (h) Indebtedness or preferred stock issued by Persons with a rating, at the time of acquisition thereof, of "A" or higher from S&P or "A2" or higher from Moody's with maturities of one year or less from the date of acquisition; (i) money market mutual or similar funds that invest substantially all of their assets in securities satisfying the requirements of clauses (a) through (h) of this definition; or (j) in the case of Foreign Subsidiaries or Canadian Subsidiaries, Investments made in the jurisdiction where such Foreign Subsidiaries or Canadian Subsidiaries, respectively, customarily make similar Investments that are of a type and credit quality comparable to the Investments described in clauses (a) through (i) of this definition.

"<u>Cash Management Obligations</u>": all obligations, including guarantees thereof, of any Loan Party or that are guaranteed by a Loan Party to a bank or other financial institution that, at the time such Cash Management Obligations are established or (if later) as of the Closing Date,  is the Administrative Agent, a Joint Lead Arranger, or a Lender (or an Affiliate of the foregoing) and has agreed in writing with the Administrative Agent that it is providing Cash Management Obligations to Group Members which constitute obligations (including guarantees thereof) in respect of (i) overdrafts and related liabilities owed to any such bank or financial institution arising from treasury, depositary and cash management services or in connection with any automated clearinghouse transfer of funds, (ii) foreign exchange and currency management services or (iii) purchase cards, credit cards or similar services, in each case, arising from transactions in the ordinary course of business of such Group Members (clauses (i) through (iii), collectively, "<u>Cash Management Services</u>"), in each case to the extent such obligations are primary obligations of a Loan Party or are guaranteed by a Loan Party.

"Cash Restricted Subsidiaries": any Restricted Subsidiary that is subject to local law restrictions on transfers of cash, including as a result of currency control restrictions.

"Certificated Securities": as defined in Section 4.19(a).

"CFC Holdco": any Subsidiary of the Borrower (i) (x) that is not treated as a corporation for U.S. federal income tax purposes and (y) substantially all of the assets of which are Capital Stock of one or more controlled foreign corporations within the meaning of Section 957 of the Code or (ii) (w) that is a Domestic Subsidiary: (x) that is treated as a corporation for U.S. federal income tax purposes and (y) substantially all of the assets of which are Capital Stock of one or more controlled foreign corporations within the meaning of Section 957 of the Code.

"Chapter 11 Plan" has the meaning assigned to such term in the recitals hereto.

"Change in Law": (a) the adoption or taking effect of any Requirement of Law after the Closing Date, (b) any change in any Requirement of Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Closing Date or (c) the compliance by any Lender or any Issuing Lender with any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided, however, that (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) of the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case constitute a "Change in Law" regardless of the date enacted, adopted or issued.

"Change of Control": at any time, (a) prior to a Qualified Public Offering, the Permitted Investors (i) shall fail to have the right, directly or indirectly, by voting power, contract or otherwise, to elect or designate for election at least a majority of the board of directors of Holdings or (ii) shall fail to Beneficially Own Capital Stock of Holdings representing a majority of the voting power represented by the issued and outstanding Capital Stock of Holdings, (b) after a Qualified Public Offering, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Investors, shall Beneficially Own Capital Stock of Holdings representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of Holdings and the percentage of the aggregate ordinary voting power represented by such Capital Stock Beneficially Owned by such person or group exceeds the percentage of the aggregate ordinary voting power represented by Capital Stock of Holdings then Beneficially Owned by the Permitted Investors, unless (i) the Permitted Investors have, at such time, the right or the ability, directly or indirectly, by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Holdings or (ii) during any period of twelve (12) consecutive months, a majority of the seats (other than vacant seats) on the board of directors of Holdings shall be occupied by persons who were (x) members of the board of directors of Holdings on the Closing Date or nominated by one or more Permitted Investors or Persons nominated by one or more Permitted Investors or (y) appointed by directors so nominated, or (c) Holdings shall cease to Beneficially Own, and to directly own of record 100% of the issued and outstanding Capital Stock of the Borrower.

"Class": (a) when used with respect to Lenders, refers to each of the Revolving Lenders, (b) when used with respect to Commitments, the Revolving Commitments and (c) when used with respect to Loans, the Revolving Loans made thereunder. Additional Classes may be established pursuant to Section 2.26.

"Closing Date": [  ], 2022.

"<u>CME Term SOFR Administrator</u>": CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"<u>Code</u>": the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>": all of the assets and property of the Loan Parties and any other Person, now owned or hereafter acquired, whether real, personal or mixed, upon which a Lien is purported to be created by any Security Document; provided, however, that the Collateral shall not include (i) Excluded Assets, (ii) any voting Capital Stock of any Excluded Foreign Subsidiary described in clause (i) or (ii) of the definition of Excluded Foreign Subsidiary, representing in excess of 66% of the total outstanding voting Capital Stock of such Excluded Foreign Subsidiary, and (iii) solely with respect to assets and property of (or the Capital Stock of) Specified Foreign Guarantors, any assets that would be excluded pursuant to the Agreed Security Principles.

"<u>Collateral Access Agreement</u>": any landlord waiver or other agreement, in form and substance reasonably satisfactory to the Administrative Agent, between the Administrative Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"<u>Collateralize</u>": to (i) pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Lenders and the Lenders (or, with respect to Cash Collateral pledged or deposited pursuant to Section 3.1(a), the applicable Issuing Lender), as collateral for the L/C Obligations, cash or deposit account balances ("<u>Cash Collateral</u>") pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent or (ii) to issue back to back letters of credit for the benefit of the Issuing Lenders in a form and substance reasonably satisfactory to the Administrative Agent, in each case, in an amount not less than 103% of the outstanding L/C Obligations.

"<u>Collection Account</u>": individually and collectively, each "Collection Account" referred to in the Security Agreement.

"<u>Commencement Date</u>": as defined in the definition of "Covenant Trigger Period".

"<u>Commitment</u>": as to any Lender, the Revolving Commitment of such Lender.

"<u>Commitment Fee</u>": as defined in <u>Section 2.8(a)</u>.

"<u>Commitment Fee Rate</u>": 0.50% per annum.

"<u>Commitment Letter</u>": the commitment letter, dated as of August 20, 2022, between JPMorgan Chase Bank, N.A., Barclays Bank PLC, Credit Suisse AG, Cayman Islands Branch, Apollo Credit Master Fund Ltd. and the Borrower.

"<u>Commitment Parties</u>" as defined in the Commitment Letter.

"<u>Commodity Exchange Act</u>": the Commodity Exchange Act (7 U.S.C. § 1 et seq), as amended from time to time, and any successor statute.

"<u>Commonly Controlled Entity</u>": an entity, whether or not incorporated, that is under common control with Holdings or the Borrower within the meaning of Section 4001 of ERISA or is part

of a group that includes Holdings or the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B.

"Confirmation Order": an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent and the Commitment Parties confirming the Chapter 11 Plan.

"Consolidated Capital Expenditures": for any period, with respect to any Person, the aggregate of all expenditures (whether paid in cash or other consideration or accrued as a liability and including that portion of Capital Lease Obligations which is capitalized on the consolidated balance sheet of the Borrower) by such Person and its Restricted Subsidiaries during such period for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that, in conformity with GAAP, are included in "additions to property, plant or equipment" or comparable items reflected in the consolidated statement of cash flows of such Person and its Restricted Subsidiaries; provided that Consolidated Capital Expenditures shall not include any expenditures in respect of the obligations of any Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP (as determined prior to implementation of ASC 842).

"Consolidated EBITDA": for any period, Consolidated Net Income for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) interest expense, amortization or write off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including (i) the Loans and (ii) the Term Loans), (c) depreciation and amortization expense, including amortization of intangibles (including, but not limited to, goodwill) and organization costs, (d) any extraordinary charges, (e) non-recurring or unusual charges (including relating to severance and relocation, integration and facilities opening costs, business optimization costs, inventory optimization programs, systems establishment, development and retirement costs, transition costs, including costs related to a transition to a stand-alone company, restructuring costs, any expenses related to any reconstruction, recommissioning or reconfiguration of fixed assets for alternative uses, plant shutdown costs and acquisition integration costs); provided that for purposes of calculating the Consolidated Fixed Charge Coverage Ratio only, the aggregate amount added back pursuant to this clause (e) for any period, together with any pro forma adjustments made to Consolidated EBITDA for such period pursuant to clauses (x) and (y) of the definition of "Pro Forma Basis", shall not exceed 15% of Consolidated EBITDA for such period, provided further, such limitation shall not apply to restructuring or severance costs and expenses referenced in this clause (e), (f) any non-cash expenses or losses for such period that do not constitute reserves and which are not expected to result in cash payments in a future period (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, non-cash losses on sales of assets outside the ordinary course of business), (g) the aggregate amount actually paid by the Borrower and its Restricted Subsidiaries in cash on account of fees and expenses incurred by the Borrower and its Restricted Subsidiaries in connection with the Transactions, (h) deductions, charges or cash or non-cash expenses incurred pursuant to any management equity plan or stock option plan or any management incentive plan or any other management or employee benefit plan, scheme or agreement, pension plan, any stock subscription or shareholder agreement or any distributor equity plan or agreement or in connection with grants of stock appreciation or similar rights or other rights to directors, officers and/or employees of any Group

14

Member, (i) expenses incurred in connection with the prepayment, amendment, modification or Refinancing of Indebtedness during such period, (j) any non-capitalized transaction costs incurred during such period in connection with an actual or proposed incurrence of Indebtedness, including a Refinancing thereof, issuance of Capital Stock (of Holdings any of its direct or indirect parent companies or any of its Restricted Subsidiaries), investment, acquisition, disposition, divestiture or recapitalization (excluding the Transactions), (k) any net loss resulting in such period from Swap Agreements and the application of Accounting Standards Codification Topic 815, (l) any net loss resulting in such period from currency translation losses, (m) non-cash losses or charges associated with any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a Change in Law or regulation, in each case pursuant to GAAP, (n) for purposes of determining compliance with the Financial Performance Covenant, the Cure Amount, if any, received by the Borrower for such period and permitted to be included in Consolidated EBITDA pursuant to Section 9.3, (o) any loss from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments, (p) any loss from disposed, abandoned or discontinued operations and losses on disposal of disposed, abandoned, transferred, closed or discontinued operations, (q) any losses (plus all fees and expenses relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Capital Stock of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, (r) any expenses and charges in connection with any investment, acquisition or Disposition permitted to be made under this Agreement and (s) any purchase price payments made in connection with an acquisition or other similar investment permitted hereunder, minus, without duplication, (1) to the extent included in the statement of such Consolidated Net Income for such period, the sum of (i) interest income, (ii) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the ordinary course of business), (iii) income tax credits (to the extent not netted from income tax expense), (iv) any net gain resulting in such period from Swap Agreements and the application of Accounting Standards Codification Topic 815, (v) any net gain resulting in such period from currency translation gains, (vi) any other non-cash income, which is not expected to result in cash income in a future period (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, non-cash income on sales of assets outside the ordinary course of business), all as determined on a consolidated basis, (vii) any income or gain from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments, (viii) any income or gain from disposed, abandoned or discontinued operations and any gains on disposal of disposed, abandoned, transferred, closed or discontinued operations, (ix) any income or gain (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Capital Stock of any Person other than in the ordinary course of business, as determined in good faith by the Borrower and (2) to the extent not deducted in determining Consolidated Net Income for such period, payments made in respect of Customer Guaranties.

"Consolidated Fixed Charge Coverage Ratio": for any period, with respect to the Borrower and its Restricted Subsidiaries on a consolidated basis, the ratio of (a) Consolidated EBITDA for such period less Unfinanced Capital Expenditures less payments for income taxes or income tax liabilities made in cash (net of cash income tax refunds during such period) during such period (excluding, solely for purposes of testing the Financial Performance Covenant, the lesser of (x) $5,000,000 and (y) 50% of the tax or tax liabilities paid in cash by the Borrower related to the taxable years ending on or before December 31, 2022 related to any gain as a result of the recapitalization effected on the Closing Date) to (b) Consolidated Fixed Charges for such period.

"Consolidated Fixed Charges": for any period, with respect to the Borrower and its Restricted Subsidiaries, the sum (without duplication) of (a) Consolidated Interest Expense for such period, (b) any scheduled payments in cash of principal on Indebtedness (other than the Loans) included

in the definition of Consolidated Total Debt during such period (other than mandatory prepayments of Term Loans pursuant to Sections 2.11(b) and 2.11(d) of the Term Loan Credit Agreement (as in effect on the Closing Date) and (c) Restricted Payments made in cash during such period, all calculated for the Borrower and its Restricted Subsidiaries on a consolidated basis and, to the extent applicable, in accordance with GAAP; provided, that with respect to the Reference Periods ending on the last day of each of the first four fiscal quarters of the Borrower ending after the Closing Date, Consolidated Fixed Charges for the relevant Reference Period shall be deemed to equal (x) Consolidated Fixed Charges for the period from the Closing Date to the end of such quarter times (y) a fraction, the numerator of which is the number of days in the relevant Reference Period and the denominator of which is the number of days in such Reference Period subsequent to the Closing Date.

"Consolidated Interest Expense": for any period, total cash interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its Restricted Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Restricted Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP) calculated on a consolidated basis for Borrower and its Restricted Subsidiaries for such period in accordance with GAAP.

"Consolidated Net Income": for any period, the consolidated net income (or loss) of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Borrower or any of its Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of the Borrower) in which the Borrower or any of its Restricted Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or such Restricted Subsidiary in the form of dividends or similar distributions, (c) [reserved], (d) any increase in amortization or depreciation or other non-cash charges, and any write up of assets or inventory, any inventory step ups and any deferred revenue valuation adjustments that results from the application of purchase accounting in relation to any acquisition that is consummated after the Closing Date, net of taxes, and (e) the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income. In addition, to the extent not already accounted for in the Consolidated Net Income, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall include the amount of net proceeds received by the Borrower or any Restricted Subsidiary thereof from business interruption insurance.

"Consolidated Total Debt": at any date, the aggregate principal amount (or, if higher, the par value or stated face amount (other than with respect to zero coupon Indebtedness)) of all Indebtedness of the Borrower and its Restricted Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP, including the outstanding principal amount of the Term Loans and the Loans, but excluding (i) any liabilities referred to in clause (f) of the definition of "Indebtedness" (except to the extent the underlying instrument has been drawn) and any Guarantee Obligations in respect of any such liabilities, (ii) Indebtedness constituting Customer Guaranties and (iii) Indebtedness incurred in reliance on clause (l) of Section 7.2 (except to the extent the underlying instrument has been drawn).

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Investment Affiliate": as to any Person, any other Person that (a) directly or indirectly, is in Control of, is Controlled by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.

"Corresponding Tenor": with respect to any Available Tenor, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covenant Trigger Period": each period beginning on any date (each a "Commencement Date") on which Specified Excess Availability is less than the greater of (x) 15% of the Line Cap and (y) $10,500,000, and continuing until the date on which Specified Excess Availability shall have met or exceeded the threshold set forth above for 30 consecutive calendar days after the Commencement Date.

"Covered Entity": any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party": as defined in Section 11.25.

"Cure Amount": as defined in Section 9.3.

"Cure Period": as defined in Section 9.3.

"Cure Right": as defined in Section 9.3.

"Customer Guaranty": any guaranty or indemnification by the Borrower or its Restricted Subsidiaries of customer obligations to third parties relating to the financing of equipment, inventory or trade payables incurred in the ordinary course of such customer's business.

"Daily Simple SOFR": for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day (such day "SOFR Determination Date") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Debt Fund Affiliate": any investment fund, separate account, or other entity owned (in whole or in part), controlled, managed and/or advised by any affiliate of Apollo Global Management, Inc. (a) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course, (b) that does not directly or indirectly have beneficial ownership of equity interests of the Borrower or any Subsidiary and (c) which is not managed on a day to day basis by Persons responsible for the management of the Borrower on a day to day basis.

"<u>Debtor Relief Laws</u>": the Bankruptcy Code of the United States, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada) or the Winding Up Act (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States, Canada or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>": any of the events specified in <u>Section 9.1</u>, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"<u>Default Right</u>": has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>Defaulting Lender</u>": any Lender that (a) has failed to fund any portion of the Loans or participations in L/C Obligations required to be funded by it hereunder within two (2) Business Days of the date required to be funded by it hereunder, (b) has notified the Administrative Agent or a Loan Party in writing that it does not intend to (or will not be able to) satisfy any or such obligation, (c) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (d) has failed, within three (3) Business Days after written request by the Administrative Agent, to confirm in a manner reasonably satisfactory to the Administrative Agent that it will comply with its funding obligations; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon the Administrative Agent's receipt of such confirmation, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, receiver and manager, monitor, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment or (iv) become the subject of a Bankruptcy Event or a Bail-In Action; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"<u>Defaulting Lender Fronting Exposure</u>": at any time there is a Defaulting Lender, with respect to an Issuing Lender, such Defaulting Lender's Pro Rata Share of the outstanding L/C Obligations of such Issuing Lender other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"<u>Deposit Account</u>": as defined in the Security Agreement.

"<u>Deposit Account Control Agreement</u>": individually and collectively, each "Deposit Account Control Agreement" referred to in the Security Agreement or blocked account agreements (in the case of Canadian deposit accounts), as the case may be.

"<u>Designated Noncash Consideration</u>": the fair market value of noncash consideration received by the Borrower or a Subsidiary of the Borrower in connection with a Disposition pursuant to <u>Section 7.5(u)</u> or <u>Section 7.5(w)</u> that is designated as Designated Noncash Consideration at the time of such Disposition pursuant to a certificate of a Responsible Officer delivered to the Administrative Agent, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the noncash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"Disposition": with respect to any property (including, without limitation, Capital Stock of the Borrower or any of its Restricted Subsidiaries), any sale, lease, Sale Leaseback Transaction, assignment, conveyance, transfer or other disposition thereof (including by merger or consolidation or amalgamation and excluding the granting of a Lien permitted hereunder) and any issuance of Capital Stock of the Borrower or any of the Borrower's Restricted Subsidiaries. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Equity Interests": any Capital Stock which, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change in control or asset sale so long as any right of the holders thereof upon the occurrence of a change in control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable and the termination of the Commitments), in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, prior to the date that is ninety-one (91) days after the Latest Maturity Date, except as a result of a change in control or an asset sale or the death, disability, retirement, severance or termination of employment or service of a holder who is an employee or director of Holdings or a Subsidiary, in each case so long as any such right of the holder (1) is not effective during the continuance of an Event of Default and is not effective to the extent that such redemption would result in a Default or an Event of Default or (2) is subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable and the termination of the Commitments, (c) requires the payment of any cash dividend or any other scheduled cash payment constituting a return of capital, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date; provided that if such Capital Stock is issued to any plan for the benefit of employees of Holdings or its Restricted Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Documents": as defined in the Security Agreement.

"Dollar Equivalent": for any amount, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount, (b) if such amount is expressed in an Alternate Currency, the equivalent of such amount in Dollars determined by using the rate of exchange for the purchase of Dollars with the Alternate Currency last provided (either by publication or otherwise provided to the Administrative Agent) by Reuters on the Business Day (New York City time) immediately preceding the date of determination or if such service ceases to be available or ceases to provide a rate of exchange for the purchase of Dollars with the Alternate Currency, as provided by such other publicly available information service which provides that rate of exchange at such time in place of Reuters chosen by the Administrative Agent in its sole discretion (or if such service ceases to be available or ceases to provide such rate of exchange, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion) and (c) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion.

"Dollars" and "$": dollars in lawful currency of the United States.

"Domestic Subsidiary": any Subsidiary of the Borrower organized under the laws of (a) any state within the United States or (b) the District of Columbia.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" as defined in the Chapter 11 Plan.

"Elective Commitment Reduction" as defined in Section 2.24(a)(vii).

"Eligible Accounts": at any time, the Accounts of a Borrowing Base Loan Party which the Administrative Agent determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans and the issuance of Letters of Credit. Without limiting the Administrative Agent's discretion provided herein, Eligible Accounts shall not include any Account of a Borrowing Base Loan Party:

(a) which is not subject to a first priority perfected security interest in favor of the Administrative Agent;

(b) which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(c) (i) which is unpaid more than 90 days after the date of the original invoice therefor (provided that, at any time, up to $2,000,000 of Accounts shall not be deemed ineligible solely as a result of this clause (c)(i) so long as they are not unpaid more than 120 days after the date of the original invoice therefor), (ii) which is unpaid more than 60 days after the original due date therefor or (iii) which has been written off the books of such Borrowing Base Loan Party or otherwise designated as uncollectible;

(d) which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible pursuant to clause (c) above;

(e) which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to all Borrowing Base Loan Parties exceeds 15% of the aggregate amount of Eligible Accounts of all Borrowing Base Loan Parties; provided that (i) in respect of Konica Minolta, the foregoing percentage shall be 25% and (ii) in respect of any Account Debtor that has an Investment Grade Rating, the foregoing percentage shall be 25% (with such percentage being subject to reduction by the Administrative Agent in its Permitted Discretion);

(f) with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Document has been breached or is not true in any material respect;

(g) which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation reasonably satisfactory to the Administrative Agent which has been sent to the Account Debtor, (iii) represents a progress billing (such that the obligation of the account debtors with respect to such Accounts is conditioned upon such Borrowing Base Loan Party's satisfactory completion of any further performance under the agreement giving rise thereto), (iv) is otherwise contingent upon such Borrowing Base Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis or (vi) relates to payments of interest;

(h) for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrowing Base Loan Party or if such Account was invoiced more than once;

(i) with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j) which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, interim receiver, receiver and manager, monitor, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, interim receiver, receiver and manager, monitor, custodian, monitor, administrator, sequestrator, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state, provincial, territorial or federal bankruptcy laws, including under any corporate law permitting a debtor to obtain an arrangement of any of its debts or a stay or compromise of the claims of creditors, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k) which is owed by any Account Debtor which has sold all or substantially all of its assets;

(l) which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S., or the District of Columbia, Canada, or any province of Canada or (iii) if organized under the laws of Canada, does not maintain its registered office in Canada,  unless (x) in any such case, such Account is backed by a Letter of Credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent or other credit support reasonably satisfactory to the Administrative Agent or (y) such Account Debtor is Konica Minolta;

(m) that is subject to a Receivables Facility;

(n) which is owed by (i) any government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent or other credit support reasonably satisfactory to the Administrative Agent, or (ii) any government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) (the "Federal Assignment of Claims Act"), and any other steps necessary to

21

perfect the Lien of the Administrative Agent in such Account have been complied with to the Administrative Agent's satisfaction; provided that, at any time, up to $5,880,000 of Accounts shall not be deemed ineligible solely as a result of clause (ii) due to a failure to comply with the Federal Assignment of Claims Act;

(o) which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p) which is owed in any currency other than U.S. dollars or Canadian Dollars;

(q) which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent of such indebtedness, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r) which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(s) which is evidenced by any promissory note, chattel paper or instrument;

(t) which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Borrowing Base Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Borrowing Base Loan Party has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u) with respect to which such Borrowing Base Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business but only to the extent of any such reduction, or any Account which was partially paid and such Borrowing Base Loan Party created a new receivable for the unpaid portion of such Account;

(v) which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state, provincial, territorial or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w) which is for goods that have been sold under a purchase order or pursuant to the terms of a written contract that indicates that any Person other than such Borrowing Base Loan Party has an ownership interest in such goods, or which indicates any party other than such Borrowing Base Loan Party as payee or remittance party;

(x) which was created on cash on delivery terms;

(y) [reserved]; or

(z) for which the Account Debtor is not directed to pay such Account into a deposit account located in the U.S. or Canada.

In determining the amount of an Eligible Account of a Borrowing Base Loan Party, the face amount of an Account may, in the Administrative Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and

actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrowing Base Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrowing Base Loan Party to reduce the amount of such Account.

"Eligible Assignee": (a) any Lender, any Affiliate of a Lender and any Approved Fund (any two or more Approved Funds with respect to a particular Lender being treated as a single Eligible Assignee for all purposes hereof), and (b) any commercial bank, insurance company, financial institution, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys commercial loans in the ordinary course; provided that "Eligible Assignee" shall not include any natural person or the Borrower, Holdings or any of their Affiliates.

"Eligible Inventory": at any time, the Inventory of a Borrowing Base Loan Party which the Administrative Agent determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans and the issuance of Letters of Credit. Without limiting the Administrative Agent's discretion provided herein, Eligible Inventory of a Borrowing Base Loan Party shall not include any Inventory:

(a) which is not subject to a first priority perfected Lien in favor of the Administrative Agent;

(b) which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(c) which is, in the Administrative Agent's opinion as determined in its Permitted Discretion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d) with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Document has been breached or is not true and which does not conform to all standards imposed by any Governmental Authority;

(e) in which any Person other than such Borrowing Base Loan Party shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f) which constitutes spare or replacement parts and non-product inventory (other than service parts), packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, rolling stock in possession of field engineers, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g) which is not located in either the U.S. or Canada or is in transit (other than Inventory in-transit between U.S. or Canadian plants owned or leased by Borrowing Base Loan Parties);

(h) which is located in any location leased by such Borrowing Base Loan Party unless (i) the lessor has delivered to the Administrative Agent a Collateral Access Agreement or (ii) a Reserve for

rent, charges and other amounts due or to become due with respect to such facility has been established by the Administrative Agent in its Permitted Discretion;

(i) which is located in any third party warehouse or is in the possession of a bailee (including a third party processor) and is not evidenced by a Document, unless (i) such warehouseman, bailee or third party processor has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may require or (ii) an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion;

(j) which is located with a customer pending such customer's final acceptance of such Inventory;

(k) which is a discontinued product or component thereof other than service parts of a discontinued product that are retained for ongoing sale to customers both directly or under service agreements;

(l) which is the subject of a consignment by such Borrowing Base Loan Party as consignor;

(m) which is perishable;

(n) which contains, embeds, embodies or bears any Intellectual Property licensed to such Borrowing Base Loan Party unless the Administrative Agent is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o) for which reclamation rights have been asserted by the seller; or

(p) which has been acquired from a Sanctioned Person.

"Environmental Laws": any and all foreign, Federal, state, provincial, territorial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning Materials of Environmental Concern, human health and safety with respect to exposure to Materials of Environmental Concern, and protection or restoration of the environment as now or may at any time hereafter be in effect.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default": any of the events specified in Section 9.1, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Availability": at any time, an amount equal to (a) the Line Cap minus (b) the Total Revolving Extensions of Credit then outstanding (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Percentage of all outstanding Loans).

"Exchange Act": the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Excluded Account": as defined in the Security Agreement.

"Excluded Taxes": as defined in Section 2.19(a).

"Excluded Assets": (i) any owned real property with a fair market value of less than $5,000,000 and all leasehold property (it being understood there shall be no requirement to obtain any landlord waivers, estoppels or collateral access letters); (ii) vehicles and other assets subject to certificates of title, in each case, to the extent a security interest therein cannot be perfected by the filing of a UCC or PPSA financing statement; (iii) letter-of-credit rights and commercial tort claims, in each case, to the extent a security interest therein cannot be perfected by the filing of a UCC or PPSA financing statement; (iv) margin stock (as defined in Regulation U); (v) [reserved], (vi) (1) any property to the extent that such grant of a security interest in such property is prohibited by any Requirement of Law of a Governmental Authority (including restrictions in respect of margin stock and financial assistance, thin capitalization or other similar laws or regulations), requires a consent not obtained of any Governmental Authority pursuant to such Requirement of Law, or is prohibited by, or constitutes a breach or default under or results in a termination in favor of any other party thereto (other than Holdings, the Borrower or a Restricted Subsidiary) or requires the consent of any Person (other than Holdings, the Borrower or a Restricted Subsidiary) that has not been obtained under, any contract, license, instrument or other document or agreement evidencing, governing or giving rise to such property, (2) any lease, license or other agreement or any property subject to a purchase money security interest or similar arrangement, in each case, to the extent permitted under the Loan Documents, to the extent that such grant of a security interest in such property is prohibited by the agreement pursuant to which such Lien is granted, or constitutes a breach or default under or results in a termination in favor of any other party thereto (other than Holdings, the Borrower or a Restricted Subsidiary) or requires the consent of any Person (other than Holdings, the Borrower or a Restricted Subsidiary) that has not been obtained, (3) [reserved] and (4) Capital Stock in any Person other than wholly owned Restricted Subsidiaries, to the extent prohibited by the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement, in each case except (A) to the extent the terms in such contract, license, agreement, instrument, state or local franchise, charter, authorization, Organizational Document, joint venture agreement, shareholders' agreement or other document, as applicable, providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under the terms of this Agreement, (B) to the extent that any Requirement of Law or the term in such contract, license, agreement, instrument, state or local franchise, charter, authorization, Organizational Document, joint venture agreement, shareholders' agreement or other document, as applicable, providing for such prohibition, breach, default or termination or requiring such consent is ineffective under the applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code and the PPSA) or principles of equity, and other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code, PPSA or other applicable law notwithstanding such prohibition or (C) such prohibition was created to evade the security requirements herein; provided that notwithstanding the foregoing, such security interest shall attach immediately at such time as such Requirement of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived or such consent is obtained, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences;  (vii) any United States intent-to-use trademark or service mark application solely to the extent that, if any, and solely during the period in which, if any, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark or service mark application under Federal law; after such period, such trademark or service mark application shall automatically be subject to a security interest in favor of the Administrative Agent

and shall be included in the Collateral; (viii) any particular assets if, in the reasonable judgment of the Borrower, evidenced in writing and determined in consultation with the Administrative Agent, obtaining a security interest in such assets or perfection thereof would result in a material adverse tax, accounting or regulatory consequence to the Borrower or any of its Subsidiaries; and (ix) those assets as to which the Administrative Agent and the Borrower agree, on or prior to the Closing Date and from time to time thereafter, that the costs of obtaining such a security interest or perfection thereof are excessive in relation to the value of the Lenders of the security afforded thereby.

"Excluded Foreign Subsidiary": any (i) First-Tier CFC Holdco or First-Tier Foreign Subsidiary to the extent that the pledge of the Capital Stock of such First-Tier CFC Holdco or such First-Tier Foreign Subsidiary as Collateral would, in the good faith judgment of the Borrower and the Administrative Agent, at the time provided or thereafter could reasonably be expected to result in material adverse tax consequences to the Borrower at the time or in the future; provided, that the Borrower hereby agrees to use all commercially reasonable efforts to overcome or eliminate any such material adverse tax consequences and (ii) any Subsidiary the Capital Stock of which is directly or indirectly owned by any First-Tier Foreign Subsidiary excluded pursuant to the forgoing clause (i); provided that, in no event shall a Canadian Subsidiary be an Excluded Foreign Subsidiary.

"Excluded Subsidiary": any Subsidiary of Holdings or the Borrower (i) that is not a Wholly-Owned Subsidiary (provided that such Subsidiary shall cease to be an Excluded Subsidiary at the time such Subsidiary becomes a Wholly Owned Subsidiary) and (ii) which is an Immaterial Subsidiary (provided that such Subsidiary shall cease to be an Excluded Subsidiary at the time such Subsidiary is no longer an Immaterial Subsidiary). Notwithstanding anything to the contrary set forth herein, no Subsidiary Guarantor shall constitute an Excluded Subsidiary by virtue of later becoming an "Excluded Subsidiary" under any clause of this definition, except as such Subsidiary Guarantor may be released under Section 8.9.

"Excluded Swap Obligation": with respect to any Guarantor, its Obligations in respect of a Swap Agreement, if, and solely to the extent that, all or a portion of the guarantee of such Guarantor hereunder of, or the grant by such Guarantor of a security interest to secure, such Obligations under such Swap Agreement is or becomes illegal either under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act or under any other applicable law by virtue of such Guarantor's failure for any reason not to constitute under such law a type of entity permitted to incur Obligations in respect of a Swap Agreement.

"Existing Credit Agreement": that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013 (as amended, restated, supplemented or otherwise modified, including pursuant to Amendment No. 1 (as defined therein), Amendment No. 2 (as defined therein), the Term Loan Borrower Assignment (as defined therein), Amendment No. 3 (as defined therein), the Joinder Agreement (as defined therein), Amendment No. 4 (as defined therein), the Extension Agreement (as defined therein), Amendment No. 5 (as defined therein) and Amendment No. 6 (as defined therein), among Existing Holdings, the Borrower, the subsidiary guarantors party thereto, the several banks, financial institutions, institutional investors and other entities from time to time parties thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent.

"Existing Holdings": Carestream Health Holdings, Inc., as Delaware corporation.

"Existing Second Lien Credit Agreement": that certain Second Lien Credit Agreement, dated as of June 7, 2013 (as amended on June 9, 2017, December 27, 2018, April 11, 2019, January 29,

2020, April 13, 2020, May 8, 2020, October 14, 2020 and December 30, 2020), among Existing Holdings, the Borrower, the subsidiary guarantors party thereto, the lenders party thereto and Credit Suisse AG, Cayman Island Branch, as administrative agent.

"FATCA": as defined in Section 2.19(a).

"Federal Funds Effective Rate": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as  shall be set forth on the NYFRB's Website  from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Board": the Board of Governors of the Federal Reserve System of the United States of America.

"Fee Letter": the administrative agent fee letter dated as of August 20, 2022 between JPMorgan Chase Bank, N.A. and the Borrower.

"Fee Payment Date": (a) the fifteenth day after the last day of each March, June, September and December, (b) the Revolving Termination Date and (c) the date the Total Revolving Commitments are reduced to zero.

"Financial Performance Covenant" as defined in Section 9.3.

"First-Tier CFC Holdco": any CFC Holdco whose Capital Stock is directly owned by (i) the Borrower or (ii) any Domestic Subsidiary of the Borrower other than any CFC Holdco.

"First-Tier Foreign Subsidiary": any Foreign Subsidiary that is a controlled foreign corporation within the meaning of Section 957 of the Code and whose Capital Stock is directly owned by (i) the Borrower or (ii) any Domestic Subsidiary of the Borrower other than any CFC Holdco.

"Floor": the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR, as applicable. For the avoidance of doubt the initial Floor for each of Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR shall be 1.00%.

"Foreign Intellectual Property": the collective reference to all Intellectual Property  solely to the extent such Intellectual Property (1) does not arise under United States or Canadian laws and (2) arises under laws of a jurisdiction other than the United States, any state or territory thereof or the District of Columbia or Canada or any province or territory thereof.

"Foreign Intellectual Property Subsidiary": a Foreign Subsidiary principally engaged in the business of owning, maintaining and licensing Foreign Intellectual Property.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary or a Canadian Subsidiary.

"Forms": as defined in Section 2.19(d).

"Funding Default": as defined in Section 2.17(e).

"Funding Office": the office of the Administrative Agent specified in Section 11.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time; provided, (i) that for purposes of Section 7.1 and the calculation of the Consolidated Fixed Charge Coverage Ratio, Total Net First Lien Leverage Ratio, the Total Net Leverage Ratio, and the Total Net Secured Leverage Ratio, GAAP shall be determined on the basis of such principles in effect on the Closing Date and consistent with those used in the preparation of the most recent audited financial statements referred to in Section 4.1 and (ii) for purposes in determining Capital Leases Obligations and Consolidated Capital Expenditures, GAAP shall be determined on the basis prior to giving effect to ASC 842. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then at the Borrower's request, the Administrative Agent shall enter into negotiations with the Borrower in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred (other than for purposes of delivery of financial statements under Section 6.1(a) and (b)). "Accounting Changes" refers to changes in accounting principles (i) required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC or (ii) otherwise proposed by the Borrower to, and approved by, the Administrative Agent.

"Governmental Approval": any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"Governmental Authority": any nation or government, any state, province or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Member": the collective reference to Holdings, the Borrower and its Restricted Subsidiaries.

"Guarantee": as defined in Section 8.2.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary

obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantor Joinder Agreement": an agreement substantially in the form of Exhibit M.

"Guarantor Obligations": as defined in Section 8.1.

"Guarantors": the collective reference to Holdings and the Subsidiary Guarantors.

"Holdings": as defined in the preamble hereto.

"Immaterial Subsidiary": each Subsidiary (i) which, as of the most recent fiscal quarter of the Borrower, for the period of four consecutive fiscal quarters then ended, for which financial statements have been delivered pursuant to Section 6.1(a), contributed less than five percent (5%) of Consolidated EBITDA for such period and (ii) which had assets with a fair market value of less than five percent (5%) of the Total Assets as of such date; provided that, if at any time the aggregate amount of Consolidated EBITDA or Total Assets attributable to all Subsidiaries that are Immaterial Subsidiaries exceeds ten percent (10%) of Consolidated EBITDA for any such period or ten percent (10%) of Total Assets as of the end of any such fiscal year, the Borrower shall designate within 30 days of the date that financial statements were required to be delivered pursuant to Section 6.1(a) (and, if the Borrower has failed to do so within such time period, the Administrative Agent may designate) sufficient Subsidiaries as "Subsidiaries" to eliminate such excess, and such designated Subsidiaries shall no longer constitute Immaterial Subsidiaries under this Agreement.

"Incremental Amendment": as defined in Section 2.24(c).

"Incremental Facility Closing Date": as defined in Section 2.24(c).

"Incremental Revolving Lender": as defined in Section 2.24(a).

"Incremental Revolving Loans": as defined in Section 2.24(a).

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued liabilities incurred in the ordinary course of such Person's business); provided that earn-outs and other similar deferred consideration payable in connection with an acquisition shall constitute Indebtedness as and to the extent that the obligation related thereto is reflected on the balance sheet of such Person in accordance with GAAP, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness

created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all Disqualified Equity Interests of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, but only to the extent of the fair market value of such property subject to such Lien and (j) for the purposes of <u>Sections 9.1(f)</u> only, all net obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. For the avoidance of doubt, "<u>Indebtedness</u>" shall include neither obligations or liabilities of any Person in respect of any of its Qualified Equity Interests nor the obligations of any Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the date of this Agreement.

"<u>Indemnitee</u>": as defined in <u>Section 11.5</u>.

"<u>Insolvency</u>": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"<u>Insolvent</u>": pertaining to a condition of Insolvency.

"<u>Intellectual Property</u>": as defined in the Security Agreement.

"<u>Intellectual Property Security Agreements</u>": as defined in the Security Agreement.

"<u>Intercreditor Agreement</u>": the Intercreditor Agreement, dated as of the Closing Date, by and between the Administrative Agent and the Term Loan Administrative Agent under the Term Loan Credit Agreement, and acknowledged and agreed by the Borrower, Holdings and the Subsidiary Guarantors from time to time party thereto (as amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Interest Payment Date</u>": (a) as to any ABR Loan, the last Business Day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Term Benchmark Loan, the last day of each Interest Period applicable to the Borrowing of which such Term Benchmark Loan is a part and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period, and the final maturity date of such Loan, (c) as to any RFR Loan, (1) each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such Loan (or, if there is no such numerically corresponding day in such month, then the last day of such month) and (2) the final maturity date of such Loan and (d) as to any Loan (other than any Loan that is an ABR Loan, except in the case of

the repayment or prepayment of all Loans), the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Term Benchmark Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Term Benchmark Loan and ending one, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Term Benchmark Loan and ending one, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)     the Borrower may not select an Interest Period with respect to any Revolving Facility that would extend beyond the Revolving Termination Date;

(iii)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month;

(iv)     the Borrower shall select Interest Periods so as not to require a scheduled payment of any Term Benchmark Loan during an Interest Period for such Loan;

(v)     if the Borrower shall fail to specify the Interest Period in any notice of borrowing of, conversion to, or continuation of, Term Benchmark Loans, the Borrower shall be deemed to have selected an Interest Period of one month; and

(vi)     no tenor that has been removed from this definition pursuant to Section 2.16(e) shall be available.

"Inventory": as defined in the Security Agreement.

"Investment Grade Rating": a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P.

"Investments": as defined in Section 7.7.

"Issuing Lender": JPMorgan Chase Bank, N.A. and Credit Suisse AG or any of their respective Affiliates or any of their respective branches, each in its capacity as issuer of any Letter of Credit and such other Lender or an Affiliate of a Lender that, with the approval of the Administrative Agent and the Borrower, agrees, pursuant to an agreement with and in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, to be bound by the terms hereof applicable to such Issuing Lender.

"Joint Bookrunners": collectively, the Joint Bookrunners listed on the cover page hereof.

"<u>Joint Lead Arrangers</u>": collectively, the Joint Lead Arrangers listed on the cover page hereof.

"<u>JPMCB</u>": JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors

"<u>Judgment Currency</u>": as defined in <u>Section 11.24</u>.

"<u>Junior Indebtedness</u>": collectively, (i) any Material Subordinated Indebtedness, (ii) any Indebtedness for borrowed money (other than the Term Loans, any Term Loan Incremental Equivalent Debt ranking *pari passu* in right of security with the Term Loans and any Permitted Refinancing Indebtedness in respect thereof) of any Group Member that is secured by a Lien on the Collateral (or any portion thereof) that is junior to the Lien on the Collateral (or any portion thereof) securing the Obligations and (iii) any Material Unsecured Indebtedness of any Group Member.

"<u>Konica Minolta</u>": Konica Minolta, Inc., a Japanese corporation.

"<u>L/C Advance</u>": with respect to each L/C Participant, such L/C Participant's funding of its participation in any Letter of Credit in accordance with <u>Section 3.4(a)</u>.

"<u>L/C Borrowing</u>": an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Borrowing.

"<u>L/C Commitment</u>": $15,000,000.

"<u>L/C Credit Extension</u>": with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"<u>L/C Exposure</u>": at any time, the total L/C Obligations.  The L/C Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total L/C Exposure at such time.

"<u>L/C Issuer Commitment</u>": with respect to any Issuing Lender, $5,000,000 or such greater amount as agreed by such Issuing Lender.

"<u>L/C Obligations</u>": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to <u>Section 3.5</u>.

"<u>L/C Participants</u>": the collective reference to all the Revolving Lenders other than the Issuing Lenders.

"<u>Latest Maturity Date</u>": at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time.

"<u>LCT Election</u>": as defined in <u>Section 1.6</u>.

"<u>LCT Test Date</u>": as defined in <u>Section 1.6</u>.

"<u>Lenders</u>": as defined in the preamble hereto; <u>provided</u>, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Issuing Lender.

"<u>Letters of Credit</u>": as defined in <u>Section 3.1(a)</u>.

"Letter of Credit Expiration Date": the earlier of (i) one year after the date of issuance or such longer period as consented to by the relevant Issuing Lenders and (ii) the day that is five (5) Business Days prior to the scheduled Revolving Termination Date (or, if such day is not a Business Day, the next succeeding Business Day); provided that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods, which in no event shall extend beyond the date in clause (ii) above.

"Liabilities": any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"Lien": any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Transaction": any Investment that the Borrower or a Restricted Subsidiary is contractually committed to consummate (it being understood that such commitment may be subject to conditions precedent, which conditions precedent may be amended, satisfied or waived in accordance with the applicable agreement) and whose consummation is not conditioned on the availability or, or on obtaining, third party financing.

"Line Cap": at any time, an amount equal to the lesser of (a) the Total Revolving Commitments and (b) the Borrowing Base. "Loan": any loan made or maintained by any Lender pursuant to this Agreement, including Protective Advances.

"Liquidity": at any time, an amount equal to Unrestricted Cash plus Excess Availability.

"Loan Documents": this Agreement, the Intercreditor Agreement, the Notes, the Security Documents, an Incremental Amendment, if any, and solely for purposes of Section 9.1(e), the Commitment Letter and Fee Letter.

"Loan Modification Agreement": as defined in Section 2.27(b).

"Loan Modification Offer": as defined in Section 2.27(a).

"Loan Parties": shall mean Holdings, the Borrower and the Subsidiary Guarantors.

"Management Stockholders": the members of management of Holdings or its Subsidiaries and their Control Investment Affiliates who are holders of Capital Stock of Holdings or any direct or indirect parent company of Holdings on the Closing Date.

"Material Adverse Effect": a material adverse effect on (a) the business, assets, liabilities, operations, financial condition or operating results of the Borrower and its Restricted Subsidiaries taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their obligations under the Loan Documents or (c) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent, any Lender or any Secured Party hereunder or thereunder.

"Material Indebtedness": Indebtedness (other than the Loans) in an aggregate outstanding principal amount in excess of $35,000,000; provided that any Indebtedness outstanding under the Term Loan Credit Agreement shall be deemed to be Material Indebtedness.

"<u>Material Subordinated Indebtedness</u>": any Subordinated Indebtedness for borrowed money in an aggregate principal amount of $2,000,000 or more.

"<u>Material Unsecured Indebtedness</u>": any Indebtedness for borrowed money in an aggregate principal amount of $2,000,000 or more that is not secured by a Lien on any property of any Group Member.

"<u>Materials of Environmental Concern</u>": any chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances regulated under Environmental Law, including any petroleum or petroleum products, asbestos, polychlorinated biphenyls, lead or lead-based paints or materials, radon, urea-formaldehyde insulation, molds fungi, mycotoxins, and radioactivity or radiofrequency radiation that may have an adverse effect on human health or the environment.

"<u>Maximum Amount</u>": as defined in <u>Section 11.18(a)</u>.

"<u>Maximum Term Loan Incremental Amount</u>": an amount equal to (A) the greater of (1) $100,000,000 and (2) 50% of Consolidated EBITDA (the "<u>Base Incremental Amount</u>") plus (B) an amount equal to all voluntary prepayments of the Term Loans made on or after the Closing Date (other than any such prepayments made with the proceeds of long-term indebtedness) (the "<u>Voluntary Prepayment Amount</u> plus (C) an additional amount if, after giving effect to any such additional amount, the Total Net First Lien Leverage Ratio on a Pro Forma Basis (but without giving effect to the cash proceeds remaining on the balance sheet of such additional amount) as of the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by <u>Section 6.1(a)</u> or <u>(b)</u> of the Term Loan Credit Agreement, as the case may be, have been or were required to have been delivered pursuant to the terms thereof, does not exceed 2.50:1.00. To the extent that any portion of the Base Incremental Amount or Voluntary Prepayment Amount is used to incur Indebtedness pursuant to Section 7.2(a)(ii) or Section 7.2(b), such amount shall reduce the portion of the Base Incremental Amount or Voluntary Prepayment Amount, as applicable, available to incur Indebtedness pursuant to Section 7.2(b) or Section 7.2(a)(ii), respectively.

"<u>Moody's</u>": Moody's Investors Service, Inc., or any successor thereto.

"<u>Mortgaged Properties</u>": the real properties as to which, pursuant to <u>Section 6.9(b)</u> or otherwise, the Administrative Agent, for the benefit of the Secured Parties, shall be granted a Lien pursuant to the Mortgages, including each real property identified as a "Mortgaged Property" on <u>Schedule 1.1C</u>.

"<u>Mortgages</u>": each of the mortgages, deeds of trust, and deeds to secure debt or such equivalent documents hereafter entered into and executed and delivered by one or more of the Loan Parties to the Administrative Agent, in each case, in form and substance reasonably acceptable to the Administrative Agent.

"<u>Multiemployer Plan</u>": a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Multiple Employer Plan</u>": a Plan which has two or more contributing sponsors at least two of whom as not under common control, as such plan is described in Section 4064 of ERISA.

"<u>Net Cash Proceeds</u>": (a) in connection with any Recovery Event or any Disposition, the proceeds thereof actually received in the form of cash and cash equivalents (including Cash Equivalents) (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when

received), net of (i) attorneys' fees, accountants' fees, investment banking fees, and other bona fide fees, costs and expenses actually incurred in connection therewith, (ii) amounts required to be applied to the repayment of Indebtedness (x) secured by a Lien expressly permitted hereunder on any asset that is the subject of such Recovery Event or Disposition (other than any Lien pursuant to a Security Document) or (y) by a Subsidiary that is not a Loan Party, (iii) taxes paid and the Borrower's reasonable and good faith estimate of income, franchise, sales, and other applicable taxes required to be paid by Holdings, the Borrower or any Restricted Subsidiary in connection with such Recovery Event or any sale of assets, (iv) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to the seller's indemnities and representations and warranties to the purchaser in respect of such sale of assets owing by Holdings or any of its Restricted Subsidiaries in connection therewith and which are reasonably expected to be required to be paid; <u>provided</u> that to the extent such indemnification payments are not made and are no longer reserved for, such reserve amount shall constitute Net Cash Proceeds, (v) cash escrows to Holdings or any of its Restricted Subsidiaries from the sale price for such sale of assets; <u>provided</u> that any cash released from such escrow shall constitute Net Cash Proceeds upon such release, (vi) in the case of a Recovery Event, costs of preparing assets for transfer upon a taking or condemnation and (vii) other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account the reduction in tax liability resulting from any available operating losses and net operating loss carryovers, tax credits, and tax credit carry forwards, and similar tax attributes or deductions and any tax sharing arrangements), and (b) in connection with any incurrence or issuance of Indebtedness, the cash proceeds received from any such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other bona fide fees and expenses actually incurred in connection therewith.

"<u>Net Orderly Liquidation Value</u>": with respect to Inventory of any Person, the orderly liquidation value thereof as determined in a manner acceptable to the Administrative Agent in its Permitted Discretion by an appraiser acceptable to the Administrative Agent, net of all costs of liquidation thereof.

"<u>New York UCC</u>": the Uniform Commercial Code as in effect from time to time in the State of New York.

"<u>Non-Bank Revolving Percentage</u>" means, at any time, the sum of the Revolving Percentages of Lenders that are not Regulated Banks.

"<u>Non-Excluded Taxes</u>": as defined in <u>Section 2.19(a)</u>.

"<u>Non-Guarantor Subsidiary</u>": (i) any Excluded Subsidiary and (ii) any Excluded Foreign Subsidiary described in clause (iii) of the definition of Excluded Foreign Subsidiary; <u>provided</u> that any Non-Guarantor Subsidiary shall cease to be a Non-Guarantor Subsidiary at the time such Subsidiary is no longer an Excluded Subsidiary or Excluded Foreign Subsidiary described in clause (iii) of the definition of Excluded Foreign Subsidiary.

"<u>Non-U.S. Lender</u>": as defined in <u>Section 2.19(d)</u>.

"<u>Note</u>": a promissory note substantially in the form of <u>Exhibit G</u>.

"<u>Notice of Intent to Cure</u>": a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent, with respect to each period of four consecutive fiscal quarters for which a Cure Right will be exercised, on the earlier of the date the financial statements required under <u>Section 6.1(a)</u> or <u>(b)</u> have been or were required to have been delivered with respect to the most recent

end of such period of four fiscal quarters, which certificate shall contain a computation of the applicable Event of Default and notice of intent to cure such Event of Default through the issuance of Permitted Cure Securities as contemplated under <u>Section 9.3</u>.

"<u>NYFRB</u>": the Federal Reserve Bank of New York.

"<u>NYFRB Rate</u>": for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); <u>provided</u> that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; <u>provided</u>, <u>further</u>, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>NYFRB's Website</u>": the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"<u>Obligations</u>": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans or the maturity of Cash Management Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower or any Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, Cash Management Obligations and all other obligations and liabilities of the Borrower or any other Loan Party (including with respect to guarantees) to the Administrative Agent, any Lender, any other Secured Party or any party to a Specified Swap Agreement or a party providing Cash Management Obligations, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement or any other Loan Document or any other document made, delivered or given in connection herewith or therewith or any Specified Swap Agreement (including guarantees thereof) or any document relating to Cash Management Obligations (including guarantees thereof), whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower or any Guarantor pursuant to any Loan Document), guarantee obligations or otherwise, but excluding any Excluded Swap Obligations.

"<u>Organizational Document</u>": (i) relative to each Person that is a corporation, its charter and its by-laws (or similar documents), (ii) relative to each Person that is a limited liability company, its certificate of formation and its operating agreement (or similar documents), (iii) relative to each Person that is a limited partnership, its certificate of formation and its limited partnership agreement (or similar documents), (iv) relative to each Person that is a general partnership, its partnership agreement (or similar document) and (v) relative to any Person that is any other type of entity, such documents as shall be comparable to the foregoing.

"<u>Original Chapter 11 Plan</u>": as defined in the recitals.

"<u>Other Connection Taxes</u>": with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or under any other Loan Document, Taxes imposed as a result of a present or former connection between such person and the jurisdiction imposing such Tax, including as a result of it carrying on a trade or business, having a permanent establishment in or being a resident of for Tax purposes in such jurisdiction (other than connections arising from such person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under,

engaged in any other transaction pursuant to this Agreement or enforced this Agreement or any other Loan Document).

"Other Taxes": any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment after the date of this Agreement (other than an assignment made pursuant to Section **Error! Reference source not found.**).

"Outstanding Amount": (a) with respect to the Loans on any date, the amount thereof after giving effect to any borrowings and prepayments or repayments of Loans (including any refinancing of outstanding unpaid drawings under Letters of Credit or L/C Credit Extensions as a Revolving Borrowing), as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the amount thereof on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Letters of Credit (including any refinancing of outstanding unpaid drawings under Letters of Credit or L/C Credit Extensions as a Revolving Borrowing) or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"Overnight Bank Funding Rate": for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parent Company": a direct or indirect parent company of the Borrower, the principal asset of which is the Borrower, which has no other material assets and has no material liabilities.

"Participant": as defined in Section 11.6(c).

"Participant Register": as defined in Section 11.6(c).

"PATRIOT Act": the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001, 31 U.S.C. Section 5318.

"Payment Conditions":

(a) no Event of Default has occurred and is continuing; and

(b) at all times during the Pro Forma Period (i) after giving effect to the proposed event as if it occurred on the first day of the Pro Forma Period, a daily average pro forma Specified Excess Availability greater than the greater of (x) 25.0% of the Line Cap and (y) $19,000,000, or (ii) after giving effect to the proposed event on a Pro Forma Basis as if it occurred on the first day of the Pro Forma Period or the most recently ended Reference Period, as applicable, (A) a daily average pro forma Specified Excess Availability during the Pro Forma Period greater than the greater of (x) 20.0% of the Line Cap and (y) $15,000,000 and (B) a Consolidated Fixed Charge Coverage Ratio for the most recently ended Reference Period greater than 1.00:1.00.

"<u>PBGC</u>": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"<u>Pension Plan</u>": any Plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA, (i) which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed to by, Holdings or the Borrower or (ii) with respect to which Holdings or the Borrower has any actual or contingent liability, including on account of a Commonly Controlled Entity.

"<u>Permitted Amendments</u>": (A) an extension of the final maturity date of the applicable Loans and/or Commitments of the Accepting Lenders, (B) a change in rate of interest (including a change to the Applicable Margin and any provision establishing a minimum rate), premium or other amount with respect to the applicable Loans and/or Commitments of the Accepting Lenders and/or a change in the payment of fees to the Accepting Lenders (such change and/or payments to be in the form of cash, Capital Stock or other property to the extent not prohibited by this Agreement), (C) any additional or different financial or other covenants or other provisions that are agreed between the Borrower, the Administrative Agent and the Accepting Lenders; <u>provided</u> such covenants and provisions are applicable only during periods after the Latest Maturity Date that is in effect on the effective date of such Permitted Amendment and (D) any other amendment to a Loan Document required to give effect to the Permitted Amendments described in clauses (A) to (C) above.

"<u>Permitted Cure Securities</u>": any Qualified Equity Interest in Holdings.

"<u>Permitted Discretion</u>": a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgement.

"<u>Permitted Encumbrances</u>": Liens permitted pursuant to Section 7.3(a), (b), (c), (d), (e), (h)(ii), (v) or (z); provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness (other than with respect to Section 7.3(h)(ii), (v) and (z)); <u>provided</u> <u>further</u> that, with respect to Section 7.3(h)(ii) and (z), any such Lien on ABL Priority Collateral does not have priority over the Lien in favor of the Administrative Agent.

"<u>Permitted Investors</u>": the collective reference to the Management Stockholders and each other Person that is an investor in Holdings or the immediate parent of Holdings on the Closing Date.

"<u>Permitted Liens</u>": as defined in <u>Section 7.3</u>.

"<u>Permitted Refinancing</u>": with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; <u>provided</u> that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (excluding the effects of nominal amortization in the amount of no greater than one percent per annum), (c) at the time thereof, no Default shall have occurred and be continuing or would result therefrom, and (d) (i) to the extent such Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing,

refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) to the extent Liens on the Collateral (or any portion thereof) securing such Indebtedness being modified, refinanced, refunded, renewed or extended are (x) subordinated to the Liens on the Collateral (or any portion thereof) securing the Obligations, the Liens, if any, securing such modification, refinancing, refunding, renewal or extension shall be subordinated to the Liens securing the Obligations to the same extent pursuant to an intercreditor agreement reasonably satisfactory to the Administrative Agent or (y) pari passu to the Liens on the Collateral securing the Obligations, the Liens, if any, securing such modification, refinancing, refunding, renewal or extension shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent, (iii) with respect to any Indebtedness modifying, refinancing, refunding, renewing or extending Indebtedness under Section 7.2(a)(ii) or 7.2(b), (x) such Indebtedness shall be incurred by the Borrower or any Guarantor and shall not be guaranteed by any Restricted Subsidiary other than the Guarantors and (y) if such Indebtedness is secured, (i) such Indebtedness shall only be secured by Collateral, (ii) the Liens securing such Indebtedness shall be junior, with respect to the ABL Priority Collateral, to the Liens on the Collateral securing the Obligations and (iii) a representative, trustee, collateral agent, security agent or similar Person acting on behalf of the holders of such Indebtedness shall become party to the Intercreditor Agreement or, in the case that the Liens securing such Indebtedness are junior with respect to the Liens on the Collateral securing the Obligations, such Indebtedness shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent, (iv) Indebtedness of a Subsidiary that is not a Guarantor shall not refinance Indebtedness of the Borrower or a Guarantor, (v) Indebtedness of the Borrower or a Restricted Subsidiary shall not refinance Indebtedness of a Subsidiary that is not a Guarantor and (vi) the other terms and conditions of such Indebtedness (excluding pricing, fees, rate floors, premiums, optional prepayment or optional redemption provisions and financial covenants) are either (a) substantially identical to the Indebtedness being refinanced, (b) (taken as a whole) not materially more favorable to the providers of such Permitted Refinancing than those applicable to the Indebtedness being refinanced or (c) on market terms for Indebtedness of the type being incurred pursuant to such Permitted Refinancing at the time of incurrence, except in each case for covenants or other provisions contained in such Indebtedness that are applicable only after the then Latest Maturity Date; provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days (or such shorter period acceptable to the Administrative Agent) prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (vi) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)).

"Permitted Tax Distributions": payments, Restricted Payments or distributions by the Borrower to Holdings (or any direct or indirect parent thereof) in order to pay consolidated or combined federal, state or local taxes attributable to the income of the Borrower, not payable directly by the Borrower or any of its Subsidiaries which payments, Restricted Payments or distributions by the Borrower are not in excess of the tax liabilities that would have been payable by the Borrower and its Subsidiaries on a stand-alone basis.

"Person": any individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a relevant time, any employee benefit plan (other than a Multiemployer Plan) that is covered by ERISA and in respect of which Holdings or the Borrower is (or, if such plan were terminated at such time, would be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform": as defined in Section 6.2(a).

"PPSA": the Personal Property Security Act (Ontario) and the regulations thereunder, as in effect from time to time (including the Securities Transfer Act, 2006 (Ontario), provided, however, if attachment, perfection or priority of Administrative Agent's security interests in any Collateral are governed by the personal property security laws of any jurisdiction of Canada other than Ontario, "PPSA" shall mean those personal property security laws in such other jurisdiction for the purposes of the provisions hereof relating to such attachment, perfection or priority and for the definitions related to such provisions.

"Prime Rate": the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Private Lender Information": any information and documentation that is not Public Lender Information.

"Proceeding": any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Pro Forma Basis": for the purposes of calculating (a) Consolidated EBITDA for any period of four consecutive fiscal quarters (each, a "Reference Period"), (i) if at any time during such Reference Period (or after such Reference Period and through the applicable date of measurement or determination) the Borrower or any Restricted Subsidiary shall have made any Disposition or discontinued any operations, the Consolidated EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Disposition or discontinued operations for such Reference Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Reference Period and (ii) if at any time during such Reference Period (or after such Reference Period and through the applicable date of measurement or determination) the Borrower or any Restricted Subsidiary shall have made an Asset Acquisition or any acquisition of more than 50% of the Capital Stock of any Person, Consolidated EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto as if such Asset Acquisition or acquisition of more than 50% of the Capital Stock of any Person, occurred on the first day of such Reference Period (including, in each such case, pro forma adjustments (x) arising out of events which are directly attributable to a specific transaction described above, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the SEC, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring charges and (y) such other pro forma adjustments relating to a specific transaction or event described above and reflective of actual or reasonably anticipated synergies and cost savings expected to be realized or achieved in the 12 months following such transaction or event, which pro forma adjustments shall be certified by the chief financial officer, treasurer, controller or comptroller of the Borrower); provided that, the aggregate amount of such pro forma adjustments under clauses (x) and (y)

and for purposes of testing compliance with the Consolidated Fixed Charge Coverage Ratio only, together with any addbacks under clause (e) in the definition of Consolidated EBITDA, in any period shall not exceed 15% of Consolidated EBITDA for such period, (b) Consolidated Total Debt for any Reference Period (and the amount of cash and Cash Equivalents which reduce Consolidated Total Debt under the Total Net First Lien Leverage Ratio, the Total Net Leverage Ratio and the Total Net Secured Leverage Ratio), Consolidated Total Debt (and such cash and Cash Equivalents) shall be calculated as of the last day of the applicable Reference Period after giving effect to any Consolidated Total Debt incurred or repaid on the last day of such Reference Period (or after such Reference Period and through the applicable date of measurement or determination) and (c) Consolidated Fixed Charges, (x) the Consolidated Fixed Charges attributable to any Indebtedness assumed or incurred in connection with a Permitted Acquisition (as defined in the Term Loan Credit Agreement) consummated during the applicable Reference Period or subsequent to the applicable Reference Period and on or prior to the date of such calculation shall be included and (y) the Consolidated Fixed Charges attributable to any Indebtedness repaid or otherwise Disposed of during the applicable Reference Period or subsequent to the applicable Reference Period and on or prior to the date of such calculation shall be excluded. The term "Disposition" in this definition shall not include dispositions of inventory and other ordinary course dispositions of property. With respect to any assumption, incurrence, repayment or other Disposition of Indebtedness,  if such Indebtedness has a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the date of calculation had been the applicable rate for the entire period (taking into account any Swap Obligations applicable to such Indebtedness if such Swap Obligation has a remaining term as at the date of calculation in excess of 12 months).

"Pro Forma Period": with respect to any Restricted Payment, Investment or prepayment of Indebtedness (any of the foregoing, a "Specified Event"), the period (a) commencing 90 days prior to the date such Specified Event is proposed by the Borrower to occur, provided that if 90 days has not lapsed since the Closing Date then the Pro Forma Period shall commence on the Closing Date and (b) ending on the date such Specified Event is proposed by the Borrower to occur.

"Pro Rata Share": with respect to (i) any Revolving Facility, and each Revolving Lender's share of such Revolving Facility, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Commitments of such Revolving Lender under such Revolving Facility at such time and the denominator of which is the amount of the aggregate Revolving Commitments under such Revolving Facility at such time; provided that if such Revolving Commitments have been terminated, then the Pro Rata Share of each Revolving Lender shall be determined based on the Pro Rata Share of such Revolving Lender under such Revolving Facility immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof, and (ii) with respect to each Lender and all Loans and Outstanding Amounts at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Outstanding Amount with respect to Loans and Commitments of such Lender at such time (plus such Lender's obligation to purchase participations in undrawn Letters of Credit) and the denominator of which is the Outstanding Amount (in aggregate) plus the amount of all Lenders' obligations to purchase participations in undrawn Letters of Credit at such time; provided that if all Outstanding Amounts have been repaid or terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Projections": as defined in Section 6.2(d).

"Properties": as defined in Section 4.17(a).

"<u>Protective Advance Exposure</u>": at any time, the sum of the aggregate amount of all outstanding Protective Advances at such time.  The Protective Advance Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total Protective Advance Exposure at such time.

"<u>Protective Advances</u>": as defined in <u>Section 2.6</u>.

"<u>PTE</u>": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Public Lender Information</u>": information and documentation that is either exclusively (i) of a type that would be publicly available if Holdings, the Borrower and their respective Subsidiaries were public reporting companies or (ii) not material with respect to Holdings, the Borrower and their respective Subsidiaries or any of its securities for purposes of foreign, United States Federal and state securities laws.

"<u>Public Market</u>": at any time after (a) a Public Offering has been consummated and (b) at least 15% of the total issued and outstanding common equity of Holdings or Holdings' immediate parent has been distributed by means of an effective registration statement under the Securities Act or sale pursuant to Rule 144 under the Securities Act.

"<u>Public Offering</u>": an initial underwritten public offering of common Capital Stock of Holdings or Holdings' direct or indirect parent pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (other than a registration statement on Form S-8 or any successor form).

"<u>QFC</u>": has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>QFC Credit Support</u>": as defined in <u>Section 11.25</u>.

"<u>Qualified Counterparty</u>": with respect to any Swap Agreement, any counterparty thereto that, at the time such Swap Agreement was entered into or (if later) as of the Closing Date, is the Administrative Agent, a Joint Lead Arranger or a Lender (or an Affiliate of the foregoing).

"<u>Qualified ECP</u>": at any date and in respect of any Obligation in respect of a Swap Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, (i) the Borrower and (ii) each Guarantor that has total assets exceeding $10,000,000 at the time such Obligations are incurred.

"<u>Qualified Equity Interests</u>": any Capital Stock that is not a Disqualified Equity Interest.

"<u>Qualified Public Offering</u>": a Public Offering that results in a Public Market.

"<u>Receivables Facility</u>": a factoring, securitization or similar receivables financing facility pursuant to which (i) a Non-Guarantor Subsidiary sells Receivables Facility Assets to a Person that is not a Loan Party; <u>provided</u> that such Receivables Facility Assets were not generated by or transferred to a Non-Guarantor Subsidiary by a Loan Party, or (ii) the Borrower or a Restricted Subsidiary of the Borrower sells Receivables Facility Assets to a Receivables Facility Subsidiary or to any other Person that is not an Affiliate of the Borrower, which sale of Receivables Facility Assets (a) shall be non-recourse to the Borrower or any of their respective Restricted Subsidiaries for losses and claims arising

from the financial inability to pay of any obligor, guarantor or other Person in respect of such Receivables Facility Assets, and (b) may involve the granting of security interests in such Receivables Facility Assets by such Receivables Facility Subsidiary to one or more third parties providing credit in connection with such Receivables Facility; provided that only with respect of this clause (ii)(x) the Borrower or such Restricted Subsidiary shall receive cash proceeds from the financing of Receivables Facility Assets in an amount that at all times equals or exceeds, in the aggregate, 70% of the aggregate face amount of such Receivables Facility Assets and (y) the facility limit or purchase limit under any such transaction shall not exceed $10,000,000 in the aggregate at any time.

"Receivables Facility Assets": accounts, payment intangibles and related assets of the Borrower or a Restricted Subsidiary arising in the ordinary course of business.

"Receivables Facility Subsidiary": a Person to which the Borrower or a Restricted Subsidiary sells, conveys, transfers or grants a security interest in Receivables Facility Assets, which Person is formed for the limited purpose of effecting one or more securitizations involving the Receivables Facility Assets.

"Receivables Facility Undertakings": representations, warranties, covenants, repurchase obligations and indemnities entered into by the Borrower or a Restricted Subsidiary of the Borrower that the Borrower has determined in good faith to be customary in financings similar to Receivables Facilities, including, without limitation, those relating to the servicing of the assets of a Receivables Facility Subsidiary.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation, eminent domain or similar proceeding relating to any asset of any Group Member.

"Reference Period": as defined in the definition of "Pro Forma Basis".

"Reference Time": with respect to any setting of the then-current Benchmark, (1) if such Benchmark is the Term SOFR Rate, 5:00 a.m. (Chicago time) on the day that is two U.S. Government Business Days preceding the date of such setting, (2) if the RFR for such Benchmark is Daily Simple SOFR, then four Business Days prior to such setting  or (3) if such Benchmark is not the Term SOFR Rate or Daily Simple SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"Refinance": in respect of any Indebtedness, to refinance, redeem, defease, refund, extend, renew or repay any Indebtedness with the proceeds of other Indebtedness, or to issue other Indebtedness, in exchange or replacement for, such Indebtedness in whole or in part; "Refinanced" and "Refinancing" shall have correlative meanings.

"Register": as defined in Section 11.6(b)(vi).

"Regulated Bank": an Approved Bank that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board of Governors under 12 CFR part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to in clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse the Issuing Lenders pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Relevant Governmental Body": the Federal Reserve Board and/or the NYFRB or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate": (1) with respect to any Term Benchmark Borrowing, the Adjusted Term SOFR Rate or (2) with respect to any RFR Borrowing, the Adjusted Daily Simple SOFR, as applicable.

"Repayments": as defined in Section 7.8(a).

"Report": reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Borrowing Base Loan Parties from information furnished by or on behalf of the Borrowing Base Loan Parties, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent. "Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under applicable regulations.

"Required Lenders": at any time, the holders of more than 50% the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding.

"Requirement of Law": as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves": any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, to maintain (including an availability reserve, reserves for accrued and unpaid interest on the Obligations, reserves for Cash Management Obligations then provided or outstanding, volatility reserves, reserves for rent and utility expenses at locations leased by any Borrowing Base Loan Party and for consignee's, warehousemen's and bailee's charges (provided, that, such Reserves will not exceed the aggregate of the amounts payable to such owners, lessors, consignees, warehouseman, bailees and utilities for the next three (3) months from any such time and including in each case amounts, if any, then outstanding and unpaid owed by any Borrowing Base Loan Party to such owners, lessors, consignees, warehouseman, bailees and utilities, but such limitations will only apply so long as no Event of Default exists or has occurred and is continuing), reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Specified Swap Obligations then outstanding, reserves for contingent liabilities of any Borrowing Base Loan Party, reserves for uninsured losses of any Borrowing Base Loan Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation, Canadian Priority Payables Reserves and reserves for taxes (including Canadian Goods and Services Taxes, Provincial Sales Taxes, harmonized sales taxes, withholding taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Borrowing Base Loan Party.

Notwithstanding anything to the contrary in this Agreement, (a) such Reserves shall not be established or changed except upon not less than three (3) Business Days' prior written notice to the Borrower (such three (3) Business Days (or longer) period the "Review Period"), which notice shall include a reasonably detailed description of such Reserve being established (during which period (i) the Administrative Agent shall, if requested, discuss any such Reserve or change with the Borrower and (ii) the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Reserve or change thereto no longer exists or exists in a manner that would result in the establishment of a lower Reserve or result in a lesser change thereto, in a manner and to the extent reasonably satisfactory to the Administrative Agent); provided that (i) if consultation with the Borrower and/or notice to the Borrower and the Lenders is not practicable or if failure to implement any such change within a shorter time period would, in the good faith judgment of the Administrative Agent, reasonably be expected to result in a Material Adverse Effect or materially and adversely affect the Collateral or the rights of the Lenders under the Loan Documents, such change may be implemented within a shorter time as determined by the Administrative Agent in its Permitted Discretion and (ii) any borrowings or issuances of Letters of Credit made during the Review Period shall be made based on the Borrowing Base as modified by the proposed new or modified Reserves, (b) the amount of any Reserve established by the Administrative Agent, and any change in the amount of any Reserve, shall have a reasonable relationship to the event, condition or other matter that is the basis for such Reserve or such change as determined by the Administrative Agent in good faith, (c) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria, (d) no reserves shall be imposed on the first 5% of dilution of accounts receivable and thereafter no dilution reserve shall exceed 1% for each incremental whole percentage in dilution over 5% and (e) no reserves may be taken after the Closing Date based on circumstances, conditions, events or contingencies known to the Administrative Agent as of the Closing Date and for which no reserves were imposed on the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in any material adverse respect since the Closing Date.

"Resolution Authority": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer": the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, controller or comptroller of the Borrower, as applicable, but in any event, with respect to financial matters, the chief financial officer, treasurer, assistant treasurer, controller or comptroller of the Borrower.

"Restricted Payments": as defined in Section 7.6.

"Restricted Subsidiary": any Subsidiary of the Borrower other than any Unrestricted Subsidiary.

"Revolving Borrowing": a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of Term Benchmark Loans, having the same Interest Period made by each of the Lenders.

"Revolving Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Loans and participate in Letters of Credit and Protective Advances in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Commitment" opposite such Lender's name on Schedule 1.1A or in the Assignment and Assumption or Incremental Amendment pursuant to which such Lender became a party hereto, as applicable, as the same may be changed from time to time pursuant to the terms hereof. The original amount of the Total Revolving Commitments is $85,000,000.

"<u>Revolving Commitment Decrease Lender</u>" as defined in <u>Section 2.24(d)</u>.

"<u>Revolving Commitment Increase</u>": as defined in <u>Section 2.24(a)</u>.

"<u>Revolving Commitment Increase Lender</u>": as defined in <u>Section 2.24(d)</u>.

"<u>Revolving Commitment Period</u>": the period from and including the Closing Date to the Revolving Termination Date.

"<u>Revolving Excess</u>": as defined in <u>Section 2.11(a)</u>.

"<u>Revolving Extensions of Credit</u>": as to any Revolving Lender at any time to an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans held by such Lender then outstanding, (b) such Lender's Revolving Percentage of the L/C Obligations then outstanding and (c) such Lender's Revolving Percentage of the Protective Advances then outstanding.

"<u>Revolving Facility</u>": any Class of Revolving Commitments and the extensions of credit made thereunder, as the context may require.

"<u>Revolving Lender</u>": each Lender that has a Revolving Commitment or that holds Revolving Loans.

"<u>Revolving Loans</u>": as defined in <u>Section 2.4(a)</u>.

"<u>Revolving Percentage</u>": as to any Revolving Lender at any time, the percentage which such Lender's Revolving Commitment then constitutes of the Total Revolving Commitments or, at any time after the Revolving Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Loans then outstanding constitutes of the aggregate principal amount of the Revolving Loans then outstanding; <u>provided</u> that in the event that the Revolving Loans are paid in full prior to the reduction to zero of the Total Revolving Extensions of Credit, the Revolving Percentages shall be determined in a manner designed to ensure that the other outstanding Revolving Extensions of Credit shall be held by the Revolving Lenders on a comparable basis.

"<u>Revolving Termination Date</u>": [  ], 202[  ][1].

"<u>RFR Borrowing</u>": as to any Borrowing, the RFR Loans comprising such Borrowing.

"<u>RFR Loans</u>": Loans the rate of interest applicable to which is based upon the Adjusted Daily Simple SOFR.

"<u>Sale Leaseback Transaction</u>": any arrangement with any Person or Persons, whereby in contemporaneous or substantially contemporaneous transactions Holdings, the Borrower or any of their respective Restrictive Subsidiaries sells substantially all of its right, title and interest in any property and, in connection therewith, a Holdings, the Borrower or any of their respective Restrictive Subsidiaries acquires, leases or licenses back the right to use all or a material portion of such property.

---

1 To be the date that is 4.5 years from the Closing Date.

"Sanctioned Territory": at any time, a country or territory which is the subject or target of comprehensive Sanctions, including, as of the Closing Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic and the Crimea regions of Ukraine, Cuba, Iran, North Korea, and Syria.

"Sanctioned Person": at any time, any Person (a) listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury of the United Kingdom, the Government of Canada (or the government of any province or territory thereof) or any other relevant sanctions authority, (b) that is a Governmental Authority of a Sanctioned Territory, (c) located, organized or resident in a Sanctioned Territory, (d) 50% or more owned or, where relevant under applicable Sanctions, controlled by one or more Persons identified in clause (a) (b) or (c) or (e) any Person with whom dealings are prohibited under Sanctions.

"Sanctions": as defined in Section 4.11(c).

"S&P": Standard & Poor's Ratings Services, or any successor thereto.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Parties": the collective reference to the Administrative Agent, the Lenders (including any Issuing Lender in its capacity as Issuing Lender), any Qualified Counterparties and banks or financial institutions providing Cash Management Obligations.

"Securities Account": as defined in the Security Agreement.

"Securities Act": the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreement": the Pledge and Security Agreement, dated as of [  ], 2022, made by the grantors party thereto in favor of the Administrative Agent, substantially in the form of Exhibit A-1.

"Security Documents": the collective reference to the Security Agreement, the Intellectual Property Security Agreements, the Mortgages, Deposit Account Control Agreements, the Canadian Pledge and Security Agreement, charge or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as Collateral in accordance (solely with respect to assets and property of (or the Capital Stock of) Specified Foreign Guarantors) with the Agreed Security Principles and all other security documents hereafter delivered to the Administrative Agent granting (or purporting to grant) a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Seller's Retained Interest": in respect of a Receivables Facility, the debt or equity interests held by the Borrower in the Receivables Facility Subsidiary to which Receivables Facility Assets have been transferred, including any such debt or equity received as consideration for or as a portion of the purchase price for the Receivables Facility Assets transferred, or any other instrument through which the Borrower has rights to or receives distributions in respect of any residual or excess interest in the Receivables Facility Assets.

"<u>Senior Representative</u>": with respect to any series of Indebtedness permitted to be incurred hereunder, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"<u>Significant Group Member</u>": at any date of determination, each Subsidiary or group of Subsidiaries of the Borrower (a) whose total assets at the last day of the most recent fiscal period for which financial statements have been delivered were equal to or greater than 7.5% of the Total Assets at such date or (b) whose gross revenues for the most recently completed period of four fiscal quarters for which financial statements have been delivered were equal to or greater than 7.5% of the consolidated gross revenues of the Borrower and its Subsidiaries for such period, in each case, determined in accordance with GAAP (it being understood that such calculations shall be determined in the aggregate for all Subsidiaries of the Borrower subject to any of the events specified in <u>Section 9.1(g)</u>).

"<u>SOFR</u>": a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>": the NYFRB (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Administrator's Website</u>": the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"<u>SOFR Determination Date</u>": as defined in the definition of "Daily Simple SOFR".

"<u>SOFR Rate Day</u>": as defined in the definition of "Daily Simple SOFR".

"<u>Solvent</u>": with respect to any Person and its Subsidiaries on a consolidated basis, means that as of any date of determination, (a) the sum of the "fair value" of the assets of such Person will, as of such date, exceed the sum of all debts of such Person as of such date, as such quoted terms are determined in accordance with applicable federal, provincial, territorial and state laws governing determinations of the insolvency of debtors, (b) the "present fair saleable value" of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability on existing debts of such Person as such debts become absolute and matured, as such quoted term is determined in accordance with applicable federal, provincial, territorial and state laws governing determinations of the insolvency of debtors, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct any business in which it is or is about to become engaged and (d) such Person does not intend to incur, or believe or reasonably should believe that it will incur, debts beyond its ability to pay as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured. For purposes of this definition, the amount of any contingent, unliquidated and disputed claim and any claim that has not been reduced to judgment at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such liabilities meet the criteria for accrual under GAAP ASC 450).

"Specified Class": as defined in Section 2.27(a).

"Specified Event of Default": any Event of Default pursuant to Section 9.1(a), Section 9.1(b) (but only with respect to any Borrowing Base Certificate), Section 9.1(c) (but only with respect to a breach of Section 7.1), Section 9.1(d) (with only with respect to a breach of Section 6.2(e)(i), Section 6.2(e)(iv) or Section 6.10) or Section 9.1(g).

"Specified Excess Availability": the sum of (i) Excess Availability and (ii) the amount (not to exceed 2.5% of the Total Revolving Commitments then in effect) by which the Borrowing Base then in effect exceeds the Total Revolving Commitments then in effect.

"Specified Foreign Guarantors": any Foreign Subsidiary (i) to the extent not excluded by the application of the Agreed Security Principles and (ii) under clause (ii) of the definition of "Subsidiary Guarantor".

"Specified Rate": as defined in Section 2.14(e).

"Specified Swap Agreement": any Swap Agreement entered into by the Borrower or any of its Restricted Subsidiaries on the one hand, and any Qualified Counterparty (or any Person who was a Qualified Counterparty as of the date such Swap Agreement was entered into or (if later) as of the Closing Date) on the other hand, in respect of interest rates, currencies and commodities to the extent permitted under Section 7.11, and any guarantee thereof by a Loan Party.

"Specified Swap Obligations": Swap Obligations of any Loan Party owing to one or more Qualified Counterparty (or any Person who was a Qualified Counterparty as of the date such Swap Agreement was entered into or (if later) as of the Closing Date); provided that at or prior to the time that any transaction relating to such Swap Obligation is executed (or, if later, the Closing Date) the Borrower (other than for transactions with JPMCB and its Affiliates) and the applicable Qualified Counterparty (other than JPMCB) shall have delivered written notice to the Administrative Agent that such a transaction has been entered into and that it constitutes a Specified Swap Obligation entitled to the benefits of the Security Documents.

"Specified Transaction: as defined in Section 1.6.

"Subordinated Indebtedness": any Indebtedness of any Group Member that is subordinated in right of payment to the Obligations; provided that, for the avoidance of doubt, Indebtedness under the Term Loan Credit Agreement shall not be considered Subordinated Indebtedness.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other Capital Stock having ordinary voting power (other than stock or such other Capital Stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower; provided that such references to a "Subsidiary" or "Subsidiaries" shall not include any Receivables Facility Subsidiary.

"Subsidiary Acquisition": any acquisition by the Borrower or any Restricted Subsidiary of at least a majority of the outstanding Capital Stock of Persons or an Asset Acquisition.

"<u>Subsidiary Guarantor</u>": (i) each Restricted Subsidiary of the Borrower that is a Domestic Subsidiary or a Canadian Subsidiary (in each case, other than a Non-Guarantor Subsidiary) and (ii) each other Restricted Subsidiary that is an obligor under or guarantor in respect of the Term Loans, Indebtedness permitted under <u>Section 7.2(b)</u> or any Permitted Refinancing in respect of the foregoing.

"<u>Supermajority Lenders</u>": at any time, the holders of more than 66 2/3% the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding; <u>provided</u> that as long as there are two or more Lenders, Supermajority Lenders shall include at least two unaffiliated Lenders.

"<u>Supported QFC</u>": as defined in <u>Section 11.25</u>.

"<u>Swap Agreement</u>": any agreement with respect to any swap, cap, collar, hedge, forward, future or derivative transaction or option or similar agreement, whether cleared or uncleared, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Group Member shall be a "Swap Agreement".

"<u>Swap Obligation</u>": with respect to any Person, any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"<u>Taxes</u>": as defined in Section 2.19(a).

"<u>Term Benchmark</u>": when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"<u>Term Benchmark Loans</u>": Loans the rate of interest applicable to which is based upon the Adjusted Term SOFR Rate.

"<u>Term Loan Administrative Agent</u>": JPMCB, as administrative agent under the Term Loan Documents, and its successors and assigns.

"<u>Term Loan Credit Agreement</u>": the Term Loan Credit Agreement, dated as of the Closing Date, among the Borrower, the lenders and agents party thereto and the Term Loan Administrative Agent.

"<u>Term Loan Documents</u>": collectively (a) the Term Loan Credit Agreement, (b) the Term Loan Security Documents, (c) the Intercreditor Agreement, (d) any promissory note evidencing loans under the Term Loan Credit Agreement and (e) any amendment, waiver, supplement or other modification to any of the documents described in clauses (a) through (d).

"<u>Term Loan Incremental Equivalent Debt</u>": any Indebtedness incurred by a Loan Party in the form of one or more series of secured or unsecured bonds, debentures, notes or similar instruments or term loans; provided that (a) if such Indebtedness is secured, (i) such Indebtedness shall only be secured by Collateral, (ii) the liens securing such Indebtedness shall be junior, with respect to the ABL Priority

Collateral, to the Liens on the Collateral securing the Obligations and (iii) a Senior Representative, trustee, collateral agent, security agent or similar Person acting on behalf of the holders of such Indebtedness shall have become party to Intercreditor Agreement or, in the case that the Liens securing such Indebtedness is junior with respect to all Collateral, such Indebtedness shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent, (b) such Indebtedness does not mature or have scheduled amortization or payments of principal and is not subject to mandatory redemption or prepayment (except customary asset sale or change of control provisions), in each case prior to  the date that is 180 days after the then Latest Maturity Date then in effect at the time of incurrence thereof, (c) such Indebtedness contains covenants, events of default and other terms that are customary for similar Indebtedness in light of then-prevailing market conditions and, when taken as a whole (other than interest rates, rate floors, fees and optional prepayment or redemption terms), are not more favorable to the lenders or investors providing such Term Loan Incremental Equivalent Debt, as the case may be, than those set forth in the Loan Documents are with respect to the Lenders (other than covenants or other provisions applicable only to periods after the Latest Maturity Date then in effect at the time of incurrence thereof); provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness or the modification, refinancing, refunding, renewal or extension thereof (or such shorter period of time as may reasonably be agreed by the Administrative Agent), together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the material definitive documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirements shall be conclusive, (d) such Indebtedness does not provide for any mandatory prepayment, redemption or repurchase (other than excess cash flow, upon a change of control, fundamental change, customary asset sale or event of loss mandatory offers to purchase and customary acceleration rights after an event of default and, for the avoidance of doubt, rights to convert or exchange into Capital Stock of the Borrower in the case of convertible or exchangeable Indebtedness) prior to the date that is 180 days after the Latest Maturity Date then in effect at the time of incurrence thereof and (e) such Indebtedness is not guaranteed by any Person other than Loan Parties.

"Term Loan Priority Collateral": as defined in the Intercreditor Agreement.

"Term Loan Security Documents": the "Security Documents" as defined in the Term Loan Credit Agreement and all other security documents hereafter delivered to the Term Loan Administrative Agent granting (or purporting to grant) a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Term Loan Documents.

"Term Loans": loans outstanding under the Term Loan Credit Agreement.

"Term SOFR Determination Day": as defined in the definition of Term SOFR Reference Rate.

"Term SOFR Rate": with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate": for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Borrowing denominated in Dollars and for any tenor comparable to the applicable Interest Period, the rate per annum published by the CME Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR.  If by 5:00 pm (New York City time) on  such Term SOFR Determination Day, the "Term

SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) preceding U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"Total Assets": the total amount of all assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP as shown on the most recent balance sheet of the Borrower.

 "Total Net First Lien Leverage Ratio": as at the last day of any period, the ratio of (a) the excess of (i) Consolidated Total Debt that is secured by a first priority lien on any of the assets or property of any Loan Party or any Restricted Subsidiary of the Borrower (including the Loans) (it being understood that the Term Loans and any other Consolidated Total Debt that is secured by Liens on all or a portion of the Collateral that are senior to, or pari passu with, the Liens on such Collateral securing the Loans shall be included) over (ii) the amount of Unrestricted Cash of the Borrower and its Restricted Subsidiaries on such date to (b) Consolidated EBITDA for such period.

"Total Net Leverage Ratio": as at the last day of any period, the ratio of (a) the excess of (i) Consolidated Total Debt on such day over (ii) the amount of Unrestricted Cash of the Borrower and its Restricted Subsidiaries on such date to (b) Consolidated EBITDA for such period.

"Total Net Secured Leverage Ratio": as at the last day of any period, the ratio of (a) the excess of (i) Consolidated Total Debt that is secured by a lien on the assets or property of any Loan Party or any Restricted Subsidiary of the Borrower over (ii) the amount of Unrestricted Cash of the Borrower and its Restricted Subsidiaries on such date to (b) Consolidated EBITDA for such period.

"Total Revolving Commitments": at any time, the aggregate amount of the Revolving Commitments then in effect.

"Total Revolving Extensions of Credit": at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Lenders outstanding at such time.

"Transactions": collectively, (a) the execution, delivery and performance by the Borrower and the other Loan Parties of this Agreement, the borrowing of Loans hereunder and the use of proceeds thereof, (b) the execution, delivery and performance by the Borrower and the other Loan Parties of the Term Loan Credit Agreement, the borrowing of Term Loans thereunder and the use of proceeds thereof, and (c) the other transactions contemplated by the  Chapter 11 Plan.

"Transferee": any Assignee or Participant.

"Type": as to any Loan, its nature as an ABR Loan, a Term Benchmark Loan or an RFR Loan.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain

credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement": the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures": for any period, to the extent paid in cash, the aggregate amount of Consolidated Capital Expenditures made by the Borrower and its Restricted Subsidiaries during such period (other than Consolidated Capital Expenditures to the extent financed with the proceeds of any incurrence of Indebtedness (other than the incurrence of any Revolving Loans), proceeds from Dispositions or proceeds from the issuance of Capital Stock).

"Uniform Commercial Code" or "UCC": the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"United States": the United States of America.

"Unrestricted Cash": cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries on such date that are free and clear of any Lien (other than Liens permitted under clauses (a), (h), (i), (l), (w) and (z) of Section 7.3).

"Unrestricted Subsidiary": (i) any Subsidiary (other than a Subsidiary in existence as of the Closing Date) of Holdings designated by the board of directors of Holdings as an Unrestricted Subsidiary pursuant to Section 6.13 subsequent to the Closing Date and (ii) any Subsidiary of an Unrestricted Subsidiary.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Voluntary Pro Rata Payments": as defined in Section 2.17(b).

"Weighted Average Life to Maturity": when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary Guarantor": any Subsidiary Guarantor that is a Wholly Owned Subsidiary of the Borrower.

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law and similar requirements under other applicable laws) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    Other Interpretive Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations (including any of the Loan Documents) shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated, amended and restated or otherwise modified from time to time. For purposes of this Agreement and the other Loan Documents, where the permissibility of a transaction or determinations of required actions or circumstances depend upon compliance with, or are determined by reference to, amounts stated in Dollars, any requisite currency translation shall be the Dollar Equivalent  in effect on the Business Day immediately preceding the date of such transaction (except for such other time periods as provided for in Section 7.2) or determination and shall not be affected by subsequent fluctuations in exchange rates. Any determinations as to the Dollar Equivalent of Letters of Credit denominated in an Alternate Currency (whether for purposes of calculating the amount of L/C Obligations or fees payable in respect of Letters of Credit or the amount required to be paid to the applicable Issuing Lender in respect of a drawing on a Letter of Credit or otherwise), the amount of fees owing in respect of Letters of Credit denominated in an Alternate Currency and the amount of Reimbursement Obligations owing to the applicable Issuing Lender shall be made by the Administrative Agent and such determination shall be conclusive absent manifest error.

(c)    For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim", "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the Uniform Commercial Code or the PPSA

shall include publication under the Civil Code of Québec, (g) all references to "perfection" of or "perfected" Liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favor of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatory or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies", as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.

(d)     The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(e)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3     Accounting. For purposes of all financial definitions and calculations in this Agreement, there shall be excluded for any period the effects of purchase accounting (including the effects of such adjustments pushed down to Holdings and its Subsidiaries) in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, post-employment benefits, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to Holdings and its Subsidiaries), as a result of the Transactions, any acquisition consummated prior to the Closing Date, any Subsidiary Acquisition or the amortization or write-off of any amounts thereof. References to financial statements delivered pursuant to Section 6.1(a) or Section 6.1(b) for purposes of calculating any financial ratio referenced herein shall, for periods not covered by such financial statements or periods prior to such delivery, include Consolidated EBITDA for the period referenced in the last sentence of the definition of Consolidated EBITDA.

1.4     Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

1.5     Interest Rates; Benchmark Notification. The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.16(b) provides a mechanism for determining an alternative rate of interest.  The Administrative

55

Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including with-out limitation, whether the composition or characteristics of any such alternative, successor or re-placement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

      1.6    <u>Limited Condition Transactions</u>. Notwithstanding anything in this Agreement or any Loan Document to the contrary when (i) calculating any applicable ratio or financial test (other than Excess Availability or Specified Excess Availability) or (other than in connection with the making of any Revolving Extension of Credit) determining whether any Default or Event of Default has occurred, is continuing or would result from any action, in each case, pursuant to <u>Section 7.2</u>, <u>Section 7.3</u>, <u>Section 7.5</u>, <u>Section 7.6</u> or <u>Section 7.7</u> in connection with the incurrence of Indebtedness, the creation of Liens, the making of any Disposition, the making of an Investment, the making of a Restricted Payment, the designation of a Subsidiary as restricted or unrestricted or the repayment of Indebtedness (each, a "<u>Specified Transaction</u>") or (ii) determining the accuracy of any representation or warranty (other than in connection with the making of any Revolving Extension of Credit), in each case of clauses (i) and (ii) in connection with a Limited Condition Transaction, the date of determination of such ratio or financial test, the accuracy of such representation or warranty (but taking into account any earlier date specified therein) or whether any Default or Event of Default has occurred, is continuing or would result therefrom shall, at the option of the Borrower (the Borrower's election to exercise such option in connection  with any Limited Condition Transaction, an "<u>LCT Election</u>"), be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into (the "<u>LCT Test Date</u>"). If on a Pro Forma Basis after giving effect to such Limited Condition Transaction and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios, financial tests, representations and warranties and absence of defaults are calculated as if such Limited Condition Transaction or other transactions had occurred at the beginning of the most recent Reference Period ending prior to the LCT Test Date for which financial statements are available, the Borrower could have taken such action on the relevant LCT Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, (i) if any of such ratios, financial tests, representations and warranties or absence of defaults are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Consolidated EBITDA), a change in facts and circumstances or other provisions at or prior to the consummation of the relevant Limited Condition Transaction, such ratios, representations and warranties and absence of defaults will not be deemed to have been exceeded, breached, or otherwise failed as a result of such fluctuations or changed circumstances solely for purposes of determining whether the Limited Condition Transaction and any related transactions is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Transaction or related Specified Transactions.  If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any subsequent calculation of any ratio or

basket availability on or following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio or basket shall be calculated on a Pro Forma Basis both (i) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated and (ii) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have not been consummated.

### SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1    [Reserved].

2.2    [Reserved].

2.3    [Reserved].

2.4    Revolving Commitments. (a) Subject to the terms and conditions hereof, each Revolving Lender severally agrees to make revolving credit loans ("Revolving Loans") (it being understood and agreed that the Revolving Lenders will be deemed to have made, on a cashless basis, a Revolving Loan in an amount set forth on Schedule 1.1A, which is equal to the amount rolled pursuant to the ABL Roll Option (as defined in the Chapter 11 Plan), on the Closing Date in accordance with the Chapter 11 Plan) to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which would not result in either (i) the Revolving Loans of such Lender when added to such Lender's Revolving Percentage of the L/C Obligations then outstanding (with the amount of any L/C Obligations denominated in an Alternate Currency to be based on the Dollar Equivalent thereof as of any applicable date of determination) and such Lender's Protective Advance Exposure then outstanding exceeding the amount of such Lender's Revolving Commitment or (ii) the Total Revolving Extensions of Credit exceeding the Line Cap, subject to the Administrative Agent's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.6. During the Revolving Commitment Period the Borrower may use the Revolving Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Loans may from time to time be Term Benchmark Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.12.

(b)    The Borrower shall repay all outstanding Revolving Loans on the Revolving Termination Date, together with accrued and unpaid interest on the Revolving Loans, to but excluding the date of payment.

2.5    Procedure for Revolving Loan Borrowing. The Borrower may borrow under the Revolving Commitments during the Revolving Commitment Period on any Business Day, provided that the Borrower shall give the Administrative Agent irrevocable notice by submitting a Borrowing Request (which notice must be received by the Administrative Agent prior to 11:00 a.m., New York City time, (a) three U.S. Government Securities Business Days prior to the requested Borrowing Date, in the case of Term Benchmark Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of ABR Loans); provided that any such notice of a borrowing of ABR Loans under the Revolving Facility to finance payments required by Section 3.5 may be given not later than 1:00 p.m., New York City time, on the date of the proposed borrowing), specifying (i) the amount and Type of Revolving Loans to be borrowed, (ii) the requested Borrowing Date, (iii) in the case of Term Benchmark Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor and

(iv) instructions for remittance of the applicable Loans to be borrowed. Each borrowing under the Revolving Commitments shall be in an amount equal to (x) in the case of ABR Loans, $1,000,000.00 or a whole multiple of $500,000 in excess thereof (or, if the then aggregate Available Revolving Commitments of the Lenders are less than $1,000,000.00, such lesser amount) and (y) in the case of Term Benchmark Loans, $1,000,000.00 or a whole multiple of $500,000.00 in excess thereof. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Lender thereof. Each Revolving Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 noon, New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting such account as is designated in writing to the Administrative Agent by the Borrower, with the aggregate of the amounts made available to the Administrative Agent by the Revolving Lenders and in like funds as received by the Administrative Agent; provided that ABR Loans made to finance the reimbursement of a Protective Advance shall be retained by the Administrative Agent. Any Protective Advance shall be made in accordance with the procedures set forth in <u>Section 2.6</u>.

        2.6    <u>Protective Advances</u>. (a)   Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrower and the Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrower, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in <u>Section 11.5</u>) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "<u>Protective Advances</u>"); <u>provided</u> that the aggregate amount of Protective Advances outstanding at any time shall not at any time exceed 10% of the Borrowing Base; <u>provided</u> further that the Total Revolving Extensions of Credit outstanding at any time shall not exceed the Total Revolving Commitments. Protective Advances may be made even if the conditions precedent set forth in <u>Section 5.2</u> have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be ABR Loans. The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders (other than any Defaulting Lender). Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. At any time that there is sufficient Excess Availability and the conditions precedent set forth in <u>Section 5.2</u> have been satisfied, the Administrative Agent may request the Revolving Lenders to make a Revolving Loan to repay a Protective Advance. At any other time the Administrative Agent may require the Lenders to fund their risk participations described in <u>Section 2.6(b)</u>.

        (b)   Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent, without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Revolving Percentage. From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender such Lender's Revolving Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

(c)      The Borrower shall repay all outstanding Protective Advances on the earlier of (i) Revolving Termination Date and (ii) demand by the Administrative Agent, together with accrued and unpaid interest on the Protective Advances, to but excluding the date of payment.

2.7      [Reserved].

2.8      Commitment Fees, etc.

(a)      The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender in accordance with its Revolving Percentage, a commitment fee (the "Commitment Fee") equal to the Commitment Fee Rate times the actual daily amount by which the Total Revolving Commitments exceed the sum of (i) the Outstanding Amount of Loans and (ii) the Outstanding Amount of L/C Obligations, subject to adjustment as provided in Section 2.24. The Commitment Fee shall accrue at all times during the Revolving Commitment Period (and thereafter so long as any Loans or L/C Obligations remain outstanding), including at any time during which one or more of the conditions in Section 5 is not met, and shall be due and payable in arrears on each Fee Payment Date. The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Commitment Fee Rate during any quarter, the actual daily amount shall be computed and multiplied by the Commitment Fee Rate separately for each period during such quarter that such Commitment Fee Rate was in effect.

(b)      The Borrower agrees to pay to the Administrative Agent, the Commitment Parties and the Joint Lead Arrangers (and their respective affiliates) the fees in the amounts and on the dates as set forth in any fee agreements (including, without limitation, the Commitment Letter and Fee Letter) with such Persons and to perform any other obligations contained therein.

2.9      Termination or Reduction of Revolving Commitments. The Borrower shall have the right, upon not less than two Business Days' notice (to the extent there are no Revolving Loans outstanding at such time) or not less than three Business Days' notice (in any other case) to the Administrative Agent, to terminate the Revolving Commitments or, from time to time, to reduce the amount of the Revolving Commitments. Any termination or reduction of Revolving Commitments pursuant to this Section 2.9 shall be accompanied by prepayment of the Revolving Loans to the extent, if any, that the Total Revolving Extensions of Credit exceed the amount of the Line Cap as so reduced, provided that if the aggregate principal amount of Revolving Loans then outstanding is less than the amount of such excess (because L/C Obligations constitute a portion thereof), the Borrower shall, to the extent of the balance of such excess, Collateralize outstanding Letters of Credit, in each case, in a manner reasonably satisfactory to the Administrative Agent. Any such reduction shall be in an amount equal to $1,000,000.00 or a whole multiple thereof or, if less than $1,000,000, the amount of the Revolving Commitments, or a whole multiple thereof, and shall reduce permanently the Revolving Commitments then in effect; and provided, further, that if any such notice of termination of the Revolving Commitments indicates that such termination is to be made in connection with a Refinancing of the Revolving Facilities, such notice of termination may be revoked if such Refinancing is not consummated.

2.10      Optional Prepayments. (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, in each case, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than (i) 11:00 noon, New York City time, three Business Days prior thereto, in the case of Term Benchmark Loans, (ii) 11:00 a.m., New York City time, three Business Days prior thereto, in the case of RFR Loans and (iii) no later than 11:00 a.m., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Term Benchmark Loans or ABR Loans; provided, that if a Term Benchmark Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.20; and

provided, further, that if such notice of prepayment indicates that such prepayment is to be funded with the proceeds of a Refinancing of a Revolving Facility, such notice of prepayment may be revoked if such Refinancing is not consummated. Upon receipt of any such notice, the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Loans that are ABR Loans, other than in connection with a repayment of all Loans) accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000.00 or a whole multiple of $100,000 in excess thereof.

2.11    Mandatory Prepayments and Commitment Reductions.

(a)    In the event and on such occasion that (i) the Total Revolving Extensions of Credit (calculated, in the case of L/C Obligations denominated in an Alternate Currency, at the Dollar Equivalent thereof) exceed the Total Revolving Commitments or (ii) the Total Revolving Extensions of Credit (excluding for such purposes Protective Advances, and calculated, in the case of L/C Obligations denominated in an Alternate Currency, at the Dollar Equivalent thereof) exceed the Borrowing Base, the Borrower shall immediately repay Revolving Loans, Collateralize Letters of Credit and (in the case of clause (i) above) repay the Protective Advances in an aggregate amount equal to such excess (the "Revolving Excess") (it being understood that the Borrower shall prepay Revolving Loans and/or Protective Advances prior to Collateralizing L/C Exposure).

(b)    The application of any prepayment pursuant to this Section 2.11 shall be applied first, to ABR Loans, second, to Term Benchmark Loans (or RFR Loans, if applicable) and third, to Collateralize L/C Obligations.

(c)    On each Business Day during any Cash Dominion Period, the Administrative Agent shall apply, subject to Section 2.17(b), all funds credited to any applicable Collection Account as of 10:00 A.M., New York City time, on such Business Day (whether or not immediately available) and first to prepay any Protective Advances that may be outstanding, second to prepay other Revolving Loans (without a corresponding reduction in Commitments) and third to Collateralize outstanding L/C Exposure.

2.12    Conversion and Continuation Options.

(a)    The Borrower may elect from time to time to convert Term Benchmark Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the first Business Day preceding the proposed conversion date; provided that any such conversion of Term Benchmark Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Term Benchmark Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); and provided, further, that no ABR Loan may be converted into a Term Benchmark Loan when any Event of Default has occurred and is continuing. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Term Benchmark Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans; provided that no Term Benchmark Loan may be continued as such when any Event of Default has occurred and is

60

continuing; and provided, further, that if the Borrower shall fail to give any required notice as described above in this Section 2.12(b) or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

This Section shall not apply to Protective Advances, which may not be converted or continued.

2.13    Limitations on Term Benchmark. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Term Benchmark Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Term Benchmark Loans comprising each Borrowing shall be equal to $1,000,000.00 or a whole multiple of $500,000.00 in excess thereof and (b) no more than ten Borrowings shall be outstanding at any one time.

2.14    Interest Rates and Payment Dates.

(a)    Each Term Benchmark Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Term SOFR Rate determined for such day plus the Applicable Margin.

(b)    Each ABR Loan (other than a Protective Advance) shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin. Each Protective Advance shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin plus 2%.

(c)    Each RFR Loan shall bear interest at a rate per annum equal to the Adjusted Daily Simple SOFR plus the Applicable Margin.

(d)    (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or if a Default or Event of Default under Section 9.1(a) or (g) has occurred and is continuing, such overdue amount (and, in the case of a Default or Event of Default under Section 9.1(g), all Loans and Reimbursement Obligations) shall bear interest at a rate per annum equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to ABR Loans under the Revolving Facility plus 2%, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any Commitment Fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans plus 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(e)    Solely for purposes of the Interest Act (Canada), (i) whenever interest is to be computed or expressed at any rate (the "Specified Rate") on the basis of a year of 360 days or any other period of time less than a calendar year hereunder, the annual rate of interest to which each such Specified Rate is equal is such Specified Rate multiplied by a fraction, the numerator of which is the actual number of days in the relevant year and the denominator of which is 360 or such other period of time, respectively; (ii) the principle of deemed reinvestment of interest shall not apply to any interest calculation hereunder; and (iii) the rates of interest stipulated herein are intended to be nominal rates and not effective rates or yields.

(f)     Interest shall be payable in arrears on each Interest Payment Date, _provided_ that interest accruing pursuant to Section 2.14(d) shall be payable from time to time on demand.

(g)     If any provision of this Agreement or of any of the other Loan Documents would obligate any Loan Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by such Lender of interest at a criminal rate (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by such Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (1) firstly, by reducing the amount or rate of interest required to be paid to such Lender under this Section 2.14, and (2) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to such Lender which would constitute "interest" for purposes of Section 347 of the Criminal Code (Canada).

2.15     Computation of Interest and Fees.

(a)     Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Term Benchmark rate. Any change in the interest rate on a Loan resulting from a change in the ABR shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted from a Term Benchmark Loan, the date of conversion of such Term Benchmark Loan to such ABR Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted to a Term benchmark Loan, the date of conversion of such ABR Loan to such Term Benchmark Loan, as the case may be, shall be excluded; _provided_ that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.14(a).

2.16     Inability to Determine Interest Rate; Illegality.

(a)     Subject to clauses (b), (c), (d), (e) and (f) of this Section 2.16, if

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error), prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate (including because the Term SOFR Reference Rate is not available or published on a current basis), for such Interest Period, or

(ii)    the Administrative Agent is advised by the Required Lenders that, prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders  (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period,

then the Administrative Agent shall provide notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until (x) the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrower delivers a new interest election request in accordance with the terms of Section 2.12 or a new Borrowing Request in accordance with the terms of Section 2.5, (A) any Term Benchmark Loans under the relevant Revolving Facility requested to be made on the first day of such Interest Period shall be made as an RFR Loans so long as the Adjusted Daily Simple SOFR is not also subject to Section 2.16(a)(i) or (ii) above or ABR Loans if the Adjusted Daily Simple SOFR also is subject to Section 2.16(a)(i) or (ii) above, (B) any Loans under the relevant Revolving Facility that were to have been converted on the first day of such Interest Period to Term Benchmark Loans shall be continued as RFR Loans so long as the Adjusted Daily Simple SOFR is not also subject to Section 2.16(a)(i) or (ii) above or ABR Loans if the Adjusted Daily Simple SOFR also is subject to Section 2.16(a)(i) or (ii) above and (C) any outstanding Term Benchmark Loans under the relevant Revolving Facility shall be converted, on the last day of the then-current Interest Period, to RFR Loans if the Adjusted Daily Simple SOFR is not also subject to Section 2.16(a)(i) or (ii) above or ABR Loans if the Adjusted Daily Simple SOFR also is subject to Section 2.16(a)(i) or (ii) above.

(b)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m., New York City time on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(c)    Notwithstanding anything to the contrary herein or in any other Loan Document, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or

election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 2.16</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.16</u>.

(e)     Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)     Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any request for a Term Benchmark Borrowing into a request for a Borrowing of or conversion to (A) an RFR Loan so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR. Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan, then until such time as a Benchmark Replacement is implemented pursuant to this <u>Section 2.16</u>, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan, be converted by the Administrative Agent to, and shall constitute, (x) an RFR Loan so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event, on such day.

(g)     Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Term Benchmark Loan or to give effect to its obligations as contemplated hereby with respect to any Term Benchmark Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)     such Lender may declare that Term Benchmark Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Term Benchmark Loans, whereupon any request for a Term Benchmark Loan (or to convert an ABR Loan to a Term Benchmark Loan or to continue a Term Benchmark Loan for an

additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Term Benchmark Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and (ii) such Lender may require that all outstanding Term Benchmark Loans made by it be converted to ABR Loans (the interest rate on which shall, if necessary to avoid illegality, be determined by the Administrative Agent without reference to the Term Benchmark rate component of the ABR), in which event all such Term Benchmark Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in clause (b) above.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Term Benchmark Loans that would have been made by such Lender or the converted Term Benchmark Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Term Benchmark Loans.

For purposes of this clause (h) a notice to the Borrower by any Lender shall be effective as to each Term Benchmark Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Term Benchmark Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

(h)    If any Secured Party determines, acting reasonably, that any applicable law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Secured Party to hold or benefit from a Lien over real property of the Loan Parties pursuant to any applicable law, such Secured Party may notify the Administrative Agent and disclaim any benefit of such security interest to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate, render unenforceable or otherwise affect in any manner such Lien for the benefit of any other Secured Party.

2.17    Pro Rata Treatment and Payments.

(a)    Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any Commitment Fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the Revolving Percentages of the Lenders.

(b)    All payments and any proceeds of Collateral received by the Administrative Agent (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower or as otherwise required under this Agreement), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.11) or (C) amounts to be applied from the Collection Account during any Cash Dominion Period is in effect (which shall be applied in accordance with Section 2.11(c)) or (ii) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, shall be applied, subject to the Intercreditor Agreement, ratably first, to pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent and any Issuing Lender (other than in connection with Cash Management Obligations or Specified Swap Obligations), second, to pay any fees, indemnities or expense reimbursements then due to the Lenders from the Loan Parties under the Loan Documents (other than in connection with Cash Management Services or Specified Swap Obligations), third, to pay interest due in respect of the Protective Advances, fourth, to pay the principal of the Protective Advances, fifth, to pay interest then due and payable on the Loans (other than the Protective Advances) and unreimbursed L/C Disbursements, ratably, sixth, to prepay principal on the Loans (other than the Protective Advances) and unreimbursed L/C Disbursements and to pay any amounts owing with respect to Cash Management Obligations and Specified Swap Obligations up to and including the amount most

recently provided to the Administrative Agent pursuant to Section 2.25 in respect thereof, for which Reserves have been established, ratably, <u>seventh</u>, to pay an amount to the Administrative Agent equal to 103% of the aggregate undrawn face amount of all outstanding Letters of Credit to be held as cash collateral for such Obligations, <u>eighth</u>, to the payment of any amounts owing with respect to Cash Management Services Obligations and Specified Swap Obligations up to and including the amount most recently provided to the Administrative Agent pursuant to Section 2.25 in respect thereof and to the extent not paid pursuant to clause sixth, ratably, <u>ninth</u>, to the payment of any other Obligations owing to the Administrative Agent or any Lender by the Loan Parties. Notwithstanding the foregoing amounts received from any Loan Party shall not be applied to any Excluded Swap Obligation of such Loan Party. Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower, or unless a Default is in existence, neither the Administrative Agent nor any Lender shall apply any payment which it receives to any Term Benchmark Loan of a Class, except (a) on the expiration date of the Interest Period applicable thereto or (b) in the event, and only to the extent, that there are no outstanding ABR Loans of the same Class and, in any such event, the Loan Parties shall pay the break funding payment required in accordance with Section 2.20. The Administrative Agent and the Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

(c)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Loans shall be made <u>pro rata</u> to the Revolving Lenders according to the respective outstanding principal amounts of the Revolving Loans then held by the Revolving Lenders.

(d)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. Any payments received after such time shall be deemed to be received on the next Business Day at the Administrative Agent's sole discretion. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. Except as otherwise provided hereunder, if any payment hereunder (other than payments on the Term Benchmark Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Term Benchmark Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension. During any Cash Dominion Period, solely for purposes of determining the amount of Loans available for borrowing purposes, checks (in addition to immediately available funds applied pursuant to Section 2.11(c)) from collections of items of payment and proceeds of any Collateral shall be applied in whole or in part against the applicable Obligations as of 10:00 A.M., New York City time, on the Business Day of receipt, subject to actual collection.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to the date of any Borrowing that such Lender will not make the amount that would constitute its share of such Borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor (a "<u>Funding Default</u>"), such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal

Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.17(e) shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Revolving Facility, on demand, from the Borrower. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.18    Requirements of Law.

(a)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case, made or occurring subsequent to the Closing Date:

(i)     shall subject any Lender, Administrative Agent or Issuing Lender to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any Application, any Term Benchmark Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes, Excluded Taxes and Other Taxes and changes in the rate of tax on the overall net income of such Lender, Administrative Agent or Issuing Lender);

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Term Benchmark rate; or

(iii)     shall impose on such Lender any other condition (other than Taxes); and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Term Benchmark Loans or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes

entitled to claim any additional amounts pursuant to this (a), it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in each case made or occurring subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Loans or Letters of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount reasonably deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor (setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this <u>Section 2.18(b))</u>, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. The Borrower shall pay such Lender the additional amount shown as due on any such certificate promptly after, and in any event within, ten Business Days of, receipt thereof. Notwithstanding anything to the contrary in this Section, no Borrower shall be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; <u>provided</u> that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19    <u>Taxes</u>.

(a)    All payments made by or on account of any obligation of the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto (including, any taxes imposed under Part XIII of the Income Tax Act (Canada) (as the same may be amended, supplemented or replaced from time to time)) ("<u>Taxes</u>"), <u>excluding</u>: (i) net income Taxes (however denominated), capital Taxes imposed by the laws of Canada or any political subdivision thereof, branch profits Taxes, and franchise Taxes, in each case (x) imposed on the Administrative Agent or any Lender as a result of the Administrative Agent or such Lender being organized or incorporated under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (y) that are Other Connection Taxes, (ii) in the case of a Lender, United States federal withholding Taxes to the extent imposed on amounts payable to any Lender with respect to an applicable interest in a Loan or Commitment at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment, if any) to receive additional amounts from the Borrower with respect to such Taxes pursuant to this clause (a), (iii) withholding Taxes imposed under the Income Tax Act (Canada) on amounts paid

or credited to or for the account of the Administrative Agent or any Lender (or the Person to which the applicable obligation is payable) in respect of any obligation of the Borrower hereunder or under any other Loan Document as a result of the Administrative Agent or Lender (or the Person to which the applicable obligation is payable): (a) not dealing at arm's length (within the meaning of the Income Tax Act (Canada)) with a Loan Party, or (b) being a "specified shareholder" (as defined in subsection 18(5) of the Income Tax Act (Canada)) of a Loan Party or not dealing at arm's length (within the meaning of the Income Tax Act (Canada)) with such a "specified shareholder", except where, in the case of clause (a) or (b) above, the non-arm's length relationship arises or the Administrative Agent or Lender is a "specified shareholder" of a Loan Party or is not dealing at arm's length with such a "specified shareholder", solely as a result of the Administrative Agent or Lender (or beneficial owner) having become a party to, received or perfected a security interest under or received or enforced any rights under, any Loan Document; (iv) Taxes that are attributable to a Lender's or the Administrative Agent's failure to comply with the requirements of clause (d), (e) or (g) of this Section 2.19; and (v) United States federal withholding taxes imposed by sections 1471 through 1474 of the Code as in existence on the date of this Agreement (and any amended versions of such provisions that are substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder and official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code ("FATCA") (such excluded Taxes, "Excluded Taxes", and non-excluded Taxes, "Non-Excluded Taxes"). If any Non-Excluded Taxes or Other Taxes are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement as if no such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.19). The Borrower shall indemnify the Administrative Agent and each Lender within 10 Business Days after written demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.19) paid by such Person and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error. Statements payable by the Borrower pursuant to this Section 2.19 shall be submitted to the Borrower at the address specified under Section 11.2.

(b)      In addition, but without duplication of any obligation under Section 2.19(a). the Borrower shall pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)      Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, an original or a certified copy of an original official receipt received by the Borrower showing payment thereof, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any incremental Taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(d)        Except as provided in the next sentence, each Lender (or Transferee) that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent two copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8BEN-E or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F-1 and a Form W-8BEN or Form W-8BEN-E, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on such payments by the Borrower under this Agreement and the other Loan Documents. To the extent a Non-U.S. Lender is not the beneficial owner, such Non-U.S. Lender shall deliver to the Borrower and the Administrative Agent two copies of U.S. Internal Revenue Service Form W-8IMY, accompanied by U.S. Internal Revenue Service Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a statement substantially in the form of Exhibit F-2 or Exhibit F-3, U.S. Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a statement substantially in the form of Exhibit F-4 on behalf of such direct and indirect partner. Any Lender (or Assignee) that is not a Non-U.S. Lender shall deliver to the Borrower and the Administrative Agent two copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Person claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The forms and certification referenced in the previous two sentences (the "Forms") shall be delivered by each Lender on or before the date it becomes a party to this Agreement. In addition, each Lender shall deliver such Forms promptly upon the obsolescence or invalidity of any Form previously delivered by such Lender and upon (i) the written request of the Borrower or (ii) any such Lender otherwise having actual knowledge of the obsolescence or invalidity of such Forms. Each Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered Form to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this clause (d), no Lender shall be required to deliver any Form pursuant to this clause (d) that such Lender is not legally able to deliver.

The Administrative Agent that is a "United States person" as defined in Section 7701(a)(30) of the Code (including, for the avoidance of doubt, JPMorgan Chase Bank, N.A.) shall, on or before the date on which the Administrative Agent becomes a party hereto, provide the Borrower with two copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the Administrative Agent, claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The Administrative Agent that is not a "United States person" as defined in Section 7701(a)(30) of the Code shall, on or before the date on which the Administrative Agent becomes a party hereto, to the extent it is legally eligible to do so, provide the Borrower with two copies of an applicable U.S. Internal Revenue Service Form W-8, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the Administrative Agent, certifying as to any entitlement of the Administrative Agent to an exemption from, or reduction in, any U.S. federal withholding tax with respect to any fees received on its own behalf under any Loan Document. In addition, the Administrative Agent shall deliver such copies of U.S. Internal Revenue Service Form W-8 or U.S. Internal Revenue Service Form W-9, as applicable, promptly upon the obsolescence or invalidity of such U.S. Internal Revenue Service Form previously delivered by the Administrative Agent and upon (i) the written request of the Borrower or (ii) the Administrative Agent otherwise having actual knowledge of the obsolescence or invalidity of such U.S. Internal Revenue Service Form. Notwithstanding any other provision of this clause (d), the Administrative Agent shall not be required to deliver any Form pursuant to this clause (d) that the Administrative Agent is not legally able to deliver.

(e)    A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.19(d)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)    If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.19, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.19 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent or any Lender be required to pay any amount to a Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent or Lender, as applicable, in a less favorable net after-Tax position than the Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (f) shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(g)    If a payment made to a Lender under any Loan Document would be subject to United States federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Non-Excluded Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Non-Excluded Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.6 relating to the maintenance of a Participant Register and (iii) any Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (h).

(i)    The agreements in this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the expiration or cancellation of all Letters of Credit and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)    For purposes of this Section 2.19, the term Lender shall include any Issuing Lender.

2.20    Indemnity.

(a)    With respect to Loans that are not RFR Loans, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Term Benchmark Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Term Benchmark Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Term Benchmark Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, reduced, converted or continued, for the period from the date of such prepayment or of such failure to borrow, reduce, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, reduce, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest or other return for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)    With respect to RFR Loans, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of RFR Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement or (b) default by the Borrower in making any prepayment of RFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement. Such indemnification may include an amount equal to

the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed or reduced, for the period from the date of such prepayment or of such failure to borrow or reduce to the Interest Payment Date (or, in the case of a failure to borrow or reduce, the Interest Payment Date that would have occurred on the date of such failure) in each case at the applicable rate of interest or other return for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.21  Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.18 or 2.19(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.18 or 2.19(a).

2.22  Replacement of Lenders. The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.18 or 2.19(a), (b) defaults in its obligation to make Loans hereunder or (c) has not consented to a proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 11.1 that requires the consent of all Lenders and which has been approved by the Required Lenders as provided in Section 11.1, with a Lender or Eligible Assignee; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) in the case of clause (a), prior to any such replacement, such Lender shall have taken no action under Section 2.21 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.18 or 2.19(a), (iii) the replacement financial institution or other Eligible Assignee shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement and the Borrower or such replacement financial institution or other Eligible Assignee shall pay all interest, fees and other amounts owing to such replaced Lender, (iv) the Borrower shall be liable to such replaced Lender under Section 2.20 if any Term Benchmark Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (v) the replacement financial institution or other Eligible Assignee, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be deemed to have made such replacement in accordance with the provisions of Section 11.6, (vii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.18, 2.19(a) or 2.19(c), as the case may be, and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender. Upon any such assignment, such replaced Lender shall no longer constitute a "Lender" for purposes hereof; provided that any rights of such replaced Lender to indemnification hereunder shall survive as to such replaced Lender. Each Lender, the Administrative Agent and the Borrower agrees that in connection with the replacement of a Lender and upon payment to such replaced Lender of all amounts required to be paid under this Section 2.22, the Administrative Agent and the Borrower shall be authorized, without the need for additional consent from such replaced Lender, to execute an Assignment and Assumption on behalf of such replaced Lender, and any such Assignment and Assumption so executed by the Administrative Agent or the Borrower and, to the extent required under Section 11.6, the Borrower and the Issuing Lenders, shall be effective for purposes of this Section 2.22 and Section 11.6.

2.23    <u>Notes</u>. If so requested by any Lender by written notice to the Borrower (with a copy to the Administrative Agent), the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 11.6</u>) (promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loans.

2.24    <u>Incremental Credit Extensions.</u>

(a)    The Borrower may, at any time or from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more increases in the amount of the Revolving Commitments (each such increase, a "<u>Revolving Commitment Increase</u>", the loans thereunder, the "<u>Incremental Revolving Loans</u>", and a Lender making such a commitment, an "<u>Incremental Revolving Lender</u>"); provided that:

(i)    the aggregate amount of all Revolving Commitment Increases shall not exceed the greater of (A) $25,000,000 plus an amount equal to the aggregate principal amount of all voluntary prepayments of Revolving Loans that are accompanied by permanent commitment reductions under the Revolving Facility and (B) the excess of the Borrowing Base (in effect immediately prior to such increase) over the aggregate amount of Revolving Commitments (in effect immediately prior to such increase);

(ii)    Any Revolving Commitment Increase shall be on the same terms and pursuant to the same documentation as the Revolving Commitments hereunder;

(iii)    after giving effect to the making of any Loans or the effectiveness of any Revolving Commitment Increase (including the use of proceeds thereof), the conditions set forth in <u>Section 5.2(a)</u> and <u>(b)</u> shall be satisfied;

(v) the Borrower shall have delivered a certificate dated as of the Incremental Facility Closing Date signed by a Responsible Officer of the Borrower certifying that the conditions precedent set forth in subclause (iii) have been satisfied;

(vi)    all fees and expenses owing in respect of such increase to the Administrative Agent and the applicable Lenders shall have been paid or shall be paid concurrently with the Incremental Facility Closing Date;

(v)    each Lender that is a Lender on the Closing Date shall be permitted to elect to have its Commitment reduced by an amount equal to 40% of such Revolving Commitment Increase (an "<u>Elective Commitment Reduction</u>") on the date thereof; <u>provided</u>, further, that if more than one Lender elects to have their Commitments reduced, such reduction shall be applied on a pro rata basis as between such electing Lenders. The Borrower shall give such Lenders three (3) Business Days' prior written notice of the proposed date of a Revolving Commitment Increase and the amount of Elective Commitment Reductions offered. In order to elect such Elective Commitment Reduction, any such Lender shall provide written notice of such election and the maximum amount by which such Lender elects to reduce its Revolving Commitment one (1) Business Day prior to the proposed date of such Revolving Commitment Increase.

(b)    Each notice from the Borrower to the Administrative Agent pursuant to <u>Section 2.24(a)</u> shall set forth the requested amount and proposed terms of the Revolving Commitment Increase.

(c)        Revolving Commitment Increases may be provided by any existing Lender or any Additional Lender (provided that no Lender shall be obligated to provide a portion of any Revolving Commitment Increase) on terms permitted in this <u>Section 2.24</u>, and, to the extent not permitted in this <u>Section 2.24</u>, all terms and documentation with respect to any Revolving Commitment Increase which relate to provisions of a mechanical or administrative nature, shall in each case be reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent and Issuing Lenders shall have consented (such consent not to be unreasonably withheld, conditioned or delayed) to such Lender's providing such Revolving Commitment Increases if such consent would be required under <u>Section 11.6(b)</u> for an assignment of Loans or Revolving Commitments, as applicable, to such Lender or Additional Lender; <u>provided</u>, <u>further</u>, that the Issuing Lenders shall have consented (such consent not to be unreasonably withheld, conditioned or delayed) to any Revolving Commitment Increase provided by any Additional Lender. Revolving Commitments in respect of Revolving Commitment Increases shall become Revolving Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Lender, an increase in such Lender's applicable Revolving Commitment) under this Agreement pursuant to an amendment (an "<u>Incremental Amendment</u>") to this Agreement and, as appropriate, the other Loan Documents, executed by Holdings, the Borrower, each Lender agreeing to provide such Revolving Commitment, if any, each Additional Lender, if any, and the Administrative Agent. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section. The effectiveness of any Incremental Amendment shall be subject to the satisfaction of each of the conditions set forth in <u>Section 2.24(a)</u> and such other conditions as the parties thereto shall agree, unless waived by the Additional Lender (the effective date of any such Incremental Amendment, an "<u>Incremental Facility Closing Date</u>"). The Borrower will use the proceeds of the Revolving Commitment Increases for any purpose not prohibited by this Agreement. No Lender shall be obligated to provide any Revolving Commitment Increases, unless it so agrees. The Loan Documents may be amended by agreement of the Administrative Agent and the Borrower to effect such modifications and amendments as may be necessary or advisable to increase the Revolving Commitments.

(d)        Upon each increase and decrease, if any, in the Revolving Commitments pursuant to this Section, each Revolving Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing a portion of the Revolving Commitment Increase (each a "<u>Revolving Commitment Increase Lender</u>") electing an Elective Commitment Reduction (each, a "Revolving Commitment Decrease Lender") in respect of such increase or decrease, as applicable, and each such Revolving Commitment Increase Lender and Revolving Commitment Decrease Lender will automatically and without further act be deemed to have assumed or assigned, as applicable, a portion of such Revolving Lender's participations hereunder in outstanding Letters of Credit such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit held by each Revolving Lender (including each such Revolving Commitment Increase Lender and Revolving Commitment Decrease Lender) will equal the percentage of the aggregate Revolving Commitments of all Revolving Lenders represented by such Revolving Lender's Revolving Commitment and if, on the date of such increase, there are any Revolving Loans outstanding, such Revolving Loans shall on or prior to the effectiveness of such Revolving Commitment Increase either be prepaid from the proceeds of additional Revolving Loans made hereunder or assigned to a Revolving Commitment Increase Lender (in each case, reflecting such increase in Revolving Commitments, such that Revolving Loans are held ratably in accordance with each Revolving Lender's Pro Rata Share, including the Pro Rata Share of any Revolving Commitment Decrease Lender, after giving effect to such increase or decrease), which prepayment or assignment shall be accompanied by accrued interest on the Revolving Loans being prepaid and any costs incurred by any Lender in accordance with <u>Section 2.20</u>. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and

pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(e)    Notwithstanding anything to the contrary herein, this <u>Section 2.24</u> shall supersede any provisions in <u>Section 2.17</u> or <u>11.1</u> to the contrary and the Borrower and the Administrative Agent may amend <u>Section 2.17</u> to implement any Incremental Amendment.

2.25    <u>Cash Management Services; Swap Agreements</u>. Each Joint Lead Arranger  or Lender (or Affiliate of the foregoing), other than JPMCB or an Affiliate thereof, providing Cash Management Services for, or having Swap Agreements with, any Loan Party or any Restricted Subsidiary of a Loan Party shall deliver to the Administrative Agent, promptly after entering into such Cash Management Services, Swap Agreements, written notice setting forth the aggregate amount of all Cash Management Services Obligations and Specified Swap Obligations of such Loan Party or Restricted Subsidiary thereof to such Joint Lead Arranger, Lender or Affiliate (whether matured or matured, absolute or contingent). In addition, each such Joint Lead Arranger, Lender or Affiliate thereof shall deliver to the Administrative Agent, following the end of each calendar month, a summary of the amounts due or to become due in respect of such Cash Management Services Obligations and Specified Swap Obligations. The most recent information provided to the Administrative Agent shall be used in determining the amounts to be applied in respect of such Cash Management Services Obligations and/or Specified Swap Obligations pursuant to Section 2.17(b) and which tier of the waterfall, contained in Section 2.17(b), such Cash Management Services Obligations and/or Specified Swap Obligations will be placed. For the avoidance of doubt, (i) so long as JPMCB or its Affiliate is the Administrative Agent, neither JPMCB nor any of its Affiliates providing Cash Management Services for, or having Specified Swap Agreements with, any Loan Party or any Restricted Subsidiary or Affiliate of a Loan Party shall be required to provide any notice described in this Section 2.25 in respect of such Cash Management Services or Specified Swap Agreements and (ii) no Reserves shall be established for Cash Management Services or Specified Swap Agreements provided by a Person that is no longer the Administrative Agent, a Joint Lead Arranger, a Lender or an Affiliate of the foregoing.

2.26    <u>Defaulting Lenders</u>.

(a)    <u>Adjustments</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 11.1</u>.

(ii)    <u>Reallocation of Payments</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Section 9</u> or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to <u>Section 11.7</u>), shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, in the case of a Revolving Lender, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to each Issuing Lender hereunder; <u>third</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>fourth</u>, in the case of a Revolving Lender, if so determined by the Administrative Agent and the

Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; <u>fifth</u>, to the payment of any amounts owing to the Lenders, the Issuing Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender, such Issuing Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>sixth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>seventh</u>, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if such payment is a payment of the principal amount of any Loans or L/C Advances and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of, and L/C Advances owed to, the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to <u>Section 3.2(b)</u>. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to <u>Section 3.2(b)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>. Such Defaulting Lender (x) shall not be entitled to receive or accrue any commitment fee pursuant to <u>Section 2.8(a)</u> for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to such Defaulting Lender) and (y) shall be limited in its right to receive Letter of Credit fees as provided in <u>Section 3.3</u>.

(iv)    <u>Reallocation of Applicable Percentages to Reduce Fronting Exposure</u>. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to <u>Section 3</u> or Protective Advances, the "<u>Pro Rata Share</u>" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Commitment of such Defaulting Lender; <u>provided</u> that the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Protective Advances shall not exceed the positive difference, if any, of (1) the Revolving Commitment of such non-Defaulting Lender <u>minus</u> (2) the aggregate principal amount of the Revolving Loans of such Lender. In the event non-Defaulting Lenders' obligations to acquire, refinance or fund participations in Letters of Credit or Protective Advances are increased as a result of a Defaulting Lender, then all Letter of Credit fees and other fees that would have been paid to such Defaulting Lender shall be paid to such non-Defaulting Lenders ratably in accordance with such increase of such non-Defaulting Lender's obligations to acquire, refinance or fund participations in Letters of Credit or Protective Advances.

If (i) a Bankruptcy Event or a Bail-In Action with respect to Holdings, the Borrower or any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) any Issuing Lender has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, such Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, unless such Issuing Lender shall have entered into arrangements with the Loan Parties or such Lender, satisfactory to such Issuing Lender to defease any risk to it in respect of such Lender hereunder.

(b)    <u>Defaulting Lender Cure</u>. If the Borrower, the Administrative Agent and each Issuing Lender agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon

as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Share (without giving effect to <u>Section 2.26(a)(iv)</u>, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)  <u>No Release</u>. The provisions hereof attributable to Defaulting Lenders shall not release or excuse any Defaulting Lender from failure to perform its obligations hereunder; <u>provided</u> that in the case of Revolving Lenders, the foregoing shall be subject to <u>Section 11.23</u>.

2.27  <u>Loan Modification Offers</u>.

(a)  The Borrower may, on one or more occasions, by written notice to the Administrative Agent, make one or more offers (each, a "<u>Loan Modification Offer</u>") to all the Lenders of one or more Classes on the same terms to each such Lender (each Class subject to such a Loan Modification Offer, a "<u>Specified Class</u>") to make one or more Permitted Amendments pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrower; <u>provided</u> that (i) any such offer shall be made by the Borrower to all Lenders with Loans with a like maturity date (whether under one or more tranches) on a pro rata basis (based on the aggregate outstanding principal amount of the applicable Loans), (ii) no Default or Event of Default shall have occurred and be continuing at the time of any such offer and (iii) each Issuing Lender shall have approved such Permitted Amendment. Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become effective (which shall not be less than five Business Days nor more than 45 Business Days after the date of such notice, unless otherwise agreed to by the Administrative Agent); <u>provided</u> that, notwithstanding anything to the contrary, (x) assignments and participations of Specified Classes shall be governed by the same or, at the Borrower's discretion, more restrictive assignment and participation provisions than those set forth in <u>Section 11.6</u>, and (y) no repayment of Specified Classes shall be permitted unless such repayment is accompanied by an at least pro rata repayment of all earlier maturing Loans (including previously extended Loans) (or all earlier maturing Loans (including previously extended Loans) shall otherwise be or have been terminated and repaid in full). Permitted Amendments shall become effective only with respect to the Loans and Commitments of the Lenders of the Specified Class that accept the applicable Loan Modification Offer (such Lenders, the "<u>Accepting Lenders</u>") and, in the case of any Accepting Lender, only with respect to such Lender's Loans and Revolving Commitments of such Specified Class as to which such Lender's acceptance has been made. No Lender shall have any obligation to accept any Loan Modification Offer.

(b)  A Permitted Amendment shall be effected pursuant to an amendment to this Agreement (a "<u>Loan Modification Agreement</u>") executed and delivered by the Borrower, each applicable Accepting Lender and the Administrative Agent. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement. No Loan Modification Agreement shall provide for any extension of any Specified Class in an aggregate principal amount that is less than 25% of such Specified Class then outstanding or committed, as the case may be. Each Loan Modification Agreement may, without the consent of any Lender other than the applicable Accepting Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate,

in the opinion of the Administrative Agent and the Borrower, to give effect to the provisions of this <u>Section 2.27</u>, including any amendments necessary to treat the applicable Loans and/or Commitments of the Accepting Lenders as a new "<u>Class</u>" of loans and/or commitments hereunder; <u>provided</u> that (x) no Loan Modification Agreement may provide for (i) any Specified Class to be secured by any Collateral or other assets of any Group Member that does not also secure the Loans, (ii) any borrowings and any participations in respect of Letters of Credit and Protective Advances shall apply to the Loans on a pro rata basis and (iii) so long as any Loans are outstanding, any mandatory or voluntary prepayment provisions that do not also apply to the Loans on a pro rata basis and shall be made on a ratable basis as between the commitments of such new "Class" and the remaining Revolving Commitments, (y) the Revolving Termination Date may not be extended without the prior written consent of the Issuing Lenders; and (z) the terms and conditions of the applicable Loans and/or Commitments of the Accepting Lenders (excluding pricing, fees, rate floors and optional prepayment or redemption terms) shall be substantially identical to, or (taken as a whole) shall be no more favorable to, the Accepting Lenders than those applicable to the Specified Class, except for financial covenants or other covenants or provisions applicable only to periods after the Latest Maturity Date at the time of such Loan Modification Offer, as may be agreed by the Borrower and the Accepting Lenders).

(c)     Subject to <u>Section 2.27(b)</u>, the Borrower may at its election specify as a condition to consummating any such Loan Modification Agreement that a minimum amount (to be determined and specified in the relevant Loan Modification Offer in the Borrower's sole discretion and may be waived by the Borrower) of Loans of any or all applicable Classes be extended.

(d)     Notwithstanding anything to the contrary in this Agreement, this <u>Section 2.27</u> shall supersede any provisions in <u>Section 2.17</u> or <u>11.1</u> to the contrary and the Borrower and the Administrative Agent may amend <u>Section 2.17</u> to implement any Loan Modification Agreement.

SECTION 3.    LETTERS OF CREDIT

3.1     <u>L/C Commitment</u>.

(a)     Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Revolving Lenders set forth in <u>Section 3.4(a)</u>, agrees to issue standby letters of credit and to the extent agreed to by an Issuing Lender, bank guarantees and commercial letters of credit ("<u>Letters of Credit</u>") for the account of the Borrower or the account of any Restricted Subsidiary on any Business Day prior to the date that is 30 days prior to the Revolving Termination Date in such form as may be approved from time to time by the applicable Issuing Lender; <u>provided</u> that (i) the Borrower shall be an applicant, and be fully and unconditionally liable, with respect to each Letter of Credit issued for the account of a Restricted Subsidiary; and (ii) with respect to any Letter of Credit issued, the Borrower shall Cash Collateralize the Outstanding Amount of such Letter of Credit (including as may be renewed, extended or otherwise modified) in an amount equal to the Non-Bank Revolving Percentage of such Outstanding Amount; <u>provided</u> <u>further</u> that an Issuing Lender shall have no obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment (with the L/C Obligations denominated in an Alternate Currency calculated at the Dollar Equivalent thereof at the time of determination), (ii) the L/C Obligations of such Issuing Lender would exceed its L/C Issuer Commitment (with the L/C Obligations denominated in an Alternate Currency calculated at the Dollar Equivalent thereof at the time of determination) or (iii) the Total Revolving Extensions of Credit would exceed the Line Cap, subject to the Administrative Agent's authority, in its sole discretion, to make Protective Advances pursuant to the terms of <u>Section 2.6</u>. Each Letter of Credit shall (i) be denominated in Dollars or any Alternate Currency reasonably acceptable to the Administrative Agent and the applicable Issuing Lender, (ii) have a stated amount of not less than $250,000.00 or such lesser amount as is acceptable to the applicable Issuing Lender, (iii) expire no later than the earlier of (x)

79

the first anniversary of its date of issuance, or such longer period as is reasonably acceptable to the applicable Issuing Lender, and (y) the date that is five Business Days prior to the Revolving Termination Date, <u>provided</u> that any Letter of Credit with a one-year (or less) term may provide for the renewal or extension thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above); and <u>provided</u>, <u>further</u>, that no Issuing Lender shall  renew or extend any such Letter of Credit if it has received written notice (or otherwise has knowledge) that an Event of Default has occurred and is continuing or any of the conditions set forth in <u>Section 5.2</u> are not satisfied prior to the date of the decision to renew or extend such Letter of Credit) and (iv) be otherwise reasonably acceptable in all respects to the applicable Issuing Lender.

(b)    No Issuing Lender shall at any time be obligated to issue any Letter of Credit if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Lender from issuing such Letter of Credit, or any law applicable to such Issuing Lender shall prohibit, or require that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Lender any unreimbursed loss, cost or expense that was not applicable on the Effective Date and that such Issuing Lender in good faith deems material to it.

### 3.2    Procedure for Issuance of Letter of Credit.

(a)    The Borrower may from time to time on any Business Day occurring from the Closing Date until the date that is thirty Business Days prior to the Revolving Termination Date request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may request. Upon receipt of any Application, such Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall such Issuing Lender be required to issue any Letter of Credit (a) earlier than (i) three Business Days, in the case of standby Letters of Credit or similar agreements or (ii) to the extent an Issuing Lender agrees to issue bank guarantees or commercial Letters of Credit, or similar agreements, such period of time as is acceptable to such Issuing Lender, or (b) later than ten Business Days, (or in each case such shorter period as may be agreed to by such Issuing Lender in any particular instance) after, its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the Borrower. The applicable Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower promptly following the issuance thereof. The applicable Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

(b)    <u>Cash Collateral</u>. (i) If an Issuing Lender has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing and the conditions set forth in <u>Section 5.2</u> to a Revolving Borrowing cannot then be met, (ii) if, as of the Letter of Credit Expiration Date, any Letter of Credit may for any reason remain outstanding and partially or wholly undrawn, (iii) if any Event of Default occurs and is continuing and the Administrative Agent or the Required Lenders, as applicable, require the Borrower to Cash Collateralize the L/C Obligations pursuant to <u>Section 9.2</u> or (iv) an Event of Default set forth under <u>Section 9.1(g)</u> occurs and is continuing, then the Borrower shall Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such L/C Borrowing or the Letter of

Credit Expiration Date, as the case may be), and shall do so not later than 2:00 p.m., New York City time, on (x) in the case of the immediately preceding clauses (i) through (iii), (1) the Business Day that the Borrower receive notice thereof, if such notice is received on such day prior to 12:00 noon, New York City time, or (2) if clause (1) above does not apply, the Business Day immediately following the day that the Borrower receive such notice and (y) in the case of the immediately preceding clause (iv), the Business Day on which an Event of Default set forth under Section 9.1(g) occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day. At any time that there shall exist a Defaulting Lender, if any Defaulting Lender Fronting Exposure remains outstanding (after giving effect to Section 2.26(a)(iv)), then promptly upon the request of the Administrative Agent or any Issuing Lender, the Borrower shall Cash Collateralize its Defaulting Lender Fronting Exposure and deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover such Defaulting Lender Fronting Exposure (after giving effect to any Cash Collateral provided by the Defaulting Lender). For purposes hereof, "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the relevant Issuing Lender and the Lenders, as collateral for the L/C Obligations, Cash Collateral pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Lender (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Lenders and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in a Cash Collateral Account and may be invested in readily available Cash Equivalents. If at any time the Administrative Agent reasonably determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent (on behalf of the Secured Parties) or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations (or in the case of Cash Collateral provided with regard to Defaulting Lender Fronting Exposure, such amount of Defaulting Lender Fronting Exposure), the Borrower will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in a Cash Collateral Account as aforesaid, an amount equal to the excess of (a) such aggregate Outstanding Amount over (b) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable law, to reimburse the relevant Issuing Lender. To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall be refunded to the Borrower.

3.3     Fees and Other Charges.

(a)     The Borrower will pay a fee on the average aggregate daily undrawn and unexpired amount of all outstanding Letters of Credit (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof) at a per annum rate equal to the Applicable Margin then in effect with respect to Term Benchmark Loans under the Revolving Facility, shared ratably among the Revolving Lenders and payable quarterly in arrears on each Fee Payment Date after the issuance date. In addition, the Borrower shall pay to each Issuing Lender for its own account a fronting fee in an amount equal to 0.125% per annum multiplied by the average aggregate daily undrawn and unexpired amount of all such Issuing Lender's Letters of Credit outstanding during the applicable period (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof), payable quarterly in arrears on each Fee Payment Date after the issuance date.

(b)     In addition to the foregoing fees, the Borrower shall pay or reimburse such Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such

81

Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

(c)      Fees with respect to Letters of Credit denominated in an Alternate Currency shall be calculated based on the average aggregate daily undrawn and unexpired Dollar Equivalent of such Letters of Credit denominated in an Alternate Currency and determined as of the Business Day preceding each Fee Payment Date (with respect to the fees paid on such date).

3.4      L/C Participations.

(a)      Each Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce each Issuing Lender to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Percentage in such Issuing Lender's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by such Issuing Lender thereunder. Each L/C Participant agrees with each Issuing Lender that, if a draft is paid under any Letter of Credit for which any Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein an amount equal to such L/C Participant's Revolving Percentage of the amount of such draft (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof determined as of the Business Day prior to the date such payment is made by such L/C Participant), or any part thereof, that is not so reimbursed. Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and irrevocable and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against such Issuing Lender, the Borrower, any other Group Member or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)      If any amount required to be paid by any L/C Participant to any Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the applicable Issuing Lender under any Letter of Credit is paid to such Issuing Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to such Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to such Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, such Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to ABR Loans under the Revolving Facility. A certificate of such Issuing Lender submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)      Whenever, at any time after any Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), such Issuing Lender receives any payment related to such Letter of Credit

(whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such L/C Participant shall return to such Issuing Lender the portion thereof previously distributed by such Issuing Lender to it.

3.5    Reimbursement Obligation of the Borrower. If any drawing is paid under any Letter of Credit, the Borrower shall reimburse the applicable Issuing Lender for the amount of (a) the drawing so paid and (b) any taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment, not later than by 3:00 p.m., New York City time, on (i) the Business Day on which notice of such drawing was received, if such notice is received on such day prior to 10:00 A.M., New York City time, or (ii) if clause (i) above does not apply, the Business Day following the day that the Borrower receives such notice. Each such payment shall be made to such Issuing Lender at its address for notices referred to herein in Dollars (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof determined as of the Business Day prior to the date such payment is made) and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant drawing is paid until payment in full at the rate set forth, (x) until the second Business Day next succeeding the date of the relevant notice, in Section 2.14(b) and (y) thereafter, in Section 2.14(d).

3.6    Obligations Absolute. The Borrower's obligations under this Section 3 shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person (it being understood that this provision shall not preclude the ability of the Borrower to bring any claim for damages against any such Person who has acted with gross negligence or willful misconduct, as determined in a final and nonappealable decision of a court of competent jurisdiction). The Borrower also agrees with each Issuing Lender that each Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee. No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Issuing Lender. The Borrower agrees that any action taken or omitted by any Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct (as determined in a final and nonappealable decision of a court of competent jurisdiction), shall be binding on the Borrower and shall not result in any liability of such Issuing Lender to the Borrower.

3.7    Letter of Credit Payments. If any draft shall be presented for payment under any Letter of Credit, the applicable Issuing Lender shall promptly notify the Borrower of the date and amount thereof. The responsibility of such Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

3.8     Applications. To the extent that any provision of any Application related to any Letter of Credit, or any other agreement submitted by the Borrower to, or entered into by the Borrower with, the applicable Issuing Lender or any other Person relating to any Letter of Credit, is inconsistent with the provisions of this Agreement, the provisions of this Agreement shall control.

3.9     [Reserved].

3.10     Additional Issuing Lenders. The Borrower may, at any time and from time to time, upon prior written notice to the Administrative Agent, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld) and such Lender, designate one or more additional Lenders (or Affiliates thereof) to act as an issuing bank with respect to Letters of Credit under the terms of this Agreement. Any Lender (or Affiliate thereof) designated as an Issuing Lender pursuant to this Section 3.10 shall be deemed to be an "Issuing Lender" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender (or Affiliate thereof) and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Lenders and such Lender (or Affiliate thereof) and such Lender (or Affiliate thereof) shall thereafter have the rights and obligations of an Issuing Lender under this Agreement and the other Loan Documents. Any such designation may be evidenced by a written instrument entered into by the Borrower, such Lender (or Affiliate thereof) and the Administrative Agent. In connection therewith, the Borrower, the Administrative Agent and the Issuing Lenders may agree on the amounts of Letters of Credit to be issued by each Issuing Lender.

SECTION 4.     REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, each Loan Party hereby jointly and severally represents and warrants to the Administrative Agent and each Lender that:

4.1     Financial Condition. The audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as at December 31, 2019 and December 31, 2020, and the related consolidated statements of income and of cash flows for the fiscal years ended on December 31, 2019 and December 31, 2020, reported on by and accompanied by an unqualified report as to going concern or scope of audit from PricewaterhouseCoopers, present fairly in all material respects the consolidated financial condition of the Borrower and its consolidated Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). No Group Member has, as of the Closing Date after giving effect to the Transactions and excluding obligations under the Loan Documents and the Term Loan Documents, any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, which are required in conformity with GAAP to be disclosed therein and which are not reflected in the most recent financial statements referred to in this Section 4.1 or in the draft 2021 financial statements provided to the Administrative Agent prior to the Closing Date.

4.2     No Change. Since December 31, 2020, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect other than with respect to any events or circumstances leading up to, or customarily resulting from, the filing of the Chapter 11 petition filed on August 23, 2022 with the United States Bankruptcy Court for the District of Delaware.

4.3     Existence; Compliance with Law. Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except where the failure to be so qualified or in good standing could not reasonably be expected to result in a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4     Power; Authorization; Enforceable Obligations. Each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder. Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement and to authorize the other Transactions. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.19. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the consummation of the Transactions (excluding the Loan Documents), except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect, (ii) the filings referred to in Section 4.19 and (iii) those, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect. Each Loan Document has been duly executed and delivered on behalf of each Loan Party party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.5     No Legal Bar. The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any material Requirement of Law, any Contractual Obligation of any Group Member that is material to the Borrower and its Subsidiaries taken as a whole or the Organizational Documents of any Loan Party and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law, any such Organizational Documents or any such Contractual Obligation (other than the Liens created by the Security Documents and Liens created under the Term Loan Documents). The consummation of the Transactions (excluding the Loan Documents) will not (a) violate (x) any Requirement of Law or any Contractual Obligation of any Group Member, except as would not reasonably be expected to have a Material Adverse Effect or (y) the Organizational Documents of any Loan Party and (b) will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law, any such Organizational Documents or any such Contractual Obligation (other than the Liens created by the Security Documents).

4.6     Litigation. No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Group Member, threatened by or against

any Group Member or against any of their respective properties, assets or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.7    No Default. No Group Member is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

4.8    Ownership of Property; Liens. Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by with respect to each Group Member, Section 7.3.

4.9    Intellectual Property. The Group Members own, or are licensed to use, all Intellectual Property necessary for the conduct in all material respects of the business of the Borrower and its Restricted Subsidiaries, taken as a whole, as currently conducted, except where failure to own or license such Intellectual Property could not reasonably be expected to (a) impair or interfere in any material respect with the operations of the business conducted by the Borrower and its Restricted Subsidiaries, taken as a whole or (b) result in a Material Adverse Effect. No claim has been asserted and is pending by any Person challenging or questioning any Group Member's use of any Intellectual Property or the validity or effectiveness of any Group Member's Intellectual Property or alleging that the conduct of any Group Member's business infringes or violates the rights of any Person, nor does Holdings or the Borrower know of any valid basis for any such claim, in each case, except for such claims that could not reasonably be expected to (x) impair or interfere in any material respect with the operations of the business conducted by the Borrower and its Restricted Subsidiaries, taken as a whole or (y) result in a Material Adverse Effect.

4.10    Taxes. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Group Member has timely filed or caused to be filed all Tax returns that are required to be filed and has paid all Taxes whether or not shown to be due and payable on said returns or on any assessments made against it or any of its property and all other Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves in conformity with GAAP have been provided on the books of the relevant Group Member); and no Tax Lien has been filed, and, to the knowledge of any of the Group Members, no claim is being asserted, with respect to any such Tax, fee or other charge.

4.11    Federal Regulations; Sanctions and Anti-Corruption Laws.

(a)    No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U), and no part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for the purpose of buying or carrying margin stock or for any purpose that violates the provisions of the Regulations of the Board. If requested by any Lender or the Administrative Agent and the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

(b)    The Borrower and its Subsidiaries and their respective directors, managers, officers and, to the knowledge of the Borrower, their respective employees and agents (acting in their capacity as such) are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and

applicable Sanctions in all material respects. The Borrower and its Subsidiaries have implemented and will maintain, policies and procedures reasonably designed to ensure compliance with Anti-Corruption Laws and applicable Sanctions by the Borrower and its Subsidiaries and their respective directors, managers, officers, and employees and, in the case of Anti-Corruption Laws, its agents (acting in their capacity as such).

(c)        None of the Borrower, any of its Subsidiaries or any of their directors, managers, officers, or, to the knowledge of the Borrower, employees, or agents is an individual or entity that is, or is 50% or more owned or, where relevant under applicable Sanctions, controlled by Persons that are: (i) the subject of any economic or financial sanctions or trade embargoes, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. Department of State, or any other agency of the U.S. government, the United Nations Security Council, the European Union, His Majesty's Treasury of the United Kingdom, the Government of Canada (or the government of any province or territory thereof) or any other relevant sanctions authority (collectively, the "Sanctions"), (ii) a Sanctioned Person or (iii) located, organized or resident in a Sanctioned Territory. No part of the proceeds of any extension of credit hereunder will be used by the Borrower, directly or, to the knowledge of the Borrower, indirectly, or lent, contributed or otherwise made available to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of,  with, or for the benefit of any Sanctioned Person, or in any Sanctioned Territory, in violation of applicable Sanctions (ii) in any other manner that would result in a violation by any Person of Sanctions by any Person (including any Person participating in the Loan, whether as lender, underwriter, advisor, investor, or otherwise) or (iii) in violation of Anti-Corruption Laws. The Loan Parties will not for the term of this Agreement engage in any dealings or transactions with any Person, or in or with any Sanctioned Territories, to the extent in violation of Sanctions.

4.12    Labor Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of any Group Member, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.13    ERISA; Canadian Pension Plans.

(a) Except as could not reasonably be expected to have a Material Adverse Effect, (i) no Reportable Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and (ii) each Plan has complied with the applicable provisions of ERISA and the Code. No termination of a Pension Plan pursuant to Section 4041(c) of ERISA or a failure to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 or 303 of ERISA has occurred during the five-year period prior to the date on which this representation is made or deemed made, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. The present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by an amount that could reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect, nor is any such withdrawal reasonably expected. No such Multiemployer Plan is Insolvent.

(b) Except as could not reasonably be expected to have a Material Adverse Effect, each Canadian Defined Benefit Plan is fully funded in accordance with applicable laws on a going concern-basis and is in excess of the 85% solvency funding threshold as of the  last actuarial valuation filed prior to the date on which this representation is made or deemed made with respect to any Canadian Defined Benefit Plan. To the knowledge of each Group Member, no facts or circumstances have occurred or existed that could result, or be reasonably anticipated to result, in the order of a termination of any Canadian Defined Benefit Plan by any Governmental Authority under applicable laws. No Group Member contributes to, participates in or has any liability in respect of any Canadian Multiemployer Plan as at the Closing Date. Except as could not reasonably be expected to have a Material Adverse Effect, no Canadian Pension Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Canadian Pension Plan. Except as could not reasonably be expected to have a Material Adverse Effect, each Canadian Pension Plan is duly registered under the Income Tax Act (Canada) and any other applicable laws which require registration, has been funded, administered and invested in accordance with the terms of such plan, the Income Tax Act (Canada) and all other applicable laws and no event has occurred which could cause the loss of such registered status. Except as could not reasonably be expected to have a Material Adverse Effect, there are no outstanding disputes concerning the Canadian Pension Plans or the assets thereof. Except as could not reasonably be expected to have a Material Adverse Effect, all contributions or premiums required to be made or paid by any Group Member to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws.  No promises of benefit improvements under the Canadian Pension Plans have been made except as required by applicable laws and disclosed to the Lenders prior to the Closing Date or where such improvement would not be reasonably expected to have a Material Adverse Effect.

4.14    <u>Investment Company Act; Other Regulations</u>. No Loan Party is an "investment company" within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.15    <u>Subsidiaries</u>. As of the Closing Date and after giving effect to the Transactions, (a) Schedule 4.15 sets forth the name and jurisdiction of organization of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party, and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary, except as created by the Loan Documents and the Term Loan Documents. As of the Closing Date, only the Restricted Subsidiaries organized in Argentina, Italy and Turkey constitute Cash Restricted Subsidiaries.

4.16    <u>Use of Proceeds</u>. The proceeds of the Loans and the Letters of Credit shall be used for working capital and general corporate purposes of the Borrower and its Restricted Subsidiaries, including on the Closing Date in accordance with <u>Section 5.1(r)</u> and to pay fees and expenses in connection with this Agreement.

4.17    <u>Environmental Matters</u>. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)     no Group Member has received or has knowledge of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>"), nor does any Loan Party have knowledge that any such notice will be received or is being threatened;

(c)     Materials of Environmental Concern have not been released, transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been released, generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d)     no judicial proceeding or governmental or administrative action is pending or, to the knowledge of any Group Member, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business, nor, to the knowledge of any Group Member, are there any past or present actions, activities, circumstances, conditions, events or incidents with respect to the Properties or the Business, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that could form the basis of any such action or order against any Group Member or against any person or entity whose liability for any such action or order any Group Member has retained or assumed either contractually or by operation of law, or otherwise result in any costs or liabilities under Environmental Law;

(e)     the Properties and all operations at the Properties are in compliance, and have in the past been in compliance, with all applicable Environmental Laws;

(f)     the Borrower has provided the Administrative Agent with copies of all material assessments, reports, data, results of investigations or audits, and other similar information that is in the possession of or reasonably available to the Borrower regarding environmental matters pertaining to the environmental condition of the Borrower, or the compliance (or noncompliance) by the Borrower (with respect to the Properties or the Business) with any Environmental Laws; and

(g)     no Group Member has assumed any liability of any other Person under Environmental Laws.

4.18     <u>Accuracy of Information, etc.</u>

(a)     No statement or information concerning any Group Member or the Business contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading. The projections and pro forma financial information, taken as a whole, contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made and as of the Closing Date (with respect to such projections and pro forma financial information delivered prior to the Closing Date), it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results

during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized.

(b)    As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

4.19    <u>Security Documents</u>.

(a)    Subject to the Agreed Security Principles (solely with respect to the assets and property of (or the Capital Stock of) Specified Foreign Guarantors), each of the Security Documents is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. In the case of (i) the Capital Stock described in the Security Agreement that are securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(15) of the New York UCC or the corresponding code or statute of any other applicable jurisdiction ("<u>Certificated Securities</u>"), when certificates representing such Capital Stock are delivered to the Administrative Agent or the Term Loan Administrative Agent (in accordance with the Intercreditor Agreement), (ii) in the case of Collateral consisting of Deposit Accounts or Securities Accounts, when such Deposit Accounts or Securities Accounts, as applicable, are subject to an Account Control Agreement (as defined in the Security Agreement)  and (iii) in the case of the other Collateral not described in clauses (i) or (ii) constituting personal property described in the Security Agreement, when financing statements and other filings, agreements and actions specified on <u>Schedule 4.19(a)</u> in appropriate form are executed and delivered, performed or filed in the offices specified on <u>Schedule 4.19(a)</u>, as the case may be, <u>and Intellectual Property Security Agreements are filed with and recorded by</u> the United States Patent and Trademark Office, the United States Copyright Office, and any Canadian counterpart of the foregoing, as applicable, the Administrative Agent, for the benefit of the Secured Parties, shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (except Permitted Encumbrances). Other than as set forth on <u>Schedule 4.19(a)</u>, as of the Closing Date, none of the Capital Stock of any Subsidiary Guarantor that is a limited liability company or partnership is a Certificated Security.

(b)    Each of the Mortgages delivered on or after the Closing Date is, or upon execution and recording will be, effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the recording offices for the applicable jurisdictions in which the Mortgaged Properties are located, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except Permitted Encumbrances). <u>Schedule 1.1C</u> lists, as of the Closing Date, each parcel of owned real property located in the United States and held by the Borrower or any of its Restricted Subsidiaries that has a fair market value, in the reasonable opinion of the Borrower, in excess of $5,000,000.

4.20    <u>Solvency</u>. Each Loan Party is, and after giving effect to the Transactions and the incurrence of all Indebtedness and obligations being incurred in connection herewith and therewith and the other transactions contemplated hereby and thereby will be and will continue to be, Solvent on a consolidated basis.

4.21    Regulation H. No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has not been made available under the National Flood Insurance Act of 1968.

4.22    Affected Financial Institution. No Loan Party is an Affected Financial Institution.

SECTION 5.    CONDITIONS PRECEDENT

5.1    Conditions to Initial Extension of Credit. The agreement of each Lender to make the initial extension of credit requested to be made by it under this Agreement on the Closing Date is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date (subject to the post-closing deliverables set forth on Schedule 6.15 with respect to certain of the Specified Foreign Guarantors) , of the following conditions precedent:

(a)    Loan Documents.

(i)    The Administrative Agent shall have received, each in form and substance reasonably satisfactory to the Commitment Parties, (i) this Agreement, executed and delivered by the Borrower, Holdings, each Guarantor and each Person listed on Schedule 1.1A, (ii) the Security Agreement, executed and delivered by the Borrower, Holdings, each Subsidiary Guarantor and the other parties thereto, (iii) the Canadian Pledge and Security Agreement executed and delivered by the general partner of the Borrower,  (iv) the Intellectual Property Security Agreements executed and delivered by each Loan Party party thereto, (v) each other Security Document executed and delivered by each Loan Party thereto, (vi) each Note duly executed by the Borrower in favor of each requesting Lender and (vii) the Intercreditor Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person party thereto.

(ii)    The Term Loan Documents shall be in full force and effect and the Borrower shall have received term loans under the Term Loan Credit Agreement in an aggregate principal amount of $540,827,403.77.

(b)    Officer's Certificate. The Administrative Agent shall have received a certificate of the Borrower, dated the Closing Date, (i) certifying that the conditions in Section 5.1(d), Section 5.2(a), Section 5.2(b) have been met and (ii) attaching true and complete copies of the Term Loan Documents.

(c)    Pro Forma Financial Statements; Financial Statements.  The Lenders shall have received (i) the unaudited pro forma consolidated balance sheet and related pro forma consolidated statement of income of the Borrower and its consolidated Restricted Subsidiaries as of and for the 12 months ended June 30, 2022, prepared giving effect (as if such events had occurred on such date (in the case of the balance sheet) or at the beginning of such period (in the case of the statement of income)) to the consummation of the Transactions and the payment of fees and expenses in connection therewith, (ii) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the 2019 and 2020 fiscal years (provided that availability of such report on the U.S. Securities and Exchange Commission EDGAR information retrieval system shall satisfy this requirement), (iii) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the 2021 fiscal year and (iv) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal quarters ended March 31, 2022 and June 30, 2022.

(d)    <u>Existing Indebtedness</u>. Prior to or substantially concurrently with the initial extensions of credit under this Agreement on the Closing Date, Indebtedness for borrowed money (excluding, for the avoidance of doubt, Indebtedness of the type described in clauses (d), (e) and (f) (solely with respect to letters of credit issued by Credit Suisse AG, Cayman Islands Branch and its Affiliates) of the definition thereof) and all Liens granted in connection with the foregoing shall have been terminated.

(e)    [Reserved]

(f)    <u>Lien Searches</u>. The Administrative Agent shall have received the results of recent lien and judgment searches in each of the jurisdictions where the Loan Parties are located (within the meaning of Section 9-307 of the New York UCC, the PPSA or the corresponding code or statute of any other applicable jurisdiction) and such searches shall reveal no liens on any of the assets of the Loan Parties (except for Permitted Liens), or any such Liens (except for Permitted Liens) shall be discharged on or prior to the Closing Date pursuant to customary documentation reasonably satisfactory to the Administrative Agent.

(g)    <u>Fees</u>. The Lenders, the Commitment Parties and the Administrative Agent shall have received all fees required to be paid, and all expenses required to be paid for which invoices have been presented (including the reasonable fees and expenses of legal counsel to the Administrative Agent), on or before the Closing Date.

(h)    <u>Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of <u>Exhibit C</u>, with appropriate insertions and attachments, including certified organizational authorizations, incumbency certifications, the certificate of incorporation or other similar organizational document of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and bylaws or other similar organizational document of each Loan Party certified by a Responsible Officer as being in full force and effect on the Closing Date, and (ii) a good standing certificate (long form, to the extent available) or the substantive equivalent for each Loan Party from its jurisdiction of organization.

(i)    <u>Legal Opinions</u>. The Administrative Agent shall have received the following executed legal opinions:

(i)    the legal opinion of Kirkland & Ellis LLP, special counsel to the Loan Parties; and

(ii)    the legal opinion of Goodmans LLP, special Ontario counsel to the general partner of the Loan Parties and Stewart McKelvey, special Nova Scotia counsel to the Loan Parties.

Each such legal opinion shall be in form and substance reasonably satisfactory to the Administrative Agent and shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent and the Commitment Parties may reasonably require.

(j)    <u>Pledged Stock; Stock Powers; Pledged Notes</u>. The Term Loan Administrative Agent shall have received (i) the certificates representing the shares of Capital Stock (to the extent certificated) pledged pursuant to the Security Agreement and the Canadian Pledge and Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, and (ii) each promissory note (if any) required to be pledged to

the Administrative Agent pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(k)    <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code and PPSA financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than Permitted Liens), shall have been executed and delivered to the Administrative Agent in proper form for filing, registration or recordation.

(l)    <u>Solvency Certificate</u>. The Administrative Agent shall have received a solvency certificate in the form of Exhibit H from the chief financial officer, treasurer or other appropriate officer or director, as applicable, of Holdings, demonstrating that Holdings, the Borrower and the Guarantors is, and after giving effect to the Transactions and the other transactions contemplated hereby, will be and will continue to be, Solvent on a consolidated basis.

(m)    <u>Insurance</u>. The Administrative Agent shall have received insurance certificates satisfying the requirements of <u>Section 4.2(b)</u> of the Security Agreement.

(n)    <u>Patriot Act; Beneficial Ownership</u>. The Administrative Agent and the Lenders (to the extent requested) shall have received (i) at least five Business Days prior to the Closing Date, all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act and CAML and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five days prior to the Closing Date, any Lender that has requested, in a written notice to the Borrower at least 10 days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(o)    <u>Inventory Appraisal and Field Examination</u>.

(i)    The Administrative Agent shall have received appraisals of the Borrowing Base Loan Parties' Inventory from one or more firms satisfactory to the Administrative Agent, which appraisals shall be satisfactory to the Administrative Agent in its sole discretion.

(ii)    The Administrative Agent or its designee shall have conducted a field examination of the Borrowing Base Loan Parties' Accounts, Inventory and related working capital matters and of the Borrowing Base Loan Parties' related data processing and other systems, the results of which shall be satisfactory to the Administrative Agent in its sole discretion.

(p)    <u>Borrowing Base Certificate</u>. The Administrative Agent shall have received a completed Borrowing Base Certificate at least 3 Business Days prior to the Closing Date, which calculates the Borrowing Base as of [  ], 2022.

(q)    <u>Deposit Account Control Agreements</u>. The Administrative Agent shall have received Deposit Account Control Agreements required to be delivered pursuant to the Security Agreement, in each case in form and substance reasonably satisfactory to the Administrative Agent;

provided that if, notwithstanding the use by the Loan Parties of commercially reasonable efforts (without undue burden and expense) to satisfy the requirements set forth in this Section 5.1(q) and, such requirement is not satisfied as of the Closing Date, the satisfaction of such requirements shall not be a condition to the agreement of each Lender to make the initial extension of credit requested to be made by it (but shall be required to be satisfied within 60 days of the Closing Date (or such later date as the Administrative Agent may agree in its reasonable discretion)).

(r)     Revolving Loans and L/C Obligations. Not more than $47,424,495.19 of Revolving Loans shall be drawn and no L/C Obligations shall be outstanding on the Closing Date. Substantially simultaneously with the initial drawings of the Revolving Loans, such drawings shall be applied pursuant to Article III.B.3(c)(ii)(B) of the Chapter 11 Plan and any funded amounts in excess thereof shall be applied pursuant to Article III.B.3(c)(ii)(A)(x) of the Chapter 11 Plan.

(s)     Material Adverse Effect. Since December 31, 2021 and after taking into account the Transactions and after giving effect to the consummation of the Chapter 11 Plan, there not having been any change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of the Borrower and its subsidiaries, taken as a whole, other than as a result of events leading up to, resulting from and/or following the commencement of their proceedings under chapter 11 of the Bankruptcy Code or the continuation and prosecution thereof (including the announcement of the filing or commencement of the Chapter 11 Cases).

(t)     Confirmation Order. The Confirmation Order shall have become a Final Order (as defined in the Chapter 11 Plan) and such order shall not have been amended, modified, vacated, stayed or reversed.

(u)     Conditions Precedent to Plan. The conditions precedent to the confirmation of the Chapter 11 Plan set forth in the Chapter 11 Plan shall have occurred and the conditions precedent to the Effective Date shall have occurred. With respect to such conditions precedent to the confirmation of the Chapter 11 Plan and Effective Date, the Borrower shall have confirmed to Administrative Agent in writing that such conditions precedent have been satisfied or waived and that the Effective Date has occurred.  All other actions, documents and agreements necessary to implement the Chapter 11 Plan shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

(v)     Bankruptcy Proceeding. There shall be no adversary proceeding pending in the Bankruptcy Court or any court of any other jurisdiction, or litigation commenced outside of the bankruptcy proceedings that is not stayed pursuant to section 362 of the Bankruptcy Code, seeking to enjoin or prevent the Transactions.

(w)     Rights Offering. The Rights Offering (as defined in the Chapter 11 Plan) shall have closed in accordance with its terms and the Borrower shall have received the proceeds therefrom and applied such proceeds (if any) in accordance with the Chapter 11 Plan.

(x)     Minimum Liquidity. As of the Effective Date (as defined in the Chapter 11 Plan) and after giving effect to the Restructuring Transactions (as defined in the Chapter 11 Plan), the Borrower and its Restricted Subsidiaries shall have Minimum Liquidity. "Minimum Liquidity" means, with respect to the Borrower and its Restricted Subsidiaries as of the Effective Date, an amount of total Liquidity equal to $100,000,000, including at least $60,000,000 of unrestricted balance sheet cash for Borrower and its Restricted Subsidiaries (provided that in no event shall more than $20,000,000 of such Liquidity be Unrestricted Cash of Cash Restricted Subsidiaries that is restricted on transfers, including as a result of

currency control restrictions), after taking into account (x) any Cash (as defined in the Chapter 11 Plan) distributions to be paid under the Chapter 11 Plan on or about the Effective Date and (y) any amounts that may come due after the Effective Date on account of Allowed Professional Fee Claims (as defined in the Chapter 11 Plan), net of the aggregate amount funded into the Professional Escrow Account (as defined in the Chapter 11 Plan) pursuant to Article II.C of the Chapter 11 Plan.

(y)     <u>The Chapter 11 Plan</u>. The Original Chapter 11 Plan shall not have been amended, supplemented or modified in a manner that is materially adverse to the interests of the Lenders without the consent of the Lenders and as further set forth in the Commitment Letter.

5.2     <u>Conditions to Each Extension of Credit</u>. The agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit, but excluding any Protective Advance) is subject to the satisfaction of the following conditions precedent:

(a)     <u>Representations and Warranties</u>. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

(b)     <u>No Default</u>. At the time of and immediately after giving effect to the extensions of credit requested to be made on such date, no Default or Event of Default shall have occurred and be continuing on such date.

(c)     <u>Protective Advances</u>. No Borrowing shall be made on any date if a Protective Advance is outstanding unless the proceeds of such Borrowing are applied to repay in full (or to the extent of such Borrowing) such Protective Advance.

(d)     <u>Cure Period</u>. No Cure Period shall be in effect unless the Borrower shall have received the Cure Amount.

Each borrowing by, and each issuance, renewal, extension, increase or amendment of a Letter of Credit on behalf of, the Borrower hereunder (other than with respect to a Protective Advance) shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this <u>Section 5.2</u> have been satisfied.

SECTION 6.     AFFIRMATIVE COVENANTS

Holdings and the Borrower hereby jointly and severally agree that, until all Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification and reimbursement obligations for which no claim has been made) and all Letters of Credit have been canceled, have expired or have been Collateralized, each of Holdings and the Borrower shall and shall cause each of its Restricted Subsidiaries to:

6.1     <u>Financial Statements</u>. Furnish to the Administrative Agent (who shall promptly furnish to each Lender):

(a)     as soon as available, but in any event within 105 days after the end of each fiscal year of the Borrower (and 150 days after the fiscal year ending December 31, 2022), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year

and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year reported on, and with respect to the fresh start accounting period in 2022 and each period thereafter, without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit (other than with respect to or resulting from (i) the maturity of any Loans under this Agreement (or, the maturity of the Term Loans), occurring within one year from the time such opinion is delivered or (ii) any potential inability to satisfy the financial covenants under <u>Section 7.1</u> (or, the financial covenants under <u>Section 7.1</u> of the Term Loan Credit Agreement) on a future date or for a future period), by PricewaterhouseCoopers or other independent certified public accountants of nationally recognized standing; <u>provided</u> that delivery within the time period specified above of copies of the Annual Report on Form 10-K of the Borrower (or any (x) Parent Company or (y) direct or indirect parent company thereof (with reconciliations and/or adjustments reasonably requested by the Administrative Agent) filed with the SEC (subject to the same requirements as to lack of qualification or exception as to the audit or the scope thereof) shall be deemed to satisfy the requirements of this <u>Section 6.1(a)</u>; and

(b)       as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as fairly stating in all material respects the financial position of the Borrower and its consolidated Subsidiaries in accordance with GAAP for the period covered thereby (subject to normal year-end audit adjustments and the absence of footnotes, and for the period ending September 30, 2022, may not be accounted for in accordance with ASC 852); <u>provided</u> that delivery within the time period specified above of copies of the Quarterly Report on Form 10-Q of the Borrower (or any (x) Parent Company or (y) direct or indirect parent company thereof (with reconciliations and/or adjustments reasonably requested by the Administrative Agent)) filed with the SEC shall be deemed to satisfy the requirements of this <u>Section 6.1(b)</u>.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and (except as otherwise provided below) in accordance with GAAP applied consistently (except to the extent any such inconsistent application of GAAP has been approved by such accountants (in the case of clause (a) above) or officer (in the case of clause (b) above), as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods. Notwithstanding the foregoing, the obligations in <u>Sections 6.1(a)</u> and (<u>b</u>) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of Holdings or any direct or indirect parent of Holdings; provided to the extent such information relates to a parent of the Borrower, such information is accompanied by information that explains in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to the Borrower and their consolidated Subsidiaries on a standalone basis, on the other hand.

6.2    <u>Certificates; Borrowing Base; Other Information</u>. Furnish to the Administrative Agent (who shall promptly furnish to each Lender) or, in the case of clause (h), to the relevant Lender:

(a)       promptly upon the request of the Administrative Agent, in connection with the delivery of any financial statements or other information pursuant to <u>Section 6.1</u> or this <u>Section 6.2</u>, confirmation of whether such statements or information contains any Private Lender Information. Holdings and the Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Holdings, the Borrower, their respective Subsidiaries or their securities) and, if documents or notices

required to be delivered pursuant to <u>Section 6.1</u> or this <u>Section 6.2</u> or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "<u>Platform</u>"), any document or notice that Holdings, the Borrower or any of its Restricted Subsidiaries has indicated contains Private Lender Information shall not be posted on that portion of the Platform designated for such public-side Lenders. If Holdings, the Borrower and its Restricted Subsidiaries have not indicated whether a document or notice delivered pursuant to <u>Section 6.1</u> or this <u>Section 6.2</u> contains Private Lender Information, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to Holdings, the Borrower, its Subsidiaries and their securities;

(b)        [reserved];

(c)        concurrently with the delivery of any financial statements pursuant to <u>Section 6.1</u>, (i) a certificate of a Responsible Officer stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate, (ii) (x) a Compliance Certificate (A) containing all information and calculations necessary for determining compliance by the Borrower with the provisions of <u>Section 7.1</u> of this Agreement (regardless of whether such covenant is then applicable) as of the last day of the applicable fiscal quarter or fiscal year of the Borrower, as the case may be, (B) certifying a list of names of all Immaterial Subsidiaries, that each Subsidiary set forth on such list individually qualifies as an Immaterial Subsidiary and that all such Subsidiaries in the aggregate do not exceed the limitation set forth in the proviso of the definition of the term "<u>Immaterial Subsidiary</u>", and (C) certifying a list of names of all Unrestricted Subsidiaries and that each Subsidiary set forth on such list individually qualifies as an Unrestricted Subsidiary and (y) to the extent not previously disclosed to the Administrative Agent, a description of any change in the jurisdiction of organization of any Loan Party and a list of any registered Intellectual Property acquired or developed by any Loan Party since the date of the most recent report delivered pursuant to this clause (y) (or, in the case of the first such report so delivered, since the Closing Date);

(d)        as soon as available, and in any event no later than 105 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including (i) projected consolidated quarterly income statements and (ii) projected consolidated annual balance sheets of the Borrower and its Subsidiaries, the related consolidated statements of projected cash flow, projected changes in financial position and projected income and a description of the material underlying assumptions applicable thereto) (collectively, the "<u>Projections</u>"), which Projections shall be based on reasonable estimates, information and assumptions that are reasonable at the time in light of the circumstances then existing, it being understood that projections are subject to uncertainties and there is no assurance that any projections will be realized;

(e)

(i)        within 20 calendar days of the end of each calendar month (or, if such day is not a Business Day, on the immediately following Business Day) (and during a Cash Dominion Period, on or prior to the third Business Day of each calendar week, with respect to the prior week), as of the period then ended, a Borrowing Base Certificate, and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(ii)        within 20 calendar days of the end of each calendar month (or, if such day is not a Business Day, on the immediately following Business Day) (and during a Cash Dominion Period, on or prior to the third Business Day of each calendar week, with respect to the

prior week), as of the period then ended, all delivered electronically in a text formatted file acceptable to the Administrative Agent;

(A)    a detailed aging of the Borrowing Base Loan Parties' Accounts, including all invoices aged by invoice date and due date (with an explanation of the terms offered), prepared in a manner reasonably acceptable to the Administrative Agent, together with a summary specifying the name, and balance due for each Account Debtor;

(B)    a schedule detailing the Borrowing Base Loan Parties' Inventory, in form satisfactory to the Administrative Agent, by location (showing Inventory in transit, any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, semi-finished goods, finished goods and service parts), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost or market and adjusted for Reserves as the Administrative Agent has previously indicated to the Borrower are deemed by the Administrative Agent to be appropriate;

(C)    a worksheet of calculations prepared by the Borrowing Base Loan Parties to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion; and

(D)    such other information as required pursuant to the Schedule of Information section of <u>Exhibit J</u>.

(iii)    within 20 days of the end of each calendar month as of the month then ended, a schedule and aging of the Borrowing Base Loan Parties' accounts payable, delivered electronically in a text formatted file acceptable to the Administrative Agent;

(iv)    concurrently with the Disposition of any assets or the designation of any Restricted Subsidiary as an Unrestricted Subsidiary that has assets, in each case included in the Borrowing Base that contribute more than $4,000,000 of the Borrowing Base (other than any Disposition pursuant to Section 7.5(b)), the Borrower shall provide a Borrowing Base Certificate (providing a calculation of the Borrowing Base after giving effect to such Disposition), and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(v)    promptly upon the Administrative Agent's request in the Administrative Agent's Permitted Discretion:

(A)    a reconciliation of the Borrowing Base Loan Parties' Accounts and Inventory between (A) the amounts shown in the Borrowing Base Loan Parties' general ledger and financial statements and the reports delivered pursuant to clauses (A) and (B) of clause (e)(ii) above and (B) the amounts and dates shown in the reports delivered pursuant to clauses (A) and (B) of clause (e)(ii) above and the Borrowing Base Certificate delivered pursuant to clause (e)(i) above as of such date; and

(B)    a reconciliation of the loan balance per the Borrowing Base Loan Parties' general ledger to the loan balance under this Agreement;

(C)    [reserved];

(D)      [reserved];

(E)      [reserved];

(F)      an updated customer list for each Borrowing Base Loan Party, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Administrative Agent and certified as true and correct by a Responsible Officer of the Borrower;

(G)      [reserved];

(H)      [reserved]; and

(I)      a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction.

(f)      [reserved];

(g)      promptly, copies of all financial statements and reports that Holdings, the Borrower or any of their respective Restricted Subsidiaries sends generally to the holders of any class of its debt securities or public equity securities, acting in such capacity, and, within five days after the same are filed, copies of all financial statements and reports that Holdings, the Borrower or any of their respective Restricted Subsidiaries may make to, or file with, the SEC;

(h)      promptly following any Lender's request therefor, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering or terrorist financing rules and regulations, including, without limitation, the PATRIOT Act, CAML and the Beneficial Ownership Regulation;

(i)      promptly following either a request thereof or any Reportable Event, copies of (i) any documents described in Section 101(k) or 101(l) of ERISA that the Borrower, its Affiliates or any Commonly Controlled Entity has received with respect to any Multiemployer Plan or any documents described in Section 101(f) of ERISA that the Borrower, its Affiliates or any Commonly Controlled Entity has received with respect to any Pension Plan; provided, that if the relevant entity has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent or upon a Reportable Event, such entity shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(j)      promptly following the request thereof, copies of the most recently sent or filed actuarial report and annual information return required to be filed with the Financial Services Regulatory Authority of Ontario or the Canada Revenue Agency or any other applicable Governmental Authority in connection with each Canadian Defined Benefit Plan;

(k)      as promptly as reasonably practicable following the Administrative Agent's request therefor, such additional information concerning any Canadian Pension Plan in the possession of any Group Member as may be reasonably requested by Administrative Agent from time to time;

(l)      copies of substantially final drafts of all agreements and ancillary documents relating to the entering into, or any material amendments, waivers or supplements with respect to, a Receivables Facility; and

(m)      as promptly as reasonably practicable from time to time following the Administrative Agent's request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Restricted Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent may reasonably request (on behalf of itself or any Lender).

6.3      <u>Payment of Obligations</u>.  Pay, discharge or otherwise satisfy at or before they become delinquent, as the case may be, all its Tax liabilities, except (i) with respect to income taxes, where the failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and adequate reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member.

6.4      <u>Maintenance of Existence; Compliance</u>. (a) (i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain or obtain all Governmental Approvals and all other all rights, privileges and franchises, in each case necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by <u>Section 7.4</u> and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect; (c) for each existing or hereafter adopted Plan or Canadian Pension Plan, comply in a timely fashion with and perform in all material respects all of its funding, investment  and administration obligations under and in respect of such Plan or Canadian Pension Plan, including under any funding agreements and all applicable laws, which obligations if unpaid or unperformed could reasonably be expected to result in the imposition of a Lien against any of its property; and (d) comply with all Governmental Approvals except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.5      <u>Maintenance of Property; Insurance</u>. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear and casualty and condemnation excepted, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, (b) maintain all the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks, industrial designs and trade names material to the conduct of its business, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (c) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by similarly situated companies engaged in the same or a similar business.

6.6      <u>Inspection of Property;  Books and Records; Discussions; Appraisals; Field Examinations</u>.

(a)      (i) Keep proper books of records and account in which entries full, true and correct in all material respects in conformity with all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and from which financial statements conforming with GAAP can be derived and (ii) permit, at the Borrower's sole expense, representatives of the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any

of its books and records at any reasonable time during normal business hours, upon reasonable prior notice, and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants; provided that (x) in no event shall there be more than one such visit for the Administrative Agent and its representatives as a group per calendar year except during the continuance of an Event of Default and (y) the Borrower shall have the right to be present during any discussions with accountants.

(b)     No more than once in each twelve month period, at the request of the Administrative Agent, the Loan Parties will cooperate with an appraiser selected and engaged by the Administrative Agent to provide Inventory appraisals or updates thereof (the "Annual Inventory Appraisal"), prepared on a basis reasonably satisfactory to the Administrative Agent, such appraisals and updates to include information required by applicable law and regulations; provided that (i) if an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of such appraisals and (ii) in addition to the Annual Inventory Appraisal, if Excess Availability is less than the greater of (x) 20% of the Line Cap or (y) $15,000,000 for a period of five consecutive Business Days, the Loan Parties will cooperate with the Administrative Agent to provide such appraisals (at the request of the Administrative Agent) on one additional occasion during such twelve month period; provided further the Administrative Agent shall have the right, but not any obligation, to conduct additional Inventory appraisals if the value of Inventory designated in the subledger as film inventory of the Borrowing Base Loan Parties (valued at the lower of cost and market) is greater than 50% of the value of the Eligible Inventory (valued at the lower of cost and market).  For purposes of this Section 6.6(b), it is understood and agreed that a single appraisal may consist of appraisals conducted at multiple relevant sites and involve one or more relevant Loan Parties and their assets.  All such appraisals shall be commenced upon reasonable notice to the Borrower and performed during normal business hours of the Borrower, and all reasonable out-of-pocket costs of such appraisals shall be at the sole expense of the Loan Parties.

(c)     No more than once in each twelve month period, at the request of the Administrative Agent, the Loan Parties will permit, upon reasonable notice, the Administrative Agent or its designee to conduct a field examination (the "Annual Field Examination") to ensure the adequacy of Collateral included in any Borrowing Base and related reporting and control systems and determine any variance between the Loan Parties' general ledger and perpetual inventory report; provided that (i) if an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of such field examinations and (ii) in addition to the Annual Field Examination, if Excess Availability is less than or equal to the greater of (x) 20% of the Line Cap or (y) $15,000,000 for a period of five consecutive Business Days, the Loan Parties will permit the Administrative Agent to conduct such examinations (at the request of the Administrative Agent) on one additional occasion during such twelve month period.  For purposes of this Section 6.6(c), it is understood and agreed that (i) a single field examination may be conducted at multiple relevant sites and involve one or more relevant Loan Parties and their assets and (ii) the Administrative Agent shall use commercially reasonable efforts to coordinate any such field exams.  All such field examinations shall be commenced upon reasonable notice to the Borrower and performed during normal business hours of the Borrower, and all reasonable out-of-pocket costs of such field examinations shall be at the sole expense of the Loan Parties.

6.7     Notices.  Promptly give notice to the Administrative Agent (who shall promptly furnish to each Lender) following a Responsible Officer's knowledge of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group

Member and any Governmental Authority, that in either case, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation or proceeding affecting any Group Member (i) in which the amount involved is $10,000,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought which injunctive or similar relief could reasonably be expected to result in a Material Adverse Effect or (iii) which relates to any Loan Document;

(d)    the following events, promptly and in any event within 30 days after the Borrower knows that the following has occurred or is reasonably likely to occur: (i) the occurrence of any Reportable Event or Canadian Pension Event with respect to any Plan or Canadian Pension Plan or a failure to make any required contribution to a Plan or a Canadian Pension Plan that, in either case, could reasonably be expected to have a Material Adverse Effect, (ii) the creation of any Lien in favor of the PBGC or a Plan or a Canadian Pension Plan or any withdrawal from, or the termination, Insolvency of, any Multiemployer Plan that would result in the imposition of a liability that could reasonably be expected to have a Material Adverse Effect, or (iii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination (in other than a "standard termination" as defined in ERISA), Insolvency of, any Plan that, in any such case, could reasonably be expected to have a Material Adverse Effect; and

(e)    any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this <u>Section 6.7</u> shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8    <u>Environmental Laws</u>.

(a)    Comply with, and take commercially reasonably action to ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and take commercially reasonably action to ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required or reasonably prudent under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect or such requirements are contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of such Group Member, and in the event that any Group Member shall fail timely to commence or cause to be commenced or fail diligently to prosecute to completion such actions, or contest such requirement in good faith as provided herein, allow the Administrative Agent (at its election) to cause such actions to be performed, and promptly pay all costs and expenses (including, without limitation, attorneys' and consultants' fees, charges and disbursements) thereof or incurred by the Administrative Agent in connection therewith.

6.9    <u>Additional Collateral, etc.</u>

(a)    With respect to any property (to the extent included in the definition of Collateral) acquired at any time after the Closing Date by any Loan Party that is a Group Member (or any Group Member required to become a Loan Party pursuant to the terms of the Loan Documents) (other than (x) any property described in clause (b), (c) or (d) below and (y) any property subject to a Lien expressly permitted by clauses (g), (o), (u), (x) and (aa) of Section 7.3 to the extent and for so long as the obligations relating to such Liens do not permit a Lien on such property in favor of the Secured Parties) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien (with respect to any assets or property of (and Capital Stock of) any Specified Foreign Guarantors, subject to the Agreed Security Principles) within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Documents or to the extent requested by the Administrative Agent, execute a security agreement compatible with the laws of Canada or any province or territory thereof in form and substance reasonably satisfactory to the Administrative Agent, or such other documents as the Administrative Agent reasonably deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such property and (ii) take all actions reasonably necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted Liens and the Intercreditor Agreement) in such property, including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may reasonably be requested by the Administrative Agent.

(b)    With respect to any interest in any real property (excluding any leasehold interest) having a value (together with improvements thereof) of at least $5,000,000 acquired after the Closing Date by any Loan Party that is a Group Member (or any Group Member required to become a Loan Party pursuant to the terms of the Loan Documents) (other than any such real property subject to a Lien expressly permitted by clauses (g), (o) and (q) of Section 7.3 to the extent and for so long as the obligations relating to such Liens do not permit a Lien on such property in favor of the Secured Parties) (with respect to any assets or property of any Specified Foreign Guarantors, subject to the Agreed Security Principles), within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver a Mortgage (with the highest priority permitted by the Intercreditor Agreement), in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such interest in real property, (ii) if requested by the Administrative Agent, provide the Lenders with title and extended coverage insurance covering such interest in real property in an amount at least equal to the fair market value of such real property (or such lesser amount as shall be specified by the Administrative Agent) as well as a current ALTA survey thereof (or an existing survey accompanied if necessary by a "no-change" affidavit and/or other documents if same is sufficient to obtain survey coverage in the applicable title policy), together with a surveyor's certificate and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above in clause (i), which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent, and (iv) provide the Administrative Agent with evidence indicating whether the mortgaged real property is located within a one hundred year flood plain or identified as a special flood hazard area as defined by the Federal Emergency Management Agency (or any successor agency) ("FEMA"), and, if so a flood notification form signed by the applicable Loan Party, in form and substance reasonably satisfactory to Administrative Agent. In addition, if at any time any portion of the real property encumbered by such Mortgage is located in a one hundred year flood plain or an area designated a "special flood hazard area" by FEMA and for which flood insurance has been made available under the National Flood Insurance Act of 1968 (or any amendment or successor act thereto), such Loan Party shall obtain and maintain flood insurance in such total amount as the Administrative Agent may from time to time reasonably require and shall provide the Administrative Agent with evidence reasonably satisfactory to Administrative Agent thereof.

(c)      With respect to any new Domestic Subsidiary or Canadian Subsidiary created or acquired after the Closing Date by any Group Member other than any Excluded Subsidiary (which, for the purposes of this Section 6.9(c), shall include any existing Subsidiary that ceases to be a Foreign Subsidiary, a Non-Guarantor Subsidiary or an Unrestricted Subsidiary), within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to this Agreement, the Security Agreement, or, in the case of a Canadian Subsidiary execute such other Security Documents (or joinder agreements) to the extent possible under and compatible with the laws of such Canadian Subsidiary's jurisdiction of organization, chief executive office, head office, registered office and domicile (within the meaning of the Civil Code of Quebec)), as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted Encumbrances) in the Capital Stock of such new Subsidiary Guarantor that is owned by any Group Member, (ii) deliver to the Administrative Agent or the Term Loan Administrative Agent (in accordance with the Intercreditor Agreement) the certificates representing such Capital Stock (if any), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii) cause such new Subsidiary Guarantor (a) to execute and deliver to the Administrative Agent (x) a Guarantor Joinder Agreement or such comparable documentation requested by the Administrative Agent to guaranty the Obligations, (y) a joinder agreement to the Security Agreement, substantially in the form annexed thereto and, in the case of a Subsidiary Guarantor that is a Canadian Subsidiary, to the extent requested by the Administrative Agent, execute a security agreement compatible with the laws of such Canadian Subsidiary's jurisdiction or in the jurisdictions in which its tangible property, chief executive office, head office, registered office and domicile (within the meaning of the Civil Code of Quebec) are located, in each case, in form and substance reasonably satisfactory to the Administrative Agent, (b) to take such actions reasonably necessary or advisable to grant to the Administrative Agent for the benefit of the Secured Parties a perfected first priority security interest (subject to Permitted Encumbrances) in the Collateral described in the Security Agreement with respect to such new Subsidiary Guarantor, including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Administrative Agent and (c) to deliver to the Administrative Agent a certificate of such Subsidiary Guarantor, substantially in the form of Exhibit C, with appropriate insertions and attachments, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d)      With respect to any new Restricted Subsidiary which is a First-Tier CFC Holdco or First-Tier Foreign Subsidiary (other than an Immaterial Subsidiary or Excluded Foreign Subsidiary) created or acquired after the Closing Date by any Loan Party that is a Group Member, within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement and, to the extent requested by the Administrative Agent, a security agreement compatible with the laws of such Foreign Subsidiary's jurisdiction, as the Administrative Agent deems necessary or reasonably advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted Encumbrances) in the Capital Stock of such Foreign Subsidiary that is owned by any such Group Member that is a Loan Party; provided that in no event shall any Capital Stock of any Excluded Foreign Subsidiary described in clause (ii) of the definition of Collateral be required to be so pledged to the extent such a pledge would, in the good faith judgment of the Borrower and the Administrative Agent at the time provided or thereafter could reasonably be expected to result in material adverse tax consequences or material repatriation of earnings to the Borrower at the time or in the future, (ii) deliver to the Administrative Agent or the Term Loan Administrative Agent (as required by the Intercreditor Agreement) the certificates (if any) representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, and take

such other action as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable to perfect the Administrative Agent's security interest therein, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent; provided that in the event the stamp, excise or similar taxes of any jurisdiction applicable to the pledge of Capital Stock of any Foreign Subsidiary organized in such jurisdiction are excessive in relation to customary practices or the benefit afforded to the Secured Parties from such pledge and the compliance with the provisions of this Section 6.9(d) would result in the imposition of such stamp, excise or similar taxes on the Borrower and its Restricted Subsidiaries, the Administrative Agent may elect not to require the Loan Parties to pledge such Capital Stock of any such Foreign Subsidiary or not to require such pledge to be recorded or registered in any applicable jurisdiction, or may defer such requirement to such date or time as the Administrative Agent may determine.

(e)      With respect to any new Non-Guarantor Subsidiary created or acquired after the Closing Date by any Loan Party (but excluding the Capital Stock of any such Subsidiary that is a Foreign Subsidiary and any Non-Guarantor Subsidiary that is an Excluded Asset, in either case, under clause (iv)(4) of the defintion thereof), within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to this Agreement and the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted Encumbrances) in the Capital Stock of such Non-Guarantor Subsidiary that is owned by any Loan Party, (ii) deliver to the Administrative Agent or the Term Loan Administrative Agent (as required by the Intercreditor Agreement) the certificates representing such Capital Stock (if any), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member and (iii) cause such new Subsidiary Guarantor to deliver to the Administrative Agent a certificate of such Subsidiary Guarantor, substantially in the form of Exhibit C, with appropriate insertions and attachments.

(f)      Other than as set forth in the Agreed Security Principles and Section 7.5(v) of this Agreement, no actions in any jurisdiction outside the United States and Canada shall be required in order to create any security interests in assets located or titled outside of the United States and Canada, or to perfect any security interests in such assets, including any Intellectual Property registered in any jurisdiction outside the United States or Canada (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any jurisdiction outside the United States or Canada (other than the agreements listed on Schedule 6.15)).

(g)      With respect to (x) any Subsidiary Guarantor under clause (ii) of the definition of "Subsidiary Guarantor", simultaneously with such Subsidiary Guarantor becoming a guarantor in respect of the Term Loans, Indebtedness permitted under Section 7.2(b) or any Permitted Refinancing in respect of the foregoing and (y) any other Specified Foreign Guarantor, within 90 days (or such longer period as agreed by the Administrative Agent) of the designation thereof (i) cause such Subsidiary (a) to execute and deliver to the Administrative Agent (x) such documentation comparable to the Guarantor Joinder Agreement requested by the Administrative Agent to guaranty the Obligations, (y) subject to the Agreed Security Principles, to execute a security agreement compatible with the laws of such Subsidiary's jurisdiction, in form and substance reasonably satisfactory to the Administrative Agent and (ii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(h)      Notwithstanding anything to the contrary in this Section 6.9, with respect to each Foreign Subsidiary that becomes a party to this Agreement after the Closing Date, the obligations of such

Foreign Subsidiary under this Agreement, any Guarantee, any Security Document, or any other Loan Document, may be limited (and such agreements may be amended, restated, supplemented or otherwise modified to give effect to such limitations without the consent of any Person other than the Administrative Agent and such Foreign Subsidiary) in accordance with the Agreed Security Principles on terms reasonably satisfactory to the Administrative Agent and the Borrower. As of the Closing Date, each Lender party to this Agreement, which Lenders constitute the Required Lenders, and each Lender that becomes a party to this Agreement after the Closing Date, expressly consents to the terms set forth in, and the rights of the Administrative Agent to consent to the terms of the amendments, restatements, supplements and modifications described in, the immediately preceding sentence.

6.10    <u>Deposit Account Control Agreements</u>. With respect to any new Deposit Account that is not an Excluded Account opened by a Loan Party after the Closing Date or any Excluded Account that ceases to be an Excluded Account, deliver to the Administrative Agent any Deposit Account Control Agreement required to be delivered pursuant to the Security Agreement, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

6.11    <u>Further Assurances</u>. At any time or from time to time upon the request of the Administrative Agent, at the expense of the Borrower, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent may reasonably request in order to effect fully the purposes of the Loan Documents. In furtherance and not in limitation of the foregoing, the Loan Parties shall take such actions as the Administrative Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, obtaining of title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession, in each case to the extent required by the applicable Security Documents) to ensure that the Obligations are guaranteed by the Guarantors, on a first priority basis (subject to Permitted Encumbrances) and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of this Agreement and the other Loan Documents) of the Loan Parties, in each case subject to the Agreed Security Principles with respect to the assets and property of (and Capital Stock of) Specified Foreign Guarantors.

6.12    [Reserved].

6.13    <u>Designation of Unrestricted Subsidiaries</u>. The Borrower may at any time after the Closing Date designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary (other than with respect to any subsidiary in existence as of the Closing Date); provided that

(i) (A) immediately before and after such designation, no Default shall have occurred and be continuing, and (B) immediately after giving effect to such designation, the Borrower shall be in compliance with the Financial Performance Covenant set forth in <u>Section 7.1</u> (regardless of whether such covenant is then applicable), determined on a Pro Forma Basis for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by <u>Section 6.1(a)</u> or <u>(b)</u> are available, in each case, as if such designation had occurred on the first day of such period and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating such compliance;

(ii) the Payment Conditions are met; and

(iii) no Restricted Subsidiary may be designated an Unrestricted Subsidiary if such Subsidiary owns any Intellectual Property that is material to the business of the Borrower or any Restricted Subsidiary (individually or taken as a whole).

The designation of any Restricted Subsidiary as an Unrestricted Subsidiary after the Closing Date shall constitute an Investment by the applicable Loan Party therein at the date of designation in an amount equal to the fair market value of the applicable Loan Party's investment therein. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (x) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time, and (y) a return on any Investment by the applicable Loan Party in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the fair market value at the date of such designation of such Loan Party's Investment in such Subsidiary. Notwithstanding the foregoing, neither the Borrower nor Holdings shall be permitted to be an Unrestricted Subsidiary. The Borrower shall cause each Unrestricted Subsidiary to be designated as an "Unrestricted Subsidiary" under any Indebtedness incurred pursuant to Section 7.2(a), (b), and (bb) (and any Permitted Refinancing thereof) and under any other instrument governing Indebtedness in excess of $35,000,000. Notwithstanding anything to the contrary contained in this Section 6.13, in no event shall any Restricted Subsidiary contributing more than $4,000,000 of the Borrowing Base be designated an Unrestricted Subsidiary unless the Administrative Agent receives a completed Borrowing Base Certificate (providing a calculation of the Borrowing Base after giving effect to such designation) and shall comply with any required prepayment pursuant to Section 2.11(a) concurrently with such designation.

6.14    Sanctions. The Borrower will maintain in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with applicable Sanctions.

6.15    Post-Closing Matters.

(a)    Cause to be delivered to the Administrative Agent within 60 days after the Closing Date (or such longer period as agreed by the Administrative Agent), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of December 31, 2021 and the related audited consolidated statements of income and of cash flows for such year by PricewaterhouseCoopers or other independent certified public accountants of nationally recognized standing; and

(b)    Cause to be delivered or performed the documents and other agreements set forth on Schedule 6.15 within the time frames specified on such Schedule 6.15, in each case as such time frames may be extended by the Administrative Agent in its reasonable discretion.


SECTION 7.    NEGATIVE COVENANTS

Holdings and the Borrower hereby jointly and severally agree that, until all Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification and reimbursement obligations for which no claim has been made) and all Letters of Credit have been canceled, have expired or have been Collateralized, each of Holdings and the Borrower shall not, and shall not permit any of their respective Restricted Subsidiaries to:

7.1    <u>Financial Condition Covenant</u>. During each Covenant Trigger Period, permit the Consolidated Fixed Charge Coverage Ratio for the Reference Period to be less than 1.00 to 1.00, to be measured (a) on the initial date of such Covenant Trigger Period for the most recent Reference Period then ended for which financial statements for the most recent four fiscal quarter period in respect thereof have been, or were required to be, delivered pursuant to <u>Section 6.1</u>, and (b) thereafter, as of the last day of each Reference Period ending during such Covenant Trigger Period for which financial statements for the most recent fiscal quarter in respect thereof have been, or were required to be, delivered pursuant to <u>Section 6.1</u>. For the avoidance of doubt the foregoing Consolidated Fixed Charge Coverage Ratio financial covenant will not be tested when a Covenant Trigger Period is not in effect.

7.2    <u>Indebtedness</u>. Incur any Indebtedness, except:

(a)    Indebtedness pursuant to (i) any Loan Document and (ii) (x) Indebtedness of the Borrower (which may be guaranteed by the Guarantors) created under the Term Loan Documents in an aggregate principal amount not to exceed $540,827,403.77 <u>plus</u> the Maximum Term Loan Incremental Amount and (y) Permitted Refinancings of Indebtedness permitted pursuant to clause (a)(ii)(x) above;

(b)    (i) Term Loan Incremental Equivalent Debt in an aggregate amount not to exceed the Maximum Term Loan Incremental Amount and Permitted Refinancings thereof; provided, that, (i) solely in respect of any Incremental Equivalent Debt constituting term loans secured on a pari passu basis with the Obligations in respect of outstanding Term Loans, the Total Net First Lien Leverage Ratio on a Pro Forma Basis (without giving effect to netting of the cash proceeds of such Term Loan Incremental Equivalent Debt on the balance sheet of such incurred amount) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), as the case may be, have been delivered shall be less than or equal to 2.50 to 1.00, (ii) solely in respect of any Incremental Equivalent Debt secured on a junior basis to the Obligations in respect of outstanding Term Loans, the Total Net Secured Lien Leverage Ratio on a Pro Forma Basis (without giving effect to netting of the cash proceeds of such Term Loan Incremental Equivalent Debt on the balance sheet of such incurred amount) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), as the case may be, have been delivered shall be less than or equal to 3.25 to 1.00 and (iii) solely in respect of any unsecured Incremental Equivalent Debt, the Total Net Leverage Ratio on a Pro Forma Basis (without giving effect to netting of the cash proceeds of such Term Loan Incremental Equivalent Debt on the balance sheet of such incurred amount) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), as the case may be, have been delivered shall be less than or equal to 3.75 to 1.00; provided further, that (1) immediately prior to and immediately after giving effect to the incurrence of any such Indebtedness under this Section 7.2(b), no Default or Event of Default shall have occurred and be continuing and (2) in no event shall any Term Loan Incremental Equivalent Debt that is secured by Liens on the Collateral be incurred as a result of any Voluntary Prepayment Amount attributable to prepayments of unsecured Indebtedness and (ii) Permitted Refinancings of Indebtedness permitted pursuant to clause (b)(i) above;

(c)    [Reserved];

(d)    [Reserved];

(e)    [Reserved];

(f)    Indebtedness of (x) the Borrower to any Restricted Subsidiary of the Borrower, (y) any Restricted Subsidiary of the Borrower to the Borrower or any Restricted Subsidiary thereof;

provided, that Indebtedness of Restricted Subsidiaries that are not Subsidiary Guarantors to the Borrower and the Subsidiary Guarantors shall be permitted only to the extent permitted under Section 7.7 and (z) any Non-Guarantor Subsidiary or Foreign Subsidiary to any other Non-Guarantor Subsidiary or Foreign Subsidiary; provided that all such intercompany Indebtedness owed by any Loan Party shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of any applicable promissory notes or an intercompany subordination agreement, in each case, in form and substance reasonably satisfactory to Administrative Agent;

(g)    Indebtedness consisting of Guarantee Obligations by the Borrower or any Subsidiary Guarantor of Indebtedness otherwise permitted under this Section 7.2 in respect of Indebtedness of (x) any Loan Party (excluding Guarantee Obligations with respect to Indebtedness under clauses (f), (p), (t) and (w) of this Section 7.2 and excluding Guarantee Obligations of Indebtedness incurred by Holdings), or (y) any Restricted Subsidiary of the Borrower that is not a Subsidiary Guarantor to the extent permitted under Section 7.7;

(h)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(h);

(i)    Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(g) in an aggregate principal amount not to exceed $25,000,000 at any one time outstanding (plus the principal amount of Indebtedness incurred in connection with a Refinancing of Indebtedness incurred under this clause (i) which equals the unpaid accrued interest and premium (including applicable prepayment penalties) of such Indebtedness being Refinanced plus fees and expenses reasonably incurred in connection with such Refinancing);

(j)    Indebtedness in respect of Swap Agreements permitted by Section 7.11;

(k)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(l)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees, import and export custom and duty guaranties and similar obligations, or obligations in respect of letters of credit, bank acceptances or guarantees or similar instruments related thereto, in each case provided in the ordinary course of business;

(m)    Indebtedness consisting of obligations under deferred compensation, purchase price, earn outs or other similar arrangements incurred by such Person in connection with any acquisitions permitted hereunder;

(n)    Cash Management Obligations and Guarantee Obligations in respect thereof, and other Indebtedness in respect of netting services, overdraft protections and similar arrangements in each case in connection with deposit accounts, in the ordinary course of business;

(o)    Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)    Indebtedness incurred by any Foreign Subsidiary or Non-Guarantor Subsidiary in an aggregate outstanding principal amount not to exceed $50,000,000;

(q)    Indebtedness which represents a Permitted Refinancing of any of the Indebtedness permitted under clauses (f) through (h), (m), (s) and (y) hereof;

(r)    Indebtedness incurred by Holdings; <u>provided</u> that (a) such Indebtedness does not mature and does not require any scheduled or mandatory redemptions or prepayments or redemptions at the option of the holders thereof prior to the date that is 180 days following the Latest Maturity Date (except upon asset sales or change of control events to the extent such redemptions are subject to compliance with the Loan Documents), (b) such Indebtedness is not secured and (c) such Indebtedness is subordinated to the payment in full in cash of the Obligations on terms reasonably satisfactory to Administrative Agent;

(s)    (i) Indebtedness of any Person that becomes a Restricted Subsidiary after the Closing Date and Indebtedness incurred, acquired or assumed in connection with acquisitions permitted hereunder; provided that, in the case of such acquired or assumed Indebtedness, such Indebtedness exists at the time such Person becomes a Restricted Subsidiary or at the time of such acquisition and is not created in contemplation of or in connection therewith; and (ii) unsecured Indebtedness or subordinated Indebtedness of the Borrower (which may be guaranteed by the Guarantors) incurred for the purpose of financing an Asset Acquisition or acquisition of more than 50% of the Capital Stock of any Person so long as (A) both immediately prior to and after giving effect thereto, no Default or Event of Default shall exist or result therefrom, (B) such Indebtedness does not mature or have scheduled amortization or payments of principal and is not subject to mandatory redemption or prepayment (except customary asset sale or change of control provisions), in each case prior to the date that is 91 days after the then Latest Maturity Date at the time such Indebtedness is incurred, (C) such Indebtedness is not guaranteed by any Subsidiary other than the Guarantors and (D) such Indebtedness contains terms and conditions (excluding pricing, premiums and optional prepayment or optional redemption provisions) that are market terms on the date of issuance (as determined in good faith by the Board of Directors of the Borrower) or are not materially more restrictive, taken as a whole, than the covenants and events of default contained in this Agreement (provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days (or such shorter period as agreed by the Administrative Agent) prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (iv) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)); <u>provided</u>, <u>further</u>, that, in each of clauses (i) and (ii), it shall be a requirement that, on a Pro Forma Basis (but without giving effect to the cash proceeds remaining on the balance sheet of such Indebtedness), the Total Net Leverage Ratio of the Borrower and its Restricted Subsidiaries for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by <u>Section 6.1(a)</u> or <u>Section 6.1(b)</u>, are available would not be greater than immediately prior to such transaction;

(t)    Indebtedness owing to current or former officers, directors and employees, their respective estates, heirs, spouses or former spouses to finance the purchase or redemption of Capital Stock of Holdings (or any direct or indirect parent thereof) permitted by <u>Section 7.6(d)</u>;

(u)    Indebtedness constituting indemnification and reimbursement obligations in connection with sales and dispositions permitted under this Agreement;

(v)    Customer Guaranties and Guarantee Obligations in respect thereof;

(w)      Indebtedness of Restricted Subsidiaries that are not Loan Parties arising in connection with a Receivables Facility;

(x)      Guarantee Obligations with respect to Indebtedness of any Foreign Subsidiary incurred in the ordinary course of such Foreign Subsidiary's business for working capital purposes; provided that the aggregate principal amount of all such Guarantee Obligations outstanding at any time do not exceed $50,000,000;

(y)      Capital Lease Obligations to the extent constituting Attributable Debt arising in Sale Leaseback Transactions permitted by Section 7.10;

(z)      [Reserved];

(aa)      to the extent constituting Indebtedness, obligations of the Borrower or any Restricted Subsidiary which is the seller or servicer in connection with a Receivables Facility in respect of any Receivables Facility Undertakings as to such Receivables Facility; and

(bb)      additional Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate principal amount (for the Borrower and all Restricted Subsidiaries) not to exceed $50,000,000 at any one time outstanding.

The accrual of interest, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.2.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the Dollar Equivalent on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that, if such Indebtedness is incurred to Refinance other Indebtedness denominated in a foreign currency, and such Refinancing would cause the applicable Dollar-denominated restriction to be exceeded if the Dollar Equivalent on the date of such Refinancing such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Indebtedness so Refinanced does not exceed the principal amount of such Indebtedness being Refinanced.

Notwithstanding the foregoing, the principal amount of any Indebtedness incurred to Refinance other Indebtedness, if incurred in a different currency from the Indebtedness being Refinanced, shall be the Dollar Equivalent in effect on the date of such Refinancing.

7.3      Liens. Incur any Lien upon any of its property, whether now owned or hereafter acquired, except (herein referred to as "Permitted Liens"):

(a)      Liens for taxes not yet delinquent or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Holdings, the Borrower or the applicable Restricted Subsidiary, as the case may be, in conformity with GAAP;

(b)      carriers', warehousemen's, landlord's, mechanics', materialmen's, repairmen's, suppliers' or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

111

(c)      pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)      deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, utilities, statutory obligations (other than any such obligation pursuant to Section 430(k) of the Code or Sections 303(k) or 4068 of ERISA), surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      easements, rights-of-way, restrictions and other similar encumbrances that, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(f)      Liens (i) in existence on the Closing Date listed on Schedule 7.3(f), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased (except to the extent of accrued interest, premiums and fees and expenses payable in connection with a Refinancing) and (ii) securing any Refinancings of Obligations secured by Liens referenced on Schedule 7.3(f) and permitted under Section 7.2(q);

(g)      Liens securing Indebtedness and related obligations of the Borrower or its Restricted Subsidiaries incurred pursuant to Section 7.2(i) to finance the acquisition of fixed or capital assets or to Refinance Indebtedness incurred for such purpose; provided that (i) such Liens shall be created within 180 days following the acquisition of such fixed or capital assets or such Refinancing, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and accessions thereto and (iii) in the case of any such Refinancing, the amount of Indebtedness secured thereby is not increased (except by an amount equal to accrued interest, a reasonable premium or other reasonable amount paid in connection with such Refinancing, as applicable, and fees and expenses reasonably incurred in connection therewith);

(h)      (i) Liens created pursuant to any Loan Document and (ii) subject to the Intercreditor Agreement, Liens on the Collateral created pursuant to the Term Loan Security Documents (or any Term Loan Security Documents (as defined in the Intercreditor Agreement)) securing Indebtedness incurred pursuant to Section 7.2(a)(ii);

(i)      [reserved];

(j)      any interest or title of a lessor under any lease entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of its business and covering only the assets so leased;

(k)      Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(l)      Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection; and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(m)    (i) Liens on property of any Foreign Subsidiary or Non-Guarantor Subsidiary, which Liens secure obligations of the applicable Restricted Subsidiary not prohibited under this Agreement and (ii) Liens on property that does not constitute Collateral, which Liens secure obligations of the applicable Restricted Subsidiary not prohibited under this Agreement;

(n)    Liens in respect of the licensing of patents, copyrights (including software), trademarks, industrial designs, trade names, other indications of origin, domain names and other forms of Intellectual Property in the ordinary course of business;

(o)    Liens (i) existing on any property or asset of any Person that becomes a Restricted Subsidiary after the Closing Date or (ii) existing on any property or asset prior to the acquisition thereof, in each case, together with Permitted Refinancings thereof; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of any Loan Party (and shall not be expanded to cover any additional property or assets of any such Person (other than proceeds or products thereof)) and (iii) such Lien shall secure only those obligations which it secures on the date such Person becomes a Restricted Subsidiary or the date of such acquisition, as the case may be, and Refinancings thereof that do not increase the outstanding principal amount thereof (except to the extent of accrued interest premiums and fees and expenses payable in connection with such Refinancings);

(p)    Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of the Borrower or any Subsidiary Guarantor;

(q)    Liens arising out of Sale Leaseback Transactions permitted by Section 7.10;

(r)    Liens arising from precautionary UCC or PPSA financing statements or similar filings made in respect of operating leases entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(s)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(t)    licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons in the ordinary course of business; provided, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(u)    Liens relating to insurance policies securing Indebtedness incurred under Section 7.2(u) and other obligations arising in connection with the financing of insurance premiums in the ordinary course of business;

(v)    Liens in respect of judgments that do not constitute an Event of Default under Section 9.1(i);

(w)    bankers' Liens, rights of setoff and similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more deposit, securities, investment or similar accounts, in each case granted in the ordinary course of business in favor of the bank or banks which such accounts are maintained, securing amounts owing to such bank with respect to cash management or other account arrangements, including those involving pooled accounts and netting arrangements or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries; provided

that in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(x)     Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement in connection with an Investment permitted hereunder;

(y)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into in the ordinary course of business or Liens arising by operation of law under Article 2 of the New York UCC in favor of a reclaiming seller of goods or buyer of goods;

(z)     Liens on the Collateral securing Indebtedness permitted under Section 7.2(b); provided that the Liens on the Collateral securing any such Indebtedness shall be (i) junior, with respect to the ABL Priority Collateral, to the Liens on the Collateral securing the Obligations and (ii) subject to the Intercreditor Agreement or such other intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent;

(aa)     Liens deemed to exist in connection with investments in repurchase agreements under Section 7.7; provided that such Liens do not extend to any assets other than those assets that are subject of such repurchase agreement;

(bb)     Liens arising in connection with a Receivables Facility;

(cc)     Liens not otherwise permitted by this Section so long as the aggregate outstanding principal amount of the Indebtedness or other obligations secured thereby does not exceed (as to the Borrower and all Restricted Subsidiaries) $25,000,000 at any one time;

(dd)     Liens and other matters of record shown on any title policies delivered pursuant to this Agreement;

(ee)     Liens on Capital Stock of Unrestricted Subsidiaries;

(ff)     Liens arising in connection with (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of Holdings or its Restricted Subsidiaries, taken as a whole;

(gg)     Liens on Receivables Facility Assets sold or transferred or purported to be sold or transferred to a Receivables Facility Subsidiary in connection with a Receivables Facility and the proceeds of such Receivables Facility Assets ;

(hh)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(ii)     grants of software and other technology licenses on a non-exclusive basis in the ordinary course of business; provided, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(jj)    Liens encumbering cash, securities and financial instruments, including initial and other margin deposits and any commodity trading or other accounts in which any of the foregoing items may be held, in each case granted, pledged or arising in connection with any Swap Agreement permitted under Section 7.11;

(kk)    restrictions on dispositions of assets to be disposed of pursuant to merger agreements, stock or asset purchase agreements and similar agreements;

(ll)    customary options, put and call arrangements, rights of first refusal and similar rights relating to Investments in joint ventures and partnerships;

(mm)    any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary; and

(nn)    customary Liens on deposits required in connection with the purchase of property, equipment and inventory, in each case incurred in the ordinary course of business.

provided, however that no reference to a Permitted Lien herein or in any other Loan Document, including any statement or provision as to the acceptability of any Permitted Lien, shall in any way constitute or be construed so as to postpone or subordinate any Liens or other rights of the Secured Parties hereunder or arising under any other Loan Document in favor of such Permitted Lien.

7.4    Fundamental Changes. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, so long as no Event of Default exists or would result therefrom, except that:

(a)    (i) any Restricted Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any Subsidiary Guarantor (provided that a Subsidiary Guarantor shall be the continuing or surviving corporation) and (ii) any Restricted Subsidiary that is not a Loan Party may be merged or consolidated with or into another Restricted Subsidiary that is not a Loan Party;

(b)    (x) any Subsidiary Guarantor may Dispose of any or all of its assets (i) to the Borrower or any Subsidiary Guarantor (upon voluntary liquidation or otherwise) or (ii) pursuant to a Disposition permitted by Section 7.5 and (y) any Restricted Subsidiary of the Borrower that is not a Loan Party may Dispose of any or all of its assets to (i) the Borrower or any Restricted Subsidiary or (ii) pursuant to a Disposition permitted by Section 7.5;

(c)    any Investment of the Borrower and its Restricted Subsidiaries expressly permitted by Section 7.7 may be structured as a merger, consolidation or amalgamation; provided that (x) if the Borrower is a party to such merger, consolidation or amalgamation, the Borrower shall be the continuing or surviving corporation thereof, (y) if a Subsidiary Guarantor is a party to such merger, consolidation or amalgamation, a Subsidiary Guarantor shall be the continuing or surviving Person thereof, and (z) if a Restricted Subsidiary that is not a Loan Party is a party to such merger, consolidation or amalgamation (and the Borrower is not a party thereto), a Restricted Subsidiary shall be the continuing or surviving Person thereof;

(d)    any Restricted Subsidiary of the Borrower may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; and

(e)     any merger, dissolution or liquidation not involving the Borrower or Holdings may be effected for the purposes of effecting a transaction permitted by <u>Section 7.5</u>.

7.5     <u>Disposition of Property</u>. Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary of the Borrower, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)     the Disposition of obsolete, worn out, damaged or surplus property in the ordinary course of business;

(b)     the sale of inventory in the ordinary course of business;

(c)     Dispositions permitted by clauses <u>(a)</u>, <u>(b)(x)(i)</u>, <u>(b)(y)(i)</u>, <u>(c)</u> and <u>(d)</u> of <u>Section 7.4</u>;

(d)     (i) the sale or issuance of Capital Stock of any Restricted Subsidiary to the Borrower or any Subsidiary Guarantor; <u>provided</u> that in the case of such issuance of Capital Stock of a Restricted Subsidiary that is not a Wholly Owned Subsidiary of the Borrower, Capital Stock of such Restricted Subsidiary may be also issued to other owners thereof (other than Group Members) to the extent such issuance is not dilutive to the ownership of the Loan Parties, and (ii) the sale or issuance of the Borrower's Capital Stock to Holdings;

(e)     the use, sale, exchange or other disposition of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(f)     the non-exclusive licensing or sublicensing of patents, trademarks, copyrights, industrial designs and other Intellectual Property in the ordinary course of business;

(g)     [Reserved];

(h)     Dispositions which are required by court order or regulatory decree or otherwise required or compelled by regulatory authorities;

(i)     licenses, sublicenses, leases or subleases with respect to any property or assets (other than patents, trademarks, copyrights, industrial designs and other Intellectual Property) granted to third Persons in the ordinary course of business; <u>provided</u>, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, or materially detract from the value of the relative assets of the Borrower and its Restricted Subsidiaries, taken as a whole;

(j)     Dispositions to, between or among the Borrower and any Subsidiary Guarantors;

(k)     Dispositions between or among any Restricted Subsidiary that is not a Subsidiary Guarantor, as transferor, and any other Restricted Subsidiaries that are not Subsidiary Guarantors;

(l)     Dispositions of any Foreign Subsidiary by the Borrower or a Subsidiary Guarantor to another Loan Party of the Borrower;

(m)     the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business;

(n)    Dispositions constituting (i) investments permitted under Section 7.7 excluding clause (i) thereof, (ii) Restricted Payments permitted under Section 7.6 or (iii) Sale Leaseback Transactions permitted under Section 7.10;

(o)    Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset;

(p)    Dispositions of property other than Accounts or Inventory included in the Borrowing Base to the extent that such property is exchanged for credit against the purchase price of similar replacement property;

(q)    the abandonment or cancellation of Intellectual Property that is no longer used or useful in any material respect in the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(r)    (x) Dispositions of Receivables Facility Assets in connection with a Receivables Facility pursuant to clause (i) of the definition thereof, and (y) so long as no Event of Default exists immediately prior to or after giving effect to such Disposition and provided that the Borrower is in compliance on a Pro Forma Basis with the Financial Performance Covenant (regardless of whether such covenant is then applicable), for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or (b) are available after giving effect to such Dispositions, Dispositions of Receivables Facility Assets in connection with a Receivables Facility pursuant to clause (ii) of the definition thereof;

(s)    the unwinding of any Swap Agreements;

(t)    Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(u)    Dispositions of non-core assets (as determined by the Borrower in good faith) acquired pursuant to any Subsidiary Acquisition by the Borrower or any of its Restricted Subsidiaries within 18 months of such Subsidiary Acquisition; provided that (i) the value of such non-core assets does not exceed 50.0% of the consideration paid in connection with such Subsidiary Acquisition, (ii) not less than 50.0% of the consideration payable to the Borrower and the Restricted Subsidiaries in connection with such Disposition is in the form of cash or Cash Equivalents (provided, further, that for purposes of this clause (ii), any Designated Noncash Consideration received by the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Noncash Consideration received pursuant to this proviso that is at that time outstanding, not in excess of $25,000,000, with the fair market value of each item of Designated Noncash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash), (iii) the consideration payable to the Borrower and the Restricted Subsidiaries in connection with such Disposition is not less than aggregate fair market value (as determined in good faith by the Borrower) thereof, (iv) no Event of Default has occurred and is continuing or would result therefrom and (v) none of such assets are included in the Borrowing Base;

(v)    Dispositions of Foreign Intellectual Property by a Loan Party to (A) any Foreign Intellectual Property Subsidiary in exchange for cash or intercompany notes (payable to a Loan Party) in an aggregate amount equal to the fair market value of such Foreign Intellectual Property, as determined by the Borrower in its reasonable judgment and Dispositions constituting the non-exclusive license by

117

such Foreign Intellectual Property Subsidiary of such Foreign Intellectual Property to other Restricted Subsidiaries or (B) any Foreign Subsidiary in exchange for cash or notes in an aggregate amount equal to the fair market value of such Foreign Intellectual Property, as determined by the Borrower in its reasonable judgment which notes shall (i) in the case of clauses (A) and (B) be pledged to secure the Obligations and (ii) in the case of clause (B) be secured by a perfected first priority lien (it being understood that a reasonable period of time may lapse from the date of such transfer before such lien is fully perfected) on the Foreign Intellectual Property transferred under such clause (B); provided that the fair market value of Dispositions made pursuant to this clause (v) shall not exceed $10,000,000 in the aggregate;

(w)    so long as no Default or Event of Default has occurred and is continuing, any Disposition of other property; provided that (A) not less than 75% of the consideration payable to the Borrower and its Restricted Subsidiaries in connection with such Disposition is in the form of cash or Cash Equivalents; provided, further that for purposes of this clause (w), (i) any Designated Noncash Consideration received by the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Noncash Consideration received pursuant to this proviso that is at that time outstanding, not in excess of $25,000,000, with the fair market value of each item of Designated Noncash Consideration being measured at the time received and without giving effect to subsequent changes in value, (ii) any liabilities (as shown on the Borrower's most recent balance sheet or in the notes thereto or, if incurred, increased or decreased subsequent to the date of such balance sheet, such liabilities that would have been reflected in the Borrower's balance sheet or in the notes thereto if such incurrence, increase or decrease had taken place on the date of such balance sheet, as reasonably determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Obligations) that are assumed by the transferee (or a third party on behalf of the transferee) of any such assets or Capital Stock pursuant to an agreement that releases or indemnifies the Borrower or such Restricted Subsidiary, as the case may be, from further liability, (iii) any notes or other obligations or other securities or assets received by the Borrower or such Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash within 180 days of the receipt thereof (to the extent of the cash received), (iv) Indebtedness of any Restricted Subsidiary of the Borrower that is no longer a Restricted Subsidiary as a result of such Disposition, to the extent that the Borrower and each other Restricted Subsidiary are released from any Guarantee of such Indebtedness in connection with such asset sale and (v) consideration consisting of Indebtedness of the Borrower or any Guarantor received from Persons who are not a Borrower or a Restricted Subsidiary, shall each be deemed to be cash, (B) the Borrower or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Disposition at least equal to the fair market value of the property disposed of (as reasonably determined by the Borrower); provided that with respect to any Disposition of Eligible Inventory fair market value shall be in no event less than the value ascribed to such assets in the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.2(e)) and (C) to the extent such Disposition is of assets that contribute more than an amount equal to the greater of (x) $4,000,000 and (y) 5.0% of the then-effective Borrowing Base to the Borrowing Base, the Borrower shall have delivered a pro forma Borrowing Base Certificate (providing a calculation of the Borrowing Base after giving effect to such Disposition), and shall comply with any required prepayment pursuant to Section 2.11(a);

(x)    so long as no Default or Event of Default has occurred and is continuing, any Disposition of other property if, after giving effect thereto, the Total Net Leverage Ratio determined on a Pro Forma Basis (including, for the avoidance of doubt, a pro forma application of the Net Cash Proceeds therefrom) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b) are available, is less than 2.75 to 1.00; provided that to the extent such Disposition is of assets that contribute more than $4,000,000 to the Borrowing Base, the Borrower shall have delivered a pro forma Borrowing Base Certificate

(providing a calculation of the Borrowing Base after giving effect to such Disposition), and shall comply with any required prepayment pursuant to Section 2.11(a);

(y)        Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business and sales of assets received by the Borrower or any Restricted Subsidiary from Persons other than Loan Parties upon foreclosure on a lien in favor of the Borrower of such Subsidiary;

(z)        any exchange of property of the Borrower or any Restricted Subsidiary (other than Capital Stock or other Investments) which qualifies as a like kind exchange pursuant to and in compliance with Section 1031 of the Code or any other substantially concurrent exchange of property by the Borrower or any Restricted Subsidiary (other than Capital Stock or other Investments) for property (other than Capital Stock or other Investments) of another person; provided that (a) such property is useful to the business of the Borrower or such Restricted Subsidiary, (b) the Borrower or such Restricted Subsidiary shall receive reasonably equivalent or greater market value for such property in good faith and (c) such property will be received by the Borrower or such Restricted Subsidiary substantially concurrently with its delivery of property to be exchanged; and

(aa)        Dispositions of any Capital Stock or interests in any joint venture entity not constituting a Restricted Subsidiary to the extent required by the applicable joint venture agreement or similar binding arrangements relating thereto.

Notwithstanding anything to the contrary contained in this Section 7.5, (i) in no event shall any Disposition of assets included in the Borrowing Base and contributing more than $4,000,000 of the Borrowing Base (other than Dispositions permitted pursuant to Section 7.5(b)) be permitted unless the Administrative Agent receives a completed Borrowing Base Certificate concurrently with such Disposition, and shall comply with any required prepayment pursuant to Section 2.11(a) (ii) no Dispositions of Intellectual Property that are material to the business of the Borrower or any Restricted Subsidiary (individually or taken as a whole) may be made to Unrestricted Subsidiaries (other than Dispositions permitted pursuant to Section 7.5(f)) and (iii) no Dispositions pursuant to clause (f) shall be made to Unrestricted Subsidiaries unless the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, or materially detract from the value of the relative assets of the Borrower and its Restricted Subsidiaries, taken as a whole.

7.6        Restricted Payments. Declare, pay or make any dividend or distribution (other than Restricted Payments payable solely in Qualified Equity Interests of the Person making such Restricted Payment) on any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or pay any management or similar fees to any holders of the Capital Stock of Holdings or any of their respective Affiliates, or make any other distribution in respect of any Capital Stock of any Group Member, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, "Restricted Payments"), except that, subject to the last paragraph of this Section 7.6:

(a)        any Restricted Subsidiary of the Borrower may make Restricted Payments to the Borrower or any Wholly Owned Subsidiary Guarantor, and any Non-Guarantor Subsidiary or Foreign Subsidiary may make Restricted Payments ratably to the holders of such Non-Guarantor Subsidiary's or Foreign Subsidiary's Capital Stock, taking into account the relative preferences, if any, on the various classes of Capital Stock of such Restricted Subsidiary;

(b)      so long as the Payment Conditions are met, the Borrower may make Restricted Payments to Holdings to permit Holdings to make, and Holdings may make, Restricted Payments to holders of Capital Stock of Holdings with the proceeds of such Restricted Payments;

(c)      Holdings or the Borrower may make cashless exercises of options and warrants;

(d)      the Borrower may make Restricted Payments or make distributions to Holdings to permit Holdings (and Holdings may make Restricted Payments or make distributions to any direct parent thereof to permit such direct parent), and the subsequent use of such payments by Holdings (or such direct parent), to repurchase, redeem or otherwise acquire for value Qualified Equity Interests of Holdings (or such direct parent) held by officers, directors or employees or former officers, directors or employees (or their transferees, estates or beneficiaries under their estates) of any Group Member; provided that the aggregate cash  consideration paid for all such redemptions and payments shall not exceed, in any fiscal year, $2,000,000; provided, that such amount in any fiscal year may be increased by an amount not to exceed, without duplication, (x) the aggregate amount of loans made by Holdings or any of its Subsidiaries pursuant to Section 7.7(j) that are repaid in connection with such purchase, redemption or other acquisition of such Capital Stock of Holdings or such direct parent), plus (y)  the amount of any Net Cash Proceeds received by or contributed to the Borrower from the issuance and sale after the Closing Date of Qualified Equity Interests of Holdings (or such direct parent) to officers, directors or employees of any Group Member that have not been used to make any repurchases, redemptions or payments under this clause (d), plus (z) the net cash proceeds of any "key- man" life insurance policies of any Group Member that have not been used to make any repurchases, redemptions or payments under this clause (d);

(e)      [reserved];

(f)      the Borrower may (i) make Restricted Payments to Holdings (or any direct parent thereof) to permit Holdings (or such direct parent) to pay, in each case without duplication, corporate overhead expenses incurred in the ordinary course of business  not to exceed $1,500,000 in any fiscal year (provided such limit shall not apply to fees, compensation and expenses paid to the board of directors of Holdings in an amount not to exceed $2,000,000) and to pay franchise taxes and other similar taxes, fees and expenses required to maintain Holdings' corporate existence and (ii) make Permitted Tax Distributions, so long as Holdings (or any direct or indirect parent thereof) contemporaneously uses such distributions to pay the taxes in accordance with the definition of "Permitted Tax Distributions";

(g)      [Reserved];

(h)      [Reserved];

(i)      [Reserved]; and

(j)      the Borrower may make Restricted Payments to Holdings to permit Holdings to make payments in respect of withholding or similar taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributes of any of the foregoing) of Holdings.

7.7      Investments. Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, any Person, or make an Asset Acquisition (all of the foregoing, "Investments"), except:

(a)     accounts receivable or notes receivable arising from extensions of trade credit granted in the ordinary course of business;

(b)     Investments in cash and Cash Equivalents;

(c)     loans and advances to employees, officers and directors of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $3,000,000 at any one time outstanding;

(d)     [Reserved];

(e)     Investments in assets useful in the business of the Borrower or any of its Restricted Subsidiaries (or in all of the issued and outstanding Capital Stock of a Person that is engaged in a business in which the Borrower and its Restricted Subsidiaries are permitted under Section 7.15) made by the Borrower or any of its Restricted Subsidiaries with the Net Cash Proceeds of any Disposition of Term Loan Priority Collateral not required to be applied to prepay Term Loans or any Term Loan Incremental Equivalent Debt pursuant to the terms of the definitive documentation in respect of such Indebtedness;

(f)     Investments in the Borrower or any Person that is a Subsidiary Guarantor or any newly created Subsidiary Guarantor;

(g)     Investments by the Borrower and Subsidiary Guarantors in any Non-Guarantor Subsidiaries and Foreign Subsidiaries not to exceed an aggregate outstanding amount equal to $4,000,000; provided that intercompany Investments made and liabilities incurred in the ordinary course of business in connection with cash management operations of the Borrower or any of its Restricted Subsidiaries in an aggregate amount equal to $2,000,000 at any one time outstanding shall not be subject to the foregoing limitation so long as such intercompany Investments are repaid within 30 days into a Deposit Account that is subject to a Deposit Account Control Agreement;

(h)     Investments by any Non-Guarantor Subsidiaries or Foreign Subsidiaries in any other Non-Guarantor Subsidiaries or Foreign Subsidiaries;

(i)     Investments by the Borrower and Subsidiary Guarantors (A) in any Foreign Subsidiary in connection with a Disposition permitted under Section 7.5(v) or (B) constituting a capital contribution or other transfer of Capital Stock in any Foreign Subsidiary in connection with a Disposition permitted under Section 7.5(l);

(j)     loans and advances to employees, officers and directors of Holdings or any of its Subsidiaries to the extent used to acquire Capital Stock of Holdings and to the extent such transactions are cashless;

(k)     Investments in the ordinary course of business consisting of prepaid expenses and endorsements of negotiable instruments for collection or deposit;

(l)     Investments received in settlement of amounts due to the Borrower or any of its Restricted Subsidiaries effected in the ordinary course of business or owing to the Borrower or any of its Restricted Subsidiaries as a result of insolvency proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of the Borrower or its Restricted Subsidiaries;

(m)     [Reserved];

121

(n)     Investments in existence or contemplated on the date of this Agreement and described in Schedule 7.7(n); and any modification, replacement, renewal, reinvestment or extension thereof (provided that the amount of the original investment is not increased except as otherwise permitted by this Section 7.7); and any investments, loans and advances existing on the Closing Date by Holdings, the Borrower or any Restricted Subsidiary in or to the Borrower or any other Restricted Subsidiary;

(o)     Investments permitted by Section 7.11;

(p)     Investments of any Person existing at the time such Person becomes a Restricted Subsidiary of the Borrower or consolidates, amalgamates or merges with the Borrower or any of its Restricted Subsidiaries so long as such investments were not made in contemplation of such Person becoming a Restricted Subsidiary or of such consolidation, amalgamation or merger;

(q)     Investments (1) paid for with consideration which consists of (i) Capital Stock of Holdings or any of its direct or indirect parent companies or (ii) the proceeds of a substantially contemporaneous issuance or sale of Capital Stock of Holdings, or a substantially contemporaneous contribution of cash to Holdings, in each case, to the extent the Net Cash Proceeds thereof (if any), or such cash shall be, as applicable, contributed to the Borrower and used by the Borrower or any of its Restricted Subsidiaries for such Investment or such Investment shall be contributed to the Borrower and (2) constituting notes issued to Holdings in exchange for Qualified Equity Interests of Holdings;

(r)     [Reserved];

(s)     guarantees of the obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Lease Obligations) or that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(t)     Guarantee Obligations permitted by Section 7.2;

(u)     in addition to Investments otherwise expressly permitted by this Section 7.7, Investments by the Borrower or any of its Restricted Subsidiaries in an aggregate amount (value at cost) not to exceed during the term of this Agreement $2,500,000;

(v)     [Reserved];

(w)     [Reserved];

(x)     advances of payroll payments to employees in the ordinary course of business and Investments made pursuant to employment and severance arrangements of officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business; and

(y)     Investments that are captured by, added to the value of or consisting of the Seller's Retained Interests in connection with a Receivables Facility permitted hereunder; and

(z)     Investments by the Borrower or any of its Restricted Subsidiaries so long as the Payment Conditions are met.

122

Notwithstanding the foregoing, no Investments of Intellectual Property that is material to the business of the Borrower or any Restricted Subsidiary (individually or taken as a whole) in Unrestricted Subsidiaries shall be permitted.

7.8     <u>Payments and Modifications of Certain Debt Instruments</u>. (a) Make any voluntary principal prepayment on, or voluntarily redeem, repurchase, defease or otherwise acquire or retire for value or give any voluntary irrevocable notice of redemption with respect to  ("<u>Repayments</u>") any Junior Indebtedness, other than:

(i)     the Refinancing of Junior Indebtedness permitted by <u>Section 7.2</u> with the proceeds of a Permitted Refinancing permitted by <u>Section 7.2</u>;

(ii)     the Refinancing of Junior Indebtedness incurred by Holdings under <u>Section 7.2(p)</u> utilizing other Indebtedness of Holdings incurred in reliance on <u>Section 7.2(p)</u>;

(iii)     Repayments of Junior Indebtedness so long as the Payment Conditions are met; and

(iv)     any Junior Indebtedness may be converted to Capital Stock (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents.

(v)     Repayments of Junior Indebtedness in an aggregate amount not to exceed $2,000,000 during the term of this Agreement.

(b)     Amend, modify or change in any manner any documentation governing any Junior Indebtedness unless, after giving effect to any such amendment, modification or other change, such amended, modified or changed Junior Indebtedness would (i) in the case of Term Loan Incremental Equivalent Debt continue to meet the requirements of the definition thereof and (ii) in the case of any other Indebtedness, meet the requirements set forth in the definition of Permitted Refinancing as if such amended, modified or changed debt were a Permitted Refinancing of such Junior Indebtedness; <u>provided</u>, that the documentation governing any Junior Indebtedness may be amended, modified or changed to increase the amount thereof to the extent such increase is permitted under <u>Section 7.2</u>.

7.9     <u>Transactions with Affiliates</u>. Directly or indirectly, enter into or permit to exist any transaction or contract (including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees) with or for the benefit of any Affiliate (each an "<u>Affiliate Transaction</u>") involving aggregate payments or consideration in excess of $5,000,000, except (a) transactions between or among Holdings and its Restricted Subsidiaries, (b) transactions that are on terms and conditions not less favorable to Holdings or such Restricted Subsidiary as would be obtainable by Holdings or such Restricted Subsidiary at the time in a comparable arm's-length transaction from unrelated third parties that are not Affiliates, (c) any Restricted Payment permitted by <u>Section 7.6</u>, (d) customary fees and compensation, benefits and incentive arrangements paid or provided to, and any indemnity provided on behalf of, officers, directors or employees of Holdings, the Borrower or any Restricted Subsidiary as determined in good faith by the board of directors of Holdings, the Borrower or such Restricted Subsidiary and in the ordinary course of business, (e) [reserved], (f) the issuance or sale of any Capital Stock of Holdings (and the exercise of any options, warrants or other rights to acquire Capital Stock of Holdings) or any contribution to the capital of Holdings, (g) [reserved], (h) the Transactions, (i) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.9 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, and (j) transactions between Holdings or any Restricted Subsidiary and any Person that is an Affiliate solely due to the fact that a director of such Person is also a director of

Holdings or any direct or indirect parent of Holdings; provided, however, that such director abstains from voting as a director of Holdings or such direct or indirect parent of Holdings, as the case may be, on any matter involving such other Person.

7.10    <u>Sale Leaseback Transactions</u>. Enter into any Sale Leaseback Transaction unless, after giving effect thereto, the aggregate outstanding amount of Attributable Debt in respect of all Sale Leaseback Transactions does not at any time exceed $25,000,000.

7.11    <u>Swap Agreements</u>. Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Restricted Subsidiary has actual or reasonably anticipated exposure (other than those in respect of Capital Stock) including with regard to currencies and commodities and (b) Swap Agreements entered into to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any actual or reasonably anticipated interest-bearing liability or investment of the Borrower or any of its Restricted Subsidiaries.

7.12    <u>Changes in Fiscal Periods</u>. Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

7.13    <u>Negative Pledge Clauses</u>. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) this Agreement, the other Loan Documents, and the Term Loan Documents, (b) any agreements evidencing or governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (c) customary restrictions on the assignment of leases, licenses and contracts entered into in the ordinary course of business, (d) any agreement in effect at the time any Person becomes a Restricted Subsidiary of the Borrower; provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary of the Borrower, (e) customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary of the Borrower (or the assets of a Restricted Subsidiary of the Borrower) pending such sale; provided such restrictions and conditions apply only to the Restricted Subsidiary of the Borrower that is to be sold (or whose assets are to be sold) and such sale is permitted hereunder), (f) restrictions and conditions existing on the Closing Date identified on Schedule 7.13 and any amendments or modifications thereto so long as such amendment or modification does not expand the scope of any such restriction or condition in any material respect, (g) restrictions under agreements evidencing or governing or otherwise relating to Indebtedness of Foreign Subsidiaries or Non-Guarantor Subsidiaries permitted under <u>Section 7.2</u>; provided that such Indebtedness is only with respect to the assets of Foreign Subsidiaries or Non-Guarantor Subsidiaries, (h) subject to the limitation set forth in the definition of Receivables Facility, restrictions on Receivables Facility Asset Disposed of (or purported to be Disposed of) in connection with a Receivables Facility, (i) customary provisions in joint venture agreements, limited liability company operating agreements, partnership agreements, stockholders agreements and other similar agreements, (j) any agreements governing Indebtedness permitted under <u>Section 7.2</u> to the extent of restrictions on assets of Foreign Subsidiaries and Non-Guarantor Subsidiaries and (k) any agreements governing Indebtedness permitted under Section 7.2 so long as any such restrictions are, taken as a whole, no more restrictive than those contained in the Term Loan Documents as in effect on the Closing Date.

7.14    <u>Clauses Restricting Restricted Subsidiary Distributions</u>. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Capital Stock of such

Restricted Subsidiary held by, or repay or prepay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Restricted Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Restricted Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under this Agreement, the other Loan Documents, the Term Loan Credit Agreement, the other Term Loan Documents, (ii) any restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary so long as such sale is permitted hereunder, (iii) customary restrictions on the assignment of leases, contracts and licenses entered into in the ordinary course of business, (iv) any agreement in effect at the time any Person becomes a Restricted Subsidiary of the Borrower; provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary of the Borrower, (v) restrictions of the nature referred to in clause (c) above under agreements governing purchase money liens or Capital Lease Obligations otherwise permitted hereby which restrictions are only effective against the assets financed thereby, (vi) agreements governing Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(h) and any amendments, modifications, restatements, renewals, increases, supplements, refundings, or Refinancings of those agreements, provided that the amendments, modifications, restatements, renewals, increases, supplements, refundings, or Refinancings are no more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the Closing Date, (vii) Liens permitted by Section 7.3 that limit the right of the Borrower or any of its Restricted Subsidiaries to dispose of the assets subject to such Liens, (viii) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, agreements in respect of sales of Capital Stock and other similar agreements entered into in connection with transactions permitted under this Agreement, provided that such encumbrance or restriction shall only be effective against the assets or property that are the subject of such agreements, (ix) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Borrower or any of its Restricted Subsidiaries as in effect at the date of such acquisition, which encumbrance or restriction is not applicable to any Person, or the property or assets of any Person, other than the Person, or the properties or assets of such Person, so acquired, (x) restrictions under agreements evidencing or governing Indebtedness of Foreign Subsidiaries permitted under Section 7.2; provided that such restrictions are only with respect to assets of Foreign Subsidiaries and Non-Guarantor Subsidiaries, (xi) restrictions of Holdings incurred in reliance on Sections 7.2(a) and (r) that when taken as a whole are no more restrictive that those contained in the Loan Documents and (xii) Indebtedness under Section 7.2(b)or (r) or any Permitted Refinancings thereof so long as any such restrictions are, taken as a whole, no more restrictive than those contained in the Loan Documents.

7.15    Lines of Business; Holdings Covenant. (a) With respect to the Borrower and each of its Restricted Subsidiaries, enter into any material business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the date of this Agreement or that are reasonably related, complementary or ancillary thereto and reasonable extensions thereof, (b) with respect to Holdings, engage in any business or activity other than (i) the ownership of all outstanding Capital Stock in the Borrower, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies including the other Group Members, (iv) the performance of obligations under the Loan Documents, the Term Loan Documents and the definitive documentation in respect of any Term Loan Incremental Equivalent Debt to which it is a party, (v) the performance of obligations under the definitive documentation governing any Indebtedness incurred pursuant to Section 7.2(r), (vi) making and receiving Restricted Payments and Investments and engaging in other activities to the extent expressly permitted by this Agreement and (vii) activities incidental to the businesses or activities described in clauses (i)-(vi) and

(b)    with respect to any Foreign Intellectual Property Subsidiary, engage in any business or activity or incur any Indebtedness other than (i) the ownership, maintenance (including prosecution and enforcement) and non-exclusive licensing or sublicensing of Foreign Intellectual Property, (ii) maintaining its corporate existence, (iii) the ownership of the Capital Stock of other Foreign Subsidiaries, (iv) the performance of obligations under any Loan Documents to which it is a party, (v) the incurrence of Indebtedness under notes issued pursuant to <u>Section 7.5(r)</u> and (vi) activities incidental to the businesses or activities described in clauses (i)-(v).

7.16    <u>Amendments to Organizational Documents</u>. Amend, supplement, or otherwise modify any Organizational Documents of any of the Group Members, if (x) such amendment, supplement or other modification, in light of the then existing circumstances at the time such amendment, supplement or other modification is entered into, taken as a whole, could reasonably be expected to be materially adverse to the Group Members, taken as a whole, or adversely affect the Liens (and the rights and remedies relating thereto) of the Secured Parties under any Loan Document or (y) a Material Adverse Effect would be reasonably likely to exist or result after giving effect to such amendment, supplement or other modification.

7.17    <u>Canadian Pension Plans</u>. (a) without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld), maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Canadian Defined Benefit Plan that is a "single employer pension plan" as that term is used in the *Pension Benefits Act* (Ontario) whether or not subject thereto other than any in existence and disclosed as of the Closing Date, or acquire an interest in any Person if such Person sponsors, administers, contributes to, participates in or has any liability in respect of, any Canadian Defined Benefit Plan that is a "single employer pension plan" as that term is used in the *Pension Benefits Act* (Ontario) whether or not subject thereto,; (b) cause or permit to occur a Canadian Pension Event that could reasonably be expected to result in a Material Adverse Effect. and (c) fail to withhold, make, remit or pay when due any employee or employer contributions to or in respect of any Canadian Pension Plan pursuant to the terms of the particular plan, any applicable collective bargaining agreement or participation agreement or applicable laws to the extent such failure could reasonably be expected to result in a Material Adverse Effect.

SECTION 8.    GUARANTEE

8.1    <u>The Guarantee</u>. Each Guarantor hereby jointly and severally guarantees, as a primary obligor and not as a surety, to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of (1) the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code or other Debtor Relief Laws after any bankruptcy or insolvency petition under the Bankruptcy Code or other Debtor Relief Laws or any similar law of any other jurisdiction) on (i) the Loans made by the Lenders to the Borrower, (ii) [reserved], (iii) [reserved], and (iv) the Notes held by each Lender of the Borrower and (2) all other Obligations from time to time owing to the Secured Parties by the Borrower and each other Guarantor (such obligations being herein collectively called the "<u>Guarantor Obligations</u>"). Each Guarantor hereby jointly and severally agrees that, if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guarantor Obligations, such Guarantor will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guarantor Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

8.2    <u>Obligations Unconditional</u>. The obligations of the Guarantors under <u>Section 8.1</u>, respectively, shall constitute a guaranty of payment (and not of collection) and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guarantor Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guarantor Obligations, and, in each case, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety by any Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall, in each case, remain absolute, irrevocable and unconditional under any and all circumstances as described above;

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Guarantor Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)    the maturity of any of the Guarantor Obligations shall be accelerated, or any of the Guarantor Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guarantor Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien or security interest granted to, or in favor of, the Issuing Lenders (with respect to the Guarantor Obligations only) or any Lender or the Administrative Agent as security for any of the Guarantor Obligations shall fail to be perfected; or

(e)    the release of any other Guarantor pursuant to <u>Section 8.9</u>, or otherwise.

Each of the Guarantors hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower, as the case may be, under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guarantor Obligations, in each case, in any jurisdiction. Each of the Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guarantor Obligations and notice of or proof of reliance by any Secured Party upon this guarantee made under this <u>Section 8</u> (this "<u>Guarantee</u>") or acceptance of this Guarantee, and the Guarantor Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guarantor Obligations at any time or from time to time held by the Secured Parties and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guarantor Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding

127

in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the applicable Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guarantor Obligations outstanding.

8.3     Reinstatement. The obligations of the Guarantors under this Section 8 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guarantor Obligations is rescinded or must be otherwise restored by any holder of any of the Guarantor Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

8.4     No Subrogation. Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guarantor Obligations (other than contingent indemnification and reimbursement obligations for which no claim has been made) and the expiration and termination of the Commitments under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 8.1, whether by subrogation, right of contribution or otherwise, against the Borrower or any other Guarantor of any of the Guarantor Obligations or any security for any of the Guarantor Obligations.

8.5     Remedies. Each Guarantor jointly and severally agrees that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 9 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 9) for purposes of Section 8.1, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower or any Guarantor and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable, or the circumstances occurring where Section 9 provides that such obligations shall become due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 8.1.

8.6     Instrument for the Payment of Money. Each Guarantor hereby acknowledges that the guarantee in this Section 8 constitutes an instrument for the payment of money, and consents and agrees that any Lender or the Administrative Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

8.7     Continuing Guarantee. The Guarantee made by the Guarantors in this Section 8 is a continuing guarantee of payment, and shall apply to all Guarantor Obligations whenever arising.

8.8     General Limitation on Guarantor Obligations. In any action or proceeding involving any federal, state, provincial or territorial, corporate, limited partnership or limited liability company law, or any applicable state, provincial, territorial, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 8.1 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 8.1, then, notwithstanding any other provision to the contrary, the amount of such liability of such Guarantor shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 8.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

8.9     Release of Guarantors. A Subsidiary Guarantor shall be automatically released from its obligations hereunder in the event that (x) all the Capital Stock of such Subsidiary Guarantor shall be sold, transferred or otherwise disposed of to a Person other than a Loan Party in a transaction permitted by Section 7 or (y) such Subsidiary ceases to be a Subsidiary of the Borrower; provided that the Borrower shall have delivered to the Administrative Agent, at least five days, or such shorter period as the Administrative Agent may agree, prior to the date of the release, a written notice of such for release identifying the relevant Subsidiary Guarantor and the terms of the sale or other disposition in reasonable detail, together with a certification by the Borrower stating that such transaction is in compliance with Section 7 of this Agreement and the other Loan Documents; provided further that the primary purpose of any such transaction was not to evade the guaranty requirements hereunder and was consummated on an arm's length basis with an unaffiliated third party. In connection with any such release of a Guarantor, the Administrative Agent shall execute and deliver to such Guarantor, at such Guarantor's expense, all UCC termination statements, PPSA financing change statements and other documents that such Guarantor shall reasonably request to evidence such release.

8.10     Right of Contribution. Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 8.4. The provisions of this Section 8.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the other Secured Parties, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the other Secured Parties for the full amount guaranteed by such Subsidiary Guarantor hereunder.

8.11     Keepwell. Each Qualified ECP which is a party hereto hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to enable such other Loan Party fully to guarantee all Obligations in respect of Swap Agreements; provided, however, that each Qualified ECP shall only be liable under this Section 8.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under this Section 8 as it relates to such Qualified ECP voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount. The obligations of each Qualified ECP under this Section 8.11 shall remain in full force and effect until the termination and release of all Guarantor Obligations in accordance with this Agreement. Each Qualified ECP intends that this Section 8.11 constitute, and this Section 8.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 9.     EVENTS OF DEFAULT

9.1     Events of Default. An Event of Default shall occur if any of the following events shall occur and be continuing; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied (any such event, an "Event of Default"):

(a)     the Borrower shall fail to pay any principal of any Loan, or Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document within five days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)     any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made (or if any representation or warranty is expressly stated to have been made as of a specific date, inaccurate in any material respect as of such specific date); or

(c)     any Loan Party shall default in the observance or performance of any agreement contained in <u>Section 2.11</u>, clause (i) or (ii) of <u>Section 6.4(a)</u> (with respect to Holdings and the Borrower only), <u>Section 6.7(a)</u>, 6.9(g) (with respect to any Subsidiary Guarantor under clause (ii) of the definition of "Subsidiary Guarantor" delivering the guaranties required thereunder), <u>Section 6.15</u> or <u>Section 7</u> of this Agreement (subject, in the case of <u>Section 7.1</u>, to <u>Section 9.3</u>) or <u>Section 4.5(a)</u> of the Security Agreement; or

(d)     any Loan Party shall default in the observance or performance of any agreement in (i) <u>Section 6.2(e)(i)</u>, <u>Section 6.10</u>, <u>Section 7.1(a)</u> or <u>Section 7.2(a)</u> of the Security Agreement2 and such default shall continue unremedied for a period of three days after notice to the Borrower from the Administrative Agent or (ii) Section 6.2(e)(ii),(iii),(iv) or (v) and such default shall continue unremedied for a period of five days after notice to the Borrower from the Administrative Agent; or

(e)     any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than (i) as provided in clauses (a) through (c) of this <u>Section 9.1</u>), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(f)     any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation in respect of Indebtedness, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to (x) cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable or (y) to cause, with the giving of notice if required, any Group Member to purchase or redeem or make an offer to purchase or redeem such Indebtedness prior to its stated maturity; <u>provided</u>, that a default, event or condition described in clause (i), (ii) or (iii) of this <u>Section 9.1(f)</u> shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this <u>Section 9.1(f)</u> shall have occurred and be continuing with respect to Material Indebtedness; <u>provided further</u> that clause (iii) of this <u>Section 9.1(f)</u> shall not apply to secured Indebtedness that becomes due as a result of the voluntary Disposition of the property or assets securing such Indebtedness, if such Disposition is permitted hereunder and such Indebtedness that becomes due is paid upon such Disposition; or

(g)     (i) Holdings, the Borrower or any Significant Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or

foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, interim receiver, receiver and manager, trustee, custodian, monitor, sequestrator, conservator or other similar official for it or for all or any substantial part of its assets, or Holdings, the Borrower or any Significant Group Member shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Holdings, the Borrower or any Significant Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against Holdings, the Borrower or any Significant Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Holdings, the Borrower or any Significant Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Holdings, the Borrower or any Significant Group Member shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(h)     (i) Holdings or the Borrower shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any Plan shall fail to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 or 303 of ERISA or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Group Member or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Pension Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Pension Plan shall terminate for purposes of Title IV of ERISA, (v) any Group Member or any Commonly Controlled Entity shall, or is reasonably likely to, incur any liability in connection with a withdrawal from, or the Insolvency of, a Multiemployer Plan, (vi) a Canadian Pension Event shall occur with respect to a Canadian Pension Plan, (vii) any Group Member shall fail to pay or remit when due any amount for which they are liable in respect of a Canadian Pension Plan, or (viii) any other event or condition shall occur or exist with respect to a Plan or a Canadian Pension Plan; and in each case in clauses (i) through (viii) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(i)     one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not (x) paid or covered by insurance as to which the relevant insurance company has been notified of the claim and has not denied coverage or (y) covered by valid third party indemnification obligation from a third party which is Solvent) of $35,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(j)     any of the Security Documents shall cease, for any reason, to be in full force and effect, other than pursuant to the terms hereof or thereof, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)　　　the Guarantee of any Guarantor contained in Section 8 shall cease, for any reason, to be in full force and effect, other than as provided for in Section 8.9, or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(l)　　　a Change of Control shall occur.

9.2　　Action in Event of Default. (a) Upon any Event of Default specified in clause (i) or (ii) of Section 9.1(g), the Commitments shall immediately terminate automatically and the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) shall automatically immediately become due and payable, and (b) if any other Event of Default under Section 9.1 occurs, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable. With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this Section 9.2, the Borrower shall at such time deposit in a Cash Collateral Account opened by the Administrative Agent an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in such Cash Collateral Account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon and all amounts drawn thereunder have been reimbursed in full and all other Obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full (other than contingent indemnification and reimbursement obligations for which no claim has been made), the balance, if any, in such Cash Collateral Account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto). Except as expressly provided above in this Section 9.2, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

9.3　　Holdings' Right to Cure. Notwithstanding anything to the contrary contained in this Section 9, in the event that the Borrower fails (or, but for the operation of this Section 9.3, would fail) to comply with the requirements of the covenant set forth in Section 7.1 (the "Financial Performance Covenant"), Holdings shall have the right from the date of delivery of a Notice of Intent to Cure with respect to the fiscal quarter most recently ended for which financial results have been provided under Section 6.1(a) or (b) until 10 Business Days thereafter (the "Cure Period"), to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Holdings, and, in each case, to contribute any such cash to the capital of the Borrower (collectively, the "Cure Right"), and upon the receipt by the Borrower of such cash (the "Cure Amount") pursuant to the exercise by Holdings of such Cure Right, the Financial Performance Covenant shall be recalculated giving effect to the following pro forma adjustments:

(a)    Consolidated EBITDA shall be increased, solely for the purpose of measuring the Financial Performance Covenant and not for any other purpose under this Agreement, by an amount equal to the Cure Amount;

(b)    if, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the Financial Performance Covenant, then the Borrower shall be deemed to have satisfied the requirements of the Financial Performance Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the Financial Performance Covenant that had occurred shall be deemed cured for the purposes of this Agreement; and

(c)    to the extent a fiscal quarter ended for which the Financial Performance Covenant was initially recalculated as a result of a Cure Right and such fiscal quarter is included in the calculation of the Financial Performance Covenant in a subsequent fiscal quarter, the Cure Amount shall be included in Consolidated EBITDA of such initial fiscal quarter.

Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period there shall be at least two fiscal quarters in which the Cure Right is not exercised, (ii) for purposes of this Section 9.3, the Cure Amount shall be no greater than the amount required for purposes of complying with the Financial Performance Covenant, determined at the time the Cure Right is exercised with respect to the fiscal quarter ended for which the Financial Performance Covenant was initially recalculated as a result of a Cure Right, (iii) the Cure Amount shall be disregarded for all other purposes of this Agreement, including, determining any baskets with respect to the covenants contained in Section 7, and shall not result in any adjustment to any amounts other than the amount of the Consolidated EBITDA as described in clause (a) above, (iv) there shall be no pro forma reduction in Indebtedness with the proceeds of any Cure Amount for the fiscal quarter immediately preceding the fiscal quarter in which the Cure Right is exercised for purposes of determining compliance with Section 7.1 and (v) the Cure Right shall not be exercised more than five times in the aggregate.

SECTION 10.   ADMINISTRATIVE AGENT

10.1    Appointment. Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to enter into or accept each Loan Document, other intercreditor arrangements or collateral trust arrangements contemplated by this Agreement on behalf of and for the benefit of the Lenders and the other Secured Parties named therein and agrees to be bound by the terms of each Loan Document and other agreements or documents, and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy with respect to any Collateral against the Borrower or any other Loan Party or any other obligor under any of the Loan Documents, the Specified Swap Agreements or any document relating to Cash Management Obligations (including, in each case, the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral of the Borrower or any other Loan Party, without the prior written consent of the Administrative Agent.

10.2    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

10.3    Exculpatory Provisions.

(a)    The Administrative Agent shall have no duties or obligations to any Lender or any other Person except those expressly set forth herein and in the other Loan Documents and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. The Administrative Agent's duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i)    shall not be subject to any fiduciary or other implied duties to any Lender or any other Person, regardless of whether any Default or any Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), as applicable, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Administrative Agent may seek clarification or direction from the Required Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided;

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the Administrative Agent shall not be liable for the failure to disclose, any information relating to the Borrower or any of its respective Affiliates that is communicated to or obtained by any Person serving as the Administrative Agent or any of its Affiliates in any capacity; and

(iv)    shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or the Issuing Lender for any failure to monitor or maintain

any portion of the Collateral. Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(b)      The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 11.1</u>) or (ii) in the absence of its own gross negligence or willful misconduct (as determined in a final, non-appealable judgment of a court of competent jurisdiction).

(c)      The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the value, validity, enforceability, effectiveness, sufficiency or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Administrative Agent's reliance on any electronic signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), (v) any failure of any Loan Party to perform its obligations hereunder or thereunder or (vi) the satisfaction of any condition set forth in <u>Section 5</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

10.4      <u>Reliance by Agents</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of Lenders as shall be provided for herein or in the other Loan Documents) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or such other number or percentage of Lenders as shall be provided for herein or in the other Loan Documents), and such request

and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and all future holders of the Loans.

10.5    <u>Notice of Default</u>. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until the Administrative Agent has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default in Section 9.1" in respect of this Agreement and identifying the specific clause under said Section is given to the Administrative Agent by the Borrower, or notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the Administrative Agent by the Borrower or a Lender. In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action or refrain from taking such action with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

10.6    <u>Posting of Communications</u>.

(a) The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Approved Electronic Communications available to the Lenders by posting the Approved Electronic Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b) Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders and the Borrower hereby approves distribution of the Approved Electronic Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)    THE APPROVED ELECTRONIC PLATFORM AND THE APPROVED ELECTRONIC COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE APPROVED ELECTRONIC COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE APPROVED ELECTRONIC COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE APPROVED ELECTRONIC COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM.  IN NO EVENT SHALL

THE ADMINISTRATIVE AGENT, ANY ARRANGER, ANY CO-SYNDICATION AGENT OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "<u>APPLICABLE PARTIES</u>") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM , EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Each Lender agrees that notice to it (as provided in the next sentence) specifying that Approved Electronic Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Approved Electronic Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)     Each Loan Party, the Lenders, the Joint Lead Arrangers and the Administrative Agent agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Approved Electronic Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable or customary document retention procedures and policies.

(f)  Nothing herein shall prejudice the right of the Administrative Agent, any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

10.7     <u>Non-Reliance on Administrative Agent and Other Lenders</u>. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, attorneys in fact or affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Group Member or any affiliate of a Group Member, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Group Members and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Group Members and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Group Member or any affiliate of a Group Member that may come into the

possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys in fact or affiliates.

10.8    Indemnification. Each of the Lenders agrees to indemnify the Administrative Agent and the Joint Lead Arrangers (and their Related Parties) in their respective capacities as such (to the extent not reimbursed by Holdings, the Borrower or any other Loan Party and without limiting the obligation of Holdings, the Borrower or any other Loan Party to do so), according to its Aggregate Exposure Percentage, on a pro rata basis, in effect on the date on which indemnification is sought under this Section 10.7 (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, on a pro rata basis, in accordance with its Aggregate Exposure Percentage immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent, the Joint Lead Arrangers or their Related Parties in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or any other Person under or in connection with any of the foregoing; provided that no Lender shall be liable to any such Person for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

10.9    Administrative Agent in its Individual Capacity. With respect to its Commitment, Loans, L/C Commitments and Letters of Credit, the Person serving as the Administrative Agent shall have and may exercise the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with the Borrower, Holdings, or any of their respective Subsidiaries or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

10.10    Successor Administrative Agent. (a) The Administrative Agent may at any time give 30 days' prior written notice of its resignation to the Lenders and the Borrower, whether or not a successor Administrative Agent has been appointed. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the approval of the Borrower, not to be unreasonably withheld, for so long as no Event of Default has occurred and is continuing, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent (which shall be a bank with an office in New York, New York or an Affiliate of any such bank with an office in New York, New York), provided that if the retiring Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Administrative Agent may continue to hold such collateral security until such time as a successor Administrative Agent is appointed

and such collateral security is assigned to such successor Administrative Agent) and (2) all payments, communications and determinations provided to be made by, to or through such Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this (Section 10.9; provided that the Administrative Agent may, in its sole discretion, agree to continue to perform any or all of such functions until such time as a successor is appointed as provided in this Section 10.9. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in Section 10.9). Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of Section 10 and Section 11.5 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(a) Notwithstanding paragraph (a) of this Section, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders, and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; *provided* that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Security Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Security Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; *provided* that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 11.5, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (i) above.

10.11   No Other Duties, etc. Anything herein to the contrary notwithstanding, none of the Co-Syndication Agents, the Joint Lead Arrangers or the Joint Bookrunners shall have any obligations, liabilities, powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as Administrative Agent or Lender hereunder. The provisions of

Section 10 are solely for the benefit of the Administrative Agent, the other Persons referenced in the preceding sentence (and the Related Parties of the Administrative Agent and such Persons) and the Lenders and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions nor shall any such provisions constitute a defense available to the Borrower nor any other Loan Party. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

10.12    [Reserved].

10.13    Acknowledgements of Lenders.

(a) Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such Lender, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the Administrative Agent, any Joint Lead Arranger, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Joint Lead Arranger any Co-Syndication Agent  or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b) Each Lender, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent, the Commitment Parties or the Lenders on the Closing Date.

10.14    Cashless Settlement Option. Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

10.15    Bankruptcy.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan or any

Reimbursement Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

        (i)  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Borrowing and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.8, 2.14, 2.16, 2.19 and 11.5) allowed in such judicial proceeding; and

        (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, assignee, monitor, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 11.5).  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

    10.16  <u>Erroneous Payments.</u>

        (i)  Each Lender hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Payment</u>") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this Section 10.13 shall be conclusive, absent manifest error.

        (ii) Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "<u>Payment Notice</u>") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has

been made with respect to such Payment. Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii) The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(iv) Each party's obligations under this Section 10.16 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

10.17    Collateral Matters.

(a)    Except with respect to the exercise of setoff rights in accordance with Section 10.18 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b)    In furtherance of the foregoing and not in limitation thereof, no arrangements in respect of Cash Management Services, the obligations under which constitute Specified Cash Management Obligations and no Swap Agreement the obligations under which constitute Specified Swap Obligations , will create (or be deemed to create) in favor of any Secured Party that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under any Loan Document. By accepting the benefits of the Collateral, each Secured Party that is a party to any such arrangement in respect of Cash Management Services or Swap Agreements, as applicable, shall be deemed to have appointed the Administrative Agent to serve as administrative agent and collateral agent under the Loan Documents and agreed to be bound by the Loan Documents as a Secured Party thereunder, subject to the limitations set forth in this paragraph.

(c)    The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

10.18    Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the

Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a)at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b)at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i)the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii)each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii)the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.1 of this Agreement), (iv)the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v)to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

10.19    Quebec Security.  Without limiting the generality of any provisions of this Agreement, each Lender hereby appoints and designates the Administrative Agent (or any successor thereto), as part of its duties as Administrative Agent, to act on behalf of each of the Secured Parties as the hypothecary representative (within the meaning of article 2692 of the Civil Code of Québec) for all present and future Lenders (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted

under the laws of the Province of Quebec as security for any of the Obligations pursuant to any deed of hypothec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and applicable laws (with the power to delegate any such rights or duties). Any Person who becomes a Lender or any successor Administrative Agent shall be deemed to have consented to and ratified the foregoing appointment of the Administrative Agent as the Hypothecary Representative, on behalf of all Secured Parties.  For greater certainty, the Administrative Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Administrative Agent in this Agreement, which shall apply *mutatis mutandis.* In the event of the resignation of Administrative Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Administrative Agent, such successor Agent shall also act as the Hypothecary Representative, as contemplated above*.*

SECTION 11.   MISCELLANEOUS

11.1    <u>Amendments and Waivers</u>.

(a)    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, waived, supplemented or modified except in accordance with the provisions of this <u>Section 11.1</u>. The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, <u>however</u>, that no such waiver and no such amendment, supplement or modification shall (A) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (A)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; (B) eliminate or reduce the voting rights of any Lender under this <u>Section 11.1</u> without the written consent of such Lender or modify any provision in this Agreement or any other Loan Document that expressly provides for the consent of any Lender without the written consent of such Lender; (C) reduce any percentage specified in the definition of Required Lenders or Supermajority Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents or release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under <u>Section 8</u> of this Agreement or under the Security Documents, in each case, without the written consent of all Lenders; (D) amend, modify or waive any provision of <u>Section 2.17(a)</u>, <u>(b)</u> or <u>(c)</u> or Section 11.7(a) which results in a change to the pro rata sharing of payments or the payment waterfall provisions without the written consent of each Lender directly affected thereby ; (E) [reserved]; (F) increase the advance rates set forth in the definition of "Borrowing Base", amend the definition of "Eligible Accounts" or "Eligible Inventory" or any defined terms used within with the effect of increasing the Borrowing Base or add new categories of eligible assets, without the written consent of the Supermajority Lenders; (G) amend, modify or waive any provision of <u>Section 10</u> or amend, modify, waive or otherwise affect the rights or duties of the Administrative Agent without the written consent of the Administrative Agent; (H) amend, modify or waive any provision of <u>Section 3</u> or amend, modify, waive or otherwise affect the rights or duties of any Issuing Lender without the written consent of each Issuing Lender;

144

(I) take any actions to contractually subordinate (x) Liens on all or substantially all of the Collateral securing the Obligations or (y) the Obligations in contractual right of payment under the Loan Documents, in each case, to other Indebtedness for borrowed money without the written consent of each Lender directly and adversely affected thereby; or (J) forgive the principal amount or extend the payment date of any Reimbursement Obligation without the written consent of each Lender directly affected thereby. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing during the period such waiver is effective; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(b)     Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (x) to increase the amount of the existing facilities under this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with and Revolving Extensions of Credit and the accrued interest and fees in respect thereof, (y) to permit any such increase in the Revolving Facility to share ratably in prepayments with the Revolving Facility and (z) to include appropriately the Lenders holding such increase in any determination of the Required Lenders.

(c)     In addition, notwithstanding the foregoing, this Agreement and the other Loan Documents may be amended or amended and restated as contemplated by Section 2.24 in connection with any Incremental Amendment and any related increase in Commitments or Loans, with the consent of the Borrower, the Administrative Agent and the Incremental Revolving Lenders providing such increased Commitments or Loans.

(d)     Notwithstanding the foregoing, this Agreement and the other Loan Documents may be amended in connection with any Permitted Amendment pursuant to a Loan Modification Offer in accordance with Section 2.27(b) (and the Administrative Agent and the Borrower may effect such amendments to this Agreement, the Intercreditor Agreement (or enter into a replacement thereof) and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of such Permitted Amendment).

(e)     Notwithstanding the foregoing, the Administrative Agent and the Borrower may amend, in a writing executed by both the Administrative Agent and the Borrower, any Loan Document to (x) cure any omission, mistake, typographical error or other defect in any provision of this Agreement or to effect administrative changes that are not adverse to any Lender or (y) solely with respect to the property or assets of (or Capital Stock of) Specified Foreign Guarantors, give effect to any limitations set forth in the Agreed Security Principles.

(f)     Notwithstanding anything to the contrary, in connection with any determination as to whether the Required Lenders have consented (or not consented) to any amendment or waiver, any non-defaulting Lender (other than (x) any Lender that is a Regulated Bank or an affiliate of a Regulated Bank and (y) any Lender that is the Administrative Agent or an affiliate of the Administrative Agent) that owns, directly or indirectly, any equity in the Borrower (each, an "Affiliated Lender") shall have no right to vote any of its Loans and Commitments and shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders; provided that Apollo entities that are Lenders on the Closing Date (the "Closing Date Apollo Entities") shall be entitled to vote their Loans and Commitments so long

145

as such entities are Debt Fund Affiliates and provided that, with respect to any such vote, any Loans and Commitments of the Closing Date Apollo Entities in excess of 12% of the aggregate Commitments as of such date shall be deemed to have voted in the same proportion as other Lenders that are not Closing Date Apollo Entities.

        11.2    <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail or telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice or notice by electronic mail, when received, addressed as follows in the case of the Borrower, Holdings and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| Holdings or the Borrower: | 150 Verona Street |
| | Rochester, New York 14608 |
| | Attention:   Scott Rosa and Robert Johnson |
| | Telecopy:  (585) 627-6359 |
| | Telephone: (585) 627-6285 |
| | Email:     scott.rosa@carestream.com and |
| |             robert.johnson2@carestream.com |
| | |
| Administrative Agent: | JPMorgan Chase Bank, N.A. |
| | 500 Stanton Christiana Road, NCC5, Floor 1 |
| | Newark, DE 19713-2107, United States |
| | Attention:   Yili Xu and Zohaib Nazir |
| |            12012443657@tls.ldsprod.com and |
| |            12012443657@tls.ldsprod.com |
| | Telephone: 302 634 7761 and 312 954 9582 |
| | Email:     yili.x.xu@chase.com and |
| |            zohaib.nazir@chase.com |
| | |
| | with a copy to: |
| | |
| | JPMorgan Chase Bank, N.A. |
| | 383 Madison Avenue |
| | New York, NY 10179 |
| | Attention:   Maurice Dattas |
| | Telephone: 212 270 5347 |
| | Email:     maurice.dattas@jpmorgan.com |

; <u>provided</u> that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder. All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

        Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices pursuant to <u>Section 2</u> unless otherwise agreed by the Administrative Agent and the applicable Lender ("<u>Approved Electronic Communications</u>"). The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other

communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (a) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (b) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (a) of notification that such notice or communication is available and identifying the website address therefor.

Each Loan Party agrees to assume all risk, and hold the Administrative Agent, the Joint Bookrunners and each Lender harmless from any losses, associated with, the electronic transmission of information (including, without limitation, the protection of confidential information), except to the extent caused by the gross negligence or willful misconduct of such Person.

11.3    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

11.5    Payment of Expenses and Taxes. (a) The Borrower shall pay (a) each Administrative Agent and its Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the credit facility provided for herein and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions (whether or not transactions contemplated hereby and thereby shall be consummated), including the reasonable fees, charges and disbursements of one counsel to the Administrative Agent and to the Joint Lead Arrangers and the Co-Syndication Agents and, if necessary, one local counsel in each relevant jurisdiction to such Person, and in the case of an actual or perceived conflict of interest where the Administrative Agent, any Joint Lead Arranger and/or any Co-Syndication Agent affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, (b) each Lender and each Issuing Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (d) all out-of-pocket expenses incurred by the Administrative Agent, any Issuing Lender or any Lender, including the fees, charges and disbursements of one counsel for the Administrative Agent, any Issuing Lender or any Lender , and if necessary, one local counsel in any relevant jurisdiction to such Persons, and in the case of an actual or perceived conflict of interest where the Administrative Agent, any Issuing Lender and/or any Lender affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, in

connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit (it being understood that expenses reimbursed by the Borrower under this Section 11.5 shall include costs and expenses incurred in connection with (1) appraisals, environmental reviews and insurance reviews, (2) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination and (3) forwarding loan proceeds, collecting checks and other items of payment and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral).

Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower and any Loan Party shall not assert and the Borrower and each Loan Party hereby waives any claim against the Administrative Agent, any Joint Lead Arranger, any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any liabilities arising from the use by others of information or other materials (including, without limitation, any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet), and (ii) no party hereto shall assert, and each such party hereby waives, any liabilities against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, nothing in this Section 11.5(a) shall relieve the Borrower and each Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in Section 11.5(b), against any special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(b) The Borrower shall indemnify the Administrative Agent, each Joint Lead Arranger and each Lender, each Issuing Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all liabilities and related expenses, including the fees, charges and disbursements of one counsel for any Indemnitee, and if necessary, one local counsel in any relevant jurisdiction, and in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, (ii) the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by an Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iv) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any environmental liability related in any way to Holdings or any of its Subsidiaries, or (v) any actual or prospective Proceeding relating to any of the foregoing, whether or not such Proceeding is brought by the Borrower or any other Loan Party or its or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the  bad faith, gross negligence or willful misconduct of such Indemnitee.

This <u>Section 11.5(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c) Each Lender severally agrees to pay any amount required to be paid by the Borrower under paragraphs (a), (b) or (c) of this Section 11.5 to the Administrative Agent, each Issuing Lender, and each Related Party of any of the foregoing Persons (each, an "<u>Agent-Related Person</u>") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Applicable Percentage in effect on the date on which such payment is sought under this Section (or, if such payment is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Applicable Percentage immediately prior to such date), and agrees to indemnify and hold each Agent-Related Person harmless from and against any and all liabilities and related expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent-Related Person in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent-Related Person under or in connection with any of the foregoing; *provided* that the unreimbursed expense or Liability or related expense, as the case may be, was incurred by or asserted against such Agent-Related Person in its capacity as such; *provided further* that no Lender shall be liable for the payment of any portion of such Liabilities, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted primarily from such Agent-Related Party's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d) All amounts due under this Section 11.5 shall be payable promptly after written demand therefor.

11.6 <u>Successors and Assigns; Participations and Assignments</u>.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Lender that issues any Letter of Credit), except that (other than as provided in <u>Section 11.19</u>) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).

(b) (i) Subject to the conditions set forth in clause (b)(ii) below, any Lender may assign to one or more Eligible Assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it and the Note or Notes (if any) held by it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A) the Borrower, <u>provided</u> that such consent shall be deemed to have been given if the Borrower has not responded in writing to the Administrative Agent within ten (10) Business Days after notice by the Administrative Agent, <u>provided further</u> that no consent of the Borrower shall be required (x) for an assignment to an existing Revolving Lender or an affiliate of a Revolving Lender or (y) if an Event of Default under <u>Section 9.1(a)</u> or <u>9.1(g)</u> has occurred and is continuing;

(B)      except with respect to an assignment to a Lender or an Affiliate of a Lender that is a Regulated Bank, the Administrative Agent (such consent not to be unreasonably withheld or delayed); and

(C)      each Issuing Lender.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Revolving Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000.00 (provided, in each case, that simultaneous assignments to or by two or more Approved Funds shall be aggregated for purposes of determining such amount) unless the Administrative Agent and the Borrower otherwise consent;

(B)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire and applicable tax forms.

This clause (b) shall not prohibit any Lender from assigning all or any portion of its rights and obligations among separate Revolving Facilities on a non-pro rata basis.

For the purposes of this Section 11.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)      [Reserved].

(iv)      [Reserved].

(v)      Subject to acceptance and recording thereof pursuant to Section 11.6(b)(vii) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 11.5). Any assignment or transfer by

150

a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 11.6</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations if such transaction complies with the requirements of <u>Section 11.6(c)</u>.

(vi)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuing Lenders and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Issuing Lender and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(vii)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), together with (x) any processing and recordation fee and (y) any written consent to such assignment required by this <u>Section 11.6(b)</u>, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (b).

(c)    (i)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than a natural person, a Defaulting Lender, Holdings, the Borrower or any Affiliate of the Borrower) (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); <u>provided</u> that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Lenders and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of <u>Section 11.1(a)</u> and (2) directly affects such Participant. Subject to <u>Section 11.6(c)(ii)</u>, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.18, 2.19</u> and <u>2.20</u> (subject to the requirements of those sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 11.6(b)</u>. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 11.7(b)</u> as though it were a Lender, provided such Participant shall be subject to <u>Section 11.7(a)</u> as though it were a Lender. Each Lender that sells a participation shall, acting solely for U.S. federal income tax purposes as the non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the commitment of, and the principal amounts (and stated interest) of, each Participant's interest in the Loans, L/C Obligations or other obligations under the Loan Documents (the "<u>Participant Register</u>"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, L/C Obligations or its other obligations under any Loan Document) except to the extent that the relevant parties, acting reasonably

and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan, L/C Obligation or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Unless otherwise required by the Internal Revenue Service ("IRS"), any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(i)    A Participant shall not be entitled to receive any greater payment under Section 2.18 or 2.19 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. No Participant shall be entitled to the benefits of Section 2.19 unless such Participant complies with Section 2.19(d) and Section 2.19(e).

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in Section 11.6(d) above.

(f)    Each Lender, upon execution and delivery hereof or upon succeeding to an interest in Commitments or Loans, as the case may be, represents and warrants as of the Closing Date and as of the effective date of the applicable Assignment and Assumption that it is a "qualified purchaser" for purposes of Section 2(a)(51) of the Investment Company Act of 1940, as amended.

(g)    Each Lender, upon succeeding to an interest in Commitments or Loans, as the case may be, represents and warrants as of the effective date of the applicable Assignment and Assumption that it is an Eligible Assignee.

11.7    Adjustments; Set-off.

(a)    Except to the extent that this Agreement expressly provides for or permits payments to be allocated or made to a particular Lender or to the Lenders under a particular Revolving Facility, if any Lender (a "Benefited Lender") shall receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 9.1(g) or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)      In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, with the prior consent of the Administrative Agent, without prior notice to Holdings or the Borrower or any other Loan Party, any such notice being expressly waived by Holdings and the Borrower and each other Loan Party to the extent permitted by applicable law, upon the occurrence and during the continuance of any Event of Default, to set off and appropriate and apply against the Obligations any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held by or owing by such Lender or any branch or agency thereof to or for the credit or the account of Holdings or the Borrower or any such other Loan Party, as the case may be. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

11.8    Counterparts; Electronic Execution.

(a)      This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or any document or instrument delivered in connection herewith by facsimile transmission or electronic PDF shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

(b)      The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any ancillary document shall be deemed to include electronic signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any electronic signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such electronic signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such electronic signature and (ii) upon the request of the Administrative Agent or any Lender, any electronic signature  shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (A) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders, the Borrower and the Loan Parties, electronic signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement,  any other Loan Document and/or any ancillary document shall have the same legal effect, validity and enforceability as any paper original, (B) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any ancillary document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (C) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any ancillary document based solely on the lack of paper original copies of

this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (D) waives any claim against any Lender-Related Person for any liabilities arising solely from the Administrative Agent's and/or any Lender's reliance on or use of electronic signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any liabilities arising as a result of the failure of the Borrower and/or any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any electronic signature.

       11.9    <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

       11.10    <u>Integration</u>. This Agreement, the Commitment Letter, the Fee Letter (and any other applicable engagement letter) and the other Loan Documents and any separate letter agreements with respect to fees payable to the Joint Lead Arranger, the Joint Bookrunners and the Administrative Agent represent the entire agreement of the Borrower, Holdings, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

       11.11    <u>Governing Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

       11.12    <u>Submission To Jurisdiction; Waivers</u>. Each party hereto hereby irrevocably and unconditionally:

       (a)    notwithstanding the governing law provisions of any applicable Loan Document, submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement and the other Loan Documents or the transactions relating hereto or thereto, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate courts from any thereof, and agrees that notwithstanding the foregoing (x) all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court and (y) a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Issuing Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower, any Loan Party or its properties in the courts of any jurisdiction;

       (b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court and waives any right to claim that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court;

(d)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to each party hereto, as the case may be at its address set forth in <u>Section 11.2</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto; and

(e)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law.

11.13   <u>Acknowledgements</u>. Holdings, the Borrower and each Guarantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to Holdings, the Borrower or any Guarantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and Holdings, the Borrower and each Guarantor, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings, the Borrower or the Guarantors and the Lenders.

11.14   <u>Releases of Guarantees and Liens</u>.

(a)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by <u>Section 11.1</u>) to take any action requested by the Borrower having the effect of (1) releasing any Collateral or Guarantor Obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with <u>Section 11.1</u> or (ii) under the circumstances described in <u>Section 11.14(b)</u> below, or (2) releasing any Lien on any Collateral subject to Liens incurred under <u>Section 7.3(g)</u> or subordinating Liens on the Collateral to such Liens permitted under <u>Section 7.3(g)</u>, in each case, to the extent required under the agreements relating to such Liens permitted under <u>Section 7.3(g)</u>;

(b)     At such time as the Loans, the Reimbursement Obligations and the other Obligations (other than (i) contingent obligations for which no claim has been made and (ii) Cash Management Obligations and all other obligations and liabilities of the Borrower or any other Loan Party (including with respect to guarantees) to the Administrative Agent, any Lender, any other Secured Party or any party to a Specified Swap Agreement or a party providing Cash Management Obligations) shall have been satisfied by payment in full in immediately available funds, the Commitments have been terminated and no Letters of Credit shall be outstanding or all outstanding Letters of Credit have been Collateralized, the Collateral shall be automatically released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall automatically terminate, all without delivery of any instrument or performance of any act by any Person

and the Administrative Agent shall, upon the request and at the sole expense of the Borrower, deliver any such instruments, release documents and lien termination notices and filings as may be reasonably requested to evidence such termination.

11.15    <u>Confidentiality</u>. Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is not designated by the provider thereof as public information or non-confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, the Joint Lead Arrangers, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with provisions no less restrictive than this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, trustees, agents, attorneys, accountants and other professional advisors that have been advised of the provisions of this Section and have been instructed to keep such information confidential, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding; provided that unless specifically prohibited by applicable law, reasonable efforts shall be made to notify the Borrower of any such request prior to disclosure, (g) that has been publicly disclosed other than as a result of a breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender; provided, such Person has been advised of the provisions of this Section and instructed to keep such information confidential or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the extensions of credit hereunder. Notwithstanding anything herein to the contrary, any party to this Agreement (and any employee, representative, or other agent of any party to this Agreement) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure. However, any such information relating to the tax treatment or tax structure is required to be kept confidential to the extent necessary to comply with any applicable federal, provincial, territorial or state securities laws.

11.16    **WAIVERS OF JURY TRIAL**. **EACH OF THE BORROWER, HOLDINGS, THE GUARANTORS THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

11.17    <u>PATRIOT Act Notification</u>. The following notification is provided to the Borrower and each Guarantor pursuant to Section 326 of the PATRIOT Act and Beneficial Ownership Regulation:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

What this means for a Borrower or Guarantor: When the Borrower or Guarantor opens an account, if the Borrower or Guarantor is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower or Guarantor is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower. The Administrative Agent and the Lenders may also ask, if the Borrower or Guarantor is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower or Guarantor is not an individual, to see the Borrower's legal organizational documents or other identifying documents.

11.18    Maximum Amount.

(a)    It is the intention of the Borrower and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Loan Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness evidenced hereby or other Obligations of the Borrower, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "Maximum Amount"). If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by applicable law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Notes until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof. The terms and provisions of this subsection shall control and supersede every other provision of all agreements between the Borrower or any endorser of the Notes and the Lenders.

(b)    If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the Loans and shall be treated as a voluntary prepayment under Section 2.10(a) and shall be so applied in accordance with Section 2.17 or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrower in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrower.

11.19    Intercreditor Agreement. Each Lender hereby authorizes and directs the Administrative Agent (a) to enter into the Intercreditor Agreement on its behalf, perform the Intercreditor Agreement on its behalf and take any actions thereunder as determined by the Administrative Agent to be necessary or advisable to protect the interest of the Lenders, and each Lender agrees to be bound by the terms of the Intercreditor Agreement and (b) to enter into any other intercreditor agreement reasonably satisfactory to the Administrative Agent on its behalf, perform such intercreditor agreement on its behalf and take any actions thereunder as determined by the Administrative Agent to be necessary or advisable to protect the interests of the Lenders, and each Lender agrees to be bound by the terms of such intercreditor agreement. Each Lender acknowledges that the Intercreditor Agreement governs, among other things, Lien priorities and rights of the Lenders and the Term Loan Secured Parties (as defined in the Intercreditor Agreement) with respect to the Collateral, including the Term Loan Priority Collateral. In the event of any conflict between this Agreement or any Loan Document with the Intercreditor Agreement, the Intercreditor Agreement shall govern and control.

11.20    [Reserved].

11.21    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent. The provisions of this Section 11.21 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

11.22    No Fiduciary Duty. Each of the Administrative Agent, the Joint Bookrunners, the Joint Lead Arrangers, the Co-Syndication Agents, each Lender and their Affiliates (collectively, solely for purposes of this Section 11.22, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their Affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its Affiliates, on the other. The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

11.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party to this Agreement acknowledges that any liability of

any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

      (a) the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

      (b)      the effects of any Bail-in Action on any such liability, including, if applicable:

      (i)      a reduction in full or in part or cancellation of any such liability;

      (ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

      (iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

      11.24   <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Loan Parties in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "<u>Agreement Currency</u>"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Loan Parties in the Agreement Currency, the Loan Parties agree, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

      11.25   <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Agreement or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)      In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regimes if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regimes if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

[*Signature pages follow*]

**<u>Exhibit D-1</u>**

**Comparison of New ABL Credit Agreement with the Initial Plan Supplement**

Draft 09/14/2022

ABL CREDIT AGREEMENT

among

Carestream Health Holdings, Inc.,

as Holdings,

Carestream Health, Inc.,

as Borrower,

The Several Lenders from Time to Time Parties Hereto,

[  ], as Co-Syndication Agents,

and

JPMorgan Chase Bank, N.A.

as Administrative Agent

Dated as of [  ], 2022

JPMorgan Chase Bank, N.A. and Barclays Bank PLC,

as Joint Lead Arrangers and Joint Bookrunners

TABLE OF CONTENTS

Page

**R E C I T A L S** ........................................................................................................... 1

SECTION 1.    DEFINITIONS ........................................................................... 1

    1.1    Defined Terms ...................................................................... 1
    1.2    Other Interpretive Provisions ............................................ 54
    1.3    Accounting ........................................................................ 55
    1.4    Divisions .......................................................................... 55
    1.5    Interest Rates; Benchmark Notification ............................ 56
    1.6    Limited Condition Transactions ........................................ 56

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS ................... 57

    2.1    [Reserved] ......................................................................... 57
    2.2    [Reserved] ......................................................................... 57
    2.3    [Reserved] ......................................................................... 57
    2.4    Revolving Commitments ................................................... 57
    2.5    Procedure for Revolving Loan Borrowing ........................ 57
    2.6    Protective Advances .......................................................... 58
    2.7    [Reserved] ......................................................................... 59
    2.8    Commitment Fees, etc. ...................................................... 59
    2.9    Termination or Reduction of Revolving Commitments ..... 59
    2.10    Optional Prepayments ....................................................... 59
    2.11    Mandatory Prepayments and Commitment Reductions ..... 60
    2.12    Conversion and Continuation Options ............................... 60
    2.13    Limitations on Term Benchmark ...................................... 61
    2.14    Interest Rates and Payment Dates ..................................... 61
    2.15    Computation of Interest and Fees ...................................... 62
    2.16    Inability to Determine Interest Rate; Illegality ................. 62
    2.17    Pro Rata Treatment and Payments .................................... 65
    2.18    Requirements of Law ........................................................ 67
    2.19    Taxes ................................................................................. 68
    2.20    Indemnity .......................................................................... 72
    2.21    Change of Lending Office .................................................. 73
    2.22    Replacement of Lenders .................................................... 73
    2.23    Notes ................................................................................. 74
    2.24    Incremental Credit Extensions. ......................................... 74
    2.25    Cash Management Services; Swap Agreements ................ 76
    2.26    Defaulting Lenders ............................................................ 76
    2.27    Loan Modification Offers .................................................. 78

SECTION 3.    LETTERS OF CREDIT ........................................................... 79

    3.1    L/C Commitment ............................................................... 79

i

3.2      Procedure for Issuance of Letter of Credit ................................ 80
3.3      Fees and Other Charges ................................................................ 81
3.4      L/C Participations ......................................................................... 81
3.5      Reimbursement Obligation of the Borrower ............................... 82
3.6      Obligations Absolute .................................................................... 83
3.7      Letter of Credit Payments ............................................................ 83
3.8      Applications .................................................................................. 83
3.9      [Reserved] ..................................................................................... 83
3.10     Additional Issuing Lenders .......................................................... 83

SECTION 4.      REPRESENTATIONS AND WARRANTIES ........................ 84

4.1      Financial Condition ...................................................................... 84
4.2      No Change ..................................................................................... 84
4.3      Existence; Compliance with Law ................................................. 84
4.4      Power; Authorization; Enforceable Obligations .......................... 84
4.5      No Legal Bar ................................................................................. 85
4.6      Litigation ...................................................................................... 85
4.7      No Default ..................................................................................... 85
4.8      Ownership of Property; Liens ....................................................... 85
4.9      Intellectual Property ..................................................................... 86
4.10     Taxes .............................................................................................. 86
4.11     Federal Regulations; Sanctions and Anti-Corruption Laws ........ 86
4.12     Labor Matters ............................................................................... 87
4.13     ERISA ............................................................................................ 87
4.14     Investment Company Act; Other Regulations ............................. 88
4.15     Subsidiaries ................................................................................... 88
4.16     Use of Proceeds ............................................................................ 88
4.17     Environmental Matters ................................................................. 88
4.18     Accuracy of Information, etc. ....................................................... 89
4.19     Security Documents ...................................................................... 89
4.20     Solvency ........................................................................................ 90
4.21     Regulation H ................................................................................. 90
4.22     Affected Financial Institution ...................................................... 90

SECTION 5.      CONDITIONS PRECEDENT .............................................. 90

5.1      Conditions to Initial Extension of Credit ..................................... 90
5.2      Conditions to Each Extension of Credit ....................................... 94

SECTION 6.      AFFIRMATIVE COVENANTS ........................................... 95

6.1      Financial Statements ..................................................................... 95
6.2      Certificates; Borrowing Base; Other Information ........................ 96
6.3      Payment of Obligations ................................................................ 99
6.4      Maintenance of Existence; Compliance ....................................... 99
6.5      Maintenance of Property; Insurance ............................................ 100

6.6     Inspection of Property; Books and Records; Discussions; Appraisals;
        Field Examinations............................................................................100
6.7     Notices...............................................................................................101
6.8     Environmental Laws...........................................................................102
6.9     Additional Collateral, etc..................................................................102
6.10    Deposit Account Control Agreements................................................105
6.11    Further Assurances.............................................................................105
6.12    [Reserved]..........................................................................................105
6.13    Designation of Unrestricted Subsidiaries..........................................105
6.14    Sanctions............................................................................................106
6.15    Post-Closing Matters..........................................................................106

SECTION 7.    NEGATIVE COVENANTS..................................................................106

7.1     Financial Condition Covenant............................................................107
7.2     Indebtedness.......................................................................................107
7.3     Liens...................................................................................................110
7.4     Fundamental Changes.........................................................................114
7.5     Disposition of Property......................................................................114
7.6     Restricted Payments...........................................................................118
7.7     Investments........................................................................................119
7.8     Payments and Modifications of Certain Debt Instruments.................121
7.9     Transactions with Affiliates...............................................................122
7.10    Sale Leaseback Transactions..............................................................122
7.11    Swap Agreements...............................................................................122
7.12    Changes in Fiscal Periods...................................................................123
7.13    Negative Pledge Clauses....................................................................123
7.14    Clauses Restricting Restricted Subsidiary Distributions....................123
7.15    Lines of Business................................................................................124
7.16    Amendments to Organizational Documents........................................124
7.17    [Canadian Pension Plans....................................................................125

SECTION 8.    GUARANTEE.......................................................................................125

8.1     The Guarantee.....................................................................................125
8.2     Obligations Unconditional..................................................................125
8.3     Reinstatement.....................................................................................126
8.4     No Subrogation...................................................................................127
8.5     Remedies.............................................................................................127
8.6     Instrument for the Payment of Money................................................127
8.7     Continuing Guarantee.........................................................................127
8.8     General Limitation on Guarantor Obligations....................................127
8.9     Release of Guarantors.........................................................................127
8.10    Right of Contribution.........................................................................128
8.11    Keepwell.............................................................................................128

SECTION 9.    EVENTS OF DEFAULT .................................................................. 128

    9.1    Events of Default ............................................................................... 128
    9.2    Action in Event of Default ................................................................. 130
    9.3    Holdings' Right to Cure ..................................................................... 131

SECTION 10.    ADMINISTRATIVE AGENT ..................................................... 132

    10.1    Appointment ..................................................................................... 132
    10.2    Delegation of Duties ........................................................................ 132
    10.3    Exculpatory Provisions .................................................................... 132
    10.4    Reliance by Agents .......................................................................... 134
    10.5    Notice of Default .............................................................................. 134
    10.6    Posting of Communications. ............................................................. 135
    10.7    Non-Reliance on Administrative Agent and Other Lenders ............. 136
    10.8    Indemnification ................................................................................ 136
    10.9    Administrative Agent in its Individual Capacity ............................. 137
    10.10    Successor Administrative Agent .................................................... 137
    10.11    No Other Duties, etc ...................................................................... 138
    10.12    [Reserved] ..................................................................................... 138
    10.13    Acknowledgements of Lenders. .................................................... 138
    10.14    Cashless Settlement Option ........................................................... 139
    10.15    Bankruptcy. .................................................................................... 139
    10.16    Erroneous Payments. ..................................................................... 140
    10.17    Collateral Matters. ......................................................................... 141
    10.18    Credit Bidding ............................................................................... 141
    10.19    ERISA and Related Matters ........................................................... 142
    10.20    Quebec Security ............................................................................. 143

SECTION 11.    MISCELLANEOUS ................................................................... 144

    11.1    Amendments and Waivers ................................................................ 144
    11.2    Notices .............................................................................................. 145
    11.3    No Waiver; Cumulative Remedies .................................................. 147
    11.4    Survival of Representations and Warranties .................................... 147
    11.5    Payment of Expenses and Taxes ..................................................... 147
    11.6    Successors and Assigns; Participations and Assignments ............... 149
    11.7    Adjustments; Set-off ........................................................................ 152
    11.8    Counterparts; Electronic Execution ................................................ 152
    11.9    Severability ...................................................................................... 153
    11.10    Integration ...................................................................................... 154
    11.11    Governing Law ............................................................................... 154
    11.12    Submission To Jurisdiction; Waivers ............................................ 154
    11.13    Acknowledgements ......................................................................... 154
    11.14    Releases of Guarantees and Liens ................................................. 155
    11.15    Confidentiality ............................................................................... 155

11.16    **WAIVERS OF JURY TRIAL** ..................................................... 156
11.17    PATRIOT Act Notification ....................................................... 156
11.18    Maximum Amount ..................................................................... 157
11.19    Intercreditor Agreement .......................................................... 157
11.20    [Reserved] ........................................................................... 157
11.21    Lender Action ....................................................................... 158
11.22    No Fiduciary Duty .................................................................. 158
11.23    Acknowledgement and Consent to Bail-In of Affected Financial
         Institutions ......................................................................... 158
11.24    Judgment Currency ................................................................. 159
11.25    Acknowledgement Regarding Any Supported QFCs ....................... 159

SCHEDULES & ANNEXES:

1.1A        Commitments
1.1B        Agreed Securities Principles
1.1C        Mortgaged Properties
4.15        Subsidiaries
4.19(a)     UCC and PPSA Filing Jurisdictions
6.15        Post-Closing Matters
7.2(h)      Existing Indebtedness
7.3(f)      Existing Liens
7.7(n)      Existing Investments
7.09        Affiliate Transactions

EXHIBITS:

A-1         Form of Pledge and Security Agreement
A-2         Form of Canadian Pledge and Security Agreement
B           Form of Compliance Certificate
C           Form of Officer's Certificate
D           Form of Assignment and Assumption
F           Form of Exemption Certificate
G           Form of Note
H           Form of Solvency Certificate
I           [Reserved]
J           Form of Borrowing Base Certificate
K           [Reserved]
M           Form of Guarantor Joinder Agreement
N           Form of Borrowing Request

ABL CREDIT AGREEMENT, dated as of [   ], 2022 (this "Agreement"), among Carestream Health Holdings, Inc., a Delaware corporation ("Holdings"), Carestream Health, Inc., a Delaware corporation (the "Borrower"), the Subsidiary Guarantors (this and each other capitalized term used herein without definition having the meaning assigned to such term in Section 1.1), the several banks, financial institutions, institutional investors and other entities from time to time parties to this Agreement as lenders or holders of the Loans and issuers of Letters of Credit (collectively, the "Lenders"), and JPMorgan Chase Bank, N.A., as Administrative Agent.

## R E C I T A L S

On August 23, 2022 (the "Petition Date"), Holdings and certain of its direct and indirect Subsidiaries (collectively the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C., §§ 101–1532, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

On the Petition Date, the Debtors filed the *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and its Debtor Affiliates* pursuant to Chapter 11 of the Bankruptcy Code Docket No. [   ] (the "Original Chapter 11 Plan" and as amended, supplemented, or revised prior to the date hereof in accordance to the Commitment Letter, the "Chapter 11 Plan") with the Bankruptcy Court, which was confirmed by the Bankruptcy Court on [   ], 2022.

The parties hereto hereby agree as follows:

SECTION 1.        DEFINITIONS

1.1        Defined Terms. As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABL Priority Collateral": as defined in the Intercreditor Agreement.

"ABR": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus 1/2 of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that, for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the ABR due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective day of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively. If the ABR is being used as an alternate rate of interest pursuant to Section 2.16 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.16(b)), then the ABR shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00% for purposes of this Agreement.

"ABR Loans": Loans the rate of interest applicable to which is based upon the ABR.

"Accepting Lenders": as defined in Section 2.27(a).

"Account": as defined in the Security Agreement.

"Account Debtor": any Person obligated on an Account.

"Additional Lender": at any time, any bank or other financial institution that agrees to provide any portion of any Revolving Commitment Increase pursuant to an Incremental Amendment in accordance with Section 2.24; provided that (i) the Administrative Agent and each Issuing Lender shall have consented (not to be unreasonably withheld) to such Additional Lender if such consent would be required under Section 11.6(b) for an assignment of Loans or Revolving Commitments, as applicable, to such Additional Lender and (ii) the Borrower shall have consented to such Additional Lender.

"Adjusted Daily Simple SOFR": an interest rate per annum equal to (a) the Daily Simple SOFR, plus (b) 0.10%; provided that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Adjusted Term SOFR Rate": for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, plus (b) 0.10%; provided that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Administrative Agent": JPMorgan Chase Bank, N.A., together with its affiliates, as the administrative agent for the Lenders and as the collateral agent for the Secured Parties under this Agreement and the other Loan Documents, together with any of its successors in such capacities.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate": with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Affiliate Transaction": as defined in Section 7.9.

"Agent": the Administrative Agent, the Joint Bookrunners, [Co-Syndication Agents] and the Joint Lead Arrangers.

"Agreed Security Principles": the Agreed Security Principles set forth on Schedule 1.1B.

"Aggregate Exposure": with respect to any Lender at any time, an amount equal to the amount of such Lender's Revolving Commitment then in effect or, if the Revolving Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Exposure Percentage": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"Agreement": as defined in the preamble hereto.

"Agreement Currency": as defined in Section 11.24.

"Alternate Currency": any currency acceptable to the applicable Issuing Lender and the Administrative Agent.

"Annual Field Examination": as defined in Section 6.6(c).

"Annual Inventory Appraisal" as defined in Section 6.6(b).

"Anti-Corruption Laws": with respect to a Person, all laws, rules, and regulations of any jurisdiction applicable to such Person from time to time concerning or relating to bribery or corruption.

"Anti-Money Laundering Laws": with respect to a Person, all laws, rules, and regulations of any jurisdiction applicable to such Person from time to time concerning or relating to financial recordkeeping, reporting requirements, and money laundering including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), as amended.

"Applicable Margin":  initially, 2.25% in the case of ABR Loans and 3.25% in the case of Term Benchmark Loans through the first two full fiscal quarters after the Closing Date and, thereafter, subject to adjustment in accordance with the Applicable Pricing Grids (as defined below).

"Applicable Pricing Grids": the table set forth below:

| Average Quarterly Excess Availability | Applicable Margin for Term Benchmark Loans and RFR Loans | Applicable Margin for ABR Loans |
|---|---|---|
| Category 1 > 66% of the Line Cap | 3.00% | 2.00% |
| Category 2 ≤66% but > 33% of the Line Cap | 3.25% | 2.25% |
| Category 3 <33% of the Line Cap | 3.50% | 2.50% |

For purposes of the foregoing, each change in the Applicable Margin resulting from a change in the Average Quarterly Excess Availability shall be effective during the period commencing on and including the first day of each fiscal quarter of the Borrower and ending on the last day of such fiscal quarter, it being understood and agreed that, for purposes of determining the Applicable Margin on the first day of any fiscal quarter of the Borrower, the Average Quarterly Excess Availability during the most recently ended fiscal quarter of the Borrower shall be used. Notwithstanding the foregoing, with respect to the Applicable Margin, the Average Quarterly Excess Availability shall be deemed to be in Category 3 (as specified above), at the option of the Administrative Agent or at the request of the Required Lenders if the Borrower fails to deliver any Borrowing Base Certificate or related information required to be delivered by them pursuant to Section 6.2, during the period from the expiration of the time for delivery thereof until each such Borrowing Base Certificate and related information is so delivered.

"<u>Application</u>": an application, in such form as the applicable Issuing Lender may specify from time to time, requesting the applicable Issuing Lender to issue a Letter of Credit.

"<u>Approved Electronic Communications</u>": as defined in <u>Section 11.2</u>.

"<u>Approved Bank</u>": any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks or $100,000,000 (or the dollar equivalent as of the date of determination) in the case of non-U.S. banks.

"<u>Approved Fund</u>": as defined in <u>Section 11.6(b)(ii)</u>.

"<u>Asset Acquisition</u>": an acquisition of assets constituting at least a division or a business unit of, or all or substantially all of the assets of, any Person.

"<u>Assignee</u>": as defined in <u>Section 11.6(b)(i)</u>.

"<u>Assignment and Assumption</u>": an Assignment and Assumption, substantially in the form of <u>Exhibit D</u>.

"<u>Attributable Debt</u>": in respect of a Sale Leaseback Transaction, at the time of determination, the present value of the obligation of the Loan Party that acquires, leases or licenses back the right to use all or a material portion of the subject property for net rental, license or other payments during the remaining term of the lease, license or other arrangement included in such Sale Leaseback Transaction including any period for which such lease, license or other arrangement has been extended or may, at the sole option of the other party (or parties) thereto, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP.

"<u>Available Revolving Commitment</u>": as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Commitment then in effect <u>minus</u> (b) such Lender's Revolving Extensions of Credit then outstanding; <u>provided</u> that in calculating the amount of the Available Revolving Commitment, Letters of Credit denominated in an Alternate Currency will be deemed to be equal to the Dollar Equivalent thereof at the relevant time of determination.

"<u>Available Tenor</u>": as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of <u>Section 2.16</u>.

"<u>Average Quarterly Excess Availability</u>": for any fiscal quarter of the Borrower, an amount equal to the average daily Excess Availability during such fiscal quarter, as determined by the Administrative Agent in its Permitted Discretion by reference to the Administrative Agent's system of records; <u>provided</u>, that in order to determine Excess Availability on any day for purposes of this definition, the Borrower's Borrowing Base for such day shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to <u>Section 6.2(e)</u> as of such day.

"<u>Bail-In Action</u>": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule. and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11 of the United States Code entitled "Bankruptcy", as now and hereinafter in effect, or any successor statute.

"Bankruptcy Event": with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, interim receiver, receiver and manager, monitor, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality), to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark": initially, with respect to any (i) Term Benchmark Loan, the Term SOFR Rate and (ii) RFR Loan, the Daily Simple SOFR; provided that if a Benchmark Transition Event, and the related Benchmark Replacement Date have occurred with respect to the Term SOFR Rate or Daily Simple SOFR, as applicable, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.16.

"Benchmark Replacement": for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)        the Adjusted Daily Simple SOFR;

(2)        the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment": with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes": with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date": with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1)        in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)        in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events

set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event": with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period": with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.16 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.16.

"Beneficial Ownership Certification": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation, which certification shall be substantially similar to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Beneficially Own": as defined within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act; "Beneficial Ownership" shall have a correlative meaning.

"Benefited Lender": as defined in Section 11.7(a).

"BHC Act Affiliate": of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Borrowing": a Revolving Borrowing.

"Borrowing Base": at any time, the sum of:

(a)      85% of the Borrowing Base Loan Parties' Eligible Accounts (to be the Dollar Equivalent of the Eligible Accounts), plus (b)      the lesser of (i) the product of 85% multiplied by the Net Orderly Liquidation Value percentage identified in the most recent Inventory appraisal ordered by the Administrative Agent multiplied by the Borrowing Base Loan Parties' Eligible Inventory and (ii) the product of 70% multiplied by the Borrowing Base Loan Parties' Eligible Inventory (valued at the lower of cost and fair market value), minus

(c)      Reserves;

provided that in determining the Net Orderly Liquidation Value with respect to Inventory, the Administrative Agent may determine such value on a blended, class (e.g., raw materials, semi-finished inventory, finished goods inventory and service parts inventory ) or other basis as it determines in its Permitted Discretion.

The Borrowing Base credit in respect of (i) Eligible Accounts of Konica Minolta included in the Borrowing Base shall not exceed the lesser of 10% of the Borrowing Base (calculated after giving effect to the Eligible Accounts of Konica Minolta) and $8,500,000 (after taking into account the 85% advance rate referenced in clause (a) of this definition) and (ii) Eligible Accounts owed by any government of the U.S., or any department, agency, public corporation, or instrumentality thereof for which the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) has not been complied with to the Administrative Agent's satisfaction shall not exceed $5,000,000 (after taking into account the 85% advance rate referenced in clause (a) of this definition). The Administrative Agent may, in its Permitted Discretion reduce the advance rates set forth above or adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base, with any change to the Reserves to be implemented as set forth in the definition thereof. The Borrowing Base at any time shall, subject to the immediately preceding sentence, be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.2(e) of this Agreement.

"Borrowing Base Certificate": a certificate, signed and certified as accurate and complete by a Responsible Officer of the Borrower, in substantially the form of Exhibit J or another form which is acceptable to the Administrative Agent in its sole discretion, which certificate shall, among other things, set forth a calculation of the Borrowing Base.

"Borrowing Base Loan Party": any Loan Party (other than Holdings) that is organized under the laws of (a) any state within the United States, (b) the District of Columbia or (c) Canada or any province or territory thereof.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Borrowing Request": a request by the Borrower for a Borrowing in accordance with Section 2.5, which shall be substantially in the form of Exhibit N or any other form approved by the Administrative Agent.

"Business": as defined in Section 4.17(b).

"Business Day": any day (other than a Saturday or a Sunday) on which banks are open for business in New York City; provided that, in addition to the foregoing, a Business Day shall be (a) in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings of such RFR Loan and (b) in relation to Loans referencing the Adjusted Term SOFR Rate and any interest rate settings, fundings, disbursements, settlements or payments of any such Loans referencing the Adjusted Term SOFR Rate or any other dealings of such Loans referencing the Adjusted Term SOFR Rate, any such day that is only a U.S. Government Securities Business Day.

"CAML": the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), the *United Nations Act* (Canada) and other anti-terrorism laws and "know your client" policies, regulations, laws or rules applicable in Canada, including any guidelines or orders thereunder.

"Canadian Defined Benefit Plan": any Canadian Pension Plan which contains a "defined benefit provision", as defined in subsection 147.1(1) of the *Income Tax Act* (Canada). "Canadian Dollars" and "C$": dollars in lawful currency of Canada.

"Canadian Multiemployer Plan": any Canadian Pension Plan that is considered to be a "multi-employer pension plan" or similar plan under applicable federal or provincial pension standards legislation in Canada.

"Canadian Pension Event": the occurrence of any of the following: (a) any Group Member  passes a resolution or takes any other action to terminate or wind up in whole or in part any Canadian Defined Benefit Plan, (b) notice being given by a Governmental Authority to any Group Member that it intends to order a wind up in whole or in part of a Canadian Defined Benefit Plan without right of hearing or appeal, (c) there is a cessation of required contributions to the fund of a Canadian Pension Plan other than suspension of contributions for the normal cost of the pension plan and contributions for the provision for adverse deviations in respect of the normal cost of the pension plan if the pension plan has an available actuarial surplus, (d) the wind up or termination (in whole or in part) of any Canadian Defined Benefit Plan, (e) the occurrence of an event or condition which would reasonably be expected to constitute grounds for the termination (in whole or in part) of, or winding-up (in full or as a partial wind-up), or the appointment by a Governmental Authority of a replacement administrator or trustee to wind up or terminate (in whole or in part) any Canadian Defined Benefit Plan, (f) the withdrawal of any Group Member from a Canadian Multiemployer Plan where any additional contributions by any Group Member are triggered by such withdrawal, (g) the imposition of any liability by any Governmental Authority in respect of a Canadian Defined Benefit Plan, other than for premiums

or contributions due but not delinquent, upon any Group Member, or (h) any statutory deemed trust or Lien, other than a Permitted Lien, arises in respect of a Canadian Pension Plan.

"<u>Canadian Pension Plan</u>": any plan or arrangement that is required to be registered as a "registered pension plan", as defined in subsection 248(1) of the *Income Tax Act* (Canada), or is required to be registered under Canadian federal or provincial pension standards laws (i) which is or was established, maintained or contributed to by, or required to be contributed to by, any Group Member for its employees or former employees, or (ii) with respect to which any Group Member has any actual or contingent liability, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively.

"<u>Canadian Pledge and Security Agreement</u>": the Canadian Pledge and Security Agreement, dated as of [   ], 2022, made by the grantors party thereto in favor of the Administrative Agent, substantially in the form of <u>Exhibit A-2</u>.

"<u>Canadian Priority Payables Reserves</u>": with respect to any Collateral of a Canadian Borrowing Base Loan Party or other Collateral located in, or subject to the laws of, Canada, without duplication, (a) the full amount of all obligations, liabilities or indebtedness of any Borrowing Base Loan Party that (i) have a trust, deemed trust or statutory lien imposed to provide for payment or a Lien, choate or inchoate, ranking or capable or ranking senior to or pari passu with Liens securing the Obligations, respectively, on any Collateral under any applicable law of Canada or any province or territory thereof, or (ii) have a right imposed to provide for payment ranking or capable or ranking senior or pari passu with the Obligations or under any applicable law of Canada or any province or territory thereof, including claims for unremitted and/or accelerated rents, utilities, taxes (including sales taxes and goods and services taxes and harmonized sales taxes and withholding taxes), amounts payable to an insolvency administrator, wages (including wages or other amounts due under the *Wage Earner Protection Program Act*), employee withholdings and deductions (including amount payable with respect to statutory benefit plans) and vacation pay, severance and termination pay, government royalties and pension fund obligations (including, without duplication, normal cost contributions and any special payments required to be made) and any amounts, whether or not due, representing wind-up deficiency or position with respect to any Canadian Defined Benefit Plans, pursuant to the *Pension Benefits Act* (Ontario) or any similar legislation, and (b) the amount equal to the aggregate value of the Inventory in Canada which the Administrative Agent, in good faith, and on a reasonable basis, considers is or may be subject to retention of title by a supplier or a right of a supplier to recover possession thereof, where such supplier's rights has priority over the Liens securing the Obligations including, without limitation, Inventory subject to a right of a supplier to repossess goods pursuant to Section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or any other applicable laws granting revendication or similar rights to unpaid suppliers.

"<u>Canadian Subsidiary</u>": any Subsidiary of the Borrower organized under the laws of Canada or any province or territory thereof.

"<u>Capital Lease Obligations</u>": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as determined prior to implementation of ASC 842) and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP (as determined prior to implementation of ASC 842).

"<u>Capital Stock</u>": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation (including common stock and preferred stock), any

and all equivalent ownership interests in a Person (other than a corporation), including partnership interests (general and limited), and membership and limited liability company interests, and any and all warrants, rights or options to purchase any of the foregoing (but excluding any debt security that is exchangeable for or convertible into such capital stock).

"Cash Collateral": as defined in the definition of "Collateralize".

"Cash Dominion Period": (a) each period when a Specified Event of Default has occurred and is continuing or (b) each period beginning on the fifth (5th) consecutive Business Day on which Excess Availability is less than the greater of (x) 15.0% of the Line Cap and (y) $10,500,000; provided that any such Cash Dominion Period commencing pursuant to clause (b) shall end when and if Excess Availability shall have not been less than such specified level for 30 consecutive calendar days.

"Cash Equivalents": (a) Dollars (including such Dollars as are held as overnight bank deposits and demand deposits with banks); (b) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 24 months from the date of acquisition; (c) certificates of deposit, time deposits, eurodollar time deposits, bankers' acceptances or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having combined capital and surplus of not less than $250,000,000.00; (d) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (e) repurchase obligations of any Lender or of any commercial bank satisfying (at the time of acquisition) the requirements of clause (c) of this definition, having a term of not more than 90 days, with respect to securities issued or fully guaranteed or insured by the United States government; (f) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) have one of the two highest ratings obtainable from either S&P or Moody's; (g) securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (c) of this definition; (h) Indebtedness or preferred stock issued by Persons with a rating, at the time of acquisition thereof, of "A" or higher from S&P or "A2" or higher from Moody's with maturities of one year or less from the date of acquisition; (i) money market mutual or similar funds that invest substantially all of their assets in securities satisfying the requirements of clauses (a) through (h) of this definition; or (j) in the case of Foreign Subsidiaries or Canadian Subsidiaries, Investments made in the jurisdiction where such Foreign Subsidiaries or Canadian Subsidiaries, respectively, customarily make similar Investments that are of a type and credit quality comparable to the Investments described in clauses (a) through (i) of this definition.

"Cash Management Obligations": all obligations, including guarantees thereof, of any Loan Party or that are guaranteed by a Loan Party to a bank or other financial institution that, at the time such Cash Management Obligations are established or (if later) as of the Closing Date,  is the Administrative Agent, a Joint Lead Arranger, or a Lender (or an Affiliate of the foregoing) and has agreed in writing with the Administrative Agent that it is providing Cash Management Obligations to Group Members which constitute obligations (including guarantees thereof) in respect of (i) overdrafts and related liabilities owed to any such bank or financial institution arising from treasury, depositary and cash management services or in connection with any automated clearinghouse transfer of funds, (ii)

foreign exchange and currency management services or (iii) purchase cards, credit cards or similar services, in each case, arising from transactions in the ordinary course of business of such Group Members (clauses (i) through (iii), collectively, "Cash Management Services"), in each case to the extent such obligations are primary obligations of a Loan Party or are guaranteed by a Loan Party.

[¨"Cash Restricted Subsidiaries": any Restricted Subsidiary that is subject to local law restrictions on transfers of cash, including as a result of currency control restrictions (it being understood that as of the Closing Date, only Restricted Subsidiaries organized in Argentina, Italy and Turkey are Cash Restricted Subsidiaries).].

"Certificated Securities": as defined in Section 4.19(a).

"CFC Holdco": any Subsidiary of the Borrower (i) (x) that is not treated as a corporation for U.S. federal income tax purposes and (y) substantially all of the assets of which are Capital Stock of one or more controlled foreign corporations within the meaning of Section 957 of the Code or (ii) (w) that is a Domestic Subsidiary: (x) that is treated as a corporation for U.S. federal income tax purposes and (y) substantially all of the assets of which are Capital Stock of one or more controlled foreign corporations within the meaning of Section 957 of the Code.

"Chapter 11 Plan" has the meaning assigned to such term in the recitals hereto.

"Change in Law": (a) the adoption or taking effect of any Requirement of Law after the Closing Date, (b) any change in any Requirement of Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Closing Date or (c) the compliance by any Lender or any Issuing Lender with any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided, however, that (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) of the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case constitute a "Change in Law" regardless of the date enacted, adopted or issued.

"Change of Control": at any time, (a) prior to a Qualified Public Offering, the Permitted Investors (i) shall fail to have the right, directly or indirectly, by voting power, contract or otherwise, to elect or designate for election at least a majority of the board of directors of Holdings or (ii) shall fail to Beneficially Own Capital Stock of Holdings representing a majority of the voting power represented by the issued and outstanding Capital Stock of Holdings, (b) after a Qualified Public Offering, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Investors, shall Beneficially Own Capital Stock of Holdings representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of Holdings and the percentage of the aggregate ordinary voting power represented by such Capital Stock Beneficially Owned by such person or group exceeds the percentage of the aggregate ordinary voting power represented by Capital Stock of Holdings then Beneficially Owned by the Permitted Investors, unless (i) the Permitted Investors have, at such time, the right or the ability, directly or indirectly, by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Holdings or (ii) during any period of twelve (12) consecutive months, a majority of the seats (other than vacant seats) on the board of directors of Holdings shall be occupied by persons who were (x) members of the board of directors of Holdings on the Closing

Date or nominated by one or more Permitted Investors or Persons nominated by one or more Permitted Investors or (y) appointed by directors so nominated, or (c) Holdings shall cease to Beneficially Own, and to directly own of record 100% of the issued and outstanding Capital Stock of the Borrower.

"Class": (a) when used with respect to Lenders, refers to each of the Revolving Lenders, (b) when used with respect to Commitments, the Revolving Commitments and (c) when used with respect to Loans, the Revolving Loans made thereunder. Additional Classes may be established pursuant to Section 2.26.

"Closing Date": [  ], 2022.

"CME Term SOFR Administrator": CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all of the assets and property of the Loan Parties and any other Person, now owned or hereafter acquired, whether real, personal or mixed, upon which a Lien is purported to be created by any Security Document; provided, however, that the Collateral shall not include (i) Excluded Assets, (ii) any voting Capital Stock of any Excluded Foreign Subsidiary described in clause (i) or (ii) of the definition of Excluded Foreign Subsidiary, representing in excess of 66% of the total outstanding voting Capital Stock of such Excluded Foreign Subsidiary, and (iii) solely with respect to assets and property of (or the Capital Stock of) Specified Foreign Guarantors, any assets that would be excluded pursuant to the Agreed Security Principles.

"Collateral Access Agreement": any landlord waiver or other agreement, in form and substance reasonably satisfactory to the Administrative Agent, between the Administrative Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"Collateralize": to (i) pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Lenders and the Lenders (or, with respect to Cash Collateral pledged or deposited pursuant to Section 3.1(a), the applicable Issuing Lender), as collateral for the L/C Obligations, cash or deposit account balances ("Cash Collateral") pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent or (ii) to issue back to back letters of credit for the benefit of the Issuing Lenders in a form and substance reasonably satisfactory to the Administrative Agent, in each case, in an amount not less than 103% of the outstanding L/C Obligations.

"Collection Account": individually and collectively, each "Collection Account" referred to in the Security Agreement.

"Commencement Date": as defined in the definition of "Covenant Trigger Period".

"Commitment": as to any Lender, the Revolving Commitment of such Lender.

"Commitment Fee": as defined in Section 2.8(a).

"Commitment Fee Rate": 0.50% per annum.

"<u>Commitment Letter</u>": the commitment letter, dated as of August 20, 2022, between JPMorgan Chase Bank, N.A., Barclays Bank PLC, Credit Suisse AG, Cayman Islands Branch, Apollo Credit Master Fund Ltd. and the Borrower.

"<u>Commitment Parties</u>" as defined in the Commitment Letter.

"<u>Commodity Exchange Act</u>": the Commodity Exchange Act (7 U.S.C. § 1 et seq), as amended from time to time, and any successor statute.

"<u>Commonly Controlled Entity</u>": an entity, whether or not incorporated, that is under common control with Holdings or the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes Holdings or the Borrower and that is treated as a single employer under Section 414 of the Code.

"<u>Compliance Certificate</u>": a certificate duly executed by a Responsible Officer substantially in the form of <u>Exhibit B</u>.

"<u>Confirmation Order</u>": an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent and the Commitment Parties confirming the Chapter 11 Plan.

"<u>Consolidated Capital Expenditures</u>": for any period, with respect to any Person, the aggregate of all expenditures (whether paid in cash or other consideration or accrued as a liability and including that portion of Capital Lease Obligations which is capitalized on the consolidated balance sheet of the Borrower) by such Person and its Restricted Subsidiaries during such period for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that, in conformity with GAAP, are included in "additions to property, plant or equipment" or comparable items reflected in the consolidated statement of cash flows of such Person and its Restricted Subsidiaries; provided that Consolidated Capital Expenditures shall not include any expenditures in respect of the obligations of any Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP (as determined prior to implementation of ASC 842).

"<u>Consolidated EBITDA</u>": for any period, Consolidated Net Income for such period <u>plus</u>, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) interest expense, amortization or write off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including (i) the Loans and (ii) the Term Loans), (c) depreciation and amortization expense, including amortization of intangibles (including, but not limited to, goodwill) and organization costs, (d) any extraordinary charges, (e) non-recurring or unusual charges (including relating to severance and relocation, integration and facilities opening costs, business optimization costs, inventory optimization programs, systems establishment, development and retirement costs, transition costs, including costs related to a transition to a stand-alone company, restructuring costs, any expenses related to any reconstruction, recommissioning or reconfiguration of fixed assets for alternative uses, plant shutdown costs and acquisition integration costs); <u>provided</u> that for purposes of calculating the <u>Consolidated</u> Fixed Charge Coverage Ratio only, the aggregate amount added back pursuant to this clause (e) for any period, together with any pro forma adjustments made to Consolidated EBITDA for such period pursuant to clauses (x) and (y) of the definition of "Pro Forma Basis", shall not exceed 15% of Consolidated EBITDA for such period<u>:, provided further</u>, such limitation shall not apply to

14

restructuring or severance costs and expenses referenced in this clause (e), (f) any non-cash expenses or losses for such period that do not constitute reserves and which are not expected to result in cash payments in a future period (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, non-cash losses on sales of assets outside the ordinary course of business), (g) the aggregate amount actually paid by the Borrower and its Restricted Subsidiaries in cash on account of fees and expenses incurred by the Borrower and its Restricted Subsidiaries in connection with the Transactions, (h) deductions, charges or cash or non-cash expenses incurred pursuant to any management equity plan or stock option plan or any management incentive plan or any other management or employee benefit plan, scheme or agreement, pension plan, any stock subscription or shareholder agreement or any distributor equity plan or agreement or in connection with grants of stock appreciation or similar rights or other rights to directors, officers and/or employees of any Group Member, (i) expenses incurred in connection with the prepayment, amendment, modification or Refinancing of Indebtedness during such period, (j) any non-capitalized transaction costs incurred during such period in connection with an actual or proposed incurrence of Indebtedness, including a Refinancing thereof, issuance of Capital Stock (of Holdings any of its direct or indirect parent companies or any of its Restricted Subsidiaries), investment, acquisition, disposition, divestiture or recapitalization (excluding the Transactions), (k) any net loss resulting in such period from Swap Agreements and the application of Accounting Standards Codification Topic 815, (l) any net loss resulting in such period from currency translation losses, (m) non-cash losses or charges associated with any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a Change in Law or regulation, in each case pursuant to GAAP, (n) for purposes of determining compliance with the Financial Performance Covenant, the Cure Amount, if any, received by the Borrower for such period and permitted to be included in Consolidated EBITDA pursuant to Section 9.3, (o) any loss from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments, (p) any loss from disposed, abandoned or discontinued operations and losses on disposal of disposed, abandoned, transferred, closed or discontinued operations, (q) any losses (plus all fees and expenses relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Capital Stock of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, (r) any expenses and charges in connection with any investment, acquisition or Disposition permitted to be made under this Agreement and (s) any purchase price payments made in connection with an acquisition or other similar investment permitted hereunder, minus, without duplication, (1) to the extent included in the statement of such Consolidated Net Income for such period, the sum of (i) interest income, (ii) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the ordinary course of business), (iii) income tax credits (to the extent not netted from income tax expense), (iv) any net gain resulting in such period from Swap Agreements and the application of Accounting Standards Codification Topic 815, (v) any net gain resulting in such period from currency translation gains, (vi) any other non-cash income, which is not expected to result in cash income in a future period (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, non-cash income on sales of assets outside the ordinary course of business), all as determined on a consolidated basis, (vii) any income or gain from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments, (viii) any income or gain from disposed, abandoned or discontinued operations and any gains on disposal of disposed, abandoned, transferred, closed or discontinued operations, (ix) any income or gain (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Capital Stock of any Person other than in the ordinary course of business, as determined in good faith by the Borrower and (2) to the extent not deducted in determining Consolidated Net Income for such period, payments made in respect of Customer Guaranties.

"Consolidated Fixed Charge Coverage Ratio": for any period, with respect to the Borrower and its Restricted Subsidiaries on a consolidated basis, the ratio of (a) Consolidated EBITDA for such period less Unfinanced Capital Expenditures less payments for income taxes or income tax liabilities made in cash (net of cash income tax refunds during such period) during such period (excluding, solely for purposes of testing the Financial Performance Covenant, the lesser of (x) $5,000,000 and (y) 50% of the tax or tax liabilities paid in cash by the Borrower related to the taxable years ending on or before December 31, 2022 related to any gain as a result of the recapitalization effected on the Closing Date) to (b) Consolidated Fixed Charges for such period.

"Consolidated Fixed Charges": for any period, with respect to the Borrower and its Restricted Subsidiaries, the sum (without duplication) of (a) Consolidated Interest Expense for such period, (b) any scheduled payments in cash of principal on Indebtedness (other than the Loans) included in the definition of Consolidated Total Debt during such period (other than mandatory prepayments of Term Loans pursuant to Sections 2.11(b) and 2.11(d) of the Term Loan Credit Agreement (as in effect on the Closing Date) and (c) Restricted Payments made in cash during such period, all calculated for the Borrower and its Restricted Subsidiaries on a consolidated basis and, to the extent applicable, in accordance with GAAP; provided, that with respect to the Reference Periods ending on the last day of each of the first four fiscal quarters of the Borrower ending after the Closing Date, Consolidated Fixed Charges for the relevant Reference Period shall be deemed to equal (x) Consolidated Fixed Charges for the period from the Closing Date to the end of such quarter times (y) a fraction, the numerator of which is the number of days in the relevant Reference Period and the denominator of which is the number of days in such Reference Period subsequent to the Closing Date.

"Consolidated Interest Expense": for any period, total cash interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its Restricted Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Restricted Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP) calculated on a consolidated basis for Borrower and its Restricted Subsidiaries for such period in accordance with GAAP.

"Consolidated Net Income": for any period, the consolidated net income (or loss) of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Borrower or any of its Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of the Borrower) in which the Borrower or any of its Restricted Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or such Restricted Subsidiary in the form of dividends or similar distributions, (c) [reserved], (d) any increase in amortization or depreciation or other non-cash charges, and any write up of assets or inventory, any inventory step ups and any deferred revenue valuation adjustments that results from the application of purchase accounting in relation to any acquisition that is consummated after the Closing Date, net of taxes, and (e) the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income. In addition, to the extent not already accounted for in the Consolidated Net Income, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall include the amount of net proceeds received by the Borrower or any Restricted Subsidiary thereof from business interruption insurance.

"Consolidated Total Debt": at any date, the aggregate principal amount (or, if higher, the par value or stated face amount (other than with respect to zero coupon Indebtedness)) of all Indebtedness of the Borrower and its Restricted Subsidiaries at such date, determined on a consolidated

basis in accordance with GAAP, including the outstanding principal amount of the Term Loans and the Loans, but excluding (i) any liabilities referred to in clause (f) of the definition of "Indebtedness" (except to the extent the underlying instrument has been drawn) and any Guarantee Obligations in respect of any such liabilities, (ii) Indebtedness constituting Customer Guaranties and (iii) Indebtedness incurred in reliance on clause (l) of Section 7.2 (except to the extent the underlying instrument has been drawn).

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Investment Affiliate": as to any Person, any other Person that (a) directly or indirectly, is in Control of, is Controlled by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.

"Corresponding Tenor": with respect to any Available Tenor, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covenant Trigger Period": each period beginning on any date (each a "Commencement Date") on which Specified Excess Availability is less than the greater of (x) 15% of the Line Cap and (y) $10,500,000, and continuing until the date on which Specified Excess Availability shall have met or exceeded the threshold set forth above for 30 consecutive calendar days after the Commencement Date.

"Covered Entity": any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party": as defined in Section 11.25.

["Co-Syndication Agents": [   ].]

"Cure Amount": as defined in Section 9.3.

"Cure Period": as defined in Section 9.3.

"Cure Right": as defined in Section 9.3.

"Customer Guaranty": any guaranty or indemnification by the Borrower or its Restricted Subsidiaries of customer obligations to third parties relating to the financing of equipment, inventory or trade payables incurred in the ordinary course of such customer's business.

"Daily Simple SOFR": for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day (such day "SOFR Determination Date") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as

such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Debt Fund Affiliate": any investment fund, separate account, or other entity owned (in whole or in part), controlled, managed and/or advised by any affiliate of Apollo Global Management, Inc. (a) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course, (b) that does not directly or indirectly have beneficial ownership of equity interests of the Borrower or any Subsidiary and (c) which is not managed on a day to day basis by Persons responsible for the management of the Borrower on a day to day basis.

"Debtor Relief Laws": the Bankruptcy Code of the United States, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada) or the Winding Up Act (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States, Canada or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default": any of the events specified in Section 9.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Right": has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender": any Lender that (a) has failed to fund any portion of the Loans or participations in L/C Obligations required to be funded by it hereunder within two (2) Business Days of the date required to be funded by it hereunder, (b) has notified the Administrative Agent or a Loan Party in writing that it does not intend to (or will not be able to) satisfy any or such obligation, (c) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (d) has failed, within three (3) Business Days after written request by the Administrative Agent, to confirm in a manner reasonably satisfactory to the Administrative Agent that it will comply with its funding obligations; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon the Administrative Agent's receipt of such confirmation, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, receiver and manager, monitor, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment or (iv) become the subject of a Bankruptcy Event or a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"Defaulting Lender Fronting Exposure": at any time there is a Defaulting Lender, with respect to an Issuing Lender, such Defaulting Lender's Pro Rata Share of the outstanding L/C Obligations of such Issuing Lender other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"Deposit Account": as defined in the Security Agreement.

"Deposit Account Control Agreement": individually and collectively, each "Deposit Account Control Agreement" referred to in the Security Agreement or blocked account agreements (in the case of Canadian deposit accounts), as the case may be.

"Designated Noncash Consideration": the fair market value of noncash consideration received by the Borrower or a Subsidiary of the Borrower in connection with a Disposition pursuant to Section 7.5(u) or Section 7.5(w) that is designated as Designated Noncash Consideration at the time of such Disposition pursuant to a certificate of a Responsible Officer delivered to the Administrative Agent, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the noncash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"Disposition": with respect to any property (including, without limitation, Capital Stock of the Borrower or any of its Restricted Subsidiaries), any sale, lease, Sale Leaseback Transaction, assignment, conveyance, transfer or other disposition thereof (including by merger or consolidation or amalgamation and excluding the granting of a Lien permitted hereunder) and any issuance of Capital Stock of the Borrower or any of the Borrower's Restricted Subsidiaries. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Equity Interests": any Capital Stock which, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change in control or asset sale so long as any right of the holders thereof upon the occurrence of a change in control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable and the termination of the Commitments), in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, prior to the date that is ninety-one (91) days after the Latest Maturity Date, except as a result of a change in control or an asset sale or the death, disability, retirement, severance or termination of employment or service of a holder who is an employee or director of Holdings or a Subsidiary, in each case so long as any such right of the holder (1) is not effective during the continuance of an Event of Default and is not effective to the extent that such redemption would result in a Default or an Event of Default or (2) is subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable and the termination of the Commitments, (c) requires the payment of any cash dividend or any other scheduled cash payment constituting a return of capital, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date; provided that if such Capital Stock is issued to any plan for the benefit of employees of Holdings or its Restricted Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Documents": as defined in the Security Agreement.

"Dollar Equivalent": for any amount, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount, (b) if such amount is expressed in an Alternate Currency, the equivalent of such amount in Dollars determined by using the rate of exchange for the purchase of

Dollars with the Alternate Currency last provided (either by publication or otherwise provided to the Administrative Agent) by Reuters on the Business Day (New York City time) immediately preceding the date of determination or if such service ceases to be available or ceases to provide a rate of exchange for the purchase of Dollars with the Alternate Currency, as provided by such other publicly available information service which provides that rate of exchange at such time in place of Reuters chosen by the Administrative Agent in its sole discretion (or if such service ceases to be available or ceases to provide such rate of exchange, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion) and (c) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion.

"Dollars" and "$": dollars in lawful currency of the United States.

"Domestic Subsidiary": any Subsidiary of the Borrower organized under the laws of (a) any state within the United States or (b) the District of Columbia.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" as defined in the Chapter 11 Plan.

"Elective Commitment Reduction" as defined in Section 2.24(a)(vii).

"Eligible Accounts": at any time, the Accounts of a Borrowing Base Loan Party which the Administrative Agent determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans and the issuance of Letters of Credit. Without limiting the Administrative Agent's discretion provided herein, Eligible Accounts shall not include any Account of a Borrowing Base Loan Party:

(a) which is not subject to a first priority perfected security interest in favor of the Administrative Agent;

(b) which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(c) (i) which is unpaid more than 90 days after the date of the original invoice therefor (provided that, at any time, up to $2,000,000 of Accounts shall not be deemed ineligible solely as a result of this clause (c)(i) so long as they are not unpaid more than 120 days after the date of the original invoice therefor), (ii) which is unpaid more than 60 days after the original due date therefor or (iii) which

has been written off the books of such Borrowing Base Loan Party or otherwise designated as uncollectible;

(d) which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible pursuant to clause (c) above;

(e) which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to all Borrowing Base Loan Parties exceeds 15% of the aggregate amount of Eligible Accounts of all Borrowing Base Loan Parties; provided that (i) in respect of Konica Minolta, the foregoing percentage shall be 25% and (ii) in respect of any Account Debtor that has an Investment Grade Rating, the foregoing percentage shall be 25% (with such percentage being subject to reduction by the Administrative Agent in its Permitted Discretion);

(f) with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Document has been breached or is not true in any material respect;

(g) which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation reasonably satisfactory to the Administrative Agent which has been sent to the Account Debtor, (iii) represents a progress billing (such that the obligation of the account debtors with respect to such Accounts is conditioned upon such Borrowing Base Loan Party's satisfactory completion of any further performance under the agreement giving rise thereto), (iv) is otherwise contingent upon such Borrowing Base Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis or (vi) relates to payments of interest;

(h) for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrowing Base Loan Party or if such Account was invoiced more than once;

(i) with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j) which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, interim receiver, receiver and manager, monitor, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, interim receiver, receiver and manager, monitor, custodian, administrator, sequestrator, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state, provincial, territorial or federal bankruptcy laws, including under any corporate law permitting a debtor to obtain an arrangement of any of its debts or a stay or compromise of the claims of creditors, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k) which is owed by any Account Debtor which has sold all or substantially all of its assets;

(l) which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S., or the District of Columbia, Canada, or any province of Canada or (iii) if organized under the laws of Canada, does not maintain its registered office in Canada, unless (x) in any such case, such Account is

backed by a Letter of Credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent or other credit support reasonably satisfactory to the Administrative Agent or (y) such Account Debtor is Konica Minolta;

(m) that is subject to a Receivables Facility;

(n) which is owed by (i) any government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent or other credit support reasonably satisfactory to the Administrative Agent, or (ii) any government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.) (the "Federal Assignment of Claims Act"), and any other steps necessary to perfect the Lien of the Administrative Agent in such Account have been complied with to the Administrative Agent's satisfaction; provided that, at any time, up to $5,880,000 of Accounts shall not be deemed ineligible solely as a result of clause (ii) due to a failure to comply with the Federal Assignment of Claims Act;

(o) which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p) which is owed in any currency other than U.S. dollars or Canadian Dollars;

(q) which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent of such indebtedness, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r) which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(s) which is evidenced by any promissory note, chattel paper or instrument;

(t) which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Borrowing Base Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Borrowing Base Loan Party has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u) with respect to which such Borrowing Base Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business but only to the extent of any such reduction, or any Account which was partially paid and such Borrowing Base Loan Party created a new receivable for the unpaid portion of such Account;

(v) which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state, provincial, territorial or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w) which is for goods that have been sold under a purchase order or pursuant to the terms of a written contract that indicates that any Person other than such Borrowing Base Loan Party has

an ownership interest in such goods, or which indicates any party other than such Borrowing Base Loan Party as payee or remittance party;

(x) which was created on cash on delivery terms;

(y) [reserved]; or

(z) for which the Account Debtor is not directed to pay such Account into a deposit account located in the U.S. or Canada.

In determining the amount of an Eligible Account of a Borrowing Base Loan Party, the face amount of an Account may, in the Administrative Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrowing Base Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrowing Base Loan Party to reduce the amount of such Account.

"Eligible Assignee": (a) any Lender, any Affiliate of a Lender and any Approved Fund (any two or more Approved Funds with respect to a particular Lender being treated as a single Eligible Assignee for all purposes hereof), and (b) any commercial bank, insurance company, financial institution, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys commercial loans in the ordinary course; provided that "Eligible Assignee" shall not include any natural person or the Borrower, Holdings or any of their Affiliates.

"Eligible Inventory": at any time, the Inventory of a Borrowing Base Loan Party which the Administrative Agent determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans and the issuance of Letters of Credit. Without limiting the Administrative Agent's discretion provided herein, Eligible Inventory of a Borrowing Base Loan Party shall not include any Inventory:

(a) which is not subject to a first priority perfected Lien in favor of the Administrative Agent;

(b) which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(c) which is, in the Administrative Agent's opinion as determined in its Permitted Discretion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d) with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Document has been breached or is not true and which does not conform to all standards imposed by any Governmental Authority;

(e) in which any Person other than such Borrowing Base Loan Party shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f) which constitutes spare or replacement parts and non-product inventory (other than service parts), packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, rolling stock in possession of field engineers, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g) which is not located in either the U.S. or Canada or is in transit (other than Inventory in-transit between U.S. or Canadian plants owned or leased by Borrowing Base Loan Parties);

(h) which is located in any location leased by such Borrowing Base Loan Party unless (i) the lessor has delivered to the Administrative Agent a Collateral Access Agreement or (ii) a Reserve for rent, charges and other amounts due or to become due with respect to such facility has been established by the Administrative Agent in its Permitted Discretion;

(i) which is located in any third party warehouse or is in the possession of a bailee (including a third party processor) and is not evidenced by a Document, unless (i) such warehouseman, bailee or third party processor has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may require or (ii) an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion;

(j) which is located with a customer pending such customer's final acceptance of such Inventory;

(k) which is a discontinued product or component thereof other than service parts of a discontinued product that are retained for ongoing sale to customers both directly or under service agreements;

(l) which is the subject of a consignment by such Borrowing Base Loan Party as consignor;

(m) which is perishable;

(n) which contains, embeds, embodies or bears any Intellectual Property licensed to such Borrowing Base Loan Party unless the Administrative Agent is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o) for which reclamation rights have been asserted by the seller; or

(p) which has been acquired from a Sanctioned Person.

"Environmental Laws": any and all foreign, Federal, state, provincial, territorial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning Materials of Environmental Concern, human health

and safety with respect to exposure to Materials of Environmental Concern, and protection or restoration of the environment as now or may at any time hereafter be in effect.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default": any of the events specified in Section 9.1, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Availability": at any time, an amount equal to (a) the Line Cap minus (b) the Total Revolving Extensions of Credit then outstanding (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Percentage of all outstanding Loans).

"Exchange Act": the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Excluded Account": as defined in the Security Agreement.

"Excluded Taxes": as defined in Section 2.19(a).

"Excluded Assets": (i) any owned real property with a fair market value of less than $5,000,000 and all leasehold property (it being understood there shall be no requirement to obtain any landlord waivers, estoppels or collateral access letters); (ii) vehicles and other assets subject to certificates of title, in each case, to the extent a security interest therein cannot be perfected by the filing of a UCC or PPSA financing statement; (iii) letter-of-credit rights and commercial tort claims, in each case, to the extent a security interest therein cannot be perfected by the filing of a UCC or PPSA financing statement; (iv) margin stock (as defined in Regulation U); (v) ~~Capital Stock in any Excluded Subsidiary~~[reserved], (vi) (1) any property to the extent that such grant of a security interest in such property is prohibited by any Requirement of Law of a Governmental Authority (including restrictions in respect of margin stock and financial assistance, thin capitalization or other similar laws or regulations), requires a consent not obtained of any Governmental Authority pursuant to such Requirement of Law, or is prohibited by, or constitutes a breach or default under or results in a termination in favor of any other party thereto (other than Holdings, the Borrower or a Restricted Subsidiary) or requires the consent of any Person (other than Holdings, the Borrower or a Restricted Subsidiary) that has not been obtained under, any contract, license, instrument or other document or agreement evidencing, governing or giving rise to such property, (2) any lease, license or other agreement or any property subject to a purchase money security interest or similar arrangement, in each case, to the extent permitted under the Loan Documents, to the extent that such grant of a security interest in such property is prohibited by the agreement pursuant to which such Lien is granted, or constitutes a breach or default under or results in a termination in favor of any other party thereto (other than Holdings, the Borrower or a Restricted Subsidiary) or requires the consent of any Person (other than Holdings, the Borrower or a Restricted Subsidiary) that has not been obtained, (3) ~~any property or rights arising under or evidenced by any governmental licenses or state or local franchises, charters and authorizations~~[reserved] and (4) Capital Stock in any Person other than wholly owned Restricted Subsidiaries, to the extent prohibited by the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement, in each case except (A) to the extent that  the terms in such contract, license, agreement, instrument, state or local franchise, charter, authorization, Organizational Document, joint venture agreement, shareholders' agreement or other document, as applicable, providing for such prohibition, breach, default

or termination, or requiring such consent are not permitted under the terms of this Agreement ~~or~~, (B) to the extent that any Requirement of Law or the term in such contract, license, agreement, instrument, state or local franchise, charter, authorization, Organizational Document, joint venture agreement, shareholders' agreement or other document, as applicable, providing for such prohibition, breach, default or termination or requiring such consent is ineffective under the applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code and the PPSA) or principles of equity, and other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code, PPSA or other applicable law notwithstanding such prohibition or (C) such prohibition was created to evade the security requirements herein; _provided_ that notwithstanding the foregoing, such security interest shall attach immediately at such time as such Requirement of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived or such consent is obtained, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences;  (vii) any United States intent-to-use trademark or service mark application solely to the extent that, if any, and solely during the period in which, if any, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark or service mark application under Federal law; after such period, such trademark or service mark application shall automatically be subject to a security interest in favor of the Administrative Agent and shall be included in the Collateral; (viii) any particular assets if, in the reasonable judgment of the Borrower, evidenced in writing and determined in consultation with the Administrative Agent, obtaining a security interest in such assets or perfection thereof would result in a material adverse tax, accounting or regulatory consequence to the Borrower or any of its Subsidiaries; and (ix) those assets as to which the Administrative Agent and the Borrower agree, on or prior to the Closing Date and from time to time thereafter, that the costs of obtaining such a security interest or perfection thereof are excessive in relation to the value of the Lenders of the security afforded thereby.

"Excluded Foreign Subsidiary": any (i) First-Tier CFC Holdco or First-Tier Foreign Subsidiary ~~in respect of which~~to the extent that the pledge ~~of all~~ of the Capital Stock of such First-Tier CFC Holdco or such First-Tier Foreign Subsidiary as Collateral would, in the good faith judgment of the Borrower and the Administrative Agent, at the time provided or thereafter could reasonably be expected to result in material adverse tax consequences to the Borrower at the time or in the future; provided, that the Borrower hereby agrees to use all commercially reasonable efforts to overcome or eliminate any such material adverse tax consequences~~,~~ and (ii) any Subsidiary the Capital Stock of which is directly or indirectly owned by any First-Tier Foreign Subsidiary excluded pursuant to the forgoing clause (i); provided that, in no event shall a Canadian Subsidiary be an Excluded Foreign Subsidiary ~~and (iii) any Foreign Subsidiary to the extent~~ excluded by the application of the Agreed Security Principles.~~]~~1.

"Excluded Subsidiary": any Subsidiary of Holdings or the Borrower (i) that is not a Wholly-Owned Subsidiary (provided that such Subsidiary shall cease to be an Excluded Subsidiary at the time such Subsidiary becomes a Wholly Owned Subsidiary) and (ii) which is an Immaterial Subsidiary (provided that such Subsidiary shall cease to be an Excluded Subsidiary at the time such Subsidiary is no longer an Immaterial Subsidiary). Notwithstanding anything to the contrary set forth herein, no Subsidiary Guarantor shall constitute an Excluded Subsidiary by virtue of later becoming an "Excluded Subsidiary" under any clause of this definition, except as such Subsidiary Guarantor may be released under Section 8.9.

---

~~1 NTD: Foreign subsidiary group TBD.~~

"Excluded Swap Obligation": with respect to any Guarantor, its Obligations in respect of a Swap Agreement, if, and solely to the extent that, all or a portion of the guarantee of such Guarantor hereunder of, or the grant by such Guarantor of a security interest to secure, such Obligations under such Swap Agreement is or becomes illegal either under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act or under any other applicable law by virtue of such Guarantor's failure for any reason not to constitute under such law a type of entity permitted to incur Obligations in respect of a Swap Agreement.

"Existing Credit Agreement": that certain Amended and Restated Credit Agreement (First Lien), dated as of June 7, 2013 (as amended, restated, supplemented or otherwise modified, including pursuant to Amendment No. 1 (as defined therein), Amendment No. 2 (as defined therein), the Term Loan Borrower Assignment (as defined therein), Amendment No. 3 (as defined therein), the Joinder Agreement (as   defined therein), Amendment No. 4 (as defined therein), the Extension Agreement (as defined therein), Amendment No. 5 (as defined therein) and Amendment No. 6 (as defined therein), among Existing Holdings, the Borrower, the subsidiary guarantors party thereto, the several banks, financial institutions, institutional investors and other entities from time to time parties thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent.

"Existing Holdings": Carestream Health Holdings, Inc., as Delaware corporation.

"Existing Second Lien Credit Agreement": that certain Second Lien Credit Agreement, dated as of June 7, 2013 (as amended on June 9, 2017, December 27, 2018, April 11, 2019, January 29, 2020, April 13, 2020, May 8, 2020, October 14, 2020 and December 30, 2020), among Existing Holdings, the Borrower, the subsidiary guarantors party thereto, the lenders party thereto and Credit Suisse AG, Cayman Island Branch, as administrative agent.

"FATCA": as defined in Section 2.19(a).

"Federal Funds Effective Rate": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as  shall be set forth on the NYFRB's Website  from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Board": the Board of Governors of the Federal Reserve System of the United States of America.

"Fee Letter": the administrative agent fee letter dated as of August 20, 2022 between JPMorgan Chase Bank, N.A. and the Borrower.

"Fee Payment Date": (a) the fifteenth day after the last day of each March, June, September and December, (b) the Revolving Termination Date and (c) the date the Total Revolving Commitments are reduced to zero.

"Final Order": an order of the Bankruptcy Court, in form and substance consistent with the RSA and otherwise reasonably satisfactory to the Administrative Agent confirming the Chapter 11 Plan.

"Financial Performance Covenant" as defined in Section 9.3.

"First-Tier CFC Holdco": any CFC Holdco whose Capital Stock is directly owned by (i) the Borrower or (ii) any Domestic Subsidiary of the Borrower other than any CFC Holdco.

"First-Tier Foreign Subsidiary": any Foreign Subsidiary that is a controlled foreign corporation within the meaning of Section 957 of the Code and whose Capital Stock is directly owned by (i) the Borrower or (ii) any Domestic Subsidiary of the Borrower other than any CFC Holdco.

"Floor": the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR, as applicable. For the avoidance of doubt the initial Floor for each of Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR shall be 1.00%.

"Foreign Intellectual Property": the collective reference to all Intellectual Property solely to the extent such Intellectual Property (1) does not arise under United States or Canadian laws and (2) arises under laws of a jurisdiction other than the United States, any state or territory thereof or the District of Columbia or Canada or any province or territory thereof.

"Foreign Intellectual Property Subsidiary": a Foreign Subsidiary principally engaged in the business of owning, maintaining and licensing Foreign Intellectual Property.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary or a Canadian Subsidiary.

"Forms": as defined in Section 2.19(d).

"Funding Default": as defined in Section 2.17(e).

"Funding Office": the office of the Administrative Agent specified in Section 11.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time; provided, (i) that for purposes of Section 7.1 and the calculation of the Consolidated Fixed Charge Coverage Ratio, Total Net First Lien Leverage Ratio, the Total Net Leverage Ratio, and the Total Net Secured Leverage Ratio, GAAP shall be determined on the basis of such principles in effect on the Closing Date and consistent with those used in the preparation of the most recent audited financial statements referred to in Section 4.1 and (ii) for purposes of determining Capital Leases Obligations and Consolidated Capital Expenditures, GAAP shall be determined on the basis prior to giving effect to ASC 842. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then at the Borrower's request, the Administrative Agent shall enter into negotiations with the Borrower in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred (other than for purposes of delivery of financial statements under Section 6.1(a) and (b)). "Accounting Changes" refers to changes in

28

accounting principles (i) required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC or (ii) otherwise proposed by the Borrower to, and approved by, the Administrative Agent.

"Governmental Approval": any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"Governmental Authority": any nation or government, any state, province or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Member": the collective reference to Holdings, the Borrower and its Restricted Subsidiaries.

"Guarantee": as defined in Section 8.2.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantor Joinder Agreement": an agreement substantially in the form of Exhibit M.

"Guarantor Obligations": as defined in Section 8.1.

"Guarantors": the collective reference to Holdings and the Subsidiary Guarantors.

"Holdings": as defined in the preamble hereto.

"Immaterial Subsidiary": each Subsidiary (i) which, as of the most recent fiscal quarter of the Borrower, for the period of four consecutive fiscal quarters then ended, for which financial statements have been delivered pursuant to Section 6.1(a), contributed less than five percent (5%) of Consolidated EBITDA for such period and (ii) which had assets with a fair market value of less than five percent (5%) of the Total Assets as of such date; provided that, if at any time the aggregate amount of Consolidated EBITDA or Total Assets attributable to all Subsidiaries that are Immaterial Subsidiaries exceeds ten percent (10%) of Consolidated EBITDA for any such period or ten percent (10%) of Total Assets as of the end of any such fiscal year, the Borrower shall designate within 30 days of the date that financial statements were required to be delivered pursuant to Section 6.1(a) (and, if the Borrower has failed to do so within such time period, the Administrative Agent may designate) sufficient Subsidiaries as "Subsidiaries" to eliminate such excess, and such designated Subsidiaries shall no longer constitute Immaterial Subsidiaries under this Agreement.

"Incremental Amendment": as defined in Section 2.24(c).

"Incremental Facility Closing Date": as defined in Section 2.24(c).

"Incremental Revolving Lender": as defined in Section 2.24(a).

"Incremental Revolving Loans": as defined in Section 2.24(a).

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued liabilities incurred in the ordinary course of such Person's business); provided that earn-outs and other similar deferred consideration payable in connection with an acquisition shall constitute Indebtedness as and to the extent that the obligation related thereto is reflected on the balance sheet of such Person in accordance with GAAP, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all Disqualified Equity Interests of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, but only to the extent of the fair market value of such property subject to such Lien and (j) for the purposes of Sections 9.1(f) only, all net obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. For the avoidance of doubt, "Indebtedness" shall include neither obligations or liabilities of any Person in respect of any of its Qualified Equity Interests nor the obligations of any Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the date of this Agreement.

"Indemnitee": as defined in Section 11.5.

"Insolvency": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Intellectual Property": as defined in the Security Agreement.

"Intellectual Property Security Agreements": as defined in the Security Agreement.

"Intercreditor Agreement": the Intercreditor Agreement, dated as of the Closing Date, by and between the Administrative Agent and the Term Loan Administrative Agent under the Term Loan Credit Agreement, and acknowledged and agreed by the Borrower, Holdings, and the Subsidiary Guarantors and any other [Representative] (as defined therein) from time to time party thereto (as amended, restated, replaced, supplemented or otherwise modified from time to time.

"Interest Payment Date": (a) as to any ABR Loan, the last Business Day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Term Benchmark Loan, the last day of each Interest Period applicable to the Borrowing of which such Term Benchmark Loan is a part and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period, and the final maturity date of such Loan, (c) as to any RFR Loan, (1) each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such Loan (or, if there is no such numerically corresponding day in such month, then the last day of such month) and (2) the final maturity date of such Loan and (d) as to any Loan (other than any Loan that is an ABR Loan, except in the case of the repayment or prepayment of all Loans), the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Term Benchmark Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Term Benchmark Loan and ending one, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Term Benchmark Loan and ending one, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

       (i)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

       (ii)    the Borrower may not select an Interest Period with respect to any Revolving Facility that would extend beyond the Revolving Termination Date;

(iii)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month;

(iv)     the Borrower shall select Interest Periods so as not to require a scheduled payment of any Term Benchmark Loan during an Interest Period for such Loan;

(v)     if the Borrower shall fail to specify the Interest Period in any notice of borrowing of, conversion to, or continuation of, Term Benchmark Loans, the Borrower shall be deemed to have selected an Interest Period of one month; and

(vi)     no tenor that has been removed from this definition pursuant to Section 2.16(e) shall be available.

"Inventory": as defined in the Security Agreement.

"Investment Grade Rating": a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P.

"Investments": as defined in Section 7.7.

"Issuing Lender": JPMorgan Chase Bank, N.A. and Credit Suisse AG or any of their respective Affiliates or any of their respective branches, each in its capacity as issuer of any Letter of Credit and such other Lender or an Affiliate of a Lender that, with the approval of the Administrative Agent and the Borrower, agrees, pursuant to an agreement with and in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, to be bound by the terms hereof applicable to such Issuing Lender.

"Joint Bookrunners": collectively, the Joint Bookrunners listed on the cover page hereof.

"Joint Lead Arrangers": collectively, the Joint Lead Arrangers listed on the cover page hereof.

"JPMCB": JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors

"Judgment Currency": as defined in Section 11.24.

"Junior Indebtedness": collectively, (i) any Material Subordinated Indebtedness, (ii) any Indebtedness for borrowed money (other than the Term Loans, any Term Loan Incremental Equivalent Debt ranking *pari passu* in right of security with the Term Loans and any Permitted Refinancing Indebtedness in respect thereof) of any Group Member that is secured by a Lien on the Collateral (or any portion thereof) that is junior to the Lien on the Collateral (or any portion thereof) securing the Obligations and (iii) any Material Unsecured Indebtedness of any Group Member.

"Konica Minolta": Konica Minolta, Inc., a [ ]Japanese corporation.

"L/C Advance": with respect to each L/C Participant, such L/C Participant's funding of its participation in any Letter of Credit in accordance with Section 3.4(a).

"L/C Borrowing": an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Borrowing.

"L/C Commitment": $15,000,000.

"L/C Credit Extension": with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"L/C Exposure": at any time, the total L/C Obligations.  The L/C Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total L/C Exposure at such time.

"L/C Issuer Commitment": with respect to any Issuing Lender, $5,000,000 or such greater amount as agreed by such Issuing Lender.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": the collective reference to all the Revolving Lenders other than the Issuing Lenders.

"Latest Maturity Date": at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time.

"LCT Election": as defined in Section 1.6.

"LCT Test Date": as defined in Section 1.6.

"Lenders": as defined in the preamble hereto; provided, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Issuing Lender.

"Letters of Credit": as defined in Section 3.1(a).

"Letter of Credit Expiration Date": the earlier of (i) one year after the date of issuance or such longer period as consented to by the relevant Issuing Lenders and (ii) the day that is five (5) Business Days prior to the scheduled Revolving Termination Date (or, if such day is not a Business Day, the next succeeding Business Day); provided that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods, which in no event shall extend beyond the date in clause (ii) above.

"Liabilities": any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"Lien": any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Transaction": any Investment that the Borrower or a Restricted Subsidiary is contractually committed to consummate (it being understood that such commitment may be subject to conditions precedent, which conditions precedent may be amended, satisfied or waived in

accordance with the applicable agreement) and whose consummation is not conditioned on the availability or, or on obtaining, third party financing.

"Line Cap": at any time, an amount equal to the lesser of (a) the Total Revolving Commitments and (b) the Borrowing Base. "Loan": any loan made or maintained by any Lender pursuant to this Agreement, including Protective Advances.

"Liquidity": at any time, an amount equal to Unrestricted Cash plus Excess Availability.

"Loan Documents": this Agreement, the Intercreditor Agreement, the Notes, the Security Documents, an Incremental Amendment, if any, and solely for purposes of Section 9.1(e), the Commitment Letter and Fee Letter.

"Loan Modification Agreement": as defined in Section 2.27(b).

"Loan Modification Offer": as defined in Section 2.27(a).

"Loan Parties": shall mean Holdings, the Borrower and the Subsidiary Guarantors.

"Management Stockholders": the members of management of Holdings or its Subsidiaries and their Control Investment Affiliates who are holders of Capital Stock of Holdings or any direct or indirect parent company of Holdings on the Closing Date.

"Material Adverse Effect": a material adverse effect on (a) the business, assets, liabilities, operations, financial condition or operating results of the Borrower and its Restricted Subsidiaries taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their obligations under the Loan Documents or (c) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent, any Lender or any Secured Party hereunder or thereunder.

"Material Indebtedness": Indebtedness (other than the Loans) in an aggregate outstanding principal amount in excess of $35,000,000; provided that any Indebtedness outstanding under the Term Loan Credit Agreement shall be deemed to be Material Indebtedness.

"Material Subordinated Indebtedness": any Subordinated Indebtedness for borrowed money in an aggregate principal amount of $2,000,000 or more.

"Material Unsecured Indebtedness": any Indebtedness for borrowed money in an aggregate principal amount of $2,000,000 or more that is not secured by a Lien on any property of any Group Member.

"Materials of Environmental Concern": any chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances regulated under Environmental Law, including any petroleum or petroleum products, asbestos, polychlorinated biphenyls, lead or lead-based paints or materials, radon, urea-formaldehyde insulation, molds fungi, mycotoxins, and radioactivity or radiofrequency radiation that may have an adverse effect on human health or the environment.

"Maximum Amount": as defined in Section 11.18(a).

"Maximum Term Loan Incremental Amount": an amount equal to (A) the greater of (1) $100,000,000 and (2) 50% of Consolidated EBITDA (the "Base Incremental Amount") plus (B) an amount equal to all voluntary prepayments of the Term Loans made on or after the Closing Date (other than any such prepayments made with the proceeds of long-term indebtedness) (the "Voluntary

Prepayment Amount plus (C) an additional amount if, after giving effect to any such additional amount, the Total Net First Lien Leverage Ratio on a Pro Forma Basis (but without giving effect to the cash proceeds remaining on the balance sheet of such additional amount) as of the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or (b) of the Term Loan Credit Agreement, as the case may be, have been or were required to have been delivered pursuant to the terms thereof, does not exceed 2.50:1.00. To the extent that any portion of the Base Incremental Amount or Voluntary Prepayment Amount is used to incur Indebtedness pursuant to Section 7.2(a)(ii) or Section 7.2(b), such amount shall reduce the portion of the Base Incremental Amount or Voluntary Prepayment Amount, as applicable, available to incur Indebtedness pursuant to Section 7.2(b) or Section 7.2(a)(ii), respectively.

"Moody's": Moody's Investors Service, Inc., or any successor thereto.

"Mortgaged Properties": the real properties as to which, pursuant to Section 6.9(b) or otherwise, the Administrative Agent, for the benefit of the Secured Parties, shall be granted a Lien pursuant to the Mortgages, including each real property identified as a "Mortgaged Property" on Schedule 1.1C.

"Mortgages": each of the mortgages, deeds of trust, and deeds to secure debt or such equivalent documents hereafter entered into and executed and delivered by one or more of the Loan Parties to the Administrative Agent, in each case, in form and substance reasonably acceptable to the Administrative Agent.

"Multiemployer Plan": a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Multiple Employer Plan": a Plan which has two or more contributing sponsors at least two of whom as not under common control, as such plan is described in Section 4064 of ERISA.

"Net Cash Proceeds": (a) in connection with any Recovery Event or any Disposition, the proceeds thereof actually received in the form of cash and cash equivalents (including Cash Equivalents) (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of (i) attorneys' fees, accountants' fees, investment banking fees, and other bona fide fees, costs and expenses actually incurred in connection therewith, (ii) amounts required to be applied to the repayment of Indebtedness (x) secured by a Lien expressly permitted hereunder on any asset that is the subject of such Recovery Event or Disposition (other than any Lien pursuant to a Security Document) or (y) by a Subsidiary that is not a Loan Party, (iii) taxes paid and the Borrower's reasonable and good faith estimate of income, franchise, sales, and other applicable taxes required to be paid by Holdings, the Borrower or any Restricted Subsidiary in connection with such Recovery Event or any sale of assets, (iv) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to the seller's indemnities and representations and warranties to the purchaser in respect of such sale of assets owing by Holdings or any of its Restricted Subsidiaries in connection therewith and which are reasonably expected to be required to be paid; provided that to the extent such indemnification payments are not made and are no longer reserved for, such reserve amount shall constitute Net Cash Proceeds, (v) cash escrows to Holdings or any of its Restricted Subsidiaries from the sale price for such sale of assets; provided that any cash released from such escrow shall constitute Net Cash Proceeds upon such release, (vi) in the case of a Recovery Event, costs of preparing assets for transfer upon a taking or condemnation and (vii) other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account the reduction in tax liability resulting from any available operating losses and net operating loss carryovers, tax credits, and tax credit carry forwards, and similar tax attributes or deductions and any tax sharing arrangements), and

(b) in connection with any incurrence or issuance of Indebtedness, the cash proceeds received from any such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other bona fide fees and expenses actually incurred in connection therewith.

"Net Orderly Liquidation Value": with respect to Inventory of any Person, the orderly liquidation value thereof as determined in a manner acceptable to the Administrative Agent in its Permitted Discretion by an appraiser acceptable to the Administrative Agent, net of all costs of liquidation thereof.

"New York UCC": the Uniform Commercial Code as in effect from time to time in the State of New York.

"Non-Bank Revolving Percentage" means, at any time, the sum of the Revolving Percentages of Lenders that are not Regulated Banks.

"Non-Excluded Taxes": as defined in Section 2.19(a).

"Non-Guarantor Subsidiary": (i) any Excluded Subsidiary ~~of the Borrower acquired after the Closing Date in an Investment permitted under this Agreement which, at the time of such acquisition, is not a Wholly Owned Subsidiary of the Borrower; provided that any Non-Guarantor Subsidiary shall cease to be a Non-Guarantor Subsidiary at the time such Subsidiary becomes a Wholly Owned Subsidiary of the Borrower, (ii) any Immaterial Subsidiary; provided that any Non-Guarantor Subsidiary shall cease to be a Non-Guarantor Subsidiary at the time such Subsidiary is no longer an Immaterial Subsidiary and (iii) any Excluded Subsidiary or~~ and (ii) any Excluded Foreign Subsidiary described in clause (iii) of the definition of Excluded Foreign Subsidiary; provided that any Non-Guarantor Subsidiary shall cease to be a Non-Guarantor Subsidiary at the time such Subsidiary is no longer an Excluded Subsidiary or Excluded Foreign Subsidiary described in clause (iii) of the definition of Excluded Foreign Subsidiary.

"Non-U.S. Lender": as defined in Section 2.19(d).

"Note": a promissory note substantially in the form of Exhibit G.

"Notice of Intent to Cure": a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent, with respect to each period of four consecutive fiscal quarters for which a Cure Right will be exercised, on the earlier of the date the financial statements required under Section 6.1(a) or (b) have been or were required to have been delivered with respect to the most recent end of such period of four fiscal quarters, which certificate shall contain a computation of the applicable Event of Default and notice of intent to cure such Event of Default through the issuance of Permitted Cure Securities as contemplated under Section 9.3.

"NYFRB": the Federal Reserve Bank of New York.

"NYFRB Rate": for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds

broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"NYFRB's Website": the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans or the maturity of Cash Management Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower or any Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, Cash Management Obligations and all other obligations and liabilities of the Borrower or any other Loan Party (including with respect to guarantees) to the Administrative Agent, any Lender, any other Secured Party or any party to a Specified Swap Agreement or a party providing Cash Management Obligations, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement or any other Loan Document or any other document made, delivered or given in connection herewith or therewith or any Specified Swap Agreement (including guarantees thereof) or any document relating to Cash Management Obligations (including guarantees thereof), whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower or any Guarantor pursuant to any Loan Document), guarantee obligations or otherwise, but excluding any Excluded Swap Obligations.

"Organizational Document": (i) relative to each Person that is a corporation, its charter and its by-laws (or similar documents), (ii) relative to each Person that is a limited liability company, its certificate of formation and its operating agreement (or similar documents), (iii) relative to each Person that is a limited partnership, its certificate of formation and its limited partnership agreement (or similar documents), (iv) relative to each Person that is a general partnership, its partnership agreement (or similar document) and (v) relative to any Person that is any other type of entity, such documents as shall be comparable to the foregoing.

"Original Chapter 11 Plan": as defined in the recitals.

"Other Connection Taxes": with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or under any other Loan Document, Taxes imposed as a result of a present or former connection between such person and the jurisdiction imposing such Tax, including as a result of it carrying on a trade or business, having a permanent establishment in or being a resident of for Tax purposes in such jurisdiction (other than connections arising from such person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to this Agreement or enforced this Agreement or any other Loan Document).

"Other Taxes": any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment after the date of this Agreement (other than an assignment made pursuant to Section 2.22).

"Outstanding Amount": (a) with respect to the Loans on any date, the amount thereof after giving effect to any borrowings and prepayments or repayments of Loans (including any refinancing of outstanding unpaid drawings under Letters of Credit or L/C Credit Extensions as a Revolving Borrowing), as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the amount thereof on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Letters of Credit (including any refinancing of outstanding unpaid drawings under Letters of Credit or L/C Credit Extensions as a Revolving Borrowing) or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"Overnight Bank Funding Rate": for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parent Company": a direct or indirect parent company of the Borrower, the principal asset of which is the Borrower, which has no other material assets and has no material liabilities.

"Participant": as defined in Section 11.6(c).

"Participant Register": as defined in Section 11.6(c).

"PATRIOT Act": the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001, 31 U.S.C. Section 5318.

"Payment Conditions":

(a) no Event of Default has occurred and is continuing; and

(b) at all times during the Pro Forma Period (i) after giving effect to the proposed event as if it occurred on the first day of the Pro Forma Period, a daily average pro forma Specified Excess Availability greater than the greater of (x) 25.0% of the Line Cap and (y) $19,000,000, or (ii) after giving effect to the proposed event on a Pro Forma Basis as if it occurred on the first day of the Pro Forma Period or the most recently ended Reference Period, as applicable, (A) a daily average pro forma Specified Excess Availability during the Pro Forma Period greater than the greater of (x) 20.0% of the Line Cap and (y) $15,000,000 and (B) a Consolidated Fixed Charge Coverage Ratio for the most recently ended Reference Period greater than 1.00:1.00.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Pension Plan": any Plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA, (i) which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed to by, Holdings or the Borrower or (ii) with respect to which Holdings or the Borrower has any actual or contingent liability, including on account of a Commonly Controlled Entity.

"Permitted Amendments": (A) an extension of the final maturity date of the applicable Loans and/or Commitments of the Accepting Lenders, (B) a change in rate of interest (including a change to the Applicable Margin and any provision establishing a minimum rate), premium or other amount with respect to the applicable Loans and/or Commitments of the Accepting Lenders and/or a change in the payment of fees to the Accepting Lenders (such change and/or payments to be in the form of cash, Capital Stock or other property to the extent not prohibited by this Agreement), (C) any additional or different financial or other covenants or other provisions that are agreed between the Borrower, the Administrative Agent and the Accepting Lenders; provided such covenants and provisions are applicable only during periods after the Latest Maturity Date that is in effect on the effective date of such Permitted Amendment and (D) any other amendment to a Loan Document required to give effect to the Permitted Amendments described in clauses (A) to (C) above.

"Permitted Cure Securities": any Qualified Equity Interest in Holdings.

"Permitted Discretion": a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgement.

"Permitted Encumbrances": Liens permitted pursuant to Section 7.3(a), (b), (c), (d), (e), (h)(ii), (v) or (z); provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness (other than with respect to Section 7.3(h)(ii), (v) and (z)); provided further that, with respect to Section 7.3(h)(ii) and (z), any such Lien on ABL Priority Collateral does not have priority over the Lien in favor of the Administrative Agent.

"Permitted Investors": the collective reference to the Management Stockholders and each other Person that is an investor in Holdings or the immediate parent of Holdings on the Closing Date.

"Permitted Liens": as defined in Section 7.3.

"Permitted Refinancing": with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (excluding the effects of nominal amortization in the amount of no greater than one percent per annum), (c) at the time thereof, no Default shall have occurred and be continuing or would result therefrom, and (d) ~~if such Indebtedness being modified, refinanced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.2(a)(ii) or 7.2(b),~~ (i) to the extent such Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) to the extent Liens on the Collateral (or any portion thereof) securing such Indebtedness being modified, refinanced, refunded, renewed or extended are (x) subordinated to the Liens on the Collateral (or any portion thereof) securing the Obligations, the Liens, if any, securing such modification, refinancing, refunding, renewal or extension shall be subordinated to the Liens securing the Obligations to the same extent pursuant to an intercreditor agreement reasonably satisfactory to the Administrative

Agent or (y) pari passu to the Liens on the Collateral securing the Obligations, the Liens, if any, securing such modification, refinancing, refunding, renewal or extension shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent, (iii) with respect to any Indebtedness modifying, refinancing, refunding, renewing or extending Indebtedness under Section 7.2(a)(ii) or 7.2(b), (x) such Indebtedness shall be incurred by the Borrower or any Guarantor and shall not be guaranteed by any Restricted Subsidiary other than the Guarantors, and (y) if such Indebtedness is secured, (i) such Indebtedness shall only be secured by Collateral, (ii) the Liens securing such Indebtedness shall be junior, with respect to the ABL Priority Collateral, to the Liens on the Collateral securing the Obligations and (iii) a representative, trustee, collateral agent, security agent or similar Person acting on behalf of the holders of such Indebtedness shall become party to the Intercreditor Agreement or, in the case that the Liens securing such Indebtedness are junior with respect to the Liens on the Collateral securing the Obligations, such Indebtedness shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent, (iv) Indebtedness of a Subsidiary that is not a Guarantor shall not refinance Indebtedness of the Borrower or a Guarantor, (v) Indebtedness of the Borrower or a Restricted Subsidiary shall not refinance Indebtedness of a Subsidiary that is not a Guarantor and (vi) the other terms and conditions of such Indebtedness (excluding pricing, fees, rate floors, premiums, optional prepayment or optional redemption provisions and financial covenants) are either (a) substantially identical to the Indebtedness being refinanced, (b) (taken as a whole) not materially more favorable to the providers of such Permitted Refinancing than those applicable to the Indebtedness being refinanced or (c) on market terms for Indebtedness of the type being incurred pursuant to such Permitted Refinancing at the time of incurrence, except in each case for covenants or other provisions contained in such Indebtedness that are applicable only after the then Latest Maturity Date; provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days (or such shorter period acceptable to the Administrative Agent) prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (vi) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)).

"Permitted Tax Distributions": payments, Restricted Payments or distributions by the Borrower to Holdings (or any direct or indirect parent thereof) in order to pay consolidated or combined federal, state or local taxes attributable to the income of the Borrower, not payable directly by the Borrower or any of its Subsidiaries which payments, Restricted Payments or distributions by the Borrower are not in excess of the tax liabilities that would have been payable by the Borrower and its Subsidiaries on a stand-alone basis.

"Person": any individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a relevant time, any employee benefit plan (other than a Multiemployer Plan) that is covered by ERISA and in respect of which Holdings or the Borrower is (or, if such plan were terminated at such time, would be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform": as defined in Section 6.2(a).

"PPSA": the Personal Property Security Act (Ontario) and the regulations thereunder, as in effect from time to time (including the Securities Transfer Act, 2006 (Ontario), provided, however, if attachment, perfection or priority of Administrative Agent's security interests in any Collateral are

governed by the personal property security laws of any jurisdiction of Canada other than Ontario, "PPSA" shall mean those personal property security laws in such other jurisdiction for the purposes of the provisions hereof relating to such attachment, perfection or priority and for the definitions related to such provisions.

"Prime Rate": the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Private Lender Information": any information and documentation that is not Public Lender Information.

"Proceeding": any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Pro Forma Basis": for the purposes of calculating (a) Consolidated EBITDA for any period of four consecutive fiscal quarters (each, a "Reference Period"), (i) if at any time during such Reference Period (or after such Reference Period and through the applicable date of measurement or determination) the Borrower or any Restricted Subsidiary shall have made any Disposition or discontinued any operations, the Consolidated EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Disposition or discontinued operations for such Reference Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Reference Period and (ii) if at any time during such Reference Period (or after such Reference Period and through the applicable date of measurement or determination) the Borrower or any Restricted Subsidiary shall have made an Asset Acquisition or any acquisition of more than 50% of the Capital Stock of any Person, Consolidated EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto as if such Asset Acquisition or acquisition of more than 50% of the Capital Stock of any Person, occurred on the first day of such Reference Period (including, in each such case, pro forma adjustments (x) arising out of events which are directly attributable to a specific transaction described above, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the SEC, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring charges and (y) such other pro forma adjustments relating to a specific transaction or event described above and reflective of actual or reasonably anticipated synergies and cost savings expected to be realized or achieved in the 12 months following such transaction or event, which pro forma adjustments shall be certified by the chief financial officer, treasurer, controller or comptroller of the Borrower); provided that, the aggregate amount of such pro forma adjustments under clauses (x) and (y) and for purposes of testing compliance with the Consolidated Fixed Charge Coverage Ratio only, together with any addbacks under clause (e) in the definition of Consolidated EBITDA, in any period shall not exceed 15% of Consolidated EBITDA for such period, (b) Consolidated Total Debt for any Reference Period (and the amount of cash and Cash Equivalents which reduce Consolidated Total Debt under the Total Net First Lien Leverage Ratio, the Total Net Leverage Ratio and the Total Net Secured Leverage Ratio), Consolidated Total Debt (and such cash and Cash Equivalents) shall be calculated as of the last day of the applicable Reference Period after giving effect to any Consolidated Total Debt incurred or repaid on the last day of such Reference Period (or after such Reference Period and through the applicable date of measurement or determination) and (c) Consolidated Fixed Charges, (x) the

Consolidated Fixed Charges attributable to any Indebtedness assumed or incurred in connection with a Permitted Acquisition (as defined in the Term Loan Credit Agreement) consummated during the applicable Reference Period or subsequent to the applicable Reference Period and on or prior to the date of such calculation shall be included and (y) the Consolidated Fixed Charges attributable to any Indebtedness repaid or otherwise Disposed of during the applicable Reference Period or subsequent to the applicable Reference Period and on or prior to the date of such calculation shall be excluded. The term "Disposition" in this definition shall not include dispositions of inventory and other ordinary course dispositions of property. With respect to any assumption, incurrence, repayment or other Disposition of Indebtedness, if such Indebtedness has a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the date of calculation had been the applicable rate for the entire period (taking into account any Swap Obligations applicable to such Indebtedness if such Swap Obligation has a remaining term as at the date of calculation in excess of 12 months).

"Pro Forma Period": with respect to any Restricted Payment, Investment or prepayment of Indebtedness (any of the foregoing, a "Specified Event"), the period (a) commencing 90 days prior to the date such Specified Event is proposed by the Borrower to occur, provided that if 90 days has not lapsed since the Closing Date then the Pro Forma Period shall commence on the Closing Date and (b) ending on the date such Specified Event is proposed by the Borrower to occur.

"Pro Rata Share": with respect to (i) any Revolving Facility, and each Revolving Lender's share of such Revolving Facility, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Commitments of such Revolving Lender under such Revolving Facility at such time and the denominator of which is the amount of the aggregate Revolving Commitments under such Revolving Facility at such time; provided that if such Revolving Commitments have been terminated, then the Pro Rata Share of each Revolving Lender shall be determined based on the Pro Rata Share of such Revolving Lender under such Revolving Facility immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof, and (ii) with respect to each Lender and all Loans and Outstanding Amounts at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Outstanding Amount with respect to Loans and Commitments of such Lender at such time (plus such Lender's obligation to purchase participations in undrawn Letters of Credit) and the denominator of which is the Outstanding Amount (in aggregate) plus the amount of all Lenders' obligations to purchase participations in undrawn Letters of Credit at such time; provided that if all Outstanding Amounts have been repaid or terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Projections": as defined in Section 6.2(d).

"Properties": as defined in Section 4.17(a).

"Protective Advance Exposure": at any time, the sum of the aggregate amount of all outstanding Protective Advances at such time. The Protective Advance Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total Protective Advance Exposure at such time.

"Protective Advances": as defined in Section 2.6.

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender Information": information and documentation that is either exclusively (i) of a type that would be publicly available if Holdings, the Borrower and their respective Subsidiaries were public reporting companies or (ii) not material with respect to Holdings, the Borrower and their respective Subsidiaries or any of its securities for purposes of foreign, United States Federal and state securities laws.

"Public Market": at any time after (a) a Public Offering has been consummated and (b) at least 15% of the total issued and outstanding common equity of Holdings or Holdings' immediate parent has been distributed by means of an effective registration statement under the Securities Act or sale pursuant to Rule 144 under the Securities Act.

"Public Offering": an initial underwritten public offering of common Capital Stock of Holdings or Holdings' direct or indirect parent pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (other than a registration statement on Form S-8 or any successor form).

"QFC": has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support": as defined in Section 11.25.

"Qualified Counterparty": with respect to any Swap Agreement, any counterparty thereto that, at the time such Swap Agreement was entered into or (if later) as of the Closing Date, is the Administrative Agent, a Joint Lead Arranger or a Lender (or an Affiliate of the foregoing).

"Qualified ECP": at any date and in respect of any Obligation in respect of a Swap Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, (i) the Borrower and (ii) each Guarantor that has total assets exceeding $10,000,000 at the time such Obligations are incurred.

"Qualified Equity Interests": any Capital Stock that is not a Disqualified Equity Interest.

"Qualified Public Offering": a Public Offering that results in a Public Market.

"Receivables Facility": a factoring, securitization or similar receivables financing facility pursuant to which (i) a Non-Guarantor Subsidiary sells Receivables Facility Assets to a Person that is not a Loan Party; provided that such Receivables Facility Assets were not generated by or transferred to a Non-Guarantor Subsidiary by a Loan Party, or (ii) the Borrower or a Restricted Subsidiary of the Borrower sells Receivables Facility Assets to a Receivables Facility Subsidiary or to any other Person that is not an Affiliate of the Borrower, which sale of Receivables Facility Assets (a) shall be non-recourse to the Borrower or any of their respective Restricted Subsidiaries for losses and claims arising from the financial inability to pay of any obligor, guarantor or other Person in respect of such Receivables Facility Assets, and (b) may involve the granting of security interests in such Receivables Facility Assets by such Receivables Facility Subsidiary to one or more third parties providing credit in connection with such Receivables Facility; provided that only with respect of this clause (ii)(x) the Borrower or such Restricted Subsidiary shall receive cash proceeds from the financing of Receivables Facility Assets in an amount that at all times equals or exceeds, in the aggregate, 70% of the aggregate face amount of such Receivables Facility Assets and (y) the facility limit or purchase limit under any such transaction shall not exceed $10,000,000 in the aggregate at any time.

"<u>Receivables Facility Assets</u>": accounts, payment intangibles and related assets of the Borrower or a Restricted Subsidiary arising in the ordinary course of business.

"<u>Receivables Facility Subsidiary</u>": a Person to which the Borrower or a Restricted Subsidiary sells, conveys, transfers or grants a security interest in Receivables Facility Assets, which Person is formed for the limited purpose of effecting one or more securitizations involving the Receivables Facility Assets.

"<u>Receivables Facility Undertakings</u>": representations, warranties, covenants, repurchase obligations and indemnities entered into by the Borrower or a Restricted Subsidiary of the Borrower that the Borrower has determined in good faith to be customary in financings similar to Receivables Facilities, including, without limitation, those relating to the servicing of the assets of a Receivables Facility Subsidiary.

"<u>Recovery Event</u>": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation, eminent domain or similar proceeding relating to any asset of any Group Member.

"<u>Reference Period</u>": as defined in the definition of "Pro Forma Basis".

"<u>Reference Time</u>": with respect to any setting of the then-current Benchmark, (1) if such Benchmark is the Term SOFR Rate, 5:00 a.m. (Chicago time) on the day that is two U.S. Government Business Days preceding the date of such setting, (2) if the RFR for such Benchmark is Daily Simple SOFR, then four Business Days prior to such setting  or (3) if such Benchmark is not the Term SOFR Rate or Daily Simple SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"<u>Refinance</u>": in respect of any Indebtedness, to refinance, redeem, defease, refund, extend, renew or repay any Indebtedness with the proceeds of other Indebtedness, or to issue other Indebtedness, in exchange or replacement for, such Indebtedness in whole or in part; "<u>Refinanced</u>" and "<u>Refinancing</u>" shall have correlative meanings.

"<u>Register</u>": as defined in <u>Section 11.6(b)(vi)</u>.

"<u>Regulated Bank</u>": an Approved Bank that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board of Governors under 12 CFR part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to in clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"<u>Regulation U</u>": Regulation U of the Board as in effect from time to time.

"<u>Reimbursement Obligation</u>": the obligation of the Borrower to reimburse the Issuing Lenders pursuant to <u>Section 3.5</u> for amounts drawn under Letters of Credit.

"<u>Related Parties</u>": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Relevant Governmental Body": the Federal Reserve Board and/or the NYFRB or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate": (1) with respect to any Term Benchmark Borrowing, the Adjusted Term SOFR Rate or (2) with respect to any RFR Borrowing, the Adjusted Daily Simple SOFR, as applicable.

"Repayments": as defined in Section 7.8(a).

"Report": reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Borrowing Base Loan Parties from information furnished by or on behalf of the Borrowing Base Loan Parties, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent. "Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under applicable regulations.

"Required Lenders": at any time, the holders of more than 50% the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding.

"Requirement of Law": as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves": any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, to maintain (including an availability reserve, reserves for accrued and unpaid interest on the Obligations, reserves for Cash Management Obligations then provided or outstanding, volatility reserves, reserves for rent and utility expenses at locations leased by any Borrowing Base Loan Party and for consignee's, warehousemen's and bailee's charges (provided, that, such Reserves will not exceed the aggregate of the amounts payable to such owners, lessors, consignees, warehouseman, bailees and utilities for the next three (3) months from any such time and including in each case amounts, if any, then outstanding and unpaid owed by any Borrowing Base Loan Party to such owners, lessors, consignees, warehouseman, bailees and utilities, but such limitations will only apply so long as no Event of Default exists or has occurred and is continuing), reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Specified Swap Obligations then outstanding, reserves for contingent liabilities of any Borrowing Base Loan Party, reserves for uninsured losses of any Borrowing Base Loan Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation, Canadian Priority Payables Reserves and reserves for taxes (including Canadian Goods and Services Taxes, Provincial Sales Taxes, harmonized sales taxes, withholding taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Borrowing Base Loan Party.

Notwithstanding anything to the contrary in this Agreement, (a) such Reserves shall not be established or changed except upon not less than three (3) Business Days' prior written notice to the Borrower (such three (3) Business Days (or longer) period the "Review Period"), which notice shall include a reasonably detailed description of such Reserve being established (during which period (i) the Administrative Agent shall, if requested, discuss any such Reserve or change with the Borrower and (ii) the Borrower may take such action as may be required so that the event, condition or matter that is the

basis for such Reserve or change thereto no longer exists or exists in a manner that would result in the establishment of a lower Reserve or result in a lesser change thereto, in a manner and to the extent reasonably satisfactory to the Administrative Agent); provided that (i) if consultation with the Borrower and/or notice to the Borrower and the Lenders is not practicable or if failure to implement any such change within a shorter time period would, in the good faith judgment of the Administrative Agent, reasonably be expected to result in a Material Adverse Effect or materially and adversely affect the Collateral or the rights of the Lenders under the Loan Documents, such change may be implemented within a shorter time as determined by the Administrative Agent in its Permitted Discretion and (ii) any borrowings or issuances of Letters of Credit made during the Review Period shall be made based on the Borrowing Base as modified by the proposed new or modified Reserves, (b) the amount of any Reserve established by the Administrative Agent, and any change in the amount of any Reserve, shall have a reasonable relationship to the event, condition or other matter that is the basis for such Reserve or such change as determined by the Administrative Agent in good faith, (c) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria, (d) no reserves shall be imposed on the first 5% of dilution of accounts receivable and thereafter no dilution reserve shall exceed 1% for each incremental whole percentage in dilution over 5% and (e) no reserves may be taken after the Closing Date based on circumstances, conditions, events or contingencies known to the Administrative Agent as of the Closing Date and for which no reserves were imposed on the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in any material adverse respect since the Closing Date.

"<u>Resolution Authority</u>": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>": the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, controller or comptroller of the Borrower, as applicable, but in any event, with respect to financial matters, the chief financial officer, treasurer, assistant treasurer, controller or comptroller of the Borrower.

"<u>Restricted Payments</u>": as defined in <u>Section 7.6</u>.

"<u>Restricted Subsidiary</u>": any Subsidiary of the Borrower other than any Unrestricted Subsidiary.

"<u>Revolving Borrowing</u>": a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of Term Benchmark Loans, having the same Interest Period made by each of the Lenders.

"<u>Revolving Commitment</u>": as to any Lender, the obligation of such Lender, if any, to make Revolving Loans and participate in Letters of Credit and Protective Advances in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Commitment" opposite such Lender's name on <u>Schedule 1.1A</u> or in the Assignment and Assumption or Incremental Amendment pursuant to which such Lender became a party hereto, as applicable, as the same may be changed from time to time pursuant to the terms hereof. The original amount of the Total Revolving Commitments is $85,000,000.

"<u>Revolving Commitment Decrease Lender</u>" as defined in <u>Section 2.24(d)</u>.

"<u>Revolving Commitment Increase</u>": as defined in <u>Section 2.24(a)</u>.

"Revolving Commitment Increase Lender": as defined in Section 2.24(d).

"Revolving Commitment Period": the period from and including the Closing Date to the Revolving Termination Date.

"Revolving Excess": as defined in Section 2.11(a).

"Revolving Extensions of Credit": as to any Revolving Lender at any time to an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans held by such Lender then outstanding, (b) such Lender's Revolving Percentage of the L/C Obligations then outstanding and (c) such Lender's Revolving Percentage of the Protective Advances then outstanding.

"Revolving Facility": any Class of Revolving Commitments and the extensions of credit made thereunder, as the context may require.

"Revolving Lender": each Lender that has a Revolving Commitment or that holds Revolving Loans.

"Revolving Loans": as defined in Section 2.4(a).

"Revolving Percentage": as to any Revolving Lender at any time, the percentage which such Lender's Revolving Commitment then constitutes of the Total Revolving Commitments or, at any time after the Revolving Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Loans then outstanding constitutes of the aggregate principal amount of the Revolving Loans then outstanding; provided that in the event that the Revolving Loans are paid in full prior to the reduction to zero of the Total Revolving Extensions of Credit, the Revolving Percentages shall be determined in a manner designed to ensure that the other outstanding Revolving Extensions of Credit shall be held by the Revolving Lenders on a comparable basis.

"Revolving Termination Date": [  ], 202[  ][21].

"RFR Borrowing": as to any Borrowing, the RFR Loans comprising such Borrowing.

"RFR Loans": Loans the rate of interest applicable to which is based upon the Adjusted Daily Simple SOFR.

"RSA": the Restructuring Support Agreement, dated as of August 21, 2022 among the Debtors, the "Consenting Creditors" party thereto and the "Consenting Parties" party thereto, as such agreement may have been amended, modified or supplemented prior to the Effective Date (as defined in the Chapter 11 Plan).

"Sale Leaseback Transaction": any arrangement with any Person or Persons, whereby in contemporaneous or substantially contemporaneous transactions Holdings, the Borrower or any of their respective Restrictive Subsidiaries sells substantially all of its right, title and interest in any property and, in connection therewith, a Holdings, the Borrower or any of their respective Restrictive Subsidiaries acquires, leases or licenses back the right to use all or a material portion of such property.

---

[21] To be the date that is 4.5 years from the Closing Date.

"Sanctioned Territory": at any time, a country or territory which is the subject or target of comprehensive Sanctions, including, as of the Closing Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic and the Crimea regions of Ukraine, Cuba, Iran, North Korea, and Syria.

"Sanctioned Person": at any time, any Person (a) ~~any Person~~ listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, ~~Her~~His Majesty's Treasury of the United Kingdom, the Government of Canada (or the government of any province or territory thereof) or any other relevant sanctions authority, (b) ~~any Person~~that is a Governmental Authority of a Sanctioned Territory, (c) located, organized or resident in a Sanctioned ~~Country~~Territory, (~~e~~d) ~~any Person~~ 50 ~~percent~~% or more owned or, where relevant under applicable Sanctions, controlled by one or more Persons identified in clause (a) ~~or~~ (b) or (~~d~~c) or (e) any Person with whom dealings are prohibited under Sanctions.

"Sanctions": as defined in Section 4.11(c).

"S&P": Standard & Poor's Ratings Services, or any successor thereto.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Parties": the collective reference to the Administrative Agent, the Lenders (including any Issuing Lender in its capacity as Issuing Lender), any Qualified Counterparties and banks or financial institutions providing Cash Management Obligations.

"Securities Account": as defined in the Security Agreement.

"Securities Act": the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreement": the Pledge and Security Agreement, dated as of [ ], 2022, made by the grantors party thereto in favor of the Administrative Agent, substantially in the form of Exhibit A-1.

"Security Documents": the collective reference to the Security Agreement, the Intellectual Property Security Agreements, ~~[the Mortgages,]~~ Deposit Account Control Agreements, the Canadian Pledge and Security Agreement, charge or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as Collateral in accordance (solely with respect to assets and property of (or the Capital Stock of) Specified Foreign Guarantors) with the Agreed Security Principles and all other security documents hereafter delivered to the Administrative Agent granting (or purporting to grant) a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Seller's Retained Interest": in respect of a Receivables Facility, the debt or equity interests held by the Borrower in the Receivables Facility Subsidiary to which Receivables Facility Assets have been transferred, including any such debt or equity received as consideration for or as a portion of the purchase price for the Receivables Facility Assets transferred, or any other instrument through which the Borrower has rights to or receives distributions in respect of any residual or excess interest in the Receivables Facility Assets.

"Senior Representative": with respect to any series of Indebtedness permitted to be incurred hereunder, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Significant Group Member": at any date of determination, each Subsidiary or group of Subsidiaries of the Borrower (a) whose total assets at the last day of the most recent fiscal period for which financial statements have been delivered were equal to or greater than 7.5% of the Total Assets at such date or (b) whose gross revenues for the most recently completed period of four fiscal quarters for which financial statements have been delivered were equal to or greater than 7.5% of the consolidated gross revenues of the Borrower and its Subsidiaries for such period, in each case, determined in accordance with GAAP (it being understood that such calculations shall be determined in the aggregate for all Subsidiaries of the Borrower subject to any of the events specified in Section 9.1(g)).

"SOFR": a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator": the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website": the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date": as defined in the definition of "Daily Simple SOFR".

"SOFR Rate Day": as defined in the definition of "Daily Simple SOFR".

"Solvent": with respect to any Person and its Subsidiaries on a consolidated basis, means that as of any date of determination, (a) the sum of the "fair value" of the assets of such Person will, as of such date, exceed the sum of all debts of such Person as of such date, as such quoted terms are determined in accordance with applicable federal, provincial, territorial and state laws governing determinations of the insolvency of debtors, (b) the "present fair saleable value" of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability on existing debts of such Person as such debts become absolute and matured, as such quoted term is determined in accordance with applicable federal, provincial, territorial and state laws governing determinations of the insolvency of debtors, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct any business in which it is or is about to become engaged and (d) such Person does not intend to incur, or believe or reasonably should believe that it will incur, debts beyond its ability to pay as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured. For purposes of this definition, the amount of any contingent, unliquidated and disputed claim and any claim that has not been reduced to judgment at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such liabilities meet the criteria for accrual under GAAP ASC 450).

"Specified Class": as defined in Section 2.27(a).

"Specified Event of Default": any Event of Default pursuant to Section 9.1(a), Section 9.1(b) (but only with respect to any Borrowing Base Certificate), Section 9.1(c) (but only with respect to a breach of Section 7.1), Section 9.1(d) (with only with respect to a breach of Section 6.2(e)(i), Section 6.2(e)(iv) or Section 6.10) or Section 9.1(g).

"Specified Excess Availability": the sum of (i) Excess Availability and (ii) the amount (not to exceed 2.5% of the Total Revolving Commitments then in effect) by which the Borrowing Base then in effect exceeds the Total Revolving Commitments then in effect.

"Specified Foreign Guarantors": ~~each~~any Foreign Subsidiary~~, except for each Excluded Foreign~~ (i) to the extent not excluded by the application of the Agreed Security Principles and (ii) under clause (ii) of the definition of "Subsidiary Guarantor".

"Specified Rate": as defined in Section 2.14(e).

"Specified Swap Agreement": any Swap Agreement entered into by the Borrower or any of its Restricted Subsidiaries on the one hand, and any Qualified Counterparty (or any Person who was a Qualified Counterparty as of the date such Swap Agreement was entered into or (if later) as of the Closing Date) on the other hand, in respect of interest rates, currencies and commodities to the extent permitted under Section 7.11, and any guarantee thereof by a Loan Party.

"Specified Swap Obligations": Swap Obligations of any Loan Party owing to one or more Qualified Counterparty (or any Person who was a Qualified Counterparty as of the date such Swap Agreement was entered into or (if later) as of the Closing Date); provided that at or prior to the time that any transaction relating to such Swap Obligation is executed (or, if later, the Closing Date) the Borrower (other than for transactions with JPMCB and its Affiliates) and the applicable Qualified Counterparty (other than JPMCB) shall have delivered written notice to the Administrative Agent that such a transaction has been entered into and that it constitutes a Specified Swap Obligation entitled to the benefits of the Security Documents.

"Specified Transaction: as defined in Section 1.6.

"Subordinated Indebtedness": any Indebtedness of any Group Member that is subordinated in right of payment to the Obligations; provided that, for the avoidance of doubt, Indebtedness under the Term Loan Credit Agreement shall not be considered Subordinated Indebtedness.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other Capital Stock having ordinary voting power (other than stock or such other Capital Stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower; provided that such references to a "Subsidiary" or "Subsidiaries" shall not include any Receivables Facility Subsidiary.

"Subsidiary Acquisition": any acquisition by the Borrower or any Restricted Subsidiary of at least a majority of the outstanding Capital Stock of Persons or an Asset Acquisition.

"Subsidiary Guarantor": (i) each Restricted Subsidiary of the Borrower that is a Domestic Subsidiary or a Canadian Subsidiary (in each case, other than a Non-Guarantor Subsidiary) and (ii) each other Restricted Subsidiary that is an obligor under or guarantor in respect of the Term Loans, Indebtedness permitted under Section 7.2(b) or any Permitted Refinancing in respect of the foregoing.

"Supermajority Lenders": at any time, the holders of more than 66 2/3% the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding; provided that as long as there are two or more Lenders, Supermajority Lenders shall include at least two unaffiliated Lenders.

"Supported QFC": as defined in Section 11.25.

"Swap Agreement": any agreement with respect to any swap, cap, collar, hedge, forward, future or derivative transaction or option or similar agreement, whether cleared or uncleared, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Group Member shall be a "Swap Agreement".

"Swap Obligation": with respect to any Person, any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"Taxes": as defined in Section 2.19(a).

"Term Benchmark": when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"Term Benchmark Loans": Loans the rate of interest applicable to which is based upon the Adjusted Term SOFR Rate.

"Term Loan Administrative Agent": JPMCB, as administrative agent under the Term Loan Documents, and its successors and assigns.

"Term Loan Credit Agreement": the Term Loan Credit Agreement, dated as of the Closing Date, among the Borrower, the lenders and agents party thereto and the Term Loan Administrative Agent.

"Term Loan Documents": collectively (a) the Term Loan Credit Agreement, (b) the Term Loan Security Documents, (c) the Intercreditor Agreement, (d) any promissory note evidencing loans under the Term Loan Credit Agreement and (e) any amendment, waiver, supplement or other modification to any of the documents described in clauses (a) through (d).

"Term Loan Incremental Equivalent Debt": any Indebtedness incurred by a Loan Party in the form of one or more series of secured or unsecured bonds, debentures, notes or similar instruments or term loans; provided that (a) if such Indebtedness is secured, (i) such Indebtedness shall only be secured by Collateral, (ii) the liens securing such Indebtedness shall be junior, with respect to the ABL Priority

Collateral, to the Liens on the Collateral securing the Obligations and (iii) a Senior Representative, trustee, collateral agent, security agent or similar Person acting on behalf of the holders of such Indebtedness shall have become party to Intercreditor Agreement or, in the case that the Liens securing such Indebtedness is junior with respect to all Collateral, such Indebtedness shall be subject to an intercreditor agreement reasonably satisfactory to the Administrative Agent, (b) such Indebtedness does not mature ~~earlier than~~or have scheduled amortization or payments of principal and is not subject to mandatory redemption or prepayment (except customary asset sale or change of control provisions), in each case prior to  the date that is 9180 days after the then Latest Maturity Date then in effect at the time of incurrence thereof, (c) such Indebtedness contains covenants, events of default and other terms that are customary for similar Indebtedness in light of then-prevailing market conditions and, when taken as a whole (other than interest rates, rate floors, fees and optional prepayment or redemption terms), are not more favorable to the lenders or investors providing such Term Loan Incremental Equivalent Debt, as the case may be, than those set forth in the Loan Documents are with respect to the Lenders (other than covenants or other provisions applicable only to periods after the Latest Maturity Date then in effect at the time of incurrence thereof); provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness or the modification, refinancing, refunding, renewal or extension thereof (or such shorter period of time as may reasonably be agreed by the Administrative Agent), together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the material definitive documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirements shall be conclusive, (d) such Indebtedness does not provide for any mandatory prepayment, redemption or repurchase (other than excess cash flow, upon a change of control, fundamental change, customary asset sale or event of loss mandatory offers to purchase and customary acceleration rights after an event of default and, for the avoidance of doubt, rights to convert or exchange into Capital Stock of the Borrower in the case of convertible or exchangeable Indebtedness) prior to the date that is 9180 days after the Latest Maturity Date then in effect at the time of incurrence thereof and (e) such Indebtedness is not guaranteed by any Person other than Loan Parties.

"Term Loan Priority Collateral": as defined in the Intercreditor Agreement.

"Term Loan Security Documents": the "Security Documents" as defined in the Term Loan Credit Agreement and all other security documents hereafter delivered to the Term Loan Administrative Agent granting (or purporting to grant) a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Term Loan Documents.

"Term Loans": loans outstanding under the Term Loan Credit Agreement.

"Term SOFR Determination Day": as defined in the definition of Term SOFR Reference Rate.

"Term SOFR Rate": with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate": for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Borrowing denominated in Dollars and for any tenor comparable to the applicable Interest Period, the rate per annum published by the CME Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based

on SOFR. If by 5:00 pm (New York City time) on such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) preceding U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"<u>Total Assets</u>": the total amount of all assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP as shown on the most recent balance sheet of the Borrower.

"<u>Total Net First Lien Leverage Ratio</u>": as at the last day of any period, the ratio of (a) the excess of (i) Consolidated Total Debt that is secured by a first priority lien on any of the assets or property of any Loan Party or any Restricted Subsidiary of the Borrower (including the Loans) (it being understood that the Term Loans and any other Consolidated Total Debt that is secured by Liens on all or a portion of the Collateral that are senior to, or pari passu with, the Liens on such Collateral securing the Loans shall be included) over (ii) the amount of Unrestricted Cash of the Borrower and its Restricted Subsidiaries on such date to (b) Consolidated EBITDA for such period.

"<u>Total Net Leverage Ratio</u>": as at the last day of any period, the ratio of (a) the excess of (i) Consolidated Total Debt on such day over (ii) the amount of Unrestricted Cash of the Borrower and its Restricted Subsidiaries on such date to (b) Consolidated EBITDA for such period.

"<u>Total Net Secured Leverage Ratio</u>": as at the last day of any period, the ratio of (a) the excess of (i) Consolidated Total Debt that is secured by a lien on the assets or property of any Loan Party or any Restricted Subsidiary of the Borrower over (ii) the amount of Unrestricted Cash of the Borrower and its Restricted Subsidiaries on such date to (b) Consolidated EBITDA for such period.

"<u>Total Revolving Commitments</u>": at any time, the aggregate amount of the Revolving Commitments then in effect.

"<u>Total Revolving Extensions of Credit</u>": at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Lenders outstanding at such time.

"<u>Transactions</u>": collectively, (a) the execution, delivery and performance by the Borrower and the other Loan Parties of this Agreement, the borrowing of Loans hereunder and the use of proceeds thereof, (b) the execution, delivery and performance by the Borrower and the other Loan Parties of the Term Loan Credit Agreement, the borrowing of Term Loans thereunder and the use of proceeds thereof, and (c) the other transactions contemplated by the Chapter 11 Plan.

"<u>Transferee</u>": any Assignee or Participant.

"<u>Type</u>": as to any Loan, its nature as an ABR Loan, a Term Benchmark Loan or an RFR Loan.

"<u>UK Financial Institution</u>": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from

time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement": the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures": for any period, to the extent paid in cash, the aggregate amount of Consolidated Capital Expenditures made by the Borrower and its Restricted Subsidiaries during such period (other than Consolidated Capital Expenditures to the extent financed with the proceeds of any incurrence of Indebtedness (other than the incurrence of any Revolving Loans), proceeds from Dispositions or proceeds from the issuance of Capital Stock).

"Uniform Commercial Code" or "UCC": the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"United States": the United States of America.

"Unrestricted Cash": cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries on such date that are free and clear of any Lien (other than Liens permitted under clauses (a), (h), (i), (l), (w) and (z) of Section 7.3).

"Unrestricted Subsidiary": (i) any Subsidiary (other than a Subsidiary in existence as of the Closing Date) of Holdings designated by the board of directors of Holdings as an Unrestricted Subsidiary pursuant to Section 6.13 subsequent to the Closing Date and (ii) any Subsidiary of an Unrestricted Subsidiary.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Voluntary Pro Rata Payments": as defined in Section 2.17(b).

"Weighted Average Life to Maturity": when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary Guarantor": any Subsidiary Guarantor that is a Wholly Owned Subsidiary of the Borrower.

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law and similar requirements under other applicable laws) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"<u>Write-Down and Conversion Powers</u>": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2     <u>Other Interpretive Provisions</u>.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in <u>Section 1.1</u> and accounting terms partly defined in <u>Section 1.1</u>, to the extent not defined, shall have the respective meanings given to them under GAAP; (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations (including any of the Loan Documents) shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated, amended and restated or otherwise modified from time to time. For purposes of this Agreement and the other Loan Documents, where the permissibility of a transaction or determinations of required actions or circumstances depend upon compliance with, or are determined by reference to, amounts stated in Dollars, any requisite currency translation shall be the Dollar Equivalent  in effect on the Business Day immediately preceding the date of such transaction (except for such other time periods as provided for in <u>Section 7.2</u>) or determination and shall not be affected by subsequent fluctuations in exchange rates. Any determinations as to the Dollar Equivalent of Letters of Credit denominated in an Alternate Currency (whether for purposes of calculating the amount of L/C Obligations or fees payable in respect of Letters of Credit or the amount required to be paid to the applicable Issuing Lender in respect of a drawing on a Letter of Credit or otherwise), the amount of fees owing in respect of Letters of Credit denominated in an Alternate Currency and the amount of Reimbursement Obligations owing to the applicable Issuing Lender shall be made by the Administrative Agent and such determination shall be conclusive absent manifest error.

(c)     For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim", "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the Uniform Commercial Code or the

PPSA shall include publication under the Civil Code of Québec, (g) all references to "perfection" of or "perfected" Liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favor of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatory or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies", as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.

(d)     The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(e)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3     Accounting. For purposes of all financial definitions and calculations in this Agreement, there shall be excluded for any period the effects of purchase accounting (including the effects of such adjustments pushed down to Holdings and its Subsidiaries) in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, post-employment benefits, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to Holdings and its Subsidiaries), as a result of the Transactions, any acquisition consummated prior to the Closing Date, any Subsidiary Acquisition or the amortization or write-off of any amounts thereof. References to financial statements delivered pursuant to Section 6.1(a) or Section 6.1(b) for purposes of calculating any financial ratio referenced herein shall, for periods not covered by such financial statements or periods prior to such delivery, include Consolidated EBITDA for the period referenced in the last sentence of the definition of Consolidated EBITDA.

1.4     Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

1.5     Interest Rates; Benchmark Notification. The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.16(b) provides a mechanism for determining an alternative rate of interest.  The Administrative

Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including with-out limitation, whether the composition or characteristics of any such alternative, successor or re-placement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

      1.6    <u>Limited Condition Transactions</u>. Notwithstanding anything in this Agreement or any Loan Document to the contrary when (i) calculating any applicable ratio or financial test (other than Excess Availability or Specified Excess Availability) or (other than in connection with the making of any Revolving Extension of Credit) determining whether any Default or Event of Default has occurred, is continuing or would result from any action, in each case, pursuant to <u>Section 7.2</u>, <u>Section 7.3</u>, <u>Section 7.5</u>, <u>Section 7.6</u> or <u>Section 7.7</u> in connection with the incurrence of Indebtedness, the creation of Liens, the making of any Disposition, the making of an Investment, the making of a Restricted Payment, the designation of a Subsidiary as restricted or unrestricted or the repayment of Indebtedness (each, a "<u>Specified Transaction</u>") or (ii) determining the accuracy of any representation or warranty (other than in connection with the making of any Revolving Extension of Credit), in each case of clauses (i) and (ii) in connection with a Limited Condition Transaction, the date of determination of such ratio or financial test, the accuracy of such representation or warranty (but taking into account any earlier date specified therein) or whether any Default or Event of Default has occurred, is continuing or would result therefrom shall, at the option of the Borrower (the Borrower's election to exercise such option in connection  with any Limited Condition Transaction, an "<u>LCT Election</u>"), be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into (the "<u>LCT Test Date</u>"). If on a Pro Forma Basis after giving effect to such Limited Condition Transaction and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios, financial tests, representations and warranties and absence of defaults are calculated as if such Limited Condition Transaction or other transactions had occurred at the beginning of the most recent Reference Period ending prior to the LCT Test Date for which financial statements are available, the Borrower could have taken such action on the relevant LCT Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, (i) if any of such ratios, financial tests, representations and warranties or absence of defaults are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Consolidated EBITDA), a change in facts and circumstances or other provisions at or prior to the consummation of the relevant Limited Condition Transaction, such ratios, representations and warranties and absence of defaults will not be deemed to have been exceeded, breached, or otherwise failed as a result of such fluctuations or changed circumstances solely for purposes of determining whether the Limited Condition Transaction and any related transactions is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Transaction or related Specified Transactions.  If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any subsequent calculation of any ratio or

basket availability on or following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio or basket shall be calculated on a Pro Forma Basis both (i) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated and (ii) assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have not been consummated.

SECTION 2.        AMOUNT AND TERMS OF COMMITMENTS

2.1        [Reserved].

2.2        [Reserved].

2.3        [Reserved].

2.4        Revolving Commitments. (a) Subject to the terms and conditions hereof, each Revolving Lender severally agrees to make revolving credit loans ("Revolving Loans") (it being understood and agreed that the Revolving Lenders will be deemed to have made, on a cashless basis, a Revolving Loan in an amount set forth on Schedule 1.1A, which is equal to the amount rolled pursuant to the ABL Roll Option (as defined in the Chapter 11 Plan), on the Closing Date in accordance with the Chapter 11 Plan) to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which would not result in either (i) the Revolving Loans of such Lender when added to such Lender's Revolving Percentage of the L/C Obligations then outstanding (with the amount of any L/C Obligations denominated in an Alternate Currency to be based on the Dollar Equivalent thereof as of any applicable date of determination) and such Lender's Protective Advance Exposure then outstanding exceeding the amount of such Lender's Revolving Commitment or (ii) the Total Revolving Extensions of Credit exceeding the Line Cap, subject to the Administrative Agent's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.6. During the Revolving Commitment Period the Borrower may use the Revolving Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Loans may from time to time be Term Benchmark Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.12.

(b)        The Borrower shall repay all outstanding Revolving Loans on the Revolving Termination Date, together with accrued and unpaid interest on the Revolving Loans, to but excluding the date of payment.

2.5        Procedure for Revolving Loan Borrowing. The Borrower may borrow under the Revolving Commitments during the Revolving Commitment Period on any Business Day, provided that the Borrower shall give the Administrative Agent irrevocable notice by submitting a Borrowing Request (which notice must be received by the Administrative Agent prior to 11:00 a.m., New York City time, (a) three U.S. Government Securities Business Days prior to the requested Borrowing Date, in the case of Term Benchmark Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of ABR Loans); provided that any such notice of a borrowing of ABR Loans under the Revolving Facility to finance payments required by Section 3.5 may be given not later than 1:00 p.m., New York City time, on the date of the proposed borrowing), specifying (i) the amount and Type of Revolving Loans to be borrowed, (ii) the requested Borrowing Date, (iii) in the case of Term Benchmark Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor and

(iv) instructions for remittance of the applicable Loans to be borrowed. Each borrowing under the Revolving Commitments shall be in an amount equal to (x) in the case of ABR Loans, $1,000,000.00 or a whole multiple of $500,000 in excess thereof (or, if the then aggregate Available Revolving Commitments of the Lenders are less than $1,000,000.00, such lesser amount) and (y) in the case of Term Benchmark Loans, $1,000,000.00 or a whole multiple of $500,000.00 in excess thereof. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Lender thereof. Each Revolving Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 noon, New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting such account as is designated in writing to the Administrative Agent by the Borrower, with the aggregate of the amounts made available to the Administrative Agent by the Revolving Lenders and in like funds as received by the Administrative Agent; provided that ABR Loans made to finance the reimbursement of a Protective Advance shall be retained by the Administrative Agent. Any Protective Advance shall be made in accordance with the procedures set forth in Section 2.6.

2.6    Protective Advances. (a)    Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrower and the Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrower, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 11.5) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "Protective Advances"); provided that the aggregate amount of Protective Advances outstanding at any time shall not at any time exceed 10% of the Borrowing Base; provided further that the Total Revolving Extensions of Credit outstanding any time shall not exceed the Total Revolving Commitments. Protective Advances may be made even if the conditions precedent set forth in Section 5.2 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be ABR Loans. The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders (other than any Defaulting Lender). Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. At any time that there is sufficient Excess Availability and the conditions precedent set forth in Section 5.2 have been satisfied, the Administrative Agent may request the Revolving Lenders to make a Revolving Loan to repay a Protective Advance. At any other time the Administrative Agent may require the Lenders to fund their risk participations described in Section 2.6(b).

(b)    Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent, without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Revolving Percentage. From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender such Lender's Revolving Percentage of all payments of principal and interest

and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

(c)     The Borrower shall repay all outstanding Protective Advances on the earlier of (i) Revolving Termination Date and (ii) demand by the Administrative Agent, together with accrued and unpaid interest on the Protective Advances, to but excluding the date of payment.

2.7     [Reserved].

2.8     Commitment Fees, etc.

(a)     The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender in accordance with its Revolving Percentage, a commitment fee (the "Commitment Fee") equal to the Commitment Fee Rate times the actual daily amount by which the Total Revolving Commitments exceed the sum of (i) the Outstanding Amount of Loans and (ii) the Outstanding Amount of L/C Obligations, subject to adjustment as provided in Section 2.24. The Commitment Fee shall accrue at all times during the Revolving Commitment Period (and thereafter so long as any Loans or L/C Obligations remain outstanding), including at any time during which one or more of the conditions in Section 5 is not met, and shall be due and payable in arrears on each Fee Payment Date. The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Commitment Fee Rate during any quarter, the actual daily amount shall be computed and multiplied by the Commitment Fee Rate separately for each period during such quarter that such Commitment Fee Rate was in effect.

(b)     The Borrower agrees to pay to the Administrative Agent, the Commitment Parties and the Joint Lead Arrangers (and their respective affiliates) the fees in the amounts and on the dates as set forth in any fee agreements (including, without limitation, the Commitment Letter and Fee Letter) with such Persons and to perform any other obligations contained therein.

2.9     Termination or Reduction of Revolving Commitments. The Borrower shall have the right, upon not less than two Business Days' notice (to the extent there are no Revolving Loans outstanding at such time) or not less than three Business Days' notice (in any other case) to the Administrative Agent, to terminate the Revolving Commitments or, from time to time, to reduce the amount of the Revolving Commitments. Any termination or reduction of Revolving Commitments pursuant to this Section 2.9 shall be accompanied by prepayment of the Revolving Loans to the extent, if any, that the Total Revolving Extensions of Credit exceed the amount of the Line Cap as so reduced, provided that if the aggregate principal amount of Revolving Loans then outstanding is less than the amount of such excess (because L/C Obligations constitute a portion thereof), the Borrower shall, to the extent of the balance of such excess, Collateralize outstanding Letters of Credit, in each case, in a manner reasonably satisfactory to the Administrative Agent. Any such reduction shall be in an amount equal to $1,000,000.00 or a whole multiple thereof or, if less than $1,000,000, the amount of the Revolving Commitments, or a whole multiple thereof, and shall reduce permanently the Revolving Commitments then in effect; and provided, further, that if any such notice of termination of the Revolving Commitments indicates that such termination is to be made in connection with a Refinancing of the Revolving Facilities, such notice of termination may be revoked if such Refinancing is not consummated.

2.10     Optional Prepayments. (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, in each case, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than (i) 11:00 noon, New York City time, three Business Days prior thereto, in the case of Term Benchmark Loans, (ii) 11:00 a.m., New York City time, three Business Days prior thereto, in the case of RFR Loans and (iii) no later than 11:00 a.m., New York City

time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Term Benchmark Loans or ABR Loans; <u>provided</u>, that if a Term Benchmark Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to <u>Section 2.20</u>; and <u>provided</u>, <u>further</u>, that if such notice of prepayment indicates that such prepayment is to be funded with the proceeds of a Refinancing of a Revolving Facility, such notice of prepayment may be revoked if such Refinancing is not consummated. Upon receipt of any such notice, the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Loans that are ABR Loans, other than in connection with a repayment of all Loans) accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000.00 or a whole multiple of $100,000 in excess thereof.

2.11    <u>Mandatory Prepayments and Commitment Reductions</u>.

(a)    In the event and on such occasion that (i) the Total Revolving Extensions of Credit (calculated, in the case of L/C Obligations denominated in an Alternate Currency, at the Dollar Equivalent thereof) exceed the Total Revolving Commitments or (ii) the Total Revolving Extensions of Credit (excluding for such purposes Protective Advances, and calculated, in the case of L/C Obligations denominated in an Alternate Currency, at the Dollar Equivalent thereof) exceed the Borrowing Base, the Borrower shall immediately repay Revolving Loans, Collateralize Letters of Credit and (in the case of clause (i) above) repay the Protective Advances in an aggregate amount equal to such excess (the "<u>Revolving Excess</u>") (it being understood that the Borrower shall prepay Revolving Loans and/or Protective Advances prior to Collateralizing L/C Exposure).

(b)    The application of any prepayment pursuant to this Section 2.11 shall be applied <u>first</u>, to ABR Loans, <u>second</u>, to Term Benchmark Loans (or RFR Loans, if applicable) and <u>third</u>, to Collateralize L/C Obligations.

(c)    On each Business Day during any Cash Dominion Period, the Administrative Agent shall apply, subject to <u>Section 2.17(b)</u>, all funds credited to any applicable Collection Account as of 10:00 A.M., New York City time, on such Business Day (whether or not immediately available) and <u>first</u> to prepay any Protective Advances that may be outstanding, <u>second</u> to prepay other Revolving Loans (without a corresponding reduction in Commitments) and <u>third</u> to Collateralize outstanding L/C Exposure.

2.12    <u>Conversion and Continuation Options</u>.

(a)    The Borrower may elect from time to time to convert Term Benchmark Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the first Business Day preceding the proposed conversion date; <u>provided</u> that any such conversion of Term Benchmark Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Term Benchmark Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); and <u>provided</u>, <u>further</u>, that no ABR Loan may be converted into a Term Benchmark Loan when any Event of Default has occurred and is continuing. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)       Any Term Benchmark Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans; provided that no Term Benchmark Loan may be continued as such when any Event of Default has occurred and is continuing; and provided, further, that if the Borrower shall fail to give any required notice as described above in this Section 2.12(b) or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

This Section shall not apply to Protective Advances, which may not be converted or continued.

2.13       Limitations on Term Benchmark. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Term Benchmark Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Term Benchmark Loans comprising each Borrowing shall be equal to $1,000,000.00 or a whole multiple of $500,000.00 in excess thereof and (b) no more than ten Borrowings shall be outstanding at any one time.

2.14       Interest Rates and Payment Dates.

(a)       Each Term Benchmark Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Term SOFR Rate determined for such day plus the Applicable Margin.

(b)       Each ABR Loan (other than a Protective Advance) shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin. Each Protective Advance shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin plus 2%.

(c)       Each RFR Loan shall bear interest at a rate per annum equal to the Adjusted Daily Simple SOFR plus the Applicable Margin.

(d)       (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or if a Default or Event of Default under Section 9.1(a) or (g) has occurred and is continuing, such overdue amount (and, in the case of a Default or Event of Default under Section 9.1(g), all Loans and Reimbursement Obligations) shall bear interest at a rate per annum equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to ABR Loans under the Revolving Facility plus 2%, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any Commitment Fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans plus 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(e)       Solely for purposes of the Interest Act (Canada), (i) whenever interest is to be computed or expressed at any rate (the "Specified Rate") on the basis of a year of 360 days or any other period of time less than a calendar year hereunder, the annual rate of interest to which each such Specified Rate is equal is such Specified Rate multiplied by a fraction, the numerator of which is the

actual number of days in the relevant year and the denominator of which is 360 or such other period of time, respectively; (ii) the principle of deemed reinvestment of interest shall not apply to any interest calculation hereunder; and (iii) the rates of interest stipulated herein are intended to be nominal rates and not effective rates or yields.

(f)    Interest shall be payable in arrears on each Interest Payment Date, _provided_ that interest accruing pursuant to Section 2.14(d) shall be payable from time to time on demand.

(g)    If any provision of this Agreement or of any of the other Loan Documents would obligate any Loan Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by such Lender of interest at a criminal rate (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by such Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (1) firstly, by reducing the amount or rate of interest required to be paid to such Lender under this Section 2.14, and (2) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to such Lender which would constitute "interest" for purposes of Section 347 of the Criminal Code (Canada).

2.15    Computation of Interest and Fees.

(a)    Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Term Benchmark rate. Any change in the interest rate on a Loan resulting from a change in the ABR shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted from a Term Benchmark Loan, the date of conversion of such Term Benchmark Loan to such ABR Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to an ABR Loan being converted to a Term benchmark Loan, the date of conversion of such ABR Loan to such Term Benchmark Loan, as the case may be, shall be excluded; _provided_ that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.14(a).

2.16    Inability to Determine Interest Rate; Illegality.

(a)    Subject to clauses (b), (c), (d), (f~~e~~) and (h~~f~~) of this Section 2.16, if

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error), prior to the commencement of any Interest Period for a Term

Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate (including because the Term SOFR Reference Rate is not available or published on a current basis), for such Interest Period, or

(ii)    (b) the Administrative Agent is advised by the Required Lenders that, prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period,

then the Administrative Agent shall provide notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until (x) the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrower delivers a new interest election request in accordance with the terms of Section 2.12 or a new Borrowing Request in accordance with the terms of Section 2.5, (A) any Term Benchmark Loans under the relevant Revolving Facility requested to be made on the first day of such Interest Period shall be made as an RFR Loans so long as the Adjusted Daily Simple SOFR is not also subject to Section 2.16(a)(i) or (ii) above or ABR Loans if the Adjusted Daily Simple SOFR also is subject to Section 2.16(a)(i) or (ii) above, (B) any Loans under the relevant Revolving Facility that were to have been converted on the first day of such Interest Period to Term Benchmark Loans shall be continued as RFR Loans so long as the Adjusted Daily Simple SOFR is not also subject to Section 2.16(a)(i) or (ii) above or ABR Loans if the Adjusted Daily Simple SOFR also is subject to Section 2.16(a)(i) or (ii) above and (C) any outstanding Term Benchmark Loans under the relevant Revolving Facility shall be converted, on the last day of the then-current Interest Period, to RFR Loans if the Adjusted Daily Simple SOFR is not also subject to Section 2.16(a)(i) or (ii) above or ABR Loans if the Adjusted Daily Simple SOFR also is subject to Section 2.16(a)(i) or (ii) above.

(b)    (c) Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m., New York City time on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(c)    (d) Notwithstanding anything to the contrary herein or in any other Loan Document, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    (e) The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (1) the implementation of any Benchmark Replacement, (2) the effectiveness of any Benchmark Replacement Conforming Changes, (3) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (4) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.16, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.16.

(e)    (f) Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (a) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (b) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (5) if a tenor that was removed pursuant to clause (i) above either (a) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (b) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)    (g) Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any request for a Term Benchmark Borrowing into a request for a Borrowing of or conversion to (A) an RFR Loan so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR. Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan, then until such time as a Benchmark Replacement is implemented pursuant to this Section 2.16, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan, be converted by the Administrative Agent to, and shall constitute, (x) an RFR Loan so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event, on such day.

(g)    (h) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Term Benchmark Loan or to give

effect to its obligations as contemplated hereby with respect to any Term Benchmark Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)    such Lender may declare that Term Benchmark Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Term Benchmark Loans, whereupon any request for a Term Benchmark Loan (or to convert an ABR Loan to a Term Benchmark Loan or to continue a Term Benchmark Loan for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Term Benchmark Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and (ii) such Lender may require that all outstanding Term Benchmark Loans made by it be converted to ABR Loans (the interest rate on which shall, if necessary to avoid illegality, be determined by the Administrative Agent without reference to the Term Benchmark rate component of the ABR), in which event all such Term Benchmark Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in clause (b) above.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Term Benchmark Loans that would have been made by such Lender or the converted Term Benchmark Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Term Benchmark Loans.

For purposes of this clause (h) a notice to the Borrower by any Lender shall be effective as to each Term Benchmark Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Term Benchmark Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

(h)    (i)  If any Secured Party determines, acting reasonably, that any applicable law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Secured Party to hold or benefit from a Lien over real property of the Loan Parties pursuant to any applicable law, such Secured Party may notify the Administrative Agent and disclaim any benefit of such security interest to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate, render unenforceable or otherwise affect in any manner such Lien for the benefit of any other Secured Party.

2.17    Pro Rata Treatment and Payments.

(a)    Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any Commitment Fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the Revolving Percentages of the Lenders.

(b)    All payments and any proceeds of Collateral received by the Administrative Agent (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower or as otherwise required under this Agreement), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.11) or (C) amounts to be applied from the Collection Account during any Cash Dominion Period is in effect (which shall be applied in accordance with Section 2.11(c)) or (ii) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, shall be applied, subject to the Intercreditor Agreement, ratably first, to pay any fees, indemnities, or

expense reimbursements then due to the Administrative Agent and any Issuing Lender (other than in connection with Cash Management Obligations or Specified Swap Obligations), <u>second</u>, to pay any fees, indemnities or expense reimbursements then due to the Lenders from the Loan Parties under the Loan Documents (other than in connection with Cash Management Services or Specified Swap Obligations), <u>third</u>, to pay interest due in respect of the Protective Advances, <u>fourth</u>, to pay the principal of the Protective Advances, <u>fifth</u>, to pay interest then due and payable on the Loans (other than the Protective Advances) and unreimbursed L/C Disbursements, ratably, <u>sixth</u>, to prepay principal on the Loans (other than the Protective Advances) and unreimbursed L/C Disbursements and to pay any amounts owing with respect to Cash Management Obligations and Specified Swap Obligations up to and including the amount most recently provided to the Administrative Agent pursuant to Section 2.25 in respect thereof, for which Reserves have been established, ratably, <u>seventh</u>, to pay an amount to the Administrative Agent equal to 103% of the aggregate undrawn face amount of all outstanding Letters of Credit to be held as cash collateral for such Obligations, <u>eighth</u>, to the payment of any amounts owing with respect to Cash Management Services Obligations and Specified Swap Obligations up to and including the amount most recently provided to the Administrative Agent pursuant to Section 2.25 in respect thereof and to the extent not paid pursuant to clause sixth, ratably, <u>ninth</u>, to the payment of any other Obligations owing to the Administrative Agent or any Lender by the Loan Parties. Notwithstanding the foregoing amounts received from any Loan Party shall not be applied to any Excluded Swap Obligation of such Loan Party. Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower, or unless a Default is in existence, neither the Administrative Agent nor any Lender shall apply any payment which it receives to any Term Benchmark Loan of a Class, except (a) on the expiration date of the Interest Period applicable thereto or (b) in the event, and only to the extent, that there are no outstanding ABR Loans of the same Class and, in any such event, the Loan Parties shall pay the break funding payment required in accordance with Section 2.20. The Administrative Agent and the Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

(c)     Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Loans shall be made <u>pro rata</u> to the Revolving Lenders according to the respective outstanding principal amounts of the Revolving Loans then held by the Revolving Lenders.

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. Any payments received after such time shall be deemed to be received on the next Business Day at the Administrative Agent's sole discretion. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. Except as otherwise provided hereunder, if any payment hereunder (other than payments on the Term Benchmark Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Term Benchmark Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension. During any Cash Dominion Period, solely for purposes of determining the amount of Loans available for borrowing purposes, checks (in addition to immediately available funds applied pursuant to Section 2.11(c)) from collections of items of payment and proceeds

of any Collateral shall be applied in whole or in part against the applicable Obligations as of 10:00 A.M., New York City time, on the Business Day of receipt, subject to actual collection.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to the date of any Borrowing that such Lender will not make the amount that would constitute its share of such Borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor (a "Funding Default"), such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.17(e) shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Revolving Facility, on demand, from the Borrower. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.18     Requirements of Law.

(a)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case, made or occurring subsequent to the Closing Date:

(i)     shall subject any Lender, Administrative Agent or Issuing Lender to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any Application, any Term Benchmark Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes, Excluded Taxes and Other Taxes and changes in the rate of tax on the overall net income of such Lender, Administrative Agent or Issuing Lender);

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or

for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Term Benchmark rate; or

(iii)         shall impose on such Lender any other condition (other than Taxes); and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Term Benchmark Loans or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this (a), it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)      If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in each case made or occurring subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Loans or Letters of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount reasonably deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor (setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.18(b)), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)      A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. The Borrower shall pay such Lender the additional amount shown as due on any such certificate promptly after, and in any event within, ten Business Days of, receipt thereof. Notwithstanding anything to the contrary in this Section, no Borrower shall be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19    Taxes.

(a)      All payments made by or on account of any obligation of the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto (including, any taxes imposed under Part XIII of the Income Tax Act (Canada) (as the same may be amended, supplemented or replaced from time to time)) ("Taxes"), excluding: (i) net income Taxes (however denominated), capital

Taxes imposed by the laws of Canada or any political subdivision thereof, branch profits Taxes, and franchise Taxes, in each case (x) imposed on the Administrative Agent or any Lender as a result of the Administrative Agent or such Lender being organized or incorporated under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (y) that are Other Connection Taxes, (ii) in the case of a Lender, United States federal withholding Taxes to the extent imposed on amounts payable to any Lender with respect to an applicable interest in a Loan or Commitment at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment, if any) to receive additional amounts from the Borrower with respect to such Taxes pursuant to this clause (a), (iii) withholding Taxes imposed under the Income Tax Act (Canada) on amounts paid or credited to or for the account of the Administrative Agent or any Lender (or the Person to which the applicable obligation is payable) in respect of any obligation of the Borrower hereunder or under any other Loan Document as a result of the Administrative Agent or Lender (or the Person to which the applicable obligation is payable): (a) not dealing at arm's length (within the meaning of the Income Tax Act (Canada)) with a Loan Party, or (b) being a "specified shareholder" (as defined in subsection 18(5) of the Income Tax Act (Canada)) of a Loan Party or not dealing at arm's length (within the meaning of the Income Tax Act (Canada)) with such a "specified shareholder", except where, in the case of clause (a) or (b) above, the non-arm's length relationship arises or the Administrative Agent or Lender is a "specified shareholder" of a Loan Party or is not dealing at arm's length with such a "specified shareholder", solely as a result of the Administrative Agent or Lender (or beneficial owner) having become a party to, received or perfected a security interest under or received or enforced any rights under, any Loan Document; (iv) Taxes that are attributable to a Lender's or the Administrative Agent's failure to comply with the requirements of clause (d), (e) or (g) of this <u>Section 2.19</u>; and (v) United States federal withholding taxes imposed by sections 1471 through 1474 of the Code as in existence on the date of this Agreement (and any amended versions of such provisions that are substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder and official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code ("<u>FATCA</u>") (such excluded Taxes, "Excluded Taxes", and non-excluded Taxes, "<u>Non-Excluded Taxes</u>"). If any Non-Excluded Taxes or Other Taxes are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement as if no such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.19). The Borrower shall indemnify the Administrative Agent and each Lender within 10 Business Days after written demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.19</u>) paid by such Person and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error. Statements payable by the Borrower pursuant to this <u>Section 2.19</u> shall be submitted to the Borrower at the address specified under <u>Section 11.2</u>.

(b)     In addition, but without duplication of any obligation under <u>Section 2.19(a)</u>. the Borrower shall pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)        Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, an original or a certified copy of an original official receipt received by the Borrower showing payment thereof, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any incremental Taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(d)        Except as provided in the next sentence, each Lender (or Transferee) that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent two copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8BEN-E or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F-1 and a Form W-8BEN or Form W-8BEN-E, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on such payments by the Borrower under this Agreement and the other Loan Documents. To the extent a Non-U.S. Lender is not the beneficial owner, such Non-U.S. Lender shall deliver to the Borrower and the Administrative Agent two copies of U.S. Internal Revenue Service Form W-8IMY, accompanied by U.S. Internal Revenue Service Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a statement substantially in the form of Exhibit F-2 or Exhibit F-3, U.S. Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a statement substantially in the form of Exhibit F-4 on behalf of such direct and indirect partner. Any Lender (or Assignee) that is not a Non-U.S. Lender shall deliver to the Borrower and the Administrative Agent two copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Person claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The forms and certification referenced in the previous two sentences (the "Forms") shall be delivered by each Lender on or before the date it becomes a party to this Agreement. In addition, each Lender shall deliver such Forms promptly upon the obsolescence or invalidity of any Form previously delivered by such Lender and upon (i) the written request of the Borrower or (ii) any such Lender otherwise having actual knowledge of the obsolescence or invalidity of such Forms. Each Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered Form to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this clause (d), no Lender shall be required to deliver any Form pursuant to this clause (d) that such Lender is not legally able to deliver.

The Administrative Agent that is a "United States person" as defined in Section 7701(a)(30) of the Code (including, for the avoidance of doubt, JPMorgan Chase Bank, N.A.) shall, on or before the date on which the Administrative Agent becomes a party hereto, provide the Borrower with two copies of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the Administrative Agent, claiming complete exemption from backup withholding on all payments by the Borrower under this Agreement and the other Loan Documents. The Administrative Agent that is not a "United States person" as defined in Section 7701(a)(30) of the Code shall, on or before the date on which the Administrative Agent becomes a party hereto, to the extent it is legally eligible to do so, provide the Borrower with two copies of an

applicable U.S. Internal Revenue Service Form W-8, or any subsequent versions thereof or successors thereto, properly completed and duly executed by the Administrative Agent, certifying as to any entitlement of the Administrative Agent to an exemption from, or reduction in, any U.S. federal withholding tax with respect to any fees received on its own behalf under any Loan Document. In addition, the Administrative Agent shall deliver such copies of U.S. Internal Revenue Service Form W-8 or U.S. Internal Revenue Service Form W-9, as applicable, promptly upon the obsolescence or invalidity of such U.S. Internal Revenue Service Form previously delivered by the Administrative Agent and upon (i) the written request of the Borrower or (ii) the Administrative Agent otherwise having actual knowledge of the obsolescence or invalidity of such U.S. Internal Revenue Service Form. Notwithstanding any other provision of this clause (d), the Administrative Agent shall not be required to deliver any Form pursuant to this clause (d) that the Administrative Agent is not legally able to deliver.

(e)     A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.19(d)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)     If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.19, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.19 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent or any Lender be required to pay any amount to a Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent or Lender, as applicable, in a less favorable net after-Tax position than the Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (f) shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(g)     If a payment made to a Lender under any Loan Document would be subject to United States federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Non-Excluded Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Non-Excluded Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.6 relating to the maintenance of a Participant Register and (iii) any Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (h).

(i)     The agreements in this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the expiration or cancellation of all Letters of Credit and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)     For purposes of this Section 2.19, the term Lender shall include any Issuing Lender.

2.20    Indemnity.

(a)     With respect to Loans that are not RFR Loans, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Term Benchmark Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Term Benchmark Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Term Benchmark Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, reduced, converted or continued, for the period from the date of such prepayment or of such failure to borrow, reduce, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, reduce, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate

of interest or other return for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)     With respect to RFR Loans, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of RFR Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement or (b) default by the Borrower in making any prepayment of RFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed or reduced, for the period from the date of such prepayment or of such failure to borrow or reduce to the Interest Payment Date (or, in the case of a failure to borrow or reduce, the Interest Payment Date that would have occurred on the date of such failure) in each case at the applicable rate of interest or other return for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.21     <u>Change of Lending Office</u>. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of <u>Section 2.18</u> or <u>2.19(a)</u> with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>.

2.22     <u>Replacement of Lenders</u>. The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>, (b) defaults in its obligation to make Loans hereunder or (c) has not consented to a proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by <u>Section 11.1</u> that requires the consent of all Lenders and which has been approved by the Required Lenders as provided in <u>Section 11.1</u>, with a Lender or Eligible Assignee; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) in the case of clause (a), prior to any such replacement, such Lender shall have taken no action under <u>Section 2.21</u> so as to eliminate the continued need for payment of amounts owing pursuant to <u>Section 2.18</u> or <u>2.19(a)</u>, (iii) the replacement financial institution or other Eligible Assignee shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement and the Borrower or such replacement financial institution or other Eligible Assignee shall pay all interest, fees and other amounts owing to such replaced Lender, (iv) the Borrower shall be liable to such replaced Lender under <u>Section 2.20</u> if any Term Benchmark Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (v) the replacement financial institution or other Eligible Assignee, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be deemed to have made such replacement in

accordance with the provisions of <u>Section 11.6</u>, (vii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to <u>Section 2.18</u>, <u>2.19(a)</u> or <u>2.19(c)</u>, as the case may be, and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender. Upon any such assignment, such replaced Lender shall no longer constitute a "<u>Lender</u>" for purposes hereof; provided that any rights of such replaced Lender to indemnification hereunder shall survive as to such replaced Lender. Each Lender, the Administrative Agent and the Borrower agrees that in connection with the replacement of a Lender and upon payment to such replaced Lender of all amounts required to be paid under this <u>Section 2.22</u>, the Administrative Agent and the Borrower shall be authorized, without the need for additional consent from such replaced Lender, to execute an Assignment and Assumption on behalf of such replaced Lender, and any such Assignment and Assumption so executed by the Administrative Agent or the Borrower and, to the extent required under <u>Section 11.6</u>, the Borrower and the Issuing Lenders, shall be effective for purposes of this <u>Section 2.22</u> and <u>Section 11.6</u>.

       2.23    <u>Notes</u>. If so requested by any Lender by written notice to the Borrower (with a copy to the Administrative Agent), the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 11.6</u>) (promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loans.

       2.24    <u>Incremental Credit Extensions.</u>

       (a)    The Borrower may, at any time or from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more increases in the amount of the Revolving Commitments (each such increase, a "<u>Revolving Commitment Increase</u>", the loans thereunder, the "<u>Incremental Revolving Loans</u>", and a Lender making such a commitment, an "<u>Incremental Revolving Lender</u>"); provided that:

       (i)    the aggregate amount of all Revolving Commitment Increases shall not exceed the greater of (A) $25,000,000 plus an amount equal to the aggregate principal amount of all voluntary prepayments of Revolving Loans that are accompanied by permanent commitment reductions under the Revolving Facility and (B) the excess of the Borrowing Base (in effect immediately prior to such increase) over the aggregate amount of Revolving Commitments (in effect immediately prior to such increase);

       (ii)    Any Revolving Commitment Increase shall be on the same terms and pursuant to the same documentation as the Revolving Commitments hereunder;

       (iii)    after giving effect to the making of any Loans or the effectiveness of any Revolving Commitment Increase (including the use of proceeds thereof), the conditions set forth in <u>Section 5.2(a)</u> and <u>(b)</u> shall be satisfied;

       (v) the Borrower shall have delivered a certificate dated as of the Incremental Facility Closing Date signed by a Responsible Officer of the Borrower certifying that the conditions precedent set forth in subclause (iii) have been satisfied;

       (vi)    all fees and expenses owing in respect of such increase to the Administrative Agent and the applicable Lenders shall have been paid or shall be paid concurrently with the Incremental Facility Closing Date;

(v)    each Lender that is a Lender on the Closing Date shall be permitted to elect to have its Commitment reduced by an amount equal to 40% of such Revolving Commitment Increase (an "Elective Commitment Reduction") on the date thereof; provided, further, that if more than one Lender elects to have their Commitments reduced, such reduction shall be applied on a pro rata basis as between such electing Lenders. The Borrower shall give such Lenders three (3) Business Days' prior written notice of the proposed date of a Revolving Commitment Increase and the amount of Elective Commitment Reductions offered. In order to elect such Elective Commitment Reduction, any such Lender shall provide written notice of such election and the maximum amount by which such Lender elects to reduce its Revolving Commitment one (1) Business Day prior to the proposed date of such Revolving Commitment Increase.

(b)    Each notice from the Borrower to the Administrative Agent pursuant to Section 2.24(a) shall set forth the requested amount and proposed terms of the Revolving Commitment Increase.

(c)    Revolving Commitment Increases may be provided by any existing Lender or any Additional Lender (provided that no Lender shall be obligated to provide a portion of any Revolving Commitment Increase) on terms permitted in this Section 2.24, and, to the extent not permitted in this Section 2.24, all terms and documentation with respect to any Revolving Commitment Increase which relate to provisions of a mechanical or administrative nature, shall in each case be reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent and Issuing Lenders shall have consented (such consent not to be unreasonably withheld, conditioned or delayed) to such Lender's providing such Revolving Commitment Increases if such consent would be required under Section 11.6(b) for an assignment of Loans or Revolving Commitments, as applicable, to such Lender or Additional Lender; provided, further, that the Issuing Lenders shall have consented (such consent not to be unreasonably withheld, conditioned or delayed) to any Revolving Commitment Increase provided by any Additional Lender. Revolving Commitments in respect of Revolving Commitment Increases shall become Revolving Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Lender, an increase in such Lender's applicable Revolving Commitment) under this Agreement pursuant to an amendment (an "Incremental Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by Holdings, the Borrower, each Lender agreeing to provide such Revolving Commitment, if any, each Additional Lender, if any, and the Administrative Agent. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section. The effectiveness of any Incremental Amendment shall be subject to the satisfaction of each of the conditions set forth in Section 2.24(a) and such other conditions as the parties thereto shall agree, unless waived by the Additional Lender (the effective date of any such Incremental Amendment, an "Incremental Facility Closing Date"). The Borrower will use the proceeds of the Revolving Commitment Increases for any purpose not prohibited by this Agreement. No Lender shall be obligated to provide any Revolving Commitment Increases, unless it so agrees. The Loan Documents may be amended by agreement of the Administrative Agent and the Borrower to effect such modifications and amendments as may be necessary or advisable to increase the Revolving Commitments.

(d)    Upon each increase and decrease, if any, in the Revolving Commitments pursuant to this Section, each Revolving Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing a portion of the Revolving Commitment Increase (each a "Revolving Commitment Increase Lender") electing an Elective Commitment Reduction (each, a "Revolving Commitment Decrease Lender") in respect of such increase or decrease, as applicable, and each such Revolving Commitment Increase Lender and Revolving Commitment Decrease Lender will automatically and without further act be deemed to have assumed or

assigned, as applicable, a portion of such Revolving Lender's participations hereunder in outstanding Letters of Credit such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit held by each Revolving Lender (including each such Revolving Commitment Increase Lender and Revolving Commitment Decrease Lender) will equal the percentage of the aggregate Revolving Commitments of all Revolving Lenders represented by such Revolving Lender's Revolving Commitment and if, on the date of such increase, there are any Revolving Loans outstanding, such Revolving Loans shall on or prior to the effectiveness of such Revolving Commitment Increase either be prepaid from the proceeds of additional Revolving Loans made hereunder or assigned to a Revolving Commitment Increase Lender (in each case, reflecting such increase in Revolving Commitments, such that Revolving Loans are held ratably in accordance with each Revolving Lender's Pro Rata Share, including the Pro Rata Share of any Revolving Commitment Decrease Lender, after giving effect to such increase or decrease), which prepayment or assignment shall be accompanied by accrued interest on the Revolving Loans being prepaid and any costs incurred by any Lender in accordance with Section 2.20. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(e)     Notwithstanding anything to the contrary herein, this Section 2.24 shall supersede any provisions in Section 2.17 or 11.1 to the contrary and the Borrower and the Administrative Agent may amend Section 2.17 to implement any Incremental Amendment.

2.25     Cash Management Services; Swap Agreements. Each Joint Lead Arranger  or Lender (or Affiliate of the foregoing), other than JPMCB or an Affiliate thereof, providing Cash Management Services for, or having Swap Agreements with, any Loan Party or any Restricted Subsidiary of a Loan Party shall deliver to the Administrative Agent, promptly after entering into such Cash Management Services, Swap Agreements, written notice setting forth the aggregate amount of all Cash Management Services Obligations and Specified Swap Obligations of such Loan Party or Restricted Subsidiary thereof to such Joint Lead Arranger, Lender or Affiliate (whether matured or matured, absolute or contingent). In addition, each such Joint Lead Arranger, Lender or Affiliate thereof shall deliver to the Administrative Agent, following the end of each calendar month, a summary of the amounts due or to become due in respect of such Cash Management Services Obligations and Specified Swap Obligations. The most recent information provided to the Administrative Agent shall be used in determining the amounts to be applied in respect of such Cash Management Services Obligations and/or Specified Swap Obligations pursuant to Section 2.17(b) and which tier of the waterfall, contained in Section 2.17(b), such Cash Management Services Obligations and/or Specified Swap Obligations will be placed. For the avoidance of doubt, (i) so long as JPMCB or its Affiliate is the Administrative Agent, neither JPMCB nor any of its Affiliates providing Cash Management Services for, or having Specified Swap Agreements with, any Loan Party or any Restricted Subsidiary or Affiliate of a Loan Party shall be required to provide any notice described in this Section 2.25 in respect of such Cash Management Services or Specified Swap Agreements and (ii) no Reserves shall be established for Cash Management Services or Specified Swap Agreements provided by a Person that is no longer the Administrative Agent, a Joint Lead Arranger, a Lender or an Affiliate of the foregoing.

2.26     Defaulting Lenders.

(a)     Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)      <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 11.1</u>.

(ii)      <u>Reallocation of Payments</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Section 9</u> or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to <u>Section 11.7</u>), shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, in the case of a Revolving Lender, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to each Issuing Lender hereunder; <u>third</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>fourth</u>, in the case of a Revolving Lender, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; <u>fifth</u>, to the payment of any amounts owing to the Lenders, the Issuing Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender, such Issuing Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>sixth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>seventh</u>, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if such payment is a payment of the principal amount of any Loans or L/C Advances and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of, and L/C Advances owed to, the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to <u>Section 3.2(b)</u>. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to <u>Section 3.2(b)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)      <u>Certain Fees</u>. Such Defaulting Lender (x) shall not be entitled to receive or accrue any commitment fee pursuant to <u>Section 2.8(a)</u> for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to such Defaulting Lender) and (y) shall be limited in its right to receive Letter of Credit fees as provided in <u>Section 3.3</u>.

(iv)      <u>Reallocation of Applicable Percentages to Reduce Fronting Exposure</u>. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to <u>Section 3</u> or Protective Advances, the "<u>Pro Rata Share</u>" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Commitment of such Defaulting Lender; <u>provided</u> that the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Protective Advances shall not exceed the positive difference, if any, of (1) the Revolving Commitment of such non-Defaulting Lender <u>minus</u> (2) the aggregate principal amount of the Revolving Loans of such Lender. In the event non-Defaulting Lenders' obligations to acquire, refinance or fund participations in Letters of Credit or Protective Advances are increased as a result of a Defaulting Lender, then all Letter

of Credit fees and other fees that would have been paid to such Defaulting Lender shall be paid to such non-Defaulting Lenders ratably in accordance with such increase of such non-Defaulting Lender's obligations to acquire, refinance or fund participations in Letters of Credit or Protective Advances.

If (i) a Bankruptcy Event or a Bail-In Action with respect to Holdings, the Borrower or any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) any Issuing Lender has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, such Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, unless such Issuing Lender shall have entered into arrangements with the Loan Parties or such Lender, satisfactory to such Issuing Lender to defease any risk to it in respect of such Lender hereunder.

(b)     Defaulting Lender Cure. If the Borrower, the Administrative Agent and each Issuing Lender agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Share (without giving effect to Section 2.26(a)(iv), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)     No Release. The provisions hereof attributable to Defaulting Lenders shall not release or excuse any Defaulting Lender from failure to perform its obligations hereunder; provided that in the case of Revolving Lenders, the foregoing shall be subject to Section 11.23.

2.27     Loan Modification Offers.

(a)     The Borrower may, on one or more occasions, by written notice to the Administrative Agent, make one or more offers (each, a "Loan Modification Offer") to all the Lenders of one or more Classes on the same terms to each such Lender (each Class subject to such a Loan Modification Offer, a "Specified Class") to make one or more Permitted Amendments pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrower; provided that (i) any such offer shall be made by the Borrower to all Lenders with Loans with a like maturity date (whether under one or more tranches) on a pro rata basis (based on the aggregate outstanding principal amount of the applicable Loans), (ii) no Default or Event of Default shall have occurred and be continuing at the time of any such offer and (iii) each Issuing Lender shall have approved such Permitted Amendment. Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become effective (which shall not be less than five Business Days nor more than 45 Business Days after the date of such notice, unless otherwise agreed to by the Administrative Agent); provided that, notwithstanding anything to the contrary, (x) assignments and participations of Specified Classes shall be governed by the same or, at the Borrower's discretion, more restrictive assignment and participation provisions than those set forth in Section 11.6, and (y) no repayment of Specified Classes shall be permitted unless such repayment is accompanied by an at least pro rata repayment of all earlier maturing

Loans (including previously extended Loans) (or all earlier maturing Loans (including previously extended Loans) shall otherwise be or have been terminated and repaid in full). Permitted Amendments shall become effective only with respect to the Loans and Commitments of the Lenders of the Specified Class that accept the applicable Loan Modification Offer (such Lenders, the "Accepting Lenders") and, in the case of any Accepting Lender, only with respect to such Lender's Loans and Revolving Commitments of such Specified Class as to which such Lender's acceptance has been made. No Lender shall have any obligation to accept any Loan Modification Offer.

(b)    A Permitted Amendment shall be effected pursuant to an amendment to this Agreement (a "Loan Modification Agreement") executed and delivered by the Borrower, each applicable Accepting Lender and the Administrative Agent. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement. No Loan Modification Agreement shall provide for any extension of any Specified Class in an aggregate principal amount that is less than 25% of such Specified Class then outstanding or committed, as the case may be. Each Loan Modification Agreement may, without the consent of any Lender other than the applicable Accepting Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent and the Borrower, to give effect to the provisions of this Section 2.27, including any amendments necessary to treat the applicable Loans and/or Commitments of the Accepting Lenders as a new "Class" of loans and/or commitments hereunder; provided that (x) no Loan Modification Agreement may provide for (i) any Specified Class to be secured by any Collateral or other assets of any Group Member that does not also secure the Loans, (ii) any borrowings and any participations in respect of Letters of Credit and Protective Advances shall apply to the Loans on a pro rata basis and (iii) so long as any Loans are outstanding, any mandatory or voluntary prepayment provisions that do not also apply to the Loans on a pro rata basis and shall be made on a ratable basis as between the commitments of such new "Class" and the remaining Revolving Commitments, (y) the Revolving Termination Date may not be extended without the prior written consent of the Issuing Lenders; and (z) the terms and conditions of the applicable Loans and/or Commitments of the Accepting Lenders (excluding pricing, fees, rate floors and optional prepayment or redemption terms) shall be substantially identical to, or (taken as a whole) shall be no more favorable to, the Accepting Lenders than those applicable to the Specified Class, except for financial covenants or other covenants or provisions applicable only to periods after the Latest Maturity Date at the time of such Loan Modification Offer, as may be agreed by the Borrower and the Accepting Lenders).

(c)    Subject to Section 2.27(b), the Borrower may at its election specify as a condition to consummating any such Loan Modification Agreement that a minimum amount (to be determined and specified in the relevant Loan Modification Offer in the Borrower's sole discretion and may be waived by the Borrower) of Loans of any or all applicable Classes be extended.

(d)    Notwithstanding anything to the contrary in this Agreement, this Section 2.27 shall supersede any provisions in Section 2.17 or 11.1 to the contrary and the Borrower and the Administrative Agent may amend Section 2.17 to implement any Loan Modification Agreement.

SECTION 3.    LETTERS OF CREDIT

3.1    L/C Commitment.

(a)    Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Revolving Lenders set forth in Section 3.4(a), agrees to issue standby letters of credit and to the extent agreed to by an Issuing Lender, bank guarantees and commercial letters of credit ("Letters of Credit") for the account of the Borrower or the account of any Restricted Subsidiary on any Business Day prior to the date that is 30 days prior to the Revolving Termination Date in such

form as may be approved from time to time by the applicable Issuing Lender; provided that (i) the Borrower shall be an applicant, and be fully and unconditionally liable, with respect to each Letter of Credit issued for the account of a Restricted Subsidiary; and (ii) with respect to any Letter of Credit issued, the Borrower shall Cash Collateralize the Outstanding Amount of such Letter of Credit (including as may be renewed, extended or otherwise modified) in an amount equal to the Non-Bank Revolving Percentage of such Outstanding Amount; provided further that an Issuing Lender shall have no obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment (with the L/C Obligations denominated in an Alternate Currency calculated at the Dollar Equivalent thereof at the time of determination), (ii) the L/C Obligations of such Issuing Lender would exceed its L/C Issuer Commitment (with the L/C Obligations denominated in an Alternate Currency calculated at the Dollar Equivalent thereof at the time of determination) or (iii) the Total Revolving Extensions of Credit would exceed the Line Cap, subject to the Administrative Agent's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.6. Each Letter of Credit shall (i) be denominated in Dollars or any Alternate Currency reasonably acceptable to the Administrative Agent and the applicable Issuing Lender, (ii) have a stated amount of not less than $250,000.00 or such lesser amount as is acceptable to the applicable Issuing Lender, (iii) expire no later than the earlier of (x) the first anniversary of its date of issuance, or such longer period as is reasonably acceptable to the applicable Issuing Lender, and (y) the date that is five Business Days prior to the Revolving Termination Date, provided that any Letter of Credit with a one-year (or less) term may provide for the renewal or extension thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above); and provided, further, that no Issuing Lender shall  renew or extend any such Letter of Credit if it has received written notice (or otherwise has knowledge) that an Event of Default has occurred and is continuing or any of the conditions set forth in Section 5.2 are not satisfied prior to the date of the decision to renew or extend such Letter of Credit) and (iv) be otherwise reasonably acceptable in all respects to the applicable Issuing Lender.

(b)    No Issuing Lender shall at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law. from issuing such Letter of Credit, or any law applicable to such Issuing Lender shall prohibit, or require that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Lender any unreimbursed loss, cost or expense that was not applicable on the Effective Date and that such Issuing Lender in good faith deems material to it.

3.2    Procedure for Issuance of Letter of Credit.

(a)    The Borrower may from time to time on any Business Day occurring from the Closing Date until the date that is thirty Business Days prior to the Revolving Termination Date request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may request. Upon receipt of any Application, such Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall such Issuing Lender be required to issue any Letter of Credit (a) earlier than (i) three Business Days, in the case of standby Letters of Credit or similar agreements or (ii) to the extent an Issuing Lender agrees to issue bank guarantees or commercial Letters of Credit, or similar agreements, such period of time as is acceptable to such Issuing Lender, or (b) later than ten Business Days, (or in

each case such shorter period as may be agreed to by such Issuing Lender in any particular instance) after, its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the Borrower. The applicable Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower promptly following the issuance thereof. The applicable Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

(b)      Cash Collateral. (i) If an Issuing Lender has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing and the conditions set forth in Section 5.2 to a Revolving Borrowing cannot then be met, (ii) if, as of the Letter of Credit Expiration Date, any Letter of Credit may for any reason remain outstanding and partially or wholly undrawn, (iii) if any Event of Default occurs and is continuing and the Administrative Agent or the Required Lenders, as applicable, require the Borrower to Cash Collateralize the L/C Obligations pursuant to Section 9.2 or (iv) an Event of Default set forth under Section 9.1(g) occurs and is continuing, then the Borrower shall Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such L/C Borrowing or the Letter of Credit Expiration Date, as the case may be), and shall do so not later than 2:00 p.m., New York City time, on (x) in the case of the immediately preceding clauses (i) through (iii), (1) the Business Day that the Borrower receive notice thereof, if such notice is received on such day prior to 12:00 noon, New York City time, or (2) if clause (1) above does not apply, the Business Day immediately following the day that the Borrower receive such notice and (y) in the case of the immediately preceding clause (iv), the Business Day on which an Event of Default set forth under Section 9.1(g) occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day. At any time that there shall exist a Defaulting Lender, if any Defaulting Lender Fronting Exposure remains outstanding (after giving effect to Section 2.26(a)(iv)), then promptly upon the request of the Administrative Agent or any Issuing Lender, the Borrower shall Cash Collateralize its Defaulting Lender Fronting Exposure and deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover such Defaulting Lender Fronting Exposure (after giving effect to any Cash Collateral provided by the Defaulting Lender). For purposes hereof, "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the relevant Issuing Lender and the Lenders, as collateral for the L/C Obligations, Cash Collateral pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Lender (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Lenders and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in a Cash Collateral Account and may be invested in readily available Cash Equivalents. If at any time the Administrative Agent reasonably determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent (on behalf of the Secured Parties) or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations (or in the case of Cash Collateral provided with regard to Defaulting Lender Fronting Exposure, such amount of Defaulting Lender Fronting Exposure), the Borrower will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in a Cash Collateral Account as aforesaid, an amount equal to the excess of (a) such aggregate Outstanding Amount over (b) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable law, to reimburse the relevant Issuing Lender. To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such

L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall be refunded to the Borrower.

3.3     Fees and Other Charges.

(a)     The Borrower will pay a fee on the average aggregate daily undrawn and unexpired amount of all outstanding Letters of Credit (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof) at a per annum rate equal to the Applicable Margin then in effect with respect to Term Benchmark Loans under the Revolving Facility, shared ratably among the Revolving Lenders and payable quarterly in arrears on each Fee Payment Date after the issuance date. In addition, the Borrower shall pay to each Issuing Lender for its own account a fronting fee in an amount equal to 0.125% per annum multiplied by the average aggregate daily undrawn and unexpired amount of all such Issuing Lender's Letters of Credit outstanding during the applicable period (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof), payable quarterly in arrears on each Fee Payment Date after the issuance date.

(b)     In addition to the foregoing fees, the Borrower shall pay or reimburse such Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

(c)     Fees with respect to Letters of Credit denominated in an Alternate Currency shall be calculated based on the average aggregate daily undrawn and unexpired Dollar Equivalent of such Letters of Credit denominated in an Alternate Currency and determined as of the Business Day preceding each Fee Payment Date (with respect to the fees paid on such date).

3.4     L/C Participations.

(a)     Each Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce each Issuing Lender to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Percentage in such Issuing Lender's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by such Issuing Lender thereunder. Each L/C Participant agrees with each Issuing Lender that, if a draft is paid under any Letter of Credit for which any Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein an amount equal to such L/C Participant's Revolving Percentage of the amount of such draft (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof determined as of the Business Day prior to the date such payment is made by such L/C Participant), or any part thereof, that is not so reimbursed. Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and irrevocable and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against such Issuing Lender, the Borrower, any other Group Member or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)    If any amount required to be paid by any L/C Participant to any Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the applicable Issuing Lender under any Letter of Credit is paid to such Issuing Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to such Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to such Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, such Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to ABR Loans under the Revolving Facility. A certificate of such Issuing Lender submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)    Whenever, at any time after any Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such L/C Participant shall return to such Issuing Lender the portion thereof previously distributed by such Issuing Lender to it.

3.5    Reimbursement Obligation of the Borrower. If any drawing is paid under any Letter of Credit, the Borrower shall reimburse the applicable Issuing Lender for the amount of (a) the drawing so paid and (b) any taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment, not later than by 3:00 p.m., New York City time, on (i) the Business Day on which notice of such drawing was received, if such notice is received on such day prior to 10:00 A.M., New York City time, or (ii) if clause (i) above does not apply, the Business Day following the day that the Borrower receives such notice. Each such payment shall be made to such Issuing Lender at its address for notices referred to herein in Dollars (or, in the case of a Letter of Credit denominated in an Alternate Currency, an amount equal to the Dollar Equivalent thereof determined as of the Business Day prior to the date such payment is made) and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant drawing is paid until payment in full at the rate set forth, (x) until the second Business Day next succeeding the date of the relevant notice, in Section 2.14(b) and (y) thereafter, in Section 2.14(d).

3.6    Obligations Absolute. The Borrower's obligations under this Section 3 shall be absolute~~ and~~, unconditional and irrevocable under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person (it being understood that this provision shall not preclude the ability of the Borrower to bring any claim for damages against any such Person who has acted with gross negligence or willful misconduct, as determined in a final and nonappealable decision of a court of competent jurisdiction). The Borrower also agrees with each Issuing Lender that each Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower

against any beneficiary of such Letter of Credit or any such transferee. No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Issuing Lender. The Borrower agrees that any action taken or omitted by any Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct (as determined in a final and nonappealable decision of a court of competent jurisdiction), shall be binding on the Borrower and shall not result in any liability of such Issuing Lender to the Borrower.

3.7     Letter of Credit Payments. If any draft shall be presented for payment under any Letter of Credit, the applicable Issuing Lender shall promptly notify the Borrower of the date and amount thereof. The responsibility of such Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

3.8     Applications. To the extent that any provision of any Application related to any Letter of Credit, or any other agreement submitted by the Borrower to, or entered into by the Borrower with, the applicable Issuing Lender or any other Person relating to any Letter of Credit, is inconsistent with the provisions of this Agreement, the provisions of this Agreement shall control.

3.9     [Reserved].

3.10    Additional Issuing Lenders. The Borrower may, at any time and from time to time, upon prior written notice to the Administrative Agent, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld) and such Lender, designate one or more additional Lenders (or Affiliates thereof) to act as an issuing bank with respect to Letters of Credit under the terms of this Agreement. Any Lender (or Affiliate thereof) designated as an Issuing Lender pursuant to this Section 3.10 shall be deemed to be an "Issuing Lender" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender (or Affiliate thereof) and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Lenders and such Lender (or Affiliate thereof) and such Lender (or Affiliate thereof) shall thereafter have the rights and obligations of an Issuing Lender under this Agreement and the other Loan Documents. Any such designation may be evidenced by a written instrument entered into by the Borrower, such Lender (or Affiliate thereof) and the Administrative Agent. In connection therewith, the Borrower, the Administrative Agent and the Issuing Lenders may agree on the amounts of Letters of Credit to be issued by each Issuing Lender.

SECTION 4.     REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, each Loan Party hereby jointly and severally represents and warrants to the Administrative Agent and each Lender that:

4.1     Financial Condition. The audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as at December 31, 2019 and December 31, 2020, and the related consolidated statements of income and of cash flows for the fiscal years ended on December 31, 2019 and December 31, 2020, reported on by and accompanied by an unqualified report as to going concern or scope of audit from PricewaterhouseCoopers, present fairly in all material respects the consolidated financial condition of the Borrower and its consolidated Subsidiaries as at such date, and the

consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). No Group Member has, as of the Closing Date after giving effect to the Transactions and excluding obligations under the Loan Documents and the Term Loan Documents, any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, which are required in conformity with GAAP to be disclosed therein and which are not reflected in the most recent financial statements referred to in this <u>Section 4.1</u> or in the draft 2021 financial statements provided to the Administrative Agent prior to the Closing Date.

4.2      <u>No Change</u>. Since December 31, 20210, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect other than with respect to any events or circumstances leading up to, or customarily resulting from, the filing of the Chapter 11 petition filed on August 23, 2022 with the United States Bankruptcy Court for the District of Delaware.

4.3      <u>Existence; Compliance with Law</u>. Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except where the failure to be so qualified or in good standing could not reasonably be expected to result in a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4      <u>Power; Authorization; Enforceable Obligations</u>. Each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder. Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement and to authorize the other Transactions. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect and (ii) the filings referred to in <u>Section 4.19</u>. No Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the consummation of the Transactions (excluding the Loan Documents), except (i) Governmental Approvals, consents, authorizations, filings and notices that have been obtained or made and are in full force and effect, (ii) the filings referred to in <u>Section 4.19</u> and (iii) those, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect. Each Loan Document has been duly executed and delivered on behalf of each Loan Party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.5      No Legal Bar. The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any material Requirement of Law, any Contractual Obligation of any Group Member that is material to the Borrower and its Subsidiaries taken as a whole or the Organizational Documents of any Loan Party and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law, any such Organizational Documents or any such Contractual Obligation (other than the Liens created by the Security Documents and Liens created under the Term Loan Documents). The consummation of the Transactions (excluding the Loan Documents) will not (a) violate (x) any Requirement of Law or any Contractual Obligation of any Group Member, except as would not reasonably be expected to have a Material Adverse Effect or (y) the Organizational Documents of any Loan Party and (b) will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law, any such Organizational Documents or any such Contractual Obligation (other than the Liens created by the Security Documents).

4.6      Litigation. No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Group Member, threatened by or against any Group Member or against any of their respective properties, assets or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.7      No Default. No Group Member is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

4.8      Ownership of Property; Liens. Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by with respect to each Group Member, Section 7.3.

4.9      Intellectual Property. The Group Members own, or are licensed to use, all Intellectual Property necessary for the conduct in all material respects of the business of the Borrower and its Restricted Subsidiaries, taken as a whole, as currently conducted, except where failure to own or license such Intellectual Property could not reasonably be expected to (a) impair or interfere in any material respect with the operations of the business conducted by the Borrower and its Restricted Subsidiaries, taken as a whole or (b) result in a Material Adverse Effect. No claim has been asserted and is pending by any Person challenging or questioning any Group Member's use of any Intellectual Property or the validity or effectiveness of any Group Member's Intellectual Property or alleging that the conduct of any Group Member's business infringes or violates the rights of any Person, nor does Holdings or the Borrower know of any valid basis for any such claim, in each case, except for such claims that could not reasonably be expected to (x) impair or interfere in any material respect with the operations of the business conducted by the Borrower and its Restricted Subsidiaries, taken as a whole or (y) result in a Material Adverse Effect.

4.10     Taxes. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Group Member has timely filed or caused to be filed all Tax returns that are required to be filed and has paid all Taxes whether or not shown to be due and payable on said returns or on any assessments made against it or any of its property and all other Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves in conformity with GAAP have been provided on the books

of the relevant Group Member); and no Tax Lien has been filed, and, to the knowledge of any of the Group Members, no claim is being asserted, with respect to any such Tax, fee or other charge.

4.11    Federal Regulations; Sanctions and Anti-Corruption Laws.

(a)    No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U), and no part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for the purpose of buying or carrying margin stock or for any purpose that violates the provisions of the Regulations of the Board. If requested by any Lender or the Administrative Agent and the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

(b)    The Borrower and its Subsidiaries and their respective directors, managers, officers and, to the knowledge of the Borrower, their respective employees and agents (acting in their capacity as such) are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions in all material respects. ~~Neither the Borrower nor any of its Subsidiaries nor any of their respective directors, managers, officers and, to the knowledge of the Borrower, their respective employees and agents has in the last five years made, offered, agreed, requested or taken an act in furtherance of an unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit, in each case in violation of Anti-Corruption Laws.~~ The Borrower and its Subsidiaries <u>have implemented and</u> will maintain<u>,</u> policies and procedures reasonably designed to ensure compliance with Anti-Corruption Laws and applicable Sanctions by the Borrower and its Subsidiaries and their respective directors, managers, officers, and employees and, in the case of Anti-Corruption Laws, its agents (acting in their capacity as such).

(c)    None of the Borrower, any of its Subsidiaries or any of their directors, managers, officers, or, to the knowledge of the Borrower, employees, or agents is an individual or entity that is, or is <u>50% or more</u> owned or<u>, where relevant under applicable Sanctions,</u> controlled by Persons that are: (i) the subject of any <u>economic or financial</u> sanctions <u>or trade embargoes,</u> administered by the U.S. Department of the Treasury's Office of Foreign Assets Control~~, or~~ the U.S. Department of State, <u>or any other agency of the U.S. government,</u> the United Nations Security Council, the European Union ~~or any European Union member state, Her~~<u>, His</u> Majesty's Treasury of the United Kingdom ~~or~~<u>, the Government of Canada (or the government of any province or territory thereof) or</u> any other relevant sanctions authority (collectively, the "Sanctions"), (ii) a Sanctioned Person or (iii) located, organized or resident in a Sanctioned ~~Country~~<u>Territory</u>. No part of the proceeds of any extension of credit hereunder will be used by the Borrower, directly or, to the knowledge of the Borrower, indirectly, or lent, contributed or otherwise made available to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of ~~or,~~ with<u>, or for the benefit of</u> any Sanctioned Person, or in any Sanctioned ~~Country~~<u>Territory, in violation of applicable Sanctions</u> (ii) in any other manner that would result in a violation by any Person of Sanctions by any Person (including any Person participating in the Loan, whether as lender, underwriter, advisor, investor, or otherwise) or (iii) in violation of Anti-Corruption Laws. The Loan Parties ~~have not in the last five years engaged in, are not now engaged in, and~~ will not for the term of this Agreement engage in~~,~~ any dealings or transactions with any Person, or in or with any Sanctioned ~~Countries~~<u>Territories</u>, to the extent in violation of Sanctions.

4.12    Labor Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of any Group Member, threatened; (b) hours worked by and

payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

       4.13    <u>ERISA</u>; Canadian Pension Plans.

       (a) Except as could not reasonably be expected to have a Material Adverse Effect, (i) no Reportable Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and (ii) each Plan has complied with the applicable provisions of ERISA and the Code. No termination of a Pension Plan pursuant to Section 4041(c) of ERISA or a failure to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 or 303 of ERISA has occurred during the five-year period prior to the date on which this representation is made or deemed made, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. The present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by an amount that could reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect, nor is any such withdrawal reasonably expected. No such Multiemployer Plan is Insolvent.

       (b) Except as could not reasonably be expected to have a Material Adverse Effect, each Canadian Defined Benefit Plan is fully funded in accordance with applicable laws on a going concern-basis and is in excess of the 85% solvency funding threshold as of the last actuarial valuation filed prior to the date on which this representation is made or deemed made with respect to any Canadian Defined Benefit Plan. To the knowledge of each Group Member, no facts or circumstances have occurred or existed that could result, or be reasonably anticipated to result, in the order of a termination of any Canadian Defined Benefit Plan by any Governmental Authority under applicable laws. No Group Member contributes to, participates in or has any liability in respect of any Canadian Multiemployer Plan as at the Closing Date. Except as could not reasonably be expected to have a Material Adverse Effect, no Canadian Pension Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Canadian Pension Plan. Except as could not reasonably be expected to have a Material Adverse Effect, each Canadian Pension Plan is duly registered under the Income Tax Act (Canada) and any other applicable laws which require registration, has been funded, administered and invested in accordance with the terms of such plan, the Income Tax Act (Canada) and all other applicable laws and no event has occurred which could cause the loss of such registered status. Except as could not reasonably be expected to have a Material Adverse Effect, there are no outstanding disputes concerning the Canadian Pension Plans or the assets thereof. Except as could not reasonably be expected to have a Material Adverse Effect, all contributions or premiums required to be made or paid by any Group Member to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws. No promises of benefit improvements under the Canadian Pension Plans have been made except as required by applicable laws and disclosed to the Lenders prior to the Closing Date or where such improvement would not be reasonably expected to have a Material Adverse Effect.

       4.14    <u>Investment Company Act; Other Regulations</u>. No Loan Party is an "investment company" within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is

subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.15    Subsidiaries. As of the Closing Date and after giving effect to the Transactions, (a) Schedule 4.15 sets forth the name and jurisdiction of organization of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party, and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary, except as created by the Loan Documents and the Term Loan Documents. As of the Closing Date, only the Restricted Subsidiaries organized in Argentina, Italy and Turkey constitute Cash Restricted Subsidiaries.

4.16    Use of Proceeds. The proceeds of the Loans and the Letters of Credit shall be used for working capital and general corporate purposes of the Borrower and its Restricted Subsidiaries, including on the Closing Date in accordance with Section 5.19(r) and to pay fees and expenses in connection with this Agreement.

4.17    Environmental Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    the facilities and properties owned, leased or operated by any Group Member (the "Properties") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)    no Group Member has received or has knowledge of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "Business"), nor does any Loan Party have knowledge that any such notice will be received or is being threatened;

(c)    Materials of Environmental Concern have not been released, transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been released, generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d)    no judicial proceeding or governmental or administrative action is pending or, to the knowledge of any Group Member, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business, nor, to the knowledge of any Group Member, are there any past or present actions, activities, circumstances, conditions, events or incidents with respect to the Properties or the Business, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that could form the basis of any such action or order against any Group Member or against any person or entity whose liability for any such action or order any Group Member has retained or assumed either contractually or by operation of law, or otherwise result in any costs or liabilities under Environmental Law;

(e)        the Properties and all operations at the Properties are in compliance, and have in the past been in compliance, with all applicable Environmental Laws;

(f)        the Borrower has provided the Administrative Agent with copies of all material assessments, reports, data, results of investigations or audits, and other similar information that is in the possession of or reasonably available to the Borrower regarding environmental matters pertaining to the environmental condition of the Borrower, or the compliance (or noncompliance) by the Borrower (with respect to the Properties or the Business) with any Environmental Laws; and

(g)        no Group Member has assumed any liability of any other Person under Environmental Laws.

4.18    Accuracy of Information, etc.

(a)        No statement or information concerning any Group Member or the Business contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading. The projections and pro forma financial information, taken as a whole, contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made and as of the Closing Date (with respect to such projections and pro forma financial information delivered prior to the Closing Date), it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized.

(b)        As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

4.19    Security Documents.

(a)        Subject to the Agreed Security Principles (solely with respect to the assets and property of (or the Capital Stock of) Specified Foreign Guarantors), each of the Security Documents is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. In the case of (i) the Capital Stock described in the Security Agreement that are securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(15) of the New York UCC or the corresponding code or statute of any other applicable jurisdiction ("Certificated Securities"), when certificates representing such Capital Stock are delivered to the Administrative Agent and the Term Loan Administrative Agent (in accordance with the Intercreditor Agreement), (ii) in the case of Collateral consisting of Deposit Accounts or Securities Accounts, when such Deposit Accounts or Securities Accounts, as applicable, are subject to an Account Control Agreement (as defined in the Security Agreement)  and (iii) in the case of the other Collateral not described in clauses (i) or (ii) constituting personal property described in the Security Agreement, when financing statements and other filings, agreements and actions specified on Schedule 4.19(a) in appropriate form are executed and delivered, performed or filed in the offices specified on Schedule 4.19(a), as the case may be, and Intellectual Property Security Agreements are filed with and recorded by

the United States Patent and Trademark Office, the United States Copyright Office, and any Canadian counterpart of the foregoing, as applicable, the Administrative Agent, for the benefit of the Secured Parties, shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (except Liens permitted by this Agreement or the Intercreditor Agreement, in each case, to be prior to the Liens on the Collateral Permitted Encumbrances). Other than as set forth on Schedule 4.19(a), as of the Closing Date, none of the Capital Stock of any Subsidiary Guarantor that is a limited liability company or partnership is a Certificated Security.

(b)    Each of the Mortgages delivered on or after the Closing Date is, or upon execution and recording will be, effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the recording offices for the applicable jurisdictions in which the Mortgaged Properties are located, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except Liens expressly permitted by this Agreement or the Intercreditor Agreement, in each case, to be prior to the Liens on the Collateral Permitted Encumbrances). Schedule 1.1C lists, as of the Closing Date, each parcel of owned real property located in the United States and held by the Borrower or any of its Restricted Subsidiaries that has a fair market value, in the reasonable opinion of the Borrower, in excess of $5,000,000.

4.20    Solvency. Each Loan Party is, and after giving effect to the Final Order on a pro forma basis, Transactions and the incurrence of all Indebtedness and obligations being incurred in connection herewith and therewith and the other transactions contemplated hereby and thereby will be and will continue to be, Solvent on a consolidated basis.

4.21    Regulation H. No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has not been made available under the National Flood Insurance Act of 1968.

4.22    Affected Financial Institution. No Loan Party is an Affected Financial Institution.

SECTION 5.    CONDITIONS PRECEDENT

5.1    Conditions to Initial Extension of Credit. The agreement of each Lender to make the initial extension of credit requested to be made by it under this Agreement on the Closing Date is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date (subject to the post-closing deliverables set forth on Schedule 6.15 with respect to certain of the Specified Foreign Guarantors), of the following conditions precedent:

(a)    Loan Documents.

(i)    The Administrative Agent shall have received, each in form and substance reasonably satisfactory to the Commitment Parties, (i) this Agreement, executed and delivered by the Borrower, Holdings, each Guarantor and each Person listed on Schedule 1.1A, (ii) the Security Agreement, executed and delivered by the Borrower, Holdings, each Subsidiary Guarantor and the other parties thereto, (iii) the Canadian Pledge and Security Agreement executed and delivered by [the general partner of the Borrower], (iv) the Intellectual Property

Security Agreements executed and delivered by each Loan Party party thereto, (v) each other Security Document executed and delivered by each Loan Party thereto, (vi) each Note duly executed by the Borrower in favor of each requesting Lender and (vii) the Intercreditor Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person party thereto.

(ii)       The Term Loan Documents shall be in full force and effect and the Borrower shall have received term loans under the Term Loan Credit Agreement in an aggregate principal amount of $[600,000,000]540,827,403.77.

(b)       Officer's Certificate. The Administrative Agent shall have received a certificate of the Borrower, dated the Closing Date, (i) certifying that the conditions in Section 5.1(d), Section 5.2(a), Section 5.2(b) have been met and (ii) attaching true and complete copies of the Term Loan Documents.

(c)       Pro Forma Financial Statements; Financial Statements. The Lenders shall have received (i) the unaudited pro forma consolidated balance sheet and related pro forma consolidated statement of income of the Borrower and its consolidated Restricted Subsidiaries as of and for the 12 months ended [June 30], 2022, prepared giving effect (as if such events had occurred on such date (in the case of the balance sheet) or at the beginning of such period (in the case of the statement of income)) to the consummation of the Transactions and the payment of fees and expenses in connection therewith, (ii) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the 2019 and 2020 fiscal years (provided that availability of such report on the U.S. Securities and Exchange Commission EDGAR information retrieval system shall satisfy this requirement), (iii) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the 2021 fiscal year and (iv) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal quarters ended March 31, 2022 and [June 30], 2022.

(d)       Existing Indebtedness. Prior to or substantially concurrently with the initial extensions of credit under this Agreement on the Closing Date, Indebtedness for borrowed money (excluding, for the avoidance of doubt, Indebtedness of the type described in clauses (d), (e) and (f) (solely with respect to letters of credit issued by Credit Suisse AG, Cayman Islands Branch and its Affiliates) of the definition thereof) and all Liens granted in connection with the foregoing shall have been terminated.

(e)       [Reserved]

(f)       Lien Searches. The Administrative Agent shall have received the results of recent lien and judgment searches in each of the jurisdictions where the Loan Parties are located (within the meaning of Section 9-307 of the New York UCC, the PPSA or the corresponding code or statute of any other applicable jurisdiction) and such searches shall reveal no liens on any of the assets of the Loan Parties (except for Permitted Liens), or any such Liens (except for Permitted Liens) shall be discharged on or prior to the Closing Date pursuant to customary documentation reasonably satisfactory to the Administrative Agent.

(g)       Fees. The Lenders, the Commitment Parties and the Administrative Agent shall have received all fees required to be paid, and all expenses required to be paid for which invoices have been presented (including the reasonable fees and expenses of legal counsel to the Administrative Agent), on or before the Closing Date.

(h)    <u>Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of <u>Exhibit C</u>, with appropriate insertions and attachments, including certified organizational authorizations, incumbency certifications, the certificate of incorporation or other similar organizational document of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and bylaws or other similar organizational document of each Loan Party certified by a Responsible Officer as being in full force and effect on the Closing Date, and (ii) a good standing certificate (long form, to the extent available) or the substantive equivalent for each Loan Party from its jurisdiction of organization.

(i)    <u>Legal Opinions</u>. The Administrative Agent shall have received the following executed legal opinions:

(i)    the legal opinion of Kirkland & Ellis LLP, special counsel to the Loan Parties; and

(ii)    the legal opinion of Goodmans LLP, special Ontario counsel to the general partner of the Loan Parties and Stewart McKelvey, special Nova Scotia counsel to the Loan Parties.

Each such legal opinion shall be in form and substance reasonably satisfactory to the Administrative Agent and shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent and the Commitment Parties may reasonably require.

(j)    <u>Pledged Stock; Stock Powers; Pledged Notes</u>. The Term Loan Administrative Agent shall have received (i) the certificates representing the shares of Capital Stock (to the extent certificated) pledged pursuant to the Security Agreement and the Canadian Pledge and Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, and (ii) each promissory note (if any) required to be pledged to the Administrative Agent pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(k)    <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code and PPSA financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than Permitted Liens), shall have been executed and delivered to the Administrative Agent in proper form for filing, registration or recordation.

(l)    <u>Solvency Certificate</u>. The Administrative Agent shall have received a solvency certificate in the form of Exhibit H from the chief financial officer, treasurer or other appropriate officer or director, as applicable, of Holdings, demonstrating that Holdings, the Borrower and the Guarantors is, and after giving effect to the Transactions and the other transactions contemplated hereby, will be and will continue to be, Solvent on a consolidated basis.

(m)    <u>Insurance</u>. The Administrative Agent shall have received insurance certificates satisfying the requirements of <u>Section 4.2(b)</u> of the Security Agreement.

(n)    <u>Patriot Act; Beneficial Ownership</u>. The Administrative Agent and the Lenders (to the extent requested) shall have received (i) at least five Business Days prior to the Closing Date, all

documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act and CAML and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five days prior to the Closing Date, any Lender that has requested, in a written notice to the Borrower at least 10 days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(o)    Inventory Appraisal and Field Examination.

(i)    The Administrative Agent shall have received appraisals of the Borrowing Base Loan Parties' Inventory from one or more firms satisfactory to the Administrative Agent, which appraisals shall be satisfactory to the Administrative Agent in its sole discretion.

(ii)    The Administrative Agent or its designee shall have conducted a field examination of the Borrowing Base Loan Parties' Accounts, Inventory and related working capital matters and of the Borrowing Base Loan Parties' related data processing and other systems, the results of which shall be satisfactory to the Administrative Agent in its sole discretion.

(p)    Borrowing Base Certificate. The Administrative Agent shall have received a completed Borrowing Base Certificate at least 3 Business Days prior to the Closing Date, which calculates the Borrowing Base as of [  ], 2022.

(q)    Deposit Account Control Agreements. The Administrative Agent shall have received Deposit Account Control Agreements required to be delivered pursuant to the Security Agreement, in each case in form and substance reasonably satisfactory to the Administrative Agent; provided that if, notwithstanding the use by the Loan Parties of commercially reasonable efforts (without undue burden and expense) to satisfy the requirements set forth in this Section 5.1(q) and, such requirement is not satisfied as of the Closing Date, the satisfaction of such requirements shall not be a condition to the agreement of each Lender to make the initial extension of credit requested to be made by it (but shall be required to be satisfied within 60 days of the Closing Date (or such later date as the Administrative Agent may agree in its reasonable discretion)).

(r)    Revolving Loans and L/C Obligations. Not more than $[47,424,495.19] of Revolving Loans shall be drawn and no L/C Obligations shall be outstanding on the Closing Date. Substantially simultaneously with the initial drawings of the Revolving Loans, such drawings shall be applied pursuant to Article III.B.3(c)(ii)(B) of the Chapter 11 Plan and any funded amounts in excess thereof shall be applied pursuant to Article III.B.3(c)(ii)(A)(x) of the Chapter 11 Plan.

(s)    Material Adverse Effect. Since December 31, 2021 and after taking into account the Transactions and after giving effect to the consummation of the Chapter 11 Plan, there not having been any change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, properties, assets, financial condition or results of operations of the Borrower and its subsidiaries, taken as a whole, other than as a result of events leading up to, resulting from and/or following the commencement of their proceedings under chapter 11 of the Bankruptcy Code or the continuation and prosecution thereof (including the announcement of the filing or commencement of the Chapter 11 Cases).

(t)      Confirmation Order. The Confirmation Order shall have become a Final Order (as defined in the Chapter 11 Plan) and such order shall not have been amended, modified, vacated, stayed or reversed.

(u)      Conditions Precedent to Plan. The conditions precedent to the confirmation of the Chapter 11 Plan set forth in the Chapter 11 Plan shall have occurred and the conditions precedent to the Effective Date shall have occurred. With respect to such conditions precedent to the confirmation of the Chapter 11 Plan and Effective Date, the Borrower shall have confirmed to Administrative Agent in writing that such conditions precedent have been satisfied or waived and that the Effective Date has occurred.  All other actions, documents and agreements necessary to implement the Chapter 11 Plan shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

(v)      Bankruptcy Proceeding. There shall be no adversary proceeding pending in the Bankruptcy Court or any court of any other jurisdiction, or litigation commenced outside of the bankruptcy proceedings that is not stayed pursuant to section 362 of the Bankruptcy Code, seeking to enjoin or prevent the Transactions.

(w)      Rights Offering. The Rights Offering (as defined in the Chapter 11 Plan) shall have closed in accordance with its terms and the Borrower shall have received the proceeds therefrom and applied such proceeds (if any) in accordance with the Chapter 11 Plan.

(x)      Minimum Liquidity. As of the Effective Date (as defined in the Chapter 11 Plan) and after giving effect to the Restructuring Transactions (as defined in the Chapter 11 Plan), the Borrower and its Restricted Subsidiaries shall have Minimum Liquidity. "Minimum Liquidity" means, with respect to the Borrower and its Restricted Subsidiaries as of the Effective Date, an amount of total Liquidity equal to $~~100 million~~100,000,000, including at least $~~60 million~~60,000,000 of unrestricted balance sheet cash for Borrower and its Restricted Subsidiaries (provided that in no event shall more than $~~15 million of such unrestricted balance sheet cash be~~20,000,000 of such Liquidity be Unrestricted ~~c~~Cash of Cash Restricted Subsidiaries that is restricted on transfers, including as a result of currency control restrictions), after taking into account (x) any Cash (as defined in the Chapter 11 Plan) distributions to be paid under the Chapter 11 Plan on or about the Effective Date and (y) any amounts that may come due after the Effective Date on account of Allowed Professional Fee Claims (as defined in the Chapter 11 Plan ~~as~~), net of the aggregate amount funded into the Professional Escrow Account (as defined in the Chapter 11 Plan) pursuant to Article II.C of the Chapter 11 Plan.

(y)      The Chapter 11 Plan. The Original Chapter 11 Plan shall not have been amended, supplemented or modified in a manner that is materially adverse to the interests of the Lenders without the consent of the Lenders and as further set forth in the Commitment Letter.

5.2      Conditions to Each Extension of Credit. The agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit, but excluding any Protective Advance) is subject to the satisfaction of the following conditions precedent:

(a)      Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

96

(b)     No Default. At the time of and immediately after giving effect to the extensions of credit requested to be made on such date, no Default or Event of Default shall have occurred and be continuing on such date.

(c)     Protective Advances. No Borrowing shall be made on any date if a Protective Advance is outstanding unless the proceeds of such Borrowing are applied to repay in full (or to the extent of such Borrowing) such Protective Advance.

(d)     Cure Period. No Cure Period shall be in effect unless the Borrower shall have received the Cure Amount.

Each borrowing by, and each issuance, renewal, extension, increase or amendment of a Letter of Credit on behalf of, the Borrower hereunder (other than with respect to a Protective Advance) shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

SECTION 6.    AFFIRMATIVE COVENANTS

Holdings and the Borrower hereby jointly and severally agree that, until all Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification and reimbursement obligations for which no claim has been made) and all Letters of Credit have been canceled, have expired or have been Collateralized, each of Holdings and the Borrower shall and shall cause each of its Restricted Subsidiaries to:

6.1     Financial Statements. Furnish to the Administrative Agent (who shall promptly furnish to each Lender):3

(a)     as soon as available, but in any event within 105 days after the end of each fiscal year of the Borrower, (and 150 days after the fiscal year ending December 31, 2022), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year reported on, and with respect to the fresh start accounting period in 2022 and each period thereafter, without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit (other than with respect to or resulting from (i) the maturity of any Loans under this Agreement (or, the maturity of the Term Loans), occurring within one year from the time such opinion is delivered or (ii) any potential inability to satisfy the financial covenants under Section 7.1 (or, the financial covenants under Section 7.1 of the Term Loan Credit Agreement) on a future date or for a future period), by PricewaterhouseCoopers or other independent certified public accountants of nationally recognized standing; provided that delivery within the time period specified above of copies of the Annual Report on Form 10-K of the Borrower (or any (x) Parent Company or (y) direct or indirect parent company thereof (with reconciliations and/or adjustments reasonably requested by the Administrative Agent) filed with the SEC (subject to the same requirements as to lack of qualification or exception as to the audit or the scope thereof) shall be deemed to satisfy the requirements of this Section 6.1(a); and

(b)     as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance

---

3     NTD: Subject to auditor review.

sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as fairly stating in all material respects the financial position of the Borrower and its consolidated Subsidiaries in accordance with GAAP for the period covered thereby (subject to normal year-end audit adjustments and the absence of footnotes, and for the period ending September 30, 2022, may not be accounted for in accordance with ASC 852); provided that delivery within the time period specified above of copies of the Quarterly Report on Form 10-Q of the Borrower (or any (x) Parent Company or (y) direct or indirect parent company thereof (with reconciliations and/or adjustments reasonably requested by the Administrative Agent)) filed with the SEC shall be deemed to satisfy the requirements of this Section 6.1(b).

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and (except as otherwise provided below) in accordance with GAAP applied consistently (except to the extent any such inconsistent application of GAAP has been approved by such accountants (in the case of clause (a) above) or officer (in the case of clause (b) above), as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods. Notwithstanding the foregoing, the obligations in Sections 6.1(a) and (b) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of Holdings or any direct or indirect parent of Holdings; provided to the extent such information relates to a parent of the Borrower, such information is accompanied by information that explains in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to the Borrower and their consolidated Subsidiaries on a standalone basis, on the other hand.

6.2    Certificates; Borrowing Base; Other Information. Furnish to the Administrative Agent (who shall promptly furnish to each Lender) or, in the case of clause (h), to the relevant Lender:

(a)    promptly upon the request of the Administrative Agent, in connection with the delivery of any financial statements or other information pursuant to Section 6.1 or this Section 6.2, confirmation of whether such statements or information contains any Private Lender Information. Holdings and the Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Holdings, the Borrower, their respective Subsidiaries or their securities) and, if documents or notices required to be delivered pursuant to Section 6.1 or this Section 6.2 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "Platform"), any document or notice that Holdings, the Borrower or any of its Restricted Subsidiaries has indicated contains Private Lender Information shall not be posted on that portion of the Platform designated for such public-side Lenders. If Holdings, the Borrower and its Restricted Subsidiaries have not indicated whether a document or notice delivered pursuant to Section 6.1 or this Section 6.2 contains Private Lender Information, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to Holdings, the Borrower, its Subsidiaries and their securities;

(b)    [reserved];

(c)    concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate, (ii) (x) a Compliance Certificate (A) containing all information and calculations necessary for determining

compliance by the Borrower with the provisions of Section 7.1 of this Agreement (regardless of whether such covenant is then applicable) as of the last day of the applicable fiscal quarter or fiscal year of the Borrower, as the case may be, (B) certifying a list of names of all Immaterial Subsidiaries, that each Subsidiary set forth on such list individually qualifies as an Immaterial Subsidiary and that all such Subsidiaries in the aggregate do not exceed the limitation set forth in the proviso of the definition of the term "Immaterial Subsidiary", and (C) certifying a list of names of all Unrestricted Subsidiaries and that each Subsidiary set forth on such list individually qualifies as an Unrestricted Subsidiary and (y) to the extent not previously disclosed to the Administrative Agent, a description of any change in the jurisdiction of organization of any Loan Party and a list of any registered Intellectual Property acquired or developed by any Loan Party since the date of the most recent report delivered pursuant to this clause (y) (or, in the case of the first such report so delivered, since the Closing Date);

(d)        as soon as available, and in any event no later than 105 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including (i) projected consolidated quarterly income statements and (ii) projected consolidated annual balance sheets of the Borrower and its Subsidiaries, the related consolidated statements of projected cash flow, projected changes in financial position and projected income and a description of the material underlying assumptions applicable thereto) (collectively, the "Projections"), which Projections shall be based on reasonable estimates, information and assumptions that are reasonable at the time in light of the circumstances then existing, it being understood that projections are subject to uncertainties and there is no assurance that any projections will be realized;

(e)

(i)        within 20 calendar days of the end of each calendar month (or, if such day is not a Business Day, on the immediately following Business Day) (and during a Cash Dominion Period, on or prior to the third Business Day of each calendar week, with respect to the prior week), as of the period then ended, a Borrowing Base Certificate, and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(ii)        within 20 calendar days of the end of each calendar month (or, if such day is not a Business Day, on the immediately following Business Day) (and during a Cash Dominion Period, on or prior to the third Business Day of each calendar week, with respect to the prior week), as of the period then ended, all delivered electronically in a text formatted file acceptable to the Administrative Agent;

(A)        a detailed aging of the Borrowing Base Loan Parties' Accounts, including all invoices aged by invoice date and due date (with an explanation of the terms offered), prepared in a manner reasonably acceptable to the Administrative Agent, together with a summary specifying the name, and balance due for each Account Debtor;

(B)        a schedule detailing the Borrowing Base Loan Parties' Inventory, in form satisfactory to the Administrative Agent, by location (showing Inventory in transit, any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, semi-finished goods, finished goods and service parts), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost or market and adjusted for Reserves as the Administrative Agent has previously indicated to the Borrower are deemed by the Administrative Agent to be appropriate;

(C)    a worksheet of calculations prepared by the Borrowing Base Loan Parties to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion; and

(D)    such other information as required pursuant to the Schedule of Information section of <u>Exhibit J</u>.

(iii)    within 20 days of the end of each calendar month as of the month then ended, a schedule and aging of the Borrowing Base Loan Parties' accounts payable, delivered electronically in a text formatted file acceptable to the Administrative Agent;

(iv)    concurrently with the Disposition of any assets or the designation of any Restricted Subsidiary as an Unrestricted Subsidiary that has assets, in each case included in the Borrowing Base that contribute more than $4,000,000 of the Borrowing Base (other than any Disposition pursuant to Section 7.5(b)), the Borrower shall provide a Borrowing Base Certificate (providing a calculation of the Borrowing Base after giving effect to such Disposition), and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(v)    promptly upon the Administrative Agent's request in the Administrative Agent's Permitted Discretion:

(A)    a reconciliation of the Borrowing Base Loan Parties' Accounts and Inventory between (A) the amounts shown in the Borrowing Base Loan Parties' general ledger and financial statements and the reports delivered pursuant to clauses (A) and (B) of clause (e)(ii) above and (B) the amounts and dates shown in the reports delivered pursuant to clauses (A) and (B) of clause (e)(ii) above and the Borrowing Base Certificate delivered pursuant to clause (e)(i) above as of such date; and

(B)    a reconciliation of the loan balance per the Borrowing Base Loan Parties' general ledger to the loan balance under this Agreement;

(C)    [reserved];

(D)    [reserved];

(E)    [reserved];

(F)    an updated customer list for each Borrowing Base Loan Party, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Administrative Agent and certified as true and correct by a Responsible Officer of the Borrower;

(G)    [reserved];

(H)    [reserved]; and

(I)    a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction.

(f)        [Rreserved];

(g)        promptly, copies of all financial statements and reports that Holdings, the Borrower or any of their respective Restricted Subsidiaries sends generally to the holders of any class of its debt securities or public equity securities, acting in such capacity, and, within five days after the same are filed, copies of all financial statements and reports that Holdings, the Borrower or any of their respective Restricted Subsidiaries may make to, or file with, the SEC;

(h)        promptly following any Lender's request therefor, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering or terrorist financing rules and regulations, including, without limitation, the PATRIOT Act, CAML and the Beneficial Ownership Regulation;

(i)        promptly following either a request thereof or any Reportable Event, copies of (i) any documents described in Section 101(k) or 101(l) of ERISA that the Borrower, its Affiliates or any Commonly Controlled Entity has received with respect to any Multiemployer Plan or any documents described in Section 101(f) of ERISA that the Borrower, its Affiliates or any Commonly Controlled Entity has received with respect to any Pension Plan; provided, that if the relevant entity has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent or upon a Reportable Event, such entity shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(j)        promptly following the request thereof, copies of the most recently sent or filed actuarial report and annual information return required to be filed with the Financial Services Regulatory Authority of Ontario or the Canada Revenue Agency or any other applicable Governmental Authority in connection with each Canadian Defined Benefit Plan;

(k)        as promptly as reasonably practicable following the Administrative Agent's request therefor, such additional information concerning any Canadian Pension Plan in the possession of any Group Member as may be reasonably requested by Administrative Agent from time to time;

(l)        copies of substantially final drafts of all agreements and ancillary documents relating to the entering into, or any material amendments, waivers or supplements with respect to, a Receivables Facility; and

(m)        as promptly as reasonably practicable from time to time following the Administrative Agent's request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Restricted Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent may reasonably request (on behalf of itself or any Lender).

6.3        <u>Payment of Obligations</u>.  Pay, discharge or otherwise satisfy at or before they become delinquent, as the case may be, all its Tax liabilities, except (i) with respect to income taxes, where the failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and adequate reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member.

6.4    <u>Maintenance of Existence; Compliance</u>. (a) (i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain or obtain all Governmental Approvals and all other all rights, privileges and franchises, in each case necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by <u>Section 7.4</u> and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect; (c) for each existing or hereafter adopted Plan or Canadian Pension Plan, comply in a timely fashion with and perform in all material respects all of its funding, investment  and administration obligations under and in respect of such Plan or Canadian Pension Plan, including under any funding agreements and all applicable laws, which obligations if unpaid or unperformed could reasonably be expected to result in the imposition of a Lien against any of its property; and (d) comply with all Governmental Approvals except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.5    <u>Maintenance of Property; Insurance</u>. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear and casualty and condemnation excepted, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, (b) maintain all the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks, industrial designs and trade names material to the conduct of its business, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (c) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by similarly situated companies engaged in the same or a similar business.

6.6    <u>Inspection of Property; Books and Records; Discussions; Appraisals; Field Examinations</u>.

(a)    (i) Keep proper books of records and account in which entries full, true and correct in all material respects in conformity with all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and from which financial statements conforming with GAAP can be derived and (ii) permit, at the Borrower's sole expense, representatives of the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time during normal business hours, upon reasonable prior notice, and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants; provided that (x) in no event shall there be more than one such visit for the Administrative Agent and its representatives as a group per calendar year except during the continuance of an Event of Default and (y) the Borrower shall have the right to be present during any discussions with accountants.

(b)    No more than once in each twelve month period, at the request of the Administrative Agent, the Loan Parties will cooperate with an appraiser selected and engaged by the Administrative Agent to provide Inventory appraisals or updates thereof (the "<u>Annual Inventory Appraisal</u>"), prepared on a basis reasonably satisfactory to the Administrative Agent, such appraisals and updates to include information required by applicable law and regulations; <u>provided</u> that (i) if an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of such appraisals and (ii) in addition to the Annual Inventory Appraisal, if Excess Availability is less than the greater of (x) 20% of the Line Cap or (y) $15,000,000 for a period of five consecutive Business Days, the Loan Parties will cooperate with the Administrative Agent to provide such appraisals (at the request of

the Administrative Agent) on one additional occasion during such twelve month period; provided further the Administrative Agent shall have the right, but not any obligation, to conduct additional Inventory appraisals if the value of Inventory designated in the subledger as film inventory of the Borrowing Base Loan Parties (valued at the lower of cost and market) is greater than 50% of the value of the Eligible Inventory (valued at the lower of cost and market). For purposes of this Section 6.6(b), it is understood and agreed that a single appraisal may consist of appraisals conducted at multiple relevant sites and involve one or more relevant Loan Parties and their assets. All such appraisals shall be commenced upon reasonable notice to the Borrower and performed during normal business hours of the Borrower, and all reasonable out-of-pocket costs of such appraisals shall be at the sole expense of the Loan Parties.

(c)    No more than once in each twelve month period, at the request of the Administrative Agent, the Loan Parties will permit, upon reasonable notice, the Administrative Agent or its designee to conduct a field examination (the "Annual Field Examination") to ensure the adequacy of Collateral included in any Borrowing Base and related reporting and control systems and determine any variance between the Loan Parties' general ledger and perpetual inventory report; provided that (i) if an Event of Default has occurred and is continuing, there shall be no limitation on the number or frequency of such field examinations and (ii) in addition to the Annual Field Examination, if Excess Availability is less than or equal to the greater of (x) 20% of the Line Cap or (y) $15,000,000 for a period of five consecutive Business Days, the Loan Parties will permit the Administrative Agent to conduct such examinations (at the request of the Administrative Agent) on one additional occasion during such twelve month period. For purposes of this Section 6.6(c), it is understood and agreed that (i) a single field examination may be conducted at multiple relevant sites and involve one or more relevant Loan Parties and their assets and (ii) the Administrative Agent shall use commercially reasonable efforts to coordinate any such field exams. All such field examinations shall be commenced upon reasonable notice to the Borrower and performed during normal business hours of the Borrower, and all reasonable out-of-pocket costs of such field examinations shall be at the sole expense of the Loan Parties.

6.7    Notices. Promptly give notice to the Administrative Agent (who shall promptly furnish to each Lender) following a Responsible Officer's knowledge of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation or proceeding affecting any Group Member (i) in which the amount involved is $150,000,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought which injunctive or similar relief could reasonably be expected to result in a Material Adverse Effect or (iii) which relates to any Loan Document;

(d)    the following events, promptly and in any event within 30 days after the Borrower knows that the following has occurred or is reasonably likely to occur: (i) the occurrence of any Reportable Event or Canadian Pension Event with respect to any Plan or Canadian Pension Plan or a failure to make any required contribution to a Plan or a Canadian Pension Plan that, in either case, could reasonably be expected to have a Material Adverse Effect, (ii) the creation of any Lien in favor of the PBGC or a Plan or a Canadian Pension Plan or any withdrawal from, or the termination, Insolvency of, any Multiemployer Plan that would result in the imposition of a liability that could reasonably be expected to have a Material Adverse Effect, or (iii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer

Plan with respect to the withdrawal from, or the termination (in other than a "standard termination" as defined in ERISA), Insolvency of, any Plan that, in any such case, could reasonably be expected to have a Material Adverse Effect; and

(e)    any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this <u>Section 6.7</u> shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8    <u>Environmental Laws</u>.

(a)    Comply with, and take commercially reasonably action to ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and take commercially reasonably action to ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required <u>or reasonably prudent</u> under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect or such requirements are contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of such Group Member, and in the event that any Group Member shall fail timely to commence or cause to be commenced or fail diligently to prosecute to completion such actions, or contest such requirement in good faith as provided herein, allow the Administrative Agent (at its election) to cause such actions to be performed, and promptly pay all costs and expenses (including, without limitation, attorneys' and consultants' fees, charges and disbursements) thereof or incurred by the Administrative Agent in connection therewith.

6.9    <u>Additional Collateral, etc.</u>

(a)    With respect to any property (to the extent included in the definition of Collateral) acquired at any time after the Closing Date by any Loan Party that is a Group Member (or any Group Member required to become a Loan Party pursuant to the terms of the Loan Documents) (other than (x) any property described in clause (b), (c) or (d) below and (y) any property subject to a Lien expressly permitted by clauses (g), (o), (u), (x) and (aa) of <u>Section 7.3</u> to the extent and for so long as the obligations relating to such Liens do not permit a Lien on such property in favor of the Secured Parties) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien (with respect to any assets or property of (and Capital Stock of) any Specified Foreign Guarantors, subject to the Agreed Security Principles) within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Documents or to the extent requested by the Administrative Agent, execute a security agreement compatible with the laws of Canada or any province or territory thereof in form and substance reasonably satisfactory to the Administrative Agent, or such other documents as the Administrative Agent reasonably deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such property and (ii) take all actions reasonably necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first

priority security interest (subject to Permitted Liens and the Intercreditor Agreement) in such property, including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may reasonably be requested by the Administrative Agent.

(b)    With respect to any interest in any real property (excluding any leasehold interest) having a value (together with improvements thereof) of at least $5,000,000 acquired after the Closing Date by any Loan Party that is a Group Member (or any Group Member required to become a Loan Party pursuant to the terms of the Loan Documents) (other than any such real property subject to a Lien expressly permitted by clauses (g), (o) and (q) of <u>Section 7.3</u> to the extent and for so long as the obligations relating to such Liens do not permit a Lien on such property in favor of the Secured Parties) (with respect to any assets or property of any Specified Foreign Guarantors, subject to the Agreed Security Principles), within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver a Mortgage (with the highest priority permitted by the Intercreditor Agreement), in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such interest in real property, (ii) if requested by the Administrative Agent, provide the Lenders with title and extended coverage insurance covering such interest in real property in an amount at least equal to the fair market value of such real property (or such lesser amount as shall be specified by the Administrative Agent) as well as a current ALTA survey thereof (or an existing survey accompanied if necessary by a "no-change" affidavit and/or other documents if same is sufficient to obtain survey coverage in the applicable title policy), together with a surveyor's certificate and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above in clause (i), which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent, and (iv) provide the Administrative Agent with evidence indicating whether the mortgaged real property is located within a one hundred year flood plain or identified as a special flood hazard area as defined by the Federal Emergency Management Agency (or any successor agency) ("<u>FEMA</u>"), and, if so a flood notification form signed by the applicable Loan Party, in form and substance reasonably satisfactory to Administrative Agent. In addition, if at any time any portion of the real property encumbered by such Mortgage is located in a one hundred year flood plain or an area designated a "special flood hazard area" by FEMA and for which flood insurance has been made available under the National Flood Insurance Act of 1968 (or any amendment or successor act thereto), such Loan Party shall obtain and maintain flood insurance in such total amount as the Administrative Agent may from time to time reasonably require and shall provide the Administrative Agent with evidence reasonably satisfactory to Administrative Agent thereof.

(c)    With respect to any new Domestic Subsidiary or Canadian Subsidiary created or acquired after the Closing Date by any Group Member other than any Excluded Subsidiary (which, for the purposes of this <u>Section 6.9(c)</u>, shall include any existing Subsidiary that ceases to be a Foreign Subsidiary, a Non-Guarantor Subsidiary or an Unrestricted Subsidiary), within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to this Agreement, the Security Agreement, or, in the case of a Canadian Subsidiary execute such other Security Documents (or joinder agreements) to the extent possible under and compatible with the laws of such Canadian Subsidiary's jurisdiction of organization, chief executive office, head office, registered office and domicile (within the meaning of the Civil Code of Quebec)), as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted ~~Liens and the Intercreditor Agreement~~Encumbrances) in the Capital Stock of such new Subsidiary Guarantor that is owned by any Group Member, (ii) deliver to the Administrative Agent or the Term Loan Administrative Agent (in accordance with the Intercreditor Agreement) the certificates representing such Capital Stock (if any), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii) cause such new Subsidiary Guarantor (a) to execute and deliver to the

Administrative Agent (x) a Guarantor Joinder Agreement or such comparable documentation requested by the Administrative Agent to ~~become a Subsidiary Gg~~uarant~~ory the Obligations~~, (y) a joinder agreement to the Security Agreement, substantially in the form annexed thereto and, in the case of a Subsidiary Guarantor that is a Canadian Subsidiary, to the extent requested by the Administrative Agent, execute a security agreement compatible with the laws of such Canadian Subsidiary's jurisdiction or in the jurisdictions in which its tangible property, chief executive office, head office, registered office and domicile (within the meaning of the Civil Code of Quebec) are located, in each case, in form and substance reasonably satisfactory to the Administrative Agent, (b) to take such actions reasonably necessary or advisable to grant to the Administrative Agent for the benefit of the Secured Parties a perfected first priority security interest (subject to Permitted ~~Liens and the Intercreditor Agreement~~Encumbrances) in the Collateral described in the Security Agreement with respect to such new Subsidiary Guarantor, including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Administrative Agent and (c) to deliver to the Administrative Agent a certificate of such Subsidiary Guarantor, substantially in the form of Exhibit C, with appropriate insertions and attachments, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d)    With respect to any new Restricted Subsidiary which is a First-Tier CFC Holdco or First-Tier Foreign Subsidiary (other than an Immaterial Subsidiary or Excluded Foreign Subsidiary) created or acquired after the Closing Date by any Loan Party that is a Group Member, within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement and, to the extent requested by the Administrative Agent, a security agreement compatible with the laws of such Foreign Subsidiary's jurisdiction, as the Administrative Agent deems necessary or reasonably advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted Encumbrances) in the Capital Stock of such Foreign Subsidiary that is owned by any such Group Member that is a Loan Party; provided that in no event shall ~~(I) more than 66% of the total outstanding voting Capital Stock of any such Foreign Subsidiary or (II)~~ any Capital Stock of any Excluded Foreign Subsidiary described in clause (ii) of the definition of ~~the Excluded Foreign Subsidiary~~Collateral be required to be so pledged to the extent such a pledge would, in the good faith judgment of the Borrower and the Administrative Agent at the time provided or thereafter could reasonably be expected to result in material adverse tax consequences or material repatriation of earnings to the Borrower at the time or in the future, (ii) deliver to the Administrative Agent or the Term Loan Administrative Agent (as required by the Intercreditor Agreement) the certificates (if any) representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, and take such other action as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable to perfect the Administrative Agent's security interest therein, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent; provided that in the event the stamp, excise or similar taxes of any jurisdiction applicable to the pledge of Capital Stock of any Foreign Subsidiary organized in such jurisdiction are excessive in relation to customary practices or the benefit afforded to the Secured Parties from such pledge and the compliance with the provisions of this Section 6.9(d) would result in the imposition of such stamp, excise or similar taxes on the Borrower and its Restricted Subsidiaries, the Administrative Agent may elect not to require the Loan Parties to pledge such Capital Stock of any such Foreign Subsidiary or not to require such pledge to be recorded or registered in any applicable jurisdiction, or may defer such requirement to such date or time as the Administrative Agent may determine.

106

(e)     With respect to any new Non-Guarantor Subsidiary created or acquired after the Closing Date by any Loan Party (but excluding the Capital Stock of any such Subsidiary that is a Foreign Subsidiary and any Non-Guarantor Subsidiary to the extent a pledge of the Capital Stock of such entity is prohibited by its Organizational Documents or requires the consent of any Person party thereto (other than a Group Member)that is an Excluded Asset, in either case, under clause (iv)(4) of the definition thereof), within 90 days (or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to this Agreement and the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest (subject to Permitted Encumbrances) in the Capital Stock of such Non-Guarantor Subsidiary that is owned by any Loan Party, (ii) deliver to the Administrative Agent or the Term Loan Administrative Agent (as required by the Intercreditor Agreement) the certificates representing such Capital Stock (if any), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member and (iii) cause such new Subsidiary Guarantor to deliver to the Administrative Agent a certificate of such Subsidiary Guarantor, substantially in the form of Exhibit C, with appropriate insertions and attachments.

(f)     NoOther than as set forth in the Agreed Security Principles and Section 7.5(v) of this Agreement, no actions in any jurisdiction outside the United States and Canada shall be required in order to create any security interests in assets located or titled outside of the United States and Canada, or to perfect any security interests in such assets, including any Intellectual Property registered in any jurisdiction outside the United States or Canada (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any jurisdiction outside the United States or Canada (other than the agreements listed on Schedule 6.15)).

(g)     With respect to (x) any Subsidiary Guarantor under clause (ii) of the definition of "Subsidiary Guarantor", simultaneously with such Subsidiary Guarantor becoming a guarantor in respect of the Term Loans, Indebtedness permitted under Section 7.2(b) or any Permitted Refinancing in respect of the foregoing and (y) any other Specified Foreign Guarantor, within 90 days (or such longer period as agreed by the Administrative Agent) of the designation thereof (i) cause such Subsidiary (a) to execute and deliver to the Administrative Agent (x) such documentation comparable to the Guarantor Joinder Agreement requested by the Administrative Agent to guaranty the Obligations, (y) subject to the Agreed Security Principles, to execute a security agreement compatible with the laws of such Subsidiary's jurisdiction, in form and substance reasonably satisfactory to the Administrative Agent and (ii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(h)     (g) Notwithstanding anything to the contrary in this Section 6.9, with respect to each Foreign Subsidiary that becomes a party to this Agreement after the Closing Date, the obligations of such Foreign Subsidiary under this Agreement, any Guarantee, any Security Document, or any other Loan Document, may be limited (and such agreements may be amended, restated, supplemented or otherwise modified to give effect to such limitations without the consent of any Person other than the Administrative Agent and such Foreign Subsidiary) in accordance with the Agreed Security Principles on terms reasonably satisfactory to the Administrative Agent and the Borrower. As of the Closing Date, each Lender party to this Agreement, which Lenders constitute the Required Lenders, and each Lender that becomes a party to this Agreement after the Closing Date, expressly consents to the terms set forth in, and the rights of the Administrative Agent to consent to the terms of the amendments, restatements, supplements and modifications described in, the immediately preceding sentence.

6.10     Deposit Account Control Agreements. With respect to any new Deposit Account that is not an Excluded Account opened by a Loan Party after the Closing Date or any Excluded Account that ceases to be an Excluded Account, deliver to the Administrative Agent any Deposit Account Control Agreement required to be delivered pursuant to the Security Agreement, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

6.11     Further Assurances. At any time or from time to time upon the request of the Administrative Agent, at the expense of the Borrower, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent may reasonably request in order to effect fully the purposes of the Loan Documents. In furtherance and not in limitation of the foregoing, the Loan Parties shall take such actions as the Administrative Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, obtaining of title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession, in each case to the extent required by the applicable Security Documents) to ensure that the Obligations are guaranteed by the Guarantors, on a first priority basis (subject to Permitted ~~Liens~~Encumbrances) and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of this Agreement and the other Loan Documents) of the Loan Parties, in each case subject to the Agreed Security Principles with respect to the assets and property of (and Capital Stock of) Specified Foreign Guarantors.

6.12     [Reserved].

6.13     Designation of Unrestricted Subsidiaries. The Borrower may at any time after the Closing Date designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary (other than with respect to any subsidiary in existence as of the Closing Date); provided that

(i) (A) immediately before and after such designation, no Default shall have occurred and be continuing, and (B) immediately after giving effect to such designation, the Borrower shall be in compliance with the Financial Performance Covenant set forth in Section 7.1 (regardless of whether such covenant is then applicable), determined on a Pro Forma Basis for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or (b) are available, in each case, as if such designation had occurred on the first day of such period and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating such compliance;

(ii) the Payment Conditions are met; and

(iii) no Restricted Subsidiary may be designated an Unrestricted Subsidiary if such Subsidiary owns any ~~material~~ Intellectual Property that is material to the business of the Borrower or any Restricted Subsidiary (individually or taken as a whole).

The designation of any Restricted Subsidiary as an Unrestricted Subsidiary after the Closing Date shall constitute an Investment by the applicable Loan Party therein at the date of designation in an amount equal to the fair market value of the applicable Loan Party's investment therein. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (x) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary

existing at such time, and (y) a return on any Investment by the applicable Loan Party in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the fair market value at the date of such designation of such Loan Party's Investment in such Subsidiary. Notwithstanding the foregoing, neither the Borrower nor Holdings shall be permitted to be an Unrestricted Subsidiary. The Borrower shall cause each Unrestricted Subsidiary to be designated as an "Unrestricted Subsidiary" under any Indebtedness incurred pursuant to Section 7.2(a), (b), and (bb) (and any Permitted Refinancing thereof) and under any other instrument governing Indebtedness in excess of $35,000,000. Notwithstanding anything to the contrary contained in this Section 6.13, in no event shall any Restricted Subsidiary contributing more than $4,000,000 of the Borrowing Base be designated an Unrestricted Subsidiary unless the Administrative Agent receives a completed Borrowing Base Certificate (providing a calculation of the Borrowing Base after giving effect to such designation) and shall comply with any required prepayment pursuant to Section 2.11(a) concurrently with such designation.

6.14    Sanctions. The Borrower will maintain in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with applicable Sanctions.

6.15    Post-Closing Matters.

(a)    Cause to be delivered to the Administrative Agent within 60 days after the Closing Date (or such longer period as agreed by the Administrative Agent), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of December 31, 2021 and the related audited consolidated statements of income and of cash flows for such year by PricewaterhouseCoopers or other independent certified public accountants of nationally recognized standing; and

(b)    Cause to be delivered or performed the documents and other agreements set forth on Schedule 6.15 within the time frames specified on such Schedule 6.15, in each case as such time frames may be extended by the Administrative Agent in its reasonable discretion.

SECTION 7.    NEGATIVE COVENANTS

Holdings and the Borrower hereby jointly and severally agree that, until all Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification and reimbursement obligations for which no claim has been made) and all Letters of Credit have been canceled, have expired or have been Collateralized, each of Holdings and the Borrower shall not, and shall not permit any of their respective Restricted Subsidiaries to:

7.1    Financial Condition Covenant. During each Covenant Trigger Period, permit the Consolidated Fixed Charge Coverage Ratio for the Reference Period to be less than 1.00 to 1.00, to be measured (a) on the initial date of such Covenant Trigger Period for the most recent Reference Period then ended for which financial statements for the most recent four fiscal quarter period in respect thereof have been, or were required to be, delivered pursuant to Section 6.1, and (b) thereafter, as of the last day of each Reference Period ending during such Covenant Trigger Period for which financial statements for the most recent fiscal quarter in respect thereof have been, or were required to be, delivered pursuant to Section 6.1. For the avoidance of doubt the foregoing Consolidated Fixed Charge Coverage Ratio financial covenant will not be tested when a Covenant Trigger Period is not in effect.

7.2    <u>Indebtedness</u>. Incur any Indebtedness, except:

(a)    Indebtedness pursuant to (i) any Loan Document and (ii) (x) Indebtedness of the Borrower (which may be guaranteed by the Guarantors) created under the Term Loan Documents in an aggregate principal amount not to exceed $~~600,000,000~~540,827,403.77 <u>plus</u> the Maximum Term Loan Incremental Amount and (y) Permitted Refinancings of Indebtedness permitted pursuant to clause (a)(ii)(x) above;

(b)    (i) Term Loan Incremental Equivalent Debt in an aggregate amount not to exceed the Maximum Term Loan Incremental Amount and Permitted Refinancings thereof; provided, that, (i) solely in respect of any Incremental Equivalent Debt constituting term loans secured on a pari passu basis with the Obligations in respect of outstanding Term Loans, the Total Net First Lien Leverage Ratio on a Pro Forma Basis (without giving effect to netting of the cash proceeds of such Term Loan Incremental Equivalent Debt on the balance sheet of such incurred amount) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), as the case may be, have been delivered shall be less than or equal to 2.50 to 1.00, (ii) solely in respect of any Incremental Equivalent Debt secured on a junior basis to the Obligations in respect of outstanding Term Loans, the Total Net Second Lien Leverage Ratio on a Pro Forma Basis (~~but~~ without giving effect to netting of the cash proceeds ~~remaining~~of such Term Loan Incremental Equivalent Debt on the balance sheet of such incurred amount) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), as the case may be, have been delivered shall be less than or equal to 3.25 to 1.00 and (iii) solely in respect of any unsecured Incremental Equivalent Debt, the Total Net Leverage Ratio on a Pro Forma Basis (~~but~~ without giving effect to netting of the cash proceeds ~~remaining~~of such Term Loan Incremental Equivalent Debt on the balance sheet of such incurred amount) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), as the case may be, have been delivered shall be less than or equal to 3.75 to 1.00; provided further, that (1) immediately prior to and immediately after giving effect to the incurrence of any such Indebtedness under this Section 7.2(b), no Default or Event of Default shall have occurred and be continuing and (2) in no event shall any Term Loan Incremental Equivalent Debt that is secured by Liens on the Collateral be incurred as a result of any Voluntary Prepayment Amount attributable to prepayments of unsecured Indebtedness and (ii) Permitted Refinancings of Indebtedness permitted pursuant to clause (b)(i) above;

(c)    [Reserved];

(d)    [Reserved];

(e)    [Reserved];

(f)    Indebtedness of (x) the Borrower to any Restricted Subsidiary of the Borrower, (y) any Restricted Subsidiary of the Borrower to the Borrower or any Restricted Subsidiary thereof; <u>provided</u>, that Indebtedness of Restricted Subsidiaries that are not Subsidiary Guarantors to the Borrower and the Subsidiary Guarantors shall be permitted only to the extent permitted under <u>Section 7.7</u> and (z) any Non-Guarantor Subsidiary or Foreign Subsidiary to any other Non-Guarantor Subsidiary or Foreign Subsidiary; <u>provided</u> that all such intercompany Indebtedness owed by any Loan Party shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of any applicable promissory notes or an intercompany subordination agreement, in each case, in form and substance reasonably satisfactory to Administrative Agent;

(g)     Indebtedness consisting of Guarantee Obligations by the Borrower or any Subsidiary Guarantor of Indebtedness otherwise permitted under this <u>Section 7.2</u> in respect of Indebtedness of (x) any Loan Party (excluding Guarantee Obligations with respect to Indebtedness under clauses (f), (p), (t) and (w) of this <u>Section 7.2</u> and excluding Guarantee Obligations of Indebtedness incurred by Holdings), or (y) any Restricted Subsidiary of the Borrower that is not a Subsidiary Guarantor to the extent permitted under <u>Section 7.7</u>;

(h)     Indebtedness outstanding on the Closing Date and listed on <u>Schedule 7.2(h)</u>;

(i)     Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by <u>Section 7.3(g)</u> in an aggregate principal amount not to exceed $25,000,000 at any one time outstanding (plus the principal amount of Indebtedness incurred in connection with a Refinancing of Indebtedness incurred under this clause (i) which equals the unpaid accrued interest and premium (including applicable prepayment penalties) of such Indebtedness being Refinanced plus fees and expenses reasonably incurred in connection with such Refinancing);

(j)     Indebtedness in respect of Swap Agreements permitted by <u>Section 7.11</u>;

(k)     Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(l)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees, import and export custom and duty guaranties and similar obligations, or obligations in respect of letters of credit, bank acceptances or guarantees or similar instruments related thereto, in each case provided in the ordinary course of business;

(m)     Indebtedness consisting of obligations under deferred compensation, purchase price, earn outs or other similar arrangements incurred by such Person in connection with any acquisitions permitted hereunder;

(n)     Cash Management Obligations and Guarantee Obligations in respect thereof, and other Indebtedness in respect of netting services, overdraft protections and similar arrangements in each case in connection with deposit accounts, in the ordinary course of business;

(o)     Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)     Indebtedness incurred by any Foreign Subsidiary or Non-Guarantor Subsidiary in an aggregate outstanding principal amount not to exceed $50,000,000;

(q)     Indebtedness which represents a Permitted Refinancing of any of the Indebtedness permitted under clauses (f) through (h), (m), (s) and (y) hereof;

(r)     Indebtedness incurred by Holdings; <u>provided</u> that (a) such Indebtedness does not mature and does not require any scheduled or mandatory redemptions or prepayments or redemptions at the option of the holders thereof prior to the date that is 180 days following the Latest Maturity Date (except upon asset sales or change of control events to the extent such redemptions are subject to compliance with the Loan Documents), (b) such Indebtedness is not secured and (c) such Indebtedness is

subordinated to the payment in full in cash of the Obligations on terms reasonably satisfactory to Administrative Agent;

(s)    (i) Indebtedness of any Person that becomes a Restricted Subsidiary after the Closing Date and Indebtedness incurred, acquired or assumed in connection with acquisitions permitted hereunder; provided that, in the case of such acquired or assumed Indebtedness, such Indebtedness exists at the time such Person becomes a Restricted Subsidiary or at the time of such acquisition and is not created in contemplation of or in connection therewith; and (ii) unsecured Indebtedness or subordinated Indebtedness of the Borrower (which may be guaranteed by the Guarantors) incurred for the purpose of financing an Asset Acquisition or acquisition of more than 50% of the Capital Stock of any Person so long as (A) both immediately prior to and after giving effect thereto, no Default or Event of Default shall exist or result therefrom, (B) such Indebtedness does not mature or have scheduled amortization or payments of principal and is not subject to mandatory redemption or prepayment (except customary asset sale or change of control provisions), in each case prior to the date that is 91 days after the then Latest Maturity Date at the time such Indebtedness is incurred, (C) such Indebtedness is not guaranteed by any Subsidiary other than the Guarantors and (D) such Indebtedness contains terms and conditions (excluding pricing, premiums and optional prepayment or optional redemption provisions) that are [market terms on the date of issuance (as determined in good faith by the Board of Directors of the Borrower) or are] not materially more restrictive, taken as a whole, than the covenants and events of default contained in this Agreement [(provided that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days (or such shorter period as agreed by the Administrative Agent) prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (iv) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees))]; provided, further, that, in each of clauses (i) and (ii), it shall be a requirement that, on a Pro Forma Basis (but without giving effect to the cash proceeds remaining on the balance sheet of such Indebtedness), the Total Net Leverage Ratio of the Borrower and its Restricted Subsidiaries for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or Section 6.1(b), are available would not be greater than immediately prior to such transaction;

(t)    Indebtedness owing to current or former officers, directors and employees, their respective estates, heirs, spouses or former spouses to finance the purchase or redemption of Capital Stock of Holdings (or any direct or indirect parent thereof) permitted by Section 7.6(d);

(u)    Indebtedness constituting indemnification and reimbursement obligations in connection with sales and dispositions permitted under this Agreement;

(v)    Customer Guaranties and Guarantee Obligations in respect thereof;

(w)    Indebtedness of Restricted Subsidiaries that are not Loan Parties arising in connection with a Receivables Facility;

(x)    Guarantee Obligations with respect to Indebtedness of any Foreign Subsidiary incurred in the ordinary course of such Foreign Subsidiary's business for working capital purposes; provided that the aggregate principal amount of all such Guarantee Obligations outstanding at any time do not exceed $50,000,000;

(y)     Capital Lease Obligations to the extent constituting Attributable Debt arising in Sale Leaseback Transactions permitted by Section 7.10;

(z)     [Reserved];

(aa)    to the extent constituting Indebtedness, obligations of the Borrower or any Restricted Subsidiary which is the seller or servicer in connection with a Receivables Facility in respect of any Receivables Facility Undertakings as to such Receivables Facility; and

(bb)    additional Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate principal amount (for the Borrower and all Restricted Subsidiaries) not to exceed $50,000,000 at any one time outstanding.

The accrual of interest, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.2.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the Dollar Equivalent on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that, if such Indebtedness is incurred to Refinance other Indebtedness denominated in a foreign currency, and such Refinancing would cause the applicable Dollar-denominated restriction to be exceeded if the Dollar Equivalent on the date of such Refinancing such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Indebtedness so Refinanced does not exceed the principal amount of such Indebtedness being Refinanced.

Notwithstanding the foregoing, the principal amount of any Indebtedness incurred to Refinance other Indebtedness, if incurred in a different currency from the Indebtedness being Refinanced, shall be the Dollar Equivalent in effect on the date of such Refinancing.

7.3     Liens. Incur any Lien upon any of its property, whether now owned or hereafter acquired, except (herein referred to as "Permitted Liens"):

(a)     Liens for taxes not yet delinquent or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Holdings, the Borrower or the applicable Restricted Subsidiary, as the case may be, in conformity with GAAP;

(b)     carriers', warehousemen's, landlord's, mechanics', materialmen's, repairmen's, suppliers' or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, utilities, statutory obligations (other than any such obligation pursuant to Section 430(k) of the Code or Sections 303(k) or 4068 of ERISA), surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)        easements, rights-of-way, restrictions and other similar encumbrances that, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(f)        Liens (i) in existence on the Closing Date listed on Schedule 7.3(f), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased (except to the extent of accrued interest, premiums and fees and expenses payable in connection with a Refinancing) and (ii) securing any Refinancings of Obligations secured by Liens referenced on Schedule 7.3(f) and permitted under Section 7.2(q);

(g)        Liens securing Indebtedness and related obligations of the Borrower or its Restricted Subsidiaries incurred pursuant to Section 7.2(i) to finance the acquisition of fixed or capital assets or to Refinance Indebtedness incurred for such purpose; provided that (i) such Liens shall be created within 180 days following the acquisition of such fixed or capital assets or such Refinancing, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and accessions thereto and (iii) in the case of any such Refinancing, the amount of Indebtedness secured thereby is not increased (except by an amount equal to accrued interest, a reasonable premium or other reasonable amount paid in connection with such Refinancing, as applicable, and fees and expenses reasonably incurred in connection therewith);

(h)        (i) Liens created pursuant to any Loan Document and (ii) subject to the Intercreditor Agreement (or such other intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent), Liens on the Collateral created pursuant to the Term Loan Security Documents (or any Term Loan Security Documents (as defined in the Intercreditor Agreement)) securing Indebtedness incurred pursuant to Section 7.2(a)(ii);

(i)        [reserved];

(j)        any interest or title of a lessor under any lease entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of its business and covering only the assets so leased;

(k)        Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(l)        Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection; and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(m)        (i) Liens on property of any Foreign Subsidiary or Non-Guarantor Subsidiary, which Liens secure obligations of the applicable Restricted Subsidiary not prohibited under this Agreement and (ii) Liens on property that does not constitute Collateral, which Liens secure obligations of the applicable Restricted Subsidiary not prohibited under this Agreement;

(n)      Liens in respect of the ~~non-exclusive~~ licensing of patents, copyrights (including software), trademarks, industrial designs, trade names, other indications of origin, domain names and other forms of Intellectual Property in the ordinary course of business;

(o)      Liens (i) existing on any property or asset of any Person that becomes a Restricted Subsidiary after the Closing Date or (ii) existing on any property or asset prior to the acquisition thereof, in each case, together with Permitted Refinancings thereof; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of any Loan Party (and shall not be expanded to cover any additional property or assets of any such Person (other than proceeds or products thereof)) and (iii) such Lien shall secure only those obligations which it secures on the date such Person becomes a Restricted Subsidiary or the date of such acquisition, as the case may be, and Refinancings thereof that do not increase the outstanding principal amount thereof (except to the extent of accrued interest premiums and fees and expenses payable in connection with such Refinancings);

(p)      Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of the Borrower or any Subsidiary Guarantor;

(q)      Liens arising out of Sale Leaseback Transactions permitted by Section 7.10;

(r)      Liens arising from precautionary UCC or PPSA financing statements or similar filings made in respect of operating leases entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(s)      ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(t)      licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons in the ordinary course of business; provided, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(u)      Liens relating to insurance policies securing Indebtedness incurred under Section 7.2(u) and other obligations arising in connection with the financing of insurance premiums in the ordinary course of business;

(v)      Liens in respect of judgments that do not constitute an Event of Default under Section 9.1(i);

(w)      bankers' Liens, rights of setoff and similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more deposit, securities, investment or similar accounts, in each case granted in the ordinary course of business in favor of the bank or banks which such accounts are maintained, securing amounts owing to such bank with respect to cash management or other account arrangements, including those involving pooled accounts and netting arrangements or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries; provided that in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(x)      Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement in connection with an Investment permitted hereunder;

(y)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into in the ordinary course of business or Liens arising by operation of law under Article 2 of the New York UCC in favor of a reclaiming seller of goods or buyer of goods;

(z)      Liens on the Collateral securing Indebtedness permitted under Section 7.2(b); provided that the Liens on the Collateral securing any such Indebtedness shall be (i) junior, with respect to the ABL Priority Collateral, to the Liens on the Collateral securing the Obligations and (ii) subject to the Intercreditor Agreement or such other intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent;

(aa)     Liens deemed to exist in connection with investments in repurchase agreements under Section 7.7; provided that such Liens do not extend to any assets other than those assets that are subject of such repurchase agreement;

(bb)     Liens arising in connection with a Receivables Facility;

(cc)     Liens not otherwise permitted by this Section so long as the aggregate outstanding principal amount of the Indebtedness or other obligations secured thereby does not exceed (as to the Borrower and all Restricted Subsidiaries) $25,000,000 at any one time;

(dd)     Liens and other matters of record shown on any title policies delivered pursuant to this Agreement;

(ee)     Liens on Capital Stock of Unrestricted Subsidiaries;

(ff)     Liens arising in connection with (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of Holdings or its Restricted Subsidiaries, taken as a whole;

(gg)     Liens on Receivables Facility Assets sold or transferred or purported to be sold or transferred to a Receivables Facility Subsidiary in connection with a Receivables Facility and the proceeds of such Receivables Facility Assets ;

(hh)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(ii)     grants of software and other technology licenses on a non-exclusive basis in the ordinary course of business; provided, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(jj)     Liens encumbering cash, securities and financial instruments, including initial and other margin deposits and any commodity trading or other accounts in which any of the foregoing items may be held, in each case granted, pledged or arising in connection with any Swap Agreement permitted under Section 7.11;

(kk)     restrictions on dispositions of assets to be disposed of pursuant to merger agreements, stock or asset purchase agreements and similar agreements;

(ll)     customary options, put and call arrangements, rights of first refusal and similar rights relating to Investments in joint ventures and partnerships;

(mm)     any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary; and

(nn)     customary Liens on deposits required in connection with the purchase of property, equipment and inventory, in each case incurred in the ordinary course of business.

provided, however that no reference to a Permitted Lien herein or in any other Loan Document, including any statement or provision as to the acceptability of any Permitted Lien, shall in any way constitute or be construed so as to postpone or subordinate any Liens or other rights of the Secured Parties hereunder or arising under any other Loan Document in favor of such Permitted Lien.

7.4    Fundamental Changes. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, so long as no Event of Default exists or would result therefrom, except that:

(a)     (i) any Restricted Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any Subsidiary Guarantor (provided that a Subsidiary Guarantor shall be the continuing or surviving corporation) and (ii) any Restricted Subsidiary that is not a Loan Party may be merged or consolidated with or into another Restricted Subsidiary that is not a Loan Party;

(b)     (x) any Subsidiary Guarantor may Dispose of any or all of its assets (i) to the Borrower or any Subsidiary Guarantor (upon voluntary liquidation or otherwise) or (ii) pursuant to a Disposition permitted by Section 7.5 and (y) any Restricted Subsidiary of the Borrower that is not a Loan Party may Dispose of any or all of its assets to (i) the Borrower or any Restricted Subsidiary or (ii) pursuant to a Disposition permitted by Section 7.5;

(c)     any Investment of the Borrower and its Restricted Subsidiaries expressly permitted by Section 7.7 may be structured as a merger, consolidation or amalgamation; provided that (x) if the Borrower is a party to such merger, consolidation or amalgamation, the Borrower shall be the continuing or surviving corporation thereof, (y) if a Subsidiary Guarantor is a party to such merger, consolidation or amalgamation, a Subsidiary Guarantor shall be the continuing or surviving Person thereof, and (z) if a Restricted Subsidiary that is not a Loan Party is a party to such merger, consolidation or amalgamation (and the Borrower is not a party thereto), a Restricted Subsidiary shall be the continuing or surviving Person thereof;

(d)     any Restricted Subsidiary of the Borrower may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; and

(e)     any merger, dissolution or liquidation not involving the Borrower or Holdings may be effected for the purposes of effecting a transaction permitted by Section 7.5.

7.5    <u>Disposition of Property</u>. Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary of the Borrower, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)    the Disposition of obsolete, worn out, damaged or surplus property in the ordinary course of business;

(b)    the sale of inventory in the ordinary course of business;

(c)    Dispositions permitted by clauses <u>(a)</u>, <u>(b)(x)(i)</u>, <u>(b)(y)(i)</u>, <u>(c)</u> and <u>(d)</u> of <u>Section 7.4</u>;

(d)    (i) the sale or issuance of Capital Stock of any Restricted Subsidiary to the Borrower or any Subsidiary Guarantor; <u>provided</u> that in the case of such issuance of Capital Stock of a Restricted Subsidiary that is not a Wholly Owned Subsidiary of the Borrower, Capital Stock of such Restricted Subsidiary may be also issued to other owners thereof (other than Group Members) to the extent such issuance is not dilutive to the ownership of the Loan Parties, and (ii) the sale or issuance of the Borrower's Capital Stock to Holdings;

(e)    the use, sale, exchange or other disposition of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(f)    the non-exclusive licensing or sublicensing of patents, trademarks, copyrights, industrial designs and other Intellectual Property in the ordinary course of business; provided, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, or materially detract from the value of the relative assets of the Borrower and its Restricted Subsidiaries, taken as a whole;

(g)    [Reserved];

(h)    Dispositions which are required by court order or regulatory decree or otherwise required or compelled by regulatory authorities;

(i)    licenses, sublicenses, leases or subleases with respect to any property or assets (other than patents, trademarks, copyrights, industrial designs and other Intellectual Property) granted to third Persons in the ordinary course of business; <u>provided</u>, that the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, or materially detract from the value of the relative assets of the Borrower and its Restricted Subsidiaries, taken as a whole;

(j)    Dispositions to, between or among the Borrower and any Subsidiary Guarantors;

(k)    Dispositions between or among any Restricted Subsidiary that is not a Subsidiary Guarantor, as transferor, and any other Restricted Subsidiaries that are not Subsidiary Guarantors;

(l)    Dispositions of any Foreign Subsidiary by the Borrower or a Subsidiary Guarantor to another Loan Party of the Borrower;

(m)    the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business;

118

(n)       Dispositions constituting (i) investments permitted under Section 7.7 excluding clause (i) thereof, (ii) Restricted Payments permitted under Section 7.6 or (iii) Sale Leaseback Transactions permitted under Section 7.10;

(o)       Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset;

(p)       Dispositions of property other than Accounts or Inventory included in the Borrowing Base to the extent that such property is exchanged for credit against the purchase price of similar replacement property;

(q)       the abandonment or cancellation of Intellectual Property that is no longer used or useful in any material respect in the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(r)       (x) Dispositions of Receivables Facility Assets in connection with a Receivables Facility pursuant to clause (i) of the definition thereof, and (y) so long as no Event of Default exists immediately prior to or after giving effect to such Disposition and provided that the Borrower is in compliance on a Pro Forma Basis with the Financial Performance Covenant (regardless of whether such covenant is then applicable), for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by Section 6.1(a) or (b) are available after giving effect to such Dispositions, Dispositions of Receivables Facility Assets in connection with a Receivables Facility pursuant to clause (ii) of the definition thereof;

(s)       the unwinding of any Swap Agreements;

(t)       Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(u)       Dispositions of non-core assets (as determined by the Borrower in good faith) acquired pursuant to any Subsidiary Acquisition by the Borrower or any of its Restricted Subsidiaries within 18 months of such Subsidiary Acquisition; provided that (i) the value of such non-core assets does not exceed 50.0% of the consideration paid in connection with such Subsidiary Acquisition, (ii) not less than 50.0% of the consideration payable to the Borrower and the Restricted Subsidiaries in connection with such Disposition is in the form of cash or Cash Equivalents (provided, further, that for purposes of this clause (ii), any Designated Noncash Consideration received by the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Noncash Consideration received pursuant to this proviso that is at that time outstanding, not in excess of $[25,000,000], with the fair market value of each item of Designated Noncash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash), (iii) the consideration payable to the Borrower and the Restricted Subsidiaries in connection with such Disposition is not less than aggregate fair market value (as determined in good faith by the Borrower) thereof, (iv) no Event of Default has occurred and is continuing or would result therefrom and (v) none of such assets are included in the Borrowing Base;

(v)       Dispositions of Foreign Intellectual Property by a Loan Party to (A) any Foreign Intellectual Property Subsidiary in exchange for cash or intercompany notes (payable to a Loan Party) in an aggregate amount equal to the fair market value of such Foreign Intellectual Property, as determined by the Borrower in its reasonable judgment and Dispositions constituting the non-exclusive license by

119

such Foreign Intellectual Property Subsidiary of such Foreign Intellectual Property to other Restricted Subsidiaries or (B) any Foreign Subsidiary in exchange for cash or notes in an aggregate amount equal to the fair market value of such Foreign Intellectual Property, as determined by the Borrower in its reasonable judgment which notes shall (i) in the case of clauses (A) and (B) be pledged to secure the Obligations and (ii) in the case of clause (B) be secured by a perfected first priority lien (it being understood that a reasonable period of time may lapse from the date of such transfer before such lien is fully perfected) on the Foreign Intellectual Property transferred under such clause (B); <u>provided</u> that the fair market value of Dispositions made pursuant to this clause (v) shall not exceed $10,000,000 in the aggregate;

(w)    so long as no Default or Event of Default has occurred and is continuing, any Disposition of other property; <u>provided</u> that (A) not less than 75% of the consideration payable to the Borrower and its Restricted Subsidiaries in connection with such Disposition is in the form of cash or Cash Equivalents; <u>provided</u>, <u>further</u> that for purposes of this clause (w), (i) any Designated Noncash Consideration received by the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Noncash Consideration received pursuant to this proviso that is at that time outstanding, not in excess of $[25,000,000], with the fair market value of each item of Designated Noncash Consideration being measured at the time received and without giving effect to subsequent changes in value, (ii) any liabilities (as shown on the Borrower's most recent balance sheet or in the notes thereto or, if incurred, increased or decreased subsequent to the date of such balance sheet, such liabilities that would have been reflected at the Borrower's balance sheet or in the notes thereto if such incurrence, increase or decrease had taken place on the date of such balance sheet, as reasonably determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Obligations) that are assumed by the transferee (or a third party on behalf of the transferee) of any such assets or Capital Stock pursuant to an agreement that releases or indemnifies the Borrower or such Restricted Subsidiary, as the case may be, from further liability, (iii) any notes or other obligations or other securities or assets received by the Borrower or such Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash within 180 days of the receipt thereof (to the extent of the cash received), (iv) Indebtedness of any Restricted Subsidiary of the Borrower that is no longer a Restricted Subsidiary as a result of such Disposition, to the extent that the Borrower and each other Restricted Subsidiary are released from any Guarantee of such Indebtedness in connection with such asset sale and (v) consideration consisting of Indebtedness of the Borrower or any Guarantor received from Persons who are not a Borrower or a Restricted Subsidiary, shall each be deemed to be cash, (B) the Borrower or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Disposition at least equal to the fair market value of the property disposed of (as reasonably determined by the Borrower); <u>provided</u> that with respect to any Disposition of Eligible Inventory fair market value shall be in no event less than the value ascribed to such assets in the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to <u>Section 6.2(e)</u>) and (C) to the extent such Disposition is of assets that contribute more than an amount equal to the greater of (x) $4,000,000 and (y) 5.0% of the then-effective Borrowing Base to the Borrowing Base, the Borrower shall have delivered a pro forma Borrowing Base Certificate (providing a calculation of the Borrowing Base after giving effect to such Disposition), and shall comply with any required prepayment pursuant to <u>Section 2.11(a)</u>;

(x)    so long as no Default or Event of Default has occurred and is continuing, any Disposition of other property if, after giving effect thereto, the Total Net Leverage Ratio determined on a Pro Forma Basis (including, for the avoidance of doubt, a pro forma application of the Net Cash Proceeds therefrom) for the most recently completed period of four consecutive fiscal quarters for which the financial statements and certificates required by <u>Section 6.1(a)</u> or <u>Section 6.1(b)</u> are available, is less than [—]2.75 to 1.00; <u>provided</u> that to the extent such Disposition is of assets that contribute more than $4,000,000 to the Borrowing Base, the Borrower shall have delivered a pro forma Borrowing Base

Certificate (providing a calculation of the Borrowing Base after giving effect to such Disposition), and shall comply with any required prepayment pursuant to Section 2.11(a);

(y)    Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business and sales of assets received by the Borrower or any Restricted Subsidiary from Persons other than Loan Parties upon foreclosure on a lien in favor of the Borrower of such Subsidiary;

(z)    any exchange of property of the Borrower or any Restricted Subsidiary (other than Capital Stock or other Investments) which qualifies as a like kind exchange pursuant to and in compliance with Section 1031 of the Code or any other substantially concurrent exchange of property by the Borrower or any Restricted Subsidiary (other than Capital Stock or other Investments) for property (other than Capital Stock or other Investments) of another person; provided that (a) such property is useful to the business of the Borrower or such Restricted Subsidiary, (b) the Borrower or such Restricted Subsidiary shall receive reasonably equivalent or greater market value for such property in good faith and (c) such property will be received by the Borrower or such Restricted Subsidiary substantially concurrently with its delivery of property to be exchanged; and

(aa)    Dispositions of any Capital Stock or interests in any joint venture entity not constituting a Restricted Subsidiary to the extent required by the applicable joint venture agreement or similar binding arrangements relating thereto.

Notwithstanding anything to the contrary contained in this Section 7.5, (i) in no event shall any Disposition of assets included in the Borrowing Base and contributing more than $4,000,000 of the Borrowing Base (other than Dispositions permitted pursuant to Section 7.5(b)) be permitted unless the Administrative Agent receives a completed Borrowing Base Certificate concurrently with such Disposition, and shall comply with any required prepayment pursuant to Section 2.11(a) and (ii) no Dispositions of material Intellectual Property, that are material to the business of the Borrower or any Restricted Subsidiary (individually or taken as a whole) may be made to Unrestricted Subsidiaries (other than Dispositions permitted pursuant to Section 7.5(f)) and (iii) no Dispositions pursuant to clause (f) shall be made to Unrestricted Subsidiaries unless the same do not in any material respect interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, or materially detract from the value of the relative assets of the Borrower and its Restricted Subsidiaries, taken as a whole.

7.6    Restricted Payments. Declare, pay or make any dividend or distribution (other than Restricted Payments payable solely in Qualified Equity Interests of the Person making such Restricted Payment) on any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or pay any management or similar fees to any holders of the Capital Stock of Holdings or any of their respective Affiliates, or make any other distribution in respect of any Capital Stock of any Group Member, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, "Restricted Payments"), except that, subject to the last paragraph of this Section 7.6:

(a)    any Restricted Subsidiary of the Borrower may make Restricted Payments to the Borrower or any Wholly Owned Subsidiary Guarantor, and any Non-Guarantor Subsidiary or Foreign Subsidiary may make Restricted Payments ratably to the holders of such Non-Guarantor Subsidiary's or Foreign Subsidiary's Capital Stock, taking into account the relative preferences, if any, on the various classes of Capital Stock of such Restricted Subsidiary;

(b)　　　so long as the Payment Conditions are met, ~~Holdings,~~ the Borrower ~~and the Restricted Subsidiaries~~ may make Restricted Payments to Holdings to permit Holdings to make, and Holdings may make, Restricted Payments to holders of Capital Stock of Holdings with the proceeds of such Restricted Payments;

(c)　　　Holdings or the Borrower may make cashless exercises of options and warrants;

(d)　　　the Borrower may make Restricted Payments or make distributions to Holdings to permit Holdings (and Holdings may make Restricted Payments or make distributions to any direct parent thereof to permit such direct parent), and the subsequent use of such payments by Holdings (or such direct parent), to repurchase, redeem or otherwise acquire for value Qualified Equity Interests of Holdings (or such direct parent) held by officers, directors or employees or former officers, directors or employees (or their transferees, estates or beneficiaries under their estates) of any Group Member; provided that the aggregate cash  consideration paid for all such redemptions and payments shall not exceed, in any fiscal year, $2,000,000; provided, that such amount in any fiscal year may be increased by an amount not to exceed, without duplication, (x) the aggregate amount of loans made by Holdings or any of its Subsidiaries pursuant to Section 7.7(j) that are repaid in connection with such purchase, redemption or other acquisition of such Capital Stock of Holdings or such direct parent), plus (y)  the amount of any Net Cash Proceeds received by or contributed to the Borrower from the issuance and sale after the Closing Date of Qualified Equity Interests of Holdings (or such direct parent) to officers, directors or employees of any Group Member that have not been used to make any repurchases, redemptions or payments under this clause (d), plus (z) the net cash proceeds of any "key- man" life insurance policies of any Group Member that have not been used to make any repurchases, redemptions or payments under this clause (d);

(e)　　　[reserved];

(f)　　　the Borrower may (i) make Restricted Payments to Holdings (or any direct parent thereof) to permit Holdings (or such direct parent) to pay, in each case without duplication, corporate overhead expenses incurred in the ordinary course of business  not to exceed $1,500,000 in any fiscal year  (provided such limit shall not apply to fees, compensation and expenses paid to the board of directors of Holdings in an amount not to exceed $2,000,000) and to pay franchise taxes and other similar taxes, fees and expenses required to maintain Holdings' corporate existence and (ii) make Permitted Tax Distributions, so long as Holdings (or any direct or indirect parent thereof) contemporaneously uses such distributions to pay the taxes in accordance with the definition of "Permitted Tax Distributions";

(g)　　　[Reserved];

(h)　　　[Reserved];

(i)　　　[Reserved]; and

(j)　　　the Borrower may make Restricted Payments to Holdings to permit Holdings to make payments in respect of withholding or similar taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributes of any of the foregoing) of Holdings.

7.7　　　Investments. Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, any Person, or make an Asset Acquisition (all of the foregoing, "Investments"), except:

(a)      accounts receivable or notes receivable arising from extensions of trade credit granted in the ordinary course of business;

(b)      Investments in cash and Cash Equivalents;

(c)      loans and advances to employees, officers and directors of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $3,000,000 at any one time outstanding;

(d)      [Reserved];

(e)      Investments in assets useful in the business of the Borrower or any of its Restricted Subsidiaries (or in all of the issued and outstanding Capital Stock of a Person that is engaged in a business in which the Borrower and its Restricted Subsidiaries are permitted under Section 7.15) made by the Borrower or any of its Restricted Subsidiaries with the Net Cash Proceeds of any Disposition of Term Loan Priority Collateral not required to be applied to prepay Term Loans or any Term Loan Incremental Equivalent Debt pursuant to the terms of the definitive documentation in respect of such Indebtedness;

(f)      Investments in the Borrower or any Person that is a Subsidiary Guarantor or any newly created Subsidiary Guarantor;

(g)      Investments by the Borrower and Subsidiary Guarantors in any Non-Guarantor Subsidiaries and Foreign Subsidiaries not to exceed an aggregate outstanding amount equal to $4,000,000; provided that intercompany Investments made and liabilities incurred in the ordinary course of business in connection with cash management operations of the Borrower or any of its Restricted Subsidiaries in an aggregate amount equal to $2,000,000 at any one time outstanding shall not be subject to the foregoing limitation so long as such intercompany Investments are repaid within 30 days into a Deposit Account that is subject to a Deposit Account Control Agreement;

(h)      Investments by any Non-Guarantor Subsidiaries or Foreign Subsidiaries in any other Non-Guarantor Subsidiaries or Foreign Subsidiaries;

(i)      Investments by the Borrower and Subsidiary Guarantors (A) in any Foreign Subsidiary in connection with a Disposition permitted under Section 7.5(v) or (B) constituting a capital contribution or other transfer of Capital Stock in any Foreign Subsidiary in connection with a Disposition permitted under Section 7.5(l);

(j)      loans and advances to employees, officers and directors of Holdings or any of its Subsidiaries to the extent used to acquire Capital Stock of Holdings and to the extent such transactions are cashless;

(k)      Investments in the ordinary course of business consisting of prepaid expenses and endorsements of negotiable instruments for collection or deposit;

(l)      Investments received in settlement of amounts due to the Borrower or any of its Restricted Subsidiaries effected in the ordinary course of business or owing to the Borrower or any of its Restricted Subsidiaries as a result of insolvency proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of the Borrower or its Restricted Subsidiaries;

(m)      [Reserved];

(n)     Investments in existence or contemplated on the date of this Agreement and described in Schedule 7.7(n); and any modification, replacement, renewal, reinvestment or extension thereof (provided that the amount of the original investment is not increased except as otherwise permitted by this Section 7.7); and any investments, loans and advances existing on the Closing Date by Holdings, the Borrower or any Restricted Subsidiary in or to the Borrower or any other Restricted Subsidiary;

(o)     Investments permitted by Section 7.11;

(p)     Investments of any Person existing at the time such Person becomes a Restricted Subsidiary of the Borrower or consolidates, amalgamates or merges with the Borrower or any of its Restricted Subsidiaries so long as such investments were not made in contemplation of such Person becoming a Restricted Subsidiary or of such consolidation, amalgamation or merger;

(q)     Investments (1) paid for with consideration which consists of (i) Capital Stock of Holdings or any of its direct or indirect parent companies or (ii) the proceeds of a substantially contemporaneous issuance or sale of Capital Stock of Holdings, or a substantially contemporaneous contribution of cash to Holdings, in each case, to the extent the Net Cash Proceeds thereof (if any), or such cash shall be, as applicable, contributed to the Borrower and used by the Borrower or any of its Restricted Subsidiaries for such Investment or such Investment shall be contributed to the Borrower and (2) constituting notes issued to Holdings in exchange for Qualified Equity Interests of Holdings;

(r)     [Reserved];

(s)     guarantees of the obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Lease Obligations) or that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(t)     Guarantee Obligations permitted by Section 7.2;

(u)     in addition to Investments otherwise expressly permitted by this Section 7.7, Investments by the Borrower or any of its Restricted Subsidiaries in an aggregate amount (value at cost) not to exceed during the term of this Agreement $42,500,000;

(v)     Investments resulting from the receipt of non-cash consideration [rReeseirved in connection with Dispositions permitted by Section 7.5];

(w)     [Reserved];

(x)     advances of payroll payments to employees in the ordinary course of business and Investments made pursuant to employment and severance arrangements of officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business; and

(y)     Investments that are captured by, added to the value of or consisting of the Seller's Retained Interests in connection with a Receivables Facility permitted hereunder; and

(z)     Investments by the Borrower or any of its Restricted Subsidiaries so long as the Payment Conditions are met.

Notwithstanding the foregoing, no Investments of ~~material~~ Intellectual Property that is material to the business of the Borrower or any Restricted Subsidiary (individually or taken as a whole) in Unrestricted Subsidiaries shall be permitted.

       7.8    <u>Payments and Modifications of Certain Debt Instruments</u>. (a) Make any voluntary principal prepayment on, or voluntarily redeem, repurchase, defease or otherwise acquire or retire for value or give any voluntary irrevocable notice of redemption with respect to  ("<u>Repayments</u>") any Junior Indebtedness, other than:

       (i)    the Refinancing of Junior Indebtedness permitted by <u>Section 7.2</u> with the proceeds of a Permitted Refinancing permitted by <u>Section 7.2</u>;

       (ii)    the Refinancing of Junior Indebtedness incurred by Holdings under <u>Section 7.2(p)</u> utilizing other Indebtedness of Holdings incurred in reliance on <u>Section 7.2(p)</u>;

       (iii)    Repayments of Junior Indebtedness so long as the Payment Conditions are met; and

       (iv)    any Junior Indebtedness may be converted to Capital Stock (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents~~;~~.

       ~~(v) [reserved]; and~~

       (v)    ~~(vi)~~ Repayments of Junior Indebtedness in an aggregate amount not to exceed $2,000,000 during the term of this Agreement.

       (b)    Amend, modify or change in any manner any documentation governing any Junior Indebtedness unless, after giving effect to any such amendment, modification or other change, such amended, modified or changed Junior Indebtedness would (i) in the case of Term Loan Incremental Equivalent Debt continue to meet the requirements of the definition thereof and (ii) in the case of any other Indebtedness, meet the requirements set forth in the definition of Permitted Refinancing as if such amended, modified or changed debt were a Permitted Refinancing of such Junior Indebtedness; <u>provided</u>, that the documentation governing any Junior Indebtedness may be amended, modified or changed to increase the amount thereof to the extent such increase is permitted under <u>Section 7.2</u>.

       7.9    <u>Transactions with Affiliates</u>. Directly or indirectly, enter into or permit to exist any transaction or contract (including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees) with or for the benefit of any Affiliate (each an "<u>Affiliate Transaction</u>") involving aggregate payments or consideration in excess of $5,000,000, except (a) transactions between or among Holdings and its Restricted Subsidiaries, (b) transactions that are on terms and conditions not less favorable to Holdings or such Restricted Subsidiary as would be obtainable by Holdings or such Restricted Subsidiary at the time in a comparable arm's-length transaction from unrelated third parties that are not Affiliates, (c) any Restricted Payment permitted by <u>Section 7.6</u>, (d) customary fees and compensation, benefits and incentive arrangements paid or provided to, and any indemnity provided on behalf of, officers, directors or employees of Holdings, the Borrower or any Restricted Subsidiary as determined in good faith by the board of directors of Holdings, the Borrower or such Restricted Subsidiary and in the ordinary course of business, (e) [reserved], (f) the issuance or sale of any Capital Stock of Holdings (and the exercise of any options, warrants or other rights to acquire Capital Stock of Holdings) or any contribution to the capital of Holdings, (g) [reserved], (h) the Transactions, (i) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.9 or any amendment thereto to the extent such an amendment is

not adverse to the Lenders in any material respect, and (j) transactions between Holdings or any Restricted Subsidiary and any Person that is an Affiliate solely due to the fact that a director of such Person is also a director of Holdings or any direct or indirect parent of Holdings; provided, however, that such director abstains from voting as a director of Holdings or such direct or indirect parent of Holdings, as the case may be, on any matter involving such other Person.

   7.10 <u>Sale Leaseback Transactions</u>. Enter into any Sale Leaseback Transaction unless, after giving effect thereto, the aggregate outstanding amount of Attributable Debt in respect of all Sale Leaseback Transactions does not at any time exceed $25,000,000.

   7.11 <u>Swap Agreements</u>. Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Restricted Subsidiary has actual or reasonably anticipated exposure (other than those in respect of Capital Stock) including with regard to currencies and commodities and (b) Swap Agreements entered into to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any actual or reasonably anticipated interest-bearing liability or investment of the Borrower or any of its Restricted Subsidiaries.

   7.12 <u>Changes in Fiscal Periods</u>. Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

   7.13 <u>Negative Pledge Clauses</u>. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) this Agreement, the other Loan Documents, and the Term Loan Documents, (b) any agreements evidencing or governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (c) customary restrictions on the assignment of leases, licenses and contracts entered into in the ordinary course of business, (d) any agreement in effect at the time any Person becomes a Restricted Subsidiary of the Borrower; provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary of the Borrower, (e) customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary of the Borrower (or the assets of a Restricted Subsidiary of the Borrower) pending such sale; provided such restrictions and conditions apply only to the Restricted Subsidiary of the Borrower that is to be sold (or whose assets are to be sold) and such sale is permitted hereunder), (f) restrictions and conditions existing on the Closing Date identified on Schedule 7.13 and any amendments or modifications thereto so long as such amendment or modification does not expand the scope of any such restriction or condition in any material respect, (g) restrictions under agreements evidencing or governing or otherwise relating to Indebtedness of Foreign Subsidiaries or Non-Guarantor Subsidiaries permitted under <u>Section 7.2</u>; provided that such Indebtedness is only with respect to the assets of Foreign Subsidiaries or Non-Guarantor Subsidiaries, (h) subject to the limitation set forth in the definition of Receivables Facility, restrictions on Receivables Facility Asset Disposed of (or purported to be Disposed of) in connection with a Receivables Facility, (i) customary provisions in joint venture agreements, limited liability company operating agreements, partnership agreements, stockholders agreements and other similar agreements, (j) any agreements governing Indebtedness permitted under <u>Section 7.2</u> to the extent of restrictions on assets of Foreign Subsidiaries and Non-Guarantor Subsidiaries and (k) any agreements governing Indebtedness permitted under Section 7.2 so long as any such restrictions are, taken as a whole, no more restrictive than those contained in the Term Loan Documents as in effect on the Closing Date.

7.14     <u>Clauses Restricting Restricted Subsidiary Distributions</u>. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or repay or prepay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Restricted Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Restricted Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under this Agreement, the other Loan Documents, the Term Loan Credit Agreement, the other Term Loan Documents, (ii) any restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary so long as such sale is permitted hereunder, (iii) customary restrictions on the assignment of leases, contracts and licenses entered into in the ordinary course of business, (iv) any agreement in effect at the time any Person becomes a Restricted Subsidiary of the Borrower; provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary of the Borrower, (v) restrictions of the nature referred to in clause (c) above under agreements governing purchase money liens or Capital Lease Obligations otherwise permitted hereby which restrictions are only effective against the assets financed thereby, (vi) agreements governing Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(h) and any amendments, modifications, restatements, renewals, increases, supplements, refundings, or Refinancings of those agreements, provided that the amendments, modifications, restatements, renewals, increases, supplements, refundings, or Refinancings are no more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the Closing Date, (vii) Liens permitted by <u>Section 7.3</u> that limit the right of the Borrower or any of its Restricted Subsidiaries to dispose of the assets subject to such Liens, (viii) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, agreements in respect of sales of Capital Stock and other similar agreements entered into in connection with transactions permitted under this Agreement, provided that such encumbrance or restriction shall only be effective against the assets or property that are the subject of such agreements, (ix) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Borrower or any of its Restricted Subsidiaries as in effect at the date of such acquisition, which encumbrance or restriction is not applicable to any Person, or the property or assets of any Person, other than the Person, or the properties or assets of such Person, so acquired, (x) restrictions under agreements evidencing or governing Indebtedness of Foreign Subsidiaries permitted under <u>Section 7.2</u>; provided that such restrictions are only with respect to assets of Foreign Subsidiaries and Non-Guarantor Subsidiaries, (xi) restrictions under Indebtedness of Holdings incurred in reliance on <u>Sections 7.2(a)</u> and <u>(r)</u> that when taken as a whole are no more restrictive that those contained in the Loan Documents and (xii) Indebtedness under <u>Section 7.2(b)</u>or <u>(r)</u> or any Permitted Refinancings thereof so long as any such restrictions are, taken as a whole, no more restrictive than those contained in the Loan Documents.

7.15     <u>Lines of Business</u>; Holdings Covenant. (a) With respect to the Borrower and each of its Restricted Subsidiaries, enter into any material business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the date of this Agreement or that are reasonably related, complementary or ancillary thereto and reasonable extensions thereof, (b) with respect to Holdings, engage in any business or activity other than (i) the ownership of all outstanding Capital Stock in the Borrower, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies including the other Group Members, (iv) the performance of obligations under the Loan Documents, the Term Loan Documents and the definitive documentation in respect of any Term Loan Incremental Equivalent Debt to which it is a party, (v) the performance of obligations under the definitive documentation governing any Indebtedness incurred pursuant to Section

7.2(r), (vi) making and receiving Restricted Payments and Investments and engaging in other activities to the extent expressly permitted by this Agreement and (vii) activities incidental to the businesses or activities described in clauses (i)-(vi) and

(b)     with respect to any Foreign Intellectual Property Subsidiary, engage in any business or activity or incur any Indebtedness other than (i) the ownership, maintenance (including prosecution and enforcement) and non-exclusive licensing or sublicensing of Foreign Intellectual Property, (ii) maintaining its corporate existence, (iii) the ownership of the Capital Stock of other Foreign Subsidiaries, (iv) the performance of obligations under any Loan Documents to which it is a party, (v) the incurrence of Indebtedness under notes issued pursuant to Section 7.5(r) and (vi) activities incidental to the businesses or activities described in clauses (i)-(v).

7.16     Amendments to Organizational Documents. Amend, supplement, or otherwise modify any Organizational Documents of any of the Group Members, if (x) such amendment, supplement or other modification, in light of the then existing circumstances at the time such amendment, supplement or other modification is entered into, taken as a whole, could reasonably be expected to be materially adverse to the Group Members, taken as a whole, or adversely affect the Liens (and the rights and remedies relating thereto) of the Secured Parties under any Loan Document or (y) a Material Adverse Effect would be reasonably likely to exist or result after giving effect to such amendment, supplement or other modification.

7.17     [Canadian Pension Plans. (a) without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld), maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Canadian Defined Benefit Plan that is a "single employer pension plan" as that term is used in the *Pension Benefits Act* (Ontario) whether or not subject thereto other than any in existence and disclosed as of the Closing Date[, or acquire an interest in any Person if such Person sponsors, administers, contributes to, participates in or has any liability in respect of, any Canadian Defined Benefit Plan that is a "single employer pension plan" as that term is used in the *Pension Benefits Act* (Ontario) whether or not subject thereto,]; (b) cause or permit to occur a Canadian Pension Event that could reasonably be expected to result in a Material Adverse Effect.]4 and (c) fail to withhold, make, remit or pay when due any employee or employer contributions to or in respect of any Canadian Pension Plan pursuant to the terms of the particular plan, any applicable collective bargaining agreement or participation agreement or applicable laws to the extent such failure could reasonably be expected to result in a Material Adverse Effect.

SECTION 8.     GUARANTEE

8.1     The Guarantee. Each Guarantor hereby jointly and severally guarantees, as a primary obligor and not as a surety, to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of (1) the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code or other Debtor Relief Laws after any bankruptcy or insolvency petition under the Bankruptcy Code or other Debtor Relief Laws or any similar law of any other jurisdiction) on (i) the Loans made by the Lenders to the Borrower, (ii) [reserved], (iii) [reserved], and (iv) the Notes held by each Lender of the Borrower and (2) all other Obligations from time to time owing to the Secured Parties by the Borrower and each other Guarantor (such obligations being herein collectively called the "Guarantor Obligations"). Each Guarantor hereby jointly and severally agrees that, if the Borrower shall fail to pay in full when due (whether at stated

---

4 To be revised based on TL credit agreement.

maturity, by acceleration or otherwise) any of the Guarantor Obligations, such Guarantor will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guarantor Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

8.2     Obligations Unconditional. The obligations of the Guarantors under Section 8.1, respectively, shall constitute a guaranty of payment (and not of collection) and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guarantor Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guarantor Obligations, and, in each case, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety by any Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall, in each case, remain absolute, irrevocable and unconditional under any and all circumstances as described above;

(a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Guarantor Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)     the maturity of any of the Guarantor Obligations shall be accelerated, or any of the Guarantor Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guarantor Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien or security interest granted to, or in favor of, the Issuing Lenders (with respect to the Guarantor Obligations only) or any Lender or the Administrative Agent as security for any of the Guarantor Obligations shall fail to be perfected; or

(e)     the release of any other Guarantor pursuant to Section 8.9, or otherwise.

Each of the Guarantors hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower, as the case may be, under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guarantor Obligations, in each case, in any jurisdiction. Each of the Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guarantor Obligations and notice of or proof of reliance by any Secured Party upon this guarantee made under this Section 8 (this "Guarantee") or acceptance of this Guarantee, and the Guarantor Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right

of offset with respect to the Guarantor Obligations at any time or from time to time held by the Secured Parties and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guarantor Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the applicable Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guarantor Obligations outstanding.

8.3     Reinstatement. The obligations of the Guarantors under this Section 8 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guarantor Obligations is rescinded or must be otherwise restored by any holder of any of the Guarantor Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

8.4     No Subrogation. Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guarantor Obligations (other than contingent indemnification and reimbursement obligations for which no claim has been made) and the expiration and termination of the Commitments under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 8.1, whether by subrogation, right of contribution or otherwise, against the Borrower or any other Guarantor of any of the Guarantor Obligations or any security for any of the Guarantor Obligations.

8.5     Remedies. Each Guarantor jointly and severally agrees that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 9 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 9) for purposes of Section 8.1, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower or any Guarantor and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable, or the circumstances occurring where Section 9 provides that such obligations shall become due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 8.1.

8.6     Instrument for the Payment of Money. Each Guarantor hereby acknowledges that the guarantee in this Section 8 constitutes an instrument for the payment of money, and consents and agrees that any Lender or the Administrative Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

8.7     Continuing Guarantee. The Guarantee made by the Guarantors in this Section 8 is a continuing guarantee of payment, and shall apply to all Guarantor Obligations whenever arising.

8.8     General Limitation on Guarantor Obligations. In any action or proceeding involving any federal, state, provincial or territorial, corporate, limited partnership or limited liability company law, or any applicable state, provincial, territorial, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 8.1 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under

Section 8.1, then, notwithstanding any other provision to the contrary, the amount of such liability of such Guarantor shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 8.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

8.9    Release of Guarantors. A Subsidiary Guarantor shall be automatically released from its obligations hereunder in the event that (x) all the Capital Stock of such Subsidiary Guarantor shall be sold, transferred or otherwise disposed of to a Person other than a Loan Party in a transaction permitted by Section 7 or (y) such Subsidiary ceases to be a Subsidiary of the Borrower; provided that the Borrower shall have delivered to the Administrative Agent, at least five days, or such shorter period as the Administrative Agent may agree, prior to the date of the release, a written notice of such for release identifying the relevant Subsidiary Guarantor and the terms of the sale or other disposition in reasonable detail, together with a certification by the Borrower stating that such transaction is in compliance with Section 7 of this Agreement and the other Loan Documents; provided further that the primary purpose of any such transaction was not to evade the guaranty requirements hereunder and was consummated on an arm's length basis with an unaffiliated third party. In connection with any such release of a Guarantor, the Administrative Agent shall execute and deliver to such Guarantor, at such Guarantor's expense, all UCC termination statements, PPSA financing change statements and other documents that such Guarantor shall reasonably request to evidence such release.

8.10    Right of Contribution. Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 8.4. The provisions of this Section 8.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the other Secured Parties, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the other Secured Parties for the full amount guaranteed by such Subsidiary Guarantor hereunder.

8.11    Keepwell. Each Qualified ECP which is a party hereto hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to enable such other Loan Party fully to guarantee all Obligations in respect of Swap Agreements; provided, however, that each Qualified ECP shall only be liable under this Section 8.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under this Section 8 as it relates to such Qualified ECP voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount. The obligations of each Qualified ECP under this Section 8.11 shall remain in full force and effect until the termination and release of all Guarantor Obligations in accordance with this Agreement. Each Qualified ECP intends that this Section 8.11 constitute, and this Section 8.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## SECTION 9.    EVENTS OF DEFAULT

9.1    Events of Default. An Event of Default shall occur if any of the following events shall occur and be continuing; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied (any such event, an "Event of Default"):

(a)        the Borrower shall fail to pay any principal of any Loan, or Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document within five days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)        any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made (or if any representation or warranty is expressly stated to have been made as of a specific date, inaccurate in any material respect as of such specific date); or

(c)        any Loan Party shall default in the observance or performance of any agreement contained in Section 2.11, clause (i) or (ii) of Section 6.4(a) (with respect to Holdings and the Borrower only), Section 6.7(a), 6.9(g) (with respect to any Subsidiary Guarantor under clause (ii) of the definition of "Subsidiary Guarantor" delivering the guaranties required thereunder), Section 6.15 or Section 7 of this Agreement (subject, in the case of Section 7.1, to Section 9.3) or [Section 4.5(a)] of the Security Agreement; or

(d)        any Loan Party shall default in the observance or performance of any agreement in (i) Section 6.2(e)(i), Section 6.10, Section 7.1(a) or [ ]Section 7.2(a) of the Security Agreement[5]2 and such default shall continue unremedied for a period of three days after notice to the Borrower from the Administrative Agent or (ii) Section 6.2(e)(ii),(iii),(iv) or (v) and such default shall continue unremedied for a period of five days after notice to the Borrower from the Administrative Agent; or

(e)        any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than (i) as provided in clauses (a) through (c) of this Section 9.1), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(f)        any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation in respect of Indebtedness, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to (x) cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable or (y) to cause, with the giving of notice if required, any Group Member to purchase or redeem or make an offer to purchase or redeem such Indebtedness prior to its stated maturity; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this Section 9.1(f) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this Section 9.1(f) shall have occurred and be continuing with respect to Material Indebtedness; provided further that clause (iii) of this Section 9.1(f) shall not apply to secured

---

5 To reference DACA requirement.

Indebtedness that becomes due as a result of the voluntary Disposition of the property or assets securing such Indebtedness, if such Disposition is permitted hereunder and such Indebtedness that becomes due is paid upon such Disposition; or

(g)    (i) Holdings, the Borrower or any Significant Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, interim receiver, receiver and manager, trustee, custodian, monitor, sequestrator, conservator or other similar official for it or for all or any substantial part of its assets, or Holdings, the Borrower or any Significant Group Member shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Holdings, the Borrower or any Significant Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against Holdings, the Borrower or any Significant Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Holdings, the Borrower or any Significant Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Holdings, the Borrower or any Significant Group Member shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(h)    (i) Holdings or the Borrower shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any Plan shall fail to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 or 303 of ERISA or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Group Member or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Pension Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Pension Plan shall terminate for purposes of Title IV of ERISA, (v) any Group Member or any Commonly Controlled Entity shall, or is reasonably likely to, incur any liability in connection with a withdrawal from, or the Insolvency of, a Multiemployer Plan, (vi) a Canadian Pension Event shall occur with respect to a Canadian Pension Plan, (vii) any Group Member shall fail to pay or remit when due any amount for which they are liable in respect of a Canadian Pension Plan, or (viii) any other event or condition shall occur or exist with respect to a Plan or a Canadian Pension Plan; and in each case in clauses (i) through (viii) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(i)    one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not (x) paid or covered by insurance as to which the relevant insurance company has been notified of the claim and has not denied coverage or (y) covered by valid third party indemnification obligation from a third party which is Solvent) of $35,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(j)     any of the Security Documents shall cease, for any reason, to be in full force and effect, other than pursuant to the terms hereof or thereof, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)     the Guarantee of any Guarantor contained in <u>Section 8</u> shall cease, for any reason, to be in full force and effect, other than as provided for in <u>Section 8.9</u>, or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(l)     a Change of Control shall occur.

9.2     <u>Action in Event of Default</u>. (a) Upon any Event of Default specified in clause (i) or (ii) of <u>Section 9.1(g)</u>, the Commitments shall immediately terminate automatically and the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) shall automatically immediately become due and payable, and (b) if any other Event of Default under <u>Section 9.1</u> occurs, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable. With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this <u>Section 9.2</u>, the Borrower shall at such time deposit in a Cash Collateral Account opened by the Administrative Agent an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in such Cash Collateral Account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon and all amounts drawn thereunder have been reimbursed in full and all other Obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full (other than contingent indemnification and reimbursement obligations for which no claim has been made), the balance, if any, in such Cash Collateral Account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto). Except as expressly provided above in this <u>Section 9.2</u>, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

9.3     <u>Holdings' Right to Cure</u>. Notwithstanding anything to the contrary contained in this Section 9, in the event that the Borrower fails (or, but for the operation of this <u>Section 9.3</u>, would fail) to comply with the requirements of the covenant set forth in <u>Section 7.1</u> (the "<u>Financial Performance Covenant</u>"), Holdings shall have the right from the date of delivery of a Notice of Intent to Cure with respect to the fiscal quarter most recently ended for which financial results have been provided under <u>Section 6.1(a)</u> or <u>(b)</u> until 10 Business Days thereafter (the "<u>Cure Period</u>"), to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Holdings, and, in each case, to contribute any such cash to the capital of the Borrower (collectively, the "<u>Cure Right</u>"), and upon the receipt by the Borrower of such cash (the "<u>Cure Amount</u>") pursuant to the exercise by Holdings of such

Cure Right, the Financial Performance Covenant shall be recalculated giving effect to the following pro forma adjustments:

(a)     Consolidated EBITDA shall be increased, solely for the purpose of measuring the Financial Performance Covenants and not for any other purpose under this Agreement, by an amount equal to the Cure Amount;

(b)     if, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the Financial Performance Covenant, then the Borrower shall be deemed to have satisfied the requirements of the Financial Performance Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the Financial Performance Covenant that had occurred shall be deemed cured for the purposes of this Agreement; and

(c)     to the extent a fiscal quarter ended for which the Financial Performance Covenant was initially recalculated as a result of a Cure Right and such fiscal quarter is included in the calculation of the Financial Performance Covenant in a subsequent fiscal quarter, the Cure Amount shall be included in Consolidated EBITDA of such initial fiscal quarter.

Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period there shall be at least two fiscal quarters in which the Cure Right is not exercised, (ii) for purposes of this Section 9.3, the Cure Amount shall be no greater than the amount required for purposes of complying with the Financial Performance Covenant, determined at the time the Cure Right is exercised with respect to the fiscal quarter ended for which the Financial Performance Covenant was initially recalculated as a result of a Cure Right, (iii) the Cure Amount shall be disregarded for all other purposes of this Agreement, including, determining any baskets with respect to the covenants contained in Section 7, and shall not result in any adjustment to any amounts other than the amount of the Consolidated EBITDA as described in clause (a) above, (iv) there shall be no pro forma reduction in Indebtedness with the proceeds of any Cure Amount for the fiscal quarter immediately preceding the fiscal quarter in which the Cure Right is exercised for purposes of determining compliance with Section 7.1 and (v) the Cure Right shall not be exercised more than five times in the aggregate.

SECTION 10.    ADMINISTRATIVE AGENT

10.1    Appointment. Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to enter into or accept each Loan Document, other intercreditor arrangements or collateral trust arrangements contemplated by this Agreement on behalf of and for the benefit of the Lenders and the other Secured Parties named therein and agrees to be bound by the terms of each Loan Document and other agreements or documents, and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy with respect to any Collateral against the Borrower or any other Loan Party or any other obligor under any of the Loan Documents, the Specified Swap Agreements or any document relating to Cash Management Obligations (including, in each case, the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise

135

commence any remedial procedures, with respect to any Collateral of the Borrower or any other Loan Party, without the prior written consent of the Administrative Agent.

10.2    <u>Delegation of Duties</u>. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

10.3    <u>Exculpatory Provisions</u>.

(a)    The Administrative Agent shall have no duties or obligations to any Lender or any other Person except those expressly set forth herein and in the other Loan Documents and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. The Administrative Agent's duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i)    shall not be subject to any fiduciary or other implied duties to any Lender or any other Person, regardless of whether any Default or any Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), as applicable, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Administrative Agent may seek clarification or direction from the Required Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided;

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and the Administrative Agent shall not be liable for the failure to disclose, any information relating to the Borrower or any of its respective Affiliates that is communicated to or obtained by any Person serving as the Administrative Agent or any of its Affiliates in any capacity; and

(iv)    shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral,

the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or the Issuing Lender for any failure to monitor or maintain any portion of the Collateral. Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(b)     The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 11.1</u>) or (ii) in the absence of its own gross negligence or willful misconduct (as determined in a final, non-appealable judgment of a court of competent jurisdiction).

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the value, validity, enforceability, effectiveness, sufficiency or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Administrative Agent's reliance on any electronic signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), (v) any failure of any Loan Party to perform its obligations hereunder or thereunder or (vi) the satisfaction of any condition set forth in <u>Section 5</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

10.4    <u>Reliance by Agents</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of Lenders as shall be provided for herein or in the other Loan Documents) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative

Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or such other number or percentage of Lenders as shall be provided for herein or in the other Loan Documents), and such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and all future holders of the Loans.

10.5    Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until the Administrative Agent has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default in Section 9.1" in respect of this Agreement and identifying the specific clause under said Section is given to the Administrative Agent by the Borrower, or notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the Administrative Agent by the Borrower or a Lender. In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action or refrain from taking such action with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

10.6    Posting of Communications.

(a)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make any Approved Electronic Communications available to the Lenders by posting the Approved Electronic Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)    Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders and the Borrower hereby approves distribution of the Approved Electronic Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)    THE APPROVED ELECTRONIC PLATFORM AND THE APPROVED ELECTRONIC COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE APPROVED ELECTRONIC COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE APPROVED ELECTRONIC COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF

THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE APPROVED ELECTRONIC COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY ARRANGER, ANY CO-SYNDICATION AGENT OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM , EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)        Each Lender agrees that notice to it (as provided in the next sentence) specifying that Approved Electronic Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Approved Electronic Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)        Each Loan Party, the Lenders, the Joint Lead Arrangers and the Administrative Agent agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Approved Electronic Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable or customary document retention procedures and policies.

(f)  Nothing herein shall prejudice the right of the Administrative Agent, any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

10.7     Non-Reliance on Administrative Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, attorneys in fact or affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Group Member or any affiliate of a Group Member, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Group Members and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Group Members and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative

Agent hereunder, the Administrative Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Group Member or any affiliate of a Group Member that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys in fact or affiliates.

        10.8    <u>Indemnification</u>. Each of the Lenders agrees to indemnify the Administrative Agent and the Joint Lead Arrangers (and their Related Parties) in their respective capacities as such (to the extent not reimbursed by Holdings, the Borrower or any other Loan Party and without limiting the obligation of Holdings, the Borrower or any other Loan Party to do so), according to its Aggregate Exposure Percentage, on a pro rata basis, in effect on the date on which indemnification is sought under this <u>Section 10.7</u> (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, on a pro rata basis, in accordance with its Aggregate Exposure Percentage immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent, the Joint Lead Arrangers or their Related Parties in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or any other Person under or in connection with any of the foregoing; provided that no Lender shall be liable to any such Person for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

        10.9    <u>Administrative Agent in its Individual Capacity</u>. With respect to its Commitment, Loans, L/C Commitments and Letters of Credit, the Person serving as the Administrative Agent shall have and may exercise the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "<u>Lender</u>" or "<u>Lenders</u>" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with the Borrower, Holdings, or any of their respective Subsidiaries or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

        10.10    <u>Successor Administrative Agent</u>. (a) The Administrative Agent may at any time give 30 days' prior written notice of its resignation to the Lenders and the Borrower, whether or not a successor Administrative Agent has been appointed. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the approval of the Borrower, not to be unreasonably withheld, for so long as no Event of Default has occurred and is continuing, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent (which shall be a bank with an office in New York, New York or an Affiliate of any such bank with an office in New York, New York), provided that if the retiring Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other

Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Administrative Agent may continue to hold such collateral security until such time as a successor Administrative Agent is appointed and such collateral security is assigned to such successor Administrative Agent) and (2) all payments, communications and determinations provided to be made by, to or through such Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this (<u>Section 10.9</u>; provided that the Administrative Agent may, in its sole discretion, agree to continue to perform any or all of such functions until such time as a successor is appointed as provided in this <u>Section 10.9</u>. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in <u>Section 10.9</u>). Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of <u>Section 10</u> and <u>Section 11.5</u> shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(a)  Notwithstanding paragraph (a) of this Section, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders, and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; *provided* that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Security Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties, and continue to be entitled to the rights set forth in such Security Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; *provided* that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 1~~01~~.~~10~~5, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (i) above.

10.11    No Other Duties, etc. Anything herein to the contrary notwithstanding, none of the Co-Syndication Agents, the Joint Lead Arrangers or the Joint Bookrunners shall have any obligations, liabilities, powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as Administrative Agent or Lender hereunder. The provisions of Section 10 are solely for the benefit of the Administrative Agent, the other Persons referenced in the preceding sentence (and the Related Parties of the Administrative Agent and such Persons) and the Lenders and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions nor shall any such provisions constitute a defense available to the Borrower nor any other Loan Party. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

10.12    [Reserved].

10.13    Acknowledgements of Lenders.

(a) Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans  and in providing other facilities set forth herein as may be applicable to such Lender, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the Administrative Agent, any Joint Lead Arranger, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Joint Lead Arranger any Co-Syndication Agent  or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b) Each Lender, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent, the Commitment Parties or the Lenders on the Closing Date.

10.14    Cashless Settlement Option. Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

10.15    Bankruptcy.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan or any Reimbursement Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Borrowing and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.8, 2.14, 2.16, 2.19 and 11.5) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, assignee, monitor, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 11.5). Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

10.16    Erroneous Payments.

(i)    Each Lender hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice

of the Administrative Agent to any Lender under this Section 10.13 shall be conclusive, absent manifest error.

(ii) Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the [NYFRB Rate] and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii) The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(iv) Each party's obligations under this Section 10.16 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

10.17    Collateral Matters.

(a)    Except with respect to the exercise of setoff rights in accordance with <u>Section 10.18</u> or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.

(b)    In furtherance of the foregoing and not in limitation thereof, no arrangements in respect of Cash Management Services, the obligations under which constitute Specified Cash Management Obligations and no Swap Agreement the obligations under which constitute Specified Swap Obligations , will create (or be deemed to create) in favor of any Secured Party that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under any Loan Document.  By accepting the benefits of the Collateral, each Secured Party that is a party to any such arrangement in respect of Cash Management Services or Swap Agreements, as applicable, shall be deemed to have appointed the Administrative Agent to serve as administrative agent and collateral agent under the Loan Documents and agreed to be bound by the Loan Documents as a Secured Party thereunder, subject to the limitations set forth in this paragraph.

(c) The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

10.18    <u>Credit Bidding</u>.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a)at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b)at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i)the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii)each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii)the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.1 of this Agreement), (iv)the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v)to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued

by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

10.19    <u>Quebec Security</u>.  Without limiting the generality of any provisions of this Agreement, each Lender hereby appoints and designates the Administrative Agent (or any successor thereto), as part of its duties as Administrative Agent, to act on behalf of each of the Secured Parties as the hypothecary representative (within the meaning of article 2692 of the Civil Code of Québec) for all present and future Lenders (in such capacity, the "<u>Hypothecary Representative</u>") in order to hold any hypothec granted under the laws of the Province of Quebec as security for any of the Obligations pursuant to any deed of hypothec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and applicable laws (with the power to delegate any such rights or duties). Any Person who becomes a Lender or any successor Administrative Agent shall be deemed to have consented to and ratified the foregoing appointment of the Administrative Agent as the Hypothecary Representative, on behalf of all Secured Parties.  For greater certainty, the Administrative Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Administrative Agent in this Agreement, which shall apply *mutatis mutandis.* In the event of the resignation of Administrative Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Administrative Agent, such successor Agent shall also act as the Hypothecary Representative, as contemplated above.

SECTION 11.    MISCELLANEOUS

11.1    <u>Amendments and Waivers</u>.

(a)    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, waived, supplemented or modified except in accordance with the provisions of this <u>Section 11.1</u>. The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (A) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (A)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; (B) eliminate or reduce the voting rights of any Lender under this <u>Section 11.1</u> without the written consent of such Lender or modify any provision in this Agreement or any other Loan Document that expressly provides for the consent of any Lender without the written consent of such Lender; (C) reduce any percentage specified in the definition of Required Lenders or Supermajority Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents or release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under <u>Section 8</u> of this Agreement or under the Security Documents, in each case, without the written consent of all Lenders; (D) amend, modify or waive any provision of

146

Section 2.17(a), (b) or (c) or Section 11.7(a) which results in a change to the pro rata sharing of payments or the payment waterfall provisions without the written consent of each Lender directly affected thereby ; (E) [reserved]; (F) increase the advance rates set forth in the definition of "Borrowing Base", amend the definition of "Eligible Accounts" or "Eligible Inventory" or any defined terms used within with the effect of increasing the Borrowing Base or add new categories of eligible assets, without the written consent of the Supermajority Lenders; (G) amend, modify or waive any provision of Section 10 or amend, modify, waive or otherwise affect the rights or duties of the Administrative Agent without the written consent of the Administrative Agent; (H) amend, modify or waive any provision of Section 3 or amend, modify, waive or otherwise affect the rights or duties of any Issuing Lender without the written consent of each Issuing Lender; (I) take any actions to contractually subordinate (x) Liens on all or substantially all of the Collateral securing the Obligations or (y) the Obligations in contractual right of payment under the Loan Documents, in each case, to other Indebtedness for borrowed money without the written consent of each Lender directly and adversely affected thereby; or (J) forgive the principal amount or extend the payment date of any Reimbursement Obligation without the written consent of each Lender directly affected thereby. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing during the period such waiver is effective; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(b)      Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (x) to increase the amount of the existing facilities under this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with and Revolving Extensions of Credit and the accrued interest and fees in respect thereof, (y) to permit any such increase in the Revolving Facility to share ratably in prepayments with the Revolving Facility and (z) to include appropriately the Lenders holding such increase in any determination of the Required Lenders.

(c)      In addition, notwithstanding the foregoing, this Agreement and the other Loan Documents may be amended or amended and restated as contemplated by Section 2.24 in connection with any Incremental Amendment and any related increase in Commitments or Loans, with the consent of the Borrower, the Administrative Agent and the Incremental Revolving Lenders providing such increased Commitments or Loans.

(d)      Notwithstanding the foregoing, this Agreement and the other Loan Documents may be amended in connection with any Permitted Amendment pursuant to a Loan Modification Offer in accordance with Section 2.27(b) (and the Administrative Agent and the Borrower may effect such amendments to this Agreement, the Intercreditor Agreement (or enter into a replacement thereof) and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of such Permitted Amendment).

(e)      Notwithstanding the foregoing, the Administrative Agent and the Borrower may amend, in a writing executed by both the Administrative Agent and the Borrower, any Loan Document to (x) cure any omission, mistake, typographical error or other defect in any provision of this Agreement or to effect administrative changes that are not adverse to any Lender or (y) solely with respect to the

property or assets of (or Capital Stock of) Specified Foreign Guarantors, give effect to any limitations set forth in the Agreed Security Principles.

(f)    Notwithstanding anything to the contrary, in connection with any determination as to whether the Required Lenders have consented (or not consented) to any amendment or waiver, any non-defaulting Lender (other than (x) any Lender that is a Regulated Bank or an affiliate of a Regulated Bank and (y) any Lender that is the Administrative Agent or an affiliate of the Administrative Agent) that owns, directly or indirectly, any equity in the Borrower (each, an "Affiliated Lender") shall have no right to vote any of its Loans and Commitments and shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders; provided that Apollo entities that are Lenders on the Closing Date (the "Closing Date Apollo Entities") shall be entitled to vote their Loans and Commitments so long as such entities are Debt Fund Affiliates and provided that, with respect to any such vote, any Loans and Commitments of the Closing Date Apollo Entities in excess of 12% of the aggregate Commitments as of such date shall be deemed to have voted in the same proportion as other Lenders that are not Closing Date Apollo Entities.

11.2    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail or telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice or notice by electronic mail, when received, addressed as follows in the case of the Borrower, Holdings and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

|  | |
|---|---|
| Holdings or the Borrower: | 150 Verona Street<br>Rochester, New York 14608<br>Attention:    Scott Rosa and Robert Johnson<br>Telecopy:    (585) 627-6359<br>Telephone:    (585) 627-6285<br>Email:    scott.rosa@carestream.com and<br>robert.johnson2@carestream.com |
| Administrative Agent: | JPMorgan Chase Bank, N.A.<br>500 Stanton Christiana Road, NCC5, Floor 1<br>Newark, DE 19713-2107, United States<br>Attention:    Yili Xu and Zohaib Nazir<br>12012443657@tls.ldsprod.com and<br>12012443657@tls.ldsprod.com<br>Telephone:    302 634 ~~302634~~7761 and 312 954 ~~312954~~9582<br>Email:    yili.x.xu@chase.com and<br>zohaib.nazir@chase.com |

with a copy to:

JPMorgan Chase Bank, N.A.
383 Madison Avenue
New York, NY 10179
Attention:    ~~[ ]~~Maurice Dattas
~~Telecopy:    [ ]~~

148

Telephone:    [ ]212 270 5347
Email:        [ ]Email:maurice.dattas@jpmorgan.com

; provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder. All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender ("Approved Electronic Communications"). The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (a) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (b) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (a) of notification that such notice or communication is available and identifying the website address therefor.

Each Loan Party agrees to assume all risk, and hold the Administrative Agent, the Joint Bookrunners and each Lender harmless from any losses, associated with, the electronic transmission of information (including, without limitation, the protection of confidential information), except to the extent caused by the gross negligence or willful misconduct of such Person.

11.3    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

11.5    Payment of Expenses and Taxes. (a) The Borrower shall pay (a) each Administrative Agent and its Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the credit facility provided for herein and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions (whether or not transactions contemplated hereby and thereby shall be consummated), including the reasonable fees, charges and disbursements of one counsel to the Administrative Agent and to the Joint Lead Arrangers and the

Co-Syndication Agents and, if necessary, one local counsel in each relevant jurisdiction to such Person, and, in the case of an actual or perceived conflict of interest where the Administrative Agent, any Joint Lead Arranger and/or any Co-Syndication Agent affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, (b) each Lender and each Issuing Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (d) all out-of-pocket expenses incurred by the Administrative Agent, any Issuing Lender or any Lender, including the fees, charges and disbursements of one counsel for the Administrative Agent, any Issuing Lender or any Lender , and if necessary, one local counsel in any relevant jurisdiction to such Persons, and in the case of an actual or perceived conflict of interest where the Administrative Agent, any Issuing Lender and/or any Lender affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit (it being understood that expenses reimbursed by the Borrower under this Section 11.5 shall include costs and expenses incurred in connection with (1) appraisals, environmental reviews and insurance reviews, (2) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination and (3) forwarding loan proceeds, collecting checks and other items of payment and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral).

Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower and any Loan Party shall not assert and the Borrower and each Loan Party hereby waives any claim against the Administrative Agent, any Joint Lead Arranger, any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any liabilities arising from the use by others of information or other materials (including, without limitation, any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet), and (ii) no party hereto shall assert, and each such party hereby waives, any liabilities against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, nothing in this Section 11.5(a) shall relieve the Borrower and each Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in Section 11.5(b), against any special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(b) The Borrower shall indemnify the Administrative Agent, each Joint Lead Arranger and each Lender, each Issuing Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all liabilities and related expenses, including the fees, charges and disbursements of one counsel for any Indemnitee, and if necessary, one local counsel in any relevant jurisdiction, and in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict has retained its own counsel, of another law firm acting as counsel for such Person and, if necessary, one local counsel in each relevant jurisdiction to such Person, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, (ii) the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the

Transactions or any other transactions contemplated hereby, (iii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by an Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iv) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any environmental liability related in any way to Holdings or any of its Subsidiaries, or (v) any actual or prospective Proceeding relating to any of the foregoing, whether or not such Proceeding is brought by the Borrower or any other Loan Party or its or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnitee. This Section 11.5(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c) Each Lender severally agrees to pay any amount required to be paid by the Borrower under paragraphs (a), (b) or (c) of this Section 11.5 to the Administrative Agent, each Issuing Lender, and each Related Party of any of the foregoing Persons (each, an "Agent-Related Person") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Applicable Percentage in effect on the date on which such payment is sought under this Section (or, if such payment is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Applicable Percentage immediately prior to such date), and agrees to indemnify and hold each Agent-Related Person harmless from and against any and all liabilities and related expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent-Related Person in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent-Related Person under or in connection with any of the foregoing; *provided* that the unreimbursed expense or Liability or related expense, as the case may be, was incurred by or asserted against such Agent-Related Person in its capacity as such; *provided further* that no Lender shall be liable for the payment of any portion of such Liabilities, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted primarily from such Agent-Related Party's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d) All amounts due under this Section 11.5 shall be payable promptly after written demand therefor.

11.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Lender that issues any Letter of Credit), except that (other than as provided in Section 11.19) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).

(b)    (i)    Subject to the conditions set forth in clause (b)(ii) below, any Lender may assign to one or more Eligible Assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it and the Note or Notes (if any) held by it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    the Borrower, <u>provided</u> that such consent shall be deemed to have been given if the Borrower has not responded in writing to the Administrative Agent within ten (10) Business Days after notice by the Administrative Agent, <u>provided further</u> that no consent of the Borrower shall be required (x) for an assignment to an existing Revolving Lender or an affiliate of a Revolving Lender or (y) if an Event of Default under <u>Section 9.1(a)</u> or <u>9.1(g)</u> has occurred and is continuing;

(B)    except with respect to an assignment to a Lender or an Affiliate of a Lender that is a Regulated Bank, the Administrative Agent (such consent not to be unreasonably withheld or delayed); and

(C)    each Issuing Lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Revolving Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000.00 (provided, in each case, that simultaneous assignments to or by two or more Approved Funds shall be aggregated for purposes of determining such amount) unless the Administrative Agent and the Borrower otherwise consent;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire and applicable tax forms.

This clause (b) shall not prohibit any Lender from assigning all or any portion of its rights and obligations among separate Revolving Facilities on a non-pro rata basis.

For the purposes of this <u>Section 11.6</u>, "<u>Approved Fund</u>" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    [Reserved].

(iv)    [Reserved].

(v)    Subject to acceptance and recording thereof pursuant to Section 11.6(b)(vii) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 11.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 11.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations if such transaction complies with the requirements of Section 11.6(c).

(vi)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuing Lenders and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Issuing Lender and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(vii)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), together with (x) any processing and recordation fee and (y) any written consent to such assignment required by this Section 11.6(b), the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (b).

(c)    (i)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than a natural person, a Defaulting Lender, Holdings, the Borrower or any Affiliate of the Borrower) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Lenders and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each

Lender directly affected thereby pursuant to the proviso to the second sentence of Section 11.1(a) and (2) directly affects such Participant. Subject to Section 11.6(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.18, 2.19 and 2.20 (subject to the requirements of those sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.6(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.7(b) as though it were a Lender, provided such Participant shall be subject to Section 11.7(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for U.S. federal income tax purposes as the non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the commitment of, and the principal amounts (and stated interest) of, each Participant's interest in the Loans, L/C Obligations or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, L/C Obligations or its other obligations under any Loan Document) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan, L/C Obligation or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Unless otherwise required by the Internal Revenue Service ("IRS"), any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(i)       A Participant shall not be entitled to receive any greater payment under Section 2.18 or 2.19 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. No Participant shall be entitled to the benefits of Section 2.19 unless such Participant complies with Section 2.19(d) and Section 2.19(e).

(d)       Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)       The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in Section 11.6(d) above.

(f)       Each Lender, upon execution and delivery hereof or upon succeeding to an interest in Commitments or Loans, as the case may be, represents and warrants as of the Closing Date and as of the effective date of the applicable Assignment and Assumption that it is a "qualified purchaser" for purposes of Section 2(a)(51) of the Investment Company Act of 1940, as amended.

(g)       Each Lender, upon succeeding to an interest in Commitments or Loans, as the case may be, represents and warrants as of the effective date of the applicable Assignment and Assumption that it is an Eligible Assignee.

11.7     Adjustments; Set-off.

(a)     Except to the extent that this Agreement expressly provides for or permits payments to be allocated or made to a particular Lender or to the Lenders under a particular Revolving Facility, if any Lender (a "Benefited Lender") shall receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 9.1(g) or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, with the prior consent of the Administrative Agent, without prior notice to Holdings or the Borrower or any other Loan Party, any such notice being expressly waived by Holdings and the Borrower and each other Loan Party to the extent permitted by applicable law, upon the occurrence and during the continuance of any Event of Default, to set off and appropriate and apply against the Obligations any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Holdings or the Borrower or any such other Loan Party, as the case may be. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

11.8     Counterparts; Electronic Execution.

(a)     This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or any document or instrument delivered in connection herewith by facsimile transmission or electronic PDF shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

(b)     The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any ancillary document shall be deemed to include electronic signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any electronic signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such electronic signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to

155

review the appearance or form of any such electronic signature and (ii) upon the request of the Administrative Agent or any Lender, any electronic signature  shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (A) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders, the Borrower and the Loan Parties, electronic signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement,  any other Loan Document and/or any ancillary document shall have the same legal effect, validity and enforceability as any paper original, (B) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any ancillary document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (C) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any ancillary document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (D) waives any claim against any Lender-Related Person for any liabilities arising solely from the Administrative Agent's and/or any Lender's reliance on or use of electronic signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any liabilities arising as a result of the failure of the Borrower and/or any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any electronic signature.

        11.9    <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

        11.10    <u>Integration</u>. This Agreement, the Commitment Letter, the Fee Letter (and any other applicable engagement letter) and the other Loan Documents and any separate letter agreements with respect to fees payable to the Joint Lead Arranger, the Joint Bookrunners and the Administrative Agent represent the entire agreement of the Borrower, Holdings, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

        11.11    <u>Governing Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

        11.12    <u>Submission To Jurisdiction; Waivers</u>. Each party hereto hereby irrevocably and unconditionally:

        (a)    notwithstanding the governing law provisions of any applicable Loan Document, submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement and the other Loan Documents or the transactions relating hereto or thereto, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan

(or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate courts from any thereof, and agrees that notwithstanding the foregoing (x) all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court and (y) a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Issuing Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower, any Loan Party or its properties in the courts of any jurisdiction;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court and waives any right to claim that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court;

(d)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to each party hereto, as the case may be at its address set forth in Section 11.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto; and

(e)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law.

11.13      Acknowledgements. Holdings, the Borrower and each Guarantor hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to Holdings, the Borrower or any Guarantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and Holdings, the Borrower and each Guarantor, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings, the Borrower or the Guarantors and the Lenders.

11.14      Releases of Guarantees and Liens.

(a)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 11.1) to take any action requested by the Borrower having the effect of (1) releasing any Collateral or Guarantor Obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 11.1 or (ii) under the

circumstances described in <u>Section 11.14(b)</u> below, or (2) releasing any Lien on any Collateral subject to Liens incurred under <u>Section 7.3(g)</u> or subordinating Liens on the Collateral to such Liens permitted under <u>Section 7.3(g)</u>, in each case, to the extent required under the agreements relating to such Liens permitted under <u>Section 7.3(g)</u>;

(b)    At such time as the Loans, the Reimbursement Obligations and the other Obligations (other than (i) contingent obligations for which no claim has been made and (ii) Cash Management Obligations and all other obligations and liabilities of the Borrower or any other Loan Party (including with respect to guarantees) to the Administrative Agent, any Lender, any other Secured Party or any party to a Specified Swap Agreement or a party providing Cash Management Obligations) shall have been satisfied by payment in full in immediately available funds, the Commitments have been terminated and no Letters of Credit shall be outstanding or all outstanding Letters of Credit have been Collateralized, the Collateral shall be automatically released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall automatically terminate, all without delivery of any instrument or performance of any act by any Person and the Administrative Agent shall, upon the request and at the sole expense of the Borrower, deliver any such instruments, release documents and lien termination notices and filings as may be reasonably requested to evidence such termination.

11.15    <u>Confidentiality</u>. Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is not designated by the provider thereof as public information or non-confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, the Joint Lead Arrangers, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with provisions no less restrictive than this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, trustees, agents, attorneys, accountants and other professional advisors that have been advised of the provisions of this Section and have been instructed to keep such information confidential, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding; provided that unless specifically prohibited by applicable law, reasonable efforts shall be made to notify the Borrower of any such request prior to disclosure, (g) that has been publicly disclosed other than as a result of a breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender; provided, such Person has been advised of the provisions of this Section and instructed to keep such information confidential or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the extensions of credit hereunder. Notwithstanding anything herein to the contrary, any party to this Agreement (and any employee, representative, or other agent of any party to this Agreement) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure. However, any such information relating to the tax

treatment or tax structure is required to be kept confidential to the extent necessary to comply with any applicable federal, provincial, territorial or state securities laws.

       11.16   **WAIVERS OF JURY TRIAL. EACH OF THE BORROWER, HOLDINGS, THE GUARANTORS THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

       11.17   <u>PATRIOT Act Notification</u>. The following notification is provided to the Borrower and each Guarantor pursuant to Section 326 of the PATRIOT Act and Beneficial Ownership Regulation:

       IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

       To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

       What this means for a Borrower or Guarantor: When the Borrower or Guarantor opens an account, if the Borrower or Guarantor is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower or Guarantor is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower. The Administrative Agent and the Lenders may also ask, if the Borrower or Guarantor is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower or Guarantor is not an individual, to see the Borrower's legal organizational documents or other identifying documents.

       11.18   <u>Maximum Amount</u>.

       (a)   It is the intention of the Borrower and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Loan Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness evidenced hereby or other Obligations of the Borrower, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "<u>Maximum Amount</u>"). If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest paid

and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by applicable law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Notes until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof. The terms and provisions of this subsection shall control and supersede every other provision of all agreements between the Borrower or any endorser of the Notes and the Lenders.

(b)    If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the Loans and shall be treated as a voluntary prepayment under Section 2.10(a) and shall be so applied in accordance with Section 2.17 or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrower in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrower.

11.19    Intercreditor Agreement. Each Lender hereby authorizes and directs the Administrative Agent (a) to enter into the Intercreditor Agreement on its behalf, perform the Intercreditor Agreement on its behalf and take any actions thereunder as determined by the Administrative Agent to be necessary or advisable to protect the interest of the Lenders, and each Lender agrees to be bound by the terms of the Intercreditor Agreement and (b) to enter into any other intercreditor agreement reasonably satisfactory to the Administrative Agent on its behalf, perform such intercreditor agreement on its behalf and take any actions thereunder as determined by the Administrative Agent to be necessary or advisable to protect the interests of the Lenders, and each Lender agrees to be bound by the terms of such intercreditor agreement. Each Lender acknowledges that the Intercreditor Agreement governs, among other things, Lien priorities and rights of the Lenders and the Term Loan Secured Parties (as defined in the Intercreditor Agreement) with respect to the Collateral, including the Term Loan Priority Collateral. In the event of any conflict between this Agreement or any Loan Document with the Intercreditor Agreement, the Intercreditor Agreement shall govern and control.

11.20    [Reserved].

11.21    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent. The provisions of this Section 11.21 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

11.22    No Fiduciary Duty. Each of the Administrative Agent, the Joint Bookrunners, the Joint Lead Arrangers, the Co-Syndication Agents, each Lender and their Affiliates (collectively, solely for purposes of this Section 11.22, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their Affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its Affiliates, on the other. The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading

thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

        11.23    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party to this Agreement acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

        (a)  the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

        (b)      the effects of any Bail-in Action on any such liability, including, if applicable:

        (i)      a reduction in full or in part or cancellation of any such liability;

        (ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

        (iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

        11.24    <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Loan Parties in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "<u>Agreement Currency</u>"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Loan Parties in the Agreement Currency, the Loan Parties agree, as a separate obligation and notwithstanding any such judgment, to

indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

11.25    <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Agreement or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regimes if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regimes if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

*[Signature pages follow]*