**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) | Case No. 22-11778 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS'**
**MEMORANDUM OF LAW**
**IN SUPPORT OF AN ORDER**
**APPROVING THE DEBTORS' DISCLOSURE**
**STATEMENT FOR, AND CONFIRMING, THE JOINT**
**PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**OF CARESTREAM HEALTH, INC. AND ITS DEBTOR AFFILIATES**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:     ljones@pszjlaw.com
            tcairns@pszjlaw.com
            ecorma@ pszjlaw.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Tricia Schwaller Collins (*pro hac vice* pending)
Yusuf U. Salloum (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     patrick.nash@kirkland.com
            tricia.schwallier@kirkland.com
            yusuf.salloum@kirkland.com
-and-

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Rachael M. Bentley (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     nicole.greenblatt@kirkland.com
Email:     rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

Dated: September 26, 2022

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232).  The location of the Debtors' service address is:  150 Verona Street, Rochester, New York 14608.

# TABLE OF CONTENTS

**Page(s)**

RELIEF REQUESTED ................................................................................................1

PRELIMINARY STATEMENT ..................................................................................2

BACKGROUND .........................................................................................................4

I.      Company Background and Restructuring Transactions ...........................................4

II.     The Solicitation Process and Voting Results. ...........................................................7

ARGUMENT ...........................................................................................................10

I.      Approval of the Disclosure Statement Is Warranted. .............................................11

       A.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and the Bankruptcy Rules. ............................................................11

               1.     The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable under Nonbankruptcy Law. ...............................................12

               2.     The Disclosure Statement Contains Adequate Information. ..........13

       B.     The Debtors Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order. ............................................................16

               1.     The Debtors Complied with the Notice Requirements Set Forth in the Scheduling Order and the Bankruptcy Rules. ...........................17

               2.     The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Scheduling Order. .............................18

               3.     The Debtors' Solicitation Period Complied with the Scheduling Order and Bankruptcy Rule 3018(b). ..............................................18

               4.     The Debtors' Vote Tabulation Procedures Complied with the Scheduling Order. ........................................................................18

               5.     Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith. ...................................................................19

II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed. ...........................................................................................20

A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). .................................................................20

 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. .................................................20

 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.......................................23

  a. **Designation of Classes of Claims and Equity Interests, Specification of Unimpaired Classes, and Treatment of Impaired Classes (§ 1123(a)(1)–(3)).** ............................23

  b. **Equal Treatment Within Classes (§ 1123(a)(4)).**...........24

  c. **Means for Implementation (§ 1123(a)(5)).**.....................24

  d. **Issuance of Non-Voting Securities (§ 1123(a)(6)).**.........25

  e. **Directors and Officers (§ 1123(a)(7)).** ...........................26

 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.......................................27

  a. **Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.**...................................27

  b. **The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**...............................................................................28

 4. The Plan Complies with Section 1123(d) of the Bankruptcy Code.39

B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).................................................40

 1. The Debtors Complied with Section 1125 of the Bankruptcy Code. 40

 2. The Debtors Complied with Section 1126 of the Bankruptcy Code. 40

C. The Plan Is Proposed in Good Faith (§ 1129(a)(3)). ................................42

D. The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). .........................44

E. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ........................................................45

F.       The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ...........................................................47

G.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ...........................................................47

H.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...............................49

I.       The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ...........................................................49

J.       At Least One Impaired Class of Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ..........................................................50

K.      The Plan Is Feasible (§ 1129(a)(11)). ........................................51

L.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...............54

M.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ..55

N.     Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. .....55

O.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ...................................................55

      1.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)). ...........................................................56

      2.     The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)). ...................59

P.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (§ 1129(c)–(e)). ...........................................61

III.    Modifications to the Plan Do Not Require Resolicitation. ....................62

IV.   Good Cause Exists to Waive the Stay of the Confirmation Order. .......................63

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*,
    701 F.2d 1071 (2d Cir. 1983)..................................................................43

*Bank of Am. Nat. Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)...................................................................47, 56

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
    764 F.2d 406 (5th Cir. 1985) ...................................................................42

*Cadle Co. II, Inc., v. PC Liquidation Corp. (In re PC Liquidation Corp.)*,
    383 B.R. 856 (E.D.N.Y. 2008) ...................................................................13

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
    860 F.2d 94 (3d Cir. 1988)...................................................................13

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983)...................................................................28

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
    116 F.3d 790 (5th Cir. 1997) ...................................................................42

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
    81 B.R. 274 (D. Del. 1988)...................................................................13

*Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993)...................................................................21

*Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*,
    590 B.R. 75 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ...................................................................56

*In re 203 N. LaSalle St. Ltd. P'ship*,
    190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................56

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993)...................................................................21

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986)...................................................................42

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................47

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ......................52, 57

*In re Alex and Ani, LLC*,
No. 21-10918 (Bankr. D. Del. Sept. 22, 2021) ................................................46

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ............................................................62

*In re Ambanc La Mesa*,
115 F.3d at 650 (9th Cir. 1997) ....................................................................56

*In re Anna Holdings, Inc.*,
No. 19-12551 (CSS) (Bankr. D. Del. Dec. 17, 2019) ........................................64

*In re APC Auto. Techs. Intermediate Holdings, LLC*,
No. 20-11466 (CSS) (Bankr. D. Del. July 10, 2020) ........................................64

*In re Apex Oil Co.*,
118 B.R. 683 (Bankr. E.D. Mo. 1990) ............................................................45

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (Bankr. D. Del. 2006) ...................................................21, 57, 59

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ........................................................56

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ............................................................46

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ................51

*In re Century Glove, Inc.*,
Civ. A. Nos. 90-400-SLR and 90-401-SLR, 1993 WL 239489 (D. Del. Feb.
10, 1993) ................................................................................................42

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) ............................................................44

*In re Clover Tech. Grp., LLC*,
No. 19-12680 (Bankr. D. Del. Jan. 22, 2020) ................................................64

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...................................................28, 57

*In re Dow Corning Corp.*,
  237 B.R. 374 (Bankr. E.D. Mich. 1999) ...................................................65

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..............................................22, 47

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992) ...........................................................40

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005) ........................................................40

*In re Exaeris, Inc.*,
  380 B.R. 741 (Bankr. D. Del. 2008) ..................................................31

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...............................................32, 60

*In re Flintkote Co.*,
  486 B.R. 99 (Bankr. D. Del. 2012) ...............................................52, 53

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) .............................................57

*In re Future Energy Corp.*,
  83 B.R. 470 (Bankr. S.D. Ohio 1988) ................................................45

*In re Gen. Wireless Operations Inc.*,
  2017 WL 5461361 (Bankr. D. Del. Oct. 26, 2017) ...................................64

*In re Genco Shipping & Trading Ltd.*,
  No. 14-11108, slip op. (Bankr. S.D.N.Y. July 2, 2014).............................35

*In re Genesis Health*,
  266 B.R. 591 (Bankr. D. Del. 2001) ..................................................59

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007) ...............................................22

*In re HighPoint Res. Corp.*,
  No. 21-10565 (CSS) (Bankr. D. Del. Mar. 18, 2021) ................................66

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) .......................................32, 33, 38

*In re ION Media Networks, Inc.*,
  419 B.R. 585 (Bankr. S.D.N.Y. Nov. 24, 2009) ......................................62

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).............................................................................22

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...............................................................58

*In re Lapworth*,
1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)...........................................41

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) .................................................................49

*In re Lernout & Hauspie Speech Prods., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003), *aff'd sub nom. In re Lernout & Hauspie
Speech Prod. N.V.*, 308 B.R. 672 (D. Del. 2004) ......................................58, 60

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (D.N.J. 2005), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir. 2007)..................13, 45

*In re Longview Power, LLC*,
No. 20-10951 (BLS) (Bankr. D. Del. May. 22, 2020) ......................................66

*In re Martin*,
91 F.3d 389 (3d Cir. 1996)...............................................................................29

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)..............................................................31

*In re Metrocraft Publ'g. Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ...............................................................14

*In re Nat'l Truck Funding LLC*,
588 B.R. 175 (Bankr. S.D. Miss. 2018)............................................................64

*In re Neff*,
60 B.R. 448 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) .........................49

*In re Neshaminy Office Bldg. Assocs.*,
62 B.R. 798 (E.D. Pa. 1986) ............................................................................29

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) .................................................................43

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) .................................................................21

*In re Phx. Petrol. Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ........................................................13, 14

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) .......................21, 38

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ....................................................................................53

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)..................................................................................38, 40, 43

*In re RGN-Group Holdings, LLC*,
No. 20-11961 (Bankr. D. Del. Aug. 19, 2021) ........................................................................46

*In re River Vill. Assocs.*,
181 B.R. 795 (E.D. Pa. 1995) ................................................................................................13

*In re Rusty Jones, Inc.*,
110 B.R. 362 (Bankr. N.D. Ill. 1990) ....................................................................................47

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ......................................................................................21

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988).....................................................................................14

*In re Sea Garden Motel & Apartments*,
195 B.R. 294 (D. N.J. 1996) ..................................................................................................53

*In re Sherwood Square Assocs.*,
107 B.R. 872 (Bankr. D. Md. 1989) .......................................................................................47

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ........................................................................31, 35, 38

*In re Stratford Assocs. Ltd. P'ship*,
145 B.R. 689 (Bankr. D. Kan. 1992) ......................................................................................47

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ........................................................................................21

*In re Town Sports Int'l, LLC*,
No. 20-12168 (Bankr. D. Del. Dec. 18, 2020)........................................................................46

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984)......................................................................................47

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011),
*on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011)......................................................53

*In re Tribune Company, et al.*,
472 B.R. 223 (Bankr. D. Del. Apr. 9, 2012) ...................................................59

*In re U.S. Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) .........................................................14

*In re U.S. Truck Co.*,
47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ...................52

*In re Verso Corp.*,
No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ...............................39

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) .....................................................................43, 52, 53

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ...................................................31, 32, 35, 38

*In re Wiersma*,
227 F. App'x 603 (9th Cir. 2007) ................................................................21

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) ...........................................................31

*In re Worldcom, Inc.*,
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .................41, 59

*In re Z Gallerie, LLC*,
No. 19-10488 (LSS) (Bankr. D. Del. June 20, 2019) ...........................46

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) .........................................................31, 35

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37
Bus. Park Assocs.)*,
987 F.2d 154 (3d Cir. 1993) ..................................................................22, 57

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ..................................................................52, 53

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003) .......................................................................12

*Liberty Nat'l Enter. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*,
115 F.3d 650 (9th Cir. 1997) .......................................................................57

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984) ...................................................................................44

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988) ...................................................................13

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
761 F.2d 1374 (9th Cir. 1985) ................................................................53

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
844 F.2d 1142 (5th Cir. 1988) ................................................................13

**Statutes**

11 U.S.C. §§ 101–1532 ............................................................................1

11 U.S.C. § 101(51D)(B) .........................................................................63

11 U.S.C. § 365 .......................................................................................29

11 U.S.C. § 365(f) ...................................................................................66

11 U.S.C. § 503(b) ..................................................................................50

11 U.S.C. § 507(a)(1) ..............................................................................51

11 U.S.C. § 507(a)(2) .........................................................................50, 55

11 U.S.C. § 507(a)(8) ..............................................................................51

11 U.S.C. § 510(b) ..................................................................................61

11 U.S.C. § 1114 .....................................................................................56

11 U.S.C. § 1122 .........................................................................21, 22, 63

11 U.S.C. § 1122(a) ...........................................................................21, 24

11 U.S.C. § 1122(b) .................................................................................21

11 U.S.C. § 1123 .................................................................21, 29, 30, 63

11 U.S.C. § 1123(a) .................................................................................25

11 U.S.C. § 1123(a)(1)–(3) ......................................................................25

11 U.S.C. § 1123(a)(4) ............................................................................25

11 U.S.C. § 1123(a)(5) ............................................................................26

11 U.S.C. § 1123(a)(6) ............................................................................27

11 U.S.C. § 1123(a)(7) ................................................................27, 28

11 U.S.C. § 1123(b) ...................................................................28, 30

11 U.S.C. § 1123(b)(1) ...............................................................28, 29

11 U.S.C. § 1123(b)(2) .....................................................................29

11 U.S.C. § 1123(b)(3)(A) .................................................................31

11 U.S.C. § 1123(b)(6) ...............................................................28, 29

11 U.S.C. § 1123(d) ..........................................................................41

11 U.S.C. § 1125 ........................................................................*passim*

11 U.S.C. § 1125(a) ....................................................................11, 12

11 U.S.C. § 1125(a)(1) ................................................................11, 13

11 U.S.C. § 1125(b) .............................................................10, 11, 12

11 U.S.C. § 1125(e) ..........................................................................20

11 U.S.C. § 1125(g) .............................................................10, 11, 16

11 U.S.C. § 1126 ........................................................................*passim*

11 U.S.C. § 1126(a) ..................................................................1, 42, 43

11 U.S.C. § 1126(b) ....................................................................10, 11

11 U.S.C. § 1126(b)(1) .....................................................................12

11 U.S.C. § 1126(b)(2) ......................................................12, 15, 16

11 U.S.C. § 1126(c) ..........................................................................20

11 U.S.C. § 1126(f) ...................................................................7, 42, 43

11 U.S.C. § 1126(g) ..........................................................8, 42, 43, 64

11 U.S.C. § 1127 ...............................................................................64

11 U.S.C. § 1127(a) ..........................................................................63

11 U.S.C. § 1129 ........................................................................*passim*

11 U.S.C. § 1129(a)(1) .....................................................................21

11 U.S.C. § 1129(a)(2)............................................................39, 41, 43

11 U.S.C. § 1129(a)(3)........................................................39, 43, 44, 45

11 U.S.C. § 1129(a)(4)..........................................................................45

11 U.S.C. § 1129(a)(5)....................................................................46, 47

11 U.S.C. § 1129(a)(5)(A)(i).................................................................46

11 U.S.C. § 1129(a)(5)(A)(ii)....................................................46, 47, 48

11 U.S.C. § 1129(a)(5)(B)................................................................46, 48

11 U.S.C. § 1129(a)(6)..........................................................................48

11 U.S.C. § 1129(a)(7)....................................................................48, 49, 50

11 U.S.C. § 1129(a)(7)(A).....................................................................49

11 U.S.C. § 1129(a)(7)(A)(ii)................................................................48

11 U.S.C. § 1129(a)(8)..........................................................50, 52, 56, 57

11 U.S.C. § 1129(a)(9)....................................................................50, 51

11 U.S.C. § 1129(a)(9)(A)...............................................................50, 51

11 U.S.C. § 1129(a)(9)(B).....................................................................51

11 U.S.C. § 1129(a)(9)(C).....................................................................51

11 U.S.C. § 1129(a)(10)...................................................................50, 52

11 U.S.C. § 1129(a)(11)..............................................................52, 53, 55

11 U.S.C. § 1129(a)(12)........................................................................55

11 U.S.C. § 1129(a)(13)........................................................................56

11 U.S.C. § 1129(a)(14)........................................................................56

11 U.S.C. § 1129(a)(15)........................................................................56

11 U.S.C. § 1129(a)(16)........................................................................56

11 U.S.C. § 1129(b)........................................................................*passim*

11 U.S.C. § 1129(b)(1).................................................56, 57, 58, 61

11 U.S.C. § 1129(b)(2) ..................................................................62

11 U.S.C. § 1129(b)(2)(B)(ii) ....................................................61

11 U.S.C. § 1129(c) .....................................................................62

11 U.S.C. § 1129(d) .....................................................................63

11 U.S.C. § 1129(e) .....................................................................63

11 U.S.C. § 3018(b) .....................................................................19

15 U.S.C. § 77d(a)(2) ...................................................................12

**Other Authorities**

17 C.F.R. § 230.501 (2017) .........................................................12

5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1984) ............53

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 .........21

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787 ............21

**RELIEF REQUESTED**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of approval of their *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates* [Docket No. 15] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and confirmation of their *Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates*, [Docket No. 159] (as modified, amended, or supplemented from time to time, the "Plan") pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). In further support of confirmation of the Plan, contemporaneously herewith, the Debtors have filed: (a) the *Declaration of Scott H. Rosa, Chief Financial Officer of Carestream Health, Inc., in Support of the Debtors' Disclosure Statement for, and Confirmation of, the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and Its Debtor Affiliates* (the "Rosa Declaration"); (b) the *Declaration of Marc Brown, Managing Director of AlixPartners, LLP, in Support of The Debtors' Disclosure Statement for, and Confirmation of, the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (the "Brown Declaration"); and (c) the *Declaration of Andrew Turnbull, Managing Director of Houlihan Lokey Capital, Inc., in Support of the Disclosure Statement for, and Confirmation of, the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (the "Turnbull Declaration"). The Debtors also rely on the *Declaration of Adam Gorman Regarding the Solicitation and Tabulation of Votes on the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* [Docket No. 42] (the "Voting Report") in further support of

confirmation of the Plan. In support of confirmation of the Plan and approval of the Disclosure Statement, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT[2]

1.      The Debtors commenced these chapter 11 cases on August 23, 2022, with the goal of confirming their prepackaged Plan swiftly and efficiently. Specifically, after extensive diligence and good-faith, arms' length negotiations with an ad hoc group of holders of First Lien Claims and Second Lien Term Loan Claims (the "Crossover Group"), the Debtors reached an agreement with their Sponsor, lenders holding more than 70 percent of the outstanding First Lien Claims, and lenders holding more than 99 percent of the outstanding Second Lien Term Loan Claims on the terms of the restructuring transactions set forth in that certain restructuring support agreement, dated as of August 21, 2022 (the "Restructuring Support Agreement" or "RSA," and the transactions contemplated thereby, the "Restructuring Transactions"). On August 21, 2022, the Debtors commenced solicitation of votes on the prepackaged Plan in accordance with the Restructuring Support Agreement. The Voting Classes unanimously voted to accept the Plan with 73% of Holders of First Lien Claims (Class 3) and 98% of Holders of Second Lien Term Loan Claims (Class 4) casting Ballots in support of the Plan. Importantly, no Holder of Claims in any of the Voting Classes voted to reject the Plan or opted out of the Third-Party Release.

2.      The Plan, built around the RSA, (a) deleverages the Debtors' balance sheet by approximately $470 million, (b) provides the Debtors with up to $75 million of new equity capital

---

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Scott H. Rosa, Chief Financial Officer of Carestream Health, Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"). Capitalized terms used but not defined in this Memorandum have the meanings ascribed to them in the First Day Declaration, the Disclosure Statement, the Plan (as amended), or the Scheduling Motion, as applicable.

to support go-forward operations, (c) provides for an $85 million New ABL Facility to support the Debtors' working capital needs following emergence, and (d) leaves General Unsecured Claims Unimpaired to minimize uncertainty for customers, vendors, and employees—all of whom are critical to the Reorganized Debtors' long-term success.

3.     To facilitate the implementation of the Restructuring Transactions contemplated by the Plan, concurrently with the execution of the Restructuring Support Agreement, certain members of the Crossover Group committed to provide the Debtors with up to $80 million in debtor-in-possession financing to cover the administrative costs of these chapter 11 cases and to backstop the Rights Offering through the DIP Rollover.  After applying the Rights Offering proceeds, the remaining Tranche B DIP Loans will be converted into New Common Stock *pro rata* with the Rights Offering New Common Stock to serve as permanent junior capital.  This investment in the Debtors' future is not property or an estate distribution being made available to the Tranche B DIP Lenders on account of their existing prepetition Claims in the Debtors.  Rather, it is an undisputed, new money investment of fresh, junior capital to facilitate the success of the Debtors' swift reorganization.

4.     Now, less than 6 weeks after the Petition Date, the Debtors stand poised to implement the Restructuring Transactions and seek approval of the Disclosure Statement and confirmation of the Plan on a fully consensual basis.  No formal objections to the Plan were filed, and the Debtors have consensually resolved all informal objections and other comments received—including from the U.S. Trustee, the United States, insurance providers, and trade parties—through inclusion of language in the form Confirmation Order and the Plan.  As a result, the Debtors stand ready to confirm and consummate a fully-consensual Plan that maximizes value for their stakeholders.

5. As set forth more fully herein, the Debtors respectfully submit that they have satisfied the various Bankruptcy Code requirements to support the approval of the Disclosure Statement and confirmation of the Plan. In particular, with respect to the ability to satisfy the requirements of section 1129(b) of the Bankruptcy Code, the Plan is "fair and equitable" and complies with the "absolute priority rule" because no class junior to Class 8 (Existing Interests) or Class 9 (Section 510(b) Claims) is receiving a recovery. The Plan also does not "unfairly discriminate" because the separate classification and reinstatement of Intercompany Interests is critical to the Debtors' successful reorganization. Finally, the Plan was proposed in "good faith." As set forth in the Rosa Declaration and the Turnbull Declaration,[3] the Plan is the result of good-faith negotiations between the Debtors, the Sponsor, the Crossover Group, the New ABL Backstop Commitment Parties, and other parties-in-interest to reach a fair and equitable resolution of various complex business and legal issues. For these and other reasons set forth more fully in this Memorandum, and based on the evidence presented in the Rosa Declaration, the Brown Declaration, the Turnbull Declaration, and the Voting Declaration, the Debtors' respectfully request that the Court approve the Disclosure Statement and enter the Confirmation Order.

## BACKGROUND

### I. Company Background and Restructuring Transactions

6. The Debtors, together with their non-Debtor affiliates (collectively, "Carestream" or the "Company"), are a leading provider of medical imaging and non-destructive testing products with over 100 years of industry experience. The Company is a partner of choice to approximately 8,000 direct customers and approximately 900 dealers in more than 130 countries. Its products are used by prominent health systems, hospitals, imaging centers, specialty practices and industrial

---

[3] *See* Turnbull Decl. ¶18; Rosa Decl. ¶71.

companies worldwide. Headquartered in Rochester, New York, Carestream employs a global workforce of approximately 3,410 employees with approximately 180 contractors.

7. Carestream, like many businesses, faced significant headwinds in 2020, principally as a result of changing product and customer trends and the global COVID-19 pandemic, all of which in light of the Debtors' capital structure, placed substantial strain on the Debtors' businesses. In early 2020, facing a constrained liquidity position, the Company commenced discussions with its lenders to address the approaching February 2021 and June 2021 maturities under the First Lien Credit Agreement and Second Lien Credit Agreement, respectively. In May 2020, the Company and its lenders successfully amended both facilities to extend the maturity date under the First Lien Credit Agreement to May 2023 and the maturity date under the Second Lien Credit Agreement to August 2023.

8. Following execution of the amendments under the debt facilities, the Company continued to explore various liquidity enhancing opportunities by investing in select growth initiatives to mitigate certain business headwinds, and by adapting its product offerings to comport with recent product demand. In September 2020, the Company retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to advise the Company on strategic transaction alternatives with respect to a potential sale process (the "Sale Process"), as contemplated by the amended Second Lien Credit Agreement. As further detailed in the First Day Declaration, despite contacting more than 145 financial and strategic buyers, and completing further diligence processes with select buyers, all of the bids received by the Company in the Sale Process were at pricing levels below the aggregate principal amount of the Company's funded debt. Accordingly, the Company proactively sought to explore alternate, comprehensive restructuring solutions.

9.     In September 2021, the Crossover Group organized and engaged advisors to begin negotiations with the Company regarding the terms of a comprehensive restructuring transaction. Following months of good-faith, arm's-length negotiations, on April 22, 2022, the Company and certain First Lien Lenders and Second Lien Term Lenders entered into a restructuring support agreement (the "Initial RSA"). Under the Initial RSA, the Company agreed to pay all then outstanding first lien claims in full from the proceeds of a new first lien term loan facility (the "Anticipated New 1L Facility"). Certain members of the Crossover Group committed to backstopping the Anticipated New 1L Facility subject to the Company achieving satisfactory corporate and debt ratings.

10.     As further described in the First Day Declaration, while the Anticipated New 1L Facility was being marketed, the U.S. credit markets shifted dramatically and demand for participation in similar refinancings was substantially diminished. Accordingly, the Company sought to enforce the Crossover Group's backstop commitment under the Initial RSA, but in July, the Company received a determination that the resulting facility would not achieve the necessary rating required by the Initial RSA. Accordingly, following extensive, good faith negotiations, the parties mutually agreed to implement a new consensual transaction that would account for the Company's financing needs.

11.     On August 21, 2022, the Debtors and the parties to the Initial RSA terminated the Initial RSA and the Debtors and certain of their lenders, including the Crossover Group, entered into the new Restructuring Support Agreement.

12.     The key terms of the Restructuring Transactions, as set forth in the Restructuring Support Agreement and the Plan, as amended, are as follows:

- certain members of the Crossover Group have committed to provide the Debtors with access to up to $80 million in debtor-in-possession financing consisting of (a)

a $5 million tranche that will be repaid in full in cash, and (b) a $75 million tranche that will be partially satisfied with proceeds of an equity rights offering, if any, and the remainder will be equitized into the New Common Stock through the DIP Rollover, subject to dilution by the Debtors' Management Incentive Plan;

- each holder of an Allowed First Lien Claim shall receive (a) cash in an amount equal to 3% of its Allowed First Lien Claim and (b) its pro rata share of the New Term Loan Facility in aggregate principal amount of approximately $541 million for the remainder of its claim, *provided* that holders of Allowed First Lien Revolving Claims may elect to roll a portion of their Allowed First Lien Revolving Claims into new loans under the New ABL Facility pursuant to the ABL Roll Option;

- the Debtors' existing Second Lien Term Loan will be cancelled and each holder of an Allowed Second Lien Term Loan Claim shall receive its pro rata share of (a) 10% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan, and (b) the right to purchase for cash its pro rata share of 80% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan;

- each Holder of an Allowed General Unsecured Claim will be paid in full in cash or have its claim reinstated; and

- existing equity interests will be cancelled on the Effective Date.

## II.    The Solicitation Process and Voting Results.

13.     On August 21, 2022 (the "Solicitation Commencement Date"), two days prior to commencing these Chapter 11 Cases, and as more fully described in the Scheduling Motion,[4] the Debtors caused their notice, claims, and solicitation agent, Kurtzman Carson Consultants LLC (the "Solicitation Agent"), to distribute solicitation packages (the "Solicitation Packages") containing the Solicitation Cover Letter, the Combined Hearing Notice, the Disclosure Statement,

---

[4]     The "Scheduling Motion" means the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Approving the Rights Offering Procedures and Related Dates, Deadlines, and Notices, and (V) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [Docket No. 20], filed on August 23, 2022.

the Plan, and the appropriate Ballots[5] for voting on the Plan to the Holders of First Lien Secured Claims (Class 3) and Second Lien Secured Claims (Class 4) (each, a "Voting Class," and collectively, the "Voting Classes") holding the relevant Claims as of August 15, 2022 (the "Voting Record Date") in accordance with sections 1125 and 1126 of the Bankruptcy Code. The Solicitation Agent transmitted the Solicitation Packages to the Voting Classes via email service.[6] Shortly after the first day hearing on August 24, 2022, the Debtors arranged for the Publication Notice to be published in *The New York Times* (national and international editions), the Rochester-based *Democrat and Chronicle*.[7]

14. The Voting Classes were directed in the Disclosure Statement and Ballots to follow the instructions contained in the Ballots (and described in the Disclosure Statement) to complete and submit their respective Ballots to cast a vote to accept or reject the Plan. Each voting party was informed in the Disclosure Statement and Ballot that such Holder needed to submit its Ballot such that it was actually received by the Solicitation Agent by August 22, 2022, at 12:00 p.m., prevailing Eastern Time (the "Voting Deadline") to be counted. Every party that submitted a Ballot voted to accept the Plan.

---

[5] The approved form of Ballots used in solicitation are attached as Exhibit 3 and Exhibit 4 to the *Order (I) Scheduling A Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Approving the Rights Offering Procedures and Related Dates, Deadlines, and Notices, and (V) Conditionally Waiving the Requirements That (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [Docket No. 66] (the "Scheduling Order").

[6] *See Certificate of Service* [Docket No. 39].

[7] A short-form version of the Combined Hearing Notice (the "Publication Notice") was published in *The New York Times* (national edition) on August 29, 2022, in the *Rochester Democrat and Chronicle* on August 30, 2022, and in *The New York Times* (international edition) on September 1, 2022. *See* Docket Nos. 115–117.

15.     Holders of Claims and Interests that are either (a) Unimpaired under and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code or (b) Impaired, entitled to receive no distribution on account of such Claims or Interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, in each case, received the Combined Hearing Notice.[8]

16.     On August 23, 2022, shortly after filing these Chapter 11 Cases, the Debtors filed, among other things, the Plan, the Disclosure Statement, and the Scheduling Motion seeking a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing").  On August 24, 2022, the Court entered the Scheduling Order that, in relevant part, (a) established September 21, 2022, at 5:00 p.m., prevailing Eastern Time, as the deadline to object to the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and approving related procedures, (b) approved the solicitation procedures set forth in the Scheduling Motion (the "Solicitation Procedures"), (c)  approved the form and manner of the Ballots and the Solicitation Cover Letter, (d) approved the form and manner of the Combined Hearing Notice and the Publication Notice, and (e) allowed the notice period for the Disclosure Statement and Combined Hearing to run simultaneously, all as more fully set forth in the Scheduling Motion.

17.     The Debtors completed their final tabulation of Ballots after the Voting Deadline, following a complete review and audit of all Ballots received.[9]  As set forth below and in the

---

[8]     *See Certificate of Service* [Docket No. 112].

[9]     For additional discussion regarding the solicitation and vote tabulation processes, see the Voting Report.

Voting Report, every party entitled to vote submitted a Ballot to accept the Plan, which resulted in unanimous acceptance of the Plan by the Holders of Claims in the Voting Classes.[10]

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | NUMBER | AMOUNT | NUMBER | AMOUNT |
| **Class 3 First Lien Claims** | 226 **100%** | $ 425,488,812.60 **100%** | 0 **0%** | $0 **0%** |
| **Class 4 Second Lien Term Loan Claims** | 187 **100%** | $ 438,268,289.47 **100%** | 0 **0%** | $0 **0%** |

18.     On September 14, 2022 and September 24, 2022, the Debtors filed the Plan Supplement [Docket No. 129] and the first amended Plan Supplement [Docket No. 161] (the "Amended Plan Supplement"), respectively, and served notice of each filing on their master service list.[11]  On September 24, 2022, the Debtors filed the proposed Confirmation Order.

## ARGUMENT

19.     This Memorandum is organized into four sections.  The first section of this Memorandum requests approval of the Disclosure Statement and a finding that the Debtors complied with the Scheduling Order.  The second section contains the Debtors' "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code.  Third, the Debtors submit that the Amended Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and, therefore the Debtors do not need to resolicit the Amended Plan.  Lastly, the Debtors submit that good cause exists to waive the stay of the Confirmation Order.

---

[10]     *See generally* Voting Report.

[11]     *See Notice of Filing of Plan Supplement* [Docket No. 129].

20.     For the reasons stated herein, and in light of the evidentiary support to be offered at the Combined Hearing, the Debtors request that the Court approve the Disclosure Statement and confirm the Plan.

## I.     Approval of the Disclosure Statement Is Warranted.

### A.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and the Bankruptcy Rules.

21.     To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code, and Bankruptcy Rules 2002, 3017(d), 3018(b), and 3018(c).

22.     Section 1125(g) of the Bankruptcy Code provides that:

> Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.[12]

23.     Section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.[13]

---

[12]  11 U.S.C. § 1125(g).  Section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan unless and until a disclosure statement is approved.  *See* 11 U.S.C. § 1125(b).  As further explained herein, section 1125(b) does not apply to the Debtors' prepetition solicitation.

[13]  11 U.S.C. § 1126(b).

24.     Prepetition solicitations must therefore either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information," as such term is defined in section 1125(a)(1) of the Bankruptcy Code.  As discussed below, the Debtors satisfied sections 1125(g) and 1126(b), as applicable, of the Bankruptcy Code.

**1.      The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable under Nonbankruptcy Law.**

25.     The Debtors' prepetition solicitation of the Plan is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") under one or more of the exceptions from registration provided thereunder, including section 4(a)(2) thereof, state "Blue Sky" laws, or any similar rules, regulations, or statutes.  Specifically, section 4(a)(2) of the Securities Act creates an exemption from the registration requirements of the Securities Act for transactions not involving a "public offering."[14]  With respect to Holders of Claims in the Voting Classes—First Lien Claims (Class 3) and Second Lien Term Loan Claims (Class 4)—they were not offered and will not receive securities pursuant to a "public offering."  Moreover, the Debtors believe that all such Holders in the Voting Classes are "accredited investors."  Therefore, the requirements of section 1126(b)(1) of the Bankruptcy Code are inapplicable to the Debtors' prepetition solicitation.

26.     As described in detail below, the Debtors respectfully submit that the Disclosure Statement satisfies the disclosure requirements of section 1126(b)(2) of the Bankruptcy Code by providing adequate information, as defined in section 1125(a) of the Bankruptcy Code.

---

[14]     15 U.S.C. § 77d(a)(2).

## 2. The Disclosure Statement Contains Adequate Information.

27. The primary purpose of a disclosure statement is to provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[15] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[16] Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[17]

28. Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

      a.     the events which led to the filing of the bankruptcy petition;

---

[15] *See, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.") (internal citations omitted).

[16] 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.") (internal citations omitted); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources) (internal citations omitted).

[17] *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.") (internal citations omitted); *In re River Vill. Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (same); *In re Phx. Petrol. Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same); *see also Cadle Co. II, Inc., v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes adequate information in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court.") (internal citations omitted); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement."), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir. 2007).

b.      a description of the available assets and their value and the present condition of a debtor while in chapter 11;

c.      the anticipated future of the company;

d.      the claims asserted against a debtor;

e.      the source of information stated in the disclosure statement;

f.      the estimated return to creditors under a chapter 7 liquidation;

g.      the future management of a debtor;

h.      the chapter 11 plan or a summary thereof;

i.      the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 plan;

j.      the information relevant to the risks posed to claimants under the plan;

k.      the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

l.      the litigation likely to arise in a nonbankruptcy context; and

m.      the tax attributes of a debtor.[18]

29.     The Disclosure Statement contains, among other things, descriptions and summaries of: (a) the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness;[19] (b) the events leading to these chapter 11 cases, including the Debtors' prepetition restructuring efforts and entry into the Restructuring Support

---

[18]     *See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics is not necessary in every case. *In re Phx. Petrol.*, 278 B.R. at 393; *In re U.S. Brass*, 194 B.R. at 425.

[19]     *See* Disclosure Statement, Art. V.

Agreement;[20] (c) the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan;[21] (d) a summary of the Plan;[22] (e) certain important effects of confirmation of the Plan;[23] (f) the discharge, releases, exculpations, and injunctions contemplated by the Plan;[24] (g) certain financial information about the Debtors, including financial projections and a liquidation analysis, and a discussion of the valuation of the Reorganized Debtors;[25] (h) the statutory requirements for confirming the Plan;[26] (i) certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan;[27] (j) certain important disclosures regarding securities laws;[28] and (k) certain U.S. federal income tax consequences of the Plan.[29]

30.     In addition, prior to solicitation, the Disclosure Statement and the Plan were subject to review and comment by the Crossover Group and their respective advisors.[30] No economic

---

[20]     *See id*. Art. VI.

[21]     *See id*. Art. III.D and Art. III.E.

[22]     *See id*. Art. IV.

[23]     *See id*. Art. III.I and Art. X.

[24]     *See id*. Art. III.O.

[25]     *See id*. Art. X.F, Exhibit C, and Exhibit D.

[26]     *See id*. Art. X.

[27]     *See id*. Art. VIII.

[28]     *See id*. Art. XI.

[29]     *See id*. Art. XII.

[30]     *See* Rosa Decl. 13.

stakeholder has asked for additional information nor disputed that the Disclosure Statement contained information sufficient for impaired claimants to be able to cast an informed vote on the Plan. For the reasons set forth above, the Debtors submit that the Disclosure Statement contains adequate information in satisfaction of section 1126(b)(2) and should be approved.

**B.      The Debtors Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order.**

31.      As set forth in the Scheduling Motion, the Debtors complied with the requirements of Bankruptcy Rules 2002, 3017(d), 3018(b), and 3018(c) with respect to the prepetition solicitation of the Plan, the form of ballot used to solicit acceptances of the Plan, and notice of the deadline to object to the Plan and/or the Disclosure Statement.  Accordingly, the Solicitation Procedures complied with the Bankruptcy Code and the Bankruptcy Rules.

32.      On August 24, 2022, the Court entered the Scheduling Order,[31] establishing the Voting Record Date, the Rights Offering Record Date, the Solicitation Commencement Date, the Voting Deadline and Rights Offering Subscription Deadline, and the Objection Deadline; and approving the form and manner of the Combined Hearing Notice, the Publication Notice, the Ballots, and the Solicitation Packages.  In the Scheduling Order, the Court found that the notice provided by the Combined Hearing Notice and the Publication Notice of the matters set forth therein constituted good and sufficient notice of such matters for all purposes and no other or further notice shall be necessary.[32]  The Debtors have complied with the procedures approved by the Scheduling Order.

---

[31]   For the avoidance of doubt, the factual and legal arguments set forth in the Scheduling Motion are incorporated herein by reference in their entirety.

[32]   *See* Scheduling Order ¶ 12.

### 1. The Debtors Complied with the Notice Requirements Set Forth in the Scheduling Order and the Bankruptcy Rules.

33.    The Debtors satisfied the notice requirements set forth in the Scheduling Order, Bankruptcy Rules 2002(b) and 3017, and Local Rule 3017-1.  *First*, on August 21, 2022, the Debtors caused the Solicitation Agent to distribute the Solicitation Packages to Holders of Claims entitled to vote to reject or accept the Plan, as of the Voting Record Date.  Specifically, the Solicitation Packaged contained:  (i) for Holders of First Lien Claims (Class 3) (a) the First Lien Claims Ballot, (b) the ABL Roll Election Form (as applicable), (c) the Solicitation Cover Letter, (d) the Plan, and (e) the Disclosure Statement  or (ii) for Holders of Second Lien Claims (a) the Second Lien Term Loan Claims Ballot (Class 4), (b) the Solicitation Cover Letter, (c) the Plan, (d) the Disclosure Statement, (e) the Rights Offering Procedures, and (f) the Rights Offering Subscription Form.[33]  *Second*, on August 24, 2022, in accordance with the Scheduling Order, the Debtors caused the Solicitation Agent to mail the Combined Hearing Notice to all parties in interest listed on the Debtors' creditor matrix (over 9,600 parties), informing the recipients of, among other things:  (a) the date of commencement of these chapter 11 cases; (b) the date for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan; and (c) the deadline for filing objections to the Plan and the Disclosure Statement.[34]  *Third*, the Debtors caused the Publication Notice to be published in *The New York Times* (national and international editions), and the Rochester, New York published *Democrat and Chronicle*.[35]  *Fourth*, the Combined

---

[33]    *See Certificate of Service* [Docket No. 39].

[34]    *See id*.  As set forth in the Certificate of Service, on August 24, 2022, the Debtors caused the Solicitation Agent to distribute the Combined Hearing Notice to the remaining parties in interest listed on the Debtors' creditor matrix. *Id.*

[35]    *See Affidavits of Publication* [Docket Nos. 115–117].

Hearing Notice included instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Court's PACER website.

### 2. The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Scheduling Order.

34. The form of Ballots used comply with the Bankruptcy Rules and were approved by the Court in the Scheduling Order.[36] Further, no party has objected to the sufficiency of the Ballots. Based on the foregoing, the Debtors submit that they complied with the Scheduling Order and satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

### 3. The Debtors' Solicitation Period Complied with the Scheduling Order and Bankruptcy Rule 3018(b).

35. The Debtors' solicitation period complied with the Scheduling Order and Bankruptcy Rule 3018(b) and Local Rule 3017-2. This Court previously approved the Voting Record Date and the Voting Deadline in the Scheduling Order.[37]

### 4. The Debtors' Vote Tabulation Procedures Complied with the Scheduling Order.

36. As described in the Scheduling Motion, the Debtors used standard tabulation procedures in tabulating votes received by Holders of Claims in the Voting Classes. The Solicitation Agent reviewed all Ballots received in accordance with the procedures described in the Scheduling Motion and the Disclosure Statement.[38] The Debtors respectfully submit that the Court should approve the Debtors' tabulation of votes confirming unanimous acceptance of the Plan by Holders of Claims in the Voting Classes, and as such, for each of Class 3 and Class 4 the

---

[36] *See* Scheduling Order ¶ 11.

[37] *See id.* ¶ 7.

[38] *See generally* Voting Report.

requisite majorities in amount and number of Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

     **5.**     **Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

37.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[39]

38.     As set forth in the Voting Report, the First Day Declaration, the Rosa Declaration, and as demonstrated by the Debtors' compliance with the Scheduling Order, the Bankruptcy Code, and the Bankruptcy Rules, the Debtors at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.[40] Therefore, the Debtors respectfully request that the Court grant the Debtors, the Reorganized Debtors, the Released Parties, the Exculpated Parties, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, the protections provided under section 1125(e) of the Bankruptcy Code.[41]

---

[39]   11 U.S.C. § 1125(e).

[40]   *See* Rosa Decl. ¶¶ 5, 12, 25–27.

[41]   *See* Plan, Art. XIII.K.

## II. The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.[42]

### A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

39.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[43]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the content of a plan of reorganization, respectively.[44]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

40.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the

---

[42]  *See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme") (citing *In re Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal quotation marks omitted).

[43]  11 U.S.C. § 1129(a)(1).

[44]  S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

other claims or interests of such class."[45]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, substantially similar claims or interests need not be grouped in the same class.[46]  Instead, claims or interests placed in a particular class must be substantially similar to each other.[47]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[48]

41.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into separate Classes based on legal or factual distinction or otherwise based on other relevant criteria.[49]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

---

[45]    11 U.S.C. § 1122(a).

[46]    *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

[47]    *Id.*

[48]    Courts have identified grounds justifying separate classification, including where members of a class possess different legal rights or there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal citation omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .") (internal citations omitted).

[49]    *See* Plan, Art. III.

a.   Class 1:  Other Secured Claims;

b.   Class 2:  Other Priority Claims;

c.   Class 3:  First Lien Claims;

d.   Class 4:  Second Lien Term Loan Claims;

e.   Class 5:  General Unsecured Claims;

f.   Class 6:  Intercompany Claims;

g.   Class 7:  Intercompany Interests;

h.   Class 8:  Existing Interests; and

i.   Class 9:  Section 510(b) Claims.

42.   Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[50]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[51]  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

43.   For example, the classification scheme distinguishes Other Priority Claims (Class 2) due to their relative priority and required treatment under the Bankruptcy Code.  In addition, the Plan classifies Existing Interests (Class 8) separately from Intercompany Interests (Class 6) because the Debtors' ownership structure is dependent upon maintaining the

---

[50]   *See* Rosa Decl. ¶ 16–19.

[51]   *See id.*

Intercompany Interests and, therefore, the Intercompany Interests may be preserved under the Plan for the administrative convenience of ensuring the preservation of the Debtors' corporate structure after the Effective Date. First Lien Claims (Class 3) are classified separately from Second Lien Term Loan Claims (Class 4) because of the different circumstances of each Class and the relative priority of their Claims against the Debtors. Finally, General Unsecured Claims (Class 5) are separately classified because they have differing legal rights then the Debtors' secured creditors and play a distinct role in ensuring the future economic viability of the Reorganized Debtors.[52]

44.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies section 1122(a) of the Bankruptcy Code. No party has asserted otherwise.

### 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

45.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy. The Plan satisfies each of these requirements.

### a. Designation of Classes of Claims and Equity Interests, Specification of Unimpaired Classes, and Treatment of Impaired Classes (§ 1123(a)(1)–(3)).

46.     The first three requirements of section 1123(a) of the Bankruptcy Code are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the treatment of any impaired class under the plan.[53] Article III of the Plan sets forth these specifications in detail, in satisfaction of these three requirements.[54] No party has asserted otherwise.

---

[52]     *See id.* at 17.

[53]     11 U.S.C. § 1123(a)(1)–(3).

[54]     Plan, Art. III.A–B.

### b. Equal Treatment Within Classes (§ 1123(a)(4)).

47.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[55]     The Plan satisfies this requirement because Holders of Allowed Claims or Interests will receive the same treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, and no party has asserted otherwise.     Additionally, the Plan provides for a $75 million equity Rights Offering in exchange for new money, all of which was offered to holders of Second Lien Term Loan Claims on a *pro rata* basis.     The consideration provided to holders of Second Lien Term Loan Claims for participating in the equity Rights Offering, and to the Tranche B DIP Lenders' for backstopping the Rights Offering, is not consideration on account of such parties' Allowed Claims.     Rather, such consideration is in exchange for new value commitments provided by such parties to provide necessary additional liquidity to the Company.[56]     Thus, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.     No party has asserted otherwise.

### c. Means for Implementation (§ 1123(a)(5)).

48.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[57]     The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides the means by which the Plan will be implemented.     Among other things, Article IV of the Plan describes the means for the cancelation

---

[55]     11 U.S.C. § 1123(a)(4).

[56]     *See* Turnbull Decl. ¶ 20.

[57]     11 U.S.C. § 1123(a)(5).

of documents evidencing existing Claims and Interests and implementation of the transactions provided for in the Plan, including, among other things: (a) the Restructuring Transactions; (b) the sources of consideration for Plan distributions, including the Rights Offering; (c) the entry into the New Term Loan Facility in accordance with the New Term Loan Documents; (d) the entry into the New ABL Facility in accordance with the New ABL Documents; (e) the issuance and distribution of the New Common Stock; (f) the adoption of the New Organizational Documents; (g) the implementation of the Management Compensation Programs; (h) the consummation of various corporate transaction steps necessary to implement the new corporate structure upon emergence; and (i) the preservation of Causes of Action and release of Avoidance Actions. In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors' emergence, such as the vesting of estate assets in the Reorganized Debtors, the assumption or rejection of Executory Contracts and Unexpired Leases, and the settlement of Claims and Interests.

49. The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement.[58] Thus, the Plan sets forth adequate means for its implementation and satisfies section 1123(a)(5) of the Bankruptcy Code. No party has asserted otherwise.

### d. Issuance of Non-Voting Securities (§ 1123(a)(6)).

50. Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[59] Article IV.H of the Plan provides that the New Organizational Documents will prohibit the issuance of non-voting

---

[58] *See* Plan Supplement.

[59] 11 U.S.C. § 1123(a)(6).

equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. The relevant New Organizational Documents for the Reorganized Debtors similarly reflect such prohibition.[60] Thus, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code. No party has asserted otherwise.

### e. Directors and Officers (§ 1123(a)(7)).

51. Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[61] On the Effective Date, the term of the current members of the ultimate board of directors of the Debtors will expire, such current directors will be deemed to have resigned, and all of the directors for the initial term of the New Board will be appointed in accordance with the appointment rights detailed in section 2.02 of the New Stockholders Agreement included in the Plan Supplement.[62] The members of the New Board and the officers of the Reorganized Debtors were disclosed in the Plan Supplement [Docket No. 161].[63] From and after the Effective Date, each of the directors and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor. The selection of the members of the New Board is consistent with the interests of all Holders of Claims and Interests and public policy.

---

[60] Plan Supplement, Exhibit A-1, Section 4.4.

[61] 11 U.S.C. § 1123(a)(7).

[62] Plan Supplement, Exhibit B, Section 2.02.

[63] *Id.* Exhibit E.

Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. No party has asserted otherwise.

### 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

#### a. Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.

52. Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[64]

53. The Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically, under Article III of the Plan, Classes 1, 2, 5, 6, and 7 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Interests within such Classes. On the other hand, Classes 3, 4, 8, and 9 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.

54. In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[65]

---

[64]   *See* 11 U.S.C. §§ 1123(b)(1)–(3), (6).

[65]   *See* Plan Art. V.A.

### b. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.

55. The Plan also includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were a material inducement for parties to enter into the Restructuring Support Agreement and support the Plan, are overwhelmingly supported by the Debtors and their key stakeholders (including unanimous support from the Voting Classes), and are consistent with applicable precedent. Furthermore, these provisions were fully and conspicuously disclosed to all parties in interest through the Combined Hearing Notice, and the Voting Parties through the Ballots, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

### (i) The Debtor Release Is Appropriate.

56. The Bankruptcy Code supports the inclusion of debtor releases in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[66] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[67] In determining whether a debtor release is proper, courts in Delaware and elsewhere generally may consider the following five factors:

---

[66] *See In re Coram Healthcare Corp.*, 315 B.R. at 334–35. Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "is above the lowest point in the range of reasonableness." *Id.* at 330 (internal citation omitted); *see also In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities) (internal citation omitted).

[67] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (internal citation omitted); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement],

a.	whether the non-debtor has made a substantial contribution to the debtor's reorganization;

b.	whether the release is essential to the debtor's reorganization;

c.	agreement by a substantial majority of creditors to support the release;

d.	identity of interest between the debtor and the third party; and

e.	whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[68]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[69]

57.	Article VIII.C of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors and their successors may have against the Released Parties (the "Debtor Release").[70] The Debtor Release meets the applicable standard because it is a valid exercise of the Debtors' business judgement, is fair, reasonable, and in the best interests of the Debtors' Estates, the product of

---

the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[68]	*See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[69]	*See, e.g.*, *In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness.") (internal citation omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[70]	Article I.A.138 of the Plan defines "Released Parties" means each of, and in each case in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Parties; (d) the Agents; (e) the DIP Lenders; (f) the Prepetition Secured Parties; (g) current and former Affiliates of each Entity in clause (a) through the following clause (h); and (h) each Related Party of each Entity in clause (a) through this clause (h); *provided, however*, that, notwithstanding the foregoing, any holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

extensive arm's-length negotiations, and was critical to obtaining support for the Plan. Indeed, the Debtor Release was negotiated in connection with the other terms of the Plan, and is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect these Chapter 11 Cases and the available recoveries under the Plan.

58. **First**, each Released Party has made a substantial contribution to the Debtors' Estates. The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof, but also in giving up material economic interests to ensure the success of the Debtors' chapter 11 cases. For instance, in exchange for the Debtor Release, various Released Parties in Classes 3 and 4, as applicable, contributed direct value in the form of their agreement to either equitize secured debt, commit new capital to fund the go-forward business, consent to the Debtors' use of Cash Collateral, and have otherwise agreed or not objected to be impaired in order to provide full recoveries to out-of-the-money unsecured creditors. These measures have improved liquidity throughout these chapter 11 cases and will continue to provide flexibility to the Debtors after emergence from chapter 11. In addition, the Debtor Release was a material inducement for the Crossover Group and the Sponsor to support the Debtors' restructuring as set forth in the Restructuring Support Agreement. Finally, the Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and implementing the restructuring transactions contemplated by the Plan.[71]

59. **Second**, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the Plan. Indeed, absent the Debtor Release, it is highly unlikely

---

[71] *See* Rosa Decl. ¶ 51.

the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the transactions contemplated thereby. Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders and is limited in scope. Such releases do not release any entity other than a Released Party from any Claims or Causes of Action expressly set forth and preserved by the Plan. In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this prepackaged chapter 11 process. The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. Nevertheless, as set forth in the Amended Plan, the Debtor Release contains a carve-out for actual fraud, willful misconduct, and gross negligence. The Debtor Release provides finality, underpins the global settlement and compromise of issues achieved by the Plan, and avoids significant delay in consummating the Plan; therefore the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

60. **_Third_**, no stakeholders have objected to the Debtor Release contained in the Plan. All of the creditors in the Voting Classes voted to accept the Plan (including the Debtor Release).

61. **_Fourth_**, an identity of interest exists between the Debtors and the parties to be released. Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and having the Debtors' businesses reorganized. Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder. Moreover, with respect to certain of the releases— *e.g.*, those releasing the Debtors' current and former directors, officers, and principals—there is a

clear identity of interest supporting the releases because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Reorganized Debtors (and such claims would "ride through" these chapter 11 cases and would be paid in full similarly to all other general unsecured claims, even assuming that the indemnification obligations were not being assumed).[72]  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against such individuals would effectively be a lawsuit against the Reorganized Debtors themselves.

62.     *Fifth*, the Plan provides for meaningful recoveries for substantially all Classes affected by the Debtor Release.  Furthermore, as noted above, the Debtor Releases are supported by all parties entitled to vote on the Plan on a unanimous basis.

63.     For these reasons, the Debtor Release is justified, is a sound exercise of the Debtors' business judgement, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and satisfies key factors considered by courts in determining whether a debtor release is proper.

### (ii)     The Third-Party Release Is Consensual and Appropriate.

64.     The Plan also provides for the Releasing Parties'[73] release of the Released Parties to the extent set forth in the Plan (the "<u>Third-Party Release</u>").[74]  Courts in this jurisdiction routinely

---

[72]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

[73]   Article I.A.139 of the Plan defines "Releasing Party" means each of, and in each case in its capacity as such: (a) the Consenting Parties; (b) the Agents; (c) the DIP Lenders; (d) all holders of Claims; (e) all Holders of Interests; (f) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (g), solely to the extent the pertinent Entity can bind any such Affiliate to the terms of this Plan under applicable law; and (g) each Related Party of each Entity in clause (a) through this clause (g), solely to the extent the pertinent Entity can bind any such Related Party to the terms of this Plan under applicable law; provided, however, that, notwithstanding the foregoing, an Entity shall not be a "Releasing Party" if such Entity (x) does not vote to, and is not deemed to, accept the Plan, and (y) timely Files on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not resolved before Confirmation or otherwise validly opts

approve such release provisions if, as here, they are consensual and appropriately tailored.[75] The

determination as to whether a third party release is consensual ultimately depends on the particular

circumstances at issue in a particular case.[76] Affirmative consent to a third party release is not

required for such release to be "consensual."[77] Rather, a third party release is consensual against

non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail

to do so.[78]

65.     Here, Article VIII.D of the Plan provides for the "Releases by Releasing Parties,"

which is a consensual release among the Debtors and certain of their creditors and interest holders.

All Holders of Claims entitled to Vote had the opportunity to opt out of the Third-Party Release

through their Ballots. Remaining Holders of Claims and Interests had the opportunity to object to

the Third-Party Release by timely filing on the Docket of the Chapter 11 Cases an objection that

is not resolved before Confirmation.

66.     The Third-Party Release is an integral and essential provision of the Plan and

provides finality for the Released Parties regarding the Party's respective obligations under the

Plan, is in exchange for good and valuable consideration provided by the Released Parties, is in

---

out of the Third-Party Release; and provided, further, that any such Entity shall be identified by name as a non Releasing Party in the Confirmation Order.

[74]   *See* Plan Art. VIII.D.

[75]   *See, e.g.*, *In re Indianapolis Downs,* 486 B.R. at 304–05 (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion*, 426 B.R. at 144 (same); *In re Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan).

[76]   *See In re Indianapolis Downs*, 486 B.R. at 305.

[77]   *See id.*; *In re Spansion*, 426 B.R. at 144.

[78]   *See In re Indianapolis Downs*, 486 B.R. at 305, 306; *In re Spansion*, 426 B.R. at 144; *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. July 2, 2014).

the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, is fair and equitable, and reasonable, and is given and made after due notice and opportunity to be heard. Finally, as set forth in the Amended Plan, the Third-Party Release contains a carve-out for actual fraud, willful misconduct, and gross negligence.

67.     For months prior to the commencement of these chapter 11 cases and throughout the pendency of these chapter 11 cases, the Released Parties worked constructively with the Debtors to negotiate and implement a value-maximizing reorganization embodied in the Plan that enables the Reorganized Debtors to emerge from these chapter 11 cases with a right-sized capital structure and the ability to continue to provide their customers with the highest quality service.[79] Such parties have provided material concessions, benefits, and commitments to the Debtors through the RSA and during the pendency of the cases, including: (a) the Sponsor waiving its GUC Claims against the Debtors, (b) certain of the Consenting Lenders committing, and funding, the Debtors' $80 million DIP Facility, (c) the Tranche B DIP Lenders agreeing to backstop the Rights Offering through the DIP Rollover, (d) the Prepetition Secured Parties' consent to the Debtors' use of cash collateral during the Chapter 11 Cases, (e) certain of the Prepetition Secured Parties committing to provide a portion of the $85 million New ABL Facility upon Emergence, and (f) the Third-Party Releases were negotiated as part of the Restructuring Support Agreement, which provided concrete evidence to the market of the support of the Debtors' key stakeholders and in turn provided stability to the Debtors' business while the Debtors navigated the restructuring process.  In addition, the Debtors' directors and officers steadfastly maintained their duties to

---

[79]     *See* Rosa Decl. ¶ 60.

maximize value for the benefit of all stakeholders, investing countless hours both prior to and after filing these chapter 11 cases in addition to performing their ordinary course responsibilities.[80]

68. Further, without the concession by the Consenting Second Lien Lenders to equitize their Second Lien Term Loan Claims, Holders of General Unsecured Claims would not have received a full recovery in these chapter 11 cases. Without the Third-Party Release, the Debtors' key stakeholders would not have been willing to fund and otherwise support the Restructuring Transactions contemplated by the Plan, which will enable the Debtors to emerge from bankruptcy with a deleveraged balance sheet while paying their trade and known general unsecured creditors in full. Successfully balancing the requirements of the Bankruptcy Code (regarding the absolute priority rule, satisfaction of secured claims, and due process) and the need to preserve the value of the Debtors' relationships with their stakeholders (including the reinstatement of General Unsecured Claims) would not have been possible without the support of the Consenting Creditors and the Sponsor. Overall, these parties have each provided material concessions or contributions to ensure that the Debtors have a consensual and expeditious reorganization.

69. For the foregoing reasons, the Third-Party Releases are permissible, and no party has asserted otherwise.

### (iii) The Exculpation Provision Is Appropriate.

70. Exculpation provisions that apply only to estate fiduciaries and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[81] Unlike third-party releases,

---

[80] *Id.*

[81] *See In re Wash. Mut.*, 442 B.R. at 350–51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[82]

71.     The Plan provides for the exculpation of the Exculpated Parties.[83]  The Exculpation is fair and appropriate under both applicable law and the facts and circumstances of these chapter 11 cases.  The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.

72.     Moreover, the Exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has

---

[82]   *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[83]   Article I.A.64 of the Plan defines "Exculpated Parties" means collectively, and in each case in its capacity as such, the Debtors, the directors, managers, and officers of the Debtors who served in such capacity between the Petition Date and the Effective Date, and the Professionals retained by the Debtors in the Chapter 11 Cases; *provided* that Exculpated Parties shall not include non-Debtor Affiliates and such non-Debtor Affiliates' Related Parties.  "Related Parties" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

been proposed in good faith and not by any means forbidden by law. These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals. Further, these findings imply that the Plan was negotiated at arm's-length and in good faith. Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack. Ultimately, the Exculpation provides protection to those parties that worked hand-in-hand with the Debtors and were instrumental in assuring the success of the Debtors' restructuring

73. Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these chapter 11 cases. Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency.[84] As a result, the Plan enjoys unanimous support from the voting Holders of Claims.[85] The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Restructuring Support Agreement, the Disclosure Statement, the Plan, and related documents in furtherance of the restructuring transactions.[86] Accordingly, the Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties. In short, the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arms'-length negotiations, and significant sacrifice by the Exculpated Parties.

---

[84]  *See* Rosa Decl. ¶ 63.

[85]  *See, e.g.*, Voting Report Exhibit A.

[86]  *See* Transcript of Hearing, 58:18–19, *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ("[T]he debtors did not do this alone; they did it with the help of many others.").

74.     Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[87]  As set forth in the Amended Plan, the Debtors revised the scope of the Exculpation—it is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring, is limited to the duration of time between the Petition Date and Effective Date, and ultimately inures to the benefit of only those parties traditionally considered estate fiduciaries and their agents.

75.     Accordingly, under the circumstances, it is appropriate for the Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[88]

### (iv)     The Injunction Provision Is Appropriate.

76.     The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan.  Thus, the Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.  Further, the injunction provided for in the Plan is narrowly tailored to

---

[87]   *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.").

[88]   *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

achieve its purpose. To the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Court should approve the Injunction Provision.

### 4. The Plan Complies with Section 1123(d) of the Bankruptcy Code.

77. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[89]

78. The Plan complies with section 1123(d) of the Bankruptcy Code. The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount, if any, on the Effective Date. Where such amounts are under review, cure amounts will be reconciled post-Effective Date pursuant to the terms of any such assumed Executory Contract or Unexpired Lease, as applicable, as noted in the Debtors' Schedule of Proposed Cure Amounts filed in the Plan Supplement.[90]

### B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

79. The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[91] The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[92] As discussed below, the Debtors

---

[89]   11 U.S.C. § 1123(d).

[90]   *See* Plan Supplement, <u>Exhibit G</u>.

[91]   11 U.S.C. § 1129(a)(2).

[92]   *See, e.g.*, *In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2).") (internal citations omitted); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928,

have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

80.     As discussed in Part I of this Memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.[93]

### 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

81.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization. Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan. Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

> (f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

> (g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive any property under the plan on account of such claims or interests.[94]

---

at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[93]     *See* Rosa Decl. ¶¶ 24–26.

[94]     11 U.S.C. §§ 1126(a), (f), (g).

82.     As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited votes from the Holders of Allowed Claims in Classes 3 and 4—the only Classes entitled to vote on the Plan.  The Debtors did not solicit votes from Holders of Claims and Interests in Classes 1, 2, 5, 6, 7, 8 or 9 because Holders of such Claims and Interests are either Unimpaired and conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

83.     With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims in such class of those voting vote to accept such plan.

84.     The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[95]  Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

C.     **The Plan Is Proposed in Good Faith (§ 1129(a)(3)).**

85.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[96]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[97]  To determine whether a plan seeks

---

[95]     *See generally* Voting Report.

[96]     11 U.S.C. § 1129(a)(3).

[97]     *See, e.g., In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400-SLR and 90-401-SLR,

relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[98]

86.     The Debtors negotiated, developed, and proposed the Plan in good faith, and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The Plan was negotiated with, and is supported by, the Consenting Parties, and other key constituents.[99]  These parties only came to consensus after months of restructuring efforts, which involved significant arm's-length negotiations.  As provided in the Rosa Declaration and the Brown Declaration, the Plan delivers significant value to creditors, and preserves the Reorganized Debtors as a going concern.[100]  Additionally, the Plan has been accepted by 100 percent of voting creditors, and no party has voted to reject the Plan.[101]  The Plan was proposed in good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.[102]

---

1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[98]     *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal.") (citing *In re Sun Country Dev., Inc.*, 764 F. 2d at 408); *Century Glove*, 1993 WL 239489, at *4 ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.") (citing *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *T-H New Orleans*, 116 F.3d at 802 (same).

[99]     *See* Rosa Decl. ¶¶ 27–28.

[100]    *See id.*

[101]    *See* Voting Report.

[102]    *See* Rosa Decl. ¶¶ 27–28.

87. The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[103] Here, the Plan will enable the Debtors to deleverage their balance sheet, leave operational obligations unimpaired, and position the Reorganized Debtors for long-term success.[104] The Plan's unanimous support by all voting creditors in Classes 3 and 4 is strong evidence that the Plan is likely to succeed. Finally, throughout the negotiation of the Plan and these chapter 11 cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand. Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

### D. The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).

88. Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent or by the debtor be subject to approval by the Court as reasonable.[105] Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[106]

---

[103] *See NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start") (internal citations omitted).

[104] *See* Rosa Decl. ¶¶ 5, 27.

[105] *See* 11 U.S.C. § 1129(a)(4).

[106] *See In re Lisanti Foods, Inc.*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees and expenses related to the plan are subject to the approval by the Bankruptcy Court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

89.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.[107] Moreover, the Plan provides that the Debtors' Professionals shall file all final requests for payment of the professional claims no later than forty-five days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional claims.[108]

### E.     The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).

90.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.   In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[109]  When evaluating whether the post-confirmation governance of the Reorganized Debtors is in "good hands," courts consider:  (a) the directors' and officers' experience in the reorganized debtors' business and industry;[110] (b) the directors' and officers' experience in financial and

---

[107]   11 U.S.C. §§ 328(a), 330(a)(1)(A).

[108]   Plan Art. II.C.1.

[109]   11 U.S.C. § 1129(a)(5)(A)(ii).

[110]   *See In re Rusty Jones, Inc.,* 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) was not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many

management matters;[111] (c) whether the debtors and creditors believe control of the entity by the proposed individuals will be beneficial;[112] and (d) whether the appointment or continuance of the proposed individuals does not "perpetuate [] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[113]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[114]

91.     The Plan satisfies section 1129(a)(5) of the Bankruptcy Code.  As of the Effective Date, the term of the current members of the ultimate board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed.[115]  As described above, in accordance with Article IV.K of the Plan, the members of the New Board were disclosed in the Plan Supplement, which include the Chief Executive Officer of the Reorganized Debtors.[116]  The directors were selected in accordance with the New Organizational Documents and Shareholders Agreement and were each

---

years of experience in the debtors' businesses, satisfied section 1129(a)(5)); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 760 (citing *Toy & Sports*, 37 B.R. at 149–50).

[111]  *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[112]  *See In re Apex Oil Co.*, 118 B.R. 683, 704–05 (Bankr. E.D. Mo. 1990) ("Further, the Debtors, as well the Creditors' Committee, believe that the continued operational control . . . [by the proposed individuals] is essential to their ability to generate the revenues and profits from their projected financial operations. As such, the continuance in office of [the proposed individuals] is consistent with both the interests of creditors and equity security holders and with public policy, as required in section 1129(a)(5)(A)(ii).").

[113]  *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003) (internal citation omitted).

[114]  7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2021).

[115]  *See* Plan Art. IV.K.

[116]  *See* Plan Supplement Exhibit E.

interviewed by the Debtors' Chief Executive Officer.[117]  For subsequent terms, the directors shall also be selected in accordance with such documents.

92.     The Debtors satisfy section 1129(a)(5)(B) with respect to their officers because, as set forth in the Plan Supplement, the Debtors propose that their existing officers remain in their current capacities as officers of the Reorganized Debtors, and serve pursuant to the New Organizational Documents and their respective employment agreements.  The Debtors' existing officers have at all times proceeded in good faith and with diligence and care in connection with these chapter 11 cases.  Furthermore, the Reorganized Debtors' proposed officers have significant knowledge and solid business and industry experience, are competent, and will provide the Reorganized Debtors with continuity in running the business. Accordingly, it is reasonable to continue such officers' employment post-emergence.

93.     The Debtors and their creditors believe control of the Reorganized Debtors by the proposed individuals, or individuals to be appointed in accordance with the New Organizational Documents, will be beneficial, and no party in interest has objected to the Plan on these grounds. Thus, the Plan complies with section 1129(a)(5).  No party has asserted otherwise.

**F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

94.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

---

[117]   *See id.* Exhibit B, Section 2.02.

### G. The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

95. Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[118] The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes,[119] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[120]

96. The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test. As set forth in the Disclosure Statement[121] and the Brown Declaration, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each Class deemed to reject the Plan. The projected recoveries for these Classes under

---

[118] *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

[119] *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[120] *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"), *aff'd*, 785 F.2d 1033 (5th Cir. 1986); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.") (internal citation and quotation marks omitted).

[121] *See* Disclosure Statement, <u>Exhibit C</u>.

the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[122]

97.     Significantly, in a hypothetical chapter 7 liquidation, Holders of General Unsecured Claims—which are Unimpaired in these chapter 11 cases and are paid in full under the Plan— would receive no recovery.  Additionally, Holders of First Lien Claims and Second Lien Term Loan Claims would receive materially reduced recovery or no recovery, respectively, which is significantly less than the proposed Plan treatment.[123]  Lastly, all Holders of Claims entitled to vote on the Plan received the Liquidation Analysis (which was attached to the Disclosure Statement) and have been provided ample time to consider the contents thereof. Accordingly, the Plan complies with section 1129(a)(7), and no party has asserted otherwise.

**H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

98.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  Holders of Claims and Interests in Classes 8 and 9 are deemed to have rejected the Plan and thus were not entitled to vote.  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

99.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan or receive certain other specified treatment as agreed by

---

[122]   *See* Brown Decl. ¶ 14.

[123]   *Id.*

the claim holder in satisfaction of the claim and that the holders of certain other priority claims receive deferred cash payments.[124]  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code— must receive on the effective date cash equal to the allowed amount of such claims.[125] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[126]  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.[127]

100.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive cash equal to the amount of such Allowed Claim.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because

---

[124]  *See* 11 U.S.C. § 1129(a)(9).

[125]  11 U.S.C. § 1129(a)(9)(A).

[126]  11 U.S.C. § 1129(a)(9)(B).

[127]  11 U.S.C. § 1129(a)(9)(C).

no Holders of the types of claims specified by 1129(a)(9)(B) are Impaired under the Plan. **Third**, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of Section 1129(a)(9)(C) of the Bankruptcy Code. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code. No party has asserted otherwise.

**J.    At Least One Impaired Class of Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

101.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."[128] Here, Classes 3 and 4, which are Impaired, voted to accept the Plan independent of any insiders' votes. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.    The Plan Is Feasible (§ 1129(a)(11)).**

102.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation. Specifically, the Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[129] To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[130] Rather, a debtor must provide only a

---

[128]    11 U.S.C. § 1129(a)(10).

[129]    11 U.S.C. § 1129(a)(11).

[130]    *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success") (internal citations and quotation marks omitted); *In re W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*,

reasonable assurance of success.[131]   There is a relatively low threshold of proof necessary to satisfy

the feasibility requirement.[132]   As demonstrated below, the Plan is feasible within the meaning of

section 1129(a)(11) of the Bankruptcy Code.

103.   In determining standards of feasibility, courts have identified the following

probative factors:

a.       the adequacy of the capital structure;

b.       the earning power of the business;

c.       the economic conditions;

d.       the ability of management;

e.       the probability of the continuation of the same management; and

f.       any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[133]

---

47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

[131]  *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (internal quotation marks omitted) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1984)); *In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[132]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks and citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

[133]  *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

104.     The Plan is feasible.  As set forth in the Rosa Declaration,[134] the Debtors and their advisors have thoroughly analyzed the Reorganized Debtors' ability to meet their post-confirmation obligations under the Plan and continue as a going concern without the need for further financial restructuring.  As detailed in the Turnbull Declaration, the Debtors negotiated and secured exit financing in the form of the New ABL Facility, the Rights Offering, and the DIP Rollover to manage post-emergence liquidity and to meet their obligations in the ordinary course.  The Debtors' management team and their advisors have made significant progress in designing and implementing a business plan that will enable the Reorganized Debtors to succeed in their go-forward operations.  To properly execute on this business plan, the Plan will deleverage the Debtors' balance sheets by eliminating approximately $470 million of the Debtors' funded debt.[135]

105.     Moreover, as set forth in the Disclosure Statement, the Debtors prepared projections (the "Financial Projections") of the Debtors' financial performance through the year 2026 (the "Projection Period").[136]   These Financial Projections reflect a series of realistic assumptions regarding the Debtors and their industries.  The detailed projections demonstrate the Reorganized Debtors' ability to generate sufficient cash to meet ongoing financial obligations of the business and otherwise meet their obligations under the Plan.  In sum, the assets and Financial Projections of the Reorganized Debtors demonstrate a reasonable assurance that the Debtors will have and maintain sufficient liquidity and capital resources to pay amounts due under the Plan and fund their operations during the Projection period.   Accordingly, on the basis of the Financial

---

[134]   *See* Rosa Decl. ¶ 36.

[135]   *See* Disclosure Statement Art. II.

[136]   *See id*. Exhibit D.

Projections, which were prepared by the Debtors, with the assistance of their advisors, the Debtors believe their financial future, taking into account the provisions of the Plan, is sound.[137]

106.     In addition, upon the Effective Date, the Debtors expect to have sufficient funds to make all payments contemplated by the Plan as a result of the enhanced liquidity provided by the New ABL Facility and equity Rights Offering.  The Debtors, along with their professionals, have closely evaluated their cash situation to ensure that they will be able to make all Plan payments required on the Effective Date as well as the months to come.[138]  In fact, pursuant to the interim all trade order [Docket No. 70], the Debtors generally have been paying obligations in the ordinary course during the pendency of these Cases.  The Debtors therefore submit that the Plan is feasible and confirmation is not likely to be followed by liquidation or need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan.[139]  Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  No party has asserted otherwise.

**L.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

107.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[140]  Section 507(a)(2) of the Bankruptcy Code provides

---

[137]   *See* Rosa Decl. ¶ 37.

[138]   *See id.*; Turnbull Decl. ¶¶ 21–22.

[139]   *See* Rose Decl. ¶ 37.

[140]   11 U.S.C. § 1129(a)(12).

that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[141]

108. The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until these chapter 11 cases are converted, dismissed, or closed, whichever occurs first.[142]

**M.      All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)).**

109. Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits established at any level continue post-confirmation in accordance with section 1114 of the Bankruptcy Code.

110. The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code because Article V.H.1 of the Plan provides that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, if any, will continue to be paid in accordance with applicable law.[143]

**N.      Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

111. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the

---

[141] 11 U.S.C. § 507(a)(2).

[142] Plan Art. II.E.

[143] *Id*. Art. V.H.1.

Bankruptcy Code. Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply. Finally, none of the Debtors is a nonprofit corporation or trust, and, therefore, section 1129(a)(16) of the Bankruptcy Code, which relates only to nonprofit corporations or trusts, is not applicable in these Chapter 11 Cases.

O. **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

112. Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[144] To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[145]

113. The Plan satisfies section 1129(b) of the Bankruptcy Code. The two Impaired Classes entitled to vote on the Plan (Classes 3 and 4) voted to accept the Plan and no Holder of Claims in either of the Voting Classes voted to reject the Plan. Classes 8 and 9 will receive no recovery and are deemed to reject the Plan. Notwithstanding the fact Classes 8 and 9 are deemed to have rejected the Plan, the Plan is confirmable.

---

[144] *See* 11 U.S.C. § 1129(b).

[145] *See* 11 U.S.C. § 1129(b)(1); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37 Bus. Park Assocs.)*, 987 F.2d at 157 n.5; *Liberty Nat'l Enter. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

1. **The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

114. Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[146] In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if (a) it provides less favorable treatment to a dissenting class of creditors than to another class of creditors with similar legal rights, taking into account whether the different treatment is material and the relative risks associated with each class's treatment, and (b) there is not sufficient justification for doing so.[147] A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates

---

[146] *See Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds*, *203 N. LaSalle St. P'ship*, 526 U.S. 434; *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[147] *See In re Nuverra*, 590 B.R. at 93 (holding that a plan's unequal treatment of substantially similar claims did not constitute unfair discrimination where such unequal treatment was justified); *In re Aleris Int'l*, 2010 WL 3492664, at *31 ("section 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes") (citing *In re Armstrong World Indus.*, 348 B.R. at 121); *In re Coram Healthcare Corp.*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination), *aff'd sub nom. In re Lernout & Hauspie Speech Prod. N.V.*, 308 B.R. 672 (D. Del. 2004); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *In re Johns-Manville Corp.*,

against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[148]

115.    Here, the Plan's treatment of Existing Interests (Class 8) and Section 510(b) Claims (Class 9) is proper because the Plan's classification scheme rests on a legally acceptable rationale.  Claims in Class 8 and Class 9 are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.

116.    The "hallmarks of the various tests [for unfair discrimination] have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."[149]

117.    With respect to Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests), the relevant Claims and Interests are Unimpaired.  These Intercompany Claims and Intercompany Interests, which exist to support the Debtors' corporate structure, will be Reinstated because reinstatement of intercompany claims and interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors.  This reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

118.    With respect to Class 8 (Existing Interests), the Debtors formed Class 8 to include Holders of Interests in Carestream Health Holdings, Inc.  As explained above, Existing Interests

---

68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[148]    *See In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.,* 348 B.R. at 121).

[149]    *In re Lernout*, 301 B.R. at 660; *see also In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003) ("Therefore, in order to confirm the [p]lan, the [d]ebtor must show that (i) there is a reasonable basis for the [d]ebtor's separate classification of the general unsecured creditors, the 10% Senior Noteholders, and the 2.9% Convertible Note Claims; and (ii) that the Debtor cannot confirm a plan absent the separate classification of unsecured claims.").

are classified separately from Intercompany Interests to preserve the option to either Reinstate, compromise, or cancel Intercompany Interests. Significantly, Holders of Intercompany Interests will not receive a recovery under the Plan and Intercompany Interests may be Reinstated only for administrative convenience in the restructuring process. Thus, the Plan's treatment of Class 8 is proper because no similarly situated class will receive more favorable treatment. No party has asserted otherwise.

119. With respect to Class 9 (Section 510(b) Claims), the Debtors do not believe any Section 510(b) Claims exist. Out of an abundance of caution, the Debtors formed Class 9 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code. The Plan's treatment of Class 9 is proper because no similarly situated class will receive more favorable treatment. As there are no holders of Section 510(b) Claims, no distributions should or will be made to Class 9. No party in interest has asserted otherwise.

120. Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the deemed rejection by Classes 8 and 9 (as applicable).

## 2. The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

121. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule. This requires either that an impaired rejecting class of claims or interests be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[150] Under the Plan, no Holder of a Claim or Interest junior to an Impaired

---

[150] *See* 11 U.S.C. 1129(b)(2); *see also In re Armstrong World Indus.*, 348 B.R. at 114) (stating that the absolute priority rule is embodied in section 1129(b) of the Bankruptcy Code).

rejecting Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest.[151]

122. Although certain Claims and Interests may be provided a recovery or Reinstatement under the Plan before senior Claims are paid in full, Holders of impaired senior Claims have voted in favor of the Plan. General Unsecured Clams will be satisfied in full while the senior Second Lien Term Loan Claims will receive less than full recovery. However, Holders of Second Lien Term Loan Claims have voted overwhelmingly in favor of the Plan and no Holder of Second Lien Term Loan Claims has voted to reject the Plan. General Unsecured Claims are being reinstated under the Plan to preserve the Debtors' relationships with their customers and contract counterparties, which are essential to the Debtors' go-forward business. The majority of the Holders of General Unsecured Claims are trade partners that will have an ongoing relationship with the Reorganized Debtors. By leaving General Unsecured Claims Unimpaired, the Debtors are able to ensure payment for creditors that are essential to, and at the core of, the Reorganized Debtors' long-term success. Because of the ongoing business relationship between the Debtors and the Holders of General Unsecured Claims, the treatment of such Claims will have a material impact on the Debtors' future day-to-day operations and ultimately weigh heavily on the prospects of a successful reorganization.

123. In addition, no subset of Holders of Existing Equity Interests are being harmed, mistreated, or discriminated against under the Plan. To the extent any Holder is entitled to received

---

[151] *See In re ION Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. Nov. 24, 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

certain distributions on account of their commitments with respect to the Reorganized Debtors, such amounts are not on account of prepetition Claims against the Debtors. Moreover, each Voting Class voted to accept the Plan notwithstanding such distributions—which in each case were negotiated in good faith at arm's length to fund the new investment needed for the Debtors' survival and to develop a new capital structure that provides for a full recovery for General Unsecured Claims and fortifies the Debtors' balance sheet. Accordingly, the Plan satisfies the absolute priority rule, does not unfairly discriminate, and is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

> **P.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (§ 1129(c)–(e)).**

124.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[152]

125.    Section 1129(d) of the Bankruptcy Code provides that "on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[153] The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[154] The Debtors filed the Plan to accomplish their objective

---

[152]    *See* 11 U.S.C. § 1129(c).

[153]    11 U.S.C. § 1129(d).

[154]    *See* Rosa Decl. ¶ 41.

of reorganizing their capital structure and maximizing value for all of their stakeholders.[155] Moreover, no governmental unit or any other party has asserted otherwise. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

126. Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[156] Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## III. Modifications to the Plan Do Not Require Resolicitation.

127. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[157] Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[158] Interpreting Bankruptcy Rule 3019, courts have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and

---

[155] *See id.*

[156] *See* 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,725,625[] (excluding debt owed to 1 or more affiliates or insiders)." 11 U.S.C. § 101(51D)(B).

[157] *See* 11 U.S.C. § 1127(a).

[158] Fed. R. Bankr. P. 3019(a).

stakeholders are treated.[159]  Bankruptcy Rule 3019 allows a creditor that is negatively impacted by a change to accept the change in writing.

128.    The Debtors filed the *Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc. and its Debtor Affiliates* at Docket No 159.   As provided in the redline attached thereto, the Debtors made certain modifications reflected in the amended Plan (the "Modifications").   The Modifications are either: (a) immaterial or technical clarifications; or (b) modifications that resolve an informal objection to the Plan.   In particular, the Debtors worked with the U.S. Trustee to address comments generally related to the scope of the discharge, settlement, and release and exculpation provisions, the rights of Holders of Unimpaired Claims, and the Plan language regarding payment of statutory fees.   Importantly, All Holders of Claims in Voting Classes are receiving the same recovery as contemplated under the original Plan [Docket 14].   Thus, the Modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.   Moreover, the Crossover Group support the modifications. Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## IV.    Good Cause Exists to Waive the Stay of the Confirmation Order.

129.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[160]

---

[159]    *See, e.g.*, *In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988); *see also In re Gen. Wireless Operations Inc.*, 2017 WL 5461361, at *4 (Bankr. D. Del. Oct. 26, 2017) (finding that additional disclosure was not required where modifications did not "materially and adversely change the treatment of any Claims or Interests"); *In re Nat'l Truck Funding LLC*, 588 B.R. 175, 178 (Bankr. S.D. Miss. 2018) ("The disclosure requirements under § 1125 apply to a modified plan only if the modification is material.").

[160]    Fed. R. Bankr. P. 3020(e).

Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[161] Each rule also permits modification of the imposed stay upon court order.

130. The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry. As noted above, these chapter 11 cases and the related Plan transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.[162] Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously. Similar waivers have been approved in comparable, prepackaged chapter 11 cases in this Court.[163]

131. For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the restructuring transactions so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date. Based on the foregoing, the Debtors request a waiver of any

---

[161] Fed. R. Bankr. P. 6004(h), 6006(d).

[162] *See* Rosa Decl. ¶ 71.

[163] *See, e.g.*, *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 18, 2021) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re APC Auto. Techs. Intermediate Holdings, LLC*, No. 20-11466 (CSS) (Bankr. D. Del. July 10, 2020) (same); *In re Longview Power, LLC,* No. 20-10951 (BLS) (Bankr. D. Del. May. 22, 2020) (same); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020) (same); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 17, 2019) (same). Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

**<u>CONCLUSION</u>**

132.     For all of the reasons set forth herein, in the Brown Declaration, in the Turnbull Declaration, in the Rosa Declaration and in the Voting Report, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

Dated: September 26, 2022
Wilmington, Delaware

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:            ljones@pszjlaw.com
                      tcairns@pszjlaw.com
                      ecorma@pszjlaw.com

-and-

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Tricia Schwallier Collins (admitted *pro hac vice*)
Yusuf U. Salloum (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                      tricia.schwallier@kirkland.com
                      yusuf.salloum@kirkland.com

-and-

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Rachael M. Bentley (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            nicole.greenblatt@kirkland.com
Email:            rachael.bentley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*