## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CARESTREAM HEALTH, INC., *et al.*,[1] | Case No. 22-11778 (JKS) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF
### SCOTT H. ROSA, CHIEF FINANCIAL
### OFFICER OF CARESTREAM HEALTH, INC.,
### IN SUPPORT OF THE DEBTORS' DISCLOSURE
### STATEMENT FOR, AND CONFIRMATION OF, THE JOINT
### PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
### OF CARESTREAM HEALTH, INC., AND ITS DEBTOR AFFILIATES

I, Scott H. Rosa, hereby declare under penalty of perjury as follows:

### Background and Qualifications

1.      I am the Chief Financial Officer of Carestream Health, Inc. ("Carestream Health," and together with the other above-captioned debtors and debtors in possession, the "Debtors," collectively with their non-debtor affiliates, "Carestream" or the "Company").

2.      I have approximately seventeen years of experience in the healthcare technology sector, with particular expertise in finance, accounting, and corporate operations. I received a Bachelor of Science degree in accounting from SUNY Geneseo in 1996, and I am a Certified Public Accountant in the State of New York. From September 1996 until September 2002, I worked at Pricewaterhouse Coopers, where I served as an Assurance Manager for both large public

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

and mid-sized private companies.  From September 2002 until January 2007, I served as Controller within various business units at Carestream's predecessor, Eastman Kodak Company ("Kodak"), including serving as the Controller for Kodak's Health Group.  Following the May 2007 acquisition of Kodak's Health Group by Onex Corporation (together with its affiliates, "Onex"), I served as Controller of Carestream.  During the Company's formation, I was an initial member of the Company's finance leadership team and I helped establish the Company's finance department and its operating mechanisms.  I also assisted with multiple acquisitions and divestitures while in that role.  In August 2018, I was appointed Chief Financial Officer of Carestream.

3.     I submit this declaration (this "Declaration") in support of approval of the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* [Docket No. 15] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* [Docket No. 14] (as modified, amended, or supplemented from time to time, the "Plan").[2]  In my capacity as Chief Financial Officer of Carestream, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except where specifically noted, the statements in this Declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team or the Debtors' advisors.

---

2  Capitalized terms used but not defined herein have the meanings ascribed to them in the *Debtors' Memorandum of Law in Support of an Order Approving the Debtors' Disclosure Statement for, and Confirming, the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (the "Memorandum"), filed contemporaneously herewith, or the Plan, as applicable.

4. I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I would testify to the facts set forth herein.

## The Proposed Restructuring

5. The Plan is the culmination of months of effort by the Debtors and their key stakeholders to right size the Debtors' capital structure and position the Debtors for long-term success. Leading up to the Petition Date, Carestream engaged in discussions with an ad hoc group of holders of First Lien Claims and Second Lien Term Loan Claims (the "Crossover Group") regarding a comprehensive balance sheet solution. As a result of these extensive, good-faith, arm's-length negotiations, the Debtors reached an agreement with their Sponsor, lenders holding more than 70 percent of the outstanding First Lien Claims, and lenders holding more than 99 percent of the outstanding Second Lien Term Loan Claims on the terms of the Restructuring Transactions set forth in the Restructuring Support Agreement. At the same time, to facilitate the implementation of the Restructuring Transactions contemplated by the Plan, certain members of the Crossover Group committed to provide the Debtors with up to $80 million in debtor-in-possession financing to cover the administrative costs of these chapter 11 cases and to backstop the Rights Offering through the DIP Rollover. The Restructuring Support Agreement, the Plan, and the Restructuring Transactions contemplated thereunder will deleverage the Debtors' balance sheet by approximately $470 million, provide liquidity to support the Reorganized Debtors' operations, and create a clear and viable path to long-term financial success.

6. Pursuant to the Restructuring Support Agreement, the Debtors solicited votes on the prepackaged Plan before the Petition Date. The key terms of the Restructuring Transactions, as set forth in the Restructuring Support Agreement and the Plan, as amended, are as follows:

    a.    certain members of the Crossover Group have committed to provide the Debtors with access to up to $80 million in debtor-in-possession financing consisting of (a) a $5 million tranche that will be repaid in full in cash, and

(b) a $75 million tranche that will be partially satisfied with proceeds of an equity rights offering, if any, and the remainder will be equitized into New Common Stock through the DIP Rollover, subject to dilution by the Debtors' Management Incentive Plan;

b.      each holder of an Allowed First Lien Claim shall receive (a) cash in an amount equal to 3% of its Allowed First Lien Claim and (b) its *pro rata* share of the New Term Loan Facility in aggregate principal amount of approximately $541 million for the remainder of its claim, *provided* that holders of Allowed First Lien Revolving Claims may elect to roll a portion of their Allowed First Lien Revolving Claims into new loans under the New ABL Facility pursuant to the ABL Roll Option;

c.      the Debtors' existing Second Lien Term Loan will be cancelled and each holder of an Allowed Second Lien Term Loan Claim shall receive its *pro rata* share of (a) 10% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan, and (b) the right to purchase for cash its *pro rata* share of 80% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan;

d.      each Holder of an Allowed General Unsecured Claim will be paid in full in cash or have its claim reinstated; and

e.      existing equity interests in Carestream Health Holdings, Inc. will be cancelled on the Effective Date.

7.      The Debtors have received unanimous support for the Plan among voting creditors—73 percent of the Holders of First Lien Claims (Class 3) and 98 percent of the Holders of Second Lien Term Loan Claims (Class 4) voted to accept the Plan. Importantly, no Holder of Claims in any of the Voting Classes voted to reject the Plan or opted out of the Third-Party Release. The Plan represents the culmination of significant efforts by multiple parties in interest to reach a fair and equitable resolution of various complex business and legal issues, resulting in a Plan that provides significant value for the Debtors' stakeholders and a vehicle for the Debtors' successful culmination of the deleveraging of the Debtors' balance sheet.

8.      I believe the proposed restructuring pursuant to the Plan is fair and equitable, maximizes stakeholder value, represents the best path forward for a successful emergence from

chapter 11, is in the best interests of the Debtors and all their stakeholders, and that, accordingly, the Court should confirm the Plan.

## The Debtors' Need to Quickly Emerge from Chapter 11

9.      The Debtors are seeking to confirm the Plan on September 28, 2022, thirty-six days after the Petition Date.  Preserving value for the benefit of the Debtors' Estates depends, in large part, on the Debtors confirming the Plan and quickly emerging from chapter 11.  Emerging swiftly from chapter 11 will permit the Debtors to minimize uncertainty for employees, customers, and vendors; mitigate potential disruptions to their supply chain and businesses; and reduce incremental professional fees and other administrative costs that would lessen the Reorganized Debtors' cash on hand at emergence.  Given that the Plan has been unanimously accepted by all Classes of creditors entitled to vote and that the Plan is uncontested, the expeditious confirmation of the Plan and the consummation of the Restructuring Transactions are in the best interests of the Debtors, their Estates, and all interested parties.

## The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code

10.      For the reasons detailed below (except where such satisfaction is apparent on the face of the Disclosure Statement), and based on consultation with the Debtors' advisors, I believe the Disclosure Statement satisfies the applicable Bankruptcy Code requirements.

11.      I understand that with respect to prepetition solicitation of a plan, such as the case was here, solicitation of a plan must either comply with applicable non-bankruptcy law or provide "adequate information" as defined in section 1125(a) of the Bankruptcy Code.  Because the Holders of Claims in the Voting Classes were not offered and will not receive securities in a "public offering" and are "accredited investors," I understand that the prepetition solicitation of the Plan was exempt from compliance with the Securities Act.

12.     I understand that a disclosure statement must provide "adequate information," which is information sufficient to allow hypothetical investors to make informed decisions on whether to vote to accept or reject a chapter 11 plan.  The Disclosure Statement contains, among other things, descriptions and summaries of:  (a) the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness;[3] (b) the events leading to these chapter 11 cases, including the Debtors' prepetition restructuring efforts and entry into the Restructuring Support Agreement;[4] (c) the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan;[5] (d) a summary of the Plan;[6] (e) certain important effects of confirmation of the Plan;[7] (f) the discharge, releases, exculpation, and injunction contemplated by the Plan;[8] (g) certain financial information about the Debtors, including financial projections and a liquidation analysis, and a discussion of the valuation of the Reorganized Debtors;[9] (h) the statutory requirements for confirming the Plan;[10] (i) certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan;[11] (j) certain important

---

[3]     *See* Disclosure Statement Art. V.

[4]     *See id.* Art. VI.

[5]     *See id.* Art. III.D and Art. III.E.

[6]     *See id.* Art. IV.

[7]     *See id.* Art. III.I and Art. X.

[8]     *See id.* Art. III.O.

[9]     *See id.* Art. X.F, Exhibit C, Exhibit D, and Exhibit E.

[10]     *See id.* Art. X.

[11]     *See id.* Art. VIII.

disclosures regarding securities laws;[12] and (k) certain U.S. federal income tax consequences of the Plan.[13]

13.     In addition, prior to solicitation, the Disclosure Statement and the Plan were subject to review and comment by the Crossover Group and their respective advisors. Furthermore, I understand that no stakeholder has asked for additional information nor disputed that the Disclosure Statement contained information sufficient for impaired claimants to be able to cast an informed vote on the Plan. I believe that the information in the Disclosure Statement accurately describes the Debtors' businesses and the Plan, and the Disclosure Statement is true and correct to the best of my knowledge. Thus, I believe that the Disclosure Statement contains "adequate information," as that term is used in section 1126(b)(2) of the Bankruptcy Code.

## The Plan Satisfies the Requirements of Confirmation

14.     For the reasons detailed below and based on discussions with the Debtors' management team and advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation.[14]

## I.     THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE — § 1129(A)(1).

### A.     Proper Classification of Claims and Interests — § 1122.

15.     I understand that the Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests

---

12     *See id.* Art. XI.

13     *See id.* Art. XII.

14     Evidence of the Debtors' compliance with additional factors of the Bankruptcy Code necessary for confirmation of the Plan is contained in the *Declaration of Marc Brown, Managing Director of AlixPartners, LLP, in Support of the Debtors' Disclosure Statement for, and Confirmation of, the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (the "Brown Declaration"), filed contemporaneously herewith.

into nine separate Classes[15] based on legal or factual distinction or otherwise based on other relevant criteria. I believe that the differences in classification are in the best interests of creditors, foster the Debtors' reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

16.     Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests. Generally, Claims (rights to payment) are classified separately from Interests (representing ownership in the businesses). Specifically, Other Priority Claims (Class 2) are classified separately because of their relative priority and because I understand the Bankruptcy Code requires such Claims to be paid in full. The Plan classifies Existing Interests (Class 8) separately from Intercompany Interests (Class 7) because the Debtors' ownership structure is dependent upon maintaining the Intercompany Interests and, therefore, the Intercompany Interests may be preserved under the Plan for the administrative convenience of ensuring the preservation of the Debtors' corporate structure after the Effective Date. First Lien Claims (Class 3) are classified separately from Second Lien Term Loan Claims (Class 4) because of the different circumstances of each Class and the relative priority of their Claims against the Debtors. Finally, General Unsecured Claims (Class 5) are separately classified because they have differing legal rights then the Debtors' secured creditors and play a distinct role in ensuring the future economic viability of the Reorganized Debtors.

---

[15]     Article III.A of the Plan provides for the following Classes: Class 1 (Other Secured Claims); Class 2 (Other Priority Claims); Class 3 (First Lien Claims); Class 4 (Second Lien Term Loan Claims); Class 5 (General Unsecured Claims); Class 6 (Intercompany Claims); Class 7 (Intercompany Interests); Class 8 (Existing Interests); and Class 9 (Section 510(b) Claims).

17. Accordingly, I submit that the Plan complies with and satisfies section 1122 of the Bankruptcy Code.

**B. Specification of Classes, Impairment, and Treatment — § 1123(a)(1)–(3).**

18. Article III of the Plan specifies in detail the classification of Claims and Interests, whether such Claims and Interests are Impaired, and the treatment that each Class of Claims and Interests will receive under the Plan. Accordingly, I believe that the Plan satisfies sections 1123(a)(1)–(3) of the Bankruptcy Code.

**C. Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).**

19. Holders of Allowed Claims or Interests will receive the same treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, unless the Holder of such Claim or Interest has agreed to less favorable treatment. Additionally, I understand that the Plan provides for a $75 million equity Rights Offering in exchange for new money, all of which was offered to holders of Second Lien Term Loan Claims on a *pro rata* basis. The consideration provided to holders of Second Lien Term Loan Claims for participating in the equity Rights Offering, and to the Tranche B DIP Lenders for backstopping the Rights Offering, is not consideration on account of such parties' Allowed Claims. Rather, such consideration is in exchange for new valuable commitments by such parties to provide necessary additional liquidity to the Company.[16] Accordingly, I believe that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

---

[16] The Rights Offering and Exit Facilities (as defined in the Turnbull Declaration) are discussed in more detail in the *Declaration of Andrew Turnbull, Managing Director of Houlihan Lokey Capital, Inc., in Support of the Debtors' Disclosure Statement for, and Confirmation of, the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* (the "Turnbull Declaration"), filed contemporaneously herewith.

**D.     Means for Implementation — § 1123(a)(5).**

20.     I believe that the Plan provides adequate means for its implementation as required under section 1123(a)(5) of the Bankruptcy Code.  Article IV and various other provisions of the Plan describe the means for the cancelation of documents evidencing existing Claims and Interests and implementation of the transactions provided for in the Plan, including, among other things: (a) the Restructuring Transactions; (b) the sources of consideration for Plan distributions, including the Rights Offering; (c) the entry into the New Term Loan Facility in accordance with the New Term Loan Documents; (d) the entry into the New ABL Facility in accordance with the New ABL Documents; (e) the issuance and distribution of the New Common Stock; (f) the adoption of the New Organizational Documents; (g) the implementation of the Management Compensation Programs; (h) the consummation of various corporate transaction steps necessary to implement the new corporate structure upon emergence; and (i) the preservation of Causes of Action and release of Avoidance Actions.  In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors' emergence, such as the vesting of estate assets in the Reorganized Debtors, the assumption or rejection of Executory Contracts and Unexpired Leases, and the settlement of Claims and Interests.

21.     The precise terms governing the execution of certain of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement.  As a result, I believe the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

**E.     Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).**

22.     Article IV.H of the Plan provides that the Reorganized Debtors' New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  Further, the relevant New Organizational

Documents for the Reorganized Debtors do in fact reflect such prohibition. Accordingly, I believe that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

**F.      Selection of Officers and Directors — § 1123(a)(7).**

23.      I understand that section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selecting any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." Article IV.K of the Plan sets forth the structure of the New Board and the procedures for selection of the New Board. I understand that, on the Effective Date, the term of the current members of the ultimate board of directors of the Debtors will expire, and such current directors will be deemed to have resigned. The members of the New Board and the officers of the Reorganized Debtors were disclosed in the Plan Supplement. From and after the Effective Date, the New Board shall serve pursuant to the terms of the applicable New Organizational Documents. I believe the selection of the members of the New Board is consistent with the interests of all Holders of Claims and Interests and public policy. Accordingly, I believe the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

**G.      The Debtors Solicited the Plan in Compliance with the Bankruptcy Code — § 1129(a)(2).**

24.      I believe that the Plan satisfies section 1129(a)(2) of the Bankruptcy Code, which I understand requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code. I understand that section 1129(a)(2) of the Bankruptcy Code encompasses the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.

25. I understand that the Debtors solicited and tabulated votes on the Plan in accordance with the customary solicitation procedures for prepackaged chapter 11 plans of reorganization established in this district. I believe the Debtors, through their Solicitation Agent, complied with the content and delivery requirements of sections 1125(a) and (g) of the Bankruptcy Code by distributing copies of the Disclosure Statement and Plan to all voting creditors and posting the Disclosure Statement and Plan on the Debtors' public restructuring case website.[17] Prior to solicitation, the Disclosure Statement and the Plan were subject to review and comment by the Crossover Group and its advisors. To the best of my knowledge, no stakeholder has asked for additional information or disputed that the Disclosure Statement contained information sufficient for impaired claimants to be able to cast an informed vote on the Plan. I understand the Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each Holder of a Claim or Interest in a particular Class. With respect to modifications to the Plan, it is my understanding that such changes are permissible modifications to the Plan that do not reflect material differences to recoveries of each affected Class—*i.e.*, no Holder is "likely" to reconsider its acceptance.

26. The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code. Based on the foregoing, I believe that the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code by complying with sections 1125 and 1126 of the Bankruptcy Code.

---

[17] For additional details regarding the Debtors' solicitation process and voting results, see the *Declaration of Adam Gorman Regarding the Solicitation and Tabulation of Votes on the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* [Docket No. 42] (the "Voting Report").

### H. The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).

27. I believe that the Plan was proposed in good faith with the legitimate honest purposes of restructuring the Debtors' balance sheet and enabling the Debtors to reorganize, achieve a fresh start, and maintain their value as a going concern. The Plan is the product of months of extensive arm's-length negotiations among the Debtors, the Consenting Parties, and other key constituents. The unanimous support of the Plan from all 413 Holders of the First Lien Claims and Second Lien Term Loan Claims, who are re-investing in the reorganized capital structure and allowing a portion of their recovery to be distributed to Holders of General Unsecured Claims, is strong evidence that the Plan is likely to succeed and maximizes value for all stakeholders. Indeed, the Plan has been accepted by 100 percent of voting creditors, and no party has voted to reject the Plan. I believe that the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### I. Payment of Professional Fees and Expenses Are Subject to Court Approval — § 1129(a)(4).

28. It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by a debtor, or by a person receiving distributions of property under the plan, be approved by the Court as reasonable. I can confirm that the Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code. Article II.C.1 of the Plan requires Professionals to file all final requests for payment of Professional Fee Claims no later than forty-five days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.

Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

### J. Compliance with Governance Disclosure Requirements — § 1129(a)(5).

29.     As of the Effective Date, the term of the current members of the ultimate board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed. As described above, in accordance with Article IV.K of the Plan, the members of the New Board were disclosed in the Plan Supplement, including the Chief Executive Officer of the Reorganized Debtors. The New Board were selected in accordance with the New Organizational Documents and Shareholders Agreement. In addition, for subsequent terms, the directors shall be selected in accordance with such documents.

30.     As set forth in the Plan Supplement, the Debtors propose that their existing officers remain in their current capacities as officers of the Reorganized Debtors. I believe that the Debtors' existing officers have at all times proceeded in good faith and with diligence and care in connection with these chapter 11 cases. Furthermore, the Reorganized Debtors' proposed officers have significant knowledge and solid business and industry experience, are competent, and will provide the Reorganized Debtors with continuity in running the business. Therefore, I believe that the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied.

### K. Governmental Regulatory Approval of Rate Changes — § 1129(a)(6).

31.     It is my understanding that section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. It is my understanding that no such rate changes are provided for in the Plan and thus, section 1129(a)(6) is not applicable here.

**L.      Classes Unimpaired Under or Accepting the Plan — § 1129(a)(8).**

32.      I understand that the Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.  I understand that all 413 Holders of the Claims in the Voting Classes (Class 3 and Class 4) voted unanimously to accept the Plan.  Holders of Claims in Classes 1, 2, 5, 6, and 7 are conclusively presumed to accept the Plan and thus were not entitled to vote.  Holders of Claims and Interests in Classes 8 and 9 are deemed to have rejected the Plan and thus were not entitled to vote.  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, I understand the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**M.      Priority Cash Payments — § 1129(a)(9).**

33.      It is my understanding that the Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment as agreed to by the claim holder in satisfaction of the claim.  Article II.A of the Plan provides that each Holder of an Allowed Administrative Claim will receive cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time set forth in Article II.A of the Plan.  In addition, no Holders of the types of Claims specified by section 1129(a)(9)(B) are Impaired under the Plan.  Finally, Article II.D of the Plan specifically provides that each Holder of Allowed Priority Tax Claims shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.  Thus, it is my understanding that the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

### N. Impaired, Non-Insider Accepting Class of Claims — § 1129(a)(10).

34.     It is my understanding that the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider." All Holders of Claims in Class 3 and Class 4, which are Impaired, voted to accept the Plan independent of any insiders' votes. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### O. The Plan Is Feasible — § 1129(a)(11).

35.     It is my understanding that section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if confirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. This is commonly referred to as the requirement that the plan be "feasible."

36.     In connection with proposing the Plan and presenting the Plan to the Court for confirmation, the Debtors and their advisors thoroughly analyzed the Reorganized Debtors' ability to meet their respective post-Confirmation obligations under the Plan and to continue as a going concern without the need for further financial restructuring. The Debtors negotiated and secured exit financing in the form of the New ABL Facility, the Rights Offering, and the DIP Rollover to manage post-emergence liquidity and to meet their obligations in the ordinary course. The Debtors' management team and their advisors have made significant progress in designing and implementing a business plan that will enable the Reorganized Debtors to succeed in their go-forward operations given current industry trends.

37.     In addition, the Debtors, together with their advisors, have closely evaluated their cash flows to ensure that they will be able to make all required Plan payments on the Effective

Date and beyond.[18]  The financial projections for the Reorganized Debtors prepared by the Debtors' management and advisors and attached as Exhibit D to the Disclosure Statement (the "Financial Projections") provide a forecast of the financial performance of the Reorganized Debtors for the remainder of the fiscal year ended December 31, 2022 and for fiscal years 2023 through 2026 (the "Projection Period").  I understand that the Financial Projections were prepared assuming an Effective Date on or around October 1, 2022 and implementation of the Plan in accordance with its stated terms.  I have been involved in the formulation of the material assumptions included in the Financial Projections, understand how they were prepared and the underlying methodology, and agree with the approach used.  Therefore, I can represent that they were prepared in good faith and are reasonable and appropriate to provide the foundation for the Financial Projections and the Plan.  The Financial Projections demonstrate the Debtors' ability to meet their obligations under the Plan and as they come due in the ordinary course of business.  In sum, the assets and Financial Projections of the Reorganized Debtors demonstrate a reasonable assurance that the Debtors will have and maintain sufficient liquidity and capital resources to pay amounts due under the Plan and fund their operations during the Projection Period.

38.      Accordingly, I believe that the Plan is feasible and that confirmation is not likely to be followed by liquidation or further financial reorganization of the Debtors or any of their successors under the Plan.

**P.      The Plan Provides for Payment of All Statutory Fees — § 1129(a)(12).**

39.      Article II.E of the Plan provides that all fees and charges payable under section 1930 of title 28 of the United States Code, to the extent not previously paid, will be paid

---

[18]      In fact, pursuant to the interim all trade order [Docket No. 70], the Debtors generally have been paying obligations in the ordinary course during the pendency of these chapter 11 cases.

17

for each quarter until the applicable chapter 11 case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first. Thus, I believe that the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

**Q. Retiree Benefits Will Continue Post-Confirmation — § 1129(a)(13).**

40. I understand that Article V.H.1 of the Plan provides that, from and after the Effective Date, all retiree benefits as defined in section 1114 of the Bankruptcy Code, if any, will continue in the ordinary course in accordance with applicable law. Accordingly, I believe that the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

**II. THE PRINCIPAL PURPOSE OF THE PLAN IS NOT THE AVOIDANCE OF TAXES OR THE AVOIDANCE OF SECTION 5 OF THE SECURITIES ACT AS REQUIRED UNDER SECTION 1129(D) OF THE BANKRUPTCY CODE.**

41. The Plan has not been filed for the principal purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended. Rather, I believe that the Debtors filed the Plan to accomplish their objective of reorganizing their capital structure and maximizing value for all of their stakeholders. The Restructuring Transactions contemplated by the Plan will eliminate approximately $470 million of the Debtors' total funded debt and provide the Debtors with up to $75 million in new equity capital and the $85 million New ABL Facility at exit. The Plan's comprehensive deleveraging will strengthen the Debtors' balance sheet and set the Debtors on the path for long-term success. Moreover, no party that is a governmental unit, or any other entity, has requested that the Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

## III. THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY CODE.

42.     I understand that the Plan's treatment of the non-accepting Impaired Classes deemed to reject the Plan—Class 8 and Class 9, and possibly Class 6 and Class 7—is proper because all similarly situated Claims and Interests will receive substantially similar treatment, there is a reasonable basis for those Claims and Interests being classified separately from other Claims and Interests that remain Unimpaired, and the Plan's classification scheme rests on a legally acceptable rationale. Claims and Interests in deemed rejecting Classes are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests.

43.     With respect to Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests), the relevant Claims and Interests may be Unimpaired. These Intercompany Claims and Intercompany Interests, which exist to support the Debtors' corporate structure, may be Reinstated because reinstatement of intercompany claims and interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors. This reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

44.     With respect to Class 8 (Existing Interests), the Debtors formed Class 8 to include Holders of Interests in Carestream Health Holdings, Inc. As explained above, Existing Interests are classified separately from Intercompany Interests to preserve the option to either Reinstate, compromise, or cancel Intercompany Interests. Significantly, Holders of Intercompany Interests will not receive a recovery under the Plan and Intercompany Interests may be Reinstated only for administrative convenience in the restructuring process. Thus, the Plan's treatment of Class 8 is proper because no similarly situated class will receive more favorable treatment.

45. I understand that, with respect to Class 9 (Section 510(b) Claims), the Debtors do not believe any Section 510(b) Claims exist. Out of an abundance of caution, the Debtors formed Class 9 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code.

46. Based on my review of the Plan, I understand that no Holder of a Claim or Interest junior to an Impaired rejecting Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest. I understand that although certain Claims and Interests may be provided a recovery or Reinstatement under the Plan before senior Claims are paid in full, Holders of impaired senior Claims have voted in favor of the Plan. Specifically, although General Unsecured Clams will be satisfied in full while the senior Second Lien Term Loan Claims will receive less than full recovery, Holders of Second Lien Term Loan Claims have voted overwhelmingly in favor of the Plan, and no Holder of Second Lien Term Loan Claims has voted to reject the Plan. General Unsecured Claims are being reinstated under the Plan to preserve the Debtors' relationships with their customers and contract counterparties, which are essential to the Debtors' go-forward business.

47. In addition, no subset of Holders of Existing Equity Interests are being harmed, mistreated, or discriminated against under the Plan. To the extent any Holder is entitled to receive certain distributions on account of their commitments with respect to the Reorganized Debtors, I understand that such distributions are not on account of prepetition Claims against the Debtors. Moreover, I understand that each Voting Class voted to accept the Plan notwithstanding such distributions—which I believe in each case were negotiated in good faith at arm's length to fund the new investment needed for the Debtors' survival and to develop a new capital structure that provides for a full recovery for General Unsecured Claims and fortifies the Debtors' balance sheet.

48.     Accordingly, I believe the Plan satisfies the absolute priority rule, does not unfairly discriminate, and is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

## IV.     THE PLAN COMPLIES WITH THE DISCRETIONARY PROVISIONS OF SECTION 1123(B) OF THE BANKRUPTCY CODE.

49.     I understand that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code, but not necessary for confirmation under the Bankruptcy Code.  For example, the Plan (a) classifies certain Classes of Claims and Interests as Impaired and leaves others Unimpaired, (b) provides for the assumption of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code (except to the extent set forth in the Plan), and (c) provides for a general settlement of all Claims and Interests pursuant to section 1123 of the Bankruptcy Code.  In addition, I understand that the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  I believe these provisions represent a valid exercise of the Debtors' business judgement, are fair, reasonable, and in the best interests of the Debtors' Estates, are the product of extensive arm's-length negotiations, and were critical to obtaining support for the Plan.

### A.     The Debtor Release Is Appropriate.

50.     Article VIII.C of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors and their successors may have against the Released Parties (the "Debtor Release").  The Debtor Release was negotiated in connection with the other terms of the Plan, and is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect these chapter 11 cases and the available recoveries under the Plan.

51.     ***First***, each Released Party has made a substantial contribution to the Debtors' Estates. The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof, but also in giving up material economic interests to ensure the success of the Debtors' chapter 11 cases. The Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and implementing the restructuring transactions contemplated by the Plan.

52.     ***Second***, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the Plan. Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the transactions contemplated thereby. Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders and is limited in scope. In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this prepackaged chapter 11 process. The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. Nevertheless, as set forth in the amended Plan, the Debtor Release contains a carve-out for actual fraud, willful misconduct, and gross negligence. Importantly, the Debtor Release provides finality and avoids significant delay in consummating the Plan, and therefore the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

53. **Third**, I understand that no stakeholders have objected to the Debtor Release contained in the Plan. All of the creditors in the Voting Classes voted to accept the Plan (including the Debtor Release).

54. **Fourth**, I understand that an identity of interest exists between the Debtors and the parties to be released. Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and having the Debtors' businesses reorganized. Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.

55. **Fifth**, the Plan provides for meaningful recoveries for substantially all of the Claims in Classes affected by the Debtor Release. Furthermore, as noted above, the Debtor Releases are supported by all parties entitled to vote on the Plan on a unanimous basis.

56. For these reasons, I believe that the Debtor Release is justified, is a sound exercise of the Debtors' business judgment, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and satisfies key factors considered by courts in determining whether a debtor release is proper.

**B.     The Consensual Third-Party Release Is Appropriate.**

57. Article VIII.D of the Plan also contains a third-party release provision (the "Third-Party Release"). Based on my discussion with the Debtors' advisors, I understand that the Third-Party Release is a consensual release. I understand that all Holders of Claims entitled to Vote had the opportunity to opt out of the Third-Party Release through their Ballots, and that remaining Holders of Claims and Interests had the opportunity to object to the Third-Party Release by timely filing on the Docket of the chapter 11 cases an objection that is not resolved before Confirmation.

58. Importantly, the Ballots and the Combined Hearing Notice quoted the entirety of the Third-Party Release in bold, conspicuous font, clearly informing such Holders of the steps they should take if they disagreed with the scope of the release. Thus, affected parties were on notice of the Third-Party Release, including the option to opt out or object to the Third-Party Release. As such, I believe that the Third-Party Release is consensual as to all creditors and interest holders who did not object. Finally, as set forth in the amended Plan, the Third-Party Release contains a carve-out for actual fraud, willful misconduct, and gross negligence.

59. I believe that the Third-Party Release is an integral and essential provision of the Plan and provides finality for the Released Parties regarding the Party's respective obligations under the Plan, is in exchange for good and valuable consideration provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, is fair and equitable, and reasonable, and is given and made after due notice and opportunity to be heard.

60. For months prior to the commencement of these chapter 11 cases and throughout the pendency of these chapter 11 cases, the Released Parties worked constructively with the Debtors to negotiate and implement a value-maximizing reorganization embodied in the Plan that enables the Reorganized Debtors to emerge from these chapter 11 cases with a right-sized capital structure and the ability to continue to provide their customers with the highest quality of service. I believe the Released Parties worked constructively with the Debtors to negotiate and implement the reorganization embodied in the Plan and have provided material concessions, benefits, and commitments to the Debtors through the Restructuring Support Agreement, during the pendency of the cases, such as: (a) the Sponsor waiving its General Unsecured Claims against the Debtors; (b) certain of the Consenting Lenders committing, and funding, the Debtors' $80 million DIP

Facility; (c) the Tranche B DIP Lenders agreeing to backstop the Rights Offering through the DIP Rollover; (d) the Prepetition Secured Parties' consent to the Debtors' use of cash collateral during the chapter 11 cases; (e) certain Prepetition Secured Parties committing to provide a portion of the $85 million New ABL Facility upon Emergence; and (f) the Third-Party Releases were negotiated as part of the Restructuring Support Agreement, which provided concrete evidence to the market of the support of the Debtors' key stakeholders and in turn provided stability to the Debtors' business while the Debtors navigated the restructuring process. In addition, I believe that the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders. The Debtors' management has provided their extensive industry knowledge to the Debtors during the Restructuring Support Agreement and Plan negotiations, which required collaborating constructively with their stakeholders. I understand that management will continue to facilitate the restructuring process during and after these chapter 11 cases and, as such, have made and will continue to make indispensable contributions to the successful reorganization of the Debtors. Further, I understand that without the concession by the Consenting Second Lien Lenders to equitize their Second Lien Term Loan Claims, Holders of General Unsecured Claims would not have received a full recovery in these chapter 11 cases.

61. For the foregoing reasons, I believe that the Third-Party Releases are permissible, and I understand that no party has asserted otherwise.

**C. The Exculpation Provision Is Appropriate.**

62. Based on my experience and discussions with the Debtors' advisors, it is my belief that the exculpation provision described in Article VIII.E of the Plan (the "Exculpation") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited

in scope. The Exculpation is intended to prevent collateral attacks against Estate fiduciaries or parties that have acted in good faith to help facilitate the Debtors' reorganization.

63. Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and the restructuring transactions contemplated in these chapter 11 cases. Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency. As a result, the Plan enjoys unanimous support from the voting Holders of Claims. In addition, I understand that the promise of exculpation played a significant role in facilitating Plan negotiations. In short, I believe that the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arm's-length negotiations, and significant sacrifice by the Exculpated Parties.

64. Accordingly, under the circumstances, I believe that it is appropriate for the Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

**D. The Injunction Provision Is Appropriate.**

65. The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan.

66. I believe that the Injunction Provision is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan. Further, the injunction provided for in the Plan is narrowly tailored to achieve its purpose. As

noted above, I believe these provisions are foundational to the success of the Plan and these chapter 11 cases, and I believe the Injunction Provision should be approved.[19]

## V.  THE PLAN COMPLIES WITH SECTION 1123(D) OF THE BANKRUPTCY CODE.

67.    I understand that section 1123(d) of the Bankruptcy Code provides that the amount proposed in a plan to cure a default will be determined in accordance with the underlying agreement and applicable nonbankruptcy law.  I understand that Article V of the Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount, if any, on the Effective Date.  I understand that, where such amounts are under review, cure amounts will be reconciled post-Effective Date pursuant to the terms of any such assumed Executory Contract or Unexpired Lease, as applicable, as noted in the Debtors' Schedule of Proposed Cure Amounts filed in the Plan Supplement.  Accordingly, it is my opinion that the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code.

## VI.  MODIFICATIONS TO THE PLAN DO NOT REQUIRE RESOLICITATION.

68.    I understand that section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, I understand that Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not materially and adversely change the treatment of the claim of any creditor or the interest of any equity security holder.

---

[19]    The foregoing description is a summary of the operative plan provisions only.  To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

69.     Here, the Debtors made certain modifications to the Plan after the Solicitation Period ended.  I believe that such modifications are either (a) immaterial or technical clarifications, or (b) modifications that resolve an informal objection to the Plan.  In particular, I understand the Debtors worked with the U.S. Trustee to address comments generally related to the scope of the discharge, settlement, and release and exculpation provisions, the rights of Holders of Unimpaired Claims, and the Plan language regarding payment of statutory fees.  Importantly, I understand that all Holders of Claims in Voting Classes are receiving the same recovery as contemplated under the original Plan.  Further, I understand that the Crossover Group supports the modifications.  Accordingly, I believe that the modifications to the Plan do not require resolicitation of the Plan under section 1127 of the Bankruptcy Code.

## VII.    GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER.

70.     I understand that Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  I also understand that Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  It is my understanding that each rule also permits modification of the imposed stay upon court order.

71.     Good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.  These chapter 11 cases and the related Plan transactions, including the Restructuring Transactions, have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of

information, both pre- and postpetition.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously.

72.     For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the Restructuring Transactions so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Accordingly, I believe that good cause exists to waive the stay of the Confirmation Order.

## Conclusion

73.     In conclusion, it is my opinion as the Chief Financial Officer of the Debtors, and having been involved in virtually every aspect of the chapter 11 cases and the negotiation of the Restructuring Support Agreement and the Plan, that confirmation of the Plan is appropriate, is in the best interests of all parties-in-interest, and should be approved.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  September 26, 2022

/s/ *Scott H. Rosa*
Scott H. Rosa
Chief Financial Officer
Carestream Health, Inc.