## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARESTREAM HEALTH, INC., *et al.*,[1] | ) | Case No. 22-11778 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF ANDREW TURNBULL, MANAGING DIRECTOR OF HOULIHAN LOKEY CAPITAL, INC., IN SUPPORT OF THE DEBTORS' DISCLOSURE STATEMENT FOR, AND CONFIRMATION OF, THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CARESTREAM HEALTH, INC., AND ITS DEBTOR AFFILIATES**

I, Andrew Turnbull, hereby make this declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director at Houlihan Lokey Capital, Inc. ("Houlihan"), an investment banking firm headquartered in Los Angeles, California that has offices around the world. The above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company")[2] have filed an application to retain Houlihan as their investment banker and financial advisor in these chapter 11 cases.

2. Houlihan, together with the other subsidiaries of its direct parent company, Houlihan Lokey, Inc., is an internationally recognized investment banking and financial advisory

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Carestream Health, Inc. (0334); Carestream Health Acquisition, LLC (0333); Carestream Health Canada Holdings, Inc. (7700); Carestream Health Holdings, Inc. (7822); Carestream Health International Holdings, Inc. (5771); Carestream Health International Management Company, Inc. (0532); Carestream Health Puerto Rico, LLC (8359); Carestream Health World Holdings, LLC (1662); and Lumisys Holding Co. (3232). The location of the Debtors' service address is: 150 Verona Street, Rochester, New York 14608.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement (as defined herein), as applicable.

firm, with 36 offices worldwide and more than 1,600 professionals.  Houlihan's Financial Restructuring Group, which has more than 200 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy.  Houlihan has been, and is, involved in some of the largest restructuring cases in the United States, including representing debtors and official committees in numerous chapter 11 cases in this and other districts.

3.     Since joining Houlihan in 2004, I have specialized in assisting companies, lenders, creditors, and investors in distressed situations.  My experience includes conducting acquisitions and divestitures of financially troubled assets, raising various forms of capital and negotiations relating to the restructuring of private and public securities, both in chapter 11 and in out-of-court situations.

4.     Prior to joining Houlihan, I was a Director at PricewaterhouseCoopers Securities. I hold a Bachelor of Science in Biology and an Honours Business Administration degree, both from the University of Western Ontario.

5.     The Debtors engaged Houlihan on September 16, 2020, to serve as their investment banker in relation to a sale process of the entire Company, including the Debtors and the Company's non-Debtor operations.  The Debtors expanded the role of Houlihan on July 2, 2021, to incorporate the firm's Financial Restructuring Group.  The Debtors chose Houlihan for these roles because of its expertise in the healthcare sector, as well as on issues relating to financially distressed companies and its extensive experience acting as an advisor in both in and out-of-court restructurings of companies of all sizes across a wide array of industries.

6. I am familiar with the Debtors' operations and business and financial affairs. One of the services the Debtors have asked Houlihan to provide is the preparation of a valuation analysis (the "Valuation Analysis") in connection with the Debtors' *Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* [Docket No. 14] (as amended, supplemented, or otherwise modified from time to time, the "Plan"). I submit this Declaration in support of confirmation of the Plan.

7. The statements in this declaration are, except where specifically noted, based on my personal knowledge, opinions and expertise, information that I have received from the Debtors' employees or other advisors, and information from or discussions with employees of Houlihan working directly with me or under my supervision, direction or control. If called to testify, I could and would competently testify as to the facts set forth herein.

## Valuation Analysis

8. As described more fully in Exhibit E to the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Carestream Health, Inc., and Its Debtor Affiliates* [Docket No. 15] (the "Disclosure Statement"), the estimated range of total enterprise value (the "Enterprise Value") of the Reorganized Debtors, on an assumed Effective Date of October 1, 2022, is approximately $658 million to approximately $777 million, with an estimated midpoint of $714 million.

9. In addition, based on the estimated range of Enterprise Value and other information described herein and solely for purposes of the Plan, Houlihan estimated a potential range of the Reorganized Debtors' total implied equity value (the "Equity Value"), which takes into account the total Enterprise Value less the estimated net debt outstanding as of the Effective Date. Houlihan assumed that the Reorganized Debtors will have, as of the Effective Date, funded net

debt obligations of $500 million (comprised of $47 million outstanding under the New ABL Facility, $536 million outstanding under the New Term Loan Facility, and unrestricted cash of $83 million). Therefore, the midpoint of the estimated potential Equity Value for the Reorganized Debtors is approximately $213 million, with a low end of $158 million and a high end of $276 million.

10. The Valuation Analysis is based on financial and other information provided by the Debtors' management, as well as the financial projections for the Reorganized Debtors prepared by the Debtors' management and advisors and attached as Exhibit D to the Disclosure Statement (the "Financial Projections"), and information provided by other sources. The Valuation Analysis values the Company as of October 1, 2022, the assumed Effective Date.

11. In conducting its analysis, Houlihan, among other things: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods provided by the Debtors; (b) reviewed certain internal financial and operating data of the debtors, including the Financial Projections, which were prepared and provided to Houlihan by management and which relate to the Debtors' business and its prospects; (c) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market values of public companies deemed by Houlihan to be potentially comparable to the operating businesses of the Debtors; (e) considered certain economic and industry information relevant to the Debtors' operating businesses; (f) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; (g) considered the value assigned to certain precedent change-of-control transactions for other businesses that are potentially similar to those of the Debtors; and (h) conducted such other analyses as Houlihan deemed appropriate.

12. In connection with its review, Houlihan did not assume any responsibility for independent verification of (and did not independently verify) any of the information supplied to, discussed with, or reviewed by Houlihan and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Houlihan did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, tax-related or otherwise) of the Reorganized Debtors.

13. For purposes of the Valuation Analysis, Houlihan assumed that no material changes that would affect estimated Enterprise Value will occur between the date of filing of the Disclosure Statement and the Effective Date. Houlihan's Valuation Analysis does not constitute an opinion as to the fairness, from a financial point of view, of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

14. The underlying financial information I reviewed in preparing the Valuation Analysis was either publicly available or provided by the Debtors or the Debtors' other retained professionals. As part of this process, I considered the Financial Projections attached as <u>Exhibit D</u> to the Disclosure Statement. My understanding is that such Financial Projections were prepared on a consolidated basis using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis).

15. In connection with my work providing investment banking and valuation services to companies, I typically rely on projections and financial data provided and prepared by other entities, and it is standard for experts in my field to rely on such projections and data.

**The Restructuring Transactions**

16. The key terms of the Restructuring Transactions, as reflected in the creditor-approved Plan, include the following:

(i) certain members of the Crossover Group have committed to provide the Debtors with up to $80 million in debtor-in-possession financing, consisting of (a) a $5 million tranche that will be repaid in full in cash, and (b) a $75 million tranche that will be partially satisfied with proceeds of an equity rights offering, if any, and the remainder will be equitized into New Common Stock through the DIP Rollover, subject to dilution by the Debtors' Management Incentive Plan;

(ii) each holder of an Allowed First Lien Claim shall receive (a) cash in an amount equal to 3% of its Allowed First Lien Claim and (b) its pro rata share of the New Term Loan Facility in aggregate principal amount of approximately $541 million[3] for the remainder of its Allowed First Lien Claim, *provided* that holders of Allowed First Lien Revolving Claims may, in lieu of the foregoing treatment, elect to roll a portion of their Allowed First Lien Revolving Claims into new loans under the New ABL Facility pursuant to the ABL Roll Option;

(iii) the Debtors' existing Second Lien Term Loan will be cancelled and each holder of an Allowed Second Lien Term Loan Claim shall receive its pro rata share of (a) 10% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan, and (b) the right to purchase for cash its pro rata share of 80% of the New Common Stock, subject to dilution by the Debtors' Management Incentive Plan;

(iv) each Holder of an Allowed General Unsecured Claim will be paid in full in cash or have its claim reinstated; and

(v) existing equity interests in the parent-level Debtor, Carestream Health Holdings, Inc., will be cancelled on the Effective Date.

---

[3]  New Term Loan Facility balance after giving effect to the ABL Roll Option.

17. Additionally, to support the Reorganized Debtors' go-forward liquidity, certain parties, including certain First Lien Lenders, have committed to provide the Reorganized Debtors with the New ABL Facility in an aggregate principal amount of $85 million.

18. I believe that the terms of the restructuring support agreement (the "RSA"), the creditor-approved Plan, and the Restructuring Transactions contemplated thereby, are the product of arm's-length, good faith negotiations, and are designed to provide the Reorganized Debtors with a manageable balance sheet and sufficient liquidity to meet their obligations under the Plan, and upon emergence from chapter 11, to satisfy their go-forward obligations. I understand that the Debtors determined, in their business judgment and after consultation with their advisors, that entering into the RSA and implementing the Restructuring Transactions through a "prepackaged" chapter 11 process with committed exit-funding at the out-set of the cases would maximize value by limiting business impacts and eliminating certain costs that might otherwise be borne by the Debtors' estates in a protracted chapter 11 process. I believe that the Debtors' entry into, and performance under, the RSA are reasonable under the circumstances, are tailored to maximize the value of the Debtors' estates, and are a sound exercise of the Debtors' business judgment.

### Exit Facilities, Rights Offering, and DIP Rollover

19. Specifically, the RSA and Plan contemplate (a) two exit financing arrangements (together, the "Exit Facilities"): (i) the $85 million New ABL Facility; and (ii) the New Term Loan Facility in the aggregate principal amount of approximately $541 million and (b) a $75 million equity Rights Offering backstopped through the DIP Rollover.

20. I understand that the Exit Facilities, the Rights Offering, and the DIP Rollover are integral components of the prepackaged chapter 11 restructuring contemplated by the RSA and embodied in the creditor-approved Plan, and that consummation of each such transaction is a

condition precedent to the effectiveness of the Plan. In the leadup to execution of the RSA, the Debtors and their advisors negotiated the economic and key documentation terms of each such transaction against the Crossover Group and the Exit ABL Lenders, as applicable, in tandem to achieve a comprehensive, integrated restructuring and establish the core of the Reorganized Debtors' capital structure. For example, the Plan provides that the proceeds of the Rights Offering will be used to partly satisfy the $75 million tranche of the DIP Facility. The DIP Rollover provides that the remaining portion of the $75 million tranche of the DIP Facility will be equitized into New Common Stock (which provides for such equitization at the Rights Offering Subscription Price available to all holders of Second Lien Term Loan Claims), mitigating participation risk in the Rights Offering and reinforcing the Reorganized Debtors' go-forward liquidity, in exchange for the DIP Rollover Premium. With respect to the New ABL Facility, I further understand that the Debtors determined that such facility would be critical to fund future working capital requirements and help the Debtors manage liquidity swings as part of day-to-day operations.

21. Accordingly, I believe that the terms of the contemplated Exit Facilities, the Rights Offering, and the DIP Rollover are the product of arm's-length, good faith negotiations, are integral components of the interrelated Restructuring Transactions contemplated by the Plan, and are designed to provide the Reorganized Debtors with a manageable balance sheet and sufficient liquidity going forward.

## Conclusion

22. In sum, I conclude the Valuation Analysis shows the Enterprise Value of the Reorganized Debtors, on an assumed Effective Date of October 1, 2022, is approximately $658 million to approximately $777 million, with an estimated midpoint of $714 million.

Additionally, I believe that the terms of the RSA and the creditor-approved Plan, and the Restructuring Transactions contemplated thereby, including the Exit Facilities, the Rights Offering, and the DIP Rollover, are the product of arm's-length, good faith negotiations, are designed to provide the Reorganized Debtors with a manageable balance sheet and sufficient go-forward liquidity, and are a sound exercise of the Debtors' business judgment.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing Declaration are true and correct to the best of my knowledge, information, and belief.

Dated: September 26, 2022  
Chicago, Illinois

*/s/ Andrew Turnbull*  
Andrew Turnbull  
Managing Director  
Houlihan Lokey Capital, Inc.